# EXHIBIT A

P1MsAUT1

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   AUTHORS GUILD, et al.,

 4              Plaintiffs,

 5        v.                          23 Civ. 8292 (SHS)(OTW)

 6   OPENAI, INC., et al.,
                                          Conference
 7
              Defendants.
 8
     ------------------------------x
 9
     JULIAN SANCTON, et al.,
10
              Plaintiffs,
11
          v.                          23 Civ. 10211 (SHS)(OTW)
12
13   OPENAI, INC., et al.,

14            Defendants.

15   ------------------------------x

16   THE NEW YORK TIMES COMPANY,

17            Plaintiff,

18        v.                          23 Civ. 11195 (SHS)(OTW)

19   MICROSOFT CORPORATION, et al.,

20            Defendants.

21   ------------------------------x

22

23

24

25
```

P1MsAUT1

```
 1   -----------------------------x

 2   NICHOLAS A. BASBANES, et al.,

 3                   Plaintiffs,

 4              v.                          24 Civ. 00084 (SHS)(OTW)

 5   MICROSOFT CORPORATION, et al.,

 6
                     Defendants.
 7   -----------------------------x

 8

 9

10                           APPEARANCES

11
     SUSMAN GODFREY LLP
12        Interim Class Counsel for Authors Guild and Alter Class
     Actions
13   BY:  ROHIT NATH

14   SUSMAN GODFREY LLP
          Attorneys for The New York Times
15   BY:  KATHERINE PEASLEE
          ZACH SAVAGE
16        ALEXANDER P. FRAWLEY
          ADNAN MUTTALIB
17        IAN CROSBY
          DEMETRI BLAISDELL
18
     ROTHWELL FIGG
19        Attorneys for New York Times and Daily News
     BY:  JENNIFER MAISEL
20        STEVEN LIEBERMAN
          JENNY COLGATE
21
     LOEVY & LOEVY
22        Attorneys for Center for Investigative Reporting
     BY:  MATTHEW TOPIC
23
     LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
24        Attorneys for Authors Guild and Alter Class Plaintiffs
     BY:  RACHEL GEMAN
25
```

P1MsAUT1

1                                    APPEARANCES
                                    (Continued)
2

3    KEKER VAN NEST & PETERS
            Attorneys for OpenAI
4    BY:   JAMES SLAUGHTER
            MICHELLE YBARRA
5            ANDREW DAWSON
            CHRISTOPHER SUN
6            SARAH SALOMON

7    MORRISON & FOERSTER LLP
            Attorneys for OpenAI
8    BY:   JOSEPH GRATZ
            CAROLYN HOMER
9

LATHAM & WATKINS LLP
10           Attorneys for Microsoft
     BY:   ELANA NIGHTINGALE DAWSON
11

FAEGRE DRINKER BIDDLE & REATH LLP
12           Attorneys for Microsoft
     BY:   JARED BRIANT
13

ORRICK HERRINGTON & SUTCLIFFE LLP
14           Attorneys for Microsoft Corporation
     BY:   ANNETTE L. HURST
15           SHERYL GARKO

16   ALSO PRESENT:
     KAREN CHESLEY, The New York Times
17   NICK STANDISH, The New York Times

18

19

20

21

22

23

24

25

P1MsAUT1

```
 1              (Cases called)
 2              THE DEPUTY CLERK:  Please state your appearances for
 3    the record.
 4              MR. CROSBY:  Ian Crosby from Susman Godfrey for The
 5    New York Times.
 6              MR. NATH:  Good morning, your Honor.  Rohit Nath from
 7    Susman Godfrey for the class plaintiffs.
 8              MR. SAVAGE:  Good morning, your Honor.  Zach Savage
 9    from Susman Godfrey for The New York Times.
10              MS. MAISEL:  Good morning, your Honor.  Jennifer
11    Maisel from Rothwell Figg on behalf of The New York Times and
12    Daily News.
13              MS. GEMAN:  Good morning, your Honor.  Rachel Geman,
14    Lieff Cabraser, class plaintiffs.
15              MR. TOPIC:  Matt Topic, Loevy & Loevy, Center for
16    Investigative Reporting.
17              THE COURT:  All right.
18              JUDGE BAHRAOUI:  Good morning, your Honor.  Adnan
19    Muttalib for the New York Times.
20              MS. PEASLEE:  Good morning, your Honor.  Katy Peaslee
21    from Susman Godfrey on behalf of The New York Times.
22              MS. COLGATE:  Good morning, your Honor.  Jenny Colgate
23    from Rothwell Figg on behalf of the Daily News.
24              MR. LIEBERMAN:  Good morning, your Honor.  Steve
25    Lieberman, Rothwell Figg, on behalf of The New York Times
```

P1MsAUT1

1    Company and the Daily News plaintiffs.

2         MR. FRAWLEY:  Alexander Frawley from Susman Godfrey on

3    behalf of The New York Times.

4         MS. CHESLEY:  None of us are speaking.

5         THE COURT:  OK.  Welcome anyway.

6         MR. SLAUGHTER:  Good morning, James Slaughter, Keker

7    Van Nest & Peters, on behalf of OpenAI.

8         MS. YBARRA:  Good morning, your Honor.  Michelle

9    Ybarra, Keker Van Nest & Peters, also on behalf of OpenAI.

10        MR. HURST:  Good morning, your Honor.  Annette Hurst

11   from Orrick on behalf of Microsoft.

12        MS. GARKO:  Good morning, your Honor.  Sheryl Garko

13   from Orrick on behalf of Microsoft.

14        MR. DAWSON:  Andrew Dawson from Keker Van Nest &

15   Peters on behalf of OpenAI.

16        MS. NIGHTINGALE DAWSON:  Good morning, your Honor.

17   Elana Nightingale Dawson from Latham Watkins on behalf of

18   OpenAI.

19        MR. BRIANT:  Good morning, your Honor.  Jared Briant,

20   Faegre Drinker, on behalf of Microsoft.

21        MR. BAILEY:  Good morning, your Honor.  Edward Bailey

22   of Keker Van Nest & Peters on behalf of OpenAI.

23        MS. SOLOMON:  Good morning, your Honor.  Sarah

24   Solomon, also from Keker Van Nest & Peters, on behalf of

25   OpenAI.

P1MsAUT1

1          MR. SUN:  Good morning, your Honor.  Christopher Sun,

2     Keker Van Nest & Peters, also on behalf of OpenAI.

3          MS. HOMER:  Good morning, your Honor.  Carolyn Homer

4     from Morrison & Foerster on behalf of OpenAI.

5          THE COURT:  All right.  Good morning.

6          All right.  I might end up messing up your seating

7     because we're going to take the issues in the news cases first

8     and we're going to actually start -- we're not going to go in

9     order on the chart, although I thank you for the chart with the

10    hyper links.  we are going to start with the AEO designation

11    issue.

12         This is styled, I think, as a motion to compel from

13    the plaintiffs, right?

14         MR. CROSBY:  I think substantively what we're asking

15    for is a modification of the protective order.  We have been

16    trying very hard to avoid having to seek to compel Microsoft to

17    re-designate its production, notwithstanding the fact that we

18    are still at 60 percent, very close to the presumptively

19    abusive 70 percent AEO designation.

20         We managed to work around that designation for

21    purposes of sharing certain documents with our clients.  We

22    still just have a problem with using documents in depositions

23    with OpenAI.  The issue is Microsoft and OpenAI were

24    collaborating on the products at issue here, and your Honor has

25    set aside discovery on Microsoft's new products that are

P1MsAUT1

1    working on separately from OpenAI.  So that issue is not really

2    there.

3            And the problem is, of course, ineffective cross-

4    examination is greatly assisted by the element of surprise and

5    by having receipts.  And because of the way that Microsoft has

6    designated its production, we are really at a disadvantage with

7    respect to both of those elements with using documents in the

8    depositions.

9            Further, there is a separate issue about the

10   deposition protocol, where at least the other side is trying to

11   greatly restrict the hours we have.

12           THE COURT:  We are not talking about that until last.

13           MR. CROSBY:  So, but having to this Mother May I with

14   AEO-designated documents is going to only make that time more

15   precious.

16           That's the issue, your Honor.

17           THE COURT:  OK.  I hear you.

18           Just a minute.  I did review the samples that I think

19   were attached to ECF 386 or 368, I can't remember the exact

20   number.

21           And on the one hand, I question a little bit -- I'm

22   not going to get into the details of what is contained in those

23   documents because I know they are under seal -- but they didn't

24   initially strike me as documents that ought to have an AEO

25   designation.

P1MsAUT1

1          At the same time, I get what you're saying about the

2     Mother May I game, whether that needs to happen at a deposition

3     or that can happen before.  I believe it was Microsoft -- and

4     maybe this is what Ms. Hurst was going to say when she popped

5     up -- that there was -- that they did propose a protocol that

6     happens pretty commonly which is to discuss some of the

7     exhibits in advance.

8          MR. CROSBY:  Well, I mean, there goes the element of

9     surprise, right?

10          You know --

11          THE COURT:  Well, yeah.  I mean, although I'm not

12     going to tell you how to litigate a trial or how to take a

13     deposition.

14          But yes, there goes some of the element of surprise.

15     At the same time, I mean, I remember back when I was doing this

16     and we had to have binders made rather than electronic

17     documents, huge binders.  I mean ...

18          MR. CROSBY:  Your Honor, I've never given a witness

19     exhibits in advance of a cross-examination in my life as a

20     trial lawyer.  It's just not how it's done, if you want to do

21     it effectively, in my personal view.

22          Certainly, it might be a protocol that could be

23     reasonable if they designated 10 percent of their documents as

24     AEO or 20 percent of their documents as AEO.  It becomes

25     completely intractable, basically every hot document in the

P1MsAUT1

1     case.

2             As your Honor pointed out, I don't understand the

3     rationale why the four examples that we gave you just now,

4     exposed four more pieces of work product.  And do we have to do

5     that for every single document that we want to use in a

6     deposition.

7             Again, if they would re-designate their production and

8     if this court were to say your hard cap i you have 10 percent

9     or 15 percent or 20 percent, use it wisely, that would be

10    another circumstance.  We don't want to make them do that.  It

11    would be -- I'm sure it would cost a lot of money, take a lot

12    of lawyer time that could be better used on the merits of the

13    case.

14            We are just trying to get around this over-designation

15    so that we can effectively use these documents in depositions

16    without too many administrative difficulties.  The solution we

17    proposed is just simply that the witness will -- first of all,

18    it has to be reasonably necessary, so we're not going to be

19    just taking random documents out of the blue that have nothing

20    to do with a particular witness.  What is the point in that?

21    Is it reasonably necessary.

22            And then they have to do the protective order

23    undertaking, which is I will only use these, among other

24    things, that says I'll only use these for purposes of the

25    lawsuit.  So, again, these documents, they concern the receipts

P1MsAUT1

1    with respect to the collaboration between OpenAI and Microsoft.

2    Typically or often they are Microsoft's documents saying I had

3    this interaction with somebody at OpenAI.

4            THE COURT:  Well, that actually brings me to the next

5    issue, which is whether we're creating a problem for ourselves

6    in the sense that, the way I read the language in the

7    protective order, it's limited to author recipient custodian or

8    other person who otherwise possessed or knew the information.

9            I mean, doesn't that -- I mean, it seemed to me that

10   the proposed examples that you provided in, I believe it's ECF

11   386 --

12           MR. CROSBY:  Yes.

13           THE COURT:  -- seems like those documents would be

14   covered under that "or other person who has knowledge of the

15   information."

16           MR. CROSBY:  I think if we could get, sort of, a safe

17   harbor that if on the face of the document, it looks like

18   somebody knew or should have known that information or is

19   referring to an interaction, I think that would get us a long

20   way.

21           I think there was one document where somebody from

22   Microsoft -- and I'll be very vague because we're in open

23   court -- basically saying, if we don't deliver on this, it

24   would be a problem for OpenAI.  And I would like to ask the

25   OpenAI witness, did they deliver on that, was that a problem

P1MsAUT1

1    for you.  If a document refers back and forth to their

2    collaboration, if that is fair game, I think that maybe we

3    could live with that interpretation.

4            But my concern is that a lawyer on the other side

5    during a deposition will say, well, they didn't know about the

6    exact contents of this document or everything in this document,

7    even though it refers to subject matter of which they would

8    have common knowledge.  If we can make sure we have a safe

9    harbor and we're not going to get in trouble when a document on

10   its face is referring to something a witness should know --

11           THE COURT:  I get the sense that, you know, a lot of

12   this is trying to frontload, because you're talking about

13   deposition protocols and potential limits on hours, that things

14   can go awry that way, and time can be spent making objections

15   about documents and having discussions about documents that

16   seem to be not appropriate.

17           If that happens, you will get more time.  OK.  If I

18   have to be called upon to make rulings about how, whether these

19   were objections made or make rulings about them at the point of

20   the deposition, believe me, there will be consequences.

21   Because the way that we have been talking about these

22   documents, the examples that are set, seems to me -- I mean,

23   it's not an advisory ruling, but I guess it's just that -- it

24   seems to me that there is room in the protective order already.

25           And I'm hesitant to go wholesale and say, look, I also

P1MsAUT1

1  think that 60 percent of all the documents produced being

2  marked AEO is probably a little bit of an over-designation.

3  That said, I'm not sure we're at the point where I want to say,

4  go back and go re-designate all of these documents.  I wonder

5  if there is something that can be done in between that can

6  work.

7          Ms. Hurst, I cut you off earlier.  Let me hear from

8  you.

9          MR. HURST:  Thank you, your Honor.  Annette Hurst from

10  Microsoft.

11          I think the court is exactly right, that if there

12  is clearly on the face of the document knowledge of the

13  information, the examining attorney can ask about that.

14  However, what they are proposing is to completely eliminate the

15  AEO designation, because that is what the effect of this would

16  be.

17          Let's just think about how this would work.  There is

18  no element of surprise because the witness can't be shown the

19  document unless the witness agrees to sign the undertaking to

20  the protective order.  But how would an individual witness from

21  OpenAI ever know whether they could appropriately undertake

22  that obligation, frankly, without the advice of personal

23  counsel at the deposition and without looking at the document

24  first.  The idea that somebody would agree to sign off on a new

25  confidentiality obligation to another company altogether in the

 1   middle of a deposition makes no sense.

 2            THE COURT:  Wait a minute.  Wait a minute.  Back up a

 3   little bit.

 4            What are you talking about here about signing an

 5   undertaking?

 6            That normally happens when you're taking a deposition

 7   and being shown documents with a protective order.

 8            MR. HURST:  Not for the witnesses, your Honor.

 9            The witnesses are ordinarily shown documents that they

10   have a foundation for, so the very first principle here is that

11   they are seeking to show properly designated AEO documents to

12   witnesses who have no foundation for that, who have never seen

13   them before, who may not have any knowledge whatsoever of the

14   contents.

15            Now, they have cherrypicked a few examples where the

16   witnesses might have some knowledge of the issues under

17   discussion, but the vast majority of the documents aren't like

18   that and they don't have any dispute about whether they are

19   properly designated AEO.  And they nevertheless want the option

20   to show documents to witnesses with no foundation for them

21   whatsoever, purely internal Microsoft documents, to a

22   competitor, OpenAI.

23            THE COURT:  Do you have a joint defense agreement in

24   place?

25            MR. HURST:  We do have a joint defense agreement?

P1MsAUT1

1          THE COURT:  What does it say about document sharing or

2     internal documents?

3          MR. HURST:  I don't remember exactly what it says, but

4     I can tell you, by and large, we do not do that, your Honor.

5          These companies are competitors.  OpenAI announced a

6     new joint venture with Oracle and SoftBank this morning, your

7     Honor.  The companies behave appropriately as competitors and

8     do not share sensitive technical and business information with

9     one another in light of that status.

10          And it would not be appropriate for plaintiffs'

11     counsel to come and show internal Microsoft documents to its

12     competitor, OpenAI.  The individual witnesses have no

13     confidentiality obligation to Microsoft, nor could they agree

14     willingly to undertake such an obligation in the course of a

15     deposition simply to facilitate plaintiffs' questioning on

16     documents where the witnesses completely lack foundation.

17          I mean, if we just think about it, a document the

18     witness has never seen before, right.  They have never seen it.

19     Imagine it discusses a very confidential or sensitive Microsoft

20     piece of business strategy related to this market.  And

21     Mr. Crosby says, Well, I want to play gotcha on cross by

22     showing them Microsoft's plan here to a witness who has never

23     seen this before.

24          And then he's go going to stop and he's going to ask

25     counsel for OpenAI, Will the witness agree to sign the

P1MsAUT1

1    undertaking to the protective order so I can show the witness a

2    confidential Microsoft document?

3            It's just a recipe for delay, inefficiency, and waste

4    because the witness has the right to say no to that.  And how

5    is the witness going to make that examination and make that

6    decision for him or herself without seeing the document first?

7            Now --

8            THE COURT:  Let me just stop.

9            We started this out where I set aside new products,

10   right.  We are talking about old products and old joint work

11   between OpenAI and Microsoft, right?

12           MR. HURST:  Well, your Honor, certainly we are not

13   doing discovery about the new products under development, but

14   that doesn't mean we haven't produced documents that don't

15   discuss future plans.  We certainly have --

16           THE COURT:  But what I'm hearing from Mr. Crosby's

17   argument is that these are, for example, documents, and the

18   ones that I saw which you say are cherrypicked, but I have to

19   say, looking at them, I'm not sure that that designation should

20   apply or that it should apply the way that we're talking about

21   or that it doesn't fall under the "or other person who

22   otherwise possessed or knew the information" catchall, OK, the

23   protective order.

24           If you want me to go through and rule on your various

25   hot docs, I can do that, but it's going to cost you.  It's

P1MsAUT1

1    going to slow everything down.  OK.  We're talking -- you're

2    talking at opposite ends.  You're talking about documents for

3    which there is no foundation, right.  No foundation to show the

4    witness.

5            That's not what I'm hearing from Mr. Crosby, that

6    there is some foundation to show the witness, granted you may

7    surprise them with it because they didn't know that the

8    document existed, but that doesn't mean that they didn't have

9    any otherwise possess or know the information or were aware of

10   the communication or the meeting or the business development

11   that was being discussed in that document, right.

12           So where do we find that middle ground?

13           MR. HURST:  Your Honor, this is why the provisions in

14   the protective order that allow for challenging designations or

15   the procedure that we propose whereby they can show us

16   documents in advance are adequate to the task without a

17   wholesale modification.

18           If Mr. Crosby wants to show us documents in advance

19   under the condition that we not disclose them to OpenAI, we are

20   perfectly willing to do that.  The courts have adopted that

21   procedure, the procedure requiring advance notice in other

22   cases.  I have tried many cases where cross-examination

23   documents were required to be disclosed 24 hours in advance of

24   the examination with a carve-out only for true impeachment,

25   your Honor.

P1MsAUT1

1          And if it was true impeachment, that can only happen

2     if the witness has seen the document before, so...

3          THE COURT:  What about refreshing recollection?

4          MR. HURST:  Your Honor, I don't see why that can't be

5     disclosed in advance to us, under an undertaking not to

6     disclose it to the witness or to counsel, and they always have

7     the opportunity to challenge, you know, the designation of any

8     particular document.

9          THE COURT:  Right.

10          What I'm hearing from the plaintiffs here is that they

11     are challenging -- you're challenging the designation on

12     grounds that if 60 percent of the documents are being marked

13     AEO, they can't all be AEO, is that what I'm hearing.

14          MR. HURST:  Your Honor, just to be fair, we have

15     resolved that issue.  We had an agreement of counsel, we

16     adopted new protocols, we completely reviewed our productions.

17     And, your Honor, counsel, if that is the issue, he is reneging

18     on an agreement here.

19          And I just think that's not appropriate, your Honor.

20     I really --

21          We have resolved that issue.  We undertook a massive

22     effort in light of our resolution of that issue, and there was

23     never any discussion at that time that the deposition carve-out

24     would involve showing our documents to OpenAI.  Here are all

25     the things we agreed to.  We agreed they could show any

P1MsAUT1

 1    Microsoft document to any Microsoft witness whether or not they

 2    had seen it before or there was any reason to think that they

 3    had.  We agreed they could show Microsoft documents to a

 4    limited number of in-house New York Times people.

 5            We agreed to all of those things because the only

 6    thing that was ever discussed at the time of the prior AEO

 7    dispute was that we would need a deposition carve-out for

 8    Microsoft people.  This show Microsoft documents to OpenAI

 9    people thing came completely out of left field at the last

10    minute prior to the court's deadline for filings.  It was not

11    something that was ever raised before and it was not part of

12    any agreement.

13            We resolved the AEO issue, your Honor.

14            THE COURT:  All right.  Let me hear from Mr. Crosby.

15            MR. CROSBY:  That is absolutely untrue.  We did not

16    resolve the AEO issue.  We agreed to leave the deposition issue

17    for another day because the depositions were not happening yet.

18            THE COURT:  Right.

19            MR. CROSBY:  So we had immediate need in order to

20    advise our client to be able to show them these over-designated

21    documents, the most important documents in the case, so they

22    could assess how the case is going.

23            We made an agreement that we would be able to do that

24    with respect to a small number of The New York Times insiders,

25    but we specifically reserved this issue.  And we have made

P1MsAUT1

1   progress on this issue.  Don't get me wrong.  The percentage of

2   designations is down from 98 percent to 60 percent.  We do

3   appreciate that.  We don't think it's enough.

4        We don't think it solves the problem.  We did agree,

5   they did agree, and we appreciate it, that we can show

6   documents to Microsoft witnesses even if they aren't the author

7   of the document.  But what we don't have, and where we're not

8   yet, is these documents that clearly they document --

9        Outside of this courtroom, Microsoft and OpenAI are

10  partners.  This Oracle deal that was just announced yesterday,

11  Microsoft is one of the technology partners for this.

12  Partners, we all remember from law school, are honest with each

13  other and don't keep secrets from each other.

14        But inside this courtroom, they are competitors.  And

15  all of a sudden, Microsoft's internal documents saying this is

16  what we did with OpenAI are somehow supposed to be hidden from

17  OpenAI.  The notion that I want to go into court and use

18  documents for which there is no foundation to examine a

19  witness.

20        First of all, what would be the point of doing that?

21  Second, all we're asking to do is to treat the documents that

22  they've treated, that they have designated as highly

23  confidential, under the same language which is in the

24  protective order with respect to confidential documents.  And

25  that language says a witness, it needs to be reasonably

P1MsAUT1

1    necessary, and the witness has to do a confidentiality

2    undertaking.  And the protective order that we have agreed to

3    it in this case contemplates witnesses and experts are going to

4    do a confidentiality undertaking without first seeing all the

5    things that they are supposed to keep confidential.

6            So the notion that you couldn't possibly do that

7    without seeing the documents first doesn't make any sense to me

8    at all.  But, look, your Honor, I mean, the bottom line, right,

9    I think your clarification that you view this knowledge of the

10   information like I do broadly and that it would be abusive for

11   someone in a deposition to be nitpicking that in a constructive

12   way, I think we might -- we could live with that clarification.

13           We certainly -- our preference would be, because most

14   documents should be, at most, confidential, that we should

15   treat all these documents confidential unless they are willing

16   to bring the percentage down lower.  But if that is not what

17   the court's ready to do today, I think we could maybe take some

18   depositions with the clarification that you have given us today

19   and with the caution that you have given today and see how it

20   goes.

21           THE COURT:  I mean, look, I saw four documents, right.

22   And even assuming they are cherrypicked to be the most obvious

23   cases, they may be internal documents, internal Microsoft

24   documents, that are talking about collaborative work or

25   meetings happening between Microsoft and OpenAI.

P1MsAUT1

1              I don't know how, if we're talking about those

2     particular documents, why they couldn't be shown at a

3     deposition with an OpenAI witness.

4              I mean, am I hearing any argument about that?

5              MR. HURST:  Your Honor, I think that the examination

6     of the documents in advance on a document-by-document basis

7     would afford us the opportunity to have that discussion.

8     Certainly there are documents where people privately express

9     thoughts that were never meant to be shared with another person

10    and, frankly, the only reason to show that to that person is

11    with an objective to create or sew discord.

12             And I don't want to us see getting into that

13    situation, and I think that that is an appropriate situation

14    for objecting to showing such a document.  You can always ask

15    people about facts.  You can always ask people about the

16    conversations that they have had and the underlying facts.

17    There is no concern whatsoever about that.

18             THE COURT:  OK.

19             MR. CROSBY:  Asking someone about the underlining

20    facts when you have a document documenting the facts and you

21    can't show them, often results in a person --

22             THE COURT:  This goes back to my question what about

23    documents to refresh recollection, right?

24             MR. HURST:  Right.

25             THE COURT:  You were talking about impeachment

P1MsAUT1

1    documents.  And with impeachment documents, a recipient had to

2    have seen it.  But refreshing recollection is a different

3    animal.

             So how do you propose to deal with that?

4

5         MR. HURST:  If on the face of the document it

6    describes conversations between the person who is in the chair

7    and others, I agree that that is something that is

8    appropriately shown to that witness under the current and

9    existing terms of the protective order without need for

10    modification.

11         THE COURT:  All right.

12         MR. CROSBY:  I do want to come back to this one

13    example, you know, that if we can't deliver on this, OpenAI

14    will be very disappointed.  I think that strongly suggests that

15    there may have been some subsequent interactions or lack of

16    subsequent interactions and that, sort of, I think that should

17    also be fair game.

18         But this is litigation on people.  It's not about

19    hurting people's feelings.  The reason that things should be

20    highly confidential is because they are competitively

21    sensitive, that OpenAI would gain a commercial advantage

22    against Microsoft by knowing this.  That Microsoft -- that

23    OpenAI's feeling might be hurt by knowing something Microsoft

24    said is not a reason for something to be highly confidential.

25         THE COURT:  I tend to agree.

1          Look, I'm not going to tell you how to conduct your

2   deposition.  You all know how to work around these things.  I

3   don't expect to see motions made under Rule 30 where I get the

4   entire deposition transcript and you're pointing out, you know,

5   the number of times that there have been objections made or

6   something.

7          You're all beyond that.  You're all above that.

8   Everybody, even the lawyers not speaking today, have probably

9   gotten more depositions under their belt than I did back then.

10  OK.  You will find a way around this.  You will find a way to

11  work with it the way that it is.  I'm not directing anybody to

12  go re-review and re-designate.

13         I think given what we talked about today and these

14  particular documents, I think there is a fairly wide area now

15  where we have some clarity about where you can work, where you

16  should work, you know, showing, you know, presenting some

17  documents 24 hours in advance isn't necessarily a terrible

18  thing, but I'm not going to order that it happen either.

19         You're all far more experienced in taking and

20  defending depositions.  You know how this works.  And if there

21  is a motion under Rule 30, we'll deal with it then.  But I

22  stand with what I said earlier about, you know, I expect that

23  objections should be made in good faith.  Even in the

24  depositions, you're trying to work all of these issues out in

25  good faith.  Make the record on the, you know, in the

P1MsAUT1

1   deposition transcript.

2          If you need more time because of it, you might get

3   more time.  All right.  We're not going to be rigid about this,

4   but at the same time, I really expect you all to try to work

5   through this.

6          Like I said, the examples that I saw, admittedly, are

7   a tiny, tiny fraction of what has been marked AEO.  If we start

8   to get through the edges and you're really finding yourself at

9   an impasse, we can revisit this.  I really want to encourage

10  you all to really to try to work through this and talk through

11  this, given how we have discussed it today.

12         MR. CROSBY:  Just so that I don't get in trouble down

13  the road.

14         So, for example, if I were to use the four documents

15  that we submitted, illustrations in support of this motion,

16  with an OpenAI witness to question them about this interaction

17  with Microsoft, I would not -- in your view, I would be within

18  the bounds of the protective order as it exists because that

19  person would have knowledge of the underlying circumstances.

20         Am I understanding correctly, your Honor?

21         THE COURT:  It sounds like that is what Ms. Hurst was

22  saying, also.

23         MR. CROSBY:  I hope so.

24         THE COURT:  You know, I don't ...

25         Yes.  I mean, nevermind.

P1MsAUT1

1          MR. CROSBY:  Those would be fair game.  Those are

2    examples of what would be fair game documents.

3          THE COURT:  Yeah.  I think what I'm saying is, I have

4    seen in other cases motions, or gotten calls during

5    depositions -- which I really, really don't think should happen

6    here -- but I've gotten calls in depositions where the

7    attorneys are fighting about, you know, he's objecting too

8    much, he's making speaking objections, da, da, da.

9          I don't expect that to happen in this case, OK.  And

10    this is the type of issue where I'm not going to give you the

11    confirmation that, like, you can use, you know, document

12    386-2 -- I don't even remember what it said -- on every single

13    OpenAI witness, right.

14          Obviously you're going to make your determinations

15    about whether or when to you use it, whether and when it might

16    be appropriate.  And it may depend on who is copied or, you

17    know, on the document and how the deposition progresses.  I'm

18    not going to tell you how to do your deposition.  But we have

19    Rule 30, we have all of your experience navigating around these

20    very sensitive issues.

21          And, you know, most of the deposition, it seems, is

22    going to be about issues and times where Microsoft and OpenAI

23    were collaborating or working together on projects.  So there

24    are a lot, there is a lot of ways to work through this, right.

25          MR. CROSBY:  OK.  So, again, if I've got a Microsoft

P1MsAUT1

1    document that talks about an interaction with OpenAI and I'm

2    not going to get whacked or, at least, you know, for using it.

3    Obviously the circumstances will be the circumstances.

4                THE COURT:  Yes.

5                MR. CROSBY:  But there is no hard-and-fast rule that

6    says you can't use a Microsoft document that OpenAI didn't see

7    to examine an OpenAI witness when the document talks about an

8    interaction between or suggest an interaction between OpenAI

9    and Microsoft, am I correct?

10               THE COURT:  That seems to me to be the case.  There is

11   no hard-and-fast rules -- I'm not giving you an advisory

12   ruling.

13               MR. CROSBY:  OK.

14               THE COURT:  -- on documents I haven't seen.  I don't

15   know what you're doing with the depositions.

16               MR. CROSBY:  I will stop seeking further

17   clarification, and I will take the words that the court has

18   expressed and, hopefully, so will my opposing counsel.

19               THE COURT:  Again and again, I mean, I do -- I'm not

20   averse to the sharing some documents 24 hours in advance.  OK.

21   I mean, 24 hours in advance, when you're prepping for some of

22   these types of depositions, you're still going to get your

23   element of surprise.

24               And, by the way, like, the aha moment is much better

25   on the witness stand than in the deposition transcript.

P1MsAUT1

1          MR. CROSBY:  True.  True.  But Steve Susman would

2     still be rolling over in his trial boots.

3          Thank you, your Honor.

4          THE COURT:  I get it.

5          MR. CROSBY:  Thank you, your Honor.

6          THE COURT:  All right.  I thought that was going to be

7     a quick issue.

8          All right.  The searches on AEO training data.  I

9     think that is still premature, right?  You're still meeting and

10    conferring?

11         MS. MAISEL:  Your Honor, if I may.

12         THE COURT:  Oh, no.  OK.

13         MS. MAISEL:  Jennifer Maisel from Rothwell Figg on

14    behalf of The Times and Daily News plaintiffs.

15         Your Honor, we're making some progress.  As you may

16    recall from our last conference, we discussed a two-stage

17    approach.  There is this foundational issue of what works were

18    used to train the GPT models at issue.

19         We landed on, first, the identification phase of that

20    approach and two searches, a URL keyword search and then an

21    Ngram search.  And we made substantial progress on the URL

22    search, as in the joint chart, OpenAI is committing to

23    producing those search results before the end of the month.

24         In contrast on the Ngram search, we are still meeting

25    and conferring about that.  There's been significant delay.  We

P1MsAUT1

1    initially proposed an Ngram search back in November, two months

2    ago.  After meeting and conferring, OpenAI rejected that Ngram

3    proposal.  We asked them for a counterproposal.  It wasn't

4    until the day before we filed this joint chart that we finally

5    got a counterproposal.

6           So I would just submit that we work well with

7    deadlines, and I would ask that the court order us to provide a

8    status update in the next week or so.  And as part of that

9    update, if we cannot come to an agreement on the Ngram search,

10   I would ask that we -- I would ask for a quick ruling on that,

11   just because the searches take quite a while to complete and we

12   would like to move this aspect of discovery forward.

13          THE COURT:  All right.  In my notes I had said,

14   although it's premature, please still meet-and-confer.  I had

15   in my notes, Encourage OpenAI to keep plaintiffs apprised of

16   goal posts for timing.

17          All right.  So do you want some timing, some timing

18   goal posts?

19          MR. BAILEY:  Your Honor, if I may.  Ed Bailey for

20   OpenAI.

21          So yes, everything Ms. Maisel said is correct.  We are

22   continuing to meet-and-confer on this issue.  On the Ngram

23   search specifically, we are still waiting on some information

24   from The New York Times about the scope of what that search

25   might entail.  This is something we asked for several times,

1    and there is clearly some miscommunications, which is apparent

2    in the chart.

3         But what we need from them -- and this is really going

4    to be necessary for us to assess the burden and scope of this

5    search -- is identification of the specific datasets that they

6    need to search.  Because as part of this Ngram search, we have

7    to set up a customized environment within OpenAI.  We have

8    OpenAI engineers working on this issue.  It takes engineering

9    time for every additional dataset that they need to search.  A

10   lot of these datasets are not going to be relevant to finding

11   The New York Times articles and New York Daily News articles.

12        So we are trying to work with them on how can we limit

13   the number of relevant datasets so we don't have to waste our

14   time setting up all of this infrastructure for datasets that

15   aren't very likely to have any information.  So that is, sort

16   of, key issue number one.

17        The second issue is the size of the Ngram.  The N in

18   the Ngram, right.  When we last met, my colleague talked about

19   what a six Ngram might be, six words in a row.  That is going

20   to obviously lead to a lot of false hits.  There is a lot of

21   six words that show up, not just in The New York Times

22   articles, but in things all over the internet and everywhere.

23        We have been trying to negotiate with them on what is

24   a reasonable N, what is a reasonable set.  We think it is one

25   or two paragraphs.  They are pushing back on that.  We need

P1MsAUT1

1    what their position is going to be so we can, you know, come to

2    a head on this in terms of whether or not we can agree with the

3    Ngram search.

4           So, if your Honor is going to put a deadline in, what

5    I would ask is to get a deadline first from them, when they are

6    going to provide the positions on these two questions, and then

7    we can have a chance to respond and finish this meet-

8    and-confer.

9           THE COURT:  Ms. Maisel.

10          Speak from there if you speak up.

11          MS. MAISEL:  We can commit to providing the datasets

12   to search by the end of this week.  And in terms of the

13   threshold, I think we settled on the Ngrams.  I think there is

14   a different threshold issue.  But that, as well, we can get you

15   by the end of the week.

16          MR. BAILEY:  That would be helpful, your Honor.

17          THE COURT:  OK.  So that would be the 23rd.  The New

18   York Times to provide datasets for the Ngrams.

19          OK.  And then should we have another back- and-forth?

20   I mean, I hate to micromanage your timing of your meet-and-

21   confer, but if they get you the information by the end of the

22   week, what's the next step and how much time does that take?

23          MR. BAILEY:  So, your Honor, we would -- we would need

24   some time to work with the engineers.  Obviously, I think,

25   having a week to do the meet-and-confer and then be able to

P1MsAUT1

```
 1   work with the engineers.  I think two weeks would be ideal
 2   because that would give us the time to both meet-and-confer
 3   with the New York Times plaintiffs and also work with the
 4   engineers before we, sort of, have it finally teed up.
 5           I don't think we would need more than that.
 6           THE COURT:  OK.  So that would be, what, February 6?
 7           MR. BAILEY:  Yes.
 8           THE COURT:  OK.  So tentatively we will aim for a
 9   status letter February 13.
10           MR. BAILEY:  That works for OpenAI.
11           Thank you, your Honor.
12           THE COURT:  OK.  All right.  This was a short issue.
13   The next one might be longer.  And they are, it starts with ECF
14   379.  I believe it's output log data or ChatGPT user
15   conversations.  You might need to bring me up to speed a little
16   bit on what those are, and then I see as possibly a related
17   issue is the Microsoft data logs.
18           Are those kind of the same?
19           MS. MAISEL:  They are related discovery issues, but
20   separate legal issues, I would say.
21           THE COURT:  OK.  Let's start with the output log data.
22           MS. MAISEL:  OK.  On OpenAI's output log data, this is
23   ECF 379.
24           This is Jennifer Maisel again.
25           As outlined in our letter, it's recently come to our
```

1  attention that OpenAI has not been preserving all user

2  conversations, and these user conversations are the prompts and

3  outputs that end users are providing to their products,

4  including ChatGPT.

5          THE COURT:  This is all OpenAI users?

6          MS. MAISEL:  Yes.

7          THE COURT:  OK.

8          MS. MAISEL:  And we were informed by a letter dated

9  November 15 that in accordance with OpenAI's website policies

10  and contracts with its end users, it had been deleting some set

11  of this user conversation data for some unspecified time

12  period.  And we responded back asking them to identify what has

13  been deleted, whether any of that deleted data included news

14  plaintiffs' content, referenced news plaintiffs, and whether

15  it's recoverable.

16          We did not get an answer.  We also asked OpenAI to

17  suspend its deletion policies and to preserve data containing

18  news plaintiffs content on a going-forward basis.  Again,

19  OpenAI is not committed to do that, and the relief that we're

20  asking for right now is we need OpenAI to identify with

21  specificity what has been deleted, what volume of these user

22  conversations have been deleted over what time periods, was

23  this data deleted, for which products.

24          We have a couple products in the case.  It's ChatGPT,

25  the browser plug-in, search GPT, the API, and certain custom

P1MsAUT1

1    GPTs, and whether any of this deleted information is

2    recoverable.  And most importantly of this deleted information,

3    did any of it contain news plaintiffs copyrighted works,

4    whether through regurgitation issues with the models or due to

5    retrieval augmented generation, where OpenAI's products is

6    conferring with Microsoft's Bing index to retrieve news

7    plaintiffs' content from their websites.  Right now we're

8    asking for a specific identification of what has been deleted

9    as well as for OpenAI to preserve this information moving

10   forward.

11          There is one point I want to highlight for your Honor

12   with the relevance of these logs and why they are so important,

13   especially the earlier ones.  Just last week we had a motion to

14   dismiss hearing before Judge Stein.  And both defendants have

15   moved to dismiss the contributory infringement claims based on

16   an alternative theory of ours that, to the extent the end users

17   are direct infringers, that end users are using ChatGPT and the

18   other generative AI products to infringe the plaintiffs'

19   copyrighted works.

20          We want information about that end user activity.

21   OpenAI has represented that this is a fringe behavior.  No

22   normal user is using the products to bypass pain walls and to

23   retrieve copyrighted content.  But all of this information is

24   going to be in the logs.

25          And as we have learned through the course of

P1MsAUT1

1    discovery, we are undertaking source code review, we have been

2    evaluating the training datasets, and it has become clear that

3    OpenAI has taken intentional steps to make it more difficult to

4    collect this evidence on a going-forward basis.

5         We are in open court, so I'm going to be very vague

6    here.  But there are specific logs on these specific plaintiffs

7    that have sued them in litigation.  Not for all copyright

8    owners generally, but for the specific plaintiffs, and it is an

9    evidence issue, a burden issue that plaintiffs bear.  This

10   evidence is uniquely in the possession or was in the possession

11   of OpenAI, which is why we're asking for them to identify what

12   was deleted and when.

13        THE COURT:  OK.  When we had our last conference, we

14   touched about this issue because it was relatively new at the

15   time.  And I thought that you were still meeting-and-conferring

16   on trying to get this information back then.  I'm just trying

17   to find out where we were when this was raised last time.

18        MS. MAISEL:  So, at our last hearing, we had -- we

19   were seeking an early custodial 30(b)(6) deposition of

20   Microsoft to ask information of Microsoft about its output

21   logs.  And pursuant to your court's guidance, we engaged in a

22   more important informal meet-and-confer process.  We were

23   working on setting up a meeting amongst the technical experts

24   to evaluate our query to the datasets.

25        We did not talk about OpenAI's open log issues, but we

P1MsAUT1

1    could have a 30(b)(6) custodial deposition of OpenAI that we

2    are in the process of scheduling.  It's scheduled for next

3    week.  The parties have been meeting-and-conferring about the

4    topics for that deposition.  One of the topics we have asked

5    for relates to custodial issues around the logs.

6          And as of our last meet-and-confer, OpenAI was

7    objecting to putting up a 30(b)(6) custodial witness on that

8    issue, on that topic, so that it would need to be a different

9    deponent than the other topics, and suggested that we pursue a

10   more informal process.

11         But I would submit, your Honor, that we really need a

12   statement under oath or a representation again about what

13   OpenAI's custodial practices have been with respect to these

14   logs.  Again, identification of what has been deleted,

15   including information specifically relevant to these cases.

16         THE COURT:  OK.  All right.  Before I hear from

17   OpenAI, what you've told me so far is that the news plaintiffs

18   are seeking the lookback, right?

19         What's been destroyed or not preserved, what did it

20   contain looking back?

21         Are you also asking for preservation going forward and

22   is that also a dispute?

23         MS. MAISEL:  Yes.

24         We have asked for preservation moving forward.  We

25   asked for them to specifically preserve evidence relevant to

P1MsAUT1

1    the litigation.  They have come back and said, we don't have a

2    solution in place to identify --

3          THE COURT:  In other words, yes, how do you identify

4    which output logs are relevant.

5          MS. MAISEL:  Exactly.

6          THE COURT:  OK.

7          MS. MAISEL:  So our position is, if we can't do that,

8    you know, for the time being, our position would be preserve

9    everything and we can sort this out based on that preservation.

10          I will add, in terms of a burden issue, what is

11    missing from OpenAI's response is there is no articulation

12    about a specific burden or cost associated with the storage of

13    this data, you know, what volume of storage that might be.

14          And I would note in their online -- in their online

15    privacy policies and their online terms, they do have

16    exceptions to preserve this data for legal purposes.  And in

17    their opposition, they raised issues about reputational issues,

18    their obligations under privacy laws.

19          We are more than willing to work with OpenAI to

20    preserve the privacy of its end user.  We are not seeking

21    information about user's personal identifiable information.

22    Again, our discovery is tailored to the copyright issues and

23    other issues in these cases.

24          And just as another point of contrast, Microsoft is

25    preserving all its data.  They have represented to us that they

1   have been preserving the similar user conversation or chat log

2   data since the inception of the litigation, so just another

3   point of contrast on burden.

4           THE COURT:  OK.  All right.  Let's hear from OpenAI.

5           MS. NIGHTINGALE DAWSON:  Good morning, your Honor.

6   Elana Nightingale Dawson on behalf of OpenAI.

7           I was heartened to hear Ms. Maisel say they are

8   willing to work with OpenAI with respect to concerns about

9   privacy.  I will start by saying that what plaintiffs are

10  asking with respect to preservation of all user conversations

11  on a going-forward basis is a request to disregard the

12  expressed preferences of OpenAI's users.

13          And to be clear, the situation is different in kind

14  from the situations in the cases that plaintiffs cited and what

15  plaintiffs are describing.  The suggestion that data does not

16  exist for the lookback period that they referred to.

17          Without getting -- I'm going to speak in generalities

18  because the numbers are under seal.  But at Docket No. 425,

19  that is the declaration from Michael Trinh, at paragraph four,

20  it details the many, many billions of conversations that are

21  retained.  And that is because OpenAI's default practice, its

22  default policy is to retain all conversations unless the user

23  ChatGPT user has an expressed preference to not have the

24  conversations retained.

25          And so it is as much in OpenAI's interest as it is, as

P1MsAUT1

1    plaintiffs desire, to have these conversations exist and that

2    is why so many billions exist.  We are already at a place that

3    there are so many conversations that the parties recognize that

4    it is not possible to actually access and work with all of that

5    data.  And that is why we are engaged in conversations about

6    sampling that data to come up with a representative sample from

7    the time period in the past from the billions of conversations

8    that are already retained in this situation.

9            Plaintiffs are now asking not just that the

10   conversations that relate to them be retained, but that all

11   preferences from OpenAI's users be disregarded on a going-

12   forward basis.

13           THE COURT:  Let me stop you right there.

14           So I'm not suggesting that this has happened, right.

15   But hypothetically, say, a ChatGPT user who had been using,

16   found some way to get around the pay wall, right, and was

17   getting The New York Times content somehow as the output, found

18   a way to do it.  And then hears about this case and says, Oh,

19   woah, you know, I'm going to ask them to delete all of my

20   searches and not retain any of my searches going forward.

21           I mean, isn't that directly the problem?

22           MS. NIGHTINGALE DAWSON:  So I don't think there is any

23   reason to believe that that -- to be clear, I hear what you're

24   saying, your Honor.  I think what we already have -- again, I

25   don't want to say the specific number -- but the volume that we

P1MsAUT1

1    already have, the billions upon billions of conversations that

2    are already retained, to then drive a truck through the

3    retention for legal purposes that Ms. Maisel referred to and

4    say we're actually going to disregard the expressed wishes of

5    OpenAI's users who request not to have their data preserved, on

6    the off chance that that has happened, I think is really

7    putting the cart before the horse because of how much we

8    already have.

9         And we are happy to -- I do think your Honor has said

10   in a number of circumstances, it sounds like the parties are

11   still conferring.  I will note that what the plaintiffs

12   originally asked for was that we look at ways of addressing

13   their content in particular, and we have been actively working

14   on that.  And so this is a situation where we would invite the

15   court's encouragement for the parties to continue discussing.

16        We certainly hear what the plaintiffs are saying, but

17   as your Honor noted and as Ms. Maisel said, this is also a

18   matter that is related to what plaintiffs are already engaged

19   with with Microsoft, the informal technical discussions.  And

20   so we do believe that rather than issuing a carte blanche

21   blanket order for retention, that we should continue to engage

22   in these discussions because, again, we have so much data

23   already that we want to be able to find a way to make that

24   accessible and usable.  And it does cover this entire time

25   period.  And, frankly, goes from before this lawsuit, the

P1MsAUT1

```
1    lawsuit was filed.  And so we're not just talking about a

2    finite period of time, we already have voluminous amounts of

3    data for this time period.

4              THE COURT:  OK.  Let's talk about the going-forward

5    preservation.

6              Is there a way, is there a way to segregate the data

7    for the users that have expressly asked for their chat logs to

8    be deleted, or is there a way to anonymize in such a way that

9    their privacy concerns are addressed or, like, what's the legal

10   issue here about why you can't, as opposed to why you would

11   not?

12             MS. NIGHTINGALE DAWSON:  Sure.

13             So I want to make sure I'm understanding.  I heard you

14   say the legal issue.  I'll start trying to answer your Honor's

15   question.  If I'm not getting to your point, please let me

16   know.

17             So, at docket 425, this is the under-seal declaration

18   submitted by Mr. Trinh, we detail in perhaps eight, nine --

19   eight and nine, the specific issues.  And so really, I think,

20   the details are what is at issue here.

21             So what I heard you saying, your Honor, was asking

22   about what the user has requested.  What I understood

23   plaintiffs to be asking for is they are focused on what comes

24   out, not necessarily what the user requested.  And we detailed

25   here -- I mean, this somewhat relates to the training data
```

P1MsAUT1

1    conversations we have been having and otherwise -- of exactly

2    how you undertake that type of analysis, how do you even begin

3    to identify what that is.

4         So, we are happy, I will say, that on, I believe it

5    was, January 9, Ms. Maisel mentioned a few other technical

6    functions and filters that they wanted us to discuss the

7    possibilities of using.  Based on what they their ask is and

8    the technological measures they are pointing to, there is a

9    mismatch.  But I do think we can continue to discuss with them

10   exactly what they are trying to look for and if there are ways

11   of trying to address it.

12        But I would say the, kind of, carte blanche, preserve

13   everything request is problematic, as is, I think, what your

14   Honor said for the reasons set forth in the declaration, the

15   more specific targeted piece.

16        But, again, to be very clear, we are retaining and

17   that is our default position, and we are continuing to retain

18   as the default position.

19        THE COURT:  OK.  So talk to me about --

20        I think I'm, like, way off on the side in the fringes

21   of the problem.  So when you're talking about -- you are

22   currently retaining, the default is retaining the logs, except

23   for users who have specifically said delete my logs.

24        Is that a going-forward ongoing basis, or is it that a

25   user can say, you know what, maybe you were retaining before,

1    now I want you to go back and delete everything that I have

2    engaged with the GPT?

3          MS. NIGHTINGALE DAWSON:  So there are different --

4    there are different options.  All of those are possibilities.

5          I should say that the default we were talking about

6    for ChatGPT and then the API, there are specific policies

7    there.  But with respect to, a user can designate a

8    conversation as temporary -- this is paragraph six of the

9    declaration at docket 425 -- a user can elect to delete a

10   specific ChatGPT conversation or they can make a request to

11   delete an entire conversation.

12         I should say, there are numerous privacy laws and

13   regulations throughout the country and the world that also

14   contemplate these type of deletion requests or that users have

15   these types of abilities.  So it is a combination of our

16   commitment.

17         I mean, as I think we see in the news and otherwise,

18   users of technological products are very concerned about having

19   the ability to control what they are doing in the data.  This

20   also interfaces with the commitment to privacy as well as your

21   obligations under various laws.

22         THE COURT:  All right.  So I think I'm seeing a little

23   bit of the mismatch of the ask, which is plaintiffs are asking

24   for the conversations to be -- everything to be preserved going

25   forward, right.

P1MsAUT1

1              But how does this work with the interaction with the

2      users?  Right.

3              Because if the users are potentially in realtime, I

4      mean, is this a tech -- is this a technological problem also,

5      or is this, like, how do we even get through this then?

6              Because I think I see what you're saying, is that you

7      could have a user who is, right now, right, doing things and

8      then going back and deleting or deleting their own chats.  No?

9              MS. NIGHTINGALE DAWSON:  Yes, I think you're exactly

10     right.  There is a technological issue in that -- I do think

11     this kind of reinforces why it would make sense at this

12     juncture to require the parties to continue conferring on this

13     issue.

14              I understand, I mean, one of the reasons we wanted to

15     wait until we actually had information was because the ask is

16     so significant.  The specific ask came in before the holidays.

17     It took us some time to figure out even what would or wouldn't

18     be doable from an engineering perspective and that is what is

19     set forth in the declaration.

20              But I do think, similar to the conversations that are

21     going on around outputs with respect to sampling and how we

22     undertake that, I do think further conversations between the

23     parties would help us continue to move forward.  Because of as

24     your Honor said, these technological issues and, frankly, the

25     user privacy concerns that, as I said, I was heartened to hear

P1MsAUT1

1    plaintiffs say they are mindful of.

2              THE COURT:  OK.  Go ahead, Ms. Maisel.

3              MS. MAISEL:  There is just a couple points I want to

4    address.

5              First off, I think your Honor hit the nail on the

6    head.  The users that are likely to be deleting their

7    conversations are potentially the ones using these tools for

8    wrongdoing.

9              Imagine a user who had been using ChatGPT's remove pay

10   wall custom GPT to do exactly what the name suggests, and they

11   see the lawsuit is filed and immediately ask OpenAI to delete

12   their logs.  And I think this is precisely the problem with the

13   retroactive lookback.

14             We don't know what was deleted.  We don't know if any

15   of those logs contained information that's relevant to this

16   case.  We don't know if OpenAI can answers those questions at

17   this point right now.

18             THE COURT:  OK.

19             MS. MAISEL:  And prospectively moving forward, the

20   fact that we can't segregate this data out.  And, again, OpenAI

21   has not articulated what burden there is in preserving

22   everything.

23             THE COURT:  Well, I think that is the burden.  I mean,

24   the burden isn't just the storage, right.  It's the competing

25   needs and trying to address the requests, the privacy concerns,

P1MsAUT1

1    and how --

2              I mean, there is a technological and engineering

3    burden, I guess is what I'm saying, as well.  Because how do

4    you manage this and not lose anything or do you just override

5    what people want to delete?

6              There could be also possibly -- I mean, I've never

7    used ChatGPT.  This is all very hypothetical for me.  There

8    could also be people who are, like, write me something, you

9    know, smutty and then they are embarrassed, right, and they

10   want to delete it.  There are so many other reasons that

11   somebody might want to delete their chat.  This is also why

12   I've never done it, but I don't even want to go into that area.

13             But it's -- but I think one of the concerns is, I saw

14   the burden as potentially being storage.  But also what is

15   coming clear to me is that there is a technological issue about

16   how do you manage or how do you thread this needle with, you

17   know, what might even be happening realtime with the -- I don't

18   even know if it's millions or billions of users of ChatGPT.

19   Even as we speak, right, there are people who are possibly

20   doing this realtime or have things set, you know, have their

21   preferences set in such a way.

22             Can I ask you to keep talking about this and

23   particularly about the technological and engineering ways to

24   manage this issue?

25             And then if you want me to give you some timelines to

P1MsAUT1

1    talk about it so it's not -- you're not having the conversation

2    the day before a status letter is due, we could maybe get a

3    status on this on February 13, also.

4              MS. NIGHTINGALE DAWSON:  That would work for OpenAI,

5    your Honor.

6              MS. MAISEL:  That works for us, your Honor.  But it's

7    only part of our request --

8              THE COURT:  OK.

9              MS. MAISEL:  -- under this order.

10              The other part of our request is the specific

11    identification of what has been deleted, whether it's

12    recoverable, what volume of data it is, whether it's relevant

13    to issues in the case, whether it contained news plaintiffs'

14    content or other intellectual property.

15              We do need answers to these questions.

16              THE COURT:  OK.

17              MS. NIGHTINGALE DAWSON:  We are certainly happy to

18    discuss with Ms. Maisel.

19              I will note, it's a bit surprising to get this now.  I

20    did hear Ms. Maisel say that she did not know about this issue

21    until November.  That is surprising because our letter from

22    February 29 -- and this is at our letter from February 29,

23    which was attached as an exhibit, this is at docket 379-3 --

24    went to Mr. Lieberman and to Ms. Maisel at Rothwell Figg, where

25    we explained we were supplying them with our privacy policies

1    and what that meant.

2            So, frankly, I don't know that what plaintiffs are

3    asking for is possible, but happy to continue discussing with

4    them the concerns that they have.  And I think I would ask,

5    from our perspective, let us discuss that part of the request

6    as well as an update, your Honor, on the 13th of February.

7            MS. MAISEL:  I'll just respond to that briefly.

8            THE COURT:  OK.

9            MS. MAISEL:  ECF 379-4, this is Exhibit 3 to our

10   motion, there is an e-mail dated March 5 from Ian Crosby

11   saying, We disagree with respect to OpenAI's position on its

12   preservation obligations.  We will comply with our preservation

13   obligations --

14           THE COURT:  Wait.  This is 379-4?

15           MS. MAISEL:  4.

16           THE COURT:  OK.

17           MS. MAISEL:  Page two.

18           THE COURT:  OK.

19           MS. MAISEL:  And this was the last word on the issue.

20   We had the Rule 26 report.  We had many requests for

21   production, requests for inspection, and not a single one of

22   OpenAI's responses and objections to our discovery requests did

23   they say, we are only preserving these categories of output

24   logs.

25           To be clear, when I say output logs, we are looking

P1MsAUT1

1    for the prompt, and I think that's clear from our discovery

2    request, and not once did they raise this issue.

3                Keep in mind, the Daily News complaint was filed after

4    this February date.  The Daily News complaint wasn't filed

5    until April, and it wasn't until mid November that we received

6    a letter that said, We wish to remind you of our preservation

7    practices.

8                And the Daily News case, there never was such a

9    letter.  There was no reminder of anything.  And in The New

10   York Times case, we thought we had resolved this.  This issue

11   had not been brought up again.  We had countless meet-and-

12   confers about our discovery requests.  OpenAI did not move for

13   a protective order under Rule 26(c).

14               THE COURT:  OK.

15               MS. MAISEL:  So we were, quite frankly, surprised to

16   get this letter.

17               MS. NIGHTINGALE DAWSON:  May I just respond on one

18   point, your Honor.  This may be in the weeds a little bit.

19               I would just like to point out that the e-mail that

20   Ms. Maisel pointed to at 379-4.

21               THE COURT:  I read it.  I just looked at it.

22               MS. NIGHTINGALE DAWSON:  OK.  So what I would like to

23   point out is, at the bottom of that, it is a March 5 e-mail

24   that responds to and it was a letter regarding plaintiffs

25   creation of Exhibit J.  So that letter was not submitted on the

P1MsAUT1

1    record and I have one copy of it.

2           We could get it to you.  But my point is simply that

3    the e-mail from Mr. Crosby where we were saying we disagree was

4    referring to a letter that is not in the record.  It was not in

5    response to the February 29 letter.  But I really do think this

6    is ultimately all matters that the parties can discuss and try

7    to address given the competing issues that are being raised and

8    certainly understand.

9           But, again, the overriding privacy concerns that we

10   have as well.

11          THE COURT:  Look, I also think at some point we are

12   where we are.  We now know that this is what was or wasn't

13   preserved.  We are getting a better understanding of the

14   technological issues maybe of trying to find out what's been

15   lost, and I would like us to try to address the issue at hand

16   without getting into a spoliation argument right now.

17          OK.  Let's see what we can -- let's see what can be

18   figured out, what can be ascertained.  Let's see what, if there

19   is a way to find out what was deleted or not preserved in the

20   past.  But then also, going forward, if there is a way to

21   manage what seems to be fairly clear-cut and specific concerns

22   that may not -- that may only be a small subset of the users

23   and the logs that want to be deleted, right.  See if there is a

24   path going forward where you can manage some of that.

25          OK.  Microsoft data logs.

P1MsAUT1

1              MS. NIGHTINGALE DAWSON:  Thank you, your Honor.

2              MS. MAISEL:  That's me again.

3              THE COURT:  I figured.

4              MS. MAISEL:  I'll stay here.

5         So we have made progress with Microsoft on the output

6    log issue.  We have exchanged letter correspondence.

7         I would say, again, this might be the theme of these

8    inspection requests.  Having a deadline helps the parties move

9    this process forward.  Plus, plaintiffs sent a letter with

10   informal questions and technical issues that we would like to

11   be addressed on this forthcoming call between Microsoft's

12   technical experts and witnesses and news plaintiffs' technical

13   experts.

14        We have received Microsoft's response to that letter.

15   Again, the day before the chart was due, after we sent our

16   position statement saying we had not received a response.  And

17   I think if we can get a deadline on the calendar for that

18   technical conversation to occur, that would be immensely

19   helpful.  I think we have a lot of helpful information from

20   Microsoft so far, and we feel ready to move forward with that

21   conversation.

22        THE COURT:  OK.  February 6 to have the conversation,

23   the technical conversation, by February 6.

24        MR. HURST:  Your Honor, I have to consider the

25   possible impact of the Chinese new year on the availability of

P1MsAUT1

1    people on our end who might need to participate in this.  I

2    don't have those dates memorized.  I apologize.

3              THE COURT:  I think it's January 28.

4              MR. HURST:  It's a whole big deal for some people --

5              THE COURT:  I know.

6              MR. HURST:  -- who are relevant to us here.

7              Your Honor, I think I might need a little leeway

8    for --

9              THE COURT:  Let's say for February 10 then.

10             How is that?

11             MR. HURST:  Yes.  Thank you, your Honor.

12             THE COURT:  OK.

13             MS. MAISEL:  Thank you, your Honor.

14             THE COURT:  OK.  February 10.

15             MR. HURST:  Your Honor, may I make one followup

16   request related to that?

17             THE COURT:  Sure.

18             MR. HURST:  We did produce quite a bit of additional

19   information, including multiple new samples, specifications,

20   and answered questions.  If the court could ask the plaintiffs

21   provide us with any additional questions that they expect to

22   discuss on that call occurring prior to the 10th, if we could

23   have that at least three business days in advance of the

24   scheduled call, that would help us prepare.

25             THE COURT:  Maybe February 6, keeping in mind the

P1MsAUT1

1    Lunar New Year issues.

2              MR. HURST:  Thank you, your Honor.

3              THE COURT:  OK.  They should have a week to recover

4    from Lunar New Year.

5              OK.  Custodians issues.  There were the four that we

6    discussed in December, which I think are still not ripe because

7    you haven't gotten the documents.  I'm trying to remember whose

8    custodians they were.

9              MS. SOLOMON:  Your Honor, this is Sarah Solomon on

10   behalf of OpenAI.

11             Since we were last before you, The Times has produced

12   a total of 355 documents --

13             THE COURT:  Stop.  We are going to talk about

14   custodians right now.  I want to talk about the two new

15   custodians who are apparently pay wall or access controls.

16             Why are these -- what do you need to know, how is this

17   relevant to claims and defenses, and how is this different from

18   custodians that are already being produced?

19             MS. SOLOMON:  Sure.

20             THE COURT:  Why these two new custodians?

21             MS. SOLOMON:  Sure, your Honor.

22             These are two custodians, two engineers at The Times

23   that have knowledge of The Times' use of access controls and

24   the way that their pay wall might interact with bots or

25   crawlers.  And The Times' knowledge of the extent to which and

P1MsAUT1

1    the manner in which its asserted works are cached or indexed by

2    such crawlers is relevant to potential defenses of waiver and

3    implied license.

4            And the issue here, The Times, we have agreed on

5    search terms related to these subjects, and The Times agrees

6    that they are relevant subjects.  The problem is that they are

7    running those search terms against quite high-level employees.

8    And so it's, like, their CTO or their head of product that are

9    just not likely to be the ones that are having these types of

10   conversations about technical capabilities.

11           They have identified these two individuals

12   specifically in rog responses as knowledgeable, and so all we

13   ask is that they are added and, at that, only for these

14   specific search terms.

15           THE COURT:  OK.  Let's hear from The New York Times.

16           MS. PEASLEE:  Good morning, your Honor.  Katherine

17   Peaslee for The New York Times.

18           So we disagree with the notion that these two

19   individuals are the ones most likely to have documents on this

20   subject and, therefore, the problem is that The Times has just

21   designated the wrong custodians.  We have designated Christine

22   Liang, who is the senior director of technical search.  I think

23   of all people, she is the most likely to have documents on this

24   topic, to the extent that you're going to find the information

25   that defendants are looking for in The Times' e-mails.

P1MsAUT1

1          But I think a more important point is that the sort of

2     information they are looking for -- for instance, when The

3     Times exclusion protocol was in place -- is not information

4     that you are going to most efficiently or most likely find in

5     e-mails.

6          We think better sources of that information would be,

7     for instance, The Times' Jira database.

8          THE COURT:  Which database?

9          MS. PEASLEE:  Jira.  It's a software program that

10    The Times engineering and products teams used to track various

11    issues.  They submit issues to that database or to that system.

12    That software they turn into tickets.  Those are resolved.

13         If you have ever submitted something to IT and

14    received a ticket back, it's probably using a similar sort of

15    software.  We have provided all of the Jira tickets back to

16    2012, which is what The Times has available that hit on the

17    robots.txt.

18         And we would be willing to talk to defendants, if

19    there are other, sort of, targeted searches they would like us

20    to run to try and get at these topics.  But The Times is also

21    continuing to produce documents from, for instance, Christine

22    Liang, who we think is the better custodian on the subject.

23    Again, to the extent that the custodian is the appropriate

24    source for this information anyway.

25         I want to talk on the point Ms. Solomon made about the

1    fact that they are only requesting these custodians for a

2    limited number of search terms.  That is good.  We appreciate

3    that.  But it overlooks the cost associated with adding a

4    custodian in the first place.

5         In order to make somebody a custodian, The Times has

6    to go collect all of their documents.  Even to run search terms

7    to get hit counts, The Times has to do that because,

8    unfortunately, The Times is not available or able, due to the

9    software that it uses, to run search terms in the native

10   environment.  We have to actually go collect all of those,

11   deliver them to the document vendor, and have them do it.  We

12   have looked into switching that software, and, unfortunately,

13   cannot do so on a timeline that is useful to this litigation.

14   But we did see if that was an option.

15        And that process of collecting all of someone's

16   documents is not just e-mail, although that is a big piece.

17   There is e-mail/shared drives, personal drives, scanning the

18   mobile device, scanning their hard drive, photocopying their

19   hard copy documents, if they have those.  All of that is part

20   of that collection process.

21        And I reached out to our vendor to ask, what is the

22   estimated cost per person just to complete on your end that

23   collection, processing, loading, staging of data, to run search

24   terms.  And the answer I got was about $46,000 per person.

25             (Continued on next page)

1              MS. PEASLEE:  (Continuing)  And that is not an

2    insignificant cost to incur just to get to that stage for

3    custodians that The Times does not believe are relevant,

4    important custodians.

5              And I am happy to answer any further questions that

6    your Honor has about these particular individuals.

7              THE COURT:  I'm guessing you've met and conferred and

8    said exactly this, so I'd like to hear what OpenAI's response

9    is to that.

10             MS. SALOMON:  This is Sarah Salomon.

11             First, on the robots.txt files, it may well be that

12   the appropriate repository for that is Jira.  However, The

13   Times has also agreed to run custodial searches, and should do

14   so against the appropriate custodians.  These would be the only

15   two technical witnesses that The Times would designate as

16   custodians.

17             But the more crucial point I want to address is

18   Ms. Peaslee's allegations with respect to burden.  And to

19   borrow Mr. Crosby's phrasing, inside this courtroom, The Times

20   has portrayed itself as a small company with a meager IT

21   department, only one temp doing these collections, but to the

22   outside world, it is a publicly traded company with significant

23   resources, a repeat player in litigation, having been involved

24   in over hundreds and hundreds of suits over the past ten years.

25   It is not sufficient to say that it is unduly burdensome to

P1MKAUT2

1    collect from two additional custodians, especially given the

2    fact that these new facts that Ms. Peaslee has provided

3    regarding their vendor were never before raised in a

4    meet-and-confer, and have never been provided in a signed

5    declaration to your Honor.

6          They are the plaintiffs here.  They are the ones who

7    brought this suit and should resource it accordingly.

8          MS. PEASLEE:  Ms. Peaslee, on behalf of The New York

9    Times.

10          To respond to the idea that The Times is not

11    appropriately resourcing this case, I believe OpenAI themselves

12    cited that The Times, in the first nine months of 2024 alone,

13    spent $7.6 million litigating this case, and that doesn't even

14    include the last three months of 2024, which your Honor is well

15    aware were very busy in discovery.

16          So, it is not the case that The Times is not investing

17    substantial resources in this case.

18          And we agree that we will provide relevant responsive

19    custodians.  It's simply that these two individuals they've

20    identified are not that.

21          THE COURT:  So, yes, let me hear from Ms. Salomon,

22    because we're talking about burden, but before we can get to

23    burden and whether it's proportional to run these search terms,

24    what is it about their documents?  Is it something that you've

25    seen in the Jira tickets that suggest that these two

P1MKAUT2

1    individuals should be additional custodians?

2            MS. SALOMON:  Your Honor, it's actually something we

3    have seen in The Times' interrogatory responses.

4            THE COURT:  No, their names?

5            MS. SALOMON:  Yes, they are named --

6            THE COURT:  What else have you seen?

7            MS. SALOMON:  Not much, your Honor, because The Times

8    has not, outside of the Jira tickets, produced much in the way

9    of custodial discovery about these subjects.

10           THE COURT:  But I guess my question is, why is it that

11   if you have specific technological questions, The Times didn't

12   identify these individuals as working in this area, that you

13   have the Jira tickets and you take depositions?

14           MS. SALOMON:  Because The Times has also agreed to run

15   custodial searches that we would need.  We need those documents

16   prior to the depositions to question witnesses.

17           THE COURT:  I guess I'm still not seeing it if The

18   Times is saying, look, they're not talking about this kind of

19   stuff over email, right, this is not an email issue.

20           MS. SALOMON:  But, your Honor, to be clear, my

21   understanding is that that representation was specifically with

22   respect to successive versions of the robots.txt file.  I

23   understood what Ms. Peaslee to be saying is the most efficient

24   way to be collecting those successive robots.txt files is not

25   email — fair enough.  But that's not to say, and I don't

P1MKAUT2

1     understand The Times to be saying, that its custodians are not

2     having discussions about how its pay wall operates over email,

3     or they are not having discussions with respect to, we are

4     noticing the potential of a certain bot or company crawling our

5     cite, what are we going to do about that.  I've never

6     understood The Times to be saying that.  That is not something

7     that would be included in custodial data.

8          THE COURT:  Right, but isn't that something Ms. Liang

9     would probably be aware of?

10          MS. SALOMON:  That's something that The Times has

11    represented they could substantiate that by offering hit counts

12    showing that Ms. Liang is the one most likely to have the

13    documents and not the two custodians that we've proposed and

14    that they have identified specifically.  The Times refuses to

15    do that, again, based on unsubstantiated burden allegations.

16          THE COURT:  This has a cost burden, and it is

17    substantiated because it's $46,000 per person, right?  So there

18    is some substantiation.

19          The other thing is that -- have you gotten Ms. Liang's

20    docs yet?

21          MS. SALOMON:  No, your Honor.  And that's what I was

22    raising earlier.  Since our last hearing, we've gotten 355

23    documents, total, from The Times.  They have not produced from

24    10 of their 22 custodians, so we don't have custodial

25    productions from near half of their custodians.  And so when

P1MKAUT2

1    we're having these conversations about, oh, you know, Ms. Liang

2    is likely to have these documents, or someone else, it's all in

3    the realm of the possible, but it's not based on documents that

4    we've actually received.

5        THE COURT:  Okay.  But then the request to add

6    additional custodians is also not based on what you've already

7    received.

8        So, I'm going to deny this request without prejudice

9    to raising after you get Liang's documents.

10       How is the production going?  In other words, are we

11   getting Ms. Liang's documents at the end?  Are they coming?

12       MS. PEASLEE:  Sure.  Of course, your Honor.  We

13   currently have 110,000 documents from the ten newer custodians

14   backed out for review, and we're adding to that population as

15   we continue to come to ground on search terms and appropriate

16   custodians for those search terms with OpenAI and Microsoft.

17   We are happy to prioritize Ms. Liang's documents.  We can put

18   those at the top of the queue so that those are reviewed in the

19   next couple of weeks.

20       THE COURT:  Well, why don't you meet and confer about

21   what you want to prioritize, because if you prioritize

22   Ms. Liang's documents, you may be putting somebody else on the

23   back burner that somebody else on your team might want.  So,

24   let's figure out among yourselves who you want to prioritize.

25       This request for Heideman and Soria is denied without

P1MKAUT2

1    prejudice to reraising after we get Liang's documents.

2              And the same thing with the other four custodians.  I

3    don't have their names right in front of me that we talked

4    about last time.  Again, I ordered a specific production based

5    on what was going on in California.  Wait until after you've

6    gotten those documents before you seek to expand production

7    from those four custodians.

8              All right.  The hit count issue.

9              MS. PEASLEE:  Thank you, your Honor.

10             THE COURT:  OpenAI, you seem to be almost in

11    agreement, and I would suggest that you not get hung up on

12    defining good cause right now, but go ahead, Ms. Ybarra.

13             MS. YBARRA:  Thank you, your Honor.  Michelle Ybarra,

14    for OpenAI.

15             Yes, I think we can compromise at the 660,000 cap.

16    You understand our position on good cause.  We cannot continue

17    to keep getting the search terms seriatim, but we take the

18    Court's guidance, and will continue to try and work this out

19    ourselves.

20             THE COURT:  I don't think we're at the end of hearing

21    about that.  I expect, if I were a betting person, at least one

22    more time, we'll talk about this, but maybe it's calming down a

23    little bit.

24             Okay.  Microsoft.

25             MR. FRAWLEY:  Sorry, your Honor.  Alexander Frawley,

P1MKAUT2

1    for The New York Times.  I think we have resolved the issue,

2    for now at least, on OpenAI's search terms, but I want to make

3    sure we're all on the same page.

4          So, when I heard Ms. Ybarra say that they can

5    compromise on the roughly 600,000 document hit counts, I just

6    want to be clear that we're referring to the January 2nd search

7    term proposal that we made to OpenAI that yielded, I think it

8    was, 666,000 documents.

9          THE COURT:  Yeah, nobody wanted to say 666.

10          MR. FRAWLEY:  Yeah, I was thinking about that.

11          THE COURT:  Yes.

12          MR. FRAWLEY:  With that clarification, I think that's

13    all I have to say on this one.  Thank you, your Honor.

14          THE COURT:  Okay.

15          Turning to the Microsoft hit counts.

16          I think I'm missing a data point when I was trying to

17    figure this out.  If Microsoft saying is that they've already

18    reviewed 600,000 documents and produced 132, is your production

19    done?

20          MR. BRYANT:  Jared Bryant, for Microsoft.

21          Absolutely not.

22          THE COURT:  Mr. Frawley, you're at the podium.  It

23    seems like this is something that ought to be able to be worked

24    out, but why are we in a different place with Microsoft's hit

25    counts?

P1MKAUT2

1          MR. FRAWLEY:  Yes.  This is Alex Frawley again, for

2     The New York Times.

3          I agree, your Honor, that this is something I think we

4     can work out, and we made our proposal yesterday to Microsoft

5     to try to resolve this, and I'd like to ask your Honor to order

6     that proposal.  And I can explain it.

7          It's a three-step process.  The first step would be

8     that Microsoft provide us with a comprehensive list of the

9     search terms that they have used in this case to generate the

10    approximately 600,000 documents that they reviewed.  And we

11    have bits and pieces of that we can pull together, but we don't

12    have a list that says, here's all the search terms we've used

13    and the corresponding hit counts.  So we think that's the most

14    important step one — we get that list.

15         Then step two would be that we review that list, and

16    we compare it against the most recent search term proposal that

17    we've made to Microsoft.  And we'll look for the gaps.  We'll

18    say, okay, here's the gaps in their search terms, they're

19    missing these kinds of terms about these kinds of topics, or

20    maybe they have some terms on some topics, but they're not good

21    enough, and we'll take a hard look at those gaps.  And then

22    we'll go back to Microsoft, and we'll say, okay, maybe it

23    doesn't have to be that you review 600,000 more documents, but

24    it's some other number of documents based on these gaps that

25    we'll identify for you.  That's step two.

P1MKAUT2

1           And then step three, I think — and hopefully step

2     three doesn't have to happen — but the potential step three is

3     that shortly from now, maybe two weeks, because, again, the

4     theme has been setting deadlines, the parties file a joint

5     update where we either tell the Court that we've resolved it,

6     and Microsoft is going to review these search terms and this

7     many more documents, or, hopefully, less likely, but possible,

8     we submit competing proposals to the Court, where we would say

9     here's the gaps we've identified, and we think that's going to

10    be resolved by them reviewing this many more documents, and

11    they say either the gaps are smaller, and we'll do something

12    less, or they'll say none at all.

13          So, that's the three-step process that we proposed to

14    Microsoft yesterday, and we'd ask your Honor to order it.

15          THE COURT:  Okay.  Well, let me hear from Mr. Bryant.

16          MR. BRYANT:  Thank you, your Honor.  Jared Bryant, for

17    Microsoft.

18          Your Honor, this is the type of thing where we should

19    have had this discussion before a motion was filed, frankly.  A

20    motion got filed, and then there's a new proposal in today that

21    we just heard about yesterday.  The Times is asking the Court

22    to order that.  I, frankly, don't think that that is necessary.

23          To be clear, what happened here was back in June, we

24    provided The Times with a list of our search terms and

25    custodians.  That was on June 12th.  And that kicked off the

P1MKAUT2

 1   process of negotiating proposed search terms from The Times.

 2   The Times never agreed to our search terms, and despite a lot

 3   of feedback from Microsoft on The Times' proposals that you saw

 4   in our letter, their proposals began in the millions, and we've

 5   been trying to work with them in good faith to bring those

 6   numbers down to something reasonable.  The Times has never

 7   agreed to any particular search term that we ran.

 8          So, we told them upfront what we were doing.  And

 9   during this time, Microsoft didn't sit on the sidelines while

10   the parties were negotiating The Times' search terms.  We

11   complied with our discovery obligations.  We ran our own terms,

12   we reviewed our own documents, we produced documents that are

13   relevant and responsive in this case, and that's what's led to

14   the 130 or so thousand that have been produced already.

15   Clearly, we've had to review many more to get there, and,

16   clearly, there will be many more coming.  There are more

17   documents in the queue.

18          So, really, what's happened is the train left the

19   station, and there are two efforts underway.  And now, after we

20   have undertaken this effort, The Times approached us, I think

21   just two weeks ago, with this motion asking for an arbitrary

22   600,000 additional documents on top of the work that we've

23   already done.

24          Now, this request is not tied to any particular

25   discovery or request for production that they claim is not

P1MKAUT2

1    captured in our custodial search terms.  It's not tied to any

2    particular discovery request.  It is an arbitrary request, long

3    after the train has left the station, for another 600,000

4    documents.

5         Now, we agree with The Times and share the desire to

6    bring this to a close, no question, but proposing an arbitrary

7    cap of 600,000 documents so late in the process just doesn't

8    get us there.

9         So, again, I see no reason why we can't continue to

10   work together and get search terms resolved and produce

11   documents that are relevant and responsive to this case.  I

12   think what The Times says here, the cap worked really well with

13   OpenAI, so it should work well for you, and, frankly, it's just

14   not a one size fits all solution, your Honor.

15        THE COURT:  I agree, and I'm going to -- in the

16   interests of time, because this is still getting longer, are

17   you saying that you've already provided the news plaintiffs the

18   list of search terms that you ran to generate the 600,000?

19        MR. BRYANT:  At the outset, we provided them, as we're

20   required to do under the ESI order, our search terms.

21        Now, throughout discovery, we've continually added

22   custodians and run those search terms against custodians.  What

23   has not happened, and I don't think it's, frankly, required, is

24   providing The Times with realtime updates, like, each and every

25   time a custodian is added — here's what's in our queue.  But

P1MKAUT2

the bottom line is it's no secret that to produce 130,000 some

documents, we're reviewing a whole lot more.

THE COURT:  Okay.  So, what's already been reviewed

and produced that The Times has, that's that June list of

search terms, you ran those?

MR. BRYANT:  That was the beginning.  There's more

than just the June list.  That was the genesis and the basis.

THE COURT:  Okay.  Can you put together quickly all

the search terms?  So I'm not going to order it, but I'm going

to ask you to continue the meet-and-confer process, confirm the

list of the search terms, so that The New York Times can put

that up against their search term proposal.  I'm not going to

order a number of hit counts, but I expect you to work in good

faith to see, as Mr. Frawley said, are there -- identify if

there are gaps.  Maybe there aren't gaps, and that's okay, too.

We can move on to depositions.

MR. BRYANT:  And, frankly, that's all we want, your

Honor.  We just want something tied to the discovery requests

in the case.

THE COURT:  Yes, yes.

So, have that meet-and-confer in the next two weeks.

Get the list of terms.  You may believe you've provided them

already.  If you've --

MR. BRYANT:  We can identify where it is, and we

have --

P1MKAUT2

1           THE COURT:  Just put it altogether in one, send it to

2     The Times, have the meet-and-confers in the next two weeks

3     about whether there are gaps, and think about what you might

4     want to do about those gaps.

5           I'm not going to order new hit counts — it sounds like

6     you've done a lot of the review — but I think what I was

7     starting with this was that I didn't have an understanding of

8     what sort of led to this dispute showing up this way.  Now I

9     have some understanding about it.

10          This is the filling in the gaps exercise.  This is not

11    like make new search terms and reinvent the wheel here, okay?

12          MR. BRYANT:  That sounds fine, your Honor.  We

13    appreciate that.

14          THE COURT:  Okay.

15          MR. BRYANT:  Thank you.

16          THE COURT:  All right.  Thank you.

17          Okay.  Next on my list was the four custodians, which

18    I just talked about, and then after that is ECF 398 and 419,

19    which seems to be related to damages discovery and also some

20    profit and market analyses issues.  It seems very broad.

21          So, Mr. Frawley.

22          MR. FRAWLEY:  Alexander Frawley, for The New York

23    Times.

24          And, yes, Docket 398 is a motion that we filed against

25    OpenAI about document disputes.  And there's really three

1    categories of document disputes.

2            The first category, I'm happy to report that we

3    resolved.  That first category was documents concerning the

4    market for training data and retrieval-augmented generation

5    data.  So we reached an agreement where OpenAI is going to do a

6    search for those documents.  So, that issue is resolved.

7            THE COURT:  Yeah.

8            MR. FRAWLEY:  The two other issues are not resolved,

9    and I will start with the next issue, which is documents

10   regarding OpenAI's revenues and valuation.

11           And to take a step back, we're talking about a very

12   young company here in OpenAI, but one that recently secured

13   over $6 billion in investments, and they're valued at

14   157 billion.  OpenAI has said to us, well, all you really need

15   are our financial statements.  But we don't think financial

16   statements, or they might not paint the full picture of where

17   OpenAI is financially and where they're going.

18           And, indeed, what OpenAI is pitching for the kinds of

19   investments that they're securing, we very much doubt that

20   they're relying exclusively on their financial statements.

21           So we're seeking documents and presentations about

22   OpenAI's current and projected revenues and their valuation.

23   And we think those are relevant to at least the fair use

24   analysis, as well as damages.  I'll start with fair use.

25           For factor 1, for the purpose and character of the

1    use, courts have been directed to consider "whether the

2    allegedly infringing use is commercial or noncommercial."  And

3    that's the *Napster* Ninth Circuit case, 239 F.3d at 1015.  And

4    unless OpenAI is willing to stipulate that they've entirely

5    abandoned their original nonprofit vision, and admit that

6    they're now, going forward, going to focus exclusively on

7    commercializing their products and making money, we think we

8    are entitled to discovery to understand not only how they're

9    making money today, but what their plans are going forward,

10   and, in particular, how they're going to use the products that

11   they built with our content, improperly, to continue to become

12   a commercial company.

13           We think the information is also relevant to damages.

14   The alleged infringement in this case is ongoing.  So we're not

15   only entitled to what OpenAI has already made from its

16   infringement, but what it continues to make every day, and what

17   it's going to make.  And we cited the *Looney* case, 2010 WL

18   5175167 at *2 for this, that future profits are recoverable.

19   And we understand OpenAI's objection here to be, well, future

20   profits, future revenues, those might be speculative, but

21   that's no reason to refuse this discovery.  That's an issue for

22   down the road.  Down the road, OpenAI might argue, whether at

23   summary judgment or in a *Daubert* motion, that we've put

24   together some requests for ongoing or future revenues that are

25   too speculative.

P1MKAUT2

1          But that's, again, for down the road.  All we're

2     seeking now is the discovery, which is narrowly tailored to a

3     discrete set of documents.  And I think OpenAI cited a case in

4     their brief, which actually makes our point pretty clear and

5     supports our request for this discovery.  And that's the *Burns*

6     *v. Imagine Films* case, 2001 WL 34059379.  And this was in

7     OpenAI's brief.  And that court was also considering a request

8     in a copyright case for future profits.  What the court said

9     was, "Certainly, the term 'any profits' in Section 504(b) can

10    be read as encompassing future profits."  And the court went

11    on, "that the revenues have not yet been received is not in

12    itself a bar to arriving at a reasonably accurate calculation."

13         Now, in that case, this was a summary judgment

14    decision, and the court refused or denied the request for

15    future profits as overly speculative, but the reason was

16    interesting.  That was a case where the defendant had made a

17    movie allegedly where parts of it were infringing on the

18    defendant's content, and the defendant said, well, if we lose

19    this case, and if we were found to have infringed, we'll just

20    take out the parts of our movie that were infringing, and we'll

21    remake the movie without those infringing parts.  And that's

22    the basis on which the court said, okay, fine, the future

23    profits are going to be speculative.

24         So, that case is different for two main reasons.  One,

25    again, we're not at the summary judgment stage, so this concern

P1MKAUT2

1    about speculative profits is premature; and point two, OpenAI

2    has never said that if they're found to have infringed, that

3    they're going to extract The Times and Daily News and CIR

4    content from their models, from their products, and then

5    basically redo them without our content.  So that's another

6    reason why, even down the road — again, it's too early to

7    really be doing this analysis — but down the road, we'd be able

8    to distinguish that case.

9            So, we think these requests are relevant, and we'd ask

10   your Honor to order them.

11           That's one category of documents.  It might make sense

12   to stop there if you have questions.

13           THE COURT:  Actually, get the third category out.

14           MR. FRAWLEY:  Sure.

15           MR. SUN:  One clarification.  Christopher Sun, on

16   behalf of OpenAI.

17           I'll be handling the argument on the question of the

18   financials, but a different lawyer is going to be handling the

19   argument on the last category.  I just raise that in case it

20   might be more helpful to segment them, but I defer to your

21   Honor.

22           THE COURT:  I just want to get it out.

23           MR. SUN:  Sure.

24           MR. FRAWLEY:  The next and remaining category in this

25   is documents produced to governmental authorities, and we're

P1MKAUT2

1    asking OpenAI to identify any foreign governmental authorities

2    to whom they have produced documents or given information

3    that's relevant to the factual allegations in this case.

4            What the dispute is here is that OpenAI has refused to

5    even investigate this question and tell us whether there's any

6    foreign governmental authorities to whom they've produced

7    information that's going to be relevant to this case, and their

8    argument is, well, if it's a foreign governmental authority,

9    they might be applying non-U.S. law, and how could that be

10   relevant.  But what we're seeking are the documents that would

11   be given to these foreign governmental entities, and those

12   documents are going to be factual in nature, or responses to

13   questions --

14           THE COURT:  Yes, so I'm going to cut you off here

15   because this is where I got lost.  But why?  Why are documents

16   produced to foreign governmental entities relevant for this

17   case?  And part of that relevance question is also, and why

18   would they not be duplicative of what's being produced here

19   anyway?

20           MR. FRAWLEY:  So, they may be duplicative of what's

21   being produced here, because I agree that, to the extent

22   there's going to be documents produced that are relevant to

23   issues in this case, we've probably served requests for those

24   kinds of documents.  I think a good example is there was a

25   dispute earlier on in this case, in the Authors Guild case, to

P1MKAUT2

1    the FTC interrogatories, and that's information that was

2    provided in an interrogatory form to the FTC, nonpublic

3    interrogatory responses, that eventually OpenAI agreed to

4    produce in this case.

5         So, those were documents that weren't being given

6    otherwise with respect to the requests that had been served.

7    And we don't know if there's a similar kind of document for a

8    foreign governmental authority because they haven't told us

9    whether there is or isn't, and there may not be, in which case

10   this is a pretty easy dispute to resolve.

11        THE COURT:  But why foreign governments?  I can see

12   for FTC, we're dealing with the United States, right, and this

13   case in the U.S. involving U.S. law, but why foreign

14   governmental authorities?

15        MR. FRAWLEY:  So, we described one example, your

16   Honor, in our brief, which was a submission that OpenAI made to

17   the House of Lords in the U.K., and that was a submission where

18   they provided information about how they train their models.

19   So, however that was being evaluated under maybe a different

20   set of laws, whether that's copyright infringement or not, it's

21   still the factual information about how those models were being

22   trained and how OpenAI was or wasn't using particular content.

23   So those kinds of documents or those kinds of information could

24   be relevant here.  We just don't know if that kind of

25   information has been provided because they haven't told us.

P1MKAUT2

1        THE COURT:  But you ought to be getting it in the

2   discovery here, right?  You're getting the information.  You're

3   not getting the submission to the House of Lords, but you're

4   getting the information, right, the underlying information

5   you're seeking because it's relevant to the case.

6        MR. FRAWLEY:  And that one, your Honor, is public, so

7   we do have that one.  That's how we know about it.  But we

8   might be -- I agree that we should be getting sort of the

9   underlying technical documents already with our request.  It's

10  really -- you know, the FTC, I think, is a good example because

11  it was a submission that otherwise wasn't being provided, and

12  we just don't if there's something like that for any foreign

13  governmental authorities.

14       THE COURT:  Yes, I get that.  But I'm not convinced

15  that you get it because it's going to a foreign governmental

16  authority.

17       MR. FRAWLEY:  And maybe, your Honor, what the issue

18  here is, and the first step could just be, they tell us whether

19  there are any kinds of situations like this, which we don't

20  know, and if there are, and they say here's what there is, but

21  you're not getting all of it, we don't think this is all

22  relevant, it would still help move the discussion forward to

23  where we get -- you know, maybe request a smaller piece of it.

24  We just think a first step would be that they actually tell us

25  whether these sorts of proceedings are occurring where they are

P1MKAUT2

1    producing this kind of information.

2            THE COURT:  I'm still not seeing it.  I'm not seeing

3    why -- I'm not seeing why you need it, but let me hear from

4    OpenAI on this third issue first.

5            MR. DAWSON:  Thank you, your Honor.  Andrew Dawson,

6    for OpenAI.

7            I won't say much because I agree with your Honor's

8    observation.  The one observation I would add is you commented

9    a moment ago that this is the time not to reinvent the wheel,

10   but to fill in gaps.  Discovery has been pending for months.

11   The Times has issued 130 RFPs.  The parties have hammered out

12   and meet-and-conferred the scope of responsive documents.

13   Those issues have been litigated here.  Now to reopen the door

14   widely to an entirely different set and to outsource discovery

15   to government regulators abroad, there's no justification for

16   it.  All relevant information, The Times has been able to craft

17   their discovery requests directly, OpenAI is making those

18   productions, and there's no justification to go broader.

19           And I'd be happy to answer any questions you might

20   have.

21           THE COURT:  Well, I think I'm going to deny this one.

22   Again, I'm not telling you how to litigate the case, but I also

23   see a lot of 1782 petitions here for discovery in aid of

24   foreign proceedings, but I'm not seeing it as something that's

25   core and necessary.  If you're trying to get the information

P1MKAUT2

1    and statements that OpenAI has made to others and other

2    governmental entities, I think there are other ways that you

3    can get that.  But I'm not going to go there now.

4                MR. DAWSON:  Thank you, your Honor.

5                THE COURT:  All right.  More concerning is the

6    revenues and valuation.

7                MR. SUN:  Christopher Sun, on behalf of OpenAI.

8                Your Honor, I think there are two components to this

9    financial request, and it might help to clarify the two

10   different categories.

11               The first category would be, broadly speaking, I think

12   they're requesting presentations that discuss discrete

13   categories of financial information, like revenues and

14   valuations.  And I recall that your initial comment with

15   respect to this dispute was that the request seemed broad, and

16   I thought it was telling that Mr. Frawley did not dispute that

17   characterization.

18               Instead, he kind of made a bunch of arguments that I

19   think prove the point.  He said that the financial statements

20   might not paint the full picture, and that there might be

21   missing information, and then he referenced OpenAI potentially

22   pitching investments.  But what was missing from Mr. Frawley's

23   explanation, and what has been missing, frankly, throughout the

24   entire meet-and-confer process, is some identification of what

25   information he thinks is missing or what relevant issue the

P1MKAUT2

1   documents that OpenAI has produced or otherwise agreed to

2   produce don't already address, because I think they do.  I

3   think we've already offered to produce all of the information

4   that they ultimately need.

5        And, of course, if there is information that we

6   haven't agreed to produce yet, we'd be willing to meet and

7   confer about it, and we can meet and confer about the best way

8   to identify and produce that specific category of relevant and

9   responsive information, but that's not what they're asking for

10   here, your Honor.  They're asking for, essentially, any

11   presentation that contains the word revenue, and it's unclear

12   to me why it would be appropriate to conduct such a broad

13   search.

14        An example that comes straight from their brief is

15   they want -- I think they would be asking for any presentation

16   that contains the revenue figure from one of our years, and

17   that figure is obviously in the audited financial statements

18   that we've agreed to produce.

19        THE COURT:  Okay.  So you haven't produced the audited

20   financial statements yet.

21        MR. SUN:  We have, your Honor.  That's why this is

22   befuddling, because we have produced the audited financial

23   statements.  If there is a question that the pages and pages of

24   notes that that financial statement does not answer, we are

25   happy to meet and confer with them about what else they need.

P1MKAUT2

1          THE COURT:  Well, talk to me about why -- the fair use

2     is a defense, right, it's your defense.

3          MR. SUN:  Oh, yes, your Honor.  I think the --

4          THE COURT:  The first fair use factor.

5          MR. SUN:  So, the first fair use factor is infringing

6     use, and I think the operative word with respect to this is the

7     nature of the infringing use.  What Mr. Frawley referenced

8     exclusively in his argument was about the commercial or

9     noncommercial use by OpenAI, the company as a whole, and the

10    case law is very clear on this, the *Phoenix Tech* case that we

11    cite in our brief references this, but the relevant question in

12    terms of factor one is the use, whether or not the use is

13    commercial.  And I reiterate that we've produced financial

14    statements that speak to the revenue generated by OpenAI's

15    variety of products.  We've offered to produce segmented

16    revenue information for our various products and models, to the

17    extent that information is kept in the ordinary course of

18    business.  So it's entirely unclear to me what additional

19    information could be provided by these unspecified

20    presentations that wouldn't address that commercial use factor.

21         THE COURT:  Well, I guess my question, and I am going

22    to ask Mr. Frawley to clarify, because, as I understand, the

23    audited financial statements are looking back, right?  This is

24    back to the, like, looking back versus looking forward, right?

25    So, looking back each year is whether the use has been

P1MKAUT2

 1      commercial?

 2              MR. SUN:  There's two points.  I think we're pivoting

 3      to the second point, so I'll just signpost that we're there,

 4      which is I think the second category of documents they're

 5      requesting are the projections.

 6              With respect to factor one, I'm not sure why -- I

 7      think there are other categories of documents we've offered to

 8      produce on this question, but the question of whether or not

 9      there will be infringing use in the future, I don't believe, is

10      a relevant one for liability in terms of fair use.  The

11      question is whether or not the use in the past was fair, and

12      we've produced documents about that.

13              Also --

14              THE COURT:  No, I think we're talking past each other.

15              MR. SUN:  Sure.

16              THE COURT:  I think the concern — and I'm going to ask

17      Mr. Frawley to clarify — is, if it's commercial — and he made

18      this remark, you know, that OpenAI is still a relatively young

19      company — that commercialization isn't just what you make off

20      of the product, but potentially what fundraising might be

21      coming in.  And that's why I see potentially projections, as

22      well as presentations, and all of that as potentially being

23      relevant.  I'm not giving it to them.  I want you to explain to

24      me what, and then I want Mr. Frawley to explain to me why, the

25      categories of the documents you're seeking, why the plaintiffs

P1MKAUT2

1    are seeking now, why the financial statements aren't enough.

2         MR. SUN:  I guess, your Honor, I would have two

3    responses to that.  I'm aware of no law, and plaintiffs have

4    cited no law, that suggests that investments would be relevant

5    to the commercial use inquiry.

6         And the second argument that I'd want to make is,

7    again, that seems like we're getting very far afield to the

8    question of the nature of the use, whether the nature of the

9    use was fair.  If we extend the number of that to include

10   things like whether or not a company can get investments,

11   whether that speaks to the commercial nature, we're expanding

12   the inquiry far beyond kind of my understanding of what that

13   inquiry otherwise encompasses, but also the kind of tailored

14   approach to use.  They're focused on use.

15        The *A&M v. Napster* case that Mr. Frawley references

16   specifically says that the inquiry should be focused on use.

17   For example, it says the purpose and character element also

18   requires a district court to determine whether the allegedly

19   infringing use is commercial versus noncommercial, not whether

20   or not the company as a whole is operating in a commercial

21   capacity, not whether or not the company as a whole is to

22   garner any investments, because that would really blow up the

23   question of fair use.

24        But the other thing I wanted to highlight before we

25   got lost, and before I forgot, is that Mr. Frawley

P1MKAUT2

1    strategically focused his discussion of the case law on two

2    particular cases, which were *Looney* and *Burns*, and I am happy

3    to discuss why he's wrong about *Burns*, but I figured it would

4    be worth pointing out that we have cited only two cases on the

5    case of whether or not projections are relevant in a copyright

6    action.  Both cases come out of the Northern District.  One

7    came out this month from Judge --

8             THE COURT:  The Northern District of?

9             MR. SUN:  California.

10            Both of those cases found, unequivocally, that

11   projections are not relevant and not discoverable in a

12   copyright case specifically with respect to damages.  And

13   that's law that the plaintiffs have never been able to dispute.

14   They've found no contrary cases.  And, in fact, the

15   *Looney Ricks* case that they cited proves the point that this is

16   probably the state of the law because the judge in that case

17   did a survey of, like, laws around the country, and he was --

18   or she was specifically inquiring about whether or not the

19   statute would allow for the collection of future profits, but

20   they were unable to identify any kind of law on the question.

21   So I think OpenAI has cited and canvassed the law on this

22   question, and it is unequivocal that projections are not

23   relevant in a copyright case, but specifically to damages.

24            And to address the *Burns* argument, your Honor, I think

25   there are two clarifications to Mr. Frawley's point.

P1MKAUT2

1              The first is that *Burns* wasn't relying specifically on

2         the question of just whether or not there would be a change in

3         the movie for purposes going forward if infringement was to be

4         found, but, rather, the crux of the court's opinion there was

5         that plaintiffs had received the actual sales and the actual

6         financials, the historical financials, so there was no need for

7         projections, which would likely be speculative.  So that's the

8         main thrust of the court's reasoning.

9              But with respect to changing the nature of the film, I

10        think that reason applies equally here.  Mr. Frawley and the

11        plaintiffs are asking for projections going many years into the

12        future, and for those to be relevant, the assumption has to be

13        that if there was a judgment in this case, if this case goes to

14        trial and there was a judgment, they are using projections that

15        would have been prepared before that judgment issued.  And,

16        thus, if a judgment did issue, they'd be basing any damages

17        calculation on the assumption that following a presumed --

18        presuming they think they're going to win, and they're

19        calculating damages based off the assumption they're going to

20        win, that they are using projections that don't take into

21        account that judgment and, therefore, assuming that OpenAI

22        would have received a judgment of infringement and then done

23        nothing to alter any of its practices or its products going

24        forward.  That's why it's speculative because it's based in

25        assumptions that will not be true when the damages model is

P1MKAUT2

1    ultimately collected.  And that reasoning, with regards to what

2    Mr. Frawley characterized as the *Burns* opinion as addressing,

3    that reasoning applies here as well.

4              THE COURT:  Okay.

5              Let's hear from Mr. Frawley.

6              MR. FRAWLEY:  Your Honor, I'll just briefly start with

7    case law.

8              I'm not sure how OpenAI can say that the case law

9    unequivocally supports them when the case they cited supports

10   us from the quote that I read.  I don't think I need to read it

11   again.  So I'll leave the case law at that.

12             In terms of your question, we got the financial

13   statements, why aren't those good enough, and I think your

14   Honor hit the nail on the head when you were talking this

15   through, which was the financial statements are capturing a

16   moment in time and costs, revenues.  And, remember, this is a

17   very young company, and often for startup type companies, at

18   the beginning of their tenure, they don't initially turn a

19   profit, and their evaluation and their plans are based on what

20   they expect to do in the future, their projections.

21             So, financial statements won't cover projections.  It

22   won't be the reason that others want to invest in the company,

23   right?  The people want to invest not because of what they're

24   doing right now, but because of what they think you can do

25   going forward.  And that's the kind of information we're

P1MKAUT2

1    seeking, those sorts of revenue projections, and we think

2    that's going to be -- and I'll just make, I think, one more

3    point, your Honor, which is that this is, in some ways, a

4    unique case because the main product that's at issue, from

5    OpenAI's perspective, is ChatGPT, the user facing chatbot they

6    released barely over two years ago.  And in this case, at least

7    at this point, most of their commercialization, most of their

8    revenues, are going to be all revolving around that particular

9    product and plans for that particular product.  And that's a

10   product that we very much allege has been improperly built with

11   news plaintiffs' content.

12          So, we're seeking to understand the profits and the

13   revenues that are projected from that.  That's relevant to

14   damages.  But also for fair use.  OpenAI talked a lot about how

15   we have to focus on the use, the use.  But, here, what does the

16   use mean?  The use means, what are their plans for ChatGPT, the

17   main product at issue in the case as to OpenAI?  How are they

18   going to continue to commercialize ChatGPT?  What exactly will

19   be the plans for ChatGPT?  What will it focus on?  What sorts

20   of -- what's going to be the specific areas that they want to

21   improve upon?  Is it going to be news content, is it going to

22   be something else?  And those are the plans that we think are

23   relevant to the fair use analysis and, in particular, the

24   commercial use prong, the first factor of the fair use

25   analysis.

P1MKAUT2

```
 1              So, your Honor -- also, I have one final point,
 2    because I think counsel for OpenAI suggested the request is
 3    overbroad, and that we are basically asking them to produce any
 4    single presentation in OpenAI's files that hit on any kind of
 5    revenue figure.  And that's not what we're asking.  In terms of
 6    custodial documents, these kinds of documents are going to come
 7    up in the search terms that we've already proposed, and that,
 8    as of today, are now the finalized subject of good cause,
 9    search terms for their custodial searches.  So, we just ask
10    them to produce any responsive documents that come up through
11    that custodial search process.
12              For the noncustodial part of it, no, we're not asking
13    them to go track down every single presentation.  We're asking
14    them to undertake a reasonable investigation for projections
15    and presentations focused on OpenAI's revenues.  And we'd be
16    surprised to hear if that's going to be a very burdensome
17    undertaking.  We don't think it would be.
18              THE COURT:  So, let me go back to what you just said,
19    which is you were asking for those documents that turn up in
20    the custodial searches.  Has OpenAI said they're not producing
21    them?
22              MR. FRAWLEY:  That's my understanding, yes.  And
23    that's only a piece of it, your Honor, but that resolves one
24    piece of it, now that we have -- we now have a set of search
25    terms as of a few moments ago.
```

P1MKAUT2

1          But we'd also -- I just want to make clear that we

2     think it's not limited to custodial documents that will come up

3     in the custodial search.  We think it should also be a

4     reasonable investigation for noncustodial documents.  And, in

5     particular, we've talked about projections, we've talked about

6     investments.  We don't think these kinds of documents are going

7     to be ones that are going to be particularly hard to find if

8     they undertake a reasonable investigation.

9          MR. SUN:  Your Honor, can I respond?

10          THE COURT:  No, not yet.

11          MR. SUN:  All right.

12          THE COURT:  I tend to think that this is a little bit

13     premature, but I will take a look at the briefing and at this

14     transcript.  I'm not going to order that OpenAI produce or not

15     produce certain categories, but, in the meantime, I really

16     encourage you to think about whether there are particular

17     investments or transactions or particular presentations or

18     other documents that you might get, or that you might be

19     getting, or that you might want to ask OpenAI to focus on.  In

20     other words, try to address OpenAI's concern about the request

21     being overbroad by not asking for all of this, but ask for a

22     subset of it, see what you get, see if it leads anywhere.

23          Also, see if any of this comes out in the production

24     that you are getting.  If there is -- I'm just making this up,

25     but if there are documents that you do get that hit on the

P1MKAUT2

1    search terms that start talking about plans for the future,

2    that seems to me that that's all part and parcel of the

3    production and the discovery that you're going to be getting

4    anyway.

5        MR. FRAWLEY:  Can I ask one clarification question?

6        THE COURT:  Yes.

7        MR. FRAWLEY:  So, it sounds like, based on what your

8    Honor just said, that for custodial documents that are going to

9    be coming through the custodial review, that you think OpenAI

10   should produce documents that are responsive to these RFPs at

11   issue in this motion and the issues that we've been addressing

12   today.

13       Is that correct?  So, in other words, these are

14   documents that they're not separately having to go find because

15   they're part of the custodial searches, and the only direction

16   is that, if you come upon, through the searches, a document

17   that is responsive to these requests, that it should be

18   produced?

19       THE COURT:  I'm already -- I feel like I'm already too

20   involved in your document review of production and how you plan

21   for your depositions.  I get my hands too much in here.

22       I understand that you've got search terms that you've

23   agreed upon, and you're going to work on narrowing those search

24   terms to get to that 666,000-ish hits.

25       MR. FRAWLEY:  We're already there.

P1MKAUT2

1      THE COURT:  Right, right.

2          So, in those documents, are there going to be hits

3      that get these documents, these particular documents, that

4      you're looking for?

5          MR. FRAWLEY:  Yes, there will be.  The only problem is

6      if OpenAI says, oh, this document is about financial

7      projections, but we don't think that's relevant, so we're --

8          THE COURT:  I see Mr. Sun shaking his head.  So maybe

9      now would be a time for you to speak.

10         MR. SUN:  I'm not candidly sure what Mr. Frawley is

11     talking about.  The first time I heard about this proposal

12     regarding, here's what the custodial search would look like,

13     here's what the noncustodial search would look like, is right

14     now in his responsive arguments.  This is the kind of thing

15     that I think it would be, to your point, more productive to

16     discuss in a meet-and-confer, and we're happy to do that.  I

17     think that it sounds like Mr. Frawley is willing to make

18     modifications that will move this negotiation forward.

19         I don't think the right thing to do is to have a

20     meet-and-confer in open court, when I haven't had an

21     opportunity to kind of check with the team doing these

22     productions, doing the review, checking with the client, and

23     asking for advisory opinions about, well, what if we offered

24     this, that would be reasonable, wouldn't it?  That's something

25     that we can all work out together.  I'm happy to do that with

P1MKAUT2

1    Mr. Frawley.

2          THE COURT:  Okay.  I started this whole conversation

3    thinking that this dispute might be a little bit premature

4    because I want you to get through that document production, I

5    want you to have your meet-and-confers about, hey, we expected

6    to see this or this or this, are you holding this back, well,

7    what about, you know, this reference in the documents.  That's

8    all a meet-and-confer.  We shouldn't be having it in court, we

9    shouldn't be having it the day before, you know, you have to

10   submit your charts, but -- and I'm not going to tell you how

11   to -- I'm really, really trying not to micromanage your

12   discovery, even though it sounds like I am.

13         So, please go back and see what the review turns up,

14   right, of the custodial review.  What does it turn up?  Are

15   there documents that are responsive to these requests?  I don't

16   think that they should be withheld in bad faith.  You know what

17   the issue is.  You get a lot of extra stuff, maybe it's not a

18   hundred percent relevant, but you don't have the time for this,

19   right, you don't have the time to pull out documents and be

20   like, oh, this is not good for us, we're going to hide this.

21   And I don't expect anybody would be doing that.  And I'm not

22   sure there's a dispute here.

23         MR. SUN:  For what it's worth, your Honor, I agree.

24   And I agree that we could resolve this, and should resolve

25   this, in a meet-and-confer.

P1MKAUT2

```
 1            MR. FRAWLEY:  And, sorry, really quickly, your Honor?

 2            THE COURT:  Okay.

 3            MR. FRAWLEY:  And, your Honor, we're happy to meet and

 4    confer.

 5            To guide the meet-and-confer, as long as we can agree

 6    that financial projections of the kind we're seeking are

 7    relevant, that would be --

 8            THE COURT:  Go talk.  Go talk not here, not on the

 9    record and not on the transcript.

10            MR. FRAWLEY:  Thank you, your Honor.

11            THE COURT:  All right.

12            ECF 322, I think, is not in dispute now.

13            This issue with RFP 2, was that resolved by our

14    conversation just now?

15            MR. FRAWLEY:  Alex Frawley again, for The Times.

16            It's a similar issue to the RFP 106 that we talked

17    about.  RFP 2 is kind of the analogous RFP, but focusing on

18    U.S. entities, not foreign entities.

19            The issue here is that OpenAI has said there are no

20    responsive documents to the RFP aside from the FTC responses

21    they've already produced.

22            THE COURT:  So why isn't that the end of it?

23            MR. FRAWLEY:  It could be.  What we brief in the

24    chart, your Honor, is that we have raised a few examples to

25    them of investigations that are publicly reported.  And one is
```

P1MKAUT2

1    a Delaware investigation into -- or a potential investigation

2    into their for-profit transition, and we've said what about

3    this one, have you produced any information as part of this

4    proceeding that could be relevant to this case?  And their

5    response to that was, no, that proceeding is not relevant; we

6    don't have to talk about that proceeding.

7            And that's the tricky part, because, as you know, the

8    parties have many times had disputes about what is and isn't

9    relevant.  So, when we're seeking relevant documents produced

10   to a governmental entity, there is going to be gateway disputes

11   about, well, was that investigation relevant or not.  So that's

12   what we briefed in the chart, your Honor.  I don't think I need

13   to belabor the point, but that's where we are on RFP 2.

14           THE COURT:  All right.  This one does seem to shade

15   into some of what we were discussing earlier.  I'm not -- I

16   suggest you continue to meet and confer.  We've heard a little

17   bit about fair use and commercialization today, and I don't

18   have any visibility into this, but you all should be talking

19   about that.  If this bubbles up into another motion, it will,

20   but I want you to get a little bit clearer on that and be able

21   to tell me why, for example, you need documents that you're not

22   already getting or documents, proximate documents, that you are

23   not already getting from the document review.

24           The other potential concern about agencies and

25   governmental investigations and things is that there could be

P1MKAUT2

1    other restrictions on why you get documents, and maybe the

2    information you get is through a different discovery process.

3          Mr. Dawson, you are standing up.  You want to say

4    something?

5          MR. DAWSON:  I don't have much to say.  I think the

6    meet-and-confer process might be useful.  The one thing I'll

7    say is, direct RFPs to OpenAI, we can hammer out relevance, we

8    can discuss, we can bring those disputes to your Honor.  When

9    we're going the circuitous third-party route, that is

10   disruptive.  That is, we can't talk directly, we can't

11   negotiate directly, and there's a third party with different

12   interests, different rules.  It's better to just proceed

13   directly.  We'll obviously discuss -- I know there are direct

14   RFPs on these subjects.  I'm sure we'll continue to meet and

15   confer on those, but I'm hesitant, given that circuitous

16   third-party aspect.

17         THE COURT:  What do you mean by "circuitous

18   third-party aspect"?

19         MR. DAWSON:  Because if a document is produced to a

20   regulator, OpenAI and The Times aren't in the room to discuss

21   what's relevant and what's not.  We are in the room here, we're

22   in the room in meet-and-confers, and a third-party that has its

23   own processes, its own incentives, its own statutes, its own

24   everything, it just adds very old stuff that we don't need to

25   address if we're face to face.

1          THE COURT:  Yes.  And they may have a different focus.
2     So you could be getting some things that you are interested in,
3     but maybe not all of the things that might be useful for you.
4          Continue to meet and confer.
5          Document-related disputes.  Microsoft, that's ECF 396.
6          We're almost done, I promise.
7          MR. FRAWLEY:  It's me again, your Honor.
8          THE COURT:  Yes.
9          MR. FRAWLEY:  Alex Frawley, for The New York Times.
10          So, there are three categories of documents that are
11     in dispute.  And I want to start with the third category
12     because it's pretty quick.
13          This third category is documents concerning the impact
14     of Microsoft's conduct in this case on content creators.  And
15     the problem here that we briefed was that for noncustodial
16     documents, Microsoft was previously limiting its investigation
17     to documents that specifically addressed the impact on the
18     three specific news plaintiffs.
19          And we understand now, from Microsoft's opposition
20     brief, that they're willing to do a broader scope, and that
21     they're not going to limit the investigation to the three news
22     plaintiffs.  So, I think the parties should meet and confer on
23     what that exact scope is, as long as I'm correct that Microsoft
24     is no longer standing on the limitation to the three news
25     plaintiffs.

P1MKAUT2

1          THE COURT:  Well, meet and confer about that.

2          All right.  Number two?

3          MR. FRAWLEY:  Number two, your Honor, is probably the

4    meatiest dispute here, and this is the dispute about documents

5    concerning the market for training data and retrieval-augmented

6    generation data.  And the crux of this dispute is that we're

7    seeking documents and communications concerning Microsoft's

8    negotiations over license agreements, and Microsoft's refused

9    to provide -- I'm sorry, I should be clear.  Licensing

10   negotiations that did not result in a final agreement.  And

11   Microsoft's objection to producing these documents is primarily

12   that they think your Honor foreclosed this route of discovery

13   in a ruling in the Authors Guild case that sought licensing

14   documents, but we think that order is distinguishable, and I'd

15   like to explain why.

16          THE COURT:  Okay.

17          MR. FRAWLEY:  With that order — and we saw this in the

18   briefing in Authors Guild, we saw it in the argument in this

19   court in December, and then we also saw it with your Honor's

20   ruling — that was driven by Microsoft's concern that what the

21   class plaintiffs were seeking, in Microsoft's view, was

22   discovery into models and products that were not at issue in

23   the case.  And they said in their brief, and I will quote,

24   "Because Microsoft's LLMs are irrelevant, so are documents

25   related to unexecuted data access agreements."  And that's

P1MKAUT2

1    Docket Authors Guild 279 at 1.

2            And then Microsoft made the same argument before this

3    Court at the hearing.  They said the plaintiffs were seeking --

4    sorry -- the plaintiffs were seeking documents about

5    "negotiations regarding data access for Microsoft's LLMs," and

6    they went on to say that implicates "an entirely different set

7    of LLMs that are not at issue."  That's the December 3rd

8    transcript, at page 138, line 2, to page 139, line 7.

9            And then this Court's ruling was tied to that issue.

10    This Court said that you would deny the motion "for the same

11    reasons as articulated in ruling on ECF No. 279 in the

12    newspaper cases."  That's the same transcript, at 142, 7 to 9.

13            And ECF 279 in the News case, in our case, was our

14    request for documents concerning Microsoft's anticipated

15    products.  So your Honor said, at this time, we're not going to

16    expand the scope of discovery, the news plaintiffs aren't

17    getting anticipated products from Microsoft at this time, and

18    the Authors Guild plaintiffs aren't getting data accessing

19    agreements or negotiations about Microsoft products that aren't

20    yet subject to discovery in the case.

21            That makes our request now, all that background, a

22    very different request, and a much narrower request, because

23    what we're seeking are licensing negotiations for the practices

24    and the products that have always been indisputably relevant to

25    discovery in this case.  And, specifically, I'm talking about

P1MKAUT2

retrieval-augmented generation — RAG for short — and the main

product here, from Microsoft's perspective, is Microsoft

Copilot, its user facing chatbot.  So we're seeking licensing

negotiations for how Microsoft uses content or has sought to

license content for RAG and for use with its Copilot chatbot.

And we think those communications are relevant.  We

don't think they're covered by the Authors Guild ruling.  And

here's how we know that they're not covered by the Authors

Guild ruling — because Microsoft has repeatedly distinguished

the News cases from the Authors cases by arguing that in the

News cases, RAG and Copilot are relevant, and in Microsoft's

view, those things aren't relevant in the Authors Guild cases.

So, we don't think your Honor's ruling could have

applied to RAG and could have applied to Copilot, and our

request here, given that Microsoft has admitted in our case

those are relevant practices, those are relevant products, and

that's the focus of our request for these licensing

negotiations.

I'll stop there if your Honor has any questions about

why we think the Authors Guild ruling is distinguishable.

THE COURT:  Okay.  Let me hear from Microsoft.

MR. BRYANT:  Thank you, your Honor.  Jared Brian, for

Microsoft.

On this issue regarding license negotiations, there

are two arguments that we're making:  Number one is that this

P1MKAUT2

1    issue was raised and decided.  Number two, even if it weren't,

2    what The Times is seeking above and beyond what we've already

3    agreed to produce is not relevant.  So, let me take both of

4    those in turn.

5            The request for production The Times is seeking to

6    compel in this letter motion is RFP 61.  It's set forth in

7    Footnote 3 of their brief.  And RFP 61 seeks documents and

8    communications concerning negotiations between, I'll say,

9    Microsoft and owners of copyrighted content, including

10   The Times, over Microsoft's use of copyrighted content in, I'm

11   going to say, their products and services.

12           This is nearly a verbatim request to the RFP that the

13   class plaintiffs were seeking to compel.  The request for

14   production the class plaintiffs sought to compel at the last

15   hearing was class plaintiffs' Request For Production 46.  This

16   was referenced in the class plaintiffs' motion at ECF 269.

17   That's RFP documents sufficient to show attempts to obtain a

18   license for use of content in connection with any LLM,

19   including negotiations.

20           So, the issue that the class plaintiffs were seeking

21   to compel were negotiations regardless of whether there was a

22   meeting of the minds, regardless of whether they resulted in an

23   executed agreement, with respect to any LLM.  So, that is

24   nearly verbatim the same request that the news plaintiffs seek

25   to compel here in RFP 61.  But here's the thing:  Even if it

99

P1MKAUT2

1   weren't already decided on this issue, what Microsoft has

2   already agreed to produce — and we mentioned this at the last

3   status conference — is, number one, any executed agreements;

4   number two, the negotiations leading to those executed

5   agreements, because we agree they might have some relevance to

6   the question of the existence of market; and then, in addition

7   to that, we have also agreed to produce any of the negotiations

8   with The New York Times, which obviously did not lead to an

9   executed agreement, or negotiations with any of the other news

10  plaintiffs.

11          Anything else beyond that -- so, clearly, we're not

12  fighting about that.  And so, instead, what we're fighting

13  about, and what the dispute is, is about any negotiation with

14  any content creator, anything that might come into the door, to

15  Microsoft, regardless of whether it led to an agreement.  And

16  that's the second argument we're making, your Honor, is that

17  these discussions, these negotiations, don't lead to any sort

18  of meeting of the minds, they don't lead to any sort of setting

19  of value for purposes of determining the existence of the

20  market.  So, they're not relevant in this case.  And we made

21  that argument in the class motion, and we're making that

22  argument here in our brief.

23          So, it's really twofold.  Number one has already been

24  decided.

25          Number two, even if it weren't, the documents beyond

P1MKAUT2

1    what we've already agreed to produce, namely, executed

2    agreements, negotiations leading to executed agreements, and

3    then negotiations with any one of the news plaintiffs, it's

4    just not relevant in this case because it doesn't lead to make

5    the existence of a market more or less likely because, frankly,

6    there's no meeting of the minds.

7            MR. FRAWLEY:  Briefly, your Honor, can I respond to

8    that?

9            THE COURT:  Yes, please do.

10           I really do want to focus on the unexecuted agreements

11   or the negotiations, because my concern is you're asking to

12   produce a negative, and that's why I'm not -- and I'm trying to

13   understand how that's relevant to a claim or a defense in this

14   case.

15           MR. FRAWLEY:  Sure.  And that's what I wanted to

16   address, your Honor.

17           So, we're seeking the kinds of communications -- maybe

18   I can start with an example.  If there is a negotiation between

19   Microsoft and another news provider where Microsoft was sending

20   whether it's emails or draft term sheets, and they said, we're

21   willing to pay you X dollars to use your news content in

22   Copilot, even if there was never a deal reached, maybe because

23   the news content provider wanted more money or just decided

24   that they didn't want to be a part of this, Microsoft's

25   admission that they were willing to pay money to use the

P1MKAUT2

content for the practices and products at issue in this case

for a news organization, that would be relevant to the

existence of the market to explain what the market looks like,

to what our potential license would look like.  So we think

those would be squarely relevant.

And if I can point your Honor — it's cited in our

brief — to the *Hatchette* case, discussing fair use factor four.

This is the Second Circuit case, 115 F.4th 163.  And the Court

said, "It is indisputable that, as a general matter, a

copyright holder is entitled to demand a royalty for licensing

others to use its copyrighted work, and that the impact on

potential licensing revenues is a proper subject for

consideration in assessing the fourth factor."

And the Court went on, "When we are looking at that

impact on potential licensing revenues, we look at traditional

markets, reasonable markets, or likely to be developed

markets."  So, when there's negotiations in this relatively new

market around how we're going to use content in Copilot, how

are we going to use content for RAG, that's relevant to

establishing the existence or the likely to be developed

market, and it's relevant for showing what that market looks

like, what the prices are, especially when we're seeing, or we

would expect to see, offers from Microsoft.

So, we think those communications are going to be

squarely relevant even where Microsoft and its counterparty did

P1MKAUT2

1    not ultimately reach an agreement.

2            Now, I heard Mr. Bryant had a concern, which I think

3    is a reasonable one, which is, what happens when they just get

4    a random email soliciting, hey, do you want to buy our content,

5    like where does this end?  And I agree that there has to be

6    some kind of scope.  And we actually worked through a similar

7    issue with OpenAI.  We filed a motion way back when, it was

8    RFP 6 to OpenAI, about licensing negotiations, and we ended up

9    meeting and conferring and resolving this.

10           I'm not saying it has to be the same way we resolve

11   it, but there's a way to meet and confer about this to figure

12   out the scope.  Okay, it's not executed licenses, it's

13   something short of that, but it's also not, we got one random

14   email from a potential counterparty.  So we think there's a way

15   we can meet and confer about the scope.

16           But we do think that these negotiations about

17   unexecuted agreements are going to be relevant, and we ask your

18   Honor to at least agree with us on that, and then we can hash

19   out the scope together.

20           THE COURT:  I'm going to tell you to meet and confer.

21   Here's what I am going to tell you to meet and confer about:

22   Whether there is a discovery mechanism where you might be able

23   to find some information about whether there's other news

24   organizations that aren't the plaintiffs in this case, and that

25   may be some lifting on your part, also, on the news plaintiffs'

P1MKAUT2

1    part.

2              And I will leave it at that — meet and confer.  If

3    there is going to be some production or some exchange of

4    information, I expect it to be more narrowed and more reeled

5    in, in that it gives Microsoft some understanding of what

6    they're looking for.

7              And if you're talking about a developing market, I

8    think that you should narrow the scope of that meet-and-confer

9    to what the market might be in the News cases.

10             MR. FRAWLEY:  Understood, your Honor.

11             THE COURT:  Okay.  Or at least start with that.

12             MR. FRAWLEY:  And, your Honor, if I may, that was a

13   big part of this motion at Docket 396, but there are a few

14   other parts.

15             THE COURT:  Okay.

16             MR. FRAWLEY:  I think that was the hard part.

17             THE COURT:  Okay.  Thank you.

18             MR. FRAWLEY:  So there's one other sort of, I think,

19   very quick issue, and I think it's quick because I think the

20   parties are reaching agreement, or close to agreement.

21             We also, in this motion, said that we'd ask Microsoft

22   to search for and produce documents that address the market for

23   this data more generally, even if the document is not

24   referencing a particular negotiation with a particular

25   counterparty.  And from Microsoft's opposition brief, it seems

P1MKAUT2

1    like we're getting close here, and that Microsoft isn't

2    objecting to considering search terms and running search terms

3    to target those kinds of documents.

4            So, if I'm correct about that, then I think this

5    issue, this subissue, can be put to bed, as long as I'm correct

6    about that.

7            (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

P1MsAUT3

1          THE COURT:  This is part of the whole, like, get the

2     search terms and fill in the gaps.

3          MR. FRAWLEY:  It can be, your Honor.  Exactly.

4          THE COURT:  Yes, it is.  It is.  We're done.

5          OK.  We're done with that part.

6          MR. FRAWLEY:  We're done with that part.

7          There is one more category at issue in this docket 396

8     motion, and that's documents concerning Microsoft's investments

9     in OpenAI and the disputes about RFP 123, which seeks

10    documenting concerning whether Microsoft's potential or actual

11    investments in OpenAI, including in the years 2016, 2019, and

12    2024, would affect OpenAI's nonprofit status, mission, or

13    ability to engage in noncommercial activities.

14         We talked a lot about the commercial stuff today.  I

15    don't think I need to say anything more about that.  But here

16    is what I to want say about this dispute with Microsoft.  So

17    Microsoft's response -- and they said this in their RFP

18    response and they said this in their brief -- they said we

19    already agreed to produce documents about out investments in

20    OpenAI in response to prior RFPs.

21         So what is missing?  To the extent that anything on

22    this RFP, you know, exists is going to be in what we already

23    agreed to produce, at least that's my understanding of the

24    argument.  And our response to that is this has kind of enabled

25    to bubble up a very concrete dispute about the timeline of

P1MsAUT3

1    Microsoft's investments.

2         And what these discussions have shown is that the

3    parties have a dispute about whether Microsoft's ongoing

4    investments in OpenAI are relevant to discovery.  And here,

5    specifically Open -- sorry -- Microsoft's 2024 investments in

6    OpenAI.  And Microsoft seems to be taking the -- Microsoft is

7    taking the position, at least so far, that 2024 investments and

8    ongoing investments are irrelevant to discovery.

9         And we disagree.  We allege claims against Microsoft

10   for contributory infringement and for vicarious infringement as

11   to OpenAI's ongoing infringement, and Microsoft's financial

12   assistance to OpenAI, its ongoing investments in OpenAI are

13   relevant to those claims.

14        So we think Microsoft should be ordered to produce

15   documents in response to this RFP, and really to all the RFPs

16   that have got these investment requests that focus on their

17   ongoing investments.  We don't think ongoing investments, in

18   particular 2024 investments, should be carved out.  So that is

19   the dispute here.  It's really a dispute about the timeline of

20   the investments and which ones are and which ones are not

21   relevant.

22        THE COURT:  Let me hear briefly from Microsoft.

23        MR. BRIANT:  Very briefly, your Honor.  My apologies.

24   Jared Briant on behalf of Microsoft.

25        Very briefly, your Honor.  That is not the RFP that is

P1MsAUT3

1    briefed in this motion.  Specific request for production 123,

2    briefed in the motion, is documents concerning whether

3    Microsoft's investments in OpenAI and a number of years would

4    affect OpenAI's nonprofit status, mission, or ability to engage

5    in noncommercial activities.

6           Frankly, your Honor, OpenAI's nonprofit status is what

7    it is.  And from our perspective, document requests geared

8    towards Microsoft for documents about whether our investments

9    impact their nonprofit status or mission, I just don't think is

10   relevant in this case.

11          That's the RFP that is at issue in this motion.  This

12   is another example of us having a discussion about an issue

13   that is really not before the court.  The issue Mr. Frawley is

14   raising is something different that is not referenced here in

15   the motion.

16          This is an RFP directed towards the impact of

17   Microsoft's investments on OpenAI's tax status, which, again,

18   is what it is.  And, frankly, I don't think it's necessary or

19   relevant, a document request geared toward Microsoft.

20          We can certainly continue to have the discussion on

21   the broader issue with the news plaintiffs, but that is not

22   what's before the court right now.

23          THE COURT:  All right.  With respect to RFP 123 then,

24   what's the dispute?

25          There was an objection because it's not relevant?

P1MsAUT3

1              MR. BRIANT:  Absolutely, your Honor.

2              Yes, we've produced documents regarding investments in

3    OpenAI.  But this is asking for something different and more,

4    in our perspective, it's documents about the impact, I suppose

5    some sort of analysis they might have on what OpenAI's

6    nonprofit status is.

7              THE COURT:  This brings me back to the beginning of

8    this conference when we were talking about hypothetically

9    documents that one of the defendants might have talking about,

10   you know, what might affect the other defendant.

11             I mean, wouldn't this stuff sort of just get produced

12   anyway, or is it not -- is it going to get --

13             MR. BRIANT:  The investments themselves are getting

14   produced.  Frankly, beyond that, what to look for, I struggle

15   with that.

16             THE COURT:  Well, then that's part of the

17   meet-and-confer, right.  If there is internal e-mails talking

18   about the investments, you know, they are what they are.  I

19   can't imagine that it's in anybody's interest to screen things

20   like that out.

21             So you're going to get them.  Raise this later if it

22   becomes a problem.  I'm talking to Mr. Frawley.

23             As far as this dispute about the timeline and how

24   investments and how it might relate to contributory negligence,

25   I think I'm going to table all of that until we see what

P1MsAUT3

1    Judge Stein says in the motion to dismiss.

2            MR. BRIANT:  That's fair, your Honor.  We can have

3    this discussion then.

4            MR. FRAWLEY:  Your Honor, can I make one really brief

5    point?

6            THE COURT:  Yes.

7            MR. FRAWLEY:  OK.  So, for the contributory -- so, the

8    vicarious claim, Microsoft did not move to dismiss that claim.

9    And for the contributory claim, they moved to dismiss a

10   different version of the claim.  They moved to dismiss the

11   claim that says if a user infringes a copyright, then Microsoft

12   is contributorily liable for the user's infringement.

13           They did not move to dismiss the claim that Microsoft

14   is contributorily liable for OpenAI's infringement.  So I

15   appreciate your Honor wanting to see --

16           THE COURT:  I get it.  I'm also, in terms of the

17   disputes that are bubbling up, I also do think that this is one

18   that you may want to continue to meet-and-confer on.

19           MR. FRAWLEY:  Thank you, your Honor.

20           MR. BRIANT:  Thank you.

21           THE COURT:  I'm not actually sure what that specific

22   dispute about 2024 investments even is at this point.  I'm not

23   sure it's concretized to a point where I really need to look at

24   it yet.

25           All right.  I think on my list this brings us to

P1MsAUT3

1    deposition coordination.  Does anybody disagree?

2            Because, for me, I want to talk about deposition

3    coordination last.  It will be very short.  I've been wrong

4    before, but I don't expect us to be here more than another 10

5    or 15 minutes.

6            MR. DAWSON:  Your Honor, Andrew Dawson for OpenAI.  I

7    did want to flag, we had a motion at docket 388, which is on

8    page 20 of the chart in The Times case.

9            THE COURT:  OK.  Let me pull up that chart.

10           MR. DAWSON:  And then I believe there is another one

11   at 383.

12           THE COURT:  OK.  I may have not put them on my big

13   list, because I think that they are either premature or I think

14   you should meet-and-confer on them, but let me take a look.

15           Sorry.  Where are they on the chart, page 20?

16           MS. HURST:  Page 20 in The Times chart.  Towards the

17   bottom there is motion at docket 388, and then there is an

18   additional one -- and I apologize -- on page 19 as well, there

19   is docket 383.  Page 20 is the docket 388.  And then there is

20   an additional one on page 21.  The public filing is at 397.

21   These are all kind of three in a row.

22           THE COURT:  OK.

23           MS. HURST:  Pages 19 to 21.

24           THE COURT:  OK.  I thought the documents, you were

25   resolved, or it's no longer an issue.  That would be 394, 397.

P1MsAUT3

1          MS. SOLOMON:  Your Honor, we are close to resolution

2     on that.  We're happy to continue to meet-and-confer.

3          THE COURT:  OK.  That's why I knew ...

4          OK.  Let's go to 388.  Oh, this is the search engine

5     issue.

6          OK.  I have them lumped under here and I didn't put

7     numbers there.

8          This is Microsoft's motion.

9          MR. DAWSON:  This is OpenAI's motion.  It has a

10    component of pricing information and then a component of search

11    engine indexing and search engine copying.

12         THE COURT:  OK.  So, for price changes and bases for

13    changes, why do you need more than what you're getting?

14         MR. DAWSON:  So, your Honor, the reason we need more

15    is that one of our challenges in this case has been to

16    substantiate The Times' allegations of loss as we've looked at

17    headline numbers, which The Times cites repeatedly in

18    discussing its productions.  Those headline numbers all reflect

19    subscribers are going up, revenue is going up, profit is going

20    up.

21         So obviously The Times has something else in mind to

22    demonstrate the harm that it's alleged.  So, RFP 200 is an

23    attempt to fill in that gap, not to reinvest the wheel again to

24    keep that theme going.  If, in fact, there is the harm that The

25    Times has alleged, we anticipate it must show up somewhere.

1       One place it would show up is when The Times is discussing

2       market forces that might affect its prices.

3             If, in fact, The Times has felt under siege and has

4       been suffering this harm, you would imagine that those

5       perceptions would be demonstrated in these kinds of

6       communications.  They are not demonstrated in the headline

7       numbers that we have received, so we need to find evidence of

8       it somewhere else either to corroborate their allegation or to

9       undermine it and to challenge it, which is, of course, our

10      right.

11            I think it gets to a deeper issue that arises in a lot

12      of RFPs, where The Times has been very, very resistant to

13      producing communications.  In many contexts, the response has

14      always been, Oh, but you have the headline numbers.  You have

15      the high-level numbers.  You have the noncustodial numbers.

16            And in many instances, that is enough, but in some of

17      these critical issues involving harm, which goes both directly

18      to damages and goes to market harm for fair use, there simply

19      is no substitute for communications.  And that is what we have

20      not received.

21            And for RFP 200, communications about these pricing

22      decisions are precisely where you might imagine these economic

23      pressures being reflected.  If the communications do not

24      reflect pressure from OpenAI's offerings or other offerings, if

25      it aligns with the headline numbers and seems to be business is

P1MsAUT3

1    going great, all the numbers going up, that's obviously

2    critical evidence for us.

3              And, in general, we just need to get deeper into the

4    rationale and understanding of The Times' alleged harm.

5              THE COURT:  All right.  Let's hear from The Times.

6              MR. MUTTALIB:  Thank you, your Honor.  Adnan Muttalib

7    for the *New York Times*.

8              I think that OpenAI's argument continues to show a

9    misunderstanding of what our theory of harm actually is.  Our

10   theory of harm has consistently been that their products are

11   causing users to less likely turn to The Times website in the

12   first instance.  It has nothing to do with our anticipated

13   pricing, what our price might be in five years.  It has simply

14   to do with the fact that there is a reduced amount of traffic

15   of individuals coming to our website which is leading to a

16   decrease in advertising revenue, affiliate link revenue, and

17   potential lost subscribers.

18             As a result, even if there were documents showing

19   discussions about anticipated pricing, that would have no

20   bearing on our actual theory of loss.

21             THE COURT:  OK.  Have you produced information about

22   documents about traffic to the site.

23             MR. MUTTALIB:  Absolutely, your Honor.

24             THE COURT:  OK.

25             MR. MUTTALIB:  Not only have we produced documents

P1MsAUT3

1    regarding traffic, we have produced the reasons for the

2    fluctuations in traffic regarding their products as well as

3    other market forces.  We have produced documents with relation

4    to subscriptions, revenues.  All those documents bear on our

5    theory of harm.  They have everything they need.

6         This is another attempt to try to get more documents

7    on things irrelevant.  As a result, we don't think they are

8    entitled to them.

9         THE COURT:  I'm not seeing pricing changes as

10    something that needs to be produced right now.

11         MR. DAWSON:  Could I respond to just one?

12         THE COURT:  Very briefly.

13         MR. DAWSON:  Nobody is misunderstanding the contention

14    of harm.  The fact of traffic to the site, what we are missing

15    is the linkage between this alleged loss in traffic and some

16    form of economic harm.  Counsel just mentioned loss of

17    subscribers, loss of advertising revenues.  We do not see that

18    in documents that we have received.

19         The high-level numbers do not show that loss, so there

20    is a critical linkage.  The Times alleges traffic is the

21    problem, but it's not showing up as damages, it's not showing

22    up as harm.  We need to fill in that gap.

23         THE COURT:  Wait a minute.  What do you mean it's not

24    showing up as damages or not showing up as harm?

25         MR. DAWSON:  Counsel just mentioned that they have

P1MsAUT3

1    produced, and the publicly available in The Times 10-K, things

2    like recent records for advertising revenue, recent records for

3    subscriber numbers, recent records for profits per subscriber.

4    All those numbers are going up.  There is no evidence in those

5    numbers that this alleged loss in traffic is, in fact, leading

6    to harm.  That is the critical linkage that we don't have, and

7    that is what we need and that is what RFP 200 is designed to

8    help get us at.

9             THE COURT:  No.  I don't see how pricing changes has

10   anything to do with that.

11            Isn't this an expert issue?

12            MR. DAWSON:  Well, we need some evidence for the

13   expert to analyze.  At the moment, we just have a black box.

14            THE COURT:  You have traffic numbers, right?

15            MR. DAWSON:  We have revenue going up.

16            THE COURT:  And you've got an expert who is going to

17   talk about, you know, substantiate or not what Times'

18   allegations of harm are.

19            Yes, Ms. Hurst.

20            MR. HURST:  Your Honor, if I may, Annette Hurst from

21   Microsoft.

22            Times has actually refused to produce a lot of the

23   traffic data that we asked for, and that was the subject of the

24   court's follow on ECF 344 orders that are now the subject of

25   our Rule 72(a) objection.  So it is not the case that The Times

P1MsAUT3

1    has agreed to produce all of its traffic data.

2             MR. DAWSON:  And that is certainly true.  There is one

3    RFP that The Times, OpenAI RFP cited repeatedly about analyses

4    of traffic.  But the granular requests, the requests Ms. Hurst

5    is referring to, those have not been produced.  What we have

6    now is the black box and insufficient data to engage with that

7    analysis.

8             THE COURT:  Right.  And you have a prior ruling from

9    me that's up before Judge Stein as a Rule 72 objection, right?

10            MR. DAWSON:  Well, we have a different basis for this

11   one as well.  So these are different RFPs.  RFP 200 is not

12   subject to that.

13            THE COURT:  What is before Judge Stein?

14            MR. DAWSON:  So there was a previous, at the last

15   hearing, there was a market harm base motion.  That is up to

16   Judge Stein.  What we had previously discussed with your Honor

17   in October, when I appeared in front of you, we raised the

18   issue of damages, and your Honor advised that it was not yet

19   time for damages.

20            And we're now, obviously, deeper in discovery and we

21   think now is the time.  And this is precisely the kind of RFP

22   that gets to the damages issues that were not, clearly were the

23   focus of the prior briefing, but they are clearly a separate

24   independent basis for discovery of these materials.

25            THE COURT:  So, I'm still not seeing drawing the line

P1MsAUT3

1  between pricing changes and proposed pricing changes and how

2  that gets to the damages.

3          MR. DAWSON:  So the idea is what we've been trying to

4  find some category of documents where if it is true, as The

5  Times alleges, that they have suffered all of these economic

6  harms through diverted traffic, that there would be some

7  conversation, some reflection of that harm.

8          And pricing discussions are one area where you might

9  expect that to happen.  If there is some competitive pressure,

10  some issue, you might imagine discussions of cutting prices to

11  increase subscriber rates.  If there is no such pressure, if,

12  in fact, OpenAI's conduct is irrelevant to The Times' financial

13  well-being, you would imagine those conversations would not

14  refer to OpenAI.  They would not refer to any of those market

15  pressures, or they might refer to entirely different pressures.

16          If pricing analyses are being driven by perception of

17  post-pandemic realignment in reading habits, if it's the rise

18  of social media, if there are entirely other factors, all of

19  these things go directly to damages of whether the alleged

20  harm, in fact, is traceable, first of all, whether it exists

21  and, second of all, whether it's traceable to OpenAI.

22          THE COURT:  OK.  I see Mr. Muttalib is standing up.

23  Why don't you respond.

24          I'll just let him respond first before I say anything.

25          MR. MUTTALIB:  Thank you, your Honor.  Adnan Muttalib

P1MsAUT3

1  for The New York Times.

2      Respectfully, this misconception, this idea that we

3  haven't turned over the traffic documents.  I mean, as you

4  know, your Honor, you have already --

5      Their attempt to relitigate this issue is improper and

6  we have already dealt with it.  We have turned over all traffic

7  documents we are required to consistent with the court's order.

8      Second, with respect to the anticipated pricing, your

9  Honor, I think we fully agree with your questioning, which is

10  to say it's not the causation link between anticipated pricing

11  and market harm.  It is just our theory of harm is completely

12  attenuated.  I mean, it could be the case that anticipated

13  pricing going up or down has nothing to do with the amount of

14  traffic to our website.

15      We fail to see why that would demonstrate the type of

16  loss theory that they need, especially given the fact that our

17  complaint has no allegation that we have increased or decreased

18  our prices which is has led to a loss of revenue.  As a result,

19  we don't understand how this category of evidence in any way is

20  relevant to our theory of harm and them disapproving it.

21      THE COURT:  OK.  This seems to me an issue for, at

22  most, expert discovery.  It's still too soon.  I'm not going to

23  order that this, the pricing changes and the bases for changes

24  and documents relating to them should be produced at this time.

25      All right.  Search engine info.  Again, my question

P1MsAUT3

1    for OpenAI is, what more do you need and why?

2             MR. DAWSON:  So, your Honor, on this one, again, I

3    think it comes down, in part, to some of the custodial

4    distinction, but I think at a higher level, obviously The Times

5    felt the need in the complaint to set aside, to try to

6    distinguish the kind of copying that search engines engage in,

7    the kind of copying apparently The Times permits.

8             The fact that it was specifically carved out seems to

9    demonstrate its relevance that there are obvious similarities

10   here.  Now, The Times argues there are differences to, and

11   certainly there are.  whether those differences are material or

12   not, it is not enough for counsel to simply allege they are

13   different.  It's close enough, in fact, close enough in the

14   kinds of copying, close enough that it was even raised, I

15   think, last week in the hearing before Judge Stein.

16            Counsel for The Times went at some length talking

17   about some of these distinctions and why those distinctions

18   matter in this case and how they are different.  But the fact

19   that they are close enough to need distinguishing demonstrates

20   that they are relevant.  And it's not enough for counsel to try

21   to simply carve it out through artful pleading.

22            We seek discovery based on those same allegations to

23   assess some of the details that are not present in the

24   complaint, things like the terms by which these things are

25   permitted, if there are further details on the forms of search

P1MsAUT3

1    engine indexing that are permitted or not permitted.  These are

2    the details that we lack and the details that might help

3    illustrate what The Times contends is different about OpenAI's

4    conduct and ways in which, perhaps, they are, in fact, similar.

5    Not in every way, but perhaps in ways that matter.

6              THE COURT:  I mean, a search engine index is not the

7    same as the whole copyrighted content, right.

8              MR. DAWSON:  I'm not sure that's entirely true.

9              Part of it is we don't know exactly the details, but

10   search engines make copies of vast quantities of the data on

11   websites in order to perform their functions.

12             THE COURT:  Mr. Muttalib.  I'm sorry I keep

13   mispronouncing your name.  Come on up.

14             MR. MUTTALIB:  Adnan Muttalib, again, for The New York

15   Times.

16             Your Honor, I think this one is patently obvious.  The

17   use of Times' works by search engines generally is obviously

18   going to be different than the use of by defendants and their

19   products.  They literally conceded this last week at the motion

20   to dismiss hearing when they opined on the record, stating that

21   their products are meaningfully different from that of search

22   engines generally.  And as a result, we fail to see how this

23   evidence is relevant.

24             But even taking them at their best and saying we have

25   given some search engines access to our content no way bears on

P1MsAUT3

1    whether we gave Open AI access to that content.  Now, it would

2    be like me inviting you over for a dinner party and then these

3    guys showing up and saying, we are also lawyers, so we are

4    allowed in, too.  It's obviously different.  It is meaningfully

5    not the same thing.  This evidence is, again, just another

6    attempt to try and get information that is not relevant to

7    their claim.

8            THE COURT:  Mr. Dawson, I do want to understand why,

9    what claim, what claims or defenses this has to do with.

10           MR. DAWSON:  So I think, in part, it would go to -- I

11    mean, the precise terms by which The Times permits search

12    engines and the factors considered by The Times, it appears to

13    us that The Times believes that such uses are fair or fair

14    uses.  It is not our understanding, but perhaps we're wrong,

15    that there are, in fact, commercial agreements between every

16    search engine in the world and the Times to permit this kind of

17    behavior.

18           So, in our view, it is close enough to what OpenAI is

19    accused of doing, and yet The Times believes this conduct is

20    fair and clearly believes OpenAI's is not.  Nobody is

21    contending these are the same.  Obviously, there are some

22    differences.

23           THE COURT:  But, I mean, isn't the fair use analysis,

24    isn't to say that we're just like the search engine or we're

25    like the search engine is enough?

P1MsAUT3

1          I mean, you have to prove your fair use defense on

2     your own, on OpenAI's own use, not on what a search engine is

3     doing or not doing with The New York Times' content, right?

4          MR. DAWSON:  We certainly intend to do precisely that,

5     but one aspect of the question will be, first of all, has The

6     Times taken different positions over time, is there some

7     inconsistency.  If there is a witness on the stand testifying

8     about one thing that search engines do, if it turns out that

9     The Times' posture with regard to search engine indexing was

10    different previously or changed over time, these are all things

11    that we think are within bounds.  Obviously, it's not the whole

12    story.

13         THE COURT:  I don't agree.  I don't agree.  You're not

14    getting it.  You're not getting it.

15         MR. DAWSON:  Thank you, your Honor.

16         THE COURT:  All right.  I'm not seeing the relevance

17    there.  If you want a clear ruling that you can appeal, I'm not

18    seeing that what The Times does with search engines and how

19    it's allowed certain aspects of its content to be used for

20    search engines to redirect back to The New York Times, by the

21    way, is relevant to what The Times has allowed or not allowed

22    OpenAI to do with its content.

23         OK.  All right.  Deposition coordination.

24         MS. SOLOMON:  Your Honor, we have a remaining motion

25    on OpenAI's RFPs 36, 37, and 39.  I can provide argument on

P1MsAUT3

1    that if the court wants.

2                    THE COURT:  Point me to the ECF numbers.

3                    MS. SOLOMON:  It is at docket 383 is the original

4    motion, and 401 for the response.  And the chart, it's the very

5    bottom of page 19.

6                    THE COURT:  OK.  I'm getting there.

7                    MS. SOLOMON:  I neglected to state my appearance.

8    Sarah Solomon for OpenAI.

9                    THE COURT:  I don't think RFPs, requests for

10   admission, are the proper vehicle here.  Has The Times actually

11   served responses to the requests for admissions?

12                   MS. SOLOMON:  No, your Honor.  The Times has said that

13   it's unable to respond to the RFPs.

14                   THE COURT:  I think my question is, has there been a

15   formal response to the requests for admissions?

16                   MS. SOLOMON:  Yes, your Honor.  There's been a formal

17   response neither admitting nor denying.

18                   THE COURT:  OK.  Then that's your response.

19                   MS. SOLOMON:  May I respond just briefly to that?

20                   THE COURT:  No.  No.  We're done.  I already said at

21   the beginning, this is not a proper vehicle for an RFP.  And,

22   you know, you have a lot of discovery ahead of you.  You could

23   explore these issues in deposition with other documents and the

24   like.

25                   MS. SOLOMON:  Thank you, your Honor.

P1MsAUT3

1              THE COURT:  Now are we on to deposition coordination?

2       Yes?  Maybe.

3              MS. GARKO:  Yes, your Honor.

4              THE COURT:  OK.

5              THE DEPUTY CLERK:  State your name.

6              MS. GARKO:  Sheryl Garko on behalf of Microsoft.

7              THE COURT:  Should we take the easier or the most

8       pressing issues first, which might be the 30(b)(6) custodial

9       30(b)(6) deposition?

10             We ruled on those.  We ruled on those.  Nevermind.

11             OK.  All right.  Deposition coordination.

12             Let me start by saying that the issues, as I see it --

13      and this is now going to apply to the Authors Gild cases as

14      well as the news cases -- but I see the issues in the news

15      cases as being wider and broader.  So I'm not going to force

16      you to do a one-size-fits-all for the Authors' cases here.  The

17      Authors' cases or case in the Northern District of California

18      and the news case here.

19             What my overall, overarching guideline here is,

20      coordinate as best you can with the Authors' cases here and the

21      Authors' cases here and the Authors' cases in the Northern

22      District of California.  OK.  It seems to me that there can be

23      a lot of efficiencies gained by coordinating for those.  But

24      I'm not going to tell the news cases that they have to go to

25      the same level of coordination.

1            OK.  I do, however, hope that the news cases and the

2      news plaintiffs will coordinate among themselves.

3            OK.  Starting from there.

4            MS. GARKO:  Well, if I may address that, your Honor,

5      because I think one of the threshold issues here is why that

6      coordination in New York is actually necessary and why it's

7      necessary to do it now.

8            So, the threshold issue here, your Honor, is we are at

9      the deposition stage.  It's now open.  Custodial depositions

10     have started.  Fact are soon to happen, likely before this next

11     stage.  We really do need some guidance here from you on the

12     rules and the limits so everyone knows what they are doing,

13     what they are playing within.

14           And why coordination is necessary within New York,

15     your Honor, is because of the overlap of issues here.  I agree

16     with with you entirely that there are additional issues in The

17     New York Times case, but that doesn't mean there aren't

18     overlapping issues and significant overlapping issues with the

19     class case in New York.

20           If you think about this, your Honor, like a Venn

21     diagram.  You have the issues with respect to training, which

22     between the class case and the news case are 100 percent

23     overlapping.  With respect to Microsoft there, for example,

24     your Honor, all of the custodians in the class case are

25     custodians in the news case.  All of our folks on the initial

P1MsAUT3

1    disclosures in the class case are on the initial disclosures in

2    the news case.  There is a one-to-one correlation.  All of the

3    documents, your Honor, that have been produced in the class

4    case have been produced in the news case.

5        THE COURT:  OK.

6        MS. GARKO:  There is significant overlap.  Then yes,

7    you have this additional issue with respect to search outputs

8    that is added on for The Times.  But with respect to that

9    overlap, your Honor, it's going to be the same witnesses, it's

10   going to be the same documents.

11       And having those witnesses have to testify more than

12   once, having those depositions uncoordinated, is just going to

13   create an enormous amount of inefficiency and is not consistent

14   with the directives of Rule 26 to avoid duplication.  So that

15   is why we believe that it's really important to have help here.

16       THE COURT:  OK.  I'm not saying there should be

17   coordination.  Talk to me about what the dispute is.

18       The way I read this was, you're having disputes about

19   capping hours for depositions and defining Apex witnesses, but

20   I don't even know what the Apex witnesses are.  So I'm not sure

21   we're there yet, and I'm not sure that a one-size-fits-all for

22   every witness is appropriate.

23       MS. GARKO:  I think, your Honor, with respect to the

24   threshold issue is right now the proposal for Microsoft on the

25   table is more formal coordination within New York.  There is no

P1MsAUT3

1    proposals that come from class plaintiffs that offers any

2    coordination with the news plaintiffs, and there is no

3    coordination proposal that is preferred from the news

4    plaintiffs that involves the class plaintiffs.

5          So, right now they are seeking to operate entirely

6    independently and not coordinate with each other at all, so

7    that is where we believe that is not going to lead to those

8    efficiencies.

9          THE COURT:  In other words, for example, Microsoft

10   wants, say, it's the same witness, you don't want them deposed

11   twice on two different schedules.

12         MS. GARKO:  Correct, and have duplicative questions

13   asked of them, where the issues are going to be identical for

14   many of those witnesses.

15         THE COURT:  Why can't you make them available, say,

16   for two separate days or two consecutive days, right, and do

17   all of the overlapping issues as much as you can the first day.

18         MS. GARKO:  Your Honor, we have proposed that type of

19   proposal, trying to have the plaintiffs coordinate and do that.

20   They have not offered that to us at all.

21         THE COURT:  OK.  Plaintiffs, talk to me.  This still

22   seems to me like something you ought to be meeting-and-

23   conferring about more, but I'll hear from you on that.

24         MS. GARKO:  And just respectfully to that point, your

25   Honor, we have been really trying on this.  We have been

P1MsAUT3

1    talking about it since August.  I personally have spent dozens

2    and dozens of hours trying to get there.  I think,

3    unfortunately, there are just fundamental disagreements between

4    the parties about how this should be approached.

5              MR. SAVAGE:  Yes, your Honor.  I'll go to the podium.

6              THE COURT:  Let's hear from Mr. Savage.

7              MR. SAVAGE:  On this issue of the coordination among

8    the New York cases, I'm not sure there really is a dispute

9    here, at least from the news plaintiffs' perspective.  We have

10   put forward two proposals.  Our preferred proposal is a

11   news-only proposal, which is consistent with what your Honor

12   proposed or suggested that you were inclined to order at the

13   beginning.

14         Even under that proposal, we would certainly welcome

15   the opportunity to confer with defendants and with the class

16   plaintiffs to schedule depositions consecutively, which is, I

17   think, what your Honor just suggested.  And so the news-only

18   proposal is what was attached to our response as Exhibit 1.

19         We also said that we are open to an SDNY all-in

20   proposal as well, and that would be a more formal sort of

21   coordination.  We don't think that's the best approach,

22   including because there have been -- we have gone back-and-

23   forth over this several times, but this issue of cross-

24   production of documents.

25         The defendants have said that they want coordination

P1MsAUT3

1    among all of the SDNY cases, but are not willing to agree to

2    cross-production of documents across all of the SDNY

3    plaintiffs.  Our view is that they have to go together.  But

4    that's fine if they don't want cross-production of documents

5    across all the SDNY cases.  Then fine, we will just do news

6    only.  But, either way, we are certainly willing to do what

7    your Honor suggested, which is schedule depositions, like, in a

8    coordinated way.

9              THE COURT:  Let's get really, really practical in the

10   next five minutes.

11             All right.  Go ahead, Mr. Nath.

12             MR. NATH:  Your Honor, I think what you suggested --

13   and I don't think there is a lot of dispute here actually --

14   what you suggested --

15             THE COURT:  That's why I saved this issue for last.  I

16   didn't think it would take that long.

17             MR. NATH:  -- is right.  The class plaintiffs, the

18   Authors' plaintiffs in SDNY, should coordinate informally with

19   the Authors' plaintiffs in the Northern District of California,

20   because there are a lot of overlapping issues.  The one issue

21   that is not overlapping between those two cases is Microsoft,

22   and we are totally fine with scheduling depositions back to

23   back.

24             I think what that leads to is the dispute that

25   currently exists is whether -- is about hours caps, like your

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P1MsAUT3

1    Honor said.  Hours caps about whether, if there are two

2    depositions in the news, you know, news case deposition

3    scheduled before a class deposition, or vice versa, whether

4    there is some sort of shorter time that the court should put

5    on, a time limit for that deposition, that the court should

6    impose prematurely we think.

7         So we think the informal coordination among SDNY,

8    particularly for Microsoft depositions, makes sense.  Informal

9    coordination between the two class cases in NoCal and SDNY

10   makes perfect sense, and we're perfectly prepared to proceed

11   that way.

12        There are other issues related to hours cap that I

13   think would be incredibly helpful to resolve here.  I agree

14   with Ms. Garko that we all put a lot of time in this, and we

15   could use some clarity on caps.

16        THE COURT:  This seems to me like the type of

17   unproductive settlement conference where parties are just

18   throwing numbers back and forth at each other and maybe you

19   just need somebody to tell you.

20        But what I took from what Mr. Savage was saying was

21   there is an open to an SDNY all-in proposal, but there are

22   concerns about cross-production.  I feel like this is really, I

23   think, up to Microsoft.

24        How do you want to handle that?

25        Go ahead.

P1MsAUT3

1          MS. GARKO:  Your Honor, there really is no issue with

2     respect to cross-production.

3          The fact is that, with respect to Microsoft,

4     100 percent of the documents that were produced in the class

5     cases have been produced to the news plaintiffs.  So it's odd

6     that they are even raising this as an issue, because they have

7     received every single document that the class plaintiffs have

8     received.

9          Because there are additional issues that are only

10    relevant to the news cases, they received additional

11    documents --

12         THE COURT:  I see.

13         MS. GARKO:  -- where there were custodians relevant to

14    the class plaintiffs that were relevant to news.  The class

15    plaintiffs got those documents.  The reason why class

16    plaintiffs have gotten fewer documents is they have one less

17    issue.

18         THE COURT:  Right.

19         MS. GARKO:  So there really is no issue here with

20    respect to cross-production at all in terms of coordination.

21         THE COURT:  OK.  So, for the class plaintiffs, have

22    you all been talking about hours caps just for the class

23    plaintiffs' deposition, or have you been talking about hours

24    caps trying for all in?

25         MS. FARKO:  So we have been talking about all in,

P1MsAUT3

1    your Honor.

2           Importantly here, the threshold is, right now under

3    the federal rules, we are numbers caps.  We would like that

4    converted to an hours cap, and then figuring out what that

5    hours cap is.  And we are at --

6           THE COURT:  You've got numbers caps and presumptive

7    hours caps.  OK.  I'm not going to -- so unless I hear some

8    other better idea, I want you to think about whether it makes

9    sense to have each Microsoft witness appear -- and taking your

10   point about the Venn diagrams, right -- starting with the

11   overlapping issues deposition, maybe that goes presumptively

12   for seven hours.  And then for the additional depositions,

13   which for the additional issues that are unique to the news

14   cases and that involve the news documents that you have

15   produced to the news plaintiffs, that there is some additional

16   time of deposition for each witness.

17          MS. GARKO:  I think, your Honor, the witnesses that

18   are going to be relevant to just the news cases, I don't

19   actually foresee being relevant to the class plaintiffs.  I

20   think the issue is for just news.  So the issue search outputs,

21   that is just for news, isn't going to be relevant to the class

22   plaintiffs.  The issues that are relevant to the class

23   plaintiffs on training will be relevant to the news plaintiffs.

24          THE COURT:  Yes.

25          MS. GARKO:  I think that is the number that was in

1    dispute in trying to solve.

2            THE COURT:  You were talking about the common issues.

3            MS. GARKO:  Correct.

4            THE COURT:  Time.  I said, how about seven hours.

5            MS. GARKO:  Your Honor, we would have no issue with

6    seven hours on those issues.

7            THE COURT:  For that plus, or are you saying that that

8    is not even going to be enough for...

9            MR. NATH:  Your Honor, the issue may be common to some

10   extent, but there are differences in the documents that are at

11   issue.

12           THE COURT:  You're right.

13           MR. NATH:  For example, there are books datasets,

14   right.  When we are talking to either a Microsoft witness or an

15   OpenAI witness about training, the class plaintiffs will be

16   focusing on the books datasets and other datasets that contain

17   books, while I expect that the news plaintiffs will be focusing

18   on different datasets.

19           So we do think that that seven hours all-in for a

20   deposition that may involve training and only training, even

21   though that issue overlaps, isn't necessarily going to be

22   sufficient.

23           THE COURT:  Why can't you do what litigants in

24   virtually every other case have done, is get to your list of

25   witnesses and talk about how long each witness you think is

1    going to take.

2              Why are we here?

3              MS. GARKO:  Your Honor, I think the threshold issue is

4    the ultimate hours cap.

5              THE COURT:  I'm not doing -- no, we're not doing an

6    ultimate hours cap.  We are not doing an ultimate hours cap

7    when you don't have a sense of who the witnesses are and how

8    long each witness is going to take, because that is just silly

9    and it's not tailored to the needs of the case and the needs of

10   the availability of each witness and it doesn't --

11             No.  No.  That's a hard no.

12             OK.  Have you talked about a list of witnesses and

13   whether some witnesses might be a two-day deposition, some

14   witnesses might be a four-hour deposition.

15             Why can't you do that?

16             MR. NATH:  Your Honor, I think we could, from the

17   class plaintiffs perspective.  I think we could do that.  I

18   think every party here is of the view that an hours cap would

19   be helpful to guide us as we go into discovery and go into

20   depositions, and we are far apart on the hours cap, but not

21   that far apart.

22             THE COURT:  You're talking about a total hours cap?

23             MR. NATH:  Talking about a total hours cap from the

24   plaintiffs' side per defendant, and the defendant have proposed

25   an aggregate hours cap to share between them for each of the

P1MsAUT3

1    separate coordinated cases.

2              If we are turning to another issue, I do want to

3    address Ms. Garko's argument about cross-production.  We think

4    that is a sort of separate issue that I want to address

5    briefly.  The cross-production issue with respect to Microsoft

6    I would like to set to one side.

7              From the class plaintiffs' perspective, we -- as the

8    court had suggested we do and as Judge Elman in the Northern

9    District instructed the Northern District of California

10   plaintiffs to do -- intend to coordinate with that case to try

11   and schedule depositions back to back and minimize the amount

12   of time on the record and coordinate with those plaintiffs for

13   depositions.

14             Right now we can't do that because we have a

15   protective order that governs this action, they have a

16   protective order that governs that action, and we can't share

17   documents that OpenAI has produced to us, which is why we're

18   asking for this court to order OpenAI to cross-produce the

19   documents that they have produced in the Northern District of

20   California action to us.

21             Because as a practical matter, if I show up to a

22   deposition that the Northern District of California plaintiffs

23   are taking, my understanding is they will have different Bates

24   numbers.  I would like to know whether the document that they

25   are questioning the witness on is actually a documents that has

P1MsAUT3

1    been produced to us, something that we can print out and use.

2    And even just keeping track of the different documents in the

3    case, it would be incredibly helpful.  If OpenAI's goal is to

4    minimize the burden on the witnesses and minimize the time of

5    the record, it would be incredibly helpful and efficient to

6    actually have cross-production of documents from OpenAI between

7    the Northern District of California and the SDNY case.

8         THE COURT:  You just brought up a new issue.  All

9    right.  And the problem is that the cross-production issue

10   needs to be resolved because it might impact on how long you

11   need to take with depositions.

12        MR. NATH:  It impacts the ability for us to actually

13   and formally coordinate with the Northern District plaintiffs.

14   Right now we can't even share documents that OpenAI produced in

15   this case with the plaintiffs in that case.

16        So if we're going to prepare for a deposition, say

17   we're both deposing the same witness, I would like to be able

18   to communicate with those plaintiffs in advance of that

19   deposition.  OpenAI's suggestion is that we should provide them

20   the documents in advance and ask what documents we should be

21   able to share with the Northern District of California

22   plaintiffs.

23        We already discussed the element of surprise.  We

24   prefer not to give a roadmap for the depositions before every

25   deposition in the case.

P1MsAUT3

1          THE COURT:  All right.  Mr. Slaughter, you're standing

2    up.

3          MR. SLAUGHTER:  Thank you, your Honor.  James

4    Slaughter on behalf of OpenAI.

5          Just with respect to this cross-production issue, your

6    Honor.  You know, there is a suggestion here that there hasn't

7    been cross-production, and that's just false.  More than

8    90 percent of the OpenAI documents have been produced in all of

9    the cases.  That is the class.  And the news cases, and has

10    Ms. Garko noted, there are some differences because the news

11    claims are broader, there is more custodians in those cases.

12    So there will be differences.

13          But this is, as you noted, not an issue that has been

14    teed up for now.  We can meet-and-confer on it.  There is,

15    obviously, very easy ways to address it, including, most

16    simply, if there is a witness who is being deposed, making sure

17    that they have -- that there's been the same documents have

18    been produced both in the class cases so that everybody is

19    working off the same dataset, so to speak.

20          The suggestion, A, there hasn't been class production

21    is not fair or appropriate, and that we can't handle this on a

22    case-by-case basis as we schedule these depositions.  That's

23    the way to do it, is to make sure that, you know, if you have a

24    deponent coming up, everybody has got the same set of

25    documents.

1              THE COURT:  Right.  That's really on OpenAI, right.

2     You're the ones that have been producing to everybody.

3              MR. SLAUGHTER:  Yes.

4              THE COURT:  OK.

5              MR. NATH:  So, your Honor, the problem that that

6     doesn't solve is it doesn't solve our ability to actually share

7     documents with the other plaintiffs that we are supposed to

8     coordinate with.  Presumably, we are also going to be

9     coordinating about witnesses we are going to depose.  Instead

10    of doing this piecemeal and having more meet-and-confer efforts

11    over cross-production, if 90 percent of the documents that have

12    been produced in our case produced in the Northern District of

13    California case, or vice versa, OpenAI should just produce that

14    other 10 percent.

15             There are enough overlapping issues that we don't

16    understand why this should be a difficulty.  And it also

17    constrains our ability, for example, to actually share a

18    document.  If we think that both cases should depose a

19    particular witness and want to explain why, we can't do that

20    given the protective order in our case, and have those open

21    communications with the Northern District of California

22    plaintiffs.

23             THE COURT:  Let's get back to hours caps and number.

24             Have you talked about the number of witnesses?

25             MS. GARKO:  Your Honor, we have not exchanged an

P1MsAUT3

1    anticipated deponent list or anything like that, and that's

2    part of the reason we have been struggling...

3           Your Honor, that exchange has not happened yet with

4    respect to the list of specific witnesses.  And that's one

5    place where we've been struggling with plaintiffs' proposal

6     because it is largely just based on custodian numbers, which

7    we know there is also more custodians than folks that get

8    deposed.

9           So we don't have a great sense of where their cap

10   numbers are coming from.  We set out in our briefing how we

11   calculated from the defendants' side to come to the caps we

12   came to, which is tied to the federal rules.  But candidly,

13   your Honor, I don't know where their proposals come from,

14   because we don't have a sense of how many witnesses they

15   actually anticipate that they are going to take depositions

16   from.

17          On our side, your Honor, defendants know we want to

18   take abbreviated depositions of all of the named class

19   plaintiffs.  There is 32 of them.  We want a seven-hour

20   deposition of the Authors Gild, so we have asked for that be

21   hours.  With respect to the entities, what we tried to do

22   there, your Honor, is treat everyone equally.  So instead of

23   the standard each side is subject to ten depositions, we split

24   that by party instead, and then just applied it across so

25   everyone gets that equivalent amount of hours that they are

P1MsAUT3

1    subject to deposition of.

2              THE COURT:  OK.

3              MS. GARKO:  Which recognizes, your Honor, the

4    increased complexities, but also doing it this way, we can

5    actually get through all of the depositions that we need to get

6    through.

7              THE COURT:  OK.  So you can choose, for example, to

8    spend more time with one witness and less time with another.

9              MS. GARKO:  That's the benefit of the cap, your Honor,

10   just flexibility there.  If it's a four-hour witness, great.

11   If it's more...

12             THE COURT:  Mr. Slaughter.

13             MR. SLAUGHTER:  Thank you, your Honor.

14             To the extent it would be helpful, your Honor, I would

15   just direct your Honor's attention to ECF 430-1 in The New York

16   Times case, which is a chart that the defendants prepared that

17   has the one page, the varying proposals, so your Honor has it.

18             I join with how Ms. Garko just described the issue,

19   and I would further say, your Honor, that we're trying to be as

20   consistent as we can with Rules 30 and 26.

21             THE COURT:  OK.

22             MR. SLAUGHTER:  There has to be a reason to exceed the

23   ten depo limit.  We have explained why that -- what that reason

24   is, but --

25             THE COURT:  Oh, you're getting more than ten

P1MsAUT3

1    depositions.  That's not the issue.

2          MR. SLAUGHTER:  Right, so it's not the issue.  So the

3    question becomes, under Rule 26 you have to prevent duplicative

4    and cumulative discovery.  And the plaintiffs' proposals all

5    assume three separate plaintiffs uncoordinated and effectively

6    unlimited with four or 500 hours of deposition time, that is

7    assuming that, you know, it's a recipe for disaster.

8          What we are suggesting is, enter in the order that we

9    have asked.  If it ends up not being enough, we can come back.

10   And we have taken some depositions and see and they can make a

11   showing about why they might need more hours.

12         But starting at their level would just, sort of, not

13   be consistent with the requirements of Rules 30 and 26.

14         THE COURT:  Mr. Nath, you have one minute.

15         MR. NATH:  I don't think you're going to be surprised.

16   We disagree with what our opposing counsel has said here.  So

17   on hours limits, first of all, I think the court cannot just

18   enter the order the defendants proposed because --

19         THE COURT:  I'm not going to.  I'm not entering any

20   order, so let me just hear from you.  Just a quick response.

21         MR. NATH:  Yes.  Let me talk about hours cap.

22         Our proposed hours cap for the plaintiffs taking

23   depositions of the defendants and third parties is 225 hours,

24   and I can explain exactly how we got there.

25         THE COURT:  No, we don't need to.

P1MsAUT3

1          Here is what I'm going to do.  We're coming up on one

2     o'clock.  I thought we would be done before now, but I'm like

3     Charlie Brown with the football.  I think we can be more

4     efficient.

5          Here is what we are going to do.  January 31, 2:00 to

6     5:00 p.m., we are going to have a settlement conference to talk

7     about deposition proposals.

8          OK.  So every party, or group of parties, send one

9     attorney or maybe two.  OK.  You can have other attorneys

10     available to consult, but I really want the attorneys who come

11     on the 31st to have the ability and to have the authority to

12     make concessions, to talk to me.

13          I want the people who can actually talk to me about

14     particular depositions, talk to me about why these issues are

15     particular issues.  This is an unusual case.  It's a unique

16     case.  I get that.  I'm going to take another look at 430-1,

17     which I think has --

18          Mr. Slaughter, you said that has the competing

19     proposals?

20          So I'm not going to ask --

21          MS. GARKO:  We have copies of it, your Honor.

22          THE COURT:  No, that's OK.  I'll look at it

23     electronically, too.  I don't want you to submit anything in

24     advance.

25          I want the people who can talk about your deposition

P1MsAUT3

1    planning, to talk about what it is you might need, to be able

2    to talk actually realistically about potential witnesses, and

3    we're going to try to figure it out.

4            I'm not going to wear my robe.  I'm actually going to

5    have you all start talking first.  I don't -- I'm not sure I'll

6    be there for the whole three hours, but we're going to have a

7    session.  It's going to be confidential, and we're going to try

8    to see if we can hammer some of this out.

9            MR. SLAUGHTER:  Thank you, your Honor.

10           MS. GARKO:  Thank you, your Honor.

11           MR. NATH:  Appreciate that, your Honor.

12           THE COURT:  Anything else?

13           MR. CROSBY:  One small thing.

14           THE COURT:  Yes.

15           MR. CROSBY:  And it's not a discovery dispute, I

16   swear.

17           THE COURT:  OK.

18           MR. CROSBY:  Just for clarification about the sealing

19   procedures that we have been going through.

20           THE COURT:  Yikes.

21           MR. CROSBY:  There was an order granting the most

22   recent spade of sealing motions.  I think there is maybe a

23   disconnect between the process that we have provided in the

24   proposal order entered in the case and your Honor's individual

25   practices.  Because the way that the protective order works is,

P1MsAUT3

1    if you're submitting another parties' designated document, says

2    you just submit it.  And the only reasoning you give for why

3    you're submitting it under seal is because the other party

4    designated it.  Then the designating party responds, and then

5    they have to justify why it should remain sealed or say we

6    don't think it should be sealed.

7         And that's what we did, and then your order -- this

8    was in the docket 378 with respect to sealed ECF 370 -- we said

9    we don't think that this thing that they sealed needs to be

10   sealed, and your Honor granted the sealing motion entirely

11   saying that we hadn't justified unsealing it, which is kind of

12   not the way the burden is supposed to be laid out.

13        I think your Honor said that you wanted more

14   description of what was going to be sealed in the moving

15   papers.  But, again, that's not how the protective order we

16   entered into works, because it's really the responsive party

17   who is the one with the interest in the sealing.

18        THE COURT:  Yes, I get that.  I think additionally,

19   though, there were -- I'm going on memory -- but I think I did

20   do an analysis, on my own anyway, on why something ought to be

21   sealed or not, does not need to be sealed.

22        This almost sounds to me, though, like a motion for

23   reconsideration, actually.

24        MR. CROSBY:  We obviously said in our opposition, we

25   didn't care about that part being sealed.  We don't.

P1MsAUT3

 1              THE COURT:  Then I'm OK with it.

 2              MR. CROSBY:  OK.  I just want to make sure we're all

 3    clear about what the process is.

 4              Is the process that we've been following the correct

 5    one?

 6              THE COURT:  Yes.

 7              MR. CROSBY:  Thank you, your Honor.

 8              THE COURT:  OK.  I think what you're referring to,

 9    there might have been -- we might have had some trouble.

10    Because there was one motion, one sealing motion maybe that

11    didn't refer to all of the documents, so that is why we were a

12    little confused and we had to go back.

13              MR. CROSBY:  Thank you for the clarification, your

14    Honor.

15              THE COURT:  Keep the ECF numbers in.

16              All right.  I request the parties order a copy of the

17    transcript.  Share the cost, 50/50 on each side of it.

18              I will see some folks on the 31st for our deposition

19    coordination settlement conference.  I think, right now, all we

20    need is a status letter on the 13th.  We'll take it from there.

21              All right.  Thank you very much.

22              We are adjourned.

23              ALL PRESENT:  Thank you, your Honor.

24              (Adjourned)

25