# EXHIBIT A

```
     P5RBOEP1

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    IN RE:  ,

4    OPENAI, INC.,
     COPYRIGHT INFRINGEMENT LITIGATION
5
                                              25 MD 03143 (SHS)(OTW)
6
                                              Conference
7
     ------------------------------x
8    Before:

9                            HON. ONA T. WANG,
                                  Magistrate Judge
10

11                           APPEARANCES

12   SUSMAN GODFREY LLP
          Interim Class Counsel for Authors Guild and Alter Class
13   Actions
     BY:  ROHIT NATH
14

15   SUSMAN GODFREY LLP
          Attorneys for The New York Times
16   BY:  KATHERINE PEASLEE
          ZACH SAVAGE
17        ALEXANDER P. FRAWLEY
          ADNAN MUTTALIB
18        IAN CROSBY
          DEMETRI BLAISDELL
19        ALEJANDRA C. SALINAS
          DAVIDA BROOK
20        ROHIT NATH
          JUSTIN NELSON
21
     ROTHWELL FIGG
22        Attorneys for New York Times and Daily News
     BY:  JENNIFER MAISEL
23        STEVEN LIEBERMAN
          JENNY COLGATE
24

25
```

```
     P5RBOEP1
                     APPEARANCES (Continued)

     LOEVY & LOEVY
          Attorneys for Center for Investigative Reporting
     BY:  MATTHEW TOPIC

     LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
          Attorneys for Authors Guild and Alter Class Plaintiffs
     BY:  RACHEL GEMAN
          WESLEY DOZIER

     BOIES, SCHILLER FLEXNER, LLP
           Attorneys for N.D. Cal Plaintiffs
     BY:   JOSHUA M. STEIN
           EVAN EZRAY

     JOSEPH SAVERI LAW FIRM
           Attorneys for Plaintiffs
     BY:  CHRISTOPHER YOUNG

     KEKER VAN NEST & PETERS
          Attorneys for OpenAI
     BY:  JAMES SLAUGHTER
          MICHELLE YBARRA
          ANDREW DAWSON
          CHRISTOPHER SUN
          SARAH SALOMON
          BILAL MALIK
          EDWARD BAYLEY


     MORRISON & FOERSTER LLP
          Attorneys for OpenAI
     BY:  JOSEPH GRATZ
          CAROLYN HOMER
          ROSE LEE
```

```
     P5RBOEP1

1                    APPEARANCES (Continued)

2    LATHAM & WATKINS LLP
          Attorneys for Microsoft
3    BY:  ELANA NIGHTINGALE DAWSON

4    FAEGRE DRINKER BIDDLE & REATH LLP
          Attorneys for Microsoft
5    BY:  JARED BRIANT

6    ORRICK HERRINGTON & SUTCLIFFE LLP
          Attorneys for Microsoft Corporation
7    BY:  ANNETTE L. HURST
          SHERYL GARKO
8

9    ALSO PRESENT:   KAREN CHESLEY, The New York Times

10                   NICK STANDISH, The New York Times
```

1    THE COURT:  Okay.

2    MS. SALOMON:  Understood, your Honor.

3    THE COURT:  Rubin, are we done with Rubin?

4    MS. SALOMON:  I believe we're done with Rubin.

5    If I may, your Honor, I would request a denial without
6    prejudice, so that we could explore these issues in deposition.

7    THE COURT:  Sure.

8    MS. SALOMON:  Thank you, your Honor.

9    THE COURT:  I will add, however, for all three of
10    these custodians is a denial without prejudice to renewal, but
11    when you renew, if you renew, I need to see specific
12    allegations, specific documents, statements, admissions that
13    indicate that these custodians are non-cumulative,
14    non-duplicative responsive documents, and that it's
15    proportional to the needs of the case.

16    I will consider Rule 37(e)(5) in cost shifting, but it
17    is denied without prejudice.

18    All right.  Showing, again, that I'm a terrible judge
19    of time, let's see, the next issue is, since we're talking
20    about documents, what about document 250, 251?

21    MR. YUE:  Good afternoon, your Honor.  Herman Yue from
22    Latham & Watkins, on behalf of OpenAI.

23    I'll be speaking to the request that CIR add an
24    additional five custodians to its existing list of the
25    custodians.  Just as an overview, these five custodians we've

1   identified are going to be relevant to 15 requests for
2   production, and these RFPs are going to be to issues such as
3   ownership of asserted works, whether OpenAI allegedly actually
4   will move to CMI from those asserted works, CIR damages claims,
5   and a number of defenses that OpenAI has asserted.
6             Now, the letter we received at the time we had
7   submitted that, we have not received the bulk -- or just
8   received the bulk of CIR's production.  Since that time, we
9   have received approximately 90 percent of CIR's production, and
10  we've taken heed of what CIR has asked us to do.  And we have
11  done our very best to triage and review those documents.  And
12  what we've seen from those documents reinforces the evidence we
13  obtained from the custodial deposition of Ms. Bowerman, CIR's
14  CEO.
15            And our review of the documents demonstrates that
16  there are, in fact, large swaths of documents for which CIR has
17  not produced responsive documents, and based on the deposition
18  testimony from Ms. Bowerman, we believe that the custodians or
19  the requested custodians that we've identified in our motion
20  should be in possession of those documents.
21            Now, I just want to address a few points that CIR has
22  made in its responsive briefing.  It's repeatedly said or
23  repeatedly urged that, you will engage in manual collection of
24  documents, and that that should obviate any need to add those
25  additional custodians.  But, respectfully, your Honor, this is

1    really the exception that swallows the rule.

2              They have made this suggestion for four out of the
3    five custodians that we have suggested, but, of course, this is
4    inconsistent with the fundamental premise of the ESI order that
5    your Honor entered, which was all about identifying custodians,
6    identifying search terms, and using that as the primary method
7    of obtaining and producing documents.  So, that simply can't be
8    the answer.

9              Now, they've also pointed out the fact that CIR is a
10   smaller organization, and they've pointed out the fact that CIR
11   has identified as existing custodian certain decision makers.
12   And we don't take issue with those representations, but the
13   fact is, as I think your Honor can well recognize, that
14   sometimes the decision makers, the CEO, the CFO, they're not
15   necessarily going to be the individuals with all of the
16   responsive documents.  So the custodians that we have
17   identified in our motion are individuals which we believe,
18   based on the deposition testimony, and what we have seen from
19   the documents, should have responsive documents.

20             THE COURT:  Okay.  I want to respond right here and
21   note that I just heard arguments from your colleague that they
22   want the people at the higher level, because they're the ones
23   that can see everything, and now you're making the argument
24   that is contrary to that, which is that the higher level people
25   probably don't have all of those documents, but the lower level

1    people, who are actually on the ground, boots on the ground,
2    working on these issues, probably do have these documents.
3             Which is it?  We're not getting all of it.
4             MR. YUE:  Understood, your Honor, and these are two
5    different organizations, and these are two different types --
6    well, more than two, obviously, but these are different types
7    and classifications of documents.
8             As Ms. Salomon was up there, I recognized you might
9    raise that specific tension, but I don't think there is any
10   tension.  I think this is a matter of apples versus oranges,
11   two different situations, and the types of documents we have,
12   and the types of documents we don't have.
13            THE COURT:  Okay.  Why don't you name the five
14   custodians, and tell me what you think they have or why they
15   should be added, what their responsive documents are going to
16   be, and I'll have CIR respond.
17            MR. YUE:  Sure.  So there's five individuals.  The
18   first one is Mr. Robert Weiss.  He is the director of online
19   technology, and we believe he's going to have documents
20   relevant to exclusion protocols and CIR's policies relating to
21   the addition of copyright management information, or CMI, to
22   its asserted works.  And this goes to the DMCA claim that
23   they've asserted against us.
24            THE COURT:  I got that.
25            MR. YUE:  And so during the custodial --

1                THE COURT:  Next custodian.

2                MR. YUE:  Okay.  The next one is Marla Jones Newman.

3    She's the vice president for people and culture.  We believe

4    she's going to have documents such as employment agreements and

5    work-for agreements that are going to go directly to ownership

6    issues of the asserted works.

7                THE COURT:  Next.

8                MR. YUE:  Next is Ms. Emily Harris.  She is the

9    director of finance at CIR, and she is going to have documents

10   that are going to be relating or underlying CIR's financial

11   analysis of its two publications, Mother Jones and Reveal.

12               THE COURT:  Okay.

13               MR. YUE:  The fourth custodian is Ruth Murai.  That's

14   spelled --

15               THE COURT:  Sorry.  Let me go back to Emily Harris.

16   So, financial analysis as the director of finance.  What does

17   that get to?

18               MR. YUE:  That gets to evaluation documents.  That

19   gets to their views and their analysis of any alleged harm that

20   CIR suffered as a result of OpenAI's alleged activities.  So it

21   just goes to general harm issues, damages.

22               And the fourth factor of the various defense --

23               THE COURT:  Okay.  Is this similar to the New York

24   Times' assertion that the use of OpenAI's tools reduces

25   subscriber demand, or anything like that, or is it something

1   different?

2          MR. YUE:  It could be.  It could encompass that.

3          At this point, your Honor, what we have are some high
4   level, sort of final financial analyses, summaries, but we
5   don't have any of the underlying documents that support that
6   analysis and that's what we're looking for.  And that's why
7   we're looking for somebody like Ms. Harris, who, again, during
8   the custodial deposition, CIR's representative indicated she
9   would be responsible for actually leading the team that
10  conducts the analysis and generates the final analysis that the
11  VP of finance would have.

12         THE COURT:  Okay.  But you have the final analyses.

13         MR. YUE:  We have some of them, your Honor.  We don't
14  have a complete collection, but what we are missing, which is
15  in our view a large enough chunk, are any underlying documents.
16  So we have no way of sort of pressure testing those final
17  numbers, if you will.

18         THE COURT:  What do the final numbers say that matters
19  for your client?

20         MR. YUE:  Well, the final numbers indicate changes in
21  revenue that CIR has experienced over the years, licensing
22  revenues, subscription revenues, advertising revenues.  These
23  all go to potential harms.  So to the extent that they're going
24  to bring those numbers in and say, hey, this demonstrates harm
25  as a result of OpenAI activities, we want to pressure test

1  those numbers, and we don't have the documents right now that
2  would enable us to do that.
3           THE COURT:  Okay.  The next person was Ruth --
4           MR. YUE:  Ruth Murai, M-u-r-a-i.
5           THE COURT:  Okay.  Talk to me about Ms. Murai.
6           MR. YUE:  So, we believe Ms. Murai has documents
7  relating to CIR's plagiarism detection efforts, and that's
8  going to include monitoring for the use of third-party works,
9  or generative AI in the creation of its works in Reveal and
10 Mother Jones.
11          THE COURT:  So it's CIR's own plagiarism detection for
12 works that it publishes?
13          MR. YUE:  Correct.
14          THE COURT:  Okay.  I'll let I guess Mr. Topic address
15 how or why that's responsive in a moment.
16          So, this is to detect use of tools like ChatGPT.
17          MR. YUE:  Correct, your Honor.  It also includes, for
18 example, the use of third-party works.  If you look at the
19 publications from Mother Jones and from Reveal, CIR's two
20 publications, you'll see that the citation and the quotes and
21 the use and the attributes of third-party works is quite
22 consistent.  And to the extent that it is not properly
23 attributing third-party works in its publication, that's
24 certainly relevant along, as you indicated, the use of
25 generative AI.

1           THE COURT:  All right.

2           MR. YUE:  And one last one, your Honor.

3           THE COURT:  Okay.

4           MR. YUE:  The last one, what we asked for here are

5    senior editors that are in possession of documents relating to

6    use of third-party works.  We've identified one individual in

7    particular based on the custodial deposition.  That

8    individual's name is Michael Mechanic, and we believe that he

9    has documents related to CIR's arrangements for the use of

10   third-party works.

11          So, these are going to be arrangements with

12   third-party content sources, and, as well, arrangements with

13   such third parties regarding the sharing of CIR's own content

14   to those third parties.

15          THE COURT:  Okay.  These are holes that you've seen in

16   the production from CIR to date?

17          MR. YUE:  Correct, your Honor.

18          THE COURT:  All right.  Well, let's hear from CIR.

19          MR. TOPIC:  Good afternoon, your Honor.  Matt Topic,

20   on behalf of CIR.

21          In terms of these alleged holes, let me go over the

22   chronology.  They filed this letter brief in early April.

23   Haven't heard anything from them since at all.  In the

24   meantime, we've doubled the size of our production.  So I've

25   said repeatedly, if they want to confer about specific things

1     they think I'm missing, I'm happy to have that discussion.
2     They have not --
3            THE COURT:  Let me pause you here.  One distinction
4     from the custodians' argument that we have just heard is this
5     is new, or new to me.
6            MR. TOPIC:  Well, I haven't been given any opportunity
7     to confer with them about whether or not these are really
8     holes.  I don't even know who else he's talking about.  He just
9     described in a vague level, with no advanced warning of what
10    those alleged are.  With that, I'm happy to go through the five
11    custodians that he's identified.
12           THE COURT:  Sure.  Well, I think what I'd like to hear
13    is go through the custodians identified, but also juxtapose it
14    with the custodians that you are -- that you are reducing from,
15    and tell me whether or not there is this overlap.
16           MR. TOPIC:  Right.  And we walked through those in the
17    letter brief as well, but let me first say we've given them our
18    CFO, our CEO, and VP of sales, who cover collectively the
19    waterfront areas in this case.  So this is a function of them
20    wanting to fish around in lower level peoples' documents and
21    see if they can find something there.
22           So Mr. Weiss, they identified exclusion protocols in
23    policies on applying copyright management information to our
24    website.  In fact, Ms. Baldwin testified that she is
25    responsible for the policies about whether to deploy CMI on the

1    website.
2            At the end of day, what matter is, is it on the
3    website or isn't it.  So I don't think it's a legitimate area
4    that there's going to be any dispute or really any need to
5    explore.
6            As to the exclusion protocols, what would be relevant
7    is the extent to which we've applied them, and maybe what's
8    relevant is why we applied them.  Those things are covered by
9    the CEO.  The person that actually put the code into the
10   computers to implement it, that's not really relevant, and
11   that's what they're looking for.  The person typing the things
12   into the computer to implement what the custodians we've
13   identified are making the decisions about.
14           Jones Newman, we've identified employment agreements.
15   We are manually collecting employment agreements.  We have them
16   in several repositories.  We don't need to mine those out of
17   people's emails, so there's really no reason to be adding a
18   custodian for a document of that sort.
19           Harris is the director of finance.  We've already
20   given them the CFO, who is who the director of finance reports
21   to.  The financial analyses, discussions of the financial
22   analyses, they would have those kind of things.
23           Murai, for plagiarism detection.  I feel pretty
24   confident in saying that if it turned out that anyone
25   identified any plagiarism in any of our documents, our CEO

would know about it within about six seconds. So to go through the person who's doing the fact checking, getting their documents, it's all redundant. If it turned out that, yes, we used AI in generating one of our works -- I am not saying that is the case. I don't believe that is the case, but that would make its way up to our CEO, so there's no reason to collect that from a lower level employee.

The last person was Mechanic. As to publication agreements, just like for employment agreements, we are manually collecting agreements.

So I think that covers all the different custodians they've identified. I am more than happy to discuss with them any specific holes they've identified. Our production is not yet complete. It should be complete in the not-too-distant future. And, again, half of it was produced after they provided this letter, and this is the first I've heard of any holes.

THE COURT: Okay. Employment agreements, can you give me a sense of how many you're collecting, you're manually collecting?

MR. TOPIC: Well, let's keep one thing in mind. It is very much in our interest to produce those. We have to show that we own the works, right? So we're going to need to show the work was written by someone who was an employee. So if they had an employment agreement, we would want to provide it.

1    Some of these people may not have an employment agreement.  It
2    may be an offer letter.  It may be payroll records.  But all
3    these things people are manually collecting, because people's
4    emails are not a natural repository for those types of things.
5             THE COURT:  Then, talk to me about the communication
6    agreements.  I just want to understand what we're talking about
7    here, because I understand CIR to be a very different party in
8    terms of nature, size, scope from, say, Innertec.
9             So, as far as employee agreements, or if there's other
10   records of somebody being paid, or being an employee, are we
11   talking about dozens, hundreds, thousands, tens of thousands?
12   What are we talking about here?
13            MR. TOPIC:  Order of magnitude, I would say we're
14   probably talking about dozens, maybe low hundreds of authors I
15   would think, but I'm just speculating.  I don't have the actual
16   numbers.
17            THE COURT:  Okay.  What about publication agreements?
18            MR. TOPIC:  I don't know the magnitude of what we're
19   talking about, but those should be consolidated in one place
20   where we would be looking for them.
21            THE COURT:  Okay.  So they're usually consolidated in
22   one location, so it makes sense for manual collection.
23            MR. TOPIC:  I'm not going to say only one.  It may be
24   a couple.  But the kind of thing that's very conducive to going
25   to the folder that has the documents in it, pull the folder,

1    and produce the documents.
2             THE COURT:  All right.  In the interest of moving this
3    forward a bit, I'm going to tell you all to meet and confer and
4    try to make this a dead issue, or a non-issue based on the
5    arguments that we've heard, the discussion we've heard.  I want
6    there to be a more robust conversation about what holes are,
7    what constitutes a hole, how you know that there's a hole
8    versus the proposed custodian just doesn't have documents of
9    that type.
10            This goes for both the CIR custodians, proposed
11   custodians, as well as the Times custodians.  I think that's
12   what you could gather from the nature of my questioning, is
13   that I really need to see a little bit more than just, we
14   didn't get very much from this person, so they must have more.
15   It could also be that they just don't have that much.  There's
16   got to be a way to make that distinction.  Okay?
17            MR. TOPIC:  Thank you.
18            MR. YUE:  Thank you, your Honor.
19            THE COURT:  All right.
20            MS. YBARRA:  Your Honor.
21            THE COURT:  Yes.
22            MS. YBARRA:  Michelle Ybarra for OpenAI.
23            I know we had discussed addressing perhaps OpenAI's
24   final negotiating against the Times -- I wanted to alert the
25   Court it is almost 4:00.  We wanted to take up the preservation

P5RDOpe6A

1  issue today.
2          THE COURT:  Let's take a break then.  Ten minutes.  We
3  will switch gears.  All right.
4          (Recess taken)
5          (Continued in separate transcript)