**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE:<br>OPENAI, INC.,<br>COPYRIGHT INFRINGEMENT LITIGATION<br>This Document Relates To:<br>No. 1:23-cv-11195 (SHS) (OTW) | 25-md-3143 (SHS) (OTW) |

**NEWS PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO OPENAI DEFENDANTS' OBJECTION TO PRESERVATION ORDER AT *MDL* ECF 33 PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 72(a)**

# TABLE OF CONTENTS

I.  INTRODUCTION ................................................................................................ 1

II.  FACTUAL BACKGROUND ............................................................................... 5

    A.  The Importance of OpenAI's Output Log Data to the News Cases ...................... 5

    B.  The Output Log Data Implicated by the Preservation Order is Likely to Lead to Direct Evidence of Infringement ................................................. 7

        1.  ChatGPT Consumer Infringement ............................................................. 8

        2.  API Platform Infringement ...................................................................... 10

    C.  OpenAI Deletes its Output Log Data Over News Plaintiffs' Objection .............. 13

    D.  Magistrate Judge Wang Requires OpenAI to Preserve its Output Log Data ............................................................................................................ 14

III.  LEGAL STANDARDS ...................................................................................... 16

IV.  ARGUMENT ..................................................................................................... 16

    A.  The Preserved Output Log Data is Likely to Contain Direct Evidence of Copyright Infringement ................................................................. 17

    B.  The Preservation Order is Proportional to the Needs of the Case ....................... 20

    C.  OpenAI Has Not "Debunked" the Facts in News Plaintiffs' Letter to this Court ........................................................................................................ 23

V.  CONCLUSION ................................................................................................... 25

# TABLE OF AUTHORITIES

## Cases

*Al Otro Lado, Inc. v. Nielsen*,
  328 F.R.D. 408 (S.D. Cal. 2018) ........................................................................... 21

*Arista Recs LLC v. Usenet.com, Inc.*,
  608 F. Supp. 2d 409 (S.D.N.Y. 2009) ..................................................................... 8

*Arista Recs. LLC v. Lime Grp. LLC*,
  784 F. Supp. 2d 313 (S.D.N.Y. 2011) ..................................................................... 6

*Arista Recs., Inc. v. Mp3Board, Inc.*,
  No. 00-cv-4660, 2002 WL 1997918 (S.D.N.Y. Aug. 29, 2002) ......................... 2, 17

*AstraZeneca LP v. Breath Ltd.*,
  No. 06-cv-1512, 2011 WL 1421800 (D.N.J. Mar. 31, 2011) ................................ 22

*Columbia Pictures Indus. v. Bunnell*,
  No. 06-cv-1093, 2007 WL 2080419 (C.D. Cal. May 29, 2007) ............................. 23

*Concord Music Group, Inc. et al. v. Anthropic PBC*,
  No. 24-cv-038110 (N.D. Cal. Apr. 30, 2025) ....................................................... 19

*Fashion Exch. LLC v. Hybrid Promotions, LLC*,
  No. 14-cv-1254, 2021 WL 1172265 (S.D.N.Y. Mar. 29, 2021)............................. 16

*Fujitsu Ltd. v. Federal Exp. Corp.*,
  247 F.3d 423 (2d Cir. 2001) ................................................................................... 13

*Int'l Swaps & Derivatives Ass'n, Inc. v. Socratek, L.L.C.*,
  712 F. Supp. 2d 96 (S.D.N.Y. 2010) ..................................................................... 17

*R.F.M.A.S., Inc. v. So et al.*,
  748 F. Supp. 2d 244 (S.D.N.Y. 2010) ................................................................... 16

*Simmons v. Danhauer & Assocs., LLC*,
  No. 08-cv-3819, 2009 WL 10677391 (D.S.C. Sept. 15, 2009) .............................. 23

*Smith v. City of New York*,
  754 F. Supp. 3d 581 (S.D.N.Y. 2024) ................................................................... 16

*United States v. Eaton Corp.*,
  No. 23-cv-00037, 2024 WL 553965 (N.D. Ohio Jan. 4, 2024) ............................. 22

*United States v. Google,*
    Case No. 20-cv-3010 (D.D.C. Apr. 22, 2025) ........................................................................ 18

*Viacom Int'l Inc. v. Youtube Inc.,*
    253 F.R.D. 256 (S.D.N.Y. 2008) ........................................................................................... 23

**Statutes**

CCPA Section 1798.105(d)(8) .................................................................................................... 22

**Rules**

Federal Rule of Civil Procedure 72(a) ........................................................................................ 16

HIPAA Privacy Rule 45 CFR 164.412(e) ................................................................................... 22

## I.    INTRODUCTION

Since its inception, this case has been about Defendants' misappropriation of millions of News Plaintiffs'[1] articles for training their large language models and building generative AI products that can deliver those articles, or derivatives thereof, to users as output.[2] Unfortunately, despite OpenAI's knowledge that outputs were central to the News Cases (*See* Case No. 23-cv-1125 ("*Times*") Dkt. 72 at ¶ 41), it chose to delete large portions of its output log data. While there appears to be no way to recover this deleted data, Magistrate Judge Wang sought to curb OpenAI's data destruction by issuing an order on May 13, 2025 to preserve output logs and related information that would otherwise be slated for deletion. Dkt. 33 (the "Preservation Order"). The Preservation Order was designed to ensure that News Plaintiffs had an opportunity to analyze the newly preserved data, so that it could be compared with other types of output logs that have been preserved. Dkt. 91-2 at 6:2-12.

OpenAI filed the instant Objection, arguing that the Preservation Order is "contrary to law" because preserving large portions of its output log data is too "burdensome" for a technology company that specializes in handling vast quantities of data.[3] OpenAI claims that this burden will also fall on its users, whose privacy will somehow be invaded despite the fact that no data is leaving OpenAI and whose expectations will be upended despite OpenAI's own privacy policy explaining retention of output log data is "subject to" any legal requirements to retain such data. OpenAI's preferred course of action to "protect its users' data and privacy"—

---

[1] The "News Plaintiffs" referenced in this memorandum include The New York Times Company ("The Times"), Daily News, LP, et al. ("*Daily News* Plaintiffs"), and The Center for Investigative Reporting ("CIR").

[2] *See* Dkt. 72 (*Times* Second Amended Compl.) at ¶¶ 8, 98, 102, 170-71; *See* Case No.24-cv-03285 ("*Daily News*") Dkt. 1 (*Daily News* Compl.) at ¶¶ 96, 114, 142, 164, 196.

[3] Earlier this year OpenAI announced that it intends to deploy $500 billion over the next four years to build new AI infrastructure. *See* Ex. A (OpenAI Blog Post titled "Announcing The Stargate Project").

immediately resuming mass deletions—will also, coincidentally, allow it to continue to destroy data that would show its liability for copyright infringement.

The premise of OpenAI's Objection is that News Plaintiffs bear the burden of submitting evidence to show that OpenAI must abide by the same discovery obligations as every other litigant. Accepting its arguments would distort civil procedure and task plaintiffs with the obligation to submit evidence simply to be able to participate in discovery. That is not the law. As this Court ruled, News Plaintiffs properly brought output-based copyright infringement claims by invoking "widely publicized instances of copyright infringement after ChatGPT, Browse with Bing, and Bing Chat were released" and "numerous examples of infringing outputs" that "raise a reasonable expectation that discovery will reveal evidence of additional examples of third-party infringement." *Times* Dkt. 514 at 15 (internal citations and quotations omitted). OpenAI's internal documents have bolstered that expectation, showing that OpenAI's products plagiarize and regurgitate copyrighted content and are able to circumvent News Plaintiffs' paywalls. *See* Section II.B, *infra*. But the "direct evidence of infringement, such as user logs or other technical data showing the downloading of copyrighted and unauthorized files," critical to a copyright infringement case is solely within OpenAI's possession—or it was, until OpenAI deleted large portions of it. *Arista Recs., Inc. v. Mp3Board, Inc.*, No. 00-cv-4660, 2002 WL 1997918, at *3 (S.D.N.Y. Aug. 29, 2002) (Stein, J.).

OpenAI does not dispute that it has ***already*** destroyed many of its user logs that would otherwise provide primary evidence for News Plaintiffs' output-based claims. That deleted evidence would also belie OpenAI's assertions that "real world" users do not use their products in an infringing way, "regurgitations" are a "rare bug," (*see* Dkt. 152-11 at 2), and "ChatGPT is not in any way a substitute for a subscription to The New York Times" (*Times* Dkt. 52 at 1). The

amount of this deleted evidence is massive: OpenAI admitted that it destroyed ▮▮▮▮▮▮▮

user conversations for ChatGPT Consumer[4] and virtually **all** of the output log data for its

application programming interface ("API") and Enterprise ChatGPT products. [5] Nor does

OpenAI dispute that, absent Judge Wang's May 13, 2025 order (Dkt. 33) (the "Preservation

Order"), it will continue to do so.

Despite OpenAI's public protestation that it was forced "to retain all user content

indefinitely going forward,"[6] the Preservation Order does no such thing. Instead, Judge Wang

made clear that the Preservation Order is narrow and will be limited in both time and scope to

avoid an undue burden on OpenAI, while at the same time ensuring relevant data is preserved so

that it can be analyzed. *See* Dkt. 91-2 at 6:9-12. The Preservation Order does not require OpenAI

to turn over anything to News Plaintiffs. Instead, as Judge Wang made clear when addressing

those who "might feel that their privacy interests are not being sufficiently protected" by the

order, "this preservation order is also not forever and it's not being provided wholesale to

anybody. It is merely segregation, preservation right now to see how we address the concerns

that have been raised."[7] Dkt. 91-2 at 4:9-12.

---

[4] OpenAI only provided this information after Magistrate Judge Wang ordered it to do so. *See Times* Dkt. 484.

[5] Following the May 27, 2025 Output Log Data Conference, Magistrate Judge Wang modified the Preservation Order on May 29, 2025, to exclude ChatGPT Enterprise output log data, based on OpenAI's representation that it did not have the data. Dkt. 79.

[6] Ex. B (OpenAI Blog Post titled "How we're responding to The New York Times' data demands in order to protect user privacy") at 3.

[7] OpenAI does not appear to have passed on these reassurances to its customers despite Magistrate Judge Wang's encouragement that it do so. *See* Dkt. 91-2 at 3:18-4:12; Ex. B. Instead, it engaged in fearmongering by issuing a statement from Sam Altman and a blog post criticizing The Times's "inappropriate request" for preservation on the basis that it would "compromise our users' privacy" in violation of a "core principle." *See id.*; Ex. C (June 5 post on X by Sam Altman) (citing blog post and claiming there should be an "AI privilege" because "talking to an AI should be like talking to a lawyer or a doctor").

In response, OpenAI argues that the Preservation Order is improper because the preferences and "privacy rights" of OpenAI's users should outweigh the right of News Plaintiffs to gather evidence for their claims. Dkt. 92 ("Mem.") at 1. Yet OpenAI fails to identify a single privacy law or regulation that bars compliance with the Preservation Order. Nor does OpenAI's privacy policy require this result—instead, it expressly advises customers that its retention of output log data is "subject to" any legal requirements to retain such data. And OpenAI ignores that News Plaintiffs have consented to the implementation of appropriate measures to protect the privacy of OpenAI's end users, including anonymizing account names and personally identifiable information.

OpenAI's technological concerns for compliance with the Preservation Order also appear to be overstated. OpenAI has admitted it is already retaining "tens of billions of ChatGPT conversations" in the ordinary course of business. Mem. at 7. And OpenAI's declarant, Vincent Monaco, fails to specify what "significant changes to OpenAI's data infrastructure" are required for compliance and why those changes "disrupt and threaten the ongoing functionality of [its] infrastructure." See Dkt. 64-4 (Monaco Decl.) at ¶ 8. This failure is particularly noteworthy given that OpenAI is a technology company that has seemingly limitless resources and a well-established history of working with large volumes of data.

Finally, OpenAI's Rule 72 objection should be rejected as unnecessary because the parties are still working under Magistrate Judge Wang's guidance to establish a methodology for analyzing the data that OpenAI has been ordered to segregate and preserve. Specifically, they are submitting proposals for sampling the newly retained ChatGPT Consumer output log data and evaluating the use of classifiers or other metadata to analyze the API output log data. News Plaintiffs should be afforded the opportunity—and should have been afforded the opportunity all

along—to analyze the different populations of ChatGPT Consumer and API output log data subject to the Preservation Order before OpenAI destroys them.

***

While the Preservation Order is a proper and necessary step to ensuring the availability of evidence on a prospective basis, this motion does not address the bigger issue: OpenAI's decision to delete, on over 17 different separate occasions, enormous volumes of important evidence, despite well understanding that outputs are a central part of the News Cases. Dkt. 44 at 1. News Plaintiffs are prejudiced by the unavailability of significant tranches of historical evidence, which prevents them from accessing direct evidence that tells the whole story about the way their content appears in the output of OpenAI products. This prejudice is exacerbated by the fact that after News Plaintiffs filed this litigation, OpenAI has implemented Plaintiff-specific "blocks" and "filters" specifically designed to make it harder to elicit output containing or referencing News Plaintiffs' copyrighted works. And, as described above, News Plaintiffs have been denied the ability to collect evidence to refute OpenAI's assertions that people do not turn to ChatGPT to obtain news for free instead of going directly to News Plaintiffs' websites and apps. Given the significant prejudice resulting from OpenAI's failure to abide by its duty to preserve relevant evidence, News Plaintiffs reserve the right to seek relief pursuant to Fed. R. Civ. P. 37(e) after obtaining further discovery into these issues.

## II.    FACTUAL BACKGROUND

### A.    The Importance of OpenAI's Output Log Data to the News Cases

OpenAI's output log data is highly relevant to the issues in the News cases. As this Court correctly recognized, News Plaintiffs allege several theories of liability pertaining to the outputs of Defendants' products, including: (1) regurgitations of News Plaintiffs' works, (2)

5

"hallucinations . . . that misattribute content to plaintiffs that they did not in fact publish," and (3) retrieval augmented generation ("RAG") responses that include "paraphrases and direct quotes of plaintiffs' works, without referring users to plaintiffs' websites in the same manner as do regular internet search engines, thereby obviating the need for users to visit plaintiffs' websites." *Times* Dkt. 514 at 8-9. For the DMCA claim, this Court held that News Plaintiffs plausibly alleged OpenAI's knowledge, or reason to know, that removing CMI would induce or conceal infringement because the models are "capable of distributing unlicensed copies of copyrighted works." *Times* Dkt. 514 at 27.

To prevail on these claims, News Plaintiffs seek access to OpenAI's output log data to show, *inter alia*, the output logs contain (i) infringing copies of News Plaintiffs' copyrighted works, (ii) responses that are based on and are substitutive of such copyrighted works, (iii) hallucinated content that dilutes the News Plaintiffs' famous trademarks, and (iv) OpenAI knew, or had reason to know, that removing CMI would facilitate unlicensed outputs of News Plaintiffs' content. Even OpenAI has admitted that ChatGPT outputs are "potentially infringing" and that "displaying long excerpts from a work" "would exceed fair use." *See* Dkt. 43-3 at 10; Ex. D (OpenAI email re: Summary of Ex Parte Meeting Regarding Copyright Office Artificial Intelligence Study) at 2-3. Each instance of output-based infringement is also material to News Plaintiffs' claims with respect to an award of statutory damages, which are assessed on a per-work basis. *See Arista Recs. LLC v. Lime Grp. LLC*, 784 F. Supp. 2d 313, 316 (S.D.N.Y. 2011) ("For any individually liable infringer, a plaintiff is entitled to one statutory damage award per work").

Defendants' output log data is also particularly germane to the fair use analysis, including the first factor (transformative use) and fourth factor (effect on the potential market).

Specifically, under the first fair use factor, News Plaintiffs intend to show that Defendants' use of News Plaintiffs' copyrighted material is not transformative and their products offer a substitute for News Plaintiffs' copyrighted articles, and rebut OpenAI's arguments that memorization is "rare" and its products do not evade paywalls. *See* Dkt. 152-11 at 2; *see also* Dkt. 43-4 (U.S. Copyright Office Report) at 47 ("The use of RAG is less likely to be transformative where the purpose is to generate outputs that summarize or provide abridged versions of retrieved copyrighted works, such as news articles, as opposed to hyperlinks."), 65, 73. Under the fourth fair use factor, News Plaintiffs intend to show that the speed and scale at which Defendants' products generate news (or news-like) content poses a serious risk of diluting the markets for News Plaintiffs' copyrighted works. Dkt. 43-5 at 10 (Chhabria, J.: "If, you know, an AI company is downloading and copying news articles, copyrighted news articles, without permission, [en masse], that it seems very likely to lead to the creation of a product that will have the capability of and likely will produce an infinite amount of content that will diminish demand for the copyrighted works that were used to feed the model – [] it's not inconceivable to imagine that the market for the copyrighted works that were fed into the model could be eliminated entirely."); Dkt. 43-4 at 65 ("The speed and scale at which AI systems generate content pose a serious risk of diluting markets for works of the same kind as in their training data.").

**B.    The Output Log Data Implicated by the Preservation Order is Likely to Lead to Direct Evidence of Infringement**

The Preservation Order ensures the continuing existence of direct evidence of output-based infringement from two of OpenAI's services: OpenAI's ChatGPT Free, Plus, and Pro chatbot marketed for individual consumers ("ChatGPT Consumer") and the API Platform that provides access to OpenAI's large language models (the "API"). *See* Mem. at 5-6. OpenAI's assertion that "News Plaintiffs have [not] put forward a shred of evidence that real-world users

deploy ChatGPT or OpenAI's API to read their news articles instead of paying for news subscriptions" (Mem. at 8) is simply not correct. This Court has already found News Plaintiffs' allegations credible in this regard (*Times* Dkt. 514), meaning that it is now Defendants' responsibility to preserve and disclose any relevant evidence in their possession. *See Arista Recs LLC v. Usenet.com, Inc.*, 608 F. Supp. 2d 409, 444 n. 36 (S.D.N.Y. 2009) ("Courts have recognized the relevance of user log data and infringing digital files in copyright infringement actions, and they have ordered litigants to preserve and produce such data."); *id.* at 431 ("[O]nce Defendants had actual notice that Plaintiffs were requesting the data, Defendants had the obligation to preserve it, if possible, or to at least negotiate in good faith what data they could produce."). OpenAI has access to its users' outputs; News Plaintiffs do not. But even if News Plaintiffs were required to present evidence to show their right to conduct discovery of an undisputedly relevant source, as described below, they easily meet that bar based on the documents produced to date by Defendants.

> 1. ChatGPT Consumer Infringement

In addition to providing natural language AI-generated answers, ChatGPT Consumer includes a suite of features that allow users to search the web and ground OpenAI's LLMs with current copyrighted news content (including "Browse with Bing," "Browse," and "SearchGPT")[8] or to create Custom GPTs ("GPTs") specifically designed to bypass paywalls (such as "Remove Paywall" or "News Summarizer").[9] This Court has ruled that News Plaintiffs may proceed to discovery on these allegations. *Times* Dkt. 514 at 15.

---

[8] *See* Dkt. 72 (*Times* Second Amended Compl.) at ¶ 108; *Daily News* Dkt. 1 (*Daily News* Compl.) at ¶ 114.

[9] *See, e.g., Daily News* Dkt. 1 (*Daily News* Compl.) at ¶ 147 (describing a "Remove Paywall" GPT designed to "retrieve webpages from RemovePaywall.com and provide the text content to bypass paywalls legally" and a "News Summarizer" GPT that encourages users to "save on subscription costs" and "skip paywalls just using the link text or URL").

OpenAI's internal documents confirm that OpenAI's customers use ChatGPT Consumer in ways that infringe copyright. For example, OpenAI compiled a dataset comprising user conversations where the user ██████████████████████████████████████████████ ████████████████████.[10] In fact, OpenAI designed an evaluation solely to assess ████████ ████████████████████████████████████. In one Slack conversation, two OpenAI employees referred to a list maintained by OpenAI that ████████████████████████████ ████████████████████████████████.[12] One user ████████████████████████████████ ██████████████████████████████████████████████████████████████████████████ ██████████████████████████████████"[13] OpenAI's documents also reflect that OpenAI itself knew that ChatGPT could "████████████████████████ and specifically ██████████████ ██████████"[14]

It is also reasonable to suspect (as Magistrate Judge Wang did on January 22, 2025)[15] that users who were employing ChatGPT to evade publishers' paywalls were also more likely to ask OpenAI to delete their output log data or to use the "temporary chat" feature. Experience with the mass infringement stemming from file sharing peer-to-peer systems from past decades teaches that anonymity and user log deletion create a safe haven for piracy. *See* Ex. E (*Napster*

---

[10] *See* Ex. F (OPCO_NEWS_0773577).

[11] *See* Ex. G (OPCO_NEWS_0904706).

[12] *See* Ex. H (OPCO_NEWS_0999054).

[13] *See id.*

[14] *See* Dkt. 43-9 (OPCO_NEWS_0841405 at -410).

[15] "[H]ypothetically, say, a ChatGPT user who had been using, found some way to get around the pay wall, right, and was getting The New York Times content somehow as the output, found a way to do it. And then hears about this case and says, Oh, woah, you know, I'm going to ask them to delete all of my searches and not retain any of my searches going forward." Dkt. 43-2 at 38:14-20.

Compl.) at ¶ 1 ("Indeed, in an effort to ensure its users a safe haven for piracy, Napster promises

and delivers user anonymity, and even boasts that it does not maintain logs of activity or other

information that could be subpoenaed to reveal the identities of its users."). Even OpenAI

acknowledges that "**users feel more free to use ChatGPT when they know** that they are in

control of their personal information, including **which conversations are retained and which

are not**." Mem. at 5 (emphasis added). Indeed, it makes sense that these users would ask OpenAI

to delete their conversations, given OpenAI's position in this case that end users are solely liable

for infringement. *See* Dkt. 50 at 43 (OpenAI's Twenty-Fifth Affirmative Defense disclaiming

liability for infringing News Plaintiffs' copyrights on the ground that "any reproduction,

distribution, or display of any allegedly infringing outputs […] were caused by the acts or

omissions of other persons or entities for whose conduct OpenAI is not legally responsible.").

These facts support a strong inference that the ███████ ChatGPT Consumer

conversations that OpenAI has already destroyed, and the additional ChatGPT Consumer

conversations that OpenAI would have destroyed but for the Preservation Order, are more likely

to contain direct evidence of output infringement.

2. API Platform Infringement

The API Platform allows end users and developers to access OpenAI's large language

models directly to create generative AI output at scale. OpenAI contends that the API logs "have

no conceivable relevance to" News Plaintiffs' claims. Mem. at 14. Not so. News Plaintiffs have

alleged that OpenAI's models "memorized" News Plaintiffs' copyrighted content ingested

during the training process and are able to "regurgitate" that content in generative AI output.

Indeed, the scores of examples of infringing regurgitations in Exhibit J to The Times's and the

*Daily News* Plaintiffs' complaints were created at scale using OpenAI's API Platform to access the GPT-4 model. *See Times* Dkt. 202-1; *Daily News* Dkt. 1-10.

OpenAI's documents further confirm that "█████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████████

████████████████████"[16] Those documents further state that OpenAI's customers were

████████████████████████████████████████████████████████████████████████████[17]

even when ████████████████████████████████[18] When one OpenAI employee asked

whether a ████████████████████████████████████████████████████████████

████████████████████████████████████████████████[19] Indeed, prior to the release of

November 2022 release of ChatGPT, Nick Turley (Head of Products for ChatGPT at OpenAI)

recognized that ██████████████████████████████████████████████████████████

████████████████████████████████████████████

---

[16] *See, e.g.,* Dkt. 43-10 (OPCO_NEWS_0776108)████████████████████████████████████████
████████████████████████████████████████████████████████████ Dkt. 43-11
(OPCO_NEWS_00778701 at -702) (███████████████████████████████████████████
Dkt. 43-12 (OPCO_NEWS_0774042 ████████████████████████████████████████████████
████████████████ Dkt. 43-14 (OPCO_NEWS_0838839)████████████████████████████████
███████████████████████████████████████████ Dkt. 43-16 (OPCO_NEWS_0840898)
████████████████████████████ Dkt. 43-17 (OPCO_NEWS_0820868 at -867)███████████
███████████████████ Ex. R (OPCO_NEWS_1042221)████████████████████████████████

[17] Dkt. 43-13 (OPCO_NEWS_0813199 at -201)█████████████████████████████████████████
██████████████████████████████████████████

[18] Dkt. 43-15 (OPCO_NEWS_0998879 at -890)█████████████████████████████████████████
███████████████-820█████████████████████████████████████████████████-883████████

[19] *See* Ex. I (OPCO_NEWS_1003380).

[20] Playground is a web-based tool that allows users to interact with OpenAI's API. *See* OpenAI, *OpenAI Platform,* OPENAI, https://platform.openai.com/playground/prompts.

███████████████████████[21] During this time, another OpenAI employee stated that ████████

████████████████████████████████████████████████████[22]

OpenAI's Memorandum also ignores unsavory uses of the API Platform at scale, including downstream "pink-slime" organizations that flood the market with low-quality AI-generated news content. *See* Dkt. 91-2 at 7:13-23, 12:19-20; Dkt. 64-2 at 2. OpenAI knew about this risk, and has written extensively about the potential malicious uses of their LLMs to generate or rewrite news articles in a slanted way as part of disinformation or misinformation campaigns. *See, e.g.*, Ex. L (January 2023 Paper Titled "Generative Language Models and Automated Influence Operations: Emerging Threats and Potential Mitigations," co-authored by OpenAI) at 8; Ex. M (July 2020 OpenAI paper titled Language Models are Few-Shot Learners) at 5 ("GPT-3 can generate synthetic news articles which human evaluators have difficulty distinguishing from human-generated articles."); Ex. N (GPT-4 Technical Report) at 50 ("GPT-4 can generate plausibly realistic and targeted content, including news articles, tweets, dialogue, and emails."). Indeed, in an April 2023 Slack Conversation, an OpenAI employee ███████████████ ████████████████████████████.[23]

Thus, while OpenAI downplays the significance of the API, stating that it "operates in the background," Mem. at 5, the API output log data likely contains substantial direct evidence of infringement and of the way OpenAI's model provides substitutive news content. But the only API output log data OpenAI appears to have preserved prior to the Preservation Order

---

[21] *See* Ex. J (OPCO_NEWS_0765633).

[22] *See* Ex. K (OPCO_NEWS_0788778) ████████████████████████████████████
████████████████████████████████████████████████████████

[23] *See* Ex. O (OPCO_NEWS_0822236 at -237-39).

corresponds to a handful of user accounts that OpenAI believes were involved in generating the outputs cited in the complaints (that is, output log data that OpenAI thought would be helpful to its case).

These facts support a strong inference that the API output log data that OpenAI destroyed, and the additional API output log data that OpenAI would have destroyed but for the Preservation Order, are likely to contain direct evidence of output infringement. All the Preservation Order does is give News Plaintiffs an opportunity to find and secure such evidence before it is irretrievably lost.

### C.    OpenAI Deletes its Output Log Data Over News Plaintiffs' Objection

OpenAI should have taken reasonable steps to preserve relevant output log data no later than December 27, 2023, the filing and service date of The Times's Original Complaint. In fact, OpenAI's obligation to preserve relevant output log data arose as early as April 2023, when The Times first reached out to OpenAI "to raise intellectual property concerns" about OpenAI's use of Times content (*Times* Dkt. 1 at ¶ 54), because at that point OpenAI "should have known that the evidence may be relevant to future litigation." *Fujitsu Ltd. v. Federal Exp. Corp.*, 247 F.3d 423, 436 (2d Cir. 2001).

With respect to OpenAI's argument that it had first informed The Times that it was not retaining certain output data on February 29, 2024 rather than on November 15, 2024, that issue was discussed in detail at the January 22, 2025 hearing. *See* Dkt. 43-2 at 46:19-49:10. OpenAI informed The Times on February 29, 2024, that it "has taken and will continue to take reasonable measures to preserve all potentially relevant evidence from within the relevant time period" but that it was "not feasible to place all ChatGPT inputs and outputs on indefinite retention." (*Times* Dkt. 379-3). The Times wrote back to OpenAI on March 5, 2024, advising OpenAI that The

13

Times expected OpenAI to comply with its preservation obligations. (*Times* Dkt. 379-4). The Times assumed that OpenAI would do so, and it was not until OpenAI's November 15, 2024 letter that News Plaintiffs learned for the first time that "OpenAI does not consider retaining user conversations in a manner different from its general practices to be required by the Federal Rules of Civil Procedure." (*Times* Dkt. 379-13). Then, at the January 29, 2025 deposition of OpenAI's custodial 30(b)(6) witness, that witness admitted that although ████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████ Dkt. 43-7 at 104:6-11.

### D.    Magistrate Judge Wang Requires OpenAI to Preserve its Output Log Data

In response to OpenAI's November 15, 2024 letter, News Plaintiffs asked OpenAI to confirm that it "will hereafter preserve ChatGPT user conversations **containing any of the News Plaintiffs' content**." *See Times* Dkt. 379-13 (emphasis added). When OpenAI refused, and News Plaintiffs presented the output log data preservation issue to Magistrate Judge Wang, she directed the parties "to meet and confer regarding the privacy and technological considerations implicated in Plaintiffs' request" for preservation of the output log data. *See Times* Dkt. 441. News Plaintiffs proffered several targeted preservation proposals for OpenAI to consider, including running searches over the output log data slated for deletion using OpenAI's existing tools to identify News Plaintiffs' content. *See Times* Dkt. 483-1. The parties, however, could not reach agreement because OpenAI refused to deviate at all from its routine data destruction practices. Moreover, OpenAI refused to identify the volume of output log data it had already destroyed, notwithstanding several rounds of letter correspondence, two motions to compel, and a 30(b)(6)

14

custodial deposition during which OpenAI's witness could not even estimate the approximate volume of destroyed output log data. *See* Dkt. 43-7 at 106:8-14.

OpenAI persisted in refusing to identify the volume of output log it had deleted until, on March 26, 2025, Magistrate Judge Wang ordered OpenAI to do so by March 31, 2025. *Times* Dkt. 484. OpenAI's March 31, 2025 letter (the response compelled by Magistrate Judge Wang's March 26, 2025 Order) admitted that OpenAI had destroyed over ███████ ChatGPT Consumer "conversations," and stated that OpenAI could not provide an accounting of the API output log data it had destroyed. News Plaintiffs subsequently filed a letter with this Court seeking permission to present this information to Judge Wang while discovery was stayed pending organization of the multidistrict litigation actions, which this Court granted. Dkt. 76.[24] Magistrate Judge Wang then promptly issued the Preservation Order.

After hearing argument from the parties on May 27, 2025 regarding the Preservation Order, Magistrate Judge Wang ordered OpenAI to do what News Plaintiffs had been proposing all along: to preserve the output log data slated for deletion and search it for responsive and relevant information. Dkt. 79. Both OpenAI and News Plaintiffs recently submitted competing search and sampling proposals for ChatGPT Consumer output log data to Magistrate Judge Wang. Dkt. 104 (OpenAI's proposal) and Dkt. 169 (News Plaintiffs' proposal). Moreover, following Magistrate Judge Wang's guidance regarding the API output log data at the May 27 hearing, News Plaintiffs reached out to OpenAI on June 3 to explore using classifiers or other metadata fields to track API usage and identify relevant API output log data in a way that would

---

[24] On April 11, 2025, OpenAI produced for the first time three terabytes of information about the output log data it had preserved for ChatGPT Consumer. News Plaintiffs needed this information to formulate an output log data sampling proposal and to assess the impact of OpenAI's destruction practices of that data. On May 9, 2025, News Plaintiffs filed a letter to this Court that included a comparison of the volume of deleted and retained ChatGPT Consumer data over time. Dkt. 76.

address OpenAI's concerns about user privacy. Dkt. 173-1. OpenAI has not substantively responded to that request.

News Plaintiffs also shared a proposal with OpenAI for sampling all of the preserved historical ChatGPT Consumer data on May 20, and have been waiting four weeks for OpenAI's response. Dkt. 64-2.

## III.    LEGAL STANDARDS

Federal Rule of Civil Procedure 72(a) provides that a district judge must "modify or set aside any part" of a magistrate judge's non-dispositive pretrial order "that is clearly erroneous or is contrary to law." Fed. R. Civ. P. 72(a). "A decision is 'clearly erroneous' when the reviewing [c]ourt is left with the definite and firm conviction that a mistake has been committed." *Smith v. City of New York*, 754 F. Supp. 3d 581, 583 (S.D.N.Y. 2024) (citation omitted); *see also Fashion Exch. LLC v. Hybrid Promotions, LLC*, No. 14-cv-1254, 2021 WL 1172265, at *1 (S.D.N.Y. Mar. 29, 2021) (Stein, J.). "Similarly, a finding is contrary to law 'when it fails to apply or misapplies relevant statutes, case law, or rules of procedure.'" *R.F.M.A.S., Inc. v. So et al.,* 748 F. Supp. 2d 244, 248 (S.D.N.Y. 2010) (citation omitted). "[P]ursuant to these standards, a magistrate judge's determinations on discovery matters are entitled to substantial deference." *Id.*

## IV.    ARGUMENT

OpenAI argues that Magistrate Judge Wang's instruction to stop deleting relevant ChatGPT and API output log data is "contrary to law" because (i) OpenAI retains a lot of other output data from ChatGPT users; (ii) saving additional output data is a "massive burden" that outweighs the benefit of preservation; and (iii) it dislikes the way its deletion practices were (accurately) depicted in a letter News Plaintiffs sent to Magistrate Judge Wang. Mem. at 12. What it does not dispute is that the output log data is relevant to the News Cases, which as

OpenAI has long recognized, include infringement claims based on outputs generated by Defendants' models and products. *See Times* Dkt. 72 at ¶ 41. Nor can it dispute that, as a highly sophisticated technology company that is currently valued at more than $300 billion[25], it has both the means and ability to preserve this concededly relevant data. Under these circumstances and as explained more fully below, Magistrate Judge Wang's careful order requiring OpenAI to preserve relevant data for a limited period of time is not "contrary to law" or "clearly erroneous" and should be affirmed.

### A. The Preserved Output Log Data is Likely to Contain Direct Evidence of Copyright Infringement

OpenAI does not challenge Magistrate Judge Wang's finding that the "relevance of ChatGPT output log data as a whole is not in dispute." Dkt. 42 at 3. Nor could it. OpenAI's API and ChatGPT Consumer output log data is the primary source of direct evidence of OpenAI's copyright infringement**.** Continued preservation of the remaining API output log data subject under the Preservation Order is critically important because **OpenAI has already destroyed virtually all of the historical API output log data**. Preservation of the ChatGPT Consumer output log data that is ordinarily slated for deletion is critical too because of the increased likelihood that individuals using ChatGPT Consumer to evade paywalls or to elicit News Plaintiffs' copyrighted works will likely seek erasure of their unlawful activities.

In another case—albeit one in which the defendant had not destroyed the direct evidence—this Court has instructed that if the plaintiffs wish to prevail on their motion for summary judgment of infringement, the plaintiffs needed to set forth "direct evidence of infringement, **such as user logs or other technical data showing the downloading of**

---

[25] *See* Ex. P (OpenAI Blog Post titled "New funding to build towards AGI").

**copyrighted and unauthorized files**," and "cannot rely solely upon circumstantial evidence and admissions by [defendant's] officers that it is statistically 'likely' that direct infringement occurred." *Arista Recs., Inc. v. Mp3Board, Inc.*, 2002 WL 1997918, at *3 (emphasis added); *see also Int'l Swaps & Derivatives Ass'n, Inc. v. Socratek, L.L.C.*, 712 F. Supp. 96, 102 (S.D.N.Y. 2010) (Stein, J.) ("Unauthorized copying is demonstrated by (1) actual copying of the item and (2) that the copy was "substantially similar" to the original copyrighted work."). Continued preservation of the ChatGPT Consumer and API output log data moving forward will ensure that at least this key evidence remains available for use in the litigation, including for summary judgment.

Magistrate Judge Wang correctly rejected OpenAI's "implicit" argument "that there is no material difference between the pool of output log data that is being deleted and the pool of output log data that is being retained." Dkt. 42 at 3. OpenAI argues that ongoing preservation will not serve a useful purpose based on the false assertion that News Plaintiffs have not put forward "**a shred of evidence** that real-world users deploy ChatGPT or OpenAI's API to read their news articles instead of paying for news subscriptions." Mem. at 8 (emphasis added). But the Preservation Order is designed to give News Plaintiffs the ability to uncover just that evidence, rather than allowing OpenAI to continue deleting it—which is precisely how discovery should work after a plaintiff makes a well-pleaded claim of infringement. And in any event, the record is replete with evidence strongly suggesting that the newly preserved output data will show infringement of News Plaintiffs' copyrighted works, including circumvention of News Plaintiffs' paywalls. *See* Section II.B, *supra*. In fact, OpenAI's declarant, Vincent Monaco, only goes so far to state that "ChatGPT *is not designed to* circumvent paywalls." *See* Dkt. 64-4 (Monaco Decl.) at ¶ 9 (emphasis added). He doesn't say that it can't. And presumably that is

because it can and it does. *See* Dkt. 43-9 (OPCO_NEWS_0841405 at -410) (confirming that

ChatGPT can ██████████████████████

    Nor do News Plaintiffs "implicitly concede that at least 99.994%" of the output log data

does not "implicate their claims at all." Mem. at 13 (cleaned up). News Plaintiffs do not know

what fraction of OpenAI's output log data is infringing because OpenAI has not shared that

information. But News Plaintiffs believe that fraction is substantial, particularly in view of the

testimony of Nick Turley, Head of Product for ChatGPT, that "**local news**" is a "**pretty common**

**quer[y]**" in ChatGPT during the damages trial in *United States v. Google,* Case No. 20-cv-3010

(D.D.C. Apr. 22, 2025). *See* Dkt. 163-2 at 396:4-397:7 (emphasis added). The 0.006% rate

instead comes from what similarly situated *defendant*, Anthropic, proffered to the music

publisher plaintiffs as an "assumed prevalence rate" for prompts and outputs relating to song

lyrics. *See* Ex. Q (Joint Discovery Submissions Regarding Dispute as to Sampling Protocol,

*Concord Music Group, Inc. et al. v. Anthropic PBC*, No. 24-cv-038110 (N.D. Cal. Apr. 30,

2025)). News Plaintiffs proposed using that same prevalence rate to OpenAI <u>as a benchmark to</u>

<u>calculate sufficient sample sizes</u> for the historical ChatGPT Consumer output log data that

OpenAI maintained in the ordinary course—not as any sort of statement as to what percentage of

ChatGPT queries relate to news. Dkt. 64-2 (May 20, 2025 Sampling Proposal).

    In sum, the output log data OpenAI has been ordered to preserve likely contains highly

relevant information. OpenAI's "solution" that News Plaintiffs be permitted to sample only the

historical population of Consumer ChatGPT output log data—which is likely statistically skewed

in OpenAI's favor due to OpenAI's deletion practices—and have no opportunity to search any

API output log data, is simply not appropriate. Before this Court (or Magistrate Judge Wang)

considers vacatur of the Preservation Order, the parties should be afforded the opportunity to

analyze the different populations of ChatGPT Consumer and API output log data subject to the Preservation Order and present those findings to the Court under Magistrate Judge Wang's guidance and supervision.

### B.    The Preservation Order is Proportional to the Needs of the Case

The Preservation Order is proportional to the needs of the case in view of the unacceptable volume of highly relevant historical output log data that OpenAI has already destroyed and the fact that the Preservation Order is "not forever." Dkt. 91-2 at 4:9-10. Magistrate Judge Wang thoughtfully weighed OpenAI's arguments regarding its technological and privacy burdens prior to issuing her order, and again when modifying the order. Judge Wang first heard extensive argument on these issues at the January 22, 2025 discovery conference, after which she denied News Plaintiffs' initial motion without prejudice and ordered the parties to "meet and confer regarding the privacy and technological considerations implicated in Plaintiffs' request." *Times* Dkt. 441. The parties submitted over half a dozen related filings leading up to the May 27, 2025 discovery conference on these issues, and at that conference Magistrate Judge Wang was careful to reassure the public "who might feel that their privacy interests are not being sufficiently protected, that this preservation order is also not forever and [the data is] not being provided wholesale to anybody." Dkt. 91-2 at 4. Magistrate Judge Wang further excluded ChatGPT Enterprise output log data based on OpenAI's representation that it did not have the data. Dkt. 79.

The scope of the Preservation Order—which includes output log data for ChatGPT Consumer and API, but excludes ChatGPT Enterprise—is appropriately tailored to the needs of the case, particularly in view of OpenAI's staunch refusal to deviate in any respect from its standard destruction practices to preserve evidence helpful for the News cases. In response to

OpenAI's November 15 letter, News Plaintiffs asked OpenAI to confirm that it "will hereafter preserve ChatGPT user conversations **containing any of the News Plaintiffs' content**." (*Times* Dkt. 379-13) (emphasis added). It refused, requiring News Plaintiffs to first raise the matter with Judge Wang on January 13, 2025. *Times* Dkt. 379.  Magistrate Judge Wang initially ordered the parties to continue to meet and confer to evaluate the technological and privacy burdens associated with preserving relevant evidence. (*Times* Dkt. 441). As part of that process, News Plaintiffs proffered several targeted preservation proposals for OpenAI to consider, including running searches over the output log data slated for deletion using OpenAI's existing tools to identify News Plaintiffs' content. (Dkt. 483-1). OpenAI refused each proposal while offering nothing in return, resulting in months of failed meet and confer efforts. *See Al Otro Lado, Inc. v. Nielsen*, 328 F.R.D. 408, 420 (S.D. Cal. 2018) ("These are the kinds of line-drawing efforts the Court expected defendants to address in order to find a reasonable preservation solution. Defendants failed, without any satisfactory explanation, to provide this information, or otherwise engage in meaningful meet and confer efforts on this issue as required by this Court.").

OpenAI's technological and privacy-related burden arguments are not well substantiated. OpenAI has failed to give specifics regarding the purported technological hurdles and user privacy concerns for compliance with the Preservation Order. For example, Mr. Monaco sets forth in an entirely conclusory fashion—and in a single paragraph—an estimate of "up to ███ ███ dedicated engineering time" and "additional costs ████████████████████ to preserve relevant output log data, but fails to provide any specificity as to what "significant changes to OpenAI's data infrastructure" are required and why those changes "disrupt and threaten the ongoing functionality of that infrastructure." *See* Dkt. 64-4 (Monaco Decl.) at ¶ 8. The volume of data does not appear to be an issue because OpenAI has already confirmed that it

retains "tens of billions of ChatGPT conversations" in the ordinary course of business (and of course, OpenAI has substantial experience dealing with vast quantities of data that it scraped from both the News Plaintiffs and others). Mem. at 7. Moreover, Mr. Monaco's time and cost estimates are belied by his testimony a few paragraphs down that OpenAI's engineers ███

████████████████████████████████████████████████████

██████████████████████████████████████████████ *See* Dkt. 64-4 (Monaco Decl.) at ¶¶ 11, 13.[26]

The declaration of Idriss Kechida, OpenAI's Global Data Protection Officer, regarding OpenAI's privacy concerns is similarly vague. Dkt. 67. Ms. Kechida asserts that a "requirement to preserve user data regardless of OpenAI's policies and agreements . . . would implicate the laws and regulations of the 160+ countries where users reside." Dkt. 67 at ¶ 4. But Ms. Kechida does not go so far as to say that any law and regulation of these 160+ countries bars compliance with the Preservation Order. *United States v. Eaton Corp.*, No. 23-cv-00037, 2024 WL 553965, at *6 (N.D. Ohio Jan. 4, 2024) ("the party relying on foreign law has the burden of showing such law bars production") (quoting *AstraZeneca LP v. Breath Ltd.*, No. 06-cv-1512, 2011 WL 1421800, at *11 (D.N.J. Mar. 31, 2011)). And the handful of U.S. regulations that Ms. Kechida cites each contain exceptions for complying with legal obligations. *See* CCPA Section 1798.105(d)(8) (providing an exception to the right to delete where necessary to comply with a legal obligation); HIPAA Privacy Rule 45 CFR 164.412(e) (permitting disclosures of protected health information in the course of a judicial proceeding in response to a discovery request).

---

[26] Mr. Monaco also appears to inflate the cost and time estimate for OpenAI to run "n-grams" or "fuzzy searches" over "a large dataset of output logs like decompressed Conversation Data for specific content." *See* Dkt. 64-4 (Monaco Decl.) at ¶ 5. Despite having no prior familiarity with the data, News Plaintiffs were able to devise and run n-gram searches over OpenAI's large datasets of compressed training data in a tightly controlled inspection environment at a fraction of the cost and time estimate provided by Mr. Monaco.

OpenAI's own privacy policy specifically advises customers that its ***retention of output log data is "subject to" any legal requirements to retain such data***.[27] And even if it did not, courts routinely reject arguments that a privacy policy supersedes a party's obligation to preserve and produce information relevant to a litigation. *See Viacom Int'l Inc. v. Youtube Inc.*, 253 F.R.D. 256, 262 (S.D.N.Y. 2008) (rejecting arguments over "users' privacy concerns" and ordering defendant to produce user log data); *Columbia Pictures Indus. v. Bunnell*, No. 06-cv-1093, 2007 WL 2080419, at *8 (C.D. Cal. May 29, 2007) (rejecting privacy policy arguments and ordering party to retain and produce server logs); *Simmons v. Danhauer & Assocs., LLC*, No. 08-cv-3819, 2009 WL 10677391, at *2 (D.S.C. Sept. 15, 2009) (finding "no violation of the privacy policy could reasonably ensue" where privacy policy permits disclosure "when required by law").

Accordingly, the Preservation Order is proportional to the needs of the case.

### C.    OpenAI Has Not "Debunked" the Facts in News Plaintiffs' Letter to this Court

The Preservation Order was not premised on "*now-debunked accusations and material omissions*." Mem. at 12 (emphasis added). The Preservation Order expressly references News Plaintiffs' renewal of their request for OpenAI to preserve output log data (Dkt. 29) for the proposition that "the volume of <u>deleted</u> conversations is significant." Dkt. 33 at 2 (emphasis added). OpenAI does not contest this finding, let alone acknowledge the significant volume of deleted output log data in its Memorandum. Moreover, the additional evidence OpenAI has set

---

[27] *See,* OpenAI, *Privacy Policy,* OPENAI, https://openai.com/policies/row-privacy-policy/ ("How long we retain personal Data will depend on a number of factors, such as: . . . ***Any legal requirements that we are subject to***.") (emphasis added); OpenAI, *Enterprise privacy at OpenAI*, OPENAI, https://openai.com/enterprise-privacy/ ("Any deleted or unsaved conversations are removed from our systems within 30 days, ***unless we are legally required to retain them***.") (emphasis added); OpenAI, *Data Controls in the OpenAI platform,* OPENAI, https://platform.openai.com/docs/models/how-we-use-your-data ("API data may be retained for up to 30 days, after which it will be deleted (***unless otherwise required by law***)") (emphasis added).

forth in the record not only falls far short of "debunking" the facts in News Plaintiffs' letter, but raises additional concerns and questions.

*First*, OpenAI **confirmed** that it was  *See* Dkt. 39-1 at 2.

*Second*, Mr. Monaco asserts that "[b]ased on my investigation, there is no reason to believe that ████████] had anything whatsoever to do with the ongoing litigation." Dkt. 64-4 at ¶¶ 12, 14. But there is no dispute that OpenAI destroyed extraordinary volumes of output log data no less than 17 times (once each month) since the filing of The Times's lawsuit under its 30-day data destruction cycles. And on two additional occasions, which happen to coincide with the timing of the parties' preservation dispute, ████████████ ███████████████████████████████████████████████. Dkt. 64-4 at ¶ 11 █████████████████████████████"), ¶ 13 ██████████████████████████████████████ ██████").

*Third*, News Plaintiffs have consistently told OpenAI that it must comply with its preservation obligations for the output log data, and had initially assumed that OpenAI would comply with those obligations. *See* Section II.C, *supra*. And if it was too burdensome to preserve *all* output log data, OpenAI could have—and should have—been searching each 30 days' worth of uncompressed output log data all along and then preserving the queries and responses that contained news content. Instead, OpenAI chose to selectively search for the output log data that

it thought was helpful for its case while discarding troves of output log data that was likely helpful for the News Plaintiffs' cases.

Accordingly, the Preservation Order is well-supported by the facts, and is an appropriate and proportionate response to allow the parties and Magistrate Judge Wang to work through next steps.

## V.    CONCLUSION

News Plaintiffs respectfully request that this Court deny OpenAI's objection and maintain the Preservation Order at Dkt. 33.

Dated: June 17, 2025                          */s/ Ian Crosby*

Ian Crosby *(pro hac vice)*
Katherine M. Peaslee *(pro hac vice)*
SUSMAN GODFREY L.L.P.
401 Union Street, Suite 3000
Seattle, WA 98101
Telephone: (206) 516-3880
Facsimile: (206) 516-3883
icrosby@susmangodfrey.com
kpeaslee@susmangodfrey.com

Davida Brook *(pro hac vice)*
Emily K. Cronin (*pro hac vice*)
Adnan Muttalib (*pro hac vice*)
SUSMAN GODFREY L.L.P.
1900 Ave of the Stars, Suite 1400
Los Angeles, CA 90067
Telephone: (310) 789-3100
Facsimile: (310) 789-3150
dbrook@susmangodfrey.com
ecronin@susmangodfrey.com
amuttalib@susmangodfrey.com

Elisha Barron (5036850)
Zachary B. Savage (ZS2668)
Alexander Frawley (5564539)
Eudokia Spanos (5021381)
SUSMAN GODFREY L.L.P.
One Manhattan West

New York, NY 10001
Telephone: (212) 336-8330
Facsimile: (212) 336-8340
ebarron@susmangodfrey.com
zsavage@susmangodfrey.com
afrawley@susmangodrey.com
espanos@susmangodfrey.com

Steven Lieberman (SL8687)
Jennifer B. Maisel (5096995)
Kristen J. Logan *(pro hac vice)*
ROTHWELL, FIGG, ERNST & MANBECK, P.C.
901 New York Avenue, N.W., Suite 900 East
Washington, DC 20001
Telephone:  (202 783-6040
Facsimile: (202) 783 6031
slieberman@rothwellfigg.com
jmaisel@rothwellfigg.com
klogan@rothwellfigg.com

**Attorneys for Plaintiff**
**The New York Times Company**


*/s/ Steven Lieberman*
Steven Lieberman (SL8687)
Jennifer B. Maisel (5096995)
Robert Parker *(pro hac vice)*
Jenny L. Colgate *(pro hac vice)*
Michael Jones *(pro hac vice)*
Mark Rawls *(pro hac vice)*
Kristen J. Logan *(pro hac vice)*
Bryan B. Thompson (6004147)
ROTHWELL, FIGG, ERNST &
MANBECK, P.C.
901 New York Avenue, N.W., Suite 900 East
Washington, DC 20001
Telephone: (202) 783-6040
Facsimile: (202) 783-6031
slieberman@rothwellfigg.com
jmaisel@rothwellfigg.com
rparker@rothwellfigg.com
jcolgate@rothwellfigg.com
mjones@rothwellfigg.com
mrawls@rothwellfigg.com
klogan@rothwellfigg.com

26

bthompson@rothwellfigg.com

Jeffrey A. Lindenbaum (JL1971)
ROTHWELL, FIGG, ERNST &
MANBECK, P.C.
3 Manhattanville Road, Suite 105
Purchase, New York 10577
Telephone: (202) 783-6040
Facsimile: (202) 783-6031
jlindenbaum@rothwellfigg.com

***Attorneys for Plaintiffs***
***Daily News, LP; The Chicago Tribune Company,***
***LLC; Orlando Sentinel Communications***
***Company, LLC; Sun-Sentinel Company, LLC;***
***San Jose Mercury-News, LLC; DP Media***
***Network, LLC; ORB Publishing, LLC; and***
***Northwest Publications, LLC***


_/s/Matthew Topic_
Jonathan Loevy (*pro hac vice*)
Michael Kanovitz (*pro hac vice*)
Lauren Carbajal (*pro hac vice*)
Stephen Stich Match (No. 5567854)
Matthew Topic (*pro hac vice*)
Thomas Kayes (*pro hac vice*)
Steven Art (*pro hac vice*)
Kyle Wallenberg (*pro hac vice*)

LOEVY & LOEVY
311 North Aberdeen, 3rd Floor
Chicago, IL 60607
312-243-5900 (p)
312-243-5902 (f)
jon@loevy.com
mike@loevy.com
carbajal@loevy.com
match@loevy.com
matt@loevy.com
steve@loevy.com
kayes@loevy.com
wallenberg@loevy.com

***Attorneys for Plaintiff***

27

*The Center for Investigative Reporting, Inc.*