

## Planet Depos®
We Make It *Happen*™

**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**

# Transcript of Samuel H. G. Altman

**Date:** February 10, 2026
**Case:** OpenAI, Inc. Copyright Infringement Litigation, In re:

**Planet Depos**
**Phone:** 888.433.3767
**Email:** transcripts@planetdepos.com
**www.planetdepos.com**

A  I am an investor in other companies that OpenAI has invested in.

Q  What companies are those?

A  I wouldn't be able to do a list off the top of my head.

Q  Can -- can you name any of them?

A  No, not off the top of my head, but I know it's happened, because we have a board conflict process for that.

Q  Okay. And those investments, are those through the OpenAI start-up fund?

A  Yes.

Q  All right. And who decides what OpenAI start-up fund invests in?

A  Ian Hathaway, who runs the fund; Brad Lightcap, who is his manager.

And then if there is a conflict -- or if it's a company that I have exposure to, for example, and I can't provide final signoff, then that would go to the board. And we have got a rigorous process in place for that.

Q  What is the value of your investment in companies in which OpenAI has invested for the OpenAI start-up fund?

A  I'm not aware --

Q  You're --

A  -- but not a significant.

Q  Not a significant?

A  No.

Q  So like, less than a million?

A  I -- I really don't know.

Q  What is your current net worth?

A  I don't keep track of that.

Q  Do you have any equity in OpenAI?

A  I have no direct equity in OpenAI. I have a small amount of indirect exposure.

There was a Y Combinator fund that invested in OpenAI that I have a carried interest in. And depending on how that fund performs, I could have some value there. It would be an insignificant amount.

Q  Have you had your deposition taken before?

A  Once.

Q  In what case?

A  The Elon Musk case.

Q  When was that?

A  Last year.

Q  And you were sworn in that deposition to tell the truth, the whole truth, and nothing but the truth?

A  Yes.

Q  Just like in this one?

A  Yes.

Q  Did you participate in having your documents collected for production in this case?

A  Yes. I had to provide some passwords and stuff to my lawyers.

Q  Did you provide your personal devices to your lawyers to collect documents in this case?

A  Only devices that I used for any work purpose.

Q  But every device that you used for work --

A  Yes.

Q  -- purpose -- you have got to let me finish --

A  Sorry.

Q  -- before you answer.

Every device you used for a work purpose, you tried -- provided to your lawyers to collect documents in this case?

A  Yes.

Q  All right. Did you identify your -- to them every email account that you used to conduct business?

A  Yes.

Q  And you gave them the name and password for those accounts as well to access those materials?

A  Yes.

Q  What messaging apps do you use to conduct business?

A  Slack, iMessage, WhatsApp, email, occasionally Signal. I think that's all off the top of my head.

Q  Did you provide access to all of those applications to your lawyers?

A  Everything -- everything my lawyers asked for, yes.

Q  Okay. Including your Y Combinator email?

A  I had my Y Combinator email set up to forward to my Gmail, so you'll probably see in the documents where it says a Y Combinator address via a Gmail account.

Q  Okay. So your lawyers did not directly access your Y Combinator email account; is that correct?

A  We don't have direct access to that account anymore.

Q  Okay. And so all your email that you receive via that email address --

A   Was --

Q   -- forwards -- you have got to let me finish -- forwards to the Gmail account that you gave your lawyers access to --

A   Yes.

Q   -- correct?
Got it.  Okay.  Let's go ahead.  And mark Altman Exhibit 1.
(Exhibit 1 was marked for identification and is attached to the transcript.)

Q   (BY ATTORNEY CROSBY) So I'm handing you an email chain that's been marked as Altman Exhibit 1. And I'm actually interested in an exchange at the bottom of the chain.  It begins May 18 -- or I'm sorry.
May 9, 2018 from Joshua Schachter to you and your response to Joshua Schachter.
Do you see that?

A   Yes.

Q   And at the time that you engaged in this email exchange with Mr. Schachter, were you employed by an OpenAI entity?

A   I don't think so.

Q   Well, your email -- so who is Mr. Schachter?

A   He was the founder of a company called Delicious and has sort of been an acquaintance of my mine for many years.

Q   Okay.  And you write to him on May 9, 2018:
"We have a new natural
language model at OpenAI."
What was your relationship to OpenAI at that time?

A   Can I have a moment just to review the document?

Q   You certainly may.

A   Okay.

Q   All right.  You wrote to Mr. Schachter on May 9, 2018:
"We have a new natural
language model at OpenAI."
What was your relationship to OpenAI at that time?

A   I was a cochair of the nonprofit, and I was spending -- I was working full time at Y Combinator, but I was spending some time helping out OpenAI --

Q   Okay.  And so you --

A   -- informally.

Q   Did you send this email in your role as cochair of the OpenAI nonprofit at that time?

A   I don't recall the specific mind-set I was in when I sent it, but it looks like I was somehow trying to help out.

Q   Okay.  And Y Combinator was a backer of the OpenAI nonprofit?

A   I don't believe so.  I think OpenAI -- Y Combinator was a backer of OpenResearch, which was a more general-purpose research funding nonprofit, but not OpenAI itself --

Q   Well --

A   -- but I'm not -- I'm not sure on that.

Q   Why were you using your Y Combinator email address to email somebody about a new natural language model at OpenAI?

A   I work on many projects.  I'm involved with hundreds -- or I was at the time involved with a hundred companies.  I used one email address for everything.

Q   You describe OpenAI in this email as a "nonprofit research company," correct?

A   Yes.

Q   And at that time the only OpenAI entity was the OpenAI nonprofit, correct?

A   Correct.

Q   Had you not determined prior to May 9, 2018, that you would need to undertake commercial for-profit activities in order to raise funds to pursue OpenAI's mission?
ATTORNEY VAN NEST:  Objection to form.
ATTORNEY HURST:  Same.
ATTORNEY VAN NEST:  You may answer.

A   At this time we were still only a nonprofit entity.  I believe we were thinking about what kind of entity we would need to be, but we didn't have anything else, as I recall, at this time.

Q   (BY ATTORNEY CROSBY) You hadn't made a decision that you were going to pursue a for-profit entity at that point?

A   I don't remember when in 2018 we kind of agreed on what the structure was going to be, but my guess -- my best guess would be that by -- by May, we had not, but I don't recall.

Q   So my recollection from Mr. Brockman's testimony was that that decision was made by the end of 2017.  I'm not asking you to validate that, but is that consistent with your recollection?
ATTORNEY VAN NEST:  Objection to form.

ATTORNEY HURST: Same.

A As mentioned earlier, I was not employed by OpenAI yet. I was not involved in a deep way at the time. I was -- Mr. Brockman and Mr. Sutskever were mostly running the show then. I was employed at Y Combinator.

Q (BY ATTORNEY CROSBY) So you don't recall having been involved in any decision to pursue a for-profit entity by the end of 2017?

A Like, I was very busy with other projects. I don't remember the timeline on this one.

Q Okay. And what -- cochair -- what were the responsibilities for the cochair at OpenAI?

A Sir, this was a research lab with, I don't know, at the time maybe 40 researchers running around trying to figure out what to do. It was a ragtag group. We had very little resources. We had very little structure.

This was like a -- at that time a sort of academic institution. I think if you could see it, a question about responsibilities would strike you as somewhat comical. But we were -- you know, we were trying to figure out how we were going to discover the secrets that have led to this deep learning revolution. But at the time it was, you know, a very small, informal effort trying to do some science.

Q Maybe I should be a little more focused on that. Who had responsibility, for example, to write checks for this organization -- or authority, I mean?

A I don't know who the officers of the organization were at that time.

Q Did you have any ability to make decisions on behalf of this entity?

A Like could I write a check?

Q No. Could you make decisions that would bind the entity in any way?

ATTORNEY VAN NEST: Object to form.

A I'm not familiar what the official duties of -- or powers of cochair was in this setup. But as a board member of a nonprofit entity, I would expect that I had whatever the standard board member abilities were. I didn't have a heavy operational role.

Q (BY ATTORNEY CROSBY) Let's go ahead and mark Altman Exhibit 2.

(Exhibit 2 was marked for identification and is attached to the transcript.)

ATTORNEY CROSBY: Pass that on down to Annette, please.

Q (BY ATTORNEY CROSBY) So Altman Exhibit 2, I believe, is a Slack message channel between yourself and several other folks with a date of 2 -- of March 3, 2019.

Does that appear correct to you?

A It looks correct.

Q All right. And this is an OpenAI business Slack channel, right? This is on their Slack platform?

A Yes.

Q And by this time had OpenAI formed a for-profit entity?

A I believe by now we had, but I don't have a strong recollection of the exact date.

Q And that would be the company that you referred to as OPCO?

A I believe that would be the entity, although I'm not sure of the exact. The names have changed a few times.

Q At the top of this chain -- so who is David Luan?

A David Luan was a VP of research at -- he at one point was a VP of research. I don't know what his title was at this time.

Q And he emails to you:

"@Sam Altman, do you have any news on Bill's scheduling?

Does that refer to scheduling a meeting with Bill Gates?

A I believe so.

Q And what was the purpose of wanting to schedule a meeting with Bill Gates?

A Let me review the document for a minute and see if it can jog my memory.

I believe what happened is we had had a meeting with Satya. And then as a follow-up, he wanted us to meet with Bill Gates.

Q And what was the purpose of meeting with Satya?

A We were trying to raise money for the entity.

Q And if you go down to the page, you'll see the bottom right corner there are these stamped numbers called -- we call them Bates numbers. The one ending in 8216. And at the top of that page Bob McGrew writes you a messages -- or writes a message, I should say, that ends with:

"But if commercialization opportunities are important for

189

custom version of it for me with like a special chapter, which I thought was like a cool example of the technology. That -- you could do a different one for every person.

Q   Do you expect that to be widespread?

A   Like customized books like that?

Q   Sure.

A   I go back and forth on this. I -- the -- I think the shared cultural experience of things like music and the great books is so important that even if we could as a society produce the ideal book for each individual person, but it was different, it -- most of us want to be able to talk to other people about books and have a shared thing. Or music is this, like, important cultural connector, and I think you want that too.

So my guess -- and obviously no one knows what's going to happen here, but my guess is that to a surprising degree, the super custom stuff have -- is more than limited in its appeal. And it'll have a place, and people will, you know, like, do very customized fan fiction with themselves in it or whatever.

But on the whole, we want -- we will want the shared cultural objects, and there's something

190

deep there.

Q   And you're certainly aware of niche audiences where the audience might be in the dozens or hundreds or even single digits, and you would agree that AI would allow the creation of those types of very niche books to be created where it, for example, would otherwise might not be the case?

ATTORNEY VAN NEST:  Object to form.

A   Not -- not yet. Like, I don't -- I mean, you could -- you could -- again, you could write some version of a hundred thousand words, but I don't know of nobody who would be -- who would say: This is -- this is a great book. Thank you.

Q   (BY ATTORNEY NELSON) I'm going to introduce as Exhibit 28, another early document.

(Exhibit 28 was marked for identification and is attached to the transcript.)

Q   (BY ATTORNEY NELSON) This is from November of 2018. It says "OpenAI Asilomar Off-Site."

Do you see that?

A   Yes.

Q   What is Asilomar?

A   It's the name of, like, a conference center. Maybe it's a city, but it's like a place on -- on the Central Coast of California.

191

Q   And OpenAI had its off-site there?

A   We did.

Q   I want to turn your attention to -- it's a native document, so it's about six pages in.

Do you see it says:  "What happens next?"

A   Yes.

Q   And what does that say?

A   It says:

"AI can take humanity to the stars or result in world's most powerful dictatorship and concentration of power.  We have disproportionate say in that outcome."

Q   And certainly, sir, you are aware that with the generation of these powerful technologies, there's tremendous risk in these new systems, correct?

ATTORNEY VAN NEST:  Object to form.

ATTORNEY HURST:  Same.

A   Our -- a significant part of our founding mission is to develop technology and also to figure out how to bring that technology to a way -- to society in a way that mitigates those risks.

And look, I'm sure you don't like me very

192

much, but I --

Q   (BY ATTORNEY NELSON) I never said that.

A   -- oh, okay. One thing that I'm very proud of -- of what we have done for the world is to democratize this technology and to figure out super important safety research and techniques to put out a model that most of our field thought a model with this capability, we would be looking at the potential of catastrophic risk to humanity, to put out something for a tremendous benefit and not have some of those huge risks facing the world.

Q   You understand -- and I think I just heard you say it -- that as much as you mitigate that risk, it's still out there, right?

ATTORNEY VAN NEST:  Object to form.

ATTORNEY HURST:  Object to form.

A   Out there for sure. I mean, there's many other companies making models. There's many open-source models.

We are shifting more and more towards an approach where it's not just about the safety of what we create, but society-based resilience. Because right now, you know, there are certainly companies putting models out that I think are quite bad for the world.

193

So yes, it's out there. It might not be ours, but it's out there.

Q (BY ATTORNEY NELSON) What companies do you think are making models that are bad for the world?

ATTORNEY VAN NEST: Object to form.

A Oh, I would love to get to answer.

Q (BY ATTORNEY NELSON) You get to answer.

ATTORNEY VAN NEST: You can answer. I'm objecting to the form of the question.

A I -- I think one example of what -- one example is I think what xAI is putting out with this sort of sexy chatbot avatars is probably going to turn bad for the world if they keep doing it in the way they're doing it.

There are open-source models that are getting very good at biology, and I could imagine new pandemics coming from those. They don't have restrictions on them. That's two categories.

Q (BY ATTORNEY NELSON) Are you concerned -- let me back up.

Do you see in that slide you're looking at, it says "result in the concentration of power"?

Do you see that, sir?

A Yes.

Q Are you concerned by the concentration of

194

power and wealth that is accruing to AI companies?

ATTORNEY VAN NEST: Object to form.

A I am not concerned at current levels. I think that -- I mean, I can speak for our company in particular.

The -- there -- there was a belief that some other people had in the field around the time of this off-site, which is that AGI was going to be such a dangerous technology that we couldn't tell the world about it; we certainly couldn't give the world access, and it needed to be a few kind of brilliant AI scientists in secret rooms deciding what to do here.

We -- we, in one of our, I think, most important decisions ever, adopted a principle that we call "iterative deployment" where we decided we were going to put out these models in the world, even if early -- even if imperfect specifically to make sure that the power didn't accrue all to one company or in one place and that society as a whole got to benefit from the power and capability of these -- of these models.

Now almost a billion people use ChatGPT, comp -- many companies, lots of scientists. This is -- this is what we wanted to do; this is what we

195

set out to do to avoid that kind of concentration of power.

Q (BY ATTORNEY NELSON) You're still concerned by it?

ATTORNEY VAN NEST: Object to form.

A I have a deep-seeded, personal continual anxiety that things can always go horribly wrong and that believing that is the best way to prevent them from doing so.

So I hope to always be concerned about what could happen in the future and then work as hard as we can to get to the good outcome, which, you know, over the last decade I think we have had a pretty nice track record on.

Q (BY ATTORNEY NELSON) Okay. Let's mark as -- Exhibit 29.

(Exhibit 29 was marked for identification and is attached to the transcript.)

Q (BY ATTORNEY NELSON) Sir, this is an email from Mira Murati to David Luan, and you're CC'd in -- with the chain that starts with an email from you on January 14, 2019.

Do you see that?

A Yes.

Q Okay. And you write in that first page

196

that you want to send Microsoft some thoughts on a proposal for collaborating together; is that fair?

A Yes.

Q And the second bullet point says:

"We set up a meeting with Bill, Satya, and Kevin to discuss the $10 billion short-term investment."

Do you see that?

A Yes.

Q Who are Bill, Satya, and Kevin?

A Bill Gates, Satya Nadella, and Kevin Scott.

Q And then you say:

"For this meeting, I would like to show them an improved language model (and huge bonus points if it could do Gates' pet project, after being trained on language, then read a book and answer questions about it)."

Do you see that, sir?

A Yes.

Q Why did you want to pursue that particular project?

197

A    Bill had said to us that one thing -- he didn't believe in these models' ability to generalize and one-shot learn.

And that if you could train a book generically on language and then -- train a model generically on language and then show it a book it hadn't seen before and it could do what a human could do, which is look at that book for the first time and answer questions about it, that that to him would be convincing evidence of understanding and generalization.

Q    And then if you turn the page, there's an "Executive Summary." You see it's -- the attachment is with a document.

A    Yeah.

Q    And then on the first page of the attachment, it says:

"Business Proposal: Microsoft and OpenAI initially commit to a transaction structure for Azure compute access and a TPU v3 pod-equivalent machine and establish nonbinding Letters of Interests outlining the agreements for supercomputing machines,"

198

right?

A    Yes.

Q    Why did you want to work with Microsoft?

A    We weren't capable of building systems at this scale. And there were only a handful of companies in the world -- maybe Microsoft, Google, and Amazon at the time -- that could, and Microsoft was very value aligned with us in the way that the other companies were more skeptical of.

Q    You were then on the Google platform, correct, in 2018 and 2019 --

A    I thought --

Q    -- and --

A    -- we were on Amazon.

Q    Okay.

A    I could -- maybe both.

Q    Okay.  Were you concerned about the power of Google, if they were to develop an AI model first?

ATTORNEY VAN NEST:  Object to form.

A    I had some concerns about some of their people's stance that AI should not be widely democratized and that it should be, you know, run by a small group.

Q    (BY ATTORNEY NELSON) Okay.  Let's go to

199

the next exhibit, which is Exhibit 30.

(Exhibit 30 was marked for identification and is attached to the transcript.)

Q    (BY ATTORNEY NELSON) And then this is an email exchange between you and Ms. Daniela Amodei and others.

Do you see that, sir?

A    Yes.

Q    Okay.  And you say that you think it's a good idea to "train on Bill Gates's tweets and blog posts.  Then generate more Bill Gates's style."

Do you see that in the middle of the page?

A    I do see that.  It looks like I'm quoting somebody else there.

Q    Yes.  If you go, actually, to the next page, you see that there's -- Ms. Amodei is talking about potential options, right?

A    Yes.

Q    And Option 2, in fact, is "Essay Ghostwriter."

Do you see that, sir?

A    Yes.

Q    What was "Essay Ghostwriter" supposed to be?

A    I don't remember this.  I'll speculate.  I

200

don't remember this particularly, but it looks like, you know, a user starts writing.  The model then gives some ideas for what goes next.  The user picks that.  The model keeps going and so on.

Q    And you respond on the previous page, Number 2, "this would be cool," right?

A    Yes.

Q    And you understood from the beginning that one of the purposes of the AI models was to help with writing; is that fair?

A    Yes.

ATTORNEY VAN NEST:  Object to form.

Slow down.

THE DEPONENT:  Sorry.

Q    (BY ATTORNEY NELSON) And during this time frame, because of this emphasis on language, OpenAI was relooking again to acquire book sets?

ATTORNEY VAN NEST:  Object to form.

A    I can't reproduce the timeline in my head. If you -- I mean, it was seven years ago.  I would believe you if you said that were true, but I don't recall.

Q    (BY ATTORNEY NELSON) Okay.  I'm going to introduce as -- Exhibit 31.

(Exhibit 31 was marked for identification

and is attached to the transcript.)

Q (BY ATTORNEY HURST) This is an email exchange with some OpenAI employees, including Ms. Amodei on it.

Do you see that?

A Um-hum.

Q And do you see the title is "Expanding our books (for long-form text) corpus"?

A "Or long form."

Q Excuse me. You're right.

"Expanding our books (or long-form text) corpus."

A Yeah.

Q Do you see that?

And you understood that books were a way to obtain long-form text, right?

A Yes.

Q Is long-form text important for model training?

A It's important to have something that is -- "long-form," I don't think, means the same thing than an author would mean by it. It's important to have something that is, like, more than a few sentences of coherence, but you don't need the kind of crazy long stuff.

Q If you go to the last page of the document, do you see it says "Thoughts from Mira"?

Do you see that?

A Yes.

Q And it lists various different sources of books. Do you see that, sir?

A Yes.

Q And it says:

"Free books we can access without need for partnership,"

right?

A Yes.

Q It also discusses "Publishers."

Do you see that?

A Yes.

Q Did OpenAI reach out to publishers during this time frame?

A I believe we did have some conversations, but I don't recall what they were specifically.

Q You're just aware that there were conversations?

A I'm not even totally sure I believe there were.

Q Oh.

A This was still before I was, like, full

time at OpenAI.

Q Okay. It's fair to say you were still actively involved at OpenAI during this time frame?

A I mean, I had a very busy day job, but yes, I was spending some time; but I was not in the details.

Q You were helping set up the Microsoft deal --

A Yes.

Q -- correct?

And you were planning to attend the forthcoming meetings with Mr. Nadella and Mr. Gates, correct?

A I was very involved in the financing piece. That was like -- you know, I sort of said: I'll take on this one thing. I have limited bandwidth, but this one I can do.

Q And "the financing piece" means what?

A Raising the -- like, figuring out the fundraising and the structure.

Q And so that's why you were so involved in raising money and meeting with Microsoft?

A Yeah.

Q And on that -- later on on that same page, it says "Thoughts from David Lansky." And then it says:

"Just learned about this search engine that links to free book downloads, LibGen.IO."

Do you see that, sir?

A I do.

Q And then with code, how "to do bulk downloads."

Do you see that, sir?

A Yes.

Q Have you heard of LibGen at this point?

A I don't know. I don't recall hearing it before this, and it doesn't stick out in memory from this.

Q Okay. To the best of your recollection, have you ever heard of LibGen or Library Genesis?

A I have heard of it since.

Q When was the first time that you remember hearing about Library Genesis?

A Well, I heard about it in conjunction with this case.

Q Prior to this case, had you heard of Library Genesis?

A I don't recall with certainty.

Q You're aware that one of the allegations

205

in this case is that OpenAI visited Library Genesis and did a bulk download?

A   I am aware of that.

Q   Okay. And were you involved, sir, in trying to figure out where these books might come from?

A   I -- I was never particularly involved in the data -- what we called the data prep or the data mix.

When someone would ask me: Could you make an introduction to this company -- in fact, there was a -- this jogs the memory of when I spent a lot of time trying -- trying to get something -- with the HathiTrust to work with us.

But generally speaking, data was not my area of focus, and I was not closely involved in what we did there.

Q   And if we go back -- actually, let's go back to Altman Exhibit 1, the very first exhibit.

That email is actually dated -- it's a forward, and you're forwarding it to Ms. Amodei in February of 2019.

Do you see that?

A   Yes.

Q   And if you go back to what we just looked

206

at, that's the same time frame as the discussion about books here, correct?

A   I believe you. Yes.

Q   And you forwarded it to Ms. Amodei here because you were helping her trying to source where books might come from, correct?

ATTORNEY VAN NEST: Object to form.

A   The way I work and I think the way many CEOs work is the people that work at the company ask me for help with things. I am effectively a glorified email router. I forward a lot of things. I make introductions. I search for stuff in the past.

I can't speculate on which of those that was in this case. But you know, if someone is, like -- I have my areas where I'm very deep and that I really focus on, and that comes down to a lot of things. So mostly I entrust other executives or leaders to do things. And I help them, when needed, which could be an introduction or forwarding an email or something like that.

Q   (BY ATTORNEY NELSON) You were aware that OpenAI was searching for large databases?

A   Very much so, yeah.

Q   Did you have a discussion about Library

207

Genesis during this time frame in February of 2019?

A   Not that I recall.

Q   And eventually you met with Mr. Nadella in late February of 2019. Do you recall that, sir?

A   I remember seeing something about that meeting in February earlier in this -- today, but I wouldn't independently recollect when that meeting was.

Q   Okay. Let's mark as -- Exhibit 32.

(Exhibit 32 was marked for identification and is attached to the transcript.)

Q   (BY ATTORNEY NELSON) And, sir, this is a Slack thread entitled "MSFT 2-28."

Do you see that, sir?

A   Yes.

Q   And you're on that, right?

A   Yep.

Q   Okay. And it's talking about a bunch of details for -- I'm actually going to point you to the page near the end that ends in 636.

A   Okay.

Q   And it's a discussion of how that meeting went after it. Do you see that, sir? It's -- I'm looking at it. It's at 8:33 p.m. UTC.

ATTORNEY VAN NEST: Mr. Altman, you can

208

review the document to get context.

A   I would rather not spend timing reading the whole thing. Is there something --

Q   (BY ATTORNEY NELSON) No.

A   -- important? If it's just about the center --

Q   It really is about that, sir.

A   All right.

Q   And so Mr. McGrew is trying to sum up what happened at the meeting. And it's:

"Sam, David, and I just had a very positive meeting with the CEO, CTO, and CFO of Microsoft. David really nailed the language demo using the new, larger model that finished training just last night. The Dota and robotics demos were also very well received. The excitement in the room was palpable. They would like us to brief Bill Gates soon."

Do you see that?

A   Yes.

Q   Is that consistent with your recollection of the February 28, 2019 meeting?

A   I -- yeah.  In fact, I -- I mean, it was, I would say, something even strong -- like, we kind of left that meeting being like:  Let's -- let's do this.

Like, sure there's some steps, but like, there was intention, I think, on both sides out of that meeting to figure it out.

Q   Do you recall what happened specifically at that meeting?

A   Yeah, we showed them these demos.  We said:  Look, we don't know yet how we're going to -- we know we need a lot of compute.  We don't know yet how we're going to make money, but we think that Microsoft is the right partner here, and we would like you to invest.

And I remember Satya saying some version of:  Okay, let's do it; let's figure it out.

Q   And he wanted you to meet with Mr. Gates --

A   Yes.

Q   -- after that?

Did you understand that the meeting with Mr. Gates was important in trying to establish the Microsoft deal?

ATTORNEY VAN NEST:  Object to form.

A   Mr. Gates was skeptical of us.  I don't think I understood at the time just how skeptical.

So maybe with what I now know, I would have said:  Yes, it was more important than I thought it was at the time.

At the time it was like -- I thought it was sort of like a just -- you know, it would be cool for Gates to hear it.  I thought it would be very cool to get to show it to Gates.

So it sounded like a -- I don't think I understood that it was, like, as important as it turned out to be.

Q   (BY ATTORNEY NELSON) Well, you certainly took it seriously when the CEO of Microsoft says:  Please present to Bill Gates, right?

ATTORNEY VAN NEST:  Object to form.

A   I mean, more than that.  It's like:  Bill Gates is a legend.

I was like:  This is an awesome opportunity.  I really want to go do this thing.

Q   (BY ATTORNEY NELSON) And in fact, you later did present this model --

A   Yeah.

Q   -- or a similar-type model, right?

A   Several times.  I don't think we were

convincing to Mr. Gates really truly until GPT-4.

Q   Well, we'll get to that.  But just -- I'm trying to just really focus in on this 2019 --

A   Yeah.

Q   -- time frame for right now.

A   We did present after this meeting.

Q   Okay.  And you recall approximately that it was in late April of 2019?

A   That sounds right, but I'm not certain.

Q   Okay.  We'll get to it.  It's --

A   Okay.

Q   -- not a memorization --

A   Okay.

Q   -- test.  Okay.  Let's mark as -- Exhibit 33.

(Exhibit 33 was marked for identification and is attached to the transcript.)

Q   (BY ATTORNEY NELSON) And this is a Slack channel again with "MSFT 2-28" on it from a little bit later.  And Mr. Luan is asking you about any news on Bill's scheduling.

Do you see that --

A   Yes.

Q   -- sir?  And he's telling you that he:

"Spent all day Friday pivoting
the language, music, and program
synthesis folks toward shipping
whatever we can in the new, short
timeline and prioritizing
fine-tunes to have them out of the
way in case Bill needs to meet next
week, for example."

Do you see that?

A   Yes.

Q   Okay.  And you respond that you're "meeting with Kevin" that "Monday afternoon," correct?

A   Yes.

Q   And you were, in fact, having discussions with Mr. Scott about when to schedule the Bill Gates demo, correct?

A   I don't remember.  It looks like I say "I may know more."

It may have just been like:  Let me ask if he has got --

THE COURT STENOGRAPHER:  May know more?

A   -- I may know more.  If -- Kevin may know more.

It says -- my message says "No," period. "I may know more after meeting Kevin Monday

213

afternoon." It could just mean I was going to ask him --

Q (BY ATTORNEY NELSON) Okay.

A -- about scheduling.

Q Okay. Let's go to Exhibit 34.

(Exhibit 34 was marked for identification and is attached to the transcript.)

Q (BY ATTORNEY NELSON) I'm going to skip ahead a little bit to April. And this just got produced to us last night, so bear with us on the temporary Bates number. But do you see -- let's start at the beginning of the chain, which you're CC'd on.

But it's an email from Kevin Scott, but you're eventually CC'd on it, to Greg Martinez and Umesh Madan on OpenAI.

Do you see that, sir?

A I see it, but I don't see that I'm CC'd on --

Q You're --

A -- it.

Q -- eventually --

A Oh --

Q -- CC'd --

A -- got it. Yes. Yes.

214

Q Okay. So -- and you see Mr. Scott asking Mr. Martinez for 30 to 60 minutes of Bill's time --

A Yes.

Q -- correct?

And that's consistent with your understanding that Microsoft was trying to help you set up a presentation with Mr. Gates and yourself, correct?

A Yes.

Q And do you see eventually at the top ending in 434, it says it's scheduled for 10:00 a.m., on Monday, April 22.

Do you see that, sir?

A Yes.

Q And then you come into the picture at 4:33, about CC'ing Sam Altman, and you confirm that time, correct?

A Yes.

Q And then going to the second page, on the -- at 4:20 p.m., on April 17, there's an email from Mr. Martinez.

Do you see that, sir?

A Yes.

Q Who is Mr. Martinez?

A He works for Mr. Gates. I don't know his

215

exact job title.

Q Okay. And he's asking you, along with Mr. Scott and Mr. Madan:

"Are there any materials that Bill can look at ahead of time?"

Do you see that?

A Yes.

Q And in fact, you did send Mr. Gates's team some materials beforehand, correct?

A I don't recall.

Q Okay. We'll get to that. On the first page, there's a question about who else was going to attend the meeting aside from yourself, and you write "Dario Amodei and Ilya Sutskever."

Do you see that, sir?

A I do.

Q In fact, they did both attend that presentation with you, right?

A That is my recollection.

Q Okay. And that -- that was your recollection, that they attended --

A Yeah.

Q -- the meeting?

And it was in person?

A That's also my recollection.

216

Q Okay.

A But there were several meetings with Bill, and I wouldn't stake too much on that.

Q Okay. Let's mark as -- Exhibit 35.

(Exhibit 35 was marked for identification and is attached to the transcript.)

THE COURT STENOGRAPHER: Watch the crosswalk, please.

ATTORNEY VAN NEST: I'm sorry, Mary?

THE COURT STENOGRAPHER: I said watch the crosswalk, please.

ATTORNEY NELSON: Oh, thank you.

Q (BY ATTORNEY NELSON) And I -- actually, I think that this was marked earlier today --

A Yes.

Q -- that you are pasting in an email that you received from Mr. Scott, correct?

A Yes.

Q And Bill, in general, likes to read stuff, so any White Papers that you have is something that he wanted you to send ahead of time for his reading --

A Yes.

Q -- correct?

ATTORNEY VAN NEST: Wait until he finishes