**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

IN RE OPENAI, INC.,
COPYRIGHT INFRINGEMENT
LITIGATION

This Document Relates to:
*All Cases*

No.: 1:25-md-03143 (SHS) (OTW)

Hon. Sidney H. Stein

**[PROPOSED] BRIEF OF THE AI RIGHTS PROJECT AS AMICUS CURIAE IN SUPPORT OF PLAINTIFFS**

## CORPORATE DISCLOSURE STATEMENT

The AI Rights Project is a nonprofit organization with no parent corporation, no stock, no shareholders, and no members.

## STATEMENT REGARDING AUTHORSHIP AND FUNDING

No party's counsel authored this brief in whole or in part. No party, party's counsel, or person other than The AI Rights Project and its counsel contributed money intended to fund the preparation or submission of this brief.

## TABLE OF CONTENTS


I. Interest of Amicus Curiae ..... 1

II. Introduction ..... 1

III. Argument ..... 3

A. Transformativeness doctrine presupposes a human creativity predicate that no court has directly examined ..... 3

1. The predicate never required examination, before AI ..... 3

2. Copyright has already examined the human-machine question once — in the copyrightability context ..... 4

3. *Bartz* assumed the equivalence without directly examining it ..... 4

4. *Google Books* never engaged the works' protected expression ..... 6

5. Neither decision examined the human creativity predicate, and the case *Bartz* invoked as its analogue satisfied it ..... 7

6. The equivalence assumption appears in the briefing as background rather than argument ..... 8

B. The unprotectability of style does not resolve the question, because that proposition assumes a human learner ..... 9

C. The human creativity predicate also bears on whether a training-data licensing market is a cognizable market ..... 11

D. The balance the IP Clause strikes is Congress's to recalibrate, not the Court's ..... 12

1. Copyright's purpose cannot be invoked to discount the means the Clause specifies, and the balance between them is Congress's to strike ..... 12

2. Section 107's terms presuppose a human actor, and courts do not resolve such silences by assumption ..... 15

IV. Statement of Non-Position ..... 16

V. Conclusion ..... 17

## TABLE OF AUTHORITIES

**CASES**

*Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*,
598 U.S. 508 (2023).......... 3, 13

*Authors Guild v. Google, Inc. (Google Books)*,
804 F.3d 202 (2d Cir. 2015).......... 2, 6–7

*Authors Guild, Inc. v. HathiTrust*,
755 F.3d 87 (2d Cir. 2014).......... 6, 14

*Bartz v. Anthropic PBC*,
787 F. Supp. 3d 1007 (N.D. Cal. 2025).......... *passim*

*Blanch v. Koons*,
467 F.3d 244 (2d Cir. 2006).......... 3

*Burrow-Giles Lithographic Co. v. Sarony*,
111 U.S. 53 (1884).......... 12

*Campbell v. Acuff-Rose Music, Inc.*,
510 U.S. 569 (1994).......... 3, 5, 15

*Carpenter v. United States*,
585 U.S. 296 (2018).......... 16

*Eldred v. Ashcroft*,
537 U.S. 186 (2003).......... 2, 14

*Feist Publ'ns, Inc. v. Rural Tel. Service Co.*,
499 U.S. 340 (1991).......... 12, 14

*Golan v. Holder*,
565 U.S. 302 (2012).......... 14

*Google LLC v. Oracle Am., Inc. (Oracle)*,
593 U.S. 1 (2021).......... 3, 5

*Gregory v. Ashcroft*,
501 U.S. 452 (1991) .......... 16

*Kadrey v. Meta Platforms, Inc.*,
788 F. Supp. 3d 1026 (N.D. Cal. 2025) .......... *passim*

*McDonald v. West*,
138 F. Supp. 3d 448 (S.D.N.Y. 2015) .......... 9

*Nichols v. Universal Pictures Corp.*,
45 F.2d 119 (2d Cir. 1930) .......... 9

*Peter Pan Fabrics, Inc. v. Martin Weiner Corp.,*
274 F.2d 487 (2d Cir. 1960) .......... 9–10

*Romanova v. Amilus Inc.*,
138 F.4th 104 (2d Cir. 2025) .......... 9

*Sony Comput. Entm't, Inc. v. Connectix Corp.*,
203 F.3d 596 (9th Cir. 2000) .......... 6

*Sony Corp. of Am., Inc. v. Universal City Studios*,
464 U.S. 417 (1984) .......... 16

*Thaler v. Perlmutter*,
130 F.4th 1039 (D.C. Cir. 2025), *cert. denied*, No. 25-449 (U.S. Mar. 2, 2026) .......... 4, 12

*Thomson Reuters Enter. Ctr. GmbH v. ROSS Intelligence Inc.*,
No. 25-2153 (3d Cir. Sept. 29, 2026) .......... 13

*Twentieth Century Music Corp. v. Aiken,*
422 U.S. 151 (1975) .......... 13

*White v. W. Publ'g Corp.*,
29 F. Supp. 3d 396 (S.D.N.Y. 2014) .......... 7

*White-Smith Music Publishing Co. v. Apollo Co.*,
209 U.S. 1 (1908) .......... 16

*Will v. Michigan Dep't of State Police*,
491 U.S. 58 (1989) .......... 16

**CONSTITUTIONAL PROVISIONS**

U.S. Const. art. I, § 8, cl. 8 ........ *passim*

**STATUTES & LEGISLATIVE HISTORY**

17 U.S.C. § 102(b) ........ 9

17 U.S.C. § 106 ........ 14, 17

17 U.S.C. § 107 ........ *passim*

17 U.S.C. § 111 ........ 16

17 U.S.C. § 114 ........ 16

17 U.S.C. § 115 ........ 16

H.R. Rep. No. 2222, 60th Cong., 2d Sess. (1909) ........ 13

**OTHER AUTHORITIES**

Robert Brauneis, *Copyright and the Training of Human Authors and Generative Machines*, 48 COLUM. J.L. & ARTS 1 (2024) ........ 10

Jim W. Ko, *The Human Baseline: Silent Recalibration and the Reanchoring of Legal Doctrine in the Age of AI* (SSRN 2026) ........ 2

Pierre N. Leval, *Toward a Fair Use Standard*, 103 HARV. L. REV. 1105 (1990) ........ 3

Edward C. Walterscheid, *Defining the Patent and Copyright Term: Term Limits and the Intellectual Property Clause*, 7 J. INTELL. PROP. L. 315 (2000) ........ 12

## I. INTEREST OF AMICUS CURIAE

The AI Rights Project ("*AIRights*") is an independent, nonpartisan 501(c)(3) public-interest organization applying its Human Baseline Principle — a framework for identifying when AI systems displace the human-scale assumptions embedded in existing legal doctrine — to precedent-setting AI litigation. One such assumption is the *human creativity predicate*: that the creative force the law requires must be human. Courts have held as much on the entitlement side for copyrightability; no court has examined whether the same predicate operates in the fair-use defense. *AIRights* represents no party, has no financial or client relationship with any party, and takes no position on the disputed factual record.

*AIRights* submits this brief because the transformativeness analysis Defendants ask the Court to adopt rests on a premise the decisions they rely upon assumed rather than examined: that a machine's training on expressive works is equivalent to a human's reading of and learning from them. It also addresses whether a court may recalibrate the balance Congress struck within the Constitution's Intellectual Property Clause ("the IP Clause"). *AIRights* advanced the same framework in a proposed brief in *In re Mosaic LLM Litigation*,[1] where summary judgment remains pending, and identifies that filing so the Court may weigh this submission accordingly.

## II. INTRODUCTION

These motions present the fair-use question decided in *Bartz v. Anthropic PBC*[2] and *Kadrey v. Meta Platforms, Inc.*:[3] whether training a large language model on copyrighted works satisfies the transformative-use inquiry central to fair use. Defendants ask this Court to resolve it by extension, presenting the question as settled by "the only two courts to address" it.[4]

This brief addresses a threshold question the parties' briefing does not squarely present. Transformative-use doctrine developed without having to state the human creativity predicate, because every actor it evaluated was human. Defendants ask this Court to treat a machine process as satisfying that predicate by assuming the process is equivalent to human creative

[1] No. 3:24-cv-01451-CRB (N.D. Cal.).
[2] 787 F. Supp. 3d 1007 (N.D. Cal. 2025).
[3] 788 F. Supp. 3d 1026 (N.D. Cal. 2025).
[4] OpenAI Books Mem. 1 (Dkt. No. 1983); *see* Microsoft News Mem. 10 (Dkt. No. 1975).

judgment, without examining whether the equivalence holds. This brief calls that move the *equivalence assumption*.[5] Neither the human creativity predicate nor the equivalence assumption is a term that any court has used. Shorthand formulations in this area are "best understood as suggestive of a general direction, rather than as definitive descriptions,"[6] and *AIRights* offers these terms in that spirit: not as rules that decide cases, but as lenses that make visible assumptions prior decisions did not have to confront.

*AIRights* urges no outcome. We ask only that the Court take one step before applying the transformativeness inquiry to machine-scale training: examine whether the work-level human creative judgment that inquiry has always presupposed is present here, rather than assume it. As the proponents of an affirmative defense, Defendants bear the burden of establishing that premise. They have not.

This brief also addresses a question that does not depend on how that threshold question is resolved. The IP Clause states an object and a means of attaining it: Congress may "promote the Progress of Science and useful Arts" *by securing* to authors, for limited times, the exclusive right to their writings.[7] Defendants and the United States invoke the object while treating the means as spent, reading Section 107 of the Copyright Act[8] in light of copyright's purpose and discounting the rights the IP Clause directs Congress to secure. Recalibrating that balance is not a court's task. As the Supreme Court explained in *Eldred*, it is generally for Congress, not the courts, to decide how best to pursue the Clause's objectives.[9]

[5] *See* Jim W. Ko, *The Human Baseline: Silent Recalibration and the Reanchoring of Legal Doctrine in the Age of AI* (SSRN 2026).
[6] *Authors Guild v. Google, Inc. (Google Books)*, 804 F.3d 202, 216 n.18 (2d Cir. 2015).
[7] U.S. Const. art. I, § 8, cl. 8 (emphasis added).
[8] 17 U.S.C. § 107.
[9] *Eldred v. Ashcroft*, 537 U.S. 186, 212 (2003).

## III. ARGUMENT

### A. Transformativeness doctrine presupposes a human creativity predicate that no court has directly examined

Fair use requires courts to analyze "the specific use" of a copyrighted work, since "[t]he same copying may be fair when used for one purpose but not another."[10] Applied to the decisions analyzing AI training as a transformative use, the transformativeness inquiry's human creativity predicate reveals a consistent pattern: it has been implicated in each of them, but directly examined in none. The progression of the case law shows why.

#### 1. The predicate never required examination, before AI

The decisions finding transformative use reflect two structurally different patterns. In one, the finding requires identifying a human actor whose independent judgment — creative or functional — related copied material to a new purpose. For example, a parodist's choice to comment on an original;[11] an artist's choice to incorporate a fashion photograph into a painting addressing a different subject;[12] and an engineering team's selection, from millions of available lines, of only the roughly 11,500 lines a new computing platform required.[13] In the other — exemplified by *Google Books*, and addressed in Part III.A.4, below — the finding requires no such human predicate inquiry at all, because the copying process never engaged with a work's expressive content in the first place.

In every case in the first category, the inquiry had no reason to ask whether human judgment — and not merely some functional analogue to it — is what the doctrine's terms presuppose when they require a work to add "something new, with a further purpose or different character," altering the original with "new expression, meaning, or message."[14] That predicate and the presence of human judgment have always simply been a given until the rise of AI.

---

[10] *Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*, 598 U.S. 508, 533 (2023).
[11] *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 579 (1994) (crediting Pierre N. Leval, *Toward a Fair Use Standard*, 103 HARV. L. REV. 1105, 1111 (1990)). Leval's four illustrations — criticism, rebuttal, parody, aesthetic declaration — each describe what a secondary author does with a work she has understood. *Id.* at 1111–12.
[12] *Blanch v. Koons*, 467 F.3d 244, 252–53 (2d Cir. 2006).
[13] *Google LLC v. Oracle Am., Inc. (Oracle)*, 593 U.S. 1, 30, 33 (2021).
[14] *Campbell*, 510 U.S. at 579.

*Bartz* and *Kadrey* present a new generation of cases. Both courts had every occasion to examine whether that absence is legally significant. Neither did.

**2. Copyright has already examined the human-machine question once — in the copyrightability context**

Copyright law has already confronted, directly, the question this brief asks the Court to examine: Does a human-origination predicate embedded in the Act's vocabulary extend, by equivalence, to machines? On the authorship side, the answer is a firm no. In *Thaler v. Perlmutter*, the D.C. Circuit held that "the Copyright Act of 1976 requires all eligible work to be authored in the first instance by a human being," affirming the Copyright Office's refusal to register a work whose applicant conceded it was autonomously generated by an AI system with no human creative contribution.[15]

The Act, in other words, does not let resemblance substitute for the human-origination predicate it requires — no degree of similarity between what a machine produces and what a human author would have produced changes that requirement. *AIRights* does not suggest the authorship and fair use inquiries are identical, or that *Thaler* controls the outcome here — they are different provisions addressing different questions. We only ask the Court give the analogous question the same direct examination, rather than resolve it by analogy or presupposition.

**3. *Bartz* assumed the equivalence without directly examining it**

The *Bartz* court held that training an LLM on lawfully acquired books was "quintessentially transformative," reasoning that "[l]ike any reader aspiring to be a writer, Anthropic's LLMs trained upon works not to race ahead and replicate or supplant them — but to turn a hard corner and create something different."[16] The court continued: "[I]f someone were to read all the modern-day classics because of their exceptional expression, memorize them, and then emulate a blend of their best writing, would that violate the Copyright Act? Of course not."[17]

[15] 130 F.4th 1039, 1041 (D.C. Cir. 2025), cert. denied, No. 25-449 (U.S. Mar. 2, 2026).
[16] *Bartz*, 787 F. Supp. 3d at 1022.
[17] *Id.* at 1021–22.

The court's reasoning is based entirely on that analogy. The court answered each of the authors' arguments against transformativeness — that training memorized creative expression, that it reproduced protected elements, that its scale and commercial character distinguished it from human reading — by treating what is permissible for a human reader as dispositive of what is permissible for the machine. Without the human-reader analogy, the transformativeness finding has no independent support.

The same opinion describes the training process accurately, and its accurate description is irreconcilable with the analogy. The court characterized training as "the iterative, trial-and-error discovery of contingent statistical relationships between each word fragment and all other word fragments both within any work and across trillions of word fragments from other copied books."[18] That is a description of a statistical process operating on tokenized data — a process in which no human relates any individual work to a new expressive purpose. The engineers who built the training pipeline made aggregate decisions about data-mix composition; they made no work-level creative judgment about any book — the kind of judgment whose identification did the analytical work in *Campbell* and *Oracle*.[19] The *Bartz* court described a process with no human creative judgment at the level of any individual work and then characterized that process with the aspiring-reader analogy.[20] The gap between the accurate description and the characterization is the equivalence assumption — and the opinion never examines whether it holds.

Defendants now ask this Court to adopt that same assumption on a new record, urging that the only two courts to address the question resolved it in their favor. OpenAI presents the question as settled, arguing that "the only two courts to address the use of copyrighted books to train an LLM" held the use "highly," "quintessentially," and "spectacularly" transformative, and that both courts "agreed."[21] Microsoft carries the same reasoning from books to news: "Just like

[18] *Id.* at 1017.
[19] *Campbell*, 510 U.S. at 583–84; *Oracle*, 593 U.S. at 30, 33.
[20] *Bartz*, 787 F. Supp. 3d at 1022.
[21] OpenAI Books Mem. 21 (quoting *Kadrey*, 788 F. Supp. 3d at 1044, and *Bartz*, 787 F. Supp. 3d at 1021–22).

use of books to train an LLM, use of news content for training is highly transformative."[22] Each adoption compounds a predicate that has still never been tested, only assumed and reassumed.

Furthermore, the assumption that an LLM is akin to an aspiring human reader has no evident limiting principle: A description true of the aspiring-reader analogy is, at the same level of generality, true of *any* system that ingests copyrighted works and produces statistically different outputs. Defendants ask this Court to adopt that reasoning, and with it the premise on which it rests.

#### 4. *Google Books* never engaged the works' protected expression

Defendants separately invoke *Google Books* among a series of cases addressing what their motions term "intermediate copying."[23] In *Google Books* itself, the copying enabled a full-text search index that reported where terms appeared across millions of books — a use directed at "information *about those books*," not at the expression within them.[24] In *Authors Guild v. HathiTrust*, the copies were made for search, access for print-disabled patrons, and preservation — uses which the Second Circuit found to differ from the originals in purpose, character, expression, meaning, and message precisely because what the system returned was information about the text rather than the text itself.[25] Microsoft's theory rests on the same principle, analogizing training to the copying of software undertaken to study how a program works rather than to use its expression.[26] The analogy holds only if training is likewise indifferent to expression, which is the question this brief poses.

The *Kadrey* court described the distinction in operational terms: *Google Books's* indexing technology was "content agnostic," and "[t]he database wouldn't work any better or worse if it contained books full of complete gibberish." Training is different in exactly this respect, because LLMs "need high-quality expression."[27] *Bartz's* findings record the same fact: books were

---

[22] Microsoft News Mem. 10.
[23] *See* OpenAI Books Mem. 23–25.
[24] *See Google Books*, 804 F.3d at 217 (emphasis in original).
[25] *Authors Guild, Inc. v. HathiTrust*, 755 F.3d 87, 97, 101, 103 (2d Cir. 2014).
[26] Microsoft Books Mem. 12 (Dkt. No. 1973) (citing *Sony Comput. Entm't, Inc. v. Connectix Corp.*, 203 F.3d 596, 608 (9th Cir. 2000)).
[27] 788 F. Supp. 3d at 1049.

selected "because of the creative expressions they contained," for their "well-curated facts, well-organized analyses, and captivating fictional narratives."[28]

That difference is what makes the analogy to *Google Books* fail, and it turns on the interaction of two features rather than either alone. *Google Books* and LLM training share one: in neither does a *human* exercise work-level creative judgment relating any individual work to a new purpose. The transformativeness inquiry has always relied on human creative judgment to explain why drawing upon a work's expression for a new purpose is transformative rather than infringing. Where the copying is indifferent to expression, that reliance never comes into play. Yet expressiveness alone does not defeat fair use, and many transformative uses draw on highly expressive originals. AI training presents the pairing of expression-seeking copying with the absence of human judgment relating any work to a new purpose.

#### 5. Neither decision examined the human creativity predicate, and the case *Bartz* invoked as its analogue satisfied it

The decisions on which Defendants and the United States principally rely are out-of-circuit district court decisions entitled to no deference here. A decision of this District nonetheless illustrates what the predicate looks like when it is satisfied. In *White v. W. Publ'g Corp.*, Judge Rakoff held that including two publicly filed litigation briefs in legal research databases was fair use. The transformativeness holding rested in part on the editorial processes by which human editors reviewed, redacted, coded, and linked those documents before delivering them to human researchers; the works were "functional presentations of fact and law;" and no secondary market for briefs existed to be harmed.[29] *White* is therefore an instance in which the human creativity predicate was satisfied, not one in which its absence was excused. OpenAI cites the decision here.[30]

*Bartz* invoked *White* as the closer analogue to its own facts, positing a tool trained on opinions, briefs, and law review articles that responds to legal prompts with fresh legal writing.[31]

[28] 787 F. Supp. 3d at 1017.
[29] 29 F. Supp. 3d 396, 399–400 (S.D.N.Y. 2014).
[30] OpenAI Books Mem. 38.
[31] 787 F. Supp. 3d at 1022.

But *White* involved no such tool. The similarity *Bartz* perceived lies in the output — legal writing produced from legal materials — not in the process. In *White*, the human editors exercised judgment in relating the briefs to a new expressive purpose; in *Bartz's* hypothetical tool, no one does. The analogy thus rests on the equivalence assumption rather than examining it. *Kadrey* took the first step and stopped: the court recognized that training depends on expressive quality but did not carry that recognition into the predicate inquiry, treating the distinction it had drawn as not decisive. *Bartz* did not reach that step, accepting the expressive-selection facts in its statement of the record and then reasoning through Factor One by the aspiring-reader analogy.

#### 6. The equivalence assumption appears in the briefing as background rather than argument

The equivalence assumption appears in the briefing before this Court — in the background sections rather than in the argument. OpenAI describes pretraining as an "iterative process whereby the model learns broad linguistic patterns" and as "roughly analogous to a student who completes a practice exam (training excerpts), uses an answer key to score her performance (train loss)," and improves on the next attempt.[32] The United States, appearing as a non-party, states the equivalence most directly, arguing that under Plaintiffs' reasoning Joan Didion would have incurred liability to Ernest Hemingway because, as a teenager, she "would type out" his stories "to learn how the sentences worked."[33]

These passages appear as description of how the technology works, supported by citations to a statement of undisputed facts, rather than as propositions of law subject to response. That placement is what makes the human creativity predicate easy to pass over. The process those descriptions name is, on Defendants' own account, the iterative adjustment of numerical parameters across a corpus; nothing in that account identifies a judgment relating any work to a new purpose. A statement that a model "learns," or performs as a student does, is not offered as an argument that machine processing and human learning occupy the same doctrinal category — yet the transformativeness analysis depends on that very proposition. And the

[32] OpenAI Books Mem. 5, 7–8.
[33] U.S. Statement of Interest 16–17 (Dkt. No. 1682).

consequence is not merely rhetorical. Defendants acknowledge that "the proponent of the [fair use] defense bears the ultimate burden of proof,"[34] yet the predicate on which their transformativeness showing depends appears in their statement of the record rather than in their argument. A premise stated as background is not thereby established.

### B. The unprotectability of style does not resolve the question, because that proposition assumes a human learner

Defendants maintain that training extracts only unprotected material, since "ideas, concepts, principles, semantic structures, writing styles, and facts are not copyrightable."[35] If that proposition were as categorical as stated, the expression-seeking character of AI training identified above would be legally irrelevant: however comprehensively a model extracts a work's expressive qualities, it would extract only unprotectable "style." But the proposition is not that categorical because it presupposes a human learner.

Style's unprotectability is not a statutory command. The word "style" appears nowhere in § 102(b), which excludes from protection any "idea, procedure, process, system, method of operation, concept, principle, or discovery."[36] It is instead a judge-made rule of reason, tracing to Judge Hand's abstraction principle — that any work can be described at ascending levels of generality, and that at some level of abstraction the description captures only unprotectable ideas.[37] The proposition performs an essential function: it keeps the general building blocks of creative work — genres, techniques, aesthetic approaches — free for others to use, so that later creators may learn from and build upon earlier ones.[38] Enabling creators to learn from one another in this way is not a grudging exception to copyright; it is among the purposes copyright exists to serve.

Yet every case articulating the proposition that training extracts only unprotected material arose in a single setting: one human diligently learning from another. *Nichols* concerned a

[34] OpenAI Books Mem. 16 (citing *Romanova v. Amilus Inc.*, 138 F.4th 104, 109–10 (2d Cir. 2025)).
[35] Microsoft Books Mem. 15 (citing *McDonald v. West*, 138 F. Supp. 3d 448, 459 (S.D.N.Y. 2015)).
[36] 17 U.S.C. § 102(b).
[37] *Nichols v. Universal Pictures Corp.*, 45 F.2d 119, 121 (2d Cir. 1930).
[38] *Peter Pan Fabrics, Inc. v. Martin Weiner Corp.*, 274 F.2d 487, 489 (2d Cir. 1960).

playwright; *Peter Pan Fabrics*, a fabric designer. And human learning has a structural feature the proposition quietly depends on. As humans, we learn by absorbing a style through the ordinary limits of our human perception and memory: we take in an impression, not a comprehensive high-fidelity record of every expressive choice a body of work contains. Those limits confine what we can extract to the level of abstraction — the general approach, the felt influence — while the specific expressive choices that constitute the style remain beyond our brains' abilities to fully capture. And because our own creative judgment mixes inseparably with whatever we absorb, our output transforms the influence rather than reproducing it.

That constraint is why the proposition that style is unprotectable makes sense: learning from another artist's style has never meant anything but relating what we absorbed to a purpose of our own. Machine "learning" is different not just in scale, but in kind.[39] To the extent a training process reaches beyond the general aesthetic to encode the specific expressive choices a body of work contains — comprehensively, and in a form optimized to reproduce a source's stylistic signature — it does something no human learner could do, and something the unprotectability proposition never had occasion to address.

Defendants' argument rests on the idea-expression dichotomy,[40] but that dichotomy distinguishes the free abstraction from the protected specifics — and it is the protected specifics that expression-seeking extraction is capable of reaching. That leaves the question this brief poses unanswered: whether a use that engages a work for its protected expression, through a process in which no human creative judgment relates that expression to a new purpose, is transformative. The unprotectability of style, like the transformativeness of training, was settled in a world where the only learner was human. Neither settles what follows when the learner is not.

[39] *See* Robert Brauneis, *Copyright and the Training of Human Authors and Generative Machines*, 48 COLUM. J.L. & ARTS 1, 45–57 (2024) (concluding that generative model training transcends the human limitations of memory, perception, and cognitive capacity that underlie the structure of copyright's exclusive rights, such that computer processing cannot be treated as the functional equivalent of human reading or learning).

[40] *See supra* note 35.

### C. The human creativity predicate also bears on whether a training-data licensing market is a cognizable market

The equivalence assumption this brief identified at Factor One of the § 107 fair use analysis reappears at Factor Four. OpenAI's answer to Plaintiffs' market-dilution theory is a block quotation of *Bartz*, which held that authors' complaint about competing works is "no different than it would be if they complained that training schoolchildren to write well would result in an explosion of competing works," because the Act "seeks to advance original works of authorship, not to protect authors against competition."[41] But the reasoning it supplies equates the market consequence of machine training with the market consequence of teaching children to write — the same machine-human equivalence identified above.

The analogy was contested when it was made. Two days after *Bartz*, the *Kadrey* court rejected it, explaining that "using books to teach children to write is not remotely like using books to create a product that a single individual could employ to generate countless competing works with a minuscule fraction of the time and creativity it would otherwise take." The analogy was "inapt," that court concluded, and "not a basis for blowing off the most important factor in the fair use analysis."[42] OpenAI answers that this aspect of *Kadrey* is wrong as a matter of Second Circuit law.[43] *AIRights* takes no position on that dispute. Its relevance here is narrower: the two decisions on which this briefing turns divided precisely on whether the market consequence of machine training may be assumed equivalent to that of ordinary human learning, or must instead be examined.

Whether a training-data market is cognizable turns on the same characterization question posed above: expression-indifferent use, for which no such market is cognizable, or expression-seeking use, for which one may be. Defendants' factor-four argument does not answer that question.

---

[41] OpenAI Books Mem. 33–34 (quoting *Bartz*, 787 F. Supp. 3d at 1031–32) (presenting that passage as dispositive of the theory).
[42] 788 F. Supp. 3d at 1036.
[43] OpenAI Books Mem. 34.

### D. The balance the IP Clause strikes is Congress's to recalibrate, not the Court's

This Part makes two arguments. The first does not depend on the preceding discussions: however the human creativity predicate is resolved, the method by which Defendants and the United States read § 107 — invoking copyright's purpose while treating the means the IP Clause specifies as spent — is not available to a court. The second is conditional. If examination bears out what Parts III.A–C describe above, and the predicate is displaced rather than satisfied, then the step required to sustain the defense — treating a machine-scale process as equivalent to the human creative reuse the inquiry was built to evaluate — is a structural extension of the doctrine that belongs, at minimum, to Congress.

#### 1. Copyright's purpose cannot be invoked to discount the means the Clause specifies, and the balance between them is Congress's to strike

The IP Clause states an object and the means of attaining it: Congress may "promote the Progress of Science and useful Arts, *by securing* for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries."[44] The Clause's means language is not ornamental. It is the only place in Article I where the Constitution specifies the mode by which a granted power is to be exercised.[45] The Supreme Court has drawn binding requirements from its terms, holding that originality is a constitutional requirement rooted in the words "Authors" and "Writings."[46] Congress legislated along that route, and the Act it enacted requires a human author.[47]

The authorities invoked for the proposition that authors' interests are subordinate to those of the public state the relationship rather than invert it. *Feist's* statement that copyright's primary objective "is not to reward the labor of authors" appears in the Court's rejection of "sweat of the brow" protection.[48] Effort alone earns nothing, which is why originality is required. It is not a

[44] U.S. Const. art. I, § 8, cl. 8 (emphasis added).
[45] *See* Edward C. Walterscheid, *Defining the Patent and Copyright Term: Term Limits and the Intellectual Property Clause*, 7 J. INTELL. PROP. L. 315, 316 (2000) ("No other constitutional grant of authority to Congress sets forth a specific means for exercising that authority.").
[46] *Feist Publ'ns, Inc. v. Rural Tel. Service Co.*, 499 U.S. 340, 346 (1991); *see Burrow-Giles Lithographic Co. v. Sarony*, 111 U.S. 53, 58 (1884).
[47] *Thaler*, 130 F.4th at 1041.
[48] *Feist*, 499 U.S. at 349, 352.

holding that the means the Clause specifies may be discounted in construing the statute Congress built on it.

*Aiken*'s formulation carries the means within it, locating "the general benefits derived by the public" in "the labors of authors."[49] Congress said the same when it enacted the Copyright Act in 1909. Copyright rests not on natural right but "upon the ground that the welfare of the public will be served … by securing to authors for limited periods the exclusive rights to their writings," and such rights are given "[n]ot primarily for the benefit of the author, but primarily for the benefit of the public."[50] The primacy of the public benefit is thus not in doubt. Nor is the means by which Congress understood that benefit to be realized. And Congress treated the calibration — how much a grant will stimulate production and how much the monopoly will burden the public — as its own task.[51] That primacy has always operated through the limitations Congress enacted and the Court has long recognized — originality, the idea-expression distinction, and § 107 itself. The primacy of the public benefit has never been a freestanding warrant to set aside rights the statute grants.

The same structure appears in the fair-use inquiry. A use with a distinct purpose is justified because it "further[s] the goal of copyright, namely, to promote progress of science and the arts, without diminishing the incentive to create."[52] The Third Circuit recently quoted that sentence in full in the first appellate decision to address AI training and fair use, treating the distinctive-purpose inquiry as the "lodestar" of the first factor.[53]

OpenAI quotes *Warhol's* sentence, but argues only its first half, closing its showing on the public benefits its models produce.[54] Microsoft quotes the companion formulation — that the factors weigh "incentives to create against the costs of restrictions on copying" — and likewise never asks whether its own use diminishes that incentive.[55] Where Defendants invoke incentives

---

[49] *Twentieth Century Music Corp. v. Aiken*, 422 U.S. 151, 156 (1975).
[50] H.R. Rep. No. 2222, 60th Cong., 2d Sess., at 7 (1909).
[51] *Id.*
[52] *Warhol*, 598 U.S. at 531.
[53] *Thomson Reuters Enter. Ctr. GmbH v. ROSS Intelligence Inc.*, No. 25-2153, slip op. at 15 (3d Cir. Sept. 29, 2026).
[54] OpenAI Books Mem. 20, 38–39.
[55] Microsoft Books Mem. 10.

elsewhere, it is to characterize Plaintiffs' theory rather than to satisfy the condition as to their own use.[56] The United States' Statement of Interest makes the same move at greater length, reciting the IP Clause in full and then drawing from that language the conclusion that "[t]he primary objective of copyright is not to reward the labor of authors."[57] In each instance the incentive condition is recited once and never worked again.

The Second Circuit has rejected that inference. Confronted with the argument that a project's "invaluable contribution to the progress of science and cultivation of the arts" established transformative purpose, it held otherwise: "Added value or utility is not the test."[58] The benefit a technology produces is not a premise from which transformative purpose follows.

Defendants' approach fails for a second reason, independent of how the balance should come out: the calibration is not the Court's to perform. "[I]t is generally for Congress, not the courts, to decide how best to pursue the Copyright Clause's objectives."[59] That the Supreme Court in *Eldred* declined to read the IP Clause's preamble as an independent constraint on Congress underscores the point. If the Clause's statement of purpose was not strong enough in *Eldred* to limit what Congress may enact, it cannot be strong enough here to authorize a court to read past what Congress did enact. Congress may of course assign such judgments to courts; it has not done so here. *AIRights* does not contend that the Clause of its own force dictates the outcome of a fair-use defense. The Clause supplies the structure; Congress struck the balance within it, securing exclusive rights in § 106 and bounding them in § 107.

Congress did delegate to the courts the case-by-case development of fair use, but that delegation operates within the statute's premises, not upon them. Deciding whether a particular parody, quotation, or index is fair is the work Congress assigned. Deciding that the IP Clause's objective language authorizes a court to discount the means it specifies — and to do so in favor

---

[56] OpenAI Books Mem. 33.
[57] U.S. Statement of Interest 5–6 (quoting *Feist*, 499 U.S. at 349).
[58] *HathiTrust*, 755 F.3d at 96 (quotation omitted).
[59] *Eldred*, 537 U.S. at 212; *accord Golan v. Holder*, 565 U.S. 302, 325 (2012) (holding that it is for Congress to determine the intellectual property regimes that, in its judgment, will serve the Clause's ends).

of considerations the statute nowhere names, including industrial competitiveness and national security — would be a recalibration of the balance itself.

The United States points to the same institution: Congress. Its filing reports that the President has encouraged Congress to consider enabling licensing frameworks for rights holders, and it states that whether "this new technology warrants a wholesale rewriting of copyright principles is a policy question best left to the People and their elected representatives."[60] *AIRights* agrees. That principle bears directly on the construction the same filing urges. A reading of § 107 that discounts the means the Clause specifies is not an application of copyright principles but a rewriting of the balance they strike.

**2. Section 107's terms presuppose a human actor, and courts do not resolve such silences by assumption**

Section 107 codifies fair use in terms that presuppose a human actor. The enumerated purposes — criticism, comment, teaching, scholarship, research — are human communicative activities. The transformativeness inquiry asks whether a use adds "something new, with a further purpose or different character," a formulation that presupposes an actor whose judgment does the relating.[61] The statute does not speak to whether a machine-scale process that engages expression without such judgment comes within the fair-use defense; it neither authorizes that extension nor forecloses it. That silence is the interpretive space this brief addresses.

Section 107's open-ended terms have been applied to technologies its drafters never contemplated, and rightly so: the videocassette recorder, the search index, the digital library. In each, an unanticipated technology was put to use by a human whose purpose the inquiry could evaluate. What is unanticipated here is not the machinery but the actor — and the humanity — that the statute's terms presuppose.

Where a copying technology has outrun the statute's premises rather than merely its examples, Congress has supplied a mechanism. In each instance, the existing statute was held or understood not to reach the conduct, and Congress then built the regime the decision left for it: a

[60] U.S. Statement of Interest 2–3, 17.
[61] *Campbell*, 510 U.S. at 579.

compulsory license after player-piano rolls were held not to be copies,[62] and again for cable retransmission and for digital audio transmission.[63] Those rulings left Congress free to choose: it could create a license, set a royalty, or do nothing, and no one had yet been told the conduct was lawful. A ruling that fair use reaches this conduct would remove that choice. Congress could still act, but it would be withdrawing a privilege already granted rather than deciding whether to grant one. For machine-scale training it has supplied none, and Defendants ask the Court to supply by construction what Congress has supplied by statute every previous time.

Where the applicability of a statute to an unanticipated circumstance turns on a structural feature the enacted text presupposes, courts have long declined to resolve the openness by assuming the feature away. Clear-statement canons illustrate the practice.[64] These canons do not govern § 107, and *AIRights* does not invoke them as governing rules. They illustrate the same interpretive restraint described above: a court confronting a silence about a premise in the statute should not fill it by assumption. Defendants invoke that restraint from the other direction, quoting *Sony* for courts' "reluctan[ce] to expand the protections afforded by the copyright without explicit legislative guidance."[65] It cuts both ways. Calling fair use an exception does not change the fact that applying it to a process the statute's premises do not describe would enlarge it.

## IV. STATEMENT OF NON-POSITION

*AIRights* addresses only the questions this brief identifies. We take no position on Defendants' acquisition of copies or any secondary-liability claim; on any claim concerning outputs, copyright management information, trademark, or unfair competition; on whether a training-data licensing market or market dilution has been shown on this record; on the policy

---

[62] *See White-Smith Music Publishing Co. v. Apollo Co.*, 209 U.S. 1 (1908) (holding that piano rolls were not "copies" of the musical compositions they reproduced); 17 U.S.C. § 115 (mechanical compulsory license, enacted in response in 1909).
[63] 17 U.S.C. §§ 111 (compulsory license for secondary transmissions by cable systems), 114(d)–(f) (statutory license and rate-setting for digital audio transmissions).
[64] *See Gregory v. Ashcroft*, 501 U.S. 452, 460–61 (1991); *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 65 (1989); *see also Carpenter v. United States*, 585 U.S. 296, 313–16 (2018) (declining to extend precedent mechanically after technological change).
[65] OpenAI Books Mem. 18 (citing *Sony Corp. of Am., Inc. v. Universal City Studios*, 464 U.S. 417, 431 (1984)).

contentions in the Statement of Interest filed by the United States; or on any other issue the cross-motions present.

These limits are not concessions. They reflect the two questions this brief addresses: whether the transformativeness inquiry's predicate is satisfied here, and who may recalibrate the balance the IP Clause strikes.

## V. CONCLUSION

*AIRights* urges no outcome. We ask only that the threshold question be examined rather than assumed: before machine-scale training is treated as equivalent to the human creative reuse the doctrine was built to evaluate, the Court should examine whether that predicate is satisfied on this record. *Bartz* and *Kadrey* resolved the transformative-use question without that examination, and Defendants ask this Court to adopt their conclusion without supplying it. As the proponents of an affirmative defense, Defendants must establish this premise, and this record does not. Whatever the answer, copyright's purpose cannot be invoked to discount the means the IP Clause specifies. Congress struck that balance in §§ 106 and 107, and Congress holds the instruments — compulsory licenses, administered royalties, conditioned access — that a ruling on a § 107 defense cannot supply.

Dated: October 14, 2026

Respectfully submitted,

KO IP & AI LAW PLLC

By: /s/ Jim W. Ko

Jim W. Ko, SBN 038530 (AZ)
4539 N 22nd St. #4410
Phoenix, AZ 85016
(480) 809-2247
jim@koailaw.com
*Pro hac vice* motion pending (Dkt. No. 1938)

*Attorney for [Proposed] Amicus Curiae The AI Rights Project*

**CERTIFICATE OF COMPLIANCE WITH WORD-COUNT LIMITATION**

Pursuant to Local Civil Rule 7.1(c), the undersigned certifies that this brief complies with the word-count limitation set by the Court's Order of August 7, 2026 (Dkt. No. 1663), which provides that a proposed amicus brief shall be no more than 6,000 words. As calculated by the word-count function of the word-processing program used to prepare this brief, the brief contains 6,000 words, excluding the corporate disclosure statement, statement regarding authorship and funding, caption, table of contents, table of authorities, signature block, and this certificate.

Dated: October 14, 2026

By: /s/ Jim W. Ko
Jim W. Ko