**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE:<br><br>OpenAI, INC.,<br><br>COPYRIGHT INFRINGEMENT LITIGATION<br><br>This Document Relates To:<br><br>1:23-cv-11195-SHS-OTW<br>1:24-cv-01515-SHS-OTW<br>1:24-cv-03285-SHS-OTW<br>1:24-cv-04872-SHS-OTW<br>1:25-cv-04315-SHS-OTW | 1:25-md-03143-SHS-OTW |

**DEFENDANTS' RESPONSE TO NEWS PLAINTIFFS' RULE 56.1 STATEMENT**

**VOLUME I – FACTS 1-547**

## VOLUME I

## TABLE OF CONTENTS


I. News Plaintiffs ....4

A. Background on News Plaintiffs ....4

1. The Times ....4

2. Daily News Plaintiffs ....8

3. Ziff Davis ....33

4. The Center for Investigative Reporting ....37

5. The Intercept ....40

B. The News Industry & Journalism ....46

C. Monetizing Journalism in the Digital Ecosystem ....51

1. How The Times Monetizes News Content ....55

2. How *Daily News* Plaintiffs Monetize News Content ....58

3. How Ziff Davis Plaintiffs Monetize Their Journalism ....65

4. How CIR and The Intercept Generate Revenue to Support their Non-Profit Journalism Missions ....66

5. Established Market for Licensing Journalism Content ....75

D. Developing Market for Licensing Data (Including News) for Generative AI Purposes ....87

E. News Plaintiffs' Ownership of Asserted Works ....189

1. The New York Times ....189

2. The Daily News Plaintiffs ....203

3. Ziff Davis ....273

4. The Center for Investigative Reporting ....293

5. The Intercept....304

6. Individual Articles....308

F. News Plaintiffs' Protection of Their Works....330

1. Paywalls....330

2. Robots Exclusion Protocol....336

3. Meta Tags....350

4. Terms of Service....356

Pursuant to Local Civil Rule 56.1, Defendants OpenAI and Microsoft respectfully submit this Response to Plaintiffs' Corrected Statement of Undisputed Material Facts in Support of their Motion for Partial Summary Judgment. ECF No. 1985 (News) (the "Statement").

Plaintiffs' Statement fails to comply with Local Civil Rule 56.1(a). That rule requires that a motion for summary judgment "be accompanied by a separate, **short, and concise statement**, in numbered paragraphs, of the **material facts** as to which the moving party contends there is no genuine issue to be tried." Local Civ. R. 56.1(a) (emphasis added). That is not what Plaintiffs did. Plaintiffs submitted 940 [*1,825*] separately numbered paragraphs spanning nearly 160 [*440*] pages. Such a voluminous submission does not comply with the local rule. *Tripathy v. McCloskey*, No. 21-CV-6584 (CS), 2024 WL 2135623, at *1 (S.D.N.Y. May 13, 2024) (striking plaintiff's 356-page submission for "ignor[ing] the Rule's requirement that a statement be short and concise"). Plaintiffs' approach has made it extremely difficult for Defendants to respond fully while also providing their responses in a format useful to the Court.

To deal with this massive and improper Statement, Defendants have attempted to streamline their response for the benefit of the Court as follows:

**Undisputed/Disputed/Disputed in Part.** Every fact includes one of these responses, to make clear Defendants' position under Local Rule 56.1(b). Facts designated "Undisputed" are facts that Defendants have elected not to dispute solely for purposes of Plaintiffs' Motion for Summary Judgment in this matter, but does not constitute a binding admission for any other purpose. Facts designated "Disputed" or "Disputed in Part" are facts that Defendants are disputing.

In addition, Defendants have included certain objections and other responses to Plaintiffs' facts where appropriate. Those additional responses and the authority supporting those responses are identified below. For the Court's convenience and to avoid further lengthening this response, Defendants do not repeat their supporting authority for these issues in every response. Instead, Defendants state these objections plainly for ease of review and incorporate the below authority into each of those responses. Where warranted and helpful for the Court, Defendants also provide additional, paragraph-specific information to assist the Court's assessment.

**Immaterial.** Facts designated "Immaterial" are facts that, even if true, do not help resolve any question currently before the Court on summary judgment, i.e., they do not "affect the outcome of the suit under the governing law." *I.M. v. United States*, 362 F. Supp. 3d 161, 190 (S.D.N.Y. 2019). Rule 56.1 statements are "immaterial" if they "do not provide any basis to rule in favor of either party for summary judgment even if they are disputed." *See Parks v. Lebhar-Friedman, Inc.*, No. 04-cv-7133-DCP-KNF, 2008 WL 3833802, at *4 (S.D.N.Y. Aug. 11, 2008). Facts designated as "Immaterial" below thus reflect facts that are not legally significant because it does not impact an element of any claim or defense at issue in Plaintiffs' summary judgment motion. Defendants' designation of certain facts as "immaterial" does not concede that any fact not designated as such is material for purposes of adjudicating Plaintiffs' Motion, or for any other purpose.

**"Not Supported by Cited Evidence."** Facts designated as "Not Supported by Cited Evidence" are facts with incorrect citations or where the cited evidence does not support the stated fact. *Holtz*, 258 F.3d at 74 (A "Rule 56.1 statement is not itself a vehicle for making factual assertions that are otherwise unsupported in the record. Where … the record does

not support the assertions in a Local Rule 56.1 statement, those assertions should be disregarded and the record reviewed independently.").

**"Not Supported by Admissible Evidence."** Facts designated as "Not Supported by Admissible Evidence" are facts that are not supported by admissible evidence as required by Local Rule 56.1, and therefore are not properly before the Court. S.D.N.Y. Local Rule 56.1 (d) ("Each statement by the movant … must be followed by citation to evidence that would be admissible[.]"); *Epstein v. Kemper Ins. Companies*, 210 F. Supp. 2d 308, 314 (S.D.N.Y. 2002) (statements in a Rule 56.1 statement "are inappropriate if they are not based on personal knowledge, contain inadmissible hearsay, … or do not cite to supporting evidence").

**"Improper Legal Argument."** Facts designated as an "Improper Legal Argument" are facts where the assertion therein constitutes improper attorney argument and/or is conclusory. These facts require no response. *Id.* (statements in a Rule 56.1 statement "are inappropriate if they are conclusory or argumentative[.]"); *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 801 F. Supp. 3d 330, 369 (S.D.N.Y. 2025) (quoting *Kesner v. Buhl*, 590 F. Supp. 3d 680, 691 (S.D.N.Y. 2022)) (the Court sets aside "[t]he portions of [a responding party's] 56.1 Statement that contain legal argument bereft of factual matter[.]").

**"Incomplete."** Facts designated as "Incomplete" are facts where Plaintiffs have "introduce[d] all or part of a statement" and Defendants introduce "any other part—or any other statement—that in fairness ought to be considered at the same time" pursuant to Federal Rule of Evidence 106.

# I. News Plaintiffs

## A. Background on News Plaintiffs

### 1. The Times

| | |
|---|---|
| 1. The Times is "a global media organization focused on creating and distributing high-quality news and information that help [its] audience understand and engage with the world." Ex. 1 [The New York Times SEC Form 10-K Dec. 31, 2025] at 1. | 1. **Undisputed.** |
| 2. The Times commenced its newspaper publication in 1851. Ex. 1 [The New York Times SEC Form 10-K Dec. 31, 2025] at 4. | 2. **Undisputed.** |
| 3. The Times had, as of December 31, 2025, "approximately 6,000 full-time equivalent employees, which includes more than 3,000 involved in [its] journalism operations." Ex. 1 [The New York Times SEC Form 10-K Dec. 31, 2025] at 7. | 3. **Undisputed.** |
| 4. The Times publishes approximately 280 articles per day. Ex. 2 [AG Sulzberger, "2026 State of the Times Remarks," https://www.nytco.com/2026-state-of-the-times-remarks/] (stating that in 2025, The Times published "52,665 articles," "The Athletic published 48,785 articles," and Wirecutter published "960 articles") (averaging 250 articles a day). | 4. **Undisputed.** |
| 5. The work that comprises The Times's Asserted Works spans decades and covers a wide range of | 5. **Disputed in Part - Not Supported by Cited Evidence.** Defendants respond as follows: Undisputed |

| | |
|---|---|
| subjects, and is not limited to bald facts, but contains elements of personal reflection, editorial judgment, creativity, and sometimes fiction. Maisel Declaration Exhibit A [The Times's SJ Rule 1006 Summaries of its Asserted Works] (the "Times Rule 1006 Summaries"); Ex. 3 [Sulzberger Depo. Tr.] at 128:2-8 (describing The Times's journalism as "a best-in-class collection of journalism from the world's leading journalists that has been systematically verified, you know, and then put in a distinctive, compelling story-telling package"); *id*. at 167:7-14 (testifying about how editing is a core part of The Times's journalism). | that The Times's Asserted Works span decades, cover different subjects, and are edited by journalists at The Times. However, disputed as to the Asserted Works being "not limited to bald facts, but contains elements of personal reflection, editorial judgment, creativity, and sometimes fiction" because the citations do not support the assertions. The Asserted Works consist predominantly of factual news reporting. *See* ECF 1702 (Microsoft News SUMF) ¶¶ 24–26. Further, the disputed proposition is not supported by the cited evidence. |
| 6. The Times's Asserted Works are written by thousands of journalists with distinct voices, but what is common among all of The Times's Asserted Works is that they are thoughtfully curated, carefully crafted, and thoroughly edited. Maisel Declaration Ex. A [Times Rule 1006 Summaries]; Ex. 3 [Sulzberger Depo. Tr.] at 167:7-14 (describing how all Times journalism "has to go through the hands of editors" "who are helping make things clear, more compelling" as well as "reading it for things like fairness, accuracy, any style considerations"), 191:16-192:10 (describing The Times's track record of "reinvesting deeply into [its] journalistic mission"); Ex. 4 [Dolnick Depo. Tr.] at 21:8-12 ("New York Times' journalism requires human reporters who go out and bear witness, and they find things out. We trust our reporters. Our reporters have very specific experience. We trust our editors, who have judgment."). | 6. **Disputed in Part – Not Supported by Cited Evidence.** Defendants do not dispute that "The Times's Asserted Works are written by thousands of journalists" and that they are edited. Defendants do dispute that "what is common among all of The Times's Asserted Works is that they are thoughtfully curated, [and] carefully crafted." The Asserted Works consist predominantly of factual news reporting. *See* ECF 1702 (Microsoft News SUMF) ¶¶ 24–26. Further disputed as to the remainder because the citations do not support the assertions. |

| | |
|---|---|
| 7. The Times invests substantial time and money to produce high-quality, accurate, and polished journalism for its readers, relying on significant human involvement in news gathering, fact checking, and editorial judgment. Ex. 5 [Levien Depo. Ex. 7] at 13; Ex. 1 [The New York Times SEC Form 10-K Dec. 31, 2025] at 2 (describing The Times's commitment to "original, independent and high-quality reporting, storytelling, and journalistic excellence" and stating that The Times "plan[s] to continue investing in [its] journalism and remain[s] committed to providing a multimedia report of depth, breadth, authority, creativity and excellence, produced with a focus on independence and integrity."); Ex. 3 [Sulzberger Depo. Tr.] at 167:7-14 (describing how all Times journalism "has to go through the hands of editors" "who are helping make things clear, more compelling" as well as "reading it for things like fairness, accuracy, any style considerations"), 191:16-192:10 (describing The Times's track record of "reinvesting deeply into [its] journalistic mission"), 302:8-23 (describing The Times's investment into its journalism, including having "bureaus all over the world" and giving journalists "sometimes years" "to do the most important work" as well as its "standard of quality and excellence," pulling together its journalism "in the most distinctive, compelling package"); Ex. 4 [Dolnick Depo. Tr.] at 21:8-12 ("New York Times' journalism requires human reporters who go out and bear witness, and they find things out. We trust our reporters. Our reporters have very specific experience. We trust our editors, who have judgment."); Ex. 6 | 7. **Undisputed.** |

| | |
|---|---|
| [NYT_00873667] at 674-675; Ex. 7 [The New York Times, *Editorial Standards* (March 26, 2025), https://www.nytimes.com/editorial-standards/ethical-journalism.html]. | |
| 8. Times journalists go where the story is, often at great risk and cost, to inform the public about important and pressing issues. Ex. 8 [Bardeen 30(b)(6) Depo. Tr.] at 167:5-16 (testifying that Times reporters "travel[] to specific places, ask[] people questions," and "talk to a lot of people and try to ascertain whether [something] really did happen, and then write about that from their firsthand experience."); Ex. 2 [Sulzberger, A.G. *AG Sulzberger 2026 Speech to Staff*. The New York Times Company (March 12, 2026), https://www.nytco.com/2026-state-of-the-times-remarks/]. | 8. **Undisputed.** |
| 9. The costs attributed to the creation of The Times's journalism include the costs to pay the individuals doing the reporting and editing. Ex. 8 [Bardeen 30(b)(6) Depo. Tr.] at 43:2-11. | 9. **Undisputed.** |
| 10. The Times's digital and print products include: its core news product, which is available in a printed newspaper, online at NYTimes.com, and via The Times's mobile application; and other interest-specific products, including The Athletic (its sports media product), Audio (its audio offering available as a separate subscription through its news app), Cooking (its recipes and cooking content product), Games (its puzzle games product), and | 10. **Undisputed.** |

| | |
|---|---|
| Wirecutter (its product review and recommendations offering). Ex. 1 [The New York Times SEC Form 10-K Dec. 31, 2025] at 1. | |
| 11. The Times publishes a wide range of journalistic works that cover categories like investigative reporting, breaking news reporting, beat reporting, reviews and analysis of arts and culture (including food, books, art, film, theater, television, music, fashion, and travel), technology, world news, U.S. news, commentary and opinion, Cooking, The Athletic, and Games. *See* Ex. 540 [NYTimes.com Homepage, https://www.nytimes.com/] (providing a menu of links various categories of Times coverage at the bottom). | 11. **Undisputed – Not Supported by Cited Evidence.** Defendants respond that the fact set forth in Paragraph 11 is undisputed, but that the Court should disregard this Paragraph because the cited evidence is not correct. News Ex. 540 is the nytco.com corporate homepage, not NYTimes.com, and does not provide a coverage menu at the bottom. |
| 12. The Times has been awarded 149 Pulitzer Prizes. Ex. 541 [The New York Times Company, *Awards and Recognition*, https://www.nytco.com/awards/]. | 12. **Undisputed.** |

**2. Daily News Plaintiffs**

| | |
|---|---|
| 13. The Daily News Plaintiffs are the owners of eight local newspapers: *New York Daily News, Chicago Tribune, Orlando Sentinel, Sun-Sentinel, Mercury News, Denver Post, Orange County Register,* and *Pioneer Press*. Ex. 10 [D. Anderson 30(b)(6) Dep. Tr.] 10:6-11:10. | 13. **Disputed in Part - Not Supported by Cited Evidence.** Defendants respond as follows: Undisputed that the Daily News Plaintiffs are eight corporate entities. Undisputed that Plaintiffs' corporate designee provided the cited testimony. A. Blanco Opp. Decl. Ex. 166 (D. Anderson 30(b)(6) Tr.) at 10:6–11:10. Otherwise, Paragraph 13 is disputed. The Daily News Plaintiffs are subsidiaries of Tribune Publishing and MediaNews Group, which are owned by Alden Global |

| | |
|---|---|
| | Capital. The Daily News Plaintiffs are not the independent owners of the Plaintiff papers. Mr. Anderson's testimony establishes, at most, which entity holds each newspaper title. It does not establish how those entities relate to each other or to their corporate parents. The facts set forth in Paragraph 13 are therefore not supported by the cited material, and the Court should disregard them.<br>Defendants further respond that the factual record regarding Daily News Plaintiffs' corporate ownership is inconsistent. Plaintiffs' corporate and other witnesses and discovery responses describe the ownership and control of the Plaintiff entities in conflicting ways.<br>Mr. Anderson testified [redacted] *Id.* at 12:1–13:13. He testified that [redacted] *Id.* But Daily News Plaintiffs' other corporate designee, Chris Loretto, testified that [redacted] A. Blanco Opp. Decl. Ex. 232 (C. Loretto 30(b)(6) Tr.) at 9:13–10:11.<br>Mr. Anderson testified that [redacted] A. Blanco Opp. Decl. Ex. 166 (D. Anderson 30(b)(6) Tr.) at 14:6–17. He also [redacted] *Id.* at 13:14–18. But Mr. Loretto testified that [redacted] |

| | |
|---|---|
| | [redacted] A. Blanco Opp. Decl. Ex. 232 (C. Loretto 30(b)(6) Tr.) at 9:22–25. Wayne Lown [redacted] A. Blanco Opp. Decl. Ex. 233 (W. Lown 30(b)(1) Tr.) at 8:20–9:2.<br>Mr. Anderson [redacted] A. Blanco Opp. Decl. Ex. 166 (D. Anderson 30(b)(6) Tr.) at 14:23–15:3. Mr. Loretto, by contrast, [redacted] A. Blanco Opp. Decl. Ex. 232 (C. Loretto 30(b)(6) Tr.) at 10:5–11.<br>Plaintiffs' supplemental interrogatory response describes yet another structure. It states that [redacted] A. Blanco Opp. Decl. Ex. 87 (Daily News Pls.' First Suppl. Resps. & Objs. to Def. Microsoft Corp.'s Second Set of Interrogs., Resp. to Interrog. No. 13). Plaintiffs also acknowledge [redacted] *Id.* |

| | |
|---|---|
| | Defendants further respond that owning a newspaper does not establish ownership of the works included in the Daily News Plaintiffs' Rule 1006 Summary. |
| 14. The Daily News Plaintiffs provide influential and consequential journalism in their region and often in the U.S. more broadly, have long histories, Pulitzer Prize winning journalism, impactful local and investigative reporting, and in some cases are designated as the newspaper of record. *See, e.g.,* Ex. 11 ["Pulitzer for news," Daily News, https://www.nydailynews.com/2007/04/17/pulitzer-for-news/]; Ex. 12 ["The New York *Daily News* and the History of Conservative Media," Cambridge University Press, https://www.cambridge.org/core/journals/modern-american-history/article/new-york-daily-news-and-the-history-of-conservative-media/B3D4FD2CF08C020C4CDAC948786116B2]; Ex. 13 [https://www.ocregister.com/about-us/]; Ex. 14 [https://www.chicagotribune.com/about/]; Ex. 36 [https://www.orlandosentinel.com/about/]; Ex. 15 [https://www.sun-sentinel.com/about-us/]; Malackowski NYT-DNP Opening Rep. at 68-69;[1] *see also* Owen Reply Rep. at Appx A. | 14. **Disputed in Part – Not Supported by Cited Evidence.** Defendants respond as follows: Undisputed that certain Daily News Plaintiff newspapers have long histories. Undisputed that certain Daily News Plaintiff newspapers have won Pulitzer Prizes in the past. to the extent Paragraph 14 describes the eight Daily News Plaintiffs as a group, but the cited evidence of prominence is concentrated in a few papers and a few past investigations. The prizes identified in the record are attributed to specific papers and specific years. They describe past work, not Plaintiffs' current journalism generally. The facts set forth in Paragraph 14 are therefore not supported by the cited material, and the Court should disregard them. |

[1] News Plaintiffs' experts are submitting declarations with News Plaintiffs' motion. These experts are: Dr. Tom Goldstein, Dr. Oren Etzioni, Dr. Emily Bell, Dr. Adam Alter, Ms. Jessie Stricchiola, Mr. James Malackowski, Dr. Taylor Owen, Dr. Emily Wenger, Dr. Michael McDonald, Ms. Sue Cross, Mr. Timothy Wu, Dr. Jonathan Krein, and Mr. Daniel Delorey. This statement cites directly to these experts' reports, which are attached to their concurrently filed declarations.

| | |
|---|---|
| 15. The Daily News Plaintiffs work hard to maintain their repntation for originality, spending time on reporters and editors to craft their journalism. *See* Ex. 16 [Colacioppo 30(b)(6) Depo. Tr.] at 83:23-84:17, 92:15-19; Ex. 17 [Pine Feb. 4, 2025 30(b)(6) Depo. Tr.] at 104:2-6; Owen Rebuttal Rep. at ¶ 57. | 15. **Disputed in Part - Not Supported by Cited Evidence.** Defendants respond as follows: Undisputed that Lee Ann Colacioppo, testifying for DP Media Network, LLC, provided the quoted testimony in News Ex. 16. Otherwise, the fact is disputed as stated.<br>The fact set forth in Paragraph 15 is not supported by the cited evidence. The cited Colacioppo testimony concerns [redacted], not all of the Daily News Plaintiffs. A. Blanco Opp. Decl. Ex. 186 (L. Colacioppo 30(b)(6) Tr.) at 83:23–84:17, 92:15–19. Plaintiffs cite no testimony from the other Daily News Plaintiffs about any effort to maintain a "[redacted]" Nor does the cited Pine testimony support Paragraph 15. A. Blanco Opp. Decl. Ex. 255 (F. Pine 30(b)(6) Tr. (Feb. 4, 2026)) at 104:2–6. Pursuaut to Fed. R. Evid. 106, Plaintiffs omit context showiug that Mr. Pine's testimony concerus [redacted] not the Daily News Plaintiffs' journalism geuerally. The facts set forth iu Paragraph 15 are therefore uot supported by the cited material, aud the Court should disregard them.<br>Defendants further respond that the record shows much of Plaintiffs' couteut takes little origiual effort. Plaintiffs' witnesses described several kiuds of content that require little time or labor, or that Plaintiffs' uewsrooms do not create at all. Plaintiffs' curreut papers are [redacted] A. Blauco Opp. Decl. Ex. 34 at DNP-00120843. One wituess described [redacted] |

| | |
|---|---|
| | [redacted]"A. Blanco Opp. Decl. Ex. 260 (M. Pugh 30(b)(1) Tr. (Jan. 7, 2026)) at 62:11–63:6. Plaintiffs' internal subscriber surveys and reader feedback also show [redacted]. *See e.g.*, A. Blanco Opp. Decl. Ex. 84 (Sherwin Dep. Ex. 4 [redacted]) at DNP-00627695 ([redacted]; A. Blanco Opp. Decl. Ex. 81 (Colacioppo Dep. Ex. 14 ([redacted])) at DNP-00627409 ([redacted]; A. Blanco Opp. Decl. Ex. 60 at DNP-00476954 [redacted]). |
| 16. The Daily News Plaintiffs' original reporting takes people, time, money, and judgment. *See* Ex. 18 [Burbach Depo Tr.] at 15:1-17; Ex. 19 [Pugh 30(b)(1) Depo. Tr.] at 111:8-14; Ex. 20 [Julie Anderson Depo. Tr.] at 137:1-138:2; 11:24-12:11; Owen Rebuttal Rep. at ¶ 53. | 16. **Disputed in Part - Not Supported by Cited Evidence.** Defendants respond as follows: Undisputed that Plaintiffs' witnesses offered the cited testimony. Undisputed that former editors from the Pioneer Press and the Orlando Sentinel and the editor of the Chicago Tribune described what they perceive as the people, time, money, and judgment that goes into reporting for specific investigations. Otherwise, disputed as stated because the disputed proposition is not supported by the cited evidence for all Daily News Plaintiffs.<br>Further disputed that the "original reporting" as stated in the fact refers to the Daily News Plaintiffs' Asserted Works or that it describes the Daily News |

| | |
|---|---|
| | Plaintiffs' journalism generally. The cited testimony describes a handful of specific, high-profile investigative projects<br>Defendants further respond that the record shows mnch of Plaintiffs' content takes little time or effort. Plaintiffs' witnesses described several kinds of content that reqnire little time or labor, or that Plaintiffs' newsrooms do not create at all. Plaintiffs' cnrrent papers are [redacted] A. Blanco Opp. Decl. Ex. 34 at DNP-00120843. One witness described [redacted] A. Blanco Opp. Decl. Ex. 260 (M. Pngh 30(b)(1) Tr. (Jan. 7, 2026)) at 62:11–63:6. Defendants further dispnte the characterization of Daily News Plaintiffs' reporting as "original," as that is a legal issue pending before the Conrt on this motion. |
| 17. The Daily News Plaintiffs' jonrnalism has built significant brand equity. *See* Ex. 21 [Pugh 30(b)(6) Depo. Tr.] at 58:24-60:4; Ex. 22 [Jnlien 30(b)(6) Depo. Tr.] at 104:9-105:13; Ex. 16 [Colacioppo 30(b)(6) Depo. Tr.] at 69:22-70:6; Malackowski NYT-DNP Opening Rep. at 70. | 17. **Disputed - Not Supported by Cited Evidence.** Defendants respond as follows: Undisputed that the three cited witnesses gave the cited testimony about their own publications. Undispnted that some of the Daily News Plaintiffs' newspaper brands have long histories. Disputed that this testimony, or any cited evidence, establishes that the Daily News Plaintiffs' jonrnalism has bnilt "significant brand eqnity." None of the cited testimony addresses "brand eqnity." Thns, the fact set forth in Paragraph 17 is therefore not snpported by the |

| | |
|---|---|
| | cited material, and the Court should disregard them. Further disputed because each witness testified only for their own publication: the Chicago Tribune (Pugh), the Daily News (and only the nydailynews.com mark) (Julien), and The Denver Post (Colacioppo). Plaintiffs cite nothing about the Orlando Sentinel, Sun Sentinel, Mercury News, Orange County Register, or Pioneer Press in support of this fact. Thus, disputed to the extent the fact refers to *all* Daily News Plaintiffs.<br>Further disputed because Plaintiffs mischaracterize the cited testimony. Mr. Julien testified [redacted] A. Blanco Opp. Decl. Ex. 222 (A. Julien 30(b)(6) Tr.) at 104:9–105:13. When asked [redacted] *Id.* at 87:13–24, 88:8–14. He also [redacted] *Id.* at 97:12–99:17. Therefore, this shows that any claim of "brand equity" is not supported by any quantifiable or measurable metric or standard that could be observable or studied. Similarly, Ms. Colacioppo testified, [redacted] A. Blanco Opp. Decl. Ex. 186 (L. Colacioppo 30(b)(6) Tr.) at 71:7–10.<br>Defendants further respond that other evidence indicates the Daily News Plaintiffs received [redacted] |

| | |
|---|---|
| | [redacted] *See e.g.*, A. Blanco Opp. Decl. Ex. 84 (Sherwin Dep. Ex. 4 ([redacted])) at DNP-00627695 (e); A. Blanco Opp. Decl. Ex. 81 (Colacioppo Dep. Ex. 14 ([redacted])) at DNP-00627409 ([redacted]; A. Blanco Opp. Decl. Ex. 62 at DNP-00529933 ([redacted] A. Blanco Opp. Decl. [redacted] |

### *i) New York Daily News*

| | |
|---|---|
| 18. The New York Daily News is a local newsroom for the New York region, and it has been serving its local community for over 100 years. Ex. 23 [https://www.nydailynews.com/about-us/]. | 18. **Undisputed** |
| 19. The New York Daily News has been serving the people of New York since 1919 – delivering stories about New York city and its people; working to protect their interests and helping New Yorkers navigate their everyday lives. Ex. 23 [https://www.nydailynews.com/about-us/]. | 19. **Disputed in Part - Not Supported by Cited Evidence; Not Supported by Admissible Evidence.** Defendants respond as follows: Undisputed that the New York Daily News newspaper has been published since 1919. Defendants respond that the record contradicts the characterization of the New York Daily News as "serving the people of New York," "delivering |

| | |
|---|---|
| | stories about New York city and its people," and "working to protect their interests." The record shows that the Daily News has permanently closed its Manhattan newsroom and has less capacity to cover the city because of staffing cuts. *See e.g.*, A. Blanco Opp. Decl. Ex. 129 (Julien Dep. Ex. 32 (N.Y. Post, Aug. 18, 2022)) ("The tabloid, which bills itself as New York's Hometown Newspaper, doesn't even have a home for its staff after the company gave up its lease in lower Manhattan during the pandemic. It has no plans to find a new space, sources said."); A. Blanco Opp. Decl. Ex. 130 (Julien Dep. Ex. 35 (N.Y. Post, Jan. 25, 2024)) (the Daily News union staged its first walkout in three decades in January 2024, with the union steward stating that "staff is diminished, which means our ability to cover the city is diminished"). |
| 20. New York Daily News content is "hard-hitting journalism" that "cares about what New Yorkers care about." Ex. 22 [Julien 30(b)(6) Depo. Tr.] at 87:17-24. | 20. **Disputed in Part.** Defendants respond as follows: Undisputed that Ex. 22 contains the quoted testimony. However, Defendants dispute this fact because the record shows [redacted] A. Blanco Opp. Decl. Ex. 62, DNP-00529930 at DNP-00529939, DNP-00529942. |
| 21. The New York Daily News and ProPublica won the 2017 Pulitzer Prize for Public Service for exposing the New York Police Department's abuse of eviction rules to force hundreds of people, most of them poor and members of minority groups, from their homes. Ex. 24 [https://www.pulitzer.org/prize-winners-by-year/2017]. | 21. **Disputed in Part.** Defendants respond as follows: Undisputed that the New York Daily News and ProPublica won the 2017 Pulitzer Prize for Public Service.<br>However, disputed to the extent Paragraph 21 implies that the articles that contributed to winning this Pulitzer Prize are included in Daily News Plaintiffs' |

| | |
|---|---|
| | Asserted Works. *See* ECF 1715 (J. Maisel Decl. Ex. B) (Daily News Pls.' Rule 1006 Summary). |

### *ii) Chicago Tribune*

| | |
|---|---|
| 22. The Chicago Tribune is a major daily newspaper based in Chicago which also serves as a local newsroom for the Chicago region, and it has been serving its local community for over 175 years. Ex. 14 [https://www.chicagotribune.com/about/]. | 22. **Undisputed.** |
| 23. The Chicago Tribune has been continuously published since 1847 and is the top source of news and information in the Chicago area, and the largest news organization in the Midwest. Ex. 14 [https://www.chicagotribune.com/about/]; Ex. 25 [Pugh Depo. Ex. 2] at -409. | 23. **Disputed in Part - Not Supported by Cited Evidence; Not Supported by Admissible Evidence.** Defendants respond as follows: Undisputed that Chicago Tribune is a daily newspaper based in Chicago and has been published since 1847. Disputed to the extent that it implies the Chicago Tribune currently functions as a robust local newsroom, which is contradicted by the record. *See, e.g.*, A. Blanco Opp. Decl. Ex. 260 (M. Pugh 30(b)(1) Tr.) at 13:8–15; A. Blanco Opp. Decl. Ex. 84 (Sherwin Dep. Ex. 4) ([redacted]) at DNP-00627695 [redacted]; A. Blanco Opp. Decl. Ex. 60 at DNP-00476954 [redacted]; A. Blanco Opp. Decl. Ex. 34, DNP-00120839 at DNP-00120843 [redacted] |

| | |
|---|---|
| 24. The Chicago Tribune is known for its innovative investigative reporting, coverage of the arts and culture, and community-leading opinion writing. Ex. 14 [https://www.chicagotribune.com/about/]. | 24. **Disputed in Part - Not Supported by Cited Evidence; Not Supported by Admissible Evidence.** Defendants respond as follows: Undisputed that historically the Chicago Tribune has been known for investigative reporting, coverage of arts and culture, and opinion writing. Disputed to the extent the statement implies that the Chicago Tribune currently delivers original investigative, cultural, and community-serving journalism. The cited evidence does not support those assertions.<br>Further, the disputed proposition is not supported by admissible evidence, as required by Local Rule 56.1, and therefore is not properly before the Court. Specifically, News Ex. 14 (Chicago Tribune, "About" webpage) is Plaintiffs' own self-promotional marketing page. It is not a verified business record or sworn testimony. It is hearsay and lacks foundation because it is offered for the truth of its contents without any authenticating testimony. It therefore may not be considered in support of summary judgment. Defendants object to the cited exhibit as a self-promotional marketing page, not a verified business record or sworn testimony. |
| 25. Chicago Tribune has won 29 Pulitzer Prizes including, *inter alia*, for local reporting on Chicago's deficient building- and fire-safety code enforcement; public service for reporting on harmful pharmacy practices that led to reforms; commentary capturing the culture of Chicago; investigative reporting on faulty government regulation of toys, car seats, and cribs; feature reporting on a deadly | 25. **Disputed in Part - Immaterial.** Defendants respond as follows: Undisputed that the Chicago Tribune or its staff have received Pulitzer Prizes over the paper's history.<br>However, on this record, it is unclear whether any article from any listed prize-winning project is among the works asserted in this motion. The record therefore cannot |

| | |
|---|---|
| tornado in Utica, Illinois; editorial writing on reforming the death penalty; explanatory reporting on the American air-traffic system; international reporting on political conflict and disease epidemics in Africa; explanatory reporting on the Human Genome Diversity Project, and editorial writing on the Illinois child welfare system. Ex. 26 [https://www.chicagotribune.com/2026/05/04/chicago-tribune-pulitzer-prize/]. | support any inference that the prizes reflect on the Chicago Tribune's Asserted Works. |

***iii) Orlando Sentinel***

| | |
|---|---|
| 26. The Orlando Sentinel is a local newsroom for the Orlando region, and it has been serving its local community for over 150 years. Ex. 27 [https://www.orlandosentinel.com/2026/06/06/150-years-in-the-making-this-is-the-story-of-the-orlando-sentinel/]. | 26. **Disputed in Part – Not Supported by Cited Evidence; Not Supported by Admissible Evidence.** Defendants respond as follows: Undisputed that The Orlando Sentinel has existed as a publication for the Orlando region for approximately 150 years. However, Defendants respond that the record contradicts the implication that the Orlando Sentinel currently operates as a robust, original-reporting newsroom. The record shows that [redacted] and reporters have publicly disputed the conditions under Alden's ownership. *See* A. Blanco Opp. Decl. Ex. 167 (J. Anderson 30(b)(1) Tr.) at 34:24–35:19; A. Blanco Opp. Decl. Ex. 103 (*Orlando Sentinel journalists join newsroom-spanning strike in protest of 'vulture fund' owners Alden Global Capital*, Orlando Weekly (Feb. 1, 2024)); A. Blanco Opp. Decl. Ex. 34, DNP-00120839 at |

| | |
|---|---|
| | DNP-00120843; A. Blanco Opp. Decl. Ex. 63, DNP-00530012 at DNP-00530015. |
| 27. The Orlando Sentinel traces its origins back to 1876. Ex. 27 [https://www.orlandosentinel.com/2026/06/06/150-years-in-the-making-this-is-the-story-of-the-orlando-sentinel/]. | 27. **Undisputed.** |
| 28. In 2023, Orlando Sentinel conducted an investigation known as "Toxic Secret," that uncovered roughly two decades of industrial groundwater contamination, including in the drinking water of the local community. Ex. 20 [Julie Anderson Depo. Tr.] at 134:17-136:12. | 28. **Disputed in Part – Immaterial.** Defendants respond as follows: Undisputed that Ms. Anderson offered cited testimony.<br>However, disputed to the extent Paragraph 28 implies that any "Toxic Secret" article is a Daily News Plaintiff Asserted Work at issue in this motion. Paragraph 28 does not identify any "Toxic Secret" article as a Daily News Plaintiffs' Asserted Work. The record therefore cannot support any inference that this prize reflects on the Orlando Sentinel's Asserted Works at issue in this motion. |
| 29. The Orlando Sentinel has won three Pulitzer Prizes for investigative reporting for chronicling racial profiling and unjust property seizures by a local sheriff's office; for editorial writing regarding lax growth management; and for editorial writing regarding predatory lending practices in Florida. Ex. 1262 [https://www.pulitzer.org/prize-winners-by-year/1988; https://www.pulitzer.org/prize-winners-by-year/1993; Ex. 29 [https://www.pulitzer.org/prize-winners-by-year/2000]. | 29. **Disputed in Part - Immaterial.** Defendants respond as follows: Undisputed that the Orlando Sentinel or its staff have received Pulitzer Prizes over the paper's history.<br>However, disputed because Paragraph 29 does not identify any specific article. It gives no headline, publication date, byline, copyright registration, or entry on Plaintiffs' asserted-works spreadsheet for any article. Plaintiffs cite no testimony, discovery response, or spreadsheet entry tying any listed prize to an Asserted |

| | |
|---|---|
| | Work at issue in this motion. On this record, it is unclear whether any article from any listed prize-winning project is among the works asserted in this motion. The record therefore cannot support any inference that the prizes reflect on the Orlando Sentinel's Asserted Works. |
| 30. The Orlando Sentinel was also a Pulitzer finalist in 2017 for breaking news reporting related to coverage of the mass shooting at the Pulse nightclub, including middle-of-the-night reports as police prepared to storm the building. Ex. 30 [https://www.pulitzer.org/finalists/staff-192] | 30. **Disputed in Part - Immaterial.** Defendants respond as follows: Undisputed that the Orlando Sentinel was a Pulitzer Prize finalist in 2017.<br>Defendants further respond that five of the ten articles that contributed to the Orlando Sentinel's selection as a finalist for this Pulitzer Prize are not Asserted Works for purposes of this motion. *See* ECF 1715 (J. Maisel Decl. Ex. B) (Daily News Pls.' Rule 1006 Summary). The record therefore cannot support any inference that the finalist designation reflects on the Orlando Sentinel's Asserted Works at issue for purposes of this motion. |

***iv) South Florida Sun Sentinel***

| | |
|---|---|
| 31. The Sun Sentinel is a local newsroom for the south Florida region, and it has been serving its local community for over 100 years. Ex. 15 [https://www.sun-sentinel.com/about-us/]. | 31. **Disputed. in Part - Not Supported by Cited Evidence.** Defendants respond as follows: Undisputed that the Sun Sentinel has published in the South Florida region for over 100 years. However, Defendants respond that the record contradicts the implication that the Sun Sentinel currently operates a robust, original-reporting local newsroom. Evidence in the record demonstrates [redacted] |

| | |
|---|---|
| | [redacted], A. Blanco Opp. Decl. Ex. 167 (J. Anderson 30(b)(1) Tr.) at 117:16–118:12; [redacted], A. Blanco Opp. Decl. Ex. 34, DNP-00120839 at DNP-00120843; and, its own employees went on strike and voted unanimously to form a union in protest of Alden's cost-cutting of the newspaper's budget. A. Blanco Opp. Decl. Ex. 91 (*Tribune Publishing: Sun Sentinel journalists deserve a fair contract now!,* Action Network). |
| 32. The Sun Sentinel dates back to 1910, serves the Florida counties of Broward, Palm Beach, and Miami-Dade, and produces original journalism aimed to help members of those communities navigate their daily lives, make informed decisions, and connect with their communities. Ex. 15 [https://www.sun-sentinel.com/about-us/]. | 32. **Disputed in Part.** Defendants respond as follows: Undisputed that Sun Sentinel was founded in approximately 1910 and serves Broward, Palm Beach, and Miami-Dade counties in Florida. However, disputed that the Sun Sentinel currently produces "original journalism" aimed at serving those communities because whether the Sun Sentinel's journalism is "original," is a legal issue pending before the Court on this motion. |
| 33. The Sun Sentinel has published nationally recognized, original local journalism, including winning the 2019 Pulitzer Prize for Public Service for exposing the failures of school and law-enforcement officials before and after the shooting at Marjory Stoneman Douglas High School in Parkland. Ex. 31 [https://www.pulitzer.org/prize-winners-by-year/2019]; Ex. 20 [Julie Anderson Depo. Tr.] at 136:14-138:2. | 33. **Disputed in Part - Immaterial.** Defendants respond as follows: Undisputed that the Sun Sentinel won a Pulitzer Prize in 2019. Undisputed that Ms. Anderson gave the cited testimony.<br>Defendants further respond that twelve of the twenty articles that contributed to the Sun Sentinel winning this Pulitzer Prize are not Asserted Works for purposes of this motion. *See* ECF 1715 (J. Maisel Decl. Ex. B) (Daily News Pls.' Rule 1006 Summary). The record therefore cannot support any inference that the prize |

| | |
|---|---|
| | reflects on the Sun Sentinel's Asserted Works at issue in this motion. |
| 34. The Sun Sentinel reporting on the Stoneman Douglas High School shooting took more than fourteen journalists over ten months and established, among other findings, that armed officers did not enter the building. Ex. 31 [https://www.pulitzer.org/prize-winners-by-year/2019]; Ex. 20 [Julie Anderson Depo. Tr.] at 136:14-138:2. | 34. **Disputed in Part - Immaterial.** Defendants respond as follows: Undisputed that the Sun Sentinel won a Pulitzer Prize in 2019 and that Ms. Anderson offered the cited testimony.<br>Defendants further respond that twelve of the twenty articles that contributed to the Sun Sentinel winning this Pulitzer Prize are not Asserted Works for purposes of this motion. *See* ECF 1715 (J. Maisel Decl. Ex. B) (Daily News Pls.' Rule 1006 Summary). The record therefore cannot support any inference that the prize reflects on the Sun Sentinel's Asserted Works at issue in this motion. |
| 35. The Sun Sentinel previously won the 2013 Pulitzer Prize for Public Service for its investigation of off-duty police officers who endangered the public by speeding. Ex. 32 [https://www.pulitzer.org/prize-winners-by-year/2013]. | 35. **Disputed. in Part - Immaterial.** Defendants respond as follows: Undisputed that the Sun Sentinel won the 2013 Pulitzer Prize for Public Service.<br>Defendants further respond that Paragraph 35 does not identify any specific article. It gives no headline, publication date, byline, copyright registration, or entry in Plaintiffs' Rule 1006 Summary of the Asserted Works at issue for purposes of this motion. Plaintiffs cite no testimony, discovery response, or spreadsheet entry tying the prize to an Asserted Work at issue in this motion. On this record, it is unclear whether any article from the prize-winning project is among the works asserted in this motion. The record therefore cannot support any inference that the |

| | |
|---|---|
| | prize reflects on the Sun Sentinel's Asserted Works at issue in this motion. |

***v) San Jose Mercury News***

| | |
|---|---|
| 36. The Mercury News is a local newsroom for the Bay Area and Silicon Valley region, and it has been serving its local community for over 175 years. Ex. 33 [https://www.mercurynews.com/2014/06/16/herhold-the-history-of-the-mercury-news-downtown/]; Ex. 34 [https://network.thetrustproject.org/partner/the-mercury-news]. | 36. **Undisputed.** |
| 37. The Mercury News has roots dating back to 1851 and produces daily reporting that covers, *inter alia*, real estate; government-accountability; sports; and business. Ex. 33 [https://www.mercurynews.com/2014/06/16/herhold-the-history-of-the-mercury-news-downtown/]; Ex. 17 [Pine Feb. 4, 2026 30(b)(6) Depo. Tr.] at 81:15-18; Ex. 35 [https://www.mercurynews.com/]. | 37. **Disputed in Part - Not Supported by Cited Evidence; Not Supported by Admissible Evidence.** Defendants respond as follows: Undisputed that Mercury News has roots dating back to 1851.<br>However, disputed to the extent Paragraph 37 characterizes the Mercury News as independently producing daily original reporting across four subject categories. That characterization is incomplete and misleading. [redacted], *see* A. Blanco Opp. Decl. Ex. 74 (Pine Dep. Ex. 62 (DNP-00568937)) at DNP-00568938; A. Blanco Opp. Decl. Ex. 37 (Turpin Dep. Ex. 2), [redacted] A. Blanco Opp. Decl. Ex. 34, DNP-00120839 at DNP-00120-843. |

| | |
|---|---|
| 38. The Mercury News has covered the region known as Silicon Valley serving as a leading source of news and information regarding the growth and development of the high-technology industry and its impact of the U.S. economy for more than half a century. Ex. 33 [https://www.mercurynews.com/2014/06/16/herhold-the-history-of-the-mercury-news-downtown/; Ex. 37 [https://historysanjose.org/plan-your-visit/exhibits-activities/online-exhibits/750-ridder-park-drive-documenting-the-former-headquarters-of-the-mercury-news/]. | 38. **Disputed in Part - Not Supported by Cited Evidence; Not Supported by Admissible Evidence.** Defendants respond as follows: Undisputed that the Mercury News has covered the Silicon Valley region and has, at certain points in its history, been recognized for that coverage.<br>However, Defendants further respond that the record contradicts the present-tense characterization of the Mercury News as "a leading source of news and information." *See* A. Blanco Opp. Decl. Ex. 106 (*VentureBeat Launches (Kinda),* Wired); A. Blanco Opp. Decl. Ex. 104 (*Bay Area News Group Hammered by More Layoffs, Resignations,* San Jose Inside). |
| 39. The Mercury News has received awards for its original reporting, including in 1986 when the paper received the Pulitzer Prize for documenting the transfers of wealth abroad by President Ferdinand Marcos of the Philippines. Ex. 38 [https://www.pulitzer.org/prize-winners-by-year/1986]. | 39. **Disputed in Part - Immaterial.** Defendants respond as follows: Undisputed that the Mercury News or its staff won the 1986 Pulitzer Prize.<br>Defendants further respond that the articles underlying the 1986 Pulitzer Prize are not Asserted Works for purposes of this motion. *See* ECF 1715 (J. Maisel Decl. Ex. B) (Daily News Pls.' Rule 1006 Summary). The record therefore cannot support any inference that the prize reflects on the Mercury News's Asserted Works at issue in this motion. |
| 40. In 1990, the Mercury News received a Pulitzer Prize for General News Reporting in connection with its coverage of the Loma Prieta earthquake. The Pulitzer Prizes, 1990, General News Reporting (Staff, San Jose Mercury | 40. **Disputed in Part - Not Supported by Admissible Evidence.** Defendants respond as follows: Undisputed that the Mercury News has received a Pulitzer Prize. Disputed to the extent that the cited article is not an |

| | |
|---|---|
| News), Ex. 39 [https://www.pulitzer.org/prize-winners-by-year/1990]. | Asserted Work at issue in this Motion. *See* ECF 1715 (J. Maisel Decl., Ex. B) (Daily News Pls.' Rule 1006 Summary). The record therefore cannot support any inference that the Pulitzer Prize bears on the Daily News's Asserted Works at issue in this Motion. *See* ECF 1715 (J. Maisel Decl. Ex. B) (Daily News Pls.' Rule 1006 Summary). |

### *vi) Denver Post*

| | |
|---|---|
| 41. The Denver Post is a local newsroom for the Denver region, and it has been serving its local community for over 125 years. Ex. 40 [https://www.denverpost.com/2017/10/15/denver-post-at-125-a-timeline/]. | 41. **Disputed in Part - Not Supported by Admissible Evidence**. Defendants respond as follows: Undisputed that the Denver Post has a publication history over 125 years and that it publishes content relating to the Denver region. Disputed that the Denver Post currently functions as a "local newspaper" for the Denver region. *See* A. Blanco Opp. Decl. Ex. 31 (Colacioppo Dep. Ex. 18) ("[redacted]"). |

| | |
|---|---|
| 42. The Denver Post traces its origins for reporting on its local communities back to 1892 and has since grown to include a diverse portfolio of digital, mobile, print and social media products that include Colorado's largest daily newspaper and the state's most visited website (DenverPost.com). Ex. 40 [https://www.denverpost.com/2017/10/15/denver-post-at-125-a-timeline/. | 42. **Disputed in Part - Not Supported by Cited Evidence; Not Supported by Admissible Evidence**. Defendants respond as follows: Undisputed that the Denver Post traces its origins to 1892 and that it publishes through digital and print channels. However, News Ex. 40, to which News Plaintiffs cite, is the Denver Post's own out-of-court statement, offered by the Denver Post for its truth. Disputed that Denver Post is "Colorado's largest daily newspaper" and "the state's most visited website" as unsupported. News Plaintiffs cite no comparative circulation data, no third-party audience-measurement data and no testimony for either claim. Defendants located no admissible evidence in the record comparing the Denver Post's circulation or web traffic against any other Colorado outlet. |
| 43. The Denver Post reports on *inter alia* information, news, business, sports, Colorado, Denver, arts, and entertainment. Ex. 41 [https://www.denverpost.com]. | 43. **Disputed in Part - Not Supported by Cited Evidence**. Defendants respond as follows: Undisputed that the Denver Post publishes articles on information, news, business, sports, Colorado, Denver, arts, and entertainment. However, disputed to the extent the statement implies that content on these subjects is original Denver Post reporting, owned by the Denver Post, or "local" in character. *See* A. Blanco Opp. Decl. Ex. 186 (L. Colacioppo 30(b)(6) Tr. (Feb. 25, 2026)) at 30:10–20 ("[redacted] |

| | |
|---|---|
| | [redacted].”). |
| 44. The Denver Post’s staff won the 2013 Pulitzer Prize for Breaking News Reporting for its coverage of the Aurora movie-theater shooting that killed twelve and injured seventy, and the 2000 Pulitzer Prize for Breaking News Reporting for its coverage of the shooting at Columbine High School. Ex. 32 [https://www.pulitzer.org/prize-winners-by-year/2013]; Ex. 29 [https://www.pulitzer.org/prize-winners-by-year/2000]. | 44. **Disputed in Part**. Defendants respond as follows: Undisputed that the Denver Post has received Pulitzer Prizes over the paper's history. Disputed to the extent the statement describes subject matter but does not identify any specific article, headline, publication date, byline, copyright registration, or place on Daily News Plaintiffs' Rule 1006 summary. News Plaintiffs cite no testimony, discovery response, or spreadsheet entry tying any listed Pulitzer Prize to an Asserted Work at issue in this Motion. On this record, it is unclear whether any article from any listed Pulitzer Prize-winning project is among the Asserted Works for purposes of this Motion. The record therefore cannot support any inference that the Pulitzer Prize bears on the Daily News’s Asserted Works at issue in this Motion. |

***vii) Orange County Register***

| | |
|---|---|
| 45. The Orange County Register is a local newsroom for Orange County, California, and it has been serving its local community for over 100 years. Ex. 42 [https://www.ocregister.com/2006/09/11/register-history/]. | 45. **Undisputed.** |
| 46. The Orange County Register’s service to its local community dates back to 1905 and continues to be a leading provider of information for the residents of Orange | 46. **Undisputed.** |

| | |
|---|---|
| County. Ex. 42 [https://www.ocregister.com/2006/09/11/register-history/]. | |
| 47. Among the local topics covered by the Orange County Register are crime and public safety, investigative reporting, politics, business, housing, health, environment, weather, transportation, things to do, and sports. Ex. 43 [https://www.ocregister.com]. | 47. **Disputed in Part - Not Supported by Cited Evidence**. Defendants respond as follows: Undisputed that the Orange County Register publishes articles on these topics. Disputed to the extent the statement implies that content produced on these "local topics" is original Orange County Register reporting, owned by the Orange County Register, or is "local" in character, as those propositions are unsupported by the cited evidence and contradicted by the record. A. Blanco Opp. Decl. Ex. 211 (T. Harmonson 30(b)(1) Tr. (Feb. 20, 2026)) at 19:8–11 ("[redacted]"); *compare* News Ex. 41 (Denver Post's homepage) *with* News Ex. 43 (Orange County Register homepage's, showing many of the same articles, such as "Tim Curry, iconic character actor and 'Rocky Horror Picture Show' star, dies at 80," "Best Evening Primrose Oil," and "Stay loud and clear with the best walkie-talkies"). |
| 48. The Orange County Register has received three Pulitzer Prizes over the years, including for original reporting earned the 1996 Pulitzer Prize for Investigative Reporting, awarded to the Register's staff for uncovering fraudulent fertility practices at a university hospital and | 48. **Disputed in Part - Immaterial.** Defendants respond as follows: Undisputed that the Orange County Register has received Pulitzer Prizes. Disputed to the extent that the cited article is not an Asserted Work at issue in this Motion. *See* ECF 1715 (J. |

| | |
|---|---|
| prompting regulatory reform. Ex. 42 [https://www.ocregister.com/2006/09/11/register-history/]; Ex. 542 [ https://www.pulitzer.org/prize-winners-by-year/1996]. | Maisel Decl. Ex. B) (Daily News Pls.' Rule 1006 Summary). The record therefore cannot support any inference that the Pulitzer Prize bears on the Daily News's Asserted Works at issue in this Motion. *See* News Ex. 542. |
| 49. The Orange County Register has also been a Pulitzer Prize finalist twice, including for investigation of care at 26 local hospitals and development of a "report card" for patients, and reporting on lead-containing candy from Mexico and its effects on children. Ex. 44 [https://www.pulitzer.org/finalists/bernard-wolfson-william-heisel-and-chris-knap]. | 49. **Disputed in Part - Immaterial.** Defendants respond as follows: Undisputed that the Orange County Register has been a Pulitzer Prize finalist. However, News Ex. 44, to which News Plaintiffs cite, is the Orange County Register's own out-of-court statement, offered by the Orange County Register for its truth. Disputed to the extent that the cited articles are not any of the Asserted Works at issue in this Motion. *See* ECF 1715 (J. Maisel Decl. Ex. B) (Daily News Pls.' Rule 1006 Summary). The record therefore cannot support any inference that the Pulitzer Prize bears on the Daily News's Asserted Works at issue in this Motion. |

***viii) St. Paul Pioneer Press***

| | |
|---|---|
| 50. The Pioneer Press is a local newsroom for the Saint Paul metropolitan area, it was Minnesota's first newspaper, and it has been serving its local community for over 175 years. Ex. 45 [https://www.twincities.com/2024/04/28/minnesotas-first-newspaper-is-175-years-old/]. | 50. **Disputed in Part - Not Supported by Admissible Evidence**. Defendants respond as follows: Undisputed that Pioneer Press is located in the Saint Paul metropolitan area, was Minnesota's first newspaper, and has been in existence for over 175 years. However, disputed that the Pioneer Press currently operates as "a local newsroom for the Saint Paul metropolitan area," as that proposition is unsupported by the cited evidence and contradicted by the record. Pioneer Press's editor testified |

| | |
|---|---|
| | that [redacted] A. Blanco Opp. Decl. Ex. 180 (M. Burbach Tr.) at 16:16–21. The editor conceded that "[redacted] *Id.* at 18:22–19:7; *see also id.* at 42:5–43:5, 59:19–60:23. |
| 51. The Pioneer Press' roots for serving its local communities began in 1849 before Minnesota was an official state and produces daily local reports across, *inter alia*, news, features, and sports. Ex. 45 [ https://www.twincities.com/2024/04/28/minnesotas-first-newspaper-is-175-years-old/]; Ex. 46 [ https://www.twincities.com/]. | 51. **Undisputed.** |
| 52. The Pioneer Press has been recognized for its outstanding original reporting, including three Pulitzer Prizes, with one in 2000 for Beat Reporting, for revealing academic fraud in the University of Minnesota men's basketball program. Ex. 29 [https://www.pulitzer.org/prize-winners-by-year/2000]; Ex. 38 [https://www.pulitzer.org/prize-winners-by-year/1986]; Ex. 28 [https://www.pulitzer.org/prize-winners-by-year/1988]. | 52. **Disputed in Part - Immaterial**. Defendants respond as follows: Undisputed that the Pioneer Press has received Pulitzer Prizes. Disputed that the Pioneer Press publishes "original reporting" in any stated volume or proportion, or that the topical content it publishes is original Pioneer Press reporting, as those propositions are unsupported by the cited evidence and contradicted by the record. A. Blanco Opp. Decl. [redacted] Disputed to the extent that the cited articles are not any of the Asserted Works at issue in this Motion. *See* ECF 1715 (J. Maisel Decl., Ex. B) (Daily News Pls.' Rule 1006 Summary). The record therefore cannot |

| | |
|---|---|
| | support any inference that the Pulitzer Prizes bear on the Daily News's Asserted Works at issue in this Motion. |

### 3. Ziff Davis

| | |
|---|---|
| 53. Ziff Davis, Inc. is a diversified media and internet company that began a century ago as a specialty magazine publisher and today operates a portfolio of leading digital media brands. Declaration of Karen Oh ("Oh Decl.") at ¶¶ 6, 9. | 53. **Disputed in Part**. OpenAI responds as follows: Undisputed that Ziff Davis is a diversified media and internet company that began as a specialty magazine publisher approximately a century ago and now operates a portfolio of digital media brands. Disputed as to the characterization of those brands as "leading."<br><br>Microsoft responds that Paragraph 53 does not pertain to claims asserted against Microsoft. |
| 54. Along with Ziff Davis, Inc., several other Ziff Davis entities are also Plaintiffs, including: Ziff Davis, LLC, IGN Entertainment, Inc., Everyday Health Media, LLC, Mashable, Inc., and CNET Media, Inc. (collectively, "Ziff Davis" or the "Ziff Davis Plaintiffs"). *See* Second Amended Complaint (ECF No. 1676). | 54. **Undisputed.**<br><br>Microsoft responds that Paragraph 54 does not pertain to claims asserted against Microsoft. |
| 55. Ziff Davis produces original, professionally written and edited news, reporting, and analysis, focusing on technology, shopping, gaming, entertainment, health, and wellness, including deeply researched and expert-reviewed articles such as explainers, guides, reviews, walk-throughs and advice pieces. Oh Decl. ¶ 7. | 55. **Disputed in Part - Not Supported by Cited Evidence.** OpenAI responds as follows: Undisputed that Ziff Davis publishes news, reporting, and analysis in the stated subject areas. Disputed as to the unqualified characterizations of that content as "original," "professionally written," "deeply researched," and "expert-reviewed." The record reflects that Ziff Davis [redacted] |

| | |
|---|---|
| | [redacted]. J. Gratz Decl. ¶ 231, Ex. 230 (A. Doree 30(b)(1) Tr.) at 49:5–9; J. Gratz Decl. ¶¶ 281–284, Exs. 280–283.<br><br>Microsoft responds that Paragraph 55 does not pertain to claims asserted against Microsoft. |
| 56. Many of Ziff Davis's digital media brands have decades-spanning histories of providing authoritative content, both timely and evergreen, to consumers. Ex. 47 [ZD SEC Form 10-K for the fiscal year ended December 31, 2025 ("ZD 2025 10-K")] at pp. 4-6. | 56. **Disputed in Part - Not Supported by Cited Evidence.** OpenAI responds as follows: Undisputed that some of Ziff Davis's brands have existed for decades. Disputed as unsupported the implication that all Ziff Davis content is "authoritative", "timely", or "evergreen." *See* J. Gratz Decl. ¶ 231, Ex. 230 (A. Doree 30(b)(1) Tr.) at 49:5–9; J. Gratz Decl. ¶¶ 281–284, Exs. 280–283.<br><br>Microsoft responds that Paragraph 56 does not pertain to claims asserted against Microsoft. |
| 57. Ziff Davis generates revenues through five lines of business: (1) Technology & Shopping, (2) Gaming & Entertainment, (3) Health & Wellness (collectively, its "Digital Media Businesses"), (4) Connectivity, and (5) Cybersecurity & Martech. Ex. 48 [ZD0534639] at -643; Ex. 47 [ZD 2025 10-K] at p. 4. | 57. **Undisputed.**<br><br>Microsoft responds that Paragraph 57 does not pertain to claims asserted against Microsoft. |
| 58. Ziff Davis's Technology & Shopping segment publishes marquee technology journalism tailored to consumers, professionals, and organizations seeking | 58. **Disputed in Part - Not Supported by Cited Evidence.** OpenAI responds as follows: Undisputed that Ziff Davis publishes content in the stated |

| | |
|---|---|
| technological expertise, with major brands including CNET, PCMag, Mashable, Lifehacker, Spiceworks, and ZDNET. Ex. 48 [ZD0534639] at -643; Ex. 47 [ZD 2025 10-K] at p.4. CNET, Mashable, and Lifehacker are frequently honored for the excellence of their digital media content, winning awards from the LA Press Club, FOLIO's Eddie & Ozzie Awards, The Webby Awards, and the Telly Awards. Declaration of Lindsey Turrentine ("Turrentine Decl.") at ¶ 8. | subject areas, including via the identified brands. Disputed as unsupported the suggestion that all of Ziff Davis's content is "marquee . . . journalism."<br><br>Microsoft responds that Paragraph 58 does not pertain to claims asserted against Microsoft. |
| 59. Ziff Davis's Gaming & Entertainment segment offers authoritative, high-quality and engaging content covering video games, movies, anime, television, comics, and technology, including game tips, reviews, and insights, with major brands including IGN and Eurogamer. Ex. 48 [ZD0534639] at -644; Ex. 47 [ZD 2025 10-K] at p. 5. IGN, Eurogamer, and VG247 have earned dozens of awards throughout their decades of operation, including MCV/DEVELOP Awards, Games Media Awards, Association of Online Publishers Digital Publishing Awards, Shorty Awards, and Webby Awards. Declaration of Peer Schneider ("Schneider Decl.") at ¶ 8. | 59. **Disputed in Part - Not Supported by Cited Evidence.** OpenAI responds as follows: Undisputed that Ziff Davis publishes content in the stated subject areas, including via the identified brands. Disputed as unsupported the suggestion that all of Ziff Davis's Gaming and Entertainment content is "authoritative," "high-quality," and "engaging." *See* J. Gratz Decl. ¶ 231, Ex. 230 (A. Doree 30(b)(1) Tr.) at 49:5–9; J. Gratz Decl. ¶¶ 281–284, Exs. 280–283.<br><br>Microsoft responds that Paragraph 59 does not pertain to claims asserted against Microsoft. |
| 60. Ziff Davis's Health & Wellness segment includes major brands including Everyday Health, Daily OM, Lose It!, What to Expect and BabyCenter, which are recognized leaders in providing patient and provider news, information, and services. Ex. 48 [ZD0534639] at -644-646; Ex. 47 [ZD 2025 10-K] at pp. 5-7. What to Expect and BabyCenter have received a variety of awards for their news | 60. **Disputed in Part.** OpenAI responds as follows: Undisputed that Ziff Davis's Health & Wellness segment includes the identified brands and provides patient and provider news, information, and services. Disputed as to the characterization of those brands as "recognized leaders"; the cited awards do not establish leadership under any identified measure. |

| | |
|---|---|
| and storytelling, including multiple The Webby Awards and Digital Health Awards. Declaration of Christine Mattheis ("Mattheis Decl.") at ¶ 8. Everyday Health has won over 100 awards in the past three years alone, including many Digital Health Awards, Academy of Interactive & Visual Arts w3 Awards for best website editorial experience, and Medical Marketing & Media Awards for best media brand. Declaration of Robert Parisi ("Parisi Decl.") at ¶ 8. | Microsoft responds that Paragraph 60 does not pertain to claims asserted against Microsoft. |
| 61. In 2024, Comscore data ranked IGN first in gaming publishing, CNET second in technology information platforms, and Everyday Health first in health information nationally. Ex. 49 [Oh Feb. 24, 2026 30(b)(6) Depo.] at 121:23-122:25; Ex. 50 [ZD0546514] at tab "Comscore – Gaming Information P," "Comscore – Tech News Platforms," "Comscore – Health News Platform."]; Ex. 51 [ZD0044231] at -233. | 61. **Undisputed.**<br><br>Microsoft responds that Paragraph 61 does not pertain to claims asserted against Microsoft. |
| 62. Ziff Davis incurs significant costs to create the content it publishes across its entire portfolio. Oh Decl. ¶ 14; Ex. 52 [ZD0668066]; Ex. 53 [ZD0668067]; Ex. 54 [ZD0488725]. | 62. **Disputed in Part - Not Supported by Cited Evidence.** OpenAI responds as follows: Undisputed that Ziff Davis incurs some costs to create content. However, disputed as unsupported the conclusion that the relevant costs are "significant," as the declaration neither uses nor defines that term. Nor does it establish the amount invested in the Asserted Works at issue in this Motion.<br><br>Microsoft responds that Paragraph 62 does not pertain to claims asserted against Microsoft. |

| | |
|---|---|
| 63. Ziff Davis produces approximately 2 million original articles and updates per year. Oh Decl. ¶ 16. | 63. **Disputed in Part - Not Supported by Cited Evidence.** OpenAI responds as follows: Undisputed that Ms. Oh states that Ziff Davis produces approximately two million articles and updates per year. Disputed insofar as "original" characterizes the underlying facts as originating with Ziff Davis or the content as uniformly human-written. Mr. Doree testified that "[redacted] J. Gratz Decl. ¶ 231, Ex. 230 (A. Doree 30(b)(1) Tr.) at 49:5–9; J. Gratz Decl. ¶¶ 281–284, Exs. 280–283.<br><br>Microsoft responds that Paragraph 63 does not pertain to claims asserted against Microsoft. |

### 4. The Center for Investigative Reporting

| | |
|---|---|
| 64. The Center for Investigative Reporting, Inc. ("CIR") is the oldest nonprofit investigative newsroom in the country. Its purpose is to benefit the public through investigative stories about underrepresented voices in our democracy. CIR reaches millions of audience members through its Mother Jones and Reveal brands. Bauerlein Decl. ¶¶ 3, 5, 6. | 64. **Undisputed**.<br><br>Microsoft responds that any part of Paragraph 64 regarding CIR's Reveal brand does not pertain to claims asserted against Microsoft. |
| 65. CIR is the product of a February 1, 2024 merger between Foundation for National Progress (d/b/a Mother Jones Magazine) and Center for Investigative | 65. **Undisputed.** |

| | |
|---|---|
| Reporting, Inc. (d/b/a Reveal). Since the merger, CIR has run the Mother Jones and Reveal brands. Bauerlein Decl. ¶ 8; Bauerlein Decl. Ex. L at -047. | Microsoft responds that any part of Paragraph 65 regarding CIR's Reveal brand does not pertain to claims asserted against Microsoft. |
| 66. CIR and its predecessors have been awarded many prestigious awards, including the George Polk Award, Peabody Award, Webby Award, Robert F. Kennedy Human Rights Award, National Magazine Award, Alfred I. duPont-Columbia University Award, IRE Award, and Edward R. Murrow Award, for their unique reporting on diverse subjects. Bauerlein Decl. ¶ 4. | 66. **Disputed in Part - Not Supported by Cited Evidence; Not Supported by Admissible Evidence**. Defendants respond as follows: Undisputed that CIR and its predecessor have been awarded the awards listed in Paragraph 66. Journalism published under the Mother Jones and Reveal brands has, at various times, received journalism awards and recognitions. However, disputed to the extent the fact does not identify any specific article, its headline, its publication date, its byline, any copyright registration, or its place on Plaintiffs' Rule 1006 Summary of Asserted Works in this Motion. On this record, it is unclear whether any article from any listed prize-winning project is among the works asserted in this motion. The record therefore cannot support any inference that the prize reflects on CIR's Asserted Works at issue in this Motion. Further, the However, Defendants respond that Paragraph 66 is not supported by admissible evidence, as required by Local Rule 56.1, and therefore is not properly before the Court. Ms. Bauerlein lacks personal knowledge. Ms. Bauerlein has been CEO of CIR only since the merger. Before that, she was an editor and later CEO of Mother Jones. The declaration shows no basis for personal knowledge of awards given to Legacy CIR or Reveal before the merger, when she had no role in that organization. |

| | |
|---|---|
| | Microsoft responds that any part of Paragraph 66 regarding CIR's Reveal brand does not pertain to claims asserted against Microsoft. |
| 67. The protection of CIR's intellectual property is critical to its continued ability to fund its nonprofit public interest journalism. Without control of its copyrighted content for revenue purposes, CIR will have even fewer journalists able to tell the ever-more dwindling number of investigative news stories that are already disappearing at an alarming rate in today's media landscape. The importance of investigative reporting to democracy is why CIR maintains two websites and a digital archive at significant cost. CIR depends on its exclusive rights of reproduction, adaptation, publication, performance, and display under copyright law to resist these forces. Bauerlein Decl. ¶ 7. | 67. **Disputed in Part – Not Supported by Cited Evidence; Not Supported by Admissible Evidence**. Defendants respond as follows: Undisputed that CIR is a nonprofit, that it operates the Mother Jones and Reveal websites, or that CIR owns copyrights in some of its content. However, the facts set forth in Paragraph 67 are disputed because they are not supported by admissible evidence, as required by Local Rule 56.1, and therefore are not properly before the Court. Bauerlein Paragraph 7 is the entire basis for this fact. It [redacted] None of that is a fact within Ms. Bauerlein's personal knowledge.<br>Further, the disputed proposition is not supported by the record. Specifically, the claim that the number of investigative stories is "dwindling" and "disappearing at an alarming rate" has no support in Paragraph 7 and is contradicted by CIR's own documents which [redacted] |

| | |
|---|---|
| | [redacted] A. Hurst Decl. Ex. 12 (M. Bauerlein 30(b)(6) Tr. (Jan. 27, 2026)) at 334:19–335:18; A. Blanco Opp. Decl. Ex. 8, CIR0046336. CIR's own records show that [redacted] *Id.* at CIR0046339 [redacted]); A. Blanco Opp. Decl. Ex. 25, CIR0676962 ([redacted]). CIR's CFO testified that [redacted] A. Blanco Opp. Decl. Ex. 179 (M. Buckingham Dep. 30(b)(6) Tr. (Dec. 19, 2025)) ([redacted]. CIR [redacted]. *Id.* at 342:7–343:21.<br><br>Microsoft responds that any part of Paragraph 67 regarding CIR’s Reveal brand does not pertain to claims asserted against Microsoft. |

**5. The Intercept**

| | |
|---|---|
| 68. The Intercept Media, Inc. (“The Intercept”) is an award-winning nonprofit news organization dedicated to holding the powerful accountable through fearless, adversarial journalism. Its in-depth investigations and unflinching analysis focus on politics, war, surveillance, corruption, the environment, technology, criminal justice, the media, and other issues. Macala Decl. ¶ 3. | 68. **Disputed in Part - Not Supported by Admissible Evidence; Not Supported by Cited Evidence.** OpenAI responds as follows: Undisputed that The Intercept Media, Inc. has been a nonprofit entity since its spin-off from First Look Institute, Inc. in 2023, or that it publishes journalism on various subjects. Disputed as to the remainder as unsupported by the cited evidence and contradicted by the record. The disputed proposition is not supported by the cited evidence. Paragraph 3 of the Macala Declaration is promotional self-description with no factual foundation, and The Intercept's own interual documents contradict it in several respects. Macala Declaration Paragraph 3 [redacted] When The Intercept [redacted]” A. Blanco Opp. Decl. Ex. 126, INT0225250 at INT0225251. Its [redacted] *Id.* It also said [redacted] *Id.* at INT0225255. Further, departing journalists cited The Intercept's departure from its original mission of “fearless and adversarial journalism” as precipitating their departure. A. Blanco Opp. Decl. Ex. 100 (Ken Klippenstein, *Why I'm Resigning From The Intercept* (Apr. 30, 2024)); A. Blanco Opp. Decl. Ex. 183 (A. Chabel 30(b)(6) Tr. (Feb. 23, 2026)) at 210:19–211:8; A. Blanco Opp. Decl. Ex. 273 (M. Sherrard 30(b)(1) Tr. (Feb. 12, 2026)) at 23:23–25:3. |

| | |
|---|---|
| | Further, the disputed proposition is not supported by admissible evidence, as required by Local Rule 56.1, and therefore is not properly before the Court. Specifically, Mr. Macala has been COO only since February 1, 2023. Before that, he was a business-operations manager and an executive assistant at First Look Institute. His declared responsibilities concern website design and business operations. He identifies no editorial role or other basis for personal knowledge of The Intercept's award history, its editorial philosophy, or the subject-matter focus of its journalism since 2014.<br><br>Microsoft responds that Paragraph 68 does not pertain to claims asserted against Microsoft. |
| 69. The protection of The Intercept's intellectual property is critical to its continued ability to fund its journalism efforts. Without the ability to control and monetize its copyrighted content through readership and donations, including its exclusive rights of reproduction, adaptation, publication, performance, and display under copyright law, The Intercept will be able to support even fewer journalists. Macala Decl. ¶ 4. | 69. **Disputed - Not Supported by Admissible Evidence; Not Supported by Cited Evidence.** OpenAI responds as follows: Undisputed that The Intercept is a nonprofit funded mostly by readers and donors, or that it owns copyrights in some of its content. Disputed as unsupported by admissible evidence and contradicted by the record. Disputed as unsupported by admissible evidence and contradicted by the record. Paragraph 4 of the Macala Declaration is the entire basis for this fact. It [redacted] Its prediction that The Intercept "[redacted] is speculation, not a fact within Mr. Macala's personal knowledge. The Intercept's revenue [redacted] |

| | |
|---|---|
| | [redacted]. A. Blanco Opp. Decl. Ex. 272 (M. Sherrard 30(b)(6) Tr. (Feb. 11, 2026)) at 21:7–16; A. Blanco Opp. Decl. Ex. 119 at INT0084341. The Intercept [redacted]. A. Blanco Opp. Decl. Ex. 108 (Chabel Dep. Ex. 17), INT0001349 at INT0001350 [redacted] A. Blanco Opp. Decl. Ex. 183 (A. Chabel 30(b)(6) Tr.) at 210:15–213:7; A. Blanco Opp. Decl. Ex. 112, INT0022211 at INT0022230 [redacted]; A. Blanco Opp. Decl. Ex. 116, INT0081725 at INT0081734 [redacted];A. Blanco Opp. Decl. Ex. 117, INT0081737 at INT0081746 [redacted] A. Blanco Opp. Decl. Ex. 124, INT0208097 at INT0208099 [redacted] A. Blanco Opp. Decl. Ex. 116, INT0081725 at INT0081733 [redacted] |

| | |
|---|---|
| | [redacted]<br>Further, the disputed proposition is not supported by admissible evidence, as required by Local Rule 56.1, and therefore is not properly before the Court. Specifically Mr. Macala has been COO only since February 1, 2023. Before that, he was a business-operations manager and an executive assistant at First Look Institute. His declared responsibilities concern website design and business operations. He identifies no editorial role or other basis for personal knowledge of The Intercept's award history, its editorial philosophy, or the subject-matter focus of its journalism since 2014.<br><br>Microsoft responds that Paragraph 69 does not pertain to claims asserted against Microsoft. |
| 70. Beginning on February 10, 2014, The Intercept operated as a brand of various First Look entities. On February 1, 2023, NewCoNews, Inc. ("NewsCoNews") spun off from First Look Institute, Inc. ("FLI"). On March 1, 2023, NewCoNews filed a Certificate of Amendment with the State of Delaware changing its corporate name to The Intercept Media, Inc. Since that time, The Intercept has continuously operated its business under that name. Macala | 70. **Undisputed.**<br><br>Microsoft responds that Paragraph 70 does not pertain to claims asserted against Microsoft. |

| | |
|---|---|
| Decl. ¶ 5; Macala Decl. Ex. F at -171, -179-82; Macala Decl. Ex. G. | |
| 71. Nonprofit newsrooms like CIR and The Intercept were founded to fill gaps in media ecosystems, and to produce journalism as a public service. Cross Rebuttal Rep. at 9. | 71. **Disputed in Part - Not Supported by Cited Evidence.** Defendants respond as follows: Undisputed that the Cross Rebuttal Report contains the cited opinion. Disputed as a statement of fact about CIR or The Intercept. The cited sentence is a general statement about the nonprofit news field, not a specific finding about Plaintiffs. Further, the disputed proposition is not supported by the cited evidence. Ms. Cross did not cite any data, study, or record evidence specific to Plaintiffs for this characterization. *See id.*<br>Further disputed, as CIR and The Intercept are nonprofit newsrooms, but they are different organizations with different origins, funding models, and organizational histories, so lumping them together as if they are comparable "nonprofit newsrooms" is misleading. Disputed as to the founding narrative for both organizations. There is no evidence that either organization described their founding purpose as "to fill gaps in media ecosystems" or to "produce journalism as a public service."<br><br>Microsoft responds that the facts related solely to The Intercept do not pertain to claims asserted against Microsoft. |
| 72. Investigative reporting conducted by CIR and The Intercept involves an added layer of risk and | 72. **Disputed in Part – Not Supported by Cited Evidence.** Defendants respond as follows: |

| | |
|---|---|
| overcoming secrecy or disclosing something that is in the public interest. It is costly, underprovided in the marketplace, and often opposed. It is more likely done when a media outlet, including a nonprofit one, has the resources to cover the costs, an incentive to tell a new story, cares about impacts, and overcomes obstacles. Cross Rebuttal Rep. at 9. | Undisputed that the Cross Rebuttal Report contains the cited opinion. However, disputed as a statement of fact about CIR or The Intercept. The cited proposition is not supported by the cited evidence. Specifically, most of the passage is a quotation from a 2016 academic book generally describing investigative reporting, and the cited sentence is a general statement about the nonprofit news field, not a finding about Plaintiffs. Nor did Ms. Cross cite any data, study, or record evidence specific to Plaintiffs for this characterization. *See* ECF 1821-1 (S. Cross Decl. Ex. A) (Rebuttal Rep.) at 9. Ms. Cross also concedes that "[redacted] *Id.* at 44.<br><br>Microsoft responds that the facts related solely to The Intercept do not pertain to claims asserted against Microsoft. |

**B. The News Industry & Journalism**

| | |
|---|---|
| 73. A lot of work, time, manpower, and expense is required to generate news. Ex. 6 [NYT_00873667] at 674-675; Ex. 19 [Pugh 30(b)(1) Depo. Tr.] at 111:4-18; Ex. 20 [Julie Anderson Depo. Tr.] at 134:17-140:21; Ex. 3 [Sulzberger Depo. Tr.] at 302:8-23 (describing The Times's investment into its journalism, including having "bureaus all over the world" and giving journalists "sometimes years" "to do the most important work"); Ex. 4 [Dolnick Depo. Tr.] | 73. **Disputed In Part — Immaterial.** Defendants respond as follows: Undisputed as to the general proposition that the production of certain news journalism involves labor, time and resources. However, the facts stated in Paragraph 73 are immaterial and therefore disputed because these facts do not affect the outcome of the suit under the governing law. |

| | |
|---|---|
| at 21:8-12 ("New York Times' journalism requires human reporters who go out and bear witness, and they find things out. We trust our reporters. Our reporters have very specific experience. We trust our editors, who have judgment."); Ex. 49 [Oh Feb. 24, 2026 30(b)(6) Depo. Tr.] at 51:10-52:9; Oh Decl. ¶ 14.; Rebuttal Expert Report of Timothy Wu ("Wu Rebuttal Rep.") ¶ 93; Bell Opening Rep. ¶¶ 48-51; Bell Rebuttal Rep. ¶ 203; Owen Opening Rep. ¶ 132; Cross Rebuttal Rep. at 9. | Microsoft further responds that Brook Decl. Ex. 49, the Wu Rebuttal Report, and the Oh Declaration do not pertain to claims asserted against Microsoft. Microsoft also responds that the facts related solely to The Intercept do not pertain to claims asserted against Microsoft. |
| 74. In addition to news reporting, journalism includes investigative reporting, sports journalism, tech journalism, reviews and criticism, service journalism, enthusiast media, and medical or other trade journalism. Declaration of Timothy Wu ("Wu Decl.") ¶ 5; Oh Decl. ¶ 7. | 74. **Disputed in Part — Immaterial.** Defendants respond as follows: Undisputed as to the general proposition that "journalism" can include a range of subject-matter categories. However, the facts stated in Paragraph 74 are immaterial and therefore disputed because these facts do not affect the outcome of the suit under the governing law. Further disputed to the extent Plaintiffs imply the noted list reflects all categories of journalism work or that all categories are equivalent in level of creative effort, investment, time or original required to produce. *See* A. Blanco Opp. Decl. Ex. 260 (M. Pugh 30(b)(1) Tr.) at 110:1–21; A. Blanco Opp. Decl. Ex. 183 (A. Chabel 30(b)(6) Tr.) at 29:24–30: 16.<br><br>Microsoft further responds that the Wu Declaration and the Oh Declaration do not pertain to claims asserted against Microsoft. |
| 75. Journalism is the product of professionals who abide by ethical standards, norms, and practices in | 75. **Disputed — Not Supported by Cited Evidence; Immaterial.** Defendants respond as follows: |

| | |
|---|---|
| their reporting, editing, and publishing who work hard to present accurate information. *See, e.g.*, Ex. 7 [The New York Times, *Editorial Standards* (March 26, 2025), https://www.nytimes.com/editorial-standards/ethical-journalism.html]; Ex. 55 [BBC, *The BBC's Editorial Standards* (n.d), https://www.bbc.co.uk/editorialguidelines/guidelines/editorial-standards/]; Ex. 56 [NPR, *These Are the Standards of Our Journalism* (Feb. 11, 2019), https://www.npr.org/ethics]; Ex. 57 [Pine Feb. 5, 2026 Depo. Tr.] at 106:22-108:14; Ex. 18 [Burbach Depo. Tr.] at 27:3-13; Ex. 58 [DNP-00543937]; Ex. 59 [DNP-00543944]; Ex. 60 [DNP-00543955]; Ex. 61 [DNP-00543959]; Ex. 62 [DNP-00543968]; Ex. 63 [DNP-00543979]; Owen Rebuttal Rep. at ¶ 55. | Undisputed that certain news organizations publish ethical standards and certain journalists aspire to present accurate information. However, the facts set forth in Paragraph 75 are disputed because they are not supported by the cited materials. The cited evidence refers to editorial standards documents for specific papers, and not for a general proposition covering all journalism or that journalists "work hard" to present accurate information. Further disputed to the extent Paragraph 75 implies all journalism, across all categories and content types, is produced under uniform standards of professional effort, rigor, and quality.<br>Defendants also respond that the facts stated in Paragraph 75 are immaterial and therefore disputed because these facts do not affect the outcome of the suit under the governing law. |
| 76. Maintaining journalistic standards and codes of ethics is expensive in part because it requires significant human involvement in news gathering, fact checking, and editorial judgment. *See, e.g.*, Ex. 7 [The New York Times. *Editorial Standards*. March 26, 2025. https://www.nytimes.com/editorial-standards/ethical-journalism.html]; Ex. 55 [BBC. *The BBC's Editorial Standards*. (n.d). https://www.bbc.co.uk/editorialguidelines/guidelines/editorial-standards/]; Ex. 56, NPR. [*These Are the Standards of Our Journalism*. February 11, 2019. https://www.npr.org/ethics]; Ex. 57 [Pine Feb. 5, 2026 Depo. Tr.] at 106:22-108:14; Ex. 18 [Burbach Depo. Tr.] at | 76. **Disputed — Not Supported by Cited Evidence; Immaterial.** Defendants respond as follows: Undisputed that maintaining journalistic standards and codes of ethics can require significant human involvement and expense in certain instances. However, the facts set forth in Paragraph 76 are disputed because they are unsupported by the cited materials. Specifically, these facts are disputed because no document or deposition cited quantifies the costs of maintaining standards. However, disputed to the extent Paragraph 76 implies expense is uniform across all categories of journalistic output, or all journalism produced by News Plaintiffs requires equal human involvement in news gathering, fact checking, and |

| | |
|---|---|
| 27:3-13; Ex. 58 [DNP-00543937]; Ex. 59 [DNP-00543944]; Ex. 60 [DNP-00543955]; Ex. 61 [DNP-00543959]; Ex. 62 [DNP-00543968]; Ex. 63 [DNP-00543979; Bell Opening Rep. at ¶ 43; Owen Rebuttal Rep. at ¶ 55; Ex. 6 [NYT_00873667] at 674-675; Ex. 19 [Pugh 30(b)(1) Depo. Tr.] at 111:4-18; Ex. 20 [Julie Anderson Depo. Tr.] at 134:17-140:21; Ex. 4 [Dolnick Depo. Tr.] at 21:8-12 ("New York Times' journalism requires human reporters who go out and bear witness, and they find things out. We trust our reporters. Our reporters have very specific experience. We trust our editors, who have judgment."); Owen Opening Rep. at ¶ 132; Cross Rebuttal Rep. at 11. | editorial content. The cited evidence consists only of editorial standards and does not speak to actual costs associated.<br>Defendants also respond that the facts stated in Paragraph 76 are immaterial and therefore disputed because these facts do not affect the outcome of the suit under the governing law. |
| 77. Much of the editorial production of CIR and The Intercept is investigative or original reporting that is costly, underprovided in the marketplace, and involves an added layer of risk and overcoming secrecy. Cross Rebuttal Rep. at 9. | 77. **Disputed in Part — Not Supported by Cited Evidence; Immaterial.** Defendants respond as follows: Undisputed that the Cross Rebuttal Report contains the cited opinion and undisputed that CIR and The Intercept publish some investigative reporting. However, disputed as a statement of fact about CIR or The Intercept. The cited sentence is a general statement about the nonprofit news field. It is not a fact about Plaintiffs specifically. Nor did Ms. Cross offer any data, sampling, or analysis of CIR's or The Intercept's output to show that their production is "costly," "underprovided," or risky. Further, the asserted facts are contradicted by the record. For example, The Intercept [redacted] A. Blanco Opp. Decl. [redacted] |

| | |
|---|---|
| | [redacted] Further disputed because originality is a legal issue.<br>Defendants also respond that the facts stated in Paragraph 77 are immaterial and therefore disputed because these facts do not affect the outcome of the suit under the governing law.<br><br>Microsoft further responds that the facts related solely to The Intercept do not pertain to claims asserted against Microsoft. |
| 78. Nonprofit newsrooms like CIR and The Intercept select what stories to cover based on a story's importance to society rather than its potential for generating profits, but nonetheless must generate sufficient revenue to fund their operations. Cross Rebuttal Rep. at 10. | 78. **Disputed in Part — Not Supported by Cited Evidence; Immaterial.** Defendants respond as follows: Undisputed that the Cross Rebuttal Report contains the cited opinion. However, disputed as unsupported by the cited evidence and contrary to the record. The cited sentence from Ms. Cross's report describes [redacted], not CIR or The Intercept. Ms. Cross's report cites no CIR or Intercept editorial document, testimony or data on story selection. Further disputed to the extent Plaintiffs imply [redacted]. *See, e.g.*, A. Blanco Opp. Decl. Ex. 272 (M. Sherrard 30(b)(6) Tr. (Feb. 11, 2026)) at 213:22–214:7 [redacted] |

| | |
|---|---|
| | Defendants also respond that the facts stated in Paragraph 78 are immaterial and therefore disputed because these facts do not affect the outcome of the suit under the governing law.<br><br>Microsoft further responds that the facts related solely to The Intercept do not pertain to claims asserted against Microsoft. |

### C. Monetizing Journalism in the Digital Ecosystem

| | |
|---|---|
| 79. News Plaintiffs generate revenue in several different ways, including subscriptions, advertising, licensing, branded content, retail referral links, and affiliate revenue. Ex. 1 [The New York Times SEC Form 10-K Dec. 31, 2025] at 1, 5, 76-77; Ex. 64 [Chicago Tribune Responses to Microsoft's Fourth Set of Interrogatories] No. 24; Ex. 65 [New York Daily News Responses to Microsoft's Fourth Set of Interrogatories] No. 24; Ex. 66 [Mercury News Responses to Microsoft's Fourth Set of Interrogatories] No. 24; Ex. 67 [Denver Post Responses to Microsoft's Fourth Set of Interrogatories] No. 24; Ex. 68 [Orlando Sentinel Responses to Microsoft's Fourth Set of Interrogatories] No. 23; Ex. 69 [Sun Sentinel Responses to Microsoft's Fourth Set of Interrogatories] No. 23; Ex. 70 [Pioneer Press Responses to Microsoft's Fourth Set of Interrogatories] No. 23; Ex. 71 [Orange County Register's Responses to Microsoft's Fourth Set of Interrogatories] No. 23; Ex. 72 [Jacobs 30(b)(6), Feb. 12, 2026, Depo Tr.] at 288:12-290:22 | 79. **Disputed in Part – Not Supported by Evidence.** Defendants do not dispute that The Times and Daily News Plaintiffs generate revenue in several different ways, including subscriptions, advertising, licensing, branded content, retail referral links, and affiliate revenue. However, OpenAI disputes to the extent that it implies all News Plaintiffs generate revenue from each revenue stream, for example, [redacted] *See* A. Blanco Opp. Decl. Ex. 110, [redacted] A. Blanco Opp. Decl. Ex. 272 (M. Sherrard 30(b)(6) Tr. (Feb. 11, 2026)) at 21:7–16; *Id.* at 22:24–25:22; A. Blanco Opp. Decl. Ex. 235 (M. Macala 30(b)(6) Tr. (Feb. 5, 2026)) at 100:6–18; A. Blanco Opp. Decl. Ex. 119, INT0084341 ([redacted]). |

| | |
|---|---|
| (describing shift from advertising-focused business to subscription focused model for Daily News Plaintiffs); Ex. 47 [ZD 2025 10-K] at p. 4; Oh Decl. ¶¶ 12-13. | Microsoft further responds that Brook Decl. 47 and the Oh Declaration do not pertain to claims asserted against Microsoft. |
| 80. CIR and The Intercept rely on their audiences and donors to fund their journalism, which includes subscribers and small donors, as well as philanthropic donations. Cross Rebuttal Rep. at 10, 20-23. | 80. **Disputed in Part.** Defendants respond as follows: Not disputed that CIR and The Intercept are nonprofits whose revenue comes predominantly from charitable contributions. However, OpenAI disputes Paragraph 80 to the extent Plaintiffs imply that The Intercept [redacted] *See* A. Blanco Opp. Decl. Ex. 111, INT0019062 at INT0019066 [redacted]; *see also* A. Blanco Opp. Decl. Ex. 272 (M. Sherrard 30(b)(6) Tr. (Feb. 11, 2026)) at 124:13–125:13.<br><br>Microsoft responds that the facts related solely to The Intercept do not pertain to claims asserted against Microsoft. |
| 81. News Plaintiffs have three primary markets: "(i) the established market for news and digital media publishing; (ii) the established market for licensing news and other content; and (iii) the developing market for licensing data (including news) for generative AI purposes." Oh Decl.¶ 11; Ex. 74 [Chicago Tribune Fourth Supplemental | 81. **Disputed in Part – Immaterial.** Defendants do not dispute that most of the News Plaintiffs participate in the established market for news and digital media publishing, and the established market for licensing news and other content. Defendants dispute that there is a "developing market for licensing data (including news) for |

| | |
|---|---|
| Responses to OpenAI's Second Set of Interrogatories] No. 7; Ex. 75 [New York Daily News Fourth Supplemental Responses to OpenAI's Second Set of Interrogatories] No. 7; Ex. 76 [Orlando Sentinel's Fourth Supplemental Responses to OpenAI's Second Set of Interrogatories] No. 7; Ex. 77 [Sun Sentinel Fourth Supplemental Responses to OpenAI's Second Set of Interrogatories] No. 7; Ex. 78 [Denver Post Fifth Supplemental Responses to OpenAI's Second Set of Interrogatories] No. 7; Ex. 79 [Pioneer Press Fifth Supplemental Responses to OpenAI's Second Set of Interrogatories] No. 7; Ex. 80 [Orange County Register Fifth Supplemental Responses to OpenAI's Second Set of Interrogatories] No. 7; Ex. 81 [Mercury News Fifth Supplemental Responses to OpenAI's Second Set of Interrogatories] No. 7; Malackowski NYT-DNP Opening Rep. at 83; McDonald Rebuttal Rep. at 27-44. | generative AI purposes." A functioning market for licensing data, including the Asserted Works, for generative AI purposes did not exist when the models at issue were trained, does not currently exist, and faces considerable challenges to developing. *See* ECF 1708 (J. Usdan Decl.) ¶¶ 10–11; ECF 1733 (C. Tucker Decl.) ¶¶ 13(a) – (f), 130–147, 154–201; *see also* ECF 1723 (J. Lafferty Decl.) ¶¶ 16, 34, 99, 168, 175, 290, 433, 435.<br><br>Defendants also respond that part (iii) of Paragraph 81 is immaterial and therefore disputed because these facts do not affect the outcome of the suit under the governing law. Whether a market for licensing data for generative AI purposes "exists or is likely to develop is irrelevant, because this market is not one that the plaintiffs are legally entitled to monopolize." *Kadrey v. Meta Platforms, Inc.*, 788 F. Supp. 3d 1026, 1052 (N.D. Cal. 2025); *Bartz v. Anthropic PBC*, 787 F. Supp. 3d 1007, 1032 (N.D. Cal. 2025).<br><br>OpenAI further disputes that some outlets, like The Intercept, operate in the market for "licensing news and other content" or the market for "licensing data (including news) for generative AI purposes." The cited evidence does not establish that The Intercept licenses content to other organizations or to AI companies, or that it has ever considered licensing to AI companies. Further disputed that any market for AI licensing existed or was likely to develop. *See* A. Blanco Opp. Decl. Ex. 183 (A. Chabel 30(b)(6) Tr.) at 134:3–8 ("[redacted] |

| | |
|---|---|
| | [redacted]"). <br><br> Microsoft further responds that the Oh Declaration does not pertain to claims asserted against Microsoft. |
| 82. Search engines are an important source of traffic to News Plaintiffs' websites. Ex. 82 [Tucker Opening Rep.] ¶ 40; Ex. 83 [Poferl 30(b)(6) Depo. Tr.] at 23:20-25 (testifying that "[s]earch engines are one of the most common ways for users on the Internet to discover[] New York Times content" and "one of [The Times's] largest referral channels"); Ex. 72 [Jacobs 30(b)(6), Feb. 12, 2026, Depo Tr.] at 78:9-14 (Google accounts for 95 percent of Daily News Plaintiffs' search traffic), 23:3-16 (explaining that "the pie continues to shrink" with respect to search as a source of Daily News Plaintiff session traffic); Ex. 84 [ZD0531000] at 13; Ex. 49 [Oh Feb. 24, 2026 30(b)(6) Depo. Tr.] at 146:16-147:10; Ex. 85 [Fortuna 30(b)(6) Depo. Tr.] at 162:19-163:8 (Google is a "material source of traffic for us"); Ex. 72 [CJ Jacobs Feb. 12, 2026 30(b)(6) Depo. Tr.] at 37:3-38:14 (highlighting presentation on search as a referral channel)]; Ex. 17 [Pine Feb. 4, 2026 30(b)(6) Depo. Tr.] at 314:20-315:4; Ex. 86 [DNP-00632487] ("[h]istorically, SEARCH has been the largest third-party driver of traffic and still generates [redacted] of referral sessions"); Cross Rebuttal Rep. at 41 (noting Google search generated 15 percent of all referral traffic to news sites as of November 2024); *id.* at 19. | 82. **Disputed in Part.** Defendants respond as follows: Defendants do not dispute the facts in Paragraph 82 as they pertain to The New York Times, Daily News Plaintiffs, and CIR. <br><br> OpenAI disputes the facts as they pertain to The Intercept because the characterization ignores other major (and sometimes larger) sources of traffic such as social media referrals. *See* A. Blanco Opp. Decl. Ex. 272 (M. Sherrard 30(b)(6) Tr. (Feb. 11, 2026)) at 59:11–60:7 (representing that [redacted]). <br><br> Microsoft further responds that the facts related solely to The Intercept do not pertain to claims asserted against Microsoft. |

### 1. How The Times Monetizes News Content

| | |
|---|---|
| 83. The Times generates revenue primarily from subscriptions. Ex. 1 [The New York Times SEC Form 10-K Dec. 31, 2025] at 76. | 83. **Undisputed.** |
| 84. The Times's "ability to attract, retain and grow [its] digital subscriber base depends on the size of [The Times's] audience and its sustained engagement directly with [The Times's] products." Ex. 1 [The New York Times SEC Form 10-K Dec. 31, 2025] at 2. | 84. **Disputed in Part – Not Supported by Cited Evidence.** Defendants respond as follows: Undisputed that The Times's cited Form 10-K contains the quoted language. However, disputed to the extent Plaintiffs' characterization of, and inferences drawn from, that language establish the factual basis for The Times's stated understanding of the relationship between audience size, engagement, and subscriber acquisition, retention, or growth. The quoted passage does not identify the underlying data or analysis or specify a metric or threshold for "sustained engagement."<br>Further disputed to the extent Plaintiffs equate "sustained engagement" with web traffic alone or suggest that changes in traffic necessarily produce corresponding changes in subscriptions. The Form 10-K discusses engagement more broadly in terms of the breadth, depth, and frequency of product use, and identifies multiple factors affecting consumers' willingness to subscribe, including subscription pricing, perceived value, and marketing. *See* News Ex. 98 at 11. |
| 85. The Times's "broad audience base serves as a vital engine for the growth of [its] subscription business, | 85. **Disputed in Part – Incomplete; Not Supported by Cited Evidence.** Defendants respond as |

| | |
|---|---|
| and provides an attractive offering for [its] advertising partners." Ex. 1 [The New York Times SEC Form 10-K Dec. 31, 2025] at 4. | follows: Undisputed that The Times's cited Form 10-K contains the quoted language. However, disputed to the extent Plaintiffs' characterization of, and inferences drawn from, that language attribute subscription-business growth to audience size without accounting for other sources of growth. The Form 10-K also identifies subscription pricing, product offerings and bundles, and marketing effectiveness as factors affecting subscriber growth and monetization. *See* News Ex. 1 at 4, 11.<br>Further disputed to the extent Plaintiffs treat the description "attractive offering" as establishing advertising partners' views or purchasing decisions. That language reflects The Times's own characterization and does not, by itself, establish the extent to which audience size drives advertising demand. The Form 10-K separately identifies audience demographics and engagement, advertising rates, targeting capabilities, observed results, and perceived effectiveness as factors affecting competition for advertising revenue. *Id.* at 6. |
| 86. The second-largest source of Times revenue is advertising. Ex. 1 [The New York Times SEC Form 10-K Dec. 31, 2025] at 76. | 86. **Undisputed.** |
| 87. The Times also generates affiliate, licensing, and other revenues which "primarily consist of revenues from licensing, Wirecutter affiliate referrals, commercial printing, the leasing of floors in [its] Company Headquarters, [its] live events business and retail commerce." Ex. 1 [The New York Times SEC Form 10-K | 87. **Undisputed.** |

| | |
|---|---|
| Dec. 31, 2025] at 31. *See also* Ex. 8 [Bardeen 30(b)(6) Depo. Tr.] at 17:22-18:3 (describing The Times's biggest revenue streams as "subscription revenue streams, our advertising revenue streams, our licensing revenue streams, and our affiliate revenue streams"), 18:22-19:3. | |
| 88. The Times derives revenue from its Wirecutter product's affiliate referrals, "which generate revenue by offering direct links to merchants in exchange for a portion of the sale price upon completion of a transaction." Ex. 1 [The New York Times SEC Form 10-K Dec. 31, 2025] at 5. | 88. **Undisputed.** |
| 89. Wirecutter generates affiliate revenue when users click on the links via the Wirecutter product recommendations directly. Ex. 87 [Frumin Depo. Tr.] at 17:19-18:16 (testifying that Wirecutter's "main revenue stream is affiliate revenue," whereby "if somebody clicks a 'buy' button on Wirecutter's website and takes [Wirecutter's] recommendation and purchases it, [The Times] will receive an affiliate revenue commission or fee."). | 89. **Disputed in Part.** Defendants respond as follows: Undisputed that Wirecutter generates affiliate revenue from its product recommendations. However, disputed that a user's click on a link alone generates affiliate revenue. The cited testimony states that [redacted] A. Blanco Opp. Decl. Ex. 200 (B. Frumin Tr.) at 17:23–18:16. |
| 90. The Times's ability to compete effectively today depends on many factors, including but not limited to: its "ability to continue delivering a breadth of high-quality journalism and content that is interesting and relevant to [its] audience"; its "ability to sustain and grow audience engagement with [its] products"; its "reputation and brand strength"; its ability to "monetize [its] products"; | 90. **Undisputed.** |

| | |
|---|---|
| "the visibility of [its] brand and content on third-party platforms, products and tools"; "whether third-party platforms, products and tools maintain functionality that allows users to directly access and engage with [Times] products (for example, through direct hyperlinking)"; and its "ability to effectively protect [its] intellectual property, including from unauthorized use by AI developers" and "to monetize it." Ex. 1 [The New York Times SEC Form 10-K Dec. 31, 2025] at 10. | |
| 91. Competition for subscription revenue and audience is based on a variety of factors, including but not limited to "reputation and brand strength," "visibility on search engines and social media platforms and in mobile app stores and the extent to which these direct traffic to [The Times's] digital properties." Ex. 1 [The New York Times SEC Form 10-K Dec. 31, 2025] at 6. | 91. **Undisputed.** |

## 2. How *Daily News* Plaintiffs Monetize News Content

| | |
|---|---|
| 92. The *Daily News* Plaintiffs monetize content in numerous ways, including via newsstand sales; by offering subscriptions, including both a standard and premium digital subscription, and print subscriptions where readers can also access digital content; through advertising; through licensing of their content; and through various other forms. Ex. 88 [Ibrahim 30(b)(6) Depo. Tr.] at 26:13-19; Ex. 89 [Deering Depo. Tr.] at 44:13-17; Ex. 90 [Loretto | 92. **Disputed in Part**. Defendants respond as follows: Undisputed that Daily News Plaintiffs monetize content. However, disputed to the extent that this implies that Daily News Plaintiffs independently license their content and that licensing is a significant monetization channel. [redacted] A. Blanco Opp. Decl. Ex. 255 (F. Pine 30(b)(6) Tr. (Feb. 4, 2026)) at |

| | |
|---|---|
| 30(b)(6) Depo. Tr.] at 14:12-15:23; Ex. 10 [D. Anderson 30(b)(6) Depo Tr.] at 38:1-11, 130:2-7. | 151:3–18. Licensing revenue [redacted]. *See id.*; *see also id.* at 183:12–189:19; A. Hurst Decl., Ex. 67 (W. Lown 30(b)(6) Tr.) at 47:8–48:16 (testifying that [redacted]. Further dispute "various other forms" as vague and ambiguous. |
| 93. *Daily News* Plaintiffs' revenues are tied to the Daily News Plaintiffs' credible, trusted, accurate, and unique copyrighted content. Ex. 88 [Ibrahim 30(b)(6) Depo Tr.] at 159:7-161:20 (reputation is a big factor that affects subscription revenues); Ex. 90 [Loretto 30(b)(6) Depo. at 14:12-15:23]; Ex. 16 [Colacioppo 30(b)(6) Depo Tr.] at 69:19-70:20. | 93. **Disputed in Part - Not Supported by Cited Evidence; Improper Legal Argument**. Defendants respond as follows: Undisputed that News Ex. 90 contains the quoted testimony. However, disputed that the testimony establishes the stated proposition. Specifically, the cited testimony addresses brand reputation, not copyright value. *See* A. Blanco Opp. Decl. Ex. 216 (A. Ibrahim 30(b)(6) Tr.) at 159:7–161:20; A. Blanco Opp. Decl. Ex. 232 (C. Loretto 30(b)(6) Tr.) at 14:10–15:23; A. Blanco Opp. Decl. Ex. 186 (L. Colacioppo 30(b)(6) Tr.) at 69:19–70:20. Even if Plaintiffs' revenues are in some respects influenced by consumers' perception that their content is "credible" or "trusted," that is a function of brand and reputation. Plaintiffs have not shown that revenue is "tied to" copyrighted content.<br>Further disputed that Paragraph 93 is supported by record evidence. A significant amount of content published by DNPs [redacted] A. Blanco Opp. Decl. Ex. 34, DNP-00120839 at DNP-00120843 [redacted] |

| | |
|---|---|
| | [redacted] Customer feedback shows [redacted] *See* A. Blanco Opp. Decl. Ex. 84, DNP-00627688 at DNP-00627695 ([redacted]); A. Blanco Opp. Decl. Ex. 81, DNP-00627402 at DNP-00627409 ([redacted] A. Blanco Opp. Decl. Ex. 60, DNP-00476954 [redacted]<br><br>Defendants further respond that the Court should disregard this Paragraph because the assertion constitutes improper attorney argument and/or is conclusory with respect to the term "copyrighted content." |
| 94. According to 2024 revenues for MediaNews Group (which manages the Daily News Plaintiffs and other | 94. **Disputed - Not Supported by Cited Evidence.** Defendants respond as follows: The facts set |

| | |
|---|---|
| newspapers under the same corporate umbrella), [redacted] of 2024 revenue came from print circulation and digital-only subscriptions, whereas [redacted] of 2024 revenue came from print and digital advertising, and the rest came from other sources (e.g., commercial printing, other). Ex. 91 [DNP-00396431/D. Anderson Dep. Ex. 11] at -437. | forth in Paragraph 94 are disputed because they are not supported by the cited evidence. Specifically, disputed that the cited evidence provides the quoted figures or that the cited figures are representative of MNG's actual revenues. News Ex. 91 [redacted] It is [redacted] A. Blanco Opp. Decl. Ex. 165 (D. Anderson 30(b)(1) Tr.) at 71:5–73:24. [redacted] News Ex. 91 at DNP-00396453. |
| 95. The *Daily News* Plaintiffs have developed strategies to increase subscribers and thus, subscription revenues, by utilizing tactics such as newsletters, introductory prices, and varying promotional offers. Ex. 89 [Deering Depo. Tr.] at 54:24-55:2, 56:6-11; Ex. 88 [Ibrahim 30(b)(6) Depo. Tr.] at 42:1-6 (newsletters); Ex. 17 [Pine Feb. 4, 2026 30(b)(6) Depo. Tr.] at 239:23-244:3 (introductory prices, paywalls, know-your-customer measures). | 95. **Disputed in Part.** Defendants respond as follows: Undisputed that Daily News Plaintiffs use the strategies described in Paragraph 95. However, disputed that Daily News Plaintiffs used other tactics beyond those listed here, including an increased use of paywalls, or that any of these tactics successfully increased Daily News Plaintiffs' subscribers or subscription revenues. *See* A. Blanco Opp. Decl. Ex. 61, DNP-00506801 at DNP-00506801, DNP-00506807; A. Blanco Opp. Decl. Ex. 40, DNP-00141970 at DNP-00141994–DNP-00141997; A. |

| | |
|---|---|
| | Blanco Opp. Decl. Ex. 45, DNP-00190371; A. Blanco Opp. Decl. Ex. 73, DNP-00567090. Further disputed as to any implication that Daily News Plaintiffs developed these strategies due to the introduction of ChatGPT; Plaintiffs began deploying these strategies before ChatGPT's launch. *See* A. Blanco Opp. Decl. Ex. 255 (F. Pine 30(b)(6) Tr. (Feb. 4, 2026)) at 228:2–232:2; A. Blanco Opp. Decl. Ex. 217 (C. Jacobs 30(b)(6) Tr. (Feb. 12, 2026)) at 289:5–290:14. |
| 96. The *Daily News* Plaintiffs have also developed strategies to monetize online content via methods such as metering, registration walls, and dynamic paywall decisions. Ex. 89 [Deering Depo. Tr.] at 114:9-14 (registration walls), 64:11-17 (dynamic paywall decisions), 32:13-20 (metering); Ex. 88 [Ibrahim 30(b)(6) Depo. Tr.] at 133:2-12; Ex. 92 [Ibrahim 30(b)(1) Depo. Tr.] at 46:21-25 ([W]e've had to increase considerably our conversion rate on our page views. That comes from tightening meters, from deep discounts."); Ex. 17 [Pine Feb. 4, 2026 30(b)(6) Depo. Tr.] at 239:23-244:3 (introductory prices, paywalls, know-your-customer measures). | 96. **Undisputed**. |
| 97. In addition to the strategies around developing and improving subscription revenues noted above, all eight of the *Daily News* Plaintiffs have worked to monetize their content through the inclusion of advertising. Ex. 90 [Chris Loretto 30(b)(6) Depo. Tr.] at 13:5-8. | 97. **Undisputed**. |

| | |
|---|---|
| 98. *Daily News* Plaintiffs' advertising revenue is generated from local, regional, and national businesses which pay to place advertisements around the Daily News Plaintiffs' works. Ex. 90 [Chris Loretto 30(b)(6) Depo. Tr.] at 14:15-20. | 98. **Undisputed**. |
| 99. *Daily News* Plaintiffs' advertising revenue is dependent on subscribers because subscribers are the critical metric that advertisers pay to reach, so when subscribers decline then *Daily News Plaintiffs* reach fewer people with advertising. Ex. 90 [Loretto 30(b)(6) Depo. Tr] at 21:2-11. | 99. **Disputed in Part - Not Supported by Cited Evidence.** Defendants respond as follows: Undisputed that News Ex. 90 contains the testimony, [redacted]" News Ex. 90 at 21:2–11. However, Defendants dispute the accuracy of such a characterization because News Plaintiffs do not cite to nor provide any underlying records to corroborate the cited testimony, nor to support the proposition set forth in this fact, and the record includes evidence to the contrary. Pursuant to Fed. R. Evid. 106, Mr. Loretto also testified that [redacted]" A. Blanco Opp. Decl. Ex. 232 (C. Loretto 30(b)(6) Tr.) at 56:14–22. Mr. Loretto further testified that [redacted] *Id.* at 94:10–15. |
| 100. *Daily News* Plaintiffs also generate revenue through, *inter alia*, licensing its intellectual property to | 100. **Disputed in Part - Not Supported by Cited Evidence.** Defendants respond as follows: |

| | |
|---|---|
| third parties in exchange for compensation. Ex. 93 [DNP-00477515]; Ex. 94 [DNP-00393598]; Ex. 95 [DNP-00533731]; Ex. 96 [DNP-00651696]; Malackowski NYT-DNP Opening Rep. at 69 and Appx. B, Exhibit 14.0. | Undisputed that Daily News Plaintiffs have engaged in licensing. Disputed as to the vague and unclear use of "intellectual property" in Paragraph 100. Further disputed to the extent that Paragraph 100 implies that all licensing agreements generate revenue, which is not supported by cited evidence or the record. Specifically, record evidence shows not all IP licenses are for revenue or compensation. For instance, News Ex. 94 shows royalties to TCA--not the Plaintiff papers themselves. *See* News Ex. 94; *see also* A. Blanco Opp. Decl. Ex. 243 (R. Morris 30(b)(6) Tr. (Dec. 17, 2025)) at 110:17–112:5; ([redacted]; A. Blanco Opp. Decl. Ex. 64 (R. Morris Dep. Ex. 9 (DNP-00531798)) ([redacted]); A. Blanco Opp. Decl. Ex. 173 (M. Brewer 30(b)(1) Tr.) at 57:20–58:25 ([redacted]); A. Blanco Opp. Decl. Ex. 59 (M. Brewer Dep. Ex. 27 (DNP-00476914)) ([redacted]); A. Blanco Opp. Decl. Ex. 137 (M. Brewer 30(b)(1) Tr.) at 61:23–62:13 ([redacted]); A. Blanco Opp. Decl. Ex. 48 (M. Brewer Ex. 28 (DNP-00265633 at DNP-00265635)) ([redacted]); A. Blanco Opp. Decl. Ex. 80 (L. Colacioppo Dep. Ex. 34 (DNP-00626848)) ([redacted]). Further, the citation to Malackowski merely asserts the proposition and cites to News Exs. 93–96 with no additional analysis. |

### 3. How Ziff Davis Plaintiffs Monetize Their Journalism

| | |
|---|---|
| 101. The mix of revenue sources for digital media publishers outside of the traditional newspaper industry, such as Ziff Davis, differs to some extent from that of traditional newspaper publishing. Ziff Davis digital media brands generate approximately 86% of their revenue from advertising and performance marketing. Ex. 47 [ZD 2025 10-K] at pp. 45-46; Ex. 48 [ZD0534639] at pp. 43-44; *see, e.g.*, Ex. 97 [Richter 30(b)(6) Depo. Tr.] at 31:8-23, 36:10-18. | 101. **Disputed in Part - Not Supported by Cited Evidence.** OpenAI responds as follows: Undisputed that approximately 86% of Ziff Davis's digital-media revenue came from advertising and performance marketing for the businesses and reporting periods addressed in the cited materials. However, disputed that the remainder of Paragraph 101 is accurate as stated because it is not supported by the cited evidence.<br><br>Microsoft responds that Paragraph 101 does not pertain to claims asserted against Microsoft. |
| 102. In addition to providing content to its readers through its owned and operated properties and generating revenue through advertising and subscriptions, Ziff Davis licenses its content through a variety of entities and business models, creating additional channels of indirect distribution of Ziff Davis content through aggregators and other platforms. Ex. 48 [ZD0534639] at –643; Oh Decl. ¶ 20. | 102. **Undisputed.**<br><br>Microsoft responds that Paragraph 102 does not pertain to claims asserted against Microsoft. |
| 103. Ziff Davis maintains several categories of license agreements: Global Operator License Agreements; Syndication Partnership Agreements; B2B Licensing/Media Monitoring Agreements; and AI-Related Agreements. Oh Decl. ¶ 21; *see, e.g.*, Ex. 49 [Oh Feb. 24, 2026 30(b)(6) Depo Tr.] at 26:11-29:13. | 103. **Disputed in Part - Not Supported by Cited Evidence.** OpenAI responds as follows: Undisputed that Ms. Oh's declaration divides the license agreements that Ziff Davis maintains into the identified categories. However, disputed that the remainder of Paragraph 103 is accurate as stated because it is not supported by the cited evidence. |

| | |
|---|---|
| | Microsoft responds that Paragraph 103 does not pertain to claims asserted against Microsoft. |

### 4. How CIR and The Intercept Generate Revenue to Support their Non-Profit Journalism Missions

| | |
|---|---|
| 104. CIR's and The Intercept's missions and the businesses that support those missions depend on building relationships with people who discover, come to recognize, and trust their work, and then support their journalism financially. Cross Rebuttal Rep. at 6. | 104. **Disputed in Part – Not Supported by Cited Evidence; Incomplete.** Defendants respond as follows: Undisputed that Ms. Cross offers the cited opinion and that CIR and The Intercept solicit financial support from readers and derive their revenues predominantly from contributions. However, disputed that either Plaintiff's mission or business depends on the particular progression from audience discovery to financial support that Plaintiffs describe. Ms. Cross [redacted]. *See* ECF 1821-1 (S. Cross Decl. Ex. A) (Rebuttal Rep.) at 6.<br>OpenAI further responds that this fact is disputed because Plaintiffs' characterization does not account for The Intercept's historical reliance on substantial funding from its founding benefactor, Pierre Omidyar. *See* A. Blanco Opp. Decl. Ex. 134 (*The Intercept Is Running Out of Cash*, Semafor). Moreover, although The Intercept's [redacted], its member contributions [redacted] ECF 1763 (A. Goldfarb Decl.) ¶ 81. [redacted] |

| | |
|---|---|
| | [redacted] *Id.* ¶ 84. Those facts undermine Plaintiffs' asserted connection between audience discovery and financial performance.<br><br>Microsoft responds that the facts related solely to The Intercept do not pertain to claims asserted against Microsoft. |
| 105. The Intercept is a digital native website and CIR is now digitally focused. Cross Rebuttal Rep. at 6. | 105. **Disputed in Part - Not Supported by Cited Evidence.** Defendants respond as follows: Undisputed that The Intercept launched as an online publication on February 10, 2014. However, disputed as to Plaintiffs' assertion that CIR is "digitally focused." Rather, CIR operates a multi-platform business that includes a paid print magazine and a nationally broadcast radio program. *See* ECF 1788 (M. Bauerlein Decl.) ¶ 3. For that reason, the disputed proposition is not supported by the cited evidence.<br><br>Microsoft responds that the facts related solely to The Intercept do not pertain to claims asserted against Microsoft. |
| 106. The long-term viability of CIR and The Intercept depends on continually being discovered by people and developing an audience that grows into a steady group of supporters. This continual renewal of the audience | 106. **Disputed in Part – Incomplete; Not Supported by Cited Evidence.** Defendants respond as follows: Undisputed that Ms. Cross offers the cited opinion in her report. However, disputed that Plaintiffs' |

| | |
|---|---|
| fuels their revenue model and is central to their editorial impact. Cross Rebuttal Rep. at 6. | characterization of, and inferences drawn from, that opinion accurately reflect its context or establish the asserted facts concerning CIR's and The Intercept's long-term viability, revenue models, or editorial impact.<br>Specifically, Ms. Cross [redacted] Further, Plaintiffs' characterization is incomplete because Ms. Cross's report itself [redacted]" *See* ECF 1821-1 (S. Cross Decl. Ex. A) (Rebuttal Rep.) at 6. The record reflects that [redacted] *See* A. Blanco Opp. Decl. Ex. 111 (A. Chabel Dep. Ex. 18 (INT0019062)); ECF 1763 (A. Goldfarb Decl.) ¶ 84. Plaintiffs' emphasis on continual audience renewal omits those [redacted].<br>Ms. Cross's generalized opinion, unsupported by Plaintiff-specific data, does not establish as an undisputed fact the asserted relationship between continual audience renewal and either Plaintiff's long-term viability, revenue, or editorial impact. The disputed propositions are therefore not supported by the cited evidence. |

| | |
|---|---|
| | Microsoft responds that the facts related solely to The Intercept do not pertain to claims asserted against Microsoft. |
| 107. CIR and The Intercept rely on traffic to their websites to build new audiences and sustain their work economically. Cross Rebuttal Rep. at 19. | 107. **Disputed in Part – Not Supported by Cited Evidence.** Defendants respond as follows: Undisputed that Ms. Cross offers an opinion referring to traffic to "[redacted]" Undisputed that CIR and The Intercept operate websites and use them, among other channels, to collect email addresses and solicit donations. However, disputed to the extent Plaintiffs' characterization of, and inferences drawn from, that opinion suggest that website traffic is the primary driver of, or directly determines, either organization's economic sustainability. Their use of websites as fundraising channels does not establish that their reliance on donations and grants amounts to dependence on website traffic.<br>OpenAI further responds that The Intercept's own materials state that [redacted] A. Blanco Opp. Decl. Ex. 115, INT0073460 at INT0073464; A. Blanco Opp. Decl. Ex. 125, INT0209356 at INT0209375. Consistent with those observations, [redacted] |

| | |
|---|---|
| | [redacted] ECF 1763 (A. Goldfarb Decl.) ¶¶ 81, 84.<br>OpenAI further responds that The Intercept [redacted] A. Blanco Opp. Decl. Ex. 127, INT0225521 at INT0225524. It also [redacted] A. Blanco Opp. Decl. Ex. 118, INT0082641 at INT0082648; A. Blanco Opp. Decl. Ex. 125, INT0209356 at INT0209366. These records undermine Plaintiffs' asserted connection between website traffic and economic sustainability.<br><br>Microsoft responds that the facts related solely to The Intercept do not pertain to claims asserted against Microsoft. |
| 108. CIR and The Intercept also raise money by applying for grants and soliciting donations, and their ability to obtain grants and donations depends on demonstrating their reach and the extent of their readership. Cross Rebuttal Rep. at 10, 20-23. | 108. **Disputed in Part – Not Supported by Cited Evidence; Incomplete.** Defendants respond as follows: Undisputed that CIR and The Intercept raise money by applying for grants and soliciting donations. However, disputed that the cited evidence establishes that their ability to obtain grants and donations depends on demonstrating their reach and the extent of their readership. Plaintiffs' characterization omits other factors |

| | |
|---|---|
| | affecting funding decisions, including personal relationships, donors' priorities, and the subject matter and perceived impartiality of the journalism.<br>CIR's corporate representative testified that [redacted]. A. Hurst Decl., Ex. 12at 321:10–322:24. CIR's materials [redacted]. A. Blanco Opp. Decl. Ex. 10, CIR0087556 at CIR0087578. [redacted] A. Blanco Opp. Decl. Ex. 11, CIR0087595 at CIR0087645– CIR0087648.<br>OpenAI further responds that The Intercept's internal materials [redacted]. A. Blanco Opp. Decl. Ex. 111, INT0019062 at INT0019066. The Intercept also reported [redacted]. A. Blanco Opp. Decl. Ex. 125, INT0209356 at INT0209366. These records undermine |

| | |
|---|---|
| | Plaintiffs' asserted dependence of funding on demonstrated reach and readership.<br><br>Microsoft responds that the facts related solely to The Intercept do not pertain to claims asserted against Microsoft. |
| 109. Both CIR and The Intercept rely on the strategic model of audience and donor funnels for their success and survival, which begin with and rely on the initial discovery of the organizations' works by readers. Cross Rebuttal Rep. at 21. | 109. **Disputed in Part – Not Supported by Cited Evidence; Incomplete.** Defendants respond as follows: Undisputed that Ms. Cross's Rebuttal Report states, "[redacted]" *See* ECF 1821-1 (S. Cross Decl. Ex. A) (Rebuttal Rep.) at 21. Undisputed that CIR and The Intercept, among other fundraising methods, seek to convert readers into donors. However, disputed that the cited evidence establishes that either Plaintiff's success or survival depends on the asserted progression from initial discovery of its works to financial support. Ms. Cross offers a generalized industry opinion relying on [redacted]. *Id.*<br>Further disputed because Plaintiffs' characterization omits the importance of existing donor relationships, major gifts, and institutional grants. CIR's records describe [redacted] A. Blanco Opp. Decl. Ex. 10, CIR0087556 at CIR0087578. The Intercept likewise identified [redacted] |

| | |
|---|---|
| | [redacted]. A. Blanco Opp. Decl. Ex. 125, INT0209356 at INT0209375. [redacted]<br><br>The Intercept's own materials further state that [redacted] A. Blanco Opp. Decl. Ex. 115, INT0073460 at INT0073464. Consistent with that assessment, [redacted]. ECF 1763 (A. Goldfarb Decl.) ¶ 81. [redacted]. *Id.* ¶ 84. The Intercept also [redacted] it. A. Blanco Opp. Decl. Ex. 118, INT0082641 at INT0082648.<br><br>Microsoft responds that the facts related solely to The Intercept do not pertain to claims asserted against Microsoft. |
| 110. CIR and The Intercept attract readers through social media, shared links, search or a media mention. Cross Rebuttal Rep. at 22. | 110. **Disputed in Part – Not Supported by Cited Evidence; Incomplete.** Defendants respond as follows: Undisputed that Ms. Cross's report states that [redacted] *See* ECF 1821-1 (S. Cross Decl. Ex. A) (Rebuttal |

| | |
|---|---|
| | Rep.) at 22. Undisputed that CIR's and The Intercept's websites receive some referral traffic from search engines and social platforms, as well as direct visits, aggregator referrals, and email.<br><br>However, disputed to the extent Plaintiffs' characterization of, and inferences drawn from, Ms. Cross's opinion suggest that the identified channels are the complete, primary, or foundational means by which either Plaintiff builds its audience or donor base. The cited passage [redacted]<br><br>Further, Plaintiffs' characterization is incomplete because [redacted] A. Blanco Opp. Decl. Ex. 26, CIR0677920.<br><br>OpenAI further responds that The Intercept likewise reported [redacted]. The same report stated that [redacted]. A. Blanco Opp. Decl. Ex. 118, INT0082641 at INT0082648. These records demonstrate [redacted] |

| | |
|---|---|
| | Microsoft responds that the facts related solely to The Intercept do not pertain to claims asserted against Microsoft. |

### 5. Established Market for Licensing Journalism Content

| | |
|---|---|
| 111. Microsoft's economics expert Dr. Tucker acknowledged that there is a market for licensing involving the display of news publishers' content that predates the development of LLMs. Ex. 82 [Tucker Opening Rep.] ¶ 137. | 111. **Disputed in Part – Incomplete.** Microsoft does not dispute that Dr. Tucker discussed agreements involving the display of news publishers' content that predates the development of LLMs, but disputes that she stated, "there is a market for licensing involvement the display of news publishers' content." Pursuant to Fed. R. Evid. 106, Dr. Tucker explained: "Agreements involving display rights predate the development of general-purpose LLMs…The display of news articles is distinct from using news articles for training or grounding since it involves presenting content directly to users rather than using the content solely to improve or inform model outputs…The existence of agreements that bundle display rights with training or grounding rights does not inform whether markets for licensing data for training or grounding purposes without display rights exists or whether such markets are likely to develop. Licensing data for display are associated with different economic considerations than licensing data for training and grounding." News Ex. 82 ¶¶ 137, 139.<br><br>OpenAI defers to Microsoft's response. |

### *i) The Times's Licenses*

| | |
|---|---|
| 112. The Times derives revenue from licensing its intellectual property for specific use cases. Ex. 1 [The New York Times SEC Form 10-K Dec. 31, 2025] at 5. | 112. **Undisputed.** |
| 113. The Times licenses content "to digital aggregators in the business, professional, academic and library markets, in addition to licensing content to third-party digital platforms for access by their users and for other purposes." Ex. 1 [The New York Times SEC Form 10-K Dec. 31, 2025] at 5. | 113. **Undisputed.** |
| 114. As part of The Times's "news and syndication services," The Times "license[s] articles, graphics and photographs both directly and through third-party sellers to a wide variety of clients, including newspapers, magazines, websites and other corporations." Ex. 1 [The New York Times SEC Form 10-K Dec. 31, 2025] at 5. | 114. **Undisputed.** |
| 115. The Times also licenses content "for use in television, films and books," provides "rights to reprint articles," and "create[s] and sell[s] news digests based on [Times] content." Ex. 1 [The New York Times SEC Form 10-K Dec. 31, 2025] at 5. | 115. **Undisputed.** |
| 116. The Times has licensed its articles, graphics, and photographs to thousands of licensees. Ex. 98 [The New York Times SEC Form 10-K Dec. 31, 2023] at 5; Ex. 99 [The New York Times SEC Form 10-K Dec. 31, 2022] at 5. | 116. **Disputed – Not Supported by Cited Evidence.** Defendants respond that the fact stated in Paragraph 116 is disputed because the cited evidence does not demonstrate that The Times has thousands of |

| | |
|---|---|
| | licensees. The 2022 10-K at News Ex. 99 states that "we license articles, graphics and photographs to over 1,500 clients" and the 2023 10-K at News Ex. 98 states that "we license articles, graphics and photographs to over 1,200 clients[.]" Neither statement supports the assertion that "The Times has licensed its articles, graphics, and photographs to thousands of licensees. The figures reflect different annual snapshots and cannot simply be added together because the filings do not establish that the 2022 and 2023 client populations are distinct. |
| 117. The Times's licensees pay The Times millions of dollars each year. Ex. 100 [NYT_00820234] (Dec. 2022 NYT Flash Book at tab 1.18); Ex. 101 [NYT_00820246] (Dec. 2023 NYT Flash Book at tab 1.22); Ex. 102 [NYT_00820258] (Dec. 2024 NYT Flash Book at tab 1.22); Ex. 103 [The New York Times SEC Form 10-K Dec. 31, 2024] at 37 (referencing "higher content licensing revenues of $14.9 million, primarily related to an Apple licensing deal"); Ex. 1 [The New York Times SEC Form 10-K Dec. 31, 2025] at 39 (referencing "higher licensing revenues of $14.4 million, largely related to commercial agreements with third-party digital platforms"). | 117. **Undisputed.** |
| 118. When it enters into content licensing agreements, The Times often limits its license of digital rights to a certain number of articles per day. *See, e.g.*, Ex. 104 [NYT_00755698] (Capital Newspapers / Times Union) ([redacted] articles per day); Ex. 105 [NYT_00755718] (Weeklys) | 118. **Undisputed.** |

| | |
|---|---|
| ([redacted] articles per day); Ex. 106 [NYT_00755635] (La Presse, Inc.) ([redacted] articles per day). | |
| 119. The Times also licensed its IP for solely non-commercial use to The Linguistic Data Consortium at the University of Pennsylvania. Ex. 107 [NYT_00146736] (LDC Agreement); Ex. 108 [DiPersio 30(b)(6) Depo. Tr.] 149:3-157:22. | 119. **Undisputed.** |

### *ii)* Daily News *Plaintiffs' Licenses*

| | |
|---|---|
| 120. The *Daily News* Plaintiffs license their content for revenue to a variety of industries and entities. *See* Robyn Morris Decl. at ¶¶ 4-8. | 120. **Disputed in Part - Not Supported by Admissible Evidence.** Defendants respond as follows: Undisputed that R. Morris Declaration ¶ 4 says DNPs license their content "to a variety of entities in different industries." However, Paragraph 120 is not supported by admissible evidence, as required by Local Rule 56.1, and therefore is not properly before the Court. Specifically, the R. Morris Declaration ¶¶ 4–8 (ECF 1776) are conclusory assertions lacking factual support in contravention of Fed. R. Evid. 602, 701; Fed. R. Civ. P. 56(c)(4). The paragraphs identify no agreement, counterparty or term to support the statement. *See id.* Further disputed as to the implication that DNPs only license their content "for revenue." Plaintiffs [redacted] A. Blanco Opp. Decl. Ex. 234 (W. Lown 30(b)(6) Tr.) at 54:5–55:24 (testifying regarding DNP-00354546, the Speciate licensing agreement). |

| | |
|---|---|
| 121. *Daily News* Plaintiffs license their content for revenue to media publishers for syndication and editorial use of content by other publishers and agencies. Robyn Morris Decl. at ¶¶ 4-8. | 121. **Disputed in Part - Not Supported by Cited Evidence; Not Supported by Admissible Evidence.** Defendants respond as follows: Undisputed that R. Morris Declaration ¶ 4 (ECF 1776) says DNPs license their content "to a variety of entities in different industries." However, the facts set forth in Paragraph 121 are disputed because they are not supported by the cited evidence. Specifically, the cited declaration does not say that DNPs license their content "for syndication or editorial use." *See* ECF 1776 (R. Morris Decl.) ¶¶ 4–8. Further, the R. Morris Declaration ¶¶ 4–8 are conclusory assertions lacking factual support in contravention of Fed. R. Evid. 602, 701; Fed. R. Civ. P. 56(c)(4). Thus, the disputed proposition is not supported by admissible evidence, as required by Local Rule 56.1, and therefore is not properly before the Court.<br>Further, R. Morris Declaration ¶¶ 4–8 identify no agreement, counterparty or term to support the statement. *See* R. Morris Decl. ¶¶ 4–8. |
| 122. The rights granted to these media companies generally include the rights to use, make available, store, copy, digitize, distribute, reproduce, and/or host online the licensed content. Robyn Morris Decl. at ¶¶ 4-8. | 122. **Disputed in Part - Not Supported by Admissible Evidence.** Defendants respond as follows: Undisputed that the Morris Declaration states generally that the rights granted to these media companies generally include the rights to use, make available, store, copy, digitize, distribute, reproduce, and/or host online the licensed content. However, the rest of Paragraph 122 is disputed because it is not supported by admissible evidence, as required by Local Rule 56.1, and therefore is |

| | |
|---|---|
| | not properly before the Court. Specifically, R. Morris Declaration ¶¶ 4–8 (ECF 1776) are conclusory assertions lacking factual support in contravention of Fed. R. Evid. 602, 701 and Fed. R. Civ. P. 56(c)(4). Further, the paragraphs identify no agreement, counterparty or term to support the statement. *See id.*; *see also* R. Morris Decl. ¶¶ 4–8. |
| 123. *Daily News* Plaintiffs license their content for revenue to research and education platforms. Robyn Morris Decl. at ¶¶ 4-8. | 123. **Disputed in Part - Not Supported by Admissible Evidence.** Defendants respond as follows: Undisputed that the Morris Declaration states generally that Daily News Plaintiffs license their content for revenue to research and education platforms. However, the rest of Paragraph 123 is disputed because it is not supported by admissible evidence, as required by Local Rule 56.1, and therefore is not properly before the Court. Specifically, disputed on the basis that the R. Morris Declaration ¶¶ 4–8 (ECF 1776) are conclusory assertions lacking factual support in contravention of Fed. R. Evid. 602, 701; Fed. R. Civ. P. 56(c)(4). Further, they identified no agreement, counterparty or term to support the statement. *See id.*; *see also* ECF 1776 (R. Morris Decl.) ¶¶ 4–8. |
| 124. The granted rights to the research and education platforms are typically limited in scope to internal, non-commercial research and educational use, often excluding redistribution or public-facing displays of licensed works. Robyn Morris Decl. at ¶¶ 4-8. | 124. **Disputed in Part - Not Supported by Admissible Evidence.** Defendants respond as follows: Undisputed that the R. Morris Declaration makes an assertion similar to the facts put forward in Paragraph 124. However, Paragraph 124 is disputed because it is not supported by admissible evidence, as required by Local |

| | |
|---|---|
| | Rule 56.1, and therefore is not properly before the Court. Specifically, disputed on the basis that the R. Morris Declaration ¶¶ 4–8 (ECF 1776) are conclusory assertions lacking factual support in contravention of Fed. R. Evid. 602, 701; Fed. R. Civ. P. 56(c)(4). Further, they identified no agreement, counterparty or term to support the statement. *See id.*; *see also* ECF 1776 (R. Morris Decl.) ¶¶ 4–8.<br>Further, the facts set forth in Paragraph 124 are disputed because they are contradicted by evidence in the record showing that licenses with research and educational platforms are not so limited in scope. The [redacted] A. Blanco Opp. Decl. Ex. 39, DNP-00138528. The [redacted] A. Blanco Opp. Decl. Ex. 50, DNP-00353807. |
| 125. *Daily News* Plaintiffs license their content for revenue for use and distribution with aggregators and platforms. Robyn Morris Decl. at ¶¶ 4-8. | 125. **Disputed in Part - Not Supported by Admissible Evidence.** Defendants respond as follows: Undisputed that the R. Morris Declaration makes an assertion similar to the facts put forward in Paragraph 125. However, Paragraph 125 is disputed because it is not supported by admissible evidence, as required by Local Rule 56.1, and therefore is not properly before the |

| | |
|---|---|
| | Court. Specifically, disputed on the basis that the R. Morris Declaration ¶¶ 4–8 (ECF 1776) are conclusory assertions lacking factual support in contravention of Fed. R. Evid. 602, 701; Fed. R. Civ. P. 56(c)(4). Further, [redacted] the statement. *See* ECF 1776 (R. Morris Decl.) ¶¶ 4–8. |
| 126. The rights granted to these aggregators and platforms often include provisions that allow the licensee to display headlines, teasers, and thumbnails linked to full articles, subject to metering, attribution, and restrictions on the amount of text displayed. Robyn Morris Decl. ¶¶ 4-8. | 126. **Disputed in Part - Not Supported by Admissible Evidence.** Defendants respond as follows: Undisputed that the R. Morris Declaration generally supports this statement. However, disputed that the rights granted always include "restrictions on the amount of text displayed." This is [redacted] *See* A. Blanco Opp. Decl. Ex. 58, DNP-00469243. Also disputed that agreements always include a requirement that display rights are "subject to...attribution." This is contradicted by licenses in the record that do not require attribution. *See*, *e.g.*, A. Blanco Opp. Decl. Ex. 46, DNP-00263921; A. Blanco Opp. Decl. Ex. 234 (W. Lown 30(b)(6) Tr.) at 43:13–44:14 ([redacted]. Further, Paragraph 126 is disputed because it is not supported by admissible evidence, as required by Local Rule 56.1, and therefore is not properly before the Court. Specifically, disputed on the basis that the R. Morris Declaration ¶¶ 4–8 are conclusory assertions lacking factual support in contravention of Fed. R. Evid. 602, 701; Fed. R. Civ. P. 56(c)(4). *See* ECF 1776 (R. Morris Decl.) ¶¶ 4–8. Further, |

| | |
|---|---|
| | they identified no agreement, counterparty or term to support the statement. *See id.* |

**iii) *Ziff Davis's Licenses***

| | |
|---|---|
| 127. Separately from its owned-and-operated properties, Ziff Davis licenses its content to third parties through indirect distribution channels such as aggregators and platforms, which allows it to extend its reach to audiences it could not otherwise access. Ex. 49 [Oh 30(b)(6) Feb. 24, 2026 Depo Tr.] at 26:11-29:13. | 127. **Undisputed.**<br><br>Microsoft responds that Paragraph 127 does not pertain to claims asserted against Microsoft. |
| 128. Under Global Operator License Agreements, Ziff Davis licenses its brand name and content to international operators in markets where it does not already have a presence, which Ziff Davis views as additive to its overall business because it gains new users in markets it would not otherwise have captured. Ex. 49 [Oh Feb. 24, 2026 30(b)(6) Depo. Tr.] at 26:11-27:6; Ex. 109 [Doree 30(b)(6) Depo. Tr.] at 11:16-24; *see, e.g.*, Ex. 110 [ZD0323073] and Ex. 111 [ZD0489061]. | 128. **Undisputed.**<br><br>Microsoft responds that Paragraph 128 does not pertain to claims asserted against Microsoft. |
| 129. Ziff Davis has established Syndication Partnership Agreements with many outlets, including [redacted] (Ex. 112 [ZD0355406], Ex. 113 [ZD0486818], Ex. 114 [ZD0492441]), [redacted] (Ex. 115 [ZD0441424]), [redacted] (Ex. 116 [ZD0572418]), [redacted] (Ex. 117 [ZD0373029]), [redacted] (Ex. 118 [ZD0493247]), [redacted] (Ex. 119 [ZD0488981]), [redacted] (Ex. 120 [ZD0370635]), and [redacted] | 129. **Undisputed.**<br><br>Microsoft responds that Paragraph 129 does not pertain to claims asserted against Microsoft. |

| | |
|---|---|
| (Ex. 121 [ZD0492754]), under which Ziff Davis licenses content for distribution, reproduction, promotion, and/or display in exchange for a revenue share, typically ranging from [redacted] of advertising revenue. Ex. 49 [Oh Feb. 24, 2026 30(b)(6) Depo. Tr.] at 27:7-21; Ex. 122 [ZD0575952] at tab "Summary". | |
| 130. Ziff Davis has established B2B/Media Monitoring Agreements with, at a minimum, the [redacted], under which Ziff Davis licenses article content to professional or educational databases in exchange for a revenue share. Ex. 122 [ZD0575952] at tab "Summary"; Ex. 123 [ZD0323404], Ex. 124 [ZD0487609]; Ex. 49 [Oh Feb. 24, 2026 30(b)(6) Depo. Tr.] at 28:7-15, 67:13-69:3; Ex. 109 [Doree 30(b)(6) Depo. Tr.] at 59:7-60:15. | 130. **Undisputed.**<br><br>Microsoft responds that Paragraph 130 does not pertain to claims asserted against Microsoft. |
| 131. Additionally, Ziff Davis has entered into AI-related content license agreements with two companies, [redacted], each consisting of limited use and/or scope grants with defined, non-renewing terms. Ex. 125 [ZD0492278]; Ex. 126 [ZD0447957]; Ex. 49 [Oh 30(b)(6) Feb. 24, 2026 Depo. Tr.] at 40-47:4; Oh Decl. ¶ 28. | 131. **Undisputed.**<br><br>Microsoft responds that Paragraph 131 does not pertain to claims asserted against Microsoft. |

### *iv)* CIR and The Intercept's Licenses

| | |
|---|---|
| 132. CIR and The Intercept license content through wire service arrangements, content partnership | 132. **Disputed - Not Supported by Cited Evidence.** Defendants respond as follows: Undisputed that CIR and The Intercept have, at various times, entered |

| | |
|---|---|
| agreements, and licensed aggregation products. McDonald Rebuttal Rep. at 37. | into a small number of third-party distribution, aggregation, and co-publishing arrangements for some of their written content. However, the remainder of the characterization is disputed as unsupported by the cited source and contrary to the record. The cited source [redacted]. ECF 1875 (McDonald Rebuttal Report) at 37. The characterization is also disputed for lack of context, because [redacted] A. Blanco Opp. Decl. Ex. 179 (M. Buckingham 30(b)(6) Tr. Dec. 19, 2025) at 311:5-8, 342:5-343:21.<br><br>Microsoft responds that the facts related solely to The Intercept do not pertain to claims asserted against Microsoft. |
| 133. In addition to providing content on its owned websites and publishing directly to subscribers, The Intercept has licensed its content to news aggregators, including Apple News and Smart News. Ex. 311 [Chabel 30(b)(6) Depo. Tr.] at 112:12-16. | 133. **Disputed in Part - Not Supported by Cited Evidence.** OpenAI responds as follows: Undisputed that The Intercept publishes content on its own website, distributes content to newsletter subscribers, and makes its articles available on the Apple News and SmartNews apps. However, disputed as to the characterization that The Intercept has "subscribers," because it does not have subscribers in the traditional |

| | |
|---|---|
| | sense [redacted] A. Blanco Opp. Decl. Ex. 235 (Macala 30(b)(6) Tr. Feb. 5, 2026) at 177:6-178:19. Further, disputed for lack of context, because the characterization [redacted] A. Blanco Opp. Decl. Ex. 183 (Chabel 30(b)(6) Tr.) at 108:22-109:6, 133:17-134:1. Similarly, another Intercept 30(b)(6) witness testified [redacted] A. Blanco Opp. Decl. Ex. 235 (Macala 30(b)(6) Tr. Feb. 5, 2026) at 183:21-184:6.<br><br>Microsoft responds that Paragraph 133 does not pertain to claims asserted against Microsoft. |
| 134. In addition to providing content on its owned websites and publishing directly to members, CIR has engaged in licensing schemes, such as by leading a partnership of the Climate Desk project with a variety of other international news organizations. Cross Rebuttal Rep. at 36-37. | 134. **Disputed in Part - Not Supported by Cited Evidence.** Defendants respond as follows: Undisputed that CIR publishes content on its owned websites, communicates directly with its members, and has led the Climate Desk collaboration among news organizations. However, disputed that Climate Desk, or any other CIR arrangement, constitutes a "licensing scheme." That characterization implies a commercial licensing program and a market relevant to the uses at |

| | |
|---|---|
| | issue, and the record does not snpport either characterization. The sole cited support for this fact is Ms. Cross's rebuttal report at pages 36-37, which cites no agreement, fee, royalty, financial record, or testimony establishing a licensing arrangement. Rather, the evidence shows that Climate Desk operates as an unusual, informal content-sharing partnership among news organizations withont a fee structnre. A. Blanco Opp. Decl. Ex. 179 (M. Buckingham 30(b)(6) Tr. (Dec. 19, 2025)) at 358:7-22 ("Having a partnership like this within the jonrnalism commnnity is extremely nnnsual. ... [I]t's extremely nnnsual to have a partnership where news organizations share content for no fee. ... [T]here have been times where it's a handshake agreement of a sharing of content becanse it's so unusnal because of the importance of the topic."); A. Blanco Opp. Decl. Ex. 7, CIR0004165 at CIR0004166 (Jan. 17, 2019 email identifying Climate Desk's participating news organizations). |

## D. Developing Market for Licensing Data (Including News) for Generative AI Purposes

| | |
|---|---|
| 135. The elements of a functioning market for licensing AI data in connection with generative AI already exist: there are willing buyers and sellers, pricing mechanisms, intermediaries, and execnted agreements. Ex. 128 [Stamm Rebnttal Rep.] at Appendix C, Ex. 1 (snmmarizing [redacted] between OpenAI [redacted]; Ex. 129 [Stamm ZD Rebnttal Rep.] ¶¶ 177-178, | 135. **Disputed in Part– Not Supported by Cited Evidence; Immaterial.** Defendants dispute that "The elements of a functioning market for licensing AI data in connection with generative AI already exist." Although Defendants do not dispute that there are some buyers, sellers, prices, intermediaries, and executed agreements for nse of content in GenAI prodncts, Defendants dispnte that the existence of these elements |

| | |
|---|---|
| Appendix C, Ex. 1; Ex. 127 [Rao Rebuttal Report] at Tabs 3-4 (summarizing [redacted], Microsoft, and [redacted]) | means a functioning market for licensing data for training or grounding general-purpose LLMs exists or is likely to develop. *See* ECF 1733 (C. Tucker Decl.) ¶ 13(e); *see also id.* ¶¶ 130-231; ECF 1702 (Microsoft News SUMF) ¶ 147.<br>Defendants further state that the cited evidence does not demonstrate the existence of a cognizable market for licensing AI data in connection with generative AI. Specifically, Defendants' experts' rebuttal reports do not support that conclusion. *See* News Ex. 128 (L. Stamm Rebuttal Rep. (NYT-DNP)) at Appendix C, Ex. 1; News Ex. 129 (L. Stamm Rebuttal Rep. (ZD)) ¶¶ 177-178, App. C, Ex. 1; News Ex. 127 (M. Rao Rebuttal Rep.) at Tabs 3-4. Further, Dr. Rao testified that he agrees that there is no functioning market to license data for GenAI purposes. *See* A. Blanco Opp. Decl. Ex. 263 (M. Rao Tr.) at 144:5-146:12; News Ex. 127.1 (M. Rao Rebuttal Rep.) ¶¶ 9, 58-61.<br>Defendants also respond that the facts in Paragraph 135 are immaterial and therefore disputed because these facts do not affect the outcome of the suit under the governing law. Whether a market for licensing data for generative AI purposes "exists or is likely to develop is irrelevant, because this market is not one that plaintiffs are legally entitled to monopolize." *Kadrey*, 788 F. Supp. 3d at 1052; *Bartz*, 787 F. Supp. 3d at 1032. |
| 136. Microsoft's economic expert, Dr. Tucker, admitted that "licensing collectives and marketplaces for data for training or grounding LLMs" are "developing" in the United States. Ex. 82 [Tucker Opening Rep.] ¶ 135. | 136. **Disputed – Not Supported by Cited Evidence; Incomplete.** Microsoft disputes Paragraph 136. Dr. Tucker did not conclude that functioning markets for licensing data for AI training or grounding are |

| | |
|---|---|
| | developing. Rather, Dr. Tucker explained that recent initiatives are experimental and would still need to overcome considerable challenges to develop into a functioning market for licensing data for AI training or grounding at the scale required for general-purpose LLMs. *See* C. Tucker Opp. Decl. ¶¶ 10(b), 19; ECF 1733 (C. Tucker Decl.) ¶ 175.<br>Pursuant to Fed. R. Evid. 106, Microsoft responds that Dr. Tucker's full opinion is that: "The recent emergence of agreements between developers of general-purpose LLMs and a few content providers, including news publishers, does not imply there are functioning markets for licensing data for training or grounding general-purpose LLMs. Many existing agreements tend to be firm-specific, individually negotiated partnerships that cover products and services in addition data for training or grounding purposes and provide value beyond the standalone economic value of the licensed content. The licensing collectives and marketplaces for data for training or grounding LLMs that are developing in the United States are still in early, experimental stages and would still need to overcome considerable challenges to develop into functioning markets for licensing data for AI training or grounding." News Ex. 82 (C. Tucker Opening Rep.) ¶ 135.<br><br>OpenAI joins. |
| 137. OpenAI's expert, Dr. Goldfarb, acknowledges that "agreements between AI developers and content | 137. **Disputed in Part – Not Supported by Cited Evidence.** OpenAI responds as follows: |

| | |
|---|---|
| providers have emerged following the release of ChatGPT," which "typically bundle a variety of rights and considerations," including rights to "display, distribution," and for "training." Ex. 467 [Goldfarb NYT Opening Rep.] ¶ 322; Ex. 474 [Goldfarb ZD Opening Rep.] ¶ 17e. | Undisputed that the cited source contains the quoted language. However, disputed to the extent Plaintiffs' selective quotation mischaracterizes Dr. Goldfarb's opinions or suggests that these agreements establish a licensing market for the use of Plaintiffs' Asserted Works to train LLMs. Dr. Goldfarb expressly explained that: "[a]lthough certain agreements between AI developers and content providers have emerged following the release of ChatGPT, these agreements do not reflect a traditional licensing market for use of The Times's content for training LLMs. Rather, they are broad-based arrangements that typically bundle a variety of rights and considerations, including [redacted]" News Ex. 467 (A Goldfarb NYT Opening Rep.) ¶ 322. Dr. Goldfarb further explained that the structure and terms of these agreements do not establish that the parties are transacting for the standalone value of training data or establish a consistent or observable pricing mechanism for such data. *Id.* Similarly, Dr. Goldfarb concluded that agreements between LLM developers and content providers "do not reflect a traditional or likely-to-develop licensing market for use of Ziff Davis's Asserted Works or |

| | |
|---|---|
| | similar content for training LLMs." News Ex. 474 (A. Goldfarb ZD Opening Rep.) ¶ 17(e).<br><br>Microsoft defers to OpenAI. |
| 138. Microsoft's economic expert, Dr. Rao, uses real-world data licenses for LLM training and RAG to inform his market approach calculations for News Plaintiffs' damages. Ex. 127 [Rao Rebuttal Rep.] ¶¶ 9, 81-93, 96-98. | 138. **Disputed in Part – Incomplete; Immaterial.** Microsoft does not dispute that Dr. Rao used real-world agreements between AI developers and content holders as a damages construct to counter Plaintiffs' damages expert's proposed lost license fee for damages purposes. But Microsoft disputes any implication that Dr. Rao agrees or that his approach implies that a functioning market to license data for training or grounding general-purpose LLMs exists. Pursuant to Federal Rule of Evidence 106, Dr. Rao testified that he agrees with Dr. Tucker that there is no functioning market to license content for generative AI purposes. *See* A. Blanco Opp. Decl. Ex. 263 (M. Rao Tr.) at 144:5-146:12; News Ex. 127.1 (M. Rao Rebuttal Rep.) ¶¶ 9, 58-61.<br>Microsoft further responds that the facts stated in Paragraph 138 are immaterial and therefore disputed because these facts do not affect the outcome of the suit under the governing law. Whether a market for licensing data for generative AI purposes "exists or is likely to develop is irrelevant, because this market is not one that plaintiffs are legally entitled to monopolize." *Kadrey*, 788 F. Supp. 3d at 1052; *Bartz*, 787 F. Supp. 3d at 1032. Additionally, Dr. Rao's calculation was related to rebutting |

| | |
|---|---|
| | Plaintiffs' damages calculation and does not help resolve any question before the Court.<br><br>OpenAI defers to Microsoft's response. |
| 139. Dr. Rao assumed for his analysis that the first date of infringement for GPT-3 was October 2019. Ex. 127 [Rao Rebuttal Rep.] ¶ 52. | 139. **Undisputed – Immaterial.** It is undisputed that Dr. Rao used this assumption in performing calculations for his expert damages opinion. but Microsoft responds that assumptions used by expert witnesses are not facts. Further, the "fact" stated in Paragraph 139 is immaterial because as an expert witness assumption it does not affect the outcome of the suit under the governing law. |
| 140. OpenAI's economics expert, Dr. Stamm, confirmed that "OpenAI has entered into a series of strategic collaboration agreements ("SCAs") with media publishers that include rights to display that content to users through its products, as well as rights for training large language models." Ex. 128 [Stamm Rebuttal Rep.] ¶ 221; *see, e.g.*, Ex. 129 [Stamm ZD Rebuttal Rep.] ¶¶178, 191-195, Appendix C, Ex. 1. | 140. **Disputed in Part – Not Supported by Cited Evidence.** OpenAI responds as follows: Undisputed that the cited evidence contains the quoted language. However, disputed to the extent Plaintiffs' selective quotation suggests that Stamm concluded that these agreements establish an existing licensing market for the use of Plaintiffs' Asserted Works to train LLMs. Stamm stated that she understood Dr. Goldfarb's opinion that "no viable market for licensing media content for training AI models exists," and that she was "not offering an opinion regarding whether such a viable market exists." News Ex. 129.1 (L. Stamm ZD Rebuttal Rep.) ¶ 18. Rather, Ms. Stamm considered these agreements as data points in a hypothetical damages analysis, explaining that they involve broader arrangements encompassing various rights and commercial considerations, [redacted] |

| | |
|---|---|
| | [redacted] *Id.* ¶¶ 18, 26. Her consideration of these agreements for purposes of assessing hypothetical damages does not establish the existence of an actual market for the training uses at issue in this litigation.<br><br>Microsoft defers to OpenAI. |
| 141. OpenAI's damages expert Dr. Stamm [redacted] between OpenAI and media entities, some providing for payments by OpenAI of [redacted] Ex. 128 [Stamm Rebuttal Rep.] at Appendix C. Ex. 1; Ex. 129 [Stamm ZD Rebuttal Rep.] at. App. C Ex. 1. | 141. **Disputed in Part – Not Supported by Cited Evidence.** OpenAI responds as follows: Undisputed that Stamm summarized certain agreements between OpenAI and media publishers, including strategic collaboration agreements that encompass a variety of rights and commercial considerations beyond training, [redacted] However, disputed to the extent Plaintiffs characterize these commercial arrangements as "license agreements for revenue." Dr. Stamm recognized that these agreements involved a variety of rights. Ex. 129.1 (L. Stamm ZD Rebuttal Rep.) ¶ 26. Further disputed that multiple agreements provide for payments of "[redacted]." The cited figure relates to a single strategic collaboration agreement between OpenAI and News Corp, and does not represent a payment specifically attributable to LLM training rights. *See id.*, App. C, Ex. 1.<br><br>Microsoft defers to OpenAI. |

| | |
|---|---|
| 142. Dr. Stamm assumed for her analysis that the first date of infringement for GPT-3 was October 2019. Ex. 128 [Stamm Rebuttal Rep.] ¶ 379; Ex. 129 [Stamm ZD Rebuttal Rep.] ¶ 338. | 142. **Disputed – Not Supported by Cited Evidence.** OpenAI responds as follows: Disputed that Stamm assumed October 2019 was the "first date of infringement for GPT-3." The cited paragraphs do not identify October 2019 as a date of infringement. Rather, Stamm used October 2019 as the starting point for a conservative estimate of the duration of a hypothetical license for purposes of her damages analysis, spanning approximately 57 months from October 2019 to July 2024. News Ex. 128 (L. Stamm Rebuttal Rep.) ¶ 379; News Ex. 129.1 (L. Stamm ZD Rebuttal Rep.) ¶ 338. Stamm further explained that a more accurate estimate of the hypothetical damages period would be shorter than 57 months. News Ex. 129.1 (L. Stamm ZD Rebuttal Rep.) ¶ 339. Accordingly, Plaintiffs improperly characterize a conservative assumption employed for a hypothetical damages calculation as a factual determination concerning the date of any alleged infringement.<br><br>Microsoft defers to OpenAI. |
| 143. The date of first infringement for GPT-2 was no earlier than July 2018. Ex. 130 [Brockman Depo Tr.] at 58:8-10 (GPT-2 was trained "towards the end of 2018, perhaps early 2019"); Goldstein Reply Report at ¶ 190. | 143. Disputed in Part – Not Supported by Cited Evidence. OpenAI responds as follows: Undisputed that Mr. Brockman testified, "I **believe** GPT-2 was trained towards the end of 2018, perhaps early 2019." News Ex. 130 (G. Brockman Tr.) at 58:8–10 (emphasis added). However, disputed that the cited testimony establishes any "date of first infringement" for GPT-2. Mr. Brockman's testimony concerns his approximate |

| | |
|---|---|
| | recollection of when GPT-2 was trained, not whether any infringement occurred. Further disputed because GPT-2 is not among the models at issue in this litigation. Disputed that Goldstein's opinion establishes an actual date of infringement; Goldstein refers only to the "first **alleged** infringement in this case" occurring in 2018. ECF 1819-3 (T. Goldstein Decl. Ex. C) (Reply Rep.) ¶ 190 (emphasis added). OpenAI disputes that any infringement occurred and that the cited evidence establishes July 2018, or any other date, as the date of first infringement for GPT-2.<br><br>Microsoft defers to OpenAI. |
| 144. Data is essential to build an LLM, and acquiring data from sources including news publishers was essential to Defendants. *See* Ex. 131 [OPCO_MDL_004776577] at 580-581 ([redacted]); Ex. 132 [Fradin Depo. Tr.] at 38:6-39:1 (agreeing that "data was critical priority for OpenAI" in December 2023), 39:13-24 (testifying about [redacted] | 144. **Disputed in Part - Not Supported by Cited Evidence.** Defendants respond as follows: Undisputed that data is essential to building and training large language models. However, disputed that "acquiring data from sources including news publishers was essential to" Defendants, because the cited evidence does not support that. The cited evidence demonstrates that OpenAI sought to acquire additional training data and explored potential partnerships with news publishers, but does not establish that news publisher content was indispensable to training or developing the at-issue models. Further, Plaintiffs' characterization is contradicted by record evidence concerning the relative importance of different types of training data. Ryder testified that investigations into the value of purportedly "high-quality data" for pretraining consistently showed |

| | |
|---|---|
| [redacted]; Ex. 133 [OPCO_MDL_004639271] (OpenAI's Head of Research Data Operations Michelle Fradin discussing with OpenAI's COO Brad Lightcap [redacted]; Ex. 134 [MSFT_AI_MDL_000004692] at 696 (Microsoft's Oct. 30, 2023 response to the US Copyright Office's Request for Comment, stating that "the development of large-scale AI (or foundational) models such as OpenAI's ChatGPT require training using vast amounts of data"). | that "the most important factor by far" was removing spam, search engine optimization content, and obscene material. A. Blanco Opp. Decl. Ex. 267 (N. Ryder 30(b)(6) Jan. 29, 2026 Tr.) at 32:8–33:14; *see also* News Ex. 686 (C. Callison-Bnrch Rebuttal Rep.) Section V (plaintiffs' experts overstate the value of their clients' content to LLM training).<br>Similarly, News Ex. 134 states only that large-scale models require "vast amounts of data"; it does not mention news publishers. Microsoft's corporate designee testified that [redacted] A. Hurst Decl. Ex. 102 (G. Russell 30(b)(6) Tr.) at 230:21–232:24.<br>Defendants further respond that the facts set forth in Paragraph 144 are immaterial and therefore disputed to the extent they suggest a market for licensing news content for training, because these facts do not affect the outcome of the suit under the governing law. Specifically, whether a market for licensing data for generative AI purposes "exists or is likely to develop is irrelevant, because this market is not one that plaintiffs are legally entitled to monopolize." *Kadrey*, F. Supp. 3d at 1052; *Bartz*, 787 F. Supp. 3d at 1032. |
| 145. OpenAI's former Chief Scientist and co-founder Ilya Sutskever said: "Data is the fossil fuel of A.I." Ex. 135 [Sutskever Depo. Tr.] at 62:17-63:1; Ex. 305 | 145. **Undisputed - Immaterial.** OpenAI responds as follows: Undisputed that the cited document contains the quoted language. However, this statement is |

| | |
|---|---|
| [Alexandra Tremayne-Pengelly, "Ilya Sutskever Warns A.I. Is Running Out of Data – Here's What Will Happen Next," *Observer* (Dec. 16, 2024), https://observer.com/2024/12/openai-cofounder-ilya-sutskever-ai-data-peak/] (noting also that "there will be no more" data). | immaterial to resolution of the summary judgment motion because it does not affect the outcome of the suit under the governing law.<br><br>Microsoft defers to OpenAI. |
| 146. Defendants specifically sought out licensing agreements with news publishers, including The Times. Ex. 136 [Shetty 30(b)(6) Depo. Tr.] at 36:17-37:11; Ex. 137 [MSFT_AI_MDL_000678077] at 078; Ex. 138 [OPCO_MDL_004408493] at 983-984 (Greg Brockman: "...I think our best idea to get to another level is finding a way for companies wanted [sic] to give us their data... I think this year we could figure out some variant of datacoin... namely, give people some financial upside (revshare in our models, a flat fee or even some exotic cyrpto thing) in exchange for giving us data." Sam Altman: "yay! I still love this idea and feel even more conviction on the need to be able to offer an incentive." Wojciech Zaremba: "I am a huge fan of paying people for data."); Ex. 782 [OPCO_MDL_004619015] at 018 (Sam Altman: "We should have a plan for how we will deal with copyrighted data and a way for publishers/creators to get value..."); Ex. 140 [OPCO_MDL_001639938] at 939; Ex. 141 [OPCO_MDL_001827703] at 703; Ex. 142 [OPCO_MDL_001697575] at 575 ("Our vision is to create a super assistant that can help you with all aspects of your daily life. A great assistant needs to have sound reasoning, be personalized to the user, and have a good pulse on all the | 146. **Disputed in Part - Not Supported by Cited Evidence.** OpenAI responds as follows: Undisputed that OpenAI explored potential commercial partnerships with news publishers, including The Times. Disputed to the extent Plaintiffs characterize the cited evidence as establishing that Defendants specifically sought to partner with news publishers to obtain training data. News Ex. 138 only reflects a general discussion of potential incentives for companies and individuals to provide data to OpenAI, not specifically news publishers. News Ex. 142 describes a potential partnership with The Times [redacted]<br><br>Microsoft responds as follows: Microsoft does not dispute that it had discussions with The Times [redacted]. But Microsoft disputes that it "specifically sought out licensing agreements with news publishers, including The |

| | |
|---|---|
| knowledge to assist the user with their requests. The NYT should be an integral part of everyone's assistant."); Ex. 143 [OPCO_MDL_004597103] at 105. | Times," because the cited evidence does not support that. The only Microsoft document cited, News Ex. 137, is [redacted] News Ex. 137 at MSFT_AI_MDL_000678078. The Times initiated those communications in April 2023 by demanding information about Microsoft's use of its content. News Ex. 235 at MSFT AI MDL 000229830. Mr. Parakhin testified that [redacted] A. Blanco Opp. Decl. Ex. 251 (M. Parakhin 30(b)(1) Tr.) 311:6–312:13. [redacted] A. Hurst Decl. Ex. 102 (G. Russell 30(b)(6) Tr.) at 230:21–232:24. Microsoft further responds that the facts set forth in Paragraph 146 are immaterial and therefore disputed because these facts do not affect the outcome of the suit under the governing law. Specifically, whether a market for licensing data for generative AI purposes "exists or is likely to develop is irrelevant, because this market is not one that plaintiffs are legally entitled to monopolize." *Kadrey*, F. Supp. 3d at 1052; *Bartz*, 787 F. Supp. 3d at 1032. |
| 147. **<u>OpenAI's Executed Agreements</u>:** OpenAI has entered license agreements with [redacted] | 147. **Undisputed – Immaterial.** OpenAI responds as follows: Undisputed that OpenAI has entered |

| | |
|---|---|
| for use of their data or content in generative AI. Ex. 128 [Stamm Rebuttal Report] at Appendix C, Ex. 1 (summarizing [redacted] Strategic Collaboration and Partnership Agreements with media publishers); Ex. 129 [Stamm ZD Rebuttal Rep.] at Appendix C, Ex. 1; Ex. 144 [OPCO_MDL_004590266] (Dotdash Meredith Inc.); Ex. 145 [OPCO_MDL_004593243] (The Atlantic Monthly Group LLC); Ex. 146 [OPCO_MDL_004590278] (The Financial Times Ltd.); Ex. 147 [OPCO_MDL_004590330] (TIME USA, LLC); Ex. 148 [OPCO_MDL_004590293] (Societe Editrice du Monde); Ex. 149 [OPCO_MDL_004590340] (Vox Media, LLC); Ex. 150 [OPCO_MDL_004590356] (Axel Springer SE); Ex. 151 [OPCO_MDL_004590440] (Advance Magazine Publishers Inc. (d/b/a Conde Nast)); Ex. 152 [OPCO_MDL_004596337] (News Corp / Nationwide News Pty Ltd); Ex. 153 [OPCO_MDL_004591305] ([redacted]); Ex. 154 [OPCO_MDL_004600925] ([redacted]; Ex. 155 [OPCO_MDL_004590656] ([redacted]; Ex. 156 [OPCO_MDL_004590223] ([redacted]); Ex. 157 [OPCO_MDL_004595016] ([redacted]); Ex. 158 [OPCO_MDL_004595013] ([redacted]); Ex. 159 [OPCO_MDL_004590323] ([redacted]); Ex. 160 [OPCO_MDL_004590516] ([redacted]); Ex. 161 [OPCO_MDL_004590504] ([redacted]); Ex. 162 [OPCO_MDL_004590667] ([redacted]; Ex. 163 [OPCO_MDL_004590684] ([redacted]); Ex. 164 | into agreements with third parties concerning the use of data or content in connection with generative AI. Disputed to the extent Plaintiffs characterize such agreements as “license agreements.” The cited agreements concern different types of commercial arrangements and permitted uses, [redacted] OpenAI further responds that Paragraphs 147-206 are immaterial because these facts do not affect the outcome of the suit under the governing law. Whether a market for licensing data for generative AI purposes “exists or is likely to develop is irrelevant, because this market is not one that plaintiffs are legally entitled to monopolize.” *Kadrey*, 788 F. Supp. 3d at 1052; *Bartz*, 787 F. Supp. 3d at 1032.<br><br>Microsoft defers to OpenAI. |

| | |
|---|---|
| [OPCO_MDL_004590701] ([redacted]); Ex. 165 [OPCO_MDL_004740479] ([redacted]); Ex. 166 [OPCO_MDL_004590367] ([redacted]; Ex. 167 [OPCO_MDL_004591249] ([redacted]); Ex. 168 [OPCO_MDL_004591248] ([redacted]; Ex. 169 [OPCO_MDL_004590211] ([redacted]; Ex. 170 [OPCO_MDL_004590352] ([redacted]); Ex. 171 [OPCO_MDL_004590354] ([redacted]); Ex. 172 [OPCO_MDL_004590350] ([redacted]); Ex. 173 [OPCO_MDL_004591258] ([redacted]); Ex. 174 [OPCO_MDL_004597643] ([redacted]; Ex. 175 [OPCO_MDL_004591290] ([redacted]; Ex. 176 [OPCO_MDL_004591264] ([redacted]); Ex. 177 [OPCO_MDL_004591279] ([redacted]); Ex. 178 [OPCO_MDL_004591274] ([redacted]); Ex. 179 [OPCO_MDL_004591312] ([redacted]); Ex. 180 [OPCO_MDL_004591268] ([redacted]; Ex. 181 [OPCO_MDL_004591302] ([redacted]); Ex. 182 [OPCO_MDL_004591285] [redacted]); Ex. 183 [OPCO_MDL_004590308] [redacted]); *see also* Malackowski NYT-DNP Opening Rep. at Appendix F, Exhibit 4.1 (chart summarizing the key terms of these license agreements). | |
| 148. OpenAI has entered licensing agreements that it calls Strategic Collaboration and Partnership Agreements | 148. **Disputed in Part – Not Supported by Cited Evidence; Immaterial.** OpenAI responds as |

| | |
|---|---|
| with media publishers that provide for OpenAI’s “training nse” and “display nse,” where display nse typically inclndes access to cnrrent information throngh an API and/or crawlers for gronnding pnrposes (“Media Publisher Agreements” or “MPAs”). *See, e.g.*, Ex. 128 [Stamm Rebuttal Rep. at Appendix C, Ex. 1; Ex. 152 [OPCO_MDL_004596337] (News Corp agreement for [redacted] display use [redacted]); Ex. 151 [OPCO_MDL_004590440] (Conde Nast agreement [redacted] display use [redacted]); *see also* Malackowski NYT-DNP Opening Rep. at Appendix F, Exhibit 4.1 (chart summarizing the key terms of these license agreements); Malackowski ZD Opening Rep. at p. 59-62, Appendix D, Exhibit 2.2.1.n/a | follows: Undispnted that OpenAI has entered into agreements with certain third parties concerning the nse of data or content in connection with generative AI. Disputed to the extent Plaintiffs characterize such agreements as “license agreements." The cited agreements concern different types of commercial arrangements and permitted uses, including training, display, and other product-related uses. The agreements include commercial terms reflective of a collaboration between OpenAI and the partner. OpenAI further responds that the fact is immaterial because these facts do not affect the outcome of the suit under the governing law. Whether a market for licensing data for generative AI purposes “exists or is likely to develop is irrelevant, because this market is not oue that plaiutiffs are legally eutitled to mouopolize.” *Kadrey*, 788 F. Supp. 3d at 1052; *Bartz*, 787 F. Supp. 3d at 1032.<br><br>Microsoft defers to OpenAI. |
| 149. Annual payments under the MPAs vary widely, [redacted]. *See* Ex. 128 [Stamm Rebuttal Report] at Appeudix C, Ex. 1; Ex. 152 [OPCO_MDL_004596337] at 342 (News Corp agreement [redacted]; Ex. 144 [OPCO_MDL_004590266] at 268 (Dotdash Meredith Iuc. agreement [redacted] | 149. **Disputed in Part – Not Supported by Cited Evidence; Inunaterial.** OpenAI respouds as follows: Uudisputed that strategic collaboratiou agreements aud other arraugemeuts between OpenAI aud media publishers contaiu varying payment structures aud amouuts. These paymeuts were made iu couuection with broader commercial arraugemeuts eucompassing a variety of rights aud consideratious, [redacted] |

| | |
|---|---|
| [redacted]); Ex. 163 [OPCO_MDL_004590684] at 694-695 (Future US agreement [redacted]). | [redacted]. The cited agreements contain differing payment structures, including [redacted], and do not establish amounts attributable specifically to training rights. Disputed to the extent Plaintiffs mischaracterize the payment terms of the cited agreements. The News Corp agreement provides for [redacted]. See News Ex. 152 at OPCO_MDL_004596342; News Ex. 163 at OPCO_MDL_004590694–695.<br>OpenAI further responds that this fact is immaterial because it does not affect the outcome of the suit under the governing law. Whether a market for licensing data for generative AI purposes "exists or is likely to develop is irrelevant, because this market is not one that plaintiffs are legally entitled to monopolize." *Kadrey*, 788 F. Supp. 3d at 1052; *Bartz*, 787 F. Supp. 3d at 1032.<br><br>Microsoft defers to OpenAI. |
| 150. The licensed content under the MPAs comprises textual content, largely in the form of articles, and can include both historical archives as well as ongoing or updated content. *See, e.g.*, Ex. 145 [OPCO_MDL_004593243] at 243 (The Atlantic Monthly Group LLC); Ex. 147 [OPCO_MDL_004590330] at 330 (TIME USA, LLC). | 150. **Disputed in Part – Not Supported by Cited Evidence; Immaterial.** OpenAI responds as follows: Undisputed that the two cited agreements define "Partner Materials" to include textual content and other materials. Disputed to the extent Plaintiffs characterize the materials covered by these agreements as "licensed content" without distinguishing among the different rights |

| | |
|---|---|
| | granted and permitted uses under each agreement, [redacted]. OpenAI further responds that this fact is immaterial because it does not affect the outcome of the suit under the governing law. Whether a market for licensing data for generative AI purposes "exists or is likely to develop is irrelevant, because this market is not one that plaintiffs are legally entitled to monopolize." *Kadrey*, 788 F. Supp. 3d at 1052; *Bartz*, 787 F. Supp. 3d at 1032.<br><br>Microsoft defers to OpenAI. |
| 151. Varun Shetty, Head of Media Partnerships at OpenAI, agreed that the OpenAI Media Publisher Agreements often include an "agreement by the media company to grant OpenAI rights to use that media company's content." Ex. 136 [Shetty 30(b)(6) Depo. Tr.] at 15:5-9. | 151. **Disputed in Part – Not Supported by Cited Evidence; Immaterial.** OpenAI responds as follows: Undisputed that News Ex. 136 contains the quoted testimony. Disputed to the extent Plaintiffs rely on this testimony to suggest that the rights granted under such agreements are uniform, or that they all encompass any particular use of content. The scope and nature of the rights granted varies by agreement and are governed by their respective contractual terms.<br>OpenAI further responds that this fact is immaterial because it does not affect the outcome of the suit under the governing law. Whether a market for licensing data for generative AI purposes "exists or is likely to develop is irrelevant, because this market is not one that plaintiffs are legally entitled to monopolize." *Kadrey*, 788 F. Supp. 3d at 1052; *Bartz*, 787 F. Supp. 3d at 1032. Additionally, the existence of one-off content |

| | |
|---|---|
| | agreement(s) does not establish that a functioning market to license data for training or grounding general-purpose LLMs exists or is likely to develop. *See* ECF 1733 (C. Tucker Decl.) ¶¶13(e), 175; see also *id.* ¶¶ 187-196.<br><br>Microsoft defers to OpenAI. |
| 152. OpenAI has also entered at least [redacted] ("OpenAI Data Agreements"). *See, e.g.,* Ex. 173 [OPCO_MDL_004591258] ([redacted]); Ex. 176 [OPCO_MDL_004591264] ([redacted]); Ex. 182 [OPCO_MDL_004591285] ([redacted]); *see also* Malackowski NYT-DNP Opening Rep. at Appendix F, Exhibit 4.2 (chart summarizing the key terms of all these license agreements); Malackowski ZD Opening Rep. at Appendix D, Ex. 2.2.2. | 152. **Disputed in Part – Not Supported by Cited Evidence; Immaterial.** OpenAI responds as follows: Undisputed that OpenAI has entered into at least [redacted] Disputed to the extent Plaintiffs characterize these agreements uniformly as "data access and content licenses," as the agreements differ in their contractual terms, rights granted, and types of content covered. OpenAI further responds that this fact is immaterial because it does not affect the outcome of the suit under the governing law. Whether a market for licensing data for generative AI purposes "exists or is likely to develop is irrelevant, because this market is not one that plaintiffs are legally entitled to monopolize." *Kadrey*, 788 F. Supp. 3d at 1052; *Bartz*, 787 F. Supp. 3d at 1032.<br><br>Microsoft defers to OpenAI. |
| 153. OpenAI entered into a data use agreement [redacted] Ex. 184 [OPCO_MDL_004591319]. | 153. **Disputed in part – Not Supported by Cited Evidence; Immaterial**. Undisputed that OpenAI entered into a Data Use Agreement [redacted] |

| | |
|---|---|
| | [redacted] Disputed as to the precise date, [redacted]<br><br>OpenAI further responds that this fact is immaterial because it does not affect the outcome of the suit under the governing law. Whether a market for licensing data for generative AI purposes "exists or is likely to develop is irrelevant, because this market is not one that plaintiffs are legally entitled to monopolize." *Kadrey*, 788 F. Supp. 3d at 1052; *Bartz*, 787 F. Supp. 3d at 1032.<br><br>Microsoft defers to OpenAI. |
| 154. OpenAI entered into a data use agreement [redacted] Ex. 185 [OPCO_MDL_004856310]. | 154. **Undisputed – Immaterial.** OpenAI responds as follows: Undisputed that OpenAI entered into a Data Use Agreement [redacted]<br><br>OpenAI further responds that this fact is immaterial because it does not affect the outcome of the suit under the governing law. Whether a market for licensing data for generative AI purposes "exists or is likely to develop is irrelevant, because this market is not one that plaintiffs are legally entitled to monopolize." *Kadrey*, 788 F. Supp. 3d at 1052; *Bartz*, 787 F. Supp. 3d at 1032.<br><br>Microsoft defers to OpenAI. |

| | |
|---|---|
| 155. OpenAI entered into a data use agreement [redacted] Ex. 186 [OPCO_MDL_004749373]. | 155. **Undisputed – Immaterial.** OpenAI responds as follows: Undisputed that OpenAI entered into a Data Use Agreement [redacted]<br><br>OpenAI further responds that this fact is immaterial because these facts do not affect the outcome of the suit under the governing law. Whether a market for licensing data for generative AI purposes "exists or is likely to develop is irrelevant, because this market is not one that plaintiffs are legally entitled to monopolize." *Kadrey*, 788 F. Supp. 3d at 1052; *Bartz*, 787 F. Supp. 3d at 1032.<br><br>Microsoft defers to OpenAI. |
| 156. OpenAI entered into a data use agreement [redacted] Ex. 167 [OPCO_MDL_004591249]; Ex. 168 [OPCO_MDL_004591248]. | 156. **Disputed in Part – Not Supported by Cited Evidence; Immaterial**. OpenAI responds as follows: Undisputed that OpenAI entered into a Data Use Agreement [redacted] Disputed to the extent Plaintiffs characterize the agreement as [redacted] News Ex. 167 at OPCO_MDL_004591255. |

| | |
|---|---|
| | OpenAI further responds that this fact is immaterial because these facts do not affect the outcome of the suit under the governing law. Whether a market for licensing data for generative AI purposes "exists or is likely to develop is irrelevant, because this market is not one that plaintiffs are legally entitled to monopolize." *Kadrey*, 788 F. Supp. 3d at 1052; *Bartz*, 787 F. Supp. 3d at 1032.<br><br>Microsoft defers to OpenAI. |
| 157. OpenAI entered into a data use agreement [redacted] Ex. 187 [OPCO_MDL_004627714]. | 157. **Disputed in Part - Not Supported by Cited Evidence; Immaterial**. OpenAI responds as follows: Undisputed that OpenAI entered into a Data Use Agreement with [redacted] Disputed as to the precise date, [redacted] Further disputed to the extent Plaintiffs characterize the agreement as [redacted] News Ex. 187 at OPCO_MDL_004627718.<br>OpenAI further responds that this fact is immaterial because these facts do not affect the outcome of the suit under the governing law. Whether a market for licensing data for generative AI purposes "exists or is likely to develop is irrelevant, because this market is not one that |

| | |
|---|---|
| | plaintiffs are legally entitled to monopolize." *Kadrey*, 788 F. Supp. 3d at 1052; *Bartz*, 787 F. Supp. 3d at 1032.<br><br>Microsoft defers to OpenAI. |
| 158. OpenAI entered into a content license agreement with [redacted] Ex. 176 [OPCO_MDL_004591264]. | 158. **Undisputed - Immaterial**. OpenAI responds as follows: Undisputed that OpenAI entered into a Content License Agreement [redacted] Ex. 176 at OPCO_MDL_004591264, OPCO_MDL_004591267.<br>OpenAI further responds that this fact is immaterial because these facts do not affect the outcome of the suit under the governing law. Whether a market for licensing data for generative AI purposes "exists or is likely to develop is irrelevant, because this market is not one that plaintiffs are legally entitled to monopolize." *Kadrey*, 788 F. Supp. 3d at 1052; *Bartz*, 787 F. Supp. 3d at 1032.<br><br>Microsoft defers to OpenAI. |
| 159. OpenAI entered into a master license agreement [redacted] on August 22, 2022 [redacted] Ex. 169 [OPCO_MDL_004590211]. | 159. **Undisputed – Immaterial.** OpenAI responds as follows: Undisputed that OpenAI entered into a Master License Agreement [redacted] dated August 22, 2022, [redacted] |

| | |
|---|---|
| | OpenAI further responds that the fact is immaterial because it does not affect the outcome of the suit under the governing law. Whether a market for licensing data for generative AI purposes "exists or is likely to develop is irrelevant, because this market is not one that plaintiffs are legally entitled to monopolize." *Kadrey*, 788 F. Supp. 3d at 1052; *Bartz*, 787 F. Supp. 3d at 1032.<br><br>Microsoft defers to OpenAI. |
| 160. OpenAI entered into a partnership agreement with [redacted] on November 15, 2022 [redacted] Ex. 154 [OPCO_MDL_004600925]. | 160. **Undisputed – Immaterial.** OpenAI responds as follows: Undisputed that OpenAI entered into a Partnership Agreement with [redacted] dated November 15, 2022, [redacted]. News Ex. 154 at OPCO_MDL_004600925. [redacted] |

| | |
|---|---|
| | [redacted] See News Ex. 155 at OPCO_MDL_004590656–657, OPCO_MDL_004590664.<br>OpenAI further responds that the fact is immaterial because it does not affect the outcome of the suit under the governing law. Whether a market for licensing data for generative AI purposes "exists or is likely to develop is irrelevant, because this market is not one that plaintiffs are legally entitled to monopolize." *Kadrey*, 788 F. Supp. 3d at 1052; *Bartz*, 787 F. Supp. 3d at 1032.<br><br>Microsoft defers to OpenAI. |
| 161. OpenAI entered into a content license agreement with [redacted] Ex. 177 [OPCO_MDL_004591279]. | 161. **Undisputed – Immaterial.** OpenAI responds as follows: Undisputed the agreement between OpenAI and [redacted]. News Ex. 177 at OPCO_MDL_004591279, OPCO_MDL_004591281.<br>OpenAI further responds that this fact is immaterial because these facts do not affect the outcome of the suit under the governing law. Whether a market for licensing data for generative AI purposes "exists or is likely to develop is irrelevant, because this market is not one that |

| | |
|---|---|
| | plaintiffs are legally entitled to monopolize." *Kadrey*, 788 F. Supp. 3d at 1052; *Bartz*, 787 F. Supp. 3d at 1032.<br><br>Microsoft defers to OpenAI. |
| 162. OpenAI entered into a content license agreement [redacted] on December 13, 2022 [redacted] Ex. 178 [OPCO_MDL_004591274]. | 162. **Disputed in Part – Not Supported by Cited Evidence; Immaterial.** OpenAI responds as follows: Undisputed that the agreement between OpenAI [redacted] Disputed as to the precise date, as the agreement was signed by [redacted] on December 23, 2022, rather than December 13, 2022. News Ex. 178 at OPCO_MDL_004591274, OPCO_MDL_004591277–278.<br>OpenAI further responds that this fact is immaterial because these facts do not affect the outcome of the suit under the governing law. Whether a market for licensing data for generative AI purposes "exists or is likely to develop is irrelevant, because this market is not one that plaintiffs are legally entitled to monopolize." *Kadrey*, 788 F. Supp. 3d at 1052; *Bartz*, 787 F. Supp. 3d at 1032.<br><br>Microsoft defers to OpenAI. |
| 163. OpenAI entered into a content license agreement [redacted] Ex. 179 [OPCO_MDL_004591312]. | 163. **Disputed in Part – Not Supported by Cited Evidence; Immaterial.** OpenAI responds as follows: Disputed in Part. Undisputed that the agreement |

| | |
|---|---|
| | between OpenAI [redacted] Disputed as to the precise date, as the agreement was signed [redacted]. News Ex. 179 at OPCO_MDL_004591312, OPCO_MDL_004591314–315.<br><br>OpenAI further responds that this fact is immaterial because these facts do not affect the outcome of the suit under the governing law. Whether a market for licensing data for generative AI purposes "exists or is likely to develop is irrelevant, because this market is not one that plaintiffs are legally entitled to monopolize." *Kadrey*, 788 F. Supp. 3d at 1052; *Bartz*, 787 F. Supp. 3d at 1032.<br><br>Microsoft defers to OpenAI. |
| 164. OpenAI entered into a master services agreement with Associated Press on July 1, 2023 [redacted] Ex. 156 [OPCO_MDL_004590223]. | 164. **Undisputed – Immaterial.** OpenAI responds as follows: Undisputed that OpenAI entered into a Master Services Agreement with The Associated Press, effective July 1, 2023, [redacted] |

| | |
|---|---|
| | [redacted] News Ex. 156 at OPCO_MDL_004590223.<br>OpenAI responds that the fact is immaterial because it does not affect the outcome of the suit under the governing law. Whether a market for licensing data for generative AI purposes "exists or is likely to develop is irrelevant, because this market is not one that plaintiffs are legally entitled to monopolize." *Kadrey*, 788 F. Supp. 3d at 1052; *Bartz*, 787 F. Supp. 3d at 1032.<br><br>Microsoft defers to OpenAI. |
| 165. OpenAI entered into a content license agreement [redacted] Ex. 180 [OPCO_MDL_004591268]. | 165. **Undisputed – Immaterial.** OpenAI responds as follows: Undisputed that the agreement between OpenAI [redacted] News Ex. 180 at OPCO_MDL_004591268, OPCO_MDL_004591272.<br>OpenAI further responds that this fact is immaterial because these facts do not affect the outcome of the suit under the governing law. Whether a market for licensing data for generative AI purposes "exists or is likely to develop is irrelevant, because this market is not one that |

| | |
|---|---|
| | plaintiffs are legally entitled to monopolize." *Kadrey*, 788 F. Supp. 3d at 1052; *Bartz*, 787 F. Supp. 3d at 1032.<br><br>Microsoft defers to OpenAI. |
| 166. OpenAI entered into a dataset license agreement [redacted] Ex. 181 [OPCO_MDL_004591302]. | 166. **Undisputed – Immaterial.** OpenAI responds as follows: Undisputed that the agreement between OpenAI [redacted] News Ex. 181 at OPCO_MDL_004591302–304.<br>OpenAI further responds that this fact is immaterial because these facts do not affect the outcome of the suit under the governing law. Whether a market for licensing data for generative AI purposes "exists or is likely to develop is irrelevant, because this market is not one that plaintiffs are legally entitled to monopolize." *Kadrey*, 788 F. Supp. 3d at 1052; *Bartz*, 787 F. Supp. 3d at 1032.<br><br>Microsoft defers to OpenAI. |
| 167. OpenAI entered into a [redacted] agreement with Free Law Project on October 19, 2023 for training use. Ex. 175 [OPCO_MDL_004591290]. | 167. **Disputed in Part – Not Supported by Cited Evidence; Immaterial.** OpenAI responds as follows: Disputed in Part. Undisputed that OpenAI entered into a [redacted] with Free Law Project, effective October 19, 2023, [redacted] |

| | |
|---|---|
| | [redacted]. Disputed to the extent Plaintiffs characterize the agreement as limited to "training use," without acknowledging that it also contemplated display use and broader data-access and product-development purposes. News Ex. 175 at OPCO_MDL_00459290–291, OPCO_MDL_00459299–300. <br> OpenAI further responds that this fact is immaterial because these facts do not affect the outcome of the suit under the governing law. Whether a market for licensing data for generative AI purposes "exists or is likely to develop is irrelevant, because this market is not one that plaintiffs are legally entitled to monopolize." *Kadrey*, 788 F. Supp. 3d at 1052; *Bartz*, 787 F. Supp. 3d at 1032. <br><br> Microsoft defers to OpenAI. |
| 168. OpenAI entered into a data access agreement with [redacted] Ex. 182 [OPCO_MDL_004591285]. | 168. **Undisputed - Immaterial.** OpenAI responds as follows: Undisputed that OpenAI entered into a Data Access Agreement with [redacted] News Ex. 182 OPCO_MDL_004591285–286, OPCO_MDL_004591289. <br> OpenAI further responds that this fact is immaterial because it does not affect the outcome of the |

| | |
|---|---|
| | suit under the governing law. Whether a market for licensing data for generative AI purposes "exists or is likely to develop is irrelevant, because this market is not one that plaintiffs are legally entitled to monopolize." *Kadrey*, 788 F. Supp. 3d at 1052; *Bartz*, 787 F. Supp. 3d at 1032.<br><br>Microsoft defers to OpenAI. |
| 169. OpenAI entered into a data access agreement with [redacted] Ex. 173 [OPCO_MDL_004591258]. | 169. **Disputed in Part – Not Supported by Cited Evidence; Immaterial.** OpenAI responds as follows: Undisputed that OpenAI entered into a Data Access Agreement with [redacted] News Ex. 173 at OPCO_MDL_004590223, OPCO_MDL_004590263. Disputed to the extent Plaintiffs misidentify the contracting party as [redacted]" or characterize the agreement as [redacted]<br><br>OpenAI further responds that this fact is immaterial because these facts do not affect the outcome of the suit under the governing law. Whether a market for |

| | |
|---|---|
| | licensing data for generative AI purposes "exists or is likely to develop is irrelevant, because this market is not one that plaintiffs are legally entitled to monopolize." *Kadrey*, 788 F. Supp. 3d at 1052; *Bartz*, 787 F. Supp. 3d at 1032.<br><br>Microsoft defers to OpenAI. |
| 170. OpenAI entered into a strategic collaboration agreement with [redacted] Ex. 153 [OPCO_MDL_004591305]. | 170. **Undisputed – Immaterial.** OpenAI responds as follows: Undisputed that OpenAI entered into a Strategic Collaboration Agreement with [redacted] News Ex. 153 at OPCO_MDL_004591306–307.<br>OpenAI further responds that this fact is immaterial because it does not affect the outcome of the suit under the governing law. Whether a market for licensing data for generative AI purposes "exists or is likely to develop is irrelevant, because this market is not one that plaintiffs are legally entitled to monopolize." *Kadrey*, 788 F. Supp. 3d at 1052; *Bartz*, 787 F. Supp. 3d at 1032.<br><br>Microsoft defers to OpenAI. |

| | |
|---|---|
| 171. OpenAI entered into a strategic collaboration agreement with Prisa Media on February 28, 2024 for training use and display use. Ex. 159 [OPCO_MDL_004590323]. | 171. **Undisputed – Immaterial.** OpenAI responds as follows: Undisputed that OpenAI entered into a Strategic Collaboration Agreement with Prisa Media, effective February 28, 2024, providing access to articles and related materials from Prisa Media publications for certain training and display uses, subject to the agreement's terms. [redacted] News Ex. 159 at OPCO_MDL_004590324–325<br>OpenAI further responds that this is immaterial because it does not affect the outcome of the suit under the governing law. Whether a market for licensing data for generative AI purposes "exists or is likely to develop is irrelevant, because this market is not one that plaintiffs are legally entitled to monopolize." *Kadrey*, 788 F. Supp. 3d at 1052; *Bartz*, 787 F. Supp. 3d at 1032. Additionally, the existence of one-off content agreement(s) does not establish that a functioning market to license data for training or grounding general-purpose LLMs exists or is likely to develop. *See* ECF 1733 (C. Tucker Decl.) ¶¶13(e), 175; see also *id.* ¶¶ 187-196.<br><br>Microsoft defers to OpenAI. |

| | |
|---|---|
| 172. OpenAI entered into a strategic collaboration agreement with Axel Springer SE on March 5, 2024 for training use and display use. Ex. 150 [OPCO_MDL_004590356]. | 172. **Undisputed – Immaterial.** OpenAI responds as follows: Undisputed that OpenAI entered into a Strategic Collaboration Agreement with Axel Springer SE, effective March 5, 2024, providing access to certain content from Axel Springer publications for training and display uses, [redacted] News Ex. 150 at OPCO_MDL_004590358–359.<br>OpenAI further responds that this fact is immaterial because these facts do not affect the outcome of the suit under the governing law. Whether a market for licensing data for generative AI purposes "exists or is likely to develop is irrelevant, because this market is not one that plaintiffs are legally entitled to monopolize." *Kadrey*, 788 F. Supp. 3d at 1052; *Bartz*, 787 F. Supp. 3d at 1032.<br><br>Microsoft defers to OpenAI. |
| 173. OpenAI entered into a strategic collaboration agreement with The Atlantic Monthly Group LLC on March 8, 2024 [redacted] display use. Ex. 145 [OPCO_MDL_004593243]. | 173. **Undisputed – Immaterial.** OpenAI responds as follows: Undisputed that OpenAI entered into a Strategic Collaboration Agreement with The Atlantic Monthly Group LLC, effective March 8, 2024, providing |

| | |
|---|---|
| | access to content for [redacted] News Ex. 145 at OPCO_MDL_004593244.<br>OpenAI further responds that this fact is immaterial because these facts do not affect the outcome of the suit under the governing law. Whether a market for licensing data for generative AI purposes "exists or is likely to develop is irrelevant, because this market is not one that plaintiffs are legally entitled to monopolize." *Kadrey*, 788 F. Supp. 3d at 1052; *Bartz*, 787 F. Supp. 3d at 1032.<br><br>Microsoft defers to OpenAI. |
| 174. OpenAI entered into a strategic collaboration agreement with Societe Editrice du Monde on March 8, 2024 for training use and display use. Ex. 148 [OPCO_MDL_004590293]. | 174. **Undisputed – Immaterial.** OpenAI responds as follows: Undisputed that OpenAI entered into a Strategic Collaboration Agreement with Société Editrice du Monde, effective March 8, 2024, providing access to archived and ongoing Le Monde content [redacted] |

| | |
|---|---|
| | [redacted] News Ex. 148 at OPCO_MDL_004590295, OPCO_MDL_004590300.<br><br>OpenAI further responds that this fact is immaterial because these facts do not affect the outcome of the suit under the governing law. Whether a market for licensing data for generative AI purposes "exists or is likely to develop is irrelevant, because this market is not one that plaintiffs are legally entitled to monopolize." *Kadrey*, 788 F. Supp. 3d at 1052; *Bartz*, 787 F. Supp. 3d at 1032.<br><br>Microsoft defers to OpenAI. |
| 175. OpenAI entered into a services and content partnership agreement with Stack Exchange on March 26, 2024 for training use and display use. Ex. 183 [OPCO_MDL_004590308]. | 175. **Undisputed – Immaterial.** OpenAI responds as follows: Undisputed that OpenAI entered into a Services and Content Partnership Agreement with Stack Exchange, Inc., effective March 26, 2024, providing access to Stack Overflow data and related materials for certain training and display uses, subject to the agreement's terms. [redacted] News Ex. 183 at OPCO_MDL_004590311, OPCO_MDL_004590320–321. |

| | |
|---|---|
| | OpenAI further responds that this fact is immaterial because these facts do not affect the outcome of the suit under the governing law. Whether a market for licensing data for generative AI purposes "exists or is likely to develop is irrelevant, because this market is not one that plaintiffs are legally entitled to monopolize." *Kadrey*, 788 F. Supp. 3d at 1052; *Bartz*, 787 F. Supp. 3d at 1032.<br><br>Microsoft defers to OpenAI. |
| 176. OpenAI entered into a strategic collaboration agreement with The Financial Times Ltd. On April 22, 2024 for training use and display use. Ex. 146 [OPCO_MDL_004590278]. | 176. **Undisputed – Immaterial.** OpenAI responds as follows: Undisputed that OpenAI entered into a Strategic Collaboration Agreement with The Financial Times Ltd., effective April 22, 2024, providing access to content published in the Financial Times for certain training and display uses, subject to the agreement's terms. [redacted] News Ex. 146 at OPCO_MDL_004590279.<br>OpenAI further responds that this fact is immaterial because these facts do not affect the outcome of the suit under the governing law. Whether a market for licensing data for generative AI purposes "exists or is likely to develop is irrelevant, because this market is not one that |

| | |
|---|---|
| | plaintiffs are legally entitled to monopolize." *Kadrey*, 788 F. Supp. 3d at 1052; *Bartz*, 787 F. Supp. 3d at 1032.<br><br>Microsoft defers to OpenAI. |
| 177. OpenAI entered into a content services agreement with [redacted] Ex. 155 [OPCO_MDL_004590656]. | 177. **Disputed in part —Not Supported by Cited Evidence; Immaterial.** OpenAI responds as follows: Undisputed that OpenAI entered into a Content Services Agreement with [redacted] Disputed as to the precise date, as the agreement identifies [redacted] as its commencement date. [redacted]. News Ex. 155 at OPCO_MDL_004590656.<br>OpenAI further responds that this fact is immaterial because these facts do not affect the outcome of the suit under the governing law. Whether a market for licensing data for generative AI purposes "exists or is likely |

| | |
|---|---|
| | to develop is irrelevant, because this market is not one that plaintiffs are legally entitled to monopolize." *Kadrey*, 788 F. Supp. 3d at 1052; *Bartz*, 787 F. Supp. 3d at 1032.<br><br>Microsoft defers to OpenAI. |
| 178. OpenAI entered into a statement of work with [redacted] Ex. 188 [OPCO_MDL_004747415]. | 178. **Disputed in part– Not Supported by Cited Evidence; Immaterial.** OpenAI responds as follows: Undisputed that OpenAI entered into a Statement of Work with [redacted] News Ex. 188 at OPCO_MDL_004747415, OPCO_MDL_004747417. Disputed to the extent Plaintiffs identify the contracting party as [redacted]<br>OpenAI further responds that this fact is immaterial because these facts do not affect the outcome of the suit under the governing law. Whether a market for licensing data for generative AI purposes "exists or is likely to develop is irrelevant, because this market is not one that plaintiffs are legally entitled to monopolize." *Kadrey*, 788 F. Supp. 3d at 1052; *Bartz*, 787 F. Supp. 3d at 1032.<br><br>Microsoft defers to OpenAI. |

| | |
|---|---|
| 179. OpenAI entered into a service order with [redacted] Ex. 189 [OPCO_MDL_004837622]. | 179. **Disputed in Part – Not Supported by Cited Evidence; Immaterial.** OpenAI responds as follows: Dispnted in Part. Undisputed that OpenAI entered into a service order with [redacted] Disputed as to the precise date, as News Ex. 189 identifies [redacted] as the agreement's effective date. The agreement permitted [redacted]. News Ex. 189 at OPCO_MDL_004837622, OPCO_MDL_004837624.<br>OpenAI further responds that this fact is immaterial because these facts do not affect the outcome of the suit under the governing law. Whether a market for licensing data for generative AI purposes "exists or is likely to develop is irrelevant, because this market is not one that plaintiffs are legally entitled to monopolize." *Kadrey*, 788 F. Supp. 3d at 1052; *Bartz*, 787 F. Supp. 3d at 1032.<br><br>Microsoft defers to OpenAI. |
| 180. OpenAI entered into a strategic collaboration agreement with Dotdash Meredith Inc. on May 6, 2024 for [redacted] display use. Ex. 144 [OPCO_MDL_004590266]. | 180. **Undisputed – Immaterial.** OpenAI responds as follows: Undisputed that OpenAI entered into a Strategic Collaboration Agreement with Dotdash Meredith Inc., effective May 6, 2024, providing access to certain content and materials, [redacted] for [redacted] display uses, subject to the agreement's terms. [redacted] |

| | |
|---|---|
| | [redacted] News Ex. 144 at OPCO_MDL_004590267.<br>OpenAI further responds that this fact is immaterial because these facts do not affect the outcome of the suit under the governing law. Whether a market for licensing data for generative AI purposes "exists or is likely to develop is irrelevant, because this market is not one that plaintiffs are legally entitled to monopolize." *Kadrey*, 788 F. Supp. 3d at 1052; *Bartz*, 787 F. Supp. 3d at 1032.<br><br>Microsoft defers to OpenAI. |
| 181. OpenAI entered into a strategic collaboration agreement with Reddit, Inc. on May 9, 2024 [redacted] display use. Ex. 166 [OPCO_MDL_004590367]. | 181. **Undisputed – Immaterial.** OpenAI responds as follows: Undisputed that OpenAI entered into a Strategic Collaboration Agreement with Reddit, Inc., effective May 9, 2024, [redacted] for [redacted] display uses, subject to the agreement's terms. [redacted] News Ex. 166 at OPCO_MDL_004590369. |

| | |
|---|---|
| | OpenAI further responds that this fact is immaterial because these facts do not affect the outcome of the suit under the governing law. Whether a market for licensing data for generative AI purposes "exists or is likely to develop is irrelevant, because this market is not one that plaintiffs are legally entitled to monopolize." *Kadrey*, 788 F. Supp. 3d at 1052; *Bartz*, 787 F. Supp. 3d at 1032.<br><br>Microsoft defers to OpenAI. |
| 182. OpenAI entered into a strategic collaboration agreement with News Corp. on May 21, 2024 for [redacted] display use. Ex. 152 [OPCO_MDL_004596337]. | 182. **Undisputed – Immaterial.** OpenAI responds as follows: Undisputed that OpenAI entered into a Strategic Collaboration Agreement with News Corp., effective May 21, 2024, [redacted] or [redacted] display uses, subject to the agreement's terms. [redacted] News Ex. 152 at OPCO_MDL_004596339.<br>OpenAI further responds that this fact is immaterial because these facts do not affect the outcome of the suit under the governing law. Whether a market for licensing data for generative AI purposes "exists or is likely |

| | |
|---|---|
| | to develop is irrelevant, because this market is not one that plaintiffs are legally entitled to monopolize." *Kadrey*, 788 F. Supp. 3d at 1052; *Bartz*, 787 F. Supp. 3d at 1032.<br><br>Microsoft defers to OpenAI. |
| 183. OpenAI entered into a strategic collaboration agreement with Vox Media, LLC on May 24, 2024 for [redacted] display use. Ex. 149 [OPCO_MDL_004590340]. | 183. **Undisputed – Immaterial.** OpenAI responds as follows: Undisputed that OpenAI entered into a Strategic Collaboration Agreement with Vox Media, LLC, effective May 24, 2024, [redacted] display uses, subject to the agreement's terms. [redacted] News Ex. 149 at OPCO_MDL_004590341.<br>OpenAI further responds that this fact is immaterial because these facts do not affect the outcome of the suit under the governing law. Whether a market for licensing data for generative AI purposes "exists or is likely to develop is irrelevant, because this market is not one that plaintiffs are legally entitled to monopolize." *Kadrey*, 788 F. Supp. 3d at 1052; *Bartz*, 787 F. Supp. 3d at 1032.<br><br>Microsoft defers to OpenAI. |

| | |
|---|---|
| 184. OpenAI entered into a strategic collaboration agreement with Time USA, LLC on June 18, 2024 for [redacted] isplay use. Ex. 147 [OPCO_MDL_004590330]. | 184. **Undisputed – Immaterial.** OpenAI responds as follows: Undisputed that OpenAI entered into a Strategic Collaboration Agreement with TIME USA, LLC, effective June 18, 2024, [redacted] for [redacted] display uses, subject to the agreement's terms. [redacted] News Ex. 147 at OPCO_MDL_004590331.<br>OpenAI further responds that this fact is immaterial because these facts do not affect the outcome of the suit under the governing law. Whether a market for licensing data for generative AI purposes "exists or is likely to develop is irrelevant, because this market is not one that plaintiffs are legally entitled to monopolize." *Kadrey*, 788 F. Supp. 3d at 1052; *Bartz*, 787 F. Supp. 3d at 1032.<br><br>Microsoft defers to OpenAI. |
| 185. OpenAI entered into a data access agreement with [redacted] Ex. 190 [OPCO_MDL_004740436]. | 185. **Disputed in Part – Not Supported by Cited Evidence; Immaterial.** OpenAI responds as follows: Undisputed that OpenAI entered into a Data Access Agreement with [redacted] Disputed to |

| | |
|---|---|
| | the extent Plaintiffs characterize the agreement [redacted] News Ex. 190 at OPCO_MDL_004740436.<br><br>OpenAI further responds that this fact is immaterial because these facts do not affect the outcome of the suit under the governing law. Whether a market for licensing data for generative AI purposes "exists or is likely to develop is irrelevant, because this market is not one that plaintiffs are legally entitled to monopolize." *Kadrey*, 788 F. Supp. 3d at 1052; *Bartz*, 787 F. Supp. 3d at 1032.<br><br>Microsoft defers to OpenAI. |
| 186. OpenAI entered into a data access agreement with [redacted] Ex. 191 [OPCO_MDL_004661162]. | 186. **Undisputed – Immaterial.** OpenAI responds as follows: Undisputed that OpenAI entered into a Data Access Agreement with [redacted]<br><br>OpenAI further responds that this fact is immaterial because these facts do not affect the outcome |

| | |
|---|---|
| | of the suit under the governing law. Whether a market for licensing data for generative AI purposes "exists or is likely to develop is irrelevant, because this market is not one that plaintiffs are legally entitled to monopolize." *Kadrey*, 788 F. Supp. 3d at 1052; *Bartz*, 787 F. Supp. 3d at 1032.<br><br>Microsoft defers to OpenAI. |
| 187. OpenAI entered into a content supply & license with [redacted] Ex. 192 [OPCO_MDL_004740447]. | 187. **Disputed in Part – Not Supported by Cited Evidence; Immaterial.** OpenAI responds as follows: Undisputed that the agreement between OpenAI [redacted] Disputed to the extent Plaintiffs characterize the agreement as [redacted] News Ex. 192 at OPCO_MDL_004740447.<br>OpenAI further responds that this fact is immaterial because these facts do not affect the outcome of the suit under the governing law. Whether a market for licensing data for generative AI purposes "exists or is likely to develop is irrelevant, because this market is not one that |

| | |
|---|---|
| | plaintiffs are legally entitled to monopolize." *Kadrey*, 788 F. Supp. 3d at 1052; *Bartz*, 787 F. Supp. 3d at 1032.<br><br>Microsoft defers to OpenAI. |
| 188. OpenAI entered into a data access agreement with [redacted] Ex. 193 [OPCO_MDL_004749176]. | 188. **Disputed in Part – Not Supported by Cited Evidence; Immaterial.** OpenAI responds as follows: Undisputed that OpenAI entered into a Data Access Agreement [redacted] News Ex. 193 at OPCO_MDL_004749176–177, OPCO_MDL_004749184–186. Disputed to the extent Plaintiffs characterize the agreement [redacted]<br><br>OpenAI further responds that this fact is immaterial because these facts do not affect the outcome of the suit under the governing law. Whether a market for licensing data for generative AI purposes "exists or is likely to develop is irrelevant, because this market is not one that |

| | |
|---|---|
| | plaintiffs are legally entitled to monopolize." *Kadrey*, 788 F. Supp. 3d at 1052; *Bartz*, 787 F. Supp. 3d at 1032.<br><br>Microsoft defers to OpenAI. |
| 189. OpenAI entered into a strategic collaboration agreement with Advance Magazine Publishers Inc. (d/b/a Conde Nast) on August 19, 2024 for [redacted] display use. Ex. 151 [OPCO_MDL_004590440]. | 189. **Undisputed – Immaterial.** OpenAI responds as follows: Undisputed that OpenAI entered into a Strategic Collaboration Agreement with Advance Magazine Publishers Inc. (d/b/a Condé Nast), effective August 19, 2024, [redacted] for [redacted] display uses, subject to the agreement's terms, [redacted] News Ex. 151 at OPCO_MDL_004590441–42, OPCO_MDL_004590447.<br>OpenAI further responds that this fact is immaterial because these facts do not affect the outcome of the suit under the governing law. Whether a market for licensing data for generative AI purposes "exists or is likely to develop is irrelevant, because this market is not one that plaintiffs are legally entitled to monopolize." *Kadrey*, 788 F. Supp. 3d at 1052; *Bartz*, 787 F. Supp. 3d at 1032.<br><br>Microsoft defers to OpenAI. |

| | |
|---|---|
| 190. OpenAI entered into a content license agreement with Yext [redacted] Ex. 194 [OPCO_MDL_004740495]. | 190. **Undisputed – Immaterial.** OpenAI responds as follows: Undispnted that the agreement between OpenAI and Yext, Inc., [redacted] News Ex. 194 at OPCO_MDL_004740495.<br>OpenAI further responds that this fact is immaterial because these facts do not affect the outcome of the suit under the governing law. Whether a market for licensing data for generative AI purposes "exists or is likely to develop is irrelevant, because this market is not one that plaintiffs are legally entitled to monopolize." *Kadrey*, 788 F. Supp. 3d at 1052; *Bartz*, 787 F. Supp. 3d at 1032.<br><br>Microsoft defers to OpenAI. |
| 191. OpenAI entered into a collaboration agreement with Hearst Enterprise Services, Inc. on September 16, 2024 for [redacted] display use. Ex. 160 [OPCO_MDL_004590516]. | 191. **Disputed in part – Immaterial.** OpenAI responds as follows: Undisputed that OpenAI entered into a Collaboration Agreement with Hearst Enterprise Services, Inc., effective September 16, 2024, [redacted] display uses, subject to the agreement's terms. [redacted] |

| | |
|---|---|
| | [redacted] News Ex. 160 at OPCO_MDL_004590517.<br>OpenAI further responds that this fact is immaterial because these facts do not affect the outcome of the suit under the governing law. Whether a market for licensing data for generative AI purposes "exists or is likely to develop is irrelevant, because this market is not one that plaintiffs are legally entitled to monopolize." *Kadrey*, 788 F. Supp. 3d at 1052; *Bartz*, 787 F. Supp. 3d at 1032.<br><br>Microsoft defers to OpenAI. |
| 192. OpenAI entered into a collaboration agreement with GEDI Gruppo Editoriale on September 24, 2024 for [redacted] display use. Ex. 161 [OPCO_MDL_004590504]. | 192. **Undisputed – Immaterial.** OpenAI responds as follows: Undisputed that OpenAI entered into a Collaboration Agreement with GEDI Gruppo Editoriale, effective September 24, 2024, [redacted] for [redacted] display uses, subject to the agreement's terms. [redacted] |

| | |
|---|---|
| | [redacted] News Ex. 161 at OPCO_MDL_004590505–506.<br>OpenAI further responds that this fact is immaterial because these facts do not affect the outcome of the suit under the governing law. Whether a market for licensing data for generative AI purposes "exists or is likely to develop is irrelevant, because this market is not one that plaintiffs are legally entitled to monopolize." *Kadrey*, 788 F. Supp. 3d at 1052; *Bartz*, 787 F. Supp. 3d at 1032.<br><br>Microsoft defers to OpenAI. |
| 193. OpenAI entered into a data access agreement with [redacted] Ex. 195 [OPCO_MDL_004740468]. | 193. **Undisputed – Immaterial.** OpenAI responds as follows: Undisputed that OpenAI entered into a Data Access Agreement with [redacted] News Ex. 195 at OPCO_MDL_004740469.<br>OpenAI further responds that this fact is immaterial because these facts do not affect the outcome of the suit under the governing law. Whether a market for licensing data for generative AI purposes "exists or is likely to develop is irrelevant, because this market is not one that plaintiffs are legally entitled to monopolize." *Kadrey*, 788 F. Supp. 3d at 1052; *Bartz*, 787 F. Supp. 3d at 1032. |

| | |
|---|---|
| | Microsoft defers to OpenAI. |
| 194. OpenAI entered into a master data services agreement with [redacted] Ex. 196 [OPCO_MDL_004740425]. | 194. **Disputed in Part – Not Supported by Cited Evidence; Immaterial.** OpenAI responds as follows: Disputed in Part. Undisputed that OpenAI [redacted] News Ex. 196 at OPCO_MDL_004740425, 430–433.<br>OpenAI further responds that this fact is immaterial because these facts do not affect the outcome of the suit under the governing law. Whether a market for licensing data for generative AI purposes "exists or is likely to develop is irrelevant, because this market is not one that plaintiffs are legally entitled to monopolize." *Kadrey*, 788 F. Supp. 3d at 1052; *Bartz*, 787 F. Supp. 3d at 1032.<br><br>Microsoft defers to OpenAI. |
| 195. OpenAI entered into a collaboration agreement with Guardian on November 22, 2024 for | 195. **Undisputed – Immaterial.** OpenAI responds as follows: Undisputed that OpenAI entered into a Collaboration Agreement with Guardian News & Media |

| | |
|---|---|
| [redacted] display use. Ex. 197 [OPCO_MDL_004651303]. | Limited, effective November 22, 2024, [redacted] for [redacted] display uses, subject to the agreement's terms. [redacted] News Ex. 197 at OPCO_MDL_004651306.<br><br>OpenAI further responds that this fact is immaterial because these facts do not affect the outcome of the suit under the governing law. Whether a market for licensing data for generative AI purposes "exists or is likely to develop is irrelevant, because this market is not one that plaintiffs are legally entitled to monopolize." *Kadrey*, 788 F. Supp. 3d at 1052; *Bartz*, 787 F. Supp. 3d at 1032.<br><br>Microsoft defers to OpenAI. |
| 196. OpenAI entered into a data access and collaboration agreement with Axios on November 25, 2024 for [redacted] isplay use. Ex. 162 [OP[redacted] | 196. **Undisputed – Immaterial.** OpenAI responds as follows: Undisputed that OpenAI entered into a Data Access and Collaboration Agreement with Axios Media Inc., effective November 25, 2024, [redacted] display uses, subject to the agreement's terms. [redacted] |

| | |
|---|---|
| | [redacted] News Ex. 162 at OPCO_MDL_004590669.<br>OpenAI further responds that this fact is immaterial because these facts do not affect the outcome of the suit under the governing law. Whether a market for licensing data for generative AI purposes "exists or is likely to develop is irrelevant, because this market is not one that plaintiffs are legally entitled to monopolize." *Kadrey*, 788 F. Supp. 3d at 1052; *Bartz*, 787 F. Supp. 3d at 1032.<br><br>Microsoft defers to OpenAI. |
| 197. OpenAI entered into a collaboration agreement with Future US on December 3, 2024 [redacted] and display use. Ex. 163 [OPCO_MDL_004590684]. | 197. **Undisputed – Immaterial.** OpenAI responds as follows: Undisputed that OpenAI entered into a Collaboration Agreement with Future US LLC, effective December 3, 2024, [redacted] for [redacted] display uses, subject to the agreement's terms. [redacted] |

| | |
|---|---|
| | [redacted] *Id.* at OPCO_MDL_004590698.<br>OpenAI further responds that this fact is immaterial because these facts do not affect the outcome of the suit under the governing law. Whether a market for licensing data for generative AI purposes "exists or is likely to develop is irrelevant, because this market is not one that plaintiffs are legally entitled to monopolize." *Kadrey*, 788 F. Supp. 3d at 1052; *Bartz*, 787 F. Supp. 3d at 1032.<br><br>Microsoft defers to OpenAI. |
| 198. OpenAI entered into a data access agreement with [redacted] Ex. 198 [OPCO_MDL_004635153]. | 198. **Undisputed – Immaterial.** OpenAI responds as follows: Undisputed that OpenAI entered into a Data Access Agreement with [redacted]<br>OpenAI further responds that this fact is immaterial because these facts do not affect the outcome of the suit under the governing law. Whether a market for licensing data for generative AI purposes "exists or is likely to develop is irrelevant, because this market is not one that plaintiffs are legally entitled to monopolize." *Kadrey*, 788 F. Supp. 3d at 1052; *Bartz*, 787 F. Supp. 3d at 1032. |

| | |
|---|---|
| | Microsoft defers to OpenAI. |
| 199. OpenAI entered into a data access agreement with [redacted] Ex. 199 [OPCO_MDL_004849973]. | 199. **Undisputed – Immaterial.** OpenAI responds as follows: Undisputed that OpenAI entered into a Data Access Agreement with [redacted]<br><br>OpenAI further responds that this fact is immaterial because these facts do not affect the outcome of the suit under the governing law. Whether a market for licensing data for generative AI purposes "exists or is likely to develop is irrelevant, because this market is not one that plaintiffs are legally entitled to monopolize." *Kadrey*, 788 F. Supp. 3d at 1052; *Bartz*, 787 F. Supp. 3d at 1032.<br><br>Microsoft defers to OpenAI. |
| 200. OpenAI entered into a collaboration agreement with [redacted] Ex. 164 [OPCO_MDL_004590701]. | 200. **Undisputed – Immaterial.** OpenAI responds as follows: Undisputed that OpenAI entered into a Collaboration Agreement with [redacted] |

| | |
|---|---|
| | [redacted] News Ex. 164 at OPCO_MDL_004590702–03.<br><br>OpenAI further responds that this fact is immaterial because these facts do not affect the outcome of the suit under the governing law. Whether a market for licensing data for generative AI purposes "exists or is likely to develop is irrelevant, because this market is not one that plaintiffs are legally entitled to monopolize." *Kadrey*, 788 F. Supp. 3d at 1052; *Bartz*, 787 F. Supp. 3d at 1032.<br><br>Microsoft defers to OpenAI. |
| 201. OpenAI entered into a content license agreement with [redacted] Ex. 200 [OPCO_MDL_004740461]. | 201. **Disputed in Part – Not Supported by Cited Evidence; Immaterial.** OpenAI responds as follows: Disputed in Part. Undisputed that the agreement between OpenAI [redacted] News Ex. 200 at OPCO_MDL_004740461, OPCO_MDL_004740463–464. Disputed to the extent Plaintiffs incorrectly identify the contracting party [redacted]<br><br>OpenAI further responds that this fact is immaterial because these facts do not affect the outcome |

| | |
|---|---|
| | of the suit under the governing law. Whether a market for licensing data for generative AI purposes "exists or is likely to develop is irrelevant, because this market is not one that plaintiffs are legally entitled to monopolize." *Kadrey*, 788 F. Supp. 3d at 1052; *Bartz*, 787 F. Supp. 3d at 1032.<br><br>Microsoft defers to OpenAI. |
| 202. OpenAI entered into a strategic collaboration agreement with Schibsted Media on February 18, 2025 for [redacted] isplay use. Ex. 201 [OPCO_MDL_004661172]. | 202. **Undisputed – Immaterial.** OpenAI responds as follows: Undisputed that OpenAI entered into a Strategic Collaboration Agreement with Schibsted Media AS, effective February 18, 2025, [redacted] for [redacted] display uses, subject to the agreement's terms. [redacted] News Ex. 201 at OPCO_MDL_004661174.<br>OpenAI further responds that this fact is immaterial because these facts do not affect the outcome of the suit under the governing law. Whether a market for licensing data for generative AI purposes "exists or is likely to develop is irrelevant, because this market is not one that |

| | |
|---|---|
| | plaintiffs are legally entitled to monopolize." *Kadrey*, 788 F. Supp. 3d at 1052; *Bartz*, 787 F. Supp. 3d at 1032.<br><br>Microsoft defers to OpenAI. |
| 203. OpenAI entered into a collaboration [redacted] gton Post on March 20, 2025 for [redacted] display use. Ex. 165 [OPCO_MDL_004740479]. | 203. **Undisputed – Immaterial.** OpenAI responds as follows: Undisputed that OpenAI entered into a Collaboration Agreement with WP Company LLC (d/b/a The Washington Post), effective March 20, 2025, [redacted] display uses, subject to the agreement's terms. [redacted] News Ex. 165 at OPCO_MDL_004740480–481.<br>OpenAI further responds that this fact is immaterial because these facts do not affect the outcome of the suit under the governing law. Whether a market for licensing data for generative AI purposes "exists or is likely to develop is irrelevant, because this market is not one that plaintiffs are legally entitled to monopolize." *Kadrey*, 788 F. Supp. 3d at 1052; *Bartz*, 787 F. Supp. 3d at 1032. |

| | |
|---|---|
| | Microsoft defers to OpenAI. |
| 204. OpenAI entered into a collaboration agreement with [redacted] Ex. 202 [OPCO_MDL_004749357]. | 204. **Undisputed – Immaterial.** OpenAI responds as follows: Undisputed that OpenAI entered into a Collaboration Agreement [redacted] News Ex. 202 at OPCO_MDL_004749358.<br>OpenAI further responds that this fact is immaterial because these facts do not affect the outcome of the suit under the governing law. Whether a market for licensing data for generative AI purposes "exists or is likely to develop is irrelevant, because this market is not one that plaintiffs are legally entitled to monopolize." *Kadrey*, 788 F. Supp. 3d at 1052; *Bartz*, 787 F. Supp. 3d at 1032.<br><br>Microsoft defers to OpenAI. |

| | |
|---|---|
| 205. OpenAI entered into a data access agreement with [redacted] Ex. 203 [OPCO_MDL_004856032]. | 205. **Undisputed – Immaterial.** OpenAI responds as follows: Undisputed that OpenAI entered into a Data Access Agreement with [redacted]<br><br>OpenAI further responds that this fact is immaterial because these facts do not affect the outcome of the suit under the governing law. Whether a market for licensing data for generative AI purposes "exists or is likely to develop is irrelevant, because this market is not one that plaintiffs are legally entitled to monopolize." *Kadrey*, 788 F. Supp. 3d at 1052; *Bartz*, 787 F. Supp. 3d at 1032.<br><br>Microsoft defers to OpenAI. |
| 206. OpenAI entered into a data access agreement with [redacted] Ex. 204 [OPCO_MDL_004856018]. | 206. **Disputed in Part – Not Supported by Cited Evidence; Immaterial.** OpenAI responds as follows: Disputed in Part. Undisputed that OpenAI entered into a Data Access Agreement [redacted] Disputed to the extent Plaintiffs incorrectly identify the contracting party as [redacted] |

| | |
|---|---|
| | OpenAI further responds that this fact is immaterial because these facts do not affect the outcome of the suit under the governing law. Whether a market for licensing data for generative AI purposes "exists or is likely to develop is irrelevant, because this market is not one that plaintiffs are legally entitled to monopolize." *Kadrey*, 788 F. Supp. 3d at 1052; *Bartz*, 787 F. Supp. 3d at 1032.<br><br>Microsoft defers to OpenAI. |
| 207. **<u>Microsoft's Executed Agreements:</u>** Microsoft has entered data access and content access agreements with at least [redacted] granting Microsoft certain rights to content including non-fiction books, [redacted] *See* Ex. 205 [MSFT_AI_MDL_002204111] ([redacted]); Ex. 206 [MSFT_AI_MDL_001432313] ([redacted]); Ex. 207 [MSFT_AI_MDL_002775289] ([redacted]; Ex. 208 [MSFT_AI_MDL_001286683] [redacted]); Ex. 209 [MSFT_AI_MDL_001286653] ([redacted]) [redacted]); Ex. 210 [MSFT_AI_MDL_001286669] [redacted]); Ex. 211 [MSFT_AI_MDL_001286883] ([redacted]); Ex. 212 [MSFT_AI_MDL_001286879] ([redacted] Ex. 213 | 207. **Disputed in Part – Not Supported by Cited Evidence; Immaterial.** Microsoft does not dispute that it entered into the cited agreements with the listed third parties. But Microsoft does dispute the [redacted] News Ex. 206 at MSFT_AI_MDL_001432315; see *id.* at MSFT_AI_MDL_001432323 ("[redacted].<br><br>Microsoft further responds that the facts stated in Paragraph 207 are immaterial because these facts do not affect the outcome of the suit under the governing law. Whether a market for licensing data for generative AI |

| | |
|---|---|
| [MSFT_AI_MDL_001286952] ([redacted]); Ex. 214 [MSFT_AI_MDL_001286828] [redacted]; Ex. 215 [MSFT_AI_MDL_001286839] ([redacted]); Ex. 216 [MSFT_AI_MDL_001286869] ([redacted]; Ex. 217 [MSFT_AI_MDL_001286896] ([redacted]); Ex. 543 [MSFT_AI_MDL_001286894] ([redacted]; Ex. 218 [MSFT_AI_MDL_001286905] ([redacted]); Ex. 219 [MSFT_AI_MDL_001286908] ([redacted]; Ex. 220 [MSFT_AI_MDL_001286918] ([redacted]; Ex. 221 [MSFT_AI_MDL_001286944] ([redacted]); Malackowski NYT-DNP Opening Rep. at Appendix F, Exhibit 5.1 (chart summarizing these agreements). | purposes "exists or is likely to develop is irrelevant, because this market is not one that plaintiffs are legally entitled to monopolize." *Kadrey*, 788 F. Supp. 3d at 1052; *Bartz*, 787 F. Supp. 3d at 1032.<br><br>OpenAI defers to Microsoft's response. |
| 208. Microsoft has also entered AI-Generated Content and Display License Agreements with [redacted], which granted Microsoft rights to the licensed content [redacted] Ex. 222 [MSFT_AI_MDL_002881548] ([redacted].); Ex. 223 [MSFT_AI_MDL_002881558] ([redacted]; Ex. 224 [MSFT_AI_MDL_002881569] ([redacted] | 208. **Undisputed – Immaterial.** Microsoft does not dispute that it entered into the AI-Generated Content and Display License Agreements with [redacted] cited in Paragraph 208. But Microsoft responds that the fact stated in Paragraph 208 is immaterial for the reasons stated in its response to Paragraph 207. |

| | |
|---|---|
| [redacted]; Malackowski NYT-DNP Opening Rep. at Appendix F, Exhibit 5.1, Appendix G, Section 2.3. | OpenAI defers to Microsoft's response. |
| 209. Microsoft has thus far paid [redacted] for access to licensed content [redacted] *See* Ex. 205 [MSFT_AI_MDL_002204111] ([redacted]; Ex. 211 [MSFT_AI_MDL_001286883] ([redacted]; Ex. 216 [MSFT_AI_MDL_001286869] [redacted]); Ex. 222 [MSFT_AI_MDL_002881548] ([redacted]). | 209. **Disputed in Part – Not Supported by Cited Evidence; Immaterial.** Microsoft does not dispute that the cited agreements provide for fees [redacted] News Ex. 211 at MSFT_AI_MDL_001286886; News Ex. 205 at MSFT_AI_MDL_002204115. But Microsoft disputes that it paid for "licensed content" under the [redacted] and further states that the cited evidence does not support the statement. *See* News Ex. 205 at MSFT_AI_MDL_002204114, MSFT_AI_MDL_002204115, MSFT_AI_MDL_002204122 ([redacted]); News Ex. 211 at MSFT_AI_MDL_001286885 ([redacted] News Ex. 216 at MSFT_AI_MDL_001286871 (same).<br>Microsoft also responds that the fact stated in Paragraph 209 is immaterial for the reasons stated in its response to Paragraph 207.<br><br>OpenAI defers to Microsoft's response. |
| 210. Microsoft entered into a data access and delivery agreement [redacted] Ex. 211 [MSFT_AI_MDL_001286883]. | 210. **Undisputed – Immaterial.** Microsoft does not dispute that Microsoft and [redacted] entered a Data Access and Delivery Agreement, effective [redacted] But Microsoft |

| | |
|---|---|
| | responds that the facts stated in Paragraph 210 are immaterial for the reasons stated in its response to Paragraph 207.<br><br>OpenAI defers to Microsoft's response. |
| 211. Microsoft entered into a data access and delivery agreement with [redacted] Ex. 217 [MSFT_AI_MDL_001286896]. | 211. **Undisputed – Immaterial.** Microsoft does not dispnte that Microsoft and [redacted] entered into a Data Access and Delivery Agreement, effective [redacted] But Microsoft responds that the facts stated in Paragraph 211 are immaterial for the reasons stated in its response to Paragraph 207.<br><br>OpenAI defers to Microsoft's response. |
| 212. Microsoft entered into a data access and delivery agreement with [redacted] Ex. 218 [MSFT_AI_MDL_001286905]. | 212. **Undisputed – Immaterial.** Microsoft does not dispute that it and [redacted] executed an amendment to a data access and delivery agreement effective [redacted] But Microsoft responds that the facts stated in Paragraph 212 are immaterial for the reasons stated in its response to Paragraph 207.<br><br>OpenAI defers to Microsoft's response. |
| 213. Microsoft entered into a data access and delivery agreement with [redacted] Ex. 221 [MSFT_AI_MDL_001286944]. | 213. **Undisputed – Immaterial.** Microsoft does not dispute that Microsoft and [redacted] entered into a Data Access aud Delivery Agreemeut, effective [redacted]. But |

| | |
|---|---|
| | Microsoft responds that the facts stated in Paragraph 213 are immaterial for the reasons stated in its response to Paragraph 207.<br><br>OpenAI defers to Microsoft's response. |
| 214. Microsoft entered into a data access and delivery agreement with [redacted] Ex. 216 [MSFT_AI_MDL_001286869]. | 214. **Undisputed – Immaterial.** Microsoft does not dispute that Microsoft and [redacted] entered into a Data Access and Delivery Agreement, effective [redacted] But Microsoft responds that the facts stated in Paragraph 214 are immaterial for the reasons stated in its response to Paragraph 207.<br><br>OpenAI defers to Microsoft's response. |
| 215. Microsoft entered into a data access and delivery agreement with [redacted] Ex. 205 [MSFT_AI_MDL_002204111]. | 215. **Undisputed – Immaterial.** Microsoft does not dispute that Microsoft and [redacted] entered into a Partnership and Data Access Agreement, effective [redacted] But Microsoft responds that the facts stated in Paragraph 215 are immaterial for the reasons stated in its response to Paragraph 207.<br><br>OpenAI defers to Microsoft's response. |
| 216. Microsoft entered into a data access and delivery agreement with [redacted] Ex. 219 [MSFT_AI_MDL_001286908]. | 216. **Undisputed – Immaterial.** Microsoft does not dispute that Microsoft and [redacted] entered into a Data Access and Delivery Agreement, effective [redacted] But Microsoft also |

| | |
|---|---|
| | responds that the facts stated in Paragraph 216 are immaterial for the reasons stated in its response to Paragraph 207.<br><br>OpenAI defers to Microsoft's response. |
| 217. Microsoft entered into a data access and delivery agreement [redacted] Ex. 210 [MSFT_AI_MDL_001286669]. | 217. **Undisputed – Immaterial.** Microsoft does not dispnte that Microsoft and [redacted] entered into a Data Access and Delivery Agreement, effective [redacted] But Microsoft also responds that the facts stated in Paragraph 217 are immaterial for the reasons stated in its response to Paragraph 207.<br><br>OpenAI defers to Microsoft's response. |
| 218. Microsoft entered into a data access and delivery agreement with [redacted] Ex. 214 [MSFT_AI_MDL_001286828]. | 218. **Undisputed – Immaterial.** Microsoft does not dispute that Microsoft and [redacted] entered into a Data Access and Delivery Agreement, effective [redacted] But Microsoft also responds that the facts stated in Paragraph 218 are immaterial for the reasons stated in its response to Paragraph 207.<br><br>OpenAI defers to Microsoft's response. |
| 219. Microsoft entered into an AI experiences license and premium content access agreement with [redacted] Ex. 206 [MSFT_AI_MDL_001432313]. | 219. **Undisputed – Immaterial.** Microsoft does not dispute that Microsoft entered into an AI Experiences License and Premium Content Access Agreement with [redacted] effective [redacted]. |

| | |
|---|---|
| | But Microsoft also responds that the facts stated in Paragraph 219 are immaterial for the reasons stated in its response to Paragraph 207.<br><br>OpenAI defers to Microsoft's response. |
| 220. Microsoft entered into a content access and delivery agreement with [redacted] Ex. 215 [MSFT_AI_MDL_001286839]. | 220. **Undisputed – Immaterial.** Microsoft does not dispute that Microsoft and [redacted] entered into a Content Access and Delivery Agreement, effective [redacted] But Microsoft also responds that the facts stated in Paragraph 220 are immaterial for the reasons stated in its response to Paragraph 207.<br><br>OpenAI defers to Microsoft's response. |
| 221. Microsoft entered into a content access and delivery agreement with [redacted] Ex. 220 [MSFT_AI_MDL_001286918]. | 221. **Undisputed – Immaterial.** Microsoft does not dispute that Microsoft and [redacted] entered into a Content Access and Delivery Agreement, effective [redacted]. But Microsoft also responds that the facts stated in Paragraph 221 are immaterial for the reasons stated in its response to Paragraph 207.<br><br>OpenAI defers to Microsoft's response. |
| 222. Microsoft entered into a content access and delivery agreement with [redacted] Ex. 207 [MSFT_AI_MDL_002775289]. | 222. **Undisputed – Immaterial.** Microsoft does not dispute that Microsoft and [redacted] entered into a Content Access and Delivery Agreement, effective [redacted] But Microsoft also responds that the facts stated in Paragraph 222 are |

| | |
|---|---|
| | immaterial for the reasons stated in its response to Paragraph 207.<br><br>OpenAI defers to Microsoft's response. |
| 223. Microsoft entered into a data access and delivery agreement with [redacted] Ex. 208 [MSFT_AI_MDL_001286683]. | 223. **Undisputed – Immaterial.** Microsoft does not dispute that Microsoft and [redacted] entered into a Data Access and Delivery Agreement, effective [redacted] But Microsoft also responds that the facts stated in Paragraph 223 are immaterial for the reasons stated in its response to Paragraph 207.<br><br>OpenAI defers to Microsoft's response. |
| 224. Microsoft entered into a content access and delivery agreement with [redacted]. Ex. 209 [MSFT_AI_MDL_001286653]. | 224. **Undisputed – Immaterial.** Microsoft does not dispute that Microsoft and [redacted] entered into a Content Access and Delivery Agreement, effective [redacted]. But Microsoft also responds that the facts stated in Paragraph 224 are immaterial for the reasons stated in its response to Paragraph 207.<br><br>OpenAI defers to Microsoft's response. |
| 225. Microsoft entered into an AI generated content and display license agreement with [redacted] Ex. 223 [MSFT _AI_MDL_002881558]. | 225. **Undisputed – Immaterial.** Microsoft does not dispute that Microsoft and [redacted] entered into an AI-Generated Content and Display License Agreement, effective [redacted] But Microsoft also responds that the facts stated in |

| | |
|---|---|
| | Paragraph 225 are immaterial for the reasons stated in its response to Paragraph 207.<br><br>OpenAI defers to Microsoft's response. |
| 226. Microsoft entered into an AI generated content and display license agreement with [redacted]. Ex. 224 [MSFT AI_MDL_002881569]. | 226. **Undisputed – Immaterial.** Microsoft does not dispute that Microsoft and [redacted] entered into an AI-Generated Content and Display License Agreement, effective [redacted] But Microsoft also responds that the facts stated in Paragraph 226 are immaterial for the reasons stated in its response to Paragraph 207.<br><br>OpenAI defers to Microsoft's response. |
| 227. Microsoft entered into an AI generated content and display license agreement with [redacted] Ex. 222 [MSFT _AI_MDL_002881548]. | 227. **Undisputed – Immaterial.** Microsoft does not dispute that Microsoft and [redacted] entered into an AI-Generated Content and Display License Agreement, effective October 1, 2024. But Microsoft also responds that the facts stated in Paragraph 227 are immaterial for the reasons stated in its response to Paragraph 207.<br><br>OpenAI defers to Microsoft's response. |
| 228. Microsoft entered into a content access and delivery agreement with [redacted] Ex. 213 [MSFT_AI_MDL_001286952]. | 228. **Undisputed – Immaterial.** Microsoft does not dispute that Microsoft and [redacted] entered into a Content Access and Delivery Agreement, effective [redacted] But Microsoft also responds that the facts stated in Paragraph |

| | |
|---|---|
| | 228 are immaterial for the reasons stated in its response to Paragraph 207.<br><br>OpenAI defers to Microsoft's response. |
| 229. **<u>The Times's Executed GenAI Licensing Agreement</u>:** On April 25, 2025, The Times and Amazon.Com Services LLC ("Amazon") entered into a "Content License and Services Agreement," whereby The Times granted Amazon a license to use its content (including The Times's collection of archived and real-time content) for training, grounding, and display in Amazon products, and research (the "Times-Amazon Agreement"). Ex. 228 [NYT_00890201] at 102, 204. | 229. **Undisputed – Immaterial.** Defendants do not dispute that the Times and Amazon entered into a "Content License and Services Agreement" on April 25, 2025 (the "Times-Amazon Agreement"). But Defendants also respond that the fact set forth in Paragraph 229 is immaterial because these facts do not affect the outcome of the suit under the governing law. Specifically, whether a market for licensing data for generative AI purposes "exists or is likely to develop is irrelevant, because this market is not one that Plaintiffs are legally entitled to monopolize." *Kadrey*, 788 F. Supp. 3d at 1052; *Bartz*, 787 F. Supp. 3d at 1032. |
| 230. [redacted] Ex. 228 [NYT_00890201] at 201. | 230. **Undisputed – Immaterial.** Defendants do not dispute that [redacted] But Defendants also respond that the fact set forth in Paragraph 230 is immaterial, for the same reasons stated in their response to Paragraph 229. |
| 231. [redacted] | 231. **Undisputed – Immaterial.** Defendants do not dispute that [redacted] But Defendants also respond |

| | |
|---|---|
| [redacted] Ex. 228 [NYT_00890201] at 201, 203, 218. | that the fact set forth in Paragraph 231 is immaterial, for the same reasons stated in their response to Paragraph 229. |
| 232. [redacted] Ex. 228 [NYT_00890201] at 201. | 232. **Undisputed – Immaterial.** Defendants do not dispute that [redacted] But Defendants also respond that the fact set forth in Paragraph 232 is immaterial, for the same reasons stated in their response to Paragraph 229. |
| 233. [redacted] Ex. 228 [NYT_00890201] at 205, 207, 208, 210. | 233. **Disputed in Part – Immaterial.** Defendants do not dispute that [redacted] News Ex. 228 at NYT_00890205, NYT_00890207. Otherwise, Defendants dispute that the Times-Amazon agreement contains the remaining provisions in Paragraph 233 as characterized therein. Specifically, it is disputed that the [redacted] |

| | |
|---|---|
| | [redacted] News Ex. 228 at NYT_00890205 (§ 1.4.3).<br>Additionally, it is disputed that the Times-Amazon agreement [redacted]." *Id.* at NYT_00890207 (§ 1.5.6.5) (emphasis added).<br>Additionally, it is disputed that the Times-Amazon agreement "[redacted]" *Id.* at NYT_00890207–208 [redacted] (emphasis added).<br>Lastly, it is disputed that [redacted] |

| | |
|---|---|
| | [redacted] Defendants also respond that the fact set forth in Paragraph 233 is immaterial, for the same reasons stated in their response to Paragraph 229. |
| 234. **<u>The Times's GenAI Licensing Negotiations:</u>** [redacted] Ex. 229 [Felix Depo. Ex. 137] [NYT_00468323]; Ex. 230 [Felix Depo. Tr.] at 312:17-314:21; Ex. 231 [Lightcap 30(b)(1) Depo. Ex. 17] Ex. 232 [Lightcap 30(b)(1) Depo. Ex. 18] [OPCO_MDL_004419803]. | 234. **Disputed in Part – Immaterial.** OpenAI responds as follows: Undisputed that [redacted] However, disputed to the extent Plaintiffs characterize the [redacted] News Ex. 229 describes [redacted] The cited evidence does not establish that [redacted] OpenAI also responds that the fact set forth in Paragraph 234 is immaterial, for the same reasons stated in response to Paragraph 229.<br><br>Microsoft defers to OpenAI. |

| | |
|---|---|
| 235. [redacted] | 235. **Disputed in Part – Immaterial.** OpenAI responds as follows: Undisputed that [redacted] Disputed to the extent Plaintiffs characterize the [redacted] News Ex. 229 describes [redacted] The cited evidence does not establish that [redacted] OpenAI also responds that the fact set forth in Paragraph 235 is immaterial, for the same reasons stated in response to Paragraph 229.<br><br>Microsoft defers to OpenAI. |
| 236. [redacted] Ex. 234 [Russell 30(b)(6) Depo. Tr.] at 221:19-228:20. | 236. **Disputed in Part – FRE 408; Incomplete; Immaterial.** Microsoft dispntes the facts in Paragraph 236 because the cited evidence is not admissible because it concerns settlement negotiations subject to Fed. R. Evid. 408. Without waiving its Fed. R. Evid. 408 objection, Microsoft further responds that it |

| | |
|---|---|
| | does not dispute that [redacted] Pursuant to Fed. R. Evid. 106, [redacted] A. Hurst Decl. Ex. 102 (G. Russell 30(b)(6) Tr.) at 230:21-232:24 (discussing Exhibit No. GR-33).<br>Microsoft also responds that the fact stated in Paragraph 236 is immaterial because this fact does not affect the outcome of the suit under the governing law. Whether a market for licensing data for generative AI purposes "exists or is likely to develop is irrelevant, because this market is not one that plaintiffs are legally entitled to monopolize." *Kadrey*, 788 F. Supp. 3d at 1052; *Bartz*, 787 F. Supp. 3d at 1032.<br><br>OpenAI defers to Microsoft's response. |
| 237. [redacted] Ex. 137 [MSFT_AI_MDL_000678077] at 079. | 237. **Undisputed – FRE 408; Immaterial.** Microsoft disputes the facts in Paragraph 237 because the cited evidence is not admissible because it concerns settlement negotiations subject to Fed. R. Evid. 408. Without waiving its Fed. R. Evid. 408 objection, Microsoft further responds: This fact is undisputed, but Microsoft responds that the fact stated in Paragraph 237 is immaterial for the reasons stated in Paragraph 236. |

| | |
|---|---|
| | OpenAI defers to Microsoft's response. |
| 238. [redacted] Ex. 235 [MSFT_AI_MDL_000229826] at 830 (Brayton requested answers to the following: "Is MS currently accessing (through crawling, scraping or otherwise) any NYT platforms (including its websites and mobile applications) for AI training or any related purpose? If so, please explain how."; "Is MS currently copying or otherwise using any NYT content from any source for AI training or any related purpose? If so, please explain how."; "Has MS engaged in the activities above in the past? If so, please provide details."). | 238. **Undisputed – FRE 408; Immaterial.** Microsoft disputes the facts in Paragraph 238 because the cited evidence is not admissible because it concerns settlement negotiations subject to Fed. R. Evid. 408. Without waiving its Fed. R. Evid. 408 objection, Microsoft further responds: This fact is undisputed, but Microsoft responds that the fact stated in Paragraph 238 is immaterial for the reasons stated in Paragraph 236.<br><br>OpenAI defers to Microsoft's response. |
| 239. [redacted] 137. Ex. 137 [MSFT_AI_MDL_000678077] at 077. | 239. **Undisputed – FRE 408; Immaterial.** Microsoft disputes the facts in Paragraph 239 because the cited evidence is not admissible because it concerns settlement negotiations subject to Fed. R. Evid. 408. Without waiving its Fed. R. Evid. 408 objection, Microsoft further responds: This fact is undisputed, but Microsoft responds that the fact stated in Paragraph 239 is immaterial for the reasons stated in Paragraph 236.<br><br>OpenAI defers to Microsoft's response. |

| | |
|---|---|
| 240. [redacted] Ex. 137 [MSFT_AI_MDL_000678077] at 078. | 240. **Undisputed – FRE 408; Immaterial.** Microsoft disputes the facts in Paragraph 240 because the cited evidence is not admissible because it concerns settlement negotiations subject to Fed. R. Evid. 408. Without waiving its Fed. R. Evid. 408 objection, Microsoft further responds: This fact is undisputed, but Microsoft responds that the fact stated in Paragraph 240 is immaterial for the reasons stated in Paragraph 236.<br><br>OpenAI defers to Microsoft's response. |
| 241. [redacted] Ex. 137 [MSFT_AI_MDL_000678077] at 078. | 241. **Undisputed – FRE 408; Immaterial.** Microsoft disputes the facts in Paragraph 241 because the cited evidence is not admissible because it concerns settlement negotiations subject to Fed. R. Evid. 408. Without waiving its Fed. R. Evid. 408 objection, Microsoft further responds: This fact is undisputed, but Microsoft responds that the fact stated in Paragraph 241 is immaterial for the reasons stated in Paragraph 236.<br><br>OpenAI defers to Microsoft's response. |
| 242. [redacted] Ex. 137 [MSFT_AI_MDL_000678077] at 078. | 242. **Undisputed — FRE 408; Incomplete; Immaterial.** Microsoft disputes the facts in Paragraph 242 because the cited evidence is not admissible because it concerns settlement negotiations subject to Fed. R. Evid. 408. Without waiving its Fed. R. Evid. 408 objection, Microsoft further responds: Microsoft does not dispute that the document contains the quoted language. Pursuant to Fed. R. Evid. 106, News Ex. 137 lists the following |

| | |
|---|---|
| | "[redacted] News Ex. 137 at MSFT_AI_MDL_000678078. Microsoft further responds that the fact stated in Paragraph 242 is immaterial for the reasons stated in Paragraph 236.<br><br>OpenAI defers to Microsoft's response. |
| 243. ***<u>Daily News Plaintiffs' Executed Agreements:</u>*** Daily News Plaintiffs have never entered into a license agreement permitting their content to be used for LLM model training or grounding. Ex. 17 [Pine Feb. 4, 2026 Depo. Tr.] at 213:7-10; Ex. 74 [Chicago Tribune's Fourth Supplemental Responses to OpenAI Second Set of Interrogatories] at No. 3; Ex. 237 [New York Daily News' Fourth Supplemental Responses to OpenAI Second Set of Interrogatories] at No. 3; Ex. 238 [Orlando Sentinel Fourth Supplemental Responses to OpenAI Second Set of Interrogatories] at No. 3; Ex. 77 [Sun Sentinel's Fourth Supplemental Responses to OpenAI Second Set of Interrogatories] at No. 3; Ex. 240 [Denver Post's Fifth Supplemental Responses to OpenAI Second Set of Interrogatories] at No. 3; Ex. 241 [Pioneer Press's Fifth Supplemental Responses to OpenAI Second Set of | 243. **Undisputed - Immaterial.** Defendants respond as follows: Undisputed that the Daily News Plaintiffs have never entered into agreements permitting their content to be used for LLM grounding.<br><br>Defendants further respond that this fact is immaterial because these facts do not affect the outcome of the suit under the governing law. Whether a market for licensing data for generative AI purposes "exists or is likely to develop is irrelevant, because this market is not one that plaintiffs are legally entitled to monopolize." *Kadrey*, 788 F. Supp. 3d at 1052; *Bartz*, 787 F. Supp. 3d at 1032. |

| | |
|---|---|
| Interrogatories] at No. 3; Ex. 242 [Mercury News's Fifth Supplemental Responses to OpenAI Second Set of Interrogatories] at No. 3; Ex. 243 [Orange County Register's Fifth Supplemental Responses to OpenAI Second Set of Interrogatories] at No. 3. | |
| 244. **<u>Ziff Davis Plaintiffs' Executed GenAI Licensing Agreements:</u>** To date, Ziff Davis has entered into AI-related content license agreements with two companies, [redacted] each consisting of limited use and/or scope grants with defined, non-renewing terms. Ex. 49 [Oh Feb. 24, 2026 30(b)(6) Depo. Tr.] at 40:11-41:22, 42:23-44:4; Oh Decl. ¶ 28; Ex. 125 [ZD0492278]; Ex. 126 [ZD0447957]. | 244. **Disputed in Part – Not Supported by Cited Evidence**. OpenAI responds as follows: Undisputed that Ziff Davis entered into AI-related agreements with [redacted] involving limited rights and defined contractual terms. Disputed to the extent Plaintiffs characterize these arrangements as evidence of an established market for licensing copyrighted content for LLM training. The cited agreements [redacted] News Exs. 125–126; ECF 1802 (K. Oh Decl.) ¶ 28. Regardless, whether a market for licensing data for such generative AI purposes "exists or is likely to develop is irrelevant, because this market is not one that Plaintiffs are legally entitled to monopolize." *Kadrey*, 788 F. Supp. 3d at 1052; *Bartz*, 787 F. Supp. 3d at 1032.<br><br>Microsoft responds that these facts do not pertain to claims asserted against Microsoft. |
| 245. In addition to its license agreements, Ziff Davis utilizes TollBit, a platform that allows AI bots and data scrapers to pay websites directly to license content for real- | 245. **Disputed in Part – Not Supported by Cited Evidence**. OpenAI responds as follows: Disputed in Part. Undisputed that Ziff Davis utilizes TollBit, a |

| | |
|---|---|
| time AI retrieval at rates set by Ziff Davis. Ex. 49 [Oh Feb. 24, 2026 30(b)(6) Depo. Tr.] at 43:10-23; Ex. 244 ["Frequently asked questions and answers," TollBit], available at https://tollbit.com/faqs/. | platform that facilitates paid access to website content for certain AI-related uses, including real-time retrieval. Disputed to the extent Plaintiffs characterize Ziff Davis's use of TollBit as establishing that AI bots or data scrapers have entered into agreements to use Ziff Davis content or that any particular transactions have occurred. The cited evidence describes TollBit's general functionality but does not establish that Ziff Davis [redacted] A. Blanco Opp. Decl. Ex. 246 (K. Oh 30(b)(6) Tr. (Feb. 24, 2026)) 43:10–23; News Ex. 244 (TollBit FAQs). Regardless, whether a market for licensing data for such generative AI purposes "exists or is likely to develop is irrelevant, because this market is not one that Plaintiffs are legally entitled to monopolize." *Kadrey*, 788 F. Supp. 3d at 1052; *Bartz*, 787 F. Supp. 3d at 1032.<br><br>Microsoft responds that these facts do not pertain to claims asserted against Microsoft. |
| 246. In 2023 and 2024, Ziff Davis and OpenAI engaged in preliminary conversations about potential partnerships through which OpenAI could license Ziff Davis content, but those conversations proved unfruitful. Ex. 136 [Varun Shetty 30(b)(6) Depo.] at 145:13-150:22; Ex. 245 [Oh Depo. Tr] at 59:6-63:15; Ex. 233 [Lightcap 30(b)(1) Depo. Tr.] at 177:10–179:25; Ex. 247 [OPCO_MDL_004660264]; Ex. 248 [ZD0011967]; Ex. 249 [OPCO_MDL_004746029]. | 246. **Disputed in Part – Not Supported by Cited Evidence**. OpenAI responds as follows: Undisputed that Ziff Davis and OpenAI engaged in preliminary discussions in 2023 and 2024 concerning potential commercial partnerships and did not ultimately execute an agreement. Disputed to the extent Plaintiffs characterize those discussions as negotiations specifically for the use of Ziff Davis content in LLM training. The cited |

| | |
|---|---|
| | evidence reflects [redacted] A. Blanco Opp. Decl. Ex. 276 (V. Shetty 30(b)(6) Tr.) at 145:13–150:22; A. Blanco Opp. Decl. Ex. 247 (K. Oh 30(b)(1) Tr. (Feb. 25, 2026)) at 59:6–63:15; A. Blanco Opp. Decl. Ex. 230 (B. Lightcap 30(b)(1) Tr.) at 177:10–179:25. Regardless, whether a market for licensing data for such generative AI purposes "exists or is likely to develop is irrelevant, because this market is not one that Plaintiffs are legally entitled to monopolize." *Kadrey*, 788 F. Supp. 3d at 1052; *Bartz*, 787 F. Supp. 3d at 1032.<br><br>Microsoft responds that these facts do not pertain to claims asserted against Microsoft. |
| 247. **<u>Amazon Data Services Agreements</u>:** Amazon has entered [redacted] Malackowski NYT-DNP Opening Rep. at Appendix F, Exhibit 8.1. | 247. **Undisputed – Immaterial.** Defendants do not dispute that [redacted]<br><br>Defendants further respond that the fact set forth in Paragraph 247 is immaterial because this fact does not affect the outcome of the suit under the governing law. Whether a market for licensing data for such generative AI purposes "exists or is likely to develop is irrelevant, because this market is not one that Plaintiffs are legally entitled to monopolize." *Kadrey*, 788 F. Supp. 3d at 1052; *Bartz*, 787 F. Supp. 3d at 1032. |

| | |
|---|---|
| 248. [redacted] Malackowski NYT-DNP Opening Rep. at Appendix F, Exhibit 8.1. | 248. **Undisputed – Immaterial.** Defendants do not dispute that [redacted] But Defendants respond that the fact set forth in Paragraph 248 is immaterial for the same reasons stated in their response to Paragraph 247. |
| 249. [redacted] Ex. 128 [Stamm Rebuttal Rep.] at ¶ 299; Ex. 129 [Stamm ZD Rebuttal Rep.] at ¶ 258. | 249. **Undisputed – Immaterial.** Defendants do not dispute that [redacted] But Defendants respond that the fact set forth in Paragraph 249 is immaterial for the same reasons stated in their response to Paragraph 247. |
| 250. [redacted] Ex. 250 [AMAZ_OPENAI_00000476] at -477. | 250. **Undisputed – Immaterial.** Defendants do not dispute that [redacted] Defendants also respond that the fact set forth in Paragraph 250 is immaterial for the same reasons stated in their response to Paragraph 247. |
| 251. [redacted] Ex. 251 [AMAZ_OPENAI_00000421] at -423. | 251. **Undisputed – Immaterial.** Defendants do not dispute that [redacted] Defendants also respond that the fact set forth in Paragraph 251 is immaterial for the same reasons stated in their response to Paragraph 247. |
| 252. [redacted] | 252. **Undisputed – Immaterial.** Defendants do not dispute that [redacted] |

| | |
|---|---|
| [redacted] Ex. 252 [AMAZ_OPENAI_00000312] at -313. | [redacted] Defendants also respond that the fact set forth in Paragraph 252 is immaterial for the same reasons stated in their response to Paragraph 247. |
| 253. [redacted] Ex. 253 [AMAZ_OPENAI_00000523] at -524. | 253. **Undisputed – Immaterial.** Defendants do not dispute that [redacted] Defendants also respond that the fact set forth in Paragraph 253 is immaterial for the same reasons stated in their response to Paragraph 247. |
| 254. [redacted] Ex. 254 [AMAZ_OPENAI_00000553] - 555. | 254. **Undisputed – Immaterial.** Defendants do not dispute that [redacted] Defendants also respond that the fact set forth in Paragraph 254 is immaterial for the same reasons stated in their response to Paragraph 247. |
| 255. [redacted] Ex. 255 [AMAZ_OPENAI_00000515] at -516. | 255. **Undisputed – Immaterial.** Defendants do not dispute that [redacted] Defendants also respond that the fact set forth in Paragraph 255 is immaterial for the same reasons stated in their response to Paragraph 247. |
| 256. [redacted] Ex. 256 [AMAZ_OPENAI_00000322] at -323. | 256. **Undisputed – Immaterial.** Defendants do not dispute that [redacted] Defendants also respond that the fact set forth in Paragraph 256 is immaterial for the same reasons stated in their response to Paragraph 247. |

| | |
|---|---|
| 257. [redacted] Ex. 257 [AMAZ_OPENAI_00000466] at -467. | 257. **Undisputed – Immaterial.** Defendants do not dispute that [redacted] Defendants also respond that the fact set forth in Paragraph 257 is immaterial for the same reasons stated in their response to Paragraph 247. |
| 258. [redacted] Ex. 258 [AMAZ_OPENAI_00000351] at -353. | 258. **Undisputed – Immaterial.** Defendants do not dispute that [redacted] Defendants also respond that the fact set forth in Paragraph 258 is immaterial for the same reasons stated in their response to Paragraph 247. |
| 259. [redacted] Ex. 259 [AMAZ_OPENAI_00000490] at -492. | 259. **Undisputed – Immaterial.** Defendants do not dispute that [redacted] Defendants also respond that the fact set forth in Paragraph 259 is immaterial for the same reasons stated in their response to Paragraph 247. |
| 260. [redacted] Ex. 260 [AMAZ_OPENAI_00000291] at -292. | 260. **Undisputed – Immaterial.** Defendants do not dispute that [redacted] Defendants also respond that the fact set forth in Paragraph 260 is immaterial for the same reasons stated in their response to Paragraph 247. |
| 261. [redacted] | [redacted] do not dispute that [redacted] |

| | |
|---|---|
| [redacted] Ex. 261 [AMAZ_OPENAI_00000572] – at -573. | [redacted] Defendants also respond that the fact set forth in Paragraph 261 is immaterial for the same reasons stated in their response to Paragraph 247. |
| 262. [redacted] Ex. 262 [AMAZ_OPENAI_00000505] at -506. | 262. **Undisputed – Immaterial.** Defendants do not dispute that [redacted] Defendants also respond that the fact set forth in Paragraph 262 is immaterial for the same reasons stated in their response to Paragraph 247. |
| 263. [redacted] Ex. 263 [AMAZ_OPENAI_00000387] at -389. | 263. **Undisputed – Immaterial.** Defendants do not dispute that [redacted] Defendants also respond that the fact set forth in Paragraph 263 is immaterial for the same reasons stated in their response to Paragraph 247. |
| 264. [redacted] Ex. 264 [AMAZ_OPENAI_00000531] at 532-33. | 264. **Undisputed – Immaterial.** Defendants do not dispute that [redacted] Defendants also respond that the fact set forth in Paragraph 264 is immaterial for the same reasons stated in their response to Paragraph 247. |
| 265. [redacted] Ex. 265 [AMAZ_OPENAI_00000300] at -301. | 265. **Undisputed – Immaterial.** Defendants do not dispute that [redacted] Defendants also respond that the fact |

| | |
|---|---|
| | set forth in Paragraph 265 is immaterial for the same reasons stated in their response to Paragraph 247. |
| 266. [redacted] Ex. 266 [AMAZ_OPENAI_00000434] at -435. | 266. **Undisputed – Immaterial.** Defendants do not dispute that [redacted] Defendants also respond that the fact set forth in Paragraph 266 is immaterial for the same reasons stated in their response to Paragraph 247. |
| 267. [redacted] Ex. 228 [NYT_00890201] at -204. | 267. **Undisputed – Immaterial.** Defendants do not dispute that [redacted] But Defendants respond that the fact set forth in Paragraph 267 is immaterial for the same reasons stated in their response to Paragraph 247. |
| 268. [redacted] Ex. 267 [AMAZ_OPENAI_00000367] at -368. | 268. **Undisputed – Immaterial.** Defendants do not dispute that [redacted] Defendants also respond that the fact set forth in Paragraph 268 is immaterial for the same reasons stated in their response to Paragraph 247. |
| 269. [redacted] Ex. 268 [AMAZ_OPENAI_00000543] at -544. | 269. **Undisputed – Immaterial.** Defendants do not dispute that [redacted] Defendants also respond that the fact set forth in Paragraph 269 is immaterial for the same reasons stated in their response to Paragraph 247. |

| | |
|---|---|
| 270. [redacted] Ex. 269 [AMAZ_OPENAI_00000378] at 379. | 270. **Undisputed – Immaterial.** Defendants do not dispute that [redacted] Defendants also respond that the fact set forth in Paragraph 270 is immaterial for the same reasons stated in their response to Paragraph 247. |
| 271. [redacted] Ex. 270 [AMAZ_OPENAI_00000457] at -458. | 271. **Undisputed – Immaterial.** Defendants do not dispute that [redacted] Defendants also respond that the fact set forth in Paragraph 271 is immaterial for the same reasons stated in their response to Paragraph 247. |
| 272. [redacted] Ex. 271 [AMAZ_OPENAI_00000332] at -333. | 272. **Undisputed – Immaterial.** Defendants do not dispute that [redacted] Defendants also respond that the fact set forth in Paragraph 272 is immaterial for the same reasons stated in their response to Paragraph 247. |
| 273. [redacted] Ex. 272 [AMAZ_OPENAI_00000341] at -342. | 273. **Undisputed – Immaterial.** Defendants do not dispute that [redacted] Defendants also respond that the fact set forth in Paragraph 273 is immaterial for the same reasons stated in their response to Paragraph 247. |
| 274. **Additional Publicly Announced GenAI Agreements**: According to public announcements, other | 274. **Disputed in Part – Not Supported by Admissible Evidence; Immaterial.** Defendants do |

| | |
|---|---|
| companies providing Generative AI tools, including Google, Meta, Perplexity, ProRata.ai, and Mistral AI, have entered agreements with content creators, including The Associated Press, The Atlantic, Axios, The Financial Times, The Guardian, Time, and Reuters, to use their content in connection with generative AI technology. Ex. 273 ["AI content licensing lessons from Factiva and TIME," Digital Content Next, March 6, 2025, https://digitalcontentnext.org/blog/2025/03/06/ai-content-licensing-lessons-from-factiva-and-time/]; Ex. 274 [Deck, Andrew, "AI search engine Perplexity launches revenue sharing with six news publishers," NiemanLab, July 30, 2024, https://www.niemanlab.org/2024/07/perplexity-ai-search-engine-launches-revenue-sharing-with-six-news-publishers/]; Ex. 275 [Wigger, Kyle, "Perplexity expands its publisher program," *TechCrunch*, December 5, 2024, https://techcrunch.com/2024/12/05/perplexity-expands-its-publisher-program/]; Ex. 276 ["ProRata Announces Gist.ai, New AI Search Engine Based Entirely on High-Quality Licensed Content," *Business Wire* , December 9, 2024, https://www.businesswire.com/news/home/20241209071998/en/ProRata-Announces-Gist.ai-New-AI-Search-Engine-Based-Entirely-on-High-Quality-Licensed-Content]; Ex. 277 [Quigley, Sam, "News/Media Alliance Announces AI Licensing Partnership with ProRata," News/Media Alliance, March 26, 2025, https://www.newsmediaalliance.org/prorata-licensing-partnership/]; Ex. 278 ["AI Licensing by AI Companies," | not dispute that there has been public reporting on agreements between AI developers and content holders related to the use of content in generative AI technology. However, Defendants also respond that Paragraph 274 is disputed on the grounds that it is not supported by admissible evidence, as required by Local Rule 56.1, and therefore is not properly before the Court. Specifically, News Exhibits 273-282 are hearsay and lack foundation because they are a non-party publication offered for the truth of its contents, unaccompanied by any authenticating testimony or sponsoring expert to establish its reliability and Plaintiffs identify no exception to the hearsay rule that would apply. It therefore may not be considered in support of summary judgment.<br>Defendants also respond that the fact set forth in Paragraph 274 is immaterial for the same reasons stated in their response to Paragraph 247. |

| | |
|---|---|
| https://copyrightalliance.org/artificial-intelligence-copyright/licensing/ai-companies/]; Ex. 279 [Guaglione, Sara, "Boston Globe, Future, Vox Media join ProRata's generative AI licensing model," *Digiday*, June 6, 2025,https://digiday.com/media/boston-globe-future-vox-media-join-proratas-generative-ai-licensing-model/]; Ex. 280 [Purcell, Scott, "Man of Many Partners with ProRata.AI to Champion Fair Publisher Compensation & Attribution in the Age of AI," June 24, 2025, https://advertise.manofmany.com/blog/prorata-ai/]; Ex. 281 ["Partnering with ProRata to explore a fair model for AI content use," September 9, 2025, https://raptive.com/blog/partnering-with-prorata-to-explore-a-fair-model-for-ai-content-use/]; Ex. 282 ["CherryRoad® Media to Empower Local Communities with Hyper-Local AI Search Powered by Gist Answers," PR Newswire, September 11, 2025, https://www.prnewswire.com/news-releases/cherryroad-media-to-empower-local-communities-with-hyper-local-ai-search-powered-by-gist-answers-302553993.html?tc=eml_cleartime]. *See also* Malackowski NYT-DNP Opening Rep. at Appendix F, Exhibit 9.0 (chart summarizing these publicly announced agreements). | |
| 275. Numerous companies have also emerged within the artificial intelligence data and content license ecosystem aimed at connecting content creators and publishers with AI companies to monetize digital data. *See, e.g.*, Ex. 244 ["Frequently asked questions and answers," *Tollbit, Inc.*, https://tollbit.com/faqs/]; Ex. 283 [Porter | 275. **Disputed in Part – Not Supported by Admissible Evidence; Immaterial.** Defendants do not dispute that there are companies attempting to facilitate agreements between content owners and AI developers. However, Defendants respond that Paragraph 275 is disputed on the grounds that it is not supported by |

| | |
|---|---|
| Anderson, "CCC Announces a Collective Licensing Subscription for AI Systems," *Publishing Perspectives*, July 16, 2024, https://publishingperspectives.com/2024/07/ccc-announces-a-collective-licensing-subscription-for-ai-systems/]; Ex. 284 [Will Allen, *et al.*, "Introducing pay per crawl: Enabling content owners to charge AI crawlers for access," *Cloudflare, Inc.*, July 1, 2025, https://blog.cloudflare.com/introducing-pay-per-crawl/]. | admissible evidence, as required by Local Rule 56.1, and therefore is not properly before the Court. Specifically, the evidence cited is hearsay and lacks foundation because it is a non-party publication offered for the truth of its contents, unaccompanied by any authenticating testimony or sponsoring expert to establish its reliability and Plaintiffs identify no exception to the hearsay rule that would apply. It therefore may not be considered in support of summary judgment.<br>Further disputed that "numerous" companies have "emerged . . . aimed at connecting content creators and publishers with AI companies to monetize digital data." That assertion is vague and is not supported by the cited evidence. At most, the cited exhibits show that certain companies have attempted to enter an AI licensing space. Further disputed that Paragraph 275 is evidence of a functioning and scalable AI training data marketplace for the Asserted Articles at issue in this motion.<br>Defendants also dispute that the existence of these companies is evidence that a functioning market for licensing data for AI training or grounding exists. *See* C. Tucker Opp. Decl. ¶¶ 19-24.<br>Further disputed because there is no evidence that News Plaintiffs were involved with or used these third parties' services. News Plaintiffs also have not offered the information needed to understand the full context of this fact or to draw any inference from it. They do not state how many news organizations, if any, have used these services, and they do not provide the pricing models for those |

| | |
|---|---|
| | services. Additionally, Defendants also respond that the fact set forth in Paragraph 275 is immaterial. Specifically, whether a market for licensing data for such generative AI purposes "exists or is likely to develop is irrelevant, because this market is not one that Plaintiffs are legally entitled to monopolize." *Kadrey*, 788 F. Supp. 3d at 1052; *Bartz*, 787 F. Supp. 3d at 1032. |
| 276. ProRata's technology allows AI platforms to "attribute contributing content sources and share revenues pro rata 50/50 on a per-use basis, protecting and rewarding creators while helping to prevent unreliable content from compromising AI answer results." Ex. 285 ["ProRata Invents Generative AI Attribution Technology to Compensate and Credit Content Owners While Facilitating Fairness and Fact," *BusinessWire*, August 6, 2024, https://www.businesswire.com/news/home/20240806000889/en/ProRata-Invents-Generative-AI-Attribution-Technology-to-Compensate-and-Credit-Content-Owners-While-Facilitating-Fairness-and-Fact]. | 276. **Undisputed – Not Supported by Admissible Evidence; Immaterial.** Defendants do not dispute that ProRata is a company that exists, and that the cited BusinessWire article contains the quoted text when describing ProRata. However, Defendants respond that Paragraph 276 is not supported by admissible evidence, as required by Local Rule 56.1, and therefore is not properly before the Court. Specifically, the evidence cited is hearsay and lacks foundation because it is a non-party publication offered for the truth of its contents, unaccompanied by any authenticating testimony or sponsoring expert to establish its reliability and Plaintiffs identify no exception to the hearsay rule that would apply. It therefore may not be considered in support of summary judgment.<br>Additionally, Defendants also respond that the fact set forth in Paragraph 276 is immaterial for the same reasons stated in their response to Paragraph 275. |
| 277. ProRata's website states that over 1,000 publications and content creators have partnered with them. Ex. 286 [https://prorata.ai/]. | 277. **Undisputed – Not Supported by Admissible Evidence; Immaterial.** Defendants do not dispute that ProRata's website states: "Join the 1000+ publications and content creators that have partnered with |

| | |
|---|---|
| | us." However, Defendants respond that Paragraph 277 is not supported by admissible evidence, as required by Local Rule 56.1, and therefore is not properly before the Court. Specifically, the evidence cited is hearsay and lacks foundation because it is a non-party publication offered for the truth of its contents, unaccompanied by any authenticating testimony or sponsoring expert to establish its reliability and Plaintiffs identify no exception to the hearsay rule that would apply. It therefore may not be considered in support of summary judgment.<br>Additionally, Defendants also respond that the fact set forth in Paragraph 277 is immaterial for the same reasons stated in their response to Paragraph 275. |
| 278. ScalePost's platform facilitates partnerships between content owners and AI companies by helping content owners monetize their content with AI companies through premium licensing opportunities. Ex. 287 ["AI Visibility," *ScalePost*, https://web.archive.org/web/20251116101520/https://www.scalepost.ai/]; Ex. 288 ["AI Content Licensing: Startups Ensure Compensation When AI Consumes Your Creativity," *OpenTools*, https://opentools.ai/news/ai-content-licensing-startups-ensure-compensation-when-ai-consumes-your-creativity]; Ex. 289 ["ScalePost – About us," *Paraform*, https://www.paraform.com/company/scalepost]. | 278. **Undisputed – Not Supported by Admissible Evidence; Immaterial.** Defendants do not dispute that ScalePost is a startup that exists. However, Defendants respond that the fact set forth in Paragraph 278 is disputed on the grounds that it is not supported by admissible evidence, as required by Local Rule 56.1, and therefore is not properly before the Court. Specifically, the evidence cited is hearsay and lacks foundation because it is a non-party publication offered for the truth of its contents, unaccompanied by any authenticating testimony or sponsoring expert to establish its reliability and Plaintiffs identify no exception to the hearsay rule that would apply. It therefore may not be considered in support of summary judgment. |

| | |
|---|---|
| | Additionally, Defendants also respond that the fact set forth in Paragraph 278 is immaterial for the same reasons stated in their response to Paragraph 275. |
| 279. Human Native AI is a startup building a marketplace to broker deals between companies building large language models and parties who are willing to license data to them, helping AI companies to find data to train their models on while ensuring rights holders opt in and are compensated. Ex. 290 [Rebecca Szkutak, "Deal Dive: Human Native AI is building the marketplace for AI training licensing deals," *TechCrunch*, June 8, 2024, https://techcrunch.com/2024/06/08/deal-dive-human-native-ai-is-building-the-marketplace-for-ai-training-licensing-deals/]; Ex. 291 ["Two former Google employees, James Smith and Ani Attamian, discuss data licensing," *All About Digital Publishing*, https://all-about-digital-publishing.com/en/1/human-native-ai]. | 279. **Undisputed – Not Supported by Admissible Evidence; Immaterial.** Defendants do not dispute that Human Native AI is a startup that exists. However, Defendants respond that the fact set forth in Paragraph 279 is not supported by admissible evidence, as required by Local Rule 56.1, and therefore is not properly before the Court. Specifically, the evidence cited is hearsay and lacks foundation because it is a non-party publication offered for the truth of its contents, unaccompanied by any authenticating testimony or sponsoring expert to establish its reliability and Plaintiffs identify no exception to the hearsay rule that would apply. It therefore may not be considered in support of summary judgment.<br>Additionally, Defendants also respond that the fact set forth in Paragraph 279 is immaterial for the same reasons stated in their response to Paragraph 275. |
| 280. Human Native AI was acquired by Cloudflare in January 2026, which announced in a press release that: "The acquisition will make it easier and faster for AI developers to discover and access the content they need, and in turn help creators and publishers optimize how their data can be surfaced to AI companies willing to pay." Ex. 292 ["Cloudflare Strengthens Content Offering to AI Companies with Acquisition of Human Native," Cloudflare (Jan. 15, 2026), https://www.cloudflare.com/press/press- | 280. **Undisputed – Not Supported by Admissible Evidence; Immaterial.** Defendants do not dispute that Human Native AI was acquired by Cloudflare and that the cited Cloudflare press release contains the text quoted in Paragraph 280. However, Defendants respond that the fact set forth in Paragraph 280 is not supported by admissible evidence, as required by Local Rule 56.1, and therefore is not properly before the Court. Specifically, the evidence cited is hearsay and lacks foundation because it is a non-party publication offered for |

| | |
|---|---|
| releases/2026/cloudflare-strengthens-content-offering-to-ai-companies-with-acquisition-of-human-native/]. | the truth of its contents, unaccompanied by any authenticating testimony or sponsoring expert to establish its reliability and Plaintiffs identify no exception to the hearsay rule that would apply. It therefore may not be considered in support of summary judgment.<br>Additionally, Defendants also respond that the fact set forth in Paragraph 280 is immaterial for the same reasons stated in their response to Paragraph 275. |
| 281. TollBit is a two-sided marketplace for publishers and AI companies that brings together companies with openly accessible websites whose data are vulnerable to scraping (such as publishers, sites with user-generated content, and sites that allow end users to take action like e-commerce sites) and AI companies who scrape data in order to allow the AI companies to pay site owners directly for use of data. Ex. 244 ["Frequently asked questions and answers," *Tollbit, Inc.*, https://tollbit.com/faqs/]. | 281. **Disputed in Part – Not Supported by Cited Evidence; Not Supported by Admissible Evidence; Immaterial.** Defendants do not dispute that TollBit exists and purports to act as a "two-sided marketplace for publishers and AI companies." Defendants dispute the remainder of Paragraph 281 because it is not supported by the cited evidence. Specifically, News Ex. 244 is a printout of a TollBit webpage. The page shows a short introductory statement followed by a list of "Frequently asked questions" whose answers are collapsed, not displayed. The phrase "two-sided marketplace" does not appear anywhere in News Ex. 244 and does not describe any category of website as "vulnerable." It does not support the categories of websites listed in Paragraph 281. Thus, the facts set forth in Paragraph 281 are not supported by the cited material, and the Court should disregard them.<br>Defendants also dispute the fact set forth in Paragraph 281 on the grounds that it is not supported by admissible evidence, as required by Local Rule 56.1, and therefore is not properly before the Court. Specifically, the evidence cited is hearsay and lacks foundation because it is |

| | |
|---|---|
| | a non-party publication offered for the truth of its contents, unaccompanied by any authenticating testimony or sponsoring expert to establish its reliability and Plaintiffs identify no exception to the hearsay rule that would apply. It therefore may not be considered in support of summary judgment.<br>Additionally, Defendants also respond that the fact set forth in Paragraph 281 is immaterial for the same reasons stated in their response to Paragraph 275. |
| 282. Copyright Clearance Center ("CCC") is a copyright licensing intermediary that announced in July 2024 a collective licensing approach for content usage in internal AI systems, based on a subscription model that would offer rights to use copyrighted works internally, such as for training, and publishers involved in the license would be paid in royalties in exchange for use of their works. Ex. 283 [Porter Anderson, "CCC Announces a Collective Licensing Subscription for AI Systems," *Publishing Perspectives*, July 16, 2024, https://publishingperspectives.com/2024/07/ccc-announces-a-collective-licensing-subscription-for-ai-systems/]; Ex. 293 ["CCC (Copyright Clearance Center) Expands Annual Copyright License for Higher Education to Include Internal-Use Reuse Rights," Globe Newswire (May 6, 2026), https://www.globenewswire.com/news-release/2026/05/06/3288897/0/en/ccc-copyright-clearance-center-expands-annual-copyright-license-for-higher-education-to-include-internal-use-ai-reuse-rights.html] (announcing in May 2026 that CCC expanded | 282. **Undisputed – Not Supported by Admissible Evidence; Immaterial.** Defendants do not dispute that Copyright Clearance Center ("CCC") exists and that it announced a self-described "collective licensing subscription for AI systems." However, Paragraph 282 is not supported by admissible evidence, as required by Local Rule 56.1, and therefore is not properly before the Court. Specifically, the evidence cited is hearsay and lacks foundation because it is a non-party publication offered for the truth of its contents, unaccompanied by any authenticating testimony or sponsoring expert to establish its reliability and Plaintiffs identify no exception to the hearsay rule that would apply. It therefore may not be considered in support of summary judgment.<br>Additionally, Defendants also respond that the fact set forth in Paragraph 282 is immaterial for the same reasons stated in their response to Paragraph 275. |

| | |
|---|---|
| its Annual Copyright License for Higher Education to include internal-use AI reuse rights, to address the growing use of AI across higher education in the U.S.). | |
| 283. In June 2024, Dappier announced its launch of a marketplace for publishers to sell content to large language model builders, in which publishers can set a price for using their content in AI model training. Ex. 294 [Ron Miller, "Dappier is building a marketplace for publishers to sell their content to LLM builders," *TechCrunch*, June 26, 2024, https://techcrunch.com/2024/06/26/dappier-is-building-a-marketplace-for-publishers-to-sell-their-content-to-llm-builders/]. | 283. **Undisputed – Not Supported by Admissible Evidence; Immaterial.** Defendants do not dispute that Dappier exists and has self-described its service as a "marketplace." However, Defendants respond that the fact set forth in Paragraph 283 is not supported by admissible evidence, as required by Local Rule 56.1, and therefore is not properly before the Court. Specifically, the evidence cited is hearsay and lacks foundation because it is a non-party publication offered for the truth of its contents, unaccompanied by any authenticating testimony or sponsoring expert to establish its reliability and Plaintiffs identify no exception to the hearsay rule that would apply. It therefore may not be considered in support of summary judgment.<br>Additionally, Defendants also respond that the fact set forth in Paragraph 283 is immaterial for the same reasons stated in their response to Paragraph 275. |
| 284. Defined.ai is a marketplace for AI training data in which companies can purchase high-quality and ethically sourced datasets (including speech & audio, image & video, and text) to train AI models. Ex. 295 ["About us," *Defined.AI*, https://defined.ai/about-us]; Ex. 296 ["Partner with the Leading AI Marketplace," *Defined.ai*, https://defined.ai/partnerships]. | 284. **Undisputed – Not Supported by Admissible Evidence; Immaterial.** Defendants do not dispute that Defined.ai exists and self-describes itself as "the leading marketplace for ethical AI data." However, Defendants respond that the fact set forth in Paragraph 284 is not supported by admissible evidence, as required by Local Rule 56.1, and therefore is not properly before the Court. Specifically, the evidence cited is hearsay and lacks foundation because it is a non-party publication offered for |

| | |
|---|---|
| | the truth of its contents, unaccompanied by any authenticating testimony or sponsoring expert to establish its reliability and Plaintiffs identify no exception to the hearsay rule that would apply. It therefore may not be considered in support of summary judgment.<br>Additionally, Defendants also respond that the fact set forth in Paragraph 284 is immaterial for the same reasons stated in their response to Paragraph 275. |
| 285. Goodrights describes itself as "a boutique agency specialized in brokering partnerships between intellectual property owners and today's leading artificial intelligence companies" and "experts in usage rights, licensing, AI model training, video supply chain, and IP software solutions." Ex. 297 ["Forming partnerships where content meets technology," *Goodrights*, https://www.goodrights.com/about]. | 285. **Undisputed – Not Supported by Admissible Evidence; Immaterial.** Defendants do not dispute that Goodrights exists and that quoted text appears on the Goodrights's website. However, Defendants respond that the fact set forth in Paragraph 285 is not supported by admissible evidence, as required by Local Rule 56.1, and therefore is not properly before the Court. Specifically, the evidence cited is hearsay and lacks foundation because it is a non-party publication offered for the truth of its contents, unaccompanied by any authenticating testimony or sponsoring expert to establish its reliability and Plaintiffs identify no exception to the hearsay rule that would apply. It therefore may not be considered in support of summary judgment.<br>Additionally, Defendants also respond that the fact set forth in Paragraph 285 is immaterial for the same reasons stated in their response to Paragraph 275. |
| 286. Valyu hosts a licensing platform for content owners to contribute to for their data to be distributed through Valyu's platform for AI agents and apps to search and retrieve information from, and every time a content | 286. **Disputed in Part – Not Supported by Cited Evidence; Not Supported by Admissible Evidence; Immaterial.** Defendants do not dispute that Valyu exists. However, Defendants respond that the fact set |

| | |
|---|---|
| owner's content is pulled into an AI or agent as grounding, citation, or context, the content owner gets paid. Ex. 298 ["Valyu," *Pitchbook*, https://pitchbook.com/profiles/company/592911-01]. | forth in Paragraph 286 is disputed on the grounds that it is not supported by cited evidence. Specifically, News Ex. 298 is a screenshot of a Pitchbook profile. It describes Valyu as a "[d]eveloper of a search API platform designed to provide access to structured, attributed content for AI applications" and does not use the term "licensing."<br>Additionally, Defendants dispute this fact on the grounds that it is not supported by admissible evidence, as required by Local Rule 56.1, and therefore is not properly before the Court. Specifically, the evidence cited is hearsay and lacks foundation because it is a non-party publication offered for the truth of its contents, unaccompanied by any authenticating testimony or sponsoring expert to establish its reliability and Plaintiffs identify no exception to the hearsay rule that would apply. It therefore may not be considered in support of summary judgment.<br>Additionally, Defendants also respond that the fact set forth in Paragraph 286 is immaterial for the same reasons stated in their response to Paragraph 275. |
| 287. Cloudflare offers an AI licensing initiative called "Pay Per Crawl" to allow content owners to charge AI crawlers for accessing their content, and the publisher or domain owner has full control over their monetization strategy and can define their own pricing for access. Ex. 284 [Will Allen, *et.al.*, "Introducing pay per crawl: Enabling content owners to charge AI crawlers for access," *Cloudflare, Inc.*, July 1, 2025, https://blog.cloudflare.com/introducing-pay-per-crawl/]. | 287. **Undisputed – Not Supported by Admissible Evidence; Immaterial.** Defendants do not dispute that Cloudflare exists and purports to offer a "Pay Per Crawl" initiative. However, Defendants respond that the fact set forth in Paragraph 287 is not supported by admissible evidence, as required by Local Rule 56.1, and therefore is not properly before the Court. Specifically, the evidence cited is hearsay and lacks foundation because it is a non-party publication offered for the truth of its contents, unaccompanied by any authenticating testimony or |

| | |
|---|---|
| | sponsoring expert to establish its reliability and Plaintiffs identify no exception to the hearsay rule that would apply. It therefore may not be considered in support of summary judgment.<br>Additionally, Defendants also respond that the fact set forth in Paragraph 287 is immaterial for the same reasons stated in their response to Paragraph 275. |
| 288. Credtent maintains an Independent Creative Registry that "orchestrates connections" between creators and AI industries and it allows creators to earn money licensing their creative work or to opt-out from all AI tools across the industry for a low price or for free. Ex. 299 [DNP-00535857] at -857; Ex. 300 [DNP-00535858] at -875. | 288. **Undisputed – Not Supported by Admissible Evidence; Immaterial.** Defendants do not dispute that Credtent exists and purports to maintain an "Independent Creative Registry." However, Defendants respond that the fact set forth in Paragraph 288 is not supported by admissible evidence, as required by Local Rule 56.1, and therefore is not properly before the Court. Specifically, the evidence cited is hearsay and lacks foundation because it is a non-party publication offered for the truth of its contents, unaccompanied by any authenticating testimony or sponsoring expert to establish its reliability, and therefore may not be considered in support of summary judgment.<br>Additionally, Defendants also respond that the fact set forth in Paragraph 288 is immaterial for the same reasons stated in their response to Paragraph 275. |
| 289. Calliope Networks aggregates audiovisual content, including movies, TV series, news, etc., for licensing by generative AI companies for model training, and it highlights its "License to Scrape" model, a voluntary collective license, that enables creators on YouTube and other platforms to have control over content. Ex. 301 | 289. **Undisputed – Not Supported by Admissible Evidence; Immaterial.** Defendants do not dispute that Calliope Networks exists and is pioneering a model called "License to Scrape." However, Defendants respond that the fact set forth in Paragraph 289 is not supported by admissible evidence, as required by Local |

| | |
|---|---|
| [“Calliope Networks,” *Calliope Networks*, https://calliopenetworks.ai/]. | Rule 56.1, and therefore is not properly before the Court. Specifically, the evidence cited is hearsay and lacks foundation because it is a non-party publication offered for the truth of its contents, unaccompanied by any authenticating testimony or sponsoring expert to establish its reliability and Plaintiffs identify no exception to the hearsay rule that would apply. It therefore may not be considered in support of summary judgment.<br>Additionally, Defendants also respond that the fact set forth in Paragraph 289 is immaterial for the same reasons stated in their response to Paragraph 275. |
| 290. Personal Digital Spaces is a software development platform that enables application developers to easily include blockchain-powered functionality to allow data to be titled with user ownership and licensed for sharing, viewing, or other uses. Ex. 302 [“Turn Your Data Into Assets (Responsibly),” *Personal Digital Spaces*, https://www.personaldigitalspaces.com/]. | 290. **Undisputed – Not Supported by Admissible Evidence; Immaterial.** Defendants do not dispute that Personal Digital Spaces exists. However, Defendants respond that the fact set forth in Paragraph 290 is not supported by admissible evidence, as required by Local Rule 56.1, and therefore is not properly before the Court. Specifically, the evidence cited is hearsay and lacks foundation because it is a non-party publication offered for the truth of its contents, unaccompanied by any authenticating testimony or sponsoring expert to establish its reliability and Plaintiffs identify no exception to the hearsay rule that would apply. It therefore may not be considered in support of summary judgment.<br>Additionally, Defendants also respond that the fact set forth in Paragraph 290 is immaterial for the same reasons stated in their response to Paragraph 275. |

| | |
|---|---|
| 291. The Dataset Providers Alliance (DPA) is a group of AI data licensing providers and intellectual property owners (including those who specialize in music, voice, text, video, and images) which "advocates for the interests of rights holders and works to create a sustainable and equitable ecosystem for the licensing of intellectual property content in the AI and ML industries." Ex. 303 ["About DPA Dataset Providers Alliance," *DPA*, https://www.thedpa.ai/]. | 291. **Undisputed – Not Supported by Admissible Evidence; Immaterial.** Defendants do not dispute that Data Providers Alliance (DPA) exists. However, Defendants respond that the fact set forth in Paragraph 291 is not supported by admissible evidence, as required by Local Rule 56.1, and therefore is not properly before the Court. Specifically, the evidence cited is hearsay and lacks foundation because it is a non-party publication offered for the truth of its contents, unaccompanied by any authenticating testimony or sponsoring expert to establish its reliability and Plaintiffs identify no exception to the hearsay rule that would apply. It therefore may not be considered in support of summary judgment.<br>Additionally, Defendants also respond that the fact set forth in Paragraph 291 is immaterial for the same reasons stated in their response to Paragraph 275. |
| 292. The Really Simple Licensing ("RSL") is an "open standard that lets publishers define machine-readable licensing terms for their content, including attribution, pay per crawl, and pay per inference compensation," aiming to automate the process to eliminate manual negotiations and integrations, enter into collective licensing terms with other content owners, and allow for standardization and secure encrypted transfer of licensable digital assets. Ex. 304 ["RSL Really Simple Licensing," *RSL*, https://rslstandard.org/]. | 292. **Undisputed – Not Supported by Admissible Evidence; Immaterial.** Defendants do not dispute that Really Simple Licensing ("RSL") exists. However, Defendants respond that the fact set forth in Paragraph 292 is not supported by admissible evidence, as required by Local Rule 56.1, and therefore is not properly before the Court. Specifically, the evidence cited is hearsay and lacks foundation because it is a non-party publication offered for the truth of its contents, unaccompanied by any authenticating testimony or sponsoring expert to establish its reliability and Plaintiffs |

| | |
|---|---|
| | identify no exception to the hearsay rule that would apply. It therefore may not be considered in support of summary judgment.<br>Additionally, Defendants also respond that the fact set forth in Paragraph 292 is immaterial for the same reasons stated in their response to Paragraph 275. |
| 293. In July 2024, Perplexity announced a Publishers Program through which media partners will be compensated through a revenue share program. Ex. 306 [Guaglione, Sara, "How Perplexity calculates publishers' share of ad revenue," Digiday, December 17, 2024, https://digiday.com/media/how-perplexity-calculates-publishers-share-of-ad-revenue/]; Ex. 307 [Bruell, Alexandra, "New York Times to Bezos-Backed AI Startup: Stop Using Our Stuff ," *The Wall Street Journal*, October 15, 2024, https://www.wsj.com/business/media/new-york-times-to-bezos-backed-ai-startup-stop-using-our-stuff-20faf2eb]. | 293. **Undisputed – Not Supported by Admissible Evidence; Immaterial.** Defendants do not dispute that Perplexity exists and announced a "Publishers Program" in July 2024. However, Defendants respond that the fact set forth in Paragraph 293 is not supported by admissible evidence, as required by Local Rule 56.1, and therefore is not properly before the Court. Specifically, the evidence cited is hearsay and lacks foundation because it is a non-party publication offered for the truth of its contents, unaccompanied by any authenticating testimony or sponsoring expert to establish its reliability and Plaintiffs identify no exception to the hearsay rule that would apply. It therefore may not be considered in support of summary judgment.<br>Additionally, Defendants also respond that the fact set forth in Paragraph 293 is immaterial for the same reasons stated in their response to Paragraph 275. |
| 294. In February 2026, Microsoft announced the "Microsoft Publisher Content Marketplace" which "creates a transparent value exchange between publishers and AI builders—supporting licensed access to premium content while preserving publisher control, independence, and | 294. **Undisputed – Immaterial.** Microsoft does not dispute that in February 2026, Microsoft announced the "Microsoft Publisher Content Marketplace" and that the website captured at Brook Decl. Ex. 308 contains the text quoted in Paragraph 294. |

| | |
|---|---|
| sustainable revenue." Ex. 308 [Tim Frank, "Building Toward a Sustainable Content Economy for the Agentic Web," https://about.ads.microsoft.com/en/blog/post/february-2026/building-toward-a-sustainable-content-economy-for-the-agentic-web]. | Additionally, Microsoft also responds that the fact set forth in Paragraph 294 is immaterial for the same reasons as set forth in their response to Paragraph 275.<br><br>OpenAI defers to Microsoft's response. |

**E. News Plaintiffs' Ownership of Asserted Works**

**1. The New York Times**

| | |
|---|---|
| 295. The Times has published over ten million copyrighted written works from the relevant time period of 1928-2024. Dkt. 1, *The New York Times Company v. Microsoft Corp. et al.*, No., 1:34-cv-11195-SHS-OTW (S.D.N.Y.) (The Times's Complaint Exhibits A-I, K (the original list of Asserted Works)); Ex. 309 [Procas 30(b)(6) Depo. Tr.] at 216:20-217:2 (original list of works was ten million). | 295. **Disputed in Part – Not Supported by Cited Evidence.** Defendants respond as follows: The fact set forth in Paragraph 295 is disputed because it is not supported by the cited evidence. Specifically, the cited evidence does not establish that The Times published over ten million copyrighted works between 1928 and 2024. The cited deposition testimony states only that, [redacted] *News* Ex. 309 (S. Procas 30(b)(6) (Mar. 19, 2026) Tr.) at 216:20–217:2. It does not establish that all such works were published during the identified period, that each constitutes a distinct copyrighted written work, or that The Times owns a valid copyright in each work. Nor have Plaintiffs identified a total number of works listed in the Complaint sufficient to substantiate the total asserted in this paragraph. |
| 296. The Times moves for summary judgment on 964,888 works (the "Times Asserted Works") identified, | 296. **Disputed in Part – Not Supported by Admissible Evidence.** Defendants respond as follows: |

| | |
|---|---|
| along with relevant ownership data, in Rule 1006 summaries attached as Ex. A to the declaration of Jennifer Maisel filed herewith. Times Rule 1006 Summaries. | Disputed that the "Rule 1006 summaries" referenced in the statement are properly presented as Rule 1006 summaries. Also disputed to the extent that Paragraph 296 implies that the information in the Rule 1006 summaries is sufficient to establish ownership of the Times Asserted Works. To the extent that the Rule 1006 summaries purport to state any claims of ownership of the articles listed therein, they are improperly argumentative and therefore inadmissible under Fed. R. Evid. 1006 and 403. |
| 297. Each Times Asserted Work has a corresponding copyright registration with a copyright registration number. Ex. 309 [Procas 30(b)(6) Depo. Tr.] at 32:13-19 ("The Times has copyright registrations for all the works it's asserting in this case."); Times Rule 1006 Summaries at Column entitled "Copyright Registration Number" (listing registration number for each Times Asserted Work). | 297. **Disputed in Part – Not Supported by Cited Evidence.** Defendants respond as follows: Disputed to the extent that not all of the Times Asserted Works have a corresponding copyright registration with a copyright registration number. Disputed because this fact is not supported by the cited evidence. Specifically, The Times did not provide a registration number for three articles. *See* ECF 1775 (J. Maisel Decl. Ex. A) (Rule 1006 Summary). Defendants also dispute that The Times has demonstrated that The Times Asserted Works (articles) were registered by the listed copyright registrations, because the registrations are for newspaper issues (collective works), not individual articles. |
| 298. The Times has produced copyright registration certificates for Times Asserted Works from April 1928-2024, the validity of which have not been challenged. *See* Ex. 312 [NYT_00000001 – NYT_00020143; NYT_00146890 – NYT_00147431; | 298. **Disputed – Not Supported by Cited Evidence.** Defendants respond as follows: Disputed because the Times has not met its burden of demonstrating that it has applied for a copyright registration and received a decision from the Copyright Office on its applications for all the Times Asserted Works. Some of the Times's |

| | |
|---|---|
| NYT_00186429 – NYT_00191175; NYT_00218808 – NYT_00264891; NYT_00420950 – NYT_00420951]. | registration certificates do not contain a registration number. *See, e.g.*, A. Blanco Opp. Decl. Ex. 132 at NYT_00223842. Other registration certificates are illegible or difficult to decipher. *See, e.g.*, A. Blanco Opp. Decl. Ex. 138 at NYT_00003517. The copyright registrations are also for newspaper issues (collective works), not individual articles.<br>Disputed that the validity of the Times copyright registration certificates has not been challenged. OpenAI provided an expert declaration from Dr. Jonathan Borck explaining various issues with Plaintiffs' production of copyright registration certificates. *See* J. Borck Opp. Decl. ¶ 13; Fed. R. Evid. 106.<br>Disputed to the extent the fact implies that ownership of the articles contained within each newspaper issue has been established. *See* Hurst Decl. Ex. 45 (R. Grossman-Cohen 30(b)(1) (Feb. 12, 2026)) at 23:2-19 ([redacted]; *see also* A. Blanco Opp. Decl. Ex. 239 (G. Miller 30(b)(1) Tr. (Feb. 10, 2026)) at 49:3-22 ([redacted].<br>The facts set forth in Paragraph 298 are therefore not supported by the cited evidence. |

| | |
|---|---|
| 299. The Times owns collective work registrations for its print newspapers and, for certain years, its website. Ex. 309 [Procas 30(b)(6) Depo. Tr.] at 38:21-39:10. | 299. **Undisputed.** |
| 300. Currently the website, nytimes.com, is registered on an ongoing basis as a dynamic news site. Ex. 309 [Procas 30(b)(6) Depo. Tr.] at 38:21-39:10. | 300. **Undisputed.** |
| 301. The Times registers one version of its print publication per day—the late edition. Ex. 309 [Procas 30(b)(6) Depo. Tr.] at 43:1-5. | 301. **Undisputed.** |
| 302. The late edition might include additional content that was not included in the early edition. Ex. 309 [Procas 30(b)(6) Depo. Tr.] at 51:7-12. | 302. **Undisputed.** |
| 303. Prior to 2015, The Times's print and online articles were the same. Ex. 309 [Procas 30(b)(6) Depo. Tr.] at 49:12-50:19. | 303. **Undisputed.** |
| 304. After 2015, the Times print and online articles are substantially similar, but they may (or may not) have small changes. Ex. 309 [Procas 30(b)(6) Depo. Tr.] at 49:12-50:19. | 304. **Undisputed.** |
| 305. In addition to identifying copyright registration numbers for each Times Asserted Work, The Times did additional diligence to bolster ownership of each Times Asserted Work. The Times Rule 1006 Summaries reflect that additional diligence and categorize the Times Asserted Works as set forth in the columns listed below: | 305. **Disputed in Part – Incorrect Evidence.** Defendants respond as follows: The cited support accurately describes the data, with the exception of the following: For 344 articles, the "Source" field lists URLs with no additional source document. J. Borck Opp. Decl. ¶ 15. There are 20,506 articles for which the Rule 1006 summaries seem to indicate they are not included in the |

| Column Title | Explanation |
|---|---|
| Digital Date | For works 1996-2024, this is the date the article was published online. For works published prior to January 1996, this is the date the original article was published in print. |
| Print Date | Date the article was published in print. |
| URL | URL to article |
| Headline | Headline of article |
| Byline | Byline (if any) of article |
| Registration Effective Date (or Secondary) | Date copyright registration effective, (or date later copyright registration effective, if any) |
| Registration Number (or Secondary or Tertiary Registration Number) | Copyright registration number (or later copyright registration numbers, if any) |
| Rights Category | Category of additional ownership evidence:<br>1. Staff: Article has an individual author byline that matches produced staff list(s) (identified in "Source" column). *See* 56.1 ¶ 306-309.<br>2. NYT Institutional Byline: Article has an "institutional byline" that indicates Times ownership. *See* 56.1 ¶¶ 313-314.<br>3. Article Type: Article has an empty byline *and* is of a type identified as historically staff-written. *See* 56.1 ¶ 315.<br>4. Pre-1978 Freelancer: Article has an author byline, was published before 1978 (the effective date of the 1976 Copyright Act), and was commissioned by/ at the instance and expense of The Times. *See* 56.1 ¶ 312.<br>5. Post-1978 Freelancer: Article has an author byline, was published after the 1976 Copyright Act took effect, and was written pursuant to a contract with a work-for-hire provision/assignment to The Times, as shown by a produced freelance list and/or contract (identified in "Source" column). *See* 56.1 ¶¶ 310-311. |
| Work-for-Hire | "Yes" denotes that the article was a "work-for-hire" article, and is therefore owned by The Times, because it is either:<br>1. Pre-1978 freelance commissioned by and written at instance and expense of The Times;<br>2. Post-1978 freelance written pursuant to a work-for-hire (WFH) provision; or<br>3. Written by staff of NYT.<br>All Asserted Works fall into one of these categories, so all Asserted Works are marked "Yes." |
| Employee | "Yes" denotes that the article was written by a Times staff member and is therefore owned by The Times. |
| Commission | "Yes" denotes that The Times commissioned the article under a "work-for-hire" arrangement, either because it was written (a) at the instance and expense of The Times (pre-1978) or (b) pursuant to a freelancer contract with a work-for-hire provision (post-1978). |

training data for any GPT models. For these articles, while the field "Number of Training Data Records Matched to Work" contains a positive figure ranging from 1 to 390, all the fields titled "Asserted Work Included in [GPT Model] Training Data" report "No", where [GPT Model] is one of GPT-2, GPT-3, GPT-3.5, GPT-3.5-turbo, GPT-4, GPT-4-turbo, GPT-4o, or GPT-4o-mini. Further, for a portion of the 20,506 articles, while all of the "Asserted Work Included in [GPT Model] Training Data" fields are "No", some of their "Best Coverage for [GPT Model] in Training Data" fields report a valid coverage score. It's unclear what the score represents if the article is not found in the training data. Similarly, there are 286 articles for which the summaries seem to indicate they are not included in the Giraffe, Webtext2, Project Mango or Common Crawl datasets. For these articles, the 4 columns named "Asserted Work Included in [Dataset]" all report "No", where [Dataset] is one of Giraffe, Webtext2, Project Mango or Common Crawl Derived Dataset. Further, there are non-zero values in columns named "Best Coverage in/for [Dataset]," where [Dataset] refers to Giraffe, WebText2, Project Mango, or the Common Crawl Derived Dataset, even when the corresponding "Asserted Work Included in [Dataset]" column contains "No." This indicates that there is a coverage score despite the fact that they do not appear in any of these datasets.

Furthermore, disputed to the extent the statement implies that the copyright registrations identified in The Times's SJ Rule 1006 Summaries are owned by the

| | |
|---|---|
| Assignment | "Yes" denotes that the article was written pursuant to a contract with an express assignment clause to The Times. |
| Source | Source of additional evidence of ownership beyond copyright registration:<br><br>1. Staff List = matched to name in a produced staff list identified in the Source column. *See* 56.1 ¶¶ 306-309.<br>2. Freelance List = matched to a standard freelance work-for-hire contract template based on a list exported from PACT and/or matched to a specific freelance work-for-hire contract (bates # identified). *See* 56.1 ¶¶ 310-311.<br>3. Witness = additional ownership evidence provided by a witness and/or other produced documents (e.g., institutional byline, article type, or pre-1978 freelance contract). *See* 56.1 ¶¶ 312-315. |
| Number of Training Data Records Matched to Work | Identifies the number of OpenAI training data records that met Dr. Goldstein's matching criteria (coverage score and shared 16-gram) for the given Asserted Work. |
| Best Coverage Score | Of the training data records that met Dr. Goldstein's matching criteria, identifies the best (highest) coverage score between the Asserted Work and the training data record. |
| Link to Comparison Between Asserted Work Text and Best-Matched Training Data Record | For the training data record having the best (highest) coverage score, links to a side-by-side PDF comparing the Asserted Work and the training data record. Spans of 4 or more consecutive words that are common between the Asserted Work and the training data record are shown in red. |
| Link to Asserted Work Text | Links to the text of the Asserted Work. |
| Link to Best-Matched Training Data Record | Links to the text of the training data record having the best (highest) coverage score. |
| Asserted Work Included in [model] Training Data | Identifies whether the Asserted Work is included in a training data set used to train [model], for [model] = GPT-2, GPT-3, GPT-3.5, GPT-3.5-turbo, GPT-4, GPT-4-turbo, GPT-4o, and GPT-4o-mini. |
| Best Coverage for [model] in Training Data | Identifies the best (highest) coverage score for the Asserted Work among the training data sets used to train [model], for [model] = GPT-2, GPT-3, GPT-3.5, GPT-3.5-turbo, GPT-4, GPT-4-turbo, GPT-4o, and GPT-4o-mini. |
| Asserted Work Included in [dataset] | Identifies whether the Asserted Work is included in [dataset], for [dataset] = Giraffe, WebText2, Project Mango, and Common Crawl Derived Dataset. |
| Best Coverage for [dataset] | Identifies the best (highest) coverage score for the Asserted Work in [dataset], for [dataset] = Giraffe, WebText2, Project Mango, and Common Crawl Derived Dataset. |

Maisel Declaration ¶ 6.

Times. Disputed to the extent the statement implies that the copyright registration issues flagged by OpenAI expert Dr. Borck have been resolved. For example, The Times still relies on registration certificates without a registration number. *See* J. Borck Opp. Decl. ¶¶ 13-14.

Defendants also dispute that each "category of additional ownership evidence" is sufficient for The Times to meet its burden that it owns the copyright in each work. For examples, the works where "Witness" is listed in the "Source" rely solely on the testimony of one individual (Simone Procas) to establish The Times's ownership of works published in the 1900s, before she was born and before she was employed at The Times. *See* A. Blanco Opp. Decl. Ex. 259 (S. Procas 30(b)(6) Tr. (Mar. 19, 2026)) at 30:17-31:25; 58:22-59:21; 104:17-105:24; 110:5-111:1; 114:24-115:13; 127:14-128:18. Thus, she has no sufficient knowledge or basis to claim that The Times owns these works. Defendants also dispute that The Times has demonstrated that The Times Asserted Works (articles) were registered by the listed copyright registrations, because the registrations are for newspaper issues (collective works), not individual articles.

Furthermore, OpenAI expert Dr. Borck has identified at least 801 articles in the Times Rule 1006 summaries that for which the byline contains a third-party news organization. See J. Borck Opp. Decl. ¶ 22. Dr. Borck also identified at least 90,078 articles with empty bylines or no identifiable writer name. *Id.* at ¶ 23. 80,072 of the articles with empty bylines have only "Witness" in the Source

| | |
|---|---|
| | column of The Times's Rule 1006 summaries. *Id.* at ¶ 24. Additionally, Dr. Borck identified at least 28 Times articles that contain identical article text, corresponding to 12 unique articles, *id.* at ¶ 31, and at least 24,920 articles in The Times Rule 1006 summaries with headlines that fall into categories that likely consist of recurring or standardized factual content. *Id.* at ¶ 32. In total, Dr. Borck identified at least 274,462 articles in The Times's Rule 1006 summaries that contain at least one of the issues described in his declaration. *Id.* at ¶ 33.<br>Defendants also dispute this fact on the grounds that the cited evidence is incorrect; the chart in Paragraph 305 appears in Maisel Declaration ¶ 5, not ¶ 6. |
| 306. 679,240 Times Asserted Works fall in the "Staff" rights category. These works have author bylines that have been matched to a Times record of staff members, produced from a Times database—either the PACT database or the Workday database—showing that the article was authored by a member of The Times's staff. *See* Times SJ Rule 1006 summaries. The staff lists are maintained in the ordinary course of business by The Times, and they were collected by Times employees and produced in this case. Ex. 309 [Procas 30(b)(6) Depo. Tr.] at 27:22-28:4, 130:1-132:25; Ex. 313 [Procas Depo. Ex. 3] at 6; Ex. 314 [NYT_01073941] (Workday Staff List); Ex. 315 [NYT_01018154] (PACT Staff List). | 306. **Disputed in Part – Not Supported by Cited Evidence.** Defendants respond as follows: Undisputed that The Times catalogued 679,240 Times Asserted Works into the self-labeled "Staff" rights category. However, disputed to the extent that not all of these works have author bylines that have been matched to a Times record showing that the article was authored by a member of The Times's staff. Dr. Borck identified 141,007 articles with bylines containing names that could not be matched to the employment records The Times cites in its Rule 1006 summaries. J. Borck Opp. Decl. ¶ 27. Further, 1,416 of these 679,240 articles previously had an entry of "NYT Institutional Byline" in the "Rights" column in the prior (July 2026) version of the Rule 1006 Summaries, showing that there are discrepancies in the evidence The |

| | |
|---|---|
| | Times is relying on to prove ownership of each work. Fnrther dispnted to the extent Plaintiffs suggest that the Times staff records are reliable evidence for purposes of determining whether article writers were Times staff members (and when). *See* A. Blanco Opp. Decl. Ex. 259 (S. Procas 30(b)(6) (Mar. 19, 2026) Tr.) 28:18-29:7 [redacted] *id*. at 58:2-11 [redacted] |
| 307. The Staff list produced at NYT_01073941 is a list of Times employees and dates of employment exported from the Times's current HR database Workday. Ex. 314 [NYT_01073941] (Workday Staff List); Declaration of | 307. **Undisputed.** |

| | |
|---|---|
| Louise McKenna ("McKenna Decl.") Decl. ¶¶ 4-8. The information reflected in NYT_01073941 is maintained by The Times in the ordinary course of business and stored in the Workday database. *Id*. The information was extracted in the format in which Workday maintains and exports that data. *Id*. | |
| 308. The Staff list produced at NYT_01018154 is a list of Times employee names and dates of employment from The Times's PACT contract database, which is maintained by The Times corporate records department. Ex. 315 [NYT_01018154] (PACT Staff List); Declaration of Jeffrey Sisson ("Sisson Decl.") Decl. ¶¶ 4-5; Louise McKenna Decl. ¶ 9. That information is maintained by The Times in the ordinary course of business and stored in the PACT database and was extracted in the standard format for the PACT database. Jeffrey Sisson Decl. ¶ 5. | 308. **Undisputed.** |
| 309. The Staff list that matches the byline in the Times Asserted Works is listed in the "Source" column. *See* Times SJ Rule 1006 summaries. | 309. **Disputed - Not Supported by Cited Evidence.** Defendants respond as follows: Disputed that "the Staff list that matches the byline in the Times Asserted Works is listed in the 'Source' column." The "Source" column lists PACT Staff List: NYT_01018154 (News Ex. 315) and Workday Staff List: NYT_01073941 (News Ex. 314). There are writers of asserted articles who are not listed in either of these files. For example, Stephanie Strom appears in the bylines of 1,217 articles as the sole author in the latest Rule 1006 summaries, as well as 46 additional articles as co-author, but is not listed in either file. Gustav Niebuhr appears in the bylines of 461 articles as the sole |

| | |
|---|---|
| | author in the latest summaries, and 8 additional articles as co-author, but is not listed in either file. Dr. Borck identified 141,007 articles with bylines containing names that could not be matched to the employment records The Times cites in its Rule 1006 summaries. J. Borck Opp. Decl. ¶ 27. Additionally, 219 articles with "Freelancer List: NYT_01017917" (News Ex. 318) in the "Source" column only have "By the New York Times" as the byline, making it impossible to verify who wrote the article or their freelancer status. |
| 310. 168,366 Times Asserted Works fall in the "Post-1978 Freelance" rights category. *See* Ex. 313 [Procas Depo. Ex. 3] at 3-4; *see* Times SJ Rule 1006 summaries at Rights Category column. These works have author bylines that have been matched to a standard freelance contract agreement with The Times stating that the article was work-for-hire and, thus, assigning The Times right, title, interest, and copyright in and to the article. Ex. 316 [NYT_01037251] (News Template); Ex. 317 [NYT_01037185] (Magazine Templates). The Times rolled out freelance contracts broadly in the 1990s, with a focus "on ensuring that The Times received ownership in their works that is published." Ex. 309 [Procas 30(b)(6) Depo. Tr.] at 145:4-10. | 310. **Disputed in Part - Not Supported by Cited Evidence.** Defendants respond as follows: Undisputed that The Times catalogued 168,366 Times Asserted Articles into the self-labeled "Post-1978 Freelance" rights category. Disputed to the extent that not all of the works were written by freelancers after 1978 who also assigned the copyright in the work to The Times.<br>Dr. Borck identified 2,347 articles in the "Post-1978 Freelance" rights category that are matched to a freelance agreement that has not been executed. J. Borck Opp. Decl. ¶ 28. Of those 2,347 articles, 2,054 cite to agreements that do not contain "work-for-hire" language and 293 cite to documents in which either the signature is redacted or the signature is different from the writer name in the "Byline" field. *Id.* Dr. Borck also found that there are 219 articles in The Times's SJ Rule 1006 summaries that have "Freelancer List" as the "Source" but are bylined "By The New York Times." *Id.* at ¶ 29. Of the 168,374 articles in The Times's |

| | |
|---|---|
| | SJ Rule 1006 summaries in the "Freelancer List" category, 136,090 rely solely on the "Freelancer List" as evidence of ownership, with no individual agreements cited in the "Source" field. *Id.*<br>17 of these articles previously listed "NYT Institutional Byline" in the "Rights" column in the July and April 2026 versions of the Times's Rule 1006 Summaries. Additionally, at least one of these articles previously listed "Staff" (as opposed to "Post-1978 Freelance") in the "Rights" column in the July and April versions of the Rule 1006 summaries. Additionally, 270 of these 168,366 articles have print dates between 11/03/1959 - 12/14/1977, and therefore were not published "Post-1978." |
| 311. The Times maintains its freelance contract records in the ordinary course of business in the PACT database. Ex. 309 [Procas 30(b)(6) Depo. Tr.] at 103:3-8. NYT_01017917 is an export from the PACT database that lists freelancer names, dates, and the type of freelance contract they had. Ex. 318 [NYT_01017917]; Ex. 309 [Procas 30(b)(6) Depo. Tr.] at 139:1-25; Jeffrey Sisson Decl. ¶¶ 6-11. Some "Post-1978 Freelance" works are matched to specific freelance contracts that were collected from the PACT database. Ex. 319 [Compilation of Freelance Contracts in Bates Range NYT_00167195-NYT_00678326] (Freelance Contracts). | 311. **Disputed in Part.** Defendants respond as follows: Defendants do not dispute that "The Times maintains its freelance contract records in the ordinary course of business in the PACT database" but do dispute that all freelance contracts properly assigned or otherwise transferred the copyright in the work from the freelancer to The Times. *See, e.g.*, A. Blanco Opp. Decl. Ex. 259 (S. Procas 30(b)(6) Tr. (Mar. 19, 2026)) at 147:20-149:23. |
| 312. 11,617 Times Asserted Works fall in the "Pre-1978 Freelance" category. *See* Ex. 313 [Procas Depo. Ex. 3] | 312. **Disputed – Improper Legal Argument; Not Supported by Cited Evidence.** |

| | |
|---|---|
| at 4; Times Rule 1006 Summaries at Right Category column. These works have author bylines and were written prior to 1978, when the 1976 Copyright Act took effect. Ex. 309 [Procas 30(b)(6) Depo. Tr.] at 31:12-19, 68:11-71:18. The "Source" for this category of works is "Witness" and, specifically, the testimony of 30(b)(6) witness Simone Procas that "prior to the 1976 Copyright Act coming into effect which was January 1, 1978….[w]hen The New York Times commissioned works from freelancers at its instance and expense and registered those works under the name of The New York Times Company under our copyright notice, there is case law that makes clear that those works are owned by the publisher in the absence of a contract expressly reserving copyright to the creator or the freelance writer in this case, and in the absence of a copyright notice, in the name of the freelance author." Ex. 309 [Procas 30(b)(6) Depo. Tr.] at 71:1-16; Ex. 313 [Procas Depo. Ex. 3] at 4; Times Rule 1006 Summaries. This category includes articles with an author byline that could not be matched to a staff record, including because The Times's staff records from prior to the 1950s are incomplete. Ex. 309 [Procas 30(b)(6) Depo. Tr.] at 28:23-29:7. Thus, certain Times Asserted Works in the pre-1978 Freelance category were likely written by staff. Regardless, The Times owns the Pre-1978 Freelance Articles under applicable law that articles commissioned by The Times and registered to The Times are owned by the Times. | Defendants respond as follows: Undisputed that The Times catalogued 11,617 Times Asserted Articles into the self-labeled "Pre-1978 Freelance" rights category. Disputed that The Times has demonstrated that it owns the copyright in these works and that they were created at the "instance and expense" of The Times. For example, the works where "Witness" is listed as the "Source" rely solely on the testimony of one individual (Simone Procas) to establish The Times's ownership of works published in the 1900s, before she was born and before she was employed at The Times. *See* A. Blanco Opp. Decl. Ex. 259 (S. Procas 30(b)(6) Tr. (Mar. 19, 2026)) at 30:17-31:25; 58:22-59:21; 104:17-105:24; 110:5-111:1; 114:24-115:13; 127:14-128:18. Thus, she has no sufficient knowledge or basis to claim that The Times owns these works, and The Times has produced no other evidence documenting that these articles are owned by The Times. Thus, this fact is not supported by the cited evidence. Additionally, Defendants further dispute this fact because it constitutes improper legal argument. Specifically, whether certain works were created at the "instance and expense" of The Times is a legal issue to be determined by the Court.<br>Dr. Borck also found that there are 219 articles in The Times's SJ Rule 1006 summaries that have "Freelancer List" as the source but are bylined "By The New York Times." J. Borck Opp. Decl. ¶ 29. Of the 168,374 articles in The Times's SJ Rule 1006 summaries in the "Freelancer List" category, 136,090 rely solely on the "Freelancer List" |

| | |
|---|---|
| | as evidence of ownership, with no individual agreements cited in the "Source" field. *Id.* |
| 313. 37,808 Times Asserted Works fall in the Rights Category "Institutional Bylines." *See* Ex. 313 [Procas Depo. Ex. 3] at 4-5; Times Rule 1006 Summaries at Rights Category column. These articles have an "institutional byline" sometimes with an author byline. The Times Style Book states: "The Times's credit style assumes that bylined articles are The Times's own, unless otherwise attributed in a credit line. Thus, bylined articles written by staff, stringers or contributors for The Times require no credit line." Ex. 320 [NYT_01017942] (excerpt from 2015 Times Style Book). Consistent with the Times Style Book's statement, articles bearing Times institutional bylines (rather than staff bylines) are historically written by a member of The Times staff. Ex. 309 [Procas 30(b)(6) Depo. Tr.] at 23:22-24:3. | 313. **Disputed in Part.** Defendants respond as follows: Undisputed that The Times catalogued 37,808 Times Asserted Works into the self-labeled "Institutional Bylines" rights category. Disputed as to the implication that all articles with "Institutional Bylines" are written by Times staff and that The Times owns the copyright in these articles. Disputed to the extent that not all of these works have "Institutional Bylines." 32 of these 37,808 articles previously listed "Pre-1978 Freelancer" in the "Rights" column in the July 2026 version of the Times's Rule 1006 Summaries. 31 of these 37,808 articles previously listed "Pre-1978 Freelancer" in the "Rights" column in the Times's April Rule 1006 summaries. |
| 314. Institutional bylines written by Times staff include: Special to The New York Times; Special Cable to The New York Times; Wireless to The New York Times; By Telephone to The New York Times; Navy Wireless to The New York Times; By Tropical Radio to The New York Times; By Mackay Radio to The New York Times; Special Correspondence The New York Times; From a Staff Correspondent; By Telegraph to the Editor of The New York Times; By Cable to the Editor of The New York Times; By Air Mail to The New York Times; By Marconi Transatlantic Wireless Telegraph to The New York Times; Editorial | 314. **Disputed.** Defendants respond as follows:<br>Disputed as to the implication that all articles with these institutional bylines are "written by Times staff" and that The Times owns the copyright in these articles. As identified by OpenAI's expert, Dr. Borck, some articles with these "institutional bylines" appear to have been written by non-staff members. For example, 160 articles have the byline "By John D. Battersby, Special to The New York Times" or "By John D, Battersby, Special to The New York Times." John Battersby does not appear in The Times's cited staff lists. Of the 964,888 Times Identified Articles, |

| | |
|---|---|
| Correspondence of the New York Times; By The New York Times; By The New York Times Staff; By {Name} NYT; By The New York Times Company; Copyright {Name} by The New York Times Company; Special Cablegram; By The International Herald Tribune; By The Metro Desk; By The Learning Network; By The Caucus Blog; By The New York Times Magazine. *See* Ex. 309 [Procas 30(b)(6) Depo. Tr.] at 84:19-85:15; Ex. 313 [Procas Depo. Ex. 3] at 4; Ex. 544 [NYT_01017922] (1937 Times Style Book listing Times credit lines); Ex. 545 [NYT_01012432] at 435 (1956 Times Style Book listing Times credit lines); Ex. 546 [NYT_01017936] (1962 Times Style Book stating, "Datelined stories by New York Times reporters that appear in the daily paper carry the following centered agate credit line above the dateline: Special to The New York Times," and noting credits lines for "news agency dispatches" as "By The Associated Press, By Reuters, By United Press International, Dispatch of The Times, London"). | at least 762 articles have institutional bylines attributed to writers whose names Dr. Borck could not identify in the document cited in the "Source" column of The Times's Rule 1006 summaries. *See* J. Borck Opp. Decl. ¶ 25. |
| 315. 67,857 Times Asserted Works fall into the Rights Category "Article Type." Ex. 313 [Procas Depo. Ex. 3] at 4; Times Rule 1006 Summaries, at Rights Category column. These articles are non-bylined. "Copy without a byline, if written locally, is also assumed to be The Times's own and requires no credit." Ex. 320 [NYT_01017942] (excerpt from 2015 Times Style Book). Examples of non-bylined article types reflected in the Asserted Works include: Business News; Corrections; Editorial Board; Obituary; Other Short Article; Real Estate Brief; Referral; | 315. **Disputed in Part.** Defendants respond as follows: Undisputed that The Times catalogued 67,857 Times Asserted Works into the self-labeled "Article Type" rights category. Disputed as to the implication that all articles in the "Article Type" rights category are written by Times staff and that The Times owns the copyright in these articles. For example, 16,164 articles in the Times Rule 1006 summaries (Ex. A) that fall within the "Staff" rights category cannot be matched to their cited staff lists. |

| | |
|---|---|
| Wedding/Engagement Announcements. Ex. 313 [Procas Depo. Ex. 3]; Ex. 321 [NYT_01012376] at 404 (1926 Times Style Book with style guidelines for Real Estate); Ex. 309 [Procas 30(b)(6) Depo. Tr.] at 97:14-98:3 (discussing Corrections), 124:3-126:5; Ex. 322 [NYT_01017921] (excerpt from 1933 Times Style Book discussing style for "Anniversaries, Births, Engagements, Marriages, Memorials and Unveilings" and "Deaths"); Ex. 323 [NYT_01012415] (1943 Times Style Book discussing Business News). | |

**2. The Daily News Plaintiffs**

| | |
|---|---|
| 316. The Daily News Plaintiffs have 1,394,129 Asserted Works at issue in this motion on which they are moving for summary judgement. Ex. 324 [DNP-00160885-952, DNP-00001672-2002; DNP-00000944 – 1338; DNP-00035848-DNP-00035881, DNP-00263284-DNP-00263464, DNP-00348298-302, DNP-00160953- 1088, DNP-00001604-1671; DNP-00263471-DNP-00263604, DNP-00001343-1603, DNP-00000187-430, DNP-00035985 - DNP-00036038, DNP-00263465-70, DNP-00348303, DNP-00002003-2209, DNP-00036105 - DNP-00036241, DNP-00000451-942, DNP-00036039 - DNP-00036104, DNP-00640861-64, DNP-00640879-964] (registration certificates); J. Maisel Declaration, Ex. B & E. | 316. **Disputed In Part.** Defendants respond as follows: Undisputed that there are 1,394,104 articles with unique URLs across the latest "Training" Rule 1006 Summaries identified in J. Maisel Declaration, Ex. B, and 68 articles with unique URLs in the "Copilot Output" Rule 1006 Summaries identified in J. Maisel Declaration, Ex. E. Disputed that the Daily News Plaintiffs have demonstrated ownership and registration of the identified works and are entitled to summary judgment on the basis of J. Maisel Declaration, Ex. B & E. |
| 317. Daily News Plaintiffs' Rule 1006 summaries for the 1,394,129 Asserted Works (. J. Maisel Declaration, | 317. **Disputed in Part - Not Supported by Cited Evidence.** Defendants respond as follows: |

| | |
|---|---|
| Ex. B & E) set forth, *inter alia*, copyright registration information for each Asserted Work and the basis for which each of the Asserted Works was a "work for hire," and the underlying copyright registrations and ownership documents are described below and produced as exhibits. | Undisputed that DNPs produced Rule 1006 summaries that they have represented contain information about the Daily News Asserted Works.<br>However, Defendants dispute that the Rule 1006 summaries referenced in the statement are properly presented as Rule 1006 summaries. To the extent that the Rule 1006 summaries purport to state any claims of ownership of the articles listed therein, they are improperly argumentative and therefore inadmissible under Fed. R. Evid. 1006 and 403. *United States v. Guan*, No. 24 CR. 0322 (VM), 2026 WL 1948543, at *1 (S.D.N.Y. July 6, 2026) (stating that Rule 1006 summaries are subject to exclusion under Fed. R. Evid. 403, meaning "if the summary does not accurately reflect the underlying voluminous evidence, or if it is argumentative, its probative value may be substantially outweighed by the risk of unfair prejudice or confusion.") (quoting Fed. R. Evid. 1006 Advisory Committee Notes on 2024 Amendment).<br>Defendants dispute the accuracy of the "work for hire" and "ownership document[]" characterizations contained in the 1006 summaries, including because DNPs have not provided complete underlying records to corroborate the proposition set forth in this fact. |
| 318. More specifically, the Rule 1006 summaries contain the following information for each Asserted Work on which Daily News Plaintiffs are moving for summary judgment: | 318. **Disputed in Part - Not Supported by Cited Evidence.** Defendants respond as follows: Undisputed that DNPs produced 1006 summaries that they have represented contain information about the Daily News Asserted Works. |

| Column | Column Title | Explanation |
|---|---|---|
| A | Title | Title of the Asserted Work |
| B | URL | URL for the electronic version of the Asserted Work, which if clicked on provides the digital text copy |
| C | Copyright Owner | The copyright owner of the Asserted Work, who is also a named Plaintiff |
| D | Copyright Registration | The copyright registration number for issue or collective work comprising the Asserted Work |
| E | Registration Date | The registration date for the copyright registration listed in Column D |
| F | Author(s) | Identifies the one or more authors listed in the byline for the Asserted Work |
| G | Print Publication Date | Identifies the date when the Asserted Work was first published in print |
| H | Verified category indicating staff-written | If one or more of the authors in column F is a category that indicates that the Asserted Work was staff written, rather than a named individual, the category is identified here. There are four possible categories that indicate an article was staff written and was thus a work-for-hire: (1) Editorial, (2) Publisher, (3) Staff Report, (4) Staff Report, Publisher. |
| I | Verified staff writer or freelancer with WFH | If one or more of the authors in column F is a named individual that matched with documentation indicating that the name is a verified staff writer or a freelancer with a work-for-hire agreement, the name(s) are indicated here. |
| J | Freelancer agreements with WFH | If column J lists a name that is a freelancer with a work-for-hire agreement (rather than a staff writer), the name and the Bates number of the freelancer agreement with work-for-hire language is listed here. |
| K | Bates Supporting Ownership | If column J lists a name, documents that have been produced and support that the Asserted Work was a work-for-hire are identified by Bates number here. The listed Bates numbers correspond with author charts, staff lists, and HR spreadsheets, which are described further in the paragraphs that follow. |
| L | Other Evidence Supporting Ownership | That every Asserted Article was a work-for-hire is supported by testimony establishing that the category identified in the byline indicates staff-written, that the named individual was an employee of Plaintiff or Plaintiff's predecessor when the Asserted Work was published, or that the named individual was a freelancer with a work-for-hire agreement when the Asserted Work was published. |
| M | Number of Training Data Records Matched to Work | Identifies the number of OpenAI training data records that met Dr. Goldstein's matching criteria (coverage score and shared 16-gram) for the given Asserted Work. |
| N | Best Coverage Score | Of the training data records that met Dr. Goldstein's matching criteria, identifies the best (highest) coverage score between the Asserted Work and the training data record. |

However, Defendants dispute that the Rule 1006 summaries referenced in the statement are properly presented as Rule 1006 summaries. To the extent that the Rule 1006 summaries purport to state any claims of ownership of the articles listed therein, they are improperly argumentative and therefore inadmissible under Fed. R. Evid. 1006 and 403. *Guan*, 2026 WL 1948543, at *1 (stating that Rule 1006 summaries are subject to exclusion under Fed. R. Evid. 403, meaning "if the summary does not accurately reflect the underlying voluminous evidence, or if it is argumentative, its probative value may be substantially outweighed by the risk of unfair prejudice or confusion.") (quoting Fed. R. Evid. 1006 Advisory Committee Notes on 2024 Amendment).

Defendants dispute the accuracy of the registration dates in the 1006 summaries, the "authors listed in the byline for the asserted work," and "Other Evidence Supporting Ownership." Further disputed because the Daily News Plaintiffs' Rule 1006 summaries do not contain all the listed information. Columns O ("Link to Comparison Between Asserted Work Text and Best-Matched Training Data Record"), P ("Link to Asserted Work Text"), Q ("Link to Best-Matched Training Data Record"), and S ("Best Coverage for [model] Training Data") are only populated with NA values. The disputed proposition is not supported by the cited evidence. Additionally, Defendants dispute this fact because the chart in Paragraph 318 appears in Maisel Declaration ¶ 6, not ¶ 5.

| | | |
|---|---|---|
| O | Link to Comparison Between Asserted Work Text and Best-Matched Training Data Record | For the training data record having the best (highest) coverage score, links to a side-by-side PDF comparing the Asserted Work and the training data record. Spans of 4 or more consecutive words that are common between the Asserted Work and the training data record are shown in red. |
| P | Link to Asserted Work Text | Links to the text of the Asserted Work. |
| Q | Link to Best-Matched Training Data Record | Links to the text of the training data record having the best (highest) coverage score. |
| R, T, V, X, Z, AB, AD, AF | Asserted Work Included in **[model]** Training Data | Identifies whether the Asserted Work is included in a training data set used to train **[model]**, for **[model]** = GPT-2, GPT-3, GPT-3.5, GPT-3.5-turbo, GPT-4, GPT-4-turbo, GPT-4o, and GPT-4o-mini. |
| S, U, W, Y, AA, AC, AE, AG | Best Coverage for **[model]** in Training Data | Identifies the best (highest) coverage score for the Asserted Work among the training data sets used to train **[model]**, for **[model]** = GPT-2, GPT-3, GPT-3.5, GPT-3.5-turbo, GPT-4, GPT-4-turbo, GPT-4o, and GPT-4o-mini. |
| AH, AJ, AL, AN | Asserted Work Included in **[dataset]** | Identifies whether the Asserted Work is included in **[dataset]**, for **[dataset]** = Giraffe, WebText2, Project Mango, and Common Crawl Derived Dataset. |
| AI, AK, AM, AO | Best Coverage for **[dataset]** | Identifies the best (highest) coverage score for the Asserted Work in **[dataset]**, for **[dataset]** = Giraffe, WebText2, Project Mango, and Common Crawl Derived Dataset. |

Maisel Declaration, ¶5.

319. The remainder of this section on the *Daily News* Plaintiffs' ownership of the Asserted Works is organized as reflected in the chart below.

| Paragraphs of 56.1 | Proof of Ownership by *Daily News* Plaintiffs |
|---|---|
| ¶¶ 320-27 | Per Plaintiff support that the Asserted Works were all works-for-hire. |
| ¶ 329 | Deposit copies of Asserted Works were produced and indicated bylines. |
| ¶ 328, ¶¶ 330-51 | Copyright registration certificates for the Asserted Works for each Plaintiff, including explanation of any naming variations and, where |

319. **Undisputed.**

| | |
|---|---|
| | applicable, discussion of acquisition history reflecting chain of title between named registrant and current owner / Plaintiff. |
| ¶¶ 352-55 | Human resources spreadsheet records maintained in the ordinary course reflecting employment for certain named authors of Asserted Works. |
| ¶¶ 356-58 | Staff list records maintained in the ordinary course reflecting employment for certain named authors of Asserted Works. |
| ¶¶ 359-64 | Freelance agreements with work-for-hire language maintained in the ordinary course corresponding to certain named authors of Asserted Works. |
| ¶¶ 365-71 | Author charts prepared by long-term employees of Plaintiffs and their predecessors (where applicable) reflecting, *inter alia*, that certain named authors of Asserted Works were employees. |
| ¶¶ 372-83 | Testimony of 30(b)(6) and fact witnesses for Plaintiffs establishing that certain bylines of Asserted Works indicate ownership (i.e., written by employee) -- e.g., publisher's name, staff, editorial board. |
| ¶ 384 | Testimony of 30(b)(6) and fact witnesses for Plaintiffs establishing that the association of certain email addresses with Asserted Works indicate ownership (i.e., written by employee). |

320. The New York Daily News Asserted Works were created as works-for-hire. J. Maisel Declaration, Ex. B & E; Ex. 325 [R. Morris 30(b)(6), 3/25/2026, Depo. Tr.] at 186:25-187:6, 189:25-191:13; Ex. 874 [DNP-00160885-952, DNP-00001672-2002 (Certificates)]; Ex. 342 [DNP-00597373 (NYDN Author Chart)]; Ex. 876 [DNP-00360156, DNP-00359276, DNP-00360204, DNP-00360194, DNP-00359570, DNP-00360121, DNP-00359590, DNP-00360222, DNP-00360126 (Freelance Agreements with Work-for-Hire language)]; Ex. 328 [DNP-00000139] (HR Data); Ex. 329 [DNP-00001341] (HR Data); Ex. 330 [DNP-00001342] (HR Data).

320. **Disputed - Not Supported by Cited Evidence; Improper Legal Argument.** Defendants respond as follows:

The assertion that "The New York Daily News Asserted Works were created as works-for-hire" is a legal conclusion, not a fact, and should be disregarded as improper attorney argument.

Further, disputed because Plaintiffs rely on litigation-created compilations that are facially incomplete and are contradicted by Plaintiffs' own testimony. Ms. Morris's deposition testimony does not affirmatively establish that the Asserted Works were created as works-for-hire. Ms. Morris testified that she "[redacted] A. Blanco Opp. Decl. Ex. 243 (R. Morris 30(b)(6) Tr. (Dec. 17, 2025)) at 191:9-25. Morris also testified that "if it's discovered that that article was not written by a staff writer, then -- or a freelancer with a freelance agreement with work-for-hire language, then we

do not own that article and did not at the time of registration." *Id.* at 191:17-21. Defendants dispute that the New York Daily News produced employment records and/or valid freelance agreements which assigned and/or transferred copyrights from the freelancer to the New York Daily News for each Asserted Work.

The NYDN Author Chart (News Ex. 342 [DNP-00597373]) was not maintained in the ordinary course of business. Robert Dominguez, the Daily News managing editor, testified that the Author Chart was "[redacted]" A. Blanco Opp. Decl. Ex. 193 (R. Dominguez 30(b)(1) Tr. (Mar. 3, 2026)) at 69:25-70:4. Mr. Dominguez [redacted] *Id.* at 53:19-54:17, 165:14-166:20.

Ms. Morris described News Exhibit 328 (DNP-00000139) as a list of "[redacted]" A. Blanco Opp. Decl. Ex. 243 (R. Morris 30(b)(6) Tr. (Dec. 17, 2025)) at 195:7-9. She testified that [redacted] *Id.* at 203:5-17. Ms. Morris [redacted]

| | |
|---|---|
| | [redacted] *Id.* at 195:12-18; 202:20-203:4. She [redacted] *Id.* at 208:3-4.<br>Mr. Dominguez also testified that the Author column in the asserted-works spreadsheets "[redacted]" A. Blanco Opp. Decl. Ex. 193 (R. Dominguez 30(b)(1) Tr. (Mar. 3, 2026)) at 130:13-131:2.<br>The Certificates of Registration (News Ex. 874) are certificates of issue-based registrations, which do not identify the individual authors of each article within a registered newspaper issue or establish the employment or contractual relationship of any particular author of any article. Defendants also dispute that the New York Daily News has demonstrated that the New York Daily News Asserted Works were registered by the Certificates of Registration because the registrations are for newspaper issues (collective works), not individual articles. |
| 321. The Chicago Tribune Asserted Works were created as works-for-hire. J. Maisel Declaration, Ex. B & E; Ex. 325 [R. Morris 30(b)(6), 3/25/2026, Depo. Tr.] at 186:10-16, 189:25-191:13; Ex. 324 [DNP-00160885-952, DNP-00001672-2002; DNP-00000944 – 1338; DNP-00035848-DNP-00035881, DNP-00263284-DNP-00263464, DNP-00348298-302, DNP-00160953- 1088, DNP-00001604-1671; DNP-00263471-DNP-00263604, DNP-00001343-1603, DNP-00000187-430, DNP- | 321. **Disputed - Not Supported by Cited Evidence; Improper Legal Argument.** Defendants respond as follows:<br>The assertion that "The Chicago Tribune Asserted Works were created as works-for-hire" is a legal conclusion, not a fact, and should be disregarded as improper attorney argument.<br>Further disputed because Plaintiffs rely on litigation-created compilations that are facially incomplete |

| | |
|---|---|
| 00035985 - DNP-00036038, DNP-00263465-70, DNP-00348303, DNP-00002003-2209, DNP-00036105 - DNP-00036241, DNP-00000451-942, DNP-00036039 - DNP-00036104, DNP-00640861-64, DNP-00640879-964 (Copyright Registrations)]; Ex. 332 [DNP-00597370 (Chicago Tribune Author Chart)]; Ex. 333 [DNP-00534593, DNP-00534595, DNP-00534573, DNP-00359849, DNP-00534561, DNP-00534569, DNP-00534609, DNP-00534619, DNP-00534603, DNP-00534599, DNP-00534557, DNP-00534553, DNP-00534603, DNP-00534597, DNP-00534607, DNP-00534615, DNP-00359040, DNP-00534611, DNP-00534585, DNP-00534581, DNP-00359813, DNP-00359777, DNP-00359044, DNP-00359665, DNP-00359168, DNP-00359148, DNP-00189222, DNP-00189218 (Freelance Agreements)]; Ex. 328 [DNP-00000139] (HR data); Ex. 329 [DNP-00001341] (HR data); Ex. 330 [DNP-00001342] (HR Data); Ex. 334 [DNP-00636447, DNP-00636773, DNP-00636829 (Staff Lists)]. | and are contradicted by Plaintiffs' own testimony. Ms. Morris's deposition testimony does not affirmatively establish that the Asserted Articles were created as works-for-hire. Ms. Morris testified that she [redacted] A. Blanco Opp. Decl. Ex. 243 (R. Morris 30(b)(6) Tr. (Dec. 17, 2025)) at 191:9-25. Ms. Morris also testified that "[redacted] *Id.* at 191:17-21. Defendants dispute that the Chicago Tribune produced employment records and/or valid freelance agreements which assigned and/or transferred copyrights from the freelancer to the Chicago Tribune for each Asserted Work.<br><br>Ms. Morris described News Exhibit 328 (DNP-00000139) as a list of "[redacted]" A. Blanco Opp. Decl. Ex. 243 (R. Morris 30(b)(6) Tr. (Dec. 17, 2025)) at 195:6-9. Ms. Morris was [redacted] *Id.* at 195:12-18; 202:20-203:4. [redacted] *Id.* at 208:3-4.<br><br>The Chicago Tribune Author Chart (News Ex. 332 [DNP-00597370]) was not maintained in the ordinary |

| | |
|---|---|
| | course of business. Elaine Varvatos, former Senior Administration Manager for the Chicago Tribnne, testified that the exhibit “[redacted]” A. Blanco Opp. Decl. Ex. 286 (E. Varvatos 30(b)(1) Tr. (Feb. 25, 2026)) at 142:12-15. Ms. Varvatos also testified [redacted] *See, e.g.*, *id.* at 99:7-10.<br>271 articles in the latest Rnle 1006 Snmmaries were anthored by Joan Giangrasse Kates and 1 article was co-authored by Mark Pearlstein, [redacted] See A. Blanco Opp. Decl. Ex. 67 DNP-00534601; A. Blanco Opp. Decl. [redacted] 68 DNP-00534605.<br>The Certificates of Registration (News Ex. 324) are certificates of issne-based registrations, which do not identify the individnal anthors of each article within a registered newspaper issue or establish the employment or contractual relationship of any particnlar anthor of any article. Defendants also dispute that the Chicago Tribune has demonstrated that the Chicago Tribune Asserted Works were registered by the Certificates of Registration becanse the registrations are for newspaper issnes (collective works), not individual articles. |
| 322. The Orlando Sentinel Asserted Works were created as works-for-hire. J. Maisel Declaration, Ex. B & E; Ex. 325 [R. Morris 30(b)(6), 3/25/2026, Depo. Tr.] at | 322. **Disputed - Not Supported by Cited Evidence; Improper Legal Argument.** Defendants respond as follows: The assertion that "The Orlando |

| | |
|---|---|
| 187:7-13, 189:25-191:13; Ex. 335 [DNP-00035848-DNP-00035881, DNP-00263284-DNP-00263464, DNP-00348298-302, DNP-00160953- 1088, DNP-00001604-1671 (Certificates)]; Ex. 326 [DNP-00597374 (Orlando Sentinel Author Chart)]; Ex. 327 [DNP-00532008, DNP-00532006 (Freelancer Agreements with Work-for-Hire Language)]; Ex. 328 [DNP-00000139] (HR Data); Ex. 329 [DNP-00001341]; Ex. 330 [DNP-00001342] (HR Data). | Sentinel Asserted Works were created as works-for-hire" is a legal conclusion, not a fact, and should be disregarded as improper attorney argument.<br><br>Further disputed because Plaintiffs rely on litigation-created compilations that are facially incomplete and are contradicted by Plaintiffs' own testimony. Ms. Morris's deposition testimony does not affirmatively establish that the Asserted Articles were created as works-for-hire. Ms. Morris testified that she "[redacted] A. Blanco Opp. Decl. Ex. 243 (R. Morris 30(b)(6) Tr. (Dec. 17, 2025)) at 191:9-25. Ms. Morris also testified that "[redacted]" *Id.* at 191:17-21. Defendants dispute that the Orlando Sentinel produced employment records and/or valid freelance agreements which assigned and/or transferred copyrights from the freelancer to the Orlando Sentinel for each Asserted Work.<br><br>The Orlando Sentinel Author Chart (News Ex. 326 [DNP-00597374]) was not maintained in the ordinary course of business. A. Blanco Opp. Decl. Ex. 241 (R. Morris 30(b)(6) Tr. (Mar. 25, 2026)) at 55:3-10. Ms. Morris described Exhibit 328 (DNP-00001339) as a list of "[redacted]" A. Blanco Opp. Decl. Ex. 243 (R. Morris 30(b)(6) Tr.) (Dec. 17, 2025) at 195:6- |

| | |
|---|---|
| | 9. Ms. Morris was [redacted] Ms. Morris also testified that [redacted]. *See, e.g.*, *id.* at 150:17-22.<br>Furthermore, the Certificates of Registration (News Ex. 335) are certificates of issue-based registrations, which do not identify the individual authors of each article within a registered newspaper issue or establish the employment or contractual relationship of any particular author of any article. Defendants also dispute that the Orlando Sentinel has demonstrated that the Orlando Sentinel Asserted Works were registered by the Certificates of Registration because the registrations are for newspaper issues (collective works), not individual articles. |
| 323. The South Florida Sun-Sentinel Asserted Works were created as works-for-hire. J. Maisel Declaration, Ex. B & E; Ex. 325 [R. Morris 30(b)(6), 3/25/2026, Depo. Tr.] at 186:17-22, 189:25-191:13; Ex. 336 [DNP-00597377 (Sun Sentinel Author Chart)]; Ex. 337 [DNP-00263471-DNP-00263604, DNP-00001343-1603 (Certificates)]; Ex. 338 [DNP-00532021, DNP-00532024, | 323. **Disputed - Not Supported by Cited Evidence; Improper Legal Argument.** Defendants respond as follows:<br>The assertion that "The South Florida Sun-Sentinel Asserted Works were created as works-for-hire" is a legal conclusion, not a fact, and the Court should disregard it as improper attorney argument. |

| | |
|---|---|
| DNP-00532030, DNP-00531997, DNP-00532000, DNP-00532039, DNP-00532027, DNP-00532018, DNP-00531992, DNP-00532036, DNP-00532033, DNP-00532003 (Freelance Agreements with Work-for-Hire Language)]; Ex. 328 [DNP-00000139] (HR Data); Ex. 329 [DNP-00001341] (HR Data); Ex. 330 [DNP-00001342] (HR Data). | Further disputed because Plaintiffs rely on litigation-created compilations that are facially incomplete and are contradicted by Plaintiffs' own testimony. Ms. Morris's deposition testimony does not affirmatively establish that the Asserted Articles were created as works-for-hire. Ms. Morris testified that she "[redacted] A. Blanco Opp. Decl. Ex. 243 (R. Morris 30(b)(6) Tr. (Dec. 17, [redacted] *Id.* at 191:17-21. Defendants dispute that the South Florida Sun Sentinel produced employment records and/or valid freelance agreements which assigned and/or transferred copyrights from the freelancer to the South Florida Sun Sentinel for each Asserted Work.<br>The Sun Sentinel Author Chart (News Ex. 336 [DNP-00597377]) was not maintained in the ordinary course of business. A. Blanco Opp. Decl. Ex. 241 (R. Morris 30(b)(6) Tr. (Mar. 25, 2026)) at 55:3-10. Ms. Morris described Exhibit 328 (DNP-00001339) as a list of [redacted]" A. Blanco Opp. Decl. Ex. 243 (R. Morris 30(b)(6) Tr. (Dec. 17, 2025)) at 195:6-9. Ms. Morris [redacted] |

| | |
|---|---|
| | [redacted] Ms. Morris also testified [redacted] *See, e.g.*, *id.* at 150:17-22.<br>The Certificates of Registration (News Ex. 337) are certificates of issue-based registrations, which do not identify the individnal anthors of each article within a registered newspaper issue or establish the employment or contractual relationship of any particular author of any article. Defendants also dispute that the Sun Sentiuel has demonstrated that the Sun Sentiuel Asserted Works were registered by the Certificates of Registration because the registrations are for uewspaper issues (collective works), uot iudividual articles. |
| 324. The Deuver Post Asserted Works were created as works-for-hire. J. Maisel Declaration, Ex. B & E; Ex. 325 [R. Morris 30(b)(6), 3/25/2026, Depo. Tr.] at 188:1-10, 189:25-191:13; Ex. 878 [DNP-00000187-430, DNP-00035985 - DNP-00036038 (Copyright Registration Certificates)]; Ex. 1250 [DNP-00597371 (Denver Post Author Chart)]; Ex. 340 [DNP-00473402, DNP-00533839, DNP-00522201 (Freelance Agreements with Work-for-Hire Lauguage)]; Ex. 328 [DNP-00000139] (HR Data); Ex. 246 [DNP-00001340] (HR Data); Ex. 329 [DNP-00001341] | 324. **Disputed - Not Supported by Cited Evidence; Improper Legal Argument.** Defeudauts respond as follows:<br>The assertion that "The Deuver Post Asserted Works were created as works-for-hire" is a legal conclusion, not a fact, aud the Court should disregard it as improper attorney argument.<br>Plaintiffs rely on litigation-created compilations that are facially incomplete aud are contradicted by Plaintiffs' own testimony. Ms. Morris's depositiou |

| | |
|---|---|
| (HR Data); Ex. 330 [DNP-00001342] (HR Data); Ex. 880 [DNP-00117468-536 (Staff Lists)]. | testimony does not affirmatively establish that the Asserted Articles were created as works-for-hire. Ms. Morris testified that she "[redacted] A. Blanco Opp. Decl. Ex. 243 (R. Morris 30(b)(6) Tr. (Dec. 17, 2025)) at 191:9-25. Ms. Morris also testified [redacted]" *Id.* at 191:17-21. Defendants dispute that the Denver Post produced employment records and/or valid freelance agreements which assigned and/or transferred copyrights from the freelancer to the Denver Post for each Asserted Work.<br>Ms. Morris described News Exhibit 328 (DNP-00000139) as a list of "[redacted]" A. Blanco Opp. Decl. Ex. 243 (R. Morris 30(b)(6) Tr. (Dec. 17, 2025)) at 195:6-9. Ms. Morris [redacted]<br>The Denver Post Author Chart (News Ex. 1250 [DNP-00597371]) [redacted] A. Blanco Opp. Decl. Ex. 241 (R. Morris 30(b)(6) Tr. (Mar. 25, 2026)) at 55:3-10. |

| | |
|---|---|
| | Ms. Brewer, corporate designee for the Daily News Plaintiffs and editorial administrator for The Denver Post, also testified [redacted] *See, e.g.*, A. Blanco Opp. Decl. Ex. 174 (M. Brewer 30(b)(6) Tr. (Nov. 25, 2025)) at 50:9-52:17.<br>The Certificates of Registration (News Ex. 878) are certificates of issne-based registrations, which do not identify the individual authors of each article within a registered newspaper issue or establish the employment or contractual relationship of any particular author of any article. Defendants also dispute that the Denver Post has demonstrated that the Denver Post Asserted Works were registered by the Certificates of Registration because the registrations are for newspaper issues (collective works), not individual articles. |
| 325. The Pioneer Press Asserted Works were created as works-for-hire. J. Maisel Declaration, Ex. B & E; Ex. 325 [R. Morris 30(b)(6), 3/25/2026, Depo. Tr.] at 187:20-25, 189:25-191:13; Ex. 882 [DNP-00263465-70, DNP-00348303, DNP-00002003-2209 (Certificates)]; Ex. 346 [DNP-00597375 (Pioneer Press Author Chart)]; Ex. 341 [DNP-00468959, DNP-00468964 (employment agreements)]; Ex. 328 [DNP-00000139]; Ex. 329 [DNP-00001341]; Ex. 330 [DNP-00001342] (HR Data). | 325. **Disputed - Not Supported by Cited Evidence; Improper Legal Argument.** Defendants respond as follows:<br>The assertion that "The Pioneer Press Asserted Works were created as works-for-hire" is a legal conclusion, not a fact, and the Court should disregard it as improper attorney argument.<br>The facts set forth in Paragraph 325 are disputed because they are not supported by the cited evidence. Specifically, Plaintiffs rely on litigation-created |

| | |
|---|---|
| | compilations that are facially incomplete and are contradicted by Plaintiffs' own testimony.<br>For example, Morris' deposition testimony does not affirmatively establish the Asserted Works were created as works-for hire. Pursuant to Fed. R. Evid. 106, Morris testified that she "[redacted]. A. Blanco Opp. Decl. Ex. 243 (R. Morris 30(b)(6) Tr. (Dec. 17, 2025)) at 191:9-25. Morris [redacted] A. Blanco Opp. Decl. [redacted] *Id.* at 191:17-21; Fed. R. Evid. 106. Defendants dispute that the Pioneer Press produced employment records and/or valid freelance agreements which assigned and/or transferred copyrights from the freelancer to the Pioneer Press for each Asserted Work. |

| | |
|---|---|
| | The Pioneer Press Author Chart (News Ex. 346 [DNP-00597375]) was not maintained in the ordinary course of business. Pursuant to Fed. R. Evid. 106, Mike Burbach, Editor and Vice President for the Pioneer Press, testified that [redacted] A. Blanco Opp. Decl. Ex. 180 (M. Burbach 30(b)(1) Tr.) (Jan. 30, 2026) at 44:19-45:2.<br>News Ex. 341 [redacted]<br>271 articles in the latest Rule 1006 Summaries were authored by Joan Giangrasse Kates and 1 article was co-authored by Mark Pearlstein, [redacted] Ms. Morris described Exhibit 328 (DNP-00000139) as [redacted] A. Blanco Opp. Decl. Ex. 243 (R. Morris 30(b)(6) Tr. (Dec. 17, 2025)) at 195:6-9; *id.* at 195:12-18; 202:20-203:4; Fed. R. Evid. 106. [redacted] *Id.* at 208:3-4; Fed. R. Evid. 106.<br>The Certificates of Registration (News Ex. 882) are certificates of issue-based registrations, which do not identify the individual authors of each article within a registered newspaper issue or establish the employment or contractual relationship of any particular author. of any article. Defendants also dispute that the Pioneer Press has demonstrated that the Pioneer Press Asserted Works were registered by the Certificates of Registration because the |

| | |
|---|---|
| | registrations are for newspaper issnes (collective works), not individnal articles.<br>Pursuant to Fed. R. Evid. 106, Mr. Burbach also testified [redacted]. *See, e.g.*, A. Blanco Opp. Decl. Ex. 180 (M. Burbach 30(b)(1) Tr. (Jan. 30, 2026)) at 57:24-58:8. |
| 326. The Orange County Register Asserted Works were created as works-for-hire. J. Maisel Declaration, Ex. B & E; Ex. 325 [R. Morris 30(b)(6), 3/25/2026, Depo. Tr.] at 188:11-189:10, 189:25-191:13; Ex. 884 [DNP-00036105 - DNP-00036241 (Certificates)]; Ex. 347 [DNP-00597376 (Orange County Register Author Chart)]; Ex. 328 [DNP-00000139]; Ex. 329 [DNP-00001341]; Ex. 330 [DNP-00001342] (HR Data)]; Ex. 886 [DNP-00632457, DNP-00632475 (Staff Lists)]. | 326. **Disputed - Not Supported by Cited Evidence; Improper Legal Argument.** Defendants respond as follows:<br>The assertion that "The Orange County Register Asserted Works were created as works-for-hire" is a legal conclusion, not a fact, and should be disregarded as improper attorney argument.<br>Plaintiffs rely on litigation-created compilations that are facially incomplete and are contradicted by Plaintiffs' own testimony. Ms. Morris's deposition testimony [redacted] A. Blanco Opp. Decl. Ex. 243 (R. Morris 30(b)(6) Tr. (Dec. 17, 2025)) at 191:9-25. Ms. Morris also [redacted] *Id.* at 191:17-21. |

| | |
|---|---|
| | Defendants dispute that the Orange County Register produced employment records and/or valid freelance agreements which assigned and/or transferred copyrights from the freelancer to the Orange County Register for each Asserted Work.<br>The Orange County Register Author Chart (News Ex. 347 [DNP-00597376]) [redacted] Todd Harmonson, Senior Editor for the Orange County Register, testified that the exhibit "[redacted]" A. Blanco Opp. Decl. Ex. 211 (T. Harmonson 30(b)(1) Tr. (Feb. 20, 2026)) at 39:11-40:4.<br>Ms. Morris described News Exhibit 328 (DNP-00000139) as a list of "[redacted]" A. Blanco Opp. Decl. Ex. 243 (R. Morris 30(b)(6) Tr. (Dec. 17, 2025)) at 195:6-9. Ms. Morris [redacted]<br>The Certificates of Registration (News Ex. 884) are certificates of issue-based registrations, which do not identify the individual authors of each article within a registered newspaper issue or establish the employmeut or contractual relatiouship of auy particular author of auy article. Defeudauts also dispute that the Orauge County Register has demonstrated that the Orauge County |

| | |
|---|---|
| | Register Asserted Works were registered by the Certificates of Registration because the registrations are for newspaper issues (collective works), not individual articles.<br>Mr. Harmonson also testified that [redacted] *See, e.g.*, A. Blanco Opp. Decl. Ex. 211 (T. Harmonson 30(b)(1) Tr. (Feb. 20, 2026)) at 67:5-9. |
| 327. The Mercury News Asserted Works were created as works-for-hire. *See* J. Maisel Declaration, Ex. B & E; Ex. 325 [R. Morris 30(b)(6), 3/25/2026, Depo. Tr.] at 187:14-19, 189:25-191:13; Ex. 888 [DNP-00000451-942, DNP-00036039 - DNP-00036104 (Certificates)]; Ex. 345 [DNP-00651698 (Mercury News Author Chart)]; Ex. 328 [DNP-00000139]; Ex. 329 [DNP-00001341]; Ex. 330 [DNP-00001342] (HR Data). | 327. **Disputed - Not Supported by Cited Evidence; Improper Legal Argument.** Defendants respond as follows:<br>The assertion that "The Mercury News Asserted Works were created as works-for-hire" is a legal conclusion, not a fact, and the Court should disregard it as improper attorney argument and conclusory.<br>Plaintiffs rely on litigation-created compilations that are facially incomplete and are contradicted by Plaintiffs' own testimony. Ms. Morris's deposition testimony does not affirmatively establish that the Asserted Articles were created as works-for-hire. Ms. Morris testified that she "[redacted] A. Blanco Opp. Decl. Ex. 243 (R. Morris 30(b)(6) Tr. (Dec. 17, 2025)) at 191:9-25. Ms. Morris also testified that [redacted] |

| | |
|---|---|
| | [redacted] *Id.* at 191:17-21. Defendants dispute that the Mercury News produced employment records and/or valid freelance agreements which assigned and/or transferred copyrights from the freelancer to the Mercury News for each Asserted Work.<br>The Mercury News Author Chart (Ex. 345 [DNP-00651698]) [redacted] Sarah Dussault, Senior Editor for the Mercury News and the East Bay Times, A. Blanco Opp. Decl. Ex. 195 (S. Dussault 30(b)(1) Tr. (Feb. 24, 2026)) at 36:24–25, testified [redacted] *Id.* at 81:15–20.<br>Additionally, at least five articles in the latest Rule 1006 Summaries were authored at least in part by Larry Magid, a [redacted] *See* A. Blanco Opp. Decl. Ex. 52 DNP-00357736.<br>Furthermore, Ms. Morris described Exhibit 328 (DNP-00000139) as a list of "[redacted]" A. Blanco Opp. Decl. Ex. 243 (R. Morris 30(b)(6) Tr. (Dec. 17, 2025)) at 195:6-9. Ms. Morris [redacted] |

| | |
|---|---|
| | The Certificates of Registration (News Ex. 888) are certificates of issue-based registrations, which do not identify the individual authors of each article within a registered newspaper issue or establish the employment or contractual relationship of any particular author of any article. Defendants also dispute that the Mercury News has demonstrated that the Mercury News Asserted Works were registered by the Certificates of Registration because the registrations are for newspaper issues (collective works), not individual articles.<br>Ms. Dussault [redacted] *See, e.g.*, A. Blanco Opp. Decl. Ex. 195 (S. Dussault 30(b)(1) Tr. (Feb. 24, 2026)) at 96:20–97:6. |
| 328. The Daily News Plaintiffs produced Copyright Office registration certificates and the Daily News Plaintiffs, OpenAI and Microsoft separately stipulated as to the validity and authenticity of Copyright Office registration certificates that were not produced for Chicago Tribune issues January 1, 1985-December 31, 1992, and August 1993, in total covering the 2.6 million Asserted Works – the validity of which has not been challenged. Ex. 324 [DNP-00160885-952, DNP-00001672-2002; DNP-00000944 – 1338; DNP-00035848-DNP-00035881, DNP-00263284-DNP-00263464, DNP-00348298-302, DNP-00160953-1088, DNP-00001604-1671; DNP-00263471-DNP- | 328. **Disputed in Part.** Defendants respond as follows:<br>Undisputed that the Daily News Plaintiffs produced Copyright Office registration certificates and that the parties entered into stipulations concerning the validity and authenticity of certain Copyright Office registration certificates that were not produced for the identified Chicago Tribune issues. Disputed that the cited evidence establishes the validity of, or that Defendants have declined to challenge the validity of, all of the Asserted Works on which Plaintiffs move for summary judgment, and Plaintiffs' characterization of the absence of such a |

| | |
|---|---|
| 00263604, DNP-00001343-1603, DNP-00000187-430, DNP-00035985 - DNP-00036038, DNP-00263465-70, DNP-00348303, DNP-00002003-2209, DNP-00036105 - DNP-00036241, DNP-00000451-942, DNP-00036039 - DNP-00036104, DNP-00640861-64, DNP-00640879-964]; Ex. 890 [Stipulation between DNP and Defendants Feb. 7, 2025]. | challenge is unsupported by the identified record evidence. Further disputed to the extent that the validity of copyrights in the individual Asserted Articles is a legal question, and the assertion constitutes improper attorney argument. Specifically, Defendants dispute that the Daily News Plaintiffs have demonstrated that the Asserted Works (articles) were registered by the listed copyright registrations because the registrations are for newspaper issues (collective works), not individual articles.<br>Additionally, disputed to the extent that the copyright registrations produced by the Daily News Plaintiffs contain potential errors. Dr. Borck found that at least 582 articles in the Daily News Plaintiffs' Rule 1006 summaries are associated with copyright registrations for which the registration date precedes the print date. J. Borck Opp. Decl. ¶ 35. |
| 329. The Daily News Plaintiffs have produced PDF copies of the newspapers in which the Asserted Works were published which include, *inter alia*, the bylines for those works. Ex. 894 [DNP-HD002 -HD005]; Ex. 900 [DNP-00636047-DNP-00636222]. | 329. **Disputed in Part.** Defendants respond as follows:<br>Undisputed that the Daily News Plaintiffs have produced PDF copies of certain newspaper issues. Disputed to the extent that the Daily News Plaintiffs have not produced complete PDF copies of each Asserted Article. For example, Daily News Plaintiffs have not produced PDFs of the print publications for "It Came From Hollywood," printed on September 20, 1998 in the New York Daily News, or "East Long Beach Pony League creates memories in 18th Battle at the Beach All-Star Invitational," printed on June 22, 2014 in the Orange County Register. |

| | |
|---|---|
| | *See* ECF 1775 (J. Maisel Decl. Ex. B.). Further disputed that each PDF contains the byline for an Asserted Work. Ms. Morris, corporate designee for the Daily News Plaintiffs, [redacted] *See e.g.*, A. Blanco Opp. Decl. Ex. 241 (R. Morris 30(b)(6) Tr. (Mar. 25, 2026)) at 128:7-22 [redacted] |
| 330. The copyright registration certificates for 2013-2024 Chicago Tribnne Asserted Works are in the name of Chicago Tribune Company, LLC, a named plaintiff, or Chicago Tribune. Ex. 896 [DNP-00001187-1331]. | 330. **Undisputed.** Defendants respond as follows: Undisputed as stated, but Defendants incorporate their response to Paragraph 331 here for the copyright registrations that are "in the name of" Chicago Tribnne. |
| 331. Some copyright registration certificates for 2013 Chicago Tribune Asserted Works are in the name of "Chicago Tribune" which is nsed to refer to Chicago Tribune Company, LLC, a named plaintiff. Ex. 898 [DNP-00001326-29]; Robyn Decl. at ¶¶22-24. | 331. **Disputed in Part - Improper Legal Argument; Not Supported by Cited Evidence; Not Supported by Admissible Evidence.** Defendants respond as follows:<br>Undispnted that News Ex. 898 (DNP-00001326) is a Certificate of Registration, No. TX 7-883-233, effective May 9, 2013, that identifies the anthor and copyright claimant as "Chicago Tribnne."<br>However, disputed as misleading and not snpported by the cited evidence. The cited certificate covers a group of 31 issnes published December 1–31, 2012, not "2013 Chicago Tribnne Asserted Works." News Ex. 898 at DNP-00001326. The certificate lists the Copyright Claimant as "Chicago Tribnne," bnt does not offer any evidence that this refers to the named Plaintiff Chicago Tribnne Company, |

| | |
|---|---|
| | LLC. The evidentiary record does not contain a valid instrument of conveyance or other admissible evidence establishing that the abbreviated name "Chicago Tribune" is legally attributable to the named Plaintiff.<br>The only support offered to connect Chicago Tribune to the named plaintiff, Chicago Tribune Company, LLC, is the Morris Declaration. Ms. Morris states that [redacted] ECF 1948 (R. Morris Decl.) ¶ 2. However, Ms. Morris [redacted] A. Blanco Opp. Decl. Ex. 242 (R. Morris 30(b)(1) Tr. (Dec. 17, 2025)) at 10:9–19. She [redacted] *Id.* at 11:19–23. Further, Ms. Morris testified that [redacted] A. Blanco Opp. Decl. Ex. 243 (R. Morris 30(b)(6) Tr. (Dec. 17, 2025)) at 46:18–47:9.<br>Therefore, the disputed proposition is not supported by the cited evidence. The disputed proposition is also not supported by admissible evidence, as required by Local Rule 56.1, and therefore is not properly before the Court. Further, the Court should disregard the disputed portion of Paragraph 331 because the assertion constitutes improper attorney argument and/or is conclusory. It thus requires no response. |

| | |
|---|---|
| 332. The copyright registration certificates for 1984-2012 Chicago Tribune Asserted Works, including the Chicago Tribune printouts from www.copyright.gov that Defendants stipulated would be treated the same as authentic, certified copyright registration certificates (covering January 1, 1985-December 31, 1992, and August 1993), are in the name of Chicago Tribune Company. Ex. 1126 [DNP-00000994-1186; DNP-00001332-1338]. | 332. **Disputed in Part.** Defendants respond as follows: Disputed in part because DNP-00001069 is in the name of "Chicago Tribune," not "Chicago Tribune Company" and DNP-00001108 is not a copyright registration. |
| 333. In 2012, Chicago Tribune Company (Illinois) merged with Chicago Tribune Company, LLC (Delaware), with the surviving company name being Chicago Tribune Company, LLC, a named plaintiff. Ex. 1127 [DNP-00532268-275]. Robyn Decl. at ¶¶22-24 | 333. **Undisputed.** |
| 334. The copyright registration certificates for the Orange County Register Asserted Works are in the name of Freedom Communications, with "Orange County Register" listed as "Other Title" or as "dba." Ex. 884 [DNP-00036105 - DNP-00036241]. | 334. **Undisputed.** |
| 335. In a March 13, 2016 Asset Purchase Agreement, Media NewsGroup, Inc. acquired assets from Freedom Communications, Inc., and subsequently assigned the Purchased Assets to California Newspaper Partnership. Ex. 547 [DNP-00478224]; Ex. 548 [DNP-00477973]; Ex. 549 [DNP-00532249]; Ex. 1128 [DNP-00477963]; Ex. 1129 [DNP-00478215]; Ex. 1130 [DNP-00477879]; *See* Robyn Decl. at ¶¶17-21. | 335. **Disputed in Part - Not Supported by Cited Evidence; Not Supported by Admissible Evidence.** Defendants respond as follows: Undisputed that MediaNews Group, Inc. and entities affiliated with Freedom Communications, Inc. entered into an Asset Purchase Agreement dated March 31, 2016, and that related transactional documents were executed afterward.<br>However, disputed to the extent the fact implies a valid, complete chain of copyright ownership over the |

| | |
|---|---|
| | specific Asserted Works at issue in this Motion. Plaintiffs' cited evidence is contradicted by the evidence. This paragraph identifies the transferee as "California Newspaper Partnership" (singular). The transactional documents consistently [redacted] *See, e.g.*, News Ex. 1129 at DNP-00478215; News Ex. 549 at DNP-00532249; ECF 1776 (R. Morris Decl.) ¶ 19.<br>The cited evidence contradicts the statement. Ex. 1129 is clear that MediaNews Group [redacted] News Ex. 1129 at ¶ 13. News Ex. 1128 likewise [redacted] News Ex. 549 [redacted] News Ex. 548 [redacted] News Ex. 547 lists [redacted]<br>The Morris Declaration cannot fill these gaps. It contradicts Ms. Morris's prior sworn testimony without explanation and is internally inconsistent. For example, [redacted] ECF 1776 (R. Morris Decl.). As |

| | |
|---|---|
| | Plaintiffs' Rule 30(b)(6) designee, however, Ms. Morris testified that [redacted] A. Blanco Opp. Decl. Ex. 243 (R. Morris 30(b)(6) Tr. (Dec. 17, 2025)) at 38:22-24. She testified that [redacted] *Id.* at 38:25-39:2. Because the disputed proposition is not supported by admissible evidence, as required by Local Rule 56.1, it is not properly before the Court. |
| 336. On March 31, 2016, Freedom Communications, Inc. and MediaNews Group, Inc. entered into an Intellectual Property Assignment Agreement for the benefit of California Newspaper Partnership, whereby the Freedom Communications, Inc. intellectual property assets – including ownership of the copyrights for the Orange County Register Asserted Works – were assigned to California Newspaper Partnership. Ex. 547 [DNP-00478224]. | 336. **Disputed in Part- Not Supported by Cited Evidence; Not Supported by Admissible Evidence.** Defendants respond as follows: Undisputed that an Intellectual Property Assignment Agreement dated March 31, 2016, was executed with the Freedom Communications bankruptcy proceedings. News Ex. 547.<br>Disputed that this agreement assigned "ownership of the copyrights for the Orange County Register Asserted Works" to California Newspapers Partnership. The cited exhibit does not support that characterization, and the Asserted Fact is contradicted or unsupported by the evidentiary record. Further, the transactional documents in the record [redacted] *See, e.g.*, News Ex. 1129 at DNP-00478215; News Ex. 549 at DNP-00532249. This underscores accuracy issues in Plaintiffs' chain of title.<br>News Ex. 547 [redacted] |

| | |
|---|---|
| | [redacted] *See* News Ex. 547 at DNP-00478224. Exhibit 1 [redacted] *see* News Ex. 547 at DNP-00478228–DNP-00478241; and (b) copyright registrations exclusively for individual 1987-era daily issues of the "Orange County (Calif.) Register," with registration dates spanning September through December 1987, *see* News Ex. 547, DNP-00478242–DNP-00478249.<br>Accordingly, the facts set forth in Paragraph 336 are disputed because the cited evidence is incorrect. The facts set forth in Paragraph 336 are also disputed because they are not supported by admissible evidence, as required by Local Rule 56.1, and therefore are not properly before the Court. Further, disputed that this agreement assigned "ownership of the copyrights for the Orange County Register Asserted Works" to California Newspapers Partnership. The cited exhibit does not support that characterization, and the Asserted Fact is contradicted or unsupported by the evidentiary record. |
| 337. On January, 1, 2024, pursuant to an Equity and Asset Purchase Agreement, ownership of the copyrights for the Orange County Register Asserted Works were | 337. **Disputed in Part - Not Supported by Cited Evidence; Not Supported by Admissible Evidence.** Defendants respond as follows: Undisputed |

| | |
|---|---|
| assigned through several intermediaries (West Coast MediaNews LLC, MNG Partnership Holdings, LLC, MediaNews Group Interactive, LLC, MediaNews Group, Inc.) to MNG Enterprises, Inc. Ex. 549 [DNP-00532249]. | that News Ex. 549 is a Written Consent of the Managing Bodies dated January 1, 2024, which authorized certain distributions of assets through the named intermediary entities.<br>However, OpenAI disputes that these documents establish that "ownership of the copyrights for the Orange County Register Asserted Works were assigned through several intermediaries . . . to MNG Enterprises, Inc." News Ex. 549 [redacted] News Ex. 549 [redacted] Therefore, the disputed proposition is not supported by the cited evidence. The disputed proposition is also not supported by admissible evidence, as required by Local Rule 56.1, and therefore is not properly before the Court. Specifically, News Ex. 549 is incomplete and unauthenticated. |
| 338. Also on January 1, 2024, pursuant to an Equity and Asset Purchase Agreement, ownership of the copyrights for the Orange County Register Asserted Works were assigned from MNG Enterprises, Inc. to ORB Publishing, LLC, a named Plaintiff. Ex. 225 [DNP-00105558]. | 338. **Disputed in Part - Not Supported by Cited Evidence; Not Supported by Admissible Evidence.** Defendants respond as follows: Undisputed that News Ex. 225 is an Equity and Asset Purchase Agreement dated January 1, 2024, executed between MNG Enterprises, Inc. and ORB Publishing, LLC. |

| | |
|---|---|
| | However, OpenAI disputes that these documents establish that "ownership of the copyrights for the Orange County Register Asserted Works were assigned through several intermediaries . . . to MNG Enterprises, Inc." News Ex. 225 omits the Disclosure Schedules. *See* News Ex. 225 at DNP-00105563 (Defined Terms). Pursuant to Fed. R. Evid. 106, the Disclosure Schedules [redacted] *See* News Ex. 225 at DNP-00105572–00105579. Without these schedules, the agreement cannot establish that the Orange County Register Asserted Works at issue in this Motion were among the "Acquired Assets" or "Intellectual Property Assets" actually conveyed. Accordingly, the disputed proposition is not supported by the cited evidence. The disputed proposition is also not supported by admissible evidence, as required by Local Rule 56.1, and therefore is not properly before the Court. Specifically, News Ex. 549 is incomplete and unauthenticated. |
| 339. The copyright registration certificates for Pioneer Press Asserted Works are in the name of Northwest Publications, Inc. Ex. 882 [DNP-00263465-70, DNP-00348303, DNP-00002003-2209]. | 339. **Undisputed.** |
| 340. Some copyright registration certificates for the Pioneer Press are in the name of Northwest | 340. **Disputed in Part - Not Supported by Cited Evidence; Not Supported by Admissible** |

| | |
|---|---|
| Publications, Inc. The corporation, Northwest Publications, Inc. was converted to an LLC on July 19, 2026 and became Northwest Publications, LLC. All copyrights in the Pioneer Press Asserted Works are owned by Northwest Publications, LLC, a named plaintiff. Ex. 226 [DNP-00532336 (Name Change)]; See Robyn Decl. at ¶¶25-26. | **Evidence.** Defendants respond as follows: Undisputed that News Ex. 226 is a Delaware Secretary of State-certified Certificate of Conversion reflecting the conversion of Northwest Publications Inc., to Northwest Publications, LLC.<br>Disputed to the extent that only some, and not all, registration certificates for the Pioneer Press are in the name of Northwest Publications. Defendants also dispute that Pioneer Press has demonstrated that the Pioneer Press Asserted Works (articles) were registered by the listed copyright registrations, because the registrations are for newspaper issues (collective works), not individual articles.<br>Further, disputed that "All copyrights in the Pioneer Press Asserted Works are owned by Northwest Publications, LLC" as it is contrary to the record. Pursuant to Fed. R. Evid. 106, when asked at her individual deposition about Northwest Publications, Ms. Morris testified that [redacted] A. Blanco Opp. Decl. Ex. 241 (R. Morris 30(b)(1) Tr. (Dec. 17, 2025)) at 19:11-14.<br>Further disputed as proffering an improper legal conclusion as to ownership of the Asserted Works at issue in this Motion. |
| 341. The Pioneer Press registration certificates for Asserted Works that reference Northwest Publications, Inc. are owned by Northwest Publications, LLC, a named plaintiff. Ex. 882 [DNP-00263465-70, DNP-00348303, | 341. **Disputed in Part - Not Supported by Cited Evidence; Improper Legal Argument; Not Supported by Admissible Evidence.** Defendants respond as follows: Undisputed that certain copyright |

| | |
|---|---|
| DNP-00002003-2209 (Certificates)]; See Robyn Decl. at ¶¶25-26. | registration certificates for the Pioneer Press identify "Northwest Publications, Inc." as the copyright claimant.<br>However, disputed as to the remainder of Paragraph 341. Plaintiffs' assertion as to ownership of the Asserted Works at issue in this Motion constitutes improper attorney argument and/or is conclusory. It thus requires no response. Further disputed as News Ex. 882 appears to be missing. The registrations within merely show that Pioneer Press works were registered with Northwest Publications, Inc. who is listed as the Author/Copyright Claimant. They do not show that registrations that reference Northwest Publication, Inc. are owned by Northwest Publications, LLC. The disputed proposition is therefore not supported by the cited evidence.<br>Further disputed because Paragraph 341 is not supported by admissible record evidence showing valid transfer of ownership of registrations. Pursuant to Fed. R. Evid. 106, when asked at her individual deposition about Northwest Publications, Ms. Morris testified [redacted] A. Blanco Opp. Decl. Ex. 242 (R. Morris 30(b)(1) Tr. (Dec. 17, 2025)) at 19:11-14. Morris also testified [redacted] A. Blanco Opp. Decl. Ex. 243 (R. Morris 30(b)(6) Tr. (Mar. 25, 2026)) at 13:3–14:2, 65:3–12. In her declaration, Ms. Morris states [redacted] |

| | |
|---|---|
| | [redacted] *See* News Ex. 226 at DNP-00532336–337; *see also* ECF 1776 (R. Morris Decl.). That date is not based on Morris' own recollection and appears to have been copied, inaccurately, from a document.<br>To the extent Ms. Morris' ownership testimony rests on information from others, it is inadmissible hearsay because it is an out-of-court statement offered for the truth of its contents. It therefore may not be considered in support of summary judgment. Fed. R. Evid. 801; Fed. R. Evid. 802; Fed. R. Evid. 803. Because the disputed proposition is not supported by admissible evidence, as required by Local Rule 56.1, and therefore is not properly before the Court. |
| 342. The copyright registration certificates for the Denver Post Asserted Works are in the names of Denver Post or The Denver Post. Ex. 878 [DNP-00000187-430, DNP-00035985 - DNP-00036038]. | 342. **Undisputed.** |
| 343. In August 2009, all rights in the Denver Post – including the copyrights for the Denver Post Asserted Works that then existed – were transferred to The Denver Newspaper Agency, LLC. Ex. 227 [DNP-00532245]; Robyn Decl. at ¶¶12-16. | 343. **Disputed in Part - Not Supported by Cited Evidence; Not Supported by Admissible Evidence.** Defendants respond as follows: Undisputed that News Ex. 227 is a Copyright Assignment dated August 26, 2009, between The Denver Post Corporation and The Denver Newspaper Agency LLC.<br>Disputed that this instrument transferred "all rights in the Denver Post — including the copyrights for the Denver Post Asserted Works that then existed." News Ex. 227 [redacted] |

| | |
|---|---|
| | [redacted] (News Ex. 227 at DNP-00532245) [redacted] *See* News Ex. 227 at DNP-00532245. [redacted] There is no evidence in News Ex. 227 or its Schedule A that any Denver Post Asserted Work at issue in this Motion was among the copyrights assigned to The Denver Newspaper Agency, LLC. |

| | |
|---|---|
| | Accordingly, the disputed proposition is not supported by the cited evidence. Additionally, Ms. Morris [redacted] *See* ECF 1948 (R. Morris Decl.) ¶ 1. She does not explain [redacted] *See* Fed. R. Evid. 602 (personal knowledge requirement); *see also* Fed. R. Civ. P. 56(c)(4) (declarations must be "made on personal knowledge" and "set out facts that would be admissible in evidence"). The disputed proposition is therefore not supported by admissible evidence, as required by Local Rule 56.1, and therefore is not properly before the Court. |
| 344. In June 2010, The Denver Newspaper Agency, LLC changed its name to The Denver Post, LLC. Ex. 236 [DNP-00532259]; Robyn Decl. at ¶¶12-16. | 344. **Undisputed.** |
| 345. In June 2017, all rights in the Denver Post – including to the registration certificates for the Denver Post Asserted Works that then existed – were transferred from Denver Post, LLC to DP Media Network, LLC, a named plaintiff, via an asset transfer agreement. Ex. 239 [DNP-00532262]; Robyn Decl. at ¶¶12-16. | 345. **Disputed in Part - Not Supported by Cited Evidence; Not Supported by Admissible Evidence.** Defendants respond as follows: Ex. 239 is an Amended and Restated Limited Liability Company Agreement of DP Media Network LLC, not an "asset transfer agreement." It [redacted] Accordingly, the disputed proposition is not supported by the cited evidence. The Morris Declaration is |

| | |
|---|---|
| | conclusory and does not cure the gap. Paragraph 15 states only that "[redacted] ECF 1776 (R. Morris Decl.). [redacted] The disputed proposition is therefore not supported by admissible evidence, as required by Local Rule 56.1, and therefore is not properly before the Court. |
| 346. After June 2017, Denver Post registration certificates were still filed in the name of The Denver Post instead of DP Media Network, LLC, but they were nevertheless owned by DP Media Network, LLC, a named plaintiff. Ex. 878 [DNP-00000187-430, DNP-00035985 - DNP-00036038]; Robyn Decl. at ¶¶12-16. | 346. **Disputed in Part - Improper Legal Argument; Not Supported by Cited Evidence; Not Supported by Admissible Evidence.** Defendants respond as follows: Undisputed that copyright registration certificates for certain Denver Post works were filed in the name of "The Denver Post" rather than DP Media Network, LLC.<br>However, disputed that these copyrights were "nevertheless owned by DP Media Network, LLC," because Plaintiffs have not produced a valid written instrument of conveyance transferring copyright ownership in the Denver Post Asserted Works at issue in this Motion to DP Media Network, LLC. Accordingly, the disputed proposition is not supported by the cited evidence. The disputed proposition is also not supported by admissible evidence, as required by Local Rule 56.1, and therefore is not properly before the Court. |

| | |
|---|---|
| | Further disputed because ownership for purposes of this motion is a legal conclusion, not a fact. The Court should therefore disregard the disputed portion of Paragraph 346 because the assertion constitutes improper attorney argument and/or is conclusory. It thus requires no response. |
| 347. The copyright registration certificates for the Mercury News Asserted Works are in the names of San Jose Mercury News (2007-2016) and The Mercury News (2016-2024). Ex. 888 [DNP-00000451-942, DNP-00036039 - DNP-00036104]. San Jose Mercury News and The Mercury News are abbreviations, as the Mercury News Asserted Works were at all times since at least 2017 owned by San Jose Mercury News, LLC, a named plaintiff. Ex. 888 [DNP-00000451-942, DNP-00036039 - DNP-00036104]; Robyn Decl. at ¶¶27-28. | 347. **Undisputed.** |
| 348. The copyright registration certificates for the Orlando Sentinel Asserted Works are in the names of Orlando Sentinel Communications (1999-2014) and Orlando Sentinel (2014-2023). Ex. 335 [DNP-00035848-DNP-00035881, DNP-00263284-DNP-00263464, DNP-00348298-302, DNP-00160953- 1088, DNP-00001604-1671]. | 348. **Undisputed.** |
| 349. Orlando Sentinel Communications and Orlando Sentinel are abbreviations, as the Orlando Sentinel Asserted Works were at all times since at least 1999 owned by Orlando Sentinel Communications Company, LLC, a | 349. **Disputed in Part - Not Supported by Cited Evidence; Not Supported by Admissible Evidence; Improper Legal Argument.** Defendants respond as follows: Undisputed that the R. Morris |

| | |
|---|---|
| named plaintiff. Ex. 335 [DNP-00035848-DNP-00035881, DNP-00263284-DNP-00263464, DNP-00348298-302, DNP-00160953- 1088, DNP-00001604-1671]; Robyn Decl. at ¶¶29-30. | Declaration at ¶¶ 29–30 (ECF 1776) states that "Orlando Sentinel Communications" and "Orlando Sentinel" are abbreviations for Orlando Sentinel Communications Company, LLC.<br>Disputed that the Orlando Sentinel Asserted Works at issue in this Action were at all times since at least 1999 owned by Orlando Sentinel Communications Company, LLC because the evidentiary record does not contain any instrument of conveyance, documented chain of title, or other admissible evidence establishing continuous copyright ownership by that specific entity. Therefore, the proposition in Paragraph 349 is not supported by the evidence cited.<br>The facts set forth in Paragraph 349 are also disputed because they are not supported by admissible evidence, as required by Local Rule 56.1, and therefore are not properly before the Court. Specifically, Ms. Morris' declaration is not based on personal knowledge. Pursuant to Fed. R. Evid. 106, she testified that [redacted] A. Blanco Opp. Decl. Ex. 243 (R. Morris 30(b)(6) Tr. (Dec. 17, 2025)) at 47:5-9. When asked [redacted] *Id.* at 47:15-18. A declarant with no knowledge of [redacted] |

| | |
|---|---|
| | [redacted] Pursuant to Fed. R. Evid. 106, [redacted] A. Blanco Opp. Decl. Ex. 33 (R. Morris Dep. Ex. 32) at DNP-00001339.<br>The Court should also disregard this Paragraph because the assertion constitutes improper attorney argument and/or is conclusory. It thus requires no response. |
| 350. The copyright registration certificates for the Sun-Sentinel Asserted Works are in the names of Sun-Sentinel Company (1992-2003), South Florida Sun-Sentinel (2003-2009), and Sun Sentinel Company (2009-2022). Ex. 337 [DNP-00263471-DNP-00263604, DNP-00001343-1603]. Ex. 335 [DNP-00035848-DNP-00035881, DNP-00263284-DNP-00263464, DNP-00348298-302, DNP-00160953- 1088, DNP-00001604-1671]. | 350. **Undisputed.** |
| 351. Sun-Sentinel Company, South Florida Sun-Sentinel, and Sun Sentinel Company are abbreviations, as the Sun-Sentinel Asserted Works were at all times since at least 1992 owned by Sun-Sentinel Company, LLC, a named | 351. **Disputed in Part - Not Supported by Cited Evidence; Improper Legal Argument; Not Supported by Admissible Evidence.** Defendants respond as follows: Undisputed that the Morris declaration |

| | |
|---|---|
| plaintiff. Ex. 335 [DNP-00035848-DNP-00035881, DNP-00263284-DNP-00263464, DNP-00348298-302, DNP-00160953- 1088, DNP-00001604-1671]; Robyn Decl. at ¶¶31-32. | at ¶¶ 31–32 states that "Sun-Sentinel Company, South Florida Sun-Sentinel, and Sun Sentinel Company are abbreviations" for Sun-Sentinel Company, LLC. ECF 1776 (R. Morris Decl.).<br><br>Disputed that "the Sun-Sentinel Asserted Works were at all times since at least 1992 owned by Sun-Sentinel Company, LLC" because the evidentiary record does not contain any instrument of conveyance, documented chain of title, or other admissible evidence establishing continuous copyright ownership by that specific entity. Moreover, the facts set forth in Paragraph 351 are disputed because they are not supported by admissible evidence, as required by Local Rule 56.1, and therefore are not properly before the Court. Specifically, Ms. Morris' declaration is not based on personal knowledge. Pursuant to Fed. R. Evid. 106, she testified [redacted]" A. Blanco Opp. Decl. Ex. 243 (R. Morris 30(b)(6) Tr. (Dec. 17, 2025)) at 47:5-9. When asked [redacted] *Id.* at 47:15-18. A declarant with no knowledge of [redacted] Pursuant to Fed. R. Evid. 106, the |

| | |
|---|---|
| | MediaNews Group Workday exports that Plaintiffs produced, and that were marked as Morris Dep. Exhibit 32, state that "[redacted] A. Blanco Opp. Decl. Ex. 33 (R. Morris 30(b)(6) Dep. Ex. 32) at DNP-00001339. When asked whether she could testify that [redacted] A. Blanco Opp. Decl. Ex. 243 (R. Morris 30(b)(6) Tr. (Dec. 17, 2025)) at 202:20–203:2.<br>The Court should also disregard this Paragraph because the assertion constitutes improper attorney argument and/or is conclusory. It thus requires no response. |
| 352. The Daily News Plaintiffs have produced HR records pulled from the Plaintiffs' Workday system which includes *inter alia*, names, dates of hire, dates of termination, job profiles, as well as the name of the company and location for which identified employees, including staff writers, worked, which have been used to verify that certain names on bylines were employees. Ex. 328 [DNP-00000139]. | 352. **Disputed in Part - Not Supported by Cited Evidence.** Defendants respond as follows: Undisputed that DNPs produced a document that includes names, dates of hire, dates of termination, job profiles, and company and location for which identified employees worked.<br>However, disputed that the document was used to "verify that certain names on bylines were employees." Pursuant to Fed. R. Evid. 106, at least 5,230 articles were written by authors whose names appear in the Daily News Rule 1006 Summaries but not DNP- |

| | |
|---|---|
| | 00000139. News Ex. 328. Record evidence also reflects that DNPs have not produced evidence verifying that all names not listed on the Author Charts were employees or freelancers with work-for-hire agreements. Specifically, Ms. Morris testified that [redacted] A. Blanco Opp. Decl. Ex. 241 (R. Morris 30(b)(6) Tr. (Mar. 25, 2026)) at 39:10–17; Fed. R. Evid. 106. Accordingly, the disputed proposition is not supported by the cited evidence. |
| 353. The Denver Post has produced HR data that includes *inter alia*, names, dates of hire, dates of termination, job profiles, as well as the name of the company and location for which the identified employees, including staff writers, worked which have been used to verify that certain names on bylines were employees. Ex. 246 [DNP-00013400]. | 353. **Disputed in Part - Not Supported by Cited Evidence.** Defendants respond as follows: Undisputed that DNPs produced a document that includes names, dates of hire, dates of termination, job profiles, and company and location for which identified employees worked.<br>However, disputed that the document was used to "verify that certain names on bylines were employees." At least 674 articles were written by authors whose names appear in the Daily News Rule 1006 Summaries but not DNP-0001340. News Ex. 246. Record evidence also reflects that DNPs have not produced evidence verifying that all names not listed on the Author Charts were employees or freelancers with work-for-hire agreements. Specifically, pursuant to Fed. R. Evid. 106, Ms. Morris testified that [redacted] |

| | |
|---|---|
| | [redacted] A. Blanco Opp. Decl. Ex. 241 (R. Morris 30(b)(6) Tr. (Mar. 25, 2026)) at 39:10–17. Therefore, the disputed proposition is not supported by the cited evidence. |
| 354. The Daily News Plaintiffs have produced company census records which include information regarding *inter alia*, names, job profile, hire date, company name, and location for identified employees, including staff writers which have been used to verify that certain names on bylines were employees. Ex. 329 [DNP-0001341]. | 354. **Disputed in Part - Not Supported by Cited Evidence.** Defendants respond as follows: Undisputed that DNPs produced a document that includes names, job profile, hire date, and company and location for which identified employees worked.<br>However, disputed that the document was used to "verify that certain names on bylines were employees." At least 674 articles were written by authors whose names appear in the Daily News Rule 1006 Summaries but not DNP-0001341. News Ex. 329. Record evidence also reflects that DNPs have not produced evidence verifying that all names not listed on the Author Charts were employees or freelancers with work-for-hire agreements. Specifically, pursuant to Fed. R. Evid. 106, Ms. Morris testified that [redacted] A. Blanco Opp. Decl. Ex. 241 (R. Morris 30(b)(6) Tr. (Mar. 25, 2026)) at 39:10–17. Therefore, the |

| | |
|---|---|
| | disputed proposition is not supported by the cited evidence. |
| 355. The Daily News Plaintiffs have produced HR records which include information regarding *inter alia*, names, dates of hire, dates of termination, employee type, time type (e.g., full-time, part-time, etc.), time in position, and name of the employing company for identified employees, including staff writers which have been used to verify that certain names on bylines were employees. Ex. 330 [DNP-0001342]. | 355. **Disputed in Part - Not Supported by Cited Evidence.** Defendants respond as follows: Undisputed that DNPs produced a document that includes names, dates of hire, dates of termination, job profiles, and company and location for which identified employees worked.<br>However, disputed that the document was used to "verify that certain names on bylines were employees." At least 674 articles were written by authors whose names appear in the Daily News Rule 1006 Summaries but not DNP-0001342. News Ex. 330. Record evidence also reflects that DNPs have not produced evidence verifying that all names not listed on the Author Charts were employees or freelancers with work-for-hire [redacted] A. Blanco Opp. Decl. Ex. 241 (R. Morris 30(b)(6) Tr. (Mar. 25, 2026)) at 39:10–17. Therefore, the disputed proposition is not supported by the cited evidence. |
| 356. The Daily News Plaintiffs have produced staff lists maintained in the ordinary course of business for the Denver Post which include the names of various employees | 356. **Disputed in Part - Not Supported by Cited Evidence.** Defendants respond as follows: Undisputed that Daily News Plaintiffs have produced staff |

| | |
|---|---|
| for the Denver Post, including staff writers. Ex. 880 [DNP-00117468-536]. | lists for the Denver Post. However, the other facts set forth in Paragraph 356 are disputed becanse they are not supported by the cited evidence. Specifically, none of the cited employment records [redacted]" *See* News Ex. 880 at DNP-00117468–536. Also disputed to the extent the Denver Post has maintained employment records in the past 5 years and not produced them so that cnrrent statns of writers can be confirmed. [redacted] *See* News Ex. 880 at DNP-00117468–536. |
| 357. The Daily News Plaintiffs have produced staff lists maintained in the ordinary course of bnsiness for the Orange County Register, which include the names of varions staff members of the Orange Connty Register, including staff writers. Ex. 886 [DNP-00632457, DNP-00632475]. | 357. **Disputed in Part - Not Supported by Cited Evidence.** Defendants respond as follows: Undispnted that Daily News Plaintiffs have prodnced staff lists for the Orange Connty Register. However, the other facts set forth in Paragraph 357 are disputed because they are not supported by the cited evidence. [redacted] News Ex. 886 at DNP-00632457–475. Also disputed to the extent the Orange Connty Register has maintained employment records in the past 20 years and has not produced them. Both of the cited documents [redacted] *See id.* |
| 358. The Daily News Plaintiffs have produced staff lists maintained in the ordinary course of bnsiness for the Chicago Tribune which inclnde, *inter alia*, the names of | 358. **Disputed in Part - Not Supported by Cited Evidence.** Defendants respond as follows: Undispnted that Daily News Plaintiffs have prodnced staff lists for the Chicago Tribnne. However, the other facts set |

| | |
|---|---|
| various staff writers for the Chicago Tribune. Ex. 334 [DNP-00636447, DNP-00636773, DNP-00636829]. | forth in Paragraph 358 are disputed because they are not supported by the cited evidence. At least some, if not all, of the Chicago Tribune staff lists were not created in the ordinary course of business. Elaine Varvatos testified that DNP_00597370, for example, [redacted] News Ex. 332, DNP-00597370; *see also* A. Blanco Opp. Decl. Ex. 286 (E. Varvatos 30(b)(1) Tr. (Feb. 25, 2026)) at 142:7-20 [redacted] *id.* at 137:23-138:10 (not [redacted], *id.* at 147:6-148:18 ([redacted]. |
| 359. The New York Daily News produced freelance agreements that include work-for-hire language. Ex. 876 [DNP-00360156, DNP-00359276, DNP-00360204, DNP-00360194, DNP-00359570, DNP-00360121, DNP-00359590, DNP-00360222, DNP-00360126]. | 359. **Disputed in Part.** Defendants respond as follows: Undisputed that the New York Daily News produced freelance agreements. However, disputed to the extent News Plaintiffs suggest that all New York Daily News freelance agreements include "work for hire" or other copyright assignment/transfer language. Record evidence reflects that [redacted] *See* A. Blanco Opp. Decl. Ex. 41 at DNP-00169705; A. Blanco Opp. Decl. Ex. 44 at DNP-00189123; A. Blanco Opp. Decl. Ex. 53 at DNP-00358865; A. Blanco Opp. Decl. Ex. 54 at DNP-00358868. Pursuant to Fed. R. Evid. 106, New York Daily News former managing editor Robert Dominguez testified |

| | |
|---|---|
| | that "[redacted]" A. Blanco Opp. Decl. Ex. 193 (R. Dominguez 30(b)(1) Tr. (Mar. 3, 2026)) at 139:2-6. |
| 360. The Chicago Tribune produced freelance agreements that include work-for-hire language. Ex. 333 [DNP-00534593, DNP-00534595, DNP-00534573, DNP-00359849, DNP-00534561, DNP-00534569, DNP-00534609, DNP-00534619, DNP-00534603, DNP-00534599, DNP-00534557, DNP-00534553, DNP-00534603, DNP-00534597, DNP-00534607, DNP-00534615, DNP-00359040, DNP-00534611, DNP-00534585, DNP-00534581, DNP-00359813, DNP-00359777, DNP-00359044, DNP-00359665, DNP-00359168, DNP-00359148, DNP-00189222, DNP-00189218 (Freelance Agreements)]. | 360. **Disputed in Part.** Defendants respond as follows: Undisputed that the Chicago Tribune produced freelance agreements. However, disputed to the extent News Plaintiffs suggest that all Chicago Tribune freelance agreements include "work for hire" or other copyright assignment/transfer language. Record evidence reflects that [redacted] *See* A. Blanco Opp. Decl. Ex. 67 at DNP-00534601; Ex. 68 at DNP-00534605; Ex. 69 at DNP-00534613. At least 272 articles in the Daily News Rule 1006 Summaries were written by freelancers with no "work for hire" agreement. |
| 361. The Orlando Sentinel produced freelance agreements that include work-for-hire language. Ex. 327 [DNP-00532008, DNP-00532006]. | 361. **Undisputed.** |
| 362. The Sun Sentinel produced freelance agreements that include work-for-hire language. Ex. 338 [DNP-00532021, DNP-00532024, DNP-00532030, DNP-00531997, DNP-00532000, DNP-00532039, DNP-00532027, DNP-00532018, DNP-00531992, DNP-00532036, DNP-00532033, DNP-00532003 (Freelance Agreements with Work-for-Hire Language)]. | 362. **Disputed in Part.** Defendants respond as follows: Undisputed that the Sun Sentinel produced freelance agreements. However, disputed to the extent News Plaintiffs suggest that all Sun Sentinel freelance agreements include "work for hire" or other copyright assignment/transfer language. Record evidence reflects that [redacted] |

| | |
|---|---|
| | [redacted] *See* A. Blanco Opp. Decl. Ex. 56 at DNP-00365402. |
| 363. The Denver Post produced freelance agreements that include work-for-hire language. Ex. 340 [DNP-00473402, DNP-00533839, DNP-00522201]. | 363. **Disputed in Part.** Defendants respond as follows: Undisputed that the Denver Post produced freelance agreements. However, disputed to the extent News Plaintiffs suggest that all Denver Post freelance agreements include "work for hire" or other copyright assignment/transfer language. Record evidence reflects that [redacted] language. *See* A. Blanco Opp. Decl. Ex. 36 at DNP-00127546. |
| 364. The Pioneer Press produced freelance agreements that include work-for-hire language. Ex. 341 [DNP-00468959, DNP-00468964]. | 364. **Disputed in Part.** Defendants respond as follows: Undisputed that the Pioneer Press produced freelance agreements. However, disputed to the extent News Plaintiffs suggest that all Pioneer Press freelance agreements include "work for hire" or other copyright assignment/transfer language. The facts set forth in Paragraph 364 are disputed because they are not supported by the cited evidence. Record evidence reflects that [redacted] *See* A. Blanco Opp. Decl. Ex. 37 at DNP-00128456; Ex. 65 at DNP-00532014. |
| 365. The Daily News Plaintiffs have produced an author chart for the New York Daily News compiled by long- | 365. **Disputed in Part - Not Supported by Cited Evidence.** Defendants respond as follows: |

| | |
|---|---|
| term employee, Editor Robert Dominquez of the New York Daily News in which Mr. Dominguez, with assistance from other members and long-term employees of the New York Daily News, has personally verified the employment status for authors as either a staff writer, freelance writer, or an author who was at one time a staff writer and at other times a freelance writer, and which have been used to verify that certain names on bylines were employees. Ex. 342 [DNP-00597373]; Ex. 343 [R. Dominguez, 3/3/2026, Depo. Tr.] at 150:4-152:14, 153:3-154:2. | Undisputed that DNPs produced a document described as an "author chart" for New York Daily News. However, disputed that Robert Dominguez compiled the author chart as contradicted by record evidence. Specifically, Mr. Dominguez testified that [redacted] A. Blanco Opp. Decl. Ex. 193 (R. Dominguez 30(b)(1) Tr. (Mar. 3, 2026)) at 45:19-46:4. Further disputed as to the accuracy of the "author chart," including because Mr. Dominguez [redacted] *Id.* at 46:5-13. Dominguez further testified [redacted] *Id.* at 53:6-15. Further disputed to the extent articles in the Daily News Plaintiffs' Rule 1006 summaries are attributed to authors who are not listed on the author chart. Dr. Borck identified 5,537 unique bylines in the Daily News Plaintiffs' SJ Rule 1006 summaries where none of the writer names match any of the names that appear in the author charts. J. Borck Opp. Decl. ¶ 45. For example, Justin Tasch is listed as the author for 906 Identified Articles for New York Daily News but does not match any name listed in the Author Charts. *Id.* at ¶ 45(e). |
| 366. The Daily News Plaintiffs have produced an author chart for the Chicago Tribune compiled by employee of 40 years, Elaine Varvatos from the Chicago Tribune in which Elaine personally verified the employment status for authors as either a staff writer, freelance writer, or an author | 366. **Disputed in Part- Not Supported by Cited Evidence.** Defendants respond as follows: Undisputed that an author chart was produced. Disputed as to its accuracy and that it was "used to verify that certain names on bylines were employees." The disputed |

| | |
|---|---|
| who was at one time a staff writer and at other times a freelance writer, and which have been used to verify that certain names on bylines were employees. Ex. 332 [DNP-00597370]; Ex. 344 [E. Varvatos, Feb. 25, 2026, Depo. Tr.] at 22:22-23:8; 23:15-24:15; 133:1-138:10. | propositions are not supported by the cited evidence. Pursuant to Fed. R. Evid. 106, Ms. Varvatos [redacted] A. Blanco Opp. Decl. Ex. 286 (E. Varvatos 30(b)(1) Tr. (Feb. 25, 2026)) at 141:25-142:15 ([redacted], *id.* at 151:24-152:17 ([redacted], *id.* at 147:8-148:18 ([redacted]).<br>Further disputed to the extent articles in the Daily News Plaintiffs' Rule 1006 summaries are attributed to authors who are not listed on the author chart. Dr. Borck identified 5,537 unique bylines in the Daily News Plaintiffs' SJ Rule 1006 summaries where none of the writer names match any of the names that appear in the author charts. J. Borck Opp. Decl. ¶ 45. For example, Barry Temkin is listed as the writer for 1,001 Identified Articles for the Chicago Tribune but does not match any name listed in the author charts, and Chris Hine is listed as the writer for 775 Identified Articles for the Chicago Tribune but does not match any name listed in the author charts. Id. at ¶ 45(c-d). |
| 367. The Daily News Plaintiffs have produced an author chart for the Mercury News compiled by long-term employees, Executive Editor Frank Pine and Sarah Dussault of the Mercury News in which they personally verified the employment status for authors as either a staff writer, freelance writer, or an author who was at one time a staff | 367. **Disputed in Part - Not Supported by Cited Evidence.** Defendants respond as follows: Undisputed that an author chart was produced. Disputed as to its accuracy and that it was "used to verify that certain names on bylines were employees." The disputed propositions are not supported by the cited evidence. Ms. |

| | |
|---|---|
| writer and at other times a freelance writer, and which have been used to verify that certain names on bylines were employees. Ex. 345 [DNP-00651698]; Ex. 325 [R. Morris 30(b)(6), 3/25/2026, Depo. Tr.] at 113:25-114:2; 114:18-115:1. | Morris testified [redacted] A. Blanco Opp. Decl. Ex. 241 (R. Morris 30(b)(6) Tr. (Mar. 25, 2026)) at 113:25-114:2. [redacted] Pursuant to Fed. R. Evid. 106, Ms. Morris also testified [redacted] *Id.* at 54:10-55:10. [redacted] Further disputed to the extent articles in the Daily News Plaintiffs' Rule 1006 summaries are attributed to authors who are not listed on the author chart. Dr. Borck identified 5,537 unique bylines in the Daily News Plaintiffs' SJ Rule 1006 summaries where none of the writer names match any of the names that appear in the author charts. J. Borck Opp. Decl. ¶ 45. For example, Ruth Bancroft is listed as the writer for 39 Identified Articles for the Mercury News but does not match any name listed in the author charts. *Id.* at ¶ 45 (h). |

| | |
|---|---|
| 368. The Daily News Plaintiffs have produced an author chart for the Orlando Sentinel compiled by long-term employee, Roger Simmons of the Orlando Sentinel in which he personally verified the employment status for authors as either a staff writer, freelance writer, or an author who was at one time a staff writer and at other times a freelance writer, and which have been used to verify that certain names on bylines were employees. Ex. 326 [DNP-00597374]; Ex. 325 [R. Morris 30(b)(6), 3/25/2026, Depo. Tr.] at 53:4-20. | 368. **Disputed in Part - Not Supported by Cited Evidence.** Defendants respond as follows: Undisputed that an author chart was produced. Disputed as to its accuracy and that it was "used to verify that certain names on bylines were employees." The disputed propositions are not supported by the cited evidence. Plaintiffs' citations do not mention Roger Simmons or state that he verified the employment status for authors. Pursuant to Fed. R. Evid. 106, Ms. Morris also testified [redacted] A. Blanco Opp. Decl. Ex. 241 (R. Morris 30(b)(6) Tr. (Mar. 25, 2026)) at 54:10-55:10.<br>Further disputed to the extent articles in the Daily News Plaintiffs' Rule 1006 summaries are attributed to authors who are not listed on the author chart. Dr. Borck identified 5,537 unique bylines in the Daily News Plaintiffs' SJ Rule 1006 summaries where none of the writer names match any of the names that appear in the author charts. J. Borck Opp. Decl. ¶ 45. For example, Sarah Sheckler is listed as the writer for 146 Identified Articles for the Orlando Sentinel but does not match any name listed in the author charts. *Id.* at ¶ 45 (g). |
| 369. The Daily News Plaintiffs have produced an author chart for the Pioneer Press compiled by long-term employees of the Pioneer Press in which these employees have personally verified the employment status for authors as either a staff writer, freelance writer, or an author who was at one time a staff writer and at other times a freelance | 369. **Disputed in Part - Not Supported by Cited Evidence.** Defendants respond as follows: Undisputed that an author chart was produced. However, disputed as to its accuracy and that it was "used to verify that certain names on bylines were employees." The disputed proposition is not supported by the cited |

| | |
|---|---|
| writer, and which have been used to verify that certain names on bylines were employees. Ex. 346 [DNP-00597375]; Ex. 18 [M. Burbach, Jan. 30, 2026, Depo. Tr.] at 45:3-46:5. | evidence. Pursuant to Fed. R. Evid. 106, Mr. Burbach testified that [redacted] A. Blanco Opp. Decl. Ex. 180 (M. Burbach 30(b)(1) Tr. (Jan. 30, 2026)) at 44:16-45:2, 45:15-46:5. Ms. Morris also testified [redacted] A. Blanco Opp. Decl. Ex. 241 (R. Morris 30(b)(6) Tr. (Mar. 25, 2026)) at 54:10-55:10.<br>Further disputed to the extent articles in the Daily News Plaintiffs' Rule 1006 summaries are attributed to authors who are not listed on the author chart. Dr. Borck identified 5,537 unique bylines in the Daily News Plaintiffs' SJ Rule 1006 summaries where none of the writer names match any of the names that appear in the author charts. J. Borck Opp. Decl. ¶ 45. For example, Rob Hubbard is listed as the writer for 25 Identified Articles for the Pioneer Press but does not match any name listed in the author charts. *Id.* at ¶ 45 (j). |
| 370. The Daily News Plaintiffs have produced an author chart for the Orange County Register compiled by long-term employee, Todd Harmonson of the Orange County Register in which he personally verified the employment status for authors as either a staff writer, freelance writer, or an author who was at one time a staff writer and at other times a freelance writer, and which have been used to verify that certain names on bylines were employees. Ex. 347 [DNP-00597376]; Ex. 348 [T. Harmonson, Feb. 20, 2026, Depo. Tr.] at 97:6-101:13. | 370. **Disputed in Part – Not Supported by Cited Evidence.** Defendants respond as follows: Undisputed that an author chart was produced. Disputed as to its accuracy and that it was "used to verify that certain names on bylines were employees." The disputed proposition is not supported by the cited evidence. Pursuant to Fed. R. Evid. 106, Mr. Harmonson was [redacted] A. |

| | |
|---|---|
| | Blanco Opp. Decl. Ex. 211 (T. Harmonson 30(b)(1) Tr. (Feb. 20, 2026)) at 104:17-105:9. Further disputed to the extent articles in the Daily News Plaintiffs' Rule 1006 summaries are attributed to authors who are not listed on the author chart. Dr. Borck identified 5,537 unique bylines in the Daily News Plaintiffs' SJ Rule 1006 summaries where none of the writer names match any of the names that appear in the author charts. J. Borck Opp. Decl. ¶ 45. For example, Laura Olson is listed as the writer for 36 Identified Articles for the Orange County Register but does not match any name listed in the author charts. *Id.* at ¶ 45 (i). |
| 371. The Daily News Plaintiffs have produced an author chart for the Sun Sentinel compiled by long-term employee, Gretchen Day-Bryant of the Sun Sentinel in which she personally verified the employment status for authors as either a staff writer, freelance writer, or an author who was at one time a staff writer and at other times a freelance writer, and which have been used to verify that certain names on bylines were employees. Ex. 336 [DNP-00597377]; Ex. 325 [R. Morris 30(b)(6), 3/25/ 2026, Depo. Tr.] at 53:4-20. | 371. **Disputed - Not Supported by Cited Evidence.** Defendants respond as follows: Undisputed that an author chart was produced. Disputed as to its accuracy and that it was "used to verify that certain names on bylines were employees." The disputed proposition is not supported by the cited evidence. Plaintiffs' citations do not mention Gretchen Day-Bryant or state that she verified the employment status for authors. Pursuant to Fed. R. Evid. 106, Ms. Morris also testified [redacted] A. Blanco Opp. Decl. Ex. 241 (R. Morris 30(b)(6) Tr. (Mar. 25, 2026)) at 54:10-55:10. Further disputed to the extent articles in the Daily News Plaintiffs' Rule 1006 summaries are attributed to authors who are not listed on the author chart. Dr. Borck identified 5,537 unique bylines in the Daily News Plaintiffs' SJ Rule 1006 summaries |

| | |
|---|---|
| | where none of the writer names match any of the names that appear in the author charts. J. Borck Opp. Decl. ¶ 45. For example, Adam Lichtenstein is listed as the writer for 384 Identified Articles for the Sun Sentinel but does not match any name listed in the Author Charts. *Id.* at ¶ 45 (f). |
| 372. The Daily News Plaintiffs have also testified as to ownership of Asserted Works based on the use of certain bylines which indicate the work was written by an employee. Ex. 325 [R. Morris 3/25/2026 30(b)(6) Depo. Tr.] at 27:14-19 (testifying regarding ownership for bylines that had the name of the paper). | 372. **Disputed - Not Supported by Cited Evidence.** Defendants respond as follows: The facts set forth in Paragraph 372 are disputed because they are not supported by the cited evidence. Specifically, disputed as to the accuracy of Plaintiffs' statement and that the substance of the statement is supported by Plaintiffs' cited evidence. News Ex. 325 appears to reference Ms. Morris's March 25, 2026 deposition, but contains Ms. Morris's December 17, 2025 deposition transcript. In the cited portion of Ms. Morris's March 25, 2026 deposition, she [redacted] A. Blanco Opp. Decl. Ex. 241 (R. Morris 30(b)(6) Tr. (Mar. 25, 2026)) at 27:14-19. However, pursuant to Fed. R. Evid. 106, Ms. Morris admitted that [redacted] A. Blanco Opp. Decl. Ex. 241 (R. Morris 30(b)(6) Tr. (Mar. 25, 2026)) at 202:23-203-8 [redacted] |

| | |
|---|---|
| | [redacted] |
| 373. An Asserted Work with a byline that reflects the name of the publication "Chicago Tribune" was written by an employee and is owned by the paper. Ex. 325 [R. Morris 30(b)(6), 3/25/2026, Depo. Tr.] at 27:14-19 (testifying regarding ownership for bylines that had the name of the paper); *see also* Ex. 19 [Mitch Pugh 30(b)(1) Depo. Tr.] at 56:15-19 ("Chicago Tribune" byline indicates staff); Ex. 344 [E. Varvatos Depo. Tr.] at 80:20-81:8 ("Chicago Tribune" byline means staff for the 40 years Elaine has personal knowledge). | 373. **Disputed - Not Supported by Cited Evidence.** Defendants respond as follows: The facts set forth in Paragraph 373 are disputed because they are not supported by the cited evidence. In the cited portion of Ms. Morris's March 25, 2026 deposition, Ms. Morris does not testify [redacted] A. Blanco Opp. Decl. Ex. 241 (R. Morris 30(b)(6) Tr. (Mar. 25, 2026)) at 27:14-19. Pursuant to Fed. R. Evid. 106, Ms. Morris also testified [redacted] A. Blanco Opp. Decl. Ex. 241, R. Morris 30(b)(6) (Mar. 25, 2026) Tr. 199:7-13 [redacted] Further, Mr. Pugh testified [redacted] A. Blanco Opp. Decl. Ex. |

| | |
|---|---|
| | 260 (M. Pugh 30(b)(1) Tr. (Jan. 7, 2026)) at 56:15-20. Ms. Varvatos testified that [redacted] A. Blanco Opp. Decl. Ex. 286 (E. Varvatos 30(b)(1) Tr. (Feb. 25, 2026)) at [redacted] |
| 374. An Asserted Work with a byline that reflects the name of the publication, “New York Daily News,” was written by an employee and is owned by the paper. Ex. 325 [R. Morris 3/25/2026 30(b)(6) Depo. Tr.] at 27:14-19 (testifying regarding ownership for bylines that had the name of the paper); *see also* Ex. 349 [Andrew Julien | 374. **Disputed - Not Supported by Cited Evidence.** Defendants respond as follows: Disputed as to the accuracy of Plaintiffs' statement and that the substance of the statement is supported by Plaintiffs' cited evidence. Specifically, the statement is contradicted by the record evidence. In the cited portion of Ms. Morris's March 25, 2026 deposition, Ms. Morris does not testify that DNPs |

| | |
|---|---|
| 30(b)(1) Depo.] at 58:3-19 (Julien testifying "New York Daily News" byline generally indicates staff written). | own articles with particular bylines in the cited testimony. She says [redacted] A. Blanco Opp. Decl. Ex. 241 (R. Morris 30(b)(6) Tr. (Mar. 25, 2026)) at 27:14-19. Pursuant to Fed. R. Evid. 106, Ms. Morris also testified that [redacted] Ex. 241 (R. Morris 30(b)(6) Tr. (Mar. 25, 2026)) at 199:7-13 [redacted] Further, Mr. Julien testified that [redacted] A. Blanco Opp. Decl. Ex. 221 (A. Julien 30(b)(1) Tr. (Jan. 16, 2026)) at 58:3-19. He did not definitively testify that [redacted] A. Blanco Opp. Decl. Ex. 193 (R. Dominguez 30(b)(1) Tr. (Mar. 3, 2026)) at 106:6–14 [redacted] |

| | |
|---|---|
| | [redacted] |
| 375. An Asserted Work with a byline that reflects the name of the publication, "OC Register," was written by an employee and is owned by the paper. Ex. 325 [R. Morris 3/25/2026 30(b)(6) Depo. Tr.] at 27:14-19 (testifying regarding ownership for bylines that had the name of the paper); *see also* Ex. 348 [Harmonson Depo.] at 20:2-16 ("OC Register" byline means written by staff). | 375. **Disputed - Not Supported by Cited Evidence.** Defendants respond as follows: Disputed as to the accuracy of Plaintiffs' statement and that the substance of the statement is supported by Plaintiffs' cited evidence. In the cited portion of Ms. Morris's March 25, 2026 deposition, Ms. Morris does not testify [redacted] A. Blanco Opp. Decl. Ex. 241 (R. Morris 30(b)(6) Tr. (Mar. 25, 2026)) at 27:14-19. Pursuant to Fed. R. Evid. 106, Ms. Morris also testified that [redacted] A. Blanco Opp. Decl. Ex. 241 (R. Morris 30(b)(6) Tr. (Mar. 25, 2026)) at 199:7-13 [redacted] Mr. Harmonson testifies that a byline that says OC Register [redacted] A. Blanco Opp. Decl. Ex. 211 (T. Harmonson 30(b)(1) Tr. (Feb. 20, 2026)) |

| | |
|---|---|
| | at 20:2-16. Pursuant to Fed. R. Evid. 106, later Harmonson admitted [redacted] A. Blanco Opp. Decl. Ex. 211 (T. Harmonson 30(b)(1) Tr. (Feb. 20, 2026)) at 92:16–94:23 [redacted] At least 127 articles in the Daily News Rule 1006 Summaries where the author field contains "Orange County Register" credit an outside source as a contributor. |
| 376. An Asserted Work with a byline that reflects the name of the publication, "Mercury News," was written by an employee and is owned by the paper. Ex. 325 [R. Morris 3/25/2026 30(b)(6) Depo. Tr.] at 27:14-19 (testifying regarding ownership for bylines that had the name of the paper); *see also* Ex. 57 [Pine Feb. 5, 2026 30(b)(6) Depo. Tr.] at 381:8-382:10 (Frank testifying that organization attribution is industry practice to convey staff written articles). | 376. **Disputed - Not Supported by Cited Evidence.** Defendants respond as follows: Disputed as to the accuracy of Plaintiffs' statement and that the substance of the statement is supported by Plaintiffs' cited evidence. The facts set forth in Paragraph 376 are disputed because they are not supported by the cited evidence. In the cited portion of Ms. Morris's March 25, 2026 deposition, Ms. Morris [redacted] A. Blanco Opp. Decl. Ex. 211 (R. Morris |

| | |
|---|---|
| | 30(b)(6) Tr. (Mar. 25, 2026)) at 27:14-19. Ms. Morris also testified [redacted] *Id.* at 199:7-13 [redacted]. Mr. Pine testified [redacted] A. Blanco Opp. Decl. Ex. 256 (F. Pine 30(b)(6) Tr. (Feb. 5, 2026)) at 381:8-11. However, the cited testimony does not mention [redacted] *Id.* at 385:1-387:2. |
| 377. An Asserted Work with a byline that reflects the name of the publication, "Denver Post," was written by an employee and is owned by the paper. Ex. 325 [R. Morris 3/25/2026 30(b)(6) Depo. Tr.] at 27:14-19 (testifying regarding ownership for bylines that had the name of the paper). | 377. **Disputed - Not Supported by Cited Evidence.** Defendants respond as follows: Disputed as to the accuracy of Plaintiffs' statement and that the substance of the statement is supported by Plaintiffs' cited evidence. In the cited portion of Ms. Morris's March 25, 2026 deposition, Ms. Morris [redacted] A. Blanco Opp. Decl. Ex. 241 (R. Morris 30(b)(6) Tr. (Mar. 25, 2026)) at 27:14-19. Ms. Morris also testified [redacted] |

| | |
|---|---|
| | [redacted] *Id.* at 199:7-13 [redacted] |
| 378. An Asserted Work with a byline that reflects the name of the publication, "Sun Sentinel," was written by an employee and is owned by the paper. Ex. 325 [R. Morris 3/25/2026 30(b)(6) Depo. Tr.] at 27:14-19 (testifying regarding ownership for bylines that had the name of the paper) | 378. **Disputed - Not Supported by Cited Evidence.** Defendants respond as follows: Disputed as to the accuracy of Plaintiffs' statement and that the substance of the statement is supported by Plaintiffs' cited evidence. In the cited portion of Ms. Morris's March 25, 2026 deposition, Ms. Morris [redacted] A. Blanco Opp. Decl. Ex. 241 (R. Morris 30(b)(6) Tr. (Mar. 25, 2026)) at 27:14-19. Ms. Morris also testified that she cannot tell who wrote a given article when the byline is the name of the publication. *Id.* at 199:7-13 [redacted] |

| | |
|---|---|
| | [redacted] |
| 379. An Asserted Work with a byline that reflects the name of the publication, "Orlando Sentinel," was written by an employee and is owned by the paper. Ex. 325 [R. Morris 3/25/2026 30(b)(6) Depo. Tr.] at 27:14-19 (testifying regarding ownership for bylines that had the name of the paper). | 379. **Disputed - Not Supported by Cited Evidence.** Defendants respond as follows: Disputed as to the accuracy of Plaintiffs' statement and that the substance of the statement is supported by Plaintiffs' cited evidence. In the cited portion of Ms. Morris's March 25, 2026 deposition, Ms. Morris [redacted] A. Blanco Opp. Decl. Ex. 241 (R. Morris 30(b)(6) Tr. (Mar. 25, 2026)) at 27:14-19. Ms. Morris also testified [redacted] *Id.* at 199:7-13 [redacted] Further, Ms. Morris [redacted] *Id.* at 146:16-148:13. |

| | |
|---|---|
| 380. An Asserted Work with a byline that reflects the name of the publication, "Pioneer Press," was written by an employee and is owned by the paper. Ex. 325 [R. Morris 3/25/2026 30(b)(6) Depo. Tr.] at 27:14-19 (testifying regarding ownership for bylines that had the name of the paper). | 380. **Disputed - Not Supported by Cited Evidence.** Defendants respond as follows: Disputed as to the accuracy of Plaintiffs' statement and that the substance of the statement is supported by Plaintiffs' cited evidence. In the cited portion of Ms. Morris's March 25, 2026 deposition, Ms. Morris [redacted] A. Blanco Opp. Decl. Ex. 241 (R. Morris 30(b)(6) Tr. (Mar. 25, 2026)) at 27:14-19. Ms. Morris also testified that [redacted] *Id.* at 199:7-13 [redacted]<br><br>Mike Burbach also testified [redacted] A. Blanco Opp. |

| | |
|---|---|
| | Decl. Ex. 180 (M. Burbach 30(b)(1) Tr. (Jan. 30, 2026)) at 65:6-66:8.<br>Among the Daily News Rule 1006 Summary rows where the author field contains "Pioneer Press," there are at least 123 articles that credit an outside source (e.g., the Associated Press, Forum News Service, New York Times) as a contributor. In at least 78 of those articles, the Daily News Rule 1006 Summary byline lists writers who are associated with Pioneer Press, even though the corresponding online article's byline credits only the Associated Press. *See, e.g.*, A. Blanco Opp. Decl. Ex. 90 (Assoc. Press, Berrian sold on Favre, Pioneer Press) |
| 381. An Asserted Work with a byline that references Bay Area News Group (or "BANG") was written by an employee and is owned by the Mercury News. Ex. 325 [R. Morris 3/25/2026 30(b)(6) Depo. Tr.] at 116:10-15 (testifying that if the byline includes reference to the cluster "BANG," Plaintiffs' would own those articles). | 381. **Disputed - Not Supported by Cited Evidence.** Defendants respond as follows: Disputed as to the accuracy of Plaintiffs' statement and that the substance of the statement is supported by Plaintiffs' cited evidence. In the cited testimony from Ms. Morris's March 25, 2026 deposition, when [redacted] A. Blanco Opp. Decl. Ex. 241 (R. Morris 30(b)(6) Tr. (Mar. 25, 2026)) at 116:10-19. |

| | |
|---|---|
| | Sarah Dussault also admitted [redacted] A. Blanco Opp. Decl. Ex. 195 (S. Dussault 30(b)(1) Dep Tr.) at 62:2–5 [redacted] |
| 382. An Asserted Work with a byline that references a community paper associated with a Plaintiff Paper was written by an employee owned by the associated plaintiff. Ex. 325 [R. Morris 3/25/2026 30(b)(6) Depo. Tr.] at 121:3-11 (testifying that Mercury News would own the articles in the community paper, SVCN); Ex. 344 [E. Varvatos 2/25/2026 Depo. Tr.] at 47:4-23 (testifying that the Chicago Tribune owns the suburban papers). | 382. **Disputed - Not Supported by Cited Evidence.** Defendants respond as follows: Disputed as to the accuracy of Plaintiffs' statement, that the substance of the statement is supported by Plaintiffs' cited evidence, and is contradicted by the record evidence. In the cited testimony from Ms. Morris's March 25, 2026 deposition, Ms. Morris testifies [redacted] A. Blanco Opp. Decl. Ex. 241 (R. Morris 30(b)(6) Tr. (Mar. 25, 2026)) at 121:3-11.<br>In the cited excerpt of News Ex. 344, Ms. Varvatos testifies [redacted] A. Blanco Opp. Decl. Ex. 286 (E. Varvatos 30(b)(1) Tr.) at 47:18-48:13 [redacted] |

| | |
|---|---|
| | [redacted] Although Plaintiffs have provided no evidence of ownership of any community paper, Plaintiffs assert at least 1,884 articles where the "Author(s)" field in the Rule 1006 summary references a community paper. For example, there are 1,209 articles in the Rule 1006 Summaries for which Jerry McDonald is included in the Author(s) field. [redacted] (DNP-00001341). There are 659 articles in the Rule 1006 Summaries for which Joshua Melvin is included in the Author(s) field. [redacted] News Ex. 328 (DNP-00001339). Ownership of the Contra Costa Times and San Mateo County Times, and thus of any articles attributed to them, is not supported by the cited evidence. |
| 383. An Asserted Work with a byline such as, "staff," "staff report," "editorial board," or some iteration | 383. **Disputed - Not Supported by Cited Evidence.** Defendants respond as follows: The cited |

| | |
|---|---|
| thereof that does not attribute staff to a third-party is written by the staff of the newspaper in which the Asserted Work appeared and owned by that newspaper. Ex. 325 [R. Morris 3/25/2026 30(b)(6) Depo. Tr.] at 152:20-153:4 (testifying that a Staff Report byline would generally be written by a staff writer); *see also* Ex. 19 [Mitch Pugh 30(b)(1) Depo. Tr.] at 112:6-9 (Pugh testifying that he has seen "staff" used for many staff writers working on a breaking news story); Ex. 18 [Burbach Depo. Tr.] at 58:2-13 ("staff" or "staff/wire reports" indicates written/assembled by Pioneer Press staff); Ex. 350 [Dussault Depo. Tr.] at 26:6-27:13 ("staff" bylines and freelancer content would be owned by the Mercury News); | testimony does not establish that all Asserted Works bearing a "staff," "staff report," "editorial board," or similar byline were written by employees of the respective newspapers or are owned by those newspapers. Morris, Pugh, Burbach, and Dussault did not testify that such bylines conclusively establish staff authorship or ownership across all Asserted Articles, nor do they speak for all News Plaintiffs. Indeed, Morris acknowledged that [redacted] A. Blanco Opp. Decl. Ex. 241 (R. Morris 30(b)(6) Tr. (Mar. 25, 2026)) at 153:11–21, 202:23–203:8; A. Blanco Opp. Decl. Ex. 180 (M. Burbach Tr.) at 58:23–59:15; A. Blanco Opp. Decl. Ex. 260 (M. Pugh 30(b)(1) Tr.) at 112:6-9; A. Blanco Opp. Decl. Ex. 195 (S. Dussault Tr.) at 26:6-27:13. Moreover, a byline alone does not establish copyright ownership, which is a legal conclusion rather than a fact.<br>Furthermore, Dr. Borck identified at least 720,011 articles in the Daily News Plaintiffs' Rule 1006 summaries for which the byline credits an institution and/or does not name any identifiable writers who contributed to the article. J. Borck Opp. Decl. ¶ 41. For example, he identified at least 131 articles in which the "Author(s)" field in the Rule 1006 summaries contains "Orange County Register" but the article text credits an outside source (e.g., City News Service, Bloomberg), and at least 239 articles listing |

| | |
|---|---|
| | "Pioneer Press" in the "Author(s)" field that credit an outside source as a contributor (e.g., the Associated Press, New York Times). *Id.* at ¶ 42(a). There are also at least 73 articles for which the "Author(s)" field in the Daily News Plaintiffs' SJ Rule 1006 summaries lists writers associated with Pioneer Press, even though the byline of the online version of the corresponding article credits only the Associated Press. *Id.* Additionally, he identified that 16 articles include "Editorial Board" in the "Author(s)" field, but the bylines in the online versions of the articles list writers associated with other publications. *Id.* at ¶ 42(b). |
| 384. Email addresses associated with one of the Daily News Plaintiffs are only given to full-time employees (including staff writers) and thus, articles that include these email addresses would be staff-written and owned by that newspaper. Ex. 325 [R. Morris 3/25/2026 30(b)(6) Depo. Tr.] at 110:3-6 ("A If the article included an email address with a domain that matches the name of the paper, then it was safe to say that person was also a staff writer for that paper.); *see also* Ex. 351 [L. Colacioppo 30(b)(1) Depo. Tr.] at 60:17-20 (Denver Post email address means staff written); Ex. 22 [Andrew Julien 30(b)(6) Depo. Tr.] 38:7-9 (@nydailynews.com email addresses are for staff writers). | 384. **Disputed.** Defendants respond as follows: Disputed as to the accuracy of Plaintiffs' statement and that the substance of the statement is supported by Plaintiffs' cited evidence. The statement is contradicted by the record evidence.<br>The cited portions of Ms. Morris' March 25, 2026 deposition and News Exs. 351 and 22 say that [redacted] However, other deposition testimony indicates [redacted] Pursuant to Fed. R. Evid. 106, Robert Dominguez testified [redacted] A. Blanco Opp. Decl. Ex. 193 (R. Dominguez 30(b)(1) Tr.) at 129:18–22 [redacted] |

| | |
|---|---|
| | [redacted] Todd Harmonson admitted that [redacted] A. Blanco Opp. Decl. Ex. 211 (T. Harmonson 30(b)(1) Tr.) at 86:12–17.<br>For example, here are 161 articles in the new summaries with a byline of "Katrina Pross kpross@pioneerpress.com," but Katrina Pross [redacted] (*News* Exs. 328-29) or [redacted] (A. Blanco Opp. Decl. Ex. 78 at DNP-00597370–377). There are [redacted] (*News* Exs. 328-29) [redacted] A. Blanco Opp. Decl. Ex. 78 at DNP-00597370–377). |

### 3. Ziff Davis

| | |
|---|---|
| 385. Ziff Davis holds copyright registrations for more than two million works with the U.S. Copyright Office, using four primary registration formats: (1) Group Registrations for News Websites (GRNW); (2) database registrations covering editorial archives; (3) serial registrations; and (4) individual article registrations. | 385. **Disputed in Part.** OpenAI responds as follows: Undisputed that the cited evidence contains four types of copyright registrations: (1) Group Registrations for News Websites (GRNW); (2) database registrations covering editorial archives; (3) serial registrations; and (4) individual article registrations. Disputed that Ziff Davis |

| | |
|---|---|
| Declaration of Robert Taylor ("Taylor Decl.") ¶19; Ex. 352 [ZD0668175–180] (GRNW registration certificates for Mashable.com); Ex. 353 [ZD0631198–205] (database registration certificates); Ex. 354 [ZD0631212] (database registration certificates); Ex. 355 [ZD0632785-786] (database registration certificates); Ex. 356 [ZD0576916-953] (database registration certificates); Ex. 357 [ZD0668127–174] (database registration certificates); Taylor Decl. Ex. J (list of database registrations); Taylor Decl. Ex. N (serial registration certificates); Taylor Decl. Ex. L (DailyOM database registrations); Taylor Decl. Ex. Q (MedPage Today database registration); Ex. 358 [ZD0631559–644] (exemplary individual article registrations for IGN); Ex. 359 [ZD0631657–710] (exemplary individual article registrations for IGN); Ex. 360 [ZD0629955–972] (exemplary individual article registrations for CNET); Ex. 361 [ZD0631258–267] (exemplary individual article registrations for BabyCenter); Ex. 362 [ZD0631381–392] (exemplary individual article registrations for What to Expect); Ex. 363 [First Am. Compl., Ex. B]; Ex. 364 [Ziff Davis's Supplemental Response to Interrogatory No. 2 (Apr. 17, 2026)]. | holds copyright registrations for more than two million works to the extent that Ziff Davis only asserts 1,636,586 articles for purposes of summary judgment.<br>Further, disputed to the extent the statement in Paragraph 385 implies that the copyright registrations referred to therein are valid or that Ziff Davis owns the copyright in the Asserted Articles. Copyright registration validity and copyright ownership are legal conclusions, not statements of fact appropriate for a 56.1 statement.<br><br>Microsoft responds that these facts do not pertain to claims asserted against Microsoft. |
| 386. Ziff Davis moves for summary judgement on ownership of 1,636,586 works (the "ZD Asserted Works"). Each ZD Asserted Work, along with relevant ownership information and copyright registration information, is identified in a Rule 1006 summary. Decl. of Lacy H. ("Lance") Koonce, III ("Koonce Decl."), Ex. AA–TT | 386. **Disputed in Part - Not Supported by Admissible Evidence; Not Supported by Cited Evidence.** OpenAI responds as follows: Disputed that the Rule 1006 summaries referenced in the statement are properly presented as Rule 1006 summaries. To the extent that the Rule 1006 summaries purport to state any claims |

| | |
|---|---|
| (collectively, the "ZD Rule 1006 Summaries"). *See also* Taylor Decl. ¶¶ 47–55. | of ownership of the articles listed therein, they are improperly argumentative and therefore inadmissible under Fed. R. Evid. 1006 and 403. *Guan*, 2026 WL 1948543, at *1 (stating that Rule 1006 summaries are subject to exclusion under Fed. R. Evid. 403, meaning "if the summary does not accurately reflect the underlying voluminous evidence, or if it is argumentative, its probative value may be substantially outweighed by the risk of unfair prejudice or confusion.") (quoting Fed. R. Evid. 1006 Advisory Committee Notes on 2024 Amendment).<br>Disputed to the extent that Plaintiffs suggest that all the information contained in the ZD Rule 1006 Summary is accurate. Further disputed because not all evidence in the ZD Rule 1006 Summary is reliable or admissible evidence of ownership. For example, Plaintiffs have acknowledged that [redacted] A. Blanco Opp. Decl. Ex. 284 (L. Turrentine 30(b)(6) Tr.) at 64:9-65:6. Because the disputed proposition is not supported by admissible evidence, as required by Local Rule 56.1, it is not properly before the Court.<br><br>Microsoft responds that these facts do not pertain to claims asserted against Microsoft. |
| 387. Ziff Davis has created a separate ZD Rule 1006 summary for each digital media brand under which the ZD Asserted Works were published: | 387. **Disputed in Part.** OpenAI responds as follows: Undisputed that there are Rule 1006 Excel files corresponding to each of the 20 listed domains. Disputed |

| Exhibit Number | Brand (copyright owner) |
|---|---|
| Koonce Decl. Ex. AA [CNET Rule 1006 Summary] | CNET (Ziff Davis, LLC) |
| Koonce Decl. Ex. BB [Mashable Rule 1006 Summary] | Mashable (Ziff Davis, LLC) |
| Koonce Decl. Ex. CC [ZDNET Rule 1006 Summary] | ZDNet (Ziff Davis, LLC) |
| Koonce Decl. Ex. DD [Lifehacker Rule 1006 Summary] | Lifehacker (Ziff Davis, LLC) |
| Koonce Decl. Ex. EE [PCMag Rule 1006 Summary] | PCMag (Ziff Davis, LLC) |
| Koonce Decl. Ex. FF [IGN Rule 1006 Summary] | IGN (IGN Entertainment, Inc.) |
| Koonce Decl. Ex. GG [Rock Paper Shotgun Rule 1006 Summary] | Rock Paper Shotgun (IGN Entertainment, Inc.) |
| Koonce Decl. Ex. HH [VG247 Rule 1006 Summary] | VG247 (IGN Entertainment, Inc.) |
| Koonce Decl. Ex. II [Eurogamer Rule 1006 Summary] | Eurogamer (IGN Entertainment, Inc.) |
| Koonce Decl. Ex. JJ [Dicebreaker Rule 1006 Summary] | Dicebreaker (IGN Entertainment, Inc.) |
| Koonce Decl. Ex. KK [GamesIndustry Rule 1006 Summary] | Games Industry (IGN Entertainment, Inc.) |
| Koonce Decl. Ex. LL [Everyday Health Rule 1006 Summary] | Everyday Health (Everyday Health Media, LLC) |
| Koonce Decl. Ex. MM [MedPage Today Rule 1006 Summary] | MedPage Today (Medpage Today, LLC) |
| Koonce Decl. Ex. NN [Diabetes Daily Rule 1006 Summary] | Diabetes Daily (Everyday Health Media, LLC) |
| Koonce Decl. Ex. OO [bpHope Rule 1006 Summary] | bpHope (Everyday Health Media, LLC) |
| Koonce Decl. Ex. PP [Lose It Rule 1006 Summary] | LoseIt! (Everyday Health Media, LLC) |
| Koonce Decl. Ex. QQ [Migraine Again Rule 1006 Summary] | Migraine Again (Everyday Health Media, LLC) |
| Koonce Decl. Ex. RR [Daily OM Rule 1006 Summary] | Daily OM (Everyday Health Media, LLC) |
| Koonce Decl. Ex. SS [BabyCenter Rule 1006 Summary] | BabyCenter (Everyday Health Media, LLC) |
| Koonce Decl. Ex. TT [What to Expect Rule 1006 Summary] | What to Expect (Everyday Health Media, LLC) |

that the files are separated by brand, as the ZDNET Rule 1006 files contain some CNET articles. Specifically: "ZDNET_Rule_1006_part1" contains 3 CNET articles and "ZDNET_Rule_1006_part2" contains 139 CNET articles.

Disputed that the Rule 1006 summaries referenced in the statement are properly presented as Rule 1006 summaries. To the extent that the Rule 1006 summaries purport to state any claims of ownership of the articles listed therein, they are improperly argumentative and therefore inadmissible under Fed. R. Evid. 1006 and 403. *Guan*, 2026 WL 1948543, at *1 (stating that Rule 1006 summaries are subject to exclusion under Fed. R. Evid. 403, meaning "if the summary does not accurately reflect the underlying voluminous evidence, or if it is argumentative, its probative value may be substantially outweighed by the risk of unfair prejudice or confusion.") (quoting Fed. R. Evid. 1006 Advisory Committee Notes on 2024 Amendment).

Disputed to the extent that Plaintiffs suggest that all the information contained in the ZD Rule 1006 Summary is accurate. Further disputed because not all evidence in the ZD Rule 1006 Summary is reliable or admissible evidence of ownership. For example, Plaintiffs have acknowledged that [redacted] A. Blanco Opp. Decl. Ex. 284 (L. Turrentine 30(b)(6) Tr.) at 64:9-65:6.

| | |
|---|---|
| | Microsoft responds that these facts do not pertain to claims asserted against Microsoft. |
| 388. For each ZD Asserted Work in the ZD Rule 1006 Summary, the spreadsheet lists: (a) the date the ZD Asserted Work was first made available online (Column A); (b) the URL at which the ZD Asserted Work was made available (Column B); (c) the title of the ZD Asserted Work (Column C); (d) the byline for the ZD Asserted Work (any work that has a "staff" byline is treated as written by Ziff Davis editorial staff) (Column D); (e) the copyright registration numbers for the registrations covering the ZD Asserted Work (Column E); (f) whether the ZD Asserted Work was created as a work-for-hire or otherwise subject to an agreement assigning ownership from the writer to the contracting entity (Column F); (g) whether the ZD Asserted Work was written by an employee or a freelancer (articles written by employees are marked as "yes" and articles written by freelancers are marked as "freelancer.") (Column G); (h) the source of additional evidence of ownership of each ZD Asserted Work (including staff lists, vendor lists, independent contractor agreements, and testimony of Ziff Davis witnesses) (Column H); (i) a unique article identifier (Column I); (j) the full text of the ZD Asserted Work. Taylor Decl. ¶¶ 50–55. | 388. **Disputed in Part - Not Supported by Cited Evidence.** OpenAI responds as follows: Not disputed that Columns A, B, C, D, E, F, G, H, and J contain the asserted information. Disputed that Column I contains the asserted information. Only the BabyCenter and What to Expect spreadsheets contain a unique article identifier in Column I. Disputed to the extent that Plaintiffs suggest that all the information contained in the ZD Rule 1006 Summary is accurate. Further disputed because not all evidence in the ZD Rule 1006 Summary is reliable or admissible evidence of ownership. For example, Plaintiffs have [redacted] A. Blanco Opp. Decl. Ex. 284 (L. Turrentine 30(b)(6) Tr.) at 64:9-65:6.<br><br>Microsoft responds that these facts do not pertain to claims asserted against Microsoft. |
| 389. It is standard practice for Ziff Davis and its entities to include work-for-hire language and alternative copyright assignment language in the freelance or independent contractor agreement it executes with a | 389. **Disputed in Part - Not Supported by Admissible Evidence.** OpenAI responds as follows: Undisputed that some freelance and independent contractor agreements Ziff Davis produced contained both |

| | |
|---|---|
| writer. In a few instances, however, freelance or independent contractor agreements used by entities that have been acquired by Ziff Davis may have contained either work-for-hire language or alternative copyright assignment language, but not both. Taylor Decl. ¶ 13. | a work-for-hire clause and an alternative copyright assignment clause. Disputed that all of the freelance and independent contractor agreements Ziff Davis produced contained both a work-for-hire clause and an alternative copyright assignment clause, or that it is standard practice to include such language in Ziff Davis contracts. For example, there are [redacted] A. Blanco Opp. Decl. [redacted] A. Blanco Opp. Decl. [redacted] These freelancers' agreements state [redacted] Furthermore, Dr. Borck identified that Ziff Davis's SJ Rule 1006 summaries list the names of at least 20 writers who have freelance agreements without work-for-hire language. J. Borck Opp. Decl. ¶ 53. For example, there are at least 3 Mashable agreements that do not contain "work for hire" or copyright assignment language. *Id.* There are also at least 17 Amendments to Freelance Master Agreements that do not contain work-for-hire language and for which Dr. Borck could not locate the underlying master agreements in either prior or present productions by searching for agreements with the same or similar freelancer names. *Id.*<br>Disputed in that the Taylor declaration is not based on personal knowledge of the facts asserted. Mr. Taylor has |

| | |
|---|---|
| | held his current role only since 2022. ECF 1826 (R. Taylor Decl.) ¶ 3. Ziff Davis acquired IGN in 2013, Everyday Health in 2016, Mashable in 2017, and CNET in 2024. *Id.* at ¶¶ 7–10. Mr. Taylor says his knowledge comes from his "[redacted]" He says he is only "[redacted]" with Ziff Davis's agreements with independent contractors. *Id.* at ¶ 4. Further, Taylor concedes that "[redacted] *Id.* at ¶ 18. No witness can testify based on documents to a uniform "standard practice" covering agreements Ziff Davis no longer has. <br><br> Disputed as contrary to the record. MedPage Today's Rule 30(b)(6) designee testified that [redacted] A. Blanco Opp. Decl. Ex. 288 (R. Warren 30(b)(6) Tr.) at 61:13–62:6. Ziff Davis's 30(b)(6) designee, Joseph Fortuna, did not know whether Ziff Davis "[redacted] A. Blanco Opp. Decl. Ex. 199 (J. Fortuna 30(b)(6) Tr.) at 246:17–247:11. The CNET Group's corporate designee testified that Ziff Davis owns all CNET Group content because [redacted] She admitted [redacted] |

| | |
|---|---|
| | [redacted] A. Blanco Opp. Decl. Ex. 284 (L. Turrentine 30(b)(6) Tr.) at 56:3–22. Ziff Davis's CFO and 30(b)(6) designee, [redacted] A. Blanco Opp. Decl. Ex. 265 (B. Richter 30(b)(6) Tr.) at 144:17–145:11.<br><br>Microsoft responds that these facts do not pertain to claims asserted against Microsoft. |
| 390. Each individual named in the byline for a given ZD Asserted Work was either an employee of one of the Ziff Davis Plaintiffs (or its predecessor or affiliate companies) or was a freelance writer whose independent contractor agreement gives the respective Ziff Davis Plaintiff (or predecessor or affiliate company) ownership over the article via work-for-hire and/or alternative assignment language. Taylor Decl. ¶¶ 12–17. Articles written by individuals for which this determination could not be made are not included in the ZD Asserted Works. Taylor Decl. ¶ 45. | 390. **Disputed in Part - Not Supported by Admissible Evidence; Not Supported by Cited Evidence; Improper Legal Argument.** OpenAI responds as follows: Undisputed that Ziff Davis attached exemplar freelancer agreements to the Taylor Declaration.<br>However, disputed that the cited evidence establishes that every bylined author of a Ziff Davis Asserted Work was either a qualifying employee or a freelancer whose agreement transferred copyright ownership to the relevant Ziff Davis entity, or that all works for which ownership could not be established were reliably excluded. ECF 1826 (R. Taylor Decl.) ¶¶ 12–17, 45. The Taylor Declaration does not establish the employment status or contractual terms applicable to each author and work. Indeed, Taylor [redacted] *Id.* ¶¶ 18, 38–45. Other Ziff Davis witnesses |

| | |
|---|---|
| | likewise acknowledged [redacted] *See* A. Blanco Opp. Decl. Ex. 288 (R. Warren 30(b)(6) Tr.) at 61:14–62:6; A. Blanco Opp. Decl. Ex. 199 (J. Fortuna 30(b)(6) Tr.) at 246:19–247:10; A. Blanco Opp. Decl. Ex. 199 (L. Turrentine 30(b)(6) Tr.) at 56:3–22; A. Blanco Opp. Decl. Ex. 265 (B. Richter 30(b)(6) Tr.) at 144–45; Fed. R. Evid. 106. The disputed proposition is therefore not supported by the cited evidence. The disputed proposition is also not supported by admissible evidence, as required by Local Rule 56.1, and therefore is not properly before the Court.<br>Moreover, whether any particular work qualifies as a work made for hire or was validly assigned is a legal conclusion, not a historical fact properly included in a Local Rule 56.1 statement. It thus requires no response.<br>Further, disputed to the extent that there are 3,135 articles with empty or non-identifying "Author" fields in the Ziff Davis Rule 1006 summaries. *See* J. Borck Opp. Decl. ¶ 54. Disputed to the extent that there are at least 940 articles for which the "Author" field consists of references to such third-party organizations. *Id.* at ¶ 55. Disputed to the extent that there are at least 334 articles for which the "Author" field contains a reference to a first name and last name, followed by a stated affiliation to a third-party organization. *Id.* at ¶ 57.<br><br>Microsoft responds that these facts do not pertain to claims asserted against Microsoft. |

| | |
|---|---|
| 391. Each ZD Asserted Work for *CNET, Mashable, PCMag, Lifehacker,* and *ZDNET* is owned by Ziff Davis, LLC. Taylor Decl. ¶ 17. These articles were written by employees of Ziff Davis, LLC (or its predecessor companies) or freelance writers whose agreements with Ziff Davis, LLC (or predecessor companies) contain work-for-hire and (in most instances) assignment language. Taylor Decl. ¶ 17; Ex. 365 [ZD0547723] (example of freelancer agreement between Ziff Davis, LLC and writer); Ex. 366 [Turrentine 30(b)(6) Depo. Tr.] at 58:4–7 ("Q. Are there – beyond freelancers and full-time employees, are there any other arrangements for writers? A. No, not that I'm aware of."), 59:9–12 ("Q. Do you know which writers sign a freelancer agreement like this one, or independent contractor agreement like this one? A. Any freelance writer for our website."), 60:18–20 ("Q. Do writers ever retain any rights in their works? A. No."). | 391. **Disputed - Not Supported by Cited Evidence; Not Supported by Admissible Evidence; Improper Legal Argument.** OpenAI responds as follows: Copyright ownership is a legal conclusion and not a fact. The Court should disregard this Paragraph because the assertion constitutes improper attorney argument and/or is conclusory. It thus requires no response.<br>Further, the cited evidence does not support Ziff Davis' claims of ownership. The facts set forth in Paragraph 391 are also not supported by admissible evidence, as required by Local Rule 56.1, and therefore are not properly before the Court.<br>Ziff Davis' own declaration contradicts the entity-level ownership claims in ¶ 17 of the Taylor Declaration. [redacted]<br>Pursuant to Fed. R. Evid. 106, Ziff Davis' 30(b)(6) designee testified that [redacted] A. Blanco Opp. |

| | |
|---|---|
| | Decl. Ex. 252 (R. Parisi 30(b)(6) Tr.) at 68:8–9. Mr. Taylor acknowledges [redacted]<br><br>The Taylor declaration is not based on personal knowledge of the facts asserted. Mr. Taylor has held his current role only since 2022. ECF 1826 (R. Taylor Decl.) ¶ 3. Ziff Davis acqnired IGN in 2013, Everyday Health in 2016, Mashable in 2017 and CNET in 2024. *Id.* ¶¶ 7-10. Mr. Taylor says his knowledge comes from his [redacted] " He says [redacted] A. Blanco Opp. Decl. Ex. 156 at ZD0550396; A. Blanco Opp. Decl. Ex. 160 at ZD0551122; A. Blanco Opp. Decl. Ex. 158 at ZD0548117; A. Blanco Opp. Decl. Ex. 157 ZD0528029. It says nothing about any specific work, author or agreement for the asserted works. Exemplary agreements with a handful of writers says nothing about who wrote decades of CNET, ZDNET, PCMag, Mashable and Lifehacker content. It also says nothing abont what agreements those writers signed.<br><br>The cited Turrentine testimony [redacted] A. Blanco Opp. Decl. Ex. 284 (L. Turrentine 30(b)(6) Tr.) at 55:21–56:9; Fed. R. |

| | |
|---|---|
| | Evid. 106. [redacted] *Id.* at 56:3–22; Fed. R. Evid. 106. [redacted] *Id.* at 54:1–55:25; Fed. R. Evid. 106.<br><br>Microsoft responds that these facts do not pertain to claims asserted against Microsoft. |
| 392. Each ZD Asserted Work for *Everyday Health, Daily OM, Lose It!, BabyCenter, What to Expect, bp Magazine/bp Hope, Diabetes Daily, and Migraine Again* is owned by Everyday Health Media, LLC. Taylor Decl. ¶¶ 7, 14. These articles were written by employees of Everyday Health Media, LLC (or its predecessor companies) or freelance writers whose agreements with Everyday Health Media, LLC (or predecessor companies) contain work-for-hire and (in most instances) assignment language. Taylor Decl. ¶¶ 7, 14; Ex. 367 [ZD0533502] (example of freelancer agreement between Everyday Health Media, LLC and writer). | 392. **Disputed - Not Supported by Admissible Evidence; Not Supported by Cited Evidence; Improper Legal Argument.** OpenAI responds as follows: Copyright ownership is a legal conclusion and not a fact. The Court should disregard this Paragraph because the assertion constitutes improper attorney argument and/or is conclusory. It thus requires no response.<br>Further disputed as unsupported by the cited evidence. Further disputed as contradicted by the record and unsupported by admissible evidence, as required by Local Rule 56.1, and therefore not properly before the Court.<br>Lose It! content was contracted and owned by FitNow, Inc., not Everyday Health Media, LLC. Pursuant to Fed. R. Evid. 106, Ziff Davis' corporate designee conceded that [redacted] A. Blanco Opp. Decl. Ex. 252 (R. Parisi |

| | |
|---|---|
| | 30(b)(6) Tr.) at 60:4-22. He testified that [redacted] *Id.* at 63:16-24; Fed. R. Evid. 106. He agreed that [redacted] *Id.* at 65:1-12; Fed. R. Evid. 106.<br><br>Taylor's statement that [redacted] A. Blanco Opp. Decl. Ex. 252 (R. Parisi 30(b)(6) Tr.) at 103:21-104:16; Fed. R. Evid. 106.<br><br>Microsoft responds that these facts do not pertain to claims asserted against Microsoft. |

| | |
|---|---|
| 393. Each ZD Asserted Work for *Medpage Today68* is owned by Everyday Health, Inc.'s subsidiary Medpage Today, LLC. Taylor Decl. ¶15. These articles were written by employees of Medpage Today, LLC (or its predecessor companies) or freelance writers whose agreements contain work-for-hire provisions and alternative copyright assignment language. Taylor Decl. ¶ 15; Ex. 368 [ZD0519120] (example of freelancer agreement between Medpage Today, LLC and writer); Ex. 369 [Warren 30(b)(6) Depo. Tr.] at 62:7–20 ("Q…pursuant to this agreement, the freelancers are assigning the copyright to Medpage? A. Mm-hmm. Q. And are they considered to be works for hire?…A. I believe so") and 62:24–25 (stating, "employees, it's assumed that they're writing for us and we have the copyright."). | 393. **Disputed - Not Supported by Admissible Evidence; Not Supported by Cited Evidence; Improper Legal Argument.** OpenAI responds as follows: Copyright ownership is a legal conclusion and not a fact. The Court should disregard this Paragraph because the assertion constitutes improper attorney argument and/or is conclusory. It thus requires no response.<br>Further disputed as unsupported by the cited evidence. The facts alleged in Paragraph 393 are also unsupported by admissible evidence, as required by Local Rule 56.1, and therefore are not properly before the Court.<br>Ex. 368 [redacted] News Ex. 368.<br>ECF 1826 (R. Taylor Decl.) ¶ 15 [redacted] *Id.* ¶ 18.<br>The cited testimony of Ms. Warren does not support the statement, or is speculative. Pursuant to Fed. R. Evid. 106, Ms. Warren testified [redacted] A. Blanco Opp. Decl. Ex. 288 (R. Warren 30(b)(6) Tr.) at 61:19-23. She [redacted] *Id.* at 60:4-61:3; Fed. R. Evid. 106. Ms. Warren also [redacted] |

| | |
|---|---|
| | [redacted] A. Blanco Opp. Decl. Ex. 288 (R. Warren 30(b)(6) Tr.) at 61:24–62:6; Fed. R. Evid. 106.<br>The record conflicts on which entity contracts with MedPage writers. Pursuant to Fed. R. Evid. 106, [redacted]. Blanco Opp. Decl. Ex. 252 [redacted] A. Blanco Opp. Decl. Ex. 288 (R. Warren 30(b)(6) Tr.) at 40:12-24; Fed. R. Evid. 106.<br>The MedPage database registration originally named Ziff Davis as author and claimant and had to be supplemented. Ex. 364 (Ziff Davis' Suppl. Resp. to Interrog. No. 2) ("[redacted]. |

| | |
|---|---|
| | Microsoft responds that these facts do not pertain to claims asserted against Microsoft. |
| 394. Each ZD Asserted Work for *IGN, Dicebreaker, Eurogamer, VG247,* and *Games Industry Biz*, is owned by IGN Entertainment, Inc or its foreign affiliate. Taylor Decl. ¶¶ 8, 16. These articles were written by employees of IGN Entertainment, Inc. (or its predecessor or affiliate companies) or freelance writers whose agreements with IGN Entertainment, Inc. (or predecessor or affiliate companies) contain work-for-hire and/or assignment language. Taylor Decl. ¶¶ 8, 16. Ex. 370 [ZD0547945] (example of freelancer agreement between IGN Entertainment, Inc. and writer); Ex. 550 [Peer Schneider 30(b)(6) Depo. Tr.] at 56:24–57:2 ("Q. Is content owned on the other IGN Entertainment brands owned by that specific brand or IGN Entertainment? A. IGN entertainment."), 57:12–14 ("Articles are written specifically for IGN by authors or freelancers working under work for hire."). | 394. **Disputed - Not Supported by Cited Evidence; Not Supported by Admissible Evidence; Improper Legal Argument.** OpenAI responds as follows: Copyright ownership is a legal conclusion and not a fact. The Court should disregard this Paragraph because the assertion constitutes improper attorney argument and/or is conclusory. It thus requires no response.<br>Further disputed as unsupported by the cited evidence. The facts alleged in Paragraph 394 are also unsupported by admissible evidence, as required by Local Rule 56.1, and therefore are not properly before the Court.<br>News Ex. 370 [redacted]<br>ECF 1826 (R. Taylor Decl.) ¶ 16 [redacted] *Id.* ¶ 18.<br>Mr. Schneider, [redacted] |

| | |
|---|---|
| | [redacted] A. Blanco Opp. Decl. [redacted] *Id.* at 76:10-17.<br>Gamer Network Limited is a subsidiary of IGN Entertainment and is not a plaintiff. No assignment from Gamer Network Limited, or from writers who contributed before 2024, to any plaintiff is in the record.<br><br>Microsoft responds that these facts do not pertain to claims asserted against Microsoft. |
| 395. For Ziff Davis's individual copyright registrations, each registration corresponds with a single Asserted Work (an article published on one of the Ziff Davis brand websites). Each such registration is under the name of the Ziff Davis entity that owns and manages that brand, as both Author and Claimant. Taylor Decl. ¶ 22; Ex. 359 [ZD0631657–710]; Ex. 360 [ZD0629955–972]; Ex. 361 [ZD0631258–267]; Ex. 362 [ZD0631381–392]. | 395. **Disputed in Part.** OpenAI responds as follows: Undisputed that the cited evidence contains individual copyright registrations listing either IGN Entertainment Inc., Ziff Davis, or Everyday Health Media, LLC as Author and Copyright Claimant. Disputed to the extent the cited evidence does not support that any particular Ziff Davis entity "owns and manages" a particular brand.<br><br>Microsoft responds that these facts do not pertain to claims asserted against Microsoft. |
| 396. For individual registrations, the U.S. Copyright Office requires that an applicant submit a deposit copy consistiug of oue complete copy of the eutire work. 37 CFR § 202.20; Taylor Decl. ¶ 23. | 396. **Disputed - Improper Legal Argument.** OpenAI respouds as follows: Paragraph 396 is disputed, and the Court should disregard this Paragraph because the assertion constitutes improper attoruey argumeut and/or is couclusory. It thus requires no respouse. Specifically, Plaiutiffs' assertiou states a legal |

| | |
|---|---|
| | proposition concerning the requirements of 37 C.F.R. § 202.20, not a fact. Moreover, Plaintiffs' characterization of the cited evidence is overbroad. Paragraph 23 of the R. Taylor Declaration (ECF 1826) [redacted] Plaintiffs omit this qualification and instead characterize the requirement as applying to all individual registrations. Accordingly, the cited evidence does not support the asserted fact as stated.<br><br>Microsoft responds that these facts do not pertain to claims asserted against Microsoft. |
| 397. Ziff Davis's GRNW group registrations for Mashable cover updates to a news website, mashable.com. Taylor Decl. ¶ 24; Ex. 352 [ZD0668175–180]. | 397. **Disputed in Part.** OpenAI responds as follows: Undisputed that the referenced registrations purport to cover updates to mashable.com. However, disputed to the extent Paragraph 397 implies that these copyright registrations are valid. Plaintiffs' characterization is incomplete because it assumes the validity of the underlying registrations without addressing the basis for that validity. ECF 1826 (R. Taylor Decl.) ¶ 24; News Ex. 352 at ZD0668175–ZD0668180.<br><br>Microsoft responds that these facts do not pertain to claims asserted against Microsoft. |
| 398. The U.S. Copyright Office requires that for each such registration, an applicant include "a complete copy of the home page for the website as it existed at a | 398. **Disputed - Improper Legal Argument.** OpenAI responds as follows: Paragraph 398 is disputed, and the Court should disregard this Paragraph |

| | |
|---|---|
| specific point on each day that an eligible update was published to the website" or, of that is "unfeasible due to the size or continuous nature of the home page," an applicant may submit "for each day of updates...one PDF showing the first twenty-five pages of the home page." Ex. 372 ["Help: Updates to a News Website _ U.S. Copyright Office" available at https://www.copyright.gov/eco/grnw/help-tx.html]; Taylor Decl. ¶ 27. | because the assertion constitutes improper attorney argument and/or is conclusory. It thus requires no response. Specifically, Plaintiffs' assertion states a legal proposition concerning the U.S. Copyright Office's deposit requirements for group registrations of updates to news websites, not a fact, and is therefore improper.<br><br>Microsoft responds that these facts do not pertain to claims asserted against Microsoft. |
| 399. For Ziff Davis's editorial database registrations, each registration represents each digital media brand's internal compilation of written text arranged in a creative taxonomy and accessible solely by means of an integrated information retrieval program (typically MySQL-based relational databases with a front-end query layer), as required by the U.S. Copyright Office. 37 C.F.R. § 202.3(b)(5); Taylor Decl. ¶ 29. | 399. **Disputed in Part - Improper Legal Argument.** OpenAI responds as follows: Undisputed that the Taylor Declaration describes Ziff Davis's editorial databases as internal compilations of written text accessed through an integrated information-retrieval program. However, disputed as to the characterizations that the taxonomy is "creative" and that each database satisfies the applicable Copyright Office requirements. Those are (a) legal conclusions rather than facts; and (b) conclusions not established merely by the description of the databases' architecture. Further disputed, as Ziff Davis's 30(b)(6) witness gave testimony [redacted] . Blanco Opp. Decl. [redacted] |

| | |
|---|---|
| | [redacted]<br><br>Microsoft responds that these facts do not pertain to claims asserted against Microsoft. |
| 400. The U.S. Copyright Office requires that for each such registration, an applicant include as a deposit copy the first 25 and last 25 pages of complete database records in printed or machine-readable format. 37 CFR § 202.20; Ex. 373 ["Registration Options for Non-Photographic Databases _ FAQ" available at https://copyright.gov/non-photographic-databases/faq.pdf]; Taylor Decl. ¶ 30. | 400. **Disputed - Improper Legal Argument.** OpenAI responds as follows: Plaintiffs' assertion states a legal proposition concerning the U.S. Copyright Office's copyright registration requirements, not a fact, and is therefore improper.<br><br>Microsoft responds that these facts do not pertain to claims asserted against Microsoft. |
| 401. Each of Ziff Davis's copyright applications complied with the U.S. Copyright Office's deposit copy requirements. Taylor Decl. ¶ 19. | 401. **Disputed - Improper Legal Argument; Not Supported by Cited Evidence.** OpenAI responds as follows: Paragraph 401 states a legal proposition rather than a fact and is therefore improper. Moreover, the cited declaration paragraph is unsupported by any evidence, let alone evidence that covers all of Ziff Davis's applications or Asserted Works.<br><br>Microsoft responds that these facts do not pertain to claims asserted against Microsoft. |
| 402. In some instances, Ziff Davis's initial copyright applications listed the parent company, Ziff Davis, as the Author and Claimant for group and database registrations, rather than the particular Ziff Davis | 402. **Disputed in Part - Improper Legal Argument.** OpenAI responds as follows: Undisputed to the extent that some applications improperly listed ZD as author and claimant. However, disputed to the extent the |

| | |
|---|---|
| subsidiary that owns the brand and the content; the resulting registrations have all been supplemented to update the registration with the correct Author and Claimant information. Taylor Decl. ¶ 32; Ex. 364 [Ziff Davis's Supplemental Response to Interrogatory No. 2 (Apr. 17, 2026)] at pp. 4–5; Ex. 357 [ZD0668127–174] (certificates for the following supplemental registrations: TXU002537399 [What to Expect]; TXU002537336 [IGN]; TXU002537325 [Dicebreaker]; TXU002537378 [VG247]; TXU002537358 [Rock Paper Shotgun]; TXU002537369 [Eurogamer]; TXU002537323 [Games Industry Biz]; TXU002537357 [Lose It]; TXU002537377 [Diabetes Daily]; TXU002537327 [BPHope]; TXU002537365 [DailyOM]; TXU002537360 [BabyCenter]; TXU002537389; TXU002537362 [Babycenter Español]; TXU002538619 [CNET]; TXU002537383 [Everyday Health]; TXU002537389 [Migraine Again]); Ex. 374 [ZD0668198]; Taylor Decl. Ex. Q (MedPage Today). | "correct Author and Claimant information" was submitted. Further, the Court should disregard the disputed portion of Paragraph 402 because the assertion constitutes improper attorney argument and/or is conclusory. It thus requires no response.<br><br>Microsoft responds that these facts do not pertain to claims asserted against Microsoft. |

### 4. The Center for Investigative Reporting

| | |
|---|---|
| 403. The term "Nonprofit News Plaintiffs' Common Crawl Training Set" refers to the following OpenAI training sets: [redacted] | 403. **Undisputed.** OpenAI responds as follows: Undisputed that Plaintiffs have announced a new defined term for the purpose of their MSJ and defined it to include the listed OpenAI training datasets.<br><br>Microsoft defers to OpenAI. |

| | |
|---|---|
| [redacted] | |
| 404. In this motion, for purposes of its DMCA claims, CIR is asserting only those Asserted Works at least 200 words long, with at least one copy (other than copies located at the Mother Jones subdomains referenced at page 3, footnote 3 of Dr. Wenger's Supplemental Report) in a Nonprofit News Plaintiffs' Common Crawl Training Set, where that copy that has a Jaccard similarity score over 3-grams with the original of at least 0.6 (the "CIR SJ Asserted Works," and, where applicable, the "Mother Jones SJ Asserted Works" and the "Reveal SJ Asserted Works"). Bauerlein Decl. ¶ 20. | 404. **Disputed in Part – Not Supported by Cited Evidence.** OpenAI responds as follows: The facts set forth in Paragraph 404 are disputed in part because they are not supported by the cited evidence. *See* M. Bauerlein Decl. ¶ 20. Specifically, undisputed that some of Plaintiffs' Asserted Works are over 200 words. *Id.* However, disputed that Plaintiffs have consistently applied their stated requirement that the Asserted Works be "at least 200 words long." CIR's Rule 1006 summaries identify as "Asserted Works" multiple articles containing fewer than 200 words, including "Conspiracy Watch: Funny Money," "Music Review: Mr. Love & Justice," and "Quiz: North Korean Slogan or TED Talk Sound Bite?" A. Blanco Opp. Decl. Ex. 29 at CIR0688802; A. Blanco Opp. Decl. Ex. 28 at CIR0687976.<br><br>Microsoft responds that these facts do not pertain to claims asserted against Microsoft. |
| 405. In this motion, for purposes of its copyright infringement claims based on training, CIR is asserting only those Mother Jones Registered Asserted Works at least 200 words long, with at least one copy (other than copies located at the Mother Jones subdomains referenced at page 3, footnote 3 of Dr. Wenger's Supplemental Report) in a | 405. **Disputed – Not Supported by Cited Evidence.** Defendants respond as follows: The facts set forth in Paragraph 405 are disputed because they are not supported by the cited evidence. *See* M. Bauerlein Decl. ¶ 20. Specifically, there are multiple articles in the "Mother Jones" tab of CIR's Rule 1006 Summaries that contain |

[2] "Nonprofit News Plaintiffs" means The Center for Investigative Reporting, Inc. and The Intercept Media, Inc.

| | |
|---|---|
| Nonprofit News Plaintiffs' Common Crawl Training Set, where that copy that has a Jaccard similarity score over 3-grams with the original of at least 0.6 (the "Mother Jones SJ Registered Asserted Works"). Bauerlein Decl. ¶ 20. | fewer than 200 words, including "Quote of the Day: Second Thoughts Now Plaguing Greece" and "Quote of the Day: The Minimum Wage is Lame, Dude." A. Blanco Opp. Decl. Ex. 12 at CIR0193075; A. Blanco Opp. Decl. Ex. 13 at CIR0208966. |
| 406. In this motion, for purposes of its copyright infringement claims based on acquisition, CIR is asserting all Mother Jones Registered Asserted Works with a copy in a Nonprofit News Plaintiffs' Common Crawl Training Set. Bauerlein Decl. ¶ 21. | 406. **Disputed in Part - Not Supported by Cited Evidence.** OpenAI responds as follows: Undisputed that in this motion, CIR is asserting what it terms the "Mother Jones Registered Asserted Works" in its copyright infringement claims based on acquisition. However, the remainder of Paragraph 406 is disputed. Disputed that every "Mother Jones Registered Asserted Work" is covered by a valid registration, and that each work has a copy in the nine named Common Crawl training sets. M. Bauerlein Decl. ¶ 21 does not establish either. Further, the disputed proposition is not supported by the cited evidence.<br><br>Microsoft defers to OpenAI. |
| 407. In this motion, for its RAG and output infringement claims against Microsoft, CIR is seeking summary judgment for all Mother Jones Registered Asserted Works for which Dr. Wenger located a copy in Microsoft's RAG or output log data. Bauerlein Decl. ¶ 22. | 407. **Disputed in Part - Not Supported by Cited Evidence; Subject to 702.** Defendants respond as follows: Undisputed that in this motion, CIR is asserting what it terms the "Mother Jones Registered Asserted Works" in its copyright infringement claims based on Microsoft's RAG or output log data. However, the remainder of Paragraph 407 is disputed. Disputed that every "Mother Jones Registered Asserted Work" is covered by a valid registration (in part because the registrations at |

| | |
|---|---|
| | issue are for magazine issues (collective works), not individual articles), and that Dr. Wenger "located a copy" of each of these works in Microsoft's RAG or output log data. M. Bauerlein Decl. ¶ 22 does not establish either. Further, the fact stated in Paragraph 407 is disputed to the extent it relies on Dr. Wenger's report, which is currently subject to a motion to exclude pursuant to Fed. R. Evid. 702. To the extent the Court excludes the challenged opinions, Plaintiffs may not rely on them to support this statement. *See* Fed. R. Civ. P. 56(c)(2). |
| 408. CIR owns the CIR SJ Asserted Works. Bauerlein Decl. ¶¶ 14-18, 24-31; Bauerlein Decl. Ex. A at "Registered Works," "Mother Jones," and "Reveal" tabs; Bauerlein Decl. Ex. B; Bauerlein Decl. Ex. C; Bauerlein Decl. Ex. D; Bauerlein Decl. Ex. E; Bauerlein Decl. Ex. F; Bauerlein Decl. Ex. G; Bauerlein Decl. Ex. H at, rows 48,920, 50,403, 83,760; Bauerlein Decl. Ex. I; Bauerlein Decl. Ex. J at -638; Bauerlein Decl. Ex. K at -734; Bauerlein Decl. Ex. L at -047. | 408. **Disputed - Not Supported by Cited Evidence.** OpenAI responds as follows: Disputed that CIR owns the CIR SJ Asserted Works. This is a legal conclusion. Further, this claim is not supported by the cited evidence. There are 26,980 CIR SJ asserted works with no registration certificates specified in Exhibit A: 23,570 from the "Mother Jones" tab, 3,409 from "Reveal" tab, and 1 from "Registered Works" tab. Pursuant to Fed. R. Evid. 106, *see* A. Blanco Opp. Decl. Ex. 169 (M. Bauerlein 30(b)(6) Tr. (Jan. 26, 2026)) at 90:23-91:4 [redacted] The facts set forth in Paragraph 408 are disputed because the cited evidence is incorrect.<br><br>Microsoft responds that these facts do not pertain to claims asserted against Microsoft. |

| | |
|---|---|
| 409. CIR owns all Mother Jones Registered Asserted Works. Bauerlein Decl. ¶¶ 14-18, 24-31; Bauerlein Decl. Ex. A at "Registered Works" tab; Bauerlein Decl. Ex. B; Bauerlein Decl. Ex. C; Bauerlein Decl. Ex. D; Bauerlein Decl. Ex. E; Bauerlein Decl. Ex. I; Bauerlein Decl. Ex. J at -638; Bauerlein Decl. Ex. K at -734; Bauerlein Decl. Ex. L at -047. | 409. **Disputed - Not Supported by Cited Evidence; Improper Legal Argument.** Defendants respond as follows: Disputed that CIR owns the Mother Jones Registered Asserted Works. This is an improper legal argument and is disputed. Further, this claim is not supported by the cited evidence. Specifically, Defendants dispute that CIR has produced sufficient evidence demonstrating that the Asserted Works (articles) were written by employees and thus are valid works for hire. Additionally, Defendants dispute that CIR has demonstrated that Mother Jones Registered Asserted Works (articles) were properly registered by the produced copyright registrations because the registrations are for magazine issues (collective works), not individual articles. OA |
| 410. CIR's Asserted Works are identified in a Rule 1006 Summary attached as Exhibit A to the Bauerlein Declaration. Bauerlein Decl. Bauerlein Decl. ¶17; Bauerlein Decl. Ex. A at "Registered Works," "Mother Jones," and "Reveal" Tabs. | 410. **Disputed in Part - Not Supported by Cited Evidence.** Defendants respond as follows: Undisputed that Exhibit A to the Bauerlein Declaration lists works CIR calls its "Asserted Works." However, the remainder of Paragraph 410 is disputed. Disputed that Exhibit A is a proper Rule 1006 summary, that it accurately and completely identifies CIR's Asserted Works at issue in this Motion, and that it can establish CIR's registration or ownership of the Asserted Works. Further, the disputed proposition is not supported by the cited evidence. |
| 411. All of CIR's Asserted Works identified in the "Registered Works" tab of Exhibit A to the Bauerlein Declaration are registered with the Copyright Office and | 411. **Disputed - Not Supported by Cited Evidence.** Defendants respond as follows: Disputed as not supported by the cited evidence and to the extent that |

| | |
|---|---|
| were registered within five years of first publication. Bauerlein Decl. ¶17; Bauerlein Decl. Ex. A at "Registered Works," "Mother Jones," and "Reveal" Tabs; Bauerlein Decl. Ex. B. | not all of CIR's Asserted Works referenced herein are registered with the Copyright Office and were registered within five years of first publication. For example, Exhibit A to the Bauerlein Declaration, tab "Registered Works" contains an article titled, "Books: The Yugo: The Rise and Fall of the Worst Car in History," published on February 3, 2010. The corresponding registration number (TX0008998007) refers to a copyright registration certificate with an effective registration date of May 24, 2021, approximately 11 years later. The facts set forth in Paragraph 411 are disputed because the cited evidence is incorrect. |
| 412. The "Registered Works" tab in Exhibit A to the Bauerlein Declaration provides a list of the Mother Jones Registered Asserted Works. For each Mother Jones Registered Asserted Work, this tab provides the associated URL link, publication date, title, registration number, magazine issue and volume, citations to the registration certificate, and Bates numbers for the magazine article. Bauerlein Decl. ¶17; Bauerlein Decl. Ex. A at "Registered Works," "Mother Jones," and "Reveal" Tabs. | 412. **Disputed in Part - Not Supported by Cited Evidence.** Defendants respond as follows: Disputed to the extent that the information in the "Registered Works" tab is not complete for all Mother Jones Registered Asserted Work. 4 articles have missing "Registration Number," "Volume," and "Registration Certificate" ("8 Electric-Car Myths Busted," "Confessions of a Tea Party Casualty," "Walking Dead: Congress Edition," and "There's a Facebook Coronavirus Post Going Viral Claiming to Be From Stanford. Don't Believe It."). 1 article has missing "Issue" ("There's a Facebook Coronavirus Post Going Viral Claiming to Be From Stanford. Don't Believe It."). 172 articles have missing Bates numbers. Further, the disputed proposition is not supported by the cited evidence. Defendants also dispute that the inclusion of this information in the "Registered |

| | |
|---|---|
| | Works" tab is sufficient to establish CIR's registration or ownership of the Mother Jones Registered Asserted Works. |
| 413. Exhibit B to the Bauerlein Declaration contains copies of the copyright registrations associated with the Mother Jones Registered Asserted Works in CIR's possession. Bauerlein Decl. ¶17; Bauerlein Decl. Ex. B. | 413. **Undisputed.** |
| 414. Exhibit C to the Bauerlein Declaration contains Bates-numbered copies of Mother Jones Registered Asserted Works as they appeared in the Mother Jones Magazine. Bauerlein Decl. ¶ 17; Bauerlein Decl. Ex. C. | 414. **Disputed in Part.** Defendants respond as follows: Disputed to the extent that Exhibit C does not contain Bates-numbered copies of all Mother Jones Registered Asserted Works at issue in this Motion. Further, A. Blanco Opp. Decl. Ex. 27 at CIR0683071 is included in M. Bauerlein Decl. Ex. C but is not an asserted work. Instead, it is a [redacted] |
| 415. Three articles highlighted in the "Registered Works" tab in Exhibit A to the Bauerlein Declaration were printed in Mother Jones magazine issues, but these issues were not registered with the U.S. Copyright Office. These articles are titled "8 Electric-Car Myths Busted," "Confessions of a Tea Party Casualty," and "Walking Dead: Congress Edition." Another article highlighted in this tab, titled "There's a Facebook Coronavirus Post Going Viral Claiming to Be From Stanford. Don't Believe It," was never printed in a Mother Jones magazine and was published online only. Bauerlein Decl. ¶ 17, n.1; Bauerlein Decl. Ex. A at "Registered Works," "Mother Jones," and "Reveal" Tabs. | 415. **Undisputed.** |

416. CIR could not locate the copyright registrations for certain Mother Jones Registered Asserted Works. The table below provides the Registration Numbers for such works and URL links to the registration certificates for such works from the U.S. Copyright Office's webpage, Copyright.Gov. These links are included in the "Registered Works" tab in Exhibit A to the Bauerlein Declaration.

| Registration # | URL |
|---|---|
| TX0004754203 | tps://publicrecords.copyright.gov/detailed-record/voyager_19982220 |
| TX0006646770 | tps://publicrecords.copyright.gov/detailed-record/voyager_22831621 |
| TX0007944847 | ps://publicrecords.copyright.gov/detailed-record/voyager_27178509 |
| TX0008035701 | ps://publicrecords.copyright.gov/detailed-record/voyager_27702824 |
| TX0008839755 | ps://publicrecords.copyright.gov/detailed-record/voyager_31384470 |
| TX0008998016 | ps://publicrecords.copyright.gov/detailed-record/voyager_32916178A |
| TX0008998013 | ps://publicrecords.copyright.gov/detailed-record/voyager_32916179 |
| TX0008998007 | ps://publicrecords.copyright.gov/detailed-record/voyager_32916180 |
| TX0009134186 | ps://publicrecords.copyright.gov/detailed-record/voyager_34046306 |
| TX0009247692 | ps://publicrecords.copyright.gov/detailed-record/voyager_34900240 |

Bauerlein Decl. ¶ 17; Bauerlein Decl. Ex. A at "Registered Works," "Mother Jones," and "Reveal" Tabs.

416. **Disputed in Part.** Defendants respond as follows: Undisputed that the only missing copyright registrations (denoted by a URL) are those listed here (aside from the three listed in News Plaintiffs SUMF ¶ 415).

Disputed to the extent that, for TX0009247692, the underlying registration, points to issues published from "November/December 2022 to vol. 48, no. 1, January/February 2022," whereas issue 48.1 corresponds to articles published between January/February 2023.

417. The "Mother Jones" tab in Exhibit A to the Bauerlein Declaration provides the author, title, URL link, publication date, screen capture and page source view HTML for the Mother Jones Asserted Works, and ownership data for the Mother Jones Asserted Works. Bauerlein Decl. ¶ 18; Bauerlein Decl. Ex. A at "Mother Jones" Tab.

417. **Disputed in Part.** OpenAI responds as follows: Undisputed that these seven fields appear in the "Mother Jones" tab. Disputed to the extent that the "Ownership Data" field is blank for 47,472 articles.

Microsoft responds this fact does not pertain to claims asserted against Microsoft.

| | |
|---|---|
| 418. The "Reveal" tab in Exhibit A to the Bauerlein Declaration provides the author, title, URL link, publication date, screen capture and page source view HTML for the Reveal Asserted Works, and ownership data for the Reveal Asserted Works. Bauerlein Decl. ¶ 19; Bauerlein Decl. Ex. A at Reveal Tab. | 418. **Disputed in Part.** OpenAI responds as follows: Undisputed that these seven fields appear in the "Reveal" tab; there are no additional fields. Disputed to the extent that the "Author" field is blank for 14 articles, the "Screen Capture" field is blank for 3 articles, the "Page Source View HTML" field is blank for 3 articles, and the "Ownership Data" field is blank for 3,409 articles.<br><br>Microsoft responds that these facts do not pertain to claims asserted against Microsoft. |
| 419. Exhibit D to the Bauerlein Declaration provides screen captures of the Mother Jones SJ Asserted Works. Bauerlein Decl. ¶ 24;; Bauerlein Decl. Ex. D; Robins Decl. ¶¶ 4-6. | 419. **Disputed in Part.** OpenAI responds as follows: Disputed to the extent that several screen captures show articles that fail to load. *See e.g.*, A. Blanco Opp. Decl. Ex. 17 at CIR0490443; A. Blanco Opp. Decl. Ex. 20 at CIR0495334; A. Blanco Opp. Decl. Ex. 19 at CIR0494462; A. Blanco Opp. Decl. Ex. 16 at CIR0487881; A. Blanco Opp. Decl. Ex. 21 at CIR0497150; A. Blanco Opp. Decl. Ex. 22 at CIR0498571.<br><br>Microsoft responds that these facts do not pertain to claims asserted against Microsoft. |
| 420. Exhibit E to the Bauerlein Declaration provides the page source view HTML of the Mother Jones SJ Asserted Works. Bauerlein Decl. ¶ 24; Bauerlein Decl. Ex. E; Robins Decl. ¶¶ 4-6. | 420. **Disputed in Part.** OpenAI responds as follows: Disputed to the extent that the page source view appears incomplete for at least one article. *See* Ex. 420 (CIR0490444).<br><br>Microsoft responds that these facts do not pertain to claims asserted against Microsoft. |

| | |
|---|---|
| 421. Exhibit F to the Bauerlein Declaration provides screen captures of the Reveal SJ Asserted Works. Bauerlein Decl. ¶ 24; Bauerlein Decl. Ex. F; Robins Decl. ¶¶ 4-6. | 421. **Disputed in Part.** OpenAI responds as follows: Disputed to the extent that several screen captures show articles that fail to load. *See e.g.*, A. Blanco Opp. Decl. Ex. 15 at CIR0472971; A. Blanco Opp. Decl. Ex. 23 at CIR0508014; A. Blanco Opp. Decl. Ex. 24 at CIR0509625; A. Blanco Opp. Decl. Ex. 14 at CIR0466487.<br><br>Microsoft responds that these facts do not pertain to claims asserted against Microsoft |
| 422. Exhibit G to the Bauerlein Declaration provides the page source view HTML of the Reveal SJ Asserted Works. Bauerlein Decl. ¶ 24; Bauerlein Decl. Ex. G; Robins Decl. ¶¶ 4-6. | 422. **Undisputed.**<br><br>Microsoft responds that these facts do not pertain to claims asserted against Microsoft |
| 423. Three Reveal SJ Asserted Works were inadvertently not downloaded and produced during discovery. These works were previously published on the Reveal Website (at https://www.revealnews.org/digging-up-a-45-year-mystery-on-a-kentucky-hillside/, https://www.revealnews.org/disfellowshipped-a-virtual-reality-experience/, and https://www.revealnews.org/leaked-immigration-court-officials-directive-could-violate-rules-that-protect-families-from-deportation/), but they are no longer available on the website. The text of these works is provided in Ex. H to the Bauerlein Declaration at rows 83,760, 50,403, and 48,920, respectively. Bauerlein Decl. ¶ 24, n.2; Bauerlein Decl. Ex. H. | 423. **Undisputed.**<br><br>Microsoft responds that these facts do not pertain to claims asserted against Microsoft |

| | |
|---|---|
| 424. The CIR SJ Asserted Works, and all Mother Jones Registered Works, were created by CIR employees as works for hire for CIR (or its predecessors prior to the merger). Bauerlein Decl. ¶¶ 29-30; Bauerlein Decl. Ex. A at "Registered Works," "Mother Jones," and "Reveal" Tabs; Bauerlein Decl. Ex. I; Bauerlein Decl. Ex. J at -638; Bauerlein Decl. Ex. K at -734. | 424. **Disputed - Not Supported by Cited Evidence.** Defendants respond as follows: The facts set forth in Paragraph 424 are disputed because they are not supported by the cited evidence. Specifically, Exhibit I of the Bauerlein Declaration contains [redacted] *See* ECF 1788-9 (M. Bauerlein Decl. Ex. I). However, 685 works in the "Registered Works" tab, 44,190 works in the "Mother Jones" tab, and 1,466 works in the "Reveal" tab were published before 2015. *See id*. Several authors, including Carrie Ching, Mark Schapiro, Kelly Chen, and Peter Overby, appear only on works published before 2015 and do not appear in News Exhibits I, J, or K. *See id*; ECF 1788-10 (M. Bauerlain Decl. Ex. J); ECF 1788-11 (M. Bauerlain Ex. K).<br><br>Microsoft further responds that this fact, as it relates to the CIR SJ Asserted Works, does not pertain to claims asserted against Microsoft. |
| 425. The CIR SJ Asserted Works, and all Mother Jones Registered Works, are original works of human expression. Bauerlein Decl. ¶¶ 14-19, 24-31; Bauerlein Decl. Ex. A at "Registered Works," "Mother Jones," and "Reveal" tabs; Bauerlein Decl. Ex. B; Bauerlein Decl. Ex. C; Bauerlein Decl. Ex. D; Bauerlein Decl. Ex. E; Bauerlein Decl. Ex. F; Bauerlein Decl. Ex. G; Bauerlein Decl. Ex. H at, rows 48,920, 50,403, 83,760; Bauerlein Decl. Ex. I; Bauerlein | 425. **Disputed in Part - Improper Legal Argument; Not Supported by Cited Evidence.** Defendants respond as follows: Undisputed that some CIR SJ Asserted Works and Mother Jones Registered Works may contain some original expression but disputed that each CIR SJ Asserted Work and each Mother Jones Registered Work at issue in this Motion is an |

| | |
|---|---|
| Decl. Ex. J at -638; Bauerlein Decl. Ex. K at -734; Robins Decl. ¶¶ 4-6. | original work of human expression authored and owned by CIR.<br>Specifically, the declaration offers only practice-level generalizations with no work-by-work showing of which aspects of each Asserted Work contain the alleged original human expression. *See* ECF 1788 (Bauerlein Decl.). Further, the Court should disregard the disputed portion of Paragraph 425 because the assertion constitutes improper attorney argument and/or is conclusory. It thus requires no response. Originality is a legal conclusion, not a fact.<br><br>Microsoft further responds that this fact, as it relates to the CIR SJ Asserted Works (aside from the Mother Jones Registered Works), does not pertain to claims asserted against Microsoft. |

### 5. The Intercept

| | |
|---|---|
| 426. In this motion, The Intercept is asserting only those Asserted Works at least 200 words long, with at least one copy in a Nonprofit News Plaintiffs' Common Crawl Training Set, where that copy that has a Jaccard similarity score over 3-grams with the original of at least 0.6 (the "The Intercept SJ Asserted Works"). Macala Decl. ¶ 12. | 426. **Disputed in Part - Not Supported by Cited Evidence.** OpenAI responds as follows: Undisputed that some Asserted Works asserted by The Intercept are at least 200 words. However, disputed that all of The Intercept's Asserted Works are over 200 words long. The disputed proposition is not supported by the cited evidence. Specifically, there are multiple articles in the "Asserted Works" tab of The Intercept's Rule 1006 summaries that contain fewer than 200 words. *See*, *e.g.*, A. Blanco Opp. Decl. Ex. 121 at INT0144100 ("Jana Winter |

| | |
|---|---|
| | Joins The Intercept"); A. Blanco Opp. Decl. Ex. 120 at INT0127100 ("In Iowa, How Bernie Sanders Won a Trilingual Satellite Caucus"); A. Blanco Opp. Decl. Ex. 122 at INT0165746 ("Notice").<br><br>Microsoft responds that these facts do not pertain to claims asserted against Microsoft. |
| 427. The Intercept owns The Intercept SJ Asserted Works. Macala Decl. ¶¶ 8-19; Macala Decl. Ex. A; Macala Decl. Ex. B; Macala Decl. Ex. C; Macala Decl. Ex. D; Macala Decl. Ex. E at -955; Macala Decl. Ex. F at -171; Macala Decl. Ex. G. | 427. **Disputed – Not Supported by Cited Evidence; Improper Legal Argument.** OpenAI responds as follows: The facts set forth in Paragraph 427 are disputed because they are not supported by the cited evidence. Specifically, 1,292 of the 9,503 asserted works in Exhibit A are missing a value in the "Ownership Data" field and the cited evidence does not include any registration certificates. *See* ECF 1836 (M. Macala Decl. Ex. A). Further, the Court should disregard Paragraph 427 because the assertion constitutes improper attorney argument and/or is conclusory. It thus requires no response. Specifically, ownership is a legal conclusion, not a fact.<br><br>Microsoft responds that these facts do not pertain to claims asserted against Microsoft. |
| 428. The Intercept's Asserted Works in this case are identified in a Rule 1006 Summary attached as Exhibit A to the Macala Declaration. For each Intercept Asserted Work, this summary provides the associated author, title, URL link, publication date, screen capture and page source | 428. **Disputed in Part.** OpenAI responds as follows: Undisputed that Exhibit A to the Macala Declaration includes a list of the Asserted Works. However, disputed as to the completeness of the summary. Specifically, 1292 of the articles identified have |

| | |
|---|---|
| view HTML, and ownership data. Macala Decl. ¶ 11; Macala Decl. Ex. A. | missing ownership data. *See* ECF 1836 (M. Macala Decl. Ex. A).<br><br>Microsoft responds that these facts do not pertain to claims asserted against Microsoft. |
| 429. Exhibit B to the Macala Declaration provides screen captures of The Intercept SJ Asserted Works. Macala Decl. ¶ 13; Macala Decl. Ex. B; Robins Decl. ¶¶ 4-6. | 429. **Disputed in Part.** OpenAI responds as follows: Undisputed that Exhibit B to the Macala Declaration contains screen captures of The Intercept asserted articles. Disputed to the extent that one article (A. Blanco Opp. Decl. Ex. 150 at INT0139614) appears to be a political cartoon originally published on "The Nib." Further, disputed to the extent the statement implies that The Intercept owns the copyright in each of the works shown in Exhibit B to the Macala Declaration.<br><br>Microsoft responds that these facts do not pertain to claims asserted against Microsoft. |
| 430. Exhibit C to the Macala Declaration provides the page source view HTML of The Intercept SJ Asserted Works. Macala Decl. ¶ 13; Macala Decl. Ex. C; Robins Decl. ¶¶ 4-6. | 430. **Undisputed.**<br><br>Microsoft responds that these facts do not pertain to claims asserted against Microsoft. |
| 431. The Intercept SJ Asserted Works were created by Intercept employees or freelancers (or employees or freelancers of its predecessor prior to the merger) as works for hire for The Intercept. Macala Decl. ¶¶ 8, 15-19; Macala Decl. Ex. A; Macala Decl. Ex. D; Macala Decl. Ex. E at -955; Macala Decl. Ex. F at -171, -179-82; Macala Decl. Ex. G. | 431. **Disputed–Not Supported by Cited Evidence; Improper Legal Argument.** OpenAI responds as follows: The facts set forth in Paragraph 431 are disputed because they are not supported by the cited evidence. Specifically, the cited evidence does not establish that all Intercept Asserted Works were created by |

| | |
|---|---|
| | employees or freelancers as works for hire for the Intercept. Although M. Macala Decl. Ex. D (ECF 1836) contains [redacted] Ex. A identifies 736 unique authors, and Plaintiffs have not established that each author was subject to an applicable work-for-hire agreement or otherwise transferred copyright ownership to The Intercept. *See* M. Macala Decl. Ex. A. For example, Edward Snowden authored an Asserted Work [redacted] and the article lacks an entry in the "Ownership Data" field. *See* ECF 1836 (M. Macala Decl. Ex. A; Ex. D). Moreover, the existence of freelancer agreements does not establish that every such agreement conveyed copyright ownership. Further, the Court should disregard Paragraph 425 because the assertion constitutes improper attorney argument and/or is conclusory. It thus requires no response. Specifically, whether the Asserted Works qualify as works made for hire is a legal conclusion, rather than a historical fact properly included in a Local Rule 56.1 statement.<br><br>Microsoft responds that these facts do not pertain to claims asserted against Microsoft. |
| 432. The Intercept SJ Asserted Works are original works of human expression. Macala Decl. ¶¶ 8-19; Macala Decl. Ex. A; Macala Decl. Ex. B; Macala Decl. Ex. C; Robins Decl. ¶¶ 4-6. | 432. **Disputed - Not Supported by Cited Evidence; Improper Legal Argument.** OpenAI responds as follows: The facts set forth in Paragraph 432 are disputed because they are not supported by the cited evidence. Specifically, disputed that the cited evidence |

| | |
|---|---|
| | shows that each Intercept SJ Asserted Work at issue in this Motion is an original work of human expression authored by CIR. The declaration offers only practice-level generalizations with no work-by-work showing. *See* M. Macala Decl. ¶¶ 8-19. Further, the Court should disregard this Paragraph because the assertion constitutes improper attorney argument and/or is conclusory. It thus requires no response. Specifically, originality is a legal conclusion, not a fact.<br><br>Microsoft responds that these facts do not pertain to claims asserted against Microsoft. |

### 6. Individual Articles

| | |
|---|---|
| 433. Since prior to 2018 (the earliest date Defendants' alleged infringement began), the New York Times and *Daily News* Plaintiffs have been publishing all of their articles individually online and their general practice has been to release news on an article-by-article basis. *See, e.g.,* Ex. 18 [M. Burbach, January 30, 2026, Depo. Tr.] at 39:7-12; Ex. 19 [Pugh, January 7, 2026, Depo. Tr.] at 44:22-45:3; Ex. 349 [A. Julien, Jan. 16, 2026, Depo. Tr.] at 44:11-24; Ex. 343 [R. Dominguez, March 3, 2026, Depo. Tr.] at 29:10-30:16; Ex. 20 [J. Anderson, December 2, 2025, Depo. Tr.] at 56:8-10; Ex. 351 [Lee Ann Colacioppo, 30(b)(1) February 25, 2026, Depo. Tr.] at 66:9-14; Ex. 130 [Brockman Depo. Tr.] at 58:8-10 (GPT-2 training began "towards the end of 2018, perhaps early 2019"). | 433. **Disputed in Part – Not Supported by Cited Evidence; Immaterial.** Defendants do not dispute that the New York Times and Daily News Plaintiffs' articles are available to be read on separate webpages on Plaintiffs' websites. Defendants dispute that [redacted] because to the extent certain articles are available to be read on Plaintiffs' website, those articles generally are also included in Plaintiffs' newspaper issues the following day or later that week. *See*, e.g., A. Blanco Opp. Decl. Ex. 180 (M. Burbach Tr.) at 39:7-12; A. Blanco Opp. Decl. Ex. 260 (M. Pugh, Tr.) at 44:22-45:3; A. Blanco Opp. Decl. Ex. 259 (S. Procas 30(b)(6) Tr.) at 49:13-21. This is consistent with Plaintiffs' undisputed practice of |

| | |
|---|---|
| | submitting copyright registrations for the newspaper issue in which the articles appear, as opposed to on an individual article-by-article basis. *See* ECF 1702 (Microsoft News SUMF) ¶ 160; ECF 1742 (News Plaintiffs SUMF) ¶¶ 299, 301, 329; A. Blanco Opp. Decl. Ex. 243 (R. Morris 30(b)(6) Tr. (Dec. 17, 2025)) at 14:18-15:4; A. Blanco Opp. Decl. Ex. 174 (M. Brewer 30(b)(6) Tr.) at 57:12-58:21.<br>Defendants further respond that this fact is disputed as to the New York Times because it is not supported by cited evidence. Specifically, the cited evidence only applies to the Daily News Plaintiffs, not the New York Times.<br>Defendants further respond that this fact is disputed as immaterial because this fact does not affect the outcome of the suit under the governing law. Specifically, whether articles are available to be read on separate webpages has no bearing on whether articles have been "separately issued." *See Bryant v. Media Right Prods., Inc.*, 603 F. 3d 135, 141 (2d Cir. 2010) (number of statutory damages awards turns on whether the copyright holder issued the works separately or as a compilation). |
| 434. In the Generative AI Data licensing market, when Generative AI platforms enter agreements with publishers, the published materials to be provided are not quantified in terms of issues. Malackowski NYT-DNP Opening Report at 155 and Appendix F, Exhibits 4.1, 5.1; Appendix G Sections 2.1, 2.3. | 434. **Disputed in Part – Immaterial.** Defendants dispute that a "Generative AI Data licensing market" exists. *See* ECF 1733 (C. Tucker Decl.) ¶¶ 13(e), 130-231.<br>Defendants do not dispute that certain agreements between content creators and generative AI platforms define the content that is the subject of the agreement in terms of articles, as opposed to newspaper issues. |

| | |
|---|---|
| | However, Defendants further respond that this is immaterial and therefore disputed because this fact does not affect the outcome of the suit under the governing law. Specifically, whether the content that is the subject of certain agreement is defined in terms of articles (as opposed to issues) has no bearing on whether articles have been "separately issued." *See Bryant*, 603 F. 3d at 141 (number of statutory damages awards turns on whether the copyright holder issued the works separately or as a compilation). |
| 435. When OpenAI was seeking out publishers' works, they spoke in terms of articles (not issues). *See, e.g.*, Ex. 551 [OPCO_MDL_000481178] (February 2022 conversation noting that "greg [Brockman] has prepped some high quality, small datasets" including "7m urls" from "nytimes", or "about half of NYT"). | 435. **Disputed – Not Supported by Cited Evidence.** OpenAI responds as follows: Paragraph 435 is disputed because it is not supported by the cited evidence. Specifically, the cited evidence does not mention articles, nor does it link the word "urls" to articles. *See* News Ex. 551 at OPCO_MDL_000481178.<br><br>Microsoft defers to OpenAI. |
| 436. In the Generative AI Data licensing market, the amount of materials to be provided are often quantified in terms of individual articles. Malackowski NYT-DNP Opening Report at 155 and Appendix F, Exhibits 4.1, 5.1; Appendix G Sections 2.1, 2.3; *see also, e.g.*, Ex. 144 [OPCO_MDL_004590266] at -266 and -277; Ex. 146 [OPCO_MDL_004590278] at -287-88, 290-91; Ex. 152 [OPCO_MDL_004596337] at 337; Ex. 165 [OPCO_MDL_004740479-494] at 486. | 436. **Disputed in Part – Immaterial.** Defendants respond as follows: Defendants dispute that a "Generative AI Data licensing market" exists. *See* ECF 1733 (C. Tucker Decl.) ¶¶ 13(e), 130-231. Defendants do not dispute that certain agreements between content creators and generative AI platforms quantify the content that is the subject of the agreement in terms of articles, as opposed to newspaper issues. However, Defendants further respond that this is immaterial and therefore disputed because this fact does not affect the outcome of the suit under the |

| | |
|---|---|
| | governing law. Specifically, whether the content that is the subject of certain agreement is quantified in terms of articles (not issues) has no bearing on whether articles have been "separately issued." *See Bryant*, 603 F. 3d at 141 (number of statutory damages awards turns on whether the copyright holder issued the works separately or as a compilation). |
| [redacted] | 437. **Undisputed – Immaterial.** Defendants do not dispute that [redacted] However, Defendants further respond that this fact is immaterial because this fact does not affect the outcome of the suit under the governing law. Specifically, whether the content that is the subject of this agreement is quantified in terms of articles (not issues) has no bearing on whether articles have been "separately issued." *See Bryant*, 603 F. 3d at 141 (number of statutory damages awards turns on whether the copyright holder issued the works separately or as a compilation). |
| 438. Likewise, OpenAI's agreement with News Corp. specified the amount of content in terms of articles, not issues. Ex. 152 [OPCO_MDL_004596337] at 337. | 438. **Undisputed.** |
| 439. OpenAI also internally priced its licensing agreements in terms of articles or words, not issues. Ex. 375 [OPCO_MDL_004589228]. | 439. **Undisputed.** |
| 440. News Plaintiffs price and license news on an article basis. *See, e.g.*, Ex. 376 [NYT_00218255] at -255. | 440. **Disputed– Not Supported by Cited Evidence; Immaterial.** Defendants respond as follows: |

| | |
|---|---|
| | Defendants do not dispute that Exhibit 376, [redacted] News Ex. 376 at NYT_00218255. Defendants do dispute that the Times "price[s]" news on an article basis" because the cited amendment provides for a revenue share subject to an annual minimum revenue guarantee. *Id.* at NYT_00218255-56. Additionally, Defendants dispute Paragraph 440 because it is not supported by cited evidence. Exhibit 376 does not establish that News Plaintiffs always, or even generally, price and license news on an article basis. Additionally, the fact is written as to all News Plaintiffs, but the cited evidence is a single agreement involving The New York Times. Therefore, News Exhibit 376 provides no evidence concerning the pricing or licensing practices of any of the other News Plaintiffs. *See id.*<br>Additionally, Defendants dispute this fact to the extent it is not supported by admissible evidence because News Exhibit 376 is an amendment to an earlier agreement that Plaintiffs have not cited or provided. Defendants further respond that this fact is immaterial because this fact does not affect the outcome of the suit under the governing law. Specifically, whether the content that is the subject of this agreement is quantified in terms of articles (not issues) |

| | |
|---|---|
| | has no bearing on whether articles have been "separately issued." *See Bryant*, 603 F. 3d at 141 (number of statutory damages awards turns on whether the copyright holder issued the works separately or as a compilation). |
| 441. News Plaintiffs also make their articles available for reading and downloading separately and apart from the "issue" in which the articles appeared. Ex. 377 [Goldfarb Depo. Tr.] at 149:23-150:23; Ex. 18 [M. Burbach, January 30, 2026, Depo. Tr.] at 39:4-16; Ex. 19 [M. Pugh 30(b)(1), January 7, 2026, Depo. Tr.] at 44:22-45:3; Ex. 349 [A. Julien, Jan. 16, 2026, Depo. Tr.] at 44:11-24; Ex. 378 [K. Gordon Depo. Tr] at 63:1-65:23. | 441. **Disputed in Part – Immaterial; Not Supported by Cited Evidence.** Defendants do not dispute that The New York Times, Daily News Plaintiffs, and CIR make some articles available to be read (and downloaded by subscribers) on separate webpages on their websites. However, Defendants further respond that this fact is immaterial because this fact does not affect the outcome of the suit under the governing law. Specifically, whether articles are available to be read on separate webpages or downloaded has no bearing on whether articles have been "separately issued." *See Bryant*, 603 F. 3d at 141 (number of statutory damages awards turns on whether the copyright holder issued the works separately or as a compilation).<br>Defendants further respond that this fact is disputed because it is not supported by cited evidence. Specifically, the cited evidence only applies to the Daily News Plaintiffs, not New York Times CIR, The Intercept, or Ziff Davis. |
| 442. Dr. Goldfarb admitted at deposition that, by the late 1990s, users "could access individual articles online without having to buy a whole edition of a newspaper" and "began consuming content at the individual piece level." Ex. 377 [Goldfarb Depo. Tr.] at 149:23-150:23. | 442. **Disputed in Part – Not Supported by Cited Evidence; Immaterial.**<br>Defendants respond as follows: Undisputed that Dr. Goldfarb said the quoted language set forth in Paragraph 442. However, disputed to the extent that Paragraph 442 implies that Dr. Goldfarb's acknowledgement that users |

| | |
|---|---|
| | "began consuming content at the individual piece level," equates to *purchasing* content "at the individual piece level."<br>Defendants further respond that this fact is immaterial because it does not affect the outcome of the suit under the governing law. Specifically, whether individual articles can be "access[ed]" online has no bearing on whether articles have been "separately issued." *See Bryant*, 603 F. 3d at 141 (number of statutory damages awards turns on whether the copyright holder issued the works separately or as a compilation). |
| 443. [redacted] Ex. 376 [NYT_00218255] at 255. | 443. **Undisputed – Immaterial.** Defendants do not dispute that [redacted] However, Defendants further respond that this fact is immaterial because this fact does not affect the outcome of the suit under the governing law. Specifically, that the content that is the subject of this agreement is quantified in terms of articles has no bearing on whether articles have been "separately issued." *See Bryant*, 603 F. 3d at 141 (number of statutory damages awards turns on whether the copyright holder issued the works separately or as a compilation). |

| | |
|---|---|
| 444. [redacted] | 444. **Undisputed – Immaterial.** Defendants do not dispute that [redacted] so Defendants dispute the characterization [redacted] Defendants further respond that this fact is immaterial because this fact does not affect the outcome of the suit under the governing law. Specifically, that the content that is the subject of [redacted] has no bearing on whether articles have been "separately issued." *See Bryant*, 603 F.3d at 141 (number of statutory damages awards turns on whether the copyright holder issued the works separately or as a compilation). |
| 445. When calculating the financial consideration associated with licensing content, The Times has a pricing model that designates price on a "Per Article" basis. Ex. 381 [NYT_00685761] at tab "Northam Pricing Matrix." | 445. **Disputed in Part – Immaterial.** Undisputed that the spreadsheet contains a cell and figure associated with "per article rate." However, the rest of the paragraph is disputed because it is not supported by the cited evidence. Specifically, disputed to the extent that nothing else in the spreadsheets indicates that the figure reflects a "pricing model" or is used "when calculating the financial consideration associated with licensing |

| | |
|---|---|
| | content." *See* News Ex. 381 at NYT_00685761 (tab [redacted]). Defendants further respond that this fact is immaterial because this fact does not affect the outcome of the suit under the governing law. Specifically, that articles can be licensed and priced on a "per-article" basis has no bearing on whether articles have been "separately issued." *See Bryant*, 603 F.3d at 141 (number of statutory damages awards turns on whether the copyright holder issued the works separately or as a compilation). |
| 446. The Times notes how an individual article can go "viral" and also tracks individual page views on an article basis. Ex. 382 ["What Makes a Times Article Go Viral," *New York Times*, https://www.nytimes.com/2022/03/16/insider/what-makes-a-times-article-go-viral.html]. | 446. **Undisputed – Immaterial; Not Supported by Admissible Evidence.** Defendants do not dispute that articles can go "viral" or that The Times tracks individual page views on an article basis. However, Defendants further respond that this fact is immaterial because this fact does not affect the outcome of the suit under the governing law. Specifically, whether articles go viral or pageviews are tracked on an individual basis have no bearing on whether articles have been "separately issued." *See Bryant*, 603 F.3d at 141 (number of statutory damages awards turns on whether the copyright holder issued the works separately or as a compilation).<br>Defendants also respond that the fact in Paragraph 446 is disputed on the grounds that it is not supported by admissible evidence, as required by Local Rule 56.1, and therefore is not properly before the Court. Specifically, the article is hearsay and lacks foundation. |

| | |
|---|---|
| 447. [redacted] Ex. 383 [DNP-00473273]. | 447. **Disputed in Part – Not Supported by Cited Evidence; Immaterial.** Defendants respond as follows: The facts set forth in Paragraph 447 are disputed in part because they are not supported by the cited evidence. *See* News Ex. 383 at DNP-00473273. Specifically, undisputed [redacted] *Id.* However, disputed as to the implication that [redacted]<br><br>Defendants further respond that this fact is immaterial because this fact does not affect the outcome of the suit under the governing law. Specifically, whether articles are licensed have no bearing on whether articles have been "separately issued." *See Bryant*, 603 F.3d at 141 (number of statutory damages awards turns on whether the copyright holder issued the works separately or as a compilation). |
| 448. [redacted] Ex. 384 [DNP-00473294] at -295 [redacted] Ex. 385 [DNP-00035917-927] at 917 [redacted] | 448. **Disputed in Part– Not Supported by Cited Evidence; Immaterial.** Defendants respond as follows: The facts set forth in Paragraph 448 are disputed in part because they are not supported by the cited evidence. See News Ex. 384 at DNP-00473295; News Ex. 385 at DNP-00035917. Specifically, undisputed that some [redacted] |

| | |
|---|---|
| [redacted] | [redacted]. News Ex. 384 at DNP-00473295; News Ex. 385 at DNP-00035917. However, disputed as to the implication that [redacted] News Ex. 384 at DNP-00473294. The other four DNPs are absent from this agreement. *Id.* Further disputed as to the implication that these agreements contemplate payment on a per-article basis. News Ex. 385 references a monthly fee for 94,300–115,400 articles that are not individually identified and are not all from DNPs. News Ex. 385 at DNP-00035917.<br>Defendants further respond that this fact is immaterial because this fact does not affect the outcome of the suit under the governing law. Specifically, whether articles are licensed have no bearing on whether articles have been "separately issued." *See Bryant*, 603 F.3d at 141 (number of statutory damages awards turns on whether the copyright holder issued the works separately or as a compilation). |
| 449. The *Daily News* Plaintiffs promote publications on an article-by-article level, such as the Chicago Tribune allocating Instagram posts to single articles. Ex. 386 [M. Pugh, January 7, 2026, Exhibit 7]. | 449. **Disputed in Part - Not Supported by Cited Evidence; Immaterial.** Defendants respond as follows: The facts set forth in Paragraph 449 are disputed in part because they are not supported by the cited evidence. *See* News Ex. 386 (M. Pugh Dep. Ex. 7); Specifically, undisputed that the Chicago Tribune |

| | |
|---|---|
| | maintains an Instagram account on which it posts links to certain individual articles. *Id.* However, disputed that this one example proves that the Chicago Tribune only promotes publications on an article-by-article level, or that this one example can be extrapolated to the other DNPs. Further disputed as to the implication that the asserted articles have been individually linked to on the News Plaintiffs' website.<br>Defendants further respond that this fact is immaterial because this fact does not affect the outcome of the suit under the governing law. Specifically, whether the Daily News Plaintiffs "promote" their publications on an "article-by-article level" has no bearing on whether articles have been "separately issued." *See Bryant*, 603 F.3d at 141 (number of statutory damages awards turns on whether the copyright holder issued the works separately or as a compilation). |
| 450. The *Daily News* Plaintiffs distribute articles and multimedia through social media, newsletters, email alerts, and breaking news emails. Ex. 378 [K. Gordon, November 12, 2025, Depo. Tr.] at 62:1-63-24. | 450. **Disputed in Part – Immaterial.** Defendants respond as follows: Undisputed that Daily News Plaintiffs may distribute some articles in the referenced manner. However, disputed to the extent it implies that each and every Asserted Article was distributed through the enumerated channels, or that articles were distributed to consumers who did not already have subscriptions to the Daily News Plaintiffs publications, neither of which is supported by the cited record evidence. *See* News Ex. 378 (K. Gordon Tr.) at 62:1- |

| | |
|---|---|
| | 63:24 (speaking to distribution without making claims about all articles, or all Asserted Articles).<br>Defendants further respond that this fact is immaterial because this fact does not affect the outcome of the suit under the governing law. Specifically, whether the Daily News Plaintiffs "distribute articles" via the cited channels has no bearing on whether articles have been "separately issued." *See Bryant*, 603 F.3d at 141 (number of statutory damages awards turns on whether the copyright holder issued the works separately or as a compilation). |
| 451. The *Daily News* Plaintiffs also track page views and conversion on an individual article basis. *See,* Ex. 387 [DNP-00366818 (Chicago)], Ex. 388 [DNP-00366819 (Denver)], Ex. 389 [DNP-00366820 (Mercury)], Ex. 390 [DNP-00366821 (NYDN)], Ex. 391 [DNP-00366822 (OCR)], Ex. 392 [DNP-00366823 (Orlando)], Ex. 393 [DNP-00366824 (Sun Sentinel)], Ex. 394 [DNP-00366825 (Pioneer Press)], Ex. 395 [DNP-00366826 (Aggregated)]. | 451. **Disputed in Part – Immaterial.** Defendants respond as follows: Disputed as to whether Daily News Plaintiffs track page views and conversions for each of the Asserted Works at issue in this Motion, and what is meant by "conversion." It is unclear from Plaintiffs' witnesses' testimony whether a conversion is counted anytime a user purchases a subscription upon viewing an article, or if a conversion is counted only when a user purchases a subscription upon encountering a paywall. Louis Deering testified that "[redacted] A. Blanco Opp. Decl. Ex. 189 (L. Deering 30(b)(1) Tr.) at 127:22-128:3. Adel Ibrahim testified that he [redacted] A. Blanco Opp. Decl. Ex. 215 (A. Ibrahim 30(b)(1) Tr.) at 46:5-11. |

| | |
|---|---|
| | Defendants further respond that this fact is immaterial because this fact does not affect the outcome of the suit under the governing law. Specifically, whether the Daily News Plaintiffs "track page views and conversion on an individual article basis" has no bearing on whether articles have been "separately issued." *See Bryant*, 603 F.3d at 141 (number of statutory damages awards turns on whether the copyright holder issued the works separately or as a compilation). |
| 452. The *Daily News* Plaintiffs can make business decisions regarding the treatment of individual articles on their website through their dynamic paywall known as "Sophi," including whether the article should be designated as free (to generate more advertising revenues or increase the likelihood of a subscription) or hard walled. Ex. 89 [L. Deering, November 6, 2025, Depo. Tr.] at 64:11-21, 70:2-13. | 452. **Disputed in Part – Immaterial.** Defendants respond as follows: Undisputed that DNPs use a dynamic paywall tool known as "Sophi" which makes certain decisions regarding article accessibility. Disputed as to the characterization or implication that Plaintiffs exercise meaningful or consistent human "business decisions" regarding the treatment of individual articles. The record demonstrates that Sophi is an automated machine learning model, not a tool through which humans make individualized "business decisions" about specific articles. Pursuant to Fed. R. Evid. 106, *see* A. Blanco Opp. Decl. Ex. 189 (L. Deering 30(b)(1) Tr. at 114:1-16). The record shows that [redacted] Deering testified that [redacted] |

| | |
|---|---|
| | [redacted] A. Blanco Opp. Decl. Ex. 256 (F. Pine 30(b)(6) Tr. (Feb. 5, 2026)) at 502:15-17; Ex. 231 (M. Lindsay 30(b)(6) Tr.) at 65:20-24.<br>Defendants further respond that this fact is immaterial because this fact does not affect the outcome of the suit under the governing law. Specifically, whether Sophi makes decisions regarding the paywall on an article-by-article basis has no bearing on whether articles have been "separately issued." *See Bryant*, 603 F.3d at 141 (number of statutory damages awards turns on whether the copyright holder issued the works separately or as a compilation). |
| 453. The "Sophi" dynamic paywall, which makes "a decision based on user behavior, user attributes, and the type of content to decide whether that article should -- how to treat that article for that user." Ex. 396 [A. Ibrahim, 30(b)(6), November 20, 2025, Depo. Tr.] at 138:12-23. | 453. **Disputed – Immaterial.** Defendants respond as follows: Undisputed that DNPs use a dynamic paywall tool known as "Sophi" which makes certain decisions regarding article accessibility. News Ex. 396 (A. Ibrahim 30(b)(6) Tr.) at 138:12–23. However, Plaintiffs' characterization is inaccurate or incomplete, and is disputed as to the characterization or implication that Plaintiffs exercise meaningful or consistent human "business decisions" regarding the treatment of individual articles. Specifically, the record demonstrates that [redacted] |

| | |
|---|---|
| | [redacted] A. Blanco Opp. Decl. Ex. 189 (L. Deering 30(b)(1) Tr.) at 114:1–24, 118:6–119:15. Further, the record shows that Sophi was not implemented uniformly or simultaneously across the eight Daily News Plaintiff publications. Mr. Deering testified that "[redacted]" *Id.* at 64:25–65:16. Mr. Deering further testified: "[redacted] *Id.* at 66:2–4. Mr. Pine confirmed that, as of his deposition in February 2026, he [redacted] A. Blanco Opp. Decl. Ex. 256 (F. Pine 30(b)(6) Tr. (Feb. 5, 2026)) at 502:15–17. Defendants further respond that this fact is immaterial because this fact does not affect the outcome of the suit under the governing law. Specifically, whether the Sophi makes decisions regarding the paywall on an article-by-article basis has no bearing on whether articles have been "separately issued." *See Bryant*, 603 F.3d at 141 (number of statutory damages awards turns on whether the copyright holder issued the works separately or as a compilation). |
| 454. The *Daily News* Plaintiffs keep a database of which articles are for open and metered use. *See,* Ex. 387 [DNP-00366818 (Chicago)], Ex. 388 [DNP-00366819 (Denver)], Ex. 389 [DNP-00366820 (Mercury)], Ex. 390 | 454. **Disputed in Part – Immaterial.** Defendants respond as follows: Disputed as to whether Daily News Plaintiffs maintain data on paywall settings for each of their Asserted Articles at issue in this |

| | |
|---|---|
| [DNP-00366821 (NYDN)], Ex. 391 [DNP-00366822 (OCR)], Ex. 392 [DNP-00366823 (Orlando)], Ex. 393 [DNP-00366824 (Sun Sentinel)], Ex. 394 [DNP-00366825 (Pioneer Press)]. | Motion. Plaintiffs testified that the [redacted] A. Blanco Opp. Decl. Ex. 256 (F. Pine 30(b)(6) Tr. (Feb. 5, 2026)) at 492:10-25, 493:23-494:14; A. Blanco Opp. Decl. Ex. 216 (A. Ibrahim 30(b)(6) Tr.) at 137:19-138:23. The exhibits cited by Plaintiffs do not show the dates, users, or any other dynamic instances for which individual articles were open or metered. Plaintiffs' evidence is therefore incomplete and unreliable.<br>Defendants further respond that this fact is immaterial because this fact does not affect the outcome of the suit under the governing law. Specifically, whether the Daily News Plaintiffs "keep a database of which articles are for open and metered use" has no bearing on whether articles have been "separately issued." *See Bryant*, 603 F.3d at 141 (number of statutory damages awards turns on whether the copyright holder issued the works separately or as a compilation). |
| 455. Prior to Sophi, *Daily News Plaintiffs* utilized a solution from Mather Economics known as CME – the solution "looked at the article content and made a decision between locking and not locking the story…" Ex. 89 [L. Deering, November 6, 2025, Depo. Tr.] at 121:6-15. | 455. **Disputed in Part – Immaterial.** Defendants respond as follows: Disputed as to whether all of the Daily News Plaintiffs utilized Mather Economics' CME prior to implementing Sophi. Frank Pine testified that [redacted] A. Blanco Opp. Decl. Ex. 216 (F. Pine 30(b)(6) Tr. (Feb. 5, 2026)) at 497:9–19; *see also* A. Blanco Opp. Decl. Ex. 208 (K. Gordon 30(b)(1) Tr.) at 38:19–39:6. |

| | |
|---|---|
| | Defendants further respond that this fact is immaterial because this fact does not affect the outcome of the suit under the governing law. Specifically, whether the Daily News Plaintiffs make decisions regarding the paywall on an article-by-article basis has no bearing on whether articles have been "separately issued." *See Bryant*, 603 F.3d at 141 (number of statutory damages awards turns on whether the copyright holder issued the works separately or as a compilation). |
| 456. News Plaintiffs' consumer terms of service conditions are based on a single piece of content and not issue based restrictions. *See, e.g.,* Ex. 397 [DNP-00536141-188] at 148; Ex. 398 [DNP-00535998-6009] at 6001; Ex. 399 [DNP-00536010-016] at 011; Ex. 400 ["Terms of Service," *New York Times*, January 20, 2026, https://help.nytimes.com/115014893428-Terms-of-Service]. | 456. **Disputed– Not Supported by Cited Evidence; Immaterial.** Defendants respond as follows: The facts set forth in Paragraph 456 are disputed because they are not supported by the cited evidence. *See* News Ex. 397 at DNP-00536148; News Ex. 398 at DNP-00536001; News Ex. 399 at DNP-00536011; News Ex. 400 (Terms of Service, New York Times (Jan. 20, 2026)). Specifically, the cited evidence only provides support for the stated fact with respect to Daily News Plaintiffs and NYT. There is no evidence cited with respect to Ziff Davis, CIR, or The Intercept.<br>Defendants further respond that this fact is immaterial because this fact does not affect the outcome of the suit under the governing law. Specifically, whether the News Plaintiffs' terms of service are based on individual pieces of content, as opposed to issues, has no bearing on whether articles have been "separately issued." |
| 457. The *Daily News* terms state "you [the user] may be able to use individual stories, articles, or video that | 457. **Undisputed – Immaterial.** Defendants further respond that this fact is immaterial because this fact |

| | |
|---|---|
| appear on the Site through online functionality we have specifically designated (e.g., to e-mail a story to a friend or to purchase the rights to reproduce a story for other use)." *See, e.g.*, Ex. 397 [DNP-00536141-188] at 148; Ex. 398 [DNP-00535998-6009] at 6001; Ex. 399 [DNP-00536010-016] at 011. | does not affect the outcome of the suit under the governing law. Specifically, whether this fact has no bearing on whether articles have been "separately issued." *See Bryant*, 603 F.3d at 141 (number of statutory damages awards turns on whether the copyright holder issued the works separately or as a compilation). |
| 458. Since at least July 2018, The Times and Daily News Plaintiffs have made articles available on an individual basis, and in many cases allowed subscribers to share an individual article as a gift or on a social media post. Ex. 377 [Goldfarb Depo. Tr.] at 149:23-150:23; Ex. 378 [K. Gordon Depo. Tr.] at 36:10-37:13, 63:1-65:24; Ex. 397 [DNP-00536141-188] at 148; Ex. 398 [DNP-00535998-6009] at 6001; Ex. 399 [DNP-00536010-016] at 011; Ex. 552 ["Gift Articles for New York Times Subscribers," The New York Times, https://help.nytimes.com/360060848652-Gift-Articles-for-New-York-Times-Subscribers]; Ex. 130 [Brockman Depo. Tr.] at 58:8-10 (GPT-2 was trained "towards the end of 2018, perhaps early 2019"). | 458. **Disputed in Part - Not Supported by Cited Evidence; Immaterial.** Defendants respond as follows: Undisputed that the Daily News Plaintiffs make articles available on an individual basis on their websites and that subscribers to certain publications may share individual articles via gift links or social media posts. Undisputed that the cited article states that The Times allows certain articles to be gifted by subscribers.<br>Disputed that the cited evidence supports the implication that each of the Asserted Articles have been made individually available. The cited evidence does not show that The Times and Daily News Plaintiffs have allowed subscribers to share an individual article as a gift or on a social media post since at least July 2018. Rather, for example, pursuant to Fed R. Evid. 106, The New York Times did not implement a gift feature until June 2021. A. Blanco Opp. Decl. Ex. 102 (*Introducing Gift Articles, a New Way for Times Subscribers to Share Articles*, N.Y. Times (June 22, 2021)).<br>Defendants further respond that this fact is immaterial because this fact does not affect the outcome of the suit under the governing law. Specifically, whether |

| | |
|---|---|
| | articles are made available on separate webpages or able to be shared as gift links has no bearing on whether articles have been "separately issued." *See Bryant*, 603 F.3d at 141 (number of statutory damages awards turns on whether the copyright holder issued the works separately or as a compilation). |
| 459. The news industry provides awards or prizes (e.g., Pulitzer Prizes) based on individual articles or a collection of articles pertaining to a certain story and the content contained therein, not based on issues, including awards received by certain *Daily News Plaintiffs* and *The Times*. *See, e.g.*, Ex. 401 [DNP-00534072-074], Ex. 402 [DNP-00534075-077], Ex. 403 [DNP-00534078-079], Ex. 404 [DNP-00534101-104], Ex. 405 [DNP-00534105-108], Ex. 406 [DNP-00534109-113], Ex. 407 [DNP-00534114-117]; Ex. 408 ["Pulitzer Prize Winners From The New York Times," *New York Times*, https://www.nytimes.com/spotlight/pulitzer-winners-new-york-times]. | 459. **Undisputed – Immaterial.**<br>Defendants further respond that this fact is immaterial because this fact does not affect the outcome of the suit under the governing law. Specifically, whether awards or prizes are given out to individual articles or a collection of articles have no bearing on whether articles have been "separately issued." *See Bryant*, 603 F.3d at 141 (number of statutory damages awards turns on whether the copyright holder issued the works separately or as a compilation). |
| 460. Every Mother Jones SJ Registered Asserted Work is published in print form, in the Mother Jones magazine, or on the Mother Jones Website. It is standard procedure to upload the same text to the Mother Jones Website as what appears in the Mother Jones magazine, and vice versa. Using the same text on the website and in the magazine is a routine practice of Mother Jones. In a small number of cases, the published magazine article is a | 460. **Disputed - Not Supported by Cited Evidence.** Defendants respond as follows: The facts set forth in Paragraph 460 are disputed because they are not supported by the cited evidence. *See* M. Bauerlein Decl. ¶ 25. Specifically, disputed that it is standard procedure to upload the same text to the Mother Jones Website as what appears in the Mother Jones magazine, and vice versa. Disputed that using the same text on the website and in the magazine is a routine practice of Mother Jones. Disputed |

| | |
|---|---|
| condensed version of the article published online, or vice-versa. Bauerlein Decl. ¶ 25. | as to the "small number of cases" language as vague and not supported by the evidence.<br>Further disputed for lack of context. Pursuant to Fed. R. Evid. 106, the sentences [redacted] A. Blanco Opp. Decl. Ex. 170 (M. Bauerlein 30(b)(6) Tr. (Jan. 27, 2026)) at 71:3–14, 70:7–13, 144:21–24, 67:20–23; A. Blanco Opp. Decl. Ex. 178 (M. Buckingham 30(b)(6) Tr. (Dec. 18, 2025)) at 75:21–23. |
| 461. As a routine practice, every Mother Jones magazine article is published at a distinct URL on the Mother Jones Website. Bauerlein Decl. ¶ 26. | 461. **Disputed - Not Supported by Cited Evidence; Immaterial.** Defendants respond as follows: The facts set forth in Paragraph 461 are disputed because they are not supported by the cited evidence. See M. Bauerlein Decl. ¶ 26. Specifically, disputed that "every" Mother Jones magazine article is published on the website. Pursuant to Fed. R. Evid. 106, Ms. Bauerlein's declaration says [redacted] but at her 30(b)(6) deposition, she testified that [redacted] A. Blanco Opp. Decl. Ex. 169 (M. Bauerlein 30(b)(6) Tr. (Jan. 26, 2026)) at 144:21–24.<br>Defendants further respond that this fact is immaterial because this fact does not affect the outcome of the suit under the governing law. Specifically, whether articles are made available on separate webpages have no bearing on whether articles have been "separately issued." *See Bryant*, 603 F.3d at 141 (number of statutory damages |

| | |
|---|---|
| | awards turns on whether the copyright holder issued the works separately or as a compilation). |
| 462. Since 2006 at the latest, users of the Mother Jones Website have never been required to maintain a subscription to the Mother Jones magazine to access individual magazine articles on the website. Bauerlein Decl. ¶ 27. | 462. **Disputed in Part - Not Supported by Cited Evidence; Immaterial.** Defendants respond as follows: Undisputed that the Bauerlein Declaration states that users of the Mother Jones Website have not been "required to maintain a subscription to the Mother Jones magazine to access individual magazine articles on the website." M. Bauerlein Decl. ¶ 27. However, the remainder of Paragraph 462 is disputed to the extent it implies that all Mother Jones content has been freely and unconditionally accessible to the public through the Mother Jones Website, because that proposition is not supported by the cited evidence. Pursuant to Fed. R. Evid. 106, when asked whether [redacted] A. Blanco Opp. Decl. Ex. 169 (M. Bauerlein 30(b)(6) Tr. (Jan. 26, 2026)) at 59:2–11. When pressed to identify [redacted] *Id.* at 59:12–:16.<br>Defendants further respond that this fact is immaterial because this fact does not affect the outcome of the suit under the governing law. Specifically, whether Mother Jones website users don't need a subscription to read magazine articles online has no bearing on whether |

| | |
|---|---|
| | articles have been "separately issued." *See Bryant*, 603 F.3d at 141 (number of statutory damages awards turns on whether the copyright holder issued the works separately or as a compilation). |

## F. News Plaintiffs' Protection of Their Works

### 1. Paywalls

| | |
|---|---|
| 463. In acquiring News Plaintiffs' content, OpenAI did not check whether it was behind a paywall and would otherwise be hidden from a human user's browser. Ex. 409 [Perelman 30(b)(6) Depo. Tr.] at 15:6-8 ("We don't have a separate method for detecting paywalled content, to my knowledge"); Ex. 410 [Feamster Opening Rep.] ¶¶ 150-52; Ex. 414 [Sohl Dec. 9, 2025, 30(b)(6) Depo. Tr.] at 343:5-15. | 463. **Disputed - Not Supported by Evidence.** OpenAI responds as follows: The facts set forth in Paragraph 463 are not supported by the cited evidence. News Plaintiffs' use of "acquiring" is vague, and the cited evidence does not address the acquisition of News Plaintiffs' content specifically. Pursuant to Fed. R. Evid. 106, News Ex. 410 (N. Feamster Opening Rep.) ¶¶ 150–52 discusses the technical operation of client-side subscription enforcement mechanisms, rather than any conduct specific to OpenAI.<br>Moreover, Plaintiffs' characterization of the Perelman and Sohl testimony omits important context. Pursuant to Fed. R. Evid. 106, Perelman testified that OpenAI investigated methods for detecting paywalled content and explained that website operators can use robots.txt to restrict crawling. A. Blanco Opp. Decl. Ex. 254 (A. Perelman 30(b)(6) Tr.) at 12:4–14:24. Pursuant to Fed. R. Evid. 106, Sohl testified only that he was unaware of a filter in the GPTBot dataset specifically designed to identify |

| | |
|---|---|
| | paywalled content. News Ex. 414 (Sohl 30(b)(6) Tr. (Dec. 09, 2025)) at 343:5–15.<br><br>Microsoft defers to OpenAI. |
| 464. Content from behind a paywall is hidden from a human user's browser. Ex. 410 [Feamster Opening Rep.] ¶ 150. | 464. **Disputed.** Defendants respond as follows: Paragraph 464 mischaracterizes the cited expert report and is technically inaccurate. When a client-side subscription enforcement mechanism is implemented, the server "sends the full content of the requested webpage to the visitor in response to the initial HTTP GET request from the client," rather than withholding it. The browser itself receives the full content of the webpage; it is the content displayed to the human user, not the content received by the browser, that is hidden, because client-side JavaScript "dynamically obscures the content so that the user cannot view it directly in the browser." News Ex. 410 (Feamster Opening Rep.) ¶ 149. Even when a subscription enforcement mechanism is implemented on the server-side, rather than fully withholding content, the server "withholds the restricted portion of the content and returns a limited version of the page" to the browser. *Id.* ¶ 145. |
| 465. **<u>The Times</u>.** The Times launched the paywall on its website in March 2011. Ex. 371 [Yang 30(b)(6) Depo. Tr.] at 168:17-20. | 465. **Undisputed.** |
| 466. When first introduced, The Times's paywall was a frequency-based or "metered" model that allowed visitors to read 20 articles per month without paying, after | 466. **Undisputed.** |

| | |
|---|---|
| which they would be prompted to purchase one of several digital subscription packages. Ex. 82 [Tucker Opening Rep.] ¶34; Ex. 553 [Yang Depo. Ex. 16]; Ex. 371 [Yang 30(b)(6) Depo. Tr.] at 168:21-169:2. | |
| 467. The Times subsequently tightened its metered paywall over time, reducing the number of free articles from 20 per month to, eventually, 5 free articles per month in 2020, and ultimately switching to a dynamic model that does not use one fixed number of free articles but rather takes user behavior into consideration. Ex. 411 [NYT_01014327] at 28, 31 (showing paywall meter at 5 free articles in July 2020); Ex. 127 [Rao Rebuttal Rep.] ¶ 238, n.609; Ex. 371 [Yang 30(b)(6) Depo.] at 182:18-183:6. | 467. **Disputed in Part - Not Supported by Cited Evidence.** Undisputed that the cited evidence reflects that The Times tightened its paywall over time and later adopted a dynamic model. However, the cited evidence does not support the assertion that The Times reduced the meter to five free articles per month in 2020. Ex. 411 [redacted] Ex. 411 at 24-33. Indeed, The Times states in Paragraph 469 that it introduced a "Dynamic Meter" system in 2019. |
| 468. When The Times introduced a paywall in March 2011, visitors would be able to read 20 articles a month before hitting a paywall, with an allowance for additional articles if the articles was accessed through search engine or social media. Ex. 371 [Yang 30(b)(6) Depo. Tr.] at 168:17-170:2. | 468. **Undisputed.** |
| 469. As of 2019, The Times added in a "Dynamic Meter" system known as "Red Bird" which is a machine learning-based model which determines "whether a paywall or ...registration wall shows up" when an article is shown. Ex. 371 [Yang 30(b)(6) Depo. Tr.] at 176:23-177:15. | 469. **Undisputed.** |
| 470. The Times also employs a registration wall (or "Regi Wall"), a separate mechanism from its paywall, which | 470. **Undisputed.** |

| | |
|---|---|
| blocks part of a page, with "a prompt to sign up via email for accessing The Times in a limited way." Ex. 83 [Poferl 30(b)(6) Depo. Tr.] at 65:10-66:5; *see also* Ex. 413 [NYT_00733728]. | |
| 471. The Regi Wall requires a user to supply identifying information and create an account before gaining access to additional free content. Ex. 83 [Poferl 30(b)(6) Depo. Tr.] at 66:7-10. | 471. **Disputed in Part – Not Supported by Cited Evidence.** Defendants do not dispute that The Times's Regi Wall requires a user to supply identifying information and create an account. But Defendants respond that the facts set forth in Paragraph 471 are disputed in part because the cited evidence does not support the fact as written. Specifically, the evidence does not support the fact that after the user supplies identifying information and creates an account, the user gains access to additional free content. News. Ex. 83 (H. Poferl 30(b)(6) Tr.) at 66:7-10. |
| 472. Once registered users hit their individual meter limit, they are served a paywall with a subscription offer which, unlike a registration wall, asks "for payment details so that [the user is] paying for access to the content." Ex. 83 [Poferl 30(b)(6) Depo. Tr.] at 66:1-5; Ex. 412 [Yang Depo. Ex. 19]; Ex. 413 [NYT_00733728] at -46. | 472. **Undisputed.** |
| 473. The Times has a paywall on News, Wirecutter, Cooking, and The Athletic content. Ex. 371 [Yang 30(b)(6) Depo. Tr.] at 180:18-23. | 473. **Undisputed.** |
| 474. OpenAI acquired Times content notwithstanding The Times's paywall. Ex. 371 [Yang 30(b)(6) Depo. Tr.] at 168:17-20 (existence of paywall); Ex. | 474. **Disputed in Part - Not Supported by Evidence.** OpenAI responds as follows: Undisputed that the cited evidence supports that The Times operated a |

| | |
|---|---|
| 371 [Yang 30(b)(6) Depo. Tr.] at 180:22-23 (existence of paywall); Ex. 708 [OPCO_MDL_001686009] at -09; Ex. 414 [Sohl Dec. 9, 2025 30(b)(6) Depo. Tr.] at 368:2-11 (OpenAI acknowledgement that it scraped paywalled sites); 414. 414 [Sohl Dec. 9, 2025 30(b)(6) Depo. Tr.] at 290:5-16, 332:6-17 (OpenAI 30(b)(6) testimony agreeing that "OpenAI directly scraped The Times's website"). | paywall and that OpenAI scraped The Times's website. However, OpenAI otherwise disputes the proposition as unsupported by evidence. The cited evidence does not establish that OpenAI bypassed a paywall or acquired Times content that was actually behind one. Pursuant to Fed. R. Evid. 106, The Times's own testimony shows that [redacted] *See* A. Blanco Opp. Decl. Ex. 290 (H. Yang 30(b)(6) Tr.) at 168:21–169:24, 178:15–179:9, 183:1–6, 197:7–12, 200:16–24. Pursuant to Fed. R. Evid. 106, Sohl likewise testified that the Times content OpenAI scraped was "publicly accessible on the Internet" and that the raw HTML fetched by the bot should have been identical to that presented to a human user. A. Blanco Opp. Decl. Ex. 277 (I. Sohl 30(b)(6) Tr. (Dec. 9, 2025)) at 294:15–296:15. Thus, evidence that OpenAI scraped The Times's website does not, without more, show that OpenAI obtained content from behind The Times's paywall.<br><br>Microsoft defers to OpenAI. |
| 475. **<u>Daily News Plaintiffs.</u>** The Daily News Plaintiffs implemented paywalls at various times between 2015 and 2018, with The Daily News Plaintiffs papers transitioning at different rates such that "within [a] five- | 475. **Undisputed.** |

| | |
|---|---|
| year period, everybody went from no paywall to paywall." Ex. 17 [Pine Feb. 4, 2026 30(b)(6) Depo. Tr.] at 237:12-19. | |
| 476. When *Daily News* Plaintiffs first implemented paywalls, it was manually determined how many "free stories" a user would get before they hit a paywall. Ex. 17 [Pine Feb. 4, 2026 30(b)(6) Depo. Tr.] at 238:10-15; Ex. 88 [A. Ibrahim 30(b)(6) Depo. Tr.] at 134:24-135:5 (explaining that content is never "free" -- "It was different for different users. And it was in the spirit of selling a subscription."). | 476. **Undisputed.** |
| 477. Over time, *Daily News* Plaintiffs' paywall meters have become more sophisticated and they take into account many factors, such as the type of content being read, whether the user's IP address is local or non-local, and other factors that gauge a person's propensity to subscribe. Ex. 17 [Pine Feb. 4, 2026 30(b)(6) Depo. Tr.] at 239:5-19. | 477. **Undisputed.** |
| 478. More recently, there has been increased pressure on *Daily News* Plaintiffs to lower meter settings and tighten paywalls to ensure readers are still being converted into subscribers because it is becoming harder to convert them, and "[a]t this point the meter settings are – are so strict that there's not a lot of room for us to tighten meters further without basically locking down everything on the website, which has a reverse effect because it basically chokes off what we'd call the top of the funnel, people coming in and experiencing the content without | 478. **Disputed in Part - Not Supported by Cited Evidence.** Defendants respond as follows: Undisputed that Mr. Pine gave the quoted testimony. Ex. 255 (F. Pine 30(b)(6) Tr. (Feb. 4, 2026)) at 239:23–240:10. However, disputed to the extent Plaintiffs suggest that any "increased pressure" to "lower meter settings and tighten paywalls" is related to Defendants, as the cited testimony does not say who is applying the "pressure," and does not mention Defendants or any Defendant product. *Id.*<br>Further, other testimony shows that [redacted] |

| | |
|---|---|
| being required to subscribe in the first place." Ex. 17 [Pine Feb. 4, 2026 30(b)(6) Depo. Tr.] at 239:23-240:10. | [redacted] Pursuant to Fed R. Evid. 106, [redacted] A. Blanco Opp. Decl. Ex. 255 (F. Pine 30(b)(6) Tr. (Feb. 4, 2026)) 237:9–10. [redacted] *Id.* at 238:23–25. And, Daily News Plaintiffs [redacted] *Id.* at 241:1–2. |

### 2. Robots Exclusion Protocol

| | |
|---|---|
| 479. The Robots Exclusion Protocol (REP) is a standard used by website owners to allow or disallow crawling by bots. Ex. 415 [Liang Depo. Tr.] at 147:13-25; Ex. 416 [Hallacy, 10/1/25, Depo. Tr.] at 455:15-18. | 479. **Disputed in Part.** Defendants respond as follows: Undisputed that the REP is a protocol to provide instructions as to which web crawlers, scrapers, and other bots may access resources contained in their websites. ECF 1756 (N. Feamster Opening Decl.) ¶ 35; ECF 1711 (F. Canel Decl.) ¶ 10. But Defendants dispute any implication in Paragraph 479 that the REP is the only method for communicating publisher preferences regarding how their content may be accessed. *See* ECF 1711 (F. Canel Decl.) ¶¶ 10-12, 26-29; *see also* News Ex. 416 (C. Hallacy Tr. (Oct. 1, 2025)) at 455:15-18. |
| 480. The REP was first introduced in 1994 and has governed bot behavior on the web as the *de facto* standard ever since. Stricchiola NYT/DN Opening Rep. at ¶ 86; Stricchiola ZD Opening Rep. at ¶ 91; Ex. 410, Feamster Opening Rep. at ¶ 288. | 480. **Disputed in Part.** Defendants respond as follows: Defendants do not dispute that the REP was first introduced in 1994 and is a widely adopted protocol that allows website owners to instruct bots on how to access their websites. ECF 1756 (N. Feamster Opening Decl.) ¶ 35; ECF 1711 (F. Canel Decl.) ¶ 10. But Defendants dispute any |

| | |
|---|---|
| | implication in Paragraph 480 that the REP is the only well-known mechanism by which website owners can express preferences regarding how their content may be accessed. *See* ECF 1711 (F. Canel Decl.) ¶¶ 10-12, 26-29; *see also* News Ex. 416 (C. Hallacy, Dep. Tr. (Oct. 1, 2025)) at 455:15-18. |
| 481. Website owners implement the REP in part through "robots.txt" files, which contain directives for different "user agents" (also referred to as "crawlers" or "bots"). Ex. 415 [Liang Depo. Tr.] at 149:11-150:14; *see also* Stricchiola NYT/DN Opening Rep. at ¶95; Stricchiola ZD Opening Rep. at ¶ 99. | 481. **Disputed in Part.** Defendants respond as follows: Undisputed that website owners implement the REP through robots.txt files, which contain directives applicable to different user agents, including web crawlers or bots. However, disputed to the extent News Plaintiffs' use of "in part" suggests that the REP may be implemented through mechanisms other than robots.txt files. News Plaintiffs cite no evidence establishing that other mechanisms constitute implementations of the REP. *See* J. Gratz Decl. Ex. 167 (About /robots.txt); ECF 1756 (N. Feamster Opening Decl.) ¶ 35. |
| 482. "Disallow" directives specify URL paths the identified crawler is instructed not to access, while "allow" directives may be used to grant access to paths within an otherwise restricted directory. Stricchiola NYT/DN Opening Rep. at ¶95; *see also* Ex. 415 [Liang Depo. Tr.] at 149:11-16; Stricchiola ZD Opening Rep. at ¶ 99-100. | 482. **Undisputed.** |
| 483. In March 2023, OpenAI announced a bot called ChatGPT-User, which OpenAI uses for certain user actions in ChatGPT, including to retrieve website content as part of generating responses in ChatGPT. Ex. 417 [https://developers.openai.com/api/docs/bots/]; Ex. 410 | 483. **Disputed in Part.** OpenAI responds as follows: Disputed to the extent "including" suggests ChatGPT-User is used for purposes beyond what is described in News Ex. 417. Specifically, "ChatGPT-User is |

| | |
|---|---|
| [Feamster Opening Rep.] at ¶ 178; Stricchiola NYT/DN Opening Rep. at 57; [Stricchiola ZD Opening Rep. at ¶ 157]; Ex. 410 [Feamster Opening Rep.] at ¶ 243. | not used for crawling the web in an automatic fashion." J. Gratz Decl. Ex. 190.<br><br>Microsoft defers to OpenAI. |
| 484. In August 2023, OpenAI announced its bot called GPTBot which OpenAI and Microsoft have used to crawl the web for training data. Ex. 418 [OPCO_MDL_001000137] at –143; Ex. 410 [Feamster Opening Rep.] ¶¶ 176, 244. Stricchiola NYT/DN Opening Rep. ¶¶56, 139; Stricchiola ZD Opening Rep. at ¶ 54; Ex. 417 [https://developers.openai.com/api/docs/bots/]. | 484. **Disputed In Part.** Defendants respond as follows: this fact is disputed because to the extent Microsoft acquired data to be used by OpenAI in connection with the development of LLMs, Microsoft did so by using ordinary software robots that crawled content from URLs across the public internet following Microsoft's responsible web crawling protocols. *See* ECF 1705 (P. Gaggara Decl.) ¶¶ 20-21; *see also* A. Hurst Decl. Ex. 38 (P. Gaggara 30(b)(6) Tr. (Aug. 20, 2025)) at 67:1-20, 143:13-144:6, 8:9-19, 9:25-13:17.<br>Further disputed to the extent the cited Stricchiola Opening Report implies GPTBot was used to collect training data long before it was announced. Pursuant to Fed. R. Evid. 106, OpenAI did not operate its own crawler to collect training data prior to the GPTBot announcement. *See* Feamster Opp. Decl. 45. |
| 485. Between July 25, 2024 and November 5, 2024, OpenAI announced a bot called OAI-SearchBot, which OpenAI uses to surface websites in search results in ChatGPT's search features. Ex. 410 [Feamster Opening Rep.] at ¶¶ 177, 244; Stricchiola ZD Opening Rep. at ¶ 53; Ex. 417 [https://developers.openai.com/api/docs/bots/]; Stricchiola NYT/DN Opening Rep. at ¶ 55; Ex. 409 [Perelman 30(b)(6) Depo. Tr.] at 27:8-28:12. | 485. **Disputed in Part.** OpenAI responds as follows: Undisputed that OpenAI announced OAI-SearchBot during the identified period and uses it to surface websites in ChatGPT search results. Disputed to the extent News Plaintiffs rely on Perelman's testimony in News Ex. 409 to support this assertion, as that testimony concerns OAI-SearchBot's use in building the Maraschino index. |

| | |
|---|---|
| | Microsoft defers to OpenAI. |
| 486. At least some instances of OpenAI's scraping occurred prior to or around the same time as OpenAI's disclosure of its user agent identifiers. Ex. 410 [Feamster Opening Rep.] at Appendix D (showing access dates prior to announcement of bots). | 486. **Disputed in Part.** OpenAI responds as follows: Undisputed that, of the 20 million ChatGPT conversation records analyzed, there are 14 instances in which a Plaintiff domain was visited by the Browser tool's click or open_url commands before the ChatGPT Browse product was publicly launched. However, disputed to the extent Plaintiffs characterize these 14 instances as "scraping." This activity is consistent with standard industry practices, such as canary testing, where a product is tested in a live production environment. News Ex. 410 (N. Feamster Opening Rep.) at App. D.<br><br>Microsoft defers to OpenAI. |
| 487. <u>**The Times.**</u> The Times maintains a robots.txt file. Ex. 419 [Wiggins Depo. Tr.] at 77:16-17; Ex. 420 [Liang Depo. Ex. 13]. | 487. **Undisputed.** |
| 488. The Times disallowed GPTBot in its robots.txt on August 17, 2023. Ex. 309 [Procas 30(b)(6) Depo. Tr.] at 242:7-10. | 488. **Undisputed.**<br><br>Microsoft defers to OpenAI. |
| 489. The Times disallowed ChatGPT-User bot in its robots.txt on February 27, 2024. Ex. 309 [Procas 30(b)(6) Depo. Tr.] at 245:13-21. | 489. **Undisputed.**<br><br>Microsoft defers to OpenAI. |

| | |
|---|---|
| 490. The Times disallowed OAI-SearchBot in its robots.txt on July 25, 2024. Ex. 309 [Procas 30(b)(6) Depo. Tr.] at 243:17-19. | 490. **Undisputed.**<br><br>Microsoft defers to OpenAI. |
| 491. On February 22, 2024, The Times updated its robots.txt with the following header text:<br>New York Times content is made available for your personal, non-commercial<br>use subject to our Terms of Service here:<br>https://help.nytimes.com/hc/en-us/articles/115014893428-Terms-of-Service.<br>Use of any device, tool, or process designed to data mine or scrape the content<br>using automated means is prohibited without prior written permission from<br>The New York Times Company. Prohibited uses include but are not limited to:<br>(1) text and data mining activities under Art. 4 of the EU Directive on Copyright in<br>the Digital Single Market;<br>(2) the development of any software, machine learning, artificial intelligence (AI),<br>and/or large language models (LLMs);<br>(3) creating or providing archived or cached data sets containing our content to others; and/or<br>(4) any commercial purposes.<br><br>Ex. 421 [NYT_00733685] at -99. | 491. **Disputed in Part - Immaterial.** Defendants do not dispute that The Times's header contains the stated text in Paragraph 491. But Defendants do dispute the implication that this text in a robots.txt file has any bearing on a web crawler's operation or that bots can act on such text. Web crawlers only process the defined directive fields and ignore all other text in a robots.txt file; comments placed elsewhere in a robots.txt file do not affect web robot behavior and are intended only to be read by humans. *See* Brook Decl. Ex. 72 at 135:12-136:4; Ex. 410 (N. Feamster Opening Rep.) ¶¶ 137-138; Ex. 423 ¶¶ 157, 160; N. Feamster Opp. Decl. ¶¶ 15-17.<br>Defendants further respond that the cited evidence does not support any inference that such header text is standard under the REP. *See* N. Feamster Opp. Decl. ¶¶ 15-17.<br>Further, the disputed proposition in Paragraph 491 is immaterial, and therefore disputed, because it does not affect the outcome of the suit under the governing law. |

| | |
|---|---|
| 492. The Times also uses a server-side block, through DataDome software, on GPTBot, ChatGPT-User, and OAI-SearchBot. Ex. 309 [Procas 30(b)(6) Depo. Tr.] at 242:2-20, 243:8-20, 245:22-24. | 492. **Disputed in Part - Not Supported by Cited Evidence.** OpenAI responds as follows: Undisputed that The Times used DataDome software to block GPTBot, ChatGPT-User, and OAI-SearchBot. News Ex. 309.<br>However, disputed that the blocking technique is a "server-side block." The cited testimony does not use or support that description, so News Plaintiffs' label mischaracterizes the cited evidence. The disputed proposition is therefore not supported by the cited evidence.<br><br>Microsoft defers to OpenAI. |
| 493. Despite The Times implementing robots.txt disallows for GPTBot, ChatGPT-User, and OAI-SearchBot, OpenAI continued to attempt to scrape The Times's webpages contravening The Times's robots.txt directives. Ex. 423 [Feamster Rebuttal Report] at ¶ 35-36, 68-69 (acknowledging scrape attempts by OpenAI's bots, notwithstanding The Times's robots.txt, that were blocked by The Times's server); Stricchiola Reply Report at ¶¶ 18, 23-26. | 493. **Disputed.** OpenAI responds as follows: Undisputed that Stricchiola opines that [redacted] J. Stricchiola Reply Rep. ¶¶ 18, 23–26.<br>However, disputed that this conclusion is accurate. News Plaintiffs, through Ms. Stricchiola, mischaracterize Dr. Feamster's analysis. Dr. Feamster does not agree that OpenAI bypassed The Times's robots.txt directives. ECF 1756 (Feamster Decl.) ¶¶ 52-69; Feamster Opp. Decl. ¶¶ 29-34. The facts set forth in Paragraph 493 are therefore not supported by the cited material, and the Court should disregard them.<br>Pursuant to Fed. R. Evid. 106, OpenAI further responds that Dr. Feamster found that [redacted] |

| | |
|---|---|
| | [redacted] Feamster Opp. Decl. ¶ 31(a). Dr. Feamster also explains that, despite the requests caused by these bugs, OpenAI's bots did not retrieve any of The Times's content. The Times's blocks on OpenAI's bots prevented it, and those blocks were possible because OpenAI is open about how its crawlers identify themselves. Feamster Opp. Decl. ¶¶ 29, 31(a).<br><br>Microsoft defers to OpenAI. |
| 494. **<u>Daily News Plaintiffs.</u>** Daily News Plaintiffs maintain robots.txt files for their respective websites. Ex. 72 [Jacobs Feb. 12, 2026 30(b)(6) Depo. Tr.] at 89:2-92:23. | 494. **Undisputed.** |
| 495. Daily News Plaintiffs, except New York Daily News and Chicago Tribune, disallowed GPTBot in their robots.txt for their respective websites on August 21, 2023. Ex. 424 [DNP-00636037]. | 495. **Undisputed.**<br><br>Microsoft defers to OpenAI. |
| 496. New York Daily News disallowed GPTBot in its robots.txt for its website at least as of September 28, 2023. Ex. 425 [Jacobs 27]; *see also* Ex. 72 [Jacobs Feb. 12, 2026 30(b)(6) Depo. Tr.] at 119:21-121:13. | 496. **Undisputed.**<br><br>Microsoft defers to OpenAI. |
| 497. Daily News Plaintiffs, except Chicago Tribune, disallowed ChatGPT-User in their robots.txt for their respective websites on October 26, 2023. Ex. 426 [DNP-00636034]; *see also* Ex. 427 [Jacobs Exhibit 30]; Ex. 428 | 497. **Undisputed.**<br><br>Microsoft defers to OpenAI. |

| | |
|---|---|
| [DNP-00364948]; Ex. 429 [DNP-00364953]; Ex. 430 [DNP-00364958]; Ex. 431 [DNP-00364963]; Ex. 432 [DNP-00364968]; Ex. 433 [DNP-00364973]; Ex. 434 [DNP-00364978]. | |
| 498. The Chicago Tribune disallowed GPTBot and ChatGPT-User in its robots.txt for its website at least as of April 30, 2024. Ex. 435 [DNP-00364939]. | 498. **Undisputed.**<br><br>Microsoft defers to OpenAI. |
| 499. Daily News Plaintiffs disallowed OAI-SearchBot in their robots.txt for their respective websites by at least August 23, 2024. Ex. 436 [DNP-00636036]. | 499. **Undisputed.**<br><br>Microsoft defers to OpenAI. |
| 500. By at least August 23, 2024, Daily News Plaintiffs updated the headers of their robots.txt with the following text:<br># Our Content is made available for your personal, non-commercial use subject to our Terms of Service here: https://www.tribpub.com/terms-and-conditions/<br># Any other uses are prohibited, including but not limited to:<br># (1) text and data mining activities under Art. 4 of the EU Directive on Copyright in the Digital Single Market;<br># (2) use of any Content or information available on the Site for purposes of retrieval augmented generation, grounding, training, or development of machine learning models, algorithms, or artificial intelligence (AI) systems, or to generate substitute | 500. **Disputed in Part - Immaterial.** Defendants do not dispute that The Daily News Plaintiffs' header contains the stated text in Paragraph 500. But Defendants do dispute the implication that this text in a robots.txt file has any bearing on a web crawler's operation or that bots can act on such text. Web crawlers only process the defined directive fields and ignore all other text in a robots.txt file; comments placed elsewhere in a robots.txt file do not affect web robot behavior and are intended only to be read by humans. *See* A. Blanco Opp. Decl. Ex. 217 (C. Jacobs 30(b)(6) Tr. (Feb. 12, 2026)) at 135:12-136:4; News Ex. 410 ¶¶ 137-138; News Ex. 423 ¶¶ 157, 160; N. Feamster Opp. Decl. ¶¶ 15-17.<br>Defendants further respond that the cited evidence does not support any inference that such header text is standard under the REP. See N. Feamster Opp. Decl. ¶¶ 15-17. Further, the disputed proposition in Paragraph 500 is |

| | |
|---|---|
| content or develop any products, services, or technology;<br># (3) caching or archiving the Content; and/or<br># (4) any commercial purposes.<br># Contact us at https://www.chicagotribune.com/contact-us/ for assistance.<br><br>Ex. 436 [DNP-00636036]; *see also* Ex. 72 [Jacobs Feb. 12, 2026 30(b)(6) Depo. Tr.] at 134:25-137:8; Ex. 427 [Jacobs Exhibit 30]; Ex. 437 [DNP-00636031]. | immaterial, and therefore disputed, because it does not affect the outcome of the suit under the governing law. |
| 501. Despite DNP implementing robots.txt disallows for GPTBot, ChatGPT-User, and OAI-SearchBot, OpenAI continued to scrape DNP's webpages contravening DNP's robots.txt directives. Ex. 423 [Feamster Rebuttal Rep.] at ¶ 88; Stricchiola Reply Rep. at ¶¶ 18-19 (explaining that Dr. Feamster's analysis shows that all three OpenAI bots have bypassed *Daily News* Plaintiffs' robots.txt disallows). | 501. **Disputed.** OpenAI responds as follows: Undisputed that Stricchiola provides this opinion.<br>However, disputed that this conclusion is accurate and dispute the characterization that OpenAI continued to scrape DNP's webpages in contravention of DNP's robots.txt directives. News Plaintiffs, through Ms. Stricchiola, mischaracterize Dr. Feamster's analysis. *See* N. Feamster Opp. Decl. 31(b), 32, 34. The facts set forth in Paragraph 501 are therefore not supported by the cited material, and the Court should disregard them.<br>Pursuant to Fed. R. Evid. 106, OpenAI further responds as follows: Dr. Feamster [redacted] t |

| | |
|---|---|
| | [redacted] A. Blanco Opp. Decl. Ex. 225 (J. Krein Tr.) at 155:4-8, 156:23-157:4.<br><br>Microsoft defers to OpenAI. |
| **<u>Ziff Davis Plaintiffs.</u>**<br>502. Each Ziff Davis Plaintiff maintains robots.txt files for its websites. Ex. 85 [Fortuna 30(b)(6) Depo. Tr.] at 154:13-15; Ex. 438 [ZD0497738]; Ex. 439 [ZD0497847]; Ex. 440 [ZD0499350]; Ex. 441 [ZD0498777]; Ex. 442 [ZD0499365]; Ex. 443 [ZD0499364]; Ex. 444 [ZD501190]. | 502. **Undisputed.**<br><br>Microsoft responds that Paragraph 502 does not pertain to claims asserted against Microsoft. |
| 503. Ziff Davis also employs Content Distribution Network ("CDN") blocks to prevent unwanted traffic from reaching its websites. Ex. 85 [Fortuna 30(b)(6) Depo. Tr.] at 153:1-23. | 503. **Undisputed.**<br><br>Microsoft responds that Paragraph 503 does not pertain to claims asserted against Microsoft. |
| 504. The Ziff Davis Plaintiffs maintain robots.txt disallows for GPTBot on their websites. Ex. 441 [ZD0498777], Ex. 442 [ZD0499365], Ex. 443 [ZD0499364], Ex. 438 [ZD0497738], Ex. 440 [ZD0499350], Ex 444 ZD501190]. | 504. **Disputed in Part.** OpenAI responds as follows: Undisputed that certain Ziff Davis brands maintain robots.txt disallows for GPTBot on their websites. However, disputed to the extent Paragraph 504 fails to establish when the GPTBot disallows were adopted, as |

| | |
|---|---|
| | various Ziff Davis brands adopted GPTBot disallows at different times. According to Ziff Davis's own expert, [redacted] News Ex. 441 at ZD0498777; News Ex. 442 at ZD0499365; News Ex. 443 at ZD0499364; News Ex. 438 at ZD0497738; News Ex. 440 at ZD0499350; News Ex. 444 at ZD0501190; ECF 1798-2 (J. Stricchiola Decl. Ex. B.) (ZD Opening Rep.) ¶ 155.<br><br>Microsoft responds that Paragraph 504 does not pertain to claims asserted against Microsoft. |
| 505. Despite Ziff Davis implementing robots.txt disallows, OpenAI continued to scrape Ziff Davis webpages contravening Ziff Davis's robots.txt directives. [Krein Rebuttal Rep.] ¶ 67-78; Krein Second Supplemental Report ¶¶6-8. | 505. **Disputed.** OpenAI responds as follows: This fact is disputed because using purely Dr. Krein's own methods, his Second Supplemental Report claims [redacted] A. Blanco Opp. Decl. Ex. 295 (J. Krein Second Supp.) ¶ 6; Ex. 294 (J. Krein Rebuttal Report ¶ 90). Dr. Krein's methodology is also flawed. Dr. |

| | |
|---|---|
| | Krein does not account for all provisions of the REP, that his analysis of bot disallow dates is inaccurate. Under Dr. Feamster's alternate methods, [redacted] N. Feamster Opp. Decl. ¶ 31(c); Ex. 294 (J. Krein Rebuttal Rep. ¶90). It is clear [redacted] as News Plaintiffs claim. [redacted] N. Feamster Opp. Decl. ¶ 31(c). Indeed, [redacted] was acknowledged by Dr. Krein during his deposition. News Ex. 225 (J. Krein Tr. at 155:4-8, 156:23-157:4).<br><br>Microsoft responds that Paragraph 505 does not pertain to claims asserted against Microsoft. |
| 506. By acquiring webpages of publishers such as CIR, The Intercept, and Ziff Davis from third party organizations like Common Crawl, OpenAI also sidestepped the REP regime by obtaining access to content without scraping the sites itself. Stricchiola Reply Rep. ¶ 65; Wenger Rebuttal Rep. at 54–55. | 506. **Disputed - Not Supported by Cited Evidence.** OpenAI responds as follows: Disputed that the cited evidence supports the proposition that OpenAI "sidestepped the REP regime." Ms. Stricchiola describes OpenAI's use of Common Crawl as a "workaround," but she gives no support for that opinion. ECF 1798-4 (J. Stricchiola Decl. Ex. D) (Reply Rep.) ¶ 65; *see also* |

| | |
|---|---|
| | Feamster Opp. Decl. ¶¶ 44-47. Dr. Wenger, also Plaintiffs' expert, correctly explains that the REP "only applies to bots visiting the website of interest." ECF 1858-4 (E. Wenger Decl. Ex. D) (Rebuttal Rep.) at 54–55. OpenAI therefore did not "sidestep" the REP. The facts set forth in Paragraph 506 are not supported by the cited material, and the Court should disregard them.<br>Pursuant to Fed. R. Evid. 106, OpenAI further responds that Common Crawl maintains its own robots.txt compliance policy. That policy was in effect when OpenAI relied on Common Crawl to train its models. N. Feamster Opp. Decl. ¶¶ 44-47.<br><br>Microsoft defers to OpenAI. Microsoft further responds that facts related solely to Ziff Davis and The Intercept do not pertain to claims asserted against Microsoft. |
| 507. Dr. Feamster does not analyze whether, in practice, GPTBot actually respected robots.txt directives. Ex. 410 [Feamster Opening Rep.] ¶ 176 (stating he did not analyze the behavior of GPTBot); Ex. 446 [Feamster Reply Rep.] ¶¶ 19–27 (suggesting review of only source code default settings and not actual practice of GPTBot). | 507. **Disputed in Part.** OpenAI responds as follows: Undisputed that Dr. Feamster's initial assignment did not include analyzing OpenAI's training-data-acquisition practices. However, disputed that Dr. Feamster failed to analyze whether GPTBot actually respected robots.txt directives in practice. Dr. Feamster analyzed the designed behavior of GPTBot by reviewing its source code and the practical behavior of GPTBot by analyzing server logs, and concluded that GPTBot's practice was consistent with the Robots Exclusion Protocol. N. Feamster Opp. Decl. ¶¶ 41-43. Further, Plaintiffs' own class expert |

| | |
|---|---|
| | witnesses Shan and Zhao confirmed that GPTBot respects robots.txt in practice. A. Blanco Opp. Decl. Ex. 147 (Shan & Zhao, *Somesite I Used to Crawl*, https://arxiv.org/html/2411.15091v1, § 5.2.1).<br><br>Microsoft defers to OpenAI. |
| 508. Ziff Davis incorporated its Terms of Use into its robots.txt files as of January 2025, by adding the following language:<br># Ziff Davis content is made available for your non-commercial use subject to our<br># Terms of Use here: https://www.ziffdavis.com/terms-of-use<br># Use of any robot, crawler, or other tool to scrape, harvest, extract, or retrieve any content on<br># this website using automated means is prohibited without written permission from Ziff Davis.<br># Prohibited uses include but are not limited to:<br># (1) text and data mining under Art. 4 of the EU Directive on Copyright in the Digital Single<br># Market;<br># (2) development or operation of artificial intelligence or machine learning software or<br># databases, including by training, fine-tuning, embedding, and retrieval-augmented generation;<br># (3) creating data sets containing our content or sharing it with others; and | 508. **Disputed in Part.** OpenAI responds as follows: Undisputed that Ziff Davis added the quoted language to certain robots.txt files in January 2025. However, OpenAI disputes any implication that following written comments in a robots.txt file is part of the REP. N. Feamster Opp. Decl. ¶¶ 15-17. Bots cannot read this type of text and it is not an industry norm to express preferences this way. N. Feamster Opp. Decl. ¶¶ 15-17.<br><br>Microsoft responds that Paragraph 508 does not pertain to claims asserted against Microsoft. |

| | |
|---|---|
| # (4) any commercial purposes.<br># Contact licensing@ziffdavis.com for assistance.<br><br>Ex. 447 [ZD0601076]; Ex. 85 [Joey Fortuna 30(b)(6) Depo.] at 155:19-160:3. | |
| 509. Effective July 1, 2025, Ziff Davis, formalized a company-wide CDN-level directive for specified AI bots across all covered properties. Ex. 448 [ZD0567082]; Ex. 85 [Joey Fortuna 30(b)(6) Depo.] at 191:14-192:16. | 509. **Disputed.** OpenAI responds as follows: This fact is disputed because Ex. 448 shows that some ZD properties [redacted] Moreover, "covered properties" is vague.<br><br>Microsoft responds that Paragraph 509 does not pertain to claims asserted against Microsoft. |

### 3. Meta Tags

| | |
|---|---|
| 510. Publishers may use meta tags such as NOARCHIVE and NOCACHE to instruct crawlers not to store or redistribute cached copies of designated pages, respectively. Stricchiola NYT/DN Opening Rep. at ¶ 98. | 510. **Disputed in Part.** Defendants respond as follows: Undisputed that publishers may use meta tags such as NOARCHIVE and NOCACHE to communicate preferences concerning the caching or storage of website content. But Defendants dispute any implication in Paragraph 510 that meta tags are the only well-known mechanism by which website owners can express preferences regarding how their content may be accessed or used, including preventing or limiting use of that content in grounding via retrieval augmented generation. *See* ECF 1711 (F. Canel Decl.) ¶¶ 10-12, 26-29; N. Feamster Opp. Decl. ¶ 18. |

| | |
|---|---|
| 511. Historically, the NOARCHIVE meta tag has been used by publishers to prevent users from accessing a cached version of paywalled content, in a manner that would bypass the publisher's paywall, while still permitting indexing of the website for search purposes. Stricchiola NYT/DN Opening Rep. ¶ 99; *see also* Ex. 449 [NYT_00849355] at -56; Ex. 450 [NYT_00480186] at -86. | 511. **Disputed in Part.** Defendants respond as follows: Undisputed that the NOARCHIVE meta tag has been used by some publishers to prevent users from accessing cached versions of website content while still permitting search engine indexing. But Defendants dispute any implication in Paragraph 511 that meta tags are the only well-known mechanism by which website owners can express preferences regarding how their content may be accessed or used, including preventing or limiting use of that content in grounding via retrieval augmented generation. *See* ECF 1711 (F. Canel Decl.) ¶¶ 10-12, 26-29; N. Feamster Opp. Decl. ¶ 18. |
| 512. On September 22, 2023, Microsoft published a blog post announcing options for publishers to control how Bing Chat uses their content. Ex. 451 [Sept. 22, 2023 Microsoft Blog Post "Announcing New Options for Webmasters to Control Usage of their Content in Bing Chat", https://blogs.bing.com/webmaster/september-2023/Announcing-new-options-for-webmasters-to-control-usage-of-their-content-in-Bing-Chat]. | 512. **Undisputed.** |
| 513. This blog post discussed two specific controls: the NOCACHE tag and the NOARCHIVE tag. Ex. 451 [Sept. 22, 2023 Microsoft Blog Post "Announcing New Options for Webmasters to Control Usage of their Content in Bing Chat", https://blogs.bing.com/webmaster/september-2023/Announcing-new-options-for-webmasters-to-control-usage-of-their-content-in-Bing-Chat]. | 513. **Undisputed.** |

| | |
|---|---|
| 514. In this blog post, Microsoft represented that, going forward, content tagged NOCACHE may be included in Bing Chat answers but that Microsoft would only display the URL/Snippet/Title in the answer. Ex. 451 [Sept. 22, 2023 Microsoft Blog Post "Announcing New Options for Webmasters to Control Usage of their Content in Bing Chat", https://blogs.bing.com/webmaster/september-2023/Announcing-new-options-for-webmasters-to-control-usage-of-their-content-in-Bing-Chat]. | 514. **Disputed in Part.** Microsoft responds as follows: Microsoft does not dispute that Exhibit 451 (Microsoft's blog post) stated that content tagged NOCACHE may be included in Bing Chat answers and that Microsoft will only display the URL/Snippet/Title in the answer. But Microsoft does dispute the implication of how the NOCACHE meta-tag operates. Microsoft's blog post stated that portions of content from a web page tagged with the NOCACHE meta tag "may be included in Bing Chat answers." A webmaster's inclusion of the NOCACHE meta-tag in the HTML on a webpage stored in the Bing Index signals to the Copilot system that it is supposed to exclude from grounding data everything on the page other than the page title, URL and a snippet. *See* ECF 1711 (F. Canel Decl.) ¶ 27.<br><br>OpenAI defers to Microsoft's response. |
| 515. In this blog post, Microsoft represented that, going forward, content tagged NOARCHIVE would not be included in Bing Chat answers, nor linked in the answers. Ex. 451 [Sept. 22, 2023 Microsoft Blog Post "Announcing New Options for Webmasters to Control Usage of their Content in Bing Chat", https://blogs.bing.com/webmaster/september-2023/Announcing-new-options-for-webmasters-to-control-usage-of-their-content-in-Bing-Chat]. | 515. **Disputed.** Microsoft responds as follows: this fact is disputed because after the release of Bing Chat, Microsoft implemented a change to its system whereby the existing NOARCHIVE and NOCACHE meta tags were designed to be used by publishers to signify the degree, if any, to which their content should be excluded from web grounding. Microsoft's blog post stated that content tagged with the repurposed NOARCHIVE meta tag "will not be included in Bing Chat answers, not be linked to in the answers." A webmaster's inclusion of the NOARCHIVE meta tag in the HTML on a webpage stored in the Bing |

| | |
|---|---|
| | Index signals to the Copilot system that it is supposed to exclude that webpage entirely from the data provided to Copilot for web grounding. *See* ECF 1711 (F. Canel Decl.) ¶¶ 23-29.<br><br>OpenAI defers to Microsoft's response. |
| 516. Microsoft committed that content tagged NOARCHIVE would not be used by Bing Chat to ground results. Ex. 452 [https://www.bing.com/webmasters/help/webmaster-guidelines-30fba23a]. | 516. **Undisputed.** |
| 517. Bing Chat continued displaying and grounding on content tagged NOARCHIVE, including paywalled content, after Microsoft's September 22, 2023 blog post. Ex. 453 [MSFT_AI_MDL_000391970] at -970 [redacted]; Ex. 454 [Abib 30(b)(1) Tr.] at 61:8-62:10 (Microsoft employee testifying [redacted]; Ex. 455 [MSFT_AI_MDL_000642967] at -967. | 517. **Disputed.** Microsoft responds as follows: this fact is disputed because the release of a new product (such as Microsoft's Bing Chat / Copilot) and new tools (e.g., the NOARCHIVE meta-tag), can be associated with software bugs, errors (including reporting errors), or certain functions not working as intended. To the extent there were any issues with Microsoft's deployment of the NOARCHIVE meta-tag, Microsoft worked to quickly respond to, and fix, these issues. *See* ECF 1711 (F. Canel Decl.) ¶¶ 22, 26, 31; ECF 2056 (F. Canel Decl.) ¶¶ 7-13; ECF 2057 (P. Gaggara Decl.) ¶¶ 4-7.<br><br>OpenAI defers to Microsoft's response. |
| 518. The Times uses the NOARCHIVE tag on all of its news article pages, and has done so since prior to at least | 518. **Disputed in Part.** Defendants respond as follows: Undisputed that The Times uses the NOARCHIVE tag on its news article pages and has done so since before |

| | |
|---|---|
| June 2019. Ex. 415 [Liang Depo. Tr.] at 20:16-21, 174:6-175:7; Ex. 450 [NYT_00480186] at -186. | at least June 2019. But Defendants dispute any implication in Paragraph 518 that meta tags like the NOARCHIVE tag are the only well-known mechanism by which website owners can express preferences regarding how their content may be accessed or used. ECF 1711 (F. Canel Decl.) ¶¶ 10-12, 26-29; Feamster Opp. Decl. ¶ 18. |
| 519. The Daily News Plaintiffs added NOARCHIVE metatags to their webpages for home pages (e.g., https://www.chicagotribune.com, https://www.nydailynews.com, https://www.orlandosentinel.com, https://www.sun-sentinel.com, https://www.denverpost.com, https://www.twincities.com, https://www.mercurynews.com, https://www.ocregister.com) and articles on or around March 7, 2025. Ex. 75 [New York Daily News Fourth Supplemental Responses to OpenAI's Second Set of Interrogatories] at No. 6; Ex. 74 [Chicago Tribune Fourth Supplemental Responses to OpenAI's Second Set of Interrogatories] at No. 6; Ex. 77 [Sun Sentinel Fourth Supplemental Responses to OpenAI's Second Set of Interrogatories] at No. 6; Ex. 238 [Orlando Sentinel Fourth Supplemental Responses to OpenAI's Second Set of Interrogatories] at No. 6; Ex. 78 [Denver Post Fifth Supplemental Responses to OpenAI's Second Set of Interrogatories] at No. 6; Ex. 81 [Mercury News Fifth Supplemental Responses to OpenAI's Second Set of Interrogatories] at No. 6; Ex. 79 [Pioneer Press Fifth | 519. **Disputed in Part.** Defendants respond as follows: Undisputed that the Daily News Plaintiffs added NOARCHIVE metatags to their home pages and article pages on or around March 7, 2025. But Defendants dispute any implication in Paragraph 519 that meta tags like the NOARCHIVE tag are the only well-known mechanism by which website owners can express preferences regarding how their content may be accessed or used. ECF 1711 (F. Canel Decl.) ¶¶ 10-12, 26-29; Feamster Opp. Decl. ¶ 18. |

| | |
|---|---|
| Supplemental Responses to OpenAI's Second Set of Interrogatories] at No. 6; Ex. 80 [Orange County Register Fifth Supplemental Responses to OpenAI's Second Set of Interrogatories] at No. 6; *see* also Ex. 73 [Jacobs Feb. 13, 2026 30(b)(6) Depo. Tr.] at 425:4-426:19. | |
| 520. Microsoft's own published data in a tool called Bing Webmaster Tools shows that Copilot is accessing and citing in its GenAI chat product content that The Times and *Daily News* Plaintiffs have marked with NOARCHIVE meta-tags. Stricchiola NYT/DN Opening Rep. at ¶¶ 282-297. | 520. **Disputed.** Microsoft responds that this fact is disputed because the release of a new product (such as Microsoft's Bing Chat / Copilot) and new tools (e.g., the NOARCHIVE meta-tag), can be associated with software bugs, errors (including reporting errors), or certain functions not working as intended. To the extent there were any issues with Microsoft's deployment of the NOARCHIVE meta-tag, Microsoft worked to quickly respond to, and fix, these issues. *See* ECF 1711 (F. Canel Decl.) ¶¶ 22, 26, 31; ECF 2056 (F. Canel Decl.) ¶¶ 7-13; ECF 2057 (P. Gaggara Decl.) ¶¶ 4-7.<br>Purported "NOARCHIVE violations" in AI Performance reports between November 2025 and February 2026 were when this tool was in a beta version, not working as designed, and inadvertently including data from traditional (*i.e.*, non-web grounding) Bing search. ECF 2056 (F. Canel Decl.) ¶ 13. In effect, there were a number of URLs associated in the Bing Index with the NOARCHIVE meta tag applied that were mistakenly included in the AI Performance reports because these URLs were properly surfacing in traditional Bing search. *See id.* |

| | |
|---|---|
| | In addition, if a web publisher changes a page that Bing has already indexed, such as by adding a NOARCHIVE meta tag that was not applied previously before, the change won't appear in the Bing Index right away. ECF 2057 (P. Gaggara Decl.) ¶ 4. Instead, the update will occur only after Microsoft's Bingbot recrawls the URL, the new content is processed, and the index is updated. *Id.* Because Bingbot is unlikely to recrawl news articles published many years ago with any frequency, the purported "NOARCHIVE violations" likely occurred because those URLs had not been recrawled since the NOARCHIVE meta tag was added (*i.e.*, on March 7, 2025 for the Daily News Plaintiffs). *Id.* ¶ 6. Microsoft's records reflect that 3,435 of the total 3,796 URLs associated with the purported "NOARCHIVE violations" were not recrawled by Microsoft's Bingbot after March 7, 2025 and through February 27, 2026. *Id.* ¶ 7.<br><br>OpenAI defers to Microsoft's response. |

### 4. Terms of Service

| | |
|---|---|
| 521. In response to the question, "[W]hen OpenAI directly crawled and scraped data from any given website, was it OpenAI's general practice not to review the applicable Terms of Service or Terms Use," OpenAI admitted that its general practice "did not include reviewing websites at all, regardless of whether or not it was Terms of Use or Service." Ex. 414 [Sohl Dec. 9, 2025 30(b)(6) Depo. Tr.] at 316:6-15; | 521. **Disputed in Part.** OpenAI responds as follows: Undisputed that the cited exhibit includes the quoted testimony. However, pursuant to Fed. R. Evid. 106, OpenAI disputes Plaintiffs' characterization of, and any inferences purportedly drawn from, the quoted testimony as misleading and irrelevant insofar as it is not an industry standard for bots to check terms of service. Bots do not |

| | |
|---|---|
| *see also* Ex. 456 [Radford Depo. Tr.] at 367:8-10 ("I don't remember checking terms of use for websites within the WebText2 or, you know, Common Crawl datasets."). | read, understand, or agree to Terms of Service. N. Feamster Opp. Decl. ¶¶ 15-17.<br><br>Microsoft defers to OpenAI. |
| 522. **<u>The Times:</u>** The Times publishes its Terms of Service on its website. *See* Ex. 400 [https://help.nytimes.com/115014893428-Terms-of-Service]. In the footer of each article on The Times's domain is a link to those Terms. Ex. 309 [Procas 30(b)(6) Depo. Tr.] at 295:15-18, 297:17-24; Ex. 457 [Procas Depo. Ex. 4]. | 522. **Undisputed.** |
| 523. The Times's Terms of Service prohibit commercial use of Times content, and explicitly provide that, without The Times's "prior written consent," a user "shall not use robots, spiders, scripts, service, software or any manual or automatic device, tool, or process designed to data mine or scrape the Content, data or information from the Services, or otherwise use, access, or collect the Content, data or information from the Services using automated means;" "use the Content for the development of any software program, model, algorithm, or generative AI tool, including, but not limited to, training or using the Content in connection with the development or operation of a machine learning or artificial intelligence (AI) system (including any use of the Content for training, fine tuning, or grounding the machine learning or AI system as part of retrieval-augmented generation);" "use services, software or any manual or automatic device, tool, or process designed to circumvent any restriction, condition, or | 523. **Disputed in Part – Not Supported by Admissible Evidence.** Defendants respond as follows: Defendants do not dispute that Exhibit 400 contains the quoted language. But Defendants dispute the statement as to when this language was added. The cited exhibit says "Effective on January 20, 2026" and it is unclear if the quoted terms were included before that. Defendants also respond that the cited Terms of Service are dated well after the timing of much of the accused conduct at issue in this litigation.<br><br>Defendants further dispute that terms of service are an appropriate way for website owners to express preferences to automated bots. N. Feamster Opp. Decl. ¶¶ 15-17. As The Times recognized, web crawlers abide by instructions in robots.txt files and in the header element of an HTML document (where a meta-tag can be placed), as opposed to a human-readable terms of service agreement(s). *See* A. Blanco Opp. Decl. Ex. 229 (C. Liang |

| | |
|---|---|
| technological measure that controls access to the Services in any way, including overriding any security feature, bypassing or circumventing any access controls or use limits of the Services, or failing to abide by exclusionary protocols such as the Robots Exclusion Protocol or the Automated Content Access Protocol (NYT's robots.txt notice does not constitute NYT's prior written consent under these Terms of Service); or "cache or archive the Content." Ex. 400 [https://help.nytimes.com/115014893428-Terms-of-Service]. | 30(b)(1) Tr.) at 147:13-25, 149:11-150:14, 169:7-170:24; N. Feamster Opp. Decl. ¶¶ 15-18. Further, Pursuant to Fed. R. Evid. 106, OpenAI's expert, Dr. Feamster, explained that bots do not, as an industry norm, parse or follow websites' terms of service. N. Feamster Opp. Decl. ¶¶ 15-17. He also explained that News Plaintiffs' terms of service do not serve as a way to control bot access. N. Feamster Opp. Decl. ¶¶ 15-17#. |
| 524. The prohibitions on commercial use and on use of "robots, spiders, scripts, service, software or any manual or automatic device, tool, or process designed to data mine or scrape the Content, data or information from the Services, or otherwise access or collect the Content, data or information from the Services using automated means" without "NYT's prior written consent"; use of "use services, software or any manual or automatic device, tool, or process designed to circumvent any restriction, condition, or technological measure that controls access to the Services in any way, including overriding any security feature or bypassing or circumventing any access controls or use limits of the Services"; and on "cach[ing] or archiv[ing] the Content" have existed in the Terms since at least January 3, 2019. Ex. 458 [https://web.archive.org/web/20200304082533/https://help.nytimes.com/hc/en-us/articles/115014893428-Terms-of-service#4]. | 524. **Disputed in Part.** Defendants respond as follows: Undisputed that the cited document shows that the quoted language appeared in the NYT's terms of service between January 3, 2019 (the last updated date) and March 4, 2020 (the web archive date). But Defendants dispute that the cited document supports that the quoted language appeared in The Times's terms of service after March 4, 2020.<br>Defendants further dispute that terms of service are an appropriate way for website owners to express preferences to automated bots. N. Feamster Opp. Decl. ¶¶ 15-17. As The Times recognized, web crawlers abide by instructions in robots.txt files and in the header element of an HTML document (where a meta-tag can be placed), as opposed to a human-readable terms of service agreement(s). *See* A. Blanco Opp. Decl. Ex. 229 (C. Liang 30(b)(1) Tr.) at 147:13-25, 149:11-150:14, 169:7-170:24; N. Feamster Opp. Decl. ¶¶ 15-18. Further, pursuant to Fed. R. |

| | |
|---|---|
| | Evid. 106, OpenAI's expert, Dr. Feamster, explained that bots do not, as an industry norm, parse or follow websites' terms of service. N. Feamster Opp. Decl. ¶¶ 15-17. He also explained that News Plaintiffs' terms of service do not serve as a way to control bot access. N. Feamster Opp. Decl. ¶¶ 15-17.<br>Defendants further respond that this fact is disputed because it is not supported by admissible evidence, as required by Local Rule 56.1. Specifically, the evidence cited is hearsay and lacks foundation. |
| 525. The prohibition on "us[ing] the Content for the development of any software program, including, but not limited to, training a machine learning or artificial intelligence (AI) system" without "NYT's prior written consent" has existed in the Terms since at least August 25, 2023. Ex. 459 [https://web.archive.org/web/20231130225337/https://help.nytimes.com/hc/en-us/articles/115014893428-Terms-of-service]. | 525. **Disputed in Part.** Defendants respond as follows: Undisputed that the cited document shows that the quoted language appeared in The Times's terms of service between August 25, 2023 (the last updated date) and November 30, 2023 (the web archive date). But, Defendants dispute that the cited document supports that the language as quoted appears in The Times's terms of service after November 30, 2023.<br>Defendants further dispute that terms of service are an appropriate way for website owners to express preferences to automated bots. N. Feamster Opp. Decl. ¶¶ 15-17. As The Times recognized, web crawlers abide by instructions in robots.txt files and in the header element of an HTML document (where a meta-tag can be placed), as opposed to a human-readable terms of service agreement(s). *See* A. Blanco Opp. Decl. Ex. 229 (C. Liang 30(b)(1) Tr.) at 147:13-25, 149:11-150:14, 169:7-170:24; N. Feamster Opp. Decl. ¶¶ 15-18. Further, pursuant to Fed. R. |

| | |
|---|---|
| | Evid. 106, OpenAI's expert, Dr. Feamster, explained that bots do not, as an industry norm, parse or follow websites' terms of service. N. Feamster Opp. Decl. ¶¶ 15-17. He also explained that News Plaintiffs' terms of service do not serve as a way to control bot access. N. Feamster Opp. Decl. ¶¶ 15-17.<br>Defendants further respond that this fact is disputed because it is not supported by admissible evidence, as required by Local Rule 56.1. Specifically, the evidence cited is hearsay and lacks foundation. |
| 526. The Times specifically flagged the prohibitions in its Terms of Service for Microsoft and OpenAI via correspondence sent on April 3, 2023, and April 4, 2023, respectively. Ex. 235 [MSFT_AI_MDL_000229826] (Microsoft); Ex. 445 [NYT_00815634] at -636 (OpenAI). | 526. **Undisputed.** |
| 527. Microsoft has a corporate subscription to The Times, and The Times incorporates its Terms of Service into the Group Purchase Orders governing that subscription. Ex. 744 [NYT_01072302] at -302. | 527. **Disputed in Part – Not Supported by Cited Evidence.** Microsoft responds as follows: Undisputed that The Times's Group Subscription Purchase Order references The Times's Terms of Service. But the fact set forth in Paragraph 527, that Microsoft has a corporate subscription to The Times, is disputed because the cited evidence does not support the claim. Specifically, Exhibit 744 states [redacted] *See* Ex. 744 at NYT_01072302.<br><br>OpenAI defers to Microsoft's response. |

| | |
|---|---|
| 528. Since July 2024, the Group Purchase Order governing Microsoft's subscription has also expressly stated that Microsoft "shall not, and shall not authorize or permit any Authorized User or third party to: a) access or use any NYT Content in connection with the development, creation, enhancement, operation or implementation of (1) any neural network, any large language model or any machine learning or other artificial intelligence process, system, model, algorithm, service or product (including any artificial intelligence 'training')." Ex. 744 [NYT_01072302] at -303. | 528. **Disputed in Part – Not Supported by Cited Evidence.** Microsoft responds as follows: Microsoft does not dispute that Exhibit 744 contains the quoted language. But responds that the fact set forth in Paragraph 528, that Microsoft has a corporate subscription to The Times, is disputed because the cited evidence does not support the claim. Specifically, Exhibit 744 states [redacted] *See* News Ex. 744 at NYT_01072302.<br><br>OpenAI defers to Microsoft's response. |
| 529. **<u>Daily News Plaintiffs:</u>** The Daily News Plaintiffs' websites include a disclaimer in the footer that "clearly say[s] [Daily News Plaintiffs'] content can't be used for scraping." Ex. 72 [Jacobs Feb. 12, 2026 30(b)(6) Depo. Tr.] at 98:15-17; *see also* https://www.chicagotribune.com; https://www.nydailynews.com; https://www.orlandosentinel.com; https://www.sun-sentinel.com; https://www.denverpost.com; https://www.twincities.com; https://www.mercurynews.com; https://www.ocregister.com. | 529. **Disputed in Part - Not Supported by Cited Evidence.** Defendants respond as follows: Defendants dispute the statement to the extent that the cited sources do not show when the disclaimer was added to each site.<br>Pursuant to Fed. R. Evid. 106, Defendants further respond that this type of disclaimer is not an industry standard, and bots cannot interpret and comply with such terms, which are written in natural language, vary significantly across websites, and are updated at irregular and unpredictable intervals. Feamster Opp. Decl. ¶¶ 15-17. |
| 530. The Daily News Plaintiffs' websites include a disclaimer in the footer which states: "The use of any content on this website for the purpose of training artificial intelligence systems, algorithms, machine learning models, text and data mining, or similar use is strictly prohibited | 530. **Disputed in Part - Not Supported by Cited Evidence.** Defendants respond as follows: Defendants dispute the statement to the extent that the cited sources do not show when the disclaimer was added to each site. |

| | |
|---|---|
| without explicit written consent." *See* also https://www.chicagotribune.com; https://www.nydailynews.com; https://www.orlandosentinel.com; https://www.sun-sentinel.com; https://www.denverpost.com; https://www.twincities.com; https://www.mercurynews.com; https://www.ocregister.com. | Pursuant to Fed. R. Evid. 106, Defendants further respond that this type of disclaimer is not an industry standard, and bots cannot interpret and comply with such terms, which are written in natural language, vary significantly across websites, and are updated at irregular and unpredictable intervals. Feamster Opp. Decl. ¶¶ 15-17. |
| 531. The websites of the Chicago Tribune (https://www.chicagotribune.com), New York Daily News (https://www.nydailynews.com), Sun Sentinel (https://www.sun-sentinel.com), and Orlando Sentinel (https://www.orlandosentinel.com) include a link to the Tribune Publishing Terms of Service in the footer: Ex. 471 [https://www.tribpub.com/central-terms-of-service/.]. | 531. **Disputed in Part - Not Supported by Cited Evidence.** Defendants respond as follows: Undisputed that Ex. 471 is the Tribune Publishing Terms of Service page located at https://www.tribpub.com/central-terms-of-service/. However, disputed that the cited evidence supports the assertion that the websites of the Chicago Tribune, New York Daily News, Sun Sentinel, and Orlando Sentinel "include a link to the Tribune Publishing Terms of Service in the footer." The cited source is the terms of service page itself. It does not show any of those websites, or a terms of service link in their footers. The cited evidence also does not show when the Terms of Service link was added to the footer of each website. For those reasons, the disputed proposition is not supported by the cited evidence.<br>Further disputed to the extent Paragraph 531 implies that terms of service are an appropriate mechanism for website owners to express preferences to automated bots. Pursuant to Fed. R. Evid. 106, OpenAI's expert Dr. Feamster explained that it is not an industry norm for bots |

| | |
|---|---|
| | to parse or adhere to websites' Terms of Service, and that Plaintiffs' websites' Terms of Service do not serve as a mechanism for controlling bot access. N. Feamster Opp. Decl. ¶¶ 15-17. |
| 532. The Tribune Publishing Terms of Service expressly provides that "[w]hile accessing or otherwise using the Site, you shall not engage in any Prohibited Conduct", which includes "(a) access or use, or attempt to access or use, the Site to take any action that could harm us or a third party; (b) use the Site in any manner that violates any applicable laws or regulations; (c) use the Site in any manner that infringes upon or otherwise violates our or any third party's Intellectual Property Rights or other proprietary rights;...(f) without our express prior written consent, use robots, spiders, scripts, service, software, or any manual or automatic device, tool, or process designed to data mine or scrape the Content, data, or information from the Site, or otherwise access, collect, or copy the Content, data, or information from the Site using automated means; (g) without our express prior written consent, use or attempt to use any Content or information available on the Site, whether by manual input or automated means, for purposes of retrieval augmented generation, grounding, training, or development of machine learning models, algorithms, or artificial intelligence (AI) systems, or to generate substitute content or develop any products, services, or technology; (j) without our express prior written consent, cache or archive the | 532. **Disputed in Part - Not Supported by Cited Evidence.** Defendants respond as follows: Undisputed that Ex. 471 is the Tribune Publishing Terms of Service page located at https://www.tribpub.com/central-terms-of-service/. However, disputed that the cited evidence shows when the Terms of Service link was added to the footer of each website. The cited source is the terms of service page itself. It does not show the websites displaying the terms of service link in their footers. For those reasons, the disputed proposition is not supported by the cited evidence.<br>Further disputed to the extent Paragraph 532 implies that terms of service are an appropriate mechanism for website owners to express preferences to automated bots. Pursuant to Fed. R. Evid. 106, OpenAI's expert Dr. Feamster explained that it is not an industry norm for bots to parse or adhere to websites' Terms of Service, and that Plaintiffs' websites' Terms of Service do not serve as a mechanism for controlling bot access. N. Feamster Opp. Decl. ¶¶ 15-17. |

| | |
|---|---|
| Content (except for a public search engine's use of spiders for creating search indices)." Ex. 471 [https://www.tribpub.com/central-terms-of-service/.] | |
| 533. The Tribune Publishing Terms of Service included language prohibiting use of content for training and grounding at least as of January 1, 2022, explicitly providing that: "You may use the Content online only, and solely for your personal, non-commercial use, and you may download or print a single copy of any portion of the Content solely for your personal, non-commercial use, provided you do not remove any trademark, copyright or other notice from such Content" and "you may not republish any portion of the Content on any Internet, Intranet, extranet site or any other online or offline publication, or incorporate the Content in any database, compilation, archive, cache, or similar medium. You may not distribute any Content to others, whether or not for payment or other consideration, and you may not archive, modify, copy, frame, cache, reproduce, sell, publish, transmit, display, or otherwise use any portion of the Content. You may not scrape or otherwise copy our Content without permission. You agree not to decompile, reverse engineer or disassemble any software or other products or processes accessible through the Site nor to insert any code or product or manipulate the Content or the Site in any way, and not to use any data mining, data gathering or extraction method." Ex. 469 [DNP-00536096] at -96; *see also* Ex. 470 [DNP-00536086] (Tribune Publishing Terms of Service from | 533. **Disputed in Part - Not Supported by Cited Evidence.** Defendants respond as follows: Disputed because the cited exhibits establish only that the Tribune Publishing Terms of Service included the quoted terms on the specific dates reflected in those exhibits, not that those terms were in effect "as of January 1, 2022." *See* News Exs. 468, 469, 470. Further disputed that the cited exhibits contain "language prohibiting use of content for training and grounding," because the quoted terms do not mention training or grounding. *See* News Ex. 469 at DNP-00536096. For those reasons, the disputed proposition is not supported by the cited evidence.<br><br>Further disputed to the extent Paragraph 533 implies that terms of service are an appropriate mechanism for website owners to express preferences to automated bots. Pursuant to Fed. R. Evid. 106, OpenAI's expert Dr. Feamster explained that it is not an industry norm for bots to parse or adhere to websites' Terms of Service, and that Plaintiffs' websites' Terms of Service do not serve as a mechanism for controlling bot access. N. Feamster Opp. Decl. ¶¶ 15-17. |

| | |
|---|---|
| January 1, 2021 with similar language); Ex. 468 [DNP-00536076] (Tribune Publishing Terms of Service captured on January 1, 2020 with similar language). | |
| 534. The websites of the Pioneer Press (https://www.twincities.com), Mercury News (https://www.mercurynews.com), Orange County Register (https://www.ocregister.com), and Denver Post (https://www.denverpost.com) include a link to the MediaNews Group Terms of Use in the footer: Ex. 472 [https://www.medianewsgroup.com/terms-of-use/]. *See also* https://www.denverpost.com; https://www.twincities.com; https://www.mercurynews.com; https://www.ocregister.com. | 534. **Disputed in Part - Not Supported by Cited Evidence.** Defendants respond as follows: Disputed because the cited sources do not show when the Terms of Service link was added to the footer of each website. *See* News Ex. 472. For those reasons, the disputed proposition is not supported by the cited evidence.<br>Further disputed to the extent Paragraph 534 implies that terms of service are an appropriate mechanism for website owners to express preferences to automated bots. Pursuant to Fed. R. Evid. 106, OpenAI's expert Dr. Feamster explained that it is not an industry norm for bots to parse or adhere to websites' Terms of Service, and that Plaintiffs' websites' Terms of Service do not serve as a mechanism for controlling bot access. N. Feamster Opp. Decl. ¶¶ 15-17. |
| 535. The MediaNews Group Terms of Use expressly provides that, "[e]xcept as expressly permitted," users and third-parties are not permitted to "(iii) use any robots, spiders, crawlers, data mining or extraction technology, or other automated scripts or means to collect or scrape information from or otherwise interact with the Technology or copy our Content without written permission; (iv) without our express prior written consent, use or attempt to use any Content or information available on the Platform, whether by manual input or automated | 535. **Disputed in Part - Not Supported by Cited Evidence.** Defendants respond as follows: Disputed because the cited source states that these terms of service were last updated November 8, 2024, and it is unclear when these terms would have been added. *See* News Ex. 472. For those reasons, the disputed proposition is not supported by the cited evidence.<br>Further disputed to the extent Paragraph 535 implies that terms of service are an appropriate mechanism for website owners to express preferences to automated |

| | |
|---|---|
| means, for purposes of retrieval augmented generation, grounding, training, or development of large language or machine learning models, algorithms, or artificial intelligence (AI) systems, or to generate substitute content or develop any products, services, or technology; (v) alter, modify, copy, frame, reproduce, republish, or create derivative works of the Technology;...(ix) violate any robot exclusion header, robot.txt files, or other exclusionary protocols." Ex. 472 [https://www.medianewsgroup.com/terms-of-use/]. | bots. Pursuant to Fed. R. Evid. 106, OpenAI's expert Dr. Feamster explained that it is not an industry norm for bots to parse or adhere to websites' Terms of Service, and that Plaintiffs' websites' Terms of Service do not serve as a mechanism for controlling bot access. N. Feamster Opp. Decl. ¶¶ 15-17. |
| 536. The MediaNews Group Terms of Use included language prohibiting use of content for training and grounding at least as of June 15, 2022, explicitly providing that: "All Content is provided for informational purposes only and you are solely responsible for verifying the accuracy, completeness, and applicability of all Content and for your use of any Content. You may use the Content online only, and solely for your personal, non-commercial use. If you operate a web site and wish to link to any of the sites owned and operated by MediaNews Group, you may do so provided you agree to cease such link upon request from MediaNews Group and that you do not state or imply any sponsorship of your site by MediaNews Group (for example, by using our stylized trademark or logo). No other use is permitted without prior written permission of MediaNews Group. The permitted use described in this paragraph is contingent on your compliance at all times with the Terms of Use. You may not, for example, republish any portion of | 536. **Disputed in Part - Not Supported by Cited Evidence.** Defendants respond as follows: Disputed because the cited exhibits establish only that the MediaNews Group Terms of Use included the quoted terms between the "last updated" date and the web archive date shown in the link at the bottom of each page, not that those terms were in effect "as of June 15, 2022." The periods covered are as follows: News Ex. 399: June 15, 2022, to Jan. 9, 2023; News Ex. 398: May 26, 2021, to Jan. 6, 2022; News Ex. 475: Aug. 20, 2020, to Jan. 1, 2021; News Ex. 473: Oct. 5, 2017, to Jan. 2, 2020. *See* News Exs. 398, 399, 473, 475. Further disputed that the cited exhibits contain "language prohibiting use of content for training and grounding," because the quoted terms do not mention training or grounding. *See* News Ex. 399 at DNP-00536011. For those reasons, the disputed proposition is not supported by the cited evidence. |

| | |
|---|---|
| the Content on any internet, intranet or extranet site or incorporate the Content in any database, compilation, archive or cache. You may not distribute any Content to others, whether or not for payment or other consideration, and you may not modify, copy, frame, cache, reproduce, sell, publish, transmit, display or otherwise use any portion of the Content. You may not scrape or otherwise copy our Content without written permission. You agree not to decompile, reverse engineer or disassemble any software or other products or processes accessible through the Platform, or insert any code or product or manipulate the Content of MediaNews Group, or the Platform in any way that affects the user's experience, and not to use any data mining, data gathering or extraction method." Ex. 399 [DNP-00536010] at -011; *see also* Ex. 398 [DNP-00535998] (Terms of Use last updated May 26, 2021 with similar language); Ex. 475 [DNP-00535992] (Terms of Use last updated August 20, 2020 with similar language); Ex. 473 [DNP- 00535985] (Terms of Use last updated October 5, 2017 with similar language). | Further disputed to the extent Paragraph 536 implies that terms of service are an appropriate mechanism for website owners to express preferences to automated bots. Pursuant to Fed. R. Evid. 106, OpenAI's expert Dr. Feamster explained that it is not an industry norm for bots to parse or adhere to websites' Terms of Service, and that Plaintiffs' websites' Terms of Service do not serve as a mechanism for controlling bot access. N. Feamster Opp. Decl. ¶¶ 15-17. |
| 537. **<u>Ziff Davis's Terms of Use</u>**: As of October 18, 2023, Ziff Davis's Terms of Use expressly prohibited (and still prohibit) use of any robot, spider, retrieval application, or other automated device to crawl, scrape, or index Services "in connection with the development or operation of any software program, including but not limited to any artificial intelligence or machine learning model." Ex. 1134 [Capture of | 537. **Disputed in Part - Not Supported by Cited Evidence.** OpenAI responds as follows: Undisputed that the October 18, 2023 capture of Ziff Davis's Terms of Use contains the quoted language. However, disputed to the extent the paragraph asserts that those restrictions remained continuously in effect thereafter, including at present; the cited evidence does not establish that temporal scope. |

| | |
|---|---|
| https://www.ziffdavis.com/terms-of-use from Oct. 18, 2023]. The prohibitions contained in the Terms of Use were and are accessible to all visitors through hyperlinks in the footers on Ziff Davis's web and browser applications. Ex. 1269 [Oh Feb. 25, 2026 30(b)(6) Depo. Tr.] at 340:25-341:4. | Further disputed to the extent Paragraph 537 implies that terms of use are an appropriate mechanism for website owners to express preferences to automated bots. Pursuant to Fed. R. Evid. 106, OpenAI's expert Dr. Feamster explained that it is not an industry norm for bots to parse or adhere to such terms, and that such natural language terms do not serve as a mechanism for controlling bot access. N. Feamster Opp. Decl. ¶¶ 15-17.<br><br>Microsoft responds that Paragraph 537 does not pertain to claims asserted against Microsoft. |
| 538. Ziff Davis's Terms of Use also contained and contain a provision prohibiting automated extraction of Ziff Davis's content through scraping, as well as an express provision prohibiting the use of its content for training and fine-tuning of AI systems. Stricchiola ZD Opening Rep. at ¶¶ 163-165; Ex. 1269 [Oh Feb. 25, 2026 30(b)(6) Depo. Tr.] at 340:2-341:4. | 538. **Disputed in Part - Not Supported by Cited Evidence.** OpenAI responds as follows: Undisputed that the versions of Ziff Davis's Terms of Use identified in the cited materials contain the described restrictions. However, disputed to the extent "contained and contain" asserts that those restrictions applied throughout the period of the challenged conduct and remain continuously in effect through the present; the cited evidence does not establish that temporal scope.<br>Further disputed to the extent Paragraph 538 implies that terms of use are an appropriate mechanism for website owners to express preferences to automated bots. Pursuant to Fed. R. Evid. 106, OpenAI's expert Dr. Feamster explained that it is not an industry norm for bots to parse or adhere to such terms, and that such natural language terms do not serve as a mechanism for controlling bot access. N. Feamster Opp. Decl. ¶¶ 15-17. |

| | |
|---|---|
| | Microsoft responds that Paragraph 538 does not pertain to claims asserted against Microsoft. |
| 539. **<u>CIR/The Intercept:</u>** From September 29, 2017 to April 29, 2025, The Intercept's Terms of Use provided that by using the service, "[y]ou further agree that you will not: (i) use the Services or Content for any commercial purpose; … (iii) harvest any information from the Services." Ex. 476 [INT0081475] at –76-77. | 539. **Disputed in Part – Not Supported by Cited Evidence.** OpenAI responds as follows: Undisputed that Ex. 476 at INT0081476–77 contains the quoted language.<br>However, OpenAI disputes that the cited source establishes that the terms of use included these terms continuously from September 29, 2017 until April 29, 2025. The cited source shows only that the terms of use included these terms as of their listed effective date of September 29, 2017.<br>OpenAI further disputes the implication that terms of service are an appropriate way for website owners to express preferences to automated bots. Pursuant to Fed. R. Evid. 106, OpenAI's expert, Dr. Feamster, explained that bots do not, as an industry norm, parse or follow websites' terms of service. He also explained that Plaintiffs' terms of service do not serve as a way to control bot access. N. Feamster Opp. Decl. ¶¶ 15-17.<br><br>Microsoft responds that the facts contained in Paragraph 539 do not pertain to claims asserted against Microsoft. |
| 540. As of April 30, 2025, The Intercept's Terms of Use provide that by using the service, "[y]ou further agree that you will not: (i) use the Services or Content for any | 540. **Disputed in Part – Not Supported by Cited Evidence.** OpenAI responds as follows: |

| | |
|---|---|
| commercial purpose; ... (iii) harvest any information from the Services." Ex. 477 [INT0081492] at –493-94. | Undisputed that News Ex. 477 at INT0081493–94 contains the quoted language.<br>However, OpenAI disputes that the cited source establishes that these terms have been in effect continuously since April 30, 2025. The cited source shows only that the terms of use included these terms as of their listed effective date of April 30, 2025.<br>OpenAI further disputes the implication that terms of service are an appropriate way for website owners to express preferences to automated bots. Pursuant to Fed. R. Evid. 106, OpenAI's expert, Dr. Feamster, explained that bots do not, as an industry norm, parse or follow websites' terms of service. He also explained that Plaintiffs' terms of service do not serve as a way to control bot access. N. Feamster Opp. Decl. ¶¶ 15-17.<br><br>Microsoft responds that the facts contained in Paragraph 540 do not pertain to claims asserted against Microsoft. |
| 541. From September 9, 2010 to June 2, 2024, the Mother Jones Terms of Service provided: "You will not reproduce, duplicate. copy. sell, trade. resell, or exploit. for any commercial purpose any content, component, or feature of the Site without the prior written permission of the Foundation, except for content you have submitted to or posted on the Site, or content which you have the prior written permission of the owner to use." Ex. 478 [CIR0085222] at –23. | 541. **Disputed in Part – Not Supported by Cited Evidence.** Defendants respond as follows: Undisputed that News Ex. 478 at CIR0085223 contains the quoted language.<br>However, Defendants dispute that the cited source establishes that the terms of service contained this language continuously from September 9, 2010 to June 2, 2024. The cited source shows only that the terms of service |

| | |
|---|---|
| | were revised to include this language on September 9, 2010.<br>Defendants further dispute the implication that terms of service are an appropriate way for website owners to express preferences to automated bots. Pursuant to Fed. R. Evid. 106, OpenAI's expert, Dr. Feamster, explained that bots do not, as an industry norm, parse or follow websites' terms of service. He also explained that Plaintiffs' terms of service do not serve as a way to control bot access. N. Feamster Opp. Decl. ¶¶ 15-17. |
| 542. As of June 3, 2024, the Mother Jones Terms of Service provide: "You will not reproduce, duplicate, copy, create derivative works of, sell, trade, resell, or exploit any content, component, or feature of the Services without the prior written permission of CIR, except for content you have submitted to or posted on the Services, or content which you have the prior written permission of the owner to use." Ex. 479 [CIR0085024] at –025. | 542. **Disputed in Part – Not Supported by Cited Evidence.** Defendants respond as follows: Undisputed that News Ex. 479 at CIR0085025 contains the quoted language.<br>However, Defendants dispute that the cited source establishes that the terms of service have contained this language continuously since June 3, 2024. The cited source shows only that the terms of service were revised to include this language on June 3, 2024.<br>Defendants further dispute the implication that terms of service are an appropriate way for website owners to express preferences to automated bots. Pursuant to Fed. R. Evid. 106, OpenAI's expert, Dr. Feamster, explained that bots do not, as an industry norm, parse or follow websites' terms of service. He also explained that Plaintiffs' terms of service do not serve as a way to control bot access. N. Feamster Opp. Decl. ¶¶ 15-17. |

| | |
|---|---|
| 543. As of June 3, 2024, the Mother Jones Terms of Service provide: "You will not engage in unauthorized spidering, "scraping," or harvesting of content or personal information, or use any other unauthorized automated means to compile information from the Services without prior written permission of CIR." Ex. 479 [CIR0085024] at –025. | 543. **Disputed in Part – Not Supported by Cited Evidence.** Defendants respond as follows: Undisputed that News Ex. 479 at CIR0085025 contains the quoted language.<br>However, Defendants dispute that the cited source establishes that the terms of service have contained this language continuously since June 3, 2024. The cited source shows only that the terms of service were revised to include this language on June 3, 2024.<br>Defendants further dispute the implication that terms of service are an appropriate way for website owners to express preferences to automated bots. Pursuant to Fed. R. Evid. 106, OpenAI's expert, Dr. Feamster, explained that bots do not, as an industry norm, parse or follow websites' terms of service. He also explained that Plaintiffs' terms of service do not serve as a way to control bot access. N. Feamster Opp. Decl. ¶¶ 15-17. |
| 544. From February 6, 2018 to June 2, 2024, the Reveal Terms of Use provided: "[Y]ou may not ... Engage in unauthorized spidering, "scraping," or harvesting of content or personal information, or use any other unauthorized automated means to compile information." Ex. 480 [CIR0085481] at –82. | 544. **Disputed in Part – Not Supported by Cited Evidence.** Defendants respond as follows: Undisputed that News Ex. 480 at CIR0085482 contains the quoted language.<br>However, Defendants dispute that the cited source establishes that the terms of use contained this language continuously from February 6, 2018 to June 2, 2024. The cited source shows only that the terms of use included this language as of their effective date of February 6, 2018.<br>Defendants further dispute the implication that terms of service are an appropriate way for website owners |

| | |
|---|---|
| | to express preferences to automated bots. Pursuant to Fed. R. Evid. 106, OpenAI's expert, Dr. Feamster, explained that bots do not, as an industry norm, parse or follow websites' terms of service. He also explained that Plaintiffs' terms of service do not serve as a way to control bot access. N. Feamster Opp. Decl. ¶¶ 15-17. |
| 545. From February 6, 2018 to June 2, 2024, the Reveal Terms of Use provided: "Except for content that you have posted on the Services, you may not publish, reproduce, distribute, display, perform, edit, adapt, modify, or otherwise exploit any part of the Services without our written consent, except as provided in these Terms." Ex. 480 [CIR0085481] at –83. | 545. **Disputed in Part – Not Supported by Cited Evidence.** Defendants respond as follows: Undisputed that News Ex. 480 at CIR0085482 contains the quoted language.<br>However, Defendants dispute that the cited source establishes that the terms of use contained this language continuously from February 6, 2018 to June 2, 2024. The cited source shows only that the terms of use included this language as of their effective date of February 6, 2018.<br>Defendants further dispute the implication that terms of service are an appropriate way for website owners to express preferences to automated bots. Pursuant to Fed. R. Evid. 106, OpenAI's expert, Dr. Feamster, explained that bots do not, as an industry norm, parse or follow websites' terms of service. He also explained that Plaintiffs' terms of service do not serve as a way to control bot access. N. Feamster Opp. Decl. ¶¶ 15-17. |
| 546. As of June 3, 2024, The Reveal Terms of Use provide: "You will not reproduce, duplicate, copy, create derivative works of, sell, trade, resell, or exploit any content, component, or feature of the Services without the prior written permission of CIR, except for content you have | 546. **Disputed in Part – Not Supported by Cited Evidence.** Defendants respond as follows: Undisputed that News Ex. 481 at CIR0085038 contains the quoted language. |

| | |
|---|---|
| submitted to or posted on the Services, or content which you have the prior written permission of the owner to use." Ex. 481 [CIR0085036] at –038. | However, Defendants dispute that the cited source establishes that the terms of use have contained this language continuously since June 3, 2024. The cited source shows only that the terms of use included this language as of their effective date of June 3, 2024.<br>Defendants further dispute the implication that terms of service are an appropriate way for website owners to express preferences to automated bots. Pursuant to Fed. R. Evid. 106, OpenAI's expert, Dr. Feamster, explained that bots do not, as an industry norm, parse or follow websites' terms of service. He also explained that Plaintiffs' terms of service do not serve as a way to control bot access. N. Feamster Opp. Decl. ¶¶ 15-17. |
| 547. As of June 3, 2024, the Reveal Terms of Use provide: "You will not engage in unauthorized spidering, "scraping," or harvesting of content or personal information, or use any other unauthorized automated means to compile information from the Services without prior written permission of CIR." Ex. 481 [CIR0085036] at –038. | 547. **Disputed in Part – Not Supported by Cited Evidence.** Defendants respond as follows: Undisputed that News Ex. 481 at CIR0085038 contains the quoted language.<br>However, Defendants dispute that the cited source establishes that the terms of use have contained this language continuously since June 3, 2024. The cited source shows only that the terms of use included this language as of their effective date of June 3, 2024.<br>Defendants further dispute the implication that terms of service are an appropriate way for website owners to express preferences to automated bots. Pursuant to Fed. R. Evid. 106, OpenAI's expert, Dr. Feamster, explained that bots do not, as an industry norm, parse or follow websites' terms of service. He also explained that Plaintiffs' terms of |

| | |
|---|---|
| | service do not serve as a way to control bot access. N. Feamster Opp. Decl. ¶¶ 15-17. |

Dated: October 23, 2026 Respectfully submitted,

*/s/ Allison S. Blanco*[*]
**LATHAM & WATKINS LLP**
Andrew M. Gass (*pro hac vice*)
*andrew.gass@lw.com*
505 Montgomery Street, Suite 2000
San Francisco, CA 94111
Telephone: 415.391.0600

Sarang V. Damle
*sy.damle@lw.com*
Luke A. Budiardjo
*luke.budiardjo@lw.com*
1271 Avenue of the Americas
New York, NY 10020
Telephone: 212.906.1200

Elana Nightingale Dawson (*pro hac vice*)
*elana.nightingaledawson@lw.com*
555 Eleventh Street, NW, Suite 1000
Washington, D.C. 20004
Telephone: 202.637.2200

*/s/ Joseph C. Gratz*
**MORRISON & FOERSTER LLP**
Joseph C. Gratz (*pro hac vice*)
*jgratz@mofo.com*
Tiffany Cheung (*pro hac vice*)
*tcheung@mofo.com*
Caitlin Sinclaire Blythe (*pro hac vice*)
*cblythe@mofo.com*
425 Market Street
San Francisco, CA 94105
Telephone: 415.268.7000

Lily Li (*pro hac vice*)
*YLi@mofo.com*
755 Page Mill Road
Palo Alto, CA 94304
Telephone: 650.813.5600

*/s/ Robert A. Van Nest*
**KEKER, VAN NEST & PETERS LLP**
Robert A. Van Nest (*pro hac vice*)
*rvannest@keker.com*
R. James Slaughter (*pro hac vice*)
*rslaughter@keker.com*
Paven Malhotra
*pmalhotra@keker.com*
Michelle S. Ybarra (*pro hac vice*)
*mybarra@keker.com*
Reid P. Mullen (*pro hac vice*)
*rmullen@keker.com*
Nicholas S. Goldberg (*pro hac vice*)
*ngoldberg@keker.com*
633 Battery St.
San Francisco, CA 94111
Telephone: 415.391.5400

*Attorneys for Defendant OpenAI*

[*] All parties whose electronic signatures are included in this filing have provided consent in accordance with Rule 8.5(b) of the Court's ECF Rules and Instructions.

*<u>/s/ Lisa Simpson</u>*

ORRICK, HERRINGTON & SUTCLIFFE LLP
Annette L. Hurst (admitted pro hac vice)
Daniel Justice (admitted pro hac vice)
Robert Scott Shwarts
Catherine Lui (admitted pro hac vice)
Amanda H. Schwartz (admitted pro hac vice)
The Orrick Building
405 Howard Street
San Francisco, CA 94105-2669
Telephone: (415) 773-5700
Facsimile: (415) 773-5759
ahurst@orrick.com
djustice@orrick.com
aschwartz@orrick.com

Christopher J. Cariello
Lisa T. Simpson
Marc Shapiro
Vanessa Sorrentino
Hilda Obeng
51 West 52nd Street
New York, NY 10019
Telephone: (212) 506-3778
Facsimile: (212) 506-5151
ccariello@orrick.com
lsimpson@orrick.com
mrshapiro@orrick.com
vsorrentino@orrick.com
hobeng@orrick.com

Sheryl Koval Garko (admitted pro hac vice)
Laura Brooks Najemy (admitted pro hac vice)
222 Berkley Street
Boston, MA 02116
Telephone: (617) 880-1800
Facsimile: (617) 880-1801
sgarko@orrick.com
lnajemy@orrick.com

Isaac Sawlih Behnawa (admitted pro hac vice)
Johnathan Vaknin (admitted pro hac vice)
355 S. Grand Ave. Suite 2700
Los Angeles, CA 90071
Telephone: (213) 612-2179
Facsimile: (213) 612-2499
ibehnawa@orrick.com
jvaknin@orrick.com

Monica Svetoslavov (admitted pro hac vice)
Louis Andrew Schreiber
2100 Pennsylvania Avenue NW
Washington, DC 20037
Telephone: (202) 339-8400
Facsimile: (202) 339-8500
msvetoslavov@orrick.com
aschreiber@orrick.com

FAEGRE DRINKER BIDDLE & REATH LLP
Jeffrey S. Jacobson
1177 Avenue of the Americas
New York, New York 10036
Telephone: (212) 248-3191
jeffrey.jacobson@faegredrinker.com

Jared B. Briant (admitted pro hac vice)
Kirstin L. Stoll-DeBell (admitted pro hac vice)
Timothy Scull (admitted pro hac vice)
Shelby Pickar-Dennis (admitted pro hac vice)
1144 15th Street, Suite 3400
Denver, Colorado 80202
Telephone: (303) 607-3588
jared.briant@faegredrinker.com
kirstin.stolldebell@faegredrinker.com
timothy.scull@faegredrinker.com
shelby.pickar-dennis@faegredrinker.com

Lora A. Brzezynski (admitted pro hac vice)
Brianna Lynn Silverstein (admitted pro hac vice)
Faith Maggard (admitted pro hac vice)
1500 K Street NW, Suite 1100
Washington, DC 20005
Telephone: (202) 230-5000
Facsimile: (202) 842-8465
lora.brzezynski@faegredrinker.com

brianna.silverstein@faegredrinker.com
faith.maggard@faegredrinker.com

Carrie A. Beyer (admitted pro hac vice)
320 South Canal Street, Suite 3300
Chicago, IL 60606-5707
Telephone: (312) 569-1000
Facsimile: (312) 569-3000
carrie.beyer@faegredrinker.com

Elizabeth M.C. Scheibel (admitted pro hac vice)
2200 Wells Fargo Center, 90 S. 7th Street
Minneapolis, MN 55402
Telephone: (612) 766-7000
Facsimile: (612) 766-1600
elizabeth.scheibel@faegredrinker.com

Andrew Lawrence Van Houter
600 Campus Drive
Florham Park, NJ 07932
Telephone: (973) 549-7018
Facsimile: (973) 360-9831
Andrew.vanhouter@faegredrinker.com

*Attorneys for Defendant Microsoft Corporation*