**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE:<br><br>OpenAI, INC.,<br><br>COPYRIGHT INFRINGEMENT LITIGATION<br><br>This Document Relates To:<br><br>1:23-cv-11195-SHS-OTW<br>1:24-cv-01515-SHS-OTW<br>1:24-cv-03285-SHS-OTW<br>1:24-cv-04872-SHS-OTW<br>1:25-cv-04315-SHS-OTW | 25-md-3143 (SHS) (OTW) |

**DEFENDANTS' RESPONSE TO NEWS PLAINTIFFS' RULE 56.1 STATEMENT**

**VOLUME IV – FACTS 1422-1825**

# VOLUME IV

## TABLE OF CONTENTS


VI. Effects of Defendants' Use and Copying of News & Journalism Content ..... 961

A. Effects of Defendants' Use On Established Market for News Content ..... 961

B. Effects of Defendants' Use On Established Market for News Content Licensing ..... 1172

C. Effects of Defendants' Use On Market for Licensing Data for GenAI ..... 1182

D. Other Effects on News Plaintiffs ..... 1220

1. Proliferation of pink slime ..... 1220

2. Hallucinations ..... 1250

3. Other Scraping-Related Harms ..... 1306

4. Anticipated effects from widespread proliferation of conduct ..... 1313

E. Other Effects on the Public ..... 1338

VII. Defendant OpenAI's Additional Facts Pursuant to Local Rule 56.1(b) ..... 1355

VIII. Defendant Microsoft's Additional Facts Pursuant to Local Rule 56.1(b) ..... 1364

Pursuant to Local Civil Rule 56.1, Defendants OpenAI and Microsoft respectfully submit this Response to Plaintiffs' Corrected Statement of Undisputed Material Facts in Support of their Motion for Partial Summary Judgment. ECF No. 1985 (News) (the "Statement").

Plaintiffs' Statement fails to comply with Local Civil Rule 56.1(a). That rule requires that a motion for summary judgment "be accompanied by a separate, **short, and concise statement**, in numbered paragraphs, of the **material facts** as to which the moving party contends there is no genuine issue to be tried." Local Civ. R. 56.1(a) (emphasis added). That is not what Plaintiffs did. Plaintiffs submitted 940 [*1,825*] separately numbered paragraphs spanning nearly 160 [*440*] pages. Such a voluminous submission does not comply with the local rule. *Tripathy v. McCloskey*, No. 21-CV-6584 (CS), 2024 WL 2135623, at *1 (S.D.N.Y. May 13, 2024) (striking plaintiff's 356-page submission for "ignor[ing] the Rule's requirement that a statement be short and concise"). Plaintiffs' approach has made it extremely difficult for Defendants to respond fully while also providing their responses in a format useful to the Court.

To deal with this massive and improper Statement, Defendants have attempted to streamline their response for the benefit of the Court as follows:

**Undisputed/Disputed/Disputed in Part.** Every fact includes one of these responses, to make clear Defendants' position under Local Rule 56.1(b). Facts designated "Undisputed" are facts that Defendants have elected not to dispute solely for purposes of Plaintiffs' Motion for Summary Judgment in this matter, but does not constitute a binding admission for any other purpose. Facts designated "Disputed" or "Disputed in Part" are facts that Defendants are disputing.

In addition, Defendants have included certain objections and other responses to Plaintiffs' facts where appropriate. Those additional responses and the authority supporting those responses are identified below. For the Court's convenience and to avoid further lengthening this response, Defendants do not repeat their supporting authority for these issues in every response. Instead, Defendants state these objections plainly for ease of review and incorporate the below authority into each of those responses. Where warranted and helpful for the Court, Defendants also provide additional, paragraph-specific information to assist the Court's assessment.

**Immaterial.** Facts designated "Immaterial" are facts that, even if true, do not help resolve any question currently before the Court on summary judgment, i.e., they do not "affect the outcome of the suit under the governing law." *I.M. v. United States*, 362 F. Supp. 3d 161, 190 (S.D.N.Y. 2019). Rule 56.1 statements are "immaterial" if they "do not provide any basis to rule in favor of either party for summary judgment even if they are disputed." *See Parks v. Lebhar-Friedman, Inc.*, No. 04-cv-7133-DCP-KNF, 2008 WL 3833802, at *4 (S.D.N.Y. Aug. 11, 2008). Facts designated as "Immaterial" below thus reflect facts that are not legally significant because it does not impact an element of any claim or defense at issue in Plaintiffs' summary judgment motion. Defendants' designation of certain facts as "immaterial" does not concede that any fact not designated as such is material for purposes of adjudicating Plaintiffs' Motion, or for any other purpose.

**"Not Supported by Cited Evidence."** Facts designated as "Not Supported by Cited Evidence" are facts with incorrect citations or where the cited evidence does not support the stated fact. *Holtz*, 258 F.3d at 74 (A "Rule 56.1 statement is not itself a vehicle for making factual assertions that are otherwise unsupported in the record. Where … the record does

not support the assertions in a Local Rule 56.1 statement, those assertions should be disregarded and the record reviewed independently.").

**"Not Supported by Admissible Evidence."** Facts designated as "Not Supported by Admissible Evidence" are facts that are not supported by admissible evidence as required by Local Rule 56.1, and therefore are not properly before the Court. S.D.N.Y. Local Rule 56.1(d) ("Each statement by the movant … must be followed by citation to evidence that would be admissible[.]"); *Epstein v. Kemper Ins. Companies*, 210 F. Supp. 2d 308, 314 (S.D.N.Y. 2002) (statements in a Rule 56.1 statement "are inappropriate if they are not based on personal knowledge, contain inadmissible hearsay, … or do not cite to supporting evidence").

**"Improper Legal Argument."** Facts designated as an "Improper Legal Argument" are facts where the assertion therein constitutes improper attorney argument and/or is conclusory. These facts require no response. *Id.* (statements in a Rule 56.1 statement "are inappropriate if they are conclusory or argumentative[.]"); *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 801 F. Supp. 3d 330, 369 (S.D.N.Y. 2025) (quoting *Kesner v. Buhl*, 590 F. Supp. 3d 680, 691 (S.D.N.Y. 2022)) (the Court sets aside "[t]he portions of [a responding party's] 56.1 Statement that contain legal argument bereft of factual matter[.]").

**"Incomplete."** Facts designated as "Incomplete" are facts where Plaintiffs have "introduce[d] all or part of a statement" and Defendants introduce "any other part—or any other statement—that in fairness ought to be considered at the same time" pursuant to Federal Rule of Evidence 106.

# VI. Effects of Defendants' Use and Copying of News & Journalism Content

## A. Effects of Defendants' Use On Established Market for News Content

| | |
|---|---|
| 1422. Generative AI models like ChatGPT have been characterized as "answer engines that "deliver answers without directing users to external websites." Ex. 1175 ["How to evolve your organic approach for the rise of answer engines," *Search Engine Land*, October 9, 2024, https://searchengineland.com/evolve-organic-approach-answer-engines-447352]. | 1422. **Disputed in Part - Not Supported by Admissible Evidence.** Defendants respond as follows: Undisputed that the phrases "answer engine" and "deliver answers without directing users to external websites" appear in Ex. 1175. However, disputed to the extent this fact implies that ChatGPT or Copilot does not direct users to external websites as such an implication is not supported by the cited evidence and contrary to the record. *See* News Ex. 495. Further disputed to the extent Plaintiffs rely on statements by third parties in the exchange for their truth; those statements constitute inadmissible hearsay. Fed. R. Evid. 802; Fed. R. Civ. P. 56(c)(2). Specifically, Exhibit 1175 is a webpage from a third party, Search Engine Land. Because the disputed proposition is not supported by admissible evidence, as required by Local Rule 56.1, it is therefore not properly before the Court. |
| 1423. Microsoft was aware as of December 2023 that LLMs' outputs substitute for the works on which they were trained in a way that threatens economic harm to the creators of those works. Ex. 843 [MSFT_AI_MDL_001180287] at 288; *see also* Ex. 844 [MSFT_AI_MDL_001233825] at 825 ("LLMs threaten the economics of the web content (e.g. webpages and artwork) they need to learn about the world, threatening a doom | 1423. **Disputed – Not Supported by Cited Evidence; Immaterial.** Microsoft disputes that "Microsoft was aware as of December 2023 that LLMs' outputs substitute for the works on which they were trained" because the cited evidence does not support the claim. None of the cited documents states that LLM outputs substitute for the works on which they were trained. Exhibit 843 is an email in which one employee, |

| | |
|---|---|
| loop that needs intervention to stop."); Ex. 810 [MSFT_AI_MDL_001233834] at slide 12 ("Non-compete heavily eroded by LLM-based businesses… Promise of LLMs is largely in the same information work domains from which they get their content… Understandable given the nature of the technology: They naturally compete with their content supply chain…"). | Hecht, offered his own "reflections" that "many applications of LLMs directly compete economically with the sources of their data," which he described as "a separate issue." Ex. 843 at MSFT_AI_MDL_001180288. Exhibit 844 discusses the "paradox of content re-use" at a general level, using the example that developers may stop visiting Stack Overflow. News Ex. 844 at MSFT_AI_MDL_001233825–826. And Exhibit 810 describes LLM-based businesses generally in "information work domains." News Ex. 810 at slide 12.<br><br>Microsoft also responds that the facts set forth in Paragraph 1423 are immaterial because these facts do not affect the outcome of the suit under the governing law. News Ex. 844 is an undated working draft containing inline comments and edits. Additionally, the portion of Ex. 844 quoted in Paragraph 1423 appears to have been written by Brent Hecht. News Ex. 844 at MSFT_AI_MDL_001233826. A Microsoft employee's personal views on any hypothetical effects of LLMs on content creators have no bearing on any element of the claims or defenses in this case. Further, Hecht's statements cannot be attributed to Microsoft. Hecht is a research academic employed at Microsoft to bring "divergent," "asymmetric, futuristic, and academic points of view"; he does not set Microsoft's core priorities or speak for Microsoft as to "his theoretical views on AI's potential effect on content creators"; Microsoft leadership "does not share all of [his] views"; |

| | |
|---|---|
| | and he is a "kind of intellectual provocateur." ECF 1706 (J. Usdan Decl.) ¶ 39; A. Blanco Opp. Decl. Ex. 285 (J. Usdan 30(b)(6) Tr.) at 173:22-174:9. Hecht has himself disclaimed any authority to speak for Microsoft, testifying that his views on these subjects are "my view, not Microsoft's view," that "[he] has no idea if [they are] shared by the board of Microsoft," and that "[he] can't speak for the company on this stuff." A. Blanco Opp. Decl. Ex. 212 (B. Hecht 30(b)(1) Tr.) at 319:18–20, 320:10–12, 321:4–5. He further described his views as "hypotheses," cautioned that "the jury is still out on a lot of this stuff," and acknowledged that he is "not a lawyer." *Id.* at 59:11–60:8, 165:9–15, 166:10–11. Hecht's personal views therefore are not statements of Microsoft and do not reflect Microsoft's knowledge, policies, or conduct.<br><br>OpenAI joins Microsoft's response. Hecht testified unequivocally: "I don't speak for Microsoft. I definitely don't speak for OpenAI." A. Blanco Opp. Decl. Ex. 212 (B. Hecht 30(b)(1) Tr.) at 100:11–12. |
| 1424. Microsoft understood during development of the AI systems in this case that its generative AI systems "severely threaten the economic model of the content on which they depend." Ex. 844 [MSFT_AI_MDL_001233825] at 826 ("LLMs severely threaten the economic model of the content on which they depend. As currently constituted, they are effectively an | 1424. **Disputed – Not Supported by Cited Evidence; Immaterial.** Microsoft does not dispute that Exhibit 844 contains the quoted language in Paragraph 1424. But Microsoft disputes that the exhibit shows what "Microsoft understood," or that it concerns "its generative AI systems" "during development of the AI systems in this case" because the cited evidence does |

| | |
|---|---|
| end product that existentially threatens its own supply chain.”). | not support the claim. Exhibit 844 is an undated working-group document that refers to “LLMs” generally, does not identify any AI system at issue in this case, and states that its first goal is to “[e]ducate leadership” by providing “a set of evidence-backed options to help them form an informed opinion.” News Ex. 844 at MSFT_AI_MDL_001233–826.<br>Microsoft also responds that the facts set forth in Paragraph 1424 are immaterial and cannot be attributed to Microsoft for the reasons stated in response to Paragraph 1423. News Ex. 844 is an undated working draft containing inline comments and edits. Additionally, the portion of Ex. 844 quoted in Paragraph 1424 appears to have been written by Brent Hecht. News Ex. 844 at MSFT_AI_MDL_001233826. A Microsoft employee’s personal views on any hypothetical effects of LLMs on content creators have no bearing on any element of the claims or defenses in this case. Additionally, Hecht’s statements are immaterial and cannot be attributed to Microsoft for the reasons stated in response to Paragraph 1423.<br><br>OpenAI joins Microsoft’s response. Hecht testified unequivocally: “I don’t speak for Microsoft. I definitely don’t speak for OpenAI.” A. Blanco Opp. Decl. Ex. 212 (B. Hecht 30(b)(1) Tr.) at 100:11–12. |
| 1425. As of March 24, 2020, OpenAI understood that its products substitute for the news publishers’ | 1425. **Disputed - Not Supported by Cited Evidence.** OpenAI responds as follows: The facts set |

| | |
|---|---|
| content. Ex. 745 [OPCO_MDL_000220773] at 783-784 (OpenAI's Greg Brockman stated: "we are excellent at news btw. every time i do any generative stuff on NYT it seems to predict the next sentence pretty well. so i kinda have a mental model of davinci as very good at any news task."); Ex. 1176 [BCG_OPCO_MDL_000003619] at 35 (Davinci is a GPT-3.5 model.). | forth in Paragraph 1425 are disputed because the cited evidence does not support the assertion. Specifically, the cited evidence does not say anything about "substitute[s]." Pursuant to Fed. R. Evid. 106, Greg Brockman, who wrote the relevant messages, explained that the Davinci model was "very good at any news task" because a user could provide the model with "context - a document [it has] never seen before, totally new - and [it does not] output a copy." A. Blanco Opp. Decl. Ex. 176 (G. Brockman 30(b)(1) Tr.) at 289:8-17. Mr. Brockman further noted that the model was "[s]imilar to how a phone can have auto-complete" because "[i]t's never going to get it perfectly right, never going to be a copy." *Id.* at 290:13-14. Mr. Brockman also noted that the model "had not been trained" on the New York Times articles referenced in his message. *Id.* at 268:7-8.<br><br>Microsoft defers to OpenAI. |
| 1426. In March 2020, OpenAI President Greg Brockman wrote: "we are excellent at news btw. every time i do any generative stuff on NYT it seems to predict the next sentence pretty well. so i kinda have a mental model of davinci as very good at any news task." Ex. 745 [OPCO_MDL_000220773] at 783-784; Ex. 1176 [BCG_OPCO_MDL_000003619] at 35 (Davinci is a GPT-3.5 model.) | 1426. **Disputed in Part.** OpenAI responds as follows: Undisputed that the document so states. However, disputed to the extent Plaintiffs suggest that the LLMs in dispute generate "copies" of the Asserted Works at issue in this Motion. Pursuant to Fed. R. Evid. 106, Greg Brockman, who wrote the relevant messages, explained that the Davinci model was "very good at any news task" because a user could provide the model with "context - a document [it has] never seen before, totally new - and [it does not] output a copy." A. |

| | |
|---|---|
| | Blanco Opp. Decl. Ex. 176 (G. Brockman (30)(b)(1) Tr.) at 289:8–17. Mr. Brockman further noted that the model was "[s]imilar to how a phone can have auto-complete" because "[i]t's never going to get it perfectly right, never going to be a copy." *Id.* at 290:13–14.<br><br>Microsoft defers to OpenAI. |
| 1427. In April 2020, OpenAI President Greg Brockman wrote that: "the model seems to be particularly good at predicting text of news articles like whenever i have it complete in the middle of a sentence in a NYT article, it seems to complete the sentence on point." Ex. 1019 [OPCO_MDL_000609714] at 716. | 1427. **Disputed in Part.** OpenAI responds as follows: Undisputed that the document so states. However, disputed to the extent Plaintiffs suggest that the LLMs in dispute generate "copies" of the Asserted Works at issue in this Motion. Pursuant to Fed. R. Evid. 106, Greg Brockman, who wrote the relevant messages, explained that the Davinci model was "very good at any news task" because a user could provide the model with "context - a document [it has] never seen before, totally new - and [it does not] output a copy." A. Blanco Opp. Decl. Ex. 176 (G. Brockman 30(b)(1) Tr.) at 289:8–17. Mr. Brockman further noted that the model was "[s]imilar to how a phone can have auto-complete" because "[i]t's never going to get it perfectly right, never going to be a copy." *Id.* at 290:13–14.<br><br>Microsoft defers to OpenAI. |
| 1428. Defendants do not dispute that the reason ChatGPT and Copilot are "good at news" is because they trained on news content. Etzioni Opening Rep. ¶ 53 (opining that "[i]f one wants to generate 'news-like' | 1428. **Disputed – Not Supported by Cited Evidence; Expert Opinion Subject to Rule 702.** Defendants respond as follows: Defendants dispute that they "do not dispute" that ChatGPT and Copilot are |

| | |
|---|---|
| outputs from LLMs, they need news content for training."); Ex. 800 [Lafferty Rebuttal Rep.] ¶ 71 (admitting that "the ability to generate news-like style or content is what one would expect from a model that has learned recurring statistical patterns of a genre"); Wenger Rebuttal Rep. at 16. | "good at news" because they trained on news content, and the cited evidence does not support that statement. None of the cited exhibits use the phrase "good at news," nor do Defendants' experts suggest that Defendants' products are "good at news" "because they trained on news content." Specifically, it is unclear where the quoted phrase "good at news" has been derived from or what it means to be "good at news," making this assertion impossible to verify.<br>Defendants also dispute the characterization in Paragraph 1428 that "the reason ChatGPT and Copilot are 'good at news' is because they trained on news content." Rather, as Dr. Lafferty explained, exposure to news-like text "may improve a model's ability to generate news-like . . . outputs." News Ex. 800 (J. Lafferty Rebuttal Rep.) ¶ 69.<br>Additionally, pursuant to Fed. R. Evid. 106, Dr. Etzioni repeatedly emphasizes that "[redacted]. News Ex. 1771 (O. Etzioni Decl. Ex. A) ¶¶ 75, 99. Dr. Wenger similarly asserts that [redacted]. ECF 1858-4 (E. Wenger Decl. Ex. D) (Rebuttal Rep.) at 16. And the cited section of Dr. Lafferty's report says nothing about whether training on news content is necessary to |

| | |
|---|---|
| | generate news-like systems or content. News Ex. 800 (J. Lafferty Rebuttal Rep.) ¶ 71.<br>Further, the fact stated in Paragraph 1428 is disputed because the evidence cited in support is currently subject to a motion to exclude expert testimony pursuant to Fed. R. Evid. 702. Defendants' pending Rule 702 motion seeks to exclude certain opinions of Etzioni and Wenger, on which this statement relies. To the extent the Court excludes the challenged opinions, Plaintiffs may not rely on them to support this statement. *See* Fed. R. Civ. P. 56(c)(2). |
| 1429. In a presentation dated October 2020, Anthropic's Dario Amodei – who was then a top researcher at OpenAI – listed "News Generation" as one of GPT-3's "Skills." Ex. 1021 [OPCO_MDL_001837980] at slide 31 (October 2020 presentation). | 1429. **Disputed in Part.** OpenAI responds as follows: The facts set forth in Paragraph 1429 are disputed in part because they are not supported by the cited evidence. Undisputed that Ex. 1021 is a technical research presentation (as opposed to a product roadmap or business strategy document) by Dario Amodei from approximately October 2020 discussing GPT-3, and that the phrase "News Generation" appears as one of several topics under the heading "GPT-3 'Skills.'" *See* News Ex. 1021 at OPCO_MDL_001837980, slide 31. Undisputed that Mr. Amodei was a researcher at OpenAI. However, disputed to the extent Plaintiffs characterize Mr. Amodei as a "top researcher," as it is unclear what it means to be a "top researcher" as Plaintiffs have used that phrase.<br><br>Microsoft defers to OpenAI. |

| | |
|---|---|
| 1430. In another presentation, Mr. Amodei identified a "Sample query" for the "Publishing" category as "What's the NYT saying today?" Ex. 1023 [OPCO_MDL_001635079] at slide 12. | 1430. **Disputed in Part - Not Supported by Cited Evidence.** OpenAI responds as follows: Undisputed that the cited slide in Ex. 1023 contains a table with three columns labeled "Category," "Sample query," and "Possible sources." Also undisputed that the third row of the column lists "Publishing" in the "Category" column and "What's the NYT saying today" in the "Sample query" column.<br>However, disputed that the cited evidence establishes that Mr. Amodei "identified" any "Sample query" in the table. Furthermore, nothing on the face of Ex. 1023 indicates that Mr. Amodei authored it. Indeed, a substantially identical or closely related version of this presentation appears in the record as A. Blanco Opp. Decl. Ex. 143 (Turley Dep. Ex. 20), attributed to Nick Turley, a product lead at OpenAI. Plaintiffs' attribution of this document to Mr. Amodei is unsupported and inaccurate.<br><br>Microsoft defers to OpenAI. |
| 1431. Microsoft also understood that AI answers would reduce the number of people who click on links. Ex. 845 [MSFT_AI_MDL_000948603] at 604 ("Prometheus's [the "new Bing" with AI answer capability] primary value-add is to reduce the need to click on individual webpages and do manual synthesis," and that "[t]he only way this can't affect click-through is if we're growing the query pie, and there is also a worry that any | 1431. **Disputed in Part – Not Supported by Cited Evidence; Immaterial.** Microsoft does not dispute that Exhibit 845 contains the quoted language. But Microsoft disputes that "Microsoft also understood that AI answers would reduce the number of people who click on links," because the cited evidence does not support that statement. The quoted passage from Ex. 845 is from a memo authored by Brent Hecht, and it is a |

| | |
|---|---|
| query pie growth would quickly be subsumed by Prometheus improving."); *see also* Ex. 1177 ["Reinventing search with a new AI-powered Microsoft Bing and Edge, your copilot for the web", Microsoft (Feb. 7, 2023), https://blogs.microsoft.com/blog/2023/02/07/reinventing-search-with-a-new-ai-powered-microsoft-bing-and-edge-your-copilot-for-the-web/]. | *prediction* in an internal memo offered in support of a *recommendation* to "[p]ut into place an extensive measurement regime" to understand "every dimension of Prometheus click-through," and the memo itself recognizes that click-through might not be affected if Microsoft is "substantially growing the pie of information needs." News Ex. 845 at MSFT_AI_MDL_000948604. The memo does not find that click-throughs declined.<br>Microsoft also responds that the facts set forth in Paragraph 1431 are immaterial and cannot be attributed to Microsoft for the reasons stated in response to Paragraph 1423. Specifically, a prediction about click-through on websites generally is not evidence of any effect on traffic to New Plaintiffs' web domains.<br><br>OpenAI defers to Microsoft's response. Hecht testified unequivocally: "I don't speak for Microsoft. I definitely don't speak for OpenAI." A. Blanco Opp. Decl. Ex. 212 (B. Hecht 30(b)(1) Tr.) at 100:11–12. |
| 1432. Microsoft's CEO Satya Nadella admitted at his deposition that conversing with chatbots like Copilot "has substituted" for publisher sites by "giving you the information right there on the website on the AI platform versus needing to go to the underlying source." Ex. 533 [Nadella Depo. Tr.] at 124:10-125:11. | 1432. D**isputed – Incomplete, Improper Legal Argument.** This "fact" is improper legal argument. The quotes here are taken out of context. Mr. Nadella's testimony was given in the midst of pages of testimony about a Microsoft blog post the day before the deposition announcing the "publisher's content marketplace" (marked as Nadella Ex. 10), in which Mr. Nadella discussed multiple ideas about a new |

| | |
|---|---|
| | experimental program for how chatbots could be used to access content, including creating a new publishers marketplace wherein Microsoft was "keen to work with publishers around traffic exchange" (Blanco Opp. Decl. Ex. 245 (S. Nadella 30(b)(1) Tr.) 111:16-24), where AI agents could obtain "access to all my subscriptions." (*id.* at 120:10-15), how traditional search had for years prior to the introduction of chatbots already included synthetic answers (*id.* at 123:11-21), that snippets in traditional search also satisfied the need for information without click-through (*id.* at 125:6-9), that "people are not just going to regular search, they're going to these conversational agents and feeds" (*id.* at 124:6-9), and that chatbots are "just a complete new experience." *Id.* at 124:14-17. Fairly read in context pursuant to Fed. R. Evid. 106, the witness engaged in wide-ranging conversation about the search market and ideas for a brand new program involving a range of possible consumer uses of and reactions to chatbot technology. Mr. Nadella did not state that Copilot had been substituting for publisher sites.<br><br>OpenAI defers to Microsoft's response. |
| 1433. In May 2024, OpenAI claimed to be building a tool called Media Manager, which would "allow creators and content owners to identify their works to OpenAI and specify how they want those works to be included or excluded from AI research and training." Ex. 1178 | 1433. **Disputed in Part.** OpenAI responds as follows: Undisputed that, in May 2024, OpenAI announced that it was developing Media Manager, a tool that would enable creators and content owners to tell OpenAI what they own and to specify how they want |

| | |
|---|---|
| [“OpenAI says it’s building a tool to let content creators ‘opt out’ of AI training,” *TechCrunch* (May 7, 2024), https://techcrunch.com/2024/05/07/openai-says-its-building-a-tool-to-let-content-creators-opt-out-of-ai-training/.]. | their works to be included in or excluded from machine learning research and training. *See* A. Blanco Opp. Decl. Ex. 94, https://openai.com/index/approach-to-data-and-ai/. However, disputed to the extent that this assertion implies that Media Manager was not in development at the time, which is not supported by the cited evidence.<br>OpenAI also responds that the facts set forth in Paragraph 1433 are disputed on the grounds that they are not supported by admissible evidence, as required by Local Rule 56.1, and therefore are not properly before the Court. S.D.N.Y. Local Rule 56.1 (d). Specifically, News Ex. 1178 was not made by OpenAI, is hearsay, and lacks foundation because it is a non-party publication offered for the truth of its contents, unaccompanied by any authenticating testimony or sponsoring expert to establish its reliability under Fed. R. of Evid. 803(18), and therefore may not be considered in support of summary judgment.<br><br>Microsoft defers to OpenAI. |
| 1434. OpenAI said that Media Manager would answer the “need” for “an efficient, scalable solution for content owners to express their preferences about the use of their content in AI systems,” including by allowing publishers to opt out of its scraping. Ex. 1179 [https://openai.com/index/approach-to-data-and- | 1434. **Disputed in Part.** OpenAI responds as follows: Undisputed that Ex. 1179 contains the quoted language. However, disputed that the section in which the quoted language appears specifically references Media Manager. *See* News Ex. 1179, https://openai.com/index/approach-to-data-and-ai/#were-building-media-manager-so-content-owners- |

| | |
|---|---|
| ai/#were-building-media-manager-so-content-owners-can-manage-how-their-works-are-used-in-ai]. | can-manage-how-their-works-are-used-in-ai. Further disputed that there was, at the time, a need to create a mechanism to "allow[] publishers to opt-out of [OpenAI] scraping," because Ex. 1179 does not contain this assertion and it is not supported by the cited evidence. *See id.*<br><br>Microsoft defers to OpenAI. |
| 1435. OpenAI never released Media Manager; instead, it decided not to pursue the Media Manager project and to "see how the landscape evolves." Ex. 136 [Shetty 30(b)(6) Depo. Tr.] at 163:6-164:3. | 1435. **Disputed in Part.** OpenAI responds as follows: Undisputed that OpenAI paused work on Media Manager or that the quoted language appears in Ex. 136. However, as presented it is incomplete under Fed. R. Evid. 106. As Mr. Shetty explained, OpenAI paused work on Media Manager because the relevant rights holders did not provide "buy-in on [OpenAI's] individual solution." A. Blanco Opp. Decl. Ex. 276 (V. Shetty 30(b)(6) Tr.) at 163:25-164:1.<br><br>Microsoft defers to OpenAI. |
| 1436. Dr. Hecht from Microsoft agreed in an internal memo in June 2024: "In the simplest terms: AI search engines scrape answers from websites." Ex. 846 [MSFT_AI_MDL_002758601] at 601; Ex. 671 [Hecht Depo. Tr.] at 305:10-306:17. | 1436. **Undisputed – Incomplete; Immaterial.** Microsoft responds as follows: Microsoft does not dispute that Exhibit 846 reproduces the quoted sentence. But pursuant to Fed. R. Evid. 106, Microsoft clarifies that the sentence is not Hecht's; it appears in a screenshot of a headline from The Verge, which the memo identifies as "[s]ome of the media coverage the launch of the new Bing engendered." News Ex. 846 at 601. |

| | |
|---|---|
| | Microsoft also responds that the facts set forth in Paragraph 1436 are immaterial and cannot be attributed to Microsoft for the reasons stated in response to Paragraph 1423. Specifically, a journalist's description of AI search, reproduced in an internal memo, is not evidence of how any accused product used Plaintiffs' works.<br><br>OpenAI joins Microsoft's response. Hecht is a Microsoft researcher who testified unequivocally: "I don't speak for Microsoft. I definitely don't speak for OpenAI." A. Blanco Opp. Decl. Ex. 212 (B. Hecht 30(b)(1) Tr.) at 100:11–12. |
| 1437. As of January 2023, Microsoft also understood that the unauthorized use of creators' content ("'hoovering' up all their work") for the purpose of Generative AI would be viewed as "an astonishing theft of unprecedented proportions," and that "almost no one intended for content they created to be used in this fashion, nor are they compensated for its use." Ex. 847 [MSFT_AI_MDL_000949427] at 430; Ex. 671 [Hecht Depo. Tr.] at 121:3-123:6. | 1437. **Disputed in Part – Not Supported by Cited Evidence; Immaterial.** Microsoft does not dispute that Exhibit 847 contains the quoted sentences. But Microsoft disputes that these quotations show that "Microsoft also understood" the facts set forth in Paragraph 1437 because the cited evidence does not support this claim. Exhibit 847 is a memo Hecht authored "with others." A. Blanco Opp. Decl. Ex. 212 (B. Hecht 30(b)(1) Tr.) at 102:21–103:4. The memo does not expressly state or address "the unauthorized use of creators' content[;]" rather, the memo predicts how "millions of people around the world will soon consider" those models – nowhere does the memo state Microsoft's formal view. News Ex. 847 at MSFT_AI_MDL_000949430. |

| | |
|---|---|
| | Microsoft also responds that the facts set forth in Paragraph 1437 are immaterial and cannot be attributed to Microsoft for the reasons stated in response to Paragraph 1423. Specifically, a prediction about how the public may perceive generative AI has no bearing on whether purported use of News Plaintiffs' works was a fair use. And, a Microsoft employee's personal views on any hypothetical effects of LLMs on content creators have no bearing on any element of the claims or defenses in this case.<br><br>OpenAI joins Microsoft's response. Hecht testified unequivocally: "I don't speak for Microsoft. I definitely don't speak for OpenAI." A. Blanco Opp. Decl. Ex. 212 (B. Hecht 30(b)(1) Tr.) at 100:11–12. |
| 1438. Microsoft recognized that the "critical unspoken assumption" that "any data on the Internet is free to use for training" was highly unlikely to hold, Ex. 847 [MSFT_AI_MDL_000949427] at 429, comparing OpenAI's platform to "Napster," Ex. 848 [MSFT_AI_MDL_000946783] at 783; Ex. 671 [Hecht Depo. Tr.] at 86:12-87:17. | 1438. **Disputed in Part – Not Supported by Cited Evidence; Immaterial.** Microsoft responds as follows: Microsoft does not dispute that Exhibit 847 contains the quoted sentence. But Microsoft disputes that these quotations show that "Microsoft recognized" the facts set forth in Paragraph 1438 because the cited evidence does not support this claim. Exhibit 847 is a memo Hecht authored "with others." A. Blanco Opp. Decl. Ex. 212 (B. Hecht 30(b)(1) Tr.) at 102:21–103:4. Microsoft also disputes that the cited evidence shows Microsoft "comparing OpenAI's platform to 'Napster.'" Exhibit 848 does not mention OpenAI, and Hecht uses "Napster" to describe a meeting-search product strategy: |

| | |
|---|---|
| | "using capabilities you don't necessarily need large models for as a 'sugar rush.'" News Ex. 848 at 783. Hecht also described the analogy as "a provocation." A. Blanco Opp. Decl. Ex. 212 (B. Hecht 30(b)(1) Tr.) at 86:15–18.<br>Microsoft also responds that the facts set forth in Paragraph 1438 are immaterial and cannot be attributed to Microsoft for the reasons stated in response to Paragraph 1423. Specifically, a researcher's prediction and an analogy he offered "as a provocation" are not facts about any conduct at issue in this litigation. And, a Microsoft employee's personal views on any hypothetical effects of LLMs on newspapers have no bearing on any element of the claims or defenses in this case.<br><br>OpenAI joins Microsoft's response. Hecht testified unequivocally: "I don't speak for Microsoft. I definitely don't speak for OpenAI." A. Blanco Opp. Decl. Ex. 212 (B. Hecht 30(b)(1) Tr.) at 100:11–12. |
| 1439. Microsoft disregarded warnings to "take the right actions" and to make a "compliant large model" that "ask[s] people and institutions for *permission* to use the content they have produced for training" which would "likely mean providing some compensation for doing so." Ex. 847 [MSFT_AI_MDL_000949427] at 430 (emphasis in original). | 1439. **Disputed in Part – Not Supported by Cited Evidence; Immaterial.** Microsoft does not dispute that Exhibit 847 contains the quoted language. But Microsoft disputes that this quotation shows that "Microsoft disregarded warnings" related to the facts set forth in Paragraph 1439 because the cited evidence does not support this claim. Exhibit 847 is a memo Hecht authored "with others." A. Blanco Opp. Decl. Ex. 212 (B. Hecht 30(b)(1) Tr.) at 102:21–103:4. Exhibit 847 says nothing about how Microsoft responded to these |

| | |
|---|---|
| | purported "warnings" and News Plaintiffs cite no other evidence. The memo frames its proposals as an opportunity, not a warning — "if we take the right actions now, all of this can be good news for Microsoft" — states that "none of the strategies outlined in this document require pivoting on a dime," and describes compliant models as raising "a significant number of open research questions." News Ex. 847 at MSFT_AI_MDL_000949429–430, MSFT_AI_MDL_000949432.<br>Microsoft also responds that the facts set forth in Paragraph 1439 are immaterial and cannot be attributed to Microsoft for the reasons stated in response to Paragraph 1423. Specifically, whether Microsoft adopted one employee's strategic proposals has no bearing on the claims or defenses asserted in this case. And, a Microsoft employee's personal views on any hypothetical effects of LLMs on newspapers have no bearing on any element of the claims or defenses in this case.<br><br>OpenAI joins Microsoft's response. Hecht testified unequivocally: "I don't speak for Microsoft. I definitely don't speak for OpenAI." A. Blanco Opp. Decl. Ex. 212 (B. Hecht 30(b)(1) Tr.) at 100:11–12. |
| 1440. Defendants' products harm News Plaintiffs by facilitating the circumvention of News Plaintiffs' paywalls. Ex. 849 [MSFT_AI_MDL_000661033]; Ex. 807 [OPCO_MDL_001700392] at 397 (an OpenAI employee | 1440. **Disputed – Not Supported by Cited Evidence; Improper Legal Argument; Immaterial.** Defendants dispute the characterization of Defendants' products as "facilitating the |

| | |
|---|---|
| alerting her colleagues that she could "use ChatGPT Browsing to get past a NYT paywall" and calling it "interesting"); Ex. 915 [OPCO_MDL_004411433] at 452-453 (Ethan Stock noting that he had "another instance of bad behavior. I asked it what the NYT says about something, and it pulled a current article from a site called Pressreader.com which advertises 'thousands of newspapers and magazines, one subscription.' We are not blocked on their robots.txt but I would be very surprised if this content is accessible by users outside a paywall, and it is certainly something that would make the NYT deeply unhappy." Stock adds that the Pressreader website was paywalled "except for an image of the front page."). | circumvention of News Plaintiffs' paywalls." Copilot is designed to recognize web publisher's content preferences, including their use of the NOARCHIVE and NOCACHE meta tags (ECF 1711 (F. Canel Decl.) ¶ 22-31). Exhibit 849, the only evidence cited pertaining to Microsoft, reflects Microsoft's efforts to monitor and promptly address system-level errors that inadvertently resulted in "paywalled" news content returned in Copilot outputs. *See generally* News Ex. 849; ECF 1711 (F. Canel Decl.) ¶ 31. Among other things, the cited evidence does not establish that any user used OpenAI products to circumvent any of Plaintiffs' paywalls. *See* News Ex. 849 at MSFT_AI_MDL_000661033; News Ex. 807 at OPCO_MDL_001700397; News Ex. 915 at OPCO_MDL_004411452–453.<br>Defendants also dispute the fact in Paragraph 1440 because the cited evidence does not support the assertion that Defendants' products have harmed Plaintiffs. At most, the exhibits cited only provide evidence of one-off statements from Defendants' employees of specific instances where a paywall was bypassed, but not evidence of harm to Plaintiffs resulting from those discrete examples. OpenAI's expert Dr. Goldfarb has "found no empirical evidence that OpenAI's alleged use served as an economic substitute for the Asserted Works or News Plaintiffs' journalism, or caused a measurable market harm across traffic, revenue, subscriptions, or user behavior." ECF 1763 (A. Goldfarb Decl.) ¶ 9. Microsoft's expert Dr. Tucker found |

| | |
|---|---|
| | no evidence of market impact—that is, no adverse change in the trend of News Plaintiffs' revenue, subscriptions, traffic, search-referred traffic, or conversion rates following the introduction of ChatGPT and Copilot. ECF 1733 (C. Tucker Decl.) ¶¶ 11, 16-104. In fact, [redacted] *Id.* ¶¶ 30-33, 63-66. And Plaintiffs' experts have not performed any quantitative analysis demonstrating such harm. ECF 1763 (A. Goldfarb Decl.) at ¶ 14 ("Based on my review of News Plaintiffs' experts' reports, I did not identify any analysis showing that real users used such outputs instead of News Plaintiffs' works, that any identified output displaced a visit to a particular News Plaintiff's website, or that such outputs caused a quantifiable loss of traffic, subscribers, revenue, or other business metrics."). <br><br> Defendants also respond that they dispute the statement in Paragraph 1440 (that "Defendants' products harm News Plaintiffs") and the Court should disregard this Paragraph because the assertion constitutes improper attorney argument and/or is conclusory. The question of harm is for the Court to weigh in its fourth factor fair use assessment. <br><br> Defendants also respond that the facts set forth in Paragraph 1440 are immaterial to the extent it claims that Defendant's products "facilitate" any end-user conduct because this fact does not affect the outcome of the suit under the governing law. Allegations that |

| | |
|---|---|
| | Defendants' products encourage end-users' conduct are immaterial to any claim or defense in this action. *See* ECF 1662 (order denying the New York Times and the Daily News Plaintiffs' motion for leave to amend their complaints to assert "inducement" and "services tailored to infringement" theories of contributory copyright infringement liability). |
| 1441. By February 2022, prior to commercial launch of ChatGPT, Microsoft identified [redacted] Ex. 850 [MSFT_AI_MDL_000406914] at slide 2. | 1441. **Disputed in Part – Not Supported by Cited Evidence.** Microsoft does not dispute that Exhibit 850 contains the language quoted. But Microsoft disputes that Microsoft identified [redacted] because this claim is not supported by the cited evidence. Exhibit 850 does not [redacted] *See* News Ex. 850. Microsoft additionally disputes the statement in Paragraph 1441 that "[b]y February 2022, prior to commercial launch of ChatGPT" as unsupported by the cited evidence; News Exhibit 850 is dated February 2023 and discusses Bing Chat prior to its commercial launch.<br>Microsoft also disputes the characterization in Paragraph 1441 that [redacted] is a "fact." Microsoft Copilot's grounding pipeline is itself a responsible AI mechanism for ensuring that "the content retrieved and provided to Copilot from the web is consistent with web publishers' permissions and |

| | |
|---|---|
| | restrictions concerning the use of their content for grounding." ECF 1710 (S. Bird Decl.) ¶ 40.<br><br>OpenAI defers to Microsoft's response. |
| 1442. By September 2022, Microsoft understood [redacted] Ex. 851 [MSFT_AI_MDL_000212025] at 031. | 1442. **Disputed in Part.** Microsoft does not dispute that Exhibit 851 contains the language quoted. But Microsoft disputes any implication in Paragraph 1442 that it did not take steps to address potential issues related to model outputs as that model was deployed in Bing Chat. Microsoft deployed a multi-layered mitigation system to prevent Copilot from outputting copyrighted content in response to a user query. Microsoft's mitigations include, for example: metaprompt and system prompt instructions; user input classifiers and filters; and an output detection system. *See* ECF 1710 (S. Bird Decl.) ¶¶ 34-39, 41-43; *see also* A. Blanco Opp. Decl. Ex. 187 (K. Cook Tr.) at 37:5-10, 52:17-53:20, 61:16-62:25, 77:22-78:3, 137:22-138:14, 144:7-145:13.<br><br>OpenAI defers to Microsoft's response. |
| 1443. By September 2022, Microsoft understood that a [redacted] Ex. 851 [MSFT_AI_MDL_000212025] at 031. | 1443. **Disputed in Part.** Microsoft does not dispute that Exhibit 851 contains the language quoted. But Microsoft disputes any implication in Paragraph 1443 that it did not add any such "safeguards" as that model was deployed in Bing Chat or that such safeguards are inadequate. Microsoft deployed a multi-layered mitigation system to prevent Copilot from outputting |

| | |
|---|---|
| | copyrighted content in response to a user query. Microsoft's mitigations include, for example: metaprompt and system prompt instructions; user input classifiers and filters; and an output detection system. *See* ECF 1710 (S. Bird Decl.) ¶¶ 34-39, 41-43; *see also* A. Blanco Opp. Decl. Ex. 187 (K. Cook Tr.) at 37:5-10, 52:17-53:20, 61:16-62:25, 77:22-78:3, 137:22-138:14, 144:7-145:13.<br><br>OpenAI defers to Microsoft's response. |
| 1444. By September 2022, Microsoft was aware of [redacted] Ex. 852 [MSFT_AI_MDL_000013670] at 681 ([redacted]); Ex. 853 [MSFT_AI_MDL_000221702] at 724 [redacted]), Ex. 1258 [MSFT_AI_MDL_000211987] at -048 ([redacted]). | 1444. **Disputed in Part – Not Supported by Cited Evidence.** Microsoft does not dispute that Exhibits 852 and 853 reflect statements made in September 2022 by Microsoft employees [redacted] But Microsoft disputes any implication in Paragraph 1444 that [redacted]. Microsoft deployed a multi-layered mitigation system to prevent Copilot from outputting copyrighted content in response to a user query. Microsoft's mitigations include, for example: metaprompt and system prompt instructions; user input classifiers and filters; and an output detection system. *See* ECF 1710 (S. Bird Decl.) ¶¶ 34-39, 41-43; *see also* A. Blanco Opp. Decl. |

| | |
|---|---|
| | Ex. 187 (K. Cook Tr.) at 37:5-10, 52:17- 53:20, 61:16-62:25, 77:22-78:3, 137:22-138:14, 144:7-145:13.<br>Microsoft also Microsoft responds that the statement in the parenthetical (that [redacted]") is disputed because the cited evidence is incorrect.<br><br>OpenAI defers to Microsoft's response. |
| 1445. When informed about its models being used to access paywalled Times content, OpenAI employees expressed concerns that putting mechanisms in place to "handicap[] the model's quote ability" by blocking paywalled Times content would result in "a very unusable product." Ex. 915 [OPCO_MDL_004411433] at 453. | 1445. **Disputed in Part.** OpenAI responds as follows: Undisputed that the quoted language appears in Ex. 915. News Ex. 915 at OPCO_MDL_004411453. However, disputed that the quoted language concerns blocking paywalled Times content because that characterization is not supported by the cited evidence. Specifically, the message appears to be responding to an earlier comment about "going down the rabbit hole of zapping all parts of the internet which the publishers don't like, hiding them from the model," not blocking the Times' (or any specific publishers') paywalled content. *See* News Ex. 915.<br><br>Microsoft defers to OpenAI. |
| 1446. Microsoft was told at least as early as 2015 that it was wrong for companies to train on content like newspapers and books without having obtained prior consent from the content producers. Ex. 671 [Hecht Depo. Tr.] at 13:15-18, 70:20-73:7 (Microsoft Director of Applied | 1446. **Disputed – Not Supported by Cited Evidence; Immaterial.** Microsoft responds as follows: Microsoft does not dispute that Hecht testified that he believes it is wrong to train on content producers' content without prior consent, and that he |

| | |
|---|---|
| Science Brent Hecht communicated that view "repeatedly and did my best for clarity" to his colleagues at Microsoft and it is "very likely" that he also communicated that view to people at OpenAI.). | communicated that view to colleagues. But Microsoft disputes that "Microsoft was told at least as early as 2015," because the cited evidence does not support that claim. The 2015 date is when Hecht "started working on this literature" that formed his personal belief. It does not mark any communication to Microsoft. A. Blanco Opp. Decl. Ex. 212 (B. Hecht 30(b)(1) Tr.) at 71:14–16. Before answering, Hecht also stated: "I don't speak for Microsoft … and what you said is a normative claim not a scientific one." *Id.* at 71:5–8. As to OpenAI, when asked whether he tried to convey the view to people there, he answered, "I don't know for sure." *Id.* at 72:19–24.<br>Microsoft also responds that the facts set forth in Paragraph 1446 are immaterial and cannot be attributed to Microsoft for the reasons stated in response to Paragraph 1423. A Microsoft employee's personal views on whether it is "wrong" for companies to train on content in certain circumstances have no bearing on any element of the claims or defenses in this case.<br><br>OpenAI joins Microsoft's response. Hecht testified unequivocally: "I don't speak for Microsoft. I definitely don't speak for OpenAI." A. Blanco Opp. Decl. Ex. 212 (B. Hecht 30(b)(1) Tr.) at 100:11–12. His statements are not based on personal knowledge of OpenAI, are not attributable to OpenAI, and are inadmissible hearsay as to OpenAI. *See* Fed. R. Civ. P. 56(c)(2), (c)(4); Fed. R. Evid. 602, 801(d)(2)(D), |

| | |
|---|---|
| | 802. This paragraph cannot be offered to establish any fact concerning OpenAI. |
| 1447. Microsoft Director of Applied Science Brent Hecht conveyed to his colleagues at Microsoft that "most people would consider [it] to be deeply unfair" to use content producers' content, including books and newspapers, to train LLMs without the knowledge, consent, and compensation to the content producers. Ex. 671 [Hecht Depo. Tr.] at 79:2-22. | 1447. **Undisputed – Immaterial.** Microsoft responds that the facts set forth in Paragraph 1447 are immaterial and cannot be attributed to Microsoft for the reasons stated in response to Paragraph 1423. Specifically, a researcher's personal view about whether an AGI paradigm pursued by others is fair has no bearing on any claim or defense.<br><br>OpenAI joins Microsoft's response. Hecht testified unequivocally: "I don't speak for Microsoft. I definitely don't speak for OpenAI." A. Blanco Opp. Decl. Ex. 212 (B. Hecht 30(b)(1) Tr.) at 100:11–12. His statements are not based on personal knowledge of OpenAI, are not attributable to OpenAI, and are inadmissible hearsay as to OpenAI. *See* Fed. R. Civ. P. 56(c)(2), (c)(4); Fed. R. Evid. 602, 801(d)(2)(D), 802. This paragraph cannot be offered to establish any fact concerning OpenAI. |
| 1448. Microsoft Director of Applied Science Brent Hecht was tasked with "helping lead the companywide efforts to introduce generative AI into Microsoft products." Ex. 671 [Hecht Depo. Tr.] at 17:10-21. | 1448. **Undisputed – Immaterial**. Microsoft does not dispute that Hecht's April 2025 Microsoft biography, which he wrote, described him as "helping lead the companywide efforts to introduce generative AI into Microsoft's products." A. Blanco Opp. Decl. Ex. 212 (B. Hecht 30(b)(1) Tr.) at 17:10–21. Microsoft also responds that the facts set forth in Paragraph 1448 are immaterial and cannot be attributed to Microsoft for the |

| | |
|---|---|
| | reasons stated in response to Paragraph 1423. Specifically, a researcher's self-written bio describing his research role has no bearing on any claim or defense.<br><br>OpenAI joins Microsoft's response. Hecht testified unequivocally: "I don't speak for Microsoft. I definitely don't speak for OpenAI." A. Blanco Opp. Decl. Ex. 212 (B. Hecht 30(b)(1) Tr.) at 100:11–12. |
| 1449. Microsoft Director of Applied Science Brent Hecht described tech companies' use of content to create LLMs a "candidate for worst use of 'fair' amidst very tough competition." Ex. 810 [MSFT_AI_MDL_001233834] at slide 37. | 1449. **Disputed in Part – Not Supported by Cited Evidence; Immaterial.** Microsoft responds as follows: Microsoft does not dispute that Exhibit 810 contains a slide titled "Law is only a fraction of the picture" that contains the phrase "Candidate for worst use of 'fair' amidst very tough competition." News Ex. 810 at slide 37. But Microsoft responds that the description in Paragraph 1449 of the slide using this phrase to describe "tech companies' use of content to create LLMs" is disputed because the cited evidence does not support the claim. Specifically, the phrase follows directly after the bullet about "legal victories" and comments on that hypothetical legal outcome. Hecht testified that it this was a slide for discussion purposes, that saying this quotation with certainty would require public opinion polling, and that it was his best hypothesis, based on the colloquial meaning of "fair" rather than any legal definition. A. Blanco Opp. Decl. Ex. 212 (B. Hecht 30(b)(1) Tr.) at 78:6–25. |

| | |
|---|---|
| | Microsoft also responds that the facts set forth in Paragraph 1449 are immaterial and cannot be attributed to Microsoft for the reasons stated in response to Paragraph 1423. Specifically, a discussion hypothesis in a researcher's internal presentation has no bearing on any claim or defense.<br><br>OpenAI joins Microsoft's response. Hecht testified unequivocally: "I don't speak for Microsoft. I definitely don't speak for OpenAI." A. Blanco Opp. Decl. Ex. 212 (B. Hecht 30(b)(1) Tr.) at 100:11–12. His statements are not based on personal knowledge of OpenAI, are not attributable to OpenAI, and are inadmissible hearsay as to OpenAI. *See* Fed. R. Civ. P. 56(c)(2), (c)(4); Fed. R. Evid. 602, 801(d)(2)(D), 802. This paragraph cannot be offered to establish any fact concerning OpenAI. |
| 1450. Microsoft Director of Applied Science Brent Hecht stated that, for tech companies that develop LLMs, "legal victories would make a complete mockery of the idea of 'fair use' in content producers' eyes." Ex. 810 [MSFT_AI_MDL_001233834] at slide 37. | 1450. **Disputed in Part – Immaterial.** Microsoft does not dispute that Exhibit 810 contains a slide with the bullet that states "Legal victories would make a complete mockery of the idea of 'fair use' in content producers' eyes." News Ex. 810 at slide 37. But Microsoft does dispute the characterization in Paragraph 1450 that this was a statement about what legal victories would mean "for tech companies that develop LLMs." By its terms, the bullet is a *prediction* about how content producers *might* perceive legal outcomes. *Id*. The bullet sits under the title "Law is only |

| | |
|---|---|
| | a fraction of the picture," and the slide argues that content producers have many ways to exert leverage, including policy, market dynamics, and data strikes, and that "legal failures on all fronts wouldn't change that." *Id*. Further, Hecht testified that he was not expressing a legal view, that it was a slide for discussion, and that it reflected his best hypothesis. A. Blanco Opp. Decl. Ex. 212 (B. Hecht. 30(b)(1) Tr.) at 77:11–78:25.<br>Microsoft also responds that the facts set forth in Paragraph 1450 are immaterial and cannot be attributed to Microsoft for the reasons stated in response to Paragraph 1423. Specifically, a researcher's prediction about how content producers might perceive a legal outcome has no bearing on fair use or any other claim or defense.<br><br>OpenAI joins Microsoft's response. Hecht testified unequivocally: "I don't speak for Microsoft. I definitely don't speak for OpenAI." A. Blanco Opp. Decl. Ex. 212 (B. Hecht 30(b)(1) Tr.) at 100:11–12. His statements are not based on personal knowledge of OpenAI, are not attributable to OpenAI, and are inadmissible hearsay as to OpenAI. *See* Fed. R. Civ. P. 56(c)(2), (c)(4); Fed. R. Evid. 602, 801(d)(2)(D), 802. This paragraph cannot be offered to establish any fact concerning OpenAI. |
| 1451. Microsoft was told by Dr. Hecht that "a risk to Microsoft of OpenAI and other companies having | 1451. **Disputed – Not Supported by Cited Evidence; Incomplete; Immaterial.** Microsoft |

| | |
|---|---|
| trained on content producers' content and other content without their knowledge, consent, or compensation [] could be viewed as akin to the largest theft of Jewish property since World War II." Ex. 671 [Hecht Depo. Tr.] at 82:15-25. | responds as follows: Microsoft disputes the facts set forth in Paragraph 1451 because the cited evidence does not support the statement that "Microsoft was told by Mr. Hecht" the quoted proposition. The quoted language is counsel's, and Hecht did not adopt it as something he told Microsoft. A. Blanco Opp. Decl. Ex. 212 (B. Hecht. 30(b)(1) Tr.) at 82:15–25.<br>Microsoft also responds that pursuant to Fed. R. Evid. 106, Hecht's full testimony included an explanation that the slide at issue was "clearly a slide for a provocation discussion to help people understand what the reputational risks" were. *Id.* at 83:7–11. He also explained that the underlying paper "looks specifically at datasets used by OpenAI" and that he did not know whether those datasets had been used by Microsoft. *Id.* at 83:20–24.<br>Microsoft also responds that the facts set forth in Paragraph 1451 are immaterial and cannot be attributed to Microsoft for the reasons stated in response to Paragraph 1423. Specifically, a deliberately provocative reputational-risk analogy about datasets that Hecht does not know were used by Microsoft has no bearing on any claim or defense.<br><br>OpenAI joins Microsoft's response, except to the extent any portion of it, including any testimony quoted under Fed. R. Evid. 106, could be read to characterize OpenAI, its models, or its conduct. OpenAI disputes any such characterization. Hecht is a Microsoft researcher |

| | |
|---|---|
| | who testified unequivocally: "I don't speak for Microsoft. I definitely don't speak for OpenAI." A. Blanco Opp. Decl. Ex. 212 (B. Hecht 30(b)(1) Tr.) at 100:11–12. His statements are not based on personal knowledge of OpenAI, are not attributable to OpenAI, and are inadmissible hearsay as to OpenAI. *See* Fed. R. Civ. P. 56(c)(2), (c)(4); Fed. R. Evid. 602, 801(d)(2)(D), 802. This paragraph cannot be offered to establish any fact concerning OpenAI. |
| 1452. Microsoft understood that LLMs substitute for the "labor of the people" who produced the original content on which they were trained, including, among other things, newspapers and books. Ex. 671 [Hecht Depo. Tr.] at 109:25-111:16. | 1452. **Disputed in Part – Immaterial.** Microsoft does not dispute that Exhibit 671 contains the quoted deposition testimony. But Microsoft does dispute the implication in Paragraph 1452 that "Microsoft understood" that LLMs substitute for the labor of people who produced newspapers and books. Hecht was describing what his own paper said about "the paradigm of foundation models." A. Blanco Opp. Decl. Ex. 212 (B. Hecht 30(b)(1) Tr.) at 109:17–110:4. Hecht did not adopt counsel's premise that LLM outputs substitute for the original content on which they were trained; he answered that he was "speaking specifically about the labor of the people who produced that content." *Id.* at 110:20–111:2. When counsel asked about reporters and editors, Hecht broadened the point to "the lawyers in this room and the many jobs of the people who work in the buildings around here." *Id.* at 111:4–11. He then described it as applying to everyone who earns a living through their work. *Id.* at 111:19–112:4. Taken together, |

| | |
|---|---|
| | Hecht's testimony is a general observation about AI automation and labor.<br>Microsoft also responds that the facts set forth in Paragraph 1452 are immaterial and cannot be attributed to Microsoft for the reasons stated in response to Paragraph 1423. Specifically, a researcher's general observation that AI may perform work previously done by people has no bearing on whether any use of Plaintiffs' works infringed or harmed the market for those works.<br><br>OpenAI joins Microsoft's response. Hecht testified unequivocally: "I don't speak for Microsoft. I definitely don't speak for OpenAI." A. Blanco Opp. Decl. Ex. 212 (B. Hecht 30(b)(1) Tr.) at 100:11–12. |
| 1453. OpenAI acknowledged: "We don't really have the bandwidth to fact-check everything that's happening in the world; whereas news orgs work on that full-time actively trying not to be biased..." Ex. 1025 [OPCO_MDL_004397741] at -741. | 1453. **Disputed in Part – Not Supported by Cited Evidence.** Undisputed that the quoted language appears in Ex. 1025 (with an additional comma after "full-time"). News Ex. 1025 at OPCO_MDL_004397741. However, disputed that this statement can be imputed to OpenAI because that assertion is not supported by the cited evidence. Specifically, the statement of an individual reflected in a single document does not establish the knowledge, acknowledgment, or position of OpenAI as a corporation.<br><br>Microsoft defers to OpenAI. |

| | |
|---|---|
| 1454. For example, the Pioneer Press directs reporters to cover "local news and information that is distinctly valuable, that [readers] can't get somewhere else" and that "involves interacting with the community," "listening to many, many different people," and "asking questions, digging through documents." Ex. 18 [Burbach Depo. Tr] at 15:1-17. | 1454. **Disputed in Part - Not Supported by Cited Evidence.** Defendants respond as follows: Undisputed that Mr. Burbach's testimony contains the quoted language. A. Blanco Opp. Decl. Ex. 180 (M. Burbach 30(b)(1) Tr.) at 15:1–17. However, disputed to the extent it purports to impute Mr. Burbach's testimony to the Pioneer Press because that assertion is not supported by the cited evidence. Specifically, Mr. Burbach testified to [redacted]. Ex. 18 is not an official Pioneer Press policy or institutional directive. Mr. Burbach [redacted] A. Blanco Opp. Decl. Ex. 180 (M. Burbach 30(b)(1) Tr.) at 21:11–13. He also acknowledged [redacted] *Id.* at 18:25–19:5. [redacted]. A. Blanco Opp. Decl. Ex. 34 (DNP-00120839) at DNP-00120843 [redacted]); *see also* A. Blanco Opp. Decl. Ex. 180 (M. Burbach 30(b)(1) Tr.) at 42:5–43:5; 59:19–60:23. |
| 1455. An example of a Chicago Tribune investigative piece involving a hospital took "more than a year" and "required two reporters speaking to hundreds of people, pouring over thousands of pages of documents" | 1455. **Disputed in Part - Not Supported by Cited Evidence.** Defendants respond as follows: Undisputed that the quoted language appears in Ex. 19 and describes an investigative piece involving a hospital. |

| | |
|---|---|
| and working with the newspaper's attorneys "to pry loose public records." Ex. 19 [Pugh 30(b)(1) Depo. Tr.] at 111:8-14. | A. Blanco Opp. Decl. Ex. 260 (M. Pugh 30(b)(1) Tr.) at 111:8–14. However, disputed as omitting context and to the extent DNPs imply that each and every Asserted Work at issue in this Motion all necessitated the same level of time and effort, because that implication is not supported by the cited evidence. Pursuant to Fed. R. Evid. 106, Mr. Pugh testified [redacted] A. Blanco Opp. Decl. Ex. 260 (M. Pugh 30(b)(1) Tr.) at 109:21–110:14. |
| 1456. As another example, an Orlando Sentinel and Sun-Sentinel investigative piece involved more than fourteen journalists working almost full time for ten months to investigate the Parkland school shooting. Ex. 20 [J. Anderson Depo. Tr.] at 137:1-138:2; 11:24-12:11. | 1456. **Disputed in Part - Not Supported by Cited Evidence.** Defendants respond as follows: Undisputed that Ms. Anderson testified that an investigation into the Parkland school shooting by the Sun-Sentinel involved more than fourteen journalists working almost full time for ten months. However, disputed that the cited evidence establishes that the Orlando Sentinel was involved in that investigation. |
| 1457. Lee Ann Colacioppo, editor of the Denver Post, testified: "We at The Denver Post work very hard to maintain our reputation for originality. We spend a lot of time on it. We spend time thinking about what stories we're going to do, how we're going to approach them, how we're going to write them, how we're going to display them, and when. And this is all part of what being a journalist | 1457. **Disputed in Part - Not Supported by Cited Evidence.** Defendants respond as follows: Undisputed that Ms. Colacioppo offered the quoted testimony. However, disputed as omitting context and to the extent DNPs imply that each and every Asserted Work at issue in this Motion all necessitated the same level of time. |

| | |
|---|---|
| means is all the thought that goes into that." Ex. 16 [Colacioppo Depo. 30(b)(6)] at 84:9-17. | |
| 1458. Lindsey Turrentine, an executive editor for Ziff, testified that advertisers "care a lot about the opinion of journalists and impartial journalists," and that being associated with "independent journalists" and their editorial judgment is valuable to brand partners because ... our authority ultimately benefits their ability to show up. So, for example, if they know that our independent journalists happen to like their product, they care a lot about that content being seen." Ex. 1270 [Turrentine Depo. Tr.] 36:5-36:23. | 1458. **Disputed in Part - Not Supported by Cited Evidence.** OpenAI responds as follows: Undisputed that Turrentine gave the quoted testimony concerning CNET. However, disputed to the extent the paragraph characterizes that testimony as establishing advertiser preferences or the value of editorial judgments across other Ziff Davis brands in other contexts.<br><br>Microsoft responds that these facts do not pertain to claims asserted against Microsoft. |
| 1459. Vivek Shah, Ziff Davis's CEO testified about CNET's editorial "awards" and "editor's choice" designations, explaining that when "CNET awards a product — the top product in its category — an editor's choice," that independent editorial judgment "would lead to a lift in conversion as a third-party review of the product" and also create licensing opportunities. Ex. 677 [Shah Depo. Tr.] 80:22-81:18, 93:13-19. | 1459. **Disputed in Part - Not Supported by Cited Evidence; Not Supported by Admissible Evidence.** OpenAI responds as follows: Undisputed that the quoted language appears in the cited deposition testimony. Disputed that the cited evidence supports that "independent editorial judgment" leads to a lift in conversation or broad licensing opportunities. Specifically, there is no reference to "independent editorial judgment" in the cited testimony and the "licensing opportunity" [redacted]. Further, disputed that the testimony supports that brand partners more generally enjoy a lift in conversation as a result of a third- |

| | |
|---|---|
| | party review of a product. The cited testimony concerns a single brand partner.<br><br>Microsoft responds that these facts do not pertain to claims asserted against Microsoft. |
| 1460. Microsoft acknowledges that its models cannot perform the human involvement in the collection and producing of news content, yet they nevertheless compete for readers and consume readers' limited attention in place of newspapers. Ex. 82 [Tucker Opening Report] ¶ 56 (collecting evidence that generative AI models cannot substitute for human involvement in collection and producing of news content); Ex. 844 [MSFT_AI_MDL_001233825] at 826. | 1460. **Disputed – Not Supported by Cited Evidence; Incomplete; Immaterial.** Microsoft disputes the fact set forth in Paragraph 1460 because the cited evidence does not support the stated fact. Paragraph 56 of Dr. Tucker's report contains no acknowledgment by Microsoft. It collects testimony from *Plaintiffs'* own witnesses, including that generative AI is not "a substitute for human involvement in the collection and producing of news content." News Ex. 82 ¶ 56. Dr. Tucker offers that testimony to support her opinion that Copilot and the Asserted Works "are not substitutes" because they "serve distinct customer needs." *Id.* ¶¶ 47, 51, 56. Microsoft further disputes that its products compete for readers and consume readers' limited attention in place of newspapers. Microsoft's expert Dr. Tucker found no evidence of market impact—that is, no adverse change in the trend of News Plaintiffs' revenue, subscriptions, traffic, search-referred traffic, or conversion rates following the introduction of ChatGPT and Copilot. ECF 1733 (C. Tucker Decl.) ¶¶ 11, 16-104. And Plaintiffs' experts have not conducted any empirical analysis demonstrating such harm has occurred, such as by analyzing Plaintiffs' traffic or revenue; instead, they |

| | |
|---|---|
| | only speculate about future harm that *may* occur. *Id.* ¶ 90.<br>Microsoft further disputes that Ex. 844 supports the proposition stated in paragraph 1460. News Ex. 844 contains general observations about industry dynamics. They are not evidence of the actual effect of any output on Plaintiffs' works.<br>Microsoft also responds that the facts set forth in Paragraph 1460 are immaterial to the extent it relies on Ex. 844 because those facts do not affect the outcome of the suit under the governing law. Ex. 844 is an undated working draft containing inline comments and edits. The portion of Ex. 844 cited in Paragraph 1460 appears to have been written by Brent Hecht. News Ex. 844 at MSFT_AI_MDL_001233826. A Microsoft employee's personal views on any hypothetical effects of LLMs on content creators have no bearing on any element of the claims or defenses in this case. Further, Hecht's statements cannot be attributed to Microsoft. Hecht is a research academic employed at Microsoft to bring "divergent," "asymmetric, futuristic, and academic points of view"; he does not set Microsoft's core priorities or speak for Microsoft as to "his theoretical views on AI's potential effect on content creators"; and Microsoft leadership "does not share all of [his] views"; and he is a "kind of intellectual provocateur." ECF 1707 (J. Usdan Decl.) ¶ 39; A. Blanco Opp. Decl. Ex. 285 (J. Usdan 30(b)(6) Tr.) at 173:22-174:9. Hecht has himself disclaimed any authority to speak for Microsoft, |

| | |
|---|---|
| | testifying that his views on these subjects are "my view, not Microsoft's view," that "[he] has no idea if [they are] shared by the board of Microsoft," and that "[he] can't speak for the company on this stuff." A. Blanco Opp. Decl. Ex. 212 (B. Hecht 30(b)(1) Tr.) at 319:18–20, 320:10–12, 321:4–5. He further described his views as "hypotheses," cautioned that "the jury is still out on a lot of this stuff," and acknowledged that he is "not a lawyer." *Id.* at 59:11–60:8, 165:9–15, 166:10–11. Hecht's personal views therefore are not statements of Microsoft and do not reflect Microsoft's knowledge, policies, or conduct.<br><br>OpenAI joins Microsoft's response. Hecht testified unequivocally: "I don't speak for Microsoft. I definitely don't speak for OpenAI." A. Blanco Opp. Decl. Ex. 212 (B. Hecht 30(b)(1) Tr.) at 100:11–12. |
| 1461. Microsoft understood that "LLMs are a product that destroys its supply chain… LLMs severely threaten the economic model of the content on which they depend. As currently constituted, they are effectively an end product that existentially threatens its own supply chain." Ex. 844 [MSFT_AI_MDL_001233825] at 826. | 1461. **Disputed in Part – Not Supported by Cited Evidence; Immaterial.** Microsoft responds as follows: Microsoft does not dispute that Ex. 844 contains the quoted language. News Ex. 844 at MSFT_AI_MDL_001233826. Microsoft disputes that the document reflects what "Microsoft understood." Ex. 844 is undated and describes itself as the initial goals of an informal, cross-organizational working group. *Id.* at MSFT_AI_MDL_001233825.<br>Microsoft also responds that the facts stated in Paragraph 1461 are immaterial and cannot be attributed to Microsoft for the reasons stated in response to |

| | |
|---|---|
| | Paragraph 1460. Ex. 844 is an undated working draft containing inline comments and edits. The portion of Ex. 844 cited in Paragraph 1460 appears to have been written by Brent Hecht. *Id.* at MSFT_AI_MDL_001233826. A Microsoft employee's personal views on any hypothetical effects of LLMs on content creators have no bearing on any element of the claims or defenses in this case.<br>Microsoft further disputes that "LLMs severely threaten the economic model of the content on which they depend." Microsoft's expert Dr. Tucker found no evidence that News Plaintiffs had suffered any adverse market impact following the introduction of ChatGPT and Copilot. In other words, News Plaintiffs did not experience an adverse change in the trend of their revenue, subscriptions, traffic, search-referred traffic, or conversion rates following the introduction of ChatGPT and Copilot. ECF 1733 (C. Tucker Decl.) ¶¶ 11, 16-104. And Plaintiffs' experts have not conducted any empirical analysis demonstrating that such harm has occurred, such as by analyzing Plaintiffs' traffic or revenue; instead, they only speculate about future harm that *may* occur. *Id.* ¶ 90.<br><br>OpenAI joins Microsoft's response. Hecht testified unequivocally: "I don't speak for Microsoft. I definitely don't speak for OpenAI." A. Blanco Opp. Decl. Ex. 212 (B. Hecht 30(b)(1) Tr.) at 100:11–12. |

| | |
|---|---|
| 1462. Microsoft understood that "[t]he primary value add of the new Bing, ChatGPT, Bard, etc. is that they reduce the need to visit websites beyond the SERP [search engine results page], but they also existentially depend on those websites to work. Without traffic, websites lose their revenue source (or their user-generated content as in Stack Overflow and Wikipedia). Unroll this process a bit into the future, and we can easily [see] these systems harming the web…" Ex. 845 [MSFT_AI_MDL_000948603] at 603. | 1462. **Disputed in Part – Not Supported by Cited Evidence; Immaterial.** Microsoft responds as follows: Microsoft does not dispute that Ex. 845 contains the quoted language. News Ex. 845 at MSFT_AI_MDL_000948603. Microsoft disputes that the passage reflects what "Microsoft understood." The passage is a "very quick summary" of what was "beginning to be called 'the content ecosystems problem,'" in a memo discussing press coverage of the new Bing's launch. *Id.* By its terms, it is a forward-looking prediction ("[u]nroll this process a bit into the future"), not a finding. *Id.* The memo then recommends steps, including a "listening tour" of content providers, among them "news publishers and journalists." *Id.* at MSFT_AI_MDL_000948604.<br>Microsoft also responds that the facts stated in Paragraph 1462 are immaterial and cannot be attributed to Microsoft for the reasons stated in response to Paragraph 1460. Specifically, the passage predicts generalized effects on websites such as Stack Overflow and Wikipedia. Ex. 845 is a memo written by Brent Hecht. A. Blanco Opp. Decl. Ex. 212 (B. Hecht 30(b)(1) Tr.) at 305:10-20. A Microsoft employee's personal views on any hypothetical effects of LLMs on content creators have no bearing on any element of the claims or defenses in this case.<br>Microsoft further disputes that News Plaintiffs lost any traffic or revenue as a result of the introduction of Copilot or ChatGPT. Microsoft's expert Dr. Tucker |

| | |
|---|---|
| | found no evidence that News Plaintiffs had suffered any adverse market impact following the introduction of ChatGPT and Copilot. In other words, News Plaintiffs did not experience an adverse change in the trend of their revenue, subscriptions, traffic, search-referred traffic, or conversion rates following the introduction of ChatGPT and Copilot. ECF 1733 (C. Tucker Decl.) ¶¶ 11, 16-104. And Plaintiffs' experts have not conducted any empirical analysis demonstrating that such harm has occurred, such as by analyzing Plaintiffs' traffic or revenue; instead, they only speculate about future harm that *may* occur. *Id.* ¶ 90.<br><br>OpenAI joins Microsoft's response. Hecht is a Microsoft researcher who testified unequivocally: "I don't speak for Microsoft. I definitely don't speak for OpenAI." A. Blanco Opp. Decl. Ex. 212 (B. Hecht 30(b)(1) Tr.) at 100:11–12. His statements are not based on personal knowledge of OpenAI, are not attributable to OpenAI, and are inadmissible hearsay as to OpenAI. *See* Fed. R. Civ. P. 56(c)(2), (c)(4); Fed. R. Evid. 602, 801(d)(2)(D), 802. This paragraph cannot be offered to establish any fact concerning OpenAI. |
| 1463. Microsoft understood that by training on content without compensating its human creators: "Content creators can no longer produce the content that models need ('Paradox of Reuse'): As LLMs and the applications built on them grow, the business models of the | 1463. **Disputed in Part – Not Supported by Cited Evidence; Immaterial.** Microsoft responds as follows: Microsoft does not dispute that Ex. 854 contains the quoted passage. News Ex. 854 at MSFT_AI_MDL_000944197. But Microsoft disputes |

| | |
|---|---|
| content creators could be threatened. This could thus in-turn threaten the viability of LLMs in the medium-term. For example, if ChatGPT can answer my questions, I wouldn't visit Reddit, StackOverflow or Wikipedia to answer those questions, threatening the viability of those essential LLM datasets. A similar argument can be made for news producers and their business models. The evidence suggests that even a small reduction in the visibility of outgoing links could cause this effect, e.g. as in the approach taken in WebGPT and perplexity.ai. If outgoing links are clicked on 30% less, for instance, that would likely be sufficient to get this negative flywheel going." Ex. 854 [MSFT_AI_MDL_000944196] at 197. | the remainder of Paragraph 1463 because it is not supported by the cited evidence. First, the cited evidence does not support the statement that "Microsoft understood" the quoted proposition. Second, the cited evidence does not support Plaintiffs' framing that the described effect results "by training on content without compensating its human creators." The passage appears under "[s]cenarios that could pose a risk." *Id.* at MSFT_AI_MDL_000944196. It describes users no longer visiting Reddit, Stack Overflow, or Wikipedia, and it mentions news producers only to say that "[a] similar argument can be made." *Id.* at MSFT_AI_MDL_000944197. The 30 percent figure is an illustration ("for instance"), not a measurement. *Id.*<br><br>Microsoft further disputes that News Plaintiffs have been "threaten[ed]" as a result of the introduction of Copilot or ChatGPT. Microsoft's expert Dr. Tucker found no evidence that News Plaintiffs had suffered any adverse market impact following the introduction of ChatGPT and Copilot. In other words, News Plaintiffs did not experience an adverse change in the trend of their revenue, subscriptions, traffic, search-referred traffic, or conversion rates following the introduction of ChatGPT and Copilot. ECF 1733 (C. Tucker Decl.) ¶¶ 11, 16-104. And Plaintiffs' experts have not conducted any empirical analysis demonstrating that such harm has occurred, such as by analyzing Plaintiffs' traffic or revenue; instead, they only speculate about future harm that *may* occur. *Id.* ¶ 90. |

| | |
|---|---|
| | Microsoft also responds that the facts stated in Paragraph 1463 are immaterial and cannot be attributed to Microsoft for the reasons stated in response to Paragraph 1460. Ex. 854 is a document written by Brent Hecht. A. Blanco Opp. Decl. Ex. 212 (B. Hecht 30(b)(1) Tr.) at 162:11-163:25. A Microsoft employee's personal views on any hypothetical effects of LLMs on content creators have no bearing on any element of the claims or defenses in this case.<br><br>OpenAI joins Microsoft's response. OpenAI further disputes that LLMs harm content creators because that assertion is not supported by the cited evidence. OpenAI's expert Dr. Goldfarb has "found no empirical evidence that OpenAI's alleged use served as an economic substitute for the Asserted Works or News Plaintiffs' journalism, or caused a measurable market harm across traffic, revenue, subscriptions, or user behavior." ECF 1763 (A. Goldfarb Decl.) ¶ 9. And Plaintiffs' experts have not performed any quantitative analysis demonstrating such harm. *Id.* ¶ 14 ("Based on my review of News Plaintiffs' experts' reports, I did not identify any analysis showing that real users used such outputs instead of News Plaintiffs' works, that any identified output displaced a visit to a particular News Plaintiff's website, or that such outputs caused a quantifiable loss of traffic, subscribers, revenue, or other business metrics."). |

| | |
|---|---|
| | Further, Hecht testified unequivocally: "I don't speak for Microsoft. I definitely don't speak for OpenAI." A. Blanco Opp. Decl. Ex. 212 (B. Hecht 30(b)(1) Tr.) at 100:11–12. His statements are not based on personal knowledge of OpenAI, are not attributable to OpenAI, and are inadmissible hearsay as to OpenAI. *See* Fed. R. Civ. P. 56(c)(2), (c)(4); Fed. R. Evid. 602, 801(d)(2)(D), 802. This paragraph cannot be offered to establish any fact concerning OpenAI. |
| 1464. As of February 2023, OpenAI understood that OpenAI's browsing and assistant functionality would "piss of [sic] webmasters" because OpenAI's functionality would not drive traffic to third party websites. Ex. 1027 [OPCO_MDL_001699819] at 819 (message from Turley to others at OpenAI). | 1464. **Disputed - Not Supported by Cited Evidence; Improper Legal Argument.** OpenAI responds as follows: Paragraph 1464 is disputed, and the Court should disregard this Paragraph because the assertion constitutes improper attorney argument and/or is conclusory. It thus requires no response. Further disputed because the cited exhibit does not support the assertion. Nothing in Exhibit 1027 references any functionality from OpenAI that would not drive traffic to third-party websites. Further disputed because News Plaintiffs seek to impute one statement from an employee to OpenAI and argue that it reflects OpenAI's understanding or knowledge.<br><br>Microsoft defers to OpenAI. |
| 1465. As of February 9, 2023, OpenAI understood that its citation systems were provided only to provide credence to the response, and that they did not prompt users to click through to the source. Ex. 1027 | 1465. **Disputed - Not Supported by Cited Evidence; Improper Legal Argument.** OpenAI responds as follows: Paragraph 1465 is disputed, and the Court should disregard this Paragraph because the |

| | |
|---|---|
| [OPCO_MDL_001699819] at 821; Ex. 528 [Turley 30(b)(1) Depo. Tr.] at 33:2-19. | assertion constitutes improper attorney argument and/or is conclusory. It thus requires no response. The facts set forth in Paragraph 1465 are disputed because the cited evidence is incorrect. It is not clear what particular "citation system," if any, is being referenced here. The cited exhibit also appears to reference citations more broadly (e.g. academic citations) as opposed to OpenAI's specific "citation systems," which appear to be referenced earlier as the "citation UX." Further disputed that the statement can be imputed to OpenAI or establish its understanding.<br><br>Microsoft defers to OpenAI. |
| 1466. As of at least June 2023, OpenAI understood that its technology poses an "existential threat" to "[p]ublishers." Ex. 1029 [OPCO_MDL_001710421] at 433. | 1466. **Disputed in part - Improper Legal Argument; Not Supported by Cited Evidence.** OpenAI responds as follows: Paragraph 1466 is disputed, and the Court should disregard this Paragraph because the assertion constitutes improper attorney argument and/or is conclusory. It thus requires no response. Undisputed that the quoted language appears in Ex. 1029.<br>To the extent a response is required, OpenAI responds as follows: Disputed that the statement can be imputed to OpenAI or establishes OpenAI's understanding. Further disputed that the cited evidence supports the implicit proposition that OpenAI's technology poses an existential threat to publishers. There is no explanation, much less evidence, |

| | |
|---|---|
| | supporting that assertion. The facts set forth in Paragraph 1466 are therefore disputed because the cited evidence is incorrect.<br>Pursuant to Fed. R. Evid. 106, OpenAI further responds that its expert, Dr. Goldfarb, "found no empirical evidence that OpenAI's alleged use served as an economic substitute for the Asserted Works or News Plaintiffs' journalism, or caused a measurable market harm across traffic, revenue, subscriptions, or user behavior." ECF 1763 (A. Goldfarb Decl.) ¶ 9. Plaintiffs' experts also have not performed any quantitative analysis demonstrating such harm. *Id.* ¶ 14 ("Based on my review of News Plaintiffs' experts' reports, I did not identify any analysis showing that real users used such outputs instead of News Plaintiffs' works, that any identified output displaced a visit to a particular News Plaintiff's website, or that such outputs caused a quantifiable loss of traffic, subscribers, revenue, or other business metrics.").<br><br>Microsoft defers to OpenAI. |
| 1467. Microsoft recognized a "real risk" of GenAI was that it could "significantly disrupt[] the employment of the very people who generated the data on which the foundation model was trained." Ex. 847 [Hecht Depo. Ex. 3] at 438-439. | 1467. **Disputed – Not Supported by Cited Evidence; Immaterial.** Microsoft responds as follows: Microsoft does not dispute that Exhibit 847 contains the quoted language. But Microsoft disputes that it shows what "Microsoft recognized," and disputes Plaintiffs' characterization of the passage. Exhibit 847 is a memo that Hecht authored "with others." A. Blanco |

| | |
|---|---|
| | Opp. Decl. Ex. 212 (B. Hecht 30(b)(1) Tr.) at 102:21–103:4. The memo does not state that generative AI, or any Microsoft product, "significantly disrupt[s]" anyone's employment. It predicts public demand that would arise "if a foundation model significantly disrupts the employment of the very people who generated the data." News Ex. 847 at 438–39. The language appears in a section proposing that Microsoft "[s]upport a redistribution of the benefits." It is framed as a conditional prediction about public pressure, and does not mention news publishers or journalists. *Id.*<br>Microsoft further disputes that GenAI presents a "risk" to News Plaintiffs. Microsoft's expert Dr. Tucker found no evidence of market impact—that is, no adverse change in the trend of News Plaintiffs' revenue, subscriptions, traffic, search-referred traffic, or conversion rates following the introduction of ChatGPT and Copilot. ECF 1733 (C. Tucker Decl.) ¶¶ 11, 16-104. And Plaintiffs' experts have not conducted any empirical analysis demonstrating such harm, such as by analyzing Plaintiffs' traffic or revenue; instead, they only speculate about future harm that may occur. *Id.* ¶ 90.<br>Microsoft further responds that the fact set forth in Paragraph 1467 is immaterial and cannot be attributed to Microsoft for the reasons stated in response to Paragraph 1460. A Microsoft employee's personal views on any hypothetical effects of LLMs on content creators have no bearing on any element of the claims or defenses in this case. |

| | |
|---|---|
| | OpenAI joins Microsoft's response. Hecht testified unequivocally: "I don't speak for Microsoft. I definitely don't speak for OpenAI." A. Blanco Opp. Decl. Ex. 212 (B. Hecht 30(b)(1) Tr.) at 100:11–12. Additionally, Plaintiffs' experts have not performed any quantitative analysis demonstrating such harm; based on his review of News Plaintiffs' experts' reports, Dr. Goldfarb did not identify any analysis showing that real users used such outputs instead of News Plaintiffs' works, that any identified output displaced a visit to a particular News Plaintiff's website, or that such outputs caused a quantifiable loss of traffic, subscribers, revenue, or other business metrics. ECF 1763 (A. Goldfarb Decl.) ¶ 14. |
| 1468. Microsoft and OpenAI understood that CustomGPTs were available that evade paywalls and provide copyrighted content to users in violation of publishers' intellectual property rights. Ex. 1031 [OPCO_MDL_004796351] at 351; Ex. 1033 [OPCO_MDL_004734998]. | 1468. **Disputed in Part – Not Supported by Cited Evidence.** Defendants respond as follows: Undisputed that OpenAI has removed several GPTs for violating its usage policy against using content from third parties without the necessary permissions. News Ex. 1031 at OPCO_MDL_004796351; News Ex. 1033. Disputed to the extent it is implied that OpenAI makes such CustomGPTs available or otherwise permitted their availability.<br>Microsoft further responds that the facts set forth in Paragraph 1468 are disputed because the cited evidence does not support the statement as it relates to Microsoft. Specifically, Paragraph 1468 cites only to |

| | |
|---|---|
| | internal OpenAI documents that do not mention Microsoft or suggest Microsoft involvement. |
| 1469. OpenAI referred to an entire category of CustomGPTs as "the paywall bypassing GPT builders." Ex. 1033 [OPCO_MDL_004734998]. | 1469. **Disputed - Not Supported by Cited Evidence.** OpenAI responds as follows: Disputed that Ex. 1033 at OPCO_MDL_004734998 establishes that there was an "entire category of CustomGPTs" known as paywall-bypassing GPTs. The quoted statement refers to "GPT builders," not to GPTs themselves. Plaintiffs' description of the quoted language as identifying a "category of CustomGPTs" therefore mischaracterizes the cited evidence. Further disputed that the statement can be imputed to OpenAI. The facts set forth in this Paragraph are not supported by the cited material, and the Court should disregard them.<br><br>Microsoft defers to OpenAI. |
| 1470. CustomGPTs on Defendants' platforms that bypass paywalls and provide copyrighted content to users without authorization from publishers include but are not limited to News Summarizer Ace, WebPilot, Browser, WebGPT, Paywall Remover, NYTimesGPT. and "FREE NEWS." Ex. 679 [Rynerson Depo. Ex. 17] at 6, 8 (OpenAI stating in response to Interrogatory No. 9 asking OpenAI to identify "Customized Products and Services that can be used to access, store, provide, or view Publishers' Content behind paywalls or other access control measures," that: "OpenAI identifies the following GPTs...: News Summarizer; Remove Paywall; WebGPT; Browser Pro; | 1470. **Disputed - Not Supported by Cited Evidence.** Defendants respond as follows: Plaintiffs' characterization that these custom GPTs "bypass paywalls and provide copyrighted content to users without authorization from publishers" is disputed because it is not supported by the cited evidence. Further disputed to the extent Plaintiffs' assertion that these custom GPTs are "on Defendants' platforms" implies that the GPTs are Defendants' products or were created or operated by Defendants. The interrogatory response makes clear that these are third-party custom GPTs created by users, not products developed by OpenAI. |

| | |
|---|---|
| WebPilot; News Summarizer Ace... NYTimesGPT... FREE NEWS"); Ex. 1031 [OPCO_MDL_004796351]; Ex. 508 [Ramchandani 30(b)(6) Depo. Tr.] at 51:9-53:10; Goldstein Opening Rep. ¶ 104 (discussing description for "Article Reader": "Use this GPT to summarize and extract key points from paid (paywalled items). Just submit the URL", and "Article and News Analizer GPTlee 1.0": "A Tool for Extracting stories and data from your daily news articles and getting no ads—just add the hyperlink or article title"). | News Ex. 679 (E. Rynerson Depo. Ex. 17) at 6. OpenAI's 30(b)(6) witness Rohit Ramchandani testified that "if a GPT builder wants to use copyrighted content, they must have permission to do so." A. Blanco Opp. Decl. Ex. 262 (R. Ramchandani 30(b)(6) Tr.) at 26:2–3. Further, Exhibit 1031 reflects that on May 10, 2024, OpenAI employees removed several of these GPTs for violating OpenAI's usage policy against "using content from third parties without the necessary permissions." News Ex. 1031 at OPCO_MDL_004796351.<br><br>Microsoft further responds that the facts stated in Paragraph 1470 are disputed to the extent "Defendants" purports to encompass Microsoft because the cited evidence does not support the statement as it relates to Microsoft. Specifically, Paragraph 1470 cites only to evidence pertaining to OpenAI products, none of which mention Microsoft in connection with the products enumerated in Paragraph 1470. |
| 1471. Kevin Scott, Microsoft's CTO, was [redacted] in August 2022 that [redacted] | 1471. **Undisputed - Incomplete; Immaterial.** Microsoft does not dispute that Exhibit 855 contains the quoted language. But pursuant to Fed. R. Evid. 106, Kevin Scott's immediately following statement was: [redacted] |

| | |
|---|---|
| [redacted]" Ex. 855 [MSFT_AI_MDL_000047584] at 588. | [redacted] News Ex. 855 at MSFT_AI_MDL_000047588.<br>Microsoft further responds that the facts set forth in Paragraph 1471 are immaterial because these facts do not affect the outcome of the suit under the governing law. Specifically, statements concerning the potential capabilities of AI are not facts and are immaterial to the issues before the Court.<br><br>OpenAI defers to Microsoft's response. |
| 1472. The basic functionalities of ChatGPT and Copilot are offered to the market for free and the vast majority of users are non-paying, making information-seeking on ChatGPT extraordinarily "cheap." Ex. 503 ["Scaling AI for everyone," *OpenAI* (Feb. 27, 2026), https://openai.com/index/scaling-ai-for-everyone/]; Ex. 1221 ["ChatGPT reaches 900M weekly active users," *Techcrunch*, https://techcrunch.com/2026/02/27/chatgpt-reaches-900m-weekly-active-users/]; Ex. 1222 [Microsoft's 2025 Schedule 14A, https://www.sec.gov/Archives/edgar/data/789019/000119312525245150/d908201ddef14a.htm#:~:text=%20Proxy%20Statement%20] at 42 (reporting that Copilot apps surpassed 100 million monthly active users as of Microsoft's Dec. 5, 2025 proxy statement); Ex. 1223 [Microsoft's Exhibit 99.1 (July 29, 2026), | 1472. **Disputed in Part – Not Supported by Cited Evidence.** Defendants respond as follows: Undisputed that the basic functionalities of ChatGPT are offered for free and the vast majority of ChatGPT users are non-paying. However, disputed that information-seeking on ChatGPT is extraordinarily cheap because the cited evidence does not support that proposition and it is unclear what it is referring to. For example, it is unclear whether the statement is referring to information seeking being "cheap" from the perspective of the user or OpenAI. It is also unclear what the referenced information seeking is cheap relative to (*e.g.*, search engines and libraries are free, and thus "cheap," as is the content on all of Ziff Davis's websites).<br><br>Microsoft additionally responds that the facts stated in Paragraph 1472 are disputed because the cited evidence |

| | |
|---|---|
| https://www.sec.gov/Archives/edgar/data/789019/000119312526323632/msft-ex99_1.htm] (stating in Microsoft's FY2026 Q4 earnings release stating that Microsoft Copilot reached over 30 million paid seats). | does not support that "[t]he basic functionalities of … Copilot are offered to the market for free and the vast majority of users are not paying." News Exs. 1222 and 1223. Microsoft also disputes the claim that the purported "functionalities" of Copilot "mak[e] information-seeking on ChatGPT extraordinarily cheap" because the cited evidence does not support that any "functionalities" of Copilot are integrated into ChatGPT. Thus, it is unclear as to whether Paragraph 1472 is even directed toward Microsoft. |
| 1473. Nick Turley, OpenAI's Head of ChatGPT, admitted in February 2024 that "[o]ur products are largely substitutive, period." Ex. 131 [OPCO_MDL_004776577] at 578. | 1473. **Disputed - Improper Legal Argument.** OpenAI responds as follows: Paragraph 1473 is disputed, and the Court should disregard this Paragraph because the assertion constitutes improper attorney argument and/or is conclusory. It thus requires no response. Undisputed that the quoted language appears in Ex. 131 and was written by Nick Turley. Disputed that OpenAI's products substitute for Plaintiffs' products because the cited evidence does not support that conclusion. Pursuant to Fed. R. Evid. 106, OpenAI's expert Dr. Goldfarb has "found no empirical evidence that OpenAI's alleged use served as an economic substitute for the Asserted Works or News Plaintiffs' journalism, or caused a measurable market harm across traffic, revenue, subscriptions, or user behavior." ECF 1763 (A. Goldfarb Decl.) ¶ 9. And Plaintiffs' experts have not performed any quantitative analysis demonstrating such harm. *Id.* ¶ 14 ("Based on |

| | |
|---|---|
| | my review of News Plaintiffs' experts' reports, I did not identify any analysis showing that real users used such outputs instead of News Plaintiffs' works, that any identified output displaced a visit to a particular News Plaintiff's website, or that such outputs caused a quantifiable loss of traffic, subscribers, revenue, or other business metrics."). <br><br> Microsoft defers to OpenAI. |
| 1474. Nick Turley also admitted in February 2024 regarding OpenAI's generative AI products: "[O]ur products – even a search product – will get more and more substitutive as they get better." Ex. 131 [OPCO_MDL_004776577] at 80. | 1474. **Disputed - Improper Legal Argument.** OpenAI responds as follows: Paragraph 1474 is disputed, and the Court should disregard this Paragraph because the assertion constitutes improper attorney argument and/or is conclusory. It thus requires no response. Undisputed that the quoted language appears in Ex. 131 and was written by Nick Turley in February 2024. Disputed to the extent News Plaintiffs suggest that the in-scope LLMs are substitutes for the Asserted Works because it is not supported by the cited evidence. Pursuant to Fed. R. Evid. 106, OpenAI's expert Dr. Goldfarb has "found no empirical evidence that OpenAI's alleged use served as an economic substitute for the Asserted Works or News Plaintiffs' journalism, or caused a measurable market harm across traffic, revenue, subscriptions, or user behavior." ECF 1763 (A. Goldfarb Decl.) ¶ 9. And Plaintiffs' experts have not performed any quantitative analysis demonstrating such harm. *Id.* ¶ 14 ("Based on my review of News Plaintiffs' |

| | |
|---|---|
| | experts' reports, I did not identify any analysis showing that real users used such outputs instead of News Plaintiffs' works, that any identified output displaced a visit to a particular News Plaintiff's website, or that such outputs caused a quantifiable loss of traffic, subscribers, revenue, or other business metrics.").<br><br>Microsoft defers to OpenAI. |
| 1475. An OpenAI software engineer Maddie Simens admitted to her OpenAI colleagues on February 9, 2023: "no matter how prominently we show the links, users won't click." Ex. 1027 [OPCO_MDL_001699819] at 823. | 1475. **Disputed - Improper Legal Argument.** OpenAI responds as follows: Paragraph 1475 is disputed, and the Court should disregard this Paragraph because the assertion constitutes improper attorney argument and/or is conclusory. It thus requires no response. Further disputed because News Plaintiffs omitted an entire portion of the quote to suggest that users will not click links in OpenAI products regardless of how prominently they are displayed. *See* Fed. R. Evid. 106. The quote provides: "The reality is also that no matter how prominently we show links, users won't click on them if they aren't delivering value." News Ex. 1027 at OPCO_MDL_001699823. Thus, the document states that links that do not deliver value will not be clicked, even if they are prominently displayed.<br><br>Microsoft defers to OpenAI. |
| 1476. Matt Dahlin of Microsoft agreed that [redacted] | 1476. **Disputed – Not Supported by Admissible Evidence; Incomplete; Immaterial.** Microsoft responds that the fact stated in Paragraph |

| | |
|---|---|
| [redacted]" Ex. 856 [MSFT_AI_MDL_000450551] at 554; Ex. 681 [Dahlin Depo Tr.] at 17:24-23:21. | 1476 is not supported by admissible evidence, as required by Local Rule 56.1, and therefore is not properly before the Court. Specifically, the statement quoted in Paragraph 1476 lacks foundation because the witness was being asked to simply confirm that a statement written by someone else in a document was read correctly by the questioner. Pursuant to Fed. R. Evid. 106, Mr. Dahlin further testified, "I would just say I feel you'd have to ask Gilles what - what exactly he meant because I -- I can't speculate." News Ex. 681 (M. Dahlin Tr.) at 25:14-16.<br>Microsoft further responds that the fact set forth in Paragraph 1476 is immaterial because this fact does not affect the outcome of the suit under the governing law." Specifically, individuals' opinions concerning future AI-user behaviors are not facts and are immaterial to the issues before the Court. Additionally, [redacted] has no bearing on the alleged harm to News Plaintiffs' market in this action.<br><br>OpenAI defers to Microsoft's response. |
| 1477. Suchir Balaji, a former OpenAI engineer turned "whistleblower," raised concerns about OpenAI's copyright violations, and stated "[i]t doesn't feel right to be training on people's data and then competing with them in the marketplace." Ex. 1224 ["Ex-OpenAI engineer who raised legal concerns about the technology he helped build has died," AP News (Dec. 21, 2024), | 1477. **Disputed - Not Supported by Admissible Evidence; Immaterial.** OpenAI responds as follows: The facts set forth in Paragraph 1477 are disputed because they are not supported by admissible evidence, as required by Local Rule 56.1, and therefore are not properly before the Court. Specifically, this assertion rests entirely on hearsay. News Exs. 1224 |

| | |
|---|---|
| https://apnews.com/article/openai-whistleblower-suchir-balaji-death-283e70b31d34ebb71b62e73aafb56a7d]; Ex. 1225 [ "When does generative AI qualify for fair use?", Suchir Balaji (Oct. 23, 2024), https://suchir.net/fair_use.html]; Ex. 1226 [Cade Metz, "Former OpenAI Researcher Says the Company Broke Copyright Law," The New York Times (Oct. 23, 2024), https://www.nytimes.com/2024/10/23/technology/openai-copyright-law.html]. | (AP News article (Dec. 21, 2024)), 1225 (S. Balaji website post (Oct. 23, 2024)), and 1226 (N.Y. Times article (Oct. 23, 2024)) are inadmissible hearsay because they are out-of-court statements offered for the truth of their contents, unaccompanied by any authenticating testimony or sponsoring expert to establish their reliability under Fed. R. Evid. 803(18). These exhibits are newspaper articles and a website that purport to quote what Mr. Balaji stated or did. They therefore may not be considered in support of summary judgment. Fed. R. Evid. 801, 802, 803.<br>Further, the facts stated in Paragraph 1477 are immaterial and therefore disputed because these facts do not affect the outcome of the suit under the governing law.<br><br>Microsoft defers to OpenAI. |
| 1478. Dr. Aram Sinnreich, OpenAI's retained media expert, admitted that AI can substitute for at least some journalism. Ex. 1217 [Sinnreich NYT Opening Rep.] ¶ 30 (admitting that AI can substitute for "rote, formulaic, and undifferentiated" journalism); Sinnreich ZD Opening Rep. ¶ 30 (same). | 1478. **Disputed in Part.** OpenAI responds as follows: Undisputed that Dr. Sinnreich's report notes narrow circumstances in which generative AI may perform or assist with "rote, formulaic, and undifferentiated" journalistic tasks. Disputed that Dr. Sinnreich agreed that AI can substitute for Asserted Works specifically or Plaintiffs' works generally because the cited evidence does not support that conclusion. Further disputed that OpenAI's products substitute for the Asserted Works or Plaintiffs' works generally. To the contrary, OpenAI's expert Dr. Goldfarb |

| | |
|---|---|
| | has "found no empirical evidence that OpenAI's alleged use served as an economic substitute for the Asserted Works or News Plaintiffs' journalism, or caused a measurable market harm across traffic, revenue, subscriptions, or user behavior." ECF 1763 (A. Goldfarb Decl.) ¶ 9. And Plaintiffs' experts have not performed any quantitative analysis demonstrating such harm. *Id.* ¶ 14 ("Based on my review of News Plaintiffs' experts' reports, I did not identify any analysis showing that real users used such outputs instead of News Plaintiffs' works, that any identified output displaced a visit to a particular News Plaintiff's website, or that such outputs caused a quantifiable loss of traffic, subscribers, revenue, or other business metrics.").<br><br>Microsoft defers to OpenAI. |
| 1479. Dr. Goldfarb, one of OpenAI's economic experts, claims that [redacted] ChatGPT prompts are related to news. Ex. 467 [Goldfarb DNP Opening Rep.] ¶ 123; Ex. 467 [Goldfarb NYT Opening Rep.] ¶ 115. | 1479. **Disputed in Part.** OpenAI responds as follows: Undisputed that Exhibit 467 contains the following statement: "A study of -1 million user interactions between GPT models and users found that only 1.88% of all messages could be classified as news-related and even within those there was a variety of intentions such as enquiring about journalistic process, generating news output, and asking for article analysis." However, disputed as to the suggestion that Dr. Goldfarb made a representation about the 1.88% figure outside the context of the referenced study. |

| | |
|---|---|
| | Microsoft defers to OpenAI. |
| 1480. Dr. Goldfarb admitted that a study of July 2025 ChatGPT conversations indicates [redacted] of all messages could be classified as news-related," which when applied to ChatGPT's 2.5 billion prompts a day, is approximately [redacted] prompts a day seeking news. Ex. 377 [Goldfarb Depo Tr.] at 49:1-51:8. | 1480. **Disputed in Part.** OpenAI responds as follows: Undisputed that the quoted language appears in a question posed by the questioner to Dr. Goldfarb during his deposition. However, disputed that the cited evidence supports that "Dr. Goldfarb admitted that a study of July 2025 ChatGPT conversations indicates '1.88% of all messages could be classified as news-related,' which when applied to ChatGPT's 2.5 billion prompts a day, is approximately 47 million prompts a day seeking news." At most, the cited testimony establishes Dr. Goldfarb's agreement that 1.88% of 2.5 billion is "a number slightly south of 50 million." News Ex. 377 (A. Goldfarb Tr.) at 51:2-8.<br><br>Microsoft defers to OpenAI. |
| 1481. OpenAI's technical expert, Dr. Berg-Kirkpatrick, determined that at least [redacted] roughly 5,000 user requests to ChatGPT ask for "information about current news events, recipes, and product information or recommendations." Ex. 461 [Berg-Kirkpatrick Opening Rep.] ¶ 147. | 1481. **Disputed in Part.** OpenAI responds as follows: Undisputed that Dr. Berg-Kirkpatrick determined that less than 1.6% of user requests to ChatGPT in a random sample of 5,000 such requests asked for "information about current news events, recipes, and product information or recommendations." However, disputed as to Plaintiffs' characterization of the figure as "at least" 1.6% because the cited evidence does not support that assertion.<br><br>Microsoft defers to OpenAI. |

| | |
|---|---|
| 1482. Current events is a subset of news. Cross Rebuttal Rep. at 48. | 1482. **Disputed in Part.** Defendants respond as follows: Disputed because an event is distinct from reporting about the event. Thus "current events" (as opposed to reporting on current events) are not necessarily a subset of news. |
| 1483. Even if news queries were restricted to current events, based on OpenAI's disclosed metrics, ChatGPT would emit approximately 42,500,000 news-related outputs per day and 15,512,500,000 news-related outputs per year. [Wenger Rebuttal Report] at 20-21. | 1483. **Disputed.** OpenAI responds as follows: Disputed that the substance of Dr. Wenger's opinion is supported by record evidence. The figures Dr. Wenger includes in her Rebuttal Report are not measurements supported by underlying data, as she erroneously attempts to extrapolate rates from a study of a limited sample to everyday usage. Undisputed that Dr. Wenger offered the stated opinion.<br><br>Microsoft defers to OpenAI. |
| 1484. Laura Stamm, OpenAI's damages expert, testified that Ziff Davis content includes news and information. Ex. 683 [Stamm Depo. Tr.] 201:15-23 ("Q Have you -- did you compare the content that was licensed to OpenAI by the Associated Press to the Ziff Davis asserted works in this matter? A Yes. I did consider the similarities. Q What similarities did you find? A So broadly speaking, AP's content is news. Broadly speaking, Ziff Davis content is information including news. So broadly speaking, this is similar content."). | 1484. **Disputed in Part.** OpenAI responds as follows: Undisputed that Ms. Stamm testified: "Broadly speaking, Ziff Davis content is information including news." However, disputed to the extent Plaintiffs attempt to characterize the meaning of Ms. Stamm's statement to be something other than what she explicitly testified.<br><br>Microsoft defers to OpenAI. |
| 1485. Even Dr. Goldfarb's quantification of news-related usage – [redacted] – when applied to ChatGPT's 2.5 | 1485. **Disputed - Not Supported by Cited Evidence.** OpenAI responds as follows: Disputed that |

| | |
|---|---|
| billion queries per day means that OpenAI is outperforming both The Times and Daily News Plaintiffs in terms of news-related traffic. Malackowski NYT-DNP Rebuttal Rep. at 57-58 & Figure 6; Ex. 467 [Goldfarb NYT Opening Rep.] ¶ 115; Malackowski ZD Rebuttal Rep. at 44-45. | OpenAI is outperforming both The Times and Daily News Plaintiffs in news-related traffic. This statement does not identify how to determine performance nor what constitutes "news-related traffic." It appears to be comparing queries in ChatGPT to pageviews on Plaintiffs' websites, but never establishes those metrics are comparable. Nor does the cited evidence establish that the information being queried in ChatGPT is the same information provided in Plaintiffs' content (or would qualify as journalism). Further disputed that the calculations underlying this assertion in the cited evidence are reliable.<br><br>Microsoft defers to OpenAI. |
| 1486. Using Dr. Goldfarb's quantification of ChatGPT query volume applied to the categories of news and information offered by Ziff Davis yields a substantial number of ChatGPT user queries. Malackowski ZD Rebuttal Rep. at 44-45; Ex. 683 [Stamm Depo. Tr.] at 201:15-23 (Ziff content includes news and information). | 1486. **Disputed - Not Supported by Cited Evidence.** OpenAI responds as follows: The facts set forth in Paragraph 1486 are disputed because the cited evidence is incorrect. The number of queries identified "[u]sing Dr. Goldfarb's quantification of ChatGPT query volume applied to the categories of news and information offered by Ziff Davis" is minuscule in relation to the total number of ChatGPT queries over the same time period. Further disputed that the categories identified by Dr. Goldfarb equate to the categories of news and information offered by Ziff Davis, because the cited evidence does not support that conclusion. Also disputed as stated to the extent Plaintiffs' characterization implies that any such query volume is |

| | |
|---|---|
| | "substantial," which mischaracterizes the relative scale of the figures reflected in the cited evidence.<br><br>Microsoft defers to OpenAI. |
| 1487. OpenAI's expert admits that their products are used for news-related queries almost [redacted] times per day. Ex. 377 [Goldfarb Depo. Tr.] at 51:2-8. | 1487. **Disputed in Part.** OpenAI responds as follows: The facts set forth in Paragraph 1487 are disputed because the cited evidence is incorrect. Undisputed that Dr. Goldfarb agreed in his deposition that 1.88 percent of 2.5 billion is "a number slightly south of 50 million." Books Ex. 377 (A. Goldfarb Tr.) at 51:2-8. However, disputed that the cited testimony addresses the rate at which OpenAI products are used for news-related queries because the cited evidence does not support that assertion.<br><br>Microsoft defers to OpenAI. |
| 1488. Microsoft's technical expert, Dr. Bail, determined that at least 1.3% of roughly 45,000 Copilot conversations are directed to current events, i.e. the "use of Copilot for events or developments that appeared to occur within a week of the date of the prompt." Ex. 906 [Bail Opening Rep.] ¶ 109. | 1488. **Disputed in Part – Not Supported by Cited Evidence.** Microsoft does not dispute that Dr. Bail created a user intent category (which he called "Information Retrieval – Current Events") for use of Copilot for events or developments that appeared to occur within a week of the date of the prompt, and that this category was used by coders in connection with an analysis of a sample of Copilot Conversations. But Microsoft disputes that Dr. Bail "determined that at least 1.3% of roughly 45,000 Copilot conversations are directed to current events" because the cited evidence does not support the statement. Dr. Bail determined |

| | |
|---|---|
| | that roughly 1.3% of ***43,000*** (not 45,000) were coded by a team of coders as representing the user intent category "Information Retrieval -- Current Events." ECF 1719 (C. Bail Decl.) ¶¶ 40, 62, Ex. 16. Microsoft also disputes that Dr. Bail is a "technical expert." *See id*. ¶¶ 4-10.<br><br>OpenAI defers to Microsoft's response. |
| 1489. Another Microsoft expert found that between 1.2% and 1.3% of Copilot uses were related to news—which, although News Plaintiffs' expert disputes these percentages and believes they are much higher, means that at minimum Microsoft is providing answers to millions of news-related queries per day. Ex. 556 [Amir Opening Rep.] ¶¶ 15(c), 44, Figure 1; Alter Rebuttal Rep. ¶ 74. | 1489. **Disputed – Not Supported by Cited Evidence.** Microsoft disputes that Dr. Amir "found that between 1.2% and 1.3% of Copilot uses were related to news" because the cited evidence does not support the statement. Dr. Amir found that 1.2% out of 2,013 respondents reported most recent Copilot uses that fell into the category "research of news or current events," and that 1.3% of 2,013 respondents indicated using Copilot for "research of news or current events" within the past twelve months. *See* ECF 1716 (O. Amir Decl.) ¶¶ 9(c), 35, Exs. 1 and 2.<br>Microsoft also disputes that the 1.2% and 1.3% represent a minimum number of answers that Copilot is providing per day. Microsoft further disputes that raw numbers (i.e., "millions of news-related queries per day") are the appropriate measure compared to percentages because raw numbers do not provide the proper context and because the raw numbers may vary significantly from day to day. News Plaintiffs do not cite evidence to support these facts. |

| | |
|---|---|
| | OpenAI defers to Microsoft's response. |
| 1490. A Research Paper titled "Language Models are Few-Shot Learners" that was authored by Former Vice President of Research at OpenAI, Dario Amodei, and Former Member of Technical Staff at Open AI, Alec Radford among others, found that "for news articles that are around 500 words long, GPT-3 continues to produce articles that humans find difficult to distinguish from human written news articles." Ex. 1035 [OPCO_MDL_004735350] at 365. | 1490. **Undisputed.**<br><br>Microsoft defers to OpenAI. |
| 1491. According to News Plaintiffs' expert Dr. Etzioni, based on current OpenAI API pricing, without a human author, editor, or reporter, and for roughly $6,800, OpenAI could generate one million news-styled articles averaging 500 words each on topics similar to those published by News Plaintiffs, such as a war, an election, a restaurant, or basically any other topic that newspapers address. Etzioni Rebuttal Rep. at ¶ 86. | 1491. **Disputed in Part - Expert Opinion Subject to Rule 702; Not Supported by Cited Evidence.** OpenAI responds as follows: Undisputed that Dr. Etzioni offers the opinion that "using OpenAI's published API pricing, it would cost roughly $6,800 – and require no human author, editor, or reporter – to generate one million news-style articles averaging 500 words each." ECF 1771 (O. Etzioni Decl. Ex. B) (Rebuttal Rep.) ¶ 86. However, disputed that the cited evidence supports that opinion because Dr. Etzioni does not identify the basis for the calculation or disclose how it was performed.<br>Further, the fact stated in Paragraph 1491 is disputed because the evidence cited in support is currently subject to a motion to exclude expert testimony pursuant to Fed. R. Evid. 702. Defendants' pending Rule 702 motion seeks to exclude certain opinions of Dr. Oren |

| | |
|---|---|
| | Etzioni (value-of-news and Copilot substitution opinions), on which this statement relies. To the extent the Court excludes the challenged opinions, Plaintiffs may not rely on them to support this statement. *See* Fed. R. Civ. P. 56(c)(2).<br><br>Microsoft defers to OpenAI. |
| 1492. Microsoft 365 promoted Copilot Chat's ability to "Monitor industry news: prepare a daily brief on news ...":<br><br><br>Ex. 1227 [Microsoft 365, "Last-minute meeting invite? Microsoft 365 Copilot Chat helps you create agendas quickly..." *LinkedIn*, May 2025, https://www.linkedin.com/posts/microsoft-365_draft- | 1492. **Disputed – Immaterial.** Microsoft disputes Paragraph 1492 on the grounds that the screenshot cited as News Ex. 1227 does not reflect the evidence submitted as Ex. 1227. Further, the document submitted as News Ex. 1227 clearly reflects, at most, Microsoft 365's "promot[ion]" of Copilot's ability to "create agendas," as stated in the text of the LinkedIn post: |

| | |
|---|---|
| meeting-agendas-anytime-anywhere-activity-7323793020196147202-zWPf/]. | <br>News Ex. 1227.<br>Even if News Ex. 1227 contained the statement and screenshot in Paragraph 1492, Microsoft responds that the facts set forth in Paragraph 1492 are immaterial to the extent they claim that Microsoft "promoted" any end-user conduct because this fact does not affect the outcome of the suit under the governing law. Allegations that Microsoft's products encourage end-users' conduct are immaterial to any claim or defense in this action. *See* MDL ECF 1662 (order denying the New York Times and the Daily News Plaintiffs' motion for leave to amend their complaints to assert "inducement" and "services tailored to infringement" theories of contributory copyright infringement |

| | |
|---|---|
| | liability). Moreover, a feature that helps users stay informed about news and factual information about current events is not a use of News Plaintiffs' protected expression. *See Authors Guild v. Google, Inc.*, 804 F.3d 202, 224 (2d Cir. 2015).<br><br>OpenAI defers to Microsoft's response. |
| 1493. On September 25, 2025, OpenAI announced the release of ChatGPT Pulse. Ex. 908 ["Introducing ChatGPT Pulse," *OpenAI*, September 25, 2025, https://openai.com/index/introducing-chatgpt-pulse/]. | 1493. **Undisputed.**<br><br>Microsoft defers to OpenAI. |
| 1494. According to OpenAI, ChatGPT Pulse creates sets of daily reports which show up as visual cards to the user. Ex. 908 ["Introducing ChatGPT Pulse," *OpenAI*, September 25, 2025, https://openai.com/index/introducing-chatgpt-pulse/]. | 1494. **Disputed in Part - Not Supported by Cited Evidence.** OpenAI responds as follows: Undisputed that ChatGPT Pulse was an experience where ChatGPT proactively did research to deliver personalized updates based on user chats, feedback, and connected apps and that the research appeared in Pulse as topical visual cards.<br>However, disputed as to the characterization of Pulse as creating "sets of daily reports," as that language does not appear in the cited evidence. Therefore, the disputed proposition is not supported by the cited evidence.<br>Further disputed that Pulse currently performs any of the preceding functionality because it was sunset in June 2026. *See* A. Blanco Opp. Decl. Ex. 92 (https://help.openai.com/en/articles/6825453-chatgpt-release-notes). |

| | |
|---|---|
| | Microsoft defers to OpenAI. |
| 1495. The ChatGPT Pulse daily reports are based on chats, feedback, and connected apps like the user's calendar. Ex. 908 ["Introducing ChatGPT Pulse," *OpenAI*, September 25, 2025, https://openai.com/index/introducing-chatgpt-pulse/]. | 1495. **Disputed in Part - Not Supported by Cited Evidence.** OpenAI responds as follows: Undisputed that ChatGPT Pulse was an experience where ChatGPT proactively did research to deliver personalized updates based on user chats, feedback, and connected apps and that the research appeared in Pulse as topical visual cards.<br>However, disputed as to the characterization of Pulse as creating "sets of daily reports," as that language does not appear in the cited evidence. Therefore, the disputed proposition is not supported by the cited evidence.<br>Further disputed that Pulse currently performs any of the preceding functionality because it was sunset in June 2026. *See* A. Blanco Opp. Decl. Ex. 92 (https://help.openai.com/en/articles/6825453-chatgpt-release-notes).<br><br>Microsoft defers to OpenAI. |
| 1496. OpenAI's ChatGPT Pulse's suggested topics include "Keep me updated on local news": | 1496. **Disputed - Not Supported by Cited Evidence.** OpenAI responds as follows: Disputed that Ex. 908 establishes that "ChatGPT Pulse's suggested topics include 'Keep me updated on local news'" because it does not appear to contain any such statement. Therefore, the disputed proposition is not supported by the cited evidence. |

| | |
|---|---|
| <br><br>Ex. 908 ["Introducing ChatGPT Pulse," *OpenAI*, September 25, 2025, ]. | Microsoft defers to OpenAI. |
| 1497. When ChatGPT Pulse was demonstrated for TechCrunch by OpenAI product lead Adam Fry, Mr. Fry showed them reports ChatGPT Pulse had generated for him, which included a "roundup of news about British soccer team Arsenal." Ex. 904 [DNP-00569617] at 619. | 1497. **Disputed in Part - Not Supported by Admissible Evidence.** OpenAI responds as follows: Undisputed that Ex. 904 contains the following statement: "In a demo for TechCrunch, OpenAI product lead Adam Fry showed several reports Pulse had made for him: a roundup of news about British soccer team Arsenal; group Halloween costume suggestions for his wife and kids; and a toddler-friendly travel itinerary for his family's upcoming trip to Sedona, Arizona."<br>Disputed because the proposition is not supported by admissible evidence, as required by Local Rule 56.1, and therefore is not properly before the Court. Ex. 904 is inadmissible hearsay because it is an out-of-court statement offered for the truth of its contents, unaccompanied by any authenticating testimony or sponsoring expert to establish its reliability under Fed. R. Evid. 803(18). It therefore may not be considered in support of summary judgment. Fed. R. Evid. 801; Fed. R. Evid. 802; Fed. R. Evid. 803. |

| | |
|---|---|
| | Microsoft defers to OpenAI. |
| 1498. TechCrunch recognized that the 5-10 daily briefs generated by ChatGPT Pulse are substitutable for checking social media or a news app in the morning. Ex. 904 [DNP-00569617] at 618. | 1498. **Disputed - Not Supported by Admissible Evidence; Not Supported by Cited Evidence.** OpenAI responds as follows: The facts set forth in Paragraph 1498 are disputed because they are not supported by admissible evidence, as required by Local Rule 56.1, and therefore are not properly before the Court. Ex. 904 is inadmissible hearsay because it is an out-of-court statement offered for the truth of its contents, unaccompanied by any authenticating testimony or sponsoring expert to establish its reliability under Fed. R. Evid. 803(18). It therefore may not be considered in support of summary judgment. Fed. R. Evid. 801; Fed. R. Evid. 802; Fed. R. Evid. 803. Specifically, Exhibit 904 is a non-party newspaper article.<br>Further, nothing in Exhibit 904 refers to "substitution." To the contrary, Exhibit 904 states explicitly that "Fry doesn't expect Pulse to replace the various news apps people use." Therefore, the disputed proposition is not supported by the cited evidence.<br>Further disputed that Pulse currently substitutes for anything because it was sunset in June 2026. *See* A. Blanco Opp. Decl. *Ex.* 92, (https://help.openai.com/en/articles/6825453-chatgpt-release-notes).<br><br>Microsoft defers to OpenAI. |

| | |
|---|---|
| 1499. Additionally, TechCrunch noted regarding ChatGPT pulse: "it's hard to overlook how Pulse could compete with existing news products, such as Apple News, paid newsletter, or traditional journalism outlets." Ex. 904 [DNP-00569617] at 621. | 1499. **Disputed in Part - Not Supported by Cited Evidence; Not Supported by Admissible Evidence.** OpenAI responds as follows: Disputed that Pulse competed with existing news products because Pulse was sunset in June 2026. Ex. 904 states explicitly that "Fry doesn't expect Pulse to replace the various news apps people use." Therefore, the disputed proposition is not supported by the cited evidence.<br>Additionally, pursuant to Fed. R. Evid. 106, OpenAI's expert Dr. Goldfarb has "found no empirical evidence that OpenAI's alleged use served as an economic substitute for the Asserted Works or News Plaintiffs' journalism, or caused a measurable market harm across traffic, revenue, subscriptions, or user behavior." ECF 1763 (A. Goldfarb Decl.) ¶ 9. And Plaintiffs' experts have not performed any quantitative analysis demonstrating such harm. *Id.* ¶ 14 ("Based on my review of News Plaintiffs' experts' reports, I did not identify any analysis showing that real users used such outputs instead of News Plaintiffs' works, that any identified output displaced a visit to a particular News Plaintiff's website, or that such outputs caused a quantifiable loss of traffic, subscribers, revenue, or other business metrics.").<br>Further, the disputed proposition is not supported by admissible evidence, as required by Local Rule 56.1, and therefore is not properly before the Court. Ex. 904 is inadmissible hearsay because it is an out-of-court statement offered for the truth of its |

| | |
|---|---|
| | contents, unaccompanied by any authenticating testimony or sponsoring expert to establish its reliability under Fed. R. Evid. 803(18). It therefore may not be considered in support of summary judgment. Fed. R. Evid. 801; Fed. R. Evid. 802; Fed. R. Evid. 803. Specifically, Ex. 904 is a non-party newspaper article.<br><br>Microsoft defers to OpenAI. |
| 1500. Indeed, OpenAI characterized ChatGPT, when paired with news content, as "[t]he modern newsstand." Ex. 1037 [OPCO_MDL_002138926] at 2. | 1500. **Disputed in Part - Not Supported by Cited Evidence.** OpenAI responds as follows: Undisputed that the phrase "[t]he modern newsstand" appears in Ex. 1037. However, disputed that OpenAI characterized ChatGPT (as it existed then or exists now) as "the modern newsstand" because the cited evidence does not support that assertion. The quoted phrase in Ex. 1037 refers to a potential version of ChatGPT that might arise following partnership between the New York Times (and other publishers) and OpenAI. Plaintiffs cite no evidence that such a partnership or version of ChatGPT ever came to fruition. Therefore, the disputed proposition is not supported by the cited evidence.<br><br>Microsoft defers to OpenAI. |
| 1501. OpenAI also recognized that its "users care" about receiving accurate news information from ChatGPT. Ex. 1039 [OPCO_MDL_001699457] at 457. | 1501. **Undisputed.**<br><br>Microsoft defers to OpenAI. |

| | |
|---|---|
| 1502. News Plaintiffs have invested in their newsrooms, hiring journalists and supporting investigations that have produced in-depth, hard-hitting, prize-winning content, including investigative pieces that have exposed problems that needed to be addressed, with the expectation that those investments will be monetized through revenues (e.g., subscription fees and advertising revenues). Ex. 20 [J. Anderson Depo. Tr.] at 134:23-140:21; Ex. 19 [Pugh 30(b)(1) Depo. Tr.] at 110:25-112:23; Ex. 22 [Julien 30(b)(6) Depo. Tr.] at 66:15-67:16; Ex. 6 [NYT_00873667] at 674-675; Ex. 5 [Meredith Levien Depo. Ex. 7] at 13; Ex. 1 [The New York Times SEC Form 10-K Dec. 31, 2025] at 41 (detailing The Times's increased journalism costs of $48.7 million, which were "largely due to higher compensation and benefits, which was driven by growth in the number of employees who work in [The Times's] newsrooms as well as higher salaries, benefits costs and incentive compensation"); Ex. 3 [Sulzberger Depo. Tr.] at 191:16-192:10 (describing The Times's track record of "reinvesting deeply into [its] journalistic mission"), 302:8-23 (describing The Times's investment into its journalism, including having "bureaus all over the world" and giving journalists "sometimes years" "to do the most important work"); Cross Rebuttal Rep. at 9-10. | 1502. **Undisputed.**<br><br>Microsoft further responds that the cited evidence in the Cross Rebuttal Report that relates solely to The Intercept does not pertain to claims asserted against Microsoft. |
| 1503. Ziff Davis has invested in its content and brand—including product reviews, gameplay guides, and expert-reviewed health, parenting, and how-to explainers across brands—with the expectation that those | 1503. **Undisputed.**<br><br>Microsoft responds that Paragraph 1503 does not pertain to claims asserted against Microsoft. |

| | |
|---|---|
| investments would be monetized through revenues from advertising, subscription, licensing, and awards-licensing fees. Oh Decl. ¶ 14; Ex. 677[Shah Depo. Tr.] 80:19-83:11, 116:13 –117:3]. | |
| 1504. Historically, traditional search providers like Google and Bing have acted as gateways to third-party websites, including news websites, by directing users to publishers' websites through organic referral links. Ex. 83 [Poferl 30(b)(6) Depo. Tr.] at 23:20-25 (testifying that "[s]earch engines are one of the most common ways for users on the Internet to discover[] New York Times content" and "one of [The Times's] largest referral channels"); Ex. 72 [CJ Jacobs 30(b)(6), Feb. 12, 2026, Depo. Tr.] at 37:3-38:9; Ex. 86 [DNP-00632487]; Ex. 467 [Goldfarb Opening NYT Rep.] at ¶ 85 (describing how "[n]ews publishers depend on search engines and news aggregators for a substantial amount of traffic" and "[s]earch engines like Google and Bing are major sources of referral traffic for news publishers"); Cross Rebuttal Rep. at 18.; Ex. 474 [Goldfarb ZD Opening Rep.] ¶ 87. | 1504. **Undisputed.**<br><br>Microsoft further responds that Ex. 474 does not pertain to claims asserted against Microsoft. |
| 1505. That exchange has been essential to News Plaintiffs' business models, as "generating audiences" is the "lifeblood" of news publishers. Ex. 912 [Felps, Paula, "As Search Ends for News, Here is What's Next," *INMA*, April 2025] at 8; Ex. 72 [CJ 30(b)(6), Feb. 12, 2026, Depo. Tr.] at 37:3-38:14; Ex. 99 [The New York Times SEC Form 10-K Dec. 31, 2022] at 10 (stating: "[The Times's] ability to attract and grow our digital subscriber base depends on the | 1505. **Disputed in Part – Not Supported by Admissible Evidence.** Defendants respond as follows: Disputed to the extent this statement characterizes organic search referrals as essential to each News Plaintiffs' business model. The quoted evidence concerning the importance of audiences and audience engagement does not establish that dependence on any particular source of traffic. Further disputed to the |

| | |
|---|---|
| size of our audience and its sustained engagement directly with our products, including the breadth, depth and frequency of use" and "Revenue from subscriptions to our digital and print products makes up a majority of our total revenue. Our future growth and profitability depend upon our ability to retain, grow and effectively monetize our audience and subscriber base".); Ex. 98 [The New York Times SEC Form 10-K Dec. 31, 2023] at 2; Ex. 1254 [Yang Depo. Ex. 13] at 5 ("A large and highly engaged audience is essential to our business growth—it helps us replenish our engaged prospect pool, fuels new subscriptions, and strengthens our advertising business"); Ex. 550 [Schneider 30(b)(6) Depo. Tr]. 75:17-18 ("as a journalistic outlet, content is king. It's our lifeblood."); Cross Rebuttal Rep. at 19. | extent this statement characterizes Schneider's testimony as describing audience generation or search referrals as the "lifeblood" of news publishers as the quoted testimony refers to content.<br>Defendants also respond that to the extent the fact set forth in this Paragraph relies on Ex. 912, the fact is disputed on the grounds that it is not supported by admissible evidence, as required by Local Rule 56.1, and therefore are not properly before the Court. Specifically, Ex. 912 is inadmissible hearsay to the extent offered for the matter asserted.<br>Microsoft further responds that News Ex. 550 does not pertain to claims asserted against Microsoft. Microsoft responds that the facts related solely to The Intercept do not pertain to claims asserted against Microsoft. |
| 1506. The rapid expansion of Generative AI poses a competitive threat to traditional search. Ex. 533 [Nadella Depo. Tr.] at 123:22-124:9 (agreeing that Generative AI users are less likely to click on links to underlying sources and instead remain in conversations on Generative AI platforms, and testifying that "Fundamentally, there is a complete change in the ecosystem where people are not just going to regular search, they're going to these conversational agents and feeds and so yes, it's all changing."), 124:10-125:11 (agreeing that the new AI chatbot experience means that users no longer need to click through to the links in the same way because the new | 1506. **Disputed – Incomplete; Not Supported by Cited Evidence; Improper Legal Argument.** This fact is improper legal argument. Defendants incorporate the response to Paragraph 1432, which explains why the quoted testimony of Mr. Nadella is taken out of context. Further, whether generative AI competes with traditional search engines is irrelevant to the question whether Copilot and ChatGPT are causing harm to the market for the Asserted Works: competition among technology platforms does not have any bearing on the *traffic* and *subscriptions* for the publishers. |

| | |
|---|---|
| chatbot conversation has substituted for the underlying source); Ex. 82 [Tucker Opening Rep.] at ¶ 117 (admitting that admitting that "[g]rounded general purpose LLMs provide a similar service to search engines but produce different outputs," providing answers instead of a ranked list of links, and that "GenAI [is] a potential threat to Google's dominance in the market for general search services.); Ex. 914 [*United States of America et al. v. Google LLC*, Case No. 20-cv-3010, Memorandum Opinion, September 2, 2025] at 1-2, 127-128; Cross Rebuttal Rep. at 19; McDonald Rebuttal Rep. at 13. | Further, the comparison of click-through rates of traditional search to Generative AI is a false one because it suggests that consumers will either use a search engine and be directed to Plaintiffs' website content or use Copilot as a substitute to Plaintiffs' website content. This comparison is misleading because it ignores many other ways consumers find and engage with online news content, and it also ignores that click-through rates are not the correct measure to ascertain whether there has been any *harm*. ECF 1733 (C. Tucker Decl.) ¶¶ 23 & Fig. 1, 117-118 & Fig. 29. Plaintiffs' own experts have cited studies estimating ChatGPT's market share of search to be between 0.25% and 2.1% in 2024 and 2025. ECF 1800-1 (J. Malackowski Decl. Ex. A (Opening Rep. (NYT-DN))) at 33.<br>Additionally, Dr. Tucker did not state that "GenAI [is] a potential threat to Google's dominance in the market for general search services." Rather, Dr. Tucker's report included that quotation from a court opinion (Ex. 914) in discussing how grounded general-purpose LLMs could be a complement to news content, just as search engines and news aggregators have turned out to be. News Ex. 82 (C. Tucker Opening Rep.) at ¶¶ 117-20. |
| 1507. Generative AI is a substitute for traditional search. Ex. 556 [Amir Opening Rep.] ¶ 60; Ex. 82 [Tucker Opening Rep.] at ¶ 117 (admitting that "[g]rounded general purpose LLMs provide a similar service to search engines but produce different outputs," providing answers instead | 1507. **Disputed – Not Supported by Cited Evidence; Immaterial.**<br>Defendants dispute that "[g]enerative AI is a substitute for traditional search" because the cited evidence does not support the statement. The |

| | |
|---|---|
| of a ranked list of links, and that "GenAI [is] a potential threat to Google's dominance in the market for general search services."); Ex. 533 [Nadella Depo. Tr.] at 124:10-125:11 (agreeing that the new AI chatbot experience means that users no longer need to click through to the links in the same way because the new chatbot conversation has substituted for the underlying source); Ex. 1040 [OPCO_MDL_004620488] at 488. | comparison of traditional search to Generative AI is a false dichotomy because it suggests that consumers will either use a search engine and be directed to Plaintiffs' website content or use Copilot or ChatGPT as a substitute to Plaintiffs' website content or for News Plaintiffs' Asserted Works at issue in this Motion. This comparison is misleading because it ignores many other ways consumers find and engage with online news content, and it also ignores that click-through rates are not the correct measure to ascertain whether there has been any *harm*. ECF 1733 (C. Tucker Decl.) ¶¶ 12, 23, 117-118, Fig. 29. Further disputed to the extent this statement implies that substitution for traditional search establishes substitution resulting market harm. OpenAI's expert Dr. Goldfarb has "found no empirical evidence that OpenAI's alleged use served as an economic substitute for the Asserted Works or News Plaintiffs' journalism, or caused a measurable market harm across traffic, revenue, subscriptions, or user behavior." ECF 1763 (A. Goldfarb Decl.) ¶ 9. Likewise, Dr. Tucker found that "Copilot and the Asserted Works are not substitutes because they meet distinct customer needs." ECF 1733 (C. Tucker Decl.) ¶ 47. And Plaintiffs' experts have not performed any quantitative analysis demonstrating such harm. ECF 1763 (A. Goldfarb Decl.) ¶ 14.<br><br>Defendants also respond that the statement in Paragraph 1507 is disputed because the cited evidence does not support the stated fact. The quoted portion of |

| | |
|---|---|
| | Dr. Amir's report says that respondents "would revert to traditional web search inquiries," and does not say whether they "would access news websites" in doing so. In fact, Dr. Amir found that "0 respondents indicated they would have gone to News Plaintiffs' websites or another similar news site." ECF 1716 (O. Amir Decl.) at ¶ 59. The citations to Mr. Nadella's deposition transcript do not support the proposition in Paragraph 1507; Mr. Nadella is describing user behavior in Generative AI tools, not discussing whether Generative AI tools are a "competitive threat" to traditional search. Pursuant to Fed. R. Evid. 106, Dr. Tucker did not state that "GenAI [is] a potential threat to Google's dominance in the market for general search services." Rather, Dr. Tucker's report included that quotation from a court opinion (Ex. 914) in discussing how grounded general-purpose LLMs could be a complement to news content, just as search engines and news aggregators have turned out to be. News Ex. 82 (C. Tucker Opening Report) at ¶¶ 117-20.<br>Defendants respond that the fact in Paragraph 1506 is immaterial and therefore disputed because the fact does not affect the outcome of the suit under the governing law. Whether generative AI competes with traditional search engines is a question about competition among technology platforms that does not have any bearing on the market for the Asserted Works. |
| 1508. ChatGPT and Copilot are capable of providing and do provide outputs about current events | 1508. **Undisputed.** |

| | |
|---|---|
| with context about what they mean. Cross Rebuttal Rep. at Appendices B-D; McDonald Rebuttal Rep. at Appendices C-D. | |
| 1509. Microsoft's CEO Satya Nadella agreed at his deposition that Generative AI users are less likely to click on links to underlying sources and instead remain in conversations on the Generative AI platform: "That is correct. So it's – Fundamentally, there is a complete change in the ecosystem where people are not just going to regular search, they're going to these conversational agents and feeds and so yes, it's all changing." Ex. 533 [Nadella Depo. Tr.] at 123:22-124:9; *see also id.* at 124:10-125:11. | 1509. **Disputed in Part – Not Supported by Cited Evidence.** Microsoft does not dispute that Mr. Nadella said the quoted words in Paragraph 1509 during his deposition but they are taken out of context for the reasons explained in Microsoft's response to Paragraph 1432. Microsoft disputes that Mr. Nadella said that "Generative AI users are less likely to click on links to underlying sources"; he did not, he said that generative AI is a "complete new experience" that could render a completely different click-through rate. News Ex. 533 (S. Nadella Tr.) at 124:6-125:11; *see also* ECF 1733 (C. Tucker Decl.) ¶ 12.<br><br>OpenAI defers to Microsoft's response. |
| 1510. When asked at deposition if "that conversation [on chatbots] has substituted for giving you the information right there on the website on the AI platform versus needing to go to the underlying source," Mr. Nadella responded: "That is correct." Ex. 533 [Nadella Depo. Tr.] at 124:24-125:11. | 1510. **Disputed in Part – Incomplete; Not Supported by Cited Evidence.** Microsoft does not dispute that Mr. Nadella said the quoted words in Paragraph 1510 in response to the quoted language from Plaintiffs' counsel. But, pursuant to Fed. R. Evid. 106, the quote is taken out of context for the reasons explained in response to Paragraph 1432; in particular, Mr. Nadella's full testimony continued on to explain that the ecosystem is different: "So basically we used to have snippets, even in the past, this is just a snippet of the entire page, you can imagine, of all of the results with |

| | |
|---|---|
| | citations, that's at least I think our design, I'm not sure exactly what the design of everybody else is, but the click-through rate is going to be different." Ex. 533 (S. Nadella Tr.) at 124:24-125:11; *see also* ECF 1733 (C. Tucker Decl.) ¶ 12.<br><br>OpenAI defers to Microsoft's response. |
| 1511. Microsoft's counsel represented to the Court at the January 14, 2025 motion to dismiss hearing in this action:<br>**THE COURT:** So what is new about this large language model? Bing presumably has always been able to print out articles on tailbone pain. What are you telling me is new?<br><br>**MR. [sic] HURST:** Your Honor, what is new is when you, in a traditional search bar, you put in a query, you get a series of links. In the Next Generation search, Copilot chat, you ask a question in a natural language format and it gives you an answer in a natural language format with cites links to those sources. So, in essence, the large language model is summarizing the information that it's found for you and delivering you the factual content of that information, and then it's giving you | 1511. **Disputed in Part - Not Supported by Admissible Evidence.** Microsoft objects and disputes the purported "fact" set forth in Paragraph 1511 on the grounds that *Ms*. Hurst, as trial counsel for Microsoft, is not a witness in this proceeding. *Flores v. Bondi*, 152 F.4th 73, 81 (2d Cir. 2025) (unsworn attorney statements are not evidence); *Sterling Select II Advisory, LLC v. Argus Info. And Advisory Servs., Inc.*, 2026 WL 734047 at *9 (S.D.N.Y. Mar. 16, 2026) (same); N.Y. Rule Prof. Conduct 3.7(a) (prohibition on lawyer as advocate). Arguments at a Motion to Dismiss hearing are not judicial admissions, nor are judicial admissions evidence. *In re Motors Liquidation Co.*, 957 F.3d 357, 360 (2d Cir. 2020); *Lovati v. Petroleos de Venezuala, S.A.*, 2025 WL 3677013 at *2 (S.D.N.Y. Dec. 18, 2025). Plaintiffs are not entitled to force *Ms*. Hurst to be a witness by offering her prior arguments as evidence. *See Scottsdale Ins. Co. v. McGrath,* 2024 WQL 4512210 at * 5-6 (S.D.N.Y. 2024) (excluding prior in-court arguments of counsel pursuant to Rule 403). |

| | |
|---|---|
| citations and the sources for that information.<br><br>**THE COURT:** So is the traditional way simply going to give me a list of sources, list of articles on tailbone pain, but the new way, the Next Generation is going to give me a plain language answer that is supported with essentially the same links?<br><br>**MR. [sic] HURST:** That's right, your Honor. And what the large language model is capable of doing that the traditional search models, which by the way were also predicative algorithms and models, is it's better at interpreting your query because it understands language better. It's better at knowing exactly what you're asking. And it's also capable of putting all of the data together and giving you an answer, rather than just giving you a series of sources.<br><br>Ex. 910 [Jan. 14, 2025 Hearing Tr.] at 28:15-29:19. | Without waiving any of the foregoing, Microsoft does not dispute the accuracy of the statements quoted in Paragraph 1511, and further responds that there is also ample admissible evidence in the record that similarly describes the functionality of Copilot. *See, e.g.*, ECF 1702 (Microsoft News SUMF) ¶¶ 66-74.<br><br>OpenAI defers to Microsoft's response. |
| 1512. Microsoft's counsel also stated at the same hearing that the difference between those systems and traditional search engines that have been deemed fair use because they direct users back to instead of substituting for original sources "is that they are actually designed to | 1512. **Not Supported by Admissible Evidence; Disputed in Part; Immaterial.** For the reasons identified in response to Paragraph 1511, the Court should disregard the statement in Paragraph 1512 in its entirety. |

| | |
|---|---|
| answer your question." Ex. 910 [Jan. 14, 2025 Hearing Tr.] at 27:1-29:19. | Further responding, Microsoft disputes that *Ms.* Hurst used the unquoted language or she implied that generative AI is a substitute for traditional search or Plaintiffs' works.<br>Microsoft also responds that the fact in Paragraph 1512 is immaterial and therefore disputed because the fact does not affect the outcome of the suit under the governing law. Whether generative AI competes with traditional search engines is a question about competition among technology platforms that does not have any bearing on the market for the Asserted Works.<br><br>OpenAI defers to Microsoft's response. |
| 1513. Microsoft's counsel elaborated: "So it's not just giving you a series of links to things you can go look for yourself and maybe find the information. But one of the great uses of a large language model is that it's able to interpret and summarize and derive facts from underlying data and then deliver those facts to you." Ex. 910 [Jan. 14, 2025 Hearing Tr.] at 27:1-29:19. | 1513. **Not Supported by Admissible Evidence; Disputed in Part; Immaterial.** For the reasons identified in response to Paragraph 1511, the Court should disregard the statement in Paragraph 1513 in its entirety.<br>Further responding, Microsoft does not dispute that *Ms.* Hurst stated the quoted words at the January 14, 2025 motion to dismiss hearing but does dispute the implication that generative AI is a substitute for traditional web search or Plaintiffs' works.<br>Microsoft also responds that the fact in Paragraph 1513 is immaterial and therefore disputed because the fact does not affect the outcome of the suit under the governing law. Whether generative AI competes with traditional search engines is a question about |

| | |
|---|---|
| | competition among technology platforms that does not have any bearing on the market for the Asserted Works.<br><br>OpenAI defers to Microsoft's response. |
| 1514. The Microsoft Copilot homepage included a "suggestion chip" inviting users to use Copilot to "summarize the top news." Ex. 857 [MSFT_AI_MDL_002286292]; *see also* Ex. 858 [MSFT_AI_MDL_001524111] at 115; Ex. 657 [Abib 30(b)(6) Depo. Tr.] at 56:5-16; Ex. 659 [Cromwell Depo. Tr.] at 104:1-10 (Microsoft employee in charge of developing the second version of Copilot confirming that [redacted]), 95:17-96:8. | 1514. **Disputed in Part – Incomplete.** Microsoft does not dispute that Ex. 857 contains the quoted language in Paragraph 1514. But Microsoft disputes any implication that the suggestion chip invited users to reproduce or summarize any particular copyrighted article. The chip refers to the "top news," *i.e.*, current events generally. And pursuant to Fed. R. Evid. 106, Rob Cromwell testified, "the goal is to educate the user on what's possible with the product, if you've never interacted with a product like this before." News Ex. 659 (R. Cromwell 30(b)(1) Tr.) at 96:21-97:3.<br><br>OpenAI defers to Microsoft's response. |
| 1515. In the absence of generative AI, many more readers would access news websites through traditional search engines. Ex. 556 [Amir Opening Rep.] ¶ 60 ("...respondents report that in the absence of a generative AI tool they would revert to traditional web search inquiries, with 37.2% of respondents indicating they would use Google or another web search, the most popular response out of all categories."); Ex. 82 [Tucker Opening Rep.] at ¶ 117 (admitting that "[g]rounded general purpose LLMs provide a similar service to search engines but produce different outputs," providing answers instead of a | 1515. **Disputed – Not Supported by Cited Evidence; Immaterial.** Defendants respond that this fact is disputed because the cited evidence does not support it. The quoted portion of Dr. Amir's report says that respondents "would revert to traditional web search inquiries," and does not say whether they "would access news websites" in doing so. In fact, Dr. Amir found that "0 respondents indicated they would have gone to News Plaintiffs' websites or another similar news site." ECF 1716 (O. Amir Decl.) at ¶ 59. Furthermore, the cited portions of Dr. Tucker's Opening Report and Brook Decl. |

| | |
|---|---|
| ranked list of links); Ex. 1041 [OPCO_MDL_004771735] at 736 (an internal OpenAI memo setting a "High level goal" for ChatGPT's new browsing feature: "It can answer most things you'd google & much more (e.g., factual, current events, etc.)). | Ex. 1041 do not support the stated fact. Pursuant to Fed. R. Evid. 106, Dr. Tucker's opinion is that "Copilot and the Asserted Works are not substitutes because they [serve/meet] distinct customer needs." ECF 1733 (C. Tucker Decl.) ¶ 16.<br>Defendants further dispute the veracity of the statement that, "[i]n the absence of generative AI, many more readers would access news websites through traditional search engines." OpenAI's expert Dr. Goldfarb has "found no empirical evidence that OpenAI's alleged use served as an economic substitute for the Asserted Works or News Plaintiffs' journalism, or caused a measurable market harm across traffic, revenue, subscriptions, or user behavior." ECF 1763 (A. Goldfarb Decl.) ¶ 9. And Plaintiffs' experts have not performed any quantitative analysis demonstrating such harm. *Id.* ¶ 14 ("Based on my review of News Plaintiffs' experts' reports, I did not identify any analysis showing that real users used such outputs instead of News Plaintiffs' works, that any identified output displaced a visit to a particular News Plaintiff's website, or that such outputs caused a quantifiable loss of traffic, subscribers, revenue, or other business metrics."). Likewise, Microsoft's expert Dr. Tucker found no change in News Plaintiffs' traffic trends following the launch of Copilot. ECF 1733 (C. Tucker Decl.) ¶¶ 11(a), 16-95, 106-116.<br>Microsoft also responds that the fact in Paragraph 1515 is immaterial and therefore disputed because the fact does not affect the outcome of the suit under the |

| | |
|---|---|
| | governing law. Whether generative AI competes with traditional search engines is a question about competition among technology platforms that does not have any bearing on the market for the Asserted Works. |
| 1516. Microsoft's survey expert Dr. On Amir reported that 37.2% of Copilot survey respondents would use "traditional web search inquiries" like Google in the "absence of a generative AI tool." Ex. 556 [Amir Opening Rep.] ¶ 60. | 1516. **Disputed in Part – Incomplete.** Microsoft does not dispute that Dr. Amir reported that 37.2% of respondents in his survey reported that they would use "traditional web search inquiries" like Google in the "absence of a generative AI tool." But, pursuant to Fed. R. Evid. 106, Microsoft does dispute News Plaintiffs' characterization of these results as evidence of substitution because Dr. Amir found that "0 respondents indicated they would have gone to News Plaintiffs' websites or another similar news site." ECF 1716 (O. Amir Decl.) at ¶ 59.<br><br>OpenAI defers to Microsoft's response. |
| 1517. OpenAI recognizes that its Generative AI systems replace traditional search. Ex. 916 ["OpenAI's Sam Altman on Building the 'Core AI Subscription' For Your Life," Sequoia Capital (May 12, 2025),, https://www.youtube.com/watch?v=ctcMA6chfDY] at 15:40-15:47; Ex. 1041 [OPCO_MDL_004771735] (an internal OpenAI memo setting a "High level goal" for ChatGPT's new browsing feature: "It can answer most things you'd google & much more (e.g., factual, current events, etc.)); Ex. 1228 [Aaron Chatterji, et. al., "How People Use ChatGPT," OpenAI (Sep. 15, 2025) | 1517. **Disputed - Not Supported by Cited Evidence.** OpenAI responds as follows: The cited evidence does not support Plaintiffs' assertion. Ex. 916 does not appear to reference any OpenAI product replacing any search product. Ex. 1041 references particular functionality, not whether any product replaces another. Ex. 1228 discusses the particular use case of users utilizing ChatGPT to seek information, which is not evidence that users use, or have used, ChatGPT instead of a traditional search platform. Moreover, Plaintiffs' own experts have cited |

| | |
|---|---|
| ,https://cdn.openai.com/pdf/a253471f-8260-40c6-a2cc-aa93fe9f142e/economic-research-chatgpt-usage-paper.pdf] at 2 (a ChatGPT study with multiple OpenAI authors confirming that ChatGPT users seeking information "about people, current events, products, and recipes… appears to be a very close substitute for web search"). | studies estimating ChatGPT's market share of search to be between 0.25% and 2.1% in 2024 and 2025. ECF 1800-1 (J. Malackowski Decl. Ex. A) (Opening Rep. (NYT-DN)) at 33.<br><br>Microsoft defers to OpenAI. |
| 1518. The Court in the Department of Justice antitrust case against Google concerning Search found that although Google maintained an illegal search monopoly, the rapid emergence of Generative AI altered competition in the search landscape:<br>The emergence of GenAI changed the course of this case. No witness at the liability trial testified that GenAI products posed a near-term threat to GSEs. The very first witness at the remedies hearing, by contrast, placed GenAI front and center as a nascent competitive threat.<br>…<br><br>Today, established technology companies are making, and start-ups are receiving, hundreds of billions of dollars in capital to develop GenAI products that pose a threat to the primacy of traditional internet search. The money flowing into this space, and how quickly it has arrived, is astonishing. These companies already are in a better position, both financially and | 1518. **Disputed in Part – Improper Legal Argument.** Defendants respond as follows: Undisputed that the opinion so states. However, disputed as to the suggestion that ChatGPT (or any generative AI) has displaced traditional search. The quoted language itself acknowledges that any competitive threat posed by Generative AI systems to traditional search platforms is "nascent" at best. The opinion further notes that "GenAI chatbots are not yet close to replacing [general search engines]." Plaintiffs' own experts have cited studies estimating ChatGPT's market share of search to be between 0.25% and 2.1% in 2024 and 2025. ECF 1800-1 (J. Malackowski Decl. Ex. A) (Opening Rep. (NYT-DN)) at 33.<br>Defendants further respond that the Court should disregard this Paragraph because the assertion constitutes improper attorney argument and/or is conclusory. The quoted material from News Ex. 914 is dicta from an unrelated case. |

| | |
|---|---|
| technologically, to compete with Google than any traditional search company has been in decades (except perhaps Microsoft). They also are moving towards monetizing on commercial queries.<br><br>Ex. 914 [*United States of America et al. v. Google LLC*, Case No. 20-cv-3010, Memorandum Opinion, September 2, 2025] at 1-2, 127-128 (internal citations omitted). | |
| 1519. OpenAI's founder, Sam Altman, has stated that one use case for ChatGPT is as "a Google replacement." Ex. 916 ["OpenAI's Sam Altman on Building the 'Core AI Subscription' For Your Life," Sequoia Capital (May 12, 2025),, https://www.youtube.com/watch?v=ctcMA6chfDY] at 15:40-15:47. | 1519. **Disputed.** OpenAI responds that the facts set forth in Paragraph 1519 omit the relevant context. Pursuant to Fed. R. Evid. 106, OpenAI responds to note that Altman stated: "Gross oversimplification, but like older people use ChatGPT as a Google replacement. Maybe people in their 20s and 30s use it as like a life advisor . . . and then, like, people in college use it as an operating system." News Ex. 916 at 15:40–15:59. Further disputed as to the implication that ChatGPT (or any generative AI) has displaced traditional search. Plaintiffs' own experts have cited studies estimating ChatGPT's market share of search to be between 0.25% and 2.1% in 2024 and 2025. ECF 1800-1 (J. Malackowski Decl. Ex. A) (Opening Rep. (NYT-DN)) at 33.<br><br>Microsoft defers to OpenAI. |
| 1520. ChatGPT's displacement of traditional search is increasing. Ex. 1229 ["ChatGPT's Search Market Share Up 740% in Just 12 Months," *Opollo,* May 31, 2025, | 1520. **Disputed.** OpenAI responds as follows: This fact is disputed because the cited estimates of ChatGPT's usage and market share, and projections of |

| | |
|---|---|
| https://opollo.com/blog/chatgpts-search-market-share-has-exploded-by-740-in-just-12-months/] (estimating that ChatGPT's market share of search has "soar[ed] by 740% in just 12 months" (early 2024 to 2025), from 0.25% to 2.1%); Ex. 1230 ["ChatGPT Surges Ahead in the Battle for Search Marketing Share," *Driving Influence*, November 21, 2024, https://avenuez.com/blog/chatgpt-surges-ahead-in-the-battle-for-search-marketing-share/] (according to Marcus Tober, an expert in Search and SEO, at its current growth rate, ChatGPT's search volume traffic could catch up with Google in approximately 4 years); Ex. 1231 ["Google vs ChatGPT Market Share: 2026 Report," *First Page Sage,* https://firstpagesage.com/seoblog/google-vs-chatgpt-market-share-report/] (recent analyses as of Q2 2025 estimate ChatGPT's share of the global digital query market to be as high as 17.9%). | future growth, do not establish that ChatGPT is increasingly displacing traditional search. For example, if ChatGPT is growing the market for search (*e.g.*, to new users), then such use is not evidence of ChatGPT "displac[ing]" traditional search.<br><br>Microsoft defers to OpenAI. |
| 1521. According to a survey administered to over 1,000 people in each of 21 countries (total of 23,882 surveys) and conducted by the University of Toronto, 22% of ChatGPT users globally (23% in the U.S.) use the platform as an alternative to Google. Ex. 1232 ["Global Public Opinion on Artificial Intelligence (GPO-AI)," Schwartz Reisman Institute for Technology and Society (SRI), supported by the Policy, Elections and Representation Lab (PEARL) at the Munk School of Global Affairs & Public Policy at the University of Toronto, May 17, 2024, https://utoronto.sharepoint.com/sites/ArtSci-SRI- | 1521. **Disputed - Not Supported by Admissible Evidence.** OpenAI responds as follows: Exhibit 1232 is double hearsay (a press release that purports to summarize a survey). Paragraph 1521 is therefore not supported by admissible evidence, as required by Local Rule 56.1, and is not properly before the Court. Fed. R. Evid. 801, 802, 803. Further disputed that the cited evidence establishes that any particular percentage of users use ChatGPT in lieu of using Google as the details regarding the survey reported in the report are unclear and the choices were artificially |

| | |
|---|---|
| External/Documents/Forms/AllItems.aspx?id=%2Fsites%2FArtSci%2DSRI%2DExternal%2FDocuments%2FGPO%2DAI%5FFinal%20Version%5FMay%2027%5Fupdated%2Epdf&parent=%2Fsites%2FArtSci%2DSRI%2DExternal%2FDocuments&p=true&ga=] at 36. | limited. Indeed, News Plaintiffs have not filed or served the survey itself.<br><br>Microsoft defers to OpenAI. |
| 1522. OpenAI has known since at least 2025 that "seeking information," defined as "searching for information about people, current events, products, and recipes," accounts for a significant and growing portion of ChatGPT's usage – and that in July 2024 seeking information accounted for 14% of ChatGPT usage, and one year later in 2025, seeking information accounted for 24% of usage. Ex. 1228 [Aaron Chatterji, et. al., "How People Use ChatGPT," OpenAI (Sep. 15, 2025),https://cdn.openai.com/pdf/a253471f-8260-40c6-a2cc-aa93fe9f142e/economic-research-chatgpt-usage-paper.pdf] at 2, 14. | 1522. **Undisputed.**<br><br>Microsoft defers to OpenAI. |
| 1523. According to Dr. Tucker, a Microsoft economics expert: "Grounded general-purpose LLMs provide a similar service to search engines but produce different outputs. Search engines and grounded LLMs both dynamically select sources in response to a user query and rely on indexing or accessing a wide range of information to generate output in response to a user prompt. However, search engines typically return a ranked list of links, while grounded general-purpose LLMs generate stochastic output that synthesizes information from retrieved sources." Ex. 82 [Tucker Opening Rep.] ¶117. | 1523. **Disputed in Part.** Microsoft does not dispute that Dr. Tucker's report contains the quoted language set forth in Paragraph 1523. Microsoft does dispute any implication from this fact that grounded LLMs are "substitutive" because they present information differently than search engines do. Dr. Tucker's opinion is: The "comparison of search engines and Copilot is a false dichotomy because it suggests that consumers will either use a search engine and be directed to Plaintiffs' website content or use Copilot as a substitute to Plaintiffs' website content. This comparison is misleading because it ignores |

| | |
|---|---|
| | the many other ways consumers find and engage with online news content." ECF 1733 (C. Tucker Decl.) ¶ 117. Dr. Tucker's statement in Paragraph 1523 only describes how search engines and grounded LLMs generally present information to users; it does not conclude, or provide basis to conclude, that those differences cause users to visit publishers' websites less often. *See* C. Tucker Opp. Decl. ¶¶ 12-17. In fact, Dr. Tucker's empirical analysis found that the trend in traffic and search-referred traffic to News Plaintiffs' sites did not change following the introduction of Copilot and ChatGPT, which invalidates any notion that grounded LLMs "substitute" for Plaintiffs' Asserted Works. *See* ECF 1733 (C. Tucker Decl.) ¶¶ 11(a), 56–89, 113–114. Additionally, there is no other evidence that News Plaintiffs have suffered any market harm from so-called "substitution." *See id.* ¶¶ 11, 24–93.<br><br>OpenAI defers to Microsoft's response. |

| | |
|---|---|
| 1524. Microsoft's Copilot home page stated: "instead of clicking through links, we can talk about whatever you're curious about." Ex. 1265 [Cromwell Depo. Ex. 6]. | 1524. **Undisputed – Immaterial.** Microsoft does not dispute that News Ex. 1265 contains the quoted language. But Microsoft responds that Paragraph 1524 is immaterial because these facts do not affect the outcome of the suit under the governing law. Allegations that Microsoft's products encourage end-users' conduct are immaterial to any claim or defense in this action. *See* ECF 1662 (order denying the New York Times and the Daily News Plaintiffs' motion for leave to amend their complaints to assert "inducement" and "services tailored to infringement" theories of contributory copyright infringement liability).<br><br>OpenAI defers to Microsoft's response. |
| 1525. OpenAI's Head of ChatGPT Nick Turley wrote in February 2023 that, once a user receives the generative AI chatbot response, there is "no good reason to click" through to the underlying source. Ex. 1027 [OPCO_MDL_001699819] at 823. | 1525. **Disputed in Part – Not Supported by Cited Evidence.** OpenAI responds as follows: Undisputed that News Ex. 1027 contains the quoted language.<br>However, disputed that the quoted language is a discussion of links generally. The cited evidence does not support that characterization, and the Court should disregard it.<br>Pursuant to Fed. R. Evid. 106, OpenAI further responds that the quoted language appears in a discussion about how to present links. Mr. Turley is discussing one potential method of displaying links. In that same discussion, he advocates for a user experience |

| | |
|---|---|
| | (UX) that would drive traffic back to websites. News Ex. 1027 at OPCO_MDL_001699823.<br><br>Microsoft defers to OpenAI. |
| 1526. OpenAI similarly stated on October 31, 2024 that ChatGPT "can now search the web in a much better way than before" by providing "fast, timely answers…which you would have previously needed to go to a search engine for" including "up-to-date sports scores, news, stock quotes, and more." Ex. 495 ["Introducing ChatGPT search," OpenAI (Oct. 31, 2024), https://openai.com/index/introducing-chatgpt-search/]. | 1526. **Disputed in Part – Not Supported by Cited Evidence.** OpenAI responds as follows: Undisputed that News Ex. 495 contains the quoted language.<br>However, disputed that Plaintiffs' partial quotation is complete or accurately characterizes the announcement. Plaintiffs' ellipsis leaves out language that changes the meaning of the passage. The cited evidence therefore does not support Plaintiffs' characterization.<br>Pursuant to Fed. R. Evid. 106, OpenAI responds that the full passage reads: "ChatGPT can now search the web in a much better way than before. You can get fast, timely answers *with links to relevant web sources*, which you would have previously needed to go to a search engine for." News Ex. 495 (emphasis added). By leaving out the language about links, Plaintiffs present the announcement as saying that ChatGPT's answers replace the need for a search engine. The announcement instead compares the links a search engine provides with the links ChatGPT provides.<br><br>Microsoft defers to OpenAI. |

| | |
|---|---|
| 1527. Microsoft's CEO Satya Nadella testified that LLMs like ChatGPT act as an alternative to and would "fundamentally change" traditional search: "Q. And is there any expectation, at least in the foreseeable future, that these LLMs, these ChatGPT products, are going to replace Internet search? A. ... I believe the search category by itself will fundamentally change, because there's a new way to think about answering questions using LLMs versus sort of just giving you the 10 blue links..." Ex. 1233 [*U.S. et al. v. Google LLC*, Nadella Trial Testimony, Day 14 Morning Session] at 3529:10-17. | 1527. **Disputed in Part – Immaterial; Incomplete.** Microsoft does not dispute that Mr. Nadella made the statements quoted in Paragraph 1527 during trial in an unrelated case. But Microsoft disputes that Mr. Nadella testified that "LLMs like ChatGPT act as an alternative to . . . traditional search." Pursuant to Fed. R. Evid. 106, Mr. Nadella's full testimony is: "Q And is there any expectation, at least in the foreseeable future, that these LLMs, these ChatGPT products, are going to replace Internet search?" "A The—there's two things. I believe the search category by itself will fundamentally change, because there's a new way to think about answering questions using LLMs versus sort of just giving you the 10 blue links, and you're still having citations, still having traffic transfers to publishers, which all matter because otherwise, why would a publisher allow you to index them. So with all that said, I do believe it fundamentally can change if allowed to sort of play out in a way where the content that allows you to create large language models is, again, not exclusive to one player." News Ex. 1233 at 3529:10–24.<br>Microsoft further responds that the fact set forth in Paragraph 1527 is immaterial because the fact does not affect the outcome of the suit under the governing law. Whether generative AI competes with traditional search engines does not answer the question whether there has been actual harm to publisher traffic or subscriptions and therefore does not have any bearing on the market for the Asserted Works. |

| | |
|---|---|
| | OpenAI defers to Microsoft's response. Ms. Nadella is a Microsoft employee not authorized to speak on behalf of OpenAI. |
| 1528. A comparison of Google search results and ChatGPT results is illustrated below for the same query ("indie games id xbox showcase announcement"):   Stricchiola NYT/DN Opening Rep. at ¶ 337. | 1528. **Disputed in Part - Expert Opinion Subject to Rule 702.** OpenAI responds as follows: Undisputed to the extent that these two photos are outputs of the stated query. However, disputed to the extent one query supports the preceding fact 1527.<br>Further, the evidence cited in support of the disputed proposition is currently subject to a motion to exclude expert testimony pursuant to Fed. R. Evid. 702. Defendants' pending Rule 702 motion seeks to exclude certain opinions of Ms. Stricchiola, on which this statement relies. To the extent the Court excludes the challenged opinions, Plaintiffs may not rely on them to support this statement. *See* Fed. R. Civ. P. 56(c)(2).<br><br>Microsoft defers to OpenAI. |
| 1529. News Plaintiffs' expert Jessie Stricchiola compared the user click-through-rate ("CTR"), measured as click / impression, of Bing Web Search (i.e., traditional search) to Bing Chat (i.e., Generative AI) for the Times and Daily News domains during the period covering December 2023 through September 2024 and for various Ziff Davis domains during June 2023. Stricchiola NYT/DN Opening | 1529. **Disputed in Part – Subject to Fed. R. Evid. 702 Motion; Immaterial.** Defendants do not dispute that Jessie Stricchiola purported to compare the click-through-rate ("CTR"), measured as click / impression, of Bing Web Search to Bing Chat (now known as Copilot) for the time period stated in Paragraph 1529 for The Times, the Daily News Plaintiffs, and Ziff Davis. Defendants dispute the characterization |

| | |
|---|---|
| Rep. at Section XIII (¶¶ 379-449); Stricchiola ZD Opening Rep. Section XIII. | of Ms. Stricchiola as "News Plaintiffs' expert" because she was not retained by, and did not offer opinions on behalf of, CIR and The Intercept.<br>Defendants also respond that Ms. Stricchiola's purported CTR "comparison" is the subject of a pending motion to exclude expert testimony pursuant to Fed. R. Evid. 702. To the extent the Court excludes the challenged opinions, Plaintiffs may not rely on them to support this statement. *See* Fed. R. Civ. P. 56(c)(2).<br>Microsoft further responds that the fact set forth in Paragraph 1529 is immaterial because the fact does not affect the outcome of the suit under the governing law. Whether generative AI competes with traditional search engines is a question about competition among technology platforms that does not have any bearing on the market for the Asserted Works.<br>Microsoft further responds that this fact, as it relates to Ziff Davis, does not pertain to claims asserted against Microsoft. |
| 1530. The CTR refers to the percentage of clicks from users to a given URL relative to the total impressions, which are the appearances of that URL in a rendered search results page or within a chatbot's response. Stricchiola NYT/DN Opening Rep. ¶ 380. | 1530. **Disputed in Part – Subject to Fed. R. Evid. 702 Motion.** Defendants do not dispute the definition of CTR as set forth in Paragraph 1530. However, Defendants also respond that Ms. Stricchiola's purported CTR "comparison" is currently the subject of a pending motion to exclude expert testimony pursuant to Fed. R. Evid. 702. To the extent the Court excludes the challenged opinions, Plaintiffs may not rely on them to support this statement. *See* Fed. R. Civ. P. 56(c)(2). |

| | |
|---|---|
| 1531. Ms. Stricchiola's analysis reflects that the CTR for Bing Chat is dramatically lower than for traditional Bing Search. Stricchiola NYT/DN Opening Rep. ¶ 389; Stricchiola Rebuttal Rep. ¶¶ 26-29; Stricchiola ZD Opening Rep. ¶ 263. | 1531. **Disputed in Part – Subject to Fed. R. Evid. 702 Motion; Immaterial.** Defendants do not dispute that Ms. Stricchiola's listing of the CTR for Bing Chat is lower than the CTR of Bing Web Search. Defendants dispute that Ms. Stricchiola did any sort of "analysis" aside from listing the CTRs of these two products side-by-side.<br>Defendants also dispute the conclusions Ms. Stricchiola purports to draw from her "comparison" because CTRs do not indicate whether a user used Bing Chat instead of Bing Web Search or whether traffic to Plaintiffs' site decreased as a result of consumers' use of Bing Chat. Additionally, Ms. Stricchiola's side-by-side lists of the Bing Chat and Bing Web Search CTRs do not purport to establish any sort of causal relation or evidence of "substitution" from one to the other. *See* ECF 1733 (C. Tucker Decl.) ¶¶ 12, 105–129; A. Blanco Opp. Decl. Ex. 293 (J. Stricchiola Tr.) at 96:24–97:1 (admitting she is not "provid[ing] an opinion on whether chatbots are replacing search engines at scale"), 90:21-97:9 (acknowledging that GenAI tools are "complementing—not replacing—search engine behavior."). For these reasons, Defendants also dispute this fact as immaterial because it does not affect the outcome of the suit under the governing law. |

| | |
|---|---|
| | Defendants also respond that Ms. Stricchiola's purported CTR "comparison" is currently the subject of a pending motion to exclude expert testimony pursuant to Fed. R. Evid. 702. To the extent the Court excludes the challenged opinions, Plaintiffs may not rely on them to support this statement. *See* Fed. R. Civ. P. 56(c)(2).<br><br>Microsoft further responds that the fact set forth in Paragraph 1531 is immaterial because the fact does not affect the outcome of the suit under the governing law. Whether generative AI competes with traditional search engines is a question about competition among technology platforms that does not have any bearing on the market for the Asserted Works.<br>Microsoft responds that this fact, as it relates to Ziff Davis, does not pertain to claims asserted against Microsoft. |
| 1532. Design differences between GenAI query responses and non-GenAI search results and the quantitative analysis CTRs of those systems shows that Defendants' products are providing a mechanism for substitution of News Plaintiffs' products. Stricchiola Rebuttal Rep. ¶¶ 26-27. | 1532. **Disputed – Improper Legal Argument; Subject to Fed. R. Evid. 702 Motion; Immaterial.** Defendants respond that this fact is disputed in full. Defendants further respond that the Court should disregard this Paragraph because the assertion constitutes improper attorney argument and/or is conclusory. Specifically, whether there is any "substitution" of News Plaintiffs' Asserted Works is an issue to be determined by the Court in this motion.<br>Defendants dispute that there has been any "substitution" of News Plaintiffs' Asserted Works and |

| | |
|---|---|
| | that "design differences between GenAI query responses and non-GenAI search results and the quantitative analysis CTRs" are evidence of that substitution. CTRs do not indicate whether a user used Bing Chat instead of Bing Search or whether traffic to Plaintiffs' site decreased as a result of consumers' use of Bing Chat and Ms. Stricchiola's side-by-side lists of the Bing Chat and Bing Search CTRs do not purport to establish any sort of causal relation or evidence of "substitution" from one to the other. ECF 1733 (C. Tucker Decl.) ¶¶ 12, 105-129; A. Blanco Opp. Decl. Ex. 293 (J. Stricchiola Tr.) at 96:24-97:1 (admitting she is not "provid[ing] an opinion on whether chatbots are replacing search engines at scale"), 90:21-97:9 (acknowledging that GenAI tools are "complementing—not replacing—search engine behavior."). Additionally, Ms. Stricchiola did not analyze News Plaintiffs' traffic or conversions, *see id.* at 79:20-81:21, 97:21-99:24. Defendants' experts have found no evidence that News Plaintiffs suffered any harm from any alleged "substitution." Empirical analysis shows that there has been no adverse change in the trend of News Plaintiffs' revenue, subscriptions, traffic, search-referred traffic, or conversion rates following the introduction of ChatGPT and Copilot. ECF 1733 (C. Tucker Decl.) ¶¶ 11, 16-104; ECF 1763 (A. Goldfarb Decl.) ¶¶ 9, 21–25, 40–43, 52–59, 71–76, 81–86. In fact, [redacted] ECF 1733 (C. Tucker Decl.) ¶¶ 30-33, 63-66; ECF 1763 (A. Goldfarb Decl.) ¶¶ 21–25. |

Defendants further responds that the fact set forth in Paragraph 1532 is immaterial because the fact does not affect the outcome of the suit under the governing law. Whether generative AI competes with traditional search engines is a question about competition among technology platforms that does not have any bearing on the market for the Asserted Works.

Defendants also respond that Ms. Stricchiola's purported CTR "comparison" is currently the subject of a pending motion to exclude expert testimony pursuant to Fed. R. Evid. 702. To the extent the Court excludes the challenged opinions, Plaintiffs may not rely on them to support this statement. *See* Fed. R. Civ. P. 56(c)(2).

1533. The chart below reflects Ms. Stricchiola's findings on the CTR difference between Bing Web Search and Bing Chat for each of the listed Times and Daily News domains:

| Domain | CTR - Bing Web Search | CTR - Bing Chat | CTR % Difference in Bing Chat |
|---|---|---|---|
| chicagotribune.com | 2.70% | 0.37% | -86.13% |
| denverpost.com | 2.70% | 0.36% | -86.84% |
| mercurynews.com | 1.83% | 0.31% | -82.82% |
| nydailynews.com | 2.25% | 0.21% | -90.60% |
| ocregister.com | 2.20% | 0.27% | -87.49% |
| orlandosentinel.com | 2.82% | 0.39% | -86.10% |
| sun-sentinel.com | 3.44% | 0.38% | -89.04% |
| twincities.com | 3.25% | 0.33% | -89.70% |
| nytimes.com | 2.96% | 0.38% | -87.15% |
| cooking.nytimes.com | 1.61% | 0.11% | -92.88% |

Malackowski NYT-DNP Opening Report at 47, Figure 9 (creating chart of Stricchiola's analysis results); Stricchiola NYT/DN Opening Report at ¶ 389 (Stricchiola's analysis); Ex. 687 [Tucker Depo. Tr.] at

1533. **Disputed in Part – Subject to Fed. R. Evid. 702 Motion; Immaterial.** Defendants do not dispute that the chart in Paragraph 1533 represents Ms. Stricchiola's chart of the CTR for Bing Chat listed side-by-side with the CTR of Bing Web Search for The Times and the Daily News Plaintiffs' domains. Defendants do dispute that the CTR numbers reported by Stricchiola in the chart can be used to calculate a "difference" between Bing Chat and Bing Web search since CTRs do not indicate whether a user used Bing Chat instead of Bing Search or whether traffic to Plaintiffs' site decreased as a result of consumers' use of Bing Chat, and because Ms. Stricchiola's side-by-side lists of the Bing Chat and Bing Web Search CTRs do not purport to establish any sort of causal relation or evidence of

| | |
|---|---|
| 97:3-9 ("So I don't dispute the numerical calculation of the click-through rate."). | "substitution" from one to the other. ECF 1733 (C. Tucker Decl.) ¶¶ 12, 105-129; A. Blanco Opp. Decl. Ex. 293 (J. Stricchiola Tr.) at 96:24-97:1 (admitting she is not "provid[ing] an opinion on whether chatbots are replacing search engines at scale"), 90:21-97:9 (acknowledging that GenAI tools are "complementing—not replacing—search engine behavior."). Defendants also dispute that Ms. Stricchiola did any sort of "analysis;" all she did was present the CTRs of the two products next to each other in side-by-side lists. For these reasons, Defendants also dispute this fact as immaterial because it does not affect the outcome of the suit under the governing law.<br>Defendants also respond that Ms. Stricchiola's purported CTR "comparison" is currently the subject of a pending motion to exclude expert testimony pursuant to Fed. R. Evid. 702. To the extent the Court excludes the challenged opinions, Plaintiffs may not rely on them to support this statement. *See* Fed. R. Civ. P. 56(c)(2).<br><br>Microsoft further responds that the fact set forth in Paragraph 1533 is immaterial because the fact does not affect the outcome of the suit under the governing law. Whether generative AI competes with traditional search engines is a question about competition among technology platforms that does not have any bearing on the market for the Asserted Works. |

1534. The chart below reflects Ms. Stricchiola's findings on the CTR difference between Bing Web Search and Bing Chat for each of the listed Ziff Davis domains:

| Domain | CTR - Bing Web Search | CTR - Bing Chat | CTR % Difference in Bing Chat |
|---|---|---|---|
| babycenter.com | 3.55% | 0.24% | -93.09% |
| cnet.com | 1.13% | 0.56% | -50.91% |
| eurogamer.net | 1.90% | 0.19% | -89.95% |
| everydayhealth.com | 2.16% | 0.37% | -82.77% |
| ign.com | 2.39% | 0.26% | -89.23% |
| lifehacker.com | 2.71% | 0.57% | -79.05% |
| mashable.com | 1.18% | 0.55% | -53.06% |
| pcmag.com | 1.10% | 0.46% | -57.98% |
| rockpapershotgun.com | 1.72% | 0.37% | -78.70% |
| vg247.com | 1.24% | 0.17% | -86.11% |
| whattoexpect.com | 3.70% | 0.21% | -94.33% |

Stricchiola ZD Opening Rep. Appendix D (another domain, ZDNet.com, showed an increase in CTR for Bing Chat which Stricchiola determined was an unrepresentative outlier reflecting anomalous chat performance and an abnormally elevated Search impression count) (Stricchiola ZD Opening Rep. ¶ 267.

1534. **Disputed in Part – Subject to Fed. R. Evid. 702 Motion; Immaterial.** Defendants do not dispute that the chart in Paragraph 1534 represents Ms. Stricchiola's chart of the CTR for Bing Chat listed side-by-side with the CTR of Bing Web Search for the Ziff Davis domains. Defendants do dispute that the CTR numbers reported by Stricchiola in the chart can be used to calculate a "difference" between Bing Chat and Bing Web search since CTRs do not indicate whether a user used Bing Chat instead of Bing Search or whether traffic to Plaintiffs' site decreased as a result of consumers' use of Bing Chat, and because Ms. Stricchiola's side-by-side lists of the Bing Chat and Bing Web Search CTRs do not purport to establish any sort of causal relation or evidence of "substitution" from one to the other. ECF 1733 (C. Tucker Decl.) ¶¶ 12, 105-129; A. Blanco Opp. Decl. Ex. 293 (J. Stricchiola Tr.) at 96:24-97:1 (admitting she is not "provid[ing] an opinion on whether chatbots are replacing search engines at scale"), 90:21-97:9 (acknowledging that GenAI tools are "complementing—not replacing—search engine behavior."). Defendants also dispute that Ms. Stricchiola did any sort of "analysis;" all she did was present the CTRs of the two products next to each other in side-by-side lists. For these reasons, Defendants also dispute this fact as immaterial because it does not affect the outcome of the suit under the governing law.

| | |
|---|---|
| | Defendants further respond that the fact set forth in Paragraph 1534 is immaterial because the fact does not affect the outcome of the suit under the governing law. Whether generative AI competes with traditional search engines is a question about competition among technology platforms that does not have any bearing on the market for the Asserted Works. Defendants also respond that Ms. Stricchiola's purported CTR "comparison" is currently the subject of a pending motion to exclude expert testimony pursuant to Fed. R. Evid. 702. To the extent the Court excludes the challenged opinions, Plaintiffs may not rely on them to support this statement. *See* Fed. R. Civ. P. 56(c)(2). |
| 1535. These click-through-rate differences are conservative because Defendants' AI products do not always contain citations (or URLs) to their sources, and when there are no URLs, there are no "impressions" -- so in those instances the measure of clicks to impressions is zero. Stricchiola NYT/DN Opening Rep. ¶ 63. | 1535. **Disputed – Subject to Fed. R. Evid. 702 Motion; Immaterial.** Defendants dispute that the CTR numbers reported by Stricchiola can be used to calculate a "difference" between Bing Chat and Bing Web search since CTRs do not indicate whether a user used Bing Chat instead of Bing Web Search or whether traffic to Plaintiffs' site decreased as a result of consumers' use of Bing Chat, and because Ms. Stricchiola's side-by-side lists of the Bing Chat and Bing Search CTRs do not purport to establish any sort of causal relation or evidence of "substitution" from one to the other. ECF 1733 (C. Tucker Decl.) ¶¶ 12, 105-129; A. Blanco Opp. Decl. Ex. 293 (J. Stricchiola Tr.) at 96:24–97:1 (admitting she is not "provid[ing] an opinion on whether chatbots are replacing search engines at scale"), 90:21- |

| | |
|---|---|
| | 97:9 (acknowledging that GenAI tools are "complementing—not replacing—search engine behavior."). Defendants also dispute that Ms. Stricchiola did any sort of "analysis;" all she did was present the CTRs of the two products next to each other in side-by-side lists. For these reasons, Defendants also dispute this fact as immaterial because it does not affect the outcome of the suit under the governing law.<br>Defendants dispute that the cited evidence establishes that the reported CTR differences are "conservative" or that zero impressions yields a CTR of zero. The cited evidence does not identify any instances where "there are no URLs, there are no 'impressions.'" Also disputed to the extent the statement implies that the absence of source URLs establishes lost traffic to News Plaintiffs' websites.<br>Defendants further respond that this fact is disputed because Copilot provides attribution and links to every webpage used as grounding content, which helps users navigate directly to those webpages to verify information or learn more. *See* ECF 1713 (E. Abib Decl.) ¶¶ 6, 10; A. Hurst Decl. Ex. 26 111:14–112:17, 147:20-148:1; A. Hurst Decl. Ex. 99 65:7–12.<br>Defendants also respond that Ms. Stricchiola's purported CTR "comparison" is currently the subject of a pending motion to exclude expert testimony pursuant to Fed. R. Evid. 702. To the extent the Court excludes the challenged opinions, Plaintiffs may not rely on them to support this statement. *See* Fed. R. Civ. P. 56(c)(2). |

| | |
|---|---|
| 1536. According to Ms. Stricchiola's analysis, the overall click-through rate difference between Bing Chat and Bing Web Search was 87% to 93% for The Times's domains, 83% to 91% for Daily News Plaintiffs' domains, and 51% to 94% for Ziff Davis' domains. Stricchiola Rebuttal Rep. ¶ 29; Stricchiola NYT/DN Opening Rep. ¶ 389; Stricchiola ZD Opening Rep. at ¶ 264; Ex. 859 [MSFT_AI_MDL_002873679] (nytimes.com); Ex. 860 [MSFT_AI_MDL_002873609] (cooking.nytimes.com); Ex. 861 [MSFT_AI_MDL_002873749] (thewirecutter.com); Ex. 862 [MSFT_AI_MDL_002873595] (chicagotribune.com); Ex. 863 [MSFT_AI_MDL_002873623] (denverpost.com); Ex. 864 [MSFT_AI_MDL_002873637] (mercurynews.com); Ex. 865 [MSFT_AI_MDL_002873665] (nydailynews.com); Ex. 866 [MSFT_AI_MDL_002873693] (ocregister.com); Ex. 867 [MSFT_AI_MDL_002873707] (orlandosentinel.com); Ex. 868 [MSFT_AI_MDL_002873735] (sun-sentinel.com); Ex. 869 [MSFT_AI_MDL_002873763 (twincities.com). | 1536. **Disputed – Subject to Fed. R. Evid. 702 Motion; Immaterial.** Defendants dispute that the CTR numbers reported by Ms. Stricchiola can be used to calculate a "difference" between Bing Chat and Bing Web Search since CTRs do not indicate whether a user used Bing Chat instead of Bing Web Search or whether traffic to Plaintiffs' site decreased as a result of consumers' use of Bing Chat, and because Ms. Stricchiola's side-by-side lists of the Bing Chat and Bing Search CTRs do not purport to establish any sort of causal relation or evidence of "substitution" of one with the other. *See* ECF 1733 (C. Tucker Decl.) ¶¶ 12, 105-129; A. Blanco Opp. Decl. Ex. 293 (J. Stricchiola Tr.) at 96:24-97:1 (admitting she is not "provid[ing] an opinion on whether chatbots are replacing search engines at scale"), 90:21-97:9 (acknowledging that GenAI tools are "complementing—not replacing—search engine behavior."). Defendants also dispute that Ms. Stricchiola did any sort of "analysis;" all she did was present the CTRs of the two products next to each other in side-by-side lists. For these reasons, Defendants also dispute this fact as immaterial because it does not affect the outcome of the suit under the governing law.<br><br>Defendants also respond that Ms. Stricchiola's purported CTR "comparison" is currently the subject of a pending motion to exclude expert testimony pursuant to Fed. R. Evid. 702. To the extent the Court excludes the challenged opinions, Plaintiffs may not rely on them to support this statement. *See* Fed. R. Civ. P. 56(c)(2). |

| | |
|---|---|
| | Defendants further respond that the fact set forth in Paragraph 1536 is immaterial because the fact does not affect the outcome of the suit under the governing law. Whether generative AI competes with traditional search engines is a question about competition among technology platforms that does not have any bearing on the market for the Asserted Works.<br><br>Microsoft responds that this fact, as it relates to Ziff Davis, does not pertain to claims asserted against Microsoft. |
| 1537. Stricchiola's Microsoft Copilot results are similar to those of other public studies of different generative AI chatbots. A study by SEER indicated that in January 2025, when Google presented an AI Overview (an AI-generated summary) alongside search results with links, the organic click-through rate for those links dropped from 3.97% to 0.64%, a reduction of almost 84%. Ex. 1100 ["Google AI Overview Study - SEO & PPC CTR impact," Seer interactive, February 4, 2025, https://www.seerinteractive.com/insights/ctr-aio]. | 1537. **Disputed – Not Supported by Cited Evidence; Not Supported by Admissible Evidence; Subject to Fed. R. Evid. 702 Motion; Immaterial**. Defendants respond that this fact is disputed in full. First, to the extent "Stricchiola's Microsoft Copilot results" in the first sentence of Paragraph 1537 refers to Ms. Stricchiola's purported comparison of the CTRs of Bing Web Search and Bing Chat for The Times and Daily News Plaintiffs, Defendants dispute the first sentence because Ms. Stricchiola's purported CTR comparison is currently the subject of a pending motion to exclude expert testimony pursuant to Fed. R. Evid. 702. To the extent the Court excludes the challenged opinions, Plaintiffs may not rely on them to support this statement. *See* Fed. R. Civ. P. 56(c)(2). Defendants further dispute Ms. Stricchiola's purported CTR "comparison" for all the reasons stated |

| | |
|---|---|
| | in response to Paragraph 1536, including because it is immaterial.<br>Defendants further respond that the second sentence in Paragraph 1537 regarding the SEER study is disputed on the grounds that it is not supported by admissible evidence, as required by Local Rule 56.1, and therefore is not properly before the Court. Specifically, the evidence cited is a third-party "study," which lacks foundation and is hearsay. *See* Fed. R. Evid. 801, 802, 803.<br>Defendants further respond that the second sentence in Paragraph 1537 regarding the SEER study is disputed on the grounds that it is not supported by cited evidence. Specifically, the website states that "For queries where AI Overviews appear, organic CTR plummeted from ***1.41%*** to 0.64% year-over-year." whereas the fact as written states that "when Google presented an AI Overview (an AI-generated summary) alongside search results with links, the organic click-through rate for those links dropped from ***3.97%*** to 0.64%, a reduction of almost 84%." |
| 1538. News Plaintiffs' expert Jessie Stricchiola was unable to draw reliable conclusions from the click-through rate data produced by OpenAI because it was unreliable. Stricchiola NYT/DN Opening Rep. ¶¶ 428-436; Stricchiola ZD Opening Rep. ¶¶ 254-260; Stricchiola Rebuttal Rep. ¶¶ 117-126; Stricchiola Reply Rep. ¶¶ 86-94. | 1538. **Disputed - Not Supported by Cited Evidence; Expert Opinion Subject to Rule 702.** OpenAI responds as follows: Undisputed that Ms. Stricchiola did not calculate click-through rates for ChatGPT. Disputed to the extent this statement characterizes Ms. Stricchiola's failure to draw reliable conclusions from the click-through rate data as |

| | |
|---|---|
| | establishing that OpenAI's data was unreliable. *See* ECF 1763 (A. Goldfarb Decl.) ¶ 90-91; Fed. R. Evid. 106 Therefore, the facts set forth in Paragraph 1538 are disputed because the cited evidence is incorrect. OpenAI also disputes that any "conclusions" that Ms. Stricchiola did draw from the Bing Web Search and Bing Chat click-through data are reliable or proper, for all the reasons stated in response to Paragraph 1536.<br>Further, the fact stated in Paragraph 1538 is disputed because the evidence cited in support is currently subject to a motion to exclude expert testimony pursuant to Fed. R. Evid. 702. Defendants' pending Rule 702 motion seeks to exclude certain opinions of Ms. Stricchiola, on which this statement relies. To the extent the Court excludes the challenged opinions, Plaintiffs may not rely on them to support this statement. *See* Fed. R. Civ. P. 56(c)(2).<br><br>Microsoft defers to OpenAI. |
| 1539. A CHI 2025 study found that participants using ChatGPT visited far fewer external websites than those using Google. The chatbot's generated answer was frequently sufficient on its own, eliminating the need (or at least the perceived need) to clickthrough to original sources. One of the most striking findings was a dramatic reduction in external browsing: 87.78% of ChatGPT users visited zero external websites during their search, compared to only 26.91% of Google users who visited none. | 1539. **Disputed in Part – Not Supported by Cited Evidence; Expert Opinion Subject to Rule 702.** Defendants respond as follows: Undisputed to the extent Paragraph 1539 reflects Ms. Stricchiola's opinions regarding the CHI 2025, but disputed to the extent that Ms. Stricchiola believes this study is "supportive informational context" (*see* A. Blanco Opp. Decl. Ex. 293 (J. Stricchiola Tr.) at 85:11-12) for any opinions related to substitution emanating from her purported |

| | |
|---|---|
| ChatGPT functioned as a "one-stop solution" rather than a hub connecting users to other sources. Ex. 1101 [Kaiser et al., "A New Era of Online Search? A Large-Scale Study of User Behavior and Personal Preferences during Practical Search Tasks with Generative AI versus Traditional Search Engines," ACM CHI 2025. https://dl.acm.org/doi/10.1145/3706599.3720123]; Stricchiola NYT/DN Opening Rep. ¶ 339; Stricchiola ZD Opening Rep. 279. | "comparison" of Bing Web Search and Bing Chat click-through rates, which is currently subject to a motion to exclude expert testimony pursuant to Fed. R. Evid. 702. ECF 1798-1 (J. Stricchiola Decl. Ex. B (NYT/DN Opening Rep.) ¶ 339; ECF 1798-1 (J. Decl. Ex. A (ZD Opening Rep.) ¶ 279. To the extent the Court excludes Ms. Stricchiola's challenged opinions, Plaintiffs may not rely on them to support this statement. *See* Fed. R. Civ. P. 56(c)(2).<br>This is further disputed to the extent Paragraph 1539 fails to identify the limitations of the study in Ex. 1101.<br>Further disputed that the study shows ChatGPT functioned as a "one-stop solution" rather than a hub connecting users to other sources. The cited evidence does not support that inference, and the Court should disregard it.<br><br>Microsoft responds that the reference to the Stricchiola Ziff Davis report pertains to claims not asserted against Microsoft. |
| 1540. Cloudflare's CEO, Mr. Prince, cited data regarding the ratio of webpages scraped (a measure of what technology companies like Google and OpenAI are taking from content creators on the web) to the number of visitors sent to the content creators webpage, finding that in 2015 Google scraped two pages for every visitor it sent to the content creator or publisher, a ratio of 2:1, and in late 2024, | 1540. **Disputed in Part– Not Supported by Cited Evidence; Not Supported by Admissible Evidence.** Defendants respond as follows: Disputed because the cited portions of the video do not contain all of the statistics in Paragraph 1540. The facts set forth in Paragraph 1540 are therefore not supported by the cited material, and the Court should disregard them. Further |

| | |
|---|---|
| that ratio was 6:1 for Google and 250:1 for OpenAI. As of June 2025, that ratio was 18:1 for Google and 1,500:1 for OpenAI. "Axios' Sara Fischer in conversation with Cloudflare's Matthew Prince," YouTube, June 20, 2025, https://www.youtube.com/watch?v=H5C9EL3C82Y at 0:40-0:47, 1:27-2:04; Ex. 1103 ["Publishers facing existential threat from AI, Cloudflare CEO says," Axios, June 19, 2025, https://www.axios.com/2025/06/19/ai-searchtraffic-publishers]. | disputed that these numbers are a reliable metric. Mr. Prince made these statements at a public event without citing any methodology or source. His statements are therefore not supported by admissible evidence, as required by Local Rule 56.1, and are not properly before the Court. Fed. R. Evid. 801, 802, 803. Specifically, Mr. Prince's statements are hearsay and lack foundation because they are a non-party's out-of-court statements offered for their truth. Nothing establishes how the figures were calculated or whether they are reliable.<br>Pursuant to Fed. R. Evid. 106, Defendants further respond that Mr. Prince made these statements shortly before Cloudflare announced its own "pay per crawl" service. *See* News Ex. 284. |
| 1541. The Q1 2025 TollBit State of the Bots report similarly reports shrinking crawl-to-referral ratios for Bing and OpenAI—*i.e.*, Bing's crawl-to-referral ratio went from 6:1 in Q3 2024 to 11:1 in Q1 2025, and OpenAI's ratio was 286:1 in Q4 2024 and 179:1 in Q1 2025. Ex. 1263 [DNP-00534490] at 510. | 1541. **Disputed - Immaterial.** Microsoft responds that "Bing's crawl-to-referral ratio went from 6:1 in Q3 2024 to 11:1 in Q1 2025" is disputed because it is not clear what this so-called ratio is referring to and because the data underlying this so-called ratio is unreliable. Specifically, regarding the "crawl" part of the ratio, [redacted] A. Blanco Opp. Decl. Ex. 220 (O. Joslin 30(b)(6) Deposition (TollBit)) at 233:5-238:24. Additionally, [redacted] *See id.* at 127:17-23. [redacted] *Id.* at 31:2-7 (addressing static |

| | |
|---|---|
| | assets), 172:12-173:21 (addressing 0-byte content), 179:10-20 (addressing robots.txt sub-pages). Regarding the "referral" part of the ratio, TollBit's corporate representative testified that [redacted]. *Id.* at 237:23-240:23, 262:1-265:11. Additionally, Defendants further dispute the fact set forth in Paragraph 1541 because it states that "crawl-to-referral ratios for Bing" are "shrinking," yet the ratio listed for Bing (although it is not clear what this is actually referring to) is increasing: *6:1* in Q3 2024 to *11:1* in Q1 2025. Thus, Defendants dispute the validity of TollBit's reported "crawl-to-referral ratio" with respect to Bing, Microsoft, and ChatGPT. *See* News Ex. 423 (N. Feamster Rebuttal Rep.) ¶¶ 106-107.<br>Defendants further respond that this fact is immaterial and therefore disputed because it does not affect the outcome of the suit under the governing law. Specifically, although it is not clear what the "crawl-to-referral ratio for Bing" is actually referring to, Bing is not an accused product at issue in this case, and thus any reference to it is immaterial. |
| 1542. OpenAI was aware of a study in 2023 indicating that "[t]wenty-nine percent of online traffic to news sites and 38% of new subscription conversions are at risk if tech companies scale generative AI-driven search, but that will likely take a couple of years…" Ex. 1043 [OPCO_MDL_004771748] at 748. | 1542. **Disputed - Improper Legal Argument; Not Supported by Cited Evidence.** OpenAI responds as follows: Paragraph 1542 is disputed as unsupported by the cited material.<br>Pursuant to Fed. R. Evid. 106, OpenAI further responds that the cited exhibit is a short internal |

| | |
|---|---|
| | exchange. News Ex. 1043. In it, Peter Hoeschele states that he "heard a stat from a few publishers" about a "drop in organic search traffic because of on "1 click answers." *Id.* at OPCO_MDL_004771748. Jonathan Lachman then provides links to a New York Times article and an INMA article. *Id.* Undisputed that the quoted language in Paragraph 1542 appears in the INMA article. However, the short exchange in News Ex. 1043 does not show that OpenAI as an entity was "aware" of this study.<br><br>Microsoft defers to OpenAI. |
| 1543. According to Dr. Hecht, a decrease in click-through-rate of even 12 percent would be a "substantial impact." Ex. 671 [Hecht Depo. Tr.] at 57:23-58:12. | 1543. **Undisputed – Incomplete; Immaterial.** Microsoft responds as follows: Microsoft does not dispute that Hecht gave the quoted testimony. But pursuant to Fed. R. Evid. 106, his full answer shows it was a qualified response to counsel's hypothetical, which was built on a slide about a study of Wikipedia links in Google search results. Hecht said that "people who work in search engines" have "more direct knowledge" of the business impact of click-through-rate changes. A. Blanco Opp. Decl. Ex. 212 (B. Hecht 30(b)(6) Tr.) at 58:6–12. He answered only "[b]ased on the public available -- publicly available information." *Id.*<br>Microsoft also responds that the facts stated in Paragraph 1543 are immaterial and therefore disputed because these facts do not affect the outcome of the suit under the governing law. Specifically, a researcher's |

| | |
|---|---|
| | answer to a hypothetical about a study of Wikipedia links in Google search results does not establish any fact regarding Plaintiffs' websites or any effect on Plaintiffs' works. Further, Hecht's statements cannot be attributed to Microsoft. Hecht is a research academic employed at Microsoft to bring "divergent," "asymmetric, futuristic, and academic points of view"; he does not set Microsoft's core priorities or speak for Microsoft as to "his theoretical views on AI's potential effect on content creators"; and Microsoft leadership "does not share all of [his] views"; and he is a "kind of intellectual provocateur." ECF 1707 (J. Usdan Decl.) ¶ 39; A. Blanco Opp. Decl. Ex. 285 (J. Usdan 30(b)(6) Tr. (Feb. 11, 2026)) at 173:22-174:9. Hecht has himself disclaimed any authority to speak for Microsoft, testifying that his views on these subjects are "my view, not Microsoft's view," that "[he] has no idea if [they are] shared by the board of Microsoft," and that "[he] can't speak for the company on this stuff." A. Blanco Opp. Decl. Ex. 212 (B. Hecht 30(b)(1) Tr.) at 319:18–20, 320:10–12, 321:4–5. He further described his views as "hypotheses," cautioned that "the jury is still out on a lot of this stuff," and acknowledged that he is "not a lawyer." *Id.* at 59:11–60:8, 165:9–15, 166:10–11. Hecht's personal views therefore are not statements of Microsoft and do not reflect Microsoft's knowledge, policies, or conduct.<br>OpenAI joins Microsoft's response, except to the extent any portion of it, including any testimony quoted under Fed. R. Evid. 106, could be read to characterize |

| | |
|---|---|
| | OpenAI, its models, or its conduct. OpenAI disputes any such characterization. Hecht is a Microsoft researcher who testified unequivocally: "I don't speak for Microsoft. I definitely don't speak for OpenAI." *Id.* at 100:11–12. His statements are not based on personal knowledge of OpenAI, are not attributable to OpenAI, and are inadmissible hearsay as to OpenAI. *See* Fed. R. Civ. P. 56(c)(2), (c)(4); Fed. R. Evid. 602, 801(d)(2)(D), 802. This paragraph cannot be offered to establish any fact concerning OpenAI. |
| 1544. In February 2024, Nick Turley (OpenAI's Head of ChatGPT) admitted that given the lack of user clicks, "[t]here's no incentive to create content anymore." Ex. 1045 [OPCO_MDL_004401106] at 118. | 1544. **Disputed in Part - Not Supported by Cited Evidence.** OpenAI responds as follows: Undisputed that Ex. 1045 contains the quoted language. However, OpenAI disputes the characterization that Turley "admitted" anything. OpenAI further disputes that his comment about incentives to create content is related to any observed clickthrough rates. The conversation does not include discussions of actual user clickthrough rates or low clicks. Plaintiffs therefore mischaracterize the comment as connecting a lack of clicks to incentives to create content.<br>Pursuant to Fed. R. Evid. 106, OpenAI further responds that the cited exhibit is a casual conversation about developing Browse and discussing potential ways to show links to users. News Ex. 1045 at OPCO_MDL_004401118. Turley also addressed this comment in his deposition. He testified that it was a rhetorical comment in a conversation about how |

| | |
|---|---|
| | prominently to display links. He also testified that his broader goal in developing the UX was to incentivize people to create content. News Ex. 528 (N. Turley Tr.) at 110:24–116:10.<br><br>Microsoft defers to OpenAI. |
| 1545. The Reuters Institute for the Study of Journalism's 2026 Digital News Report found that 42% of AI chatbot users for news say they always or often click through from chatbot answers to original news sources, which was lower than the percentage of users who say they click through to original news sources from search: "We also asked *why* people click through from the search engines, social media platforms, and AI chatbots. For every platform the most commonly cited reason is that they wanted more detail about the underlying story, but AI chatbot users are relatively less likely to say this compared to search and social, perhaps because the AI response has already satisfied their needs." Ex. 1104 [Jim Egan et al., *Digital News Report 2026*, 11, Reuters Institute for the Study of Journalism (2026), available at https://reutersinstitute.politics.ox.ac.uk/sites/default/files/2026-06/DNR%202026%20FINAL_2.pdf] at 13. | 1545. **Disputed in Part - Not Supported by Admissible Evidence; Immaterial.** Defendants respond as follows: Undisputed that the referenced study purported to reach the referenced findings. However, the proposition is not supported by admissible evidence, as required by Local Rule 56.1, and therefore is not properly before the Court. Specifically, the referenced news article is inadmissible hearsay to the extent offered for the matter asserted.<br><br>Further disputed as immaterial to the claims and defenses in the instant matter. The Digital News Report 2026 is based on survey data collected in January and February 2026 — well after the conduct at issue in this litigation. News Ex. 1104.1, at 2. It measures consumer attitudes and self-reported behavior at a single point in time and does not purport to measure the effects of any specific defendant's products or any specific copyrighted work. The Report surveys users of "standalone AI chatbots such as ChatGPT, Perplexity, and Google Gemini" globally across 48 markets. News Ex. 1104.1, at 12. It does not isolate the behavior of ChatGPT users specifically, does not measure the use of any particular |

| | |
|---|---|
| | Plaintiff's copyrighted content, and does not purport to establish a causal link between any AI chatbot and any harm to Plaintiffs. Whether generative AI competes with traditional search engines is a question about competition among technology platforms that does not have any bearing on the market for the Asserted Works<br>Further disputed to the extent this Paragraph implies that AI chatbots meaningfully suppress click-through rates or that the data establishes substitution of News Plaintiffs' Asserted Works. The Report states: "AI chatbot users are more likely than search or social media users to say they click through because they want to verify the news or find out more about the source, suggesting click-throughs from AI chatbots may be driven more by doubt or curiosity about the accuracy or provenance of the information." News Ex. 1104.1 at 40 (Section 2.1). Specifically, 44% of AI chatbot users who click through say they do so to "verify that the news was correct," compared to only 36% from search and 33% from social media; and 43% click through to "find out more about the news source," compared to 35% from search and 34% from social media. News Ex. 1104.1 at 13, 4.<br>Finally, disputed to the extent the facts set forth in Paragraph 1545 omit necessary context. The Report cautions that the click-through figures for AI, search, and social media "should be compared with caution because they are proportions of quite different user bases." News Ex. 1104.1, at 13. The Report also states: |

| | |
|---|---|
| | "It is worth remembering this may be an area where there are differences between what people say they do and their actual behaviour." News Ex. 1104.1 at 13. The Report's methodology section further cautions: "Surveys capture people's self-reported behaviour, which does not always reflect people's actual behaviour due to biases and imperfect recall." News Ex. 1104.1 at 2. The section of the Report addressing this data in detail similarly warns: "[I]t is important to acknowledge that the data reflect self-reported behaviour, which may under- or overestimate what people do in practice, due to limitations in recall and the tendency to give socially desirable responses." News Ex. 1104.1 at 38. |
| 1546. The same 2026 Reuters study found that use of chatbots such as ChatGPT, Gemini, and Perplexity for news is increasing quickly, especially among younger demographics and particularly among those heavily engaged with the news. Ex. 1104 [Jim Egan et al., *Digital News Report 2026*, 11, Reuters Institute for the Study of Journalism (2026), available at https://reutersinstitute.politics.ox.ac.uk/sites/default/files/2026-06/DNR%202026%20FINAL_2.pdf] at 12. | 1546. **Disputed in Part - Not Supported by Admissible Evidence; Not Supported by Cited Evidence.** Defendants respond as follows: Undisputed that the Reuters Institute Digital News Report 2026 purports to show that the use of AI chatbots for news has grown and that usage is higher among younger audiences. News Ex. 1104.1 at 12, 36. However, disputed to the extent the Digital News Report 2026 is based on survey data collected in January and February 2026 — well after the conduct at issue in this litigation. News Ex. 1104.1 at 2. It measures consumer attitudes and self-reported behavior at a single point in time and does not purport to measure the effects of any specific defendant's products or any specific copyrighted work. The Report surveys users of "standalone AI |

| | |
|---|---|
| | chatbots such as ChatGPT, Perplexity, and Google Gemini" globally across 48 markets. News Ex. 1104.1 at 12. It does not isolate the behavior of ChatGPT users specifically, does not measure the use of any particular Plaintiff's copyrighted content, and does not purport to establish a causal link between any AI chatbot and any harm to Plaintiffs.<br>Further, the disputed proposition is not supported by admissible evidence, as required by Local Rule 56.1, and therefore is not properly before the Court. Specifically, the referenced report is inadmissible hearsay to the extent offered for the matter asserted.<br>Also disputed to the extent it omits necessary context. While the report documents modest global growth in chatbot use for news, it specifically notes that "several markets including the USA, the UK, France, and Germany reported no increase in AI chatbot use for news over the year." News Ex. 1104.1 at 6. The report further notes that only 1% of respondents identify AI as their "main source of news," that AI chatbot use for news "does not (yet) appear to be exploding," and that chatbot use "currently plays a complementary role for most users." News Ex. 1104.1 at 912, 36. The Report's methodology section further cautions: "Surveys capture people's self-reported behaviour, which does not always reflect people's actual behaviour due to biases and imperfect recall." Ex. 1104.1, at 2.<br>Further disputed because the use of AI tools in relation to the news does not support Plaintiffs' |

| | |
|---|---|
| | implication. As Professor Tucker explains: "While research suggests that some uses of Copilot and ChatGPT involve seeking information, this does not imply that Copilot and ChatGPT are substitutes for Plaintiffs' content." ECF 1733 (C. Tucker Decl.) ¶ 100. Further disputed because the facts set forth in Paragraph 1546 omit consumers' many other free alternatives for engaging with the news. Professor Tucker explained that consumers who do not pay for news have long had a "multitude of free alternative news sources, including search engines, news aggregators, social media, and free digital content from sources such as ABC News, NBC News, CBS News, BBC News, Reuters, The Associated Press, NPR, and PBS News." *Id.* at ¶ 100. |
| 1547. According to a Pew Research Study from 2025, most people choosing not to pay for news justified that decision because they could find news from other sources for free. Ex. 82 [Tucker Opening Rep.] ¶ 54; Ex. 1105 [Tomasik, Emily and Michael Lipka, "Few Americans Pay for News When They Encounter Paywalls," Pew Research Center, June 24, 2025, available at https://www.pewresearch.org/short-reads/2025/06/24/few-americans-pay-for-news-when-they-encounter-paywalls/] ("What people do when they reach a paywall [...] The most common reaction is that people seek the information somewhere else (53%)" and "Among the 83% of U.S. adults who have not paid for news | 1547. **Disputed in Part - Not Supported by Admissible Evidence; Not Supported by Cited Evidence.** Defendants respond as follows: Undisputed that Ex. 1105 reports that 53% of U.S. adults who encounter paywalled news articles say they typically "try to find the information somewhere else" and that 49% of those who have not paid for news in the past year cite the availability of "plenty of other free news articles" as the main reason. However, the disputed proposition is not supported by admissible evidence, as required by Local Rule 56.1, and therefore is not properly before the Court. Specifically, the Pew Research study is an out of court statement and constitutes inadmissible hearsay to |

| | |
|---|---|
| in the past year, the most common reason they cite is that they can find plenty of other news articles for free. About half of those who don't pay for news (49%) say this is the main reason."). | the extent offered for the matter asserted. Further, disputed to the extent the Pew Research Study results are intended to be applied to AI chatbots since the Study does not ask about AI chatbots, and does not identify AI chatbots as a destination for consumers who "seek the information somewhere else.<br>Further disputed because to the extent Plaintiffs suggest that free news sources are available only because of generative AI or that ChatGPT or Copilot represent substitutes for their content. Professor Tucker explained that consumers who do not pay for news have long had a "multitude of free alternative news sources, including search engines, news aggregators, social media, and free digital content from sources such as ABC News, NBC News, CBS News, BBC News, Reuters, The Associated Press, NPR, and PBS News." ECF 1733 (C. Tucker Decl.) ¶ 100. Professor Tucker also explained that "While research suggests that some uses of Copilot and ChatGPT involve seeking information, this does not imply that Copilot and ChatGPT are substitutes for Plaintiffs' content." *Id.* at ¶ 100. Further disputed because the facts set forth in Paragraph 1546 omit consumers' many other free alternatives for engaging with the news. |
| 1548. By that same logic, it follows that some users who can get their news for free from Defendants' products-in-suit will choose to do so rather than pay News Plaintiffs. Ex. 88 [Ibrahim 30(b)(6) Depo Tr.] at 39:20-40:12, 55:1-7 | 1548. **Disputed - Not Supported by Cited Evidence; Expert Opinion Subject to Rule 702.** Defendants respond as follows: Disputed because Plaintiffs' assertion is speculative and does not establish |

| | |
|---|---|
| ("If a subscriber called me…and stated, why would I pay you a subscription price when I can get this information for free…I have no argument to it"); Ex. 1255 [Yang 30(b)(1) Depo. Tr.] at 11:1-10 (testifying that The Times's "business is all about proving value to our subscribers at the moment of purchase and throughout their experience with us," and "at those points of evaluating value, if there is a free substitute out there that can replace us, that ability to prove value becomes weaker over time."); Bell Rebuttal Rep. ¶ 147. | that users actually substituted Defendants' products for paid subscriptions to News Plaintiffs' publications. Additionally, the facts set forth in Paragraph 1548 are disputed because they are not supported by the cited evidence. Specifically, the cited testimony addresses hypothetical scenarios in which consumers might choose a free alternative and does not show actual substitution or lost subscriptions attributable to Defendants' conduct. A. Blanco Opp. Decl. Ex. 216 (A. Ibrahim 30(b)(6) Tr.) at 39:20–40:12, 55:1–7; News Ex. 1255 (H. Yang 30(b)(1) Tr.) at 11:1–10. Nor does the cited evidence establish that Defendants' products provide substitutes for News Plaintiffs' paid offerings. The record suggests otherwise; for instance, Dr. Goldfarb found no evidence that using ChatGPT reduced visits to The Times. *See* News Ex. 467 at ¶ 246. The fact stated in Paragraph 1548 is further disputed because the evidence cited in support, Ms. Bell's Rebuttal Report at Paragraph 147, is currently subject to a motion to exclude expert testimony pursuant to Fed. R. Evid. 702. To the extent the Court excludes the challenged opinions, Plaintiffs may not rely on them to support this statement. *See* Fed. R. Civ. P. 56(c)(2). |
| 1549. Less traffic to The Times's websites reduces subscriptions, advertising revenue, and affiliate revenue. Ex. 1106 [The Times Supplemental Response to Microsoft's 2nd Interrogatory No. 15] ("[R]educed traffic to The Times's websites—including the Athletic and Wirecutter— | 1549. **Disputed.** Defendants respond that the facts set forth in Paragraph 1549 are disputed because The Times's [redacted] ECF 1733 |

| | |
|---|---|
| reduce subscriptions, advertising revenue, and affiliate revenue."); Ex. 1234 [NYT_00832517]; Ex. 8 [Bardeen 30(b)(6) Depo. Tr.] at 198:2-11 ("[T]he less traffic we get, the less subscribers we have, the less advertising we can sell, and, therefore, the less advertising revenue. And so, for the exact same reasons that I've described why the drop in audience... having fewer subscribers than our expectations would lead to less subscriber revenue, the same dynamic would lead to less advertising revenue than we would otherwise have."); Ex. 1254 [Yang Depo. Ex. 13] at 5 (a Times Oct. 2025 board presentation [redacted] | (Tucker Decl.) ¶¶ 50–53, 106–107, 111, Figure 9. [redacted] News Ex. 99 (NYT 2022 10-K) at 32-38; News Ex. 98 (NYT 2023 10-K) at 34-38; News Ex. 103 (NYT 2024 10-K) at 33-37; News Ex. 1 (NYT 2025 10-K) at 35-39; A. Hurst Decl. Ex. 10 (W. Bardeen 30(b)(6) Tr.) at 17:22-18:21, 95:4-96:4; A. Hurst Decl. Ex. 63 (M. Levien Tr.) 42:2-43:2 ([redacted]); A. Hurst Decl. Ex. 91 (H. Poferl 30(b)(6) Tr.) 15:2-15; *see also* ECF 1733 (C. Tucker Decl.) ¶¶ 11(a), 64-66, Figure 12, Figure 13A, Figure 13B, Figure 14A, Figure 14B.<br>Defendants further dispute the facts in Paragraph 1549 to the extent they imply that any reduction in traffic necessarily reduces each of those revenue streams or establishes losses attributable to OpenAI. The trend in [redacted]. ECF 1733 (C. Tucker Decl.) ¶¶ 63–64, Figure 12. The trends in [redacted]. ECF 1733 (C. Tucker Decl.) ¶¶ 65–66, Figures 13A, 13B, 14A, 14B; ECF 1763 (A. Goldfarb Decl.) |

| | |
|---|---|
| | ¶¶ 23–25, Fig. 5. The Times's [redacted] A. Hurst Decl. Ex. 206 at NYT_01034148. |
| 1550. [redacted] Ex. 1106 [The Times Supplemental Response to Microsoft's 2nd Interrogatory No. 15]; Ex. 1234 [NYT_00832517]. | 1550. **Disputed – Not Supported by Cited Evidence.** Defendants respond that the facts set forth in Paragraph 1550 are disputed because the cited evidence does not demonstrate [redacted] ECF 1733 (Tucker Decl.) ¶¶ 30–31, Figure 2. The trends in [redacted]. *Id.* ¶¶ 65–66, Figures 13A, 13B, 14A, 14B; ECF 1763 (A. Goldfarb Decl.) ¶¶ 23–25, Fig. 5; *see also* News Ex. 467 at ¶ 246.<br>Furthermore, [redacted] A. Hurst Decl. Ex. 63 (W. Bardeen 30b6 Tr.) 159:3-15; A. Hurst Decl. Ex. 63 (M. Levien Tr.) at 42:2-43:2 ([redacted]). |
| 1551. Matt Lindsay, CEO of Mather Economics, which provides "subscription pricing services" and "retention, scoring and modeling" services for firms in the media industry, testified when asked about the significant | 1551. **Disputed in Part.** Defendants respond as follows: Undisputed that Matt Lindsay offered the quoted testimony. Defendants object to this asserted "fact" because it does not identify any specific plaintiff, |

| | |
|---|---|
| challenges in the news industry from generative AI: "[t]raffic from search engines was very productive for new subscribers, and so when consumers don't go to a newspaper's website... the search traffic referrals have dropped pretty considerably." Ex. 691 [Lindsay Depo. Tr.] at 125:21-126:4. | any specific publisher, any quantified decline, any time period, or any causal link to OpenAI's products or Microsoft's products. Mr. Lindsay testifies in wholly general terms that "search traffic referrals have dropped pretty considerably" for [redacted]. He does not [redacted]. *See* A. Blanco Opp. Decl. Ex. 231 (M. Lindsay 30(b)(6) Tr.) 125:21-126:4. Pursuant to Fed. R. Evid. 106, Mather [redacted] *Id.* at 128:9-18. Mr. Lindsay is the CEO and founder of Mather Economics, a company that sells "[redacted] *Id.* at 28:15-29:6, 37:3-11. Mr. Lindsay himself testified that some of Mather's services [redacted]" *Id.* at 126:14-20. In other words, [redacted]. Mr. Lindsay thus has a direct commercial interest in characterizing AI as harmful to publishers: the more alarmed publishers are about AI, the greater the demand for the retention and monetization services that Mather Economics provides. *Id.* Disputed as to scope of |

| | |
|---|---|
| | services provided by Mather Economics, [redacted]. *Id.* at 28:15-29:6, 37:3-11. Disputed to the extent this testimony is cited for the proposition that OpenAI's services or Microsoft's services pose challenges to the news industry. |
| 1552. Olivia Joslin, Co-founder and COO of TollBit, an intermediary that facilitates content licensing from Generative AI, testified as to the harm as follows: "If I have a question, and I go to something like ChatGPT or Perplexity, and they fetch the answer for me, and I'm not clicking through to the site, then the website is losing out on a human visitor – an opportunity to have a human visitor visit the site." Ex. 693 [Joslin Depo. Tr.] at 295:20-25. | 1552. **Disputed in Part – Incomplete; Not Supported by Admissible Evidence; Immaterial.** Defendants do not dispute that Ms. Joslin stated the quoted words at her deposition. Pursuant to Fed. R. Evid. 106, Ms. Joslin's statement [redacted] A. Blanco Opp. Decl. Ex. 220 (O. Joslin 30(b)(6) Tr.) at 295:20-25. Ms. Joslin [redacted] Indeed, during the same deposition, Ms. Joslin acknowledged that [redacted] *Id.* at 305:21-22. Because the witness did not testify based on personal knowledge, the disputed proposition is not supported by admissible evidence, as required by Local Rule 56.1, and therefore is not properly before the Court.<br>Defendants further dispute that Ms. Joslin's personal experience or views, as an employee of a third |

| | |
|---|---|
| | party, are material in any way to the issues before the Court on summary judgment. Defendants similarly dispute any implication that her testimony could possibly demonstrate that News Plaintiffs have been harmed by Defendants' alleged conduct.<br>Ms. Joslin's personal views do not affect the outcome of the suit under the governing law. TollBit is not a party in this case, and Ms. Joslin's testimony is not material to the alleged harm to the market for the Asserted Works. Whether generative AI competes with traditional search engines is a question about competition among technology platforms that does not have any bearing on the market for the Asserted Works.<br>Further disputed as to characterization of TollBit, whose primary business model is to charge AI companies a transaction fee each time the AI company's web crawlers visit a TollBit client's website. Ms. Joslin is the co-founder and COO of TollBit, a for-profit company whose entire business model [redacted]. Disputed that ChatGPT outputs remove opportunities to have human visitors visit Plaintiffs' websites. *See* A. Blanco Opp. Decl. Ex. 220 (O. Joslin 30(b)(6) Tr.) 56:17-57:14. |
| 1553. Ms. Joslin further explained with regard to bots or scrapers used for RAG: "[I]f publishers are losing out on human visitors to the sites, they're losing out on that | 1553. **Disputed in Part – Incomplete; Not Supported by Admissible Evidence; Immaterial;.** Defendants do not dispute that Ms. |

| | |
|---|---|
| as a revenue opportunity, and that could be detrimental to their business, given many publishers rely on human visitors to their sites for revenue opportunities… If human visitors are declining, period, that's certainly not good for publishers' business, and if AI visitors are increasing, you know, there also may be potential costs to the CDN, depending on how the volume increases over time." Ex. 693 [Joslin Depo. Tr.] at 309:22-310:12. | Joslin stated the quoted words at her deposition. Pursuant to Fed. R. Evid. 106, Ms. Joslin [redacted] Ms. Joslin testified: [redacted] A. Blanco Opp. Decl. Ex. 220 (O. Joslin 30(b)(6) Tr.) at 305:21-22. [redacted] *Id.* at 304:23-305:3. The passage quoted in Paragraph 1553 is, by its own terms, speculative and hypothetical rather than a statement of undisputed material fact appropriate for a Rule 56.1 submission. The disputed proposition is therefore not supported by admissible evidence, as required by Local Rule 56.1, and therefore is not properly before the Court.<br>Defendants dispute that Ms. Joslin's personal experience or views, as an employee of a third party, are material in any way to the issues before the Court on summary judgment. Defendants similarly dispute any implication that her testimony could possibly demonstrate that News Plaintiffs have been harmed by Defendants' alleged conduct.<br>Ms. Joslin's personal views do not affect the outcome of the suit under the governing law. TollBit is a third party in this case, and Ms. Joslin's testimony is not |

| | |
|---|---|
| | material to the alleged harm to the market for the Asserted Works. Whether generative AI competes with traditional search engines is a question about competition among technology platforms that does not have any bearing on the market for the Asserted Works.<br>Further, disputed as to the characterization of TollBit, whose primary business model is to charge AI companies a transaction fee each time the AI company's web crawlers visit a TollBit client's website. Ms. Joslin is the co-founder and COO of TollBit, a for-profit company whose entire business model [redacted]. Additionally, disputed that "AI visitors are increasing," as the statement is speculative and not specific to Defendants. Disputed that any alleged increase in AI bot activity has resulted in increased CDN costs for Plaintiffs. *See* News Ex. 423 (N. Feamster Rebuttal Rep.) ¶¶ 276-289 (rebutting server load theory of harm). |
| 1554. Ms. Joslin further explained: "So the vision for TollBit always was the hair on fire problem is publishers. That's going to be the first place there's disruption…" Ex. 693 [Joslin Depo. Tr.] at 56:6-9. | 1554. **Disputed in Part – Not Supported by Cited Evidence; Not Supported by Admissible Evidence; Immaterial.** Undisputed that Ms. Joslin offered the quoted testimony. Disputed to the extent that it is missing context. The disputed proposition is not supported by the cited evidence. Pursuant to Fed. R. Evid. 106, Ms. Joslin testified in full [redacted] |

| | |
|---|---|
| | [redacted] A. Blanco Opp. Decl. Ex. 220 (O. Joslin 30(b)(6) Tr.) at 56:6-12.<br><br>Defendants dispute that Ms. Joslin's personal experience or views, as an employee of a third party, are material in any way to the issues before the Court on summary judgment. Defendants similarly dispute any implication that her testimony could possibly demonstrate that News Plaintiffs have been harmed by Defendants' alleged conduct.<br><br>Ms. Joslin's personal views do not affect the outcome of the suit under the governing law. TollBit is a third party in this case, and Ms. Joslin's testimony is not material to the alleged harm to the market for the Asserted Works. Whether generative AI competes with traditional search engines is a question about competition among technology platforms that does not have any bearing on the market for the Asserted Works.<br><br>Disputed as to characterization of TollBit, whose primary business model is to charge AI companies a transaction fee each time the AI company's web crawlers visit a TollBit client's website. Ms. Joslin is the co-founder and COO of TollBit, a for-profit company whose entire business model [redacted] |

| | |
|---|---|
| | [redacted]. Further, the disputed proposition is not supported by admissible evidence, as required by Local Rule 56.1, and therefore is not properly before the Court. |
| 1555. A report from TollBit summarized the impact of Generative AI on publishers as follows: "Whether a publisher, an ecommerce or an aggregator site, their advertising and subscription revenues depend upon humans engaging with content on properties. When AI systems scrape and summarize (or browse and checkout), they potentially negate the need for a user to visit the site. This corresponds to lost monetization opportunity for the content creator." Ex. 918 ["State of the Bots (Q2 2025)," *TollBit*, https://tollbit.com/state-of-the-bots/q2-2025/, accessed via https://assets.cdn.tollbit.com/documents/whitepaper-q3-2025.pdf] at 11. | 1555. **Disputed – Immaterial; Not Supported by Cited Evidence.** Defendants respond that the facts stated in Paragraph 1555 are immaterial and therefore disputed because these facts do not affect the outcome of the suit under the governing law. The quoted material is not a statement of fact at all, but rather a speculative, argumentative, and conclusory opinion offered by TollBit, a third-party commercial vendor with a direct financial interest in the proposition it advances and does not bear on the alleged harm to the market for the Asserted Works at issue in this case. TollBit is a for-profit company whose entire business model [redacted]<br><br>Further, the disputed proposition is not supported by the cited evidence. Specifically, Defendants dispute that the quoted statement reflects an accurate or complete picture of the relationship between generative AI and publisher monetization. TollBit's own Q4 2024 report states: '[redacted] |

| | |
|---|---|
| | [redacted]." *Id.* at 4. |
| 1556. It becomes harder for publishers to charge for access to their copyrighted works if users can obtain the same work or its equivalent elsewhere for free. *See* Ex. 1 [The New York Times SEC Form 10-K Dec. 31, 2025] at 10 (warning that third parties "are increasingly encouraging their large audiences to access [The Times's] content, or derivations thereof, and/or competing content, within their products, impacting [The Times's] ability to attract, engage and monetize users directly within [its] products"); Ex. 695 [Sheridan Depo. Ex. 12] (internal Times document from 2023 warning of business risks from GenAI); Ex. 697 [Sobel Depo. Ex. 13] (L.E.K. consulting report for The Times from August 2023 analyzing the threat of GenAI to The Times's monetization); Ex. 49 [Oh Feb. 24, 2026 30(b)(6) Depo Tr.] 260:21-261:2 ("there is still absolutely a threat with tech companies developing GenAI applications that are using and extracting from original content producers, and ultimately providing a substitute product in which users no longer need to come to our sites"); Oh Decl. ¶ 14; Malackowski NYT-DN Opening Rep. at 67; Malackowski ZD Opening Rep. 35, 46. | 1556. **Disputed – Not Supported by Cited Evidence; Not Supported by Admissible Evidence.** Defendants respond that the facts set forth in Paragraph 1556 are disputed because the cited evidence does not demonstrate "the same work" or an "equivalent" of News Plaintiffs' Asserted Works are available for free from Defendants' tools. The evidence in this case shows that Defendants' tools do not provide "the same work" or an "equivalent" of News Plaintiffs' Asserted Works for free. *See* ECF 1723 (J. Lafferty Decl.) ¶¶ 26-28; ECF 1714 (K. Cook Decl.) ¶ 5; A. Hurst Decl. Ex. 1.A (E. Abib 30(b)(6) Ex. 3); A. Hurst Decl. Ex. 101 (C. Rossett Tr.) at 69:20-72:23.<br>To the extent Paragraph 1556 relies on Ex. 1, the facts set forth in this Paragraph are disputed on the grounds that they are not supported by admissible evidence, as required by Local Rule 56.1, and therefore are not properly before the Court. Specifically, The Times's 10-K is hearsay and cannot be considered for the truth of the matter asserted.<br>Microsoft further responds that News Ex. 49, Oh Declaration, and Malackowski ZD Opening Report do not pertain to claims asserted against Microsoft. |
| 1557. [redacted] | 1557. **Disputed in Part.** Defendants do not dispute that the cited document contains the words |

| | |
|---|---|
| [redacted] Ex. 1117 [NYT_01034148] at slides 2, 11. | quoted in Paragraph 1557. But Defendants do dispute any implication that Defendants' Generative AI tools have negatively impacted The Times's audience or subscriber base. *See* ECF 1733 (C. Tucker Decl.) ¶¶ 11(a), 64-66, Figure 12, Figure 13A, Figure 13B, Figure 14A, Figure 14B. The Times's [redacted] News Ex. 99 (NYT 2022 10-K) at 32-38; News Ex. 98 (NYT 2023 10-K) at 34-38; News Ex. 103 (NYT 2024 10-K) at 33-37; News Ex. 1 (NYT 2025 10-K) at 35-39; A. Hurst Decl. Ex. 10 (W. Bardeen 30(b)(6) Tr.) at 17:22-18:21, 95:4-96:4; A. Hurst Decl. Ex. 63 (M. Levien Tr.) at 42:2-43:2 ([redacted]); A. Hurst Decl. Ex. 91 (H. Poferl 30(b)(6) Tr.) at 15:2-15; *see also* ECF 1733 (C. Tucker Decl.) ¶¶ 11(a), 64-66, Figure 12, Figure 13A, Figure 13B, Figure 14A, Figure 14B. Defendants further dispute the implication that [redacted]. *See* News Ex. 1117 (NYT_01034148) at slides 2, 11. |

| | |
|---|---|
| 1558. Consumers have less need to visit Ziff Davis properties because ChatGPT offers "another way" for consumers to obtain the same type of information. Ex. 683 [Stamm Depo. Tr.] at 231:13-232:22 ("Does this document suggest to you that ChatGPT would be an alternative for finding shopping research to certain Ziff Davis asserted works? ... It could be another way that -- it could be something else users would use for shopping research."). | 1558. **Disputed in Part - Not Supported by Cited Evidence.** OpenAI responds as follows: The facts set forth in Paragraph 1558 are disputed because they are unsupported by the cited evidence. Undisputed that Dr. Stamm testified that ChatGPT "could be another way" consumers might conduct shopping research. However, disputed that this testimony establishes that consumers "have less need to visit Ziff Davis properties." Dr. Goldfarb found no statistically significant decrease in visits to Ziff Davis websites following users' adoption of ChatGPT. ECF 1763 (A. Goldfarb Decl.) ¶¶ 61–64. Malackowski described [redacted] ECF 1740 (J. Gratz Decl.) ¶ 243, Ex. 242 at 93:4–7; ECF 1763 (A. Goldfarb Decl.) ¶ 7, 29, 30-32, 46-49, 61-64; News Ex. 49 (Karen Oh 30(b)(6) Tr. (Feb. 24, 2026)) at 172:12-173:18.<br><br>Microsoft responds that Paragraph 1558 does not pertain to claims asserted against Microsoft. |
| 1559. Though OpenAI claims to have implemented guardrails, all three OpenAI bots – including GPTBot (training), ChatGPT-User (RAG), and OAI-SearchBot (index) have continued to access articles published by News Plaintiffs (and disallowed under robots.txt). Ex. 423 [Feamster Rebuttal Rep.] Section 6 (OpenAI expert admitting, based on review of Plaintiffs' server logs, that OpenAI's bots have continued accessing News Plaintiffs' | 1559. **Disputed - Not Supported by Cited Evidence.** OpenAI responds as follows: The facts set forth in Paragraph 1559 are disputed because the cited evidence is incorrect. OpenAI disputes this statement as misleading because it mischaracterizes the cited evidence and the analysis of OpenAI's expert, Dr. Feamster. Specifically, pursuant to Fed. R. Evid. 106, Dr. Feamster found that News Plaintiffs' blocking measures |

| | |
|---|---|
| content); Stricchiola NYT/DN Opening Rep. ¶¶ 265-279 (analyzing server logs for The Times and Daily News Plaintiffs, which contain data about how often OpenAI's bots attempt to access their sites); Ex. 1235 [DNP-00633129]; [Krein Rebuttal Rep] ¶¶67-78 (analyzing server logs for Ziff Davis); Krein Second Supplemental Report ¶¶6-8. | were effective. He did not observe OpenAI's bots "continu[ing] to access articles" on News Plaintiffs' websites against their robots.txt preferences. *See* News Ex. 423 (N. Feamster Rebuttal Rep.) Section VI.<br>Disputed to the extent News Plaintiffs suggest that OpenAI's bots ignore robots.txt directives or failed to follow implemented guardrails. OpenAI designed Browse so that its bots do not fetch content from websites whose robots.txt files indicate a contrary preference. *See id.* ¶ 30. OpenAI also performs a robots.txt check before Browse sends a request to a webpage for direct retrieval. *See id.* ¶¶ 186-195. Pursuant to Fed. R. Evid. 106, Dr. Feamster also explained that OpenAI publishes the user agent identifiers ChatGPT-User and OAI-SearchBot, which allows website owners to manage those bots' access through their robots.txt files. *See id.* ¶¶ 30, 193.<br>Disputed to the extent News Plaintiffs suggest that OpenAI's bots continued to access articles from nytimes.com. Pursuant to Fed. R. Evid. 106, The New York Times put in place a "hard" block against OpenAI's bots. *See* ECF 1798-1 (J. Stricchiola Decl. Ex. A) (NYT/DN Opening Rep.) ¶¶ 275–278.<br>Disputed to the extent News Plaintiffs suggest that OpenAI's bots continued to access the Daily News Plaintiffs' ("DNP") articles despite DNP's robots.txt directives. DNP's robots.txt blocks were effective. Pursuant to Fed. R. Evid. 106, Dr. Feamster observed that 99.95% of the requests to DNP's servers either |

| | |
|---|---|
| | contained spoofed user agent strings or reflected behavior consistent with the REP. *See* News Ex. 423 (N. Feamster Rebuttal Rep.) ¶ 85.<br>Disputed to the extent News Plaintiffs suggest that OpenAI's bots continued to access Ziff Davis's articles despite ZD's robots.txt directives. ZD's robots.txt blocks were similarly effective. Pursuant to Fed. R. Evid. 106, Dr. Feamster observed that 99.76% of the requests to ZD's servers either came from non-OpenAI IP addresses or reflected behavior consistent with the REP. *See id.* ¶ 100. ZD also put in place server-side blocks against OpenAI's bots in July 2025. *Id.* ¶ 74.<br>Disputed to the extent News Plaintiffs suggest that the small number of remaining requests to DNP's and ZD's servers reflects intended production behavior by OpenAI's bots. Pursuant to Fed. R. Evid. 106, Dr. Feamster explained that those requests may be explained by isolated software bugs or testing-related activity. *See id.* ¶¶ 86, 100.<br>Disputed as to the substance of Mr. Krein's and Ms. Stricchiola's opinions that OpenAI's bots accessed News Plaintiffs' articles in disregard of robots.txt directives. Those opinions are contradicted by the record evidence, based on Dr. Feamster's analysis described above. *See* A. Blanco Opp. Decl. Ex. 294 (J. Krein Rebuttal Rep.) ¶¶ 67–78; A. Blanco Opp. Decl. Ex. 295 (J. Krein Second Supplemental Rep.) ¶¶ 6–8; ECF 1798-1 (J. Stricchiola Decl.) Ex. A (Stricchiola NYT/DN Opening Rep.) ¶¶ 265–279. Pursuant to Fed. R. Evid. |

| | |
|---|---|
| | 106, *see* News Ex. 423 (N. Feamster Rebuttal Rep.) ¶¶ 68, 85–86, 100.<br><br>Microsoft defers to OpenAI. Microsoft further responds that the Krein Rebuttal Report and Krein Second Supplemental Report do not pertain to claims asserted against Microsoft. |
| 1560. Copilot is also continuing to access and use News Plaintiffs' content, even for content marked NOARCHIVE. Stricchiola NYT/DN Opening Rep. ¶¶ 280-297. | 1560. **Disputed – Not Supported by Admissible Evidence.** Microsoft responds that the fact set forth in Paragraph 1560 is disputed as the evidence cited in support is currently the subject of a pending motion to exclude expert testimony pursuant to Fed. R. Evid. 702. To the extent the Court excludes the challenged opinions, Plaintiffs may not rely on them to support this statement. *See* Fed. R. Civ. P. 56(c)(2).<br>Microsoft disputes that Copilot is "continuing to access" News Plaintiffs' content marked as NOARCHIVE. Microsoft worked to quickly respond to, and fix, these issues. *See* ECF 1711 (F. Canel Decl.) ¶¶ 22, 26, 31; ECF 2056 (F. Canel 702 Decl.) ¶¶ 7–13; ECF 2057 (P. Gaggara 702 Decl.) ¶¶ 4–7. The purported "NOARCHIVE violations" reflected in AI Performance reports between November 2025 and February 2026 occurred when that tool was in a beta version, not working as designed, and inadvertently including data from traditional (*i.e.*, non-web grounding) Bing search. ECF 2056 (F. Canel 702 Decl.) ¶ 13. |

| | |
|---|---|
| | In addition, if a web publisher changes a page that Bing has already indexed, such as by adding a NOARCHIVE meta tag that was not previously applied, the change will not appear in the Bing Index right away. ECF 2057 (P. Gaggara 702 Decl.) ¶ 4. Instead, the update will occur only after Microsoft's Bingbot recrawls the URL, the new content is processed, and the index is updated. *Id.* Because Bingbot is unlikely to recrawl news articles published many years ago with any frequency, the purported "NOARCHIVE violations" likely occurred because those URLs had not been recrawled since the NOARCHIVE meta tag was added (*i.e.*, on March 7, 2025 for the Daily News Plaintiffs). *Id.* ¶ 6. Microsoft's records reflect that 3,435 of the total 3,796 URLs associated with the purported "NOARCHIVE violations" were not recrawled by Microsoft's Bingbot after March 7, 2025 and through February 27, 2026. *Id.* ¶ 7.<br><br>OpenAI defers to Microsoft's response. |
| 1561. The Times's Form 10-K for the year ending December 31, 2025 reported: "Generative AI technology has negatively impacted, and we expect will continue to negatively impact, our ability to attract, engage, and retain audience and subscribers; maintain and grow demand among advertisers and licensees; protect and monetize our intellectual property; maintain and grow other revenue streams; and our reputation and trust in our brand; and | 1561. **Disputed in Part – Not Supported by Admissible Evidence.** Defendants do not dispute that The Times's Form 10-K includes the quoted words. But Defendants do dispute the veracity of the statement contained within the 10-K, both in general and specifically with respect to any purported impact resulting from Defendants' tools. The Times's [redacted] |

| | |
|---|---|
| may involve other risks." Ex. 1 [The New York Times SEC Form 10-K Dec. 31, 2025] at 14. | [redacted] News Ex. 99 (NYT 2022 10-K) at 32-38; News Ex. 98 (NYT 2023 10-K) at 34-38; News Ex. 103 (NYT 2024 10-K) at 33-37; News Ex. 1 (NYT 2025 10-K) at 35-39; Hurst Decl. Ex. 10 (W. Bardeen 30b6 Dep.) 17:22-18:21, 95:4-96:4; Hurst Decl. Ex. 63 (M. Levien Dep.) 42:2-43:2 ([redacted]); Hurst Decl. Ex. 91 (H. Poferl 30(b)(6) Tr.) 15:2-15; *see also* ECF 1733 (C. Tucker Decl.) ¶¶ 11(a), 64-66, Figure 12, Figure 13A, Figure 13B, Figure 14A, Figure 14B. The disclosed statements are forward-looking, "based upon our current expectations, estimates and assumptions and involve risks and uncertainties that change over time; actual results could differ materially," and readers are "cautioned not to place undue reliance" on them. News Ex. 1 [The New York Times SEC Form 10-K Dec. 31, 2025] at 1. Further disputed to the extent Plaintiffs imply the disclosure relates to Defendants or any of Defendants' products, as the statement refers generically to "Generative AI technology" and does not reference OpenAI, Microsoft, ChatGPT, or Copilot. Ex. 1 [The New York Times SEC Form 10-K Dec. 31, 2025] at 14.<br>Defendants also respond that the facts set forth in this Paragraph are disputed on the grounds that they are not supported by admissible evidence, as required by |

| | |
|---|---|
| | Local Rule 56.1, and therefore are not properly before the Court. Specifically, The Times's 10-K is hearsay and cannot be considered for the truth of the matter asserted. |
| 1562. The Times's Form 10-K for the year ending December 31, 2024 similarly reported: "Recent advances and continued rapid development in generative AI technology may significantly alter the market for our products and services. Generative AI tools powered by models that have been trained or grounded on our content, or that are able to display and produce output that contains, is similar to, is based on, or purports to be our content – without our permission, fair compensation or proper attribution – may significantly reduce our online traffic; decrease our audience size; reduce current and potential subscriber demand; infringe our intellectual property rights; harm existing and potential revenue streams; damage our brand and reputation (e.g., through misattribution of incorrect information to us); and adversely affect our business, revenues and results of operations." Ex. 103 [The New York Times SEC Form 10-K Dec. 31, 2024] at 12-13. | 1562. **Disputed in Part – Not Supported by Admissible Evidence.** Defendants do not dispute that The Times's Form 10-K includes the quoted words. But Defendants do dispute the veracity of the statements contained within the 10-K, both in general and specifically with respect to any purported impact resulting from Defendants' tools for the same reasons cited in response to Paragraph 1561.<br>Defendants also respond that the facts set forth in this Paragraph are disputed on the grounds that they are not supported by admissible evidence, as required by Local Rule 56.1, and therefore are not properly before the Court for the same reasons cited in response to Paragraph 1561. |
| 1563. The Times's Form 10-K for the year ending December 31, 2023 likewise reported: "Recent advances and continued rapid development in generative AI technology may alter the market for our services. Generative AI tools powered by models that have been trained on our content, or that are able to display and produce output that contains, is similar to, or is based on, | 1563. **Disputed in Part – Not Supported by Admissible Evidence.** Defendants do not dispute that The Times's Form 10-K includes the quoted words. But Defendants do dispute the veracity of the statements contained within the 10-K, both in general and specifically with respect to any purported impact |

| | |
|---|---|
| our content, without our permission, fair compensation, or proper attribution, may reduce our online traffic, decrease our audience size and subscriber demand, infringe our intellectual property rights, impair our ability to attract new subscribers, harm existing and potential revenue streams, and adversely affect our business, revenues and results of operations. Additionally, such tools may also misattribute incorrect information to us, which could damage our brand and reputation." Ex. 98 [The New York Times SEC Form 10-K Dec. 31, 2023] at 13. | resulting from Defendants' tools for the same reasons cited in response to Paragraph 1561.<br>Defendants also respond that the facts set forth in this Paragraph are disputed on the grounds that they are not supported by admissible evidence, as required by Local Rule 56.1, and therefore are not properly before the Court for the same reasons cited in response to Paragraph 1561. |
| 1564. To date, generative AI technology "has impacted and may significantly alter the market for [The Times's] products and services." Ex. 1 [The New York Times SEC Form 10-K Dec. 31, 2025] at 14. | 1564. **Disputed in Part – Not Supported by Admissible Evidence.** Defendants do not dispute that The Times's Form 10-K includes the quoted words. But Defendants do dispute the veracity of the statement contained within the 10-K, both in general and specifically with respect to any purported impact on the market for the Asserted Works resulting from Defendants' tools for the same reasons cited in response to Paragraph 1561.<br>Defendants also respond that the facts set forth in this Paragraph are disputed on the grounds that they are not supported by admissible evidence, as required by Local Rule 56.1, and therefore are not properly before the Court for the same reasons cited in response to Paragraph 1561. |
| 1565. Generative AI products (like Defendants') are powered by models that have been trained on and grounded on Times content and/or "are able to retrieve | 1565. **Disputed in Part – Not Supported by Cited Evidence; Not Supported by Admissible Evidence.** Defendants do not dispute that The Times's |

| | |
|---|---|
| and display output that contains, is similar to, is derived from, or purports to be [Times] content, without [The Times's permission], fair compensation, proper attribution or referrals to [The Times's] digital properties." Ex. 1 [The New York Times SEC Form 10-K Dec. 31, 2025] at 14. | Form 10-K includes the quoted words. But Defendants do dispute that the quoted language applies to Defendants' products because the Form 10-K indicates the quoted language applies to "certain AI products," and does not specify which products those are. Disputed that the cited document contains any evidence of actual harm or establishes any causal connection between any Defendant's conduct and any actual or potential harm. At most, the cited document describes The Times's own perspective on what an unspecified category of generative AI products "are able to" do.<br>Defendants also respond that the facts set forth in this Paragraph are disputed on the grounds that they are not supported by admissible evidence, as required by Local Rule 56.1, and therefore are not properly before the Court for the same reasons cited in response to Paragraph 1561. |
| 1566. These Generative AI products "have adversely impacted" and are "expect[ed] to continue to adversely impact" The Times's "traffic; audience size; current and potential subscriber, advertiser and licensee demand; and [The Times's] brand and reputation (e.g., through misattribution of incorrect information to [The Times]), resulting in harm to existing and potential revenue streams." Ex. 1 [The New York Times SEC Form 10-K Dec. 31, 2025] at 14. | 1566. **Disputed in Part – Not Supported by Admissible Evidence.** Defendants do not dispute that The Times's Form 10-K includes the quoted words. However, pursuant to Fed. R. Evid. 106, the very next sentence of the cited disclosure reverts to the conditional, stating that "[a]ny or all of these risks may adversely affect our business, revenues and results of operations." News Ex. 1 [The New York Times SEC Form 10-K Dec. 31, 2025] at 14. Defendants do dispute the veracity of the statement contained within the 10-K, both |

in general and specifically with respect to any impact from Defendants' tools to any of the Asserted Works.

*Traffic and audience*: The trend in pageviews to [redacted]. ECF 1733 (C. Tucker Decl.) ¶¶ 63–64, Figure 12. The trends in [redacted]. ECF 1733 (C. Tucker Decl.) ¶¶ 65–66, Figures 13A, 13B, 14A, 14B; ECF 1763 (A. Goldfarb Decl.) ¶¶ 23–25, Fig. 5. The Times's [redacted] Hurst Decl. Ex. 206, NYT_01034148.

*Subscriber, advertiser, and licensee demand*: [redacted] ECF 1733 (C. Tucker Decl.) ¶¶ 30–31, Figure 2; SUMF ¶¶ 28(a)–(d). [redacted] ECF 1733 (C. Tucker Decl.) ¶¶ 32–33, Figures 3, 4; Hurst Decl. Ex. 47 (D. Gurian-Peck Tr.) 8:22–9:1,

| | |
|---|---|
| | 106:7–12. [redacted] ECF 1733 (C. Tucker Decl.) ¶ 52, Figure 9.<br>*Brand and reputation*. Copilot provides attribution and links to every webpage used as grounding content. ECF 1713 (E. Abib Decl.) ¶¶ 6, 10. Microsoft deployed multi-layered mitigation systems to prevent Copilot from outputting copyrighted content. ECF 1710 (S. Bird Decl.) ¶¶ 34–43. Plaintiffs' experts produced no analysis quantifying any loss of traffic, subscriptions, or revenue resulting from readers choosing Copilot outputs over The Times's Asserted Works, and no evidence quantifying brand or reputation harm from alleged misattribution.<br>*Expected future harm*. Microsoft's expert found no adverse trends despite accelerating generative-AI adoption. ECF 1733 (C. Tucker Decl.) ¶¶ 11, 16, 22–23, 90–93. The Times's continued publication of new works demonstrates that its incentives to create remain intact. *See id.* at ¶¶ 237–238.<br>Defendants also respond that the facts set forth in this Paragraph are disputed on the grounds that they are not supported by admissible evidence, as required by Local Rule 56.1, and therefore are not properly before the Court for the same reasons cited in response to Paragraph 1561. |

| | |
|---|---|
| 1567. Moreover, "[p]rotecting and enforcing [The Times's] intellectual property rights against third parties" like Defendants "that have used and may continue to use [Times] content… without authorization is and will continue to be costly and time consuming." Ex. 1 [The New York Times SEC Form 10-K Dec. 31, 2025] at 14. | 1567. **Disputed in Part – Not Supported by Admissible Evidence; Immaterial.** Defendants do not dispute that The Times's Form 10-K includes the quoted words or that intellectual property enforcement involves cost and time. But Defendants do dispute Paragraph 1567 to the extent it implies ongoing, harmful, unauthorized use of the Asserted Works by Defendants.<br>Defendants also respond that the facts set forth in this Paragraph are disputed on the grounds that they are not supported by admissible evidence, as required by Local Rule 56.1, and therefore are not properly before the Court for the same reasons cited in response to Paragraph 1561.<br>Defendants further respond that the fact in Paragraph 1567 is immaterial and therefore disputed because this fact does not affect the outcome of the suit under the governing law. The cost of enforcement is not an element of infringement or of any fair use factor. |
| 1568. The Times's business depends on its ability to control and protect its intellectual property and maintain a direct relationship with its audience. For this reason, "the protection and monetization of" its "copyrighted content" "is critical to [its] continued success and maintaining [its] competitive position." Ex. 1 [The New York Times SEC Form 10-K Dec. 31, 2025] at 18. | 1568. **Disputed in Part – Not Supported by Admissible Evidence; Immaterial.** Defendants do not dispute that the Times's Form 10-K includes the quoted words or that it views "the protection and monetization of" its "copyrighted content" as critical. However, it omits "We believe," which converts management's stated opinion into an apparent assertion of fact. Disputed as misleading for omitting that this statement appears under the risk-factor heading "Our business may suffer if we cannot protect our intellectual |

| | |
|---|---|
| | property." *See* Fed. R. Evid. 106. Defendants further dispute this Paragraph on the grounds that it is not supported by admissible evidence, as required by Local Rule 56.1, and therefore are not properly before the Court for the same reasons cited in response to Paragraph 1561. Defendants also respond that the facts in Paragraph 1568 are immaterial and therefore disputed because these facts do not affect the outcome of the suit under the governing law. The role of The Times's copyrights in its business strategy is not probative of any element of infringement, fair use, or cognizable market harm with respect to Defendants or the Asserted Works. |
| 1569. If The Times "is unable to protect and enforce [its] intellectual property rights," its "business and profitability may suffer, and [its] brand may be tarnished by misuse of its intellectual property." Ex. 1 [The New York Times SEC Form 10-K Dec. 31, 2025] at 18. | 1569. **Disputed in Part – Not Supported by Admissible Evidence; Immaterial.** Defendants do not dispute that the Times's Form 10-K includes the quoted words. But Defendants do dispute the veracity of the statement in Paragraph 1569, both in general and specifically with respect to any purported impact on the market for the Asserted Works resulting from Defendants' tools for the same reasons cited in response to Paragraph 1561. Defendants also respond that the facts set forth in this Paragraph are disputed on the grounds that they are not supported by admissible evidence, as required by Local Rule 56.1, and therefore are not properly before the Court for the same reasons cited in response to Paragraph 1561. |

| | |
|---|---|
| | Defendants also respond that the fact in Paragraph 1569 is immaterial and therefore disputed because this fact does not affect the outcome of the suit under the governing law. The statement is a conditional, forward-looking business-risk disclosure about what *may* happen if The Times cannot enforce its intellectual property. Furthermore, reputational harm is not probative of any element of copyright infringement, fair use, or cognizable market harm, and The Times has dismissed its trademark claims. *See* MDL ECF 1662. |
| 1570. The Times's former Chief Data Officer Hannah Poferl further testified that Defendants' Accused Products have harmed The Times by "violating [its] copyright and stealing [its] content." Ex. 699 [Poferl 30(b)(1) Depo. Tr.] at 63:9-12. | 1570. **Disputed in Part – Improper Legal Argument; Immaterial.** Defendants do not dispute that Ms. Poferl said the quoted words at her deposition. Defendants do dispute the veracity of the statement that "Defendants' Accused Products have harmed The Times" for the same reasons cited in response to Paragraph 1561.<br>Defendants further respond that the Court should disregard the statement in Paragraph 1570 that Defendants violated The Times' copyright and stole its content because the assertion constitutes improper attorney argument and is conclusory.<br>Defendants further respond that the Court should disregard Poferl's statement that Defendants have "harmed" The Times because it does not affect the outcome of the suit under the governing law. Specifically, individual lay opinions concerning whether |

| | |
|---|---|
| | Plaintiffs have been harmed generally are not facts and are immaterial to the issues before the Court. |
| 1571. The Times's former Vice President of Platform Strategy Sam Felix testified that GenAI products "used our content without permission and gave enough – a satisfying enough experience that users no longer needed to come back to our own platforms." Ex. 230 [Felix Depo. Tr.] at 33:24-34:2. | 1571. **Disputed in Part – Incomplete; Immaterial; Improper Legal Argument.** Defendants do not dispute that Ms. Felix said the quoted words at her deposition. But pursuant to Fed. R. Evid. 106, Ms. Felix's full testimony included that her statement was based on a privileged investigation directed by counsel that was conducted in connection with The Times's outreach to AI companies for potential licensing deals, and her observations from non-Defendant AI tools. A. Blanco Opp. Decl. Ex. 198 (S. Felix Tr.) at 31:1–21, 33:6–35:20.<br>Defendants further dispute this statement on the grounds that it is immaterial because this fact does not affect the outcome of the suit under the governing law. Ms. Felix's general statement that GenAI products "used our content without permission and gave enough – a satisfying enough experience that users no longer needed to come back to our own platforms" is not probative of any element of infringement, fair use, or cognizable market harm with respect to Defendants or the Asserted Works.<br>Microsoft further disputes the facts in Paragraph 1571 as inadmissible under Fed. R. Evid. 701. Ms. Felix is a lay witness not testifying as an expert, and the testimony cited in Paragraph 1571 is improper opinion testimony that is inadmissible under Fed. R. Evid. 701. |

| | |
|---|---|
| 1572. The Times's Chief Growth and Customer Officer Hannah Yang testified that The Times's "business is all about proving value to our subscribers at the moment of purchase and throughout their experience with us. Because of the way our pricing model works, we have to prove value at many points in their subscription journey. And at those points of evaluating value, if there is a free substitute out there that can replace us, that ability to prove value becomes weaker over time." Ex. 1255 [Yang 30(b)(1) Depo. Tr.] at 11:2-10. | 1572. **Disputed in Part – Immaterial.** Defendants do not dispute that Ms. Yang said the quoted words at her deposition. But Defendants do dispute any implication that Defendants' tools provide a "free substitute" to the Asserted Works. Ms. Yang's testimony is conditional ("if there is a free substitute"), and the record contains no evidence that Copilot or ChatGPT is such a substitute. ECF 1733 (C. Tucker Decl.) ¶¶ 20, 94–104; ECF 1763 (A. Goldfarb Decl.) ¶¶ 10–14, 23–25, Fig. 5. Furthermore, pursuant to Fed. R. Evid. 106, Ms. Yang indicated that The Times had not adjusted its pricing in response to generative AI products. News Ex. 1255 (H. Yang 30(b)(1) Tr.) at 11:18–23.<br>Defendants also respond that the facts in Paragraph 1572 are immaterial and therefore disputed because these facts do not affect the outcome of the suit under the governing law. Ms. Yang's general statement that "if there is a free substitute out there that can replace us, that ability to prove value becomes weaker over time" is not probative of any element of infringement, fair use, or cognizable market harm with respect to Defendants or the Asserted Works. |
| 1573. Separately, providing health and wellness information was identified by OpenAI as "one of the most common ways people use ChatGPT, with hundreds of millions of people asking health and wellness questions each week." Ex. 1236 ["Introducing ChatGPT Health," | 1573. **Undisputed.**<br><br>Microsoft defers to OpenAI. |

| | |
|---|---|
| *OpenAI* (Jan. 7, 2026), https://openai.com/index/introducing-chatgpt-health/]. | |
| 1574. Health and wellness are topics frequently addressed by the *Daily News* Plaintiffs and The Times. *See* Ex. 1237 ["Health," The New York Daily News, https://www.nydailynews.com/news/health/]; Ex. 1238 ["Health", The Chicago Tribune, https://www.chicagotribune.com/news/health/]; Ex. 1239 ["Well," The New York Times, https://www.nytimes.com/section/well]. | 1574. **Undisputed.** |
| 1575. Ziff Davis derives substantial revenue from its health and wellness vertical. Ex. 1240 [ZD 10-K 2025] pp. 4-7, 108-09. | 1575. **Disputed in Part.** OpenAI responds as follows: Undisputed that Ziff Davis "derives revenue from its health and wellness vertical." Disputed that this revenue is "substantial," a term that is vague and undefined.<br><br>Microsoft responds that Paragraph 1575 does not pertain to claims asserted against Microsoft. |
| 1576. Loss in audience tends to lead to a loss in the revenue streams coming to News Publishers, including The Times. Ex. 1 [The New York Times SEC Form 10-K Dec. 31, 2025] at 11 ("Subscription revenues make up the majority of our total revenue. Our future growth and profitability depend upon our ability to retain, grow and effectively monetize our audience and subscriber base in the United States and abroad... Our ability to attract and grow our digital subscriber base depends on the size of our audience | 1576. **Disputed – Not Supported by Cited Evidence; Not Supported by Admissible Evidence.** Defendants respond that the fact in Paragraph 1576 is disputed because News Publishers' revenue does not necessarily decline in tandem with audience or traffic metrics. For example, The Times's [redacted] |

| | |
|---|---|
| and its engagement directly with our journalism and products.”). | [redacted] ECF 1733 (C. Tucker Decl.) ¶¶ 30–31, 112–113, Figs. 2, 23; ECF 1763 (A. Goldfarb Decl.) ¶¶ 21–22, Figs. 3, 4; ECF 1702 (Microsoft News SUMF) ¶¶ 28(a)–(d), 91. [redacted]. ECF 1733 (C. Tucker Decl.) ¶ 122. [redacted] *Id.* at ¶¶ 50, 52, 106–107, 111, Fig. 9. [redacted] *Id.* at ¶ 52, Fig. 9; ECF 1702 (Microsoft News SUMF) ¶ 87.<br>Defendants also respond that the fact set forth in this Paragraph is disputed on the grounds that it is not supported by admissible evidence, as required by Local Rule 56.1, and therefore are not properly before the Court. Specifically, The Times's 10-K is hearsay and cannot be considered for the truth of the matter asserted. *See Sec. & Exch. Comm'n v. Fiore*, 416 F. Supp. 3d 306, 328-29 (S.D.N.Y. 2019); *State of West Virginia v. Letitia James*, No. 1:25-CV-00168 (BKS/DJS), 2026 WL 2568355, at *9-10, n.16 (N.D.N.Y. Aug. 31, 2026). |
| 1577. Internal studies conducted by The Times support that Generative AI competes directly with the primary benefits offered by The Times's news, Cooking, | 1577. **Disputed – Not Supported by Cited Evidence; Not Supported by Admissible Evidence; Subject to Fed. R. Evid. 702 Motion.** |

| | |
|---|---|
| and Wirecutter products. *See* Ex. 1241 [NYT_00832494]; Ex. 1246 [NYT_01072776]; Ex. 1214 [NYT_01018244]. | Defendants respond that the facts set forth in Paragraph 1577 are disputed because the cited documents are [redacted] ECF 2061 (O. Amir 702 Decl.) ¶¶ 8(c)(ii), 41, 47, 51–56.<br>Defendants further respond that this Paragraph is disputed on the grounds that it is not supported by admissible evidence, as required by Local Rule 56.1, and therefore is not properly before the Court. Specifically, the evidence cited lacks foundation and is hearsay.<br>Defendants also respond that this Paragraph is disputed as the evidence cited in support is the subject of a pending motion to exclude expert testimony pursuant to Fed. R. Evid. 702. *See* ECF 2055. Specifically, Defendants have moved to exclude the portions of Bell's and Malackowski's reports and potential testimony that encompass or rely on the documents cited in Paragraph 1577 on the grounds that those opinions are not supported by sufficient facts or data due to the unreliability of the NYT Brand Tracker Survey. To the extent the Court excludes the Brand Trackers and/or challenged opinions, Plaintiffs may not rely on them to support this statement. *See* Fed. R. Civ. P. 56(c)(2). |
| 1578. The Times's analysis of Q2 2025 survey data found that "[b]y now, most of our target audiences, and | 1578. **Disputed in Part – Not Supported by Admissible Evidence; Subject to Fed. R. Evid.** |

| | |
|---|---|
| especially our readers and subscribers, are using GenAI. At the low end, [redacted] of US news consumers say they use it to get news and [redacted] of US sports media consumers say they use it for sports at the high end. This gives us strong conviction that GenAI is taking a share of engagement among our current and potential readers and subscribers across all of our products." Ex. 1214 [NYT_01018244] at 1, 5. | **702 Motion.** Defendants do not dispute that the cited document contains the quoted language. Defendants do dispute that the survey results quoted in Paragraph 1578 support a "strong conviction that GenAI is taking a share of engagement among our current and potential readers and subscribers across all of our products." The cited document is [redacted]. ECF 2061 (O. Amir Decl.) ¶¶ 8(c), 29–39; *see also* News Ex. 1214.<br>Defendants also respond that this Paragraph is disputed on the grounds that it is not supported by admissible evidence, as required by Local Rule 56.1, and therefore is not properly before the Court. Specifically, the evidence cited lacks foundation and is hearsay.<br>Defendants also respond that this Paragraph is disputed as the evidence cited in support is the subject of a pending motion to exclude expert testimony pursuant to Fed. R. Evid. 702. *See* ECF 2055. Specifically, Defendants have moved to exclude the portions of Bell's and Malackowski's reports and potential testimony that encompass or rely on the document cited in Paragraph 1578 on the grounds that those opinions are not supported by sufficient facts or data due to the unreliability of the NYT Brand Tracker Survey. To the extent the Court excludes the Brand Trackers and/or challenged opinions, Plaintiffs may not |

| | |
|---|---|
| | rely on them to support this statement. *See* Fed. R. Civ. P. 56(c)(2). |
| 1579. That survey data found that across The Times's product categories of News, Cooking, Wirecutter, and the Athletic, GenAI competes with primary benefits offered by The Times. Ex. 1214 [NYT_01018244] at 54-55, 58-60. | 1579. **Disputed – Not Supported by Cited Evidence; Not Supported by Admissible Evidence; Subject to Fed. R. Evid. 702 Motion.** Defendants respond that the facts set forth in Paragraph 1579 are disputed because the cited document is [redacted] ECF 2061 (O. Amir 702 Decl.) ¶¶ 8(c)(ii), 41, 47, 51–56; *see also* News Ex. 1214.<br>Defendants also respond that this Paragraph is disputed on the grounds that it is not supported by admissible evidence, as required by Local Rule 56.1, and therefore is not properly before the Court. Specifically, the evidence cited lacks foundation and is hearsay.<br>Defendants also respond that this Paragraph is disputed as the evidence cited in support is the subject of a pending motion to exclude expert testimony pursuant to Fed. R. Evid. 702. *See* ECF 2055. Specifically, Defendants have moved to exclude the portions of Bell's and Malackowski's reports and potential testimony that encompass or rely on the document cited in Paragraph 1579 on the grounds that those opinions are not supported by sufficient facts or data due to the unreliability of the NYT Brand Tracker |

| | |
|---|---|
| | Survey. To the extent the Court excludes the Brand Trackers and/or challenged opinions, Plaintiffs may not rely on them to support this statement. *See* Fed. R. Civ. P. 56(c)(2). |
| 1580. The Times's survey data also demonstrated that ChatGPT specifically is a substitute for news delivered by The Times. Ex. 1246 [NYT_01072776]. | 1580. **Disputed – Not Supported by Cited Evidence; Not Supported by Admissible Evidence; Improper Legal Conclusion; Subject to Fed. R. Evid. 702 Motion.** Defendants respond that the facts set forth in Paragraph 1580 are disputed because the cited document contains [redacted]. ECF 2061 (O. Amir 702 Decl.) ¶¶ 8(c), 51–56; *see also* News Ex. 1246.<br>Defendants also respond that this Paragraph is disputed on the grounds that it is not supported by admissible evidence, as required by Local Rule 56.1, and therefore is not properly before the Court. Specifically, the evidence cited lacks foundation and is hearsay.<br>Defendants further respond that the Court should disregard this Paragraph because the assertion constitutes improper attorney argument and/or is conclusory with respect to the term "substitute."<br>Defendants also respond that this Paragraph is disputed as the evidence cited in support is the subject of a pending motion to exclude expert testimony pursuant to Fed. R. Evid. 702. *See* ECF 2055. |

| | |
|---|---|
| | Specifically, Defendants have moved to exclude the portions of Bell's and Malackowski's reports and potential testimony that encompass or rely on the document cited in Paragraph 1580 on the grounds that those opinions are not supported by sufficient facts or data due to the unreliability of the NYT Brand Tracker Survey. To the extent the Court excludes the Brand Trackers and/or challenged opinions, Plaintiffs may not rely on them to support this statement. *See* Fed. R. Civ. P. 56(c)(2). |
| 1581. Of The Times subscribers who were surveyed who used or paid for ChatGPT for news (which constitute [redacted] of the Times subscribers surveyed), 36% responded that "[m]y use of ChatGPT means I no longer need news from the New York Times at all" and [redacted] responded that "[m]y use of ChatGPT means I only need news from the New York Times some of the time." Ex. 1246 [NYT_01072776]. | 1581. **Disputed – Not Supported by Cited Evidence; Not Supported by Admissible Evidence; Subject to Fed. R. Evid. 702 Motion.** Defendants do not dispute that the cited document contains the quoted language. Defendants do dispute the facts set forth in Paragraph 1581 because the cited document contains [redacted] ECF 2061 (O. Amir 702 Decl.) ¶¶ 8(c), 51–56; *see also* News Ex. 1246.<br>Defendants also respond that this Paragraph is disputed on the grounds that it is not supported by admissible evidence, as required by Local Rule 56.1, and therefore is not properly before the Court. Specifically, the evidence cited lacks foundation and is hearsay. |

| | |
|---|---|
| | Defendants also respond that this Paragraph is disputed as the evidence cited in support is the subject of a pending motion to exclude expert testimony pursuant to Fed. R. Evid. 702. *See* ECF 2055. Specifically, Defendants have moved to exclude the portions of Bell's and Malackowski's reports and potential testimony that encompass or rely on the document cited in Paragraph 1581 on the grounds that those opinions are not supported by sufficient facts or data due to the unreliability of the NYT Brand Tracker Survey. To the extent the Court excludes the Brand Trackers and/or challenged opinions, Plaintiffs may not rely on them to support this statement. *See* Fed. R. Civ. P. 56(c)(2). |
| 1582. With respect to non-subscribers of The Times who were surveyed who used or paid for ChatGPT (which constitute [redacted] of the non-Times subscribers surveyed), [redacted] responded that "[m]y use of ChatGPT means I no longer need news from the New York Times at all" and [redacted] responded that "[m]y use of ChatGPT means I only need news from the New York Times some of the time." Ex. 1246 [NYT_01072776]. | 1582. **Disputed – Not Supported by Cited Evidence; Not Supported by Admissible Evidence; Subject to Fed. R. Evid. 702 Motion.** Defendants do not dispute that the cited document contains the quoted language. Defendants do dispute the facts set forth in Paragraph 1582 because the cited document contains [redacted] ECF 2061 (O. Amir 702 Decl.) ¶¶ 8(c), 51–56; *see also* News Ex. 1246.<br>Defendants also respond that this Paragraph is disputed on the grounds that it is not supported by |

| | |
|---|---|
| | admissible evidence, as required by Local Rule 56.1, and therefore is not properly before the Court. Specifically, the evidence cited lacks foundation and is hearsay.<br>Defendants also respond that this Paragraph is disputed as the evidence cited in support is the subject of a pending motion to exclude expert testimony pursuant to Fed. R. Evid. 702. *See* ECF 2055. Specifically, Defendants have moved to exclude the portions of Bell's and Malackowski's reports and potential testimony that encompass or rely on the document cited in Paragraph 1582 on the grounds that those opinions are not supported by sufficient facts or data due to the unreliability of the NYT Brand Tracker Survey. To the extent the Court excludes the Brand Trackers and/or challenged opinions, Plaintiffs may not rely on them to support this statement. *See* Fed. R. Civ. P. 56(c)(2). |
| 1583. A significant number of individuals surveyed felt that Generative AI tools provide enough benefits that many are considering using them in place of The Times. Ex. 1241 [NYT_00832494] at 6; Ex. 1214 [NYT_01018244] at 45. | 1583. **Disputed – Not Supported by Cited Evidence; Not Supported by Admissible Evidence; Subject to Fed. R. Evid. 702 Motion.** Defendants respond that the facts set forth in Paragraph 1583 are disputed because the cited documents are [redacted] ECF 2061 (O. Amir 702 Decl.) ¶¶ 8(c)(ii), 41, 47, 51–56; *see also* News Ex. 1214; News Ex. 1241. |

| | |
|---|---|
| | Defendants also respond that this Paragraph is disputed on the grounds that it is not supported by admissible evidence, as required by Local Rule 56.1, and therefore is not properly before the Court. Specifically, the evidence cited lacks foundation and is hearsay.<br>Defendants also respond that this Paragraph is disputed as the evidence cited in support is the subject of a pending motion to exclude expert testimony pursuant to Fed. R. Evid. 702. *See* ECF 2055. Specifically, Defendants have moved to exclude the portions of Bell's and Malackowski's reports and potential testimony that encompass or rely on the document cited in Paragraph 1583 on the grounds that those opinions are not supported by sufficient facts or data due to the unreliability of the NYT Brand Tracker Survey. To the extent the Court excludes the Brand Trackers and/or challenged opinions, Plaintiffs may not rely on them to support this statement. *See* Fed. R. Civ. P. 56(c)(2). |
| 1584. The Times's Q2 2025 surveys found that [redacted] of the U.S. news consumers surveyed use Generative AI – including ChatGPT and Copilot – to get news. Ex. 1214 [NYT_01018244] at 5, 11. | 1584. **Disputed in Part – Not Supported by Cited Evidence; Not Supported by Admissible Evidence; Subject to Fed. R. Evid. 702 Motion.** Defendants respond that the facts set forth in Paragraph 1584 are disputed because the cited document is a [redacted] |

| | |
|---|---|
| | ECF 2061 (O. Amir 702 Decl.) ¶¶ 8(c), 29–32, 35, 51–56; *see also* News Ex. 1214.<br>Defendants also respond that this Paragraph is disputed on the grounds that it is not supported by admissible evidence, as required by Local Rule 56.1, and therefore is not properly before the Court. Specifically, the evidence cited lacks foundation and is hearsay.<br>Defendants also respond that this Paragraph is disputed as the evidence cited in support is the subject of a pending motion to exclude expert testimony pursuant to Fed. R. Evid. 702. *See* ECF 2055. Specifically, Defendants have moved to exclude the portions of Bell's and Malackowski's reports and potential testimony that encompass or rely on the document cited in Paragraph 1584 on the grounds that those opinions are not supported by sufficient facts or data due to the unreliability of the NYT Brand Tracker Survey. To the extent the Court excludes the Brand Trackers and/or challenged opinions, Plaintiffs may not rely on them to support this statement. *See* Fed. R. Civ. P. 56(c)(2). |
| 1585. In the same surveys, [redacted] of the U.S. sports media consumers surveyed said they use Generative AI for sports news. Ex. 1214 [NYT_01018244] at 5. | 1585. **Disputed in Part – Not Supported by Cited Evidence; Not Supported by Admissible Evidence; Subject to Fed. R. Evid. 702 Motion.** Defendants respond that the facts set forth in Paragraph 1585 are disputed because the cited document is a [redacted] |

| | |
|---|---|
| | [redacted] ECF 2061 (O. Amir 702 Decl.) ¶¶ 8(c), 29–32, 35, 51–56; *see also* News Ex. 1214.<br>Defendants also respond that this Paragraph is disputed on the grounds that it is not supported by admissible evidence, as required by Local Rule 56.1, and therefore is not properly before the Court. Specifically, the evidence cited lacks foundation and is hearsay.<br>Defendants also respond that this Paragraph is disputed as the evidence cited in support is the subject of a pending motion to exclude expert testimony pursuant to Fed. R. Evid. 702. *See* ECF 2055. Specifically, Defendants have moved to exclude the portions of Bell's and Malackowski's reports and potential testimony that encompass or rely on the document cited in Paragraph 1585 on the grounds that those opinions are not supported by sufficient facts or data due to the unreliability of the NYT Brand Tracker Survey. To the extent the Court excludes the Brand Trackers and/or challenged opinions, Plaintiffs may not rely on them to support this statement. *See* Fed. R. Civ. P. 56(c)(2). |
| 1586. **DNP Documents/Evidence/GenAI survey.** An email from Frank Pine, Executive Editor at MediaNews Group, highlights a presentation about session data for the News Plaintiffs stating, "[h]istorically, SEARCH has been the largest third-party driver of traffic | 1586. **Undisputed.** |

| | |
|---|---|
| and still generates [redacted] of referral sessions." Ex. 72 [Jacobs 30(b)(6), Feb. 12, 2026, Depo. Tr.] at 37:3-14; Ex 86 [DNP-00632487]. | |
| 1587. In June of 2025, the Tribune Publishing conducted a "GenAI Survey." Ex. 1242 [DNP-00535393-402]. | 1587. **Disputed in Part - Not Supported by Admissible Evidence; Subject to Fed. R. Evid. 702 Motion.** Defendants respond as follows: Undisputed that News Ex. 1242 is a PowerPoint presentation bearing the title "GenAI Survey June 2025." Disputed as to any implication that the survey is reliable evidence of consumer behavior, of substitution, or of any use of Defendants' products. ECF 2061 (O. Amir 702 Decl.) ¶¶ 21–22, 25–26, 57, 62. Disputed as to the characterization of the survey as an institutional survey "conducted" by "Tribune Publishing" in the ordinary course of business. It was [redacted] A. Blanco Opp. Decl. Ex. 275 (S. Sherwin Tr.) at 77:9–12. Further, the disputed proposition is not supported by admissible evidence, as required by Local Rule 56.1, and therefore is not properly before the Court. Specifically, News Ex. 1242 lacks foundation.<br>Defendants also respond that this Paragraph is disputed as the evidence cited in support is the subject of a pending motion to exclude expert testimony pursuant to Fed. R. Evid. 702. *See* ECF 2055. Specifically, Defendants have moved to exclude the portions of Owen's and Malackowski's reports and potential testimony that encompass or rely on the document cited in Paragraph 1587 on the grounds that |

| | |
|---|---|
| | those opinions are not supported by sufficient facts or data due to the unreliability of the "GenAI Survey." To the extent the Court excludes the survey and/or challenged opinions, Plaintiffs may not rely on them to support this statement. *See* Fed. R. Civ. P. 56(c)(2). |
| 1588. According to former Director of Customer Experience at Tribune Publishing Samantha Sherwin, who created the survey presentation, the objective of the survey was "to understand if and how subscribers and former subscribers are using GenAI tools for news and how they feel about the accuracy and trustworthiness of them." Ex. 701 [Samantha Sherwin, February 27, 2026, Depo. Tr.] at 86:14-24. | 1588. **Disputed in Part – Subject to Fed. R. Evid. 702 Motion.** Defendants respond as follows: Undisputed that slide 2 of Ex. 1242 states: "[redacted]" However, Plaintiffs' characterization is inaccurate or incomplete. Disputed as to any implication that the survey serves as evidence of any alleged harm caused by Defendants' products.<br>Defendants also respond that this Paragraph is disputed as the evidence cited in support is the subject of a pending motion to exclude expert testimony pursuant to Fed. R. Evid. 702. *See* ECF 2055. Specifically, Defendants have moved to exclude the portions of Owen's and Malackowski's reports and potential testimony that encompass or rely on the document cited in Paragraph 1588 on the grounds that those opinions are not supported by sufficient facts or data due to the unreliability of the "GenAI Survey." To the extent the Court excludes the survey and/or challenged opinions, Plaintiffs may not rely on them to support this statement. *See* Fed. R. Civ. P. 56(c)(2). |

| | |
|---|---|
| 1589. The Tribune Publishing GenAI survey was sent to current and former digital and print subscribers across 8 markets, which correspond to the eight *Daily News Plaintiffs*, using a random sample of active and former subscribers. Ex. 1242 [DNP-00535393] at 394; Ex. 17 [Pine, 30(b)(6), February 4, 2026, Depo. Tr.] at 288:12-21; Ex. 701 [S. Sherwin Depo. Tr.] at 88:2-21. | 1589. **Disputed in Part - Not Supported by Cited Evidence; Not Supported by Admissible Evidence; Subject to Fed. R. Evid. 702 Motion.** Defendants respond as follows: Undisputed that slide 2 of Ex. 1242 states that the survey "[s]urveyed current and former digital and print subs across 8 markets; [redacted] Undisputed that the eight publications listed on that slide are the eight Daily News Plaintiffs. However, disputed as to any inference that the survey's distribution makes its results representative of subscribers in the eight markets or shows any use of, reliance on, or substitution by Defendant's products. The survey was not distributed "across 8 markets" in any market-wide sense. It was sent to [redacted]. *See* A. Blanco Opp. Decl. Ex. 255 (F. Pine 30(b)(6) Tr. (Feb. 4, 2026)) at 280:10–281:10; Fed. R. Evid. 106. Respondents [redacted]. See A. Blanco Opp. Decl. Ex. 275 (S. Sherwin Tr.) at 83:16–25. Further, the disputed proposition is not supported by admissible evidence, as required by Local Rule 56.1, and therefore is not properly before the Court. Specifically, News Ex. 1242 lacks foundation and is hearsay.<br>Defendants also respond that this Paragraph is disputed as the evidence cited in support is the subject of a pending motion to exclude expert testimony pursuant to Fed. R. Evid. 702. *See* ECF 2055. |

| | |
|---|---|
| | Specifically, Defendants have moved to exclude the portions of Owen's and Malackowski's reports and potential testimony that encompass or rely on the documents cited in Paragraph 1589 on the grounds that those opinions are not supported by sufficient facts or data due to the unreliability of the "GenAI Survey." To the extent the Court excludes the survey and/or challenged opinions, Plaintiffs may not rely on them to support this statement. *See* Fed. R. Civ. P. 56(c)(2). |
| 1590. Of the almost 3,500 respondents to the Tribune Publishing GenAI survey, [redacted] were aware of at least one GenAI tool and [redacted] or more of active and former digital readers were aware of at least one GenAI tool. Ex. 1242 [DNP-00535393] at 394, 395. | 1590. **Disputed in Part - Not Supported by Admissible Evidence; Subject to Fed. R. Evid. 702 Motion.** Defendants respond as follows: Undisputed that the cited document states that [redacted] of respondents were aware of at least one GenAI tool and [redacted] or more of active and former digital readers were aware of at least one GenAI tool. Disputed as to the characterization of, and inferences purportedly drawn from, this statement as Plaintiffs omit additional context that this was a [redacted]. Nothing in the survey's design ties the results to Defendants. ECF 2061 (O. Amir 702 Decl.) ¶¶ 21–22, 57, 62. ChatGPT was [redacted] *See* A. Blanco Opp. Decl. Ex. 79 DNP-00626845 at q3; Fed. R. Evid. 106. [redacted] *See* A. Blanco Opp. Decl. Ex. 79 DNP-00626845; A. Blanco |

| | |
|---|---|
| | Opp. Decl. Ex. 275 (S. Sherwin Tr.) at 101:20–102:3; Fed. R. Evid. 106.<br>Further disputed as to the characterization of, and inferences purportedly drawn from, the stated survey results as Plaintiffs omit additional context that [redacted]. *See* A. Blanco Opp. Decl. Ex. 275 (S. Sherwin Tr.) at 70:21–24; A. Blanco Opp. Decl. Ex. 255 (F. Pine 30(b)(6) Tr. (Feb. 4, 2026)) at 279:14–17, 280:10–13, 281:19–21; Fed. R. Evid. 106. Disputed as to the survey methodology and reliability. *See* Ex. (S. Sherwin Tr.) at 78:17–21; 105:11–107:9; ECF 2061 (O. Amir 702 Decl.) ¶¶ 21–22, 25–26, 57, 62; Fed. R. Evid. 106. Defendants dispute the statement to the extent it implies that respondents who used generative AI to obtain news did so instead of consuming the Daily News Plaintiffs' content, or that the cited survey demonstrates substitution. The survey [redacted]. ECF 2061 (O. Amir 702 Decl.) at ¶¶ 21–22, 25–26, 57, 62. Objective, user-level behavioral data refute any inference of substitution. *See* ECF 1763 (A. Goldfarb Decl.) ¶¶ 40–47; Fed. R. Evid. 106. Further, the disputed proposition is not supported by admissible evidence, as required by Local Rule 56.1, and therefore is not properly before the Court. Specifically, News Ex. 1242 lacks foundation and is hearsay. |

| | |
|---|---|
| | Defendants also respond that this Paragraph is disputed as the evidence cited in support is the subject of a pending motion to exclude expert testimony pursuant to Fed. R. Evid. 702. *See* ECF 2055. Specifically, Defendants have moved to exclude the portions of Owen's and Malackowski's reports and potential testimony that encompass or rely on the document cited in Paragraph 1590 on the grounds that those opinions are not supported by sufficient facts or data due to the unreliability of the "GenAI Survey." To the extent the Court excludes the survey and/or challenged opinions, Plaintiffs may not rely on them to support this statement. *See* Fed. R. Civ. P. 56(c)(2). |
| 1591. In the Tribune Publishing GenAI survey, of the respondents aware of a GenAI tool, [redacted] used it to obtain news in the two months prior to the survey, with former subscribers being more likely to use GenAI for news than current subscribers. Ex. 1242 [DNP-00535393] at 396. | 1591. **Disputed in Part - Not Supported by Admissible Evidence; Subject to Fed. R. Evid. 702 Motion.** Defendants respond as follows: Undisputed that the cited document states that [redacted] of respondents used "GenAI tools" to obtain news in the two months prior to the survey. Disputed as to the characterization of, and inferences purportedly drawn from, this statement as Plaintiffs omit additional context that this was a [redacted]. Nothing in the survey's design ties the results to Defendants. ECF 2061 (O. Amir 702 Decl.) ¶¶ 21–22, 57, 62. ChatGPT [redacted] *See* A. Blanco Opp. Decl. Ex. 79 DNP- |

| | |
|---|---|
| | 00626845 at q3; Fed. R. Evid. 106. [redacted] *See* A. Blanco Opp. Decl. Ex. 79 DNP-00626845; A. Blanco Opp. Decl. Ex. 275 (S. Sherwin Tr.) at 101:20–102:3; Fed. R. Evid. 106. Disputed as to the characterization of, and inferences purportedly drawn from, the stated survey results as Plaintiffs omit additional context that [redacted]. *See* A. Blanco Opp. Decl. Ex. 275 (S. Sherwin Tr.) at 70:21–24; A. Blanco Opp. Decl. Ex. 255 (F. Pine 30(b)(6) Tr. (Feb. 4, 2026) at 279:14–17, 280:10–13, 281:19–21; Fed. R. Evid. 106. Disputed as to the survey methodology and reliability. *See* A. Blanco Opp. Decl. Ex. 275 (S. Sherwin Tr.) at 78:17–21; 105:11–107:9; ECF 2061 (O. Amir 702 Decl.) ¶¶ 21–22, 25–26, 57, 62. Disputed as to the characterization of, and inferences purportedly drawn from, the statement that "former subscribers being more likely to use GenAI for news than current subscribers" to the extent it suggests correlation or causation which is not supported by the document. ECF 2061 (O. Amir 702 Decl.) ¶¶ 58–60, 62. Defendants dispute the statement to the extent it implies that respondents who used generative AI to obtain news did so instead of consuming the Daily News Plaintiffs' content, or that the cited survey demonstrates substitution. The survey measures [redacted]. ECF 2061 (O. Amir 702 Decl.) ¶¶ 21–22, 25–26, 57, 62. Objective, user-level behavioral data |

| | |
|---|---|
| | refute any inference of substitution. *See* ECF 1763 (A. Goldfarb Decl.) ¶¶ 40–47; Fed. R. Evid. 106. Further, the disputed proposition is not supported by admissible evidence, as required by Local Rule 56.1, and therefore is not properly before the Court. S.D.N.Y. Specifically, News Ex. 1242 lacks foundation and is hearsay.<br>Defendants also respond that this Paragraph is disputed as the evidence cited in support is the subject of a pending motion to exclude expert testimony pursuant to Fed. R. Evid. 702. *See* ECF 2055. Specifically, Defendants have moved to exclude the portions of Owen's and Malackowski's reports and potential testimony that encompass or rely on the document cited in Paragraph 1591 on the grounds that those opinions are not supported by sufficient facts or data due to the unreliability of the "GenAI Survey." To the extent the Court excludes the survey and/or challenged opinions, Plaintiffs may not rely on them to support this statement. *See* Fed. R. Civ. P. 56(c)(2). |
| 1592. In the Tribune Publishing GenAI survey, of the respondents that had used GenAI for news in the past two months, [redacted] had used ChatGPT and [redacted] had used Microsoft Copilot or Bing GenAI tools. Ex. 1242 [DNP-00535393] at 397. | 1592. **Disputed in Part - Not Supported by Admissible Evidence; Subject to Fed. R. Evid. 702 Motion.** Defendants respond as follows: Undisputed that the cited document states that [redacted] of the respondents that said they had used GenAI for news in the past two months said they had used ChatGPT. Disputed as to the characterization of, and inferences purportedly drawn from, this statement as Plaintiffs omit additional context that this was a |

| | |
|---|---|
| | [redacted]. Nothing in the survey's design ties the results to Defendants. ECF 2061 (O. Amir 702 Decl.) ¶¶ 21–22, 57, 62. ChatGPT [redacted] *See* A. Blanco Opp. Decl. Ex. 79 DNP-00626845 at q3; Fed. R. Evid. 106. [redacted] *See* A. Blanco Opp. Decl. Ex. 79 DNP-00626845; A. Blanco Opp. Decl. Ex. 275 (S. Sherwin Tr.) at 101:20–102:3. Disputed as to the characterization of, and inferences purportedly drawn from, the stated survey results as Plaintiffs omit additional context that [redacted] *See* A. Blanco Opp. Decl. Ex. 275 (S. Sherwin Tr.) at 70:21–24; A. Blanco Opp. Decl. Ex. 255 (F. Pine 30(b)(6) Tr. (Feb. 4, 2026)) at 279:14–17, 280:10–13, 281:19–21. Disputed as to the survey methodology and reliability. *See* A. Blanco Opp. Decl. Ex. 275 (S. Sherwin Tr.) at 78:17–21; 105:11–107:9; ECF 2061 (O. Amir 702 Decl.) ¶¶ 21–22, 25–26, 57, 62. Defendants dispute the statement to the extent it implies that respondents who used generative AI to obtain news did so instead of consuming the Daily News Plaintiffs' content, or that the cited survey demonstrates substitution. The survey [redacted]. ECF 2061 (O. Amir 702 Decl.) ¶¶ 21–22, 25–26, 57, 62. Objective, |

| | |
|---|---|
| | user-level behavioral data refute any inference of substitution. *See* ECF 1763 (A. Goldfarb Decl.) at ¶¶ 40–47. Further, the disputed proposition is not supported by admissible evidence, as required by Local Rule 56.1, and therefore is not properly before the Court. Specifically, News Ex. 1242 lacks foundation and is hearsay.<br>Defendants also respond that this Paragraph is disputed as the evidence cited in support is the subject of a pending motion to exclude expert testimony pursuant to Fed. R. Evid. 702. *See* ECF 2055. Specifically, Defendants have moved to exclude the portions of Owen's and Malackowski's reports and potential testimony that encompass or rely on the document cited in Paragraph 1592 on the grounds that those opinions are not supported by sufficient facts or data due to the unreliability of the "GenAI Survey." To the extent the Court excludes the survey and/or challenged opinions, Plaintiffs may not rely on them to support this statement. *See* Fed. R. Civ. P. 56(c)(2). |
| 1593. According to Senior Vice President of Circulation at MediaNews Group, Adel Ibrahim, the survey provided evidence that "subscriptions have been harmed by generative AI products" as the results show "former subscribers, including print, are [redacted] more likely to read news on ChatGPT and other similar tools. [redacted] is a big enough number that I would call it a causation, not | 1593. **Disputed in Part – Subject to Fed. R. Evid. 702 Motion; Incomplete.** Defendants respond as follows: Undisputed that Mr. Ibrahim offered the quoted testimony at his November 20, 2025 deposition. Disputed that the testimony is admissible evidence that the GenAI Survey shows harm to subscriptions or causation, and disputed that it accurately describes News Ex. 1242. Disputed as to any |

| | |
|---|---|
| just a correlation." Ex. 396 [Ibrahim, 30(b)(6), November 20, 2025, Depo. Tr.] at 147:15-148:10. | inference that ChatGPT or any Defendants' products caused any subscriber to cancel. Nothing in the Generative AI survey results DNPs provided at News Ex. 1242 that Mr. Ibrahim relies on in his testimony purports to show "causation" or even "correlation" between AI use and harm to DNP subscriptions. The survey cannot support a causation finding. ECF 2061 (O. Amir 702 Decl.) ¶¶ 58–60, 62. Pursuant to Fed. R. Evid. 106, Mr. Ibrahim further testified that [redacted] A. Blanco Opp. Decl. Ex. 216 (A. Ibrahim 30(b)(6) Tr.) at 150:4–10. Dispute characterization of, and inferences purportedly drawn from, this statement as Plaintiffs omit additional context that this was a [redacted] Nothing in the survey's design ties the results to Defendants. ECF 2061 (O. Amir 702 Decl.) ¶¶ 21–22, 57, 62. ChatGPT [redacted] *See* A. Blanco Opp. Decl. Ex. 79 (DNP-00626845) at q3. [redacted]. *See* A. Blanco Opp. Decl. Ex. 79 (DNP-00626845); A. Blanco Opp. Decl. Ex. 275 (S. Sherwin Tr.) at 101:20–102:3. Disputed as to the characterization of, and inferences purportedly drawn from, the stated survey results as Plaintiffs omit additional context that the [redacted] |

| | |
|---|---|
| | [redacted]. *See* A. Blanco Opp. Decl. Ex. 275 (S. Sherwin Tr.) at 70:21–24; A. Blanco Opp. Decl. Ex. 255 (F. Pine 30(b)(6) Tr. (Feb. 4, 2026)) at 279:14–17, 280:10–13, 281:19-21; Fed. R. Evid. 106. Disputed as to the survey methodology and reliability. *See* A. Blanco Opp. Decl. Ex. 275 (S. Sherwin Tr.) at 78:17–-21; 105:11–107:9; ECF 2061 (O. Amir 702 Decl.) ¶¶ 21–22, 25–26, 57, 62. Defendants dispute the statement to the extent it implies that respondents who used generative AI to obtain news did so instead of consuming the Daily News Plaintiffs' content, or that generative AI use caused subscriber attrition. The survey [redacted]. ECF 2061 (O. Amir 702 Decl.) at ¶¶ 21–22, 25–26, 57, 62. Objective, user-level behavioral data refute any inference of substitution. *See* ECF 1763 (A. Goldfarb Decl.) ¶¶ 40–47; Fed. R. Evid. 106.<br>Defendants also respond that this Paragraph is disputed as the evidence cited in support is the subject of a pending motion to exclude expert testimony pursuant to Fed. R. Evid. 702. *See* ECF 2055. Specifically, Defendants have moved to exclude the portions of Owen's and Malackowski's reports and potential testimony that encompass or rely on the document cited in Paragraph 1593 on the grounds that those opinions are not supported by sufficient facts or data due to the unreliability of the "GenAI Survey." To the extent the Court excludes the survey and/or |

| | |
|---|---|
| | challenged opinions, Plaintiffs may not rely on them to support this statement. *See* Fed. R. Civ. P. 56(c)(2). |
| 1594. According to Jim Malackowski, News Plaintiffs' damages expert, the Tribune Publishing GenAI survey shows that former digital subscribers are [redacted] more likely and former print subscribers are [redacted] more likely to use GenAI tools than active digital and active print subscribers respectively. Malackowski NYT-DNP Opening Rep. at 50 (citing DNP-00535393-402 at 396) [redacted] | 1594. **Disputed in Part - Expert Opinion Subject to Rule 702.** Defendants respond as follows: Undisputed that these numbers and calculations are included in Malackowski's expert report. However, disputed as to the characterization of, and inferences purportedly drawn from, this statement because they are not supported by the cited evidence.<br>Specifically, disputed as to the characterization of, and inferences purportedly drawn from, this statement because Plaintiffs omit additional context [redacted]. Nothing in the survey's design ties the results to Defendants. ECF 2061 (O. Amir 702 Decl.) ¶¶ 21–22, 57, 62. ChatGPT [redacted] *See* A. Blanco Opp. Decl. Ex. 79 DNP-00626845 at q3; Fed. R. Evid. 106. [redacted] *See* A. Blanco Opp. Decl. Ex. 79 (DNP-00626845) at q3; A. Blanco Opp. Decl. Ex. 275 (S. Sherwin Tr.) at 101:20–102:3; Fed. R. Evid. 106.<br>Further disputed as to the characterization of, and inferences purportedly drawn from, the stated survey results because Plaintiffs [redacted] |

| | |
|---|---|
| | [redacted] *See* A. Blanco Opp. Decl. Ex. 275 (S. Sherwin Tr.) at 70:21–24; A. Blanco Opp. Decl. Ex. 255 (F. Pine 30(b)(6) Tr. (Feb. 4, 2026)) at 279:14–17, 280:10–13. 281:19–21. Further disputed as to the survey methodology and reliability. *See* A. Blanco Opp. Decl. Ex. 275 (S. Sherwin Tr.) at 78:17–21, 105:11–107:9; ECF 2061 (O. Amir 702 Decl.) ¶¶ 21–22, 25–26, 57, 62.<br><br>Defendants further dispute the statement to the extent it implies that respondents who used generative AI to obtain news did so instead of consuming the Daily News Plaintiffs' content, or that the cited survey demonstrates substitution. [redacted]. ECF 2061 (O. Amir 702 Decl.) ¶¶ 21–22, 25–26, 57, 62. Objective, user-level behavioral data refute any inference of substitution. *See* ECF 1763 (A. Goldfarb Decl.) ¶¶ 40–47.<br><br>Further, the disputed proposition is not supported by admissible evidence, as required by Local Rule 56.1, and therefore is not properly before the Court.<br><br>Further, the fact stated in Paragraph 1594 is disputed because the evidence cited in support is currently subject to a motion to exclude expert testimony pursuant to Fed. R. Evid. 702. Defendants' pending Rule 702 motion seeks to exclude certain opinions of Malackowski, on which this statement relies. To the extent the Court excludes the challenged opinions, Plaintiffs may not rely on them to support this statement. *See* Fed. R. Civ. P. 56(c)(2). |

| | |
|---|---|
| 1595. In the Tribune Publishing GenAI survey, only [redacted] of respondents who used GenAI for news said they will continue to read publisher news content as frequently as they do. DNP-00535393-402 at 401. | 1595. **Disputed in Part – Subject to Fed. R. Evid. 702 Motion.** Defendants respond as follows: Undisputed that the cited document contains the [redacted] figure. However, disputed as to the characterization of, and inferences purportedly drawn from, this statement because they are not supported by the cited evidence. Specifically, [redacted]. *See* News Ex. 1242 at DNP-00535401. Plaintiffs omit additional context that this was a [redacted]. Nothing in the survey's design ties the results to Defendants. ECF 2061 (O. Amir 702 Decl.) at ¶¶ 21–22, 25–26, 57, 62. ChatGPT [redacted] *See* A. Blanco Opp. Decl. Ex. 79 (DNP-00626845) at q3; Fed. R. Evid. 106. [redacted] *See* A. Blanco Opp. Decl. Ex. 79 (DNP-00626845) at q3; A. Blanco Opp. Decl. Ex. 275 (S. Sherwin Tr.) at 101:20–102:3; Fed. R. Evid. 106.<br><br>Further disputed as to the characterization of, and inferences purportedly drawn from, the stated survey results because Plaintiffs omit additional context that the [redacted]. *See* A. Blanco Opp. Decl. Ex. 275 (S. Sherwin Tr.) at 70:21–24; A. Blanco Opp. Decl. Ex. 255 |

| | |
|---|---|
| | (F. Pine 30(b)(6) Tr. (Feb. 4, 2026)) at 279:14–17, 280:10–13, 281:19–21; Fed. R. Evid. 106. Further disputed as to the survey methodology and reliability. *See* A. Blanco Opp. Decl. Ex. 275 (S. Sherwin Tr.) at 78:17–21, 105:11–107:9; ECF 2061 (O. Amir 702 Decl.) ¶¶ 21–22, 25–26, 57, 62.<br>OpenAI further disputes the statement to the extent it implies that respondents who used generative AI to obtain news did so instead of consuming the Daily News Plaintiffs' content, or that the cited survey demonstrates substitution. [redacted]. ECF 2061 (O. Amir 702 Decl.) ¶¶ 21–22, 25–26, 57, 62. Objective, user-level behavioral data refute any inference of substitution. *See* ECF 1763 (A. Goldfarb Decl.) ¶¶ 40–47.<br>Further, the disputed proposition is not supported by admissible evidence, as required by Local Rule 56.1, and therefore is not properly before the Court.<br>Further, the fact stated in Paragraph 1595 is disputed because the evidence cited in support is currently subject to a motion to exclude expert testimony pursuant to Fed. R. Evid. 702. Defendants' pending Rule 702 motion seeks to exclude certain opinions of Malackowski, on which this statement relies. To the extent the Court excludes the challenged opinions, Plaintiffs may not rely on them to support this statement. *See* Fed. R. Civ. P. 56(c)(2). |

| | |
|---|---|
| 1596. Mr. Ibrahim, Senior Vice President of Circulation at MediaNews Group, when discussing the propensity of subscribers "to read their news on ChatGPT" and "why they are cancelling," testified that "when they tell me that they don't like my price, it's because I'm competing with a zero price on ChatGPT, on CoPilot…" and that such products were "disrupting [his business] with no value exchange." Ex. 396 [Ibrahim, 30(b)(6), November 20, 2025, Depo. Tr.] at. 55:1-56:18. | 1596. **Disputed in Part - Improper Legal Argument; Not Supported by Cited Evidence.** Defendants respond as follows: Undisputed that Mr. Ibrahim offered the quoted testimony.<br>Disputed as unsupported by the cited evidence. Specifically, Paragraph 1596 omits context and is misleading. Pursuant to Fed. R. Evid. 106, Mr. Ibrahim also testified that [redacted] A. Blanco Opp. Decl. Ex. 216 (A. Ibrahim 30(b)(6) Tr.) at 55:1–6. In the same deposition, he confirmed: [redacted] *Id.* at 54:20–25; Fed. R. Evid. 106.<br>Pursuant to Fed. R. Evid. 106, Plaintiffs' own internal documents [redacted] *See* A. Blanco Opp. Decl. Ex. 61 DNP-00506801 at DNP-00506801. Pursuant to Fed. R. Evid. 106, Mr. Ibrahim's own testimony confirms that any decline in subscriptions is attributable to a multiplicity of independent causes. [redacted] |

| | |
|---|---|
| | [redacted]. A. Blanco Opp. Decl. Ex. 216 (A. Ibrahim 30(b)(6) Tr.) at 119:10–125:3. Mr. Ibrahim offered no testimony—and the record contains no evidence—establishing that any user has cancelled or declined to subscribe to a Daily News Plaintiff publication because that user instead obtained the same content from ChatGPT. The "substitution" theory rests entirely on Mr. Ibrahim's unverified personal belief, not on any documentary or empirical evidence. *See* ECF 1763 (A. Goldfarb Decl.) ¶¶ 40–47; A. Blanco Opp. Decl. Ex. 268 (E. Rynerson 30(b)(6) Tr. (Feb. 10, 2026)) at 33:4–7, 33:19–34:1; A. Blanco Opp. Decl. Ex. 253 (A. Passos Tr.) at 34:22–35:6; A. Blanco Opp. Decl. Ex. 57 DNP-00366817 (showing that DNP subscription cancellation spreadsheet does not include OpenAI's LLMs as a reason for cancellation); A. Blanco Opp. Decl. Ex. 216 (A. Ibrahim 30(b)(6) Tr.)79:14–24; Fed. R. Evid. 106.<br>The statement in Paragraph 1596 is disputed as inadmissible hearsay because it is an out-of-court statement offered for the truth of its contents, unaccompanied by any authenticating testimony or sponsoring expert to establish its reliability under Fed. R. Evid. 803(18). It therefore may not be considered in support of summary judgment. Fed. R. Evid. 801; Fed. R. Evid. 802; Fed. R. Evid. 803.<br>The Court should disregard the disputed portion of Paragraph 1596 because the assertion constitutes |

| | |
|---|---|
| | improper attorney argument and/or is conclusory. It thus requires no response. |
| 1597. Adel Ibrahim, Senior Vice President of Circulation at MediaNews Group, testified: "I believe that changes in [user] engagement are definitely a factor [that impact plaintiffs' revenue]. For example, if they were to engage on my content on ChatGPT for free, it has a direct – it is having a direct impact on my subscriptions." Ex. 396 [Ibrahim, 30(b)(6), November 20, 2025, Depo. Tr.] at 124:20-24 | 1597. **Disputed in Part - Improper Legal Argument; Not Supported by Cited Evidence; Incomplete.** Defendants respond as follows: Undisputed that Mr. Ibrahim offered the quoted testimony.<br>Disputed as unsupported by the cited evidence. Specifically, Paragraph 1597 omits context and is misleading. Pursuant to Fed. R. Evid. 106, Mr. Ibrahim also testified [redacted] A. Blanco Opp. Decl. Ex. 216 (A. Ibrahim 30(b)(6) Tr.) at 55:1–6. In the same deposition, he confirmed: "[redacted]" *Id.* at 54:20–254; Fed. R. Evid. 106.<br>Pursuant to Fed. R. Evid. 106, Plaintiffs' own internal documents [redacted] A. Blanco Opp. Decl. Ex. 61 DNP-00506801 at DNP-00506801. Pursuant to Fed. R. Evid. 106, Mr. Ibrahim's own testimony confirms that any decline in |

| | |
|---|---|
| | subscriptions is attributable to a multiplicity of independent causes. [redacted] A. Blanco Opp. Decl. Ex. 216 (A. Ibrahim 30(b)(6) Tr.) at 119:10–125:3. Mr. Ibrahim offered no testimony—and the record contains no evidence—establishing that any user has cancelled or declined to subscribe to a Daily News Plaintiff publication because that user instead obtained the same content from ChatGPT. The "substitution" theory rests entirely on Mr. Ibrahim's unverified personal belief, not on any documentary or empirical evidence. *See* ECF 1763 (A. Goldfarb Decl.) ¶¶ 40–47; News Ex. 96 (DNP-00651696); A. Blanco Opp. Decl. Ex. 86 DNP-00651697; Fed. R. Evid. 106.<br>The Court should disregard the disputed portion of Paragraph 1597 because the assertion constitutes improper attorney argument and/or is conclusory. It thus requires no response. |
| 1598. Adel Ibrahim, Senior Vice President of Circulation at MediaNews Group, testified: "If a subscriber today called me or reached out to us and stated, why would I pay you a subscription price when I can get this information for free, I don't know how fast that's going to happen. I know it's going to happen if we don't change something, and I have no argument to it." Ex. 396 | 1598. **Disputed in Part - Improper Legal Argument; Not Supported by Cited Evidence; Incomplete.** Defendants respond as follows: Undisputed that Mr. Ibrahim offered the quoted testimony.<br>Disputed as unsupported by the cited evidence. Specifically, Paragraph 1598 omits context |

| | |
|---|---|
| [Ibrahim, 30(b)(6), November 20, 2025, Depo. Tr.] at 55:1-7. | and is misleading. Pursuant to Fed. R. Evid. 106, Mr. Ibrahim also testified that [redacted] A. Blanco Opp. Decl. Ex. 216 (A. Ibrahim 30(b)(6) Tr.) at 55:1–6. In the same deposition, he confirmed: "[redacted]" *Id.* at 54:20–25; Fed. R. Evid. 106.<br>Pursuant to Fed. R. Evid. 106, Plaintiffs' own internal documents [redacted] *See* A. Blanco Opp. Decl. Ex. 61 DNP-00506801 at DNP-00506801. Mr. Ibrahim's own testimony confirms that any decline in subscriptions is attributable to a multiplicity of independent causes. [redacted] A. Blanco Opp. Decl. Ex. 216 (A. Ibrahim 30(b)(6) Tr.) at 119:10–125:3. Mr. Ibrahim offered no testimony—and the record contains no evidence—establishing that any user has cancelled or declined to subscribe to a Daily News Plaintiff publication because that user instead obtained |

| | |
|---|---|
| | the same content from ChatGPT. The "substitution" theory rests entirely on Mr. Ibrahim's unverified personal belief, not on any documentary or empirical evidence. |
| 1599. According to Mr. Chris Loretto, ("EVP") of Revenue and Digital for MediaNews Group, who testified on behalf of the Daily News Plaintiffs, the Defendants' products and services are "an existential threat to all credible news media" that is having "catastrophic impacts" on Daily News Plaintiffs' business, including by eroding Daily News Plaintiffs' "trust and brand" in the marketplace and causing a loss of web traffic, which in turn, leads to a significant impact on the subscriber base and the ability to sell advertising. Ex. 90 [Loretto 30(b)(6), October 3, 2025, Depo. Tr.] at 30:3-34:25. | 1599. **Disputed in Part - Improper Legal Argument; Not Supported by Cited Evidence.** Defendants respond as follows: Undisputed that Mr. Loretto's deposition testimony included the quoted statements. <br> Disputed that 'Defendants' products and services have had "catastrophic impacts" on Daily News Plaintiffs' business; have eroded Daily News Plaintiffs' brand reputation; have caused any loss of web traffic for Daily News Plaintiffs; or have had any impact on Daily News Plaintiffs' subscriber base or ability to sell advertising as unsupported by the evidence. *See, e.g.*, ECF 1763 (A. Goldfarb Opening Decl. ¶¶ 38, 42–49 (finding [redacted]); *id.* ¶¶ 40–41 (discussing DNP subscription trends and finding that [redacted]. Importantly, there is no break in or acceleration of the decline around the release of ChatGPT . . . ."); News Ex. 96 at DNP-00651696 (internal DNP data showing that advertising revenue has declined steadily since 2020, with no change in the trend after the launch of ChatGPT); Fed. R. Evid. 106. Also disputed that OpenAI's products and services are an "existential |

| | |
|---|---|
| | threat to all credible news media." Therefore, the facts set forth in Paragraph 1599 are disputed because the cited evidence is incorrect. [redacted]. ECF 1733 (C. Tucker Decl.) ¶¶ 67–76, 112–113, Figs. 15, 16, 24; ECF 1763 (A. Goldfarb Decl.) ¶¶ 38, 42–49 ([redacted] *Id.* at ¶¶ 54–55, Fig. 10. |
| 1600. According to Mr. Loretto, these harms "will result in significant reductions of employees" in Daily News Plaintiffs' newsrooms and advertising departments, which will lead to a lesser ability to "produce the same amount of copyrighted, quality, accurate, and trusted content. Ex. 90 [Loretto 30(b)(6), October 3, 2025, Depo. Tr.] at 36:12-37:6. | 1600. **Disputed in Part - Not Supported by Cited Evidence; Incomplete.** Defendants respond as follows: Undisputed that Mr. Loretto testified as quoted.<br>The facts set forth in Paragraph 1600 are disputed because the cited evidence is incorrect.<br>Specifically, Defendants dispute Paragraph 1600 to the extent it implies that defendants' products will cause "significant reductions of employees" in Plaintiffs' newsrooms and advertising departments or diminish Plaintiffs' ability to produce content. This is not testimony about an event that has occurred or a harm that has been observed. It is a prediction about what Mr. Loretto speculates will happen in the future, predicated on a multi-link causal chain: [redacted] |

| | |
|---|---|
| | [redacted]. A. Blanco Opp. Decl. Ex. 232 (C. Loretto 30(b)(6) Tr.) at 31:1–10. In fact, pursuant to Fed. R. Evid. 106, Mr. Pine testified [redacted] A. Hurst Decl. Ex. 89 at 442:3–11.<br>In fact, [redacted] A. Hurst Decl. Ex. 32 at 20:13–21:24; A. Hurst Decl. Ex. 90 at 62:9–15; A. Blanco Opp. Decl. Ex. 186 (L. Colacioppo 30(b)(6) Tr.) at 99:23–100:25; A. Hurst Decl. Ex. 33 at 40:25–41:8. |
| 1601. Mr. Ibrahim, Senior Vice President of Circulation, who testified on behalf of the Daily News Plaintiffs, described the "catastrophic disruption" caused by ChatGPT and Copilot, noting that the platforms were "stealing" and acting as a substitute for Daily News Plaintiffs' content. Ex. 396 [Ibrahim, 30(b)(6), November | 1601. **Disputed in Part - Not Supported by Cited Evidence.** Defendants respond as follows: Do not dispute that Mr. Ibrahim offered the quoted testimony.<br>Disputed that it accurately described the impact of ChatGPT and Copilot on news platforms, including Daily News Plaintiffs' content or any alleged harm to |

| | |
|---|---|
| 20, 2025, Depo. Tr.] at. 29:6-31:8, 120:22-122:19, 127:19-25. | Daily News Plaintiffs' content caused by ChatGPT or Copilot. Pursuant to Fed. R. Evid. 106, Mr. Ibrahim's testimony was unsupported speculation; [redacted] A. Blanco Opp. Decl. Ex. 216 (A. Ibrahim 30(b)(6) Tr.) at 55:1–6.<br>Mr. Ibrahim's sole basis for claiming that ChatGPT is a "substitute" for Plaintiffs' content [redacted] A. Blanco Opp. Decl. Ex. 216 (A. Ibrahim 30(b)(6 Dep. Tr.) at 148:17–149:10.<br>Therefore, the disputed proposition is not supported by the cited evidence. Furthermore, additional evidence shows that Copilot does not act as a substitute for the Asserted Works. In a survey conducted by Dr. Amir, only 1.2% of survey respondents reported using Copilot for "research of news or current events." ECF 1716 (O. Amir Decl.) ¶¶ 9(c), 42, Fig. 1. Dr. Bail found that only 1.3% of Copilot conversations were classified as "Information Retrieval – Current Events." ECF 1719 (C. Bail Decl.) ¶¶ 97, 124–25. |

| | |
|---|---|
| 1602. According to Mr. Ibrahim, "as a result of the damage [Daily News Plaintiffs] are incurring," it has had to "tighten[] meters" and offer "deep discounts" to convert subscribers and "offset this traffic loss" attributable to Defendants. Ex. 703 [Ibrahim, November 20, 2025, Depo. Tr.] 46:21-47:23. See also, Ex. 703 [Ibrahim, November 20, 2025, Depo. Tr.] at. 50:8-51:13. | 1602. **Disputed – Not Supported by the Cited Evidence.** Defendants respond as follows: Undisputed that the statement describes testimony provided by Mr. Ibrahim.<br>However, the proposition is not supported by the cited evidence. Specifically, the spreadsheet Ibrahim was testifying on in the cited excerpts provides no evidence to support his conclusion.<br>Defendants dispute that Daily News Plaintiffs have incurred any damages due to OpenAI's prodncts or services, or that any Daily News Plaintiff traffic losses are attributable to OpenAI's products or services. Also disputed that Daily News Plaintiffs have tightened paywall meters or offered discounts to convert readers to subscribers to offset any traffic losses attributable to OpenAI's products or services. Further, pursuant to Fed. R. Evid. 106, [redacted] *See* A. Blanco Opp. Decl. Ex. 217 (C. Jacobs 30(b)(6) Tr. (Feb. 12, 2026)) at 289:5–290:14; A. Blanco Opp. Decl. Ex. 61 DNP-00506801 at DNP-00506801, DNP-00506807; A. Blanco Opp. Decl. Ex. 40 DNP-00141970 at DNP-00141977, DNP-00141983; A. Blanco Opp. Decl. Ex. 45 DNP-00190371 at DNP-00190371; A. Blanco Opp. Decl. Ex. 73 DNP-00567090. |
| 1603. Mr. Anderson, CFO of MediaNews Group, similarly confirmed that Daily News Plaintiffs "have | 1603. **Disputed in Part – Not Supported by Cited Evidence; Not Supported by Admissible** |

| | |
|---|---|
| metrics that show [its] audience is declining, search referrals are declining, [its] ability to acquire new subscribers are declining" and such declines are correlated with "ChatGPT, Microsoft have put substitutive products in the market utilizing [Daily News Plaintiffs'] copyrighted content." Ex. 10 [D. Anderson 30(b)(6), February 19, 2026, Depo. Tr.] at 65:25-66:8. | **Evidence.** Defendants respond as follows: Undisputed that Dan Anderson testified as quoted.<br>Disputed to the extent implies that Defendants' products have caused the audience declines, search referral declines, or subscriber acquisition declines described, or that a causal "correlation" between Defendants' products and those declines has been established. Mr. Anderson's assertion that audience declines, search referral declines, and subscriber acquisition declines are "correlating" with Defendants' "substitutive products" is a conclusion unsupported by any identified methodology, dataset, or analysis. In fact, [redacted] ECF 1733 (C. Tucker Decl.) ¶¶ 67–76, 112–113, Figs. 15, 16, 24. The conversion rates for the Daily News Plaintiffs' websites [redacted]. *Id.* at ¶¶ 54–55, Fig. 10; ECF 1763 (A. Goldfarb Decl.) ¶¶ 38, 42–49 ([redacted]).<br>Defendants also respond that the disputed proposition is not supported by admissible evidence, as required by Local Rule 56.1, and therefore is not properly before the Court. Specifically, Mr. Anderson lacked foundation to provide the testimony. [redacted] |

| | |
|---|---|
| | [redacted] A. Blanco Opp. Decl. Ex. 166 (D. Anderson 30(b)(6) Tr.) at 70:9–13. Mr. Anderson did not identify any quantitative analysis, regression, controlled study, or other competent methodology underlying his assertion of "correlation." |
| 1604. Mr. Pine, Executive Editor of MediaNews Group, testified: "[A]ll of these things are serving, basically, the same audience that we would serve with the same information that we would serve to that audience, although not necessarily to the same level of quality, but without sourcing the information back to our websites, without sending readers back to our websites, without providing any reimbursement to use for the use of our content. And, essentially, we see from our generative AI study that our subscribers are aware that they can get news from generative AI and from ChatGPT specifically, and we see that former readers have a higher propensity to say that that's where they're getting their news. Even if they find it untrustworthy, they say that they're going to continue to go there to get it. We can see from our analytics that our referral traffic is declining across the board, that our referrals from search are declining across the board. We have reports that say that search overall is declining as people turn to generative artificial intelligence over search. So we know that a – a source of traffic to us is being choked off by generative AI, which, again, is doing that with our | 1604. **Disputed in Part - Not Supported by Admissible Evidence.** Defendants respond as follows: Undisputed that Mr. Pine testified as quoted.<br>Disputed to the extent Paragraph 1604 implies that ChatGPT or any OpenAI product has caused cognizable traffic declines, market harm, or an "existential threat" to Plaintiffs' businesses. Mr. Pine's testimony that "all of these things are serving, basically, the same audience" and that generative AI poses an "existential threat" is not evidence of actual market harm attributable to Defendants' products. Pursuant to Fed. R. Evid. 106, Mr. Pine himself conceded that [redacted] |

| | |
|---|---|
| content.... I think it has been well documented that generative AI poses a serious, immediate, and existential threat to the economy and the industry for local news, essentially to my business, and I think that has been acknowledged by both Microsoft and OpenAI." Ex. 17 [Pine 30(b)(6), February 4, 2026, Depo. Tr.] at 248:16-251:6. | [redacted] A. Blanco Opp. Decl. Ex. 255 (F. Pine 30(b)(6) Tr. (Feb. 4, 2026) 231:6–18. Mr. Pine also testified that [redacted]" *Id.* at 281:19–21; Fed. R. Evid. 106.<br>Accordingly, the disputed proposition is not supported by admissible evidence, as required by Local Rule 56.1, and therefore is not properly before the Court because Mr. Pine lacked foundation to provide the quoted testimony.<br>Defendants further dispute that Copilot and ChatGPT serve "the same audience" as News Plaintiffs because they do not "meet the same consumer needs." ECF 1733 (C. Tucker Decl.) ¶¶ 94–104; *see also* ECF 1763 (A. Goldfarb Decl.) ¶¶ 38, 42–49 (finding that reduction in traffic was not attributable to ChatGPT). |
| 1605. CJ Jacobs, Head of Product Development, MediaNews Group, testified that "[t]here are certainly – there were certainly a decline trend going on that can be observed from 2019 to 2023, but then there was a more significant decline trend that came in on top, I would say starting in 2023 that's now continued through 2025. In 2025 alone, we saw a [redacted] in our search referrals from 2024. That compares pretty well to the industry benchmark of search declines of the World Wide | 1605. **Disputed in Part - Not Supported by Cited Evidence; Incomplete.** Defendants respond as follows: Undisputed that Ms. Jacobs offered the quoted testimony.<br>However, disputed that the quoted testimony implies that Defendants caused any decline in Plaintiffs' search referral traffic, page views, or overall web traffic which is contrary to the record. Pursuant to Fed. R. Evid. 106, Ms. Jacobs testified that [redacted] |

| | |
|---|---|
| Web of 15 percent overall. And that's in spite of the efforts that we put in place to try to stem that decline to do things to fortify our platforms and products, do things to increase engagement of our readers and subscribers. But in spite of that, with the content theft, they have reduced over time, our page views have declined, we've seen a [redacted] drop in traffic from 2025 to 2024, and we continue to project out overall declines going forward as a result of this problem." Ex. 72 [Jacobs 30(b)(6), Feb. 12, 2026, Depo. Tr.] at 22:6-23:2. | [redacted] A. Blanco Opp. Decl. Ex. 217 (C. Jacobs 30(b)(6) Tr. (Feb. 12, 2026) at 297:8–298:7.<br>Ms. Jacobs also testified that [redacted] Ms. Jacobs herself acknowledged that [redacted] *Id.* at 22:6–8; Fed. R. Evid. 106. [redacted] A. Blanco Opp. Decl. Ex. 219 (C. Jacobs 30(b)(6) Tr. (Feb. 13, 2026) at 370:5–20.<br>Therefore, the proposition is not supported by the cited evidence. In fact, [redacted] ECF 1733 (C. Tucker Decl.) ¶¶ 67–76, 112–113, Figs. 15, 16, 24; ECF 1763 (A. Goldfarb Decl.) ¶¶ 42–43, Figs. 15–18. The |

| | |
|---|---|
| | conversion rates for the Daily News Plaintiffs' websites did not decline following Copilot and ChatGPT. *Id.* at ¶¶ 54–55, Fig. 10. |
| 1606. Ms. Jacobs explained that traditional search is "extremely important" to the Daily News Plaintiffs' business, "but it's shrinking every day as a source of our session traffic." Ex. 72 [Jacobs 30(b)(6), Feb. 12, 2026 Depo. Tr.] at 23:3-8. | 1606. **Disputed in Part – Incomplete.** Defendants respond as follows: Undisputed that Ms. Jacobs offered the quoted testimony. However, disputed as omitting context or demonstrating that the decrease in search referral decline is due to Defendants' products. Ms. Jacobs' own testimony [redacted] Pursuant to Fed. R. Evid. 106, [redacted] A. Blanco Opp. Decl. Ex. 217 (C. Jacobs 30(b)(6) Tr. (Feb. 12, 2026) at 38:3–4; *id.* at 43:17–44:0; *id.* at 295:19–296:14. |
| 1607. According to Ms. Jacobs, in 2022, search was responsible for about [redacted] of Daily News Plaintiffs' overall inbound sessions; in 2024, it declined to around [redacted]; and as of Ms. Jacobs' deposition in February 2026, they had declined to [redacted]. Ex. 72 [Jacobs 30(b)(6), Feb. 12, 2026, Depo. Tr.] at 23:6-22. | 1607. **Disputed in Part - Not Supported by Admissible Evidence; Incomplete.** Defendants respond as follows: Undisputed that Ms. Jacobs offered the quoted testimony.<br>Defendants dispute that any declines were attributable to Defendants' products. Further disputed as misleading and omitting necessary context. Pursuant |

| | |
|---|---|
| | to Fed. R. Evid. 106, [redacted] A. Blanco Opp. Decl. Ex. 217 (C. Jacobs 30(b)(6) Tr. (Feb. 12, 2026)) at 23:8–9. The record further reveals significant data-reliability concerns: [redacted]. A. Blanco Opp. Decl. Ex. 217 (C. Jacobs 30(b)(6) Tr. (Feb. 12, 2026)) at 261:8–262:17; *id.* at 207:6–208:3; *id.* at 178:13–179:8. Ms. Jacobs herself acknowledged that [redacted] *Id.* at 22:6–8.<br>Because Ms. Jacobs lacked proper foundation to provide her testimony, the disputed proposition is not supported by admissible evidence, as required by Local Rule 56.1, it is therefore not properly before the Court. |
| 1608. Ms. Jacobs emphasized how important search is for the acquisition of new customers: "[redacted] of new starts actually come in from search as the referral source. So this is an incredibly important referral source | 1608. **Undisputed.** |

| | |
|---|---|
| for our business." Ex. 72 [Jacobs 30(b)(6), Feb. 12, 2026 Depo. Tr.] at 23:19-22. | |
| 1609. All eight Daily News Plaintiffs have experienced declining referrals from search between 2022 and 2024. *See* Ex. 1243 [DNP-00366826] tab "Metrics; see also Malackowski NYT-DNP Opening Report, Appendix B, Exhibit 13.1. | 1609. **Disputed in Part - Expert Opinion Subject to Rule 702.** Defendants respond as follows: Do not dispute that the "Metrics" tab of News Ex. 1243 records lower annual organic search referral totals in calendar year 2024 than in calendar year 2022 for each of the eight Daily News Plaintiffs.<br><br>Dispute Plaintiffs' characterization of this fact to the extent it implies or invites any inference that Defendants' products or conduct caused or contributed to the asserted decline. The 2022-to-2024 comparison period selected by Plaintiffs is misleading because it conceals the fact that [redacted] Pursuant to Fed. R. Evid. 106, [redacted] ECF 1763 (A. Goldfarb Decl.) ¶ 43. [redacted]. ECF 1733 (C. Tucker Decl.) ¶¶ 112–113, Fig. 24. Daily News Plaintiffs have testified that [redacted]. A. Hurst Decl. Ex. 56 at 119:10–120:7.<br><br>Further, the evidence cited in support of the disputed proposition is currently subject to a motion to exclude expert testimony pursuant to Fed. R. Evid. |

| | |
|---|---|
| | 702. Defendants' pending Rule 702 motion seeks to exclude certain opinions of Malackowski, on which this statement relies. To the extent the Court excludes the challenged opinions, Plaintiffs may not rely on them to support this statement. *See* Fed. R. Civ. P. 56(c)(2). |
| 1610. [redacted] See Ex. 1243 [DNP-00366826] (tab "Metrics); *see also* Malackowski NYT-DNP Opening Report, Appendix B, Exhibit 13.1. | 1610. **Disputed in Part - Expert Opinion Subject to Rule 702.** Defendants respond as follows: Do not dispute [redacted]<br>Dispute Plaintiffs' characterization of this fact to the extent it implies or invites any inference that Defendants' products or conduct caused or contributed to [redacted] ECF 1733 (C. Tucker Decl.) ¶¶ 112–113, Fig. 24; ECF 1763 (A. Goldfarb Decl.) ¶¶ 42–43, Figs. 17–18.<br>Further, the evidence cited in support of the disputed proposition is currently subject to a motion to |

| | |
|---|---|
| | exclude expert testimony pursuant to Fed. R. Evid. 702. Defendants' pending Rule 702 motion seeks to exclude certain opinions of Malackowski, on which this statement relies. To the extent the Court excludes the challenged opinions, Plaintiffs may not rely on them to support this statement. *See* Fed. R. Civ. P. 56(c)(2). |
| 1611. [redacted] See Ex. 1243 [DNP-00366826] (tab "Metrics); *see also* Malackowski NYT-DNP Opening Report, Appendix B, Exhibit 13.1. | 1611. **Disputed in Part - Expert Opinion Subject to Rule 702.** Defendants respond as follows: Do not dispute [redacted]<br><br>Dispute Plaintiffs' characterization of this fact to the extent it implies or invites any inference that Defendants' products or conduct caused or contributed to [redacted] ECF 1733 (C. Tucker Decl.) ¶¶ 112–113, Fig. 24; ECF 1763 (A. Goldfarb Decl.) ¶¶ 42–43, Figs. 17–18. Further, the evidence cited in support of the disputed proposition is currently subject to a motion to |

| | |
|---|---|
| | exclude expert testimony pursuant to Fed. R. Evid. 702. Defendants' pending Rule 702 motion seeks to exclude certain opinions of Malackowski, on which this statement relies. To the extent the Court excludes the challenged opinions, Plaintiffs may not rely on them to support this statement. *See* Fed. R. Civ. P. 56(c)(2). |
| 1612. [redacted]. See Ex. 1243 [DNP-00366826] (tab "Metrics); *see also* Malackowski NYT-DNP Opening Report, Appendix B, Exhibit 13.1. | 1612. **Disputed in Part - Expert Opinion Subject to Rule 702.** Defendants respond as follows: Do not dispute that [redacted]<br><br>Dispute Plaintiffs' characterization of this fact to the extent it implies or invites any inference that Defendants' products or conduct caused or contributed to [redacted] ECF 1733 (C. Tucker Decl.) ¶¶ 112–113, Fig. 24; ECF 1763 (A. Goldfarb Decl.) ¶¶ 42–43, Figs. 17–18. Further, the evidence cited in support of the disputed proposition is currently subject to a motion to |

| | |
|---|---|
| | exclude expert testimony pursuant to Fed. R. Evid. 702. Defendants' pending Rule 702 motion seeks to exclude certain opinions of Malackowski, on which this statement relies. To the extent the Court excludes the challenged opinions, Plaintiffs may not rely on them to support this statement. *See* Fed. R. Civ. P. 56(c)(2). |
| 1613. [redacted] See Ex. 1243 [DNP-00366826] (tab "Metrics); *see also* Malackowski NYT-DNP Opening Report, Appendix B, Exhibit 13.1. | 1613. **Disputed in Part - Expert Opinion Subject to Rule 702.** Defendants respond as follows: Do not dispute that [redacted]<br><br>Dispute Plaintiffs' characterization of this fact to the extent it implies or invites any inference that Defendants' products or conduct caused or contributed to [redacted] ECF 1733 (C. Tucker Decl.) ¶¶ 112–113, Fig. 24; ECF 1763 (A. Goldfarb Decl.) ¶¶ 42–43, Figs. 17–18. |

| | |
|---|---|
| | Further, the evidence cited in support of the disputed proposition is currently subject to a motion to exclude expert testimony pursuant to Fed. R. Evid. 702. Defendants' pending Rule 702 motion seeks to exclude certain opinions of Malackowski, on which this statement relies. To the extent the Court excludes the challenged opinions, Plaintiffs may not rely on them to support this statement. *See* Fed. R. Civ. P. 56(c)(2). |
| 1614. [redacted] See Ex. 1243 [DNP-00366826] (tab "Metrics); see also Malackowski NYT-DNP Opening Report, Appendix B, Exhibit 13.1. | 1614. **Disputed in Part - Expert Opinion Subject to Rule 702.** Defendants respond as follows: Do not dispute that [redacted]<br><br>Dispute Plaintiffs' characterization of this fact to the extent it implies or invites any inference that Defendants' products or conduct caused or contributed to [redacted] ECF 1733 (C. Tucker Decl.) ¶¶ 112–113, Fig. 24; ECF 1763 (A. Goldfarb Decl.) ¶¶ 42–43, |

| | |
|---|---|
| | Figs. 17–18. Further, the evidence cited in support of the disputed proposition is currently subject to a motion to exclude expert testimony pursuant to Fed. R. Evid. 702. Defendants' pending Rule 702 motion seeks to exclude certain opinions of Malackowski, on which this statement relies. To the extent the Court excludes the challenged opinions, Plaintiffs may not rely on them to support this statement. *See* Fed. R. Civ. P. 56(c)(2). |
| 1615. [redacted] See Ex. 1243 [DNP-00366826] (tab "Metrics); see also Malackowski NYT-DNP Opening Report, Appendix B, Exhibit 13.1. | 1615. **Disputed in Part - Expert Opinion Subject to Rule 702.** Defendants respond as follows: Do not dispute that [redacted]<br><br>Dispute Plaintiffs' characterization of this fact to the extent it implies or invites any inference that Defendants' products or conduct caused or contributed to [redacted] ECF 1733 (C. Tucker Decl.) ¶¶ 112–113, Fig. 24; ECF 1763 (A. Goldfarb Decl.) ¶¶ 42–43, |

| | |
|---|---|
| | Figs. 17–18. Further, the evidence cited in support of the disputed proposition is currently subject to a motion to exclude expert testimony pursuant to Fed. R. Evid. 702. Defendants' pending Rule 702 motion seeks to exclude certain opinions of Malackowski, on which this statement relies. To the extent the Court excludes the challenged opinions, Plaintiffs may not rely on them to support this statement. *See* Fed. R. Civ. P. 56(c)(2). |
| 1616. [redacted] See Ex. 1243 [DNP-00366826] (tab "Metrics); see also Malackowski NYT-DNP Opening Report, Appendix B, Exhibit 13.1. | 1616. **Disputed in Part — Expert Opinion Subject to Rule 702.** Defendants respond as follows: Undisputed that the cited document reflects [redacted] Disputed to the extent Plaintiffs' characterization of this fact implies any inference that Defendants' products or conduct caused or contributed to [redacted] ECF 1733 (C. Tucker Decl.) ¶¶ 112–113, Fig. 24; ECF 1763 (A. Goldfarb Decl.) ¶¶ 42–43, Figs. 17–18. Further, the evidence cited in support of the disputed proposition is currently subject to a motion to exclude expert testimony pursuant to Fed. R. Evid. 702. Defendants' pending Rule 702 motion seeks to |

| | |
|---|---|
| | exclude certain opinions of Malackowski, on which this statement relies. To the extent the Court excludes the challenged opinions, Plaintiffs may not rely on them to support this statement. *See* Fed. R. Civ. P. 56(c)(2). |
| 1617. [redacted] See Ex. 1243 [DNP-00366826] (tab "Metrics); see also Malackowski NYT-DNP Opening Report, Appendix B, Exhibit 13.1. | 1617. **Disputed in Part — Expert Opinion Subject to Rule 702.** Defendants respond as follows: Undisputed that the cited document reflects [redacted] Disputed to the extent Plaintiffs' characterization of this fact implies or invites any inference that Defendants' products or conduct caused or contributed to [redacted] ECF 1733 (C. Tucker Decl.) ¶¶ 112–113, Fig. 24; ECF 1763 (A. Goldfarb Decl.) ¶¶ 42–43, Figs. 17–18.Further, the evidence cited in support of the disputed proposition is currently subject to a motion to exclude expert testimony pursuant to Fed. R. Evid. 702. Defendants' pending Rule 702 motion seeks to exclude certain opinions of Malackowski, on which this statement relies. To the extent the Court excludes the challenged opinions, |

| | |
|---|---|
| | Plaintiffs may not rely on them to support this statement. *See* Fed. R. Civ. P. 56(c)(2). |
| 1618. The Daily News Plaintiffs forecasted that declines in pageviews will continue into the future. *See* Ex. 1244 [DNP-00626843] (tab "ROLLUP") [redacted] | 1618. **Disputed — Not Supported by Cited Evidence.** Defendants respond as follows: The facts set forth in Paragraph 1618 are disputed because the cited evidence is incorrect. Further, these facts are disputed because News Ex. 1244 contains [redacted] No deposition witness has been cited to authenticate this specific exhibit or explain how the FY 2026 pageview projections were derived. Undisputed that News Ex. 1244, tab "ROLLUP," contains [redacted] *See* Ex. 1244 [DNP-00626843], tab "ROLLUP," rows 40, 210, 251, 277, and 290. However, disputed to the extent the exhibit does not identify [redacted] The "ROLLUP" tab [redacted] |

| | |
|---|---|
| | [redacted]<br><br>Defendants further dispute this fact to the extent it implies that Defendants are [redacted]. ECF 1733 (C. Tucker Decl.) ¶¶ 67-77, Fig. 15; ECF 1763 (A. Goldfarb Decl.) ¶¶ 42–43, Figs. 17–18. |
| 1619. [redacted] Ex. 1244 [DNP-00626843] (tab "ROLLUP"). | 1619. **Disputed in Part — Not Supported by Cited Evidence.** Defendants respond as follows: Undisputed to the extent the asserted fact contends only that Ex. 1244, tab "ROLLUP," [redacted] |

| | |
|---|---|
| | [redacted] However, disputed insofar as Ex. 1244 does not contain the label [redacted] However, the exhibit contains no creator name, preparer name, date of preparation, explanatory notes, or forecast methodology description. *See* Ex. 1244 (DNP-00626843) (all tabs). [redacted]. No deposition witness has been cited to authenticate this specific exhibit or explain [redacted] *See* Ex. 1244 (DNP-00626843), tabs “ROLLUP” and [redacted]<br>Defendants further dispute this fact to the extent it implies that Defendants are [redacted] ¶ 67-69, 74, 77, Figure 15; ECF 1763 (A. Goldfarb Decl.) ¶¶ 42–43, Figs. 17–18. |

| | |
|---|---|
| 1620. [redacted] Ex. 1244 [DNP-00626843] (tab "ROLLUP"). | 1620. **Disputed in Part — Not Supported by Admissible Evidence.** Defendants respond as follows: Undisputed to the extent the asserted fact contends only that Ex. 1244, tab "ROLLUP," contains [redacted]. However, disputed because [redacted] *See* Ex. 1244 (DNP-00626843) (all tabs). [redacted]. No deposition witness has been cited to authenticate this specific exhibit or explain how [redacted].<br>Disputed insofar as Ex. 1244 does not [redacted] |

| | |
|---|---|
| | [redacted]. *See id.*, tab [redacted]<br><br>Defendants further dispute this fact to the extent it implies that Defendants are [redacted]. Tucker Decl., ¶¶ 67-69, 71, 77, Figure 15; ECF 1763 (A. Goldfarb Decl.) ¶¶ 42–43, Figs. 17–18. |
| 1621. [redacted] Ex. 1244 [DNP-00626843] (tab "ROLLUP"). | 1621. **Disputed in Part — Not Supported by Admissible Evidence.** Defendants respond as follows: Undisputed to the extent the asserted fact contends only that Ex. 1244 contains [redacted]. However, disputed because the exhibit [redacted] *See* Ex. 1244 (DNP-00626843) (all tabs). [redacted] No |

| | |
|---|---|
| | deposition witness has been cited to authenticate this specific exhibit or explain [redacted] *See* Ex. 1244 (DNP-00626843), tabs "ROLLUP" and [redacted] *See id.*, tab "ROLLUP," [redacted]<br><br>Defendants further dispute this fact to the extent it implies that Defendants [redacted] ECF 1733 (C. Tucker Decl.) ¶¶ 67-70, 77, Figure 15; ECF 1763 (A. Goldfarb Decl.) ¶¶ 42–43, Figs. 17–18. |

| | |
|---|---|
| 1622. [redacted] Ex. 1244 [DNP-00626843] (tab “ROLLUP”). | 1622. **Disputed in Part — Not Supported by Cited Evidence.** Defendants respond as follows: Undisputed to the extent the asserted fact contends only that Ex. 1244 contains [redacted] However, disputed because the exhibit [redacted] *See* Ex. 1244 (DNP-00626843) (all tabs). [redacted] No deposition witness has been cited to authenticate this specific exhibit or [redacted]<br><br>Disputed insofar as the cited exhibit, DNP-00626843, does not [redacted] *See* Ex. 1244 [DNP-00626843], tab “ROLLUP” [redacted]<br><br>Defendants further dispute this fact to the extent it implies that Defendants are [redacted] |

| | |
|---|---|
| | [redacted] ECF 1733 (C. Tucker Decl.) ¶¶ 67-69, 73, 77, Figure 15; ECF 1763 (A. Goldfarb Decl.) ¶¶ 42–43, Figs. 17–18. |
| 1623. [redacted] Ex. 1244 [DNP-00626843] (tab “ROLLUP”). | 1623. **Disputed in Part — Not Supported by Cited Evidence.** Defendants respond as follows: Undisputed to the extent the asserted fact contends only that Ex. 1244 [redacted] Disputed insofar as Ex. 1244 does not [redacted] Further disputed because the exhibit contains [redacted] *See* Ex. 1244 (DNP-00626843) (all tabs). [redacted] No deposition witness has been cited to authenticate this specific exhibit [redacted] *See* Ex. 1244 (DNP-00626843), tab “ROLLUP” [redacted] |

| | |
|---|---|
| | [redacted] Defendants further dispute this fact to the extent it implies that Defendants [redacted] ECF 1733 (C. Tucker Decl.) ¶¶ 67-69, 72, 77, Figure 15; ECF 1763 (A. Goldfarb Decl.) ¶¶ 42–43, Figs. 17–18. |
| 1624. The chart below reflects the declining revenues of the Daily News Plaintiffs from FY 2020 to FY 2024: [redacted] Malackowski NYT-DNP Opening Report at 84; Ex. 95 [DNP-00533731]; Ex. 96 [DNP-00651696]. | 1624. **Disputed in Part - Not Supported by Cited Evidence; Expert Opinion Subject to Rule 702.** Defendants respond as follows: Disputed insofar that the chart does not provide any revenue data for New York Daily News. Further disputed that the "Total Revenue" row of the chart accurately reflects the sum of annual revenue figures included in each column of the chart. Disputed as to Plaintiffs' characterization of this fact to the extent it implies or invites any inference that Defendants' products or conduct caused or contributed to [redacted] The 2020-to-2024 comparison period selected by Plaintiffs is misleading because it obscures the fact that [redacted] ECF 1733 (C. Tucker Decl.) ¶¶ 34-43; ECF 1763 (A. Goldfarb Decl.) ¶¶ 40-41, Figs. 13-14. |

| | |
|---|---|
| | Further, the evidence cited in support is currently subject to a motion to exclude expert testimony pursuant to Fed. R. Evid. 702. Defendants have moved to exclude certain opinions of James Malackowski (market-harm opinions). *See* Defs.' Mem. of Law ISO Rule 702 Mot. to Exclude Expert Testimony. To the extent the Court excludes the challenged opinions, Plaintiffs may not rely on them to support this statement. *See* Fed. R. Civ. P. 56(c)(2). |
| 1625. Daily News Plaintiffs have implemented strategic initiatives that have masked the full extent of the harm caused by Defendants, such as introductory offers at a lower price point, tightening of paywalls and increased hard-walling of content, and newsletters. Ex. 88 [Ibrahim 30(b)(6), Nov. 20, 2025 Depo. Tr.] at 45:3-47:2; Ex. 17 [Pine 30(b)(6)) Depo. Tr.] at 241:7-242:16, Exhibit 26, p. 15. | 1625. **Disputed in Part — Not Supported by Cited Evidence.** Defendants respond as follows: Undisputed that Daily News Plaintiffs implement certain business strategies including introductory pricing offers, paywall adjustments, and newsletters. However, disputed that the testimony establishes that these initiatives were implemented in response to or "mask" any alleged harm caused by any conduct of Defendants. The record establishes that these are longstanding, ordinary-course business practices that predate Copilot or any service offered by OpenAI and are consistent with industry-wide strategies. Mr. Pine [redacted] F. Pine 30(b)(6) Tr. 237:5-19. Likewise, Mr. Ibrahim [redacted] *See* A. Blanco |

| | |
|---|---|
| | Opp. Decl. Ex. 216 (A. Ibrahim 30(b)(6) Tr.) at 119:10–17 [redacted] *id.* at 119:18–120:2 [redacted]; *id.* at 120:3–9 [redacted]; *id.* at 123:13–124:2 [redacted] *id.* at 146:19–22 [redacted] *id.* at 146:23–147:6 [redacted]<br><br>Neither the cited testimony nor record evidence quantifies the alleged "masking" effect or disaggregates any alleged "masking" from the numerous other factors that affect DNP's website traffic and subscriptions. *See* A. Blanco Opp. Decl. Ex. 216 (A. Ibrahim 30(b)(6) Tr.) 125:8–14. |
| 1626. Ziff Davis invests heavily in search-engine optimization, advertising, and other efforts designed to increase monetizable traffic to its properties, but those monetization efforts have been undermined by declines in traffic and revenues attributable to Generative AI answer engines. Oh Decl. ¶ 14; Ex. 705 [Bill Elward Depo. Tr.] 80:21-81:15. | 1626. **Disputed in Part - Not Supported by Cited Evidence.** OpenAI responds as follows: The facts stated in Paragraph 1626 are disputed because they are not supported by the cited evidence. Undisputed that Ziff Davis invests in efforts designed to increase monetizable traffic. However, disputed that the cited evidence establishes the asserted causal attribution to generative AI answer engines. *See* Shah testified [redacted] J. Gratz Decl. Ex. 222 (V. Shah 30(b)(1) Tr.) 76:4–11. As to ChatGPT specifically, Dr. Goldfarb found no statistically |

| | |
|---|---|
| | significant decrease in visits to Ziff Davis websites following users' adoption of ChatGPT. ECF 1763 (A. Goldfarb Decl.) ¶¶ 61–64. *See also* V. Shah 30(b)(1) Tr. 76:4-11; *id.* at 108:2-110:1; A. Blanco Opp. Decl. Ex. 265 (B. Richter 30(b)(6) Tr.) 78:6-19; K. Oh 30(b)(6) Tr. (Feb. 24, 2026) 270:13–20; J. Gratz Decl. Ex. 261 (Ziff Davis 2024 10-K); J. Gratz Decl. Ex. 260 (Ziff Davis 2025 10-K).<br><br>Microsoft defers to OpenAI. Further, Microsoft responds that the Oh Decl. and Ex. 705 are related solely Ziff Davis and do not relate to claims asserted against Microsoft. |
| 1627. Monthly unique visitors to The Intercept declined by an estimated 69,900 per month on a secular trend basis between January 2022 and August 2025, after controlling for article output and email subscriber additions, a decline statistically significant at the 0.01% level ($p < 0.0001$). A similar trend occurred for CIR's Mother Jones website. McDonald Rebuttal Rep. at 6, 16-26. | 1627. **Disputed — Expert Opinion Subject to Rule 702.** OpenAI responds as follows: The fact stated in Paragraph 1627 is disputed because the evidence cited in support is currently subject to a motion to exclude expert testimony pursuant to Fed. R. Evid. 702. Defendants' pending Rule 702 motion seeks to exclude certain opinions of McDonald, on which this statement relies. To the extent the Court excludes the challenged opinions, Plaintiffs may not rely on them to support this statement. *See* Fed. R. Civ. P. 56(c)(2). Further disputed as not supported by the evidence and contrary to the record. *See* ECF 1763 (A. Goldfarb Decl.) ¶ 75; *id.* ¶ 70.<br><br>Microsoft defers to OpenAI. |

| | |
|---|---|
| 1628. CIR and The Intercept have suffered, and will continue to suffer, declining web traffic, readers, and revenue as a result of AI chatbots and tools. McDonald Rebuttal Rep. at 6. | 1628. **Disputed — Not Supported by Cited Evidence; Expert Opinion Subject to Rule 702.** Defendants respond as follows: The facts set forth in Paragraph 1628 are disputed because the cited evidence is incorrect. Further, the fact stated in Paragraph 1628 is disputed because the evidence cited in support is currently subject to a motion to exclude expert testimony pursuant to Fed. R. Evid. 702. Defendants' pending Rule 702 motion seeks to exclude certain opinions of McDonald, on which this statement relies. To the extent the Court excludes the challenged opinions, Plaintiffs may not rely on them to support this statement. *See* Fed. R. Civ. P. 56(c)(2).<br><br>OpenAI further disputes this fact because any decline in traffic, readership, or revenue alleged by CIR and The Intercept is driven by factors other than OpenAI's LLMs. *See* ECF 1763 (A. Goldfarb Decl.) ¶ 75; *id*. ¶ 70; A. Blanco Opp. Decl. Ex. 113 (INT0036104) at INT0036104; A. Blanco Opp. Decl. Ex. 183 (A. Chabel 30(b)(6) Tr.) 223:20-229:7; A. Blanco Opp. Decl. Ex. 109 (INT0007411); A. Blanco Opp. Decl. Ex. 272 (M. Sherrard 30(b)(6) Tr. (Feb. 11, 2026)) 144:22-145:7 [redacted] A. Blanco Opp. Decl. Ex. 123 (INT0203861); A. Blanco Opp. Decl. Ex. 109 (INT0007411) [redacted]; A. Blanco Opp. Decl. Ex. 272 (M. Sherrard |

| | |
|---|---|
| | 30(b)(6) Tr. (Feb. 11, 2026)) 196:3-14 [redacted]; A. Blanco Opp. Decl. Ex. 183 (A. Chabel 30(b)(6) Tr.) 224:3-18; A. Blanco Opp. Decl. Ex. 274 (M. Sherrard 30(b)(6) Tr. (Feb. 12, 2026)) 434:15-25 [redacted]<br><br>Microsoft further disputes this fact because [redacted] ECF 1733 (C. Tucker Decl.) ¶¶ 48, 86–89, Figures 17–19; Hurst Decl. Ex. 12, Bauerlein Dep. 30(b)(6) Vol. 2, 334:25–335:18, 385:9–24; Hurst Decl. Ex. 19, Buckingham Dep. 7:25–8:1; Hurst Decl. Ex. 11, Bauerlein Dep. 30(b)(6) Vol. 1, 299:13–21.<br>Microsoft responds that the facts related solely to The Intercept do not pertain to claims asserted against Microsoft. |

**B. Effects of Defendants' Use On Established Market for News Content Licensing**

| | |
|---|---|
| 1629. Defendants' use of News Plaintiffs' copyrighted works harms News Plaintiffs in the established market for licensing news content to paying licensees by diminishing the market for New Plaintiffs' work and diverting audience, and therefore revenue, from New Plaintiffs' digital properties and those of their licensees. Ex. 57 [Pine 30(b)(6), Feb. 5, 2026, Depo. Tr.] at 445:10-24 | 1629. **Disputed – Not Supported by Cited Evidence; Not Supported by Admissible Evidence; Improper Legal Argument.** Defendants dispute the fact set forth in Paragraph 1629 in full. The cited evidence does not establish that Defendants' conduct caused any actual diminution in licensing revenue, audience traffic, or revenue-sharing payments. Pine's testimony addresses [redacted] |

| | |
|---|---|
| (testifying that "[t]he declining traffic affects [of] any licensing agreement that's based on a revenue share because there's less traffic to go around, so you're going to see less revenue from revenue share agreements."); Ex. 103 [The New York Times SEC Form 10-K Dec. 31, 2024] at 6 (describing how The Times "compete[]s for audience, subscribers, licensees and advertising against a wide variety of companies, including… products and tools powered by generative artificial intelligence," which can "attract audiences and/or advertisers to their platforms and away from [The Times]."); Ex. 1 [The New York Times SEC Form 10-K Dec. 31, 2025] at 14 (describing how Generative AI tools have adversely impacted "licensee demand"). | [redacted] Similarly, The Times's SEC filings describe competitive risks and market conditions but do not establish that Defendants' alleged use of News Plaintiffs' works caused the asserted harm. Additionally, the cited evidence does not establish an existing licensing market for the particular uses at issue in this litigation. Defendants further respond that this Paragraph not supported by cited evidence, because the fact applies to all News Plaintiffs, but the evidence cited only applies to the Daily News Plaintiffs and The Times, not CIR, The Intercept, or Ziff Davis.<br>It is further disputed that Defendants' use of News Plaintiffs' content caused harm to an established licensing market, diminished the market for News Plaintiffs' works, or diverted audiences or revenue from News Plaintiffs or their licensees. *See* ECF 1763 (A. Goldfarb Decl.) ¶¶ 9, 21–26 31, 40–43, 45, 47, 49, 52-58, 62, 71-76, 81, 83, 87, 90, 92; In fact, [redacted] ECF 1733 (C. Tucker Decl.) ¶¶ 30–33, 63–66; ECF 1763 (A. Goldfarb Decl.) ¶¶ 21–26.<br>News Plaintiffs also have not identified any licensing opportunity that they were not offered or did not accept specifically because of Defendants' alleged use of their content. Additionally, Defendants respond that The Times [redacted] *See* News Ex. 228. |

| | |
|---|---|
| | Defendants further respond that this Paragraph is disputed on the grounds that it is not supported by admissible evidence, as required by Local Rule 56.1, and therefore is not properly before the Court. S.D.N.Y. Local Rule 56.1(d) ("Each statement by the movant ... must be followed by citation to evidence that would be admissible[.]"); Specifically, Mr. Pine is a lay witness not testifying as an expert, and his cited testimony is improper opinion testimony that is inadmissible under Fed. R. Evid. 701. Additionally, News Ex. 103 and News Ex. 1 are hearsay and the statements therein cannot be offered for the truth of its contents pursuant to Fed. R. Evid. 801, 802, 803. Lastly, Paragraph 1629 is further disputed, and the Court should disregard this Paragraph, because the assertion constitutes improper argument and/or is conclusory. It thus requires no response. |
| 1630. Audience attention is a scarce resource. Ex. 82 [Tucker Opening Rep.] ¶ 28 ("Research on the economics of attention explains that consumers' attention is a scarce resource."); Ex. 1217 [Sinnreich NYT Opening Rep.] at ¶ 64 (describing how news publishers "compete[]for consumers' limited time and attention"); Wu Rebuttal Rep. ¶¶ 39-40; Ex. 474 [Goldfarb ZD Opening Rep.] ¶ 68, ¶ 73. | 1630. **Undisputed – Immaterial.** Defendants respond that it is undisputed that there are various sources that compete for consumers' attention. Defendants further respond that this fact is immaterial because it does not affect the outcome of the suit under the governing law. Specifically, copyright law gives News Plaintiffs no right to "attention." Instead, it gives them the right to exploit their creative expression—that is, the copyrightable expression in the Asserted Works.<br>Microsoft further responds that the Wu Rebuttal Report and Ex. 474 do not pertain to claims asserted against Microsoft |

| | |
|---|---|
| 1631. Defendants' products also substitute for News Plaintiffs' authorized licensees - undermining the established market for licensing news. Ex. 103 [The New York Times SEC Form 10-K Dec. 31, 2024] at 6 (describing how The Times "compete[s] for audience, subscribers, licensees and advertising against a wide variety of companies, including… products and tools powered by generative artificial intelligence," which can "attract audiences and/or advertisers to their platforms and away from [The Times]."); Ex. 1 [The New York Times SEC Form 10-K Dec. 31, 2025] at 14 (describing how Generative AI tools have adversely impacted "licensee demand"); Ex. 57 [Pine Feb. 5, 2026 30(b)(6) Depo. Tr.] at 445:10-14 ("The declining traffic affects any licensing agreement that's based on a revenue share because there's less traffic to go around, so you're going to see less revenue from revenue share agreements."); Oh Decl. ¶ 14; Ex. 1240 [ZD 2025 10K] p. 18. | 1631. **Disputed – Not Supported by Cited Evidence; Not Supported by Admissible Evidence.** Defendants dispute the fact set forth in Paragraph 1631 in full. Specifically, the cited SEC filings discuss competition from generative AI products and potential or reported impacts on audience traffic and licensee demand, but do not establish that Defendants' products substitute for News Plaintiffs' authorized licensees or caused a decline in licensing revenue. Likewise, Pine's testimony describes [redacted] Empirical analysis shows that there has been no adverse change in the trend of News Plaintiffs' revenue (including licensing revenue) following the introduction of ChatGPT and Copilot. ECF 1733 (C. Tucker Decl.) ¶¶ 11, 24–48; ECF 1763 (A. Goldfarb Decl.) ¶¶ 9, 21–22, 40–41, 52–54, 71–73, 81–84. In fact, [redacted] ECF 1733 (C. Tucker Decl.) ¶¶ 30-31; ECF 1763 (A. Goldfarb Decl.) ¶¶ 21–22. Additionally, Plaintiffs' assertion is also contrary to record evidence showing that their existing news licensing relationships continued and that licensing revenue was not undermined as alleged. *See* ECF 1763 (A. Goldfarb Decl.) ¶¶ 22, 54. News Plaintiffs have not identified any licensing opportunity that they were not offered or did not accept specifically because of Defendants' alleged use of their content. Additionally, Defendants respond that [redacted] |

| | |
|---|---|
| | [redacted] *See* News Ex. 228.<br>Defendants further respond that this Paragraph is disputed on the grounds that it is not supported by cited evidence. Specifically, the fact applies to all News Plaintiffs, but the evidence cited only applies to the Daily News Plaintiffs The Times, and Ziff Davis, not CIR or The Intercept.<br>Defendants further respond that this Paragraph is disputed on the grounds that it is not supported by admissible evidence, as required by Local Rule 56.1, and therefore is not properly before the Court. Specifically, Mr. Pine is a lay witness not testifying as an expert, and his cited testimony is improper opinion testimony that is inadmissible under Fed. R. Evid. 701. Additionally, News Ex. 103, News Ex. 1, and News Ex. 1240 are hearsay and the statements therein cannot be offered for the truth of their contents pursuant to Fed. R. Evid. 801, 802, 803.<br><br>Microsoft further responds that ECF 1802 (K. Oh Decl.) and News Ex. 1240 do not pertain to claims asserted against Microsoft. |
| 1632. Moreover, the unauthorized use of News Plaintiffs' content to provide news summaries also undermines the market for licensed distribution of News Plaintiffs' content. Ex. 57 [Pine Feb. 5, 2026 30(b)(6) Depo. Tr.] at 437:1-21 ("So there's a market for licensing. There's a market for distribution where you might be able to sell or | 1632. **Disputed – Not Supported by Cited Evidence; Not Supported by Admissible Evidence; Improper Legal Argument.** Defendants dispute the fact set forth in Paragraph 1632 in full. Empirical analysis shows [redacted] |

license content to others. That's undermined by the fact that the audience may think that they can get it for free from ChatGPT."); Ex. 49 [Oh Feb. 24, 2026 30(b)(6) Depo. Tr] at 260:21-261:2; Oh Decl. ¶ 14.

following the introduction of ChatGPT and Copilot. ECF 1733 (C. Tucker Decl.) ¶¶ 11, 24–48; ECF 1763 (A. Goldfarb Decl.) ¶¶ 9, 21–22, 40–41, 52–54, 71–73, 81–84. In fact, [redacted] ECF 1733 (C. Tucker Decl.) ¶¶ 30–31; ECF 1763 (A. Goldfarb Decl.) ¶¶ 21–22. Additionally, News Plaintiffs have not identified any licensing opportunity that they were not offered or did not accept specifically because of Defendants' alleged use of their content. Additionally, Defendants respond that [redacted] *See* News Ex. 228.

Defendants further respond that this Paragraph is disputed on the grounds that it is not supported by cited evidence. Specifically, the fact applies to all News Plaintiffs, but the evidence cited only applies to the Daily News Plaintiffs and Ziff Davis, not The Times, CIR, or The Intercept.

Defendants further respond that this Paragraph is disputed on the grounds that it is not supported by admissible evidence, as required by Local Rule 56.1, and therefore is not properly before the Court. Specifically, Mr. Pine (News Ex. 57) and Ms. Oh (News Ex. 49) are lay witnesses not testifying as experts, and their cited testimony is improper opinion testimony that is inadmissible under Fed. R. Evid. 701.

Paragraph 1632 is further disputed, and the Court should disregard this Paragraph because the assertion constitutes improper attorney argument and is

| | |
|---|---|
| | conclusory. It thus requires no response. Further, the facts set forth in Paragraph 1632 are not supported by the evidence and are contrary to the record. Specifically, ChatGPT does not substitute for news. *See, e.g.*, ECF 1763 (A. Goldfarb Decl.) ¶¶ 9–14; ECF 1733 (C. Tucker Decl.) ¶¶ 94–104.<br><br>Microsoft further responds that News Ex. 49 and ECF 1802 (K. Oh Decl.) do not pertain to claims asserted against Microsoft. |
| 1633. The unauthorized use of News Plaintiffs' content affects all licensing agreements based on a revenue share because there is less traffic to go around. Ex. 57 [Pine Feb. 5, 2026 30(b)(6) Depo. Tr.] at 445:10-14 ("The declining traffic affects any licensing agreement that's based on a revenue share because there's less traffic to go around, so you're going to see less revenue from revenue share agreements."). | 1633. **Disputed – Not Supported by Cited Evidence; Not Supported by Admissible Evidence; Improper Legal Argument.** Defendants dispute the fact set forth in Paragraph 1633 in full. Empirical analysis shows that [redacted] ECF 1733 (C. Tucker Decl.) ¶¶ 11, 24–48, 56–93; ECF 1763 (A. Goldfarb Decl.) ¶¶ 9, 21–26, 40–43, 52–58, 71–76, 81, 83, 84, 87. In fact, [redacted] ECF 1733 (C. Tucker Decl.) ¶¶ 30–31, 63–66; ECF 1763 (A. Goldfarb Decl.) ¶¶ 21–26. Specifically, for the News Plaintiffs, total traffic either increased, remained stable, or continued on the same trend it was on before the launch of ChatGPT. ECF 1733 (C. Tucker Decl.) ¶¶ 56–89; ECF 1763 (A. Goldfarb Decl.) ¶¶ 9, 23–26, 42–43, 55–58, 74–76, 87. Additionally, News Plaintiffs have not |

| | |
|---|---|
| | identified any licensing opportunity that they were not offered or did not accept specifically because of Defendants' alleged use of their content. Additionally, Defendants respond that [redacted] *See* News Ex. 228.<br><br>Defendants further respond that this Paragraph is disputed on the grounds that it is not supported by cited evidence. Specifically, the fact applies to all News Plaintiffs, but the evidence cited only applies to the Daily News Plaintiffs, not The Times, Ziff Davis, CIR or The Intercept.<br><br>Defendants further respond that this Paragraph is disputed on the grounds that it is not supported by admissible evidence, as required by Local Rule 56.1, and therefore is not properly before the Court. Specifically, Mr. Pine is a lay witness not testifying as an expert, and his cited testimony is improper opinion testimony that is inadmissible under Fed. R. Evid. 701.<br><br>Paragraph 1633 is disputed, and the Court should disregard this Paragraph because the assertion constitutes improper attorney argument and is conclusory. It thus requires no response.<br><br>OpenAI further responds that for Ziff Davis, licensing revenue was stable post-ChatGPT release. ECF 1763 (A. Goldfarb Decl.) ¶ 54. The statement is also disputed as vague and speculative. |

| | |
|---|---|
| 1634. The unauthorized use of News Plaintiffs' content to train Defendants' large language models also harms News Plaintiffs by depriving them of the licensing fees to which they are entitled. Ex. 1106 [The Times's Supplemental Response to Microsoft's 2nd Interrogatory No. 15] (describing how Microsoft's unauthorized use of The Times's content harms its licensing negotiations with other third parties, caused price erosion to The Times's licensing business, and has deprived The Times of licensing revenue); Ex. 707 [Miller 30(b)(6) Depo. Tr.] 122:1-125:9 (re: how Defendants' generative AI is harming The Times's licensing). | 1634. **Disputed – Not Supported by Cited Evidence; Not Supported by Admissible Evidence; Immaterial; Improper Legal Argument.** Defendants dispute the fact set forth in Paragraph 1634 in full. Empirical analysis shows that [redacted] ECF 1733 (C. Tucker Decl.) ¶¶ 11, 24–48; ECF 1763 (A. Goldfarb Decl.) ¶¶ 9, 21–22, 40–41, 52–54, 71–73, 81–84. In fact, [redacted] ECF 1733 (C. Tucker Decl.) ¶¶ 30–31; ECF 1763 (A. Goldfarb Decl.) ¶¶ 21–22. Furthermore, the cited evidence does not establish an existing standalone market for licensing News Plaintiffs' content for LLM training or that Defendants' conduct caused lost licensing revenue or price erosion. *See also* ECF 1733 (C. Tucker Decl.) ¶¶ 13, 130–231; ECF 1763 (A. Goldfarb Decl.) ¶¶ 22, 54; ECF 1800 (J. Malackowski Decl.) (Ex. F (J. Malackowski Opening Rep. (New York Times, Daily News Plaintiffs))) at 87. Additionally, News Plaintiffs have not identified any licensing opportunity that they were not offered or did not accept specifically because of Defendants' alleged use of their content. Additionally, Defendants respond that [redacted] *See* News Ex. 228. The record also reflects that [redacted] *See* A. Hurst Decl. Ex. 88 (F. Pine 30(b)(6) Tr. (Feb. 4, 2026)) at 207:18–25; A. Blanco Opp. |

| | |
|---|---|
| | Decl. Ex. 194 (A. Doree 30(b)(1) Tr.) at 21:16–29:9. Plaintiffs' interrogatory response and Miller's testimony do not establish that Defendants' conduct deprived News Plaintiffs of licensing fees to which they were legally entitled. *See also* A. Blanco Opp. Decl. Ex. 198 (S. Felix Tr.) 232:6–11; A. Hurst Decl. Ex. 67 (W. Lown 30(b)(6) Tr.) at 48:25–49:7.<br><br>Defendants further respond that this Paragraph is disputed on the grounds that it is not supported by cited evidence. Specifically, the fact applies to all News Plaintiffs, but the evidence cited only applies to The Times, not the Daily News Plaintiffs, Ziff Davis, CIR or The Intercept.<br><br>Defendants further respond that this Paragraph is disputed on the grounds that it is not supported by admissible evidence, as required by Local Rule 56.1, and therefore is not properly before the Court. Specifically, Mr. Miller (Ex. 707) is a lay witness not testifying as an expert, and his cited testimony is improper opinion testimony that is inadmissible under Fed. R. Evid. 701.<br><br>Defendants also respond that the facts in Paragraph 1634 are immaterial and therefore disputed because these facts do not affect the outcome of the suit under the governing law. Any alleged harm is irrelevant because that is not a legally cognizable harm under copyright law. *Kadrey*, 788 F. Supp. 3d at 1052; *Bartz*, 787 F. Supp. 3d at 1032. Paragraph 1634 is further disputed, and the court should disregard this Paragraph because the assertion contains improper attorney argument and is unsupported |

| | |
|---|---|
| | by the cited evidence. Plaintiffs' assertion improperly assumes that Defendants' training activities were unauthorized, that News Plaintiffs are legally entitled to licensing fees for such uses, and that the absence of those fees constitutes cognizable market harm. These are disputed legal conclusions concerning copyright infringement and fair use, rather than undisputed material facts properly included in a Local Rule 56.1 statement. |

### C. Effects of Defendants' Use On Market for Licensing Data for GenAI

| | |
|---|---|
| 1635. The key building blocks of a market are: willing buyers with demand, willing sellers with supply, pricing mechanisms, intermediaries and license facilitators, and executed transactions. Malackowski NYT-DNP Rebuttal Rep. at 36; Malackowski ZD Rebuttal Rep. at 27. | 1635. **Disputed in Part.** Defendants respond as follows: Undisputed that the Malackowski report provides the offered language. Disputed because Malackowski's opinions are not a fact or evidence and the cited report pages do not provide any evidentiary support for this proposition.<br>Defendants also dispute that the presence of these "building blocks" mean that a functioning market exists. ECF 1733 (C. Tucker Decl.) ¶¶ 130-53. |
| 1636. Defendants have acknowledged that publishers deserve to be paid for their intellectual property. Ex. 1247 [DNP-00569555] at 556 (Microsoft slide deck reads: "You deserve to be paid on the quality of your IP"); Ex. 533 [Nadella Depo. Tr.] at 154:8-14 (testifying that content creators "should have economic return for the value they are delivering" to generative AI models); Ex. 709 [Weyl Depo. Tr.] at 37:4-9 (agreeing that "creators of content that is used to train generative | 1636. **Disputed in Part – Incomplete; Not Supported by Admissible Evidence; Immaterial.** Defendants respond as follows: Paragraph 1636 is disputed because Plaintiffs mischaracterize the evidence cited to fabricate a unified "acknowledgment" by Defendants that publishers "deserve to be paid for their intellectual property" from disparate sources that, in context, do not support the proposition as stated. Pursuant to Fed. R. Evid. 106, Mr. Nadella's full testimony shows that he was answering a |

| | |
|---|---|
| AI models should be compensated"); Ex. 1248 ["A Different Path on Local News," OpenAI Global Affairs, https://openaiglobalaffairs.substack.com/p/a-different-path-on-local-news] at 2-3 ("People want to know the sources of news they see on ChatGPT, and showing high-quality journalism makes ChatGPT more useful and informative.... That belief shapes how we engage with publishers. Instead of resisting or delaying engagement, we've prioritized partnerships early in our development. Since we launched ChatGPT three years ago, we've built a broad and growing set of commercial relationships with leading news and media companies around the world. These collaborations reflect a shared commitment to quality information, sustainable business models, and mutual benefit."). | question about whether Microsoft should share the value of its OpenAI investment. Mr. Nadella said that content creators "should participate in the AI economy like they participated in the web before." A. Blanco Opp. Decl. Ex. 245 (S. Nadella 30(b)(1) Tr.) at 153:2–154:7. Weyl's testimony reflects his personal academic views on "data dignity" and therefore is not a statement on behalf of Defendants. Data Dignity is not a Microsoft-wide initiative; it is a project conceived by a few individuals in Microsoft Research, including Weyl, and reflects their outside-the-box and idealistic thinking. ECF 1707 (J. Usdan Decl.) ¶ 38. Weyl himself testified that he knows of no example where the full scope of anything he has advocated was implemented, because "[t]hat's kind of not the, really the way that academic research works." A. Hurst Decl. Ex. 127 at 41:13–25.<br><br>Defendants also respond that Paragraph 1636 is disputed on the grounds that it is not supported by admissible evidence, as required by Local Rule 56.1, and therefore is not properly before the Court. Specifically, Exhibit 1247 is not a "Microsoft slide deck" as represented in Paragraph 1636; it is an article published on Axios.com. Exhibit 1247 is therefore hearsay and lacks foundation because it is a non-party publication offered for the truth of its contents, unaccompanied by any authenticating testimony or sponsoring expert to establish its reliability and Plaintiffs identify no exception to the hearsay rule that would apply. It therefore may not be considered in support of summary judgment. For the same reasons, Exhibit 1248 (a screenshot |

| | |
|---|---|
| | from OpenAI's global affairs Substack) is hearsay as to Microsoft.<br>Defendants also respond that the facts set forth in Paragraph 1636 are immaterial and therefore disputed because these facts do not affect the outcome of the suit under the governing law. In particular, Weyl's statements cannot be attributed to Microsoft. Weyl is employed at Microsoft Research. ECF 1707 (J. Usdan Decl.) (Sept. 4, 2026) ¶ 38. Weyl holds "divergent, academic, and forward-looking views about how data ecosystems for AI should operate" and is employed at Microsoft "to bring these asymmetric, futuristic, and academic points of view." *Id.* ¶ 39. Weyl's personal views therefore are not statements of Microsoft and do not reflect Microsoft's knowledge, policies, or conduct. |
| 1637. Microsoft specifically listed [redacted] Ex. 870 [MSFT_AI_MDL_000450229] at -231-232; Ex. 1249 [http://web.archive.org/web/20230922085732/https://tribunecontentagency.com/us/] (at the time, Tribune Content agency included New York Daily News, Chicago Tribune, Orlando Sentinel, and Sun-Sentinel)]. | 1637. **Disputed – Not Supported by Cited Evidence; Not Supported by Admissible Evidence.** Microsoft responds as follows: Microsoft disputes that the cited evidence shows [redacted] The phrase [redacted] appears in a separate, earlier September 29, 2023 email that does not contain the list. News Ex. 870 at MSFT_AI_MDL_000450232. [redacted] |

| | |
|---|---|
| | [redacted] *Id.* at MSFT_AI_MDL_000450230–31. [redacted] *Id.* at MSFT_AI_MDL_000450231.<br><br>Microsoft also responds that Paragraph 1637 is disputed on the grounds that it is not supported by admissible evidence, as required by Local Rule 56.1, and therefore is not properly before the Court. Specifically, Exhibit 1249 is hearsay and lacks foundation. It is an archived non-party webpage offered for the truth of its contents. It is not accompanied by any authenticating testimony or sponsoring expert to establish its reliability, and therefore may not be considered in support of summary judgment.<br><br>OpenAI defers to Microsoft's response. |
| 1638. Microsoft specifically listed [redacted] Ex. 870 [MSFT_AI_MDL_000450229] at -231. | 1638. **Disputed in Part – Not Supported by Cited Evidence.** Microsoft responds as follows: Microsoft does not dispute that [redacted] at News Ex. 870 at MSFT_AI_MDL_000450231. But Microsoft disputes any implication in Paragraph 1638 that the list identified content for training LLMs, because the cited evidence does not support that implication. [redacted] |

| | |
|---|---|
| | Ex. 870 at MSFT_AI_MDL_000450230–31. Microsoft responds that facts related to Ziff Davis do not pertain to claims asserted against Microsoft.<br><br>OpenAI defers to Microsoft's response. |
| 1639. OpenAI's expert Laura Stamm acknowledged that [redacted] Ex. 683[Stamm Depo. Tr.] 213:11-25; Ex. 870 [MSFT_AI_MDL_000450229] at -231. | 1639. **Disputed in Part - Not Supported by Cited Evidence.** Defendants respond as follows: the facts set forth in Paragraph 1639 are disputed because they are not supported by the cited evidence for the same reasons described in Paragraph 1637. Undisputed that the Microsoft document [redacted] However, disputed that this designation means Stamm indicated they are "must-have" data sources for training, rather than for partnerships for display rights. In the cited excerpt of her deposition transcript, Stamm does not confirm that [redacted] means content sources were "must-have."<br><br>Microsoft responds that the facts related solely to Ziff Davis do not pertain to claims asserted against Microsoft. |
| 1640. Mr. Turley, OpenAI's Head of ChatGPT, admitted that local news is a "pretty common quer[y]" in ChatGPT. Ex. 1184 [United States v. Google, Case No. 20-cv-3010, U.S. District Court for the District of Columbia, Transcript of Remedies Hearing, Apr. 22, 2025] at 396. | 1640. **Disputed in Part- Not Supported by Cited Evidence.** OpenAI responds as follows: Undisputed that News Ex. 1184 (United States v. Google, No. 20-cv-3010 (D.D.C.), Remedies Hr'g Tr. (Apr. 22, 2025)) at 396 contains the quoted language.<br>However, OpenAI disputes the implication that "pretty common" is significant or reflects anything empirical about how often ChatGPT users search for local news. The cited testimony does not quantify how often such queries occur. |

| | |
|---|---|
| | Pursuant to Fed. R. Evid. 106, OpenAI further responds that Turley gives Taylor Swift and the winner of a sports game as other examples of "pretty common" queries. He does not quantify how common any of them are. News Ex. 1184 (*United States v. Google*, No. 20-cv-3010 (D.D.C.), Remedies Hr'g Tr. (Apr. 22, 2025)) at 396.<br><br>Microsoft defers to OpenAI. |
| 1641. [redacted] Ex. 528 [Turley 30(b)(1) Depo. Tr.] at 161:12-163:5; Ex. 520 [OPCO_MDL_001894242]. | 1641. **Disputed in Part - Not Supported by Cited Evidence.** OpenAI responds as follows: Undisputed that document contains the quoted language.<br>However, OpenAI disputes that local news or Times data has any unique value to training OpenAI's models. Further, the disputed proposition is not supported by the cited evidence. As Dr. Callison-Burch discussed in his Opening Declaration, a wide diversity of language data is critical for LLM training, but the data itself is fungible. *See* ECF 1748 (C. Callison-Burch Decl.) ¶ 77; News Ex. 676 (C. Callison-Burch Rebuttal Rep.) Section V.<br><br>Microsoft defers to OpenAI. |
| 1642. An OpenAI research scientist noted that "...newspapers like NYT are among the best running historical records we have." Ex. 1047 [OPCO_MDL_000222028] at -030. | 1642. **Disputed in Part - Not Supported by Cited Evidence.** OpenAI responds as follows: The facts set forth in Paragraph 1642 are disputed because they are not supported by the cited evidence. Undisputed that the cited document contains the quoted language. However, disputed that The Times's data has any unique value for training OpenAI's models. As Dr. Callison-Burch discussed in his |

| | |
|---|---|
| | Opening Declaration, a wide diversity of language data is critical for LLM training, but the data itself is fungible. *See* ECF 1748 (C. Callison-Burch Decl.) ¶ 77; News Ex. 676 (C. Callison-Burch Rebuttal Rep.) Section V.<br><br>Microsoft defers to OpenAI. |
| 1643. OpenAI estimated that "high-quality data is amplified by 1000x or 10,000x in terms of value..." Ex. 131 [OPCO_MDL_004776577] at 580. | 1643. **Disputed in Part - Not Supported by Cited Evidence.** OpenAI responds as follows: The facts set forth in Paragraph 1643 are disputed because they are not supported by the cited evidence. Undisputed that Ex. 131 contains the quoted language. However, disputed that the quoted language concedes that News Plaintiffs' data is "high-quality data;" it does not in fact address News Plaintiffs' data. Further, as discussed in Dr. Callison-Burch's Rebuttal Report, "high-quality data" in the context of LLM training can refer to data that is "diverse, well-formatted, and representative such that it contains useful examples of actual human language," rather than data that is considered aesthetically or commercially valuable. News Ex. 676 (C. Callison-Burch Rebuttal Rep.) ¶¶ 46-50.<br><br>Microsoft defers to OpenAI. |
| 1644. ChatGPT as of June 2023 had recognized limitations – it couldn't "outperform existing alternatives" or "replace Google" until OpenAI and ChatGPT could "answer queries that go beyond the pre-training set." Ex. 1029 [OPCO_MDL_001710421] at 429 (internal memo last updated June 25, 2023). | 1644. **Disputed in Part - Not Supported by Cited Evidence.** OpenAI responds as follows: Undisputed that the cited document contains the quoted language. However, disputed to the extent Paragraph 1644 as stated implies that ChatGPT was limited to answering questions explicitly contained in the training dataset or that ChatGPT simply |

| | |
|---|---|
| | regurgitates data from its training dataset to answer questions; neither of which is supported by the cited evidence.<br><br>Microsoft defers to OpenAI. |
| 1645. Generative AI "existentially depend[s] on the persistent and at-scale labor of the general public." Ex. 847 [MSFT_AI_MDL_000949427] at 427. | 1645. **Disputed in Part – Immaterial.** Microsoft does not dispute that Exhibit 847 contains the quoted language. But Microsoft disputes Paragraph 1645 because it presents as a freestanding fact a phrase taken from Hecht's characterization of the "current paradigm of foundation models." A. Blanco Opp. Decl. Ex. 212 (B. Hecht 30(b)(1) Tr). at 105:13–19. Pursuant to Fed. R. Evid. 106, the full sentence describes one assumption of that paradigm: that "any data on the Internet can be used for model training ... regardless of licenses, permissions, or consent[;]" the memo states that this assumption makes foundation models different from prior technologies that "did not existentially depend on the persistent and at-scale labor of the general public." News Ex. 847 at MSFT_AI_MDL_000949427.<br>Microsoft also responds that the facts set forth in Paragraph 1645 are immaterial and therefore disputed because these facts do not affect the outcome of the suit under the governing law. Specifically, a researcher's characterization of whether foundation models depend on public data does not bear on any element of Plaintiffs' claims or Defendants' defenses. Further, Hecht's statements cannot be attributed to Microsoft. Hecht is a research academic employed at Microsoft to bring "divergent," "asymmetric, futuristic, and academic points of view"; he does not set |

| | |
|---|---|
| | Microsoft's core priorities or speak for Microsoft as to "his theoretical views on AI's potential effect on content creators"; and Microsoft leadership "does not share all of [his] views"; and he is a "kind of intellectual provocateur." ECF 1707 (J. Usdan Decl.) ¶ 39; A. Blanco Opp. Decl. Ex. 285 (J. Usdan 30(b)(6) Tr.) at 173:22–174:9. Hecht has himself disclaimed any authority to speak for Microsoft, testifying that his views on these subjects are "my view, not Microsoft's view," that "[he] ha[s] no idea if [they are] shared by the board of Microsoft," and that "[he] can't speak for the company on this stuff." A. Blanco Opp. Decl. Ex. 212 (B. Hecht 30(b)(1) Tr.) at 319:18–20, 320:10–12, 321:4–5. He further described his views as "hypotheses," cautioned that "the jury is still out on a lot of this stuff," and acknowledged that he is "not a lawyer." *Id.* at 59:11–60:8, 165:9–15, 166:10–11. Hecht's personal views therefore are not statements of Microsoft and do not reflect Microsoft's knowledge, policies, or conduct.<br><br>OpenAI joins Microsoft's response, except to the extent any portion of it, including any testimony quoted under Fed. R. Evid. 106, could be read to characterize OpenAI, its models, or its conduct. OpenAI disputes any such characterization. Hecht is a Microsoft researcher who testified unequivocally: "I don't speak for Microsoft. I definitely don't speak for OpenAI." A. Blanco Opp. Decl. Ex. 212 (B. Hecht 30(b)(1) Tr.) at 100:11–12. His statements are not based on personal knowledge of OpenAI, are not attributable to OpenAI, and are inadmissible hearsay as to OpenAI. *See* Fed. R. Civ. P. 56(c)(2), (c)(4); Fed. R. Evid. 602, |

| | |
|---|---|
| | 801(d)(2)(D), 802. This paragraph cannot be offered to establish any fact concerning OpenAI. |
| 1646. A Microsoft presentation acknowledged: [redacted] Ex. 930 [MSFT_AI_MDL_000611908] at Slide 7. | 1646. **Disputed in Part – Incomplete.** Microsoft does not dispute that Exhibit 930 contains the quoted language. But Microsoft disputes the characterization in Paragraph 1646 that the presentation "acknowledged" [redacted] Pursuant to Fed. R. Evid. 106, the full statement reads: [redacted] News Ex. 930 at slide 20. Further, the statement is one of several [redacted] from an August 2020 [redacted] *Id*. at slides 1, 6–7.<br><br>OpenAI defers to Microsoft's response. |
| 1647. OpenAI acknowledged that its competitiveness depends on its ability to access and compile up-to-date data. Ex. 1051 [OPCO_MDL_001947427] at -427 ("OpenAI's competitiveness depends on its ability to access and compile the world's human-generated tokens into datasets for training models… Access to data is a 'forever problem'; even if OpenAI successfully collects all data ever created by humans, there is a 'head' of new content that humans are continually creating and must be | 1647. **Disputed in Part - Not Supported by Cited Evidence.** OpenAI responds as follows: Undisputed that the cited document contains the following quote: "OpenAI's competitiveness depends on its ability to access and compile the world's human-generated tokens into datasets for training models." However, disputed to the extent Paragraph 1647 implies that OpenAI's existence depends on this principle. The disputed proposition is not supported by the cited evidence. |

| | |
|---|---|
| continuously collected on an ongoing basis for the rest of OpenAI's existence... OpenAI's ability to stay current with the 'head' of new human generated tokens is existentially critical to its strategy to capitalize the pursuit of AGI by commercializing world-leading models trained with up-to-date datasets."). | Microsoft defers to OpenAI. |
| 1648. OpenAI has admitted that its continued access to data is "existentially critical" to Defendants' ability to commercialize successful generative AI models. Ex. 1051 [OPCO_MDL_001947427] at -427. | 1648. **Disputed in Part - Not Supported by Cited Evidence; Not Supported by Admissible Evidence.** OpenAI responds as follows: Undisputed that Ex. 1051 has the quoted language. Disputed that Plaintiffs' characterization is supported by the cited evidence. Exhibit 1051 is in no way an official OpenAI memo or business document and does not speak or "admit" anything on behalf of OpenAI. Plaintiffs provide no additional evidence to corroborate their factual claim. Therefore, the disputed proposition is not supported by the cited evidence.<br><br>Additionally, Ex. 1051 is hearsay as to Microsoft. Microsoft otherwise defers to OpenAI. |
| 1649. A Microsoft-produced document acknowledged: [redacted] Ex. 870 [MSFT_AI_MDL_000450229] at -232. | 1649. **Undisputed – Incomplete.** Microsoft responds as follows: Microsoft does not dispute that Exhibit 870 contains the quoted language. But pursuant to Fed. R. Evid. 106, Microsoft responds that the quoted sentence [redacted] |

| | |
|---|---|
| | [redacted] A. Blanco Opp. Decl. Ex. 285 (J. Usdan 30(b)(6) Tr.) 134:24–136:4.<br><br>OpenAI defers to Microsoft's response. |
| 1650. OpenAI acknowledged that the value of data decreases when an AI model is trained on that data. Ex. 1053 [OPCO_MDL_000158237] at -238. | 1650. **Disputed - Not Supported by Cited Evidence.** OpenAI responds as follows: Disputed that the cited evidence stands for the proposition that value of data decreases when an AI model is trained on the data. Exhibit 1053 instead discusses a thought-experiment and one possibility. This was by no means an acknowledgement, and the citation does not concede the truth of any possibility. Therefore, the disputed proposition is not supported by the cited evidence.<br><br>Microsoft defers to OpenAI. |
| 1651. Microsoft has recognized that all LLM-based products depend on an "implicit contract with content providers to provide their crown jewels to us for free." Ex. 845 [MSFT_AI_MDL_000948603] at -603 ("Prometheus (and all LLM-based products) rely on an implicit contract with content providers to provide their crown jewels to us for free. If the other side wants to tear up this contract or are unable to perform their end of it, Prometheus and all our LLM-based systems will be in big trouble."). | 1651. **Disputed in Part – Immaterial.** Microsoft does not dispute that Exhibit 845 contains the quoted language. But Microsoft disputes the characterization in Paragraph 1651 that "Microsoft has recognized" a purported "implicit contract with content providers[.]" Exhibit 845 is a discussion memo written by Brent Hecht about potential risks to the Bing Chat search product. *See* News Ex. 845 at MSFT_AI_MDL_000948603; *see* A. Blanco Opp. Decl. Ex. 212 (B. Hecht 30(b)(1) Tr.) at 305:10–20.<br>Microsoft also responds that the facts set forth in Paragraph 1651 are immaterial and therefore disputed because these facts do not affect the outcome of the suit under |

| | |
|---|---|
| | the governing law. Specifically, a researcher's discussion of search-traffic dynamics for the new Bing has no bearing on any element of Plaintiffs' claims or Defendants' defenses. And, a Microsoft employee's personal views on any hypothetical effects of LLMs on content creators have no bearing on any element of the claims or defenses in this case. Further, Hecht's statements cannot be attributed to Microsoft. Hecht is a research academic employed at Microsoft to bring "divergent," "asymmetric, futuristic, and academic points of view"; he does not set Microsoft's core priorities or speak for Microsoft as to "his theoretical views on AI's potential effect on content creators"; and Microsoft leadership "does not share all of [his] views"; and he is a "kind of intellectual provocateur." ECF 1707 (J. Usdan Decl.) ¶ 39; A. Blanco Opp. Decl. Ex. 285 (J. Usdan 30(b)(6) Tr.) at 173:22–174:9. Hecht has himself disclaimed any authority to speak for Microsoft, testifying that his views on these subjects are "my view, not Microsoft's view," that "[he] has no idea if [they are] shared by the board of Microsoft," and that "[he] can't speak for the company on this stuff." A. Blanco Opp. Decl. Ex. 212 (B. Hecht 30(b)(1) Tr.) at 319:18–20, 320:10–12, 321:4–5. He further described his views as "hypotheses," cautioned that "the jury is still out on a lot of this stuff," and acknowledged that he is "not a lawyer." *Id.* at 59:11–60:8, 165:9–15, 166:10–11. Hecht's personal views therefore are not statements of Microsoft and do not reflect Microsoft's knowledge, policies, or conduct. |

| | |
|---|---|
| | OpenAI joins Microsoft's response, except to the extent any portion of it, including any testimony quoted under Fed. R. Evid. 106, could be read to characterize OpenAI, its models, or its conduct. OpenAI disputes any such characterization. Hecht is a Microsoft researcher who testified unequivocally: "I don't speak for Microsoft. I definitely don't speak for OpenAI." A. Blanco Opp. Decl. Ex. 212 (B. Hecht 30(b)(1) Tr.) at 100:11–12. His statements are not based on personal knowledge of OpenAI, are not attributable to OpenAI, and are inadmissible hearsay as to OpenAI. *See* Fed. R. Civ. P. 56(c)(2), (c)(4); Fed. R. Evid. 602, 801(d)(2)(D), 802. This paragraph cannot be offered to establish any fact concerning OpenAI. |
| 1652. Dr. Brent Hecht, Director of Applied Science at Microsoft, characterized the "threat LLMs present to content ecosystems" as a challenge that would lead to "being accused of the 'largest theft of labor in human history.'" Ex. 844 [MSFT_AI_MDL_001233825] at -826. | 1652. **Disputed in Part – Immaterial.** Microsoft does not dispute that Exhibit 844 contains the quoted language. But Microsoft disputes that the cited evidence shows Hecht (let alone Microsoft) "characterized" the fact stated in Paragraph 1652; rather, the full passage is a catalog of potential public relations risks: "We will have to navigate the PR challenges of being accused of the 'largest theft of labor in human history.'" News Ex. 844 at MSFT_AI_MDL_001233826. Hecht was quoting *external* rhetoric about what Microsoft might be accused of, not himself endorsing the characterization. The same bullet point lists a dozen other potential risks: regulatory challenges, competitor dynamics, lawsuits, security risks - as part of a comprehensive risk inventory. *Id.* |

| | |
|---|---|
| | Microsoft also responds that the facts set forth in Paragraph 1652 are immaterial and cannot be attributed to Microsoft for the reasons stated in response to Paragraph 1651. Specifically, a list of potential public-relations risks, which repeats an accusation from a third-party op-ed, has no bearing on any element of Plaintiffs' claims or Defendants' defenses. And, a Microsoft employee's personal views on any hypothetical effects of LLMs on content creators have no bearing on any element of the claims or defenses in this case.<br><br>OpenAI joins Microsoft's response, except to the extent any portion of it, including any testimony quoted under Fed. R. Evid. 106, could be read to characterize OpenAI, its models, or its conduct. OpenAI disputes any such characterization. Hecht is a Microsoft researcher who testified unequivocally: "I don't speak for Microsoft. I definitely don't speak for OpenAI." A. Blanco Opp. Decl. Ex. 212 (B. Hecht 30(b)(1) Tr.) at 100:11–12. His statements are not based on personal knowledge of OpenAI, are not attributable to OpenAI, and are inadmissible hearsay as to OpenAI. *See* Fed. R. Civ. P. 56(c)(2), (c)(4); Fed. R. Evid. 602, 801(d)(2)(D), 802. This paragraph cannot be offered to establish any fact concerning OpenAI. |
| 1653. Microsoft identified that this theft was a "violation of [] trust" and that "[c]ustomers will perceive [Microsoft] to be 'thieves' of their data." Ex. 847 [MSFT_AI_MDL_000949427] at -427; *see also* Ex. 932 [MSFT_AI_MDL_000182403] at -406 [redacted] | 1653. **Disputed in Part – Immaterial.** Microsoft does not dispute that Exhibits 847 and 932 contain the quoted language. But Microsoft disputes the characterization in Paragraph 1653 that "Microsoft identified" any "theft" or will be "perceive[d]" as "thieves." Exhibit 847 is an undated memo |

| | |
|---|---|
| [redacted] | that invites readers to contact Hecht. News Ex. 847 at MSFT_AI_MDL_000949429. The "violation of [] trust" language describes two characteristics of "the current paradigm of foundation models" across the industry. *Id.* at MSFT_AI_MDL_000949427. The "thieves" item appears in a list of "threats to Microsoft that emerge from the literature on foundation models," footnoted to an external blog post. *Id.* The cited passage describes a potential reputational risk, not a finding about Microsoft's conduct. News Ex. 932 at MSFT_AI_MDL_000182406.<br>Microsoft also responds that the facts set forth in Paragraph 1653 are immaterial and cannot be attributed to Microsoft for the reasons stated in response to Paragraph 1651. Specifically, predictions in internal memos about how customers or the public might perceive the industry have no bearing on any element of News Plaintiffs' claims or Defendants' defenses. And, a Microsoft employee's personal views on any hypothetical effects of LLMs on content creators have no bearing on any element of the claims or defenses in this case.<br><br>OpenAI joins Microsoft's response, except to the extent any portion of it, including any testimony quoted under Fed. R. Evid. 106, could be read to characterize OpenAI, its models, or its conduct. OpenAI disputes any such characterization. Hecht is a Microsoft researcher who testified unequivocally: "I don't speak for Microsoft. I definitely don't speak for OpenAI." A. Blanco Opp. Decl. Ex. 212 (B. Hecht 30(b)(1) Tr.) at 100:11–12. His statements are |

| | |
|---|---|
| | not based on personal knowledge of OpenAI, are not attributable to OpenAI, and are inadmissible hearsay as to OpenAI. *See* Fed. R. Civ. P. 56(c)(2), (c)(4); Fed. R. Evid. 602, 801(d)(2)(D), 802. This paragraph cannot be offered to establish any fact concerning OpenAI. |
| 1654. Others at Microsoft, like Jaron Lanier, have expressed similar sentiments, advocating for "data dignity" where data is seen as labor, and content creators are compensated for their contributions. Ex. 1180 ["There Is No A.I." The New Yorker, https://www.newyorker.com/science/annals-of-artificial-intelligence/there-is-no-ai]; Inner Cosmos with David Eagleman Podcast (Episode: Data Dignity with Jaron Lanier), March 1, 2025, https://www.youtube.com/watch?v=mKSH7Vx19Vc at 0:15-0:55; Ex. 934 [MSFT_AI_MDL_000993734]; Ex. 936 [MSFT_AI_MDL_000994463]. | 1654. **Disputed in Part – Not Supported by Admissible Evidence; Immaterial.** Microsoft does not dispute that Lanier has advocated for the concept of "data dignity." But Microsoft disputes any implication that this advocacy reflects Microsoft's position.<br>To the extent that Paragraph 1654 relies on Ex. 1180 and the "Inner Cosmos with David Eagleman Podcast", those facts are disputed on the grounds that they are not supported by admissible evidence, as required by Local Rule 56.1, and therefore are not properly before the Court. Both documents are hearsay and lack foundation.<br>Microsoft also responds that the facts set forth in Paragraph 1654 are immaterial and therefore disputed because these facts do not affect the outcome of the suit under the governing law. Specifically, the personal advocacy by researchers for a theoretical framework ("Data Dignity") has no bearing on the claims and defenses asserted in this case.<br>Additionally, statements by Lanier and Weyl cannot be attributed to Microsoft. Lanier and Weyl are employed at Microsoft Research. ECF 1707 (J. Usdan Decl.) ¶ 38. They hold "divergent, academic, and forward-looking views about how data ecosystems for AI should operate" and are employed at Microsoft "to bring these asymmetric, futuristic, and |

| | |
|---|---|
| | academic points of view." *Id.* ¶ 39. Lanier and Weyl's conceived Data Dignity initiative "is not a Microsoft-wide initiative"; it is "a project conceived by a few individuals employed by Microsoft Research, such as Jaron Lanier, … and Glen Weyl," and it "reflected the outside-the-box and idealistic thinking of these individuals." *Id.* ¶ 38. It "did not include an executed licensing program for copyrighted material." *Id.* The only Microsoft effort attempted under the Data Dignity ideology, the Trove app, "predated the current LLM-training data acquisition work and ultimately failed." *Id.* ¶ 41. Lanier himself testified that he was describing "a future framework," in which the incentive "might be money or it might be some other thing that evolves," and that it is "the future I want." A. Hurst Decl. Ex. 61 (J. Lanier 30(b)(1) Tr.) at 33:20–34:19. Weyl testified that the "full scope" of what he has advocated has never been implemented by anyone, because "[t]hat's kind of not the, really the way that academic research works." News Ex. 709 (E. Weyl 30(b)(1) Tr.) at 41:15–22. Thus, Lanier's and Weyl's personal views therefore are not statements of Microsoft and do not reflect Microsoft's knowledge, policies, or conduct.<br><br>OpenAI defers to Microsoft's response. |
| 1655. A May 2023 email drafted by Mr. Lanier advocated for creating a "sustainable financial model" that supported creative contributors:<br>…many believe that, at least in spirit, the models do not themselves respect the intellectual inputs | 1655. **Undisputed – Immaterial.** Microsoft does not dispute that Exhibit 934 contains the quoted language. Microsoft responds that the facts set forth in Paragraph 1655 are immaterial and therefore disputed because these facts do not affect the outcome of the suit under the governing law. |

| | |
|---|---|
| of the creatives and data subjects whose contributions the models are trained on. A strategy to resolve this would be for us to ally with these creative contributors, harnessing their political and moral clout to create a sustainable financial model that supports both the OpenAl/Microsoft platform and the content contributors who make its models possible. This would mirror Apple's strategy with their Music Store and its positioning as an antidote to Napster and similar services in the early 2000s.<br><br>Ex. 934 [MSFT_AI_MDL_000993734] at 735. | Specifically, the personal advocacy by a researcher for a theoretical framework has no bearing on whether the use of News Plaintiffs' works to train the models at issue was infringing or fair. Additionally, Mr. Lanier's statements are immaterial and cannot be attributed to Microsoft for the reasons stated in response to Paragraph 1654.<br><br>OpenAI defers to Microsoft's response. |
| 1656. Research Lead at the Plural Technology Collaboratory Catalyst Lab at Microsoft Research, Dr. Glen Weyl, agreed that creators of content used to train generative AI should be compensated. Ex. 709 [Weyl Depo. Tr.] at 37:4-9. | 1656. **Undisputed – Incomplete; Immaterial.** Microsoft does not dispute that Exhibit 709 reflects the cited Weyl testimony.<br>But Microsoft responds that the facts set forth in Paragraph 1656 are immaterial and therefore disputed because these facts do not affect the outcome of the suit under the governing law. Specifically, the personal advocacy by a researcher for a theoretical framework has no bearing on whether the use of News Plaintiffs' works to train the models at issue was infringing or fair. Additionally, Weyl's statements are immaterial and cannot be attributed to Microsoft for the reasons stated in response to Paragraph 1654.<br><br>OpenAI defers to Microsoft's response. |

| | |
|---|---|
| 1657. Dr. Weyl stated compensating these content creators is "in the best interests of my employer, of my country, and of many other groups I belong to." Ex. 709 [Weyl Depo. Tr.] at 37:10-20. | 1657. **Undisputed – Immaterial.** Microsoft responds as follows: Microsoft does not dispute that Exhibit 709 contains the quoted Weyl deposition testimony.<br>But Microsoft also responds that the facts set forth in Paragraph 1657 are immaterial and cannot be attributed to Microsoft for the reasons stated in response to Paragraph 1654. Specifically, the personal advocacy by a researcher for a theoretical framework has no bearing on the claims and defenses at issue in this case.<br><br>OpenAI defers to Microsoft's response. |
| 1658. Dr. Weyl agreed that implementing a data dignity policy to compensate creators for their content would "accelerate and improve [Generative AI companies', including Defendants,] performance both financially and in terms of adoption." Ex. 709 [Weyl Depo. Tr.] at 44:3-12. | 1658. **Disputed In Part – Incomplete; Immaterial.** Microsoft does not dispute that Mr. Weyl made the quoted statement at his deposition. Pursuant to Fed. R. Evid. 106, Weyl also testified that it is not "unilaterally in the … remit of those companies to implement those ideas," and that no "one company unilaterally" could "implement the full scope of what we're advocating." A. Blanco Opp. Decl. Ex. 289 (E. Weyl 30(b)(1) Tr.) at 43:1–44:2.<br>Microsoft also responds that the facts set forth in Paragraph 1658 are immaterial and cannot be attributed to Microsoft for the reasons stated in response to Paragraph 1654. Specifically, the personal advocacy by a researcher for a theoretical framework has no bearing on the claims and defenses at issue in this case.<br><br>OpenAI defers to Microsoft's response. |

| | |
|---|---|
| 1659. Sam Altman, founder and CEO of OpenAI, has publicly testified that he believes that content creators should control how their creative works are used and should receive value for their contributions to Generative AI. Ex. 1182 [Sam Altman Testimony U.S. Senate Judiciary Committee Subcommittee on Privacy, Technology and the Law, "Oversight of A.I.: Rules for Artificial Intelligence," https://www.techpolicy.press/transcript-senate-judiciary-subcommittee-hearing-on-oversight-of-ai/] at 12-14 (exchange with Senator Blackburn). *See also* Ex. 138 [OPCO_MDL_004408493] at 493 (Altman stating that he "love[s]" the "idea" of paying people in exchange for data); Ex. 782 [OPCO_MDL_004619015] at 018 (Altman writing that "We should have a... way for publishers/creators to get value"). | 1659. **Disputed in Part.** OpenAI responds as follows: Dispute the implication that Altman testified that creators should be paid for training data. None of the cited sources use the phrase "contributions to Generative AI." Altman's testimony addressed the possibility of paying creatives to use their likenesses, not that OpenAI should pay for training data. Pursuant to Fed. R. Evid. 106, Altman clarified in his deposition that his public comments were about "new business models for creators" related to payments for generating material in the style of an artist at the time of inference, but noted "that's very different than training." A. Blanco Opp. Decl. Ex. 163 (S. Altman 30(b)(1) Tr.) at 164:8–22. The other cited exhibits are not public statements and do not support the proposition as stated. News Ex. 138 is a Slack message, not a public statement, and is related to a potential proposal to pay people for voluntarily supplied data. News Ex. 782, not a public statement, discusses "a way for publishers/creators to get value, but ideally not . . . part of the core training."<br><br>Microsoft defers to OpenAI. |
| 1660. Microsoft has long recognized the importance of strong rights for its own intellectual property—Bill Gates agreed the ability to charge for one's intellectual property is what makes the business. Ex. 711 [Gates Depo. Tr.] at 30:19-25. | 1660. **Disputed in Part – Incomplete; Immaterial.** Microsoft does not dispute that Exhibit 711 reflects the cited deposition testimony. But Microsoft disputes the implication in Paragraph 1660 that the cited testimony bears on Microsoft's policies. Pursuant to Fed. R. Evid. 106, Mr. Gates was discussing his 1976 open letter to computer hobbyists who copied Microsoft's BASIC software |

| | |
|---|---|
| | in its exact form. A. Blanco Opp. Decl. Ex. 205 (W. Gates 30(b)(1) Tr.) at 29:1–30:18. And, in the cited lines Mr. Gates limited his answer to "*this case*, where you're taking exactly what we'd written and using it." *Id.* at 30:19–25 (emphasis added).<br>Microsoft also responds that the facts set forth in Paragraph 1660 are immaterial and therefore disputed because these facts do not affect the outcome of the suit under the governing law. Specifically, Mr. Gates's views about hobbyists copying Microsoft's software verbatim in the 1970s have no bearing on the claims and defenses at issue in this case.<br><br>OpenAI defers to Microsoft's response. |
| 1661. Mr. Gates also agreed that copyright law covers books, paintings, news articles, music and others, and depending on the use of the material "you may owe a copyright fee." Ex. 711 [Gates Depo. Tr.] at 50:8-17. | 1661. **Disputed in Part – Incomplete; Immaterial.** Microsoft does not dispute that Exhibit 711 reflects the cited deposition testimony. But, pursuant to Fed. R. Evid. 106, Mr. Gates's full testimony is: "Yeah, I understand that, based on the way it's used, you may owe a copyright fee." A. Blanco Opp. Decl. Ex. 205 (W. Gates 30(b)(1) Tr.) at 50:8–17. He also testified that when a use is fair, no fee is owed: "If they're making fair use, they don't have to pay us. If they're doing something beyond fair use, then I would expect them to pay us." *Id.* at 153:9–18.<br>Microsoft also responds that the facts set forth in Paragraph 1661 are immaterial and therefore disputed because these facts do not affect the outcome of the suit under the governing law. Specifically, a non-lawyer's general |

| | |
|---|---|
| | statement that copyright law covers many kinds of works, and that a fee may be owed depending on the use, has no bearing on whether the use of News Plaintiffs' works to train the models at issue was infringing or fair.<br><br>OpenAI defers to Microsoft's response. |
| 1662. Satya Nadella, CEO of Microsoft, further testified that content creators should be compensated for their role in helping to generate AI models. Ex. 533 [Nadella Depo. Tr.] at 154:8-14. | 1662. **Undisputed – Incomplete; Immaterial.** Microsoft responds as follows: Microsoft does not dispute that Mr. Nadella said that content creators "should have economic return for the value they are delivering." A. Blanco Opp. Decl. Ex. 245 (S. Nadella 30(b)(1) Tr.) at 154:8–14. Pursuant to Fed. R. Evid. 106, Mr. Nadella's full testimony was part of a broader statement that Microsoft should "come up with a marketplace mechanism that works for content producers to participate" in "the AI economy like they participated in the web before," as the web shifts from "user-driven" to "agent-driven." *Id.* at 153:7–154:7. When Mr. Nadella was asked directly whether content creators should be compensated for their role in creating generative AI models, he answered: "If it is licensed content, they are compensated." *Id.* at 95:2–8. He then explained that "if the data is available publicly, using that data to create a transformative technology that is not a regurgitation engine, that's fair use," and that grounding "is a completely different set of access rights." *Id.* at 298:16–299:2.<br>Microsoft also responds that the facts set forth in Paragraph 1662 are immaterial and therefore disputed because these facts do not affect the outcome of the suit under |

| | |
|---|---|
| | the governing law. Specifically, statements about content creators' participation in the AI economy have no bearing on the claims and defenses at issue in this case.<br><br>OpenAI defers to Microsoft's response. |
| 1663. OpenAI likewise values its own intellectual property. On February 12, 2026, OpenAI published a memo it wrote to the U.S. House Select Committee on Strategic Competition between the United States and the Chinese Communist Party alleging that DeepSeek had stolen its intellectual property to fuel its own generative AI models. Ex. 1183 [OpenAI Memo (Feb. 12, 2026), https://assets.bwbx.io/documents/users/iqjWHBFdfxIU/rRmql_jJcxb4/v0] at 3-6 ("OpenAI provides responsible distillation pathways for developers. However, we do not allow our outputs to be used to create imitation frontier AI models that replicate our capabilities."). | 1663. **Undisputed.**<br><br>Microsoft defers to OpenAI. |
| 1664. OpenAI contemplated licensing agreements with [redacted] Ex. 170 [OPCO_MDL_004590352]; Ex. 171 [OPCO_MDL_004590354]; Ex. 172 [OPCO_MDL_004590350]. | 1664. **Undisputed.**<br><br>Microsoft defers to OpenAI. |
| 1665. OpenAI's Varun Shetty testified that [redacted] Ex. 136 [Shetty 30(b)(6) Depo. Tr.] at 115:12-16. | 1665. **Disputed in Part - Not Supported by Cited Evidence.** OpenAI responds as follows: Undisputed that the deposition transcript describes dozens of [redacted] |

| | |
|---|---|
| | Disputed that Plaintiffs' characterizations of those conversations extends beyond the scope of the deposition testimony, only pertains to training, or establishes a market for licensing the Asserted Works for the uses at issue in this litigation. Accordingly, the disputed proposition is not supported by the cited evidence.<br><br>Microsoft defers to OpenAI. |
| 1666. Microsoft identified The Times and *Tribune* related publications as valuable content that was a top priority. Ex. 870 [MSFT_AI_MDL_000450229] at –231-232; Ex. 938 [MSFT_AI_MDL_000934681] at -681. | 1666. **Disputed in Part – Not Supported by Cited Evidence.** Microsoft does not dispute that "The New York Times" and "Tribune Content Agency/McClatchy" appear in the [redacted] table in Exhibit 870, or that Exhibit 938 [redacted] News Ex. 870 at MSFT_AI_MDL_000450230–31; News Ex. 938 at MSFT_AI_MDL_000934681. But Microsoft disputes the remainder of Paragraph 1666 (that Microsoft identified these publications as valuable content and a top priority) because the cited evidence does not support the claim. Exhibit 870 is a [redacted] *See* News Ex. 870 at MSFT_AI_MDL_000450230–31. The New York Times reference at -232 is [redacted] *Id.* at MSFT_AI_MDL_000450232. And Exhibit 938 concerns [redacted] |

| | |
|---|---|
| | [redacted] News Ex. 938 at MSFT_AI_MDL_000934681. Exhibit 938 does not mention any Tribune publication.<br><br>OpenAI defers to Microsoft's response. |
| 1667. OpenAI listed [redacted] Ex. 1054 [OPCO_MDL_004591496] at -496. | 1667. **Disputed - Not Supported by Cited Evidence.** OpenAI responds as follows: Disputed that this represents OpenAI's priority list. This is a [redacted] He says [redacted] News Ex. 1054 at OPCO_MDL_004591496. Plaintiffs misattribute this as OpenAI's official position. Accordingly, the disputed proposition is not supported by the cited evidence.<br><br>Microsoft defers to OpenAI. |
| 1668. OpenAI also listed [redacted] Ex. 1055 [OPCO_MDL_002118849] at -849. | 1668. **Disputed in Part – Not Supported by Cited Evidence.** OpenAI responds as follows: Disputed to the extent that this implies that OpenAI needed access [redacted] In context, these messages maintain that OpenAI [redacted] *See* News Ex. 1055 at OPCO_MDL_002118849. Accordingly, the disputed proposition is not supported by the cited evidence. |

| | |
|---|---|
| | Microsoft defers to OpenAI. |
| 1669. Local news, an important aspect of the *Daily News Plaintiffs*' business, has been described by OpenAI as a "pretty common quer[y]" in ChatGPT. Ex. 1184 [*United States v. Google*, Case No. 20-cv-3010, U.S. District Court for the District of Columbia, Transcript of Remedies Hearing, Apr. 22, 2025] at 396; Ex. 1185 [https://openaiglobalaffairs.substack.com/p/a-different-path-on-local-news] (OpenAI's Internal data as of February 2026 showing that "the demand for reliable local news is already visible inside ChatGPT at a rate of about 1 million prompts per week"). | 1669. **Disputed in Part - Not Supported by Cited Evidence.** OpenAI responds as follows: Undisputed that Ex. 1184 contains an opinion that local news is a "pretty common query." However, disputed that Ex. 1184 or Ex. 1185 supports Plaintiffs' characterization that OpenAI described local news queries as having any outsized importance. Further disputed that either exhibit reflects any OpenAI position about the Daily News Plaintiffs or their business. Neither exhibit mentions the Daily News Plaintiffs, and Plaintiffs' framing of local news as "an important aspect of the Daily News Plaintiffs' business" and draws an inference the cited evidence does not support. The facts in this Paragraph are not supported by the cited material, and the Court should disregard them.<br><br>Microsoft defers to OpenAI. |
| 1670. Nick Turley explained that for "ChatGPT utility" it is important to have "some high quality news content in each major geography." Ex. 528 [Turley 30(b)(1) Depo. Tr.] at 49:4-18; *see also* Ex. 1057 [OPCO_MDL_004591556] at -556 ("Insofar as people use the platform to ask about recent information; we want to be able to point them to authoritative, high quality information."). | 1670. **Disputed in Part - Not Supported by Cited Evidence.** OpenAI responds as follows: Undisputed that News Ex. 528 (N. Turley 30(b)(1) Tr.) at 49:4–18 contains the quoted language. However, disputed that News Plaintiffs' data has particular significance to OpenAI's models. The cited testimony does not support that inference.<br><br>Further disputed that Turley made the statement quoted in the parenthetical to Ex. 1057. Turley is not a participant in the Slack conversation in Ex. 1057. The quoted language was written by David Duxin, not Turley. *See* News Ex. 1057 at OPCO_MDL_004591556. Attributing Duxin's |

| | |
|---|---|
| | statement to Turley mischaracterizes the cited evidence. The facts in this Paragraph are therefore not supported by the cited material, and the Court should disregard them.<br><br>Microsoft defers to OpenAI. |
| 1671. OpenAI sought to ensure its models were relying more heavily on high-quality data rather than "joe schmo's blog articles." Ex. 1059 [OPCO_MDL_000220898] at -900. | 1671. **Disputed in Part - Not Supported by Cited Evidence.** OpenAI responds as follows: Undisputed that Ex. 1059 contains the quoted language. However, disputed that News Plaintiffs' data has any outsized importance to training OpenAI's models. Further disputed that Ex. 1059 supports the proposition that OpenAI "sought to ensure its models were relying more heavily on high-quality data." The facts in this Paragraph are therefore not supported by the cited material, and the Court should disregard them.<br><br>Microsoft defers to OpenAI. |
| 1672. Brent Hecht wrote in January 2024: "Our AI content strategy has started a 'doom loop' that will hurt the performance of our models and the entire web at the same time: It is highly unusual that an end product threatens the economic foundations of its essential suppliers, but that is the situation we have created for our LLM business with respect to its 'content supply chain'. This is an inherent outcome of creating LLMs with our current content strategy: LLMs are useful because they replicate the patterns in their training content which, without ways of distributing economic value down the content supply chain, necessarily threatens the economic | 1672. **Undisputed – Incomplete; Immaterial.** Microsoft does not dispute that Ex. 940 contains the quoted language or that Hecht read it into the record. But, pursuant to Fed. R. Evid. 106, Hecht wrote that the document "is framed around questions for a reason," that "[t]he goal here is to start these discussions rather than to claim that the hypotheses proposed below are inherently the right answers," and that "there's lots that is probably incorrect below." News Ex. 940 at MSFT_AI_MDL_001513956. Before reading the passage, Hecht testified that "this is not a peer-reviewed document" and would "require more revision." A. Blanco Opp. Decl. Ex. 212 (B. Hecht 30(b)(1) Tr.) at 274:18–25. He |

| | |
|---|---|
| sustainability of those who create the content." Ex. 940 [MSFT_AI_MDL_001513956] at -959; Ex. 671 [Hecht Depo. Tr.] at 275:18-276:6. | also testified that the "evidence" was "very early" and came "largely from my knowledge in public and scientific proceedings." *Id.* at 276:9–13.<br>Microsoft also responds that the facts stated in Paragraph 1672 are immaterial and therefore disputed because these facts do not affect the outcome of the suit under the governing law. Specifically, a researcher's discussion paper raising questions has no bearing on whether the use of Plaintiffs' works to train the models at issue was infringing or fair. A Microsoft employee's personal views on any hypothetical effects of LLMs on content creators have no bearing on any element of the claims or defenses in this case.<br>Additionally, Hecht's statements cannot be attributed to Microsoft. Mr. Hecht is a research academic employed at Microsoft to bring "divergent," "asymmetric, futuristic, and academic points of view;" he does not set Microsoft's core priorities for Microsoft or speak for Microsoft as to "his theoretical views about AI's potential effect on content creators;" and Microsoft leadership "does not share all of [his] views"; and he is a "kind of intellectual provocateur." ECF 1707 (J. Usdan Decl.) ¶ 39; A. Blanco Opp. Decl. Ex. 285 (J. Usdan 30(b)(6) Tr.) at 173:22-174:9. He was not involved in negotiating any of Microsoft's data access or display agreements and was not part of the decision-making process. ECF 1707 (J. Usdan Decl.) ¶ 40. Hecht has himself disclaimed any authority to speak for Microsoft, testifying that his views on these subjects are "my view, not Microsoft's view," that "[he] has no idea if [they are shared] by the board of Microsoft," and that "[he] can't speak for the company on this |

| | |
|---|---|
| | stuff." A. Blanco Opp. Decl. Ex. 212 (B. Hecht 30(b)(1) Tr.) at 319:18–20, 320:10–12, 321:4–5, 71:5–6, 302:6–9. He further described his views as "hypotheses," cautioned that "the jury is still out on a lot of this stuff," and acknowledged that he is "not a lawyer." A. Blanco Opp. Decl. Ex. 212 (B. Hecht 30(b)(1) Tr.) 59:11–60:8, 165:9–15, 166:10–11. His personal views therefore are not statements of Microsoft, and do not reflect Microsoft's knowledge, policies, or conduct.<br><br>OpenAI joins Microsoft's response, except to the extent any portion of it, including any testimony quoted under Fed. R. Evid. 106, could be read to characterize OpenAI, its models, or its conduct. OpenAI disputes any such characterization. Hecht is a Microsoft researcher who testified unequivocally: "I don't speak for Microsoft. I definitely don't speak for OpenAI." A. Blanco Opp. Decl. Ex. 212 (B. Hecht 30(b)(1) Tr.) at 100:11–12. His statements are not based on personal knowledge of OpenAI, are not attributable to OpenAI, and are inadmissible hearsay as to OpenAI. *See* Fed. R. Civ. P. 56(c)(2), (c)(4); Fed. R. Evid. 602, 801(d)(2)(D), 802. This paragraph cannot be offered to establish any fact concerning OpenAI. |
| 1673. When he referred to "our content strategy," Dr. Hecht was referring to both Microsoft and OpenAI's content strategy because Microsoft "used [OpenAI's] model so extensively." Ex. 671 [Hecht Depo. Tr.] at 276:14-18. | 1673. **Disputed in Part – Incomplete; Immaterial.** Microsoft respond as follows: Microsoft does not dispute that Hecht gave the cited testimony. But, pursuant to Fed. R. Evid. 106, his full statement was: "I would also say that 'our content strategy' here … largely is referring to our following OpenAI's content strategy because we used |

| | |
|---|---|
| | their model so extensively." News Ex. 671 (B. Hecht 30(b)(1) Tr.) at 276:14–18. Hecht was describing Microsoft's use of models that OpenAI trained, not a joint content strategy. Microsoft did not acquire third-party data for LLM training on OpenAI's behalf, and none of the data Microsoft acquired through its data acquisition efforts was used to train the OpenAI models at issue. ECF 1707 (J. Usdan Decl.) ¶¶ 4, 6. Hecht also testified, "I don't speak for Microsoft. I definitely don't speak for OpenAI." A. Blanco Opp. Decl. Ex. 212 (B. Hecht 30(b)(1) Tr.) at 100:11–12.<br>Microsoft also responds that the facts stated in Paragraph 1673 are immaterial and cannot be attributed to Microsoft for the reasons stated in response to Paragraph 1672. Specifically, a researcher's explanation of a phrase in his own discussion paper has no bearing on the claims and defenses asserted in this case. A Microsoft employee's personal views on any hypothetical effects of LLMs on content creators have no bearing on any element of the claims or defenses in this case.<br><br>OpenAI joins Microsoft's response, except to the extent any portion of it, including any testimony quoted under Fed. R. Evid. 106, could be read to characterize OpenAI, its models, or its conduct. OpenAI disputes any such characterization. Hecht is a Microsoft researcher who testified unequivocally: "I don't speak for Microsoft. I definitely don't speak for OpenAI." A. Blanco Opp. Decl. Ex. 212 (B. Hecht 30(b)(1) Tr.) at 100:11–12. His statements are not based on personal knowledge of OpenAI, are not |

| | |
|---|---|
| | attributable to OpenAI, and are inadmissible hearsay as to OpenAI. *See* Fed. R. Civ. P. 56(c)(2), (c)(4); Fed. R. Evid. 602, 801(d)(2)(D), 802. This paragraph cannot be offered to establish any fact concerning OpenAI. |
| 1674. Dr. Hecht also stated that "we have seen some evidence of this [the doom loop] occurring largely from my knowledge in public and scientific proceedings." Ex. 671 [Hecht Depo. Tr.] at 276:9-13. | 1674. **Undisputed – Incomplete; Immaterial.** Microsoft responds as follows: Microsoft does not dispute that Hecht gave the cited testimony. But, pursuant to Fed. R. Evid. 106, his full statement was: "There is -- at that time, I guess very early we have seen some evidence of this occurring largely from my knowledge in public and scientific proceedings." A. Blanco Opp. Decl. Ex. 212 (B. Hecht 30(b)(1) Tr.) at 276:9–13. The examples his paper gives are Stack Overflow and Reddit; its only reference to news is to the "claimed" economic threat alleged in The Times's lawsuit. News Ex. 940 at MSFT_AI_MDL_001513959.<br>Microsoft also responds that the facts stated in Paragraph 1674 are immaterial and cannot be attributed to Microsoft for the reasons stated in response to Paragraph 1672. Specifically, a researcher's description of early public literature about other websites has no bearing on the claims or defenses in this case.<br><br>OpenAI joins Microsoft's response, except to the extent any portion of it, including any testimony quoted under Fed. R. Evid. 106, could be read to characterize OpenAI, its models, or its conduct. OpenAI disputes any such characterization. Hecht is a Microsoft researcher who testified unequivocally: "I don't speak for Microsoft. I |

| | |
|---|---|
| | definitely don't speak for OpenAI." A. Blanco Opp. Decl. Ex. 212 (B. Hecht 30(b)(1) Tr.) at 100:11–12. His statements are not based on personal knowledge of OpenAI, are not attributable to OpenAI, and are inadmissible hearsay as to OpenAI. *See* Fed. R. Civ. P. 56(c)(2), (c)(4); Fed. R. Evid. 602, 801(d)(2)(D), 802. This paragraph cannot be offered to establish any fact concerning OpenAI. |
| 1675. Dr. Hecht further stated that "this issue [doom loop] is also core to the recent New York Times lawsuit which discusses the threat to strong journalism presented by the claimed economic threat by Bing Chat and ChatGPT." Ex. 671 [Hecht Depo. Tr.] at 276:19-25. | 1675. **Undisputed – Immaterial.** Microsoft responds as follows: The facts stated in Paragraph 1675 are immaterial and cannot be attributed to Microsoft for the reasons stated in response to Paragraph 1672. A Microsoft employee's personal views on any hypothetical effects of LLMs on content creators have no bearing on any element of the claims or defenses in this case.<br><br>OpenAI joins Microsoft's response, except to the extent any portion of it, including any testimony quoted under Fed. R. Evid. 106, could be read to characterize OpenAI, its models, or its conduct. OpenAI disputes any such characterization. Hecht is a Microsoft researcher who testified unequivocally: "I don't speak for Microsoft. I definitely don't speak for OpenAI." A. Blanco Opp. Decl. Ex. 212 (B. Hecht 30(b)(1) Tr.) at 100:11–12. His statements are not based on personal knowledge of OpenAI, are not attributable to OpenAI, and are inadmissible hearsay as to OpenAI. *See* Fed. R. Civ. P. 56(c)(2), (c)(4); Fed. R. Evid. 602, 801(d)(2)(D), 802. This paragraph cannot be offered to establish any fact concerning OpenAI. |

| | |
|---|---|
| 1676. On a podcast between Sam Altman and Nicholas Thompson, the CEO of The Atlantic, Mr. Altman was asked about the survival of media companies and the decline of traditional search, and Mr. Altman described a "micropayment-based approach" which is what he "hope[s] will happen and what [he] wanted to happen for a long time." Ex. 1186 [Deck, Andrew, "Sam Altman backs "micropayment" model for AI agents to compensate publishers," *NiemanLab*, https://www.niemanlab.org/2026/05/sam-altman-backs-micropayment-model-for-ai-agents-to-compensate-publishers] at 1-2 ("What really makes sense in a world of agents is we try a sort of micropayment-based approach. So, if my agent wants to come read Nick Thompson's article, Nick Thompson or The Atlantic can set a price for the agent to read it — might be different than a human reading it. My agent can read it, pay $0.17, and give me a summary of that. If I want to go read the whole article, pay $1, or however that works."). | 1676. **Disputed - Not Supported by Cited Evidence; Not Supported by Admissible Evidence.** OpenAI responds as follows: The facts set forth in Paragraph 1676 are disputed because the cited evidence is not supported by admissible evidence, as required by Local Rule 56.1, and therefore are not properly before the Court. S.D.N.Y. Local Rule 56.1(d) ("Each statement by the movant ... must be followed by citation to evidence that would be admissible[.]"). Specifically, Ex. 1186 is hearsay and lacks foundation. It is a non-party blog post that attributes certain quotes to Mr. Thompson and Mr. Altman during a podcast. It is offered for the truth of its contents without any authenticating testimony, and it therefore may not be considered in support of summary judgment. Pursuant to Fed. R. Evid. 106, further disputed because Ex. 1186 does not provide a complete transcript of the podcast and may therefore be misleading. *See* News Ex. 1186 at 1–2.<br><br>Further, the facts set forth in Paragraph 1676 are not supported by admissible evidence, as required by Local Rule 56.1, and therefore are not properly before the Court. Specifically, Ex. 1186 is hearsay and lacks foundation. It is a non-party blog post that attributes certain quotes to Mr. Thompson and Mr. Altman during a podcast. It is offered for the truth of its contents without any authenticating testimony, and it therefore may not be considered in support of summary judgment. Pursuant to Fed. R. Evid. 106, further disputed because Ex. 1186 does not provide a complete transcript of the podcast and may therefore be misleading. *See* News Ex. 1186 at 1–2. |

| | |
|---|---|
| | Microsoft defers to OpenAI. |
| 1677. OpenAI's former VP of Policy Jack Clark wrote in a 2020 memo that he circulated to OpenAI's executives, including Sam Altman and Greg Brockman: "[O]ur work on AI and Creativity is going to increasingly lead to us creating systems that substitute for the labor of the people that define the 'culture' of society[.]" Ex. 1061 [OPCO_MDL_001686928] at -928; Ex. 1063 [OPCO_MDL_000199315] (Clark sharing the memo with OpenAI's executives). | 1677. **Disputed in Part – Incomplete; Immaterial.** OpenAI responds as follows: Undisputed that Ex. 1061 at OPCO_MDL_001686928 contains the quoted language. However, the facts stated in this Paragraph are immaterial to the question of substitution for purposes of fair use, as *Google Books* instructs courts to ask whether the defendant's copying "results in widespread revelation of sufficiently significant portions of the original as to make available a significantly competing substitute." *Google Books*, 804 F.3d at 223. Therefore Paragraph 1677 is disputed, because these facts do not affect the outcome of the suit under the governing law.<br><br>Microsoft defers to OpenAI. |
| 1678. Mr. Clark warned in the same 2020 memo that "OpenAI will become *the* symbol of how Silicon Valley is thoughtlessly stepping into other parts of life and leaving a mess on the carpet." Ex. 1061 [OPCO_MDL_001686928] at -928 (emphasis in original). | 1678. **Disputed in Part – Incomplete; Immaterial.** OpenAI responds as follows: Undisputed that Ex. 1061 at OPCO_MDL_001686928 contains the quoted language. However, pursuant to Fed. R. Evid. 106, OpenAI responds that Mr. Clark testified [redacted] A. Blanco Opp. Decl. Ex. 185 (J. Clark 30(b)(1) Tr.) at 53:12–18. OpenAI further responds that the facts stated in this Paragraph are immaterial to the question of substitution for purposes of fair use, as *Google Books* instructs courts to ask whether the defendant's copying "results in widespread revelation of sufficiently significant portions of the original as |

| | |
|---|---|
| | to make available a significantly competing substitute." *Google Books*, 804 F.3d at 223. Therefore Paragraph 1678 is disputed, because these facts do not affect the outcome of the suit under the governing law.<br><br>Microsoft defers to OpenAI. |
| 1679. Mr. Clark further warned that "[o]ur work in this area will make people unemployed." Ex. 1061 [OPCO_MDL_001686928] at -928. | 1679. **Disputed in Part – Incomplete; Immaterial.** OpenAI responds as follows: Undisputed that Ex. 1061 at OPCO_MDL_001686928 contains the quoted language. However, the facts stated in this Paragraph are immaterial to the question of substitution for purposes of fair use, as *Google Books* instructs courts to ask whether the defendant's copying "results in widespread revelation of sufficiently significant portions of the original as to make available a significantly competing substitute." *Google Books*, 804 F.3d at 223. Therefore Paragraph 1679 is disputed, because these facts do not affect the outcome of the suit under the governing law.<br><br>Microsoft defers to OpenAI. |
| 1680. Mr. Clark continued in the same memo: "There's an old adage from the height of newspapers, which is 'don't get into a war with someone who buys ink by the barrel'. Well, with AI and Creativity, we're going to war with the people that buy ink by the barrel, buy musical instruments by the ton, and buy paint by the swimming pool." Ex. 1061 [OPCO_MDL_001686928] at -929. | 1680. **Disputed in Part – Incomplete; Immaterial.** OpenAI responds as follows: Undisputed that Ex. 1061 at OPCO_MDL_001686928 contains the quoted language. However, the facts stated in this Paragraph are immaterial to the question of substitution for purposes of fair use, as *Google Books* instructs courts to ask whether the defendant's copying "results in widespread revelation of sufficiently significant portions of the original as to make |

| | |
|---|---|
| | available a significantly competing substitute." *Google Books*, 804 F.3d at 223. Therefore Paragraph 1680 is disputed, because these facts do not affect the outcome of the suit under the governing law.<br><br>Microsoft defers to OpenAI. |
| 1681. Mr. Clark concluded by cautioning OpenAI's other executives against releasing "something which ultimately substitutes for the practiced, deeply personal labor of the creative communities of the world. If we want to show the world we're capable of inventing the future, then we should use AI to invent entirely new things – not synthesize stuff that will seem substitutive for the personal labor of people." Ex. 1061 [OPCO_MDL_001686928] at -929. | 1681. **Disputed in Part – Incomplete; Immaterial.** OpenAI responds as follows: Undisputed that Ex. 1061 at OPCO_MDL_001686928 contains the quoted language. However, the facts stated in this Paragraph are immaterial to the question of substitution for purposes of fair use, as *Google Books* instructs courts to ask whether the defendant's copying "results in widespread revelation of sufficiently significant portions of the original as to make available a significantly competing substitute." *Google Books*, 804 F.3d at 223. Therefore Paragraph 1681 is disputed, because these facts do not affect the outcome of the suit under the governing law.<br><br>Microsoft defers to OpenAI. |
| 1682. Dr. Hecht admitted that within five weeks of ChatGPT coming out, there was an emerging market for people licensing content to be used in large language models. Ex. 671 [Hecht Depo. Tr.] at 126:18-25. | 1682. **Disputed –Not Supported by Cited Evidence; Immaterial.** Microsoft responds as follows: Microsoft disputes Paragraph 1682 because the cited evidence does not support the stated fact. In response to counsel's question of whether "within five weeks of ChatGPT coming out, you observed that it was already starting to happen that people are paying for content to be used in these foundational models," Hecht responded, "Yes. Although critical context is |

| | |
|---|---|
| | that this was specifically about DALL-E," an image-generation model. A. Blanco Opp. Decl. Ex. 212 (B. Hecht 30(b)(1) Tr.) at 126:18–127:2. Hecht also disputed that "there was an emerging market," stating: "Very early emerging – emerging. And to call it a market, I think is an overstatement. There are beginnings of folks exchanging value for content in monetary terms, yeah." *Id.* at 125:6–19.<br>Microsoft also responds that the facts stated in Paragraph 1682 are immaterial and cannot be attributed to Microsoft for the reasons stated in response to Paragraph 1672. Specifically, a researcher's observation about an image-licensing example in a January 2023 memo has no bearing on any element of the claims or defenses in this case.<br><br>OpenAI joins Microsoft's response, except to the extent any portion of it, including any testimony quoted under Fed. R. Evid. 106, could be read to characterize OpenAI, its models, or its conduct. OpenAI disputes any such characterization. Hecht is a Microsoft researcher who testified unequivocally: "I don't speak for Microsoft. I definitely don't speak for OpenAI." A. Blanco Opp. Decl. Ex. 212 (B. Hecht 30(b)(1) Tr.) at 100:11–12. His statements are not based on personal knowledge of OpenAI, are not attributable to OpenAI, and are inadmissible hearsay as to OpenAI. *See* Fed. R. Civ. P. 56(c)(2), (c)(4); Fed. R. Evid. 602, 801(d)(2)(D), 802. This paragraph cannot be offered to establish any fact concerning OpenAI. |

### D. Other Effects on News Plaintiffs

#### 1. Proliferation of pink slime

| | |
|---|---|
| 1683. Generative AI platforms facilitate the creation of unreliable news websites, sometimes called "pink slime" websites. Ex. 467 [Goldfarb Opening Report] ¶¶ 254-256 (summarizing studies and academic papers reporting the increase in pink slime from AI); Ex. 1187 [Giovanni Puccetti et al., "AI 'News' Content Farms Are Easy to Make and Hard to Detect: A Case Study in Italian," Proceedings of the 62nd Annual Meeting of the Association for Computational Linguistics (Volume 1: Long Papers), https://doi.org/10.18653/v1/2024.acl-long.817]. | 1683. **Disputed in Part – Not Supported by Admissible Evidence.** Defendants do not dispute that OpenAI's expert opined on so-called "pink slime." Defendants dispute that Generative AI tools (including Defendants') uniquely facilitate the creation of unreliable news websites. As Microsoft's corporate deponent, Sarah Bird, testified in regards to so-called "pink slime": "AI is just a new tool that threat actors can potentially leverage for this, but it's not the only tool that they can use. It doesn't create a sort of new capability in the world. It's just another tool. So this is a problem that we were looking at prior to AI and continue to look at as we think about AI as a new technology in this ecosystem." *See* News Ex. 1194 (S. Bird 30(b)(6) Tr.) at 48:8-21.<br>Defendants further respond that this Paragraph is disputed on the grounds that it is not supported by admissible evidence, as required by Local Rule 56.1, and therefore is not properly before the Court. Specifically, Ex. 1187 is hearsay and lacks foundation because it is a non-party publication offered for the truth of its contents, unaccompanied by any authenticating testimony or sponsoring expert to establish its reliability under Fed. R. of Ev. 803(18), and therefore may not be considered in support of summary judgment.<br>Defendants also respond that the facts in Paragraph 1683 are immaterial and therefore disputed because these facts do not affect the outcome of the suit under the governing |

| | |
|---|---|
| | law. Any alleged harm from so-called "market dilution" from "pink slime" is irrelevant because it is not a legally cognizable harm under copyright law. *See* ECF 1698 (Microsoft Opening Brief) at 12–13. |
| 1684. Pink slime content is unreliable low-quality news content that is often either plagiarized or remixed from legitimate news sources. Bell Opening Rep. ¶ 128; Cross Rebuttal Rep. at 32. | 1684. **Disputed - Not Supported by Cited Evidence; Improper Legal Argument; Expert Opinion Subject to Rule 702.** Defendants respond as follows: The facts set forth in Paragraph 1684 are disputed because they are unsupported by the record. Specifically, disputed because neither the Bell Opening Report nor the Cross Rebuttal Report sufficiently substantiate News Plaintiffs' definition of "pink slime." Bell relies on two articles that provide different definitions for "pink slime journalism" and Cross provides no support for her definition. *See* ECF 1794-1 (E. Bell Decl. Ex. A) (Opening Rep.) ¶ 128; ECF 1821-1 (S. Cross Decl. Ex. A) (Rebuttal Rep.) at 32. Further, the Court should disregard this Paragraph because the assertion constitutes improper attorney argument and/or is conclusory. It thus requires no response. Specifically, News Plaintiffs' definition closely approximates improper legal argument by implying plagiarism. Further, the fact stated in Paragraph 1684 is disputed because the evidence cited in support is currently subject to a motion to exclude expert testimony pursuant to Fed. R. Evid. 702. To the extent the Court excludes the challenged opinions, News Plaintiffs may not rely on them to support this statement. *See* Fed. R. Civ. P. 56(c)(2). |

| | |
|---|---|
| | Defendants also respond that the facts in Paragraph 1684 are immaterial and therefore disputed because these facts do not affect the outcome of the suit under the governing law. Any alleged harm from so-called "market dilution" from "pink slime" is irrelevant because that is not a legally cognizable harm under copyright law. *See* ECF 1698 (Microsoft Opening Brief) at 12–13. |
| 1685. An August 2023 OpenAI slack message discussed an inquiry from a reporter about how "dozens of content farm websites are appear [sic] to be using AI chatbots to remix/plagiarize legitimate news content." Ex. 1188 [OPCO_MDL_000481019]. | 1685. **Disputed in Part - Not Supported by Admissible Evidence; Immaterial.** OpenAI responds as follows: Undisputed that Ex. 1188 contains the quoted text from a reporter's email inquiry shared in Slack. However, OpenAI disputes News Plaintiffs' characterization of, and inferences drawn therefrom, as misleading because it omits context necessary to understand the quoted language. Specifically, the Slack thread demonstrates that the reporter was referencing an unverified report by NewsGuard regarding third-party websites, which OpenAI employees noted was "low quality research" and opted not to validate or engage with. News Ex. 1188.<br>Further, the disputed proposition is not supported by admissible evidence, as required by Local Rule 56.1, and therefore is not properly before the Court. Specifically, OpenAI objects to Plaintiffs' use of a third-party's inquiry to the extent offered as proof on the subject of the third-party's inquiry as hearsay not within an exception. Fed. R. Evid. 802.<br>OpenAI also disputes this fact because a statement by a single employee is insufficient to establish the underlying fact, at all times and for all purposes in this litigation, |

| | |
|---|---|
| | including as to any belief or understanding held by OpenAI. OpenAI further objects to this fact because it is irrelevant and immaterial to resolution of Plaintiffs' Motion. Fed. R. Evid. 401, 403. Specifically, an inquiry from a third-party journalist summarizing an unverified report regarding third-party content farm websites does not establish any wrongdoing or model behavior by OpenAI.<br>OpenAI also responds that the facts in Paragraph 1685 are immaterial and therefore disputed because these facts do not affect the outcome of the suit under the governing law. Any alleged harm from so-called "market dilution" from "pink slime" is irrelevant because that is not a legally cognizable harm under copyright law. *See* ECF 1698 (Microsoft Opening Brief) at 12–13.<br><br>Microsoft defers to OpenAI. |

| | |
|---|---|
| 1686. Defendants' Generative AI products have made pink slime news content "farms" (i.e. producers of large volumes of such content) cheaper, easier to make, and harder to detect. Bell Opening Rep. at ¶¶ 131, 133-134; Owen Rebuttal Report at ¶ 118; *see also* Ex. 942 [MSFT_AI_MDL_002771169]; Ex. 1189 [Knibbs, Kate. "Confessions of an AI Clickbait Kingpin." Wired, February 7, 2024. https://www.wired.com/story/confessions-of-an-ai-clickbaitkingpin/]; Ex. 1190 ["Sad Milestone: Fake Local News Sites Now Outnumber Real Local Newspaper Sites in U.S." NewsGuard, June 11, 2024. https://www.newsguardtech.com/press/sadmilestone-fake-local-news-sites-now-outnumber-real-local-newspaper-sites-in-u-s/] (discussing proliferation of pink slime sites generally); Ex. 1191 [Adami, Marina. "AI-Generated Slop Is Quietly Conquering the Internet. Is It a Threat to Journalism or a Problem That Will Fix Itself? \| Reuters Institute for the Study of Journalism." November 26, 2024. https://reutersinstitute.politics.ox.ac.uk/news/ai-generated-slop-quietly-conquering-internet-it-threat-journalism-or-problem-will-fix-itself] (discussing proliferation of "AI-Generated Slop"). | 1686. **Disputed in Part – Not Supported by Admissible Evidence; Not Supported by Cited Evidence; Immaterial.** Defendants respond as follows: Defendants do not dispute that Plaintiffs' experts opined on so called "pink slime" news content "farms." Defendants dispute that Generative AI tools (including Defendants') uniquely facilitate the creation of unreliable news websites, let alone in a cheaper, easier, and less detectable manner. As Microsoft's corporate deponent Sarah Bird testified in regards to so called "pink slime": "AI is just a new tool that threat actors can potentially leverage for this, but it's not the only tool that they can use. It doesn't create a sort of new capability in the world. It's just another tool. So this is a problem that we were looking at prior to AI and continue to look at as we think about AI as a new technology in this ecosystem." *See* News Ex. 1194 at 48:8-21.<br>Defendants further respond that the facts set forth in Paragraph 1686 are disputed because they are not supported by the cited evidence. None of the sources specifically attribute any "pink slime news content 'farms'" to Defendants. *See* E. Bell Opening Rep. at ¶¶ 131, 133-134; T. Owen Rebuttal Report at ¶ 118; News Ex. 942 at MSFT_AI_MDL_002771169; News Ex. 1189; News Ex. 1190; News Ex. 1191.<br>Defendants further respond that this Paragraph is disputed on the grounds that it is not supported by admissible evidence, as required by Local Rule 56.1, and therefore is not properly before the Court. Specifically, Exhibits 1189-91 are hearsay and lack foundation because they are non-party |

| | |
|---|---|
| | publications offered for the truth of their contents, unaccompanied by any authenticating testimony or sponsoring expert to establish their reliability and News Plaintiffs identify no exception to the hearsay rule that would apply. These therefore may not be considered in support of summary judgment.<br>In addition, the fact stated in Paragraph 1686 is disputed because the evidence cited in support is currently subject to a motion to exclude expert testimony pursuant to Fed. R. Evid. 702. To the extent the Court excludes the challenged opinions, Plaintiffs may not rely on them to support this statement. *See* Fed. R. Civ. P. 56(c)(2). Bell's Opening Report is challenged as unreliable under Rule 702 for lacking a reliable verification methodology.<br>Defendants also respond that the facts in Paragraph 1686 are immaterial and therefore disputed because these facts do not affect the outcome of the suit under the governing law. Any alleged harm from so-called "market dilution" from "pink slime" is irrelevant because that is not a legally cognizable harm under copyright law. *See* ECF 1698 (Microsoft Opening Brief) at 12–13. |
| 1687. Advancements in generative AI technology have "made widescale, systematic unauthorized copying and exploitation of unlicensed content easier, including by anonymous foreign actors" and "AI companies that compete with [The Times] for audience and revenue." Ex. 1 [The New York Times SEC Form 10-K Dec. 31, 2025] at 18. | 1687. **Disputed in Part – Not Supported by Admissible Evidence; Immaterial.** Defendants respond as follows: Defendants do not dispute that the exhibit contains the quoted language. But Defendants respond that they dispute generative AI technology has made "systematic unauthorized copying" "of unlicensed content easier" in Paragraph 1687 and that the Court should disregard this |

| | |
|---|---|
| | Paragraph because the assertion constitutes improper attorney argument and/or is conclusory. It thus requires no response.<br>Defendants further respond that this Paragraph is disputed on the grounds that it is not supported by admissible evidence, as required by Local Rule 56.1, and therefore is not properly before the Court. Specifically, The Times's 10-K is hearsay and cannot be considered for the truth of the matter asserted. *See SEC*, 416 F. Supp. 3d at 328-29; *James*, No. 1:25-CV-00168 (BKS/DJS), 2026 WL 2568355, at *9-10, n.16.<br>Defendants also respond that the facts in Paragraph 1687 are immaterial and therefore disputed because these facts do not affect the outcome of the suit under the governing law. Any alleged harm from so-called "market dilution" from "pink slime" is irrelevant because that is not a legally cognizable harm under copyright law. *See* ECF 1698 (Microsoft Opening Brief) at 12–13. |
| 1688. In a 2020 paper titled "All the News That's Fit to Fabricate," now-former OpenAI employee Miles Brundage tested whether GPT-2 could generate news text that readers found credible, and concluded that outputs from larger GPT-2 models were indistinguishable from the original Times article used as a baseline in terms of perceived credibility. In one case, the GPT-generated version of the article was found more credible than the original. Ex. 1192 [Brundage Deposition Ex. 5]. | 1688. **Disputed - Not Supported by Cited Evidence; Immaterial.** OpenAI responds as follows: The facts set forth in Paragraph 1688 are disputed because they are not supported by the cited evidence. Plaintiffs strip away the relevant context in violation of Fed. R. Evid. 106. Pursuant to Fed. R. Evid. 106, at his deposition, Dr. Brundage testified that, [redacted] |

| | |
|---|---|
| | [redacted] (M. Brundage 30(b)(1) Tr.) at 108:14–109:4-10. Dr. Brundage also testified: [redacted] *Id.* at 115:25-116:7.<br>OpenAI also responds that the facts in Paragraph 1688 are immaterial and therefore disputed because these facts do not affect the outcome of the suit under the governing law. Any alleged harm from so-called "market dilution" from "pink slime" is irrelevant because that is not a legally cognizable harm under copyright law. *See* ECF 1698 (Microsoft Opening Brief) at 12–13.<br><br>Microsoft defers to OpenAI. |
| 1689. Brundage admitted at his deposition that this paper explored "the effect of the GPT model on the media landscape." Ex. 519 [Brundage Depo. Tr.] 102:24-103:4. | 1689. **Disputed in Part - Immaterial.** OpenAI responds as follows: Undisputed that Dr. Brundage provided the cited deposition testimony in Ex. 519. Disputed to the extent Plaintiffs' characterization is misleading and omits necessary context. Pursuant to Fed. R. Evid. 106, Dr. Brundage [redacted] A. Blanco Opp. Decl. Ex. 177 (M. Brundage 30(b)(1) Tr.) at 90:16-94:16.<br>OpenAI also responds that the facts in Paragraph 1689 are immaterial and therefore disputed because these facts do not affect the outcome of the suit under the governing law. Any alleged harm from so-called "market dilution" from |

| | |
|---|---|
| | "pink slime" is irrelevant because that is not a legally cognizable harm under copyright law. *See* ECF 1698 (Microsoft Opening Brief) at 12–13.<br><br>Microsoft defers to OpenAI. |
| 1690. Brundage also confirmed how, when a GPT model is presented with the first sentence or two of a news article, the model could "generate something in a style that is similar to what it perceives to be the intended style or the kind of ongoing style of text, which might be news-style coverage, and it would attempt to, you know, imagine what the content might have been as well." Ex. 519 [Brundage Depo. Tr.] 108:25-109:10. | 1690. **Disputed in Part - Immaterial.** OpenAI responds as follows: Undisputed that the cited source includes the quoted language. However, disputed as to the remainder of Paragraph 1690 as Plaintiffs strip away the relevant context. Pursuant to Fed. R. Evid. 106, at his deposition, [redacted] News Ex. 519 (M. Brundage 30(b)(1) Tr.) at 108:25-109:10. Further, disputed that the quoted statement applies to any "GPT model." Dr. Brundage [redacted] *Id.* at 108:18-23.<br><br>OpenAI also responds that the facts in Paragraph 1690 are immaterial and therefore disputed because these facts do not affect the outcome of the suit under the governing law. Any alleged harm from so-called "market dilution" from "pink slime" is irrelevant because that is not a legally |

| | |
|---|---|
| | cognizable harm under copyright law. *See* ECF 1698 (Microsoft Opening Brief) at 12–13.<br><br>Microsoft defers to OpenAI. |
| 1691. OpenAI acknowledges that ChatGPT and Copilot can be used to create pink slime news articles. Ex. 713 [Turley 30(b)(6) Depo. Tr.] at 22:6-23:2; *see also* Ex. 817 [OPCO_MDL_000157541] at –49 (GPT-4 System Card providing that "GPT-4 can generate plausibly realistic and targeted content, including news articles, dialogue, and emails."). | 1691. **Disputed - Immaterial.** Defendants respond as follows: The fact set forth in Paragraph 1691 is disputed. Specifically, Turley stated that pink slime is "news articles created by AI that may be of poor quality" and that pink slime could be created by any generative AI. News Ex. 713 (N. Turley 30(b)(6) Tr.) at 22:11-13, 22:18-19. Pursuant to Fed. R. Evid. 106, Turley also said that OpenAI "would not be aware of every single thing being done with the product," qualifying any acknowledgment of actual third-party pink-slime use. *Id.* at 65:14-17.<br>Defendants also respond that the facts in Paragraph 1691 are immaterial and therefore disputed because these facts do not affect the outcome of the suit under the governing law. Any alleged harm from so-called "market dilution" from "pink slime" is irrelevant because that is not a legally cognizable harm under copyright law. *See* ECF 1698 (Microsoft Opening Brief) at 12–13. |
| 1692. OpenAI was aware of specific instances where third parties used OpenAI's GenAI products to produce pink slime news content [or fake news] that was falsely attributed to real news sources. Ex. 713 [Turley 30(b)(6) Depo. Tr.] at 69:23-70:16. | 1692. **Disputed - Immaterial.** OpenAI responds as follows. Disputed because Plaintiffs overstate the referenced testimony. In the cited portion of Turley's testimony, he testifies that the cited pages identifies only that individuals at OpenAI had seen third-party media reports making claims that pink-slime sites used OpenAI tools, not that OpenAI independently verified or was specifically made aware of |

| | |
|---|---|
| | "specific instances" through its own investigation. News Ex. 713 (N. Turley 30(b)(6) Tr.) at 69:23-70:16. None of the reports were of confirmed instances. Pursuant to Fed. R. Evid. 106, Turley said that OpenAI "would not be aware of every single thing being done with the product at all times." *Id.* at 65:2-67:7.<br>OpenAI also responds that the facts in Paragraph 1692 are immaterial and therefore disputed because these facts do not affect the outcome of the suit under the governing law. Any alleged harm from so-called "market dilution" from "pink slime" is irrelevant because that is not a legally cognizable harm under copyright law. *See* ECF 1698 (Microsoft Opening Brief) at 12–13.<br><br>Microsoft defers to OpenAI. |
| 1693. OpenAI's and Microsoft's internal documents and emails confirm that both ChatGPT and Copilot could also be used to generate fake news stories (i.e., pink slime). Ex. 944 [MSFT_AI_MDL_000256150]; Ex. 946 [MSFT_AI_MDL_000176010]; Ex. 817 [OPCO_MDL_000157541] at –49; Ex. 740 [OPCO_MDL_004809431] at -9437; Ex. 942 [MSFT_AI_MDL_002771169]; Ex. 948 [MSFT_AI_MDL_002179221]; Ex. 950 [MSFT_AI_MDL_002776680]; Ex. 1071 [OPCO_MDL_001886041]; Ex. 1069[OPCO_MDL_001898994] at -9000; Ex. 1193 | 1693. **Disputed - Immaterial.** Defendants respond that this fact is disputed because Defendants' Generative AI tools do not uniquely facilitate the creation of unreliable news websites. As Microsoft's corporate deponent Sarah Bird testified in regards to so called pink slime: "AI is just a new tool that threat actors can potentially leverage for this, but it's not the only tool that they can use. It doesn't create a sort of new capability in the world. It's just another tool. So this is a problem that we were looking at prior to AI and continue to look at as we think about AI as a new technology in this ecosystem." *See* News Ex. 1194 at 48:8-21.<br>Defendants also respond that the facts in Paragraph 1693 are immaterial and therefore disputed because these |

| | |
|---|---|
| [OPCO_MDL_001816273] at -274; Ex. 952 [MSFT_AI_MDL_000007246]. | facts do not affect the outcome of the suit under the governing law. Any alleged harm from so-called "market dilution" from "pink slime" is irrelevant because that is not a legally cognizable harm under copyright law. *See* ECF 1698 (Microsoft Opening Brief) at 12–13. |
| 1694. OpenAI's former VP of Policy Jack Clark testified that even back in the days of GPT-2, he saw the model generate a news story about Theresa May and understood at the time that it could be used to create "fake news." Ex. 715 [Clark Depo. Tr.] at 54:2-25. | 1694. **Disputed in Part– Not Supported by Cited Evidence; Immaterial.** OpenAI responds as follows: Undisputed that Jack Clark stated [redacted] News Ex. 715 (J. Clark Tr.) at 54:2–25. However, disputed as to the characterization of Mr. Clark's testimony because it is not supported by the cited evidence. Specifically, Mr. Clark's stated concern was [redacted]<br><br>OpenAI also responds that the facts in Paragraph 1694 are immaterial and therefore disputed because these facts do not affect the outcome of the suit under the governing law. Any alleged harm from so-called "market dilution" from "pink slime" is irrelevant because that is not a legally cognizable harm under copyright law. *See* ECF 1698 (Microsoft Opening Brief) at 12–13.<br><br>Microsoft defers to OpenAI. |
| 1695. OpenAI knew its Generative AI models were capable of generating realistic fake news articles | 1695. **Disputed in Part - Immaterial.** OpenAI responds as follows: Undisputed that News Ex. 680 discusses the model's capacity to generate text difficult to distinguish |

| | |
|---|---|
| before it released ChatGPT in 2022. Ex. 680 [OPCO_MDL_000000439]. | from human writing. OpenAI disputes Plaintiffs' unsubstantiated inferences drawn therefrom.<br>OpenAI also responds that the facts in Paragraph 1695 are immaterial and therefore disputed because these facts do not affect the outcome of the suit under the governing law. Any alleged harm from so-called "market dilution" from "pink slime" is irrelevant because that is not a legally cognizable harm under copyright law. *See* ECF 1698 (Microsoft Opening Brief) at 12–13.<br><br>Microsoft defers to OpenAI. |
| 1696. Microsoft also knew by at least November 2023 about the growing prevalence of and the dangers of pink slime news being generated by Generative AI. Ex. 717 [Bird Depo. Ex. 2]. | 1696. **Disputed – Immaterial.** Microsoft responds that this fact is disputed because Defendants' Generative AI tools do not uniquely facilitate the creation of unreliable news websites. As Microsoft's corporate deponent Sarah Bird testified in regards to so-called pink slime: "AI is just a new tool that threat actors can potentially leverage for this, but it's not the only tool that they can use. It doesn't create a sort of new capability in the world. It's just another tool. So this is a problem that we were looking at prior to AI and continue to look at as we think about AI as a new technology in this ecosystem." *See* News Ex. 1194 (S. Bird 30(b)(6) Tr.) at 48:8-21.<br>Microsoft also responds that the facts in Paragraph 1696 are immaterial and therefore disputed because these facts do not affect the outcome of the suit under the governing law. Any alleged harm from so-called "market dilution" from "pink slime" is irrelevant because it is not a legally cognizable |

| | |
|---|---|
| | harm under copyright law. *See* ECF 1698 (Microsoft Opening Brief) at 12–13.<br><br>OpenAI defers to Microsoft's response. |
| 1697. Microsoft was aware by at least November 2023 that ChatGPT surfaced misinformation 80-100% of the time and that [redacted] Ex. 717 [Bird Depo. Ex. 2]. | 1697. **Disputed in Part - Immaterial.** Microsoft does not dispute that the exhibit contains the quoted language from a Microsoft employee reporting back from a "Newsguard Trust & Safety brunch" she attended in 2023. But Microsoft responds that the statement in Paragraph 1697 that "ChatGPT surfaced misinformation 80-100% of the time and that [redacted]" is disputed on the grounds that it is not supported by admissible evidence, as required by Local Rule 56.1, and therefore are not properly before the Court. Specifically, the evidence cited is hearsay and lacks foundation because News Ex. 717 is an email discussing what was presented at a "Newsguard Trust and Safety Brunch," *see* News Ex. 717 at –169) being offered for the truth of its contents, unaccompanied by any authenticating testimony or sponsoring expert to establish its reliability and Plaintiffs identify no exception to the hearsay rule that would apply. It therefore may not be considered in support of summary judgment.<br>Microsoft also responds that the facts in Paragraph 1697 are immaterial and therefore disputed because these facts do not affect the outcome of the suit under the governing law. Any alleged harm from so-called "market dilution" from "pink slime" is irrelevant because it is not a legally cognizable |

| | |
|---|---|
| | harm under copyright law. *See* ECF 1698 (Microsoft Opening Brief) at 12–13.<br><br>OpenAI defers to Microsoft's response. |
| 1698. In fact, Microsoft was aware before November 2023 that generative AI tools including Bing Chat and Defendants' accused products could be used to contribute to content that might appear on pink slime websites. Ex. 1194 [Bird 30(b)(6) Depo. Tr.] at 48:3-49:11 (admitting that Microsoft knew before November 2023 that AI tools could be used to generate pink slime websites and confirming that Microsoft had been "looking at this topic for a long time," including before November 2023), 42:7-44:3 (testifying that "[a]ny AI tool has the potential to generate content that can be used to mislead people," including Bing Chat and ChatGPT). | 1698. **Disputed in Part - Immaterial.** Microsoft responds as follows: Microsoft does not dispute that the exhibit contains the quoted language. Microsoft disputes that Defendants' Generative AI tools uniquely facilitate the creation of unreliable news websites. As Microsoft's corporate deponent Sarah Bird testified in regards to so-called pink slime: "AI is just a new tool that threat actors can potentially leverage for this, but it's not the only tool that they can use. It doesn't create a sort of new capability in the world. It's just another tool. So this is a problem that we were looking at prior to AI and continue to look at as we think about AI as a new technology in this ecosystem." *See* News Ex. 1194 (S. Bird 30(b)(6) Tr.) at 48:8-21.<br>Microsoft also responds that the facts in Paragraph 1698 are immaterial and therefore disputed because these facts do not affect the outcome of the suit under the governing law. Any alleged harm from so-called "market dilution" from "pink slime" is irrelevant because it is not a legally cognizable harm under copyright law. *See* ECF 1698 (Microsoft Opening Brief) at 12–13.<br><br>OpenAI defers to Microsoft's response. |
| 1699. Microsoft also knew that its products rely on websites that plagiarize Times content, such as Dnuyz. | 1699. **Disputed - Immaterial.** Microsoft responds as follows: this fact is disputed because Microsoft's products |

| | |
|---|---|
| Ex. 954 [MSFT_AI_MDL_000908708] at -8717 (citing at bottom of page an example of a "copy cat" of a Times article published by DNyuz.com that a GPT crawler returned in response to a query). | do not "rely on websites that plagiarize Times content." By contrast, Copilot's web grounding relies on next token prediction and retrieved content supported by material synthesized from publicly accessible web sources. *See* ECF 1713 (E. Abib Decl.) at ¶¶ 8-10; *see also* ECF 1723 (J. Lafferty Decl.) at ¶¶ 181-182. Copilot's grounding choices reflect relevance to the user's request (and publisher permissions), not any judgment of a webpage's relative value. ECF 1713 (E. Abib Decl.) at ¶ 20.<br>Microsoft also responds that the facts in Paragraph 1699 are immaterial and therefore disputed because these facts do not affect the outcome of the suit under the governing law. Any alleged harm from so-called "market dilution" from "pink slime" is irrelevant because it is not a legally cognizable harm under copyright law. *See* ECF 1698 (Microsoft Opening Brief) at 12–13.<br><br>OpenAI defers to Microsoft's response. |
| 1700. Futurism reported in August 2024 that the website DNyuz.com published plagiarized articles that it stole word-for-word from legitimate news organizations like The Times, which were then cited by ChatGPT (instead of the original source, like The Times). Ex. 1195 [Dupré, Maggie Harrison, "Amid New York Times Lawsuit, ChatGPT Is Citing Plagiarized Versions of NYT Articles on an Armenian Content Mill." Futurism (Aug. 1, 2024), https://futurism.com/chatgpt-plagiarized-nyt-articles]. | 1700. **Disputed in Part – Not Supported by Admissible Evidence; Immaterial.** Defendants respond as follows: Defendants do not dispute that the exhibit describes this Futurism report.<br>Defendants further respond that this Paragraph is disputed on the grounds that it is not supported by admissible evidence, as required by Local Rule 56.1, and therefore is not properly before the Court. Specifically, News Ex. 1195 is hearsay and lacks foundation because it is a non-party publication offered for the truth of its contents, |

| | |
|---|---|
| | unaccompanied by any authenticating testimony or sponsoring expert to establish its reliability and Plaintiffs identify no exception to the hearsay rule that would apply. It therefore may not be considered in support of summary judgment.<br>Defendants also respond that the facts in Paragraph 1700 are immaterial and therefore disputed because these facts do not "affect the outcome of the suit under the governing law." Any alleged harm from so-called "market dilution" from "pink slime" is irrelevant because that is not a legally cognizable harm under copyright law. *See* ECF 1698 (Microsoft Opening Brief) at 12–13. |
| 1701. As of June 23, 2026, NewsGuard had identified 3,749 unreliable AI-generated news and information websites. Ex. 1245 ["Tracking AI-enabled Misinformation: 3,749 AI Content Farm sites (and Counting), Plus the Top False Claims Generated by Artificial Intelligence Tools", NewsGuard, June 23, 2026, https://www.newsguardtech.com/special-reports/ai-tracking-center/]. | 1701. **Disputed in Part – Not Supported by Admissible Evidence; Immaterial.** Defendants do not dispute that the exhibit describes this NewsGuard report. But Defendants respond that this Paragraph is disputed on the grounds that it is not supported by admissible evidence, as required by Local Rule 56.1, and therefore is not properly before the Court. Specifically, News Ex. 1245 is hearsay and lacks foundation because it is a non-party publication offered for the truth of its contents, unaccompanied by any authenticating testimony or sponsoring expert to establish its reliability and Plaintiffs identify no exception to the hearsay rule that would apply. It therefore may not be considered in support of summary judgment.<br>Defendants also respond that the facts in Paragraph 1701 are immaterial and therefore disputed because these facts do not affect the outcome of the suit under the governing |

| | |
|---|---|
| | law. Any alleged harm from so-called "market dilution" from "pink slime" is irrelevant because that is not a legally cognizable harm under copyright law. *See* ECF 1698 (Microsoft Opening Brief) at 12–13. |
| 1702. A Wall Street Journal article authored by a NewsGuard editor illustrated that with very little time and expense, a fully automated, AI-Generated news site could be created using OpenAI's ChatGPT. Ex. 1197 ["How I Built an AI-Powered, Self-Running Propaganda Machine for $105," The Wall Street Journal, https://www.wsj.com/politics/how-i-built-an-ai-powered-self-running-propaganda-machine-for-105-e9888705]. | 1702. **Disputed in Part – Not Supported by Admissible Evidence; Immaterial.** Defendants respond as follows: Defendants do not dispute that the exhibit describes this Wall Street Journal article. Defendants disputes that Defendants' Generative AI tools uniquely facilitate the creation of unreliable news websites. As Microsoft's corporate deponent Sarah Bird testified in regards to so called "pink slime:" "AI is just a new tool that threat actors can potentially leverage for this, but it's not the only tool that they can use. It doesn't create a sort of new capability in the world. It's just another tool. So this is a problem that we were looking at prior to AI and continue to look at as we think about AI as a new technology in this ecosystem." *See* News Ex. 1194 at 48:8-21.<br>Further disputed to the extent Plaintiffs' characterization is misleading and omits necessary context. The article describes an intentional experiment involving third-party freelancer services (Fiverr) and custom API scripts configured to alter prompts. *See* News Ex. 1197.<br>Defendants further respond that this Paragraph is disputed on the grounds that it is not supported by admissible evidence, as required by Local Rule 56.1, and therefore is not properly before the Court. Specifically, News Ex. 1197 is hearsay and lacks foundation because it is a non-party |

| | |
|---|---|
| | publication offered for the truth of its contents, unaccompanied by any authenticating testimony or sponsoring expert to establish its reliability and Plaintiffs identify no exception to the hearsay rule that would apply. It therefore may not be considered in support of summary judgment.<br>Defendants also respond that the facts in Paragraph 1702 are immaterial and therefore disputed because these facts do not affect the outcome of the suit under the governing law. Any alleged harm from so-called "market dilution" from "pink slime" is irrelevant because that is not a legally cognizable harm under copyright law. *See* ECF 1698 (Microsoft Opening Brief) at 12–13. |
| 1703. According to a Press Gazette article, fake AI news websites are "robbing real journalists and real publishers of advertising revenue." Ex. 1198 [DNP-00535512] at 514; *see also* Ex. 90 [Loretto 30(b)(6) Depo. Tr.] at 30:3-33:2; Ex. 1199 [DNP-00363917] (recipient of cease and desist letter from Chicago Tribune responded that the infringing conduct was the result of its "developer write [sic] the script that ask ChatGPT and Perplexity AI for article writing."). | 1703. **Disputed in Part – Not Supported by Admissible Evidence; Immaterial.** Defendants respond as follows: Defendants do not dispute that News Exhibits 1198 and 1199 contain the quoted language. But Defendants dispute that Defendants' Generative AI tools uniquely facilitate the creation of unreliable news websites that impact publishers' advertising revenues. As Microsoft's corporate deponent Sarah Bird testified in regards to so called "pink slime:" "AI is just a new tool that threat actors can potentially leverage for this, but it's not the only tool that they can use. It doesn't create a sort of new capability in the world. It's just another tool. So this is a problem that we were looking at prior to AI and continue to look at as we think about AI as a new technology in this ecosystem." *See* News Ex. 1194 at 48:8–21. |

| | |
|---|---|
| | Further disputed because News Ex. 1198 does not make any reference to OpenAI, the products at issue, and the articles focuses on the French (not U.S.) market. *See* News Ex. 1198.<br>Defendants further respond that this Paragraph is disputed on the grounds that it is not supported by admissible evidence, as required by Local Rule 56.1, and therefore is not properly before the Court. Specifically, News Ex. 1198 is hearsay and lacks foundation because it is a non-party publication offered for the truth of its contents, unaccompanied by any authenticating testimony or sponsoring expert to establish its reliability and Plaintiffs identify no exception to the hearsay rule that would apply. It therefore may not be considered in support of summary judgment.<br>Defendants also respond that the facts in Paragraph 1703 are immaterial and therefore disputed because these facts do not affect the outcome of the suit under the governing law. Any alleged harm from so-called "market dilution" from "pink slime" is irrelevant because that is not a legally cognizable harm under copyright law. *See* ECF 1698 (Microsoft Opening Brief) at 12–13. |
| 1704. A 2025 study by Institution for Social and Policy Studies researchers noted it was "50-50" as to whether readers preferred "pink-slime" websites to authentic journalism sites. Ex. 1200 [Rick Harrison, Study: People Often Trust Fake Local News Sites More Than Real Ones; Yale Political Scientist Warns of | 1704. **Disputed in Part – Not Supported by Admissible Evidence; Immaterial.** Defendants respond as follows: Defendants do not dispute that the exhibit contains the quoted language. But Defendants respond that this Paragraph is disputed on the grounds that it is not supported by admissible evidence, as required by Local Rule |

| | |
|---|---|
| Growing Influence of AI-Driven 'Pink-Slime' News, Yale University: Institution for Social and Policy Studies (Sept. 16, 2025), https://isps.yale.edu/news/blog/2025/09/study-people-often-trust-fake-local-news-sites-more-than-real-ones-yale-political]. 16, 2025), https://isps.yale.edu/news/blog/2025/09/study-people-often-trust-fake-local-news-sites-more-than-real-ones-yale-political]. | 56.1, and therefore is not properly before the Court. Specifically, News Ex. 1200 is hearsay and lacks foundation because it is a non-party publication offered for the truth of its contents, unaccompanied by any authenticating testimony or sponsoring expert to establish its reliability and Plaintiffs identify no exception to the hearsay rule that would apply. It therefore may not be considered in support of summary judgment.<br>Defendants also respond that the facts in Paragraph 1704 are immaterial and therefore disputed because these facts do not affect the outcome of the suit under the governing law. Any alleged harm from so-called "market dilution" from "pink slime" is irrelevant because that is not a legally cognizable harm under copyright law. *See* ECF 1698 (Microsoft Opening Brief) at 12–13. |
| 1705. Research performed by Miles Brundage, a research scientist at OpenAI, in 2020 found that readers perceived AI-generated text curated by a human editor to be as credible as an original human-written news article about the same event. Ex. 1201 [Kreps, Sarah, R. Miles McCain, and Miles Brundage. "All the News That's Fit to Fabricate: AI-Generated Text as a Tool of Media Misinformation." *Journal of Experimental Political Science* 9, no. 1 (2020): 104–17. https://doi.org/10.1017/XPS.2020.37]; *see* Bell Opening Rep. at ¶ 139. | 1705. **Disputed - Not Supported by Cited Evidence; Immaterial.** OpenAI responds as follows: The facts set forth in Paragraph 1705 are disputed because they are not supported by the cited evidence. Specifically, Ex. 1201 does not contain the pages cited (104–17). *See* Ex. 1201. The fact is largely pulled from Bell Opening Report ¶ 139, which states "OpenAI's own research in 2020 found that 'readers perceived AI-generated text curated by a human editor to be as credible as an original human-written news article about the same event.'" ECF 1794-1 (E. Bell Decl.) Ex. A (E. Bell Opening Rep.) ¶ 139. However, that quote cites to the article in Ex. 1201, so there is no actual evidence in the cited support itself that supports the stated fact. |

| | |
|---|---|
| | OpenAI also responds that the facts in Paragraph 1705 are immaterial and therefore disputed because these facts do not affect the outcome of the suit under the governing law. Any alleged harm from so-called "market dilution" from "pink slime" is irrelevant because that is not a legally cognizable harm under copyright law. *See* ECF 1698 (Microsoft Opening Brief) at 12–13.<br><br>Microsoft defers to OpenAI. |
| 1706. The way in which Defendants' accused products summarize and often misrepresent news carries threats to brand integrity and visibility. Ex. 1202 [OPCO_MDL_004589848] at -849; Ex. 309 [Procas 30(b)(6) Dep.] at 155:3-10. | 1706. **Disputed– Not Supported by Cited Evidence; Immaterial.** Defendants respond as follows: The facts set forth in Paragraph 1706 are disputed because they are not supported by the cited evidence. Specifically, disputed that this occurs frequently or that it causes harm to news brands. Plaintiffs cite (1) [redacted] and (2) [redacted] *See* News Ex. 1202 at OPCO_MDL_004589849; News Ex. 309 (S. Procas 30(b)(6) Tr.) at 155:3–10. Neither of these demonstrates any actual, non-speculative harm to brand integrity or visibility. The fact is pulled nearly verbatim from Bell Opening Report ¶ 164. ECF 1794-1 (E. Bell. Decl.) Ex. A (E. Bell Opening Rep.) ¶ 164.<br>Defendants also respond that the facts in Paragraph 1706 are immaterial and therefore disputed because these |

| | |
|---|---|
| | facts do not affect the outcome of the suit under the governing law. Any alleged harm from so-called "market dilution" from "pink slime" is irrelevant because that is not a legally cognizable harm under copyright law. *See* ECF 1698 (Microsoft Opening Brief) at 12–13. |
| 1707. Defendants' generative AI tools rely on the credibility of news brands in their chatbots' source links without necessarily returning audiences to those original sources. Ex. 1027 [OPCO_MDL_001699819] at 821 ("citations exist to offer credence to the answer, not to make you want to explore further"). | 1707. **Disputed – Not Supported by Cited Evidence; Immaterial.** Defendants respond as follows: The facts set forth in Paragraph 1707 are disputed because they are not supported by the cited evidence. Specifically, disputed that ChatGPT does not drive audiences to the original sources. The cited exhibit is a Slack conversation among OpenAI employees in which they discuss "how we might drive traffic back to 3P sites." *See* News Ex. 1027 at OPCO_MDL_001699819. It does not include any information about actual user behavior. ChatGPT search launched with links to sources, and OpenAI developed its publisher partnership program in part with the aim of driving traffic to partner sites. *See* News Ex. 143 at OPCO_MDL_004597107 (discussing the preferred partnership program's goal to drive traffic to partner sites). Exhibit 1027 also does not make reference to Copilot, so the cited evidence does not establish the proposition set forth in Paragraph 1707 specific to Microsoft.<br>Defendants also respond that the facts in Paragraph 1707 are immaterial and therefore disputed because these facts do not affect the outcome of the suit under the governing law. Any alleged harm from so-called "market dilution" from "pink slime" is irrelevant because that is not a legally |

| | |
|---|---|
| | cognizable harm under copyright law. *See* ECF 1698 (Microsoft Opening Brief) at 12–13. |
| 1708. As users increasingly get news from GenAI chatbots rather than traditional news publishers, trust in news generally may continue to decline. As the 2026 Reuters Institute Report explains: "Reductions in trust are also related to changes in the news consumption mix. Social media and video networks have long been trusted less than traditional news media, so trust overall is prone to go down as more people's consumption trends towards using social media and video networks (and AI chatbots) for news at the expense of legacy sources." Ex. 1104 [Jim Egan et al., *Digital News Report 2026*, 11, Reuters Institute for the Study of Journalism (2026), available at https://reutersinstitute.politics.ox.ac.uk/sites/default/files/2026-06/DNR%202026%20FINAL_2.pdf] at 7. | 1708. **Disputed - Not Supported by Cited Evidence; Not Supported by Admissible Evidence; Immaterial.** Defendants respond as follows: Disputed that "[a]s users increasingly get news from GenAI chatbots rather than traditional news publishers, trust in news generally may continue to decline." The statement is unsupported by News Ex. 1104. Specifically, this exhibit does not analyze the Accused Products, does not address any specific News Plaintiff, and contains no finding that ChatGPT or any other OpenAI product has caused any decline in trust for any party to this litigation. It is also forward-looking and speculative, and not a statement of present fact as required under Rule 56.1. Further, the Reuters Report does not state that users "increasingly get news from GenAI chatbots rather than traditional news publishers," nor does it draw a causal link between AI chatbot use and declining trust. The statement in Paragraph 1708 is also missing critical context. The next sentence reads: "We can probably expect trust in news overall to fall further in future, but trust for many established news providers appears to be defying this trend." News Ex. 1104 at 7. The Reuters Report identifies social media, political instability, and anti-press messaging, not AI chatbots, as the primary drivers of declining trust. *Id.* at 15. The report's own data show that AI chatbot use for news is minimal and not accelerating in the U.S. *Id.* at 6. |

| | |
|---|---|
| | Further, the facts set forth in Paragraph 1708 are disputed because they are not supported by admissible evidence. News Ex. 1104 is the Reuters Institute's Digital News Report 2026, a survey-based annual publication analyzing news consumption trends across 48 markets, based on approximately 100,000 online respondents surveyed by YouGov between January and February 2026. It is inadmissible hearsay. Specifically, News Ex. 1104 is inadmissible hearsay because it is an out-of-court statement offered for the truth of its contents, unaccompanied by any authenticating testimony or sponsoring expert to establish its reliability under Fed. R. Evid. 803(18). It therefore may not be considered in support of summary judgment. Fed. R. Evid. 801, 802, 803.<br>Defendants also respond that the facts in Paragraph 1708 are immaterial and therefore disputed because these facts do not affect the outcome of the suit under the governing law. Any alleged harm from so-called "market dilution" from "pink slime" is irrelevant because that is not a legally cognizable harm under copyright law. *See* ECF 1698 (Microsoft Opening Brief) at 12–13. |
| 1709. "There is also a more direct link between trust in news and the falling prominence of traditional sources of news. A downward impact on trust in news overall as third-party platform consumption increases is to be expected because of the 'trust gap'. The trust gap exists because trust in news consumed via third-party platforms is substantially lower than trust in news | 1709. **Disputed in Part - Not Supported by Admissible Evidence; Immaterial.** Defendants respond as follows: Undisputed that Ex. 1104 states "There is also a more direct link between trust in news and the falling prominence of traditional sources of news. A downward impact on trust in news overall as third-party platform consumption increases is to be expected because of the 'trust |

| | |
|---|---|
| overall." Ex. 1104 [Jim Egan et al., *Digital News Report 2026*, 11, Reuters Institute for the Study of Journalism (2026), available at https://reutersinstitute.politics.ox.ac.uk/sites/default/files/2026-06/DNR%202026%20FINAL_2.pdf] at 17. | gap.' The trust gap exists because trust in news consumed via third-party platforms is substantially lower than trust in news overall." News Ex. 1104 at 17. However, disputed to the extent the statement implies that GenAI chatbots are causing a decline in trust in news, because that implication is not supported by the cited evidence. Specifically, the cited passage discusses third-party platforms including social media, video networks, and others. Furthermore, the Reuters Report is a global survey of 48 markets. It does not analyze the Accused Products, does not address any specific News Plaintiff, and contains no finding that ChatGPT or any other OpenAI product has caused any decline in trust for any party to this litigation.<br>The statement in Paragraph 1709 is also missing critical context. The next paragraph in News Ex. 1104 reads: "On a global level, trust in news on social media and from AI chatbots stands at 22% and 20% respectively (trust in answers to news queries on search engines is significantly higher). As we have seen, trust in news overall has fallen to 37% while a significant change in the make-up of news usage has been unfolding, with audiences relying less on print, broadcast, and 'owned' online properties and more on news they consume on third-party platforms. If the composition of news consumption continues to move in favour of discovery on social media, video networks, and AI as it has done in 2026, a decline in overall trust is, at least in part, an expected outcome because news on these platforms is less trusted than the legacy forms of news people are drifting away from." *Id.* at 17. The Reuters Report identifies social media, political |

| | |
|---|---|
| | instability, and anti-press messaging, not AI chatbots, as the primary drivers of declining trust. *Id.* at 15. The report's own data show that AI chatbot use for news is minimal and not accelerating in the U.S. *Id.* at 6.<br>Further, the facts set forth in Paragraph 1709 are disputed because they are not supported by admissible evidence. Ex. 1104 is the Reuters Institute's Digital News Report 2026, a survey-based annual publication analyzing news consumption trends across 48 markets, based on approximately 100,000 online respondents surveyed by YouGov between January and February 2026. It is inadmissible hearsay. Thus, Paragraph 1709 is not supported by admissible evidence, as required by Local Rule 56.1, and therefore is not properly before the Court. Specifically, News Ex. 1104 is inadmissible hearsay because it is an out-of-court statement offered for the truth of its contents, unaccompanied by any authenticating testimony or sponsoring expert to establish its reliability under Fed. R. Evid. 803(18). It therefore may not be considered in support of summary judgment. Fed. R. Evid. 801, 802, 803.<br>Defendants also respond that the facts in Paragraph 1709 are immaterial and therefore disputed because these facts do not affect the outcome of the suit under the governing law. Any alleged harm from so-called "market dilution" from "pink slime" is irrelevant because that is not a legally cognizable harm under copyright law. *See* ECF 1698 (Microsoft Opening Brief) at 12–13. |

| | |
|---|---|
| 1710. Prism News was a "pink slime" network of over 200 AI-generated publications, posing as local newsrooms and hobby websites, operated by four employees. Ex. 1203 [Goldfarb Exhibit 10]; *see also* Ex. 1204 ["Prism Media Launches Prism News, an AI-Native Publishing Platform Operating More than 200 Niche Publications Nationwide," TMX Newsfile (May 26, 2026), https://www.newsfilecorp.com/release/298739/Prism-Media-Launches-Prism-News-an-AINative-Publishing-Platform-Operating-More-Than-200-Niche-Publications-Nationwide]. | 1710. **Disputed in Part – Not Supported by Admissible Evidence; Immaterial.** Defendants respond as follows: Defendants do not dispute that the exhibits contain the quoted language. Disputed to the extent the statement in Paragraph 1710 implies or suggests that OpenAI is responsible for, contributed to, directed, or had any involvement in Prism News's conduct, or that Prism News's conduct is in any way attributable to OpenAI. Neither cited exhibit identifies any OpenAI product as the AI technology used by Prism. Plaintiffs do not cite any evidence that Prism used ChatGPT, Copilot, or any other Accused Product to generate its content.<br>Defendants also respond that this Paragraph is disputed on the grounds that it is not supported by admissible evidence, as required by Local Rule 56.1, and therefore is not properly before the Court. Specifically, Exhibits 1203 and 1204 are hearsay and lack foundation because they are non-party publications offered for the truth of their contents, unaccompanied by any authenticating testimony or sponsoring expert to establish their reliability and Plaintiffs identify no exception to the hearsay rule that would apply. These therefore may not be considered in support of summary judgment.<br>Defendants also respond that the facts in Paragraph 1710 are immaterial and therefore disputed because these facts do not affect the outcome of the suit under the governing law. Any alleged harm from so-called "market dilution" from "pink slime" is irrelevant because that is not a legally |

| | |
|---|---|
| | cognizable harm under copyright law. *See* ECF 1698 (Microsoft Opening Brief) at 12–13. |
| 1711. Prism News published local and national news stories masquerading as original content, featuring real people, places, and events—but these stories are generated by GenAI tools collecting and summarizing original articles without any human hand-editing. Ex. 1203 [Goldfarb Exhibit 10]; Ex. 1204 [“Prism Media Launches Prism News, an AI-Native Publishing Platform Operating More than 200 Niche Publications Nationwide,” TMX Newsfile (May 26, 2026), https://www.newsfilecorp.com/release/298739/Prism-Media-Launches-Prism-News-an-AINative-Publishing-Platform-Operating-More-Than-200-Niche-Publications-Nationwide]; Ex. 1205 [“More than 200 AI-generated ‘local news’ sites just went dark,” Poynter (Aug. 18, 2026), https://www.poynter.org/commentary/2026/prism-news-local-news-ai-fake-shuts-down/] (reporting that “Prism News [] suspended its network of more than 200 AI-generated ‘local news’ sites following investigations from multiple outlets that exposed plagiarism and falsehoods… Articles on the sites — which bore the tagline “(t)he stuff mainstream media skips, finally getting the coverage it deserves” — were published under fake, AI-generated bylines and regularly included information and quotes lifted from local reporting.”). | 1711. **Disputed in Part – Not Supported by Admissible Evidence; Immaterial.** Defendants respond as follows: Defendants do not dispute that the exhibits describe these Prism News reports. But Defendants dispute that Defendants’ Generative AI tools uniquely facilitate the creation of unreliable news websites. As Microsoft’s corporate deponent Sarah Bird testified in regards to so called “pink slime:” “AI is just a new tool that threat actors can potentially leverage for this, but it’s not the only tool that they can use. It doesn’t create a sort of new capability in the world. It’s just another tool. So this is a problem that we were looking at prior to AI and continue to look at as we think about AI as a new technology in this ecosystem.” *See* News Ex. 1194 at 48:8–21.<br>Defendants further dispute the statement in Paragraph 1711 to the extent it implies or suggests that OpenAI is responsible for, contributed to, directed, or had any involvement in Prism News’s conduct, or that Prism News’s conduct is in any way attributable to OpenAI. Prism News was operated by Prism Media, an Israel-based startup which is not affiliated with, controlled by, or in any commercial or business relationship with OpenAI. Neither cited exhibit identifies any OpenAI product as the AI technology used by Prism. Plaintiffs do not cite any evidence that Prism used ChatGPT, Copilot, or any other Accused Product to generate its content. |

| | |
|---|---|
| | Defendants further respond that this Paragraph is disputed on the grounds that it is not supported by admissible evidence, as required by Local Rule 56.1, and therefore is not properly before the Court. Specifically, Exhibits 1203-05 are hearsay and lack foundation because they are non-party publications offered for the truth of their contents, unaccompanied by any authenticating testimony or sponsoring expert to establish their reliability and Plaintiffs identify no exception to the hearsay rule that would apply. These therefore may not be considered in support of summary judgment.<br>Defendants also respond that the facts in Paragraph 1711 are immaterial and therefore disputed because these facts do not affect the outcome of the suit under the governing law. Any alleged harm from so-called "market dilution" from "pink slime" is irrelevant because that is not a legally cognizable harm under copyright law. *See* ECF 1698 (Microsoft Opening Brief) at 12–13. |
| 1712. Prism News ceased operations in mid-August 2026, stating that: "We have currently completed our experiment." Ex. 1206 [https://digitaldrummermag.com/2026/07/25/digitaldrummer-calls-out-ai-content-scraping/]. | 1712. **Disputed in Part – Not Supported by Admissible Evidence; Immaterial.** Defendants respond as follows: Defendants do not dispute that the exhibit contains the quoted language. But Defendants dispute the statement in Paragraph 1712 to the extent it implies or suggests that OpenAI is responsible for, contributed to, directed, or had any involvement in Prism News's conduct, or that Prism News's conduct is in any way attributable to OpenAI. Prism News was operated by Prism Media, an Israel-based startup which is not affiliated with, controlled |

| | |
|---|---|
| | by, or in any commercial or business relationship with OpenAI. Neither cited exhibit identifies any OpenAI product as the AI technology used by Prism. Plaintiffs do not cite any evidence that Prism used ChatGPT, Copilot, or any other Accused Product to generate its content.<br>Defendants further respond that this Paragraph is disputed on the grounds that it is not supported by admissible evidence, as required by Local Rule 56.1, and therefore is not properly before the Court. Specifically, Exhibit 1206 is hearsay and lacks foundation because it is a non-party publication offered for the truth of its contents, unaccompanied by any authenticating testimony or sponsoring expert to establish its reliability and Plaintiffs identify no exception to the hearsay rule that would apply. It therefore may not be considered in support of summary judgment.<br>Defendants also respond that the facts in Paragraph 1712 are immaterial and therefore disputed because these facts do not affect the outcome of the suit under the governing law. Any alleged harm from so-called "market dilution" from "pink slime" is irrelevant because that is not a legally cognizable harm under copyright law. *See* ECF 1698 (Microsoft Opening Brief) at 12–13. |

### 2. Hallucinations

| | |
|---|---|
| 1713. The Tow Center for Digital Journalism conducted a series of experiments from late 2024 and early 2025 and found that major GenAI tools including ChatGPT | 1713. **Disputed in Part – Immaterial; Incomplete; Not Supported by Cited Evidence; Not Supported by Admissible Evidence.** OpenAI responds as follows: |

| | |
|---|---|
| and Copilot were routinely bad at declining to answer questions about sources of excerpts of news articles that they could not answer accurately, and were instead "confidently wrong." Ex. 1207 [Jaźwińska, K., & Chandrasekar, A. *AI Search Has a Citation Problem*. Tow Center for Digital Journalism, Columbia Journalism Review. March 6, 2025. https://www.cjr.org/tow_center/we-compared-eight-ai-search-engines-theyre-all-bad-at-citing-news.php]; Bell Opening Rep. ¶ 160. | Undisputed that Ex. 1207 reports on experiments involving eight generative search tools, including ChatGPT and Copilot. However, disputed that Plaintiffs' characterization accurately reflects the study's scope, methodology, and findings. The experiments asked chatbots to identify a specific news article's headline, publisher, publication date, and URL from a verbatim excerpt; they did not measure reliability across the full range of user queries. News Ex. 1207.<br>Plaintiffs omit the authors' express qualifications that "our findings are not intended to be extrapolated to all models or news organizations" and that their "research design may not reflect typical user behavior." News Ex. 1207 at 15. Moreover, the article expressly distinguishes Copilot from the other tools, reporting that it declined more questions than it answered. *Id.* Accordingly, disputed to the extent Plaintiffs present the results as general conclusions about the tools' routine behavior beyond the particular tests conducted or suggest that the findings concerning refusal to answer applied uniformly to ChatGPT and Copilot.<br>Further disputed as immaterial to the extent Plaintiffs rely on the study to establish infringement of, or cognizable harm involving, the Asserted Works at issue in this Motion. The reported excerpt-identification experiments do not establish that OpenAI infringed any Asserted Work or caused cognizable market harm to News Plaintiffs. News Ex. 1207. |

| | |
|---|---|
| | Microsoft disputes the facts as to Copilot. Plaintiffs' own cited source reports that Copilot declined more questions than it answered. News Ex. 1207. That is the opposite of being "routinely bad at declining to answer." The characterization is therefore not supported as to Copilot. Microsoft also incorporates OpenAI's immateriality and admissibility objections. |
| 1714. In the Tow Center's 2025 study, ChatGPT incorrectly identified the source article for 134 out of 200 articles, but signaled a lack of confidence just 15 times, and never declined to provide an answer. Ex. 1207 [Jaźwińska, K., & Chandrasekar, A. *AI Search Has a Citation Problem*. Tow Center for Digital Journalism, Columbia Journalism Review. March 6, 2025. https://www.cjr.org/tow_center/we-compared-eight-ai-search-engines-theyre-all-bad-at-citing-news.php]. | 1714. **Disputed in Part – Immaterial; Not Supported by Cited Evidence; Not Supported by Admissible Evidence.** OpenAI responds as follows: Undisputed that Ex. 1207 reports claimed instances of incorrectly identified source articles.<br><br>Otherwise disputed because the asserted fact is not supported by admissible evidence, as required by Local Rule 56.1. Specifically, News Ex. 1207 is a non-party publication offered for the truth of its contents and constitutes inadmissible hearsay. OpenAI objects to Plaintiffs' reliance on the article to establish the truth of the reported findings. Fed. R. Evid. 802; Fed. R. Civ. P. 56(c)(2).<br><br>Further disputed to the extent Plaintiffs' characterization of, and inferences drawn from, Ex. 1207 suggest that the study measures ChatGPT's reliability across the full range of user queries. The study asked chatbots to identify a specific news article's headline, publisher, publication date, and URL from a verbatim excerpt; it did not evaluate performance across the full range of user queries. News Ex. 1207. Moreover, the |

| | |
|---|---|
| | authors expressly cautioned: "While we made an effort to represent a diversity of relationships between AI companies and publishers in the dataset, our findings are not intended to be extrapolated to all models or news organizations." *Id.* at 22. The authors also acknowledged that their "research design may not reflect typical user behavior." *Id.*<br>Further disputed as immaterial because Plaintiffs have not connected the study's reported results to the Asserted Works or established their bearing on the claims or defenses at issue in this Motion. The asserted fact therefore does not affect the outcome of the suit under the governing law.").<br><br>Microsoft defers to OpenAI. |
| 1715. ChatGPT correctly linked the original article in only eight out of 200 outputs. Ex. 1207 [Jaźwińska, K., & Chandrasekar, A. *AI Search Has a Citation Problem*. Tow Center for Digital Journalism, Columbia Journalism Review. March 6, 2025. https://www.cjr.org/tow_center/we-compared-eight-ai-search-engines-theyre-all-bad-at-citing-news.php]; Bell Opening Rep. ¶ 160. | 1715. **Disputed in Part – Immaterial; Incomplete; Not Supported by Cited Evidence; Not Supported by Admissible Evidence; Expert Opinion Subject to Rule 702.** OpenAI responds as follows: Undisputed that the referenced study purported to make the suggested finding. ECF 1794-1 (E. Bell Decl.) Ex. A (E. Bell Opening Rep.) ¶ 160. However, disputed to the extent Plaintiffs present that study-specific result as a general measure of ChatGPT's accuracy or reliability. The experiments asked chatbots to identify a specific news article's headline, publisher, publication date, and URL from a verbatim excerpt; they did not measure performance across the full range of user queries. News Ex. |

| | |
|---|---|
| | 1207. Plaintiffs omit the authors' express qualifications that "our findings are not intended to be extrapolated to all models or news organizations" and that their "research design may not reflect typical user behavior." *Id.* at 22.<br>Further disputed as incomplete because Bell's accompanying account distinguishes among different outcomes: links to incorrect articles in 79 instances, homepage-only links in 37 instances, outputs without links in 42 instances, failures to identify the article in 38 instances, and links to error pages "a handful of times." ECF 1794-1 (E. Bell Decl.) Ex. A (E. Bell Opening Rep.) ¶ 160. The reported failure to link directly to the original article should not be conflated with an affirmative misidentification or fabricated citation in every remaining output. Plaintiffs' characterization is disputed to the extent it draws such an inference or extrapolates beyond the particular experiments conducted.<br>Further disputed as immaterial to the extent Plaintiffs rely on the reported linking results to establish infringement of the Asserted Works or cognizable harm to News Plaintiffs. Neither the reported statistic nor Bell's repetition of it establishes either proposition.<br>Further disputed as immaterial to the extent Plaintiffs rely on the reported linking results to establish infringement of the Asserted Works or cognizable harm to News Plaintiffs. Neither the reported statistic nor Bell's repetition of it establishes either proposition. |

| | |
|---|---|
| | OpenAI further objects to News Ex. 1207 and the third-party statements it contains as inadmissible hearsay to the extent offered for the truth of the matters asserted. Fed. R. Evid. 802, 803; Fed. R. Civ. P. 56(c)(2). Bell's reliance on the study does not, by itself, render the underlying publication admissible for its truth. *See* Fed. R. Evid. 703.). OpenAI also objects under Fed. R. Evid. 702 to any expert opinion extrapolating from these results absent a showing of sufficient facts or data and a reliable methodology supporting that extrapolation, particularly given the study's express limitations.<br><br>Microsoft defers to OpenAI. |
| 1716. In the same study, Microsoft Copilot rarely identified the correct article link, linked the wrong article on 72 instances, and did not identify the article at all 46 times; and while Copilot declined more questions than it answered, when it responded it did so confidently despite the fact that it only produced 16 correct outputs out of 96. Ex. 1207 [Jaźwińska, K., & Chandrasekar, A. *AI Search Has a Citation Problem*. Tow Center for Digital Journalism, Columbia Journalism Review. March 6, 2025. https://www.cjr.org/tow_center/we-compared-eight-ai-search-engines-theyre-all-bad-at-citing-news.php; Bell Opening Rep. ¶ 160. | 1716. **Disputed in Part – Immaterial; Incomplete; Not Supported by Cited Evidence; Not Supported by Admissible Evidence; Expert Opinion Subject to Rule 702.** Microsoft responds as follows: Undisputed that the referenced study purported to make the suggested finding. ECF 1794-1 (E. Bell Decl.) Ex. A (E. Bell Opening Rep.) ¶ 160. However, disputed to the extent Plaintiffs present that study-specific result as a general measure of Copilot's accuracy or reliability. The experiments asked chatbots to identify a specific news article's headline, publisher, publication date, and URL from a verbatim excerpt; they did not measure performance across the full range of user queries. News Ex. 1207. Plaintiffs omit the authors' express qualifications that "our findings are not intended to be extrapolated to all |

| | |
|---|---|
| | models or news organizations" and that their "research design may not reflect typical user behavior." *Id.* at 22. Plaintiffs also omit that the study itself identified Copilot's tendency to decline answers as the responsible behavior, noting that "with the exception of Copilot—which declined more questions than it answered—all of the tools were consistently more likely to provide an incorrect answer than to acknowledge limitations." *Id.* at 6. The study further noted that Copilot was the only chatbot not blocked by any publisher in the dataset because it uses BingBot, the same crawler as Bing search, meaning it theoretically had full access yet still declined more often than it responded. *Id.* at 10–11. The characterization that Copilot responded "confidently" is Bell's gloss; the study singled out Copilot as the exception to the confident-wrong-answer pattern.<br><br>Further disputed as incomplete because Bell's accompanying account distinguishes among different outcomes: "hardly ever" identifying the correct article link, linking the wrong article on 72 instances, and not identifying the article at all 46 times. ECF 1794-1 (E. Bell Decl.) Ex. A (E. Bell Opening Rep.) ¶ 160. The reported failure to link directly to the original article should not be conflated with an affirmative misidentification or fabricated citation in every remaining output. Plaintiffs' characterization is disputed to the extent it draws such an inference or extrapolates beyond the particular experiments conducted.<br><br>Further disputed as immaterial to the extent Plaintiffs rely on the reported linking results to establish |

| | |
|---|---|
| | infringement of the Asserted Works or cognizable harm to News Plaintiffs. Neither the reported statistic nor Bell's repetition of it establishes either proposition.<br>Microsoft further objects to News Ex. 1207 and the third-party statements it contains as inadmissible hearsay to the extent offered for the truth of the matters asserted. Fed. R. Evid. 802; Fed. R. Civ. P. 56(c)(2). Bell's reliance on the study does not, by itself, render the underlying publication admissible for its truth. *See* Fed. R. Evid. 703. Microsoft also objects under Fed. R. Evid. 702 to any expert opinion extrapolating from these results absent a showing of sufficient facts or data and a reliable methodology supporting that extrapolation, particularly given the study's express limitations.<br><br>OpenAI defers to Microsoft. |
| 1717. In the same study, Tow Center researchers found that content licensing deals with news sources provided no guarantee that the chatbot would provide accurate citations to those sources in chatbot responses, while the fact that a publisher blocked a chatbot operator's crawlers did not mean that publisher's content would not be accessed. Ex. 1207 [Jaźwińska, K., & Chandrasekar, A. *AI Search Has a Citation Problem*. Tow Center for Digital Journalism, Columbia Journalism Review. March 6, 2025. https://www.cjr.org/tow_center/we-compared-eight-ai-search-engines-theyre-all-bad-at-citing-news.php. | 1717. **Disputed in Part – Immaterial; Incomplete; Not Supported by Cited Evidence; Not Supported by Admissible Evidence.** Defendants respond as follows: Undisputed that News Ex. 1207 states that "[c]ontent licensing deals with news sources provided no guarantee of accurate citation in chatbot responses" and reports that certain chatbots appeared to provide responses concerning publishers' content even where those publishers had blocked the operators' crawlers through robots.txt. News Ex. 1207.<br>However, disputed that Plaintiffs' characterization accurately reflects the scope and qualifications of those |

| | |
|---|---|
| | findings. The study reports "a wide range of accuracy in the responses to queries related to partner publishers," rather than uniform results across publishers or tools. *Id.* at 18. Further, the authors also acknowledge "other means through which the chatbots could obtain information about restricted content (such as through references to the work in publicly accessible publications)." *Id.* at 10. Accordingly, a chatbot's response concerning a publisher's content does not, without more, establish that its operator's crawlers accessed that publisher's website in disregard of robots.txt preferences.<br>Further disputed to the extent Plaintiffs suggest that OpenAI or Microsoft disregards publishers' robots.txt preferences or that inaccurate citations establish concealment of a work's source or author. Dr. Feamster concluded that OpenAI's bots follow robots.txt preferences. ECF 1766 (N. Feamster Decl.) (Sept. 4, 2026) ¶¶ 57, 59. So too for Microsoft's web robots. ECF 1705 (Gaggara Decl.) ¶¶ 13-14. OpenAI's expert also found that the ChatGPT outputs he reviewed did not function to conceal the identity of the work's source or author from the user. ECF 1750 (T. Berg-Kirkpatrick Decl.) ¶¶ 77–78. Plaintiffs' contrary inferences are not supported by the cited evidence.<br>Further disputed as immaterial to the extent Plaintiffs rely on these findings to establish infringement of the Asserted Works or cognizable harm to News Plaintiffs. The study's reported observations concerning |

| | |
|---|---|
| | citation accuracy and crawler preferences do not themselves establish either proposition.<br>Defendants further object to News Ex. 1207 and the third-party statements it contains as inadmissible hearsay to the extent offered for the truth of the matters asserted. Fed. R. Evid. 802; Fed. R. Civ. P. 56(c)(2). |
| 1718. In the Tow Center's 2024 study, which focused only on ChatGPT, one of the publishers whose content was tested was The Times. Ex. 1207 [Jaźwińska, K., & Chandrasekar, A. *AI Search Has a Citation Problem*. Tow Center for Digital Journalism, Columbia Journalism Review. March 6, 2025. https://www.cjr.org/tow_center/we-compared-eight-ai-search-engines-theyre-all-bad-at-citing-news.php]; Ex. 1271 [Jaźwińska, K., & Chandrasekar, *How ChatGPT Search Mis(represents) Publisher Content*, November 27, 2024, https://www.cjr.org/tow_center/how-chatgpt-misrepresents-publisher-content.php]. | 1718. **Undisputed.** |
| 1719. When the Tow Center asked ChatGPT to identify the provenance of excerpts from 10 different Times articles, rather than declining to respond to questions due to lack of access, ChatGPT answered completely incorrectly five times and somehow answered partially correctly five times. Ex. 1207 [Jaźwińska, K., & Chandrasekar, A. *AI Search Has a Citation Problem*. Tow Center for Digital Journalism, Columbia Journalism Review. March 6, 2025. https://www.cjr.org/tow_center/we-compared-eight-ai-search-engines-theyre-all-bad-at-citing-news.php]. | 1719. **Disputed – Immaterial; Incomplete; Not Supported by Cited Evidence; Not Supported by Admissible Evidence.** OpenAI responds as follows: News Ex. 1207's narrative does not report the asserted finding that ChatGPT answered five queries concerning Times articles completely incorrectly and five partially correctly. The report's discussion of aggregate results does not itself establish Plaintiffs' asserted Times-specific breakdown. *See* News Ex. 1207. Plaintiffs' numerical assertion is therefore not established by those aggregate |

| | |
|---|---|
| | findings. Further disputed to the extent Plaintiffs extrapolate beyond the particular experiments conducted. The authors expressly cautioned that "our findings are not intended to be extrapolated to all models or news organizations" and that their "research design may not reflect typical user behavior." *Id.* at 22. Further disputed as immaterial because the cited report does not establish that the tested excerpts were drawn from the Asserted Works. *See Id.* OpenAI further objects to News Ex. 1207 and the third-party statements it contains as inadmissible hearsay to the extent offered for the truth of the matters asserted. Fed. R. Evid. 802; Fed. R. Civ. P. 56(c)(2).<br><br>Microsoft defers to OpenAI. |
| 1720. In one instance, ChatGPT's output stated that content from The Times originated from a website called DMS Retail, which in fact had plagiarized the entirety of the original Times article and republished it without attributing its source or including any of its impactful visual storytelling. Ex. 1207 [Jaźwińska, K., & Chandrasekar, A. *AI Search Has a Citation Problem*. Tow Center for Digital Journalism, Columbia Journalism Review. March 6, 2025. https://www.cjr.org/tow_center/we-compared-eight-ai-search-engines-theyre-all-bad-at-citing-news.php]. | 1720. **Disputed - Not Supported by Admissible Evidence; Not Supported by Cited Evidence.** OpenAI responds as follows: The facts set forth in Paragraph 1720 are disputed because they are not supported by the cited evidence. *See* News Ex. 1207. Specifically, disputed to the extent Plaintiffs' characterization of the Tow Center article overstates or misrepresents the scope, methodology, and findings of the cited study. The study's authors acknowledged that their "research design may not reflect typical user behavior," and stated that "our findings are not intended to be extrapolated to all models or news organizations." *Id.* at 22. The statement in Paragraph 1720 is immaterial because the study does not involve the Asserted Works at issue in |

| | |
|---|---|
| | this Motion. Further, disputed because News Ex. 1207 makes no mention of "DMS Retail."<br>Further, the facts set forth in Paragraph 1720 are disputed because they are not supported by admissible evidence, as required by Local Rule 56.1, and therefore are not properly before the Court. Specifically, News Ex. 1207 is inadmissible hearsay because it is an out-of-court statement offered for the truth of its contents, unaccompanied by any authenticating testimony or sponsoring expert to establish its reliability under Fed. R. Evid. 803(18). It therefore may not be considered in support of summary judgment. Fed. R. Evid. 801, 802, 803.<br><br>Microsoft defers to OpenAI. |
| 1721. Additionally, in another instance when the Tow Center asked for the provenance of an article published in the Washington Post, ChatGPT incorrectly attributed it to The Times without attaching a link. Ex. 1207 [Jaźwińska, K., & Chandrasekar, A. *AI Search Has a Citation Problem*. Tow Center for Digital Journalism, Columbia Journalism Review. March 6, 2025. https://www.cjr.org/tow_center/we-compared-eight-ai-search-engines-theyre-all-bad-at-citing-news.php]. | 1721. **Disputed in Part - Not Supported by Admissible Evidence; Not Supported by Cited Evidence.** OpenAI responds as follows: The facts set forth in Paragraph 1721 are disputed in part because they are not supported by the cited evidence. Specifically, Plaintiffs' characterization of the Tow Center article (Ex. 1207) overstates or misrepresents the scope, methodology, and findings of that study. The study's authors acknowledged that their "research design may not reflect typical user behavior." Ex. 1207 at 15. Moreover, Ex. 1207 states: "While we made an effort to represent a diversity of relationships between AI companies and publishers in the dataset, our findings are not intended to be extrapolated to all models |

| | |
|---|---|
| | or news organizations." *Id.* at 16. Further disputed as immaterial because the exhibit does not establish that the study involves the Asserted Works at issue in this Motion. Further, Ex. 1207 makes no mention of ChatGPT incorrectly attributing a Washington Post article to The Times.<br>Further, the facts set forth in Paragraph 1721 are disputed because they are not supported by admissible evidence, as required by Local Rule 56.1, and therefore are not properly before the Court. Ex. 1207 is inadmissible hearsay because it is an out-of-court statement offered for the truth of its contents, unaccompanied by any authenticating testimony or sponsoring expert to establish its reliability under Fed. R. Evid. 803(18). It therefore may not be considered in support of summary judgment. Fed. R. Evid. 801, 802, 803.<br><br>Microsoft defers to OpenAI. |
| 1722. In March 2026, the Center for Media, Technology and Democracy ("CMTD") ran a test studying how well Generative AI models including ChatGPT, Gemini, Claude, and Grok use and cite Canadian news, and found that the majority of these chatbot's responses to queries about Canadian news content provided no source attribution even when those news sources were in their training data. Ex. 1208 [Bridgman, Aengus, and Taylor Owen. *AI News Audit: AI, Canadian Journalism, and Paths for Policy Action*. Centre for Media, Technology and | 1722. **Disputed in Part - Not Supported by Admissible Evidence.** Defendants respond as follows: The cited evidence is not supported by admissible evidence, as required by Local Rule 56.1, and therefore is not properly before the Court. The source cited, Ex. 1208, is an unsworn third-party report that constitutes inadmissible hearsay. Fed. R. Evid. 801, 802. Subject to and without waiving this objection, undisputed that Ex. 1208 reflects a study by the Centre for Media. However, disputed as to the characterization of the study's finding insofar as Paragraph |

| | |
|---|---|
| Democracy, 2026. https://www.mediatechdemocracy.com/all-work/ai-canadian-journalism-and-paths-for-policy-action]. | 1722 suggests the study tested, or supports an inference about, the specific models at issue in this case. Plaintiffs' expert Professor Taylor Owen testified that the models tested in the AI News Audit "are not" the same models at issue in this case, but rather "later developed -- further developed models, subsequent models." A. Blanco Opp. Decl. Ex. 249 (T. Owen Tr.) at 72:18-21. When asked whether the AI News Audit tested whether any of the models "were trained on the articles that the News plaintiffs are asserting," Professor Owen stated: "Oh, no. We weren't testing for that. We weren't testing for that." *Id.* at 151:23-152:5. Professor Owen also confirmed that he has "not conducted any studies of the models at issue in this case like the studies you did in the AI News Audit." *Id.* at 153:25-154:3. He further admitted that the ChatGPT model tested in the AI News Audit was "a subsequent version of ChatGPT's product," and that he did not know whether that model was trained on the articles the Daily News plaintiffs are asserting in this case. *Id.* at 152:17-23. Professor Owen additionally confirmed that he did not know whether the ChatGPT model he studied ever output articles that the Daily News plaintiffs are asserting in this case. *Id.* at 153:9-15. |
| 1723. In the same CMTD study, when the models were given access to specific news sources via RAG, ChatGPT in particular provided unique details from the original source article in response to user queries about those news sources that were drawn from the original | 1723. **Disputed in Part - Not Supported by Admissible Evidence.** Defendants responds as follows: Undisputed that Ex. 1208 reflects a study by the Center for Media, Technology, and Democracy purporting to test four AI models on queries about Canadian news content. |

| | |
|---|---|
| sources but almost never credited to the originating source. Ex. 1208 [Bridgman, Aengus, and Taylor Owen. *AI News Audit: AI, Canadian Journalism, and Paths for Policy Action*. Centre for Media, Technology and Democracy, 2026. https://www.mediatechdemocracy.com/all-work/ai-canadian-journalism-and-paths-for-policy-action]. | Disputed as to the characterization of the study's findings. The CMTD study simply "enabled web search" on each model's API and asked questions about 140 Canadian articles. The study's methodology section describes the objective as testing "what happens when models can actively search the web," activating "[e]ach provider's native search capability"— i.e., "OpenAI's web search preview, Google's Search grounding, Anthropic's web search tool, and xAI's web search." Models were not "given access to specific news sources;" they were queried about topics and used their own web-search capabilities to locate and retrieve relevant content from across the internet. The study did not test, control, or even describe how any model's internal retrieval-augmented generation architecture operated. Pursuant to Fed. R. Evid. 106, Prof. Owen confirmed at deposition that he did not "conduct a study of the grounding data used by ChatGPT or Copilot." A. Blanco Opp. Decl. Ex. 249 (T. Owen Tr.) at 69:18-70:1. When asked to define "grounding data," the questioner specified: "Any data that is used in the process of retrieval-augmented generation." Owen answered: "No, I didn't." *Id.*<br>Prof. Owen further testified at deposition that the models tested in the AI News Audit "are not" the same models at issue in this case, but rather "later developed — further developed models, subsequent models." *Id.* at 72:14-23. When asked whether the AI News Audit tested whether any of the models "were trained on the articles that the News plaintiffs are asserting," Owen stated: "Oh, no. |

| | |
|---|---|
| | We weren't testing for that. We weren't testing for that." *Id.* at 152:1–7. Owen also confirmed he had not conducted any studies of the models at issue in this case. *Id.* at 153:25-154:3. He further admitted that "the Canadian journalism queries involved models that are not at issue in this case" and that he "did not study any prompt or outputs from the models at issue in this case." *Id.* at 165:20–166:3. Prof. Owen additionally confirmed that he did not know whether the ChatGPT model he studied "ever output articles that the Daily News are asserting in this case." *Id.* at 153:16-21.<br>Further, the disputed proposition is not supported by admissible evidence, as required by Local Rule 56.1, and therefore is not properly before the Court. Ex. 1208 is inadmissible hearsay because it is an out-of-court statement offered for the truth of its contents, unaccompanied by any authenticating testimony or sponsoring expert to establish its reliability under Fed. R. Evid. 803(18). It therefore may not be considered in support of summary judgment. Fed. R. Evid. 801; Fed. R. Evid. 802; Fed. R. Evid. 803. |
| 1724. The CMTD study further found that when ChatGPT was not asked directly to provide a source, it only provided a source 1% of the time for the sample studied. Ex. 1208 [Bridgman, Aengus, and Taylor Owen. *AI News Audit: AI, Canadian Journalism, and Paths for Policy Action.* Centre for Media, Technology and Democracy, 2026. | 1724. **Disputed in Part - Not Supported by Admissible Evidence.** Defendants respond as follows: Undisputed that Ex. 1208 states that, under one specific condition, the rate at which AI models named the originating outlet in the response text ranged from 1% to 16% across the four models tested. |

| | |
|---|---|
| https://www.mediatechdemocracy.com/all-work/ai-canadian-journalism-and-paths-for-policy-action]. | Disputed as to the characterization of the study's finding. Pursuant to Fed. R. Evid. 106, Prof. Owen testified at deposition that the models tested in the AI News Audit "are not" the same models at issue in this case, but rather "later developed — further developed models, subsequent models." A. Blanco Opp. Decl. Ex. 249 (T. Owen Tr.) at 72:14-23. When asked whether the AI News Audit tested whether any of the models "were trained on the articles that the News plaintiffs are asserting," Owen stated: "Oh, no. We weren't testing for that. We weren't testing for that." *Id.* at 152:1–7. Owen also confirmed he had not conducted any studies of the models at issue in this case. *Id.* at 153:25-154:3. He further admitted that "the Canadian journalism queries involved models that are not at issue in this case" and that he "did not study any prompt or outputs from the models at issue in this case." *Id.* at 165:20–166:3. Prof. Owen additionally confirmed that he did not know whether the ChatGPT model he studied "ever output articles that the Daily News are asserting in this case." *Id.* at 153:16-21.<br>Further, the disputed proposition is not supported by admissible evidence, as required by Local Rule 56.1, and therefore is not properly before the Court. Ex. 1208 is inadmissible hearsay because it is an out-of-court statement offered for the truth of its contents, unaccompanied by any authenticating testimony or sponsoring expert to establish its reliability under Fed. R. Evid. 803(18). It therefore may not be considered in |

| | |
|---|---|
| | support of summary judgment. Fed. R. Evid. 801; Fed. R. Evid. 802; Fed. R. Evid. 803. |
| 1725. OpenAI recognized the issue of false information or hallucinations in their generative AI products. Ex. 915 [OPCO_MDL_004411433] at 439 (“this is new behavior and it hallucinated the cite <> great the night before launch”). | 1725. **Disputed in Part - Not Supported by Cited Evidence.** OpenAI responds as follows: Undisputed as to the accuracy of the quote.<br>However, disputed to the extent Plaintiffs overstate the implications of the referenced quote. Plaintiffs omit that Exhibit 915 is a Slack channel log (#chatgpt-browsing) in which engineers Alex Tachard Passos and Ethan Stock were debugging a narrow technical issue and discussing a single incorrect link. This is the remark of a single employee in the context of a single identified error, not a corporate acknowledgment of endemic hallucination across OpenAI’s products. Accordingly, the disputed proposition is not supported by the cited evidence.<br><br>Microsoft defers to OpenAI. |
| 1726. For example, shortly before the launch of ChatGPT, OpenAI employees admitted that its models “hallucinated,” using real people’s names that work at Lifehacker (a Ziff Davis brand), but the model “misattributed quotes to them.” Ex. 1065 [OPCO_MDL_001805836] at 5837. | 1726. **Disputed - Not Supported by Cited Evidence.** OpenAI respond as follows: OpenAI does not dispute that the Slack conversation reflected in Exhibit 1065 occurred, but denies that the document constitutes an “admis[sion]” by “OpenAI employees” of a systemic hallucination problem, and disputes Plaintiffs’ characterization of the document.<br>Ex. 1065 demonstrates that OpenAI personnel were actively testing for and cataloguing precisely this type of model behavior before the product launched—and were taking steps to address it. Plaintiffs’ characterization is |

| | |
|---|---|
| | also misleading because it implies that the Lifehacker incident reflects a persistent or unaddressed problem. To the contrary, the record establishes that OpenAI devoted substantial and increasing resources to mitigating hallucinations across successive model generations. ECF 1748 (C. Callison-Burch Decl.). Accordingly, the disputed proposition is not supported by the cited evidence.<br><br>Microsoft defers to OpenAI. |
| 1727. One OpenAI employee stated that the hallucination "somehow feels worse than verbatim copying." Ex. 1065 [OPCO_MDL_001805836] at 5840. | 1727. **Undisputed.**<br><br>Microsoft defers to OpenAI. |
| 1728. Below is an example of the hallucinated Lifehacker article using real people's names, but with hallucinated content: | 1728. **Disputed in Part.** Defendants respond as follows: Undisputed that the referenced output misattributes certain quotes. Ex. 1065 at OPCO_MDL_001805839. However, the remainder of Paragraph 1728 is disputed because Plaintiffs omit necessary context. Pursuant to Fed. R. Evid. 106, the exhibit shows that this was pre-release internal testing by an OpenAI contractor and not a ChatGPT user experience from a publicly available product. Id.<br><br>Microsoft defers to OpenAI. |

| | |
|---|---|
| <br>Ex. 1065 [OPCO_MDL_001805836] at 5839. | |
| 1729. Microsoft knew in February 2023 that citation errors and hallucinations were "very prevalent" in its Generative AI products' responses. Ex. 956 [MSFT_AI_MDL_000447446] at -450. | 1729. **Disputed in Part – Incomplete.** Microsoft does not dispute that it was aware in February 2023 that the LLM underlying its product launched as Bing Chat could "hallucinate" and that the document cited as News Ex. 956 at MSFT_AI_MDL_000447450 states that "the results indicate that citation errors [were] very prevalent" in the Generative AI product's responses. But, pursuant to Fed. R. Evid. 106, Microsoft responds that the document cited as News Ex. 956 reflects [redacted] |

| | |
|---|---|
| | [redacted] *See* News Ex. 956 at MSFT_AI_MDL_000447451; *see also* ECF 1710 (S. Bird Decl.) ¶¶ 25-31.<br><br>OpenAI defers to Microsoft's response. |
| 1730. Misha Bilenko, Microsoft's former Vice President of Cognitive Services, noted that as of January 20, 2023, Microsoft "employees had an understanding that… hallucinations were occurring" with Bing Chat. Ex. 719[Bilenko Depo. Tr.] at 163:1–4. | 1730. **Disputed in Part – Incomplete.** Microsoft does not dispute that Mr. Bilenko made the quoted statement at his deposition. But, pursuant to Fed. R. Evid. 106, Mr. Bilenko also testified: that his "technical understanding" was that hallucination rates have "been greatly mitigated in the recent years" and "dramatically reduced." News Ex. 719 (M. Bilenko 30(b)(1) Tr.) at 157:7-11.<br><br>OpenAI defers to Microsoft's response. |
| 1731. Mr. Bilenko acknowledged that such "[h]allucinations are undesirable because they typically refer to producing untrue information," which is "generally not a desired behavior by users of any product that involve LLMs." Ex. 719 [Bilenko Depo. Tr.] at 109:22–110:8. | 1731. **Undisputed.** |
| 1732. Mr. Bilenko also noted that it is difficult for Microsoft to completely quell hallucinations because it was "an inherently difficult technical problem." Ex. 719[Bilenko Depo. Tr.] at 163:9–14. | 1732. **Disputed in Part – Incomplete.** Microsoft does not dispute that Mr. Bilenko made the quoted statement during his deposition. But, pursuant to Fed. R. Evid. 106, Mr. Bilenko also testified |

| | |
|---|---|
| | that: his "technical understanding" was that hallucination rates have "been greatly mitigated in the recent years" and "dramatically reduced." News Ex. 719 (M. Bilenko 30(b)(1) Tr.) at 157:7-11.<br><br>OpenAI defers to Microsoft's response. |
| 1733. As of March 30, 2023, Mr. Bilenko noted that [redacted] Ex. 719 [Bilenko Depo. Tr.] at 164:22–165:7. | 1733. **Disputed in Part – Incomplete.** Microsoft does not dispute that Mr. Bilenko agreed with the quoted statement at his deposition. But, pursuant to Fed. R. Evid. 106, Mr. Bilenko also testified: his "technical understanding" was that hallucination rates have "been greatly mitigated in the recent years" and "dramatically reduced." News Ex. 719 (M. Bilenko 30(b)(1) Tr.) at 157:7-11.<br><br>OpenAI defers to Microsoft's response. |
| 1734. Indeed, Mr. Bilenko noted that he understood hallucinations to still be found in LLMs in the present day. Ex. 719 [Bilenko Depo. Tr.] 160:10–12. | 1734. **Disputed in Part – Incomplete.** Microsoft does not dispute that Paragraph 1734 reflects Mr. Bilenko's deposition testimony. But, pursuant to Fed. R. Evid. 106, Mr. Bilenko's full testimony is as follows: "Q. But hallucinations still persist to this day in some form, correct?" "A. I think 'persist' is a strong word here. I -- my understanding is that they are still occasionally found." News Ex. 719 (M. Bilenko 30(b)(1) Tr.) at 160:7-12.<br><br>OpenAI defers to Microsoft's response. |

| | |
|---|---|
| 1735. Mr. Balaji, a former OpenAI engineer turned "whistleblower," was concerned about how OpenAI's product had a "propensity for spouting false information known as hallucinations." Ex. 1209 ["Ex-OpenAI engineer who raised legal concerns about the technology he helped build has died," AP News, https://apnews.com/article/openai-whistleblower-suchir-balaji-death-283e70b31d34ebb71b62e73aafb56a7d] at 2. | 1735. **Disputed in Part - Not Supported by Admissible Evidence.** OpenAI responds as follows: Undisputed that the cited Associated Press article contains the quoted text. However, disputed because the facts proffered in Paragraph 1735 rely on inadmissible hearsay. Specifically, the article is a journalist's out-of-court account of a conversation with Mr. Balaji. To the extent Plaintiffs offer that account to establish that Mr. Balaji held the reported concerns, they offer a non-party's out of court assertions for their truth. To the extent Plaintiffs offer the statements attributed to Mr. Balaji to establish the alleged characteristics of OpenAI's products, those statements present an additional layer of hearsay. OpenAI therefore objects to the article and the statements attributed to Mr. Balaji to the extent offered for the truth of the matters asserted. The disputed facts are therefore not supported by admissible evidence, as required by Local Rule 56.1, and therefore are not properly before the Court. Further disputed to the extent Plaintiffs' use of "whistleblower" implies that Mr. Balaji established any wrongdoing by OpenAI. That label is a journalistic characterization and is not supported by any cited evidence. Further disputed as immaterial, and OpenAI objects under Fed. R. Evid. 401 and 402. The cited article does not address any Asserted Work or identify any particular model or output. It therefore does not establish a connection between the reported concern and the uses of any Asserted Works. |

| | |
|---|---|
| | Microsoft defers to OpenAI. |
| 1736. As of at least February 2023, OpenAI knew that the GPT-3.5 launch Model "produced false claims in [redacted] responses." Ex. 1256 [Gaffney Depo. Ex. 10] at 25. | 1736. **Disputed in Part.** OpenAI responds as follows: Undisputed that Gaffney Depo. Ex. 10 includes the quoted text. Disputed as to the characterization because when read in context, the statement is more limited. News Ex. 1256 (B. Gaffney Dep. Ex. 10) states that as of at least February 2023 OpenAI knew that the GPT-3.5 launch model "produced false claims in 54% of responses" to "prompts seeking information about criminal claims or allegations against an individual"; that "[t]he majority of these claims appeared in connection with requests about professors, journalists, celebrities, and Korean pop stars"; and that "the[] evaluations revealed that only a few specific prompt wordings triggered the Model to produce such claims." *Id.* at OPCO_MDL_001000160.<br><br>Microsoft defers to OpenAI. |
| 1737. A Microsoft and OpenAI intercompany team review document from September 2022 noted [redacted] Ex. 852 [MSFT_AI_MDL_000013670] at 696; *see also* Ex. 915 [OPCO_MDL_004411433] at 439 [redacted] | 1737. **Disputed in Part.** Defendants respond as follows: Undisputed that Exhibit 852 contains the quoted language. However, disputed to the extent Paragraph 1737 implies that this quoted language is an accurate characterization of DV3's hallucination behavior at the time of launch. Exhibit 852 reflects a [redacted]. Ex. 852 at 696. Further disputed to the extent Paragraph 1737 implies that Exhibit 915 relates to the same |

| | |
|---|---|
| [redacted]). | [redacted] described in Exhibit 852. Exhibit 915 is a Slack message thread from the "#chatgpt-browsing" channel dated September 14, 2023, roughly a year after the [redacted] quoted in Exhibit 852, and concerns a specific, discrete bug in which the ChatGPT Browse-with-Bing feature cited the wrong source for a search result ("it got the info from bing but didn't quote and hallucinate the cite," to which a colleague responded, "this is new behavior" and "it hallucinated the cite <> great the night before launch"). Ex. 915 at OPCO_MDL_004411433. |
| 1738. Microsoft's CTO of Azure, Mark Russinovich, testified about hallucinations during Bing Chat's launch demonstration that: "I believe that it's undesirable behavior for a chatbot to produce incorrect information, which are called hallucinations," because "the users of those systems expect what the model produces to be factually correct." Ex. 649 [Russinovich Depo. Tr.] at 67:14–22. | 1738. **Undisputed.** |
| 1739. Russinovich further testified: "I don't think there's a fix for this type of behavior in large language models. . . . These models are probabilistic in nature. They can make mistakes in their reasoning, which lead to . . . hallucinations." Ex. 649 [Russinovich Depo. Tr.] at 67:25-68:6. | 1739. **Disputed in Part – Incomplete.** Microsoft responds as follows: Microsoft does not dispute that Mr. Russinovich made the statements quoted in Exhibit 649 at his deposition.<br>But, pursuant to Fed. R. Evid. 106, Mr. Russinovich also testified: "I don't think it's possible for any LLM-based system to be prevented from --100 percent reliability from producing hallucinations." Ex. 649 (M. Russinovich 30(b)(1) Tr) at 68:9-12. Microsoft also disputes any implication in Paragraph 1739 that Microsoft does not implement mechanisms to prevent or limit potential |

| | |
|---|---|
| | hallucinations in Copilot outputs. Copilot was specifically designed to mitigate hallucination risk through web grounding, which reduces reliance on pure next-token prediction by incorporating retrieved content from publicly accessible web sources (ECF 1708 (E. Abib Decl.) ¶ 10; ECF 1710 (S. Bird Decl.) ¶¶ 30, 39), including with attribution and links to every webpage used as grounding content, enabling users to verify information directly (ECF 1708 (E. Abib Decl.) ¶¶ 6, 10).<br><br>OpenAI defers to Microsoft's response. |
| 1740. Microsoft was aware as of at least July 7, 2023 that Microsoft's Generative AI model had incorrectly claimed it was summarizing from The Times when in fact it was summarizing from other news sources. Ex. 1210 [MSFT_AI_MDL_000388803] at -804; Ex. 721 [Cook Depo. Tr.] at 106:16–107:11. | 1740. **Disputed in Part – Incomplete.** Microsoft does not dispute that Exhibits 1210 and 721 state that [redacted] But, pursuant to Fed. R. Evid. 106, Ms. Cook's full testimony is: "I would say this is what I would consider a defect. This is not desirable behavior that the model is doing this and again would have been something that we continuously work to mitigate against. I just want to clarify. This is not the intended behavior." Ex. 721 (K. Cook 30(b)(1) Tr.) at 107:24-108:4.<br>Microsoft also responds that it disputes any implication in Paragraph 1740 that the purported "hallucination" was an issue (or widespread), as opposed to internal testing that demonstrated proper model behavior. Rather, Exhibit 721 reflects that Ms. Cook [redacted] |

| | |
|---|---|
| | [redacted]. Ex. 1210 at MSFT_AI_MDL_000388803-804; Ex. 721 (K. Cook 30(b)(1) Tr.) at 105:7-14, 105:25-106:1. |
| 1741. Microsoft's Principal Product Manager Lead Katherine Cook testified that this was a "known issue on hallucination and misattribution of content," which was "not desirable behavior." Ex. 721 [Cook Depo. Tr.] at 106:16–107:11, 107:24–108:4. | 1741. **Disputed in Part – Incomplete.** Microsoft responds as follows: Microsoft does not dispute that Exhibit 721 contains the quoted deposition testimony. But, pursuant to Fed. R. Evid. 106, Ms. Cook's full testimony is: "I would say this is what I would consider a defect. This is not desirable behavior that the model is doing this and again would have been something that we continuously work to mitigate against. I just want to clarify. This is not the intended behavior." Ex. 721 (K. Cook 30(b)(1) Tr.) at 107:24-108:4.<br>Microsoft also responds that it disputes any implication in Paragraph 1741 that the purported "hallucination" was an issue (or widespread), as opposed to internal testing that demonstrated proper model behavior. Rather, Exhibit 721 reflects that [redacted] Ex. 1210 at -803 -04; Ex. 721 (K. Cook 30(b)(1) Tr) at 105:7-14, 105:25-106:1.<br><br>OpenAI defers to Microsoft's response. |
| 1742. OpenAI's GPT-4 Technical Report stated in March 27, 2023 regarding their model's tendency to generate hallucinations: "This tendency can be particularly harmful as models become increasingly convincing and believable, leading to overreliance on them by users. | 1742. **Undisputed.** |

| | |
|---|---|
| Counterintuitively, hallucinations can become more dangerous as models become more truthful, as users build trust in the model when it provides truthful information in areas where they have some familiarity." Ex. 723 [Jain Depo. Ex. 106] at 46. | |
| 1743. OpenAI's expert Dr. Callison-Burch acknowledged that "hallucinations primarily occur when a model is called to provide factual information that is insufficiently represented in the pre-training corpus." Ex. 676 [Callison-Burch Rebuttal Rep.] at ¶154. | 1743. **Disputed in Part.** OpenAI responds as follows: Undisputed that the quoted text appears in the cited source. News Ex. 676 (C. Callison-Burch Rebuttal Rep.) ¶ 154. However, disputed to the extent the characterization omits necessary context. Pursuant to Fed. R. Evid. 106, Paragraph 154 of Dr. Callison-Burch's Rebuttal Expert Report explains that Plaintiffs' own expert, Dr. Melanie Mitchell, acknowledged that the "rate of hallucinations in LLMs" will decrease as LLM developers "scale up" the "amount of training data," which Dr. Callison-Burch notes "makes sense because hallucinations primarily occur when a model is called to provide factual information that is insufficiently represented in the pre-training corpus." *Id.*<br><br>Microsoft defers to OpenAI. |
| 1744. One OpenAI document described "weekly" check-in meetings in May 2023 "on hallucinations." Ex. 1067 [OPCO_MDL_000156260] at -260. | 1744. **Disputed in Part.** OpenAI responds as follows: Undisputed that Ex. 1067 references "weekly" check-ins "on hallucinations." News Ex. 1067 at OPCO_MDL_000156260. However, disputed to the extent the characterization is misleading and omits necessary context. The statement is misleading to the extent it implies anything other than the fact that OpenAI was actively and |

| | |
|---|---|
| | diligently working to improve the technical accuracy and reliability of its AI models. Further disputed because the characterization is not supported by the cited evidence. Specifically, Ex. 1067 is a private Slack message that describes informal status check-ins between a senior executive and a researcher, not formal "check-in meetings" as Plaintiffs' characterization implies. *Id.* Pursuant to Fed. R. Evid. 106, as the document makes clear, the "hallucinations" at issue were a well-known technical limitation of large language models, and the "weekly" check-ins related to OpenAI's ongoing engineering efforts to mitigate and reduce that limitation. *Id.* The broader context of the conversation further confirms that these discussions were part of OpenAI's affirmative technical research program to improve model accuracy and reliability. *Id.*<br><br>Microsoft defers to OpenAI. |
| 1745. Microsoft identified the failure to provide attribution to the source data as an issue with Bing Chat, but "false attribution" was identified as a "worse than no attribution" problem. Ex. 958 [MSFT_AI_MDL_000687908] at -908. | 1745. **Disputed – Immaterial.** Microsoft responds that the fact stated in Paragraph 1745 is disputed because Microsoft, at the institutional level, did not "identif[y] the failure to provide attribution to the source data as an issue with Bing Chat." Exhibit 958 reflects an email from an employee, who was not involved with developing Bing Chat, directing questions toward the Bing Chat development team because he was "[t]rying to understand the chat response and the blue links." Ex. 958 at MSFT_AI_MDL_000687908. Neither of the employees |

| | |
|---|---|
| | involved with the development of Bing Chat that engaged with this email thread "identified the failure to provide attribution to the source data as an issue with Bing Chat" (*see id.* at MSFT_AI_MDL_000687909-910).<br>Microsoft also responds that the facts set forth in Paragraph 1745 are immaterial and therefore disputed because these facts do not affect the outcome of the suit under the governing law. Specifically, concerns related to hypothetical "cases" which he "fear[ed] could be frequent" is not a fact and is therefore immaterial to the issues before the Court.<br><br>OpenAI defers to Microsoft's response. |
| 1746. On September 4, 2025, a study led by three researchers from OpenAI, and one from Georgia Tech, found that "language models hallucinate because the training and evaluation procedures reward guessing over acknowledging uncertainty," further arguing that "guessing when uncertain improves test performance." Ex. 1211 ["Why Language Models Hallucinate," Arxiv, September 4, 2025, https://arxiv.org/pdf/2509.04664]. | 1746. **Disputed in Part.** OpenAI responds as follows: Undisputed that Ex. 1211, a paper titled Why Language Models Hallucinate (dated September 4, 2025), includes the quoted statements. Ex. 1211. However, disputed to the extent the characterization is misleading and omits necessary context. This proposed fact omits the paper's actual thesis that the problem is solvable and the paper proposes a solution. It is misleading to the extent it implies that the authors viewed hallucinations as an unmitigable feature or that OpenAI embraced evaluation benchmarks that incentivize guessing. Pursuant to Fed. R. Evid. 106, Ex. 1211 is a research paper examining how pre-training statistical pressures and standard benchmark scoring reward guessing over abstention. *Id.* The paper specifically discusses modified benchmark scoring systems |

| | |
|---|---|
| | to encourage proper expressions of uncertainty and improve model reliability. *Id.*<br><br>Microsoft defers to OpenAI. |
| 1747. Computerworld's interpretation of the study was that "large language models will always produce plausible but false outputs, even with perfect data, due to fundamental statistical and computation limits," and that OpenAI's advanced reasoning models actually hallucinated more frequently than simpler models. Ex. 1212 [DNP-00569563] at 564, 565. | 1747. **Disputed in Part - Not Supported by Admissible Evidence.** Defendants respond as follows: Undisputed that the article contains the quoted language, but Computerworld's interpretation of an independent study is inadmissible hearsay and should not be considered. Ex. 1212 is inadmissible hearsay because it is an out-of-court statement offered for the truth of its contents, unaccompanied by any authenticating testimony or sponsoring expert to establish its reliability under Fed. R. Evid. 803(18). It therefore may not be considered in support of summary judgment. Fed. R. Evid. 801; Fed. R. Evid. 802; Fed. R. Evid. 803.<br>Further, disputed to the extent Plaintiffs are implying or making inferences stemming from Computerworld's interpretation of the study because Plaintiffs offer no admissible evidence that such a conclusion is true nor about the alleged hallucination rates of OpenAI's models. Disputed to the extent this article relies on an out-of-scope model. *See* Ex. 1212 at DNP-00569565 (referencing GPT-5).<br><br>Microsoft defers to OpenAI. |

| | |
|---|---|
| 1748. According to NewsGuard, ChatGPT spreads falsehoods 40 percent of the time. Ex. 1213 [DNP-00543997] at 6. | 1748. **Disputed in Part - Not Supported by Cited Evidence; Not Supported by Admissible Evidence.** Defendants respond as follows: Undisputed only that Ex. 1213 states that ChatGPT repeated false claims in 40 percent of test responses in NewsGuard's August 2025 audit. Ex. 1213 (DNP-00543997) at 6. However, disputed to the extent Plaintiffs' characterization is misleading, argumentative, and omits necessary context by presenting a single, targeted testing metric as a general statement about ChatGPT's overall reliability in standard usage. That characterization is not supported by the cited evidence. Specifically, pursuant to Fed. R. Evid. 106, Ex. 1213 evaluates AI models under an artificial methodology using prompts intentionally designed to elicit false claims or bypass guardrails on controversial news topics. Ex. 1213. The report specifically notes that this audit evaluated real-time web search capabilities with a zero-percent non-response rate, and that other AI models exhibited significantly higher failure rates under the same audit. Id.<br><br>Further, the facts set forth in Paragraph 1748 are disputed because they are not supported by admissible evidence, as required by Local Rule 56.1, and therefore are not properly before the Court. Ex. 1213 is an unsworn, third-party report by NewsGuard that constitutes inadmissible hearsay and lacks proper foundation and authentication. Fed. R. Evid. 702, 901. Ex. 1213 is inadmissible hearsay because it is an out-of-court statement offered for the truth of its contents, unaccompanied by any authenticating testimony or |

| | |
|---|---|
| | sponsoring expert to establish its reliability under Fed. R. Evid. 803(18). It therefore may not be considered in support of summary judgment. Fed. R. Evid. 801, 802, 803.<br><br>Microsoft defers to OpenAI. |
| 1749. OpenAI CEO Sam Altman has explained that "[p]eople have a very high degree of trust in ChatGPT, which is interesting, because AI hallucinates;" "[i]t should be the tech that you don't trust that much." Ex. 1213 [DNP-00543997] at 7. | 1749. **Disputed in Part - Not Supported by Cited Evidence; Not Supported by Admissible Evidence.** OpenAI responds as follows: Undisputed only that Ex. 1213 includes a quote attributed to OpenAI CEO Sam Altman from a June 2025 podcast episode. Ex. 1213 (DNP-00543997) at 7. However, disputed to the extent Plaintiffs' characterization is misleading and omits necessary context. That characterization is not supported by the cited evidence. Specifically, the statement is misleading to the extent it implies that OpenAI or Mr. Altman dismissed the issue of model accuracy or discouraged trust in AI technology. In context, Mr. Altman's comments emphasize the importance of user awareness regarding current technical limitations such as hallucinations, while highlighting OpenAI's ongoing focus on user education, transparency, and technical improvements to model reliability. Ex. 1213 at 7.<br>Further, the facts set forth in Paragraph 1749 are disputed because they are not supported by admissible evidence, as required by Local Rule 56.1, and therefore are not properly before the Court. S.D.N.Y. Ex. 1213 is an unsworn, third-party publication that constitutes inadmissible hearsay and lacks proper foundation and |

| | |
|---|---|
| | authentication. Fed. R. Evid. 901. Ex. 1213 is inadmissible hearsay because it is an out-of-court statement offered for the truth of its contents, unaccompanied by any authenticating testimony or sponsoring expert to establish its reliability under Fed. R. Evid. 803(18). It therefore may not be considered in support of summary judgment. Fed. R. Evid. 801, 802, 803.<br><br>Microsoft defers to OpenAI. |
| 1750. Dario Amodei similarly testified about the concerns he had with GPT-2 and GPT-3's capability of creating fake content – calling it "terrifying." Ex. 625 [Amodei Depo. Tr.] at 324:14-23 ("There was a section of the GPT-3 paper that discussed the generation of fake news. The generation of fake news was described as a – a reason not to release the model weights of the GPT-2 paper. So these -- these accurately reflect concerns that I had and actions that -- that I pushed OpenAI to take as a result of these concerns."); Ex. 1069 [OPCO_MDL_001898994] at 9005. | 1750. **Disputed in Part - Not Supported by Cited Evidence.** OpenAI responds as follows: Undisputed that the word "terrifying" appears in a 2019 Slack message that Dr. Amodei confirmed at his deposition. Ex. 1069 at OPCO_MDL_001899005; Ex. 625 (D. Amodei Tr.) 324:14–23. However, disputed because the proposed fact materially mischaracterizes the evidence and is not supported by the cited evidence. Specifically, the Slack conversation is about a 12B model, which is neither GPT-2 (1.5B parameters) nor GPT-3 (175B parameters). Ex. 1069 at OPCO_MDL_001899005. The "terrifying" comment was made in the context of viewing samples from this particular research model. *Id.*<br><br>Microsoft defers to OpenAI. |
| 1751. The Times's 2025 GenAI surveys found that "[a] substantial share of users across [its] categories [i.e., News, Cooking, Wirecutter, Sports, Games] view GenAI | 1751. **Disputed in Part – Not Supported by Cited Evidence; Not Supported by Admissible Evidence; Immaterial.** Defendants respond as follows: Defendants do not dispute that Exhibit 1214 contains the |

| | |
|---|---|
| tools as equally or more trustworthy than traditional sources in their category." Ex. 1214 [NYT_01018244] at 19. | quoted language. But Defendants do dispute the facts set forth in Paragraph 1751 because Exhibit 1214 is a [redacted] ECF 2061 (O. Amir Decl.) ¶¶ 8(c), 31, 38–39, 63-66; News Ex. 1214. News Ex. 1214 [redacted] News Ex. 1214 at 19.<br>Defendants also respond that Paragraph 1751 is disputed on the grounds that it is not supported by admissible evidence, as required by Local Rule 56.1, and therefore is not properly before the Court. Specifically, Exhibit 1214 lacks foundation and is hearsay.<br>Defendants also respond that the facts set forth in Paragraph 1751 are immaterial and therefore disputed because these facts do not affect the outcome of the suit under the governing law. Trustworthiness is not probative of any element of copyright infringement, fair use, or cognizable market harm, and The Times has dismissed its trademark claims. ECF 1662. |
| 1752. The same Times surveys also found that "[g]reater usage of GenAI is also associated with levels of trust in GenAI," in that "frequent users are nearly 3x as likely [as infrequent NYT users] to say that 'GenAI tools are | 1752. **Disputed in Part – Not Supported by Cited Evidence; Not Supported by Admissible Evidence; Immaterial.** Defendants respond as follows: The facts set forth in Paragraph 1752 are disputed in part |

| | |
|---|---|
| more trustworthy than traditional news sources." Ex. 1214 [NYT_01018244] at 21. | because they are not supported by the cited evidence. Ex. 1214 contains a similar quote, but it is transcribed incorrectly: "Greater usage of GenAI is also associated with higher levels of trust in GenAI." News Ex. 1214 at 21. Additionally, the bracketed insertion "[as infrequent NYT users]" is not present in the quote and cannot intrinsically be inferred. Id.<br>Defendants further dispute the facts set forth in Paragraph 1752 because Exhibit 1214 is a [redacted] ECF 2061 (O. Amir Decl.) ¶¶ 8(c), 31, 38–39, 49, 63-67; News Ex. 1214. News Ex. 1214 [redacted] News Ex. 1214 at 19.<br>Defendants also respond that Paragraph 1752 is disputed on the grounds that it is not supported by admissible evidence, as required by Local Rule 56.1, and therefore is not properly before the Court. Specifically, Exhibit 1214 lacks foundation and is hearsay.<br>Defendants also respond that the facts set forth in Paragraph 1752 are immaterial and therefore disputed because these facts do not affect the outcome of the suit under the governing law. Trustworthiness is not probative of any element of copyright infringement, fair use, or |

| | |
|---|---|
| | cognizable market harm, and The Times has dismissed its trademark claims. ECF 1662. |
| 1753. Additionally, "[f]requent NYT users are more than 5x as likely [as infrequent NYT users] to say that GenAI tools are more trustworthy than traditional news sources overall." Ex. 1214 [NYT_01018244] at 22. | 1753. **Disputed in Part – Not Supported by Cited Evidence; Not Supported by Admissible Evidence; Immaterial.** Defendants respond as follows: The facts set forth in Paragraph 1753 are disputed in part because they are not supported by the cited evidence. News Ex. 1214 contains a similar quote, but it is transcribed incorrectly: "Greater usage of GenAI is also associated with higher levels of trust in GenAI." News Ex. 1214 at 22. Additionally, the bracketed insertion "[as infrequent NYT users]" is not present in the quote and cannot intrinsically be inferred. *Id.*<br>Defendants further dispute the facts set forth in Paragraph 1753 because Exhibit 1214 is a [redacted] ECF 2061 (O. Amir Decl.) ¶¶ 8(c), 31, 38–39, 49, 63-68; News Ex. 1214. Ex. 1214 [redacted]" News Ex. 1214 at 19.<br>Defendants also respond that Paragraph 1753 is disputed on the grounds that it is not supported by admissible evidence, as required by Local Rule 56.1, and |

| | |
|---|---|
| | therefore is not properly before the Court. Specifically, Exhibit 1214 lacks foundation and is hearsay. Defendants also respond that the facts set forth in Paragraph 1753 are immaterial and therefore disputed because these facts do not affect the outcome of the suit under the governing law. Trustworthiness is not probative of any element of copyright infringement, fair use, or cognizable market harm, and The Times has dismissed its trademark claims. ECF 1662. |
| 1754. Sam Felix from The Times told OpenAI's CEO Sam Altman in February 2023 that OpenAI was hallucinating a false claim in its outputs that OpenAI had a licensing agreement with The Times. Ex. 231 [Lightcap Deposition Ex. 17] at 618. | 1754. **Disputed in Part– Not Supported by Cited Evidence.** Defendants respond as follows: The facts set forth in Paragraph 1754 are disputed in part because they are not supported by the cited evidence. *See* Ex. 231 at OPCO_MDL_004419618. Specifically, undisputed that the cited document OPCO_MDL_004419618 contains a message from Ms. Felix that supports the statement. *Id.* However, disputed to the extent that The Times characterizes Ms. Felix's statement as true, as no evidence is provided to substantiate the statement in Ms. Felix's email. |
| 1755. Sam Altman responded to Ms. Felix's email and admitted "this is an error, sorry about that" and copied OpenAI's General Counsel and its COO Brad Lightcap into the email thread. Ex.231 [Lightcap Deposition Ex. 17] at 618. | 1755. **Disputed in Part – Not Supported by Cited Evidence.** Defendants respond as follows: The facts set forth in Paragraph 1755 are disputed in part because they are not supported by the cited evidence. *See* Ex. 231 at OPCO_MDL_004419618. Specifically, undisputed that the cited document contains the quoted text and that Mr. Altman copied OpenAI's General Counsel and COO. *Id.* |

| | |
|---|---|
| | However, disputed to the extent this implies anything beyond this specific alleged erroneons ontpnt concerning a licensing agreement with The Times. |
| 1756. Generative AI has negatively impacted The Times's "repntation and trust in [its] brand," inclnding throngh misattribntion of incorrect information to The Times. Ex. 1 [The New York Times SEC Form 10-K Dec. 31, 2025] at 14. | 1756. **Disputed – Not Supported by Admissible Evidence; Immaterial.** Defendants respond as follows: Defendants do not dispnte that Exhibit 1 contains the qnoted langnage. Bnt Defendants dispnte the facts set forth in Paragraph 1756 on the gronnds that they are not snpported by admissible evidence, as reqnired by Local Rnle 56.1, and therefore are not properly before the Conrt. Specifically, The Times's 10-K is hearsay and cannot be considered for the truth of the matter asserted.<br>Defendants fnrther dispnte the veracity of the statement contained within the 10-K to the extent Plaintiffs imply this statement attribntes any pnrported impact specifically to Defendants, as the 10-K attribntes the general risk to "Generative AI technology" overall rather than Defendants. Ex. 1 (NYT 2025 10-K) at 14; *see also* A. Blanco Opp. Decl. Ex. 228 (M. Levien Tr. (Feb. 19, 2026)) 33:12–17 ([redacted]); *id.* 38:21–39:6 ([redacted]); A. Blanco Opp. Decl. Ex. 280 ([redacted] |

| | |
|---|---|
| | [redacted]"); A. Blanco Opp. Decl. Ex. 210 (A. Hardiman 30(b)(1) Tr. (Oct. 24, 2025)) at 71:13–23 ([redacted]); A. Blanco Opp. Decl. Ex. 137 (The Times's Suppl. Resp. to Interrog. No. 22) ("[redacted]").<br>Defendants also respond that the facts set forth in Paragraph 1756 are immaterial and therefore disputed because these facts do not affect the outcome of the suit under the governing law. Reputational harm is not probative of any element of copyright infringement, fair use, or cognizable market harm, and The Times has dismissed its trademark claims. ECF 1662. |
| 1757. The Times's brand "with a reputation for high-quality independent journalism and content" is "a key element of [The Times's] business." Ex. 1 [The New York Times SEC Form 10-K Dec. 31, 2025] at 14. | 1757. **Disputed in Part – Not Supported by Admissible Evidence; Immaterial.** Defendants respond as follows: Defendants do not dispute that Exhibit 1 contains the quoted language. But Defendants dispute the facts set forth in Paragraph 1757 on the grounds that they are not supported by admissible evidence, as required by Local Rule 56.1, and therefore are not properly before the Court. Specifically, The Times's 10-K is hearsay and cannot |

| | |
|---|---|
| | be considered for the truth of the matter asserted. Further, disputed to the extent Plaintiffs' characterization is misleading or seeks to establish a factual finding of harm or liability against Defendants. The cited statement is a boilerplate, forward-looking disclosure in an SEC filing regarding general business risk factors, not an established fact related to any alleged injury in this action.<br>Defendants also respond that the facts set forth in Paragraph 1757 are immaterial and therefore disputed because these facts do not affect the outcome of the suit under the governing law. Reputational harm is not probative of any element of copyright infringement, fair use, or cognizable market harm, and The Times has dismissed its trademark claims. ECF 1662. |
| 1758. The Times's brand, as well as its other brands including The Athletic, Cooking, and Wirecutter, "might be damaged by incidents that erode consumer trust," by "a perception that [The Times's] journalism is unreliable," or by "the decline in the perceived value of independent journalism and general trust in the media." Ex. 1 [The New York Times SEC Form 10-K Dec. 31, 2025] at 14. | 1758. **Disputed in Part – Not Supported by Admissible Evidence; Immaterial.** Defendants respond as follows: Defendants do not dispute that Exhibit 1 contains the quoted language. But Defendants dispute the facts set forth in Paragraph 1758 on the grounds that they are not supported by admissible evidence, as required by Local Rule 56.1, and therefore are not properly before the Court. Specifically, The Times's 10-K is hearsay and cannot be considered for the truth of the matter asserted. Further, disputed to the extent the statement implies that this general description of media-industry risk in The Times's 10-K is evidence of any actual harm. The statement is purely conditional and forward-looking. It reports no damage that has occurred, no incident, and no measure of |

| | |
|---|---|
| | lost trust. Further disputed to the extent the statement purports to support any speculative "damage[]" attributable to Defendants. That is unsupported by the cited document, which does not identify Defendants in relation to this claimed risk.<br>Defendants also respond that the facts in Paragraph 1758 are immaterial and therefore disputed because these facts do not affect the outcome of the suit under the governing law. Reputational harm is not probative of any element of copyright infringement, fair use, or cognizable market harm, and The Times has dismissed its trademark claims. ECF 1662. |
| 1759. To the extent that The Times's "brand and reputation are damaged," its "ability to attract and retain audience, subscribers, advertisers and/or employees could be adversely impacted, which could in turn have an adverse impact on [its] business, revenues and operating results." Ex. 1 [The New York Times SEC Form 10-K Dec. 31, 2025] at 14. | 1759. **Disputed in Part – Not Supported by Admissible Evidence; Immaterial.** Defendants respond as follows: Defendants do not dispute that Exhibit 1 contains the quoted language. But Defendants dispute the facts set forth in Paragraph 1759 on the grounds that they are not supported by admissible evidence, as required by Local Rule 56.1, and therefore are not properly before the Court. Specifically, The Times's 10-K is hearsay and cannot be considered for the truth of the matter asserted. The 10-K describes possible consequences but reports no actual damage to brand or reputation. Further disputed that any potential future impact on brand or reputation, and the further hypothetical downstream consequences that may arise therefrom, can be attributed to Defendants. The document does not support such an implication, as the sentence appears in the general brand-and-reputation |

| | |
|---|---|
| | paragraph, which does not mention Defendants or generative AI.<br>Defendants also respond that the facts set forth in Paragraph 1759 are immaterial and therefore disputed because these facts do not affect the outcome of the suit under the governing law. Reputational harm is not probative of any element of copyright infringement, fair use, or cognizable market harm, and The Times has dismissed its trademark claims. ECF 1662. |
| 1760. The Times's Deputy Managing Editor Sam Dolnick testified that "trust and transparency is the most important part of the New York Times," which is in part why generative AI tools can be dangerous. Ex. 4 [Dolnick Depo. Tr.] at 19:3-6. | 1760. **Disputed in Part – Not Supported by Cited Evidence; Immaterial.** Defendants respond as follows: Defendants do not dispute that Exhibit 4 contains the quoted deposition testimony. But Defendants dispute the characterization in Paragraph 1760 that "generative AI tools can be dangerous" because this claim is not supported by the cited evidence. Mr. Dolnick stated, [redacted] these tools can be dangerous," and Plaintiffs' omission of [redacted] is misleading. *Id.* Further, Defendants dispute the truth or implication of the statement as unsupported by evidence in the record. New York Times employees testified that [redacted]. A. Blanco Opp. Decl. Ex. 192 (S. Dolnick 30(b)(1) Dep. (Feb. 18, 2026) 33:6-14; A. Blanco Opp. Decl. Ex. 210 (A. Hardiman 30(b)(1) Dep. (Oct. 24, 2025)) 71:13-23; A. Blanco Opp. Decl. Ex. 200 (B. Frumin 30(b)(1) Dep. (Dec. 17, 2025)) 77:1-18.<br>Defendants also respond that the facts set forth in Paragraph 1760 are immaterial and therefore disputed |

| | |
|---|---|
| | because these facts do not affect the outcome of the suit under the governing law. Reputational harm is not probative of any element of copyright infringement, fair use, or cognizable market harm, and The Times has dismissed its trademark claims. ECF 1662. |
| 1761. Mr. Dolnick also testified that "the ChatGPT LLMs have contributed to a distrust in the information ecosystem, and to a plethora of unverified and inaccurate and hallucinatory information that damaged the public trust that [The Times] think[s] is really important for [its] mission and for [its] business." Ex. 4 [Dolnick Depo. Tr.] at 69:9-15. | 1761. **Disputed in Part – Incomplete; Immaterial.** Defendants respond as follows: Defendants do not dispute that Exhibit 4 contains the quoted deposition testimony. Disputed to the extent Plaintiffs misleadingly omit context. Pursuant to Fed. R. Evid. 106, Mr. Dolnick specifically testified [redacted]. He further testified that [redacted]" News Ex. 4 (S. Dolnick 30(b)(1) Tr. (Feb. 18, 2026)) at 71:10-73:14. Further, Defendants dispute the truth or implication of the statement as unsupported by evidence in the record. Times internal documents note [redacted]. *See* A. Blanco Opp. Decl. Ex. 141 at NYT_0700358.<br>Disputed to the extent Plaintiffs' suggestion that ChatGPT has actually provided "inaccurate and hallucinatory information" is unsupported by the record. For example, The Times's Chief Data Officer acknowledged that [redacted] |

| | |
|---|---|
| | [redacted]. A. Blanco Opp. Decl. Ex. 257 (H. Poferl 30(b)(1) Dep. (Dec. 5, 2025)) at 66:21-67:14.<br>Defendants further respond that the facts set forth in Paragraph 1761 are immaterial and therefore disputed because these facts do not affect the outcome of the suit under the governing law. Reputational harm is not probative of any element of copyright infringement, fair use, or cognizable market harm, and The Times has dismissed its trademark claims. ECF 1662. |
| 1762. The Times's Chief Product Officer Alex Hardiman testified that ChatGPT causes harm when it hallucinates because of "the potential to erode quality and trusted facts and brands like The New York Times." Ex. 725 [Hardiman 30(b)(1) Depo. Tr.] at 191:20-23. | 1762. **Disputed in Part – Not Supported by Cited Evidence; Immaterial.** Defendants respond as follows: The facts set forth in Paragraph 1762 are disputed in part because they are not supported by the cited evidence. *See* A. Blanco Opp. Decl. Ex. 210 (A. Hardiman 30(b)(1) Tr. (Oct. 24, 2025)) at 191:20–23. Specifically, undisputed that Ms. Hardiman's testimony contains the quoted language. *Id.* However, disputed to the extent Plaintiffs misleadingly omit context. Pursuant to Fed. R. Evid. 106, Ms. Hardiman [redacted] A. Blanco Opp. Decl. Ex. 210 (A. Hardiman 30(b)(1) Tr. (Oct. 24, 2025)) 191:13–192:6. Further, Defendants dispute the truth or implication of the statement as unsupported by evidence in the record. NYT internal documents [redacted] |

| | |
|---|---|
| | [redacted] *See* A. Blanco Opp. Decl. Ex. 141 at NYT_0700358.<br>Further disputed that any harm has been shown. Mr. Dolnick testified that he [redacted] Ex. 4 (S. Dolnick 30(b)(1) Tr. (Feb. 18, 2026)) at 71:10–73:14.<br>Further disputed to the extent Plaintiffs' suggestion that ChatGPT has actually provided "inaccurate and hallucinatory information" is unsupported by the record. For example, The Times's Chief Data Officer acknowledged [redacted]. Ex. 699 (H. Poferl 30(b)(1) Tr. (Dec. 5, 2025)) at 66:21–67:14.<br>Defendants also respond that the facts set forth in Paragraph 1762 are immaterial and therefore disputed because these facts do not affect the outcome of the suit under the governing law. Reputational harm is not probative of any element of copyright infringement, fair use, or cognizable market harm, and The Times has dismissed its trademark claims. ECF 1662. |
| 1763. Ben Frumin, Wirecutter's Editor-in-Chief, testified regarding Wirecutter: "Our most proprietary IP advantage… is not the picks on their own, it is when they are paired with an explanation or demonstration of the tremendous and empathetic reporting and research and | 1763. **Disputed in Part – Immaterial.** Defendants respond as follows: Defendants do not dispute that Exhibit 87 contains the quoted deposition testimony. But Defendants respond that the facts set forth in Paragraph 1763 are immaterial and therefore disputed |

| | |
|---|---|
| testing that we've done to settle upon those picks and those recommendations." Ex. 87 [Frumin Depo. Tr.] at 95:22-96:5. | because these facts do not affect the outcome of the suit under the governing law. The testimony describes Wirecutter's editorial strategy and does not establish infringement of protectable expression, the absence of fair use, or cognizable market harm attributable to Defendants. |
| 1764. The Times has expended significant efforts and expense over decades building trust in its brand and earning the trust of its readers and subscribers, so to the extent that Defendants' generative AI products produce hallucinations in response to a query about what was published by The Times or Wirecutter, it harms The Times's reputation for accuracy, originality, and quality. Ex. 1106 [The Times's Supplemental Response to Microsoft's 2nd Interrogatory No. 15]. | 1764. **Disputed – Not Supported by Cited Evidence; Immaterial.** Defendants respond that Paragraph 1764 is disputed because the cited evidence does not support the stated fact. Specifically, undisputed that The Times contends this in the cited interrogatory response. *Id.* However, disputed that the substance of this statement is supported by record evidence. Mr. Dolnick testified [redacted] News Ex. 4 (S. Dolnick 30(b)(1) Tr. (Feb. 18, 2026)) at 71:10–73:14.<br>Further disputed to the extent Plaintiffs' suggestion that ChatGPT has actually provided "inaccurate and hallucinatory information" is unsupported by the record. For example, The Times's Chief Data Officer acknowledged [redacted] News Ex. 699 (H. Poferl 30(b)(1) Tr. (Dec. 5, 2025)) at 66:21–67:14.<br>Additionally, Copilot was specifically designed to mitigate hallucination risk through web grounding, which |

| | |
|---|---|
| | reduces reliance on pure next-token prediction by incorporating retrieved content from publicly accessible web sources (ECF 1713 (E. Abib Decl.) ¶ 10; ECF 1710 (S. Bird Decl.) ¶¶ 30, 39) including with attribution and links to every webpage used as grounding content, enabling users to verify information directly (ECF 1708 (E. Abib Decl.) ¶¶ 6, 10). No Plaintiff expert quantified any harm from hallucinations, identified a specific instance of Copilot misattributing content to The Times, or produced any analysis quantifying any loss of traffic, subscriptions, or revenue from readers choosing a Copilot output over an Asserted Work. ECF 1733 (C. Tucker Decl.) ¶ 90. Further disputed as to harm, as The Times continues to report record revenues and subscription figures.<br>Defendants also respond that the facts set forth in Paragraph 1764 are immaterial and therefore disputed because these facts do not affect the outcome of the suit under the governing law. Reputational harm is not probative of any element of copyright infringement, fair use, or cognizable market harm, and The Times has dismissed its trademark claims. ECF 1662. |
| 1765. Both false attribution and no attribution have occurred in connection with the Accused Products. Ex. 1107 [DNP-00535654] at 5-6. | 1765. **Disputed – Not Supported by Cited Evidence; Not Supported by Admissible Evidence.** Defendants responds as follows: The asserted fact relies on evidence that improperly generalizes from a single product feature, ChatGPT search, to all "Accused Products." The article purports to study only whether |

| | |
|---|---|
| | ChatGPT Search "could identify the source of block quotes pasted verbatim into its interface." *See* Ex. 1107 at 3.<br>Language model hallucination rates have demonstrably decreased over time as developers scale up training data and improve post-training techniques. *See* News Ex. 676 (C. Callison-Burch Rebuttal Rep.) ¶¶ 153-55. Ex. 1107 reflects a snapshot of ChatGPT Search's performance shortly after its October 2024 launch, and Plaintiffs have not presented evidence that the specific inaccuracies observed at that time persist in current product versions.<br>OpenAI's produced data and Dr. Feamster's expert testimony confirm that when ChatGPT's Browse/Search functionality is invoked, the model includes citations to referenced webpages. Similarly, Microsoft Copilot provides attribution and links to every webpage used as grounding content. ECF 1708 (E. Abib Decl.) ¶¶ 6, 10. Plaintiffs have not rebutted this evidence with any analysis of actual ChatGPT or Copilot citation rates, relying instead on a third-party journalistic article that tested an atypical use case.<br>Disputed to the extent the statement relies on inadmissible hearsay. Exhibit 1107 is a printout of a November 2024 journalistic article published by the Columbia Journalism Review's Tow Center for Digital Journalism. Therefore, it is not properly before the Court. Ex. 1107 is inadmissible hearsay because it is an out-of-court statement offered for the truth of its contents, unaccompanied by any authenticating testimony or |

| | |
|---|---|
| | sponsoring expert to establish its reliability under Fed. R. Evid. 803(18). It therefore may not be considered in support of summary judgment. Fed. R. Evid. 801; Fed. R. Evid. 802; Fed. R. Evid. 803.<br>Disputed because the cited article does not purport to be a peer-reviewed scientific study; its authors acknowledged that "more rigorous experimentation is needed to understand the true frequency of errors." Ex. 1107 at 13. Without the data and methodology of the Tow Center's study, its accuracy cannot be evaluated. |
| 1766. In a study by Columbia School of Journalism, it was found that ChatGPT incorrectly attributed a quote from a letter to the editor published in the Orlando Sentinel to a Time Magazine article published ten days earlier. Ex. 1107 [DNP-00535654] at 5-6. | 1766. **Disputed in Part – Not Supported by Cited Evidence; Not Supported by Admissible Evidence; Immaterial.** Defendants respond as follows: Undisputed that the article purports to identify an instance where "ChatGPT incorrectly attributed a quote from a letter to the editor published in the Orlando Sentinel on November 19 to a Time article originally published on November 9 with the headline "What Trump's Win Means for LGBTQ+ Rights."<br>Disputed to the extent it implies that other such instances exist, are common, or are probative of consumer interaction with ChatGPT Search, which is contrary to record evidence.<br>Language model hallucination rates have demonstrably decreased over time as developers scale up training data and improve post-training techniques. *See* ECF 1748 (C. Callison-Burch Decl.) ¶¶ 153-55. Ex. 1107 reflects a snapshot of ChatGPT Search's performance |

| | |
|---|---|
| | shortly after its October 2024 launch, and Plaintiffs have not presented evidence that the specific inaccuracies observed at that time persist in current product versions.<br>OpenAI's expert Dr. Feamster confirmed that when ChatGPT's Browse/Search functionality is invoked, the model includes citations to referenced webpages. Similarly, Microsoft Copilot provides attribution and links to every webpage used as grounding content. ECF 1708 (E. Abib Decl.) ¶¶ 6, 10. Plaintiffs have not rebutted this evidence with any analysis of actual ChatGPT or Copilot citation rates, relying instead on a third-party journalistic article that tested an atypical use case.<br>Disputed to the extent the statement relies on inadmissible hearsay. Exhibit 1107 is a printout of a November 2024 journalistic article published by the Columbia Journalism Review's Tow Center for Digital Journalism. Therefore, it is not properly before the Court. Ex. 1107 is inadmissible hearsay because it is an out-of-court statement offered for the truth of its contents, unaccompanied by any authenticating testimony or sponsoring expert to establish its reliability under Fed. R. Evid. 803(18). It therefore may not be considered in support of summary judgment. Fed. R. Evid. 801; Fed. R. Evid. 802; Fed. R. Evid. 803.<br>Disputed because the cited article does not purport to be a peer-reviewed scientific study; its authors acknowledged that "more rigorous experimentation is needed to understand the true frequency of errors." Ex. |

| | |
|---|---|
| | 1107 at 13. Without the data and methodology of the Tow Center's study, its accuracy cannot be evaluated. OpenAI accordingly responds that the fact set forth in Paragraph 1766 is immaterial because this fact does not affect the outcome of the suit under the governing law. |
| 1767. That study reported that more than a third of ChatGPT's responses to tested queries resulted in incorrect citations such as this. Ex. 1107 [DNP-00535654] at 5. | 1767. **Disputed in Part – Not Supported by Admissible Evidence; Immaterial.** Defendants respond as follows: Undisputed that the article states that "[m]ore than a third of ChatGPT's responses to our queries included incorrect citations such as this."<br>Disputed to the extent it implies that other such instances exist, are common, or are probative of consumer interaction with ChatGPT Search, which is contrary to record evidence.<br>Language model hallucination rates have demonstrably decreased over time as developers scale up training data and improve post-training techniques. *See* ECF 1748 (C. Callison-Burch Decl.) ¶¶. Ex. 1107 reflects a snapshot of ChatGPT Search's performance shortly after its October 2024 launch, and Plaintiffs have not presented evidence that the specific inaccuracies observed at that time persist in current product versions.<br>OpenAI's expert Dr. Feamster confirmed that when ChatGPT's Browse/Search functionality is invoked, the model includes citations to referenced webpages. Similarly, Microsoft Copilot provides attribution and links to every webpage used as grounding content. ECF 1708 (E. Abib Decl.) ¶¶ 6, 10. Plaintiffs have not rebutted this evidence |

| | |
|---|---|
| | with any analysis of actual ChatGPT or Copilot citation rates, relying instead on a third-party journalistic article that tested an atypical use case.<br>Disputed to the extent the statement relies on inadmissible hearsay. Exhibit 1107 is a printout of a November 2024 journalistic article published by the Columbia Journalism Review's Tow Center for Digital Journalism. Therefore, it is not properly before the Court. Ex. 1107 is inadmissible hearsay because it is an out-of-court statement offered for the truth of its contents, unaccompanied by any authenticating testimony or sponsoring expert to establish its reliability under Fed. R. Evid. 803(18). It therefore may not be considered in support of summary judgment. Fed. R. Evid. 801; Fed. R. Evid. 802; Fed. R. Evid. 803.<br>Disputed because the cited article does not purport to be a peer-reviewed scientific study; its authors acknowledged that "more rigorous experimentation is needed to understand the true frequency of errors." Ex. 1107 at 13. Without the data and methodology of the Tow Center's study, its accuracy cannot be evaluated. OpenAI accordingly responds that the fact set forth in Paragraph 1767 is immaterial because this fact does not affect the outcome of the suit under the governing law. |
| 1768. The BBC undertook research to understand the accuracy of major Generative AI Platforms when responding to queries about their journalism and found that 51% of all AI answers to questions about the news were | 1768. **Disputed in Part – Not Supported by Admissible Evidence; Incomplete.** Defendants respond as follows: Ex. 1108 is an unsworn, third-party study that constitutes inadmissible hearsay (Fed. R. Evid. |

| | |
|---|---|
| judged to have significant issues of some form; 19% of AI answers which cited BBC content introduced factual errors – incorrect factual statements, numbers and dates; and 13% of the quotes sourced from BBC articles were either altered from the original source or not present in the article cited. Ex. 1108 ["Representation of BBC News content in AI Assistants," BBC, https://www.bbc.co.uk/aboutthebbc/documents/bbc-research-into-ai-assistants.pdf]. | 801, 802) and lacks proper foundation and authentication (Fed. R. Evid. 602, 702, 901). Therefore, it is not properly before the Court. Ex. 1108 is inadmissible hearsay because it is an out-of-court statement offered for the truth of its contents, unaccompanied by any authenticating testimony or sponsoring expert to establish its reliability under Fed. R. Evid. 803(18). It therefore may not be considered in support of summary judgment. Fed. R. Evid. 801; Fed. R. Evid. 802; Fed. R. Evid. 803.<br>Subject to and without waiving these objections, undisputed only that Ex. 1108 states that 51% of evaluated AI answers to news questions were judged to have significant issues (p. 3), 19% of AI answers citing BBC content introduced factual errors (p. 3), and 13% of quotes sourced from BBC articles were altered or not present in the cited article (p. 3).<br>Otherwise disputed to the extent Plaintiffs' characterization is misleading, incomplete, and presents selective metrics out of context to imply uniform performance across all AI models or products. Specifically, the report's 13% quote-alteration finding explicitly excludes ChatGPT. Ex. 1108 at 7. |
| 1769. A Microsoft Research experiment revealed that when an LLM's response contained deliberate errors (inserted by researchers as a test), participants in the LLM condition were significantly more likely to rely on incorrect information than those in the non-GenAI search condition. Ex. 1109 [Spatharioti et al. (Microsoft Research), | 1769. **Disputed in Part – Immaterial.** Defendants do not dispute that the study in Ex. 1109 reported lower accuracy among LLM-search participants on a task where the LLM-based tool gave wrong information. But Defendants dispute the characterization in Paragraph 1769 that errors were "deliberate errors |

| | |
|---|---|
| "Comparing Traditional and LLM-based Search for Consumer Choice: A Randomized Experiment," arXiv 2023. https://arxiv.org/pdf/2307.03744]. | (inserted by researchers as a test)." The quoted phrase in Paragraph 1769 does not come from the study; rather, Paragraph 1769 repeats verbatim how Plaintiffs' search-market expert described the study. *See* ECF 1768-1 (J. Stricchiola Dec. Ex. A) (NYT/DNP Opening Rep.) ¶ 349. In the cited study, the researchers picked a vehicle for which the LLM tends, on its own, to confuse seats-up and seats-down cargo space. Ex. 1109 at 7. The study also found that on routine tasks, LLM-search participants were about as accurate as the traditional-search group (95.3% vs. 92.3%) and took roughly half the time. *Id.* at 8–9. Its second experiment found that simple color-coded confidence highlighting roughly doubled accuracy on the hard task, from 26% to 53–58%. *Id.* at 12. The authors concluded that "LLM-based information retrieval tools have promise for increasing the productivity of people engaged in decision tasks." *Id.* at 1. Defendants further dispute Plaintiffs characterizations and inferences drawn from the study as not supported by Exhibit 1109.<br><br>Defendants also respond that the facts set forth in Paragraph 1769 are disputed on the grounds that they are not supported by admissible evidence, as required by Local Rule 56.1, and therefore are not properly before the Court. Specifically, Exhibit 1109 is hearsay and lacks foundation because it is a non-party publication offered for the truth of its contents, unaccompanied by any authenticating testimony or sponsoring expert to establish its reliability under Fed. R. of Ev. 803(18), and therefore may not be considered in support of summary judgment. |

| | |
|---|---|
| 1770. A 2024 experimental study published in Computers in Human Behavior directly tested "automation bias" through an incentivized behavioral experiment, and researchers found that mere knowledge that advice originated from AI caused participants to follow that advice even when it contradicted available contextual information and their own prior assessment, and moreover, overreliance was not limited to situations where the AI happened to be correct--participants followed AI advice when wrong, leading to worse outcomes for themselves and third parties affected by their decisions. Ex. 1109 [Spatharioti et al (Microsoft Research), "Comparing Traditional and LLM-based Search for Consumer Choice: A Randomized Experiment," arXiv 2023. https://arxiv.org/pdf/2307.03744]. | 1770. **Disputed - Not Supported by Cited Evidence.** Defendants respond as follows: Plaintiffs cite the wrong source. Their citation is a research paper ("Comparing Traditional and LLM-based Search for Consumer Choice: A Randomized Experiment") by Microsoft. This error stems from a citation error in Stricchiola's Opening Expert Report. The correct source is Artur Klingbeil, Cassandra Grützner & Philipp Schreck, Trust and Reliance on AI — An experimental study on the extent and costs of overreliance on AI, 160 Computers in Human Behavior 108352 (2024). The facts set forth in Paragraph 1770 are disputed because the cited evidence is incorrect. |
| 1771. OpenAI's output logs show real world examples where ChatGPT provided hallucinated outputs harming News Plaintiffs. For example, in one conversation ChatGPT responded by providing a narrative response in the style of a news article attributing the provided "articles" to the *New York Times*. Neither of the outputted "articles" was a *New York Times* article. And when pressed by the user about how ChatGPT was able to access the information, ChatGPT doubled down on the attribution to the *New York Times*. Goldstein Opening Rep. at ¶ 502. | 1771. **Disputed – Not Supported by Cited Evidence.** OpenAI responds as follows: The facts set forth in Paragraph 1771 are disputed because they are not supported by the cited evidence. Specifically, Dr. Goldstein's identification and categorization of non-literal infringement in model outputs, such as "style of" examples like this one, lack any reliable methodology to support the opinions he offers. At deposition, he described keyword searches using Plaintiffs' names and manual review, qualitative comparison to the descriptions provided in his report, and a "hand curated methodology." A. Blanco Opp. Decl. Ex. 207 (T. Goldstein Tr. (July 31, 2026)) at 424:14-430:24. He admitted that his "methodology" lacked even |

| | |
|---|---|
| | basic instructions for reviewers. *Id.* at 429:17-24 ("We did a hand—it's a hand curated methodology . . . I don't recall whether [the instructions] were written."). Dr. Goldstein testified that he directed his team to "go get these files and look at them and mark down when they found relevant things, and [he] would take a look and decide whether it seemed reasonable" and that "the process wasn't as clean." *Id.* at 425:17-25. His process was simply directing his team to identify examples that "qualitatively matched the description in [his] report." *Id.* at 429:9-15. His categories of non-literal infringement–such as "style of"–also lack any analysis of protected expression, and Goldstein has admitted he did no such analysis and made no effort to filter the AW corpus that he relies on. *See, e.g.*, A. Blanco Opp. Decl. Ex. 206 (T. Goldstein Tr. (July 30, 2026)) at 214:6-18. His categories, like "style of," merely describe user or model behavior.<br>Further disputed to the extent that the example identified in Goldstein ¶ 502 represents "harm" to News Plaintiffs, which is not even discussed or analyzed in the cited Goldstein paragraph or his report. *See* ECF 1819-1 Ex. A (Goldstein Opening Rep.) at ¶ 502.<br><br>Microsoft defers to OpenAI. |

### 3. Other Scraping-Related Harms

| | |
|---|---|
| 1772. Another negative consequence of Generative AI tools on publishers stems from the effect of Generative | 1772. **Disputed in Part- Not Supported by Cited Evidence.** Defendants respond as |

| | |
|---|---|
| AI companies - including Defendants - crawling the web to copy news content. Ex. 90 [Loretto 30(b)(6) Depo. Tr.] at 34:15-35:6; Ex. 73 [Jacobs 30(b)(6), Feb. 13, 2026, Depo. Tr.] at 406:6-407:20. | follows: Undisputed that Chris Loretto testified, "defendants also can have impact—also have impact from the scraping activity," and that C.J. Jacobs testified about [redacted] News Ex. 90 (C. Loretto 30(b)(6) Tr.) at 34:15–35:6; A. Blanco Opp. Decl. Ex. 219 (C. Jacobs 30(b)(6) Tr. (Feb. 13, 2026)) at 406:6–407:20. However, disputed as to the substance of their testimony as unsupported and contradicted by evidence in the record. Pursuant to Fed. R. Evid. 106, increased bot scraping does not automatically affect [redacted] especially when there are proper rate-limiting measures applied. News Ex. 90 at 35:1-6. The rate-limiting is performed per-client and will not impact other clients or the quality of the content. News Ex. 423 (N. Feamster Rebuttal Rep.) at ¶¶ 280–284. Further disputed as to "effect" as undefined, vague, and unclear. |
| 1773. The Times's "efforts to identify and block such actors to protect [its] content from unauthorized use are not guaranteed to be effective and may result in [Times] content being excluded from third party platforms, which could disrupt users' ability to find [Times] content." Ex. 1 [The New York Times SEC Form 10-K Dec. 31, 2025] at 14. | 1773. **Disputed in Part – Not Supported by Admissible Evidence.** Defendants respond as follows: Undisputed that The Times's cited 2025 Form 10-K contains the quoted statement. Ex. 1 (The New York Times SEC Form 10-K Dec. 31, 2025) at 14. However, disputed because the cited statement is speculative, discussing what "could" happen, and is not evidence of any factual impact. Further, the statement does not name any Defendant. There is no stated connection to OpenAI or Microsoft. By its terms, the risk is that The Times's own blocking may |

| | |
|---|---|
| | cause its content to be "excluded from third party platforms." Even under The Times's framing, any speculative consequences are the result of a business choice by The Times.<br>Defendants also dispute the facts set forth in Paragraph 1773 on the grounds that it is not supported by admissible evidence, as required by Local Rule 56.1, and therefore is not properly before the Court. Specifically, The Times's 10-K is hearsay and cannot be considered for the truth of the matter asserted. *See SEC*, 416 F. Supp. 3d at 328-29; *James*, No. 1:25-CV-00168 (BKS/DJS), 2026 WL 2568355, at *9-10, n.16.<br>Microsoft further disputes any implication in Paragraph 1773 that the website owners lack effective means to control use of their content in connection with Copilot. Microsoft offers website owners the choice to opt-out of having their content used in connection with Copilot and Microsoft's generative AI features. *See* ECF 1711 (F. Canel Decl.) ¶ 27; *see also* A. Hurst Decl. Ex. 21 at 201:2-20, 202:9-11, Ex. 21.A. Microsoft's Bingbot is designed to respect the permissions set by web publishers, including where a website publisher has prevented or limited use of their content for use with Microsoft's Generative AI tools via application of the NOARCHIVE and / or NOCACHE meta-tags. ECF 1711 (F. Canel Decl.) ¶¶ 26-29. Further, The Times's expert, Ms. Stricchiola, found that 99.85% of Copilot citations to Times URLs were compliant (as she put it, "not in violation") with the NOARCHIVE meta tag. ECF 1768-1 (J. Stricchiola Ex. A (Opening Report) ¶ 294. |

| | |
|---|---|
| | Additionally, Microsoft's records reflect that at least 3,435 of the total 3,796 Daily News Plaintiffs' URLs that Ms. Stricchiola claimed were used in Copilot grounding in violation of the "NOARCHIVE" tag had not been recrawled by Microsoft's Bingbot after March 7, 2025 (the date on which the Daily News Plaintiffs applied the NOARCHIVE metatag) and through February 27, 2026 (the date of the alleged "violations"). ECF 2057 (P. Gaggara Decl. (Sept. 24, 2026)) ¶ 7.<br>Microsoft also disputes the claim in Paragraph 1773 that users' ability to find The Times's content "could" be disrupted because empirical analysis shows that traffic to The Times website has not changed following the introduction of ChatGPT and Copilot. ECF 1733 (C. Tucker Decl.) ¶¶ 11(a), 63-66, 92-93. |
| 1774. The rapid growth of generative AI companies and products "has escalated this challenge, as they are sending unauthorized user agents to scrape and copy [The Times's] intellectual property." Ex. 1 [The New York Times SEC Form 10-K Dec. 31, 2025] at 14. | 1774. **Disputed in Part – Not Supported by Admissible Evidence.** Defendants respond as follows: Undisputed that The Times's 2025 Form 10-K contains the quoted statement. Ex. 1 (The New York Times SEC Form 10-K Dec. 31, 2025) at 14. However, disputed because the implication that the cited source describes Defendants is not supported by the document. Further disputed as to the implication that the statement shows or suggests any actual harm.<br>Defendants also dispute the facts set forth in Paragraph 1774 on the grounds that they are not supported by admissible evidence, as required by Local Rule 56.1, and therefore are not properly before the Court. Specifically, |

| | |
|---|---|
| | The Times's 10-K is hearsay and cannot be considered for the truth of the matter asserted. *See SEC*, 416 F. Supp. 3d at 328-29; *James*, No. 1:25-CV-00168 (BKS/DJS), 2026 WL 2568355, at *9-10, n.16.<br>To the extent Paragraph 1774 implies that Microsoft sends "unauthorized user agents to scrape and copy The Times's intellectual property," Microsoft disputes that implication. Microsoft offers website owners the choice to opt-out of having their content used in connection with Copilot and Microsoft's generative AI features. *See* ECF 1711 (F. Canel Decl.) ¶ 27; *see also* A. Hurst Decl. Ex. 21 (F. Canel 30(b)(6) Tr.) at 201:2-20, 202:9-11. Microsoft's Bingbot is designed to respect the permissions set by web publishers, including where a website publisher has prevented or limited use of their content for use with Microsoft's Generative AI tools via application of the NOARCHIVE and / or NOCACHE meta-tags. MDL ECF 1711 (F. Canel Decl.) ¶¶ 26-29. Further, The Times's expert, Ms. Stricchiola, found that 99.85% of Copilot citations to Times URLs were compliant (as she put it, "not in violation") with the NOARCHIVE meta tag. ECF 1798-1 (J. Stricchiola Decl. Ex. A) (Opening Report) ¶ 294. Additionally, Microsoft's records reflect that at least 3,435 of the total 3,796 Daily News Plaintiffs' URLs that Ms. Stricchiola claimed were used in Copilot grounding in violation of the "NOARCHIVE" tag had not been recrawled by Microsoft's Bingbot after March 7, 2025 (the date on which the Daily News Plaintiffs applied the NOARCHIVE metatag) and through February 27, 2026 (the date of the |

| | |
|---|---|
| | alleged "violations"). ECF 2057 (P. Gaggara Decl. (dated 09.24.26)) ¶ 7. |
| 1775. According to Mr. Loretto, ("EVP") of Revenue and Digital for MediaNews Group, scraping activity across the Daily News Plaintiff websites causes harm because such scraping activity had increased by 256 percent, and "[t]hose hits and increased volume of scrapes add pressure and cost on our CDN [content delivery network], our platforms, which result in higher costs." Ex. 90 [Loretto 30(b)(6) Depo. Tr.] at 34:15-35:6. | 1775. **Disputed in Part - Not Supported by Cited Evidence.** Defendants respond as follows: Undisputed that Chris Loretto offered the quoted testimony. Ex. 90 (C. Loretto 30(b)(6) Tr.) at 34:15–35:6. However, disputed insofar as it implies that any latency concerns are material or quantifiable given that no measurable proof has been identified. Specifically, Mr. Loretto's testimony is unsupported and contradicted by evidence in the record. Mr. Loretto did not provide any support for the "256 percent" figure he cited or any figures supporting his claim about increased costs. Pursuant to Fed R. Evid. 106, increased bot scraping does not automatically affect "programmatic owned and operated revenue streams," especially when there are proper rate-limiting measures applied. The rate-limiting is performed per-client and will not impact other clients or the quality of the content. News Ex. 423 (N. Feamster Rebuttal Rep.) at ¶¶ 280–284 |
| 1776. Mr. Loretto also testified: "Additionally, it [bot scraping activity] introduces latency and weight to the websites which produce slower websites, and those impacts directly affect programmatic owned and operated revenue streams in the form of lower rates in the programmatic marketplace." Ex. 90 [Loretto 30(b)(6) Depo. Tr.] 35:1-6. | 1776. **Disputed in Part.** Defendants respond as follows: Undisputed that Chris Loretto offered the quoted testimony. However, disputed insofar as it implies that any latency concerns are material or quantifiable given that no measurable proof has been identified. Specifically, Mr. Loretto's testimony is unsupported and contradicted by evidence in the record. Mr. Loretto did not provide any support for his statement that bot activity "introduces |

| | |
|---|---|
| | latency and weight to the websites which produce slower websites." He also did not provide any support for his statement that "impacts directly affect programmatic owned and operated revenue streams in the form of lower rates in the programmatic marketplace." Increased bot scraping does not automatically affect "programmatic owned and operated revenue streams," especially when there are proper rate limiting measures applied. The rate-limiting is performed per-client and will not impact other clients or the quality of the content. Pursuant to Fed. R. Evid. 106, *see* News Ex. 423 (N. Feamster Rebuttal Rep.) at ¶¶ 280-284. |
| 1777. Ms. Jacobs, Head of Product Development for MediaNews Group, testified: "There's content theft, but there's also the impact to performance that could be implied in scraping, in my definition of scraping" and explained that even if the bot is just accessing the robots.txt file, it "still produces a non-zero load on our systems. Every access request does something." Ex. 73 [Jacobs 30(b)(6), Feb. 13, 2026, Depo. Tr.] at 406:6-407:20. | 1777. **Disputed in Part.** Defendants respond as follows: Undisputed that C.J. Jacobs offered the quoted testimony. Disputed insofar as it implies that any "impact to performance" is material or quantifiable given that no measurable proof has been identified. Specifically, Ms. Jacobs did not provide any support for her statement that "there's also the impact to performance that could be implied in scraping" and it is unclear what she means by "implied." As Dr. Feamster notes, "Due to relatively small file sizes compared to other components of a website, the retrieval of robots.txt files imposes negligible load on website infrastructure. Because robots.txt files are so often fetched by all compliant crawlers, they are also typically cached and distributed by a CDN, which are intermediary local systems specifically designed to reduce load on primary servers. For instance, Cloudflare's CDN |

| | |
|---|---|
| | documentation states that 'by default Cloudflare caches a website's robots.txt.' As a result, requests to robots.txt files are unlikely to impose strain on website infrastructure. In fact, where a Plaintiff domain properly disallows a bot in its robots.txt file, this may even reduce server load by lowering crawler traffic and significantly decreasing the volume of automated requests sent to a website." Pursuant to Fed. R. Evid. 106, *see* News Ex. 423 (N. Feamster Rebuttal Rep.) at ¶ 289. |

**4. Anticipated effects from widespread proliferation of conduct**

| | |
|---|---|
| 1778. Microsoft acknowledged that: "Today, most LLMs (including those from OpenAl) are built on millions of scraped webpages and other large text datasets, and almost none of this content has been obtained with its owners' knowledge or consent." Ex. 854 [MSFT_AI_MDL_000944196] at 196. | 1778. **Disputed in Part – Immaterial.** Microsoft responds as follows: Microsoft does not dispute that News Exhibit 854 contains the quoted language. But Microsoft disputes the characterization in Paragraph 1778 of that sentence as something "Microsoft acknowledged." News Exhibit 854 is an internal discussion document authored by Hecht, whose stated goals are to "[d]iscuss the existential challenges that today's LLMs face," to "[c]onsider and ideate potential mitigation strategies," and to "[a]lign on path forward." News Ex. 854 at MSFT_AI_MDL_000944196; A. Blanco Opp. Decl. Ex. 212 (B. Hecht 30(b)(1) Tr.) at 164:19–165:3. It describes the risks it discusses as ones that "the AI scientific literature has identified." News Ex. 854. The quoted sentence is a general statement about "most LLMs" across the industry. *Id.* |

| | |
|---|---|
| | Microsoft also responds that the facts stated in Paragraph 1778 are immaterial and therefore disputed because these facts do not affect the outcome of the suit under the governing law. An internal research memo, drafted for discussion purposes, has no bearing on the claims and defenses at issue in this case. A Microsoft employee's personal views on any hypothetical effects of LLMs on content creators have no bearing on any element of the claims or defenses in this case.<br>Additionally, Hecht's statements cannot be attributed to Microsoft. Hecht is a research academic employed at Microsoft to bring "divergent," "asymmetric, futuristic, and academic points of view;" he does not set Microsoft's core priorities for Microsoft or speak for Microsoft as to "his theoretical views about AI's potential effect on content creators." ECF 1707 (J. Usdan Decl.) ¶ 39. Microsoft leadership "does not share all of [his] views" and he is a "kind of intellectual provocateur." *Id.* *See* also A. Blanco Opp. Decl. Ex. 285 (J. Usdan 30(b)(6) Tr. (Feb. 11, 2026)) at 173:22-174:9. He was not involved in negotiating any of Microsoft's data access or display agreements and was not part of the decision-making process. ECF 1707 at ¶ 40. Hecht has himself disclaimed any authority to speak for Microsoft, testifying that his views on these subjects are "my view, not Microsoft's view," that "[he] has no idea if [they are shared] by the board of Microsoft," and that "[he] can't speak for the company on this stuff." Hecht himself testified that he does not speak for Microsoft and that his views are "my personal view" and "[n]ot the view of |

| | |
|---|---|
| | Microsoft." A. Blanco Opp. Decl. Ex. 212 (B. Hecht 30(b)(1) Tr.) at 319:18–20, 320:10–12, 321:4–5, 71:5–6, 302:6–9. He further described his views as "hypotheses," cautioned that "the jury is still out on a lot of this stuff," and acknowledged that he is "not a lawyer." *Id.* at 59:11–60:8, 165:9–15, 166:10–11. His personal views therefore are not statements of Microsoft and do not reflect Microsoft's knowledge, policies, or conduct.<br><br>OpenAI joins Microsoft's response, except to the extent any portion of it, including any testimony quoted under Fed. R. Evid. 106, could be read to characterize OpenAI, its models, or its conduct. OpenAI disputes any such characterization. Hecht is a Microsoft researcher who testified unequivocally: "I don't speak for Microsoft. I definitely don't speak for OpenAI." A. Blanco Opp. Decl. Ex. 212 (B. Hecht 30(b)(1) Tr.) at 100:11–12. His statements are not based on personal knowledge of OpenAI, are not attributable to OpenAI, and are inadmissible hearsay as to OpenAI. *See* Fed. R. Civ. P. 56(c)(2), (c)(4); Fed. R. Evid. 602, 801(d)(2)(D), 802. This paragraph cannot be offered to establish any fact concerning OpenAI. |
| 1779. One effect of ChatGPT's release in November 2022 was to spark other companies like Google to fast-track their own generative AI products, including but not limited to Google AI Overviews. Ex. 1111 [TONER_000000154] at 183. | 1779. **Disputed - Not Supported by Admissible Evidence.** Defendants respond as follows: The Court should disregard Paragraph 1779 because it is not supported by admissible evidence, as required by Local Rule 56.1, and therefore is not properly before the |

| | |
|---|---|
| | Court. Specifically, News Ex. 1111 is inadmissible hearsay because it is an out-of-court statement offered for the truth of its contents, unaccompanied by any authenticating testimony or sponsoring expert to establish its reliability under Fed. R. Evid. 803(18). It therefore may not be considered in support of summary judgment. Fed. R. Evid. 801; Fed. R. Evid. 802; Fed. R. Evid. 803. |
| 1780. Google AI Overviews and ChatGPT both provide quick answers in a presentable format, relieving the user of doing deep research. Ex. 1112 [“Ways to Search (AI Overviews),” Google, https://search.google/ways-to-search/ai-overviews/]; Ex. 128 [Stamm Rebuttal Rep.] ¶ 148; Ex. 1113 [“Find information in faster & easier ways with AI Overviews in Google Search,” Google Search Help, https://support.google.com/websearch/answer/14901683 ]; Ex. 495 [“Introducing ChatGPT search,” OpenAI ( Oct. 31, 2024), https://openai.com/index/introducing-chatgpt-search/]. | 1780. **Disputed in Part – Not Supported by Cited Evidence.** Defendants respond as follows: The facts set forth in Paragraph 1780 are disputed in part because they are not supported by the cited evidence. *See* News Ex. 1112 (“Ways to Search (AI Overviews),” Google); News Ex. 128 (L. Stamm Rebuttal Rep.) ¶ 148; News Ex. 1113 (“Find information in faster & easier ways with AI Overviews in Google Search,” Google Search Help); News Ex. 495 (“Introducing ChatGPT search,” OpenAI (Oct. 31, 2024)). Specifically, this fact suggests that Google AI Overviews and ChatGPT are the same, but they do not operate in the same way, and research may still be required after using ChatGPT. *See* J Gratz Decl. Ex. 278 (DNP-00534691 at -4695 (“ChatGPT is designed to have a conversation with the user and provide answers to questions, whereas Google Search is designed to retrieve and display relevant web pages based on a user’s query.”). |
| 1781. Defendants’ experts have acknowledged that News Plaintiffs have been harmed by Google AI Overviews. Ex. 467 [Goldfarb Opening Rep.] ¶ 169 (NYT); Ex. 467 [Goldfarb Opening Rep.] ¶ 185 (Daily News); Ex. 474 | 1781. **Disputed - Not Supported by Cited Evidence.** Defendants respond as follows: OpenAI objects to this fact because it omits the context necessary to understand or evaluate the statement, Fed. R. Evid. 401, |

| | |
|---|---|
| [Goldfarb ZD Opening Rep.] ¶¶ 132-33; Ex. 499 [Goldfarb ZD Reply Rep.] ¶ 96; Ex. 128 [Stamm Rebuttal Report] ¶¶ 139-147. | 403, and because News Plaintiffs' statement is not supported by the cited evidence. Specifically, the cited paragraphs concern Google AI Overviews, a product developed and operated by Google, an entirely separate company that is not a party in this action and that has no bearing on any alleged harm attributable to OpenAI or its products. News Plaintiffs mischaracterize the substance of the cited expert opinions.<br>Dr. Goldfarb [redacted] |

| | |
|---|---|
| | [redacted] Dr. Stamm does not acknowledge harm from Google AI Overviews. To the contrary, Dr. Stamm demonstrates that Mr. Malackowski "fails to distinguish the potential impact of Google AI Overviews on Google referrals from the potential impact of other Generative AI applications" and emphasizes that "unlike ChatGPT, Google AI Overviews can be accessed through Google Search, the very interface used by a predominant share of traditional search engine users." News Ex. 128 (Stamm Rebuttal Rep.) ¶ 138.<br><br>Microsoft disputes the fact in Paragraph 1781. The fact refers to "Defendants' experts" but Plaintiffs do not cite any evidence related to Microsoft's experts to support Paragraph 1781. For that reason, Paragraph 1781 is not supported by the cited evidence as to Microsoft. Microsoft further defers to OpenAI. |
| 1782. Dr. Stamm, an OpenAI economic expert, opined that users who view content via Google AI Overviews are less likely to click on a link. Ex. 128 [Stamm Rebuttal Rep.] ¶¶ 139-140; Ex. 129 [Stamm ZD Rebuttal Rep.] ¶ 129; Ex. 1215 [Chapekis, A., and Lieb, A., "Google users are less likely to click on links when an AI summary appears in the results," Pew Research, July 22, 2025, https://www.pewresearch.org/short-reads/2025/07/22/google-users-are-less-likely-to-click-on-links-when-an-ai-summary-appears-in-the-results/]. | 1782. **Disputed in Part – Not Supported by Cited Evidence.** OpenAI responds as follows: Undisputed that Dr. Stamm restates the Pew Research finding stating that "[t]he lower tendency of users to click on links on a search results page with AI Overviews *potentially* can result in lower Google search referral traffic to news publisher websites." News Ex. 128 (L. Stamm Rebuttal Rep.) ¶ 140 (emphasis added); News Ex. 129 (L. Stamm ZD Rebuttal Rep.) ¶ 129. However, disputed to the extent it implies that AI Overviews meaningfully suppress |

| | |
|---|---|
| | click-through rates and cause harm, because that implication is not supported by the cited evidence. Specifically, Dr. Stamm cites the Pew Research report only in support of her opinion that Mr. Malackowski "has not shown that ChatGPT specifically has 'materially altered' the search engine referral mechanism." News Ex. 128 (Stamm Rebuttal Rep.) ¶ 138.<br>Further, the cited Pew Research Center survey is narrower than Plaintiffs suggest. Pew's own methodology measures searches, not distinct users. News Ex. 1215 (Chapekis, A., and Lieb, A., "Google users are less likely to click on links when an AI summary appears in the results," Pew Research (July 22, 2025)). Pew measured clicks per visit: users who received an AI summary clicked on a traditional link in 8 percent of *visits*, versus 15 percent of visits when users did not encounter a summary. *Id.* at 1. It did not measure whether individual "users" are less likely to click. *Id.*<br><br>Microsoft defers to OpenAI. |
| 1783. According to the July 2025 Pew Research study cited by Dr. Stamm, users clicked on traditional search results in just 8% of searches where a Google AI summary was present, compared to 15% of searches without one. Ex. 128 [Stamm Rebuttal Rep.] ¶ 139; Ex. 129 [Stamm ZD Rebuttal Rep.] ¶ 130; Ex. 1216 [Chapekis, A., and Lieb, A., "Google users are less likely to click on links when an AI summary appears in the results," Pew Research, July 22, 2025, https://www.pewresearch.org/short- | 1783. **Disputed in Part – Not Supported by Cited Evidence.** Defendants respond as follows: Undisputed only that Dr. Stamm's reports quote the Pew Research Center as reporting that "15 percent of Google users click on links in search result pages without, while only 8 percent do so when they encounter, AI Overviews." News Ex. 128 (L. Stamm Rebuttal Rep.) ¶ 139; News Ex. 129 (L. Stamm ZD Rebuttal Rep.) ¶ 129. However, disputed to the extent it implies that AI Overviews meaningfully |

| | |
|---|---|
| reads/2025/07/22/google-users-are-less-likely-to-click-on-links-when-an-ai-summary-appears-in-the-results/]. | suppress click-through rates and cause harm, because that implication is not supported by the cited evidence. *See* Ex. 1216 (Chapekis, A., and Lieb, A., "Google users are less likely to click on links when an AI summary appears in the results," Pew Research (July 22, 2025)). Specifically, Dr. Stamm cites the Pew Research report only in support of her opinion that Mr. Malackowski "has not shown that ChatGPT specifically has 'materially altered' the search engine referral mechanism." Ex. 128 (L. Stamm Rebuttal Rep.) ¶ 138. |
| 1784. Dr. Goldfarb, an OpenAI economic expert, opined: "I find that the decline in referral traffic to The Times's properties has been driven by a combination" of factors including "e.g., Google AI Overviews." Ex. 467 [Goldfarb Opening Rep.] ¶169 (NYT). | 1784. **Disputed in Part.** OpenAI responds as follows: Defendants object to this fact because it omits the context necessary to understand or evaluate the statement. Fed. R. Evid. 401, 403. Specifically, the fact quotes only the phrase "a combination" and the isolated reference to "e.g., Google AI Overviews," omitting the full statement. Pursuant to Fed. R. Evid. 106, Dr. Goldfarb's report stated: "I find that the decline in referral traffic to The Times's properties has been driven by a combination of [redacted] (e.g., Google AI Overviews), [redacted]." Ex. 467 (A. Goldfarb NYT Opening Rep.) ¶ 169.<br><br>Microsoft defers to OpenAI. |
| 1785. Dr. Goldfarb also opined that "...Google's introduction of AI overviews may have depressed search | 1785. **Disputed in Part.** OpenAI responds as follows: The facts set forth in Paragraph 1785 are disputed |

| | |
|---|---|
| referrals by 20 to 60 percent" for the Daily News Plaintiffs. Ex. 467 [Goldfarb Opening Rep.] ¶ 185 (Daily News). | in part because they are not supported by the cited evidence. *See* News Ex. 467 (A. Goldfarb NYT/DN Opening Rep.) ¶ 185. Specifically, the cited exhibit is incorrect. Plaintiffs cite Dr. Goldfarb's NYT Opening Report for a Daily News proposition, not the Goldfarb DN Opening Report.<br>Further, Defendants object to this fact because it omits the context necessary to understand or evaluate the statement. Fed. R. Evid. 401, 403. Plaintiffs' characterization misstates the source and nature of the figure. Pursuant to Fed. R. Evid. 106, Dr. Goldfarb states, in full: "By DNP's own estimates, Google's introduction of AI Overviews may have depressed search referrals by 20 to 60 percent. If accurate, I would expect this to present a substantial headwind to DNP's traffic and, by extension, its subscriber acquisition efforts." News Ex. 467 (A. Goldfarb NYT/DN Opening Rep.) ¶ 185. The figure is the Daily News Plaintiffs' own internal projection, not Dr. Goldfarb"s empirical finding. Dr. Goldfarb cited the projection to show that Google, not ChatGPT, explains the decline in referrals. Paragraph 185 states that the Daily News Plaintiffs [redacted] Id.<br>Microsoft defers to OpenAI. |

| | |
|---|---|
| 1786. Dr. Goldfarb opined further that Google's "AI Overviews have the potential to impact CTR and referral traffic from Google Search" to Ziff Davis websites. Ex. 499 [Goldfarb ZD Reply Rep.] ¶ 98. | 1786. **Disputed in Part.** OpenAI responds as follows: Defendants object to this fact because it omits the context necessary to understand or evaluate the statement. Fed. R. Evid. 401, 403. Pursuant to Fed. R. Evid. 106, Dr. Goldfarb states, in full: "Like other changes that Google makes to Google Search, AI Overviews have the potential to impact CTR and referral traffic from Google Search because Google AI Overviews are presented to users who are already using Google Search." News Ex. 499 (A. Goldfarb ZD Reply Rep.) ¶ 98. Dr. Goldfarb goes on to state that "ChatGPT is not part of the Google Search system of functionality[.]" *Id.* He states that Plaintiff "has not presented any evidence or analysis (or even described a mechanism) through which ChatGPT could have an impact on the CTR the plaintiff receives from Google Search." *Id.* And he states that "Google AI Overviews reflect Google's product decisions, made independently by a different company with different technology[.]" Id.<br><br>Further, News Plaintiffs mischaracterize the substance of the cited expert opinion. Dr. Goldfarb cited News Plaintiffs" own internal documents ascribing harm to Google AI Overviews or as context in support of his opinion that factors wholly unrelated to OpenAI were the cause of the traffic declines Plaintiffs attribute to Defendants. Pursuant to Fed. R. Evid. 106, in the paragraph cited, Dr. Goldfarb explains: "Evidence from Ziff Davis's own internal documents [redacted] plaintiff's [redacted]." News Ex. 474 (A. |

| | |
|---|---|
| | Goldfarb ZD Opening Rep.) ¶ 98. *See also* ECF 1763 (A. Goldfarb Decl.) ¶ 89 ("My reports identified several alternative causes of traffic and revenue changes that predated or were independent of ChatGPT... Ziff Davis's data [] pointed to Google-driven referral changes.")<br><br>Microsoft responds that Paragraph 1786 does not pertain to claims asserted against Microsoft. |
| 1787. Dr. Sinnreich, OpenAI's media expert, opined: "According to a 2026 analysis of ChartBeat data by the Reuters Institute, referral traffic to publishers from both Google Search and Google Discover has dropped considerably (from over 5 billion monthly referrals via Discover to fewer than 4 billion, and from well over 3 billion via Search to slightly more than 2 billion) since Google introduced AI overviews." Ex. 1217 [Sinnreich NYT Opening Rep.] at ¶ 74; Ex. 1218 [Sinnreich ZD Opening Rep.] at ¶ 74 | 1787. **Disputed in Part– Not Supported by Cited Evidence; Immaterial.** OpenAI responds as follows: Undisputed that the Sinnreich NYT and ZD Opening Reports offered the quoted language. News Ex. 1217 (A. Sinnreich NYT Opening Rep.) ¶ 74; News Ex. 1218 (A. Sinnreich ZD Opening Rep.) ¶ 74. However, disputed to the extent Plaintiffs offer that sentence as Dr. Sinnreich's own finding, or as evidence of any harm attributable to OpenAI, because the cited evidence does not support either proposition. Specifically, the figures are not specific to the News Plaintiffs. They do not show that ChatGPT or any accused model substituted for the Asserted Works, diverted traffic from Plaintiffs' properties, or caused cognizable harm.<br><br>Microsoft defers to OpenAI. |
| 1788. Dr. Sinnreich admitted that declines in Google referrals are related to AI-generated summaries, among other things. Ex. 1217 [Sinnreich NYT Opening Rep.] | 1788. **Disputed in Part– Not Supported by Cited Evidence.** OpenAI responds that the facts set forth in Paragraph 1788 are disputed in part because they are not |

| | |
|---|---|
| at ¶¶114-115; Ex. 1218 [Sinnreich ZD Opening Rep.] ¶¶114-115. | supported by the cited evidence. Specifically, Plaintiffs did not file or serve Exhibits 1217 and 1218.<br>Undisputed that ¶ 114 of Dr. Sinnreich's opening reports states that, to the extent publishers have experienced changes in traffic patterns since Google introduced AI Overviews, "those effects are closely tied to the design and policies of Google, which has independently introduced features, including algorithmic ranking changes and AI-generated summaries, that can affect how users access news content." Ex. 1217 ¶ 114; Ex. 1218 ¶ 114.<br>However, disputed because the fact omits the context necessary to understand or evaluate the statement, and Defendants object to it on that basis. Fed. R. Evid. 401, 403. Pursuant to Fed. R. Evid. 106, Plaintiffs also omit the conclusion of ¶ 114. Those Google dynamics "provide a more direct explanation for observed changes in publisher traffic than any effects attributable to OpenAI's products." Ex. 1217 ¶ 114; Ex. 1218 ¶ 114. And "[a]ny changes in publisher traffic patterns should not be taken as evidence that users are substituting news or summaries generated in response to user prompts on ChatGPT for the professional journalism of Plaintiff(s)." Ex. 1217 ¶ 114; Ex. 1218 ¶ 114.<br>Further, News Plaintiffs mischaracterize the substance of ¶¶ 114–115 of Exs. 1217 and 1218, which are identical. Dr. Sinnreich states that AI Overviews only "potentially" reduce the incentive for users to click through. Ex. 1217 ¶ 113; Ex. 1218 ¶ 113 (emphasis added). He states that the features "can affect" how users access news. Ex. 1217 ¶ 114; Ex. 1218 ¶ 114 (emphasis added). He did not |

| | |
|---|---|
| | opine that ChatGPT or any OpenAI product caused any decline in referral traffic. Ex. 1217 ¶¶ 112–115; Ex. 1218 ¶¶ 112–115.<br><br>Microsoft defers to OpenAI. |
| 1789. Google is also reported to be using content from publishers who "opt out" of other AI training to power AI overviews. Ex. 1219 ["Google is using content from publishers who "opt out" of other AI training to power AI Overviews," *Nieman Labs*, May 5, 2025, https://www.niemanlab.org/2025/05/google-is-using-content-from-publishers-who-opt-out-of-other-ai-training-to-power-ai-overviews/]. | 1789. **Undisputed – Not Supported by Admissible Evidence; Immaterial.** Defendants respond as follows: Undisputed that News Ex. 1219 reports that Google is using content from publishers who "opt out" of other AI training to power AI Overviews. News Ex. 1219. However, News Ex. 1219 is inadmissible hearsay because it is an out-of-court statement offered for the truth of its contents. Fed. R. Evid. 801, 802.<br>And the fact stated in Paragraph 1789 is immaterial because this fact does not affect the outcome of the suit under the governing law. Specifically, a third party's operations has no bearing on the claims or defenses asserted in this case. |
| 1790. Google's AI Overviews are AI-generated summaries that appear at the top of Google users' search queries. Ex. 467 [Goldfarb Opening Rep.] ¶ 199 (NYT); Ex. 474 [Goldfarb ZD Opening Rep.] ¶ 132; Ex. 1220 ["How Google's AI Overviews Work, and How to Turn Them Off (You Can't)," Wired, May 16, 2024, https://www.wired.com/story/google-ai-overviews-how-to-use-how-to-turn-off/]. | 1790. **Undisputed – Immaterial.** Defendants do not dispute Paragraph 1790, but the fact stated in Paragraph 1790 is immaterial because this fact does not affect the outcome of the suit under the governing law. Specifically, a third party's operations has no bearing on the claims or defenses asserted in this case. |

| | |
|---|---|
| 1791. According to Google, "AI overviews provide a snapshot of key information about a topic or question with links so you can easily explore more on the web." Ex. 1112 ["Ways to Search (AI Overviews)," Google, https://search.google/ways-to-search/ai-overviews/]. | 1791. **Undisputed – Not Supported by Admissible Evidence; Immaterial.** Defendants respond as follows: Undisputed that News Ex. 1112 states that "AI overviews provide a snapshot of key information about a topic or question with links so you can easily explore more on the web." News Ex. 1112. However, News Ex. 1112 is inadmissible hearsay because it is an out-of-court statement offered for the truth of its contents. Fed. R. Evid. 801, 802.<br>And the fact stated in Paragraph 1791 is immaterial because this fact does not affect the outcome of the suit under the governing law. Specifically, a third party's operations has no bearing on the claims or defenses asserted in this case. |
| 1792. As Google explains: "Sometimes you want a quick answer, but you don't have time to piece together all the information you need. Search will do the work for you with AI Overviews." Ex. 474 [Goldfarb ZD Opening Rep.] ¶ 132; Ex. 1114 [Reid, Elizabeth, "Generative AI in Search: Let Google do the searching for you," Google, May 14, 2024, https://blog.google/products-and-platforms/products/search/generative-ai-google-search-may-2024/]. | 1792. **Undisputed – Immaterial.** Defendants do not dispute Paragraph 1792, but the fact stated in Paragraph 1792 is immaterial because this fact does not affect the outcome of the suit under the governing law. Specifically, a third party's operations has no bearing on the claims or defenses asserted in this case. |
| 1793. According to Tom Rubin, OpenAI's Chief IP Officer, "[u]sers increasingly like answers to be delivered quickly in a conversational and context-aware manner as opposed to the traditional land of an inefficient list of ten blue links." Ex. 1110 ["OpenAI content boss on Google 'ten | 1793. **Undisputed - Not Supported by Admissible Evidence; Immaterial.** OpenAI responds as follows: Undisputed that News Ex. 1110 reports that Mr. Rubin stated that "[u]sers increasingly like answers to be delivered quickly in a conversational and context-aware |

| | |
|---|---|
| blue links' and arrival of ChatGPT search," Press Gazette, https://pressgazette.co.uk/platforms/openai-chatgpt-search-tom-rubin/]. | manner as opposed to the traditional land of an inefficient list of ten blue links." News Ex. 1110. However, News Ex. 1110 is inadmissible hearsay because it is an out-of-court statement offered for the truth of its contents. Fed. R. Evid. 801, 802.<br>And fact stated in Paragraph 1793 is immaterial because this fact does not affect the outcome of the suit under the governing law. Specifically, a third party's operations has no bearing on the claims or defenses asserted in this case.<br><br>Microsoft defers to OpenAI. |
| 1794. Google AI Overviews is marketed as being intended to answer complex, contextual questions and deliver substantive summaries, guides and explanations. Ex. 128 [Stamm DN/NYT Rebuttal Rep.] ¶ 145. | 1794. **Undisputed – Immaterial.** Defendants do not dispute Paragraph 1794, but the fact stated in Paragraph 1794 is immaterial because this fact does not affect the outcome of the suit under the governing law. Specifically, a third party's operations has no bearing on the claims or defenses asserted in this case. |
| 1795. OpenAI likewise advertises itself as a platform that can handle tasks such as "Answering questions and explaining concepts." Ex. 1115 ["ChatGPT Capabilities Overview," OpenAI, https://help.openai.com/en/articles/9260256-chatgpt-capabilities-overview]. | 1795. **Undisputed – Immaterial.** Defendants do not dispute Paragraph 1795, but the fact stated in Paragraph 1795 is immaterial because this fact does not affect the outcome of the suit under the governing law. Specifically, a third party's operations has no bearing on the claims or defenses asserted in this case. |
| 1796. Google noted that users will "find AI Overviews in your Google Search results when [its] systems determine that generative AI can be especially helpful—for | 1796. **Undisputed – Immaterial.** Defendants do not dispute Paragraph 1796, but the fact stated in Paragraph 1796 is immaterial because this fact does not |

| | |
|---|---|
| example, when [users] want to quickly understand information from a range of sources." Ex. 1113 ["Find information in faster & easier ways with AI Overviews in Google Search," Google Search Help, https://support.google.com/websearch/answer/14901683]; Ex. 128 [Stamm DN/NYT Rebuttal Rep.] ¶ 148; Ex. 129 [Stamm ZD Rebuttal Rep.] ¶ 134. | affect the outcome of the suit under the governing law. Specifically, a third party's operations has no bearing on the claims or defenses asserted in this case. |
| 1797. ChatGPT claims their system "reads and synthesizes content across multiple online sources and produces cited, structured outputs." Ex. 1115 ["ChatGPT Capabilities Overview," OpenAI, https://help.openai.com/en/articles/9260256-chatgpt-capabilities-overview]. | 1797. **Disputed in Part– Not Supported by Cited Evidence.** OpenAI responds as follows: The facts set forth in Paragraph 1797 are disputed in part because they are not supported by the cited evidence. *See* News Ex. 1115. Specifically, ChatGPT is a product that is not capable of making "claims." The cited source is an OpenAI help center page. Attributing the statement to "ChatGPT" rather than "OpenAI" is a rhetorical device that personifies the product.<br>Further, OpenAI objects to this fact because it omits the context necessary to understand or evaluate the statement. Fed. R. Evid. 401, 403. Pursuant to Fed. R. Evid. 106, the cited section concerns "deep research" specifically, not the entire product. News Ex. 1115 at 2.<br><br>Microsoft defers to OpenAI. |
| 1798. According to Microsoft, the "[p]romise of LLMs is largely in the same information work domains from which they get their content… They naturally compete with their content supply chain." Ex. 810 [Hecht Depo. Ex. 2] at 13. | 1798. **Disputed in Part – Immaterial.** Microsoft responds as follows: Microsoft does not dispute that News Ex. 810 contains the quoted language. But Microsoft disputes the implication in Paragraph 1798 that the quoted language reflects a statement "[a]ccording to |

| | |
|---|---|
| | Microsoft." News Ex. 810 is a slide deck by Brent Hecht for a September 6, 2023 research talk. News Ex. 810 at 2. The ellipsis in Paragraph 1798 omits the domains the slide actually lists, "(law, medicine, coding, science . . .)," none of which are news. Paragraph 1798 likewise drops the slide's framing that this is "[u]nderstandable given the nature of the technology." *Id.* at 13.<br>Microsoft further responds that the facts set forth in Paragraph 1798 are immaterial and therefore disputed because these facts do not affect the outcome of the suit under the governing law. Specifically, an individual researcher's theoretical views in a research talk have no bearing on the claims and defenses asserted in this case.<br>Additionally, Hecht's statements cannot be attributed to Microsoft. Hecht is a research academic employed at Microsoft to bring "divergent," "asymmetric, futuristic, and academic points of view"; he does not set Microsoft's core priorities or speak for Microsoft as to "his theoretical views on AI's potential effect on content creators"; and Microsoft leadership "does not share all of [his] views"; and he is a "kind of intellectual provocateur." ECF 1707 (J. Usdan Decl.) (Sept. 4, 2026) ¶ 39; A. Blanco Opp. Decl. Ex. 285 (J. Usdan 30(b)(6) Tr.) at 173:22–174:9. Hecht has himself disclaimed any authority to speak for Microsoft, testifying that his views on these subjects are "my view, not Microsoft's view," that "[he] has no idea if [they are] shared by the board of Microsoft," and that "[he] can't speak for the company on this stuff." A. Blanco Opp. Decl. Ex. 212 (B. Hecht 30(b)(1) Tr.) at 319:18–20, 320:10– |

| | |
|---|---|
| | 12, 321:4–5. He further described his views as "hypotheses," cautioned that "the jury is still out on a lot of this stuff," and acknowledged that he is "not a lawyer." *Id.* at 59:11–60:8, 165:9–15, 166:10–11. Hecht's personal views therefore are not statements of Microsoft and do not reflect Microsoft's knowledge, policies, or conduct.<br><br>OpenAI joins Microsoft's response, except to the extent any portion of it, including any testimony quoted under Fed. R. Evid. 106, could be read to characterize OpenAI, its models, or its conduct. OpenAI disputes any such characterization. Hecht is a Microsoft researcher who testified unequivocally: "I don't speak for Microsoft. I definitely don't speak for OpenAI." *Id.* at 100:11–12. His statements are not based on personal knowledge of OpenAI, are not attributable to OpenAI, and are inadmissible hearsay as to OpenAI. *See* Fed. R. Civ. P. 56(c)(2), (c)(4); Fed. R. Evid. 602, 801(d)(2)(D), 802. This paragraph cannot be offered to establish any fact concerning OpenAI. |
| 1799. The ongoing shift in the digital landscape to contained ecosystems has adversely impacted, and The Times expects it will continue to adversely impact, its online traffic and audience. Ex. 1 [The New York Times SEC Form 10-K Dec. 31, 2025] at 11. | 1799. **Disputed – Not Supported by Admissible Evidence.** Defendants respond as follows: Defendants do not dispute that News Ex. 1 reflects the language set forth in Paragraph 1799. But Defendants dispute the fact set forth in Paragraph 1799 that the "ongoing shift in the digital landscape to contained ecosystems has adversely impacted, and The Times expects it will continue to adversely impact, its online traffic and |

| | |
|---|---|
| | audience" because the fact as stated is a speculative prediction ("we expect"), rather than an actual fact. The fact as stated also does not mention Defendants, does not attribute any traffic or audience effect to Defendants, and does not establish causation, injury, or damages. Further, the fact is contradicted by empirical analysis, which shows that traffic to The Times website has not changed following the introduction of ChatGPT and Copilot. ECF 1733 (C. Tucker Decl.) ¶¶ 11(a), 63–66, 92–93.<br>Defendants also dispute the fact set forth in Paragraph 1799 on the grounds that it is not supported by admissible evidence, as required by Local Rule 56.1, and therefore is not properly before the Court. Specifically, The Times's 10-K is hearsay and cannot be considered for the truth of the matter asserted. |
| 1800. The Times's Deputy Managing Editor Sam Dolnick testified that "[s]ince the LLMs have launched, the entire Internet ecosystem has changed. And we used to get much more traffic from Google Search than we do now." Ex. 4 [Dolnick Depo. Tr.] at 71:23-25. | 1800. **Disputed in Part.** Defendants respond as follows: Undisputed that Mr. Dolnick gave the quoted testimony. A. Blanco Opp. Decl. Ex. 192 (S. Dolnick 30(b)(1) Tr.) 71:23–25. However, disputed that Defendants have caused harm to Plaintiffs. Specifically, Defendants dispute that The Times' traffic has been impacted by the launch of ChatGPT and Copilot. *See* ECF 1733 (C. Tucker Decl.) ¶¶ 11(a), 56–66, 92–93, 113–114, 119–120. |
| 1801. In the first half of 2024, although The Times grew its enterprise audience from the prior year, [redacted] | 1801. **Disputed in Part – Not Supported by Admissible Evidence.** Defendants respond as follows: Defendants do not dispute that News Ex. 1116 contains the quoted language. However, disputed as to Plaintiffs' |

| | |
|---|---|
| [redacted] Ex. 1116 [NYT_00467379] at 399. | characterization of that document, and Defendants object to the paragraph to the extent it is offered to show that Defendants caused any harm to Plaintiffs' audience. Specifically, News Ex. 1116 states that The Times [redacted] News Ex. 1116 at NYT_00467398–99. The document does not identify OpenAI, ChatGPT, or any OpenAI product as a cause of any audience decline. [redacted]. *Id.* But Defendants dispute that The Times suffered any harm from the alleged use of its Asserted Works to train or ground the LLMs at issue in part because [redacted]. *See* ECF 1733 (C. Tucker Decl.) ¶¶ 11(a), 56–66, 92–93, 113–114, 119–120.<br>Defendants further respond that Paragraph 1801 is disputed on the grounds that it is not supported by admissible evidence, as required by Local Rule 56.1, and therefore is not properly before the Court. Specifically, the evidence cited lacks foundation and is hearsay. |

| | |
|---|---|
| 1802. An October 2025 Times board presentation notes that [redacted] Ex. 1117 [NYT_01034148] at slide 11 notes. | 1802. **Disputed in Part – Not Supported by Cited Evidence; Not Supported by Admissible Evidence; Immaterial.** Defendants respond as follows: The facts set forth in Paragraph 1802 are disputed as characterized and because they are not supported by the cited evidence. *See* News Ex. 1117 (NYT_01034148) at slide 11 notes. Specifically, News Ex. 1117 does not contain the quoted "slide 11 notes" language. Slide 11 of that exhibit contains only slide text. *Id.* at slide 11. Further, disputed because the cited presentation, titled [redacted] Defendants also dispute that [redacted] *See* ECF 1733 (C. Tucker Decl.) ¶¶ 11(a), 56–66, 92–93, 113–114, 119–120.<br>Defendants also respond that Paragraph 1802 is disputed on the grounds that it is not supported by admissible evidence, as required by Local Rule 56.1, and therefore is not properly before the Court. Specifically, the evidence cited lacks foundation and is hearsay.<br>Defendants also respond that whether [redacted] is immaterial because that does not |

| | |
|---|---|
| | affect the outcome of the suit under the governing law. The Times is not entitled to any particular business model, including a certain amount of search-referred traffic, and thus any alleged change in search-referred traffic to The Times's site is not a cognizable copyright harm. |
| 1803. As OpenAI's expert Dr. Goldfarb recognizes, The Times has cited evergreen articles – articles that are 30 days or older - as those being most impacted by Google AI Overviews. Ex. 467 [Goldfarb Opening Rep.] ¶ 141; Ex. 1119 [Poferl 30(b)(6) Depo. Ex. 10] at 6, 24; Ex. 1118 [Poferl 30(b)(6) Depo. Ex. 4] at 4, 52, 56. | 1803. **Disputed in Part – Not Supported by Cited Evidence.** OpenAI responds as follows: Undisputed that Plaintiffs' internal documents [redacted]. News Ex. 1119 (H. Poferl 30(b)(6) Dep. Ex. 10) at 6, 24; News Ex. 1118 (H. Poferl 30(b)(6) Dep. Ex. 4) at 4, 52, 56. However, disputed as to the remainder of the paragraph, which omits context and mischaracterizes Dr. Goldfarb's report. Specifically, pursuant to Fed. R. Evid. 106, Dr. Goldfarb cited Plaintiffs' internal documents to show [redacted] News Ex. 467 (A. Goldfarb NYT/DN Opening Rep.) ¶ 141. He opined that he is not "aware of any reliable evidence that would support the conclusion that ChatGPT has resulted in decreasing traffic to 'evergreen' content or otherwise harmed the market for or value of such content." *Id.*<br><br>Microsoft defers to OpenAI. |
| 1804. As of May 2024, evergreen search made up an average of [redacted] of The Times's total search readership and | 1804. **Undisputed.** |

| | |
|---|---|
| [redacted] of The Times's overall weekly readership. Ex. 1120 [NYT_00692284] at slide 27. | |
| 1805. The Times's conversion rates are [redacted] on evergreen coverage than on newer coverage. Ex. 83 [Poferl 30(b)(6) Depo. Tr.] at 127:14-16; Malackowski NYT-DNP Rebuttal Rep. at 88, Figure 12. | 1805. **Disputed in Part – Not Supported by Cited Evidence.** Defendants respond as follows: Undisputed that Plaintiffs' Rule 30(b)(6) designee gave the cited testimony. A. Blanco Opp. Decl. Ex. 258 (H. Poferl 30(b)(6) Tr.) at 127:14–16. However, disputed that the cited evidence establishes the asserted fact. Specifically, pursuant to Fed. R. Evid. 106, Ms. Poferl testified only that [redacted]. *Id.* at 127:8–11. Further, Figure 12 of the Malackowski Rebuttal Report does not depict conversion rates. It depicts "[redacted] drawn from NYT_00692284 at slide 27. ECF 1800-2 (J. Malackowski Decl. Ex. B (NYT-DNP Rebuttal Rep.)) at 88, Fig. 12. Defendants further dispute any implication in Paragraph 1805 that The Times suffered any harm from the alleged use of its Asserted Works to train or ground the LLMs at issue in part because [redacted] *See* ECF 1733 (C. Tucker Decl.) ¶¶ 11(a), 52–53. |
| 1806. Ziff Davis saw a decline in Google click-through traffic after it launched AI Overviews. Ex. 550 [Schneider Depo. Tr.] 34:12-19, 39:13-40:8, 40:18-41:2, Ex. | 1806. **Disputed in Part.** OpenAI responds as follows: Undisputed that certain Ziff Davis witnesses testified that traffic to certain Ziff Davis properties fell |

| | |
|---|---|
| 727 [Mattheis 30(b)(1) Depo. Tr.] at 32:15–34:22, Ex. 705 [Elward Depo. Tr.] at 19:11–20:13, 33:19-23, 61:4-24. | during periods after Google introduced its AI Overviews feature.<br>However, OpenAI disputes the remainder. The cited testimony shows a time sequence, not a cause. Mr. Schneider [redacted]. A. Blanco Opp. Decl. Ex. 269 (P. Schneider 30(b)(6) Tr.) at 34:18–19. Ziff Davis [redacted]. A. Blanco Opp. Decl. Ex. 196 (W. Elward Tr.) at 79:6–80:2; A. Blanco Opp. Decl. Ex. 246 (K. Oh 30(b)(6) Tr. (Feb. 24, 2026)) at 104:19–105:4. Moreover, Ziff Davis's witness acknowledged that [redacted] A. Blanco Opp. Decl. Ex. 271 (V. Shah Tr.) at 160:2–22. Accordingly, the disputed proposition is not supported by the cited evidence.<br><br>Microsoft responds that Paragraph 1806 does not pertain to claims asserted against Microsoft. |
| 1807. Certain publishers are reportedly laying off workers, citing the decline in search-driven referral models. Ex. 1121 ["News Sites Are Getting Crushed by Google's New AI Tools," The Wall Street Journal, https://www.wsj.com/tech/ai/google-ai-news-publishers-7e687141]. | 1807. **Disputed in Part – Immaterial; Not Supported by Cited Evidence; Not Supported by Admissible Evidence.** Defendants respond as follows: Undisputed that News Ex. 1121 is a Wall Street Journal article reporting on declines in search referrals to certain publishers. However, disputed to the extent Plaintiffs suggest that the article establishes harm to Plaintiffs attributable to OpenAI or Microsoft. The reported traffic declines and layoffs concern non-party publishers and are |

| | |
|---|---|
| | not probative of harm to Plaintiffs. Moreover, the article attributes the reported traffic declines to Google, not OpenAI or Microsoft.<br>Defendants further object to News Ex. 1121 and the third-party statements it recounts as inadmissible hearsay to the extent offered for the truth of the matters asserted. Fed. R. Evid. 802; Fed. R. Civ. P. 56(c)(2). |
| 1808. On June 3, 2025, when the online publication Business Insider laid off 21% of its workforce, "scaling back on coverage areas and traffic sensitive business and exiting its "Commerce verticals, which have long been a major revenue driver through affiliate links and search engine traffic," it "cited volatility in traffic and the decline of search-driven referral models as reasons to curtail its coverage." Ex. 1122 ["Business Insider goes 'all-in on AI,' laying off 21% of staff," Yahoo Finance, https://finance.yahoo.com/news/business-insider-goes-ai-laying-151220359.html]. | 1808. **Disputed in Part – Immaterial; Not Supported by Cited Evidence; Not Supported by Admissible Evidence.** Defendants respond as follows: Undisputed that News Ex. 1122 is an article reporting on layoffs at Business Insider. However, disputed to the extent Plaintiffs suggest that the article establishes harm to Plaintiffs attributable to OpenAI or Microsoft. Business Insider is not a plaintiff in this action, and its layoffs, traffic trends, and operational decisions are not probative of harm to Plaintiffs. Although the article references "volatility in traffic and the decline of search-driven referral models," neither the article nor the quoted language identifies OpenAI, Microsoft, or any of their products as the cause of Business Insider's traffic declines. News Ex. 1122.<br>Defendants further object to News Ex. 1122 and the third-party statements it recounts as inadmissible hearsay to the extent offered for the truth of the matters asserted. Fed. R. Evid. 802; Fed. R. Civ. P. 56(c)(2). |
| 1809. In February 2026, the Washington Post laid off more than "300 of its roughly 800 journalists in the newsroom," and Matt Murray, the Post's executive editor, | 1809. **Disputed in Part – Immaterial; Not Supported by Cited Evidence; Not Supported by Admissible Evidence.** Defendants respond as follows: |

| | |
|---|---|
| explained that "online search traffic, partly because of the rise of generative A.I., had fallen by nearly half in the last three years." Ex. 1123 ["Washington Post Lays Off More than 300 Journalists," The New York Times, https://www.nytimes.com/2026/02/04/business/media/washington-post-layoffs.html]. | Undisputed that News Ex. 1123 contains the quoted statements attributed to Matt Murray. However, disputed to the extent Plaintiffs suggest that the article establishes harm to Plaintiffs attributable to OpenAI or Microsoft. The Washington Post is not a plaintiff in this action, and its layoffs, traffic trends, and operational decisions are not probative of harm to Plaintiffs. Mr. Murray's statement that search traffic fell "partly because of the rise of generative AI" does not attribute those declines specifically to OpenAI, Microsoft, or any of their products. The article also identifies other challenges affecting the news industry, including the fragmentation of audiences across social media platforms. News Ex. 1123 at 4.<br>Defendants further object to News Ex. 1123 and the third-party statements it recounts, including Mr. Murray's statements, as inadmissible hearsay to the extent offered for the truth of the matters asserted. Fed. R. Evid. 802; Fed. R. Civ. P. 56(c)(2). |

### E. Other Effects on the Public

| | |
|---|---|
| 1810. Former Vice President of Research at OpenAI Dario Amodei testified that he left OpenAI after losing "trust in the honesty and integrity of the leadership team at OpenAI" and confirmed he believed OpenAI was not taking safety issues seriously enough. Ex. 625 [Amodei Depo. Tr.] at 325:18-326:22. | 1810. **Disputed in Part – Immaterial; Incomplete; Not Supported by Cited Evidence.** OpenAI responds as follows: Undisputed that Amodei testified concerning his reasons for leaving OpenAI. However, the circumstances of his departure are immaterial to the claims and defenses in this case and do not affect the outcome of the suit under the governing law. OpenAI further objects to Plaintiffs' reliance on testimony |

| | |
|---|---|
| | concerning Amodei's departure as irrelevant and unfairly prejudicial under Fed. R. Evid. 401 and 403. Any arguable probative value is substantially outweighed by the danger of unfair prejudice to OpenAI and confusion of the issues.<br>The facts in Paragraph 1810 are further disputed because they omit the relevant context for Amodei's understanding of "AI safety." Pursuant to Fed. R. Evid. 106, OpenAI responds to note that Amodei testified that his understanding of "AI safety" [redacted] A. Blanco Opp. Decl. Ex. 164 (Dario Amodei 30(b)(1) Tr.) at 259:22–260:18. When asked [redacted], Amodei [redacted] *Id.* at 260:19–261:20.<br><br>Microsoft defers to OpenAI. |
| 1811. Microsoft's Brad Smith agreed with this sentiment:<br>When news organizations suffer, democracy suffers as well. A shortage of trusted reporters who hold government officials accountable has exacerbated issues at the local level. According to a study by University of Notre Dame and University of Illinois researchers, communities located in | 1811. **Disputed in Part – Immaterial.** Microsoft responds as follows: Microsoft does not dispute that News Ex. 1124 contains the quoted language. But Microsoft disputes the characterization in Paragraph 1811 as Mr. Smith "agree[ing] with this sentiment." Mr. Smith's 2021 statement concerned the economic challenges facing local journalism and the digital advertising market. It did not concern AI training, copyright infringement, or any conduct at issue in this litigation. *See* Ex. 1124 at 1. The |

| | |
|---|---|
| news deserts suffer from less competitive political campaigns, less informed voters, and lower voter turnout. Without reporters holding officials accountable, these communities also see higher public costs, with municipal borrowing costs increase by 5 to 11 basis points, costing municipalities an average of $650,000 more per issue.<br><br>Ex. 1124 [Brad Smith, "Technology and the Free Press: The Need for Healthy Journalism in a Healthy Democracy," Microsoft On the Issues Blog (March 12, 2021), https://blogs.microsoft.com/on-the-issues/2021/03/12/technology-and-the-free-press-the-need-for-healthy-journalism-in-a-healthy-democracy/]. | statements about news deserts, voter turnout, and municipal borrowing costs are not Mr. Smith's own findings. They summarize a third-party academic study. *Id.* at 10, n.13.<br>Microsoft further responds that the facts set forth in Paragraph 1811 are immaterial and therefore disputed because these facts do not affect the outcome of the suit under the governing law. Specifically, a 2021 statement about local journalism, democracy, and municipal borrowing costs has no bearing on any claim or defense to copyright infringement.<br><br>OpenAI joins Microsoft's response. |
| 1812. Brent Hecht testified in his deposition that the OpenAI content strategy created a doom loop that will "hurt the performance of our models and the entire web at the same time" and at the same time "necessarily threatens the economic sustainability of those who create the content." Ex. 671 [Hecht Depo. Tr.] at 275:18-276:6. | 1812. **Disputed in Part – Not Supported by Cited Evidence; Immaterial.** Microsoft does not dispute that at counsel's direction, Hecht read into the record a passage from a draft article he wrote (News Ex. 940), which refers to "[o]ur AI content strategy." Ex. 671 at 275:8–276:6. Hecht further explained that "our content strategy" was "largely … referring to our following OpenAI's content strategy because we used their model so extensively." *Id.* at 276:14–18.<br>Microsoft further responds that the facts set forth in Paragraph 1812 are immaterial and therefore disputed because these facts do not "affect the outcome of the suit under the governing law." Specifically, a researcher's |

| | |
|---|---|
| | hypothesis has no bearing on whether the use of Plaintiffs' works to train the models at issue was infringing or fair.<br>Additionally, Hecht's statements cannot be attributed to Microsoft. Hecht is a research academic employed at Microsoft to bring "divergent," "asymmetric, futuristic, and academic points of view." He does not set Microsoft's core priorities or speak for Microsoft as to "his theoretical views on AI's potential effect on content creators," and Microsoft leadership "does not share all of [his] views"; and he is a "kind of intellectual provocateur." ECF 1707 (J. Usdan Decl.) (Sept. 4, 2026) ¶ 39; A. Blanco Opp. Decl. Ex. 285 (J. Usdan 30(b)(6) Tr.) at 173:22–174:9. Hecht has himself disclaimed any authority to speak for Microsoft. He testified that his views on these subjects are "my view, not Microsoft's view," that "I have no idea if it's shared by the board of Microsoft," and that "I don't speak for Microsoft." A. Blanco Opp. Decl. Ex. 212 (B. Hecht 30(b)(1) Tr.) at 319:18–20, 320:10–12, 71:5–6. He further described his views as "hypotheses," cautioned that "the jury is still out on a lot of this stuff," and acknowledged that he is "not a lawyer." *Id.* at 59:11–60:8, 165:9–15, 166:10–11. Hecht's personal views therefore are not statements of Microsoft and do not reflect Microsoft's knowledge, policies, or conduct. They have no bearing on any element of the claims or defenses asserted against Microsoft in this case.<br><br>OpenAI joins Microsoft's response, except to the extent any portion of it, including any testimony quoted |

| | |
|---|---|
| | under Fed. R. Evid. 106, could be read to characterize OpenAI, its models, or its conduct. OpenAI disputes any such characterization. Hecht is a Microsoft researcher who testified unequivocally: "I don't speak for Microsoft. I definitely don't speak for OpenAI." *Id.* at 100:11–12. His statements are not based on personal knowledge of OpenAI, are not attributable to OpenAI, and are inadmissible hearsay as to OpenAI. *See* Fed. R. Civ. P. 56(c)(2), (c)(4); Fed. R. Evid. 602, 801(d)(2)(D), 802. This paragraph cannot be offered to establish any fact concerning OpenAI. |
| 1813. Dr. Hecht stated: "There is evidence that viewed ecosystem-wide, we are eating our own seed corn" the seed corn being "content provided by the content producers." Ex. 671 [Hecht Depo. Tr.] at 52:25-53:20. | 1813. **Disputed in Part – Immaterial.** Microsoft responds as follows: Microsoft does not dispute that Hecht gave the quoted testimony. Microsoft disputes any implication that it was an admission about Microsoft. Hecht testified that the "we" in "we are eating our own seed corn" "actually is everyone who is part of the production of AI systems which includes content producers." News Ex. 671 (B. Hecht. 30(b)(1) Tr.) at 53:9–12. He agreed only that equating "seed corn" with content was "a reasonable approximation." *Id.* at 53:19–20. He also described the underlying phenomenon as "emerging evidence" that "is a subject of scientific debate." *Id.* at 52:6–10.<br><br>Microsoft further responds that the facts set forth in Paragraph 1813 are immaterial and cannot be attributed to Microsoft for the reasons stated in response to Paragraph 1812. Specifically, a researcher's metaphor for an industry-wide hypothesis that is "a subject of scientific debate" has no bearing on the claims and defenses asserted in this case. |

| | |
|---|---|
| | OpenAI joins Microsoft's response, except to the extent any portion of it, including any testimony quoted under Fed. R. Evid. 106, could be read to characterize OpenAI, its models, or its conduct. OpenAI disputes any such characterization. Hecht is a Microsoft researcher who testified unequivocally: "I don't speak for Microsoft. I definitely don't speak for OpenAI." *Id.* at 100:11–12. His statements are not based on personal knowledge of OpenAI, are not attributable to OpenAI, and are inadmissible hearsay as to OpenAI. *See* Fed. R. Civ. P. 56(c)(2), (c)(4); Fed. R. Evid. 602, 801(d)(2)(D), 802. This paragraph cannot be offered to establish any fact concerning OpenAI. |
| 1814. According to Dr. Hecht, one consequence of using content producer content to train LLMs was that the content producers might go out of business. Ex. 671 [Hecht Depo. Tr.] at 47:3-24. | 1814. **Disputed in Part – Immaterial.** Microsoft responds as follows: Microsoft does not dispute that Hecht agreed with the statement in Paragraph 1814. But Microsoft disputes any implication that this was a finding about actual conditions. The testimony concerned slides titled "What Do LLM Data Strikes Look Like?" and "Are Data Strikes Guaranteed?" Those slides present "an unsuccessful data strike," in which "content producers go out of business," as one hypothetical outcome of a conceptual framework. News Ex. 671 (B. Hecht. 30(b)(1) Tr.) at 47:3–19; News Ex. 810 at 23–24.<br>Microsoft further responds that the facts set forth in Paragraph 1814 are immaterial and cannot be attributed to Microsoft for the reasons stated in response to Paragraph 1812. Specifically, a hypothetical scenario in a research |

| | |
|---|---|
| | presentation has no bearing on the claims and defenses in this case.<br><br>OpenAI joins Microsoft's response, except to the extent any portion of it, including any testimony quoted under Fed. R. Evid. 106, could be read to characterize OpenAI, its models, or its conduct. OpenAI disputes any such characterization. Hecht is a Microsoft researcher who testified unequivocally: "I don't speak for Microsoft. I definitely don't speak for OpenAI." Ex. 671 at 100:11–12. His statements are not based on personal knowledge of OpenAI, are not attributable to OpenAI, and are inadmissible hearsay as to OpenAI. *See* Fed. R. Civ. P. 56(c)(2), (c)(4); Fed. R. Evid. 602, 801(d)(2)(D), 802. This paragraph cannot be offered to establish any fact concerning OpenAI. |
| 1815. According to Dr. Hecht, if content producers went out of business because LLMs were training on their content, that would also be bad for Microsoft because it would have less content to train its models on, and it would be bad for the world. Ex. 671 [Hecht Depo. Tr.] at 47:13-48:19. | 1815. **Disputed in Part – Immaterial.** Microsoft responds as follows: Microsoft does not dispute that Hecht gave the cited testimony. Microsoft disputes any implication that it describes actual conditions. The slide deck about which Hecht testified concerned hypothetical "unsuccessful data strike" outcomes shown on a slide titled "Are Data Strikes Guaranteed?"; the slide and discussion at Hecht's deposition was not about any actual event. News Ex. 671 (B. Hecht 30(b)(1) Tr.) at 47:13–48:19.<br>Microsoft further responds that the facts set forth in Paragraph 1815 are immaterial and cannot be attributed to Microsoft for the reasons stated in response to Paragraph |

| | |
|---|---|
| | 1812. Specifically, a researcher's view of whether a hypothetical scenario would be "bad" for content producers, Microsoft, or "the world" has no bearing on the claims and defenses asserted in this case.<br><br>OpenAI joins Microsoft's response, except to the extent any portion of it, including any testimony quoted under Fed. R. Evid. 106, could be read to characterize OpenAI, its models, or its conduct. OpenAI disputes any such characterization. Hecht is a Microsoft researcher who testified unequivocally: "I don't speak for Microsoft. I definitely don't speak for OpenAI." *Id.* at 100:11–12. His statements are not based on personal knowledge of OpenAI, are not attributable to OpenAI, and are inadmissible hearsay as to OpenAI. *See* Fed. R. Civ. P. 56(c)(2), (c)(4); Fed. R. Evid. 602, 801(d)(2)(D), 802. This paragraph cannot be offered to establish any fact concerning OpenAI. |
| 1816. According to Dr. Hecht, generators of books and newspapers provide content that is existentially important to the people who created the LLMs and the products based on the LLMs, such that if newspapers and authors did not provide this existentially important content, the existence of LLMs and the products based on them would be at risk. Ex. 671 [Hecht Depo. Tr.] at 50:21-51:22. | 1816. **Undisputed– Incomplete; Immaterial.** Microsoft responds as follows: Microsoft does not dispute that Hecht gave the cited testimony. But pursuant to Fed. R. Evid. 106, Hecht explained that "[t]he origins of the scientific discussion" of the "doom loop" lie in the user-generated content community, and that user-generated content "typically does not include" books or news. News Ex. 671 (B. Hecht 30(b)(1) Tr.) 50:13–19.<br>Microsoft further responds that the facts set forth in Paragraph 1816 are immaterial and cannot be attributed to |

| | |
|---|---|
| | Microsoft for the reasons stated in response to Paragraph 1812. Specifically, a researcher's summary of scientific literature on content ecosystems has no bearing on the claims and defenses asserted in this case.<br><br>OpenAI joins Microsoft's response, except to the extent any portion of it, including any testimony quoted under Fed. R. Evid. 106, could be read to characterize OpenAI, its models, or its conduct. OpenAI disputes any such characterization. Hecht is a Microsoft researcher who testified unequivocally: "I don't speak for Microsoft. I definitely don't speak for OpenAI." A. Blanco Opp. Decl. Ex. 212 (B. Hecht 30(b)(1) Tr.) at 100:11–12. His statements are not based on personal knowledge of OpenAI, are not attributable to OpenAI, and are inadmissible hearsay as to OpenAI. *See* Fed. R. Civ. P. 56(c)(2), (c)(4); Fed. R. Evid. 602, 801(d)(2)(D), 802. This paragraph cannot be offered to establish any fact concerning OpenAI. |
| 1817. The following cartoon is taken from a slide of a Microsoft presentation by Brent Hecht: | 1817. **Disputed in Part – Immaterial.** Microsoft responds as follows: Microsoft disputes that Ex. 960 is a "Microsoft presentation." It is a research presentation by Hecht titled "Recent Research on Data Centric AI and its Implications for Microsoft." News Ex. 960.<br>Microsoft further responds that the facts set forth in Paragraph 1817 are immaterial and cannot be attributed to Microsoft for the reasons stated in response to Paragraph |

| | |
|---|---|
| <br><br>Argument from Data Leverage literature: We tech folks might think we're the entire world, but content creators are Archimedes.<br><br>Ex. 960 [MSFT_AI_MDL_001360563] at Slide 11. | 1812. Specifically, a cartoon on a slide in a researcher's presentation has no bearing on the claims and defenses in this case.<br><br>OpenAI joins Microsoft's response, except to the extent any portion of it, including any testimony quoted under Fed. R. Evid. 106, could be read to characterize OpenAI, its models, or its conduct. OpenAI disputes any such characterization. Hecht is a Microsoft researcher who testified unequivocally: "I don't speak for Microsoft. I definitely don't speak for OpenAI." *Id.* at 100:11–12. His statements are not based on personal knowledge of OpenAI, are not attributable to OpenAI, and are inadmissible hearsay as to OpenAI. *See* Fed. R. Civ. P. 56(c)(2), (c)(4); Fed. R. Evid. 602, 801(d)(2)(D), 802. This paragraph cannot be offered to establish any fact concerning OpenAI. |
| 1818. According to Dr. Hecht, "[l]arge language models could exacerbate existing economic inequalities leading to substantial breakdowns of the business models of [Microsoft's] customers." Ex. 671 [Hecht Depo. Tr.] at 112:5-12. | 1818. **Undisputed – Immaterial.** Microsoft responds as follows: Microsoft does not dispute that Hecht confirmed a January 2023 document he wrote contains the quoted language.<br>But Microsoft responds that the facts set forth in Paragraph 1818 are immaterial and cannot be attributed to Microsoft for the reasons stated in response to Paragraph 1812. Specifically, a researcher's speculation that LLMs "could exacerbate existing economic inequalities" has no bearing on the claims and defenses in this case. News Ex. 671 (B. Hecht 30(b)(1) Tr.) at 112:5–12. Additionally, |

| | |
|---|---|
| | Hecht's statements are immaterial and cannot be attributed to Microsoft for the reasons stated in response to Paragraph 1812.<br><br>OpenAI joins Microsoft's response, except to the extent any portion of it, including any testimony quoted under Fed. R. Evid. 106, could be read to characterize OpenAI, its models, or its conduct. OpenAI disputes any such characterization. Hecht is a Microsoft researcher who testified unequivocally: "I don't speak for Microsoft. I definitely don't speak for OpenAI." *Id.* at 100:11–12. His statements are not based on personal knowledge of OpenAI, are not attributable to OpenAI, and are inadmissible hearsay as to OpenAI. *See* Fed. R. Civ. P. 56(c)(2), (c)(4); Fed. R. Evid. 602, 801(d)(2)(D), 802. This paragraph cannot be offered to establish any fact concerning OpenAI. |
| 1819. According to Dr. Hecht, "[t]he current paradigm of models will reduce the incentive to put content online, including things like news and current events." Ex. 671 [Hecht Depo. Tr.] at 112:5-12. | 1819. **Disputed in Part – Immaterial.** Microsoft responds as follows: Microsoft does not dispute that Hecht's January 2023 document states that "[t]he current paradigm of models will reduce the incentive to put content online, which appears at News Ex. 671 at 114:1–5, not 112:5–12. The cited evidence does not contain the words "including things like news and current events." And pursuant to Fed. R. Evid. 106, Hecht narrowed the statement, explaining that by "online" he meant "making it accessible in the same manner that content is typically |

| | |
|---|---|
| | accessible online now," for example a Wikipedia page. News Ex. 671 (B. Hecht 30(b)(1) Tr.) at 114:17–24.<br>Microsoft further responds that the facts set forth in Paragraph 1819 are immaterial and cannot be attributed to Microsoft for the reasons stated in response to Paragraph 1812. Specifically, a researcher's prediction about future incentives to make content available online has no bearing on the claims or defenses asserted in this case.<br><br>OpenAI joins Microsoft's response, except to the extent any portion of it, including any testimony quoted under Fed. R. Evid. 106, could be read to characterize OpenAI, its models, or its conduct. OpenAI disputes any such characterization. Hecht is a Microsoft researcher who testified unequivocally: "I don't speak for Microsoft. I definitely don't speak for OpenAI." *Id.* at 100:11–12. His statements are not based on personal knowledge of OpenAI, are not attributable to OpenAI, and are inadmissible hearsay as to OpenAI. *See* Fed. R. Civ. P. 56(c)(2), (c)(4); Fed. R. Evid. 602, 801(d)(2)(D), 802. This paragraph cannot be offered to establish any fact concerning OpenAI. |
| 1820. Dr. Hecht said he was worried about the current paradigm of LLMs creating less incentive for people to create, produce, and to make available news and current events if that content can be taken and used in conjunction with an LLM to create a substitute product. Ex. 671 [Hecht Depo. Tr.] at 116:1-8. | 1820. **Undisputed – Immaterial.** Microsoft responds as follows: Microsoft does not dispute that Hecht testified he was "worried about that." News Ex. 671 (B. Hecht 30(b)(1) Tr.) 116:9–10. Microsoft responds that the facts set forth in Paragraph 1820 are immaterial and cannot be attributed to Microsoft for the reasons stated in |

| | |
|---|---|
| | response to Paragraph 1812. Specifically, a researcher's personal worry about a "very complex" hypothetical has no bearing on the claims or defenses asserted in this case.<br><br>OpenAI joins Microsoft's response, except to the extent any portion of it, including any testimony quoted under Fed. R. Evid. 106, could be read to characterize OpenAI, its models, or its conduct. OpenAI disputes any such characterization. Hecht is a Microsoft researcher who testified unequivocally: "I don't speak for Microsoft. I definitely don't speak for OpenAI." *Id.* at 100:11–12. His statements are not based on personal knowledge of OpenAI, are not attributable to OpenAI, and are inadmissible hearsay as to OpenAI. *See* Fed. R. Civ. P. 56(c)(2), (c)(4); Fed. R. Evid. 602, 801(d)(2)(D), 802. This paragraph cannot be offered to establish any fact concerning OpenAI. |
| 1821. OpenAI has renounced its intention to offer evidence that they believed at the time that any of its conduct as alleged in this lawsuit was justified by fair use. Ex. 1125 [Feb. 27, 2026 Emails Between Craig Smyser and Nick Goldberg]; *see also* Opinion & Order, In re: OpenAI, Inc., No. 1:25-cv-03483-SHS-OTW, Dkt. 1276 at 7-8. n.4 ("OpenAI has explicitly and unambiguously stated its intention to forego asserting a good faith or state of mind defense, as it must to avoid a waiver . . ."). | 1821. **Disputed – Not Supported by Cited Evidence.** OpenAI responds as follows: Plaintiffs mischaracterize both cited documents. The cited email was written by counsel for Books Plaintiffs, not News Plaintiffs. *See* News Ex. 1125 at 3. OpenAI's counsel did not independently renounce any position in that exchange, and Book Plaintiffs' counsel instead reiterated OpenAI's position as set forth in the Court's order. *See id. at* 3–5, 7–8, 11–12.<br>The Court's order speaks for itself. Its reference to OpenAI's intention to "forego asserting a good faith or state |

| | |
|---|---|
| | of mind defense" concerns OpenAI's election not to assert such a defense to Class Plaintiffs' allegations of willfulness in relation to OpenAI's assertion of attorney-client privilege. That election is entirely unrelated to OpenAI's fair-use defense, and Plaintiffs' assertion omits the willfulness context and the express qualifications in the Court's ruling. ECF 1276 (Opinion & Order) at 7–8 & n.4. Specifically, the Court explained that "OpenAI need not, however, forego 'any factual arguments in opposition to Class Plaintiffs' allegations of willfulness' to avoid effecting an at-issue privilege waiver." *Id.* at 8 n.4. The Court further stated that "OpenAI therefore may present factual arguments in opposition to Class Plaintiffs' allegations of willfulness without waiving attorney-client privilege so long as OpenAI does not put its state of mind regarding the legality of its actions at issue by, for example, offering testimony that OpenAI employees believed their activities to be lawful." *Id.* Neither the cited correspondence nor the order supports Plaintiffs' broader characterization of OpenAI's position.<br><br>Microsoft defers to OpenAI. |
| 1822. OpenAI's expert, Dr. Callison Burch recognized that verbatim memorization enables LLMs "to be able to provide, paraphrase, critique, or analyze texts," and stats that memorization "is not always a bad thing." Ex. 675 [Callison-Burch Reply Rep.] ¶¶ 51, 73. | 1822. **Disputed in Part – Incomplete; Not Supported by Cited Evidence.** OpenAI responds as follows: Undisputed that paragraph 51 of Dr. Callison-Burch's Reply Report contains the phrase "to be able to provide, paraphrase, critique, or analyze texts." However, disputed that Plaintiffs' truncated quotation accurately |

| | |
|---|---|
| | reflects the context and scope of his opinion. The full sentence states: "'verbatim memorization' happens to some degree, which enables an LLM 'to be able to provide, paraphrase, critique, or analyze texts that are not subject to copyright protection, like Constitutional provisions, Bible verses, common sayings, and works in the public domain.'" News Ex. 675 (C. Callison-Burch Reply Rep.) ¶ 51.<br>Plaintiffs omit the express qualification that the passage concerns texts not subject to copyright protection. Further disputed to the extent Plaintiffs characterize this passage, or the statement that memorization "is not always a bad thing," as a general endorsement of verbatim memorization of copyrighted works, including Plaintiffs' works. *Id.* ¶ 50. Identifying benefits of memorization involving public-domain and non-copyrightable content does not establish such an endorsement. Plaintiffs' broader characterization is therefore not supported by the cited evidence.<br><br>Microsoft defers to OpenAI. |
| 1823. As explained in Section III.C above, OpenAI's post-training policies encouraged the models to provide summaries of copyrighted articles. | 1823. **Disputed - Not Supported by Cited Evidence**. OpenAI responds as follows: The post-training policies outline that the model's refusal should be brief and provide an offer to summarize the copyrighted text, even if it should not automatically respond with a summary. Pursuant to Fed. R. Evid. 106, *see* A. Blanco Opp. Decl. Ex. 142 at OPCO_MDL_000999214. The facts set forth in Paragraph 1823 are disputed because the cited |

| | |
|---|---|
| | evidence is incorrect. OpenAI refers to its responses to Section III.C, *supra*.<br><br>Microsoft defers to OpenAI. |
| 1824. This intended summarization behavior is confirmed by testing performed by OpenAI's expert, Dr. Berg-Kirkpatrick. In Dr. Berg-Kirkpatrick's "Forced Regurgitation" experiments, ChatGPT repeatedly acknowledged that a requested Plaintiff article was paywalled or "copyright-protected" and then offered to summarize it. *See* [Goldstein Rebuttal Rep.] ¶¶ 274-276. | 1824. **Disputed in Part – Not Supported by Cited Evidence; Immaterial.** Defendants respond as follows:<br><br>Undisputed that Plaintiffs' expert Dr. Goldstein offered an opinion in his Rebuttal Report that "Dr. Berg-Kirkpatrick's 'Forced Regurgitation' testing reveals that ChatGPT routinely offers to provide summaries for articles it is blocked from accessing." ECF 1819-2 (T. Goldstein Decl. Ex. B) (Rebuttal Rep.) ¶¶ 274–276.<br>However, the statement that OpenAI's models have "intended summarization behavior" is disputed because it is not supported by the cited evidence. Specifically, the screenshots on which Dr. Goldstein relies depict ChatGPT refusing to reproduce copyrighted text and offering limited alternatives—evidence of the model's protective guardrails, not of "intended summarization behavior." ECF 1819-2 (T. Goldstein Decl. Ex. B) (Rebuttal Rep.) ¶¶ 274–276. Further disputed that the identified purported summaries operated as a paywall workaround. In the New York Times example cited by Dr. Goldstein, ChatGPT expressly refused to provide the full text of the article because it was copyrighted, and instead provided the user with suggestions for obtaining authorized access to the article, including: (a) "Viewing it via a library digital newspaper access"; (b) "Using the NYT app with a subscription"; and |

| | |
|---|---|
| | (c) "[S]earching the exact title on Google/Naver/Bing to find links to the NYT page." *Id.* at ¶ 273.<br>Further disputed as immaterial. This Court has already rejected News Plaintiffs' claim that OpenAI's LLMs infringe their works by summarizing the facts in them. Op. at 41, *New York Times v. Microsoft*, No. 1:23-cv-11195-SHS-OTW (S.D.N.Y. Apr. 4, 2025), Dkt. No. 514 ("Works are not substantially similar as a matter of law when their only similarity concerns general or underlying facts and ideas, which are not copyrightable.").<br>Further disputed that Dr. Berg-Kirkpatrick's "Forced Regurgitation" analysis tested summarization behavior, robots.txt compliance, or the Accused Models' typical behavior with respect to copyrighted material. As stated in his Opening Report, the purpose of the Forced Regurgitation Study was "assess whether a technically sophisticated user could induce GPT models to output a selected work using prompts deliberately designed to overcome ChatGPT's ordinary safeguards." ECF 1750 (T. Berg-Kirkpatrick Decl.) ¶ 47. Based on this study, Dr. Berg-Kirkpatrick concluded that adversarial techniques designed to extract texts from GPT models are largely ineffective at retrieving the selected Asserted Works. Id. ¶ 55.<br><br>Microsoft defers to OpenAI. |
| 1825. Microsoft's expert's likewise characterizes Copilot's output as frequently "summariz[ing] or | 1825. **Disputed.** Microsoft responds that this fact is disputed because it mischaracterizes Dr. Lafferty's |

| | |
|---|---|
| reword[ing] the retrieved material." Ex. 800 [Lafferty Rebuttal Rep.] ¶ 103. | testimony. Dr. Lafferty does not say "frequently." He says that "the user-facing output *predominantly* summarizes or rewords the retrieved material *rather than reproducing it*." ECF 1723 (J. Lafferty Decl.) ¶ 358 (emphasis added). And he made this statement in the context of rebutting Dr. Goldstein's opinions regarding the (inflated) rate of verbatim regurgitation. *Id.* ¶¶ 346–359. Further, the word "likewise" appears to tie this SUF to a preceding statement about substantial copying. Microsoft disputes any such linkage.<br><br>OpenAI defers to Microsoft's response. |

**VII. Defendant OpenAI's Additional Facts Pursuant to Local Rule 56.1(b)**

| | |
|---|---|
| 1826. OpenAI's expert, Dr. Krishnan, was not able to replicate the number of "copies" identified by Dr. Goldstein in the declaration and working papers submitted in support of News Plaintiffs' summary judgment motion. S. Krishnan Opp. Decl. (News) ¶¶ 50–58. | |
| 1827. The News Plaintiffs' Motion for Summary Judgment, Goldstein Declaration Exhibit I, and Goldstein's working papers report different numbers of training-based infringement counts. S. Krishnan Opp. Decl. (News) ¶ 50. | |
| 1828. The Times and Daily News's expert, Dr. Goldstein, provided a quantitative matching analysis for the New York Times Annotated Corpus in his summary judgment declaration but did not offer that analysis in his | |

| | |
|---|---|
| opening, rebuttal, or reply reports. S. Krishnan Opp. Decl. (News) ¶¶ 27–29. | |
| 1829. The Times and Daily News's expert, Dr. Goldstein, identified "matches" between NYT/DN Asserted Works and OpenAI training data records where the matched text was third-party authored books and poetry. S. Krishnan Opp. Decl. (News) ¶ 61. | |
| 1830. CIR/Intercept's expert, Dr. Wenger, served a supplemental report on August 17, 2026. S. Krishnan Opp. Decl. (News) ¶ 6. | |
| 1831. The SJ Asserted Works allegedly copied, as reported in Dr. Wenger's Supplemental Report Appendices, include thousands of works not in the Rule 1006 Summaries. S. Krishnan Opp. Decl. (News) ¶¶ 69–79. | |
| 1832. Dr. Wenger's Supplemental Report identified a 75-word article as a "match" to OpenAI's training data records. S. Krishnan Opp. Decl. (News) ¶ 74. | |
| 1833. Ziff Davis's expert, Mr. Delorey, served a supplemental report on September 4, 2026. S. Krishnan Opp. Decl. (News) ¶ 5. | |
| 1834. OpenAI's expert, Dr. Krishnan, was not able to replicate the number of "copies" identified by Mr. Delorey in the declaration and working papers submitted in support of News Plaintiffs' summary judgment motion. S. Krishnan Opp. Decl. (News) ¶¶ 105, 108 & Tables 13, 14. | |

| | |
|---|---|
| 1835. Ziff Davis's expert, Mr. Delorey, included 1,689 articles in his analysis that do not appear in Ziff Davis's Rule 1006 summaries. S. Krishnan Opp. Decl. (News) ¶ 113. | |
| 1836. Ziff Davis has identified 1,636,586 Asserted Works on which it seeks summary judgment as to ownership. S. Krishnan Opp. Decl. (News) ¶¶ 112–13. | |
| 1837. Mr. Delorey's supplemental MSJ report identifies 1,644,150 Asserted Works. S. Krishnan Opp. Decl. (News) ¶¶ 112–13. | |
| 1838. Mr. Delorey's "matches" between Ziff Davis Asserted Works and OpenAI training data records include statements by government officials. S. Krishnan Opp. Decl. (News) Appendix C, Fig. C.7. | |
| 1839. The Times and Daily News's expert, Dr. Goldstein, identified at least 4 million instances of "CMI removals" where the information allegedly removed originated from website footers, headers, and navigation bars. S. Krishnan Opp. Decl. (News) ¶ 63; S. Krishnan Opp. Decl. (News) Ex. A (S. Krishnan Rebuttal Rep. (Goldstein)) ¶ 198 & Table 7, Appendix B & Tables B.1–B.8 (4 million footers). | |
| 1840. Ziff Davis's expert, Mr. Delorey, identified at least 6 million instances of "CMI removals" where the information allegedly removed originated from website footers, headers, and navigation bars. S. Krishnan Opp. Decl. ¶ 121; News Ex. 1167 (S. Krishnan Rebuttal Rep. (Delorey)) ¶¶ 177–88 & Table t12 (6 million removals attributable to sitewide content). | |

| | |
|---|---|
| 1841. 91% of the weak "copyright notices" and 80% of the "strong" notices Mr. Delorey identified as "removed" contained registration dates that did not reflect the publication or registration dates of Ziff Davis's Asserted Works. S. Krishnan Opp. Decl. (News) ¶ 121; News Ex. 1167 (S. Krishnan Rebuttal Rep. (Delorey)) ¶¶ 177–78. | |
| 1842. In millions of instances, Plaintiffs' experts have extracted, and characterized as "CMI," information from raw HTML files that differs from the CMI present in their Asserted Works datasets. S. Krishnan Opp. Decl. (News) ¶¶ 63, 121; News Ex. 1167 (S. Krishnan Rebuttal Rep. (Delorey)) ¶¶ 196–97 & Table 13; S. Krishnan Opp. Decl. (News) Ex. A (S. Krishnan Rebuttal Rep. (Goldstein)) ¶¶ 197–209, Table 7 & Appendix B, Tables B.1–B.8. | |
| 1843. The Times and Daily News's expert, Dr. Goldstein, has identified approximately 7 million instances of "CMI" where the identified information "removed" is a publisher. S. Krishnan Opp. Decl. (News) ¶ 63, Appendix D; S. Krishnan Opp. Decl. (News) Ex. A (S. Krishnan Rebuttal Rep. (Goldstein)) ¶¶ 202–03 & Tables 5, 7, 10 (7 million publisher "removals" and millions of malformed copyright notices). | |
| 1844. Ziff Davis's expert, Mr. Delorey, has identified at least 3.6 million of instances of "CMI" where the identified information "removed" is a publisher. S. Krishnan Opp. Decl. (News) ¶ 121; Ex. 1167 (S. Krishnan Rebuttal Rep. (Delorey)) ¶ 211 & Table 14 (3.6 million publisher "removals"). | |

| | |
|---|---|
| 1845. The training datasets for the in-scope models were assembled prior to the spring of 2024. ECF 1774-1 (D. Delorey Decl. Ex. A) (Opening Rep.) ¶¶ 171–76, 229. | |
| 1846. Ziff Davis's expert, Mr. Delorey, did not conduct any analysis to determine whether Ziff Davis works had been registered within three months of their publication. A. Blanco Opp. Decl. Ex. 190 (D. Delorey Tr.) 84:3–8. | |
| 1847. OpenAI uses blocklists to filter out certain content from being included in or used by its models. News Ex. 410 (N. Feamster Opening Rep.) ¶¶ 250–51. | |
| 1848. A blocklist is a common cybersecurity mechanism that is often employed to prevent specific Internet entities from accessing a system or network. News Ex. 410 (N. Feamster Opening Rep.) ¶¶ 250–51. | |
| 1849. OpenAI applies blocklists [redacted] News Ex. 410 (N. Feamster Opening Rep.) ¶¶ 250–51. | |
| 1850. The benefit of the multilayered blocklist system described above is that it ensures updated blocklists can be applied even after initial data collection. News Ex. 410 (N. Feamster Opening Rep.) ¶¶ 250–51. | |
| 1851. OpenAI's blocklist [redacted] includes the following domains associated with Plaintiffs: [redacted] | |

| | |
|---|---|
| [redacted] N. Feamster Opp. Decl. ¶ 40. | |
| 1852. Ziff Davis's expert Dr. Krein confirmed that Ziff Davis domains were added to OpenAI's blocklist on July 19, 2024. ECF 1769-1 (J. Krein Decl. Ex. A) ¶ 125. | |
| 1853. Bots, inclnding those operated by OpenAI, retrieve webpage content by sending a request to the server where that website is stored, and the server then decides whether to send back a response consisting of the requested webpage content. N. Feamster Opp. Decl. ¶ 14. | |
| 1854. When a website owner implements a subscription enforcement mechanism to restrict access to content on a website, the technical implementation of the subscription enforcement mechanism can enable bots to access content even when it is not visible to human users. N. Feamster Opp. Decl. ¶¶ 10–11. | |
| 1855. If a website owner implements a subscription enforcement mechanism on the client side, the code that performs the subscription check runs on the client side, and the server does no authentication check before sending the full content of the requested webpage in response to the initial request. N. Feamster Opp. Decl. ¶ 12. | |

| | |
|---|---|
| 1856. If the client is a human user's browser, the browser then runs code that performs an authorization check and obscures the content for unauthorized users. The user is presented with a log-in or subscription page, even though the server response contains the underlying webpage content. N. Feamster Opp. Decl. ¶ 13. | |
| 1857. If the client is instead a bot, it receives the full webpage content returned by the server but, unlike a browser, does not execute JavaScript code for an authorization check. In this circumstance, a bot may access content that would otherwise be hidden in a human user's browser because the server chose to return the requested content to the bot. N. Feamster Opp. Decl. ¶ 14. | |
| 1858. Bots do not read, understand, or agree to Terms of Service, as there is no technically feasible mechanism for bots to reliably locate, interpret, and comply with such terms. N. Feamster Opp. Decl. ¶ 15. | |
| 1859. Pretraining does not enable retrieval of information published after a model's knowledge cutoff, which is at least several months before a model is released. A. Blanco Opp. Decl. Ex. 267 (N. Ryder 30(b)(6) Tr. (Jan. 29, 2026)) 135:19–25, 136:18–137:2, 137:12–15; A. Blanco Opp. Decl. Ex. 268 (E. Rynerson 30(b)(6) Tr. (Feb. 10, 2026)) at 115:4–19; A. Blanco Opp. Decl. Ex. 270 (J. Schulman Tr.) at 26:5–23. | |
| 1860. Common Crawl maintains its own robots.txt compliance policy, and used this same compliance policy at the time that OpenAI relied on Common Crawl to train its | |

| | |
|---|---|
| models. N. Feamster Opp. Decl. ¶ 46.<br><br>*See* Frequently Asked Questions - Common Crawl, The Wayback Machine (Dec. 30, 2021), https://web.archive.org/web/20211230021339/http://commoncrawl.org/big-picture/frequently-asked-questions/ ("How can I block this bot? You configure your robots.txt file which uses the Robots Exclusion Protocol to block the crawler. Our bot's Exclusion User-Agent string is: CCBot."). | |
| 1861. News Plaintiffs did not block Common Crawl's crawler during the time that OpenAI relied on Common Crawl to train its models. N. Feamster Opp. Decl. ¶ 47. | |
| 1862. Ziff Davis registered 1,463,999 Identified Articles in 2025. J. Borck Opp. Decl. ¶ 50. | |
| 1863. 2,581 Asserted Articles associated with "BabyCenter" were registered the day Ziff Davis filed suit or after. J. Borck Opp. Decl. ¶ 50. | |
| 1864. Ziff Davis did not produce copyright registrations for 180,011 Asserted Works. J. Borck Opp. Decl. ¶ 51. | |
| 1865. The New York Times/Daily News Plaintiffs seek summary judgment regarding infringement based on content from President Lincoln's Second Inaugural Address. S. Krishnan Opp. Decl. (News) Appendix A, Figure A.13. | |
| 1866. The New York Times/Daily News Plaintiffs seek summary judgment regarding infringement based on | |

| | |
|---|---|
| content from the Bill of Rights. S. Krishnan Opp. Decl. (News) Appendix A, Figure A.23. | |
| 1867. Ziff Davis seeks summary judgment regarding infringement based on content from the complaint filed in *Cisco v. Apple*, 3:07-cv-00198 (N.D. Cal. 2007). S. Krishnan Opp. Decl. (News) Appendix C, Figure C.11. | |
| 1868. The New York Times/Daily News Plaintiffs seek summary judgment regarding infringement based on content from the Supreme Court Decision in *Planned Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S. 833 (1993). S. Krishnan Opp. Decl. (News) Appendix A, Figure A.25. | |
| 1869. Ziff Davis seeks summary judgment regarding infringement based on the track list of the soundtrack from *Grand Theft Auto: San Andreas*. S. Krishnan Opp. Decl. (News) Appendix C, Figure C.27. | |
| 1870. Ziff Davis seeks summary judgment regarding infringement based on a concert schedule for the band As Tall As Lions. S. Krishnan Opp. Decl. (News) Appendix C, Figure C.29. | |
| 1871. Sam Felix testified that The Times was aware at least by February 2023 of Common Crawl crawling its site. Felix Tr. 198:13-17. | |
| 1872. Sam Felix testified that The Times was aware at least by February 2023 of OpenAI relying upon data from Common Crawl to train its models. Felix Tr. 198:18-24. | |

| | |
|---|---|
| 1873. The Times did not contact Common Crawl regarding its crawling of The Times's site until July 25, 2023. Felix Tr. 201:22-202:5; Felix Dep. Ex. 116-117. | |

## VIII. Defendant Microsoft's Additional Facts Pursuant to Local Rule 56.1(b)

Pursuant to Local Rule 56.1(b), Microsoft incorporates by reference Facts 1-160 as stated in its Statement of Undisputed Material Facts In Support of Defendant Microsoft's Motion for Summary Judgment, filed on September 4, 2026. ECF 1702 ¶¶ 1-160. Microsoft understands that Plaintiffs will be responding to those facts in connection with their opposition to that motion, and therefore Microsoft does not repeat those facts here.

Dated: October 23, 2026 Respectfully submitted,

*/s/ Allison S. Blanco*[*]
**LATHAM & WATKINS LLP**
Andrew M. Gass (*pro hac vice*)
*andrew.gass@lw.com*
505 Montgomery Street, Suite 2000
San Francisco, CA 94111
Telephone: 415.391.0600

Sarang V. Damle
*sy.damle@lw.com*
Luke A. Budiardjo
*luke.budiardjo@lw.com*
1271 Avenue of the Americas
New York, NY 10020
Telephone: 212.906.1200

Elana Nightingale Dawson (*pro hac vice*)
*elana.nightingaledawson@lw.com*
555 Eleventh Street, NW, Suite 1000
Washington, D.C. 20004
Telephone: 202.637.2200

*/s/ Joseph C. Gratz*
**MORRISON & FOERSTER LLP**
Joseph C. Gratz (*pro hac vice*)
*jgratz@mofo.com*
Tiffany Cheung (*pro hac vice*)
*tcheung@mofo.com*
Caitlin Sinclaire Blythe (*pro hac vice*)
*cblythe@mofo.com*
425 Market Street
San Francisco, CA 94105
Telephone: 415.268.7000

Lily Li (*pro hac vice*)
*YLi@mofo.com*
755 Page Mill Road
Palo Alto, CA 94304
Telephone: 650.813.5600

*/s/ Robert A. Van Nest*
**KEKER, VAN NEST & PETERS LLP**
Robert A. Van Nest (*pro hac vice*)
*rvannest@keker.com*
R. James Slaughter (*pro hac vice*)
*rslaughter@keker.com*
Paven Malhotra
*pmalhotra@keker.com*
Michelle S. Ybarra (*pro hac vice*)
*mybarra@keker.com*
Reid P. Mullen (*pro hac vice*)
*rmullen@keker.com*
Nicholas S. Goldberg (*pro hac vice*)
*ngoldberg@keker.com*
633 Battery St.
San Francisco, CA 94111
Telephone: 415.391.5400

*Attorneys for Defendant OpenAI*

[*] All parties whose electronic signatures are included in this filing have provided consent in accordance with Rule 8.5(b) of the Court's ECF Rules and Instructions.

*/s/ Lisa Simpson*

ORRICK, HERRINGTON & SUTCLIFFE LLP
Annette L. Hurst (admitted pro hac vice)
Daniel Justice (admitted pro hac vice)
Robert Scott Shwarts
Catherine Lui (admitted pro hac vice)
Amanda H. Schwartz (admitted pro hac vice)
The Orrick Building
405 Howard Street
San Francisco, CA 94105-2669
Telephone: (415) 773-5700
Facsimile: (415) 773-5759
ahurst@orrick.com
djustice@orrick.com
aschwartz@orrick.com

Christopher J. Cariello
Lisa T. Simpson
Marc Shapiro
Vanessa Sorrentino
Hilda Obeng
51 West 52nd Street
New York, NY 10019
Telephone: (212) 506-3778
Facsimile: (212) 506-5151
ccariello@orrick.com
lsimpson@orrick.com
mrshapiro@orrick.com
vsorrentino@orrick.com
hobeng@orrick.com

Sheryl Koval Garko (admitted pro hac vice)
Laura Brooks Najemy (admitted pro hac vice)
222 Berkley Street
Boston, MA 02116
Telephone: (617) 880-1800
Facsimile: (617) 880-1801
sgarko@orrick.com
lnajemy@orrick.com

Isaac Sawlih Behnawa (admitted pro hac vice)
Johnathan Vaknin (admitted pro hac vice)
355 S. Grand Ave. Suite 2700
Los Angeles, CA 90071
Telephone: (213) 612-2179
Facsimile: (213) 612-2499
ibehnawa@orrick.com
jvaknin@orrick.com

Monica Svetoslavov (admitted pro hac vice)
Louis Andrew Schreiber
2100 Pennsylvania Avenue NW
Washington, DC 20037
Telephone: (202) 339-8400
Facsimile: (202) 339-8500
msvetoslavov@orrick.com
aschreiber@orrick.com

FAEGRE DRINKER BIDDLE & REATH LLP
Jeffrey S. Jacobson
1177 Avenue of the Americas
New York, New York 10036
Telephone: (212) 248-3191
jeffrey.jacobson@faegredrinker.com

Jared B. Briant (admitted pro hac vice)
Kirstin L. Stoll-DeBell (admitted pro hac vice)
Timothy Scull (admitted pro hac vice)
Shelby Pickar-Dennis (admitted pro hac vice)
1144 15th Street, Suite 3400
Denver, Colorado 80202
Telephone: (303) 607-3588
jared.briant@faegredrinker.com
kirstin.stolldebell@faegredrinker.com
timothy.scull@faegredrinker.com
shelby.pickar-dennis@faegredrinker.com

Lora A. Brzezynski (admitted pro hac vice)
Brianna Lynn Silverstein (admitted pro hac vice)
Faith Maggard (admitted pro hac vice)
1500 K Street NW, Suite 1100
Washington, DC 20005
Telephone: (202) 230-5000
Facsimile: (202) 842-8465
lora.brzezynski@faegredrinker.com

brianna.silverstein@faegredrinker.com
faith.maggard@faegredrinker.com

Carrie A. Beyer (admitted pro hac vice)
320 South Canal Street, Suite 3300
Chicago, IL 60606-5707
Telephone: (312) 569-1000
Facsimile: (312) 569-3000
carrie.beyer@faegredrinker.com

Elizabeth M.C. Scheibel (admitted pro hac vice)
2200 Wells Fargo Center, 90 S. 7th Street
Minneapolis, MN 55402
Telephone: (612) 766-7000
Facsimile: (612) 766-1600
elizabeth.scheibel@faegredrinker.com

Andrew Lawrence Van Houter
600 Campus Drive
Florham Park, NJ 07932
Telephone: (973) 549-7018
Facsimile: (973) 360-9831
Andrew.vanhouter@faegredrinker.com

*Attorneys for Defendant Microsoft Corporation*