# Exhibit A

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE:<br><br>OpenAI, INC.,<br><br>COPYRIGHT INFRINGEMENT LITIGATION<br><br>This Document Relates To:<br><br>*All cases* | 25-md-3143 (SHS) (OTW) |

**PROPOSED BRIEF OF *AMICUS CURIAE* DIGITAL CONTENT NEXT IN SUPPORT OF NEWS PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS


**Page**

TABLE OF AUTHORITIES .......... ii

INTEREST OF *AMICUS CURIAE* .......... 1

SUMMARY OF ARGUMENT .......... 2

ARGUMENT .......... 2

I. Digital Traffic Is Essential to Digital Publishers' Economic Viability. .......... 2

II. The Use of Digital Publishers' Content Without Publishers' Consent or Compensation Poses an Existential Threat to Them. .......... 3

A. Defendants' AI Tools Reduce Traffic to Digital Publishers' Content. .......... 3

B. Digital Publishers Are Losing Critical Revenue from Advertising and Subscriptions Due to Reduced Traffic. .......... 7

C. Defendants' Conduct Does Not Satisfy the Fair Use Exception Because It Is Negatively Impacting the Market for Plaintiffs' Works. .......... 8

III. Digital Publishers Did Not Impliedly License Their Creative Works to Microsoft by Not "Opting Out". .......... 13

CONCLUSION .......... 18

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ABKCO Music, Inc. v. Sagan*, 50 F.4th 309 (2d Cir. 2022) ........ 15

*Andy Warhol Found. for Visual Arts, Inc. v. Goldsmith*, 11 F.4th 26 (2d Cir. 2021) ........ 9

*Associated Press v. Meltwater U.S. Holdings, Inc.*, 931 F. Supp. 2d 537 (S.D.N.Y. 2013) ........ 14, 15, 18

*Authors Guild v. Google, Inc.*, 770 F. Supp. 2d 666 (S.D.N.Y. 2011) ........ 13, 15

*Bartz v. Anthropic, PBC*, No. 3:24-CV-05417, 2026 WL 2087580 (N.D. Cal. July 20, 2026) ........ 17

*Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569 (1994) ........ 9, 10, 12

*Field v. Google Inc.*, 412 F. Supp. 2d 1106 (D. Nev. 2006) ........ 14, 15, 16, 17

*Graham v. James*, 144 F.3d 229 (2d Cir. 1998) ........ 13

*Graham v. Prince*, No. 15-CV-10160 (SHS), 2023 WL 3383029 (S.D.N.Y. May 11, 2023) ........ 16

*Hachette Book Grp., Inc. v. Internet Archive*, 115 F.4th 163 (2d Cir. 2024) ........ 9, 10

*Harper & Row, Publishers, Inc. v. Nation Enters.*, 471 U.S. 539 (1985) ........ 11

*MidlevelU, Inc. v. ACI Info. Grp.*, 989 F.3d 1205 (11th Cir. 2021) ........ 16

*Nihon Keizai Shimbun, Inc. v. Comline Bus. Data, Inc.*, 166 F.3d 65 (2d Cir. 1999) ........ 11

*Parker v. Yahoo! Inc.*, No. 07-2757, 2008 WL 4410095 (E.D. Pa. Sept. 25, 2008) ........ 14, 16

*Psihoyos v. Pearson Educ., Inc.*, 855 F. Supp. 2d 103 (S.D.N.Y. 2012) ........ 15

*Spinelli v. Nat'l Football League*, 903 F.3d 185 (2d Cir. 2018) ........ 13

*Thomson Reuters Enter. Ctr. GmbH v. Ross Intel. Inc.*, No. 25-2153, 2026 WL 2932557 (3d Cir. Sept. 29, 2026) ........ 12, 17

*United States v. Google LLC*, 803 F. Supp. 3d 18 (D.D.C. 2025) ........ 3

**Statutes**

17 U.S.C. § 106 ........ 9

17 U.S.C. § 107 ........ 9

Digital Content Next ("DCN")[1] hereby submits this brief as *Amicus Curiae* in support of News Plaintiffs' September 17, 2026 Motion for Summary Judgment (the "Motion").[2]

**INTEREST OF *AMICUS CURIAE***

Founded in 2001, DCN is the only trade organization dedicated to serving the unique and diverse needs of high-quality digital content companies that enjoy trusted, direct relationships with consumers and advertisers. DCN's members[3] include many of the most trusted and well-respected publishing brands in the United States. Together, DCN's members have an unduplicated audience of 259 million unique visitors and reach 95 percent of the U.S. online population.

Consumers seek out DCN member brands because they value trustworthy information that has gone through a rigorous editorial process, and publishers are held to account for the quality and trustworthiness of their news and entertainment by audiences who have high expectations.

DCN's membership, which includes a broad cross-section of leading news and digital media brands, places DCN in a unique position to advise the Court on the impact of Defendants' practices on DCN's members and, by extension, consumers of digital news and media. DCN regularly conducts private surveys of its members that provide perspective as to the toll Defendants' practices have taken across the news and media industries. The results of several of those surveys—which demonstrate that the rise of generative AI has had real, deleterious effects

[1] DCN is a non-profit, tax-exempt business association organized under Section 501(c)(6) of the Internal Revenue Code and based in New York, New York. DCN has no parent corporation, and no publicly held corporation has 10% or greater ownership in DCN. DCN affirms that no counsel for a party authored this brief in whole or in part, and no person other than DCN contributed any money to fund its preparation or submission. DCN notes that plaintiff The New York Times is a member of DCN.

[2] Unless otherwise indicated, all defined terms take on the meaning given to them in News Plaintiffs' Combined Summary Judgment Brief, *In re: OpenAI, Inc., Copyright Infringement Litig.*, No. 1:25-md-3143 (SHS) (OTW), Dkt. No. 1977-1 (S.D.N.Y. Sept. 17, 2026) ("News Plaintiffs' Summary Judgment Brief"). Citations to "SF" refer to News Plaintiffs' Corrected Combined Rule 56.1 Statement of Material Undisputed Facts, Dkt. No. 2036 (S.D.N.Y. Sept. 18, 2026).

[3] *See* https://digitalcontentnext.org/membership/members/ for a listing of current DCN members.

on revenue streams that are critical to the maintenance of a vibrant free press and information economy—are discussed herein.

## SUMMARY OF ARGUMENT

The rise of generative AI tools that summarize and present publishers' original content poses an existential threat to the publishing industry. Web traffic, subscriptions, online advertising, and licensing are critical to publishers' operations, and the revenue from these revenue streams funds the provision of valuable, expensive original content including investigative reporting. AI tools that copy content and present it to users without sending them directly to the source (or without other financial remuneration) strike at the heart of publishers' business models and deprive them of revenue necessary to produce new works.

AI companies' wholesale piracy of original content has already throttled publisher revenues and, if allowed to continue, could break the back of the free press on which society, including those same AI companies, depends. In this vicious cycle, Defendants are draining the lifeblood from news and content providers every time they copy original content and present it as tool output. In this action, the Court has the opportunity to serve as a bulwark protecting creative expression and defending the rights of authors and publishers against an onslaught of copying by enormous, well-funded infringers the likes of which the world has never before seen. DCN strongly urges the Court to do so.

## ARGUMENT

### I. Digital Traffic Is Essential to Digital Publishers' Economic Viability.

Web traffic to digital publishers' online content is an essential component of their business model. Traffic does not merely expose users to the publishers' content. It also creates an opportunity for users to discover the publishers' brands, dive deeper into additional content created

by the same publisher, subscribe to their products and services, and, importantly, engage with advertising displayed on their sites.

Each of these activities generates revenue for digital publishers and compensates them for the content they create. For example, a June 2026 DCN member study revealed that, in 2025, advertising generated 84 percent of digital revenue for participating DCN member companies, while other activities, including subscriptions, generated 16 percent.[4] Digital publishers depend on a mix of revenue streams to monetize their content. But without traffic to their online content, all of these streams of revenue may significantly erode or cease to exist.

## II. The Use of Digital Publishers' Content Without Publishers' Consent or Compensation Poses an Existential Threat to Them.

### A. Defendants' AI Tools Reduce Traffic to Digital Publishers' Content.

The Defendants' AI tools are designed to keep users within their ecosystems, thus significantly reducing web traffic to digital publishers' content. There are a number of stages in the process of developing an AI tool and delivering its output. These stages include "training" an AI model to predict text by repeatedly exposing it to data (e.g., documents); "grounding" a model's response by generating its output from specific and identifiable external sources in response to a user's query; and displaying the output. Grounding may be assisted by retrieval-augmented generation ("RAG"), a technological process by which, in response to a user query, the tool retrieves relevant external sources and supplies those sources to the tool so that it may generate its response. RAG thus ensures that the tool is grounded in recent relevant data and, in doing so, enhances the tool's value. *See, e.g.*, *United States v. Google LLC*, 803 F. Supp. 3d 18, 54 (D.D.C.

---

[4] *See* Exhibit B, Declaration of Rande E. Price, dated October 29, 2026 (the "Price Declaration"), filed concurrently herewith, ¶ 6. The survey information referenced in this brief, which summarizes the results of nonpublic surveys of DCN members, has been compiled by DCN itself and has not been previously published in any forum. *Id.* ¶¶ 4-5.

2025) ("Grounding . . . provides a solution to the recency issue, because the LLM can pull from and incorporate up-to-date information.").

The external sources retrieved by RAG include publishers' digital content. Because the AI tool's output is derived from those underlying external sources, the model may deliver a verbatim copy, an excerpt, or a summary of the underlying work; in any event, it frequently serves as a direct substitute for the underlying content. Indeed, the process of grounding AI output by retrieving content is specifically designed to improve tool output by making it ***more similar to***—and thus a direct substitute for—recent, reliable original content. Thus, RAG makes it unnecessary for a user to "click through" to read and engage with the external source material itself.

This effect extends to a wide variety of published content, including news, reviews, opinion, and analysis. Reviews of consumer products, for example, are well-established copyrightable subject matter—they include creative expression by both consumer reviewers and in-house laboratory testers. However, RAG can completely eliminate any need a user might have to visit the underlying consumer-product reviewing site by yielding the content creator's review in response to a user's query. For example, if a user asks GPT-6, one of Defendant OpenAI's generative AI "chatbot" products, "What does Consumer Reports say about Rivian's cars?", GPT-6 may return a response that notes that "Consumer Reports' view is mixed" because they are "fast, capable, and loved by owners, but reliability is a major weakness." It highlights Consumer Reports' "biggest findings," which include that Rivian comes in "first place" with respect to "[o]wner satisfaction" but "last among 26 ranked brands" with respect to "[r]eliability." GPT-6's response makes it entirely unnecessary for the user to visit the webpages—in this case, Consumer Reports, a DCN member—that served as the external sources (identified as "Sources") for its response. And by substituting for the external source, that substitutive response makes it even less likely the user

will download any given publisher's app or subscribe to the service. A real-world example of GPT-6's output is reproduced below:

What does Consumer Reports say about Rivian's cars?

Worked for 27s >

**Consumer Reports' view is mixed: Rivians are fast, capable, and loved by owners, but reliability is a major weakness.** Its current brand page lists no Rivian models as "CR Recommended." CR CR's Rivian overview

The biggest findings from its **2026 rankings**:

- **Owner satisfaction: first place.** In CR's survey, **85% of Rivian owners said they would buy the same vehicle again**—the highest percentage of any brand. CR Owner satisfaction survey
- **Reliability: last among 26 ranked brands.** Rivian scored **24/100** overall for predicted reliability; the **R1S scored 29/100** and the **R1T 18/100**. These are reliability scores, not overall vehicle ratings. CR Reliability rankings

Its driving reviews differ by model:

| Model | What CR likes | Main criticisms |
|---|---|---|
| R1T pickup | Exceptional acceleration, strong off-road capability, impressive handling for a truck, premium cabin, clever storage. | Abrupt regenerative braking at low speeds; distracting touchscreen controls for basic functions. CR R1T review |
| R1S three-row SUV | Quick acceleration, plentiful passenger and cargo space, and **358 miles in CR's 70-mph highway test** of the Dual Max. | Even after the 2025 update, the ride remains stiff and bouncy, steering feels overly sensitive, and controls are distracting. CR says its road-test performance trails competing electric SUVs. CR R1S review |

For the smaller **R2**, the CR pages I found still show preliminary coverage and no detailed reliability data, so it doesn't yet have the same established assessment. CR R2 reliability page

Because of the reliability and trustworthiness of publishers' content, AI developers, like Defendants here, specifically and extensively rely on the webpages of trusted news sources, such as the webpages of DCN's members, as the external sources from which RAG draws. Ironically, despite relying heavily on high-quality published content to fuel valuable output, RAG has caused a significant and meaningful reduction in web traffic to digital publishers' sites by trapping users within the AI provider's ecosystem. Data collected from participating DCN's members indicate that from 2023 compared to 2025, there was a 26 percent reduction in unique visitors to DCN's

members' sites, 18 percent reduction in total views of their sites, and a 16 percent reduction in total visits to their sites.[5] In early July 2025, DCN conducted a snap study of its members specifically to assess the impact of Google's "AI Overviews" and "AI Mode," both of which yield AI-generated results in response to user queries, similar to Defendants' tools here. DCN's study found that, over the eight-week period covered by the survey, the year-over-year[6] ("YoY") web traffic referred to the participating surveyed publishers declined, with a median decline rate of 10 percent.[7]

The effect of AI tools on web traffic has only gotten worse over time, as the technology continues to develop at a rapid pace. In July 2026, DCN repeated its 2025 survey and analyzed the same eight-week period in 2026. It found that, when compared to the YoY web traffic in 2025, the YoY web traffic in 2026 had declined even more dramatically, with a median decline of 22 percent.[8]

These results are consistent with independent empirical research. A 2025 study by the Pew Research Center analyzed data shared by 900 U.S. users and reported that users of Google's search engine "who encounter an AI summary are less likely to click on links to other websites than users who do not see one."[9] And a more recent study, conducted by researchers from Carnegie Mellon and the Indian School of Business, found that Google's AI Overviews, a quintessential example of RAG standing in the way of publisher traffic, "reduce outbound organic clicks to publishers' webpages by 39.8%".[10] Defendants' offerings—which, like Google's AI Overviews, present

[5] *See* Price Decl. ¶ 7.
[6] "Year-over-year" measures the percentage change in a particular metric between a particular period and the exact same period from the previous year.
[7] *See* Price Decl. ¶ 8.
[8] *See* Price Decl. ¶ 9.
[9] Athena Chapekis & Anna Lieb, *Google Users Are Less Likely To Click on Links When an AI Summary Appears in the Results*, Pew Research Center (May 23, 2025), https://www.pewresearch.org/short-reads/2025/07/22/google-users-are-less-likely-to-click-on-links-when-an-ai-summary-appears-in-the-results/.
[10] Saharsh Agarwal & Ananya Sen, *The Impact of Google AI Overviews on Publisher Traffic and User Experience: Evidence from a Field Experiment* (July 8, 2026), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=6513059 at 3.

source data in response to users that serves as a near-perfect or perfect substitute for the original source data—almost certainly have a similar effect.

Indeed, the Court need look no further than Microsoft's own data for evidence that RAG has caused a reduction in web traffic that is at least as severe as the empirically demonstrated Google AI Overviews effects. Microsoft's data indicates that the overall click-through rate reduction between Bing Chat and Bing Web Search shows a significant reduction in users clicking to visit an external site, with ***as much as an 87 to 93 percent reduction for the New York Times alone***.[11] The effect of grounding is especially extreme in the news industry; approximately 18 percent of Copilot conversations and a whopping 40 percent of ChatGPT conversations that invoke RAG rely on news-publisher content.[12] The result is that news and media publishers—such as DCN's members—are disproportionately harmed by Defendants' actions.

### B. Digital Publishers Are Losing Critical Revenue from Advertising and Subscriptions Due to Reduced Traffic.

Confidential data collected from DCN's members reveal that both total advertising revenue and total overall revenue began a downward trajectory in 2025, with both measures declining 5 percent YoY.[13] RAG is thus already eating away at publishers' businesses.

Advertising is not the only revenue stream threatened by Defendants' conduct. Defendants' infringement of source material damages subscription revenue as well. A 2025 survey of New York Times subscribers found that, among those who used or paid for ChatGPT for news, 36 percent agreed that ChatGPT "means I no longer need news from the New York Times at all."[14] A news executive from another newspaper testified that subscribers are "cancelling" because publishers

[11] News Plaintiffs' Summary Judgment Brief, at 68 (citing SF1536).
[12] SF1020–22; SF1029–30.
[13] *See* Price Decl. ¶ 10.
[14] SF1581.

are "competing with a zero price on ChatGPT, on CoPilot."[15] Every subscriber lost to a substitutive AI tool represents the loss of a renewing revenue stream that would otherwise fund publishers' creation of new content.

In order to provide high-quality results, RAG depends, as training data, on access to the same high-quality content that RAG is throttling, which underscores the shortsightedness of Defendants' conduct. As digital publishers decline due to Defendants' conduct, so too will the availability of reliable training data. That diminution will, in turn, threaten the ongoing usefulness and vitality of every LLM trained on public data. Microsoft recognizes as much, noting:

> Our AI content strategy has started a "doom loop" that will hurt the performance of our models and the entire web at the same time: It is highly unusual that an end-product threatens the economic foundations of its essential suppliers, but that is the situation we have created for our LLM business with respect to its "content supply chain."[16]

And yet, Defendants continue to pursue a course of killing the goose that lays their golden eggs. Defendants' conduct of pirating valuable digital publisher content creates a "doom loop" that will undermine the reliability and outputs of their own product while threatening the entire digital publishing industry. OpenAI's own Head of ChatGPT put it plainly: without traffic flowing back to content owners, "[***t]here's no incentive to create content anymore***."[17]

### C. Defendants' Conduct Does Not Satisfy the Fair Use Exception Because It Is Negatively Impacting the Market for Plaintiffs' Works.

Defendants are wrong that their substitution of the copyrighted works at issue here with their AI products constitutes "fair use" under copyright law, because those AI products result in substantial negative impacts on the digital publishing market. Copyright law reserves for the rights holder the "exclusive rights" to, among other things, "reproduce the copyrighted work" and

---

[15] SF1596.
[16] News Plaintiffs' Summary Judgment Brief at 2 (citing SF1672).
[17] SF1544 (emphasis added).

"prepare derivative works based upon the copyrighted work".[18] Uses that constitute "fair use" are excepted from the definition of what constitutes infringement.[19] But a finding that the second work adversely affects the market for the original work will weigh against finding such use is "fair." *See Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 590 (1994) ("[The fourth fair use factor] requires courts to consider not only the extent of market harm caused by the particular actions of the alleged infringer, but also whether unrestricted and widespread conduct of the sort engaged in by the defendant would result in a substantially adverse impact on the potential market for the original." (cleaned up)); *Hachette Book Grp., Inc. v. Internet Archive*, 115 F. 4th 163, 189 (2d Cir. 2024) (noting that the fourth factor of a fair use analysis, which considers the market effects of the use, is "undoubtedly the single most important element of fair use"). Importantly, in assessing the market effects of the second work, the court need not rely on empirical data; it is sufficient to "rely on . . . logical inferences" of the impact of such use. *Hachette*, 115 F.4th at 193; *see also Andy Warhol Found. for Visual Arts, Inc. v. Goldsmith*, 11 F.4th 26, 50 (2d Cir. 2021). And, because fair use is an affirmative defense, defendants bear the burden of demonstrating that their use will not adversely affect the market for the copyrighted work. *See Campbell*, 510 U.S. at 590; *Hachette*, 115 F.4th at 194. The Second Circuit has "never held that the rightsholder bears the burden of showing actual market harm", and courts "routinely rely on . . . logical inferences" in applying the fourth factor. *Hachette*, 115 F.4th at 193-94. Defendants' assertion that Plaintiffs must come forward with their own "empirical" proof of harm gets the burden backward.

Defendants have failed to meet that burden. Defendants cannot establish that their use of digital publishers' content, which includes training and grounding their models in a manner designed to serve as a substitute for the original content, does not adversely affect the market for

---

[18] 17 U.S.C. § 106(1) – (2).
[19] *See* 17 U.S.C. § 107.

digital publishers' content. AI output affects the market for the original work because it acts as a direct substitute for the work in the market in which the *end user making the query is the customer*—a user gains access to the content without ever having to navigate to digital publishers' webpages, apps, or the like.

But training and grounding also affect the market for the original work. These processes and techniques require making an exact copy of the digital publishers' works for inclusion in the AI tools' training datasets, as well as the focused information used for grounding results.[20] The copy accordingly serves as a direct substitute for the work in the market in which the *AI company using the data to deliver its tool is the consumer*. If not for their "theft" by scraping, these companies would be required to invest substantial time and money to build a newsroom, hire reporters, and build trust with consumers over time, or purchase a copy of the underlying work or seek a license, like any other user of the content.

It is hard to come up with a more "logical inference" than that such uses serve as a substitute for digital publishers' original works. But it is worth noting that even Microsoft appreciated the import of all such uses on the market for digital publishers' content, such that its Director of Applied Science characterized its use of scraped content as "an astonishing theft of unprecedented proportions" and possibly the "largest theft of labor in human history."[21] Moreover, there is ample empirical evidence that end users actually view and consume the two products—the AI output versus the original copyrighted content—as direct substitutes. Since the introduction of LLMs relying on RAG technology, digital publishers have received significantly fewer unique visitors to their webpages.[22] And, when they do visit, those visitors are generating less revenue.[23] The

[20] *See* News Plaintiffs' Summary Judgment Brief at 8-11, 13-14.
[21] News Plaintiffs' Summary Judgment Brief at 1 (citing SF1437, SF1652).
[22] *See* Price Decl. ¶ 11.
[23] *Id.* ¶ 10.

reduction in unique visitors and revenue suggests users substitute the output they receive from the LLM for the content they otherwise would have consumed from the digital publishers. Indeed, when independent researchers compared user behavior in a randomized, controlled experiment, they found that users who were shown an AI summary were significantly less likely to click through to the underlying source than users who received standard search engine results.[24] This Court should accordingly conclude that Defendants' use of Plaintiffs' works fails to constitute "fair use."

Defendants' *de minimis* argument that infringing outputs are too "rare" to matter fails on the law and the record. "Isolated instances of minor infringements, when multiplied many times, become in the aggregate a major inroad on copyright that must be prevented." *Harper & Row, Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 569 (1985); *accord Nihon Keizai Shimbun, Inc. v. Comline Bus. Data, Inc.*, 166 F.3d 65, 71-72, 73 (2d Cir. 1999); *Thomson Reuters Enter. Ctr. GmbH v. Ross Intel. Inc.*, No. 25-2153, 2026 WL 2932557, at *8 (3d Cir. Sept. 29, 2026) (rejecting as insufficient the contention that the defendant copied "only 0.08%" of the plaintiff's works). The record here establishes far more than merely trivial infringement: Plaintiffs' experts identified at least 59,545 Copilot conversations containing verbatim content from the Asserted Works, and verbatim grounding content "leaks" into roughly ***10 to 20 percent of the Copilot outputs***.[25] And as discussed above, DCN's member survey data confirms that this infringement has real-world effects.[26]

[24] Saharsh Agarwal & Ananya Sen, *The Impact of Google AI Overviews on Publisher Traffic and User Experience: Evidence from a Field Experiment*, at 3 (July 8, 2026), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=6513059.
[25] SF1032–33; Def. Microsoft Corp.'s Mem. of Law in Supp. of Mot. for Summ. J. in News Pls.' Consol. Cases, No. 1:25-md-3143, Dkt. No. 1698, at 20–22 (S.D.N.Y. Sept. 4, 2026) ("Microsoft News Brief") at 22.
[26] *See* Price Decl. ¶ 10.

Despite Microsoft's arguments to the contrary, the fair use analysis is not impacted by the fact that digital publishers can "opt out" of having their content included as part of Copilot's web grounding. *See* Microsoft News Brief at 3 (arguing that "[i]t is hard to imagine a fairer use than one a copyright holder can block at will.") In *Campbell*, the Supreme Court made clear that a user's request for permission to use a copyright protected work is irrelevant to whether the use is fair. *See id.* at 585 n.18. Rather, a fair use determination is entirely independent from such considerations. *See id.* ("If the use is otherwise fair, then no permission need be sought or granted.").

Here, Microsoft is ***not even asking for permission*** to use digital publishers' copyrighted work. Instead, it is merely giving digital publishers, through the creation of meta tags, the ability to ask that their data ***not*** be used. That argument turns the concept of "fair use" on its head by focusing not on whether the copying and use is fair, but on whether the author conformed its publication to requirements ***set by the infringer***. Such a rule would invert copyright law's default arrangement by requiring rights holders to come forward to protect their rights, rather than requiring potential users to come forward before intruding on them. *Cf. Authors Guild v. Google, Inc.*, 770 F. Supp. 2d 666, 682 (S.D.N.Y. 2011) (rejecting settlement in class action brought against Google for scanning and displaying snippets of books in part because the ability of copyright holders to "opt out" of settlement was an ill-suited safeguard given the nature of the underlying rights at stake: "[I]t is incongruous with the purpose of the copyright laws to place the onus on copyright owners to come forward to protect their rights when Google copied their works without first seeking their permission.").

Framing the issue as whether digital publishers are "entitled" to web traffic is a sleight of hand, meant to distract this Court from the wholesale infringement at issue here.[27] Digital publishers do not claim they are "entitled" to web traffic. What they ***do*** claim is that Microsoft is not entitled to free, permissionless use of their content; if it wants to use that content, Microsoft needs to seek permission and "pay" for that use.[28] Content, of course, ***drives*** traffic, whether the traffic is going to the source or to an AI summary, and publishers have a right to restrict the use of their copyrighted works.

### III. Digital Publishers Did Not Impliedly License Their Creative Works to Microsoft by Not "Opting Out".

A license is an affirmative defense to a claim of copyright infringement. *See Spinelli v. Nat'l Football League*, 903 F.3d 185, 197 (2d Cir. 2018). A copyright holder may grant a nonexclusive license either expressly or impliedly through its conduct. *See Graham v. James*, 144 F.3d 229, 235 (2d Cir. 1998). Some courts have concluded in other contexts that digital publishers have impliedly granted a license to their online works when they have failed to use available technologies to "opt out" of having their webpages used. *See Field v. Google Inc.*, 412 F. Supp. 2d 1106, 1116 (D. Nev. 2006); *see also Parker v. Yahoo! Inc.*, No. 07-2757, 2008 WL 4410095, at *4 (E.D. Pa. Sept. 25, 2008) (adopting *Field*'s reasoning in a suit brought by a pro se plaintiff).

For example, in *Field v. Google Inc.*, the Nevada district court concluded that the plaintiff had impliedly granted Google a license to store his copyrighted works in Google's system cache when the plaintiff failed to use widely recognized protocols that would have instructed Google's

[27] Def. Microsoft Corporation's Memo. Of Law in Support of Motion for Summary Judgement in News Plaintiffs' Consolidated Cases, Case No. 1:25-md-3143, Dkt. No. 729 (SDNY Sept. 17, 2026) ("Microsoft News Brief"), at 29-31.

[28] Users pay for content when they visit digital publishers' webpages and view advertisements displayed on them. By using digital publishers' content as a necessary upstream input in its LLM products, Microsoft accesses the same content without ever paying for it. Making matters worse, by then presenting the content in substitutive AI summaries, Microsoft additionally enables ***other*** users to avoid paying for the content as well.

web crawler to refrain from storing them. *See* 412 F. Supp. 2d at 1109-16. Those protocols included "placing specific instructions in 'meta-tags' within the computer code . . . that comprises a given page." *Id.* at 1112. Importantly, among the "[u]ndisputed [f]acts" the court recited was that the plaintiff, who was an author and an attorney, "decided to manufacture a claim for copyright infringement against Google in the hopes of making money from Google's standard practice", *id.* at 1113; it noted he "created the 51 works at issue in [the] lawsuit" over a three-day period, *id.* at 1114, and sought statutory damages for infringement of each, *id.* at 1110.

DCN urges this Court to refrain from adopting the Nevada district court's reasoning in *Field* or extending it to the context of the present case, for at least two reasons.

*First*, and most importantly, requiring a copyright owner to "opt out" or else risk a finding that it impliedly licensed its work improperly shifts the burden onto creators to secure rights granted to them under the Copyright Act. That is precisely the ground on which the court in *Associated Press v. Meltwater U.S. Holdings, Inc.,* refused to find an implied license arising from a failure to deploy crawler-exclusion protocols: such a theory "would shift the burden to the copyright holder to prevent unauthorized use instead of placing the burden on the infringing party to show it had properly taken and used content", and "there is no fair inference, based simply on the absence of the robots.txt protocol, that there has been a meeting of the minds between the copyright owner and the owner of the web crawler about the extent of copying." 931 F. Supp. 2d 537, 563 (S.D.N.Y. 2013); *see also id.* at 564 ("Adopting Meltwater's position would require websites concerned about improper copying to signal crawlers that they are not welcome."). The *Meltwater* court found *Field* of "limited relevance" and held that "the website's failure to use the robots.txt protocol to block its access will not create an implied license." *Id.*; *cf. Authors Guild*, 770 F. Supp. 2d at 682 ("[I]t is incongruous with the purpose of the copyright laws to place the

onus on copyright owners to come forward to protect their rights when Google copied their works without first seeking their permission."). A copyright holder's failure to "opt out" is thus irrelevant to determining whether it has impliedly licensed its work, for the same reasons opting out is irrelevant to a fair use determination.

*Second*, the Nevada district court's holding in *Field* is an outlier that multiple courts, including the Second and Eleventh Circuit Courts of Appeals, have refused to extend beyond its specific facts.[29] The Second Circuit has described *Field* as a "more permissive test", which the Second Circuit has never adopted, and has emphasized that any implied license requires "a 'meeting of the minds between the parties to permit the particular usage at issue'" — a requirement that a copyright owner's mere silence cannot satisfy. *ABKCO Music, Inc. v. Sagan*, 50 F.4th 309, 320 (2d Cir. 2022) (quoting *Psihoyos v. Pearson Educ., Inc.*, 855 F. Supp. 2d 103, 124 (S.D.N.Y. 2012)). The Eleventh Circuit likewise affirmed the rejection of an implied-license defense modeled on *Field* "regardless of whether *Field* was correct," observing that because "'an opt-out scheme for gaining copyright holders' permission online represents a significant departure from the traditional framework of American copyright law, . . . some courts have been hesitant to extend *Field*'s reach beyond the narrow search engine context.'" *MidlevelU, Inc. v. ACI Info. Grp.*, 989 F.3d 1205, 1217 (11th Cir. 2021) (quoting Monika Isia Jasiewicz, Comment, *Copyright Protection in an Opt-Out World: Implied License Doctrine and News Aggregators*, 122 Yale L.J. 837, 846 (2012)). Similarly, in the context of images posted on social media, this Court, in *Graham v. Prince*, held *Field* was "neither analogous nor controlling" where the defendant invoked it to claim a license from the copyright owner's public posting of his work, explaining that the argument was

[29] *Field* raised the issue of implied license in the context of somewhat peculiar facts: that the plaintiff, a lawyer, "manufacture[d]" a copyright claim in hopes of extracting statutory damages in excess of $2,500,000. 412 F. Supp. 2d at 1113.

"a request to find that any copyright holder who posts his copyrighted material onto a social media platform has waived his copyright to the material," and that "*Field* does not support finding in favor of such a sweeping rule." No. 15-CV-10160 (SHS), 2023 WL 3383029, at *23 (S.D.N.Y. May 11, 2023). *Field* accordingly does not support the proposition that a mere failure to "opt out" automatically creates an implied license and forfeits a creator's rights under the Copyright Act, and this Court should decline to extend *Field* to create such a rule. Moreover, *Field* and *Parker* addressed a well-known, long-established use—*i.e.*, caching for conventional search—whereas grounding by a generative AI tool is a novelty; publishers cannot be charged with silent acquiescence to a use they had no reason to anticipate, and have acted promptly to resist.

Moreover, *Field* arose in the context of use of copyrighted works ***by a search engine***, not an AI tool. Such use is fundamentally different from use by an AI tool. A search engine's use of digital content—e.g., the display of a website name, a snippet of content, and a hyperlink—does not have a substitutive effect for the underlying content. In fact, a search engine's main purpose is to act as a traffic delivery vehicle getting users to the destination website that satisfies the user's prompt. Therefore, the court's decision in *Field* to imply a license to a search engine did not displace a market for actual licenses that might otherwise have developed.

The same is not true for use of content in generating AI tool output. There is an actual and growing market for licensing digital publisher content to AI companies. *Cf. Thomson Reuters*, 2026 WL 2932557, at *9 (recognizing, in a suit for infringement by an AI company that copied plaintiff's "Headnotes" into AI training memos, that "the market for licensing headnotes as text to train AI is rapidly developing" and concluding that defendant's copying "usurped" plaintiff's opportunity to license headnotes for that purpose, thereby causing plaintiff market harm that weighed against a finding of fair use). Recent settlements and licensing deals—*e.g.*, *Bartz v.*

*Anthropic, PBC*, No. 3:24-CV-05417, 2026 WL 2087580 (N.D. Cal. July 20, 2026), and News Corp.-OpenAI,[30] among others—demonstrate that the market for such licenses is real and in a state of competitive growth. The existence of this market is not hypothetical: Defendants have entered into licenses for news and media content, and third parties—including Amazon, Google, Meta, Perplexity, ProRata.ai, and Mistral AI—pay to license news content for AI training and grounding.[31] The New York Times has licensed content to Amazon for AI-related uses, including retrieval-augmentation, and publishers increasingly field their own RAG tools, such as The Washington Post's "Ask The Post AI" and the New York Post's "Hamilton" chatbot. These licenses will serve to compensate digital publishers for the use of their works and offset the reductions in advertising revenue they are experiencing because of the output of AI tools. This Court should not interfere with this burgeoning market by implying ***a royalty-free license*** that enriches AI companies at the expense of digital publishers.

[30] *News Corp and OpenAI Sign Landmark Multi-Year Global Partnership*, Press Release, News Corp. (May 22, 2024), https://investors.newscorp.com/news-releases/news-release-details/news-corp-and-openai-sign-landmark-multi-year-global-partnership.
[31] SF147; SF229–33; SF247–94.

## CONCLUSION

A functioning press is critical to the maintenance of a free, democratic society. Even AI companies depend on the ability of publishers—whose business is the dissemination of the creative output of human beings—to continue to generate quality content for their engines to rely on in providing answers to users' queries. But in their rush to generate staggering profits, Defendants have set a course designed to bankrupt and degrade the very information economy that their models require to train. As *Meltwater* warned, in refusing to let an aggregator take "the fruit of [a news organization's] labor for its own profit, without compensating" it, enforcement of the copyright laws "permits [publishers] to earn the revenue that underwrites" the "expensive undertaking" of newsgathering—an "essential function of democracy." *Meltwater*, 931 F. Supp. 2d at 553. Defendants' misuse of publishers' data is not "fair", and it is not legal—and this Court should not countenance it.

Dated: October 29, 2026

Respectfully submitted,

HUTH REYNOLDS LLP

*/s/ Karl C. Huth*

Karl C. Huth
Matthew J. Reynolds
Jennifer Sturiale, Of Counsel
J. Lee Hill
huth@huthreynolds.com
reynolds@huthreynolds.com
jsturiale@huthreynolds.com
lhill@huthreynolds.com
41 Cannon Court
Huntington, NY 11743
Tel: (631) 263-3648
Fax: (646) 664-1512

*Attorneys for Digital Content Next*

**CERTIFICATE OF COMPLIANCE**

In accordance with Local Civil Rule 7.1(c ) and the Court's August 7, 2026 Order (Dkt. 1663, 25-md-3143), I hereby certify that the foregoing Proposed Brief of *Amicus Curiae* complies with the word count limit because it contains 5,559 words, excluding the parts exempted by Local Civil Rule 7.1(c). The basis of my knowledge is the word count feature of the word-processing system used to prepare this Proposed Brief.

Dated: October 29, 2026

By: */s/ Karl C. Huth*