# EXHIBIT A

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE: OPENAI, INC.<br>COPYRIGHT INFRINGEMENT<br>LITIGATION<br><br>This Document Relates To:<br>Case No. 1:25-cv-04315-SHS-OTW<br>Case No. 1:23-cv-11195-SHS-OTW<br>Case No. 1:23-cv-08292-SHS-OTW | Case No. 1:25-md-03143 (SHS) (OTW) |

**[PROPOSED] BRIEF OF AMICUS CURIAE AUTHORS ALLIANCE IN SUPPORT OF DEFENDANTS' MOTIONs FOR SUMMARY JUDGMENT**

Date: October 29, 2026

By: */s/ David Robert Hansen*
David Robert Hansen
Authors Alliance
5095 Peach Blossom Drive
Graham, NC 27253
dave@authorsalliance.org
(704) 747-4314

*Counsel for Authors Alliance*
*Admission pro hac vice pending*

## CORPORATE DISCLOSURE STATEMENT

Amicus Curiae does not have any parent corporations and no publicly held corporation owns 10% or more of its stock.

## TABLE OF CONTENTS

INTEREST OF AMICUS CURIAE ........ 1

INTRODUCTION AND SUMMARY OF ARGUMENT ........ 2

ARGUMENT ........ 3

I. MARKET DILUTION IS JUST A FANCY TERM FOR COMPETITION, AND COPYRIGHT LAW SUPPORTS COMPETITION ........ 3

A. Factor Four Reaches Only Substitution by Uses That Appropriate Protected Expression 4

B. Intermediate Copying That Enables Indirect Competition Does Not Cause Cognizable Harm ........ 8

II. WHETHER TO SHIELD RIGHTSHOLDERS FROM COMPETITION AT SCALE IS A POLICY CHOICE FOR CONGRESS, NOT A COGNIZABLE FACTOR FOUR HARM ... 10

III. MARKET DILUTION WOULD RESTRICT USES THAT SECTION 102(b) AND THE CONSTITUTION PROTECT ........ 13

IV. ADOPTION OF THE MARKET DILUTION THEORY WOULD HARM NEW AUTHORS ........ 15

CONCLUSION ........ 17

## TABLE OF AUTHORITIES

### Cases

*Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*, 598 U.S. 508 (2023) ........ 7

*Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*, 11 F.4th 26 (2d Cir. 2021), *aff'd*, 598 U.S. 508 (2023) ........ 5

*Arica Inst., Inc. v. Palmer*, 970 F.2d 1067 (2d Cir. 1992) ........ 7

*Authors Guild v. Google, Inc.*, 804 F.3d 202 (2d Cir. 2015) ....................6, 7, 10, 12

*Bartz v. Anthropic PBC*, 787 F. Supp. 3d 1007 (N.D. Cal. 2025) ....................3

*Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569 (1994) ....................4, 5, 12

*Castle Rock Ent., Inc. v. Carol Publ'g Grp., Inc.*, 150 F.3d 132 (2d Cir. 1998) ....................8

*Eldred v. Ashcroft*, 537 U.S. 186 (2003)....................14

*Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340 (1991) ....................13, 14

*Hachette Book Grp., Inc. v. Internet Archive*, 115 F.4th 163 (2d Cir. 2024) ....................5, 10, 12

*Kadrey v. Meta Platforms, Inc.*, 788 F. Supp. 3d 1026 (N.D. Cal. 2025) ....................2, 3, 4, 9, 11

*Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024) ....................11

*NXIVM Corp. v. Ross Inst.*, 364 F.3d 471 (2d Cir. 2004)....................4, 8

*Peters v. West*, 692 F.3d 629 (7th Cir. 2012)....................13

*Romanova v. Amilus Inc.*, 138 F.4th 104 (2d Cir. 2025) ....................8, 12

*Sega Enters. Ltd. v. Accolade, Inc.*, 977 F.2d 1510 (9th Cir. 1992) ....................8, 9

*Sony Comput. Ent., Inc. v. Connectix Corp.*, 203 F.3d 596 (9th Cir. 2000) ....................9

*Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417 (1984) ....................5, 13

*Sundeman v. Seajay Soc'y, Inc.*, 142 F.3d 194 (4th Cir. 1998) ....................9, 10

*Thomson Reuters Enter. Ctr. GmbH v. ROSS Intel. Inc.*, No. 25-2153 (3d Cir. Sept. 29, 2026) ....................8

**Constitutional Provisions**

U.S. Const. art. I, § 8, cl. 8....................2

**Statutes**

17 U.S.C. § 102(b) ....................3, 13, 14

17 U.S.C. § 107....................2, 11, 18

**Other Authorities**

Benjamin Franklin, *The Autobiography of Benjamin Franklin*: manuscript, 1790 (Literature in Context: An Open Anthology), http://anthologydev.lib.virginia.edu/work/Franklin/franklin-autobiography....................16

Edward Lee, *Copyright Dilution Under Constitutional Scrutiny*, 25 Chi.-Kent J. Intell. Prop. 1 (2026) ........................................................................................15

Louis Menand, *Believer*, New Yorker, Mar. 7, 2005 ....................................................................16

Pamela Samuelson, Abhishek Nagaraj & Christopher Jon Sprigman, *Market Dilution, Fair Use, and Generative AI*, Science, Oct. 15, 2026 ......................................................11

U.S. Copyright Office, *Copyright and Artificial Intelligence, Part 3: Generative AI Training* (pre-publication version May 2025) ..................................................................11

## INTEREST OF AMICUS CURIAE

Authors Alliance is a nonprofit organization that advances the interests of authors who write to be read and serve the public good.[1] Our over 3,500 members include Nobel laureates, prize-winning historians, biographers, novelists, journalists, law professors, and academic researchers. Many of our members' works have been used to train the large language models at issue in this case. Many of our members also routinely depend on fair use to quote, criticize, analyze, revise, and build upon the works that came before them, including through the use of new technology such as AI. Authors Alliance therefore has an interest in ensuring the sound development of both fair use law and AI in ways that support the interests of our members in creating new works and reaching new readers.

Class Plaintiffs, who include individual authors and the Authors Guild, present this case as one about the interests of authors generally. *See* Class Pls.' Mem. of Law in Supp. of Mot. for Partial Summ. J. at 3–4, ECF No. 1881 ("Pls.' Mem."). They urge the Court to adopt "market dilution," contending that "Defendants' Use of Books in AI Training Threatens Wholesale Market Displacement of Human-Authored Books" and that the resulting "harm to the market for books" defeats fair use. *Id.* at 34–36.

Amicus offers a distinct perspective. Authors are copyright owners, but authors are also users of copyrighted works and entrants into markets already occupied by other authors. A rule that treats competition from new, noninfringing expression as cognizable market harm would not operate only against artificial intelligence companies. It would burden scholarship, criticism, biography, commentary, educational publishing, and every other form of authorship that depends

[1] No party's counsel authored this brief in whole or in part, and no party, party's counsel, or person other than amicus, its members, and its counsel contributed money intended to fund its preparation or submission.

on fair use. Amicus's members have an interest in a copyright system that serves its constitutional purpose by giving authors control over markets for their protected expression, not by shielding incumbent authors from competition by new works that take none of it.

## INTRODUCTION AND SUMMARY OF ARGUMENT

This brief addresses only one issue: whether so-called "market dilution" is a cognizable form of harm under 17 U.S.C. § 107(4). By "market dilution" we mean the theory, first articulated by a court in *Kadrey v. Meta Platforms, Inc.,* 788 F. Supp. 3d 1026 (N.D. Cal. 2025), that copying works (in this case, to train an AI model) weighs against fair use because that copying helps enable the generation of new works that compete with the originals, "even if those works aren't themselves infringing." *Id.* at 1052. Amicus takes no position on the other questions presented by the parties' motions.

Market dilution departs radically from the settled structure of copyright law, which deliberately limits what is protectable so that ideas, facts, genres, and the other building blocks of expression remain free for every author to use. It is also contrary to copyright's purpose. The Constitution authorizes copyright "[t]o promote the Progress of Science and useful Arts," U.S. Const. art. I, § 8, cl. 8, and copyright pursues that goal by giving authors control over the exploitation of their protected expression. A theory that counts the creation of new, noninfringing works as a harm to be weighed against fair use would discourage the very abundance of expression copyright exists to promote.

The Court should decline the invitation to adopt the "market dilution" theory of market harm for four reasons:

*First*, market dilution is ordinary competition: factor four reaches uses that substitute for protected expression, not new works that compete for the same readers. *Second*, neither

Defendants' burden of proof nor the scale of generative AI changes the kind of harm the statute recognizes. *Third*, the theory would protect the ideas, facts, and genres that § 102(b) and the Constitution leave free. *Fourth*, it would fall hardest on authors who build on earlier works, as scholars, critics, and biographers routinely do.

## ARGUMENT

### I. MARKET DILUTION IS JUST A FANCY TERM FOR COMPETITION, AND COPYRIGHT LAW SUPPORTS COMPETITION

Until last year, no court had recognized "market dilution" as a form of harm under the fourth fair use factor. *Kadrey*, the first decision to embrace the theory, acknowledged that it had "never made a difference in a case before." 788 F. Supp. 3d at 1055. Judge Alsup, confronting a similar argument in *Bartz v. Anthropic PBC*, rejected it: such competition is "not the kind of competitive or creative displacement that concerns the Copyright Act," which "seeks to advance original works of authorship, not to protect authors against competition." 787 F. Supp. 3d 1007, 1032 (N.D. Cal. 2025).

The theory begins with an economic premise that may well be true: more lawful works can make existing works less valuable. A new biography can reduce sales of an older one. A better casebook can displace its predecessor. A new romance novel can win a reader who might otherwise have bought another. But copyright law has never treated every economic effect of a new expression as a copyright injury. Copyright gives authors control over the market for their protected expression. It does not give them a right to be free from competition by works that borrow only the ideas, facts, genres, and methods that remain free to all.

In *Kadrey*'s formulation, copying books to train a model can harm the market for those books "by helping to enable the rapid generation of countless works that compete with the

originals, even if those works aren't themselves infringing." 788 F. Supp. 3d at 1052. On that view a new work is an "indirect substitute" whenever a reader chooses it instead of the plaintiff's, even though it contains none of the plaintiff's protected expression. *Id.* at 1054. By that logic, two independently written romance novels are copyright substitutes because a reader might buy one rather than the other. So are two biographies of the same public figure, two textbooks on the same subject, or two news accounts of the same event. That is ordinary competition, not substitutionary expression, and it is competition copyright deliberately permits and even encourages.

**A. Factor Four Reaches Only Substitution by Uses That Appropriate Protected Expression**

Copyright's concern has never been indirect competition, but competition by works that appropriate an earlier author's protected expression. Market dilution instead asks the Court to count competitive pressure from outputs that are lawful in themselves. That converts factor four from a measure of harm to the market for protected expression into a general shield against competition from new works.

This capacious view of "market harm" leads Class Plaintiffs to insist that Defendants must demonstrate "the lack of any market effect" on the works at issue. Pls.' Mem. at 33. That is not the law. The Second Circuit has long held that factor four does not reach every version of "harm" to the market for the original, precisely because the law values competition from new expression. If it did not, all manner of criticism and parody that reduces demand for an original would be considered under factor four. But as the Supreme Court has explained: "when a lethal parody, like a scathing theater review, kills demand for the original, it does not produce a harm cognizable under the Copyright Act." *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 591–92 (1994). *See also NXIVM Corp. v. Ross Inst.*, 364 F.3d 471, 481–82 (2d Cir. 2004). The cognizable harm under the fourth factor is market substitution. The Supreme Court has expressly rejected harm that arises

merely because a secondary work suppresses demand for the original, distinguishing "[b]iting criticism [that merely] suppresses demand" from "copyright infringement[, which] usurps it." *Campbell*, 510 U.S. at 592.

Indeed, courts have long recognized the principle of "limited monopoly" to leave room for competing expressions. *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 429 (1984). One of the most significant ways they have done so has been to hew closely to the statute's insistent focus on the particular works allegedly copied and whether the alleged infringer had created a competing substitute of that work.

This is why the Second Circuit in *Hachette Book Group v. Internet Archive* recently explained that the inquiry is not "whether the second work would damage the market for the first . . . (by, for example, devaluing it through parody or criticism), but whether it usurps the market for the first by offering a competing substitute." 115 F.4th 163, 189 (2d Cir. 2024) (quoting *Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*, 11 F.4th 26, 48 (2d Cir. 2021), *aff'd*, 598 U.S. 508 (2023)). The court found usurpation in that case because it concluded that the Internet Archive offered "effectively the same product as Publishers—full copies of the Works—but at no cost." *Id.* at 190. The substitute was the Publishers' own expression, copied in full. The injury the court found flowed from the availability of the works themselves as substitutes, not from competition by other works in the same literary markets. A "competing substitute," in this sense then, is substitutionary expression: a use that supplants demand for the work by offering the copyright owner's protected expression, or a cognizable derivative of it, to the owner's audience. A work that competes for the same readers while taking none of that expression is not a substitute in the sense factor four uses the term, however much it may affect the original's sales.

*Authors Guild v. Google, Inc.*, 804 F.3d 202 (2d Cir. 2015) ("*Google Books*"), likewise involved a technology operating at enormous scale. Google copied millions of books, yet the Second Circuit did not ask whether Google Books altered the competitive environment for books generally. And it surely did, making huge numbers of older and backlist books easier to find, evaluate for usefulness, and purchase. Its aggregate effect undoubtedly harmed some rightsholders' business models while benefiting others. There, the court asked whether the challenged feature revealed enough of each copyrighted work to serve as an "effectively competing substitute" for it. 804 F.3d at 223–24. *Google Books* in some ways goes beyond the use of material for AI training because it did reproduce some protected expression to users. Judge Leval in that case acknowledged that snippet view (small excerpts of books displayed in response to searches) "can cause some loss of sales," yet held that "the possibility, or even the probability or certainty, of some loss of sales does not suffice to make the copy an effectively competing substitute." *Id.* at 224. It was only if the use had resulted in "widespread revelation of sufficiently significant portions of the original as to make available a significantly competing substitute." *Id.* at 223. The court went on to explain that even the sales that snippet view did displace "generally occur in relation to interests that are not protected by the copyright." *Id.* at 224.

A student who used snippet view to learn the year Franklin Roosevelt contracted polio might have no further need for the book, but "what the searcher derived from the snippet was a historical fact," and the author's copyright "does not extend to the facts communicated by his book." *Id.* That the fact "came embedded in three lines of Goldberg's writing, which were superfluous to the searcher's needs, would not change the taking of an unprotected fact into a copyright infringement." *Id.* And even where a snippet revealed some authorial expression, the court thought it "a rare case in which the searcher's interest in the protected aspect of the author's

work would be satisfied" by the "cumbersome, disjointed, and incomplete" fragments available, and "rarer still" that they could "provide a significant substitute for the purchase of the author's book." *Id.* at 224–25. Reuse of some expression, then, was not enough; what mattered was whether the use satisfied demand for the protected aspect of the work.

The focus on market harm from reuse of protected expression holds true even where the competing work targets precisely the same market. *Arica Institute, Inc. v. Palmer*, 970 F.2d 1067 (2d Cir. 1992), is a good example. In that case, Arica's founder, Oscar Ichazo, developed a theory of personality built on nine "ego fixations" arranged around a nine-pointed figure, the enneagram, and Arica taught the system through copyrighted books and training manuals. Helen Palmer, who learned the system largely from a psychologist who had attended Ichazo's first training, wrote her own book on the enneagram, published by Harper & Row. Arica claimed she had copied some 250 of its words and phrases, its sequence of personality types, and its labeled enneagram figures. The court treated the system itself as unprotectable fact and found only three short passages, along with the pairing of labels and figures, substantially similar. On the fourth factor, the court accepted that Palmer's book might compete with Arica's, because both "might well interest those pursuing emotional and psychological self-help." *Id.* at 1078. That competition did not count: "the relevant market effect is that which stems from defendant's use of plaintiff's 'expression,' not that which stems from defendant's work as a whole. . . . Defendant, after all, is perfectly entitled to create a competing work. The copyright statute simply constrains her from using plaintiff's original expression in doing so." *Id.*

Numerous other precedents confirm this longstanding focus on limiting cognizable market harm to substitutionary uses that incorporate copies of the copyright owner's protected expression. *See Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*, 598 U.S. 508, 528, 536 n.12 (2023)

(describing substitution as "copyright's bête noire" and explaining that the fourth factor "focuses on actual or potential market substitution"); *Romanova v. Amilus Inc.*, 138 F.4th 104, 117 n.9 (2d Cir. 2025) (asking whether the copy can "serve as a market substitute for the protected expression of the original"); *NXIVM*, 364 F.3d at 482 ("[T]he relevant market effect with which we are concerned is the market for plaintiffs' 'expression,' and thus it is the effect of defendants' use of that expression on plaintiffs' market that matters, not the effect of defendants' work as a whole."); *Castle Rock Ent., Inc. v. Carol Publ'g Grp., Inc.*, 150 F.3d 132, 145 (2d Cir. 1998) (asking not whether a secondary use "suppresses or even destroys" the market for the original or its derivatives, but whether it "usurps or substitutes for" that market). None of these decisions treats economic rivalry between distinct, independently expressive uses as enough.[2]

**B. Intermediate Copying That Enables Indirect Competition Does Not Cause Cognizable Harm**

In *Sega Enterprises Ltd. v. Accolade, Inc.*, Accolade copied Sega's code in the course of reverse engineering it and then released independently created games that competed with Sega's own. 977 F.2d 1510, 1514–17 (9th Cir. 1992). The court acknowledged that, "[b]y facilitating the entry of a new competitor," Accolade's copying "undoubtedly 'affected' the market for Genesis-compatible games in an indirect fashion." *Id.* at 1523. It held that this indirect effect did not weigh against fair use: "an attempt to monopolize the market by making it impossible for others to compete runs counter to the statutory purpose of promoting creative expression and cannot

[2] Nor does the Third Circuit's recent decision in *Thomson Reuters Enterprise Centre GmbH v. ROSS Intelligence Inc.*, No. 25-2153 (3d Cir. Sept. 29, 2026). The court found that ROSS used Westlaw's headnotes for "the same ultimate purpose" as Thomson Reuters, to build a platform that "aims to replace Westlaw"; that ROSS "appropriated the headnotes' value" as a draw for Westlaw users; and that it bypassed a market for licensing the headnotes as training data. Slip op. at 17, 19, 25–26. The court expressly distinguished this case: unlike the models here, ROSS's platform "cannot generate original expression." *Id.* at 17 n.7. It did not adopt *Kadrey*'s theory.

constitute a strong equitable basis for resisting the invocation of the fair use doctrine." *Id.* at 1523–24. *Kadrey*'s "indirect substitution" is *Sega*'s "indirect" market effect under a new name.

*Sony Computer Entertainment, Inc. v. Connectix Corp.* applied the same rule. Connectix copied Sony's BIOS while creating a software platform that competed with the PlayStation console. 203 F.3d 596, 599–601 (9th Cir. 2000). The court accepted that Sony would "lose console sales and profits." *Id.* at 607. But because the Virtual Game Station was "a legitimate competitor in the market for platforms on which Sony and Sony-licensed games can be played," rather than a substitute copy of protected expression, "some economic loss by Sony as a result of this competition does not compel a finding of no fair use." *Id.* Sony "understandably" sought control over that market, but "[t]he copyright law . . . does not confer such a monopoly." *Id.*

*Kadrey* distinguished *Sega* and *Connectix* on the ground that the defendants there copied to reach unprotected functional elements, whereas language models are "trained on the creative expression in copyrighted books." 788 F. Supp. 3d at 1054. That distinction does not justify a new category of fourth-factor harm. What the copier draws from the work bears on why the copying occurred and may bear on the first factor; it does not transform downstream lawful expression into a protected market held by the plaintiff.

Indeed, critics, parodists, and scholars all learn and draw on expressions they copy. In each case the fourth-factor question is the same: whether the resulting use substitutes for protected expression in a market copyright reserves to the owner. For example, in *Sundeman v. Seajay Society,* a scholar was given a complete copy of Marjorie Kinnan Rawlings's unpublished first novel so that she could study it without damaging the fragile manuscript, and she then presented a critique that quoted it at length. 142 F.3d 194, 197–99 (4th Cir. 1998). The Fourth Circuit held both the copying to provide the scholar with the manuscript and her reuse in a scholarly

presentation were fair, explaining that "[i]t would severely restrict scholarly pursuit, and inhibit the purposes of the Copyright Act, if a fragile original could not be copied to facilitate literary criticism." *Id.* at 205–06. On the fourth factor, the court focused on whether the resulting work substituted for the novel: because the novel and the critique "serve different market functions," the critique was "not a market substitute for the original work." *Id.* at 206–07. The complete copy was an intermediate step toward new expression, and what mattered was whether that new expression supplanted Rawlings's. The same is true of copies made to train a model.

## II. WHETHER TO SHIELD RIGHTSHOLDERS FROM COMPETITION AT SCALE IS A POLICY CHOICE FOR CONGRESS, NOT A COGNIZABLE FACTOR FOUR HARM

Class Plaintiffs invoke copyright's concern with preserving the incentive to create. Pls.' Mem. at 33–35. But the Copyright Act secures that incentive in a specific way: "by giving potential creators exclusive control over copying of their works." *Google Books*, 804 F.3d at 212. It does not secure it by guaranteeing authors a market free of new, noninfringing entrants.

Plaintiffs ask the Court to adopt *Kadrey*'s theory wholesale and to treat "market dilution" as a freestanding harm under factor four. Pls.' Mem. at 34–36. They frame the question as one of burden: because they assert that fair use is an affirmative defense, Defendants bear the "burden of proving that the secondary use does not compete in the relevant market[s]." *Id.* at 33 (quoting *Hachette*, 115 F.4th at 189). But a burden of proof does not define what must be proved. *Hachette* placed on the secondary user the burden of disproving harm in a *relevant* market, while recognizing that "the rightsholder may bear some initial burden of identifying relevant markets." 115 F.4th at 194. Nothing in *Hachette* suggests that a copyright owner may define the "relevant market" as every work in a genre and then require the defendant to disprove competition within it. Copyright law does not police competition; it polices substitution for protected expression.

*Kadrey*, the source of Plaintiffs' theory, reasoned that even where a model neither regurgitates a plaintiff's work nor generates substantially similar text, it can generate works similar enough in subject matter or genre to compete with the original. 788 F. Supp. 3d at 1052–55. In the court's words, "indirect substitution is still substitution: If someone bought a romance novel written by an LLM instead of a romance novel written by a human author, the LLM-generated novel is substituting for the human-written one." *Id.* at 1054. Because a model can generate enormous numbers of such works quickly, the court regarded that competition as potentially decisive, *id.* at 1055, 1059, though it granted summary judgment to Meta because the plaintiffs had "barely give[n] this issue lip service" and presented no evidence of dilution, *id.* at 1036. The only other institutional endorsement of the theory comes from the U.S. Copyright Office, which suggested in a pre-publication report that § 107(4) is broad enough to encompass market dilution because the statute speaks of the "effect" of a use on the potential market. U.S. Copyright Office, *Copyright and Artificial Intelligence, Part 3: Generative AI Training* 64–65 (pre-publication version May 2025).[3] But the word "effect" has never been read to reach every economic consequence of a use. If it were, *Campbell*'s lethal parody and *Google Books*' lost sales would both have counted.

*Kadrey*'s economic observation is plausible, though as OpenAI's brief points out, the evidence of such an effect is disputed.[4] Even if it is true, however, it does not follow that copyright

---

[3] The report was released as a "pre-publication version" and, so far as amicus is aware, has not been finalized. The Office's views on the meaning of § 107 are entitled to respectful consideration but not to deference. *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412 (2024).

[4] *See also* Pamela Samuelson, Abhishek Nagaraj & Christopher Jon Sprigman, *Market Dilution, Fair Use, and Generative AI*, Science, Oct. 15, 2026 ("Some first-generation research papers testing for market dilution make valuable contributions. However, by lacking a common conceptual definition of market dilution, the implications of the papers seem equivocal or debatable.").

law recognizes such a harm. Countless products are substitutes in the economist's sense because consumers allocate finite budgets and attention among them. A mystery novel may substitute for a romance novel; a streaming subscription may substitute for a book purchase; an evening at a concert may substitute for either. Copyright's fourth factor uses "substitute" in a narrower, legal sense. It asks whether the challenged use offers the copyrighted work, its protected expression, or a legally protected derivative as an alternative to the rightsholder's offering. *See Hachette*, 115 F.4th at 189; *Romanova*, 138 F.4th at 117 n.9; *Google Books*, 804 F.3d at 223–24.

A language model can generate more text, faster, than any individual author. If a system makes protected expression available as a substitute for the originals, then certainly widespread use may magnify the market harm dramatically. But Plaintiff's theory does not even depend on making such a showing. Instead, Plaintiffs offer a theory: that models will generate so many new works—none containing Plaintiffs' protected expression—that the sheer volume of competition will depress demand for the originals. That is competition at scale, not substitution at scale. Multiplying the number of noninfringing competitors does not change the nature of the injury; a thousand new romance novels that take nothing protectable from a plaintiff's book inflict no more cognizable harm than one does. Scale can magnify a harm that copyright recognizes, but it cannot create one where none exists.

*Campbell*'s instruction to view potential uses in aggregate does not alter that conclusion. The Court instructed courts to ask whether "unrestricted and widespread conduct of the sort engaged in by the defendant" would "result in a substantially adverse impact on the potential market" for the original. 510 U.S. at 590 (citations omitted). The instruction prevents a copier from defending a substitutive use on the ground that its own transaction was too small to matter. It does

not enlarge the rights copyright protects. Aggregation can multiply substitutive access to protected expression; it cannot convert ordinary competition from new expression into usurpation.

The contrary reading has no limiting principle. If scale makes otherwise noncognizable rivalry actionable, what is the threshold—one hundred new works, ten thousand, one million? Section 107 supplies no production-rate test and no special rule for machine-generated works. Class Plaintiffs respond that LLMs "are not children learning how to read and write." Pls.' Mem. at 35. True, but that a model works faster than a human author is a difference in productivity, not in the kind of harm inflicted, and a court could not confine such a doctrine to AI simply by invoking speed. Once competition by lawful works is a cognizable injury in principle, any defendant using fair use to enter a crowded market must litigate whether the aggregate of similar conduct depresses the plaintiff's sales enough to matter.

*Sony* counsels restraint in the face of such disruption: when "major technological innovations alter the market for copyrighted materials," courts should be reluctant "to expand the protections afforded by the copyright without explicit legislative guidance." 464 U.S. at 431. We urge the Court to heed that admonition.

## III. MARKET DILUTION WOULD RESTRICT USES THAT SECTION 102(B) AND THE CONSTITUTION PROTECT

Copyright does not extend to any "idea, procedure, process, system, method of operation, concept, principle, or discovery." 17 U.S.C. § 102(b). Facts are likewise free for all to use. *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 347–50 (1991). Nor does copyright protect a genre or a form: "Copyright protects actual expression, not methods of expression . . . no poet can claim copyright protection in the form of a sonnet or a limerick." *Peters v. West*, 692 F.3d 629, 636 (7th Cir. 2012). As the Supreme Court has put it, "every idea, theory, and fact in a copyrighted

work becomes instantly available for public exploitation at the moment of publication." *Eldred v. Ashcroft*, 537 U.S. 186, 219 (2003) (citations omitted).

Market dilution focuses precisely on the competitive similarity that remains after protected expression is removed: the same topic, genre, type of work, facts, concepts, or stylistic characteristics stated at a level of generality that copyright does not protect. A lawful biography of Lyndon Johnson can compete with earlier biographies because it covers the same life and events. A lawful romance novel can compete because it occupies the same genre. Those shared features are not a residual copyright interest that factor four can restore after § 102(b) and the infringement inquiry have excluded them.

The decisive question is what the defendant has made available as the substitute. Where the alleged substitute is a different, noninfringing work and the claimed rivalry depends only on unprotected similarities or general audience overlap, the economic injury does not arise from appropriation of the copyright owner's protected expression.

These boundaries serve the First Amendment function the Supreme Court has identified in the idea-expression distinction and fair use. *Eldred*, 537 U.S. at 219–20. Treating lawful new speech as an injury because it competes with earlier copyrighted speech would press copyright's exclusive rights into territory those built-in safeguards are designed to keep open. The same conclusion follows from the Progress Clause: "[t]he primary objective of copyright is not to reward the labor of authors, but '[t]o promote the Progress of Science and useful Arts.'" *Feist*, 499 U.S. at 349. A doctrine under which a work's influence expands its owner's power over successor

expression runs counter to that objective. The Court need not reach a constitutional question to avoid that result; the statute and controlling fair-use precedent already supply the narrower rule.[5]

## IV. ADOPTION OF THE MARKET DILUTION THEORY WOULD HARM NEW AUTHORS

Copyright incentivizes new creation because new works are additive, building on the past to "promote the progress" of science and culture. Scholarship often advances by displacement. A scholar reads an influential article, quotes it where necessary, shows that it is mistaken or outdated in light of newer work, and publishes a new book that becomes the standard account. The new book may take its predecessor's place as a course reading, and eventually cause it to go out of print. The scholar copied protected expression under fair use; the resulting work competes in the same market; and the earlier author is worse off. That is not a defect in copyright. It is how copyright's system of limited rights produces progress.

The same structure appears in critical biographies, revised translations, literature reviews, replication studies, casebooks, documentaries, and works of commentary. Open educational resources, which many of our members write, are a clear example. An open textbook may be written for the stated purpose of replacing expensive commercial textbooks in the same courses. The displacement can be intentional, widespread, and measurable. Yet the copyright question remains whether the new textbook appropriates protected expression, not whether it succeeds in taking market share from incumbents. Copyright separates these lawful competitive effects from usurpation because authors need room not merely to coexist with prior works, but to challenge, revise, outperform, and sometimes replace them.

---

[5] *See generally* Edward Lee, *Copyright Dilution Under Constitutional Scrutiny*, 25 CHI.-KENT J. INTELL. PROP. 1 (2026) (examining the constitutional difficulties the theory presents).

Authors have long copied the works of others to learn their craft. Hunter S. Thompson typed out pages of *The Great Gatsby* "just to get the feeling, he said, of what it was like to write that way." Louis Menand, *Believer*, New Yorker, Mar. 7, 2005, at 27. Benjamin Franklin taught himself to write by rewriting essays from *The Spectator* from his own notes and comparing his versions with the originals. BENJAMIN FRANKLIN, THE AUTOBIOGRAPHY OF BENJAMIN FRANKLIN: MANUSCRIPT, 1790, AT 13 (LITERATURE IN CONTEXT: AN OPEN ANTHOLOGY). http://anthologydev.lib.virginia.edu/work/Franklin/franklin-autobiography (reproducing Franklin's handwritten manuscript, whose prose reflects the skill he developed by rewriting essays from *The Spectator*).

Each copied expression to learn how it works, and each went on to write works that compete with those studied. No one would say that *Fear and Loathing in Las Vegas* inflicted a copyright injury on Fitzgerald because Thompson learned his rhythms by retyping *Gatsby*. Under market dilution's logic, however, the copying that enabled that competition would count against fair use.

It may be tempting to regard market dilution as an AI-specific response to an AI-specific problem of scale. But a legal rule does not stay attached to the technology that prompted it. Section 107(4) does not ask whether a human or a machine produced the downstream work; it asks about market effect. If the production of lawful competing works is a cognizable injury merely because an author copied and learned something from a previous work, future litigants will invoke that principle whenever copying under fair use helps create a competing product.

The burden would fall hardest on those new authors and publishers. Established rightsholders with catalogs, licensing infrastructure, and the resources to commission market experts would be best positioned to assert genre-level or field-level dilution. New entrants, small publishers, documentary producers, academic presses, and individual authors who rely heavily on

fair use would bear the cost of disproving diffuse counterfactual theories about how a field would look had they not made the challenged use.

None of this is a reason to disregard genuine substitution where it exists. It is a reason to keep factor four focused on protected expression, and on whether a given use makes available substitutes for the original. A plaintiff who can point to a substantially similar passage of meaningful length, a protected derivative, or another use that substitutes for protected expression may litigate the resulting market effect. What a plaintiff should not be able to do is aggregate the lawful output of a technology to show that more competition tends to reduce incumbents' sales, and treat that market fact as a copyright injury.

Authors are both copyright holders and users. A rule broad enough to protect an incumbent author from noninfringing AI-generated competition is broad enough in principle to protect an incumbent author from noninfringing human competition that fair use helped enable. The correct rule is also the most administrable one, and it is the rule the Second Circuit already applies: factor four asks about usurpation by a competing substitute for protected expression, not about competition more generally.

## CONCLUSION

The market dilution theory asks copyright law to protect rightsholders against an economic phenomenon that it has never restricted before. New works can reduce the sales, visibility, or value of older works without copying their protected expression. The Copyright Act deliberately leaves that competition outside the copyright owner's control.

Amicus therefore respectfully asks the Court to hold that "market dilution," i.e., aggregate competitive pressure from noninfringing outputs, including those that occupy the same subject

matter or genre, that share unprotected characteristics, or compete for the same audience, is not cognizable market harm under 17 U.S.C. § 107(4).

Rejecting the theory would preserve the distinction the Second Circuit has always maintained: copyright protects authors against substitution for their protected expression, not against the success of new expression that merely competes with it.

Dated: October 29, 2026

Respectfully submitted,

By: *_/s/ David Robert Hansen_*
David Robert Hansen
Authors Alliance
5095 Peach Blossom Drive
Graham, NC 27253
dave@authorsalliance.org
(704) 747-4314

*Counsel for Authors Alliance*
*Admission pro hac vice pending*

**CERTIFICATE OF COMPLIANCE**

In accordance with Local Civil Rule 7.1(c), I hereby certify that this brief is 5,540 words, exclusive of the caption page, table of contents, table of authorities, and signature block. The basis of my knowledge is the word count feature of the word-processing system used to prepare this memorandum.

Dated: October 29, 2026

By: */s/ David Robert Hansen*
David Robert Hansen
Authors Alliance
5095 Peach Blossom Drive
Graham, NC 27253
dave@authorsalliance.org
(704) 747-4314

*Counsel for Authors Alliance*
*Admission pro hac vice pending*