UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE: OPENAI, INC., COPYRIGHT INFRINGEMENT LITIGATION<br><br>THIS DOCUMENT RELATES TO:<br>ALL CASES | No. 25-md-3143 (SHS) (OTW)<br><br>Hon. Sidney H. Stein<br>Hon. Ona T. Wang |

**[PROPOSED] BRIEF OF SCREEN ACTORS GUILD-AMERICAN FEDERATION OF TELEVISION AND RADIO ARTISTS, AMERICAN FEDERATION OF MUSICIANS OF THE UNITED STATES AND CANADA, WRITERS GUILD OF AMERICA, WEST, INC. AND WRITERS GUILD OF AMERICA EAST, INC. AS *AMICI CURIAE* IN SUPPORT OF PLAINTIFFS**

## CORPORATE DISCLOSURE STATEMENT

*Amici curiae* Screen Actors Guild-American Federation of Television and Radio Artists, American Federation of Musicians of the United States and Canada, Writers Guild of America, West, Inc. and Writers Guild of America East, Inc. are all non-profit corporations; they do not offer stock; and they have no parent corporations.

# TABLE OF CONTENTS


CORPORATE DISCLOSURE STATEMENT .......... i

TABLE OF AUTHORITIES .......... iv

INTEREST OF THE AMICI .......... 1

ARGUMENT .......... 3

I. Introduction .......... 3

II. The News and Entertainment Industries, and the Livelihoods of the People Who Power Them, Depend on the Ability to License Work .......... 4

A. Union Member Compensation and Benefits Flow from Authorized, Licensed Use of Copyrighted Works .......... 5

B. The Humans Behind the News .......... 6

1. Delivering the news is skilled, demanding, and often dangerous work that relies on the credibility of the people who deliver it. .......... 6

2. Defendants' Products Exacerbate Industry Losses to the Detriment of its Workers and the Public .......... 7

C. The Humans Behind Entertainment .......... 8

1. Actors, Musicians, and other Performers .......... 9

2. Writers .......... 10

D. AI Terms Have Been a Key Issue in Recent Union Negotiations .......... 11

III. The Fair Use Analysis Cannot Isolate a Model's Training from Its Purpose, Outputs, and Harms .......... 12

A. Whether AI Training Is Fair Use Must Consider What the Model Is Built to Do .......... 13

1. Fair Use Is an Equitable Rule that Must Be Decided Case-by-Case .......... 13

2. Training on Human Works to Facilitate Generation of Competitive Works Weighs Against Fair Use .......... 14

B. Models Retain the Expression They Are Trained On .......... 15

C. The Harm Lands Hardest on the Humans Whose Work is Appropriated by Defendants ..... 17

1. The Unions' Members Directly Experience the Harms from Defendants' Products ..... 18

2. New Works Flooding the Market Is the "Substantially Adverse Impact" the Campbell Court Anticipated ..... 19

3. A Categorical Ruling Would Stifle a Developing Market ..... 21

IV. The Public Interest Favors Licensing, Not a Categorical Exemption ..... 22

A. AI Gatekeeps the Voices That Reach the Public ..... 24

B. Licensing Is Compatible with Innovation ..... 24

Conclusion ..... 25

# TABLE OF AUTHORITIES

## Cases

*Am. Geophysical Union v. Texaco Inc.*, 60 F.3d 913 (2d Cir. 1994).......................... 22

*Am. Soc'y for Testing & Materials v. UpCodes, Inc.*, 172 F.4th 253 (3d Cir. 2026).. 23

*Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*, 598 U.S. 508 (2023) .. 13, 14

*Associated Press v. United States*, 326 U.S. 1 (1945) ............................................. 24

*Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569 (1994) .................................. 14, 19

*Castle Rock Ent., Inc. v. Carol Publ'g Grp., Inc.*, 150 F.3d 132 (2d Cir. 1998) ......... 15

*GEMA v. OpenAI*, No. 42 O 14139/24 (LG München I Nov. 11, 2025) (Ger.) ........... 17

*Hachette Book Grp., Inc. v. Internet Archive*, 115 F.4th 163 (2d Cir. 2024) ............ 21

*Kadrey v. Meta Platforms, Inc.*, 788 F. Supp. 3d 1026 (N.D. Cal. 2025)........... passim

*N.Y. Times Co. v. Microsoft Corp.*, 757 F. Supp. 3d 594 (S.D.N.Y. 2024) ................ 23

*Thomson Reuters Enter. Ctr. GmbH v. Ross Intel. Inc.*, No. 25-2153, 2026 WL 2932557 (3d Cir. Sept. 29, 2026) ..................................................................... 4, 22, 25

## Other Authorities

Alexandra Alter, *The New Fabio Is Claude*, N.Y. Times (Feb. 8, 2026), https://www.nytimes.com/2026/02/08/business/ai-claude-romance-books.html........ 20

BJ Ard, *Copyright's Latent Space: Generative AI and the Limits of Fair Use*, 110 Cornell L. Rev. 509 (2025) ............................................................................... 17

Catherina Gioino, *These Fortune 500 Companies Are Bigger Than Most National Economies—Here's Where They'd Rank As Countries*, Fortune (June 2, 2026), https://fortune.com/2026/06/03/fortune-500-companies-national-economy-fortune-500-gdp/ .............................................................................................................. 3

CISAC & PMP Strategy, *Study on the Economic Impact of Generative AI in the Music and Audiovisual Industries* (Dec. 4, 2024), https://www.cisac.org/Newsroom/news-releases/global-economic-study-shows-human-creators-future-risk-generative-ai. .................. 18

Dan Whateley and Lucia Moses, *They Booked Acting Jobs — Then Were Replaced by AI*, Business Insider (June 4, 2026), http://businessinsider.com/actors-losing-jobs-to-ai-hollywood-micro-drama-industry-2026-6 ............................................................ 19

Deezer, *AI Music Has Surpassed 50% of New Music Uploads for the First Time* (July 21, 2026), https://newsroom-deezer.com/2026/07/ai-music-exceeds-50-percent-daily-uploads-deezer/ .......... 18

Int'l Trade Admin., U.S. Dep't of Com., *Media & Entertainment*, https://www.trade.gov/media-entertainment (last updated Aug. 2024) .......... 4

Jacqueline C. Charlesworth, *Generative AI's Illusory Case for Fair Use*, 27 Vand. J. Ent. & Tech. L. 323 (2025) .......... 3

Jess Barnes, *Streaming Made Up Nearly Half of All TV Viewing in May 2026*, Cord Cutters News (July 28, 2026) http://cordcuttersnews.com/streaming-made-up-nearly-half-of-all-tv-viewing-in-may-2026/ .......... 6

Kirsten Eddy & Elisa Shearer, How Americans' Trust in Information from News Organizations and Social Media Sites Has Changed Over Time, Pew Rsch. Ctr. (Oct. 29, 2025), https://www.pewresearch.org/short-reads/2025/10/29/how-americans-trust-in-information-from-news-organizations-and-social-media-sites-has-changed-over-time/ .......... 7

Letter from Thomas Jefferson to Edward Carrington (Jan. 16, 1787), Founders Online, https://founders.archives.gov/documents/Jefferson/01-11-02-0047 .......... 8

Marina Temkin, *OpenAI Reportedly In Talks To Raise $30B Round At $1.4T Valuation*, TechCrunch (Sept. 29, 2026) https://techcrunch.com/2026/09/29/openai-reportedly-in-talks-to-raise-30b-round-at-1-4t-valuation/ .......... 3

Motion Picture Ass'n, *The American Motion Picture and Television Industry: Creating Jobs, Trading Around the World* (Feb. 2026), https://www.motionpictures.org/research-docs/the-american-motion-picture-and-television-industry-creating-jobs-trading-around-the-world-2024/ .......... 4

NAVA, *The State of Voiceover in 2026*, https://navavoices.org/vo-survey-2026/ .......... 19

Robert Stoner & Jéssica Dutra, *The U.S. Music Industries: Jobs & Benefits—The 2024 Report* (Oct. 1, 2024) (prepared for the Recording Indus. Ass'n of Am.), https://ssrn.com/abstract=5015521 .......... 4

Samuel G. Goldberg & H. Tai Lam, *Generative AI & Creative Goods: Market Expansion, Crowd-Out, and Copyright* 4 (Stanford Graduate Sch. of Bus. Research Paper, July 27, 2026), https://ssrn.com/abstract=5152649 .......... 21

Tianxin Zou, Zijun (June) Shi & Yue Wu, *Welfare Implications of Democratization in Content Creation: Generative AI and Beyond*, 63 J. Mktg. Rsch. 607 (2026) .......... 23, 24

Tim Mirabito et al., *Local TV News Employment Continues to Decline*, Radio Television Digital News Ass'n (Sept. 8, 2026), https://www.rtdna.org/news/local-tv-news-employment-continues-to-decline .......... 8

Tong Chen et al., *CopyBench: Measuring Literal and Non-Literal Reproduction of Copyright-Protected Text in Language Model Generation*, Proc. 2024 Conf. on Empirical Methods in Nat. Lang. Processing 15134 (2024)....................................... 17

Xiang Hui, Oren Reshef & Luofeng Zhou, *The Short-Term Effects of Generative Artificial Intelligence on Employment: Evidence from an Online Labor Market*, 35 Org. Sci. 1977 (2024).......................................................................................... 20

Xinyue Liu, Niloofar Mireshghallah, Jane C. Ginsburg & Tuhin Chakrabarty, *Alignment Whack-a-Mole: Finetuning Activates Verbatim Recall of Copyrighted Books in Large Language Models* Conf. on Language Modeling (2026), arXiv:2603.20957v5 ..................................................................................... 16, 17

Zhivar Sourati et al., *The Homogenizing Effect of Large Language Models on Human Expression and Thought*, Trends Cognitive Scis. (Mar. 2026). ................................. 24

<u>Government Reports</u>

H.R. Rep. No. 94-1476 (1976) ............................................................................. 15

*Report of the Register of Copyrights on the General Revision of the U.S. Copyright Law*, 87th Cong., 1st Sess. 1 (Comm. Print 1961) ..................................................... 15

U.S. Copyright Off., *Copyright and Artificial Intelligence, Part 3: Generative AI Training* (pre-publication version May 2025) ........................................................... 14

# INTEREST OF THE AMICI

*Amici Curiae* (the "Unions") are labor unions representing working professionals in the news and entertainment industries.

Screen Actors Guild – American Federation of Television and Radio Artists ("SAG-AFTRA") is the world's largest labor union representing working media artists. SAG-AFTRA represents more than 160,000 actors, announcers, broadcasters, journalists, dancers, DJs, news writers, news editors, program hosts, puppeteers, recording artists, singers, stunt performers, voiceover artists, influencers and other media professionals. The professionals represented by SAG-AFTRA are the faces and voices that entertain and inform America and the world. SAG-AFTRA exists to secure the strongest possible protections for media artists in the 21st century and beyond.

American Federation of Musicians of the United States and Canada ("AFM") is the largest organization in the world representing the interests of professional musicians, including the interests of featured artists and session musicians. AFM represents over 80,000 musicians who perform in orchestras, backup bands, festivals, clubs and theaters and make music for films, television, commercials and sound recordings.

Writers Guild of America, West, Inc. (WGAW) is a labor union representing approximately 11,000 professional writers who write literary material for television and streaming series, movies, news programs, and documentaries. WGAW's mission is to protect the economic and creative rights of the writers it represents. As the

bargaining representative of creators of audiovisual programs, WGAW has a significant interest in the protection of copyrighted material against infringement.

Writers Guild of America East, Inc. (WGAE)[1] is a union of more than 7,000 writers and other creative professionals working in film, television, and online media that is dedicated to advancing labor standards and working conditions in the media industry and among all workers in the United States. WGAE members include writers of theatrical features, episodic television, late night comedy, television and radio news, online journalism, and scripted podcasts. Through collective bargaining and policy advocacy, the WGAE works to protect the value and integrity of its members' written work by ensuring that generative artificial intelligence is not used to substitute for human creativity.

Collectively, the Unions represent over 250,000 workers in the media and entertainment industries who, with generations before them, have had their work appropriated to train artificial intelligence ("AI") systems that copy and compete with those works on a massive scale. This unlicensed, uncompensated appropriation harms creative professionals, like the Unions' members, whose livelihoods depend on downstream licensing revenues. SAG-AFTRA and WGA have both negotiated terms with their signatory employers relating to AI training licenses.[2]

---

[1] WGAW and WGAE are collectively referred to in this brief as "WGA."

[2] AFM's current collective bargaining agreement does not expire until mid-2027.

## ARGUMENT

### I. Introduction

This case emerges from a highly concentrated industry in which companies, many valued in the *trillions*, are appropriating the work of middle- and working-class people to develop their technology. OpenAI's estimated valuation is approximately $1.4 trillion, and Microsoft's is in excess of $2.7 trillion, exceeding the gross domestic product of all but the largest nations.[3] Companies of that size can afford to license the works they use.

The harms of unlicensed training fall not just on companies like the News Plaintiffs, but on the countless professionals behind the work.

A rule condoning all training as fair use would "effect a potentially enormous transfer of value from the creators and owners of copyrighted works to the commercial entities that seek to exploit them." Jacqueline C. Charlesworth, *Generative AI's Illusory Case for Fair Use*, 27 Vand. J. Ent. & Tech. L. 323, 372 (2025). An exception of that reach would not be "a question of fair use but rather a fundamental question of policy for Congress to decide." *Id.* Ultimately, this AI training dispute is "no more than an ordinary copyright case" and should be treated as such. *Thomson Reuters Enter. Ctr.*

---

3 Marina Temkin, *OpenAI Reportedly In Talks To Raise $30B Round At $1.4T Valuation*, TechCrunch (Sept. 29, 2026) https://techcrunch.com/2026/09/29/openai-reportedly-in-talks-to-raise-30b-round-at-1-4t-valuation/; Catherina Gioino, *These Fortune 500 Companies Are Bigger Than Most National Economies—Here's Where They'd Rank As Countries*, Fortune (June 2, 2026), https://fortune.com/2026/06/03/fortune-500-companies-national-economy-fortune-500-gdp/.

*GmbH v. Ross Intel. Inc.*, No. 25-2153, 2026 WL 2932557, at *1 (3d Cir. Sept. 29, 2026).

The outcome here will reach well beyond Plaintiffs' works, including to those on which the Unions' members build their livelihoods. The Court should therefore reject any categorical rule.

## II. The News and Entertainment Industries, and the Livelihoods of the People Who Power Them, Depend on the Ability to License Work

The U.S. media and entertainment industry, the largest in the world, supports millions of jobs, including those performed by the Unions' more than 250,000 members, and is a significant contributor to the U.S. economy.[4] Licensing lies at the heart of that success, and none of it happens without the writers, performers, and other humans whose work AI developers copy to train their technology. The appropriation of copyrighted works threatens the revenue streams that underpin this

---

[4] Int'l Trade Admin., U.S. Dep't of Com., *Media & Entertainment*, https://www.trade.gov/media-entertainment (last updated Aug. 2024) (citing PwC data). According to industry data, film and television alone support 2.01 million jobs, with nearly 790,000 direct jobs, 320,000 in producing, marketing, and manufacturing content, while the music industry supports more than 2.5 million jobs, including more than 1.3 million direct jobs. Motion Picture Ass'n, *The American Motion Picture and Television Industry: Creating Jobs, Trading Around the World* (Feb. 2026) (infographic reporting 2024 data), https://www.motionpictures.org/research-docs/the-american-motion-picture-and-television-industry-creating-jobs-trading-around-the-world-2024/; Robert Stoner & Jéssica Dutra, *The U.S. Music Industries: Jobs & Benefits—The 2024 Report* 6, 17 (Oct. 1, 2024) (prepared for the Recording Indus. Ass'n of Am.), https://ssrn.com/abstract=5015521.

industry, as well as the terms bargained by the Unions over decades that ensure entertainment workers share in them.

OpenAI suggests ChatGPT "can allow novice writers or individuals who may never attempt to write a book to compete in the book marketplace, lowering the barriers to entry in the traditional book market." Dkt. 1983 at 15, 38–39; *see* Dkt. 1979 ¶ 135. But therein lies the issue: the so-called barriers are the very craft and humanity behind the work, and the ability of professionals to make a living through the creation and reuse of those works. A commercial technology built to replace human craft and unique voices is exactly what Judge Chhabria had in mind: "using books to teach children to write is not remotely like using books to create a product" one can use to "generate countless competing works with a miniscule fraction of the time and creativity it would otherwise take." *Kadrey v. Meta Platforms, Inc.*, 788 F. Supp. 3d 1026, 1036 (N.D. Cal. 2025).

### A. Union Member Compensation and Benefits Flow from Authorized, Licensed Use of Copyrighted Works

The economic value of creative works can accrue over decades through licensing across global media markets and territories. The ongoing exploitation provides critical royalties, residuals (royalty-like payments), and benefit plan contributions for the Unions' members. Because creative employment is inherently intermittent and project-based, often with long stretches between jobs, this downstream income sustains them through those gaps, and helps qualify them for health insurance.

The Unions have direct experience with how licensing markets for new technologies emerge and take shape, having long bargained for protections, including a share of downstream revenues. For example, when studios first began streaming programs online, they insisted that streaming was just promotional. The Unions recognized this as an emerging market, and it has been a core bargaining issue across multiple bargaining cycles. Now, streaming accounts for nearly half of all TV viewing,[5] and streaming payments are a key form of member compensation in the Unions' contracts.[6]

Likewise, the market for AI training data might currently look small and speculative, but it is already developing and the Unions are already bargaining terms around it.

### B. The Humans Behind the News

#### *1. Delivering the news is skilled, demanding, and often dangerous work that relies on the credibility of the people who deliver it.*

A news story that reaches the public is the product of many people, including reporters and correspondents, writers, producers, editors, photographers and camera

---

5 *See, e.g.*, Jess Barnes, *Streaming Made Up Nearly Half of All TV Viewing in May 2026*, Cord Cutters News (July 28, 2026) (reporting on Nielsen data) http://cordcuttersnews.com/streaming-made-up-nearly-half-of-all-tv-viewing-in-may-2026/.

6 For example, residuals from streaming reuse now represent almost two-thirds of total WGA residuals per internal data.

crews, and anchors and broadcasters. Their job is not only to gather information, but to verify it, put it in context, and stand behind it.

Much of journalism is invisible and happens before a story is aired or published. The work includes calls that go nowhere, records requests, sources cultivated over years, and hours in the field that lead to the article or segment. It can also put people in harm's way at home and abroad. This is work that only humans can do.

Credibility, judgment, and on-air presence are a cornerstone of a journalist's career. Audiences can only trust the news when they trust the people who report and deliver it, and that trust is often local and personal. Even as trust in news has declined overall, audiences continue to trust their local news.[7]

### *2. Defendants' Products Exacerbate Industry Losses to the Detriment of its Workers and the Public*

AI answer engines and retrieval tools simply appropriate finished news stories and repackage them. Synthetic, "pink slime," and "content farm" sites trade on the public's trust in local journalism, particularly in areas where non-AI generated local coverage is lacking.[8]

---

7 See Kirsten Eddy & Elisa Shearer, How Americans' Trust in Information from News Organizations and Social Media Sites Has Changed Over Time, Pew Rsch. Ctr. (Oct. 29, 2025), https://www.pewresearch.org/short-reads/2025/10/29/how-americans-trust-in-information-from-news-organizations-and-social-media-sites-has-changed-over-time/ (finding 70% of U.S. adults have at least some trust in information from local news organizations, compared with 56% for national organizations).

8 News Plaintiffs address these harms in detail. *See* Dkt. 2108 at 13–15, 65–71.

The harm hits hardest where news is already fragile. Full-time local television news employment fell for the second year in a row in 2025, with the number of stations producing their own local news hitting a new low.[9] This already-shrinking industry has little room to absorb further audience losses precipitated by automated systems that appropriate original reporting.

The loss reaches beyond journalists to the communities that rely on them to hold local government accountable. AI models cannot do this work; they depend on the human reporters who do. Starving the industry of revenue threatens our democracy—a cost the public cannot afford. As Thomas Jefferson once wrote:

> "Were it left to me to decide whether we should have a government without newspapers, or newspapers without a government, I should not hesitate a moment to prefer the latter."[10]

### C. The Humans Behind Entertainment

The entertainment works AI developers appropriate to train their models are the product of generations of human labor and experiences. Entertainment workers, including the Unions' members, typically spend years developing their craft and building careers, unique styles, reputations, and bodies of work.

---

9 Tim Mirabito et al., *Local TV News Employment Continues to Decline*, Radio Television Digital News Ass'n (Sept. 8, 2026), https://www.rtdna.org/news/local-tv-news-employment-continues-to-decline.

10 Letter from Thomas Jefferson to Edward Carrington (Jan. 16, 1787), Founders Online, https://founders.archives.gov/documents/Jefferson/01-11-02-0047.

Entertainment and the arts are fueled by human experience: by memory, loss, ambition, and the uniquely individual life each creative worker lives. Even the most advanced Generative AI model has no life experience to draw upon. It is fueled by what it copies.

### *1. Actors, Musicians, and other Performers*

Actors often invest years of practice and study to develop the skills necessary to deliver performances that move us. Individual roles may require additional, specialized training. Many spend years doing student films, showcases, and regional or local jobs, typically holding another job to make ends meet while they audition for paid acting gigs that are intermittent and short-term by nature. Stunt performers train in disciplines such as fight choreography, high falls, and driving, and they work under safety practices the industry has built over decades. Voice actors develop the technique to sustain characters, creatures, and combat sounds through hours of recording.

Musicians typically begin as children and train for years, continuing to rehearse and train well into their professional careers. A musician's sound, tone, and technique are their most important professional asset, and every recording they play on captures it. Like other performers, they often work irregular part-time schedules and may travel for work.

Many other types of performers, including singers and dancers, take similar paths.

The investment does not end when a performer starts working steadily, or even when they become famous. Working performers keep taking classes, keep auditioning, and keep preparing for each role on their own time. Every performance in works appropriated by AI developers to train their models embodies that investment.

### *2. Writers*

Professional film and television writers invest significant time and labor competing for work writing and producing film and television, often within a particular genre. Feature writers work alone or in teams, typically contracted for defined "writing steps" such as a first draft, rewrite, or polish, and may spend months or even years on a script. Television writers typically work in a writers' room: a staffed creative unit, led by a showrunner, responsible for forming the story, writing scripts, and maintaining the creative voice of a series. A single season is the product of a group of writers working over months to write and then produce the episodes.

That experience, labor, and time is behind the screenplays and teleplays, and the works derived from them, that AI developers use to train their models. And those models compete with exactly the work on which they were trained, all without consent, credit, compensation, or transparency to the writers whose work they appropriated. This risk is not limited to prompts that ask for material "in the style of" a named writer. A model trained on the body of work in a genre draws on the work of writers who have built that genre.

Credit and attribution are also core issues for writers; since the earliest collective bargaining agreements in Hollywood, writers have had control over the

credit determination process. Credits are part of writers' professional reputation, and credited writers receive the residual compensation for reuse of a project in subsequent markets. For other Unions' members, too, credit can impact their future employment and the compensation they can command.

### D. AI Terms Have Been a Key Issue in Recent Union Negotiations

Training AI models on entertainment works without consent, compensation, control, and credit is not just a reputational and dignitary harm, but an economic one, for the workers behind them. That harm made AI a central issue in the historic double strikes by the WGA and SAG-AFTRA in 2023. The agreements that ended those strikes, and those negotiated since by the Unions, address AI directly.

The agreements that emerged from the 2023 negotiation cycle established worker protections when AI is used on a union-covered production. SAG-AFTRA's 2023 agreements set minimum compensation terms around the creation and use of its members' digital replicas and established guardrails around wholly synthetic characters.[11] The 2023 WGA agreement established that AI is not a "writer," and that AI-generated written material cannot compete with a writer for credit (and thus residuals) or be used to reduce a writer's compensation, together with other protections. AFM added AI safeguards for musicians in its 2024 agreement, including

---

11 "Synthetics" are digital assets that do not resemble specific performers, used in otherwise human roles. SAG-AFTRA also obtained similar AI terms in other contracts, such as those covering commercials and sound recordings.

compensation for musicians whose work is used to generate AI outputs and protections for on-camera performers.

The 2026 WGA and SAG-AFTRA negotiations focused on the emerging licensing market.[12] Consistent with past agreements over new technologies, SAG-AFTRA and WGA sought a fair share of the employers' downstream revenue from licensing covered work to train AI. The negotiated terms include a notice-and-bargaining right for third-party licenses of covered work to train public-facing, commercially-available generative AI systems.

These negotiated provisions presuppose that training on covered work is a use that can be licensed and that the people whose work is used have a stake in the terms. A ruling here that training is categorically fair use would render moot the terms the Unions and the industry agreed to at the bargaining table. It would harm not just the copyright owners, but the people who create the work.

## III. The Fair Use Analysis Cannot Isolate a Model's Training from Its Purpose, Outputs, and Harms

Plaintiffs' briefs address why the fair use decisions Defendants rely on do not govern this case. The News Plaintiffs also address why training should not be viewed in isolation from a model's outputs, and how the Department of Justice's analysis

---

[12] SAG-AFTRA also negotiated additional terms around Synthetics.

conflicts with the Copyright Office's considered views. The Unions' focus is on the people they represent.

### A. Whether AI Training Is Fair Use Must Consider What the Model Is Built to Do

The Supreme Court has reiterated that the fair use analysis must consider a use's purpose. *Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*, 598 U.S. 508, 533 (2023) ("The same copying may be fair when used for one purpose but not another"). The Copyright Office has said as much: "Fair use must also be evaluated in the context of the overall use." U.S. Copyright Off., *Copyright and Artificial Intelligence, Part 3: Generative AI Training* 37 (pre-publication version May 2025). It also rejected the argument that AI training "is inherently transformative because it is not for expressive purposes" as "mistaken." *Id.* at 47.

Here, the purpose of using human-created works is to train a model to generate works that emulate and compete with human-created works.

#### *1. Fair Use Is an Equitable Rule that Must Be Decided Case-by-Case*

The "fair use" doctrine began as an implied exception, crafted and refined in the common law over many decades before it was codified.[13] Historically, "fair use" generally meant that "a reasonable portion of a copyrighted work may be reproduced without permission when necessary for a legitimate purpose which is not competitive

---

[13] Report of the Register of Copyrights on the General Revision of the U.S. Copyright Law, 87th Cong., 1st Sess. 24 (Comm. Print 1961) ("1961 Report").

with the copyright owner's market for his work." 1961 Report at 24. Congress codified fair use "to restate the present judicial doctrine . . . not to change, narrow, or enlarge it in any way." H.R. Rep. No. 94-1476, at 66 (1976). It admonished that the consideration of commerciality, "while not conclusive with respect to fair use, can and should be weighed along with other factors." *Id.*

From its inception fair use has been "an equitable rule of reason . . . and each case raising the question must be decided on its own facts." *Id.* at 65. The Supreme Court has held that fair use cannot "be simplified with bright-line rules, for the statute, like the doctrine it recognizes, calls for case-by-case analysis." *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 577 (1994).

Here, equity weighs in favor of the humans, not the companies who appropriated their work without consent, compensation, or even credit, to train a commercial technology that can compete with them on an unprecedented scale.

#### *2. Training on Human Works to Facilitate Generation of Competitive Works Weighs Against Fair Use*

"If an original work and a secondary use share the same or highly similar purposes, and the secondary use is of a commercial nature, the first factor is likely to weigh against fair use, absent some other justification for copying." *Warhol*, 598 U.S. at 532–33.

Microsoft argues that training extracts only unprotected facts, ideas, and patterns of language, and places "no value on the specific expressive aspects of works." Dkt. 1973 at 29. OpenAI's record says otherwise. In developing one training set,

OpenAI kept only those books listed for sale on Amazon, "in order to increase the dataset quality." Class Pls.' Corrected R. 56.1 Stmt. ¶ 459, Dkt. 1987 ("Class SUF"). Its researchers wrote that "books are generally higher quality than stuff on the internet." *Id.* ¶ 480. A fact is the same no matter its source; it's the expression that differs, and that is what OpenAI selected for.

Defendants also compare AI training to human learning, an inapt comparison. *Kadrey*, 788 F. Supp. 3d at 1036. Anyone who has learned a craft, including lawyers, understands why. A law student rarely writes with the precision or speed of a seasoned lawyer, and neither can write complete briefs in seconds. Similarly, a student trained to write cannot produce thousands of books on demand, no matter how skilled.

Nor does it matter that a model is "general purpose." A foundation model trained on everything powers products that can generate anything, including scripts, songs, voices, and video. A ruling that training is categorically fair use would reach all uses across all industries.

### B. Models Retain the Expression They Are Trained On

Copyright protects more than literal text. It extends to a work's protectable structure, including the sequence of its events and the expression of its characters. *See Castle Rock Ent., Inc. v. Carol Publ'g Grp., Inc.*, 150 F.3d 132, 138–40 (2d Cir. 1998). For writers those protectable elements are at the heart of their work and expression. Models reproduce it.

OpenAI tells this Court that an AI "model does not store any particular excerpt of training data during pretraining." Dkt. 1983 at 7. But its internal documents describe something different. "We train our networks to memorize the training data—that's their objective." Class SUF ¶ 560. An internal presentation also acknowledged that "models want to regurgitate, so we're inherently fighting against the training objective." *Id.* ¶ 559. In 2022, OpenAI called it a "major problem" that GPT-3.5 "can easily reproduce training data verbatim." *Id.* ¶ 563.

A growing body of independent research reaffirms that models, including some at issue here, memorize their training data. In one study, models fine-tuned to expand plot summaries into prose reproduced up to 85–90% of copyrighted books, with single *verbatim* spans exceeding 460 words. [14] In one case, GPT-4o reproduced 68.9% of a book in passages exceeding fifty consecutive words. Liu et al., *supra* note 14, at 5, 7 tbl. 1. The generated text was not from books used in the fine-tuning but from what the models memorized during pretraining. *Id.* at 2, 10.

Nor do safeguards reliably keep users from extracting memorized text. Those measures do not remove what a model has memorized; they simply hide it. Testing Meta's Llama, whose base and aligned versions are both public, researchers found that alignment reduced its recall of the test books, but fine-tuning restored much of

---

[14] Xinyue Liu, Niloofar Mireshghallah, Jane C. Ginsburg & Tuhin Chakrabarty, *Alignment Whack-a-Mole: Finetuning Activates Verbatim Recall of Copyrighted Books in Large Language Models* 1–2, Conf. on Language Modeling (2026), arXiv:2603.20957v5.

it, concluding that "[a]lignment hides memorization rather than removing it." *Id.* at 6–7.

Research has found that as models grow, non-literal copying of events and characters rises, and current mitigation methods "primarily reduce literal but not non-literal copying."[15] Likewise, when image generators refused prompts naming a protected character, a description still produced it.[16] Lyrics are no exception: a German court found they were embedded in OpenAI's models and reproducible. *GEMA v. OpenAI*, No. 42 O 14139/24 (LG München I Nov. 11, 2025) (Ger.).

Memorization is not an isolated defect in an otherwise transformative use; memorizing human expression is at the core of how Defendants' models are trained.

### C. The Harm Lands Hardest on the Humans Whose Work is Appropriated by Defendants

Plaintiffs' briefs illustrate that a market for licensing works to train AI exists and is growing, and Defendants take part in it. OpenAI's own damages expert confirms that its publisher agreements include "rights for training large language models." News Pls.' R. 56.1 Stmt. ¶ 140, Dkt. 2036 ("News SUF").

---

[15] Tong Chen et al., *CopyBench: Measuring Literal and Non-Literal Reproduction of Copyright-Protected Text in Language Model Generation*, Proc. 2024 Conf. on Empirical Methods in Nat. Lang. Processing 15134, 15134 (2024).

[16] BJ Ard, *Copyright's Latent Space: Generative AI and the Limits of Fair Use*, 110 Cornell L. Rev. 509, 545–46 (2025).

#### *1. The Unions' Members Directly Experience the Harms from Defendants' Products*

Most of the creative professionals the Unions represent compete based on their body of work, not just their names, and substitution lands hardest on them.

In the news industry, the harm is immediate and widespread. Retrieval-augmented generation represents direct substitution, because it copies current reporting at the moment a user requests it. Licenses already exist for both training and retrieval; continued appropriation of new reporting usurps that market.[17] The result is less traffic, less revenue, fewer jobs, and less original reporting.

The harm is not confined to news and books. As Judge Chhabria observed, generative AI can "flood the market with endless amounts of images, songs, articles, books, and more." *Kadrey*, 788 F. Supp. 3d at 1034. AI-generated music already accounts for more than half of new tracks uploaded daily on one streaming service.[18]

---

17 Defendants argue that publishers who did not block their crawlers impliedly licensed retrieval. Dkt. 1980 at 19–20; Dkt. 1975 at 31–34. Opt-out rights are only exercisable by website operators: most entertainment workers do not control the sites where their work appears.

18 By June 2026, fully AI-generated tracks made up more than half of daily music uploads to the Deezer streaming platform, about 90,000 tracks daily. Deezer, *AI Music Has Surpassed 50% of New Music Uploads for the First Time* (July 21, 2026), https://newsroom-deezer.com/2026/07/ai-music-exceeds-50-percent-daily-uploads-deezer/. One study projected that by 2028, AI-generated music could account for about 60% of music library revenues, and that roughly a quarter of music creators' revenues were at risk. CISAC & PMP Strategy, *Study on the Economic Impact of Generative AI in the Music and Audiovisual Industries* (Dec. 4, 2024), https://www.cisac.org/Newsroom/news-releases/global-economic-study-shows-human-creators-future-risk-generative-ai

Voice actors are among those already impacted by AI-generated content trained on their work. In a 2026 survey by the National Association of Voice Actors ("NAVA"), 21% of respondents reported knowingly losing work to a synthetic voice.[19] AI-generated content is also impacting the rapidly growing market for vertical micro-dramas (short-form, app-delivered episodic series). Actors report being booked for jobs, only to learn AI had replaced them.[20]

### *2. New Works Flooding the Market Is the "Substantially Adverse Impact" the* Campbell *Court Anticipated*

Defendants argue that competition from a flood of new works is not a cognizable harm. Dkt. 1983 at 18, 31–35; Dkt. 1973 at 30–32. The government calls it speculative. Statement of Interest of the United States at 15–17, Dkt. 1682 ("Stmt."). Neither is right.

The fourth factor asks "whether unrestricted and widespread conduct of the sort engaged in by the defendant . . . would result in a substantially adverse impact on the potential market" for the original. *Campbell*, 510 U.S. at 590. A model that

---

19 *See* NAVA, *The State of Voiceover in 2026*, https://navavoices.org/vo-survey-2026/. 94% of respondents indicated they had not made a synthetic version of their voice. The top reasons included the overall industry impact, lack of laws governing AI, and consent concerns. *Id.*

20 Dan Whateley and Lucia Moses, *They Booked Acting Jobs — Then Were Replaced by AI*, Business Insider (June 4, 2026), http://businessinsider.com/actors-losing-jobs-to-ai-hollywood-micro-drama-industry-2026-6.

churns out and floods the market with genre novels for genre readers does just that.[21] And Judge Chhabria, despite ruling for Meta, surmised that "market dilution will often cause plaintiffs to decisively win the fourth factor" and defeat a fair use claim in training cases. *Kadrey*, 788 F. Supp. 3d at 1055. The *Kadrey* plaintiffs lost because they presented no evidence of dilution, only "speculation." *Id.* at 1056.

OpenAI saw it coming: an early employee predicted that "[t]he better we do on GPT-X, the more worried genre fiction authors will become about us substituting for them on Amazon." Class SUF ¶ 749. Producing that flood is cheap: GPT-4o can generate about 20,000 words of book-length text for roughly ninety cents in under ten minutes. *Id.* ¶ 845.

The pattern is not limited to books. After products like OpenAI's ChatGPT and DALL-E 2 launched, freelance writers' and designers' monthly earnings on Upwork fell 5.2%, with "high-quality workers being disproportionately affected."[22] When a major stock-image marketplace began accepting AI-generated images, the number of active artists working without AI fell 29%, and sales of their images fell 28%. The researchers concluded that "blanket fair use defenses for model training warrant

---

[21] For example, one romance writer released more than 200 novels under 21 pen names in a single year. *See* Alexandra Alter, *The New Fabio Is Claude*, N.Y. Times (Feb. 8, 2026), https://www.nytimes.com/2026/02/08/business/ai-claude-romance-books.html.

[22] Xiang Hui, Oren Reshef & Luofeng Zhou, *The Short-Term Effects of Generative Artificial Intelligence on Employment: Evidence from an Online Labor Market*, 35 Org. Sci. 1977, 1977–79 (2024).

scrutiny, as the downstream effects on original creators are economically meaningful."[23] If creative work stops paying, less will get made. Revenue from existing works finances new productions and sustains the careers of the people who make them. A market flooded with AI-generated substitutes leaves "little motivation to produce new works," and this "dearth of creative activity would undoubtedly negatively impact the public." *Hachette Book Grp., Inc. v. Internet Archive*, 115 F.4th 163, 195 (2d Cir. 2024).

Trading of datasets compounds the harm. When AI developers transfer datasets containing the Unions' members' work, voices, and likenesses to each other, they do so without the consent, compensation, credit, or control that are central to the Unions' bargaining on AI. These trades evade the Unions' negotiated terms, even if the dataset originated with a signatory.

### *3. A Categorical Ruling Would Stifle a Developing Market*

Defendants argue that licensing is unworkable because training uses works by millions of dispersed authors. Dkt. 1973 at 27–29; *see* Dkt. 1983 at 36–38. Their transaction-cost argument assumes no one bargains on creators' behalf. The government calls license fees "large subsidies for old mainstream media companies," ignoring the humans who create the material being licensed. Stmt. at 4.

---

23 Samuel G. Goldberg & H. Tai Lam, *Generative AI & Creative Goods: Market Expansion, Crowd-Out, and Copyright* 4, 43 (Stanford Graduate Sch. of Bus. Research Paper, July 27, 2026), https://ssrn.com/abstract=5152649.

The Unions have heard all this before. Repeatedly.

Payments for the ongoing exploitation of their members' work have never been a "subsidy." They represent wages and health care for the many humans who made the work. And they exist because the Unions have bargained for them. The AI licensing terms in the 2026 Agreements are clear evidence that the entertainment industry believes a market is "likely to be developed." *Am. Geophysical Union v. Texaco Inc.*, 60 F.3d 913, 930 (2d Cir. 1994). The Third Circuit recently held as much for AI training data: a market for such licenses "is rapidly developing," and copying for training without authorization "usurp[s]" the owner's "opportunity to enter that derivative market." *Ross*, 2026 WL 2932557, at *9.

These AI licensing markets are young and imperfect. But the answer to a young market is to let it develop, not to declare the use free.

## IV. The Public Interest Favors Licensing, Not a Categorical Exemption

The government frames this case as a contest between AI innovation and established media. *See* Stmt. at 4. Microsoft calls Plaintiffs "entrenched economic interests." Dkt. 1973 at 32. That framing leaves out other important interests, including the public, which needs a diverse and trustworthy information ecosystem and a strong creative economy. Licensing serves both.

Defendants offer a catalog of public benefits they claim AI can offer. Dkt. 1973 at 3, 13. This Court has already said that public benefits "must relate to the benefits *from the copying*." *N.Y. Times Co. v. Microsoft Corp.*, 757 F. Supp. 3d 594, 598 n.3

(S.D.N.Y. 2024) (emphasis in original). None of Defendants' purported benefits relate to, require, nor justify unfettered, unauthorized, and uncompensated appropriation of creative works.

Benefits are only half the equation: any assessment of public benefits "must account for the other side of the same coin—potential public harm." *Am. Soc'y for Testing & Materials v. UpCodes, Inc.*, 172 F.4th 253, 270 (3d Cir. 2026). In *Hachette*, the Second Circuit held that "[a]ny short-term public benefits" of free access "are outweighed not only by harm to [p]ublishers and authors but also by the long-term detriments society may suffer if [the] infringing use were allowed to continue." *Hachette*, 115 F.4th at 196. Even the lower barriers to entry OpenAI touts can crowd professional work out of the market, leaving consumers and creators alike worse off.[24]

Microsoft now dismisses these concerns as "doomsday rhetoric." Dkt. 1973 at 32–33. But Defendants' own employees saw the harm coming. A Microsoft employee wrote that "[i]t is highly unusual that an end product threatens the economic foundations of its essential suppliers." Class SUF ¶ 765. Its own researcher called the problem a "doom loop." News SUF ¶ 1672. OpenAI, for its part, calls its ability to keep current with "the 'head' of new human generated tokens" "existentially critical" to its strategy. *Id.* ¶ 1647. Those "human generated tokens" are the works from which people earn a living.

---

[24] *See* Tianxin Zou, Zijun (June) Shi & Yue Wu, *Welfare Implications of Democratization in Content Creation: Generative AI and Beyond*, 63 J. Mktg. Rsch. 607, 622 (2026).

### A. AI Gatekeeps the Voices That Reach the Public

These harms are not a referendum on AI, but the logical consequence of building technology on the backs of others' reporting and creative work without consent or compensation, such that the sources the public depends on lose the revenue that sustains them. The First Amendment values "the widest possible dissemination of information from diverse and antagonistic sources." *Associated Press v. United States*, 326 U.S. 1, 20 (1945). The government asserts that AI models do just that. Stmt. at 4. An OpenAI engineer knew better: "no matter how prominently we show the links, users won't click." News SUF ¶ 1475.

The result is media consolidation of unprecedented scale, with a handful of models increasingly standing between the public and its news and entertainment. Researchers warn that reliance on the same few chatbots is homogenizing human expression and thought.[25] And when content becomes more uniform, audiences are "more likely to encounter 'mediocre' content." Zou et al., *supra* note 24, at 609. Even if AI lets more people generate material, fewer human voices reach the public, and what does reach it reflects a few companies' design choices.

### B. Licensing Is Compatible with Innovation

Courts have rejected the premise that liability would halt AI development. A ruling that copying is not fair use merely "means that [the developers] have to get

---

[25] Zhivar Sourati et al., The Homogenizing Effect of Large Language Models on Human Expression and Thought, Trends Cognitive Scis. (Mar. 2026).

permission for it." *Kadrey*, 788 F. Supp. 3d at 1059. The Third Circuit rejected the same claim as unsupported, holding that AI does not give developers "carte blanche to violate copyright law." *Ross*, 2026 WL 2932557, at *9. Microsoft is right that "[a] copyright case is not the place to litigate every policy implication that attends LLMs," itself a reason to decline Defendants' categorical rule. Dkt. 1973 at 3.

The *Bartz* settlement shows that compensation at scale is workable: $1.5 billion for nearly 500,000 works. Class SUF ¶¶ 837–38. But a settlement that divides a fixed sum across a class, without valuing any individual work, is no substitute for a market. The Unions' contracts show markets can assign value work-by-work.

Defendants recite a history of rightsholders who predicted ruin from new technologies. Dkt. 1983 at 17 & nn.8–12. "Each time the law said otherwise," Microsoft concludes, "the rights owners adapted, and our world was richer for it." Dkt. 1973 at 2. The Unions and their members have lived that adaptation. When new technologies emerge, the Unions and employers collectively bargain new models to compensate members for use in those new markets.

The adaptation Defendants celebrate is licensing.

## Conclusion

For the foregoing reasons the Court should reject Defendants' fair use defenses.

Dated: October 29, 2026

Respectfully submitted,

By: /s/ *Danielle S. Van Lier*
Danielle S. Van Lier (CA SBN: 200435)

(*pro hac vice* pending, ECF No. 2116)
5632 Van Nuys Blvd., #2155
Sherman Oaks, CA 91401
(424) 265-5564
Danielle@VanLierLaw.com

*Counsel for Proposed Amici Curiae*

## CERTIFICATE OF COMPLIANCE

Pursuant to Local Civil Rule 7.1(c), I certify that this memorandum of law contains 5,998 words, excluding the caption, table of contents, table of authorities, signature block, disclosure statement, and required certificates, as counted by the word-processing program used to prepare it.

Dated: October 29, 2026

By: /s/ *Danielle S. Van Lier*
Danielle S. Van Lier (CA SBN: 200435)
(*pro hac vice* pending, ECF No. 2116)
5632 Van Nuys Blvd., #2155
Sherman Oaks, CA 91401
(424) 265-5564
Danielle@VanLierLaw.com

*Counsel for Proposed Amici Curiae*