# EXHIBIT A

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE: OPENAI, INC. COPYRIGHT INFRINGEMENT LITIGATION | No. 1:25-md-03143-SHS-OTW |
| | Hon. Sidney H. Stein<br>Hon. Ona T. Wang |
| This Document Relates To:<br><br>No. 1:25-md-08292<br>No. 1:25-md-04315<br>No. 1:25-md-11195 | |

**[PROPOSED] BRIEF *AMICUS CURIAE* ON BEHALF OF FLOOR64, INC. d/b/a THE COPIA INSTITUTE IN SUPPORT OF OPENAI'S MOTION FOR SUMMARY JUDGMENT**

## CORPORATE DISCLOSURE STATEMENT

Amicus curiae Floor64, Inc. d/b/a The Copia Institute states that it does not have a parent corporation, and that no publicly held corporation owns 10% or more of its stock.

## STATEMENT REGARDING AUTHORSHIP AND FUNDING

Amicus curiae certifies that no party or party's counsel authored this brief in whole or in part, that no party or party's counsel provided any money that was intended to fund the preparation or submission of this brief, and that no party or person—other than the amicus curiae, its members, or its counsel—contributed money that was intended to fund the preparation or submission of this brief.

## TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT .......... II

STATEMENT REGARDING AUTHORSHIP AND FUNDING .......... II

TABLE OF AUTHORITIES .......... IV

STATEMENT OF INTEREST .......... 6

SUMMARY OF ARGUMENT .......... 7

ARGUMENT .......... 7

I. Copyright cannot and should not be used to throttle technology .......... 8

A. It would run afoul of the progress clause .......... 8

B. It would run afoul of the first amendment .......... 12

II. Copyright cannot and does not foreclose ai training .......... 15

A. Copyright does not grant copyright holders the right to foreclose training .......... 15

B. Copyright constitutionally cannot grant the right to foreclose ai training .......... 19

CONCLUSION .......... 22

CERTIFICATE OF COMPLIANCE .......... 23

# TABLE OF AUTHORITIES

**Cases**
*Authors Guild v. Google, Inc.*, 804 F.3d 202 (2d Cir. 2015)......20

*Board of Education v. Pico*, 457 U.S. 853 (1982)......19

*Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569 (1994)......13

*Eldred v. Ashcroft*, 537 U.S. 186 (2003)......12, 13

*Golan v. Holder*, 132 S.Ct. 873 (2012)......13

*Reno v. ACLU*, 521 U.S. 844 (1997)......20

*United States v. Morrison*, 529 U.S. 598 (2000)......12

**Statutes**
17 U.S.C. § 102(b)......19

17 U.S.C. § 106......17

17 U.S.C. § 107......19

17 U.S.C. § 301 et seq.......19

Marrakesh Treaty Enabling Act, Pub. L. No. 115-261 (2018)......21

U.S. Const. amend. I......13

U.S. Const. art. I, § 8, cl. 8......12

**Other Authorities**
Amanda Levendowski, *How Copyright Law Can Fix Artificial Intelligence's Implicit Bias Problem*, 93 WASH. L. REV. 579 (2018)......11

Andres Guadamuz, *Everything I know about AI regulation I learned from music videos*, TECHNOLLAMA (Oct. 26, 2026)......15

ANDRES GUADAMUZ, *Like Company v Google: copyright case explainer* (YouTube, Oct. 26, 2026), https://www.youtube.com/watch?v=ts1tu1BiSuY......16

ANDRES GUADAMUZ, *Sweat of the Brow* (YouTube, Sep. 30, 2026), https://www.youtube.com/watch?v=8cjXUAEvKcs ....................................................... 16

Cathy Gellis, *Book Review: Danny Dunn and the Homework Machine*, TECHDIRT (Apr. 17, 2020) ........................................................................................................ 15

Cathy Gellis, *The Copia Institute Tells The Copyright Office Again That Copyright Law Has No Business Obstructing AI Training*, TECHDIRT (Dec. 8, 2023) ............................................. 7

Cathy Gellis, *Wherein The Copia Institute Tells The Supreme Court Not To Let Copyright Law Destroy Free Expression, A Rare Right We Ostensibly Have Left*, TECHDIRT (Jun. 28, 2022) .. 7

*History of robots*, WIKIPEDIA, https://en.wikipedia.org/wiki/History_of_robots ........................ 11

Mike Masnick, *An Update On How I Use AI To Help With Techdirt (It's Still Not Writing Articles)*, TECHDIRT (Aug. 18, 2026) ......................................................................... 15

Mike Masnick, *How I Built A Task Management Tool For Almost Nothing*, TECHDIRT (Jun. 3, 2025) ........................................................................................................ 15

Mike Masnick, *My Kid Vibe Coded Their Way To Actually Learning Math*, TECHDIRT (May 26, 2026) ........................................................................................................ 15

Mike Masnick, *The Sky Is Rising 2024 Edition: Rather Than Destroying Culture, The Internet Has Saved The Content Industries*, TECHDIRT (Jan. 22, 2024) ............................................ 7

## STATEMENT OF INTEREST

Amicus Copia Institute is the think tank arm of Floor64, Inc., the privately-held small business behind Techdirt.com ("Techdirt"), an online publication that has chronicled technology law and policy for nearly 30 years. In this time Techdirt has published more than 85,000 articles regarding subjects such as freedom of expression, copyright, AI, innovation policy, and more. The site regularly approaches more than a million page views per month, and its articles have attracted more than two million reader comments.

As a think tank the Copia Institute also produces evidence-driven white papers[1] examining the underpinnings of tech policy. Then, armed with its insight, it regularly files amicus briefs,[2] regulatory comments,[3] and other advocacy instruments on these subjects to help educate lawmakers, courts, and other regulators—as well as innovators, entrepreneurs, and the public—with the goal of influencing good policy that promotes and sustains innovation and expression. Many such filings have implicated the exact same issues as those at the fore of this litigation.

As an enterprise whose business is built around engaging in expressive activities, copyright policy is itself highly relevant to its own endeavors, which also heavily depend on the First Amendment. The Copia Institute therefore submits this brief *amicus curiae* wearing two hats: as a longtime commenter on the issues raised by the underlying litigation at issue, and as a small

---

[1] *See*, *e.g.*, Mike Masnick, *The Sky Is Rising 2024 Edition: Rather Than Destroying Culture, The Internet Has Saved The Content Industries*, TECHDIRT (Jan. 22, 2024), https://www.techdirt.com/2024/01/22/the-sky-is-rising-2024-edition-rather-than-destroying-culture-the-internet-has-saved-the-content-industries/.

[2] *See*, *e.g.*, Cathy Gellis, *Wherein The Copia Institute Tells The Supreme Court Not To Let Copyright Law Destroy Free Expression, A Rare Right We Ostensibly Have Left*, TECHDIRT (Jun. 28, 2022), https://www.techdirt.com/2022/06/28/someday-soon-my-andy-warhol-prince-prints-related-amicus-brief-will-come-before-the-supreme-court/.

[3] *See*, *e.g.*, Cathy Gellis, *The Copia Institute Tells The Copyright Office Again That Copyright Law Has No Business Obstructing AI Training*, TECHDIRT (Dec. 8, 2023), https://www.techdirt.com/2023/12/08/the-copia-institute-tells-the-copyright-office-again-that-copyright-law-has-no-business-obstructing-ai-training/.

business whose own expressive freedom stands to be limited if the plaintiffs' expansive view of the power of copyright law is allowed to prevail.

## SUMMARY OF ARGUMENT

Copyright law does not and cannot do what the plaintiffs seek it to do: obstruct the development of AI by targeting its training. Nor should any exception be made allowing it to limit AI development because even if every fear about AI were to be born out, copyright law is not the tool to remedy those potential defects. No matter how tempting it might seem to try to use it as a means of restraining AI, even if only in the context of foreclosing training, such temptation must be resisted, or else it will cause its own direct, measurable harm, including to the very innovation and expression copyright law is itself supposed to vindicate, the Constitution is supposed to protect, and the public is supposed to benefit from.

## ARGUMENT

Software capable of understanding and engaging with language is an innovation with untold beneficial applications, many of which have already begun to be realized. That its current development, in the form of "AI" and Large Language Models ("LLMs"), has also produced unfortunate effects does not mean law should foreclose its legitimate benefits or prevent anyone from producing something better. Indeed, the more troubling its current embodiment is the more important it is that law not stand in the way of better technology being developed to replace it.

But it should *especially* not be copyright law that is used to say no to its current or future development. Especially not when copyright law is explicitly intended to be a statutory tool for promoting innovation it should certainly not be something that can be used to obstruct it. And especially not when both the copyright statute itself and the First Amendment protects the very sort of learning activities targeted by this litigation. Misusing copyright law as a cudgel to restrain the development of innovative software tools risks doing untold damage, not just to the

development of what we currently think of as "AI," but all present and future innovation and expression in any form. Indulging plaintiffs' claims would grant copyright holders veto power over innovation and expression and invite harm that neither the Constitution nor the copyright statute itself allows, in the context of AI or otherwise.

## I. Copyright cannot and should not be used to throttle technology

The fundamental question at the heart of this case is whether copyright law can say no to AI, be it deliberately or simply by targeting an integral part of its development. The answer is no and must be no, no matter how tempting it may be to say yes, lest copyright law violate the very constitutional principles that animate it in the first place.

### A. It would run afoul of the Progress Clause

Although framed in terms of whether a copyright holder can prevent the training of an LLM, this case is about much more than just that question. It is effectively about the power of copyright law to restrain the development not just of AI but ultimately so much more. If copyright can say no to how AI is developed then it can say no to any innovation and expression the future has to offer, indeed the very innovation and expression copyright law exists to foster, and no matter how much we need it to. No matter how much today's AI might tempt a regulatory response, this case cannot be a referendum on it, because far more is at stake.

"Artificial intelligence," or "AI," is a term that unfortunately reveals little about what sort of technology it actually is. It has largely become an all-purpose buzzword, often invoked to either connote a form of potential magic that miraculously can solve all sorts of previously intractable problems, or a power so dangerous that its use threatens the survival of humanity. Neither is quite the case, however. Despite the aspirational nomenclature, AI today is just software, albeit sophisticated software, rather than a ready replacement for human intellect. Even so, it is capable of both promise and peril, and, as such, it evokes both genuine concern and genuine excitement. It

spans a spectrum, inspiring both naive enthusiasm prone to deploying it in damaging ways, as well as equally unfounded moral panics that prevent it from being used beneficially.

Nevertheless, although some of the reactions to AI have been overwrought, both the defendant and its competitors' products have raised a plethora of legitimate concerns, such as those stemming from hallucinated outputs, cyberthreats, and tortious conduct by either the AI itself or its users, all of which could fairly tempt a regulatory response. The problem here, though, is that using copyright law as the vehicle for that regulatory response would allow copyright to foreclose any legitimate uses or any further development, including development that would remediate its current problems. Furthermore, it would leave in its wake a distorted copyright law with new, supercharged power that would reverberate in other contexts unrelated to AI. Regardless of the harm using copyright is intended to forestall, doing so will only cause its own.

The problem with using any law to address the negative externalities of a technology is that such law tends to also suppress the positive benefits. Worse, it tends to suppress the potential to get anything better by now making that development fraught with liability. Which is why copyright law in particular cannot be used to address AI's shortcomings. First, it is ill-targeted to any specific AI-related harm it may be intended to address—copyright is only designed to defeat the harm of market failure. Regulatory solutions tailored to the specific problems raised by AI being used poorly or in dubious contexts need to be designed to deal with those particular harms. Whereas copyright is at best a blunt instrument where a scalpel is needed and may instead exacerbate the very problems it is supposedly attempting to target. For instance, using AI in discriminatory ways, such as in hiring, is not a problem copyright is built to deal with. It may be a real problem for some sort of regulation to solve, but applying copyright to it as a way of hobbling AI won't solve it. In fact, to the extent that an AI system may display bias in its outputs, that bias

will only get worse the more limited the universe it can train on. *See* Amanda Levendowski, *How Copyright Law Can Fix Artificial Intelligence's Implicit Bias Problem*, 93 WASH. L. REV. 579, 617-19 (2018). Indeed, ensuring that AI can be trained on the widest universe of material is itself the best way to mitigate many of its more unfortunate externalities.

Furthermore, using copyright in an attempt to pump the brakes on AI presents its own inherent harm, a harm directly at odds with the constitutional purpose of copyright. It risks smothering the nascent technology in its cradle and foreclosing every possible beneficial use AI might ever be put to. And completely counter-productively, because the worse one thinks AI is in its current form, the more important it is that something better can be developed. AI is not simply going to go away no matter how much anyone might wish it to. Not when the idea of independent, man-made intelligence has captured the imagination for centuries.[4] Notions of artificial beings have filled the human imagination since ancient times. Where they were once animated by gods they eventually became the dream of men to build.[5] But what plaintiffs propose would end that dream.

Even if today's LLMs turn out to be a dead end producing more harm than good it does not follow that a better path could not and would not be followed. Whatever the AI-ish technology that is birthed, be it the sort of comprehensive software tool capable of language and independent reasoning that we have today, or a truly autonomous entity, for it to realize its potential it will still need to be endowed with the greatest amount of information and ideas possible, which will require

---

[4] Consider Frankenstein's monster, from the 19th Century, or, more recently, Commander Data from the Star Trek universe, or any number of the autonomous, man-made beings (e.g., the Tin Man (1900), Rosie the Jetson's maid (1962)) capable of conversation and reasoning imagined by science fiction authors in between. *See, e.g.*, *History of robots*, WIKIPEDIA (last accessed Oct. 29, 2026), https://en.wikipedia.org/wiki/History_of_robots.

[5] *See id.*

exposing it to everything there is to teach it. But finding in favor of the plaintiffs would effectively starve it, foreclosing any further development and freezing in place, or even rolling back, the innovation we've already achieved.

Furthermore, we would instead be left with an imbalanced, overpowered law that would give copyright holders veto power over any future use of their works, no matter how innovative or expressive. Even if it is not the intention to stop AI or any other technology, it is still the effect. If copyright could suddenly have the power the plaintiffs argue it should it wouldn't just be today's AI developers and users who are chilled but all who follow is law is allowed to do more than Congress ever let it, or constitutionally ever could. AI could be everything people fear and worse, but using copyright law to say no to AI development means saying no to anything better the future has to offer, including better AI that lacks the downsides that today's products currently sport. But such negating is not something that copyright should ever be able to do. The Congressional authority to pass copyright law is found in the Progress Clause of the Constitution, which empowers Congress to further the progress of sciences and useful arts through systems of limited monopolies, such as copyright. U.S. Const. art. I, § 8, cl. 8. But if Congress produces a law that does not further this Constitutional objective to promote the progress of science and useful arts, then that resulting law cannot be rooted in this authority, even if it may bear on those systems of limited monopolies. The condition for this particular grant of legislative power is that exercising it will promote progress, and it is an important predicate for the exercise of such power. Were it not, then that language conditioning that power would not have needed to be included in this constitutional clause otherwise empowering Congress.

Thus, given that the sole purpose of copyright law is to promote innovation, it cannot be a law that is used to obstruct it. If it is interpreted in a way that causes that obstruction, then it cannot

be a valid interpretation, because Congress would not have had the authority to pass a statute with that effect. Congress's power to legislate is inherently limited to areas articulated by the Constitution as places where it is appropriate for it to act. *See United States v. Morrison*, 529 U.S. 598, 607 (2000) (citing *Marbury v. Madison*, 1 Cranch 137, 176 (1803) ("Every law enacted by Congress must be based on one or more of its powers enumerated in the Constitution. 'The powers of the legislature are defined and limited; and that those limits may not be mistaken, or forgotten, the constitution is written.'")). If Congress acts in a way that is not consistent with its grant of legislative authority, then its legislation is unconstitutional. *Id.* at 602. While the Supreme Court has found Congress to have wide latitude to decide how best to promote the progress of science and useful arts in its legislation, *Eldred v. Ashcroft*, 537 U.S. 186, 211-13 (2003), it did not and could not grant Congress the power to do the exact opposite of promoting progress with its legislation. As a result, because it is beyond Congress's authority to pass a copyright statute that does not promote progress or, worse, directly undermines that objective, it cannot be something that the copyright law it has produced can be found to do.

**B. It would run afoul of the First Amendment**

The First Amendment is clear: Congress can "make no law" abridging freedom of expression. U.S. Const. amend. I. Copyright is one of the laws Congress has made. And even though it has been made under the authority the Progress Clause granted Congress, as with any law Congress passes under any Article I authority, it is still constrained by the First Amendment. And necessarily so, because the very point of copyright law is to regulate expression, here by generally incentivizing more of it. *See* discussion *supra* Section I.A. Not only would copyright law run afoul of Congress's constitutional authority to promote progress if the law had the opposite effect, but it would also run afoul of the First Amendment, which specifically prevents Congress

from impinging on the very expression copyright was supposed to incentivize, which is what the plaintiffs' claims actually *threaten*.

As explained further in Section II.A, *infra*, if AI training could violate copyright law then copyright law would violate the First Amendment's "right to read." But as a more general manner, if copyright law could chill a technology like defendant's, then it would also chill all sorts of expressive uses of that technology as well. And copyright law is not supposed to chill expression. It is one of the reasons why fair use is baked into the copyright statute, to make sure copyright law remains bound by the First Amendment and does not injure expression. *Golan v. Holder*, 132 S.Ct. 873, 890 (2012); *Eldred*, 537 U.S. at 219-20. Fair use also helps vindicate the goals and purposes of the Progress Clause itself, given how it helps promote the creation of future new works. *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 577 (1994) ("The fair use doctrine thus permits [and requires] courts to avoid rigid application of the copyright statute when, on occasion, it would stifle the very creativity which that law is designed to foster."). The plaintiffs' claims, however, if upheld would trump not just the defendant's educational use of the works, but any other legitimate use of the tools it produces, including all the ways others use AI to produce new expression. It would say no to everything else expressive anyone could use these tools to produce if copyright could say no to the tool itself.

As for that new expression, while many may justly complain about "AI slop," AI's capacity to cheaply and easily produce low-value expression does not take away from AI's very real ability to enable people to express themselves in ways that were not previously available to them—ways that are lawful, constitutionally protected, and even their own contributions to the corpus of

knowledge and information that copyright law is supposed to incentivize the development of.[6] It would be impossible to catalog them all, but a few salient examples follow.

For instance, Mike Masnick, who helms *amicus* Copia Institute and is the founder and editor of Techdirt, has engaged in multiple productive experiments using AI. For instance, he has written several posts describing how he has used it to sharpen his writing.[7] The posts he produces are still his work, but AI has helped him author them better and more efficiently. He's also described how he used AI to write his own software tools, availing himself of its ability to produce computer code he did not otherwise have the fluency in.[8] And he has also documented how others have used AI as well, including his son who used it to develop his own educational tool.[9] It has long been understood that interacting with technology to help one study can itself be an educational exercise, and in this case it was AI that assisted with that educational purpose.[10]

As another salient example, Andres Guadamuz, who teaches intellectual property law at the University of Sussex in England, has recently been using AI to help him create videos that themselves explain copyright law to his students. Sometimes they are music videos with

---

[6] *See* Andres Guadamuz, *Everything I know about AI regulation I learned from music videos*, TECHNOLLAMA (Oct. 26, 2026), https://www.technollama.co.uk/everything-i-know-about-ai-regulation-i-learned-from-music-videos.

[7] Mike Masnick, *An Update On How I Use AI To Help With Techdirt (It's Still Not Writing Articles)*, TECHDIRT (Aug. 18, 2026), https://www.techdirt.com/2026/08/18/an-update-on-how-i-use-ai-to-help-with-techdirt-its-still-not-writing-articles/.

[8] Mike Masnick, *How I Built A Task Management Tool For Almost Nothing*, TECHDIRT (Jun. 3, 2025), https://www.techdirt.com/2025/06/03/how-i-built-a-task-management-tool-for-almost-nothing/.

[9] Mike Masnick, *My Kid Vibe Coded Their Way To Actually Learning Math*, TECHDIRT (May 26, 2026), https://www.techdirt.com/2026/05/26/my-kid-vibe-coded-their-way-to-actually-learning-math/.

[10] *See* Cathy Gellis, *Book Review: Danny Dunn and the Homework Machine*, TECHDIRT (Apr. 17, 2020), https://www.techdirt.com/2020/04/17/book-review-danny-dunn-homework-machine/ (summarizing a children's book from the 1950s about a young student who programmed a machine to do his homework for him and ended up learning as much as he would have had he done the homework himself.)

previously un-created catchy tunes.[11] Other times they discuss litigation, similar to this case, where courts have been considering questions of copyright with respect to AI.[12] In these cases AI is serving to augment his own creative ability, not supplant it, as the final works are all produced with his supervision and expressive decisions.[13]

These are only a few of the myriad examples of AI facilitating the exact sort of expressive output copyright is supposed to incentivize but that would be threatened if the plaintiffs' claims were validated. But validating the plaintiffs' claims would, instead of encouraging more expression, have the exact opposite effect by removing, or at least degrading, the tools people are using to create their own expressive works. It would elevate the plaintiffs' past expression above all subsequent expression, no matter how transformative or otherwise valuable that subsequent expression might be. The result would be a net loss of expression, which neither the Progress Clause nor the First Amendment allow Congress to pass a law to effect.

## II. Copyright cannot and does not foreclose AI training

The upshot to this litigation is that copyright is being used to threaten the development of AI. But the particular mechanism the plaintiffs are trying to use—asserting that their copyrights give them the legal ability to prevent training—is one that the statute does not allow, nor could it.

### A. Copyright does not grant copyright holders the right to foreclose training

[11] ANDRES GUADAMUZ, *Sweat of the Brow* (YouTube, Sep. 30, 2026), https://www.youtube.com/watch?v=8cjXUAEvKcs (explaining how to evaluate whether a work would be copyrightable under English law).
[12] ANDRES GUADAMUZ, *Like Company v Google: copyright case explainer* (YouTube, Oct. 26, 2026), https://www.youtube.com/watch?v=ts1tu1BiSuY.
[13] Note, for instance, the llama characters regularly appearing in his videos, reflecting Guadamuz's "technollama" Internet *nom de plume*, which is his own creative choice and one AI would not be likely to have made on its own without his authorial input.

AI training needs to be, at minimum, considered a fair use. But the reason it must be is because if a copyright holder could stop it, it would inflate the power a copyright holder beyond what copyright law was designed to let them control.

The plaintiffs' claims are predicated on the idea that the copyright statute has granted them a right they do not have: the right to control the *consumption* of their works. In actuality, per the statute, copyright holders have only a few discrete exclusive rights, which are spelled out in their entirety. 17 U.S.C. § 106. All of those rights relate to what can be done with a work as a container holding expression, but not the consumption of the expression contained within. For example, the performance right lets copyright holders restrain others from using the entity of the work in a market for such entities, like to produce a play for an audience interested in seeing plays, but not the audience's ability to benefit from the expression the dramatic work conveys. There is a significant and legally meaningful difference between staging a play and attending a play, with the benefit of the former relating to participation in the market of producing plays and the benefit of the latter being the enhancement of one's consciousness by the artistic expression just witnessed.

That critical difference maps to why we have copyright in the first place: to incentivize the creation of works in order for the public to benefit from them. It would make no sense for the public not to be able to derive that benefit once the works have been created *because* they have been created. In this case, although the plaintiffs frame their complaint in terms of what copyright law lets them do—control the copies of their works—fundamentally they seek to do what it does not: foreclose others from being able to freely benefit from the intellectual contributions contained within them. Even if copying may technically occur during training, it is incidental to what the defendant is really doing: learning, just as anyone learns from consuming a work. It would distort copyright law in harmful ways to give copyright holders such a preclusive power to control the

consumption of their works, as plaintiffs would wish, and thus be able to limit whose intelligence is allowed to be enriched.

It is even a censorial power, given that there is reason to believe that many copyright holders are hoping their copyrights give them the power to veto AI training on their works because they do not like AI.[14] But regardless of how reasonable copyright holders' unhappiness with the technology, copyright does not and cannot give anyone the power to limit who gets to benefit from the ideas and information contained within their works once they have been released to the world. If they could do so here it would mean they could do so in any context, forbidding anyone they do not like, however validly, from benefiting from the works copyright has incentivized them to create for the public, which would now be restricted.

What plaintiffs propose is that copyright holders nevertheless have the right to limit who can benefit from their works. In the case of AI it would mean having to opt in before their works could be available in the universe of materials for an AI—of, effectively, anything—to train on. But such a system is inconsistent with the goals and purposes of copyright: to promote innovation and expression. In the case of AI development specifically, if the end product is going to be useful it needs to be comprehensive. Artificially limiting its training hobbles its usefulness, including as a tool to help make other expressive works. *See* discussion *infra* Section I.B. An LLM, for instance, needs to learn how humans speak if it is going to be able to attain fluency, but were it to be restricted to only what a small set of human speakers say then there will be significant gaps in its learned vocabulary and any utility it might have been able to offer will be inherently compromised. It would be like restricting a painter to only a few colors instead of the rainbow

[14] Some have even called for its outright destruction. Complaint of New York Times Company at 68.

that the full corpus of human expression could afford, and not in a way that copyright can suborn. Once the contents of works have been contributed to the corpus of human knowledge—which we gave copyright holders their monopolies in order for them to do—then it is in that corpus for all to benefit from, however they wish to be enriched by their substance.[15]

That the defendant is trying to obtain that benefit for the tool it is building rather than its human representatives directly does not change the basic statutory math: copyright law is about developing the corpus of knowledge for the public to benefit from and it is fundamentally agnostic about how the public is benefitted. Whether it is a person enriching their own mind, someone teaching a child, or someone teaching a piece of software, the intellectual fruits of those works are still theirs to benefit from however suits them.

Fair use itself promotes that education purpose. *See* 17 U.S.C. § 107. But fair use also serves to ensure that copyright holders cannot use their copyrights to effectively remove the substance of their works from that corpus. As AI training illustrates, sometimes learning requires actions that may impinge upon the exclusive rights of a copyright holder, but that overall activity, learning, requires that such impingement be excused. It would miss the forest for the trees to do otherwise, placing so much emphasis on the rights of a copyright holder to exclude that the reason we gave them any rights to do so in the first place is subordinated. Copyright law is about making that corpus of knowledge produced in works available to the public, and copyrights themselves are simply the means for doing it. They aren't supposed to be the ends themselves.

---

[15] The corpus of human knowledge also includes things that are not copyrighted, see, e.g., 17 U.S.C. § 301 et seq. (relating to copyright terms), or copyrightable. 17 U.S.C. § 102(b). If infringement liability can be found because training involved a copy, then a detailed analysis is needed to assess whether that copy indeed involved a valid copyright, which is too individualized an assessment for a class action. Especially because the infringement question would not only involve a work as a whole but whether whatever was copied from it was itself copyrightable.

**B. Copyright constitutionally cannot grant the right to foreclose AI training**

Ultimately when we speak of training AI we are speaking about letting software "read" or otherwise consume works on behalf of the people developing it. Copyright law does not prevent reading; its exclusive rights pertain to controlling the copies of the works but not to the consumption of the intellectual contents of those works. *See* discussion *supra* Section II.A. Nor could copyright have that effect, because the point of copyright law is to make it so there are works for the public to consume. *See* discussion *supra* Section I.B. As discussed throughout, it would be an absurd result, and one inconsistent with what the Progress Clause of the Constitution enables copyright law to do, if copyright law could prevent the public from getting to benefit from the works that copyright law has incentivized the creation of, because further progress depends on it.

Such barriers would also conflict with the right to read found in the First Amendment. *See, e.g.*, *Board of Education v. Pico*, 457 U.S. 853, 866-67 (1982). The First Amendment not only guarantees the right to free expression, but the right to receive it. *Id.* at 867 (citing *Stanley v. Georgia*, 394 U. S. 557, 564 (1969); *Kleindienst v. Mandel*, 408 U. S. 753, 762-763 (1972)). One significant reason the First Amendment extends to what is sometimes referred to as the "right to read" is because "the right to receive ideas is a necessary predicate to the recipient's meaningful exercise of his own rights of speech, press, and political freedom." *Id.* As the Supreme Court has observed, its precedents have focused "not only on the role of the First Amendment in fostering individual self-expression but also on its role in affording the public access to discussion, debate, and the dissemination of information and ideas." *Id.* at 866. The government is not entitled to "contract the spectrum of available knowledge." *Id.* at 866-67. But what plaintiffs propose is that the government has nevertheless given them the ability to indeed contract that spectrum through the power of their copyrights. They argue that Congress has given them the ability to throttle who

should be able to glean the benefit of the expression the law incentivized them to create, instead of the public at large being free to.

Such is the bottom line of their argument. Although the plaintiffs frame their complaint in the context of how the defendant has accessed the copies of their works containing that knowledge, the crux of their objection is not that those works were copied—which indeed can itself be fair use, *Authors Guild v. Google, Inc.*, 804 F.3d 202, 221 (2d Cir. 2015)—but that the knowledge within them was, for lack of a better term, consumed. Read, watched, listened to, *learned* from. These are the verbs implicated by AI training, and these are the activities that the First Amendment, via fair use, protects—and copyright itself exists to ensure can happen.

The implications would be significant if the plaintiffs' argument were validated. Currently there should be no question that any of the human developers of an AI system would have the right to read all the works themselves, if they could. And that right to consume the works is not curtailed by the fact that they use tools to do it. Indeed, the ability to use tools to receive and perceive created works is often integral to facilitating that consumption—after all, how could the public listen to a record without a record player, or consume digital media without a computer. No law could prevent the use of tools without seriously impinging upon the inherent right to consume the works entirely. Nor could a law allow only physical tools and not software tools. *See Reno v. ACLU*, 521 U.S. 844, 860 (1997) (finding that the First Amendment applies to the use of computer technology to aid in the exercise of free expression). The United States is also a signatory to the Marrakesh Treaty, which addresses the unique need by those with visual and audio impairments to use tools such as screen readers to help them consume the works to which they would otherwise be entitled to perceive. Marrakesh Treaty Enabling Act, Pub. L. No. 115-261 (2018). But it is not

only those with such impairments who may have need to use tools in order to effectively access the ideas contained within those works, especially at speed or in volume.

Copyright should not be able to stand in the way of that consumption. No copyright holder in a vinyl LP has any right to mandate that the record not be played back at 45 rpm, nor to forbid that a movie not be watched on fast forward. Nor does a copyright holder have the right to restrict how much media someone can consume. After all, a voracious reader is free to read as many books as they want without penalty, and, indeed, we should want them to since the goal of copyright is to promote the exchange of knowledge, and exposure to the most knowledge produces the greatest educational benefit.

Consequently, that AI systems tend to consume lots of works very quickly should not invite copyright law to supply any more restriction than it could if humans were to do the consuming themselves, either directly or even with tools. AI may be a different sort of tool than a physical one like a record player, and function differently as software than something like an MP3 player, but it is still just a software tool, albeit a fancy software tool, that is used to collect knowledge for the benefit of the people deploying it. And if we let copyright law say no to the fancy software getting to read works then we are also saying no to the tools people have long used to help them enjoy copyrighted works, and even the right to enjoy them at all.

AI training should be understood as simply being an extension of these same principles that allow people to use tools, including software tools, to help them consume works. But instead of individual humans attempting the impossible task of reading, watching, or listening to all the material that has been created, AI developers have simply deployed a technical tool to help do the learning on their behalf. Which should be fine: if people can direct their screen reader to read one work, then they should be able to direct their screen reader to read many works. Conversely, if

they cannot use a tool to read many works, then it undermines their ability to use a tool to help them read any. Thus it is critically important that copyright law not interfere with AI training in order not to interfere with the public's ability to consume works as the First Amendment says they have the right to do.

**CONCLUSION**

The defendant's development of AI does not violate copyright law.

Dated: October 30, 2026

By: /s/ Catherine R. Gellis

Catherine R. Gellis, Esq.
3020 Bridgeway #247
Sausalito, CA 94965
Telephone: 202-642-2849
Email: cathy@cgcounsel.com

*Counsel for Amicus Curiae*

**CERTIFICATE OF COMPLIANCE**

Pursuant to Local Civil Rule 7.1(c), the undersigned certifies that this brief complies with the word-count limitation set by the Court's Order of August 7, 2026 (Dkt. No. 1663), which provides that a proposed amicus brief shall be no more than 6,000 words. As calculated by the word-count function of the word-processing program used to prepare this brief, the brief contains 5684 words, excluding the parts exempted by Local Civil Rule 7.1(c).

Dated: October 30, 2026

By: /s/ Catherine R. Gellis

Catherine R. Gellis

*Counsel for Amicus Curiae*