UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE:<br><br>OPENAI, INC.,<br><br>COPYRIGHT INFRINGEMENT LITIGATION<br><br>This Document Relates To:<br><br>News Cases<br><br>1:23-cv-11195-SHS-OTW<br>1:24-cv-01515-SHS-OTW<br>1:24-cv-03285-SHS-OTW<br>1:24-cv-04872-SHS-OTW<br>1:25-cv-04315-SHS-OTW | 1:25-md-03143-SHS-OTW |

**BRIEF OF *AMICI CURIAE* NEWS/MEDIA ALLIANCE, NATIONAL NEWSPAPER ASSOCIATION, THE NATIONAL PRESS PHOTOGRAPHERS ASSOCIATION, AND PRO PUBLICA, INC. ("NEWS ORGANIZATIONS") IN SUPPORT OF NEWS PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AND IN OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Civil Procedure 7.1, *Amici* make the following corporate disclosures:

News/Media Alliance has no parent corporation and no publicly held corporation owns 10% or more of its stock.

National Newspaper Association has no parent corporation and no publicly held corporation owns 10% or more of its stock.

The National Press Photographers Association has no parent corporation and no publicly held corporation owns 10% or more of its stock.

Pro Publica, Inc. has no parent corporation and no publicly held corporation owns 10% or more of its stock.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT .......... i

TABLE OF AUTHORITIES .......... iii

INTEREST OF *AMICI CURIAE* .......... 1

SUMMARY OF ARGUMENT .......... 3

ARGUMENT .......... 6

I. News Organizations Depend on Copyright Law to Protect Original News Content and Support Journalists .......... 6

II. Defendants' Copying of News Articles to Develop Products that Supersede Them Is Incompatible With Fair Use .......... 7

A. Fair Use Factor One Weighs Heavily Against Fair Use Because Defendants' AI Copying to Supplant News Articles Is a Commercial Use that Does Not Serve a Transformative Purpose .......... 8

B. Factor Four Points Decisively Against Fair Use Because Defendants' AI Uses Undermine Primary and Derivative Markets for News Plaintiffs' Works .......... 11

1. Harm to Online News Markets .......... 11

2. Threat to AI Licensing Markets .......... 15

III. The Public Interest Mandates a Copyright Framework that Supports the Vitality of an Independent Press .......... 18

CONCLUSION .......... 20

# TABLE OF AUTHORITIES

## Constitutional Provisions

U.S. Const. art. I, § 8, cl. 8 .......... 6

## Cases

*Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*,
598 U.S. 508 (2023) .......... 5, 8, 13

*Associated Press v. Meltwater U.S. Holdings, Inc.*,
931 F. Supp. 2d 537 (S.D.N.Y. 2013) .......... 6, 7, 14

*Authors Guild v. Google, Inc.*,
804 F.3d 202 (2d Cir. 2015) .......... 8, 9, 14

*Campbell v. Acuff-Rose Music, Inc.*,
510 U.S. 569 (1994) .......... 9, 13, 15

*Castle Rock Ent., Inc. v. Carol Publ'g Grp., Inc.*,
150 F.3d 132 (2d Cir. 1998) .......... 14

*EMI Christian Music Grp., Inc. v. MP3tunes, LLC*,
844 F.3d 79 (2d Cir. 2016) .......... 15

*Field v. Google*,
412 F. Supp. 2d 1106 (D. Nev. 2006) .......... 19

*Fox News Network, LLC v. TVEyes, Inc.*,
883 F.3d 169 (2d Cir. 2018) .......... 5

*Google LLC v. Oracle Am., Inc.*,
593 U.S. 1 (2021) .......... 11, 18

*Hachette Book Grp., Inc. v. Internet Archive*,
115 F.4th 163 (2d Cir. 2024) .......... 13, 18

*Harper & Row, Publishers, Inc. v. Nation Enters.*,
471 U.S. 539 (1985) .......... 4, 6, 10, 14

*Kadrey v. Meta Platforms, Inc.*,
788 F. Supp. 3d 1026 (N.D. Cal. 2025) .......... 12

*Nihon Keizai Shimbun, Inc. v. Comline Bus. Data*,
166 F.3d 65 (2d Cir. 1999) .......... 10

*Parker v. Yahoo!, Inc.*,
No. 07-2757, 2008 WL 4410095 (E.D. Pa. Sept. 25, 2008) .......... 19

*Salinger v. Random House, Inc.*,
811 F.2d 90 (2d Cir. 1987) .......... 14

*Sega Enters. Ltd.* v. *Accolade, Inc.*,
977 F.2d 1510 (9th Cir. 1992) .......... 11

*Sony Comput. Ent., Inc.* v. *Connectix Corp.*,
203 F.3d 596 (9th Cir. 2000) ....................................................................................11
*Thomson Reuters Enter. Ctr. GMBH v. ROSS Intelligence Inc.*,
No. 25-2153, 2026 WL 2932557 (3d Cir. Sept. 29, 2026).................................... 3, 8, 9, 11, 18
*Twentieth Century Music Corp. v. Aiken*,
422 U.S. 151 (1975)........................................................................................... 18
*VHT, Inc. v. Zillow Grp., Inc.*,
69 F.4th 983 (9th Cir. 2023)................................................................................ 15
*Video Pipeline, Inc. v. Buena Vista Home Ent., Inc.*,
342 F.3d 191 (3d Cir. 2003) ................................................................................ 15
*Wainwright Secs., Inc. v. Wall St. Transcript Corp.*,
558 F.2d 91 (2d Cir. 1977) .................................................................................. 14
*Warner Bros. Ent. Inc. v. RDR Books*,
575 F. Supp. 2d 513 (S.D.N.Y. 2008) ................................................................. 14

**Statutes**

17 U.S.C. § 107.............................................................................................. 14, 15

**Other Authorities**

Amy Ross Arguedas, *The Use of AI Chatbots for News Is on the Rise—But Not Everywhere*,
Nieman Lab (Jun. 23, 2026) ................................................................................ 12
Andrew Deck, *People Who Use Chatbots for News Consider Them Unbiased and "Good Enough," New Study Finds*, Nieman Lab (Jan. 22, 2026)........................................... 12
Emily Heaslip, *What Is Evergreen Content, and When Should You Use It?*, CO
(Jul. 28, 2026) .................................................................................................... 13
4 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright*.................................... 9, 14
News/Media Alliance, *White Paper: How the Pervasive Copying of Expressive Works to Train and Fuel Generative Artificial Intelligence Systems Is Copyright Infringement and Not a Fair Use* 19 (2023)............................................................................ 10
Nicolas Padilla et al., *The Impact of Early LLM Adoption on Online User Behavior*, SSRN (Sept. 17, 2026) ................................................................................................... 9, 12
Luis Rijo, *ChatGPT Sends 190x Less Traffic Than Google Despite 12% Search Volume*, PPC Land (Feb. 14, 2026)............................................................................................ 12
Qiaoni Shi et al., *Answering Without Referring: How AI Search Rewrites the Web's Economic Bargain* (Jul. 8, 2026) ........................................................................................... 12
Alyson Shontell, *Can This Tech Billionaire Save the Media from an AI Apocalypse?*, Fortune (Feb. 4, 2025)..................................................................................................... 12
*State of the Bots: 2025 Q3 & Q4, The Leaky Pipes*, TollBit............................................ 12

## INTEREST OF *AMICI CURIAE*[1]

News/Media Alliance ("NMA") is a nonprofit organization representing over 2,200 publishers in the United States, ranging from the largest news and magazine publishers in the country to hyperlocal newspapers, and from digital-only outlets to papers that have printed news since the nation's founding. Its members invest in the investigation, reporting, and publication of news stories and analysis that are foundational to an informed citizenry and democratic governance. As the leading voice for the industry, NMA advocates for laws and policies that allow high-quality journalism to thrive, including a balanced interpretation of the fair use exception to copyright.

National Newspaper Association is a 141-year-old organization representing local community newspapers. It is a non-stock, not-for-profit corporation based in Florida. It represents members in every state. Its members publish in print and in all digital formats, including websites, mobile applications and commercial platforms. Its typical member is a 3,000 to 5,000 circulation nondaily newspaper with staff based in communities they serve.

The National Press Photographers Association ("NPPA") is a 501(c)(6) nonprofit organization founded in 1946 and dedicated to the advancement of visual journalism in its creation, editing, and distribution. As the voice of visual journalists, NPPA promotes its members' constitutional and intellectual property rights and has a vital interest in ensuring that

[1] No party in any of the News Cases or their counsel authored this brief in whole or in part, and no person or entity other than NMA contributed money intended to fund the preparation or submission of this brief. NMA notes that although plaintiffs The New York Times Company, Ziff Davis, The Center for Investigative Reporting, and Intercept Media, Inc. are among its thousands of members, none of these parties authored or contributed money intended to fund this brief.

AI uses of copyrighted journalistic work do not undermine licensing markets and the livelihoods of those who create it.

Pro Publica, Inc. (“ProPublica”) is an independent, nonprofit newsroom that produces investigative journalism with moral force. It has won nine Pulitzer Prizes, most recently the 2026 prize for local reporting and the 2025 prize for public service. ProPublica is supported almost entirely by philanthropy and offers its articles for republication, both through its website, propublica.org, and directly to leading news organizations selected for maximum impact.

## SUMMARY OF ARGUMENT

News Plaintiffs' cases against Defendants OpenAI and Microsoft concern nothing less than the ability to fund and publish trustworthy, high-quality journalism, a foundational value of democratic society. Asserting fair use, defendants contend they are free to copy and exploit online news articles created by others, without permission or compensation, to generate and profit from substitutional output that competes with the content they copy. Common sense tells us this is not fair. And so does copyright law. Contrary to Defendants' claims, there is no fair use precedent that supports appropriating copyrighted works to offer a product that competes with the copied works.

Indeed, the Third Circuit flatly rejected a similar fair use argument in the case *Thomson Reuters Enterprise Centre GMBH v. ROSS Intelligence Inc.*, No. 25-2153, 2026 WL 2932557 (3d Cir. Sept. 29, 2026). In that case, defendant ROSS argued that unauthorized copying of thousands of West headnotes to train an AI-driven legal research platform was a permissible fair use so long as the copying was only an "intermediate" step in the training process and the copied material was not made available to the public. *Id.* at *6–7. But the court was less concerned with when and how the copies were used in the training process than the ultimate objective of the copying. Because ROSS's use of the headnotes "share[d] the same ultimate purpose as Thomson Reuters's use"—namely, to respond to legal research inquiries—the use was "minimally transformative, at best." *Id.* "By copying the headnotes and using them to build its own competing legal-research platform, ROSS appropriated the headnotes' value for finding and analyzing judicial opinions and diminished their value as a draw for users to Thomson Reuters's legal-research platform." *Id.* at *9.

Journalism is an expensive undertaking. Copyright protection is essential to enabling news organizations to recover the significant investments required to carry out the work of covering breaking news, worldwide developments and local events. Publishers employ a variety of strategies to monetize and protect their content, generating revenue through advertising, subscriptions, paid access to premium content, affiliate revenue, and donations, among other methods. Each of these models depends upon the publisher's ability to draw readers to its site.

In copying news content and offering it through AI models and applications, Defendants encourage readers to access substituted content instead of the underlying originals. AI news chatbots and the like allow users to consume publishers' work product without the need to visit the sites from which it was taken. Defendants' own data confirms a precipitous decline in click-through rates from Defendants' AI products compared to traditional search engine referrals. Pls. Br. [ECF1977-1] at 2 (citing record evidence).[2] If Defendants' flagrant takings are allowed to continue, it will profoundly undermine news publishers' ability to produce high-quality journalism for the benefit of the public, upending the constitutional objective of copyright. As the Supreme Court has observed, "[i]n our haste to disseminate news, it should not be forgotten that the Framers intended copyright itself to be the engine of free expression. By establishing a marketable right to the use of one's expression, copyright supplies the economic incentive to create and disseminate ideas." *Harper & Row, Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 558 (1985).

Defendants appropriate news content not only to train large language models but also to enable those models to address user queries where the dataset on which a model was trained lacks sufficient information to respond. Given the finite nature of training datasets, models are

---

[2] Unless otherwise noted, all ECF references are to the docket in Case No. 1:25-md-03143.

not equipped to provide responses to queries that relate to events that happened, or content created, *after* the model was trained. To close this gap and make their models more relevant and valuable to users, Defendants' AI news offerings depend upon a secondary type of systematic copying, retrieval augmented generation ("RAG"), to "ground" the model's response to user queries. When the model receives a query, it searches the internet to locate and copy relevant content—often news stories—so the AI system can respond to the query. RAG is thus a factually distinct form of unauthorized copying by Defendants beyond the original training process that fails the fair use test in its own right.

Defendants' copying of news content to train and then operate their AI systems using RAG is not transformative under the first fair use factor because the use has the same purpose as, and serves as a substitute for, original journalistic works. *Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*, 598 U.S. 508, 527–29 (2023) ("*Warhol*"). Copying news articles to train large language models exploits those works for their intrinsic expressive value to produce competing content, including by memorizing and "regurgitating" training material in outputs. Likewise, RAG copying directly exploits news stories for the same expressive and informational purposes for which they were originally created. Such substitutional copying precludes any finding of transformativeness. Even if one could discern some degree of transformativeness in AI uses of publishers' journalistic works, it is unquestionably negated by Defendants' purpose of offering products that compete with the original news sources. *Fox News Network, LLC v. TVEyes, Inc.*, 883 F.3d 169, 178 (2d Cir. 2018) (despite its "modest" transformative character, holding that defendant's service offering searchable broadcast news content was not a fair use because service subscribers used content "for the same purpose" as authorized Fox viewers).

The crucial fourth statutory fair use factor, market impact, also weighs heavily against fair use in these cases. Defendants' copying has harmed multiple direct and derivative markets for news publishers' works. These include not only the reader markets supplanted by Defendants' AI but the valuable market for the licensing of news content to AI companies who seek to use it legally and compensate those who produce it. A determination that news content can be taken with impunity would threaten news publishers' economic viability by eviscerating a well-established licensing market for news content, ultimately diminishing the availability of high-quality journalism to the public. This outcome would be manifestly contrary to the public interest.

## ARGUMENT

### I. News Organizations Depend on Copyright Law to Protect Original News Content and Support Journalists

Our copyright system is founded on the belief that authors of works that inform and benefit the public should be rewarded with exclusive rights in their works. As explained by the Supreme Court, this *quid pro quo*, rooted in the Constitution, "applies equally to works of fiction and nonfiction. . . . Creation of a nonfiction work, even a compilation of pure fact, entails originality." *Harper & Row*, 471 U.S. at 546–47 (citing U.S. Const. art. I, § 8, cl. 8).

Quality journalism comes at a price: news publishers employ teams of professional journalists to produce a steady, reliable stream of news covering local, national, and global events. Reporting the news requires enormous upfront investment, as publishers have to provide editorial, operational, security, and legal resources to support continuous coverage, sometimes in multiple locations around the world. "Investigating and writing about newsworthy events occurring around the globe is an expensive undertaking and enforcement of the copyright laws permits [news organizations] to earn the revenue that underwrites that work." *Associated Press v.*

*Meltwater U.S. Holdings, Inc.*, 931 F. Supp. 2d 537, 553 (S.D.N.Y. 2013). And the "news" upon which the public relies is not limited to what makes the front page. Publishers provide a vast array of other offerings—health and wellness content, arts and entertainment coverage, product reviews, opinion pieces and so much more—all of which serve as vital resources and touchstones of community life.

Without the ability to recoup the enormous investments these organizations make in producing trustworthy content, there is no sustainable business model for the creation and distribution of journalistic works. News sites employ a variety of strategies to support their journalism. These include traditional revenue-generation models like sales of advertising and subscriptions, as well as licensing and syndication deals, paid access to premium content, payments earned from links to products or services, non-profit and grant-based models, and monetary contributions from readers. Importantly, all these models provide value not only through the revenue they generate, but because they help create ongoing reader relationships which build trust and sustainable web traffic. And while some publishers rely on paywalls to regulate access, others—including small, non-profit, philanthropic, and/or community-based publications—make their content freely available, including on ad-based properties, allowing a broad range of readers to access valuable information without the need for a subscription. None of these approaches would be possible if publishers lacked the legally enforceable right to protect their content against unauthorized commercial exploitation by third parties.

## II. Defendants' Copying of News Articles to Develop Products that Supersede Them Is Incompatible With Fair Use

Defendants ask this Court to rule that they can appropriate copyrighted online news content at will to produce and market competing products in the name of fair use. This Court

need only to look to basic guideposts of fair use to conclude that Defendants' uses point in exactly the opposite direction.

### A. Fair Use Factor One Weighs Heavily Against Fair Use Because Defendants' AI Copying to Supplant News Articles Is a Commercial Use that Does Not Serve a Transformative Purpose

The first fair use factor considers the purpose and character of the use, including whether it is commercial or "transformative" with a "further purpose or different character." *Warhol*, 598 U.S. at 525. Defendants' copying is indisputably commercial in nature. Defendants thus spend much of their energy attempting to persuade the Court that because they exploit News Plaintiffs' copyrighted works using AI technology, the use of those works is "highly transformative." Defendants' claim of transformativeness is deeply flawed.

Any analysis of transformativeness fundamentally turns on "the problem of substitution—copyright's bête noire." *Warhol*, 598 U.S. at 528. The Supreme Court has never suggested that "any secondary use that is innovative" is necessarily transformative. *Id*. at 543 n.18. Rather, "[a] use that shares the purpose of a copyrighted work . . . is more likely to provide 'the public with a substantial substitute'" for "'the original wor[k] or derivatives of [it],' which undermines the goal of copyright." *Id.* at 531–32 (quoting *Authors Guild v. Google, Inc.*, 804 F.3d 202, 207 (2d Cir. 2015) (alterations in original) (citation omitted) ("*Authors Guild*"). The critical question, then, is whether the challenged use is undertaken "to achieve a purpose that is the same as, or highly similar to, that of the original work," such that it is "likely to . . . 'supplan[t]'" the original. *Id.* at 528 (alteration in original) (citation omitted); *see also Thomson Reuters*, 2026 WL 2932557, at *6 (looking to whether secondary use "shares the same ultimate purpose as [plaintiff's] use"). Here the answer is clearly yes.

Defendants do not suggest they are copying massive amounts of news for a recognized fair use purpose, such as to offer criticism or commentary, to "shed[] light" on the articles they copy, *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 579 (1994), or to offer a utilitarian functionality unrelated to expressive content such as a search or indexing mechanism. *Compare Authors Guild*, 804 F.3d at 216–17 (copying to offer search utility) *with Thomson Reuters*, 2026 WL 2932557, at *7 (copying to develop competing product). Nor could they. The goal of Defendants' copying is to capture and exploit the expressive content of the articles so it can be used for system output that serves as a substitute for the original publications. As Professor Nimmer explains, "[u]sing a work for a purpose that exploits its intrinsic expressive value . . . fails the [transformativeness] test, notwithstanding the alteration or addition of expression." 4 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* ("*Nimmer*") § 13F.05.

This clear substitutional purpose is borne out by the impact of Defendants' product. Multiple empirical studies confirm that AI repackaging of news articles in abridgements and summaries draws readers away from the original sources. Once users turn to AI tools, their "level of search in traditional search engines falls by roughly a fifth to a third." Nicolas Padilla et al., *The Impact of Early LLM Adoption on Online User Behavior* 1, SSRN (Sept. 17, 2026), https://dx.doi.org/10.2139/ssrn.5393256. Defendants' own researchers confirmed a severe drop in click-through rates to news publisher sites after introducing AI news chatbots. Pls. Br. at 2 (citing record evidence). In short, Defendants' exploitation of news content to operate AI products that convey the same information is a substitutional use, not a transformative one.

Defendants attempt to minimize their takings by claiming they are merely "extract[ing]" facts from the works they bodily appropriate, as though facts conveyed in a copied news story are somehow separable from the writing by which they are conveyed. Defs. Br. [ECF1753] at

15–17; Microsoft (“MS”) Br. [ECF1975] at 18–19. Contrary to their suggestion, Defendants are not compiling lookup tables of “facts” to operate their AI systems. The ability of AI models to respond to user queries is the result of systematic, verbatim copying of the text of those articles—*i.e.*, the specific context and ways in which the authors chose to *express* those facts.[3] Defendants ignore the core holding of *Harper & Row*: that journalistic works, even though they embody facts of interest to the public, are protected by copyright. “The fair use doctrine is not a license for corporate theft, empowering a court to ignore a copyright whenever it determines the underlying work contains material of possible public importance.” 471 U.S. at 558; *see also Nihon Keizai Shimbun, Inc. v. Comline Bus. Data*, 166 F.3d 65, 70 (2d Cir. 1999) (compilations of fact are protectable by copyright because they “display originality in their selection, arrangement or presentation of facts,” while “[d]escriptions of facts afford even more room for originality”).

Defendants seek to rely on the premise that—apart from admitted instances of memorization and regurgitation of content in output, Defs. Br. at 4–5, MS Br. at 20—their models do not permit the public to access “intermediate” training or RAG materials. Defs. Br. at 15–16; MS Br. at 19–20. But the fact that copied materials may be used in a nonpublic way does not mean that the copying is excused as fair use. Defendant ROSS made the same argument in

[3] Indeed, “[news] [p]ublisher content is a major category of expressive information contained in the datasets used to build the LLMs. News and media reports rank[] third among all categories of sources in Google’s C4 data set, and half of the top ten represented sites overall are news outlets.” News/Media Alliance, *White Paper: How the Pervasive Copying of Expressive Works to Train and Fuel Generative Artificial Intelligence Systems Is Copyright Infringement and Not a Fair Use* 19 (2023), https://tinyurl.com/2ky9ht4d. And the companies’ products do not simply “read” this material as a human would. As multiple studies have documented, LLMs “can reproduce the content on which they were trained, demonstrating that the models retain and can memorize the expressive content of the training works.” *Id.* at 2. Such direct exploitation of a work for its expressive value is not transformative.

the *Thomson Reuters* case, and the court roundly debunked it. While acknowledging that in some cases copying of software has been found to be a fair use when necessary to permit interoperability,[4] the court held that that did not apply to ROSS, which was not seeking to develop an interoperable product, but a substitutive one. 2026 WL 2932557, at *7. The same holds true here.

### B. Factor Four Points Decisively Against Fair Use Because Defendants' AI Uses Undermine Primary and Derivative Markets for News Plaintiffs' Works

Defendants' appropriation of news publishers' articles is harming multiple direct and derivative markets for those works. These include the reader markets that are directly supplanted by Defendants' products, as well as existing and potential licensing markets for authorized uses of news content by AI developers.

#### 1. Harm to Online News Markets

Defendants' AI systems copy original news content and supply answers to user queries without the need to leave the AI platform itself, thus obviating the need for users to visit the publisher source sites. As explained above, this has resulted in a massive drop in the rates at which news chatbot users click through to the original story as compared to users of traditional search engines. This trend can only be expected to escalate as users become more familiar with

[4] *Google LLC v. Oracle Am., Inc.*, 593 U.S. 1 (2021); *Sony Comput. Ent., Inc. v. Connectix Corp.*, 203 F.3d 596 (9th Cir. 2000); *Sega Enters. Ltd. v. Accolade, Inc.*, 977 F.2d 1510 (9th Cir. 1992). The court in *Sega* expressly rejected the contention that intermediate copying is noninfringing so long as the final product does not contain copyrighted material. 977 F.2d at 1519 ("[I]ntermediate copying of computer object code may infringe the exclusive rights granted to the copyright owner . . . regardless of whether the end product of the copying also infringes those rights."). *Sony* reaffirmed that holding. 203 F.3d at 602–03. In any event, in all of these cases, the copying was for the purpose of facilitating interoperability, not to produce competing expressive works. *E.g.*, *Sega*, 977 F.2d at 1522 ("With respect to the video game programs contained in Accolade's game cartridges, there is no evidence in the record that Accolade sought to avoid performing its own creative work.").

AI products.[5]

Defendants' substitutional activities have already had a significant impact on online publishers' ability to monetize their copyrighted works through subscriptions and B2B sales, with a disproportionate share of traffic losses falling on "smaller sites that are most dependent on search-driven referrals." Padilla et al. at 3.[6] As Judge Chhabria recognized in *Kadrey v. Meta Platforms, Inc.*, 788 F. Supp. 3d 1026, 1059 (N.D. Cal. 2025), "markets for certain types of works (like news articles)" that rely on web traffic may be "even more vulnerable" to competition from unlicensed AI uses.

In evaluating a claim of fair use, the court must consider not only immediate market harm but also "whether 'unrestricted and widespread conduct of the sort engaged in by [the

---

[5] See Amy Ross Arguedas, *The Use of AI Chatbots for News Is on the Rise—But Not Everywhere*, Nieman Lab (Jun. 23, 2026), https://www.niemanlab.org/2026/06/the-use-of-ai-chatbots-for-news-is-on-the-rise-but-not-everywhere/ ("[O]ne in 10 people are now using AI chatbots like ChatGPT and Google Gemini for news weekly, up 3 percentage points from last year."); Andrew Deck, *People Who Use Chatbots for News Consider Them Unbiased and "Good Enough," New Study Finds*, Nieman Lab (Jan. 22, 2026), https://www.niemanlab.org/2026/01/people-who-use-chatbots-for-news-consider-them-unbiased-and-good-enough-new-study-finds/ ("As AI chatbot usage only continues to grow, there's real potential for these products to become a fixture in the way many discover and read the news—and upend traditional search traffic in the process.").

[6] Additional studies reinforce these conclusions. One analysis reports that "ChatGPT produces outbound clicks in only 5.2% of conversation sessions, far below Google's referral ratio." Qiaoni Shi et al., *Answering Without Referring: How AI Search Rewrites the Web's Economic Bargain* (Jul. 8, 2026), https://arxiv.org/abs/2607.07652. Others find the rate to be even lower. *See, e.g.*, Luis Rijo, *ChatGPT Sends 190x Less Traffic Than Google Despite 12% Search Volume*, PPC Land (Feb. 14, 2026), https://ppc.land/chatgpt-sends-190x-less-traffic-than-google-despite-12-search-volume/ ("[F]or traditional search queries, [ChatGPT] achieves an estimated [click-through rate] of 1.3%—representing a 96% reduction compared to Google's performance."); *State of the Bots: 2025 Q3 & Q4, The Leaky Pipes*, TollBit, https://tollbit.com/state-of-the-bots/q1-q2-2026/ ("AI apps continue to be an extremely small source of referrals for sites, averaging 0.12%."); Alyson Shontell, *Can This Tech Billionaire Save the Media from an AI Apocalypse?*, Fortune (Feb. 4, 2025), https://fortune.com/2025/02/04/matthew-prince-ai-audit-block-media/ (reporting Cloudflare's finding that OpenAI crawls a website 250 times for every one user it refers to that site).

defendant] would result in a substantially adverse impact on the potential market' for the [copied work], including the market for derivative works." *Warhol*, 598 U.S. at 524 n.3 (quoting *Campbell*, 510 U.S. at 590) (internal quotes omitted). Where news stories are systematically copied and made available to the public and AI developers without compensation, it is "self-evident" that the takings will adversely affect publishers' markets for those stories. *See Hachette Book Grp., Inc. v. Internet Archive*, 115 F.4th 163, 193 (2d Cir. 2024) (unlicensed digital distribution of books).

Defendants seek to diminish the harm to publishers by asserting that most of what they copy is "old news." Defs. Br. at 10. But while copying of current news is undoubtedly valuable to RAG, evergreen content also plays a critical role as a driver of online attention and traffic. Such offerings provide enormous value to publishers, not only by drawing new readers and subscribers to their sites but by "position[ing] [the publisher's] brand as an authority, thought leader, and trustworthy business." Emily Heaslip, *What Is Evergreen Content, and When Should You Use It?*, CO (Jul. 28, 2026), https://www.uschamber.com/co/grow/marketing/evergreen-seo-content. The value of publishers' content does not expire with the news cycle—as evidenced by Defendants' desire to exploit it.

Defendants next contend that the market harm resulting from the actions is not cognizable because their news chatbots merely paraphrase or summarize facts from publishers' articles. Defs. Br. at 18. But this claim fails on both the facts and the law. Factually speaking, it is clear that Defendants' AI systems can and do memorize and deliver verbatim news content. *See* Pls. Br. at 15–31. Moreover, users rely on Defendants' output in lieu of the original. Contrary to Defendants' claim, Defs. Br. at 18; MS Br. at 28, their AI uses are readily

distinguishable from those in *Authors Guild*, where user searches resulted in only short snippets of text that did not substitute for the original works. 804 F.3d at 224.

Defendants are also wrong to suggest that market harm can only arise from verbatim copies. It is well recognized that one can infringe through non-literal copying of the plaintiff's work, such as by abridging or summarizing a work. Courts have consistently found market harm under the fourth fair use factor based on summaries, paraphrases, and excerpts of news articles and other works. *See, e.g.*, *Harper & Row*, 471 U.S. at 565–66 (excerpts were quantitatively insubstantial but included "the heart of the book"); *Castle Rock Ent., Inc. v. Carol Publ'g Grp., Inc.*, 150 F.3d 132, 139, 145 (2d Cir. 1998) (copying of fragments of television series to create a trivia book was infringing where book substituted for a derivative market that copyright owner could develop); *Salinger v. Random House, Inc.*, 811 F.2d 90, 99 (2d Cir. 1987) (likely market impairment from publication of "most interesting passages" of letters); *Wainwright Secs., Inc. v. Wall St. Transcript Corp.*, 558 F.2d 91, 96 (2d Cir. 1977) (abstracts of financial reports were "blatantly self-serving, with the obvious intent, if not the effect, of fulfilling the demand for the original work"); *Meltwater*, 931 F. Supp. 2d at 561 (news monitoring service deprived AP of opportunity to license excerpts); *Warner Bros. Ent. Inc. v. RDR Books*, 575 F. Supp. 2d 513, 535, 550–51 (S.D.N.Y. 2008) (reference guide to *Harry Potter* series infringed originals because entries contained "direct quotations or paraphrases, plot details, or summaries of scenes," and harmed market for author's own companion books and other derivative works); *see also* 4 *Nimmer* § 13D.11 ("The mere fact that defendant has paraphrased rather than literally copied cannot preclude a finding of substantial similarity.").

Defendants similarly fail to address the separate harm that AI news chatbots have on the value of publishers' own excerpts or summaries of their articles. *See* 17 U.S.C. § 107(4) (fourth

factor considers use's effect on "potential market for or *value of* the copyrighted work") (emphasis added). Publishers commonly include such materials on their websites' main pages to draw readers deeper into the sites and drive monetization. The Third Circuit recognized the harm arising from this type of diversion in *Video Pipeline, Inc. v. Buena Vista Home Entertainment, Inc.*, 342 F.3d 191 (3d Cir. 2003), where the defendant made "clip previews" of Disney films available online. In rejecting the defendant's fair use defense, the court found that the defendant's activity harmed Disney's ability to use its trailers to draw visitors to its own websites and sell other products. *Id.* at 202–03. Defendants' AI-generated summaries undercut the same type of economic opportunities for news publishers.[7]

### 2. Threat to AI Licensing Markets

Under the fourth fair use factor, courts "must take account not only of harm to the original but also of harm to the market for derivative works." *Campbell*, 510 U.S. at 590 (citation omitted). As much as Defendants seek to deny it, *see* Defs. Br. at 11; MS Br. at 28–29, there is a well-established and rapidly growing derivative market for the licensing of news content to AI companies in need of reliable input to train and operate their systems. A finding of

[7] Microsoft's contention (MS Br. at 34–35) that the News Plaintiffs are entitled to only one statutory damages award per periodical issue reflects a flawed understanding of both the legal standard and publisher business models. As the Second Circuit has made clear, "when a copyright holder or publisher issues material on an independent basis, the law permits a statutory damages award for each individual work." *EMI Christian Music Grp., Inc. v. MP3tunes, LLC*, 844 F.3d 79, 101 (2d Cir. 2016). This analysis is informed by whether individual works have independent economic value. *See, e.g.*, *VHT, Inc. v. Zillow Grp., Inc.*, 69 F.4th 983, 990 (9th Cir. 2023). Individual articles have substantial economic value to publishers in the modern media landscape, where readers typically access online news on an article-by-article basis instead of reading editions from cover to cover. Moreover, individual articles clearly have significant economic value to AI companies, which copy them not for how they are arranged in a newspaper but for their individual content.

fair use in these cases would eviscerate this critical market, which serves AI developers as well as publishers.

Numerous AI companies, including OpenAI, Microsoft, Google, Meta, Amazon, Perplexity and Mistral, have entered into licensing arrangements with publishers to access and use news content. These include licenses for model training as well as a variety of innovative RAG uses that enable delivery of high-quality news content to readers while providing fair compensation and attribution to publishers. The chart below lists AI licensing deals for news content of which *Amici* are aware or that have been publicly reported (no doubt there are additional deals that remain confidential):[8]

| **AI Company** | **Publishers** |
|---|---|
| Amazon | 200+ publishers, including Business Insider, Condé Nast, Forbes, Hearst, Politico, Reach PLC, Reuters, The Associated Press, The New York Times, The Washington Post, TIME, USA Today Co., and Vox |
| Bria | Various news publishing partners via News/Media Alliance, and Getty Images |
| Dow Jones / Factiva | 8,000+ publishing partners, including Adweek, AWP Finanznachrichten, Barron's, Beijing Review, Dow Jones Newswires, EFE, Exame, Fast Company, Financial News, Hong Kong Economic Times, IBD, MarketWatch, McClatchy Media, News Corp Australia, News UK, Newsquest Media Group, Private Equity News, The Associated Press, The Atlantic, The Globe and Mail, The National, The Wall Street Journal, The Washington Post, and USA Today Co. |
| Google | Der Spiegel, El País, Financial Times, Folha, Infobae, Kompas, The Associated Press, The Atlantic, The Economist, The Guardian Media Group, The Times of India, The Washington Examiner, and The Washington Post, among other, unnamed publishers |
| LexisNexis | 20,000+ titles, including Benzinga, FiscalNote - CQ Roll Call, USA Today Co., McClatchy, and The Associated Press |
| Meta | CNN, Fox News and Fox Sports, Le Figaro, Le Monde, News Corp, Newsmax, People Inc., Prisa Media, Reuters, Süddeutsche Zeitung, The Daily Caller, The Washington Examiner, and USA Today Co. |

[8] Supporting citations for the chart are available at https://www.newsmediaalliance.org/licensing-citations/.

| | |
|---|---|
| Microsoft | Axel Springer, Business Insider, Condé Nast, Financial Times, Hearst, Informa, Nine Entertainment, People Inc., Reuters, Semafor, The Associated Press, USA Today Co., and Vox Media, |
| Mistral | Agence France-Presse, The Danish Press Publications' Collective Management Organisation (DPCMO), and Wikimedia |
| OpenAI | Axel Springer, Axios, Bennett, Coleman and Co, Condé Nast, Folha, Free Law Project, Future, GEDI, Getty Images, Hearst, Le Monde, News Corp., People Inc., Prisa Media, Schibsted Media, The Associated Press, The Atlantic, The Financial Times, The Guardian Media Group, The Indian Express Group, The Washington Post, TIME, Village Media, and Vox Media |
| Particle News | Agence France-Presse, Austin American-Statesman, Fortune, Getty Images, Houston Chronicle, Reuters, San Antonio Express-News, San Francisco Chronicle, SFGATE, The Associated Press, The Atlantic, The Los Angeles Times, The Observer, TheStreet, and TIME |
| Perplexity | AccuWeather, Adweek, Automattic, Blavity, CNN, Condé Nast, Der Spiegel, DPReview, Entrepreneur, Fortune, Fortune, Gear Patrol, Getty Images, Le Figaro, Le Monde, Lee Enterprises, MediaLab, Mexico News Daily, Minkabu the Infonoid, NewsPicks, Pris Media, RTL Germany, The Independent, The Los Angeles Times, The Texas Tribune, The Washington Post, TIME, USA Today Co., and World History Encyclopedia |
| ProRata.ai | 1,000+ publishers, including multiple publishers via News/Media Alliance, 270 Media, Adweek, Arena Group, Atlas Obscura, Axel Springer, Boston Globe Media, BuzzFeed, Cherry Road Media, dmg media, DPCMO, EFE, Fast Company, Financial Times, FiscalNote, Fortune, Frommer's, Future, Gear Patrol, Graham Holdings Company, Healthline, Hello!, IBT Media, Industry Dive, Johns Hopkins University Press, Lee Enterprises, Man of Many, Map Happy, Mediahuis, Newsday, Newstex, PRISA Media, Pro Football Network, Prospect, Reach PLC, Reader's Digest, Recurrent Ventures, Skift, Sky News, Snopes, StyleBlueprint, The Atlantic, The Guardian Media Group, The Nation, The New Republic, The Philadelphia Inquirer, TipRanks, Vox Media, Washingtonian, and Worth |
| Snowflake | At least 17 publishers, including People, Inc., Reuters, The Associated Press, The Washington Post, and USA Today Network, |
| TNO | Vast majority of Dutch news publishers, including over 30 outlets |

The Government's supposition that only the largest technology companies can afford to license copyrighted content, *see* U.S. Statement of Interest [ECF1682] at 4, is belied by the facts. As the above chart illustrates, smaller and mid-sized AI companies are already licensing such

content. The Government also takes an oddly restrictive view of the flexibility of markets. As AI licensing frameworks continue to mature, willing buyers and sellers will develop varying pricing models for different segments of the market—just as happens with licensing for other types of content. These market-based solutions will accommodate, not exclude, startups and smaller AI companies.

### III. The Public Interest Mandates a Copyright Framework that Supports the Vitality of an Independent Press

The Framers recognized that democracy relies upon a flourishing independent press. A ruling in this case that makes journalistic works free for the taking so trillion-dollar companies can profit by offering competing substitutes will put news publishers out of business and cannot be reconciled with the constitutional vision or public interest.

In assessing the purported public benefit of a claimed fair use, a court must consider the "long-term consequences" of the activity, in particular its impact on copyright's overall incentive structure. *Hachette*, 115 F.4th at 195; *see also Thomson Reuters*, 2026 WL 2932557, at *9 ("[W]e consider whether the public benefits are 'related to copyright's concern for the creative production of new expression.'") (quoting *Oracle*, 593 U.S. at 35–36). A finding of fair use here would undermine publishers' ability to invest in high-quality journalism and in turn diminish the availability of such content to the public. Our copyright laws are designed specifically to protect against such impoverishment of the public discourse. *See Twentieth Century Music Corp. v. Aiken*, 422 U.S. 151, 156 (1975) ("The immediate effect of our copyright law is to secure a fair return for an 'author's' creative labor. But the ultimate aim is, by this incentive, to stimulate artistic creativity for the general public good.").

Defendants and the Government are wrong to suggest that requiring AI companies to license copyrighted works is somehow incompatible with technological progress. To the

contrary, the development of healthy licensing markets is mutually beneficial for both rightsholders and AI companies, promoting investment, innovation, and legal certainty on both sides of the market. When copyright owners can share in the economic benefits made possible by the use of their works in AI, they are incentivized not only to continue creating those works but to assemble and deliver relevant content to licensees in efficient formats. AI companies, in turn, gain reliable access to sophisticated and curated datasets, improving the performance and accuracy of their models. And the public ultimately benefits from both the continued availability of quality news content and the development of more trustworthy AI platforms. Far from impeding the development of AI, the licensing of content is essential to avoiding the very "doom loop" scenario Microsoft predicted internally, in which AI models' displacement of news publishers imperils the supply of inputs needed for those technologies to exist. *See* Pls. Br. at 2.[9]

[9] This Court should also reject Defendants' fallback position that news publishers impliedly licensed the use of their works by declining to implement anti-scraping mechanisms like robots.txt or metatags to prevent the commercial use of their works in a competing manner. It is the equivalent of saying any material on the internet is fair game to take for any purpose unless you have walled off your content. This turns copyright on its head. The two decades-old district court decisions on which Defendants rely, *Field v. Google*, 412 F. Supp. 2d 1106 (D. Nev. 2006), and *Parker v. Yahoo!, Inc.*, No. 07-2757, 2008 WL 4410095 (E.D. Pa. Sept. 25, 2008), were concerned with search engine indexing to allow internet users to find content, a functional use. They do not come close to condoning systematic AI copying of website material so the copier can offer a product to compete with the website.

## CONCLUSION

For the foregoing reasons, *Amici* respectfully urge this Court to grant Plaintiffs' motion for partial summary judgment and to deny Defendants' motions for summary judgment.

DATED: October 30, 2026

Respectfully submitted,

By: /s/ Jacqueline C. Charlesworth

Jacqueline C. Charlesworth
Kevin R. Amer (*pro hac vice pending*)
BAYLA LAW GROUP, LLP
One Embarcadero Center
Suite 1200
San Francisco, California 94111
Telephone: 415.765.6633
jcharlesworth@baylalaw.com
kamer@baylalaw.com

*Attorneys for Amici Curiae News/Media Alliance, National Newspaper Association, The National Press Photographers Association, and Pro Publica, Inc.*

**CERTIFICATE OF COMPLIANCE**

Pursuant to Local Civil Rule 7.1(c), I hereby certify that the foregoing Brief of *Amici Curiae* News Organizations contains 5,979 words according to the word-count feature of the word-processing program used to prepare it, and therefore it complies with this Court's Order of August 7, 2026. [ECF1663]

/s/ Jacqueline C. Charlesworth