**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE:<br><br>OpenAI, Inc.,<br><br>COPYRIGHT INFRINGEMENT LITIGATION<br><br>This Document Relates To:<br>1:23-cv-11195-SHS-OTW<br>1:24-cv-01515-SHS-OTW<br>1:24-cv-03285-SHS-OTW | 25-md-3143 (SHS) (OTW) |

# [PROPOSED] BRIEF OF *AMICUS CURIAE* OPEN MARKETS INSTITUTE IN SUPPORT OF THE NEWS PLAINTIFFS

## CORPORATE DISCLOSURE STATEMENT

I hereby certify that amicus curiae Open Markets Institute is a nonprofit, non-stock corporation. It has no parent corporations, and no publicly traded corporations have an ownership interest in it.

## STATEMENT REGARDING AUTHORSHIP AND FUNDING

No counsel for any party authored this brief in whole or in part. Apart from *amicus curiae*, no person contributed money intended to fund the brief's preparation and submission.

# TABLE OF CONTENTS

**CORPORATE DISCLOSURE STATEMENT** .................... i

**STATEMENT REGARDING AUTHORSHIP AND FUNDING** .................... i

**TABLE OF AUTHORITIES** .................... iii

**INTEREST OF THE *AMICUS CURIAE*** .................... 1

**INTRODUCTION** .................... 1

**ARGUMENT** .................... 4

**I. The Defendants' Large-Scale Copying Constitutes Unfair and Socially Destructive Competition Against the Publishers.** .................... 4

**II. The Defendants' Conduct Undermines Law-Abiding LLM Rivals and Could Destroy an Emerging Market for Licensing Copyrighted Materials.** 13

**CONCLUSION** .................... 19

# TABLE OF AUTHORITIES

## Cases

*Am. Geophysical Union v. Texaco Inc.*, 60 F.3d 913 (2d Cir. 1994)....................9, 17
*Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*, 598 U.S. 508 (2023) ........................................................................................................ passim
*Authors Guild v. Google, Inc.*, 804 F.3d 202 (2d Cir. 2015)........................... passim
*Authors Guild, Inc. v. HathiTrust*, 755 F.3d 87 (2d Cir. 2014) .................................6
*Broad. Music, Inc. v. Columbia Broad. Sys., Inc.*, 441 U.S. 1 (1979) .....................18
*Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569 (1994) ............................... 3, 7, 8
*Fed. Trade Comm'n v. R.F. Keppel & Bro.*, 291 U.S. 304 (1934) .................... 20, 22
*Google LLC v. Oracle Am., Inc.*, 593 U.S. 1 (2021)....................................... 3, 5, 8
*Hachette Book Grp., Inc. v. Internet Archive*, 115 F.4th 163 (2d Cir. 2024) ...........17
*Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539 (1985) ........ passim
*Infinity Broadcast Corp. v. Kirkwood*, 150 F.3d 104 (2d Cir. 1998) .....................3, 7
*Kadrey v. Meta Platforms, Inc.*, 788 F.Supp.3d 1026 (N.D. Cal. 2025)..................14
*Pollock v. Williams*, 322 U.S. 4 (1944) ...............................................................22
*Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417 (1984) .............4, 7
*Stewart v. Abend*, 495 U.S. 207 (1990) ..................................................................5
*Times-Picayune Pub. Co. v. United States*, 345 U.S. 594 (1953)...........................15

## Statutes

17 U.S.C. § 106 ....................................................................................................18
17 U.S.C. § 107 ..................................................................................................5, 6
17 U.S.C. § 107(1) ....................................................................................................8
29 U.S.C. § 202(a) ..................................................................................................21

## Other Authorities

Alex Reisner, *The Hypocrisy as the Heart of the AI Industry*, Atlantic (Mar. 20, 2026) ...............................................................................................................11
Amy Ross Arguedas, *Emerging Uses of AI Chatbots for News and What It Means for Journalism*, Reuters Inst. for the Study of Journalism (June 16, 2026) .........13
Courtney Radsch & Karina Montoya, *Same Gatekeepers, New Tollbooths: Mapping the AI Content Licensing Market*, Open Markets Inst. (2026)................4
Pierre N. Leval, *Towards a Fair Use Standard*, 103 Harv. L. Rev. 1105 (1990) ....12
Sandeep Vaheesan, *Lawbreaking as a Method of Competition*, 75 Am. U. L. Rev. 1535 (2026)...........................................................................................................20

U.S. Copyright Off., Copyright and Artificial Intelligence, Part 3: Generative AI Training (May 2025) (pre-publication version)........................................ 13, 14, 19

## INTEREST OF THE *AMICUS CURIAE*

The Open Markets Institute ("OMI") is a non-profit organization dedicated to protecting democracy and individual liberties from concentrated economic power and control. OMI does so by promoting fair competition throughout our political economy, a broadly shared prosperity, and innovation that serves the public interest. OMI regularly provides expertise on antitrust law and competition policy to Congress, federal agencies, courts, journalists, and members of the public. The Center for Media and Digital Governance ("CMDG") is a research and policy center at the Open Markets Institute that investigates concentrated power over digital infrastructure, AI systems, and information markets through research, convening, and advocacy. Neither OMI nor CMDG accepts any funding or donations from for-profit corporations.

## INTRODUCTION

The development of technology cannot be used as a justification for a for-profit corporation to copy the original, expressive works of another and use those works to compete with the copyright holder in the same market. OpenAI and Microsoft ("Defendants") claim that they are entitled to a fair use defense because they are using the news plaintiffs' ("Publishers") content to train their large language model ("LLM") artificial intelligence ("AI") chatbot, which is marketed under the brand ChatGPT. What they fail to address is that the material the

Defendants copied from the Publishers' websites can be used in multiple ways and is not limited to training their models. In the case at hand, at least part of the Publishers' allegations are concerned with the "output" stage, when ChatGPT delivers a response to a query or prompt to a member of the public. In many instances, ChatGPT's response to a user's prompt will be substantially similar to, if not an almost verbatim regurgitation of, the Publishers' original copyrighted expressive work that was used in the "training." Given the fact that the Defendants are competing in the same market as the publishers (i.e., providing news to the public), the Defendants fair use defense must fail.

If an LLM developer copies the Publishers' content without first securing a license, they are engaging in unfair and socially destructive competition. Out of the four statutory factors that a court must consider under a fair use defense, factors one (purpose and character of infringing use) and four (market harm) weigh in favor of Publishers.[1] These two factors are rooted in traditional notions of fair competition. Factor one favors the Publishers because the Publishers' original use and Defendants' secondary one are the same. *Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*, 598 U.S. 508, 553–54 (2023) (Gorsuch, J., concurring). In both cases, the content is being presented to the public as news. A use is not transformative if it acts as a competitive substitute. *Id.* at 554 (Gorsuch, J.,

[1] OMI takes no position regarding factors two and three.

concurring). Additionally, the Defendants' secondary use is not transformative because they fail to produce a "new expression, meaning or message" that "alter[s]" the original. *Google LLC v. Oracle Am., Inc.*, 593 U.S. 1, 29 (2021) (quoting *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 579 (1994)).

Factor four also weighs in favor of the Publishers. Under this factor, the court considers whether the secondary use "usurp[s] a market" to which the copyright owner is entitled. *Infinity Broadcast Corp. v. Kirkwood*, 150 F.3d 104, 110 (2d Cir. 1998). A copyright owner merely needs to show that a potential market for its works will be "adversely affect[ed]" if the infringer's use "should become widespread." *Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 568 (1985) (quoting *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 451 (1984)). The Publishers have shown that users who get their news for free from an LLM have no incentive to click through to the website from which the LLM got its information (this is particularly true if the output is a regurgitation of the original). As a result, the Publishers lose sales and advertising revenue.

Further, the Defendants' conduct threatens to sabotage the emerging market for LLMs to license copyrighted material. As of today, developers of LLMs of all sizes are negotiating licenses to use copyrighted works and are agreeing to a range of compensation arrangements, including pay per use and pay per access. Courtney

Radsch & Karina Montoya, *Same Gatekeepers, New Tollbooths: Mapping the AI Content Licensing Market*, Open Markets Inst. 5–7 (2026).[2]

Specifically, the Defendants' conduct harms their LLM rivals who do not rely on an untenable fair-use defense to train their models but instead seek permission and pay royalties to copyright holders. The Defendants' illegal copying of original, expressive works puts these law-abiding rivals at a distinct disadvantage. By not paying for the inputs, the Defendants gain a significant and unfair cost and competitive advantage that allows them to offer products to the public at a lower price and thereby capture sales and market share.

## ARGUMENT

### I. The Defendants' Large-Scale Copying Constitutes Unfair and Socially Destructive Competition Against the Publishers.

The affirmative fair-use defense "permits courts to avoid rigid application of the copyright statute when, on occasion, it would stifle the very creativity which that law is designed to foster." *Google LLC v. Oracle Am., Inc.*, 593 U.S. 1, 18 (2021) (quoting *Stewart v. Abend*, 495 U.S. 207, 236 (1990)). Fair use, originally developed by the courts and subsequently codified by Congress in section 107 of the Copyright Act, establishes that certain uses do not infringe copyright

---

2 https://static1.squarespace.com/static/5efcb64b1cf16e4c487b2f61/t/69ea38642f5aa266473a4403/1776957540232/Same+Gatekeepers+New+Tollbooths+-+Mapping+the+AI+Content+Licensing+Market+Report+April+2026+WEB-1.pdf.

protections. 17 U.S.C. § 107. These limitations are important because "copyright is intended to increase and not to impede the harvest of knowledge." *Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 545 (1985). Even so, because "the original works … provide the seed and substance of this harvest," *Id.* at 546, the copyright laws have been crafted to encourage the production of creative and noncreative works for the public's benefit. *Authors Guild, Inc. v. HathiTrust*, 755 F.3d 87, 94–95 (2d Cir. 2014).

The fair-use analysis features four statutory factors. Courts are required to evaluate the following factors to determine whether an infringing use is entitled to the fair-use defense:

> (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and (4) the effect of the use upon the potential market for or value of the copyrighted work. 17 U.S.C. § 107.

The task for the courts is "how to define the boundary limit of the original author's exclusive rights in order to best serve the overall objectives of the copyright law to expand public learning while protecting the incentives of authors to create for the public good." *Authors Guild v. Google, Inc.* (Google Books), 804 F.3d 202, 213 (2d Cir. 2015).

Factors one (purpose and character of infringing use) and four (market harm) are rooted in traditional notions of unfair competition and consider how copying damages the copyright owner and the public. *See Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 593 (1994); *Google Books*, 804 F.3d at 219. In the words of the Second Circuit, fair use in general and factor four in particular are "concerned with secondary uses that, by offering a substitute for the original, *usurp a market* that properly belongs to the copyright-holder." *Infinity Broadcast Corp. v. Kirkwood*, 150 F.3d 104, 110 (2d Cir. 1998) (emphasis added). Highlighting the role of unfair competition norms in a fair-use analysis, factor four alone can be dispositive: "[T]o negate fair use one need only show that if the challenged use 'should become widespread, it would adversely affect the potential market for the copyrighted work.'" *Harper & Row*, 471 U.S. at 568 (1985) (quoting *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 451 (1984)).

In this case, factors one and four weigh in favor of the Publishers and indicate that the Defendants are engaged in unfair competition. Thus, the Defendants' fair use argument fails, and the Publishers are entitled to a holding that the Defendants infringed on their copyright when they copied and used the Publishers' works without permission.

Factor One: The Defendants' "purpose and character" of copying does not weigh in favor of fair use because OpenAI and Microsoft's LLMs act as a

substitute in the market. 17 U.S.C. § 107(1). The Court should focus "on the particular use under challenge" and "assess whether the purpose and character of that use is different from (and thus complements) or is the same as (and thus substitutes for) a copyrighted work." *Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*, 598 U.S. 508, 554 (2023) (Gorsuch, J., concurring).

For a use to be fair, it must transform the original. A use may be transformative if "the copier's use adds something new, with a further purpose or different character," which "alter[s] the copyrighted work with new expression, meaning or message." *Oracle Am.*, 593 U.S. at 29 (quoting *Campbell*, 510 U.S. at 579). A critical focus of the inquiry is whether the accused infringer produced something distinctive and delivered new public benefits using the original work. *Am. Geophysical Union v. Texaco Inc.*, 60 F.3d 913, 922–23 (2d Cir. 1994). That said, "[t]he word 'transformative' cannot be taken too literally" because it is simply "a suggestive symbol for a complex thought, and does not mean that any and all changes made to an author's original text will necessarily support a finding of fair use." *Google Books*, 804 F.3d at 214.

On the other hand, if the copier seeks to create a competitive substitute for the original, it is not transformative. *Warhol*, 598 U.S. at 553–54 (Gorsuch, J., concurring). An accused infringer is not free to capture the value embodied in the original work. *Texaco*, 60 F.3d at 923. The practical threat of market substitution

can defeat a fair-use defense: "Even if the purpose of the copying is for a valuably transformative purpose, such copying might nonetheless harm the value of the copyrighted original if done in a manner that results in widespread revelation of sufficiently significant portions of the original as to make available a significantly competing substitute." *Google Books*, 804 F.3d at 223.

The Publishers have presented sufficient evidence to show that OpenAI's products act as competitive substitutes for the Publishers' original works and thereby are not transformative. For example, OpenAI offers commercial products named *News Summarizer Ace*, *NYTimesGPT*, *Bypass Paywall*, and others that are designed to allow its users to extract stories from the Publishers' websites without paying a fee. [Plaintiffs' Brief, ECF No. 1977-1, at 6–7]. In addition to allowing users to access the Publishers' content, OpenAI knowingly and purposefully designed its products to provide the news to its users in response to prompts and it uses copies that are taken from the Publishers' websites without permission to do so. As such, the purpose and character of the copies is the same as the original because both are presented to the audience as news. *Warhol*, 598 U.S. 508 at 553–54 (Gorsuch, J., concurring). When the original and the copy operate in the same market and are used by the audience for the same purpose, they are substitutes, not complements.

Contrary to the Defendants' assertions, their models do not "generate new text" that is not heavily influenced by the original works. This is the case with both training data and the addition of inference data to provide more accurate, timely results, particularly to queries related to topics in the news. It is well known that "chatbots and image generators can produce near-exact copies of media they were trained on, spitting out near-complete copies of Harry Potter and the Sorcerer's Stone, for example, or rendering images that are fuzzy copies of existing artwork." Alex Reisner, *The Hypocrisy as the Heart of the AI Industry*, Atlantic (Mar. 20, 2026).[3] While LLMs could someday advance to the point where they will always generate new and original text in response to a prompt, this case must be decided on the real-world evidence rather than on a hypothetical utopia that may never emerge.

Factor Four: This factor focuses on the effect that the copier's use has on the potential market for or value of the copyrighted work. The copyright laws protect the creators and "[t]he rights conferred by copyright are designed to assure contributors to the store of knowledge a fair return for their labors." *Harper & Row*, 471 U.S. at 546. While copyright owners are not guaranteed sales and profits and cannot seek legal recourse due to lost revenues from critical commentary or unflattering publicity, Judge Leval wrote that they can defeat a fair-use defense

[3] https://www.theatlantic.com/technology/2026/03/hypocrisy-ai-industry/686477/.

"when the market is impaired because the quoted material serves the consumer as a substitute." Pierre N. Leval, *Towards a Fair Use Standard*, 103 Harv. L. Rev. 1105, 1125 (1990). Because OpenAI's use has a substantial impact on the value of the Publishers' protected works, and the news market as a whole, this factor also weighs against fair use.

Factor four asks the court to focus on whether the copy acts as "a competing substitute for the original" in the market, which denies the copyright "holder of significant revenues because" a "potential purchasers may opt to acquire the copy in preference to the original." *Google Books*, 804 F.3d at 223. Accentuating the connection between fair-use doctrine and unfair competition, the Supreme Court once called factor four "undoubtedly the single most important element of fair use." *Harper & Row*, 471 U.S. at 566. OpenAI reported that ChatGPT receives about one million local news queries per week, with traffic spiking heavily during severe weather events or local disasters.[4] Furthermore, research from the Reuters Institute for the Study of Journalism at Oxford University found that people are increasingly using AI chatbots for news, particularly existing news consumers, further supporting the proposition that chatbots are replacing news even among those most likely to engage with news, and that this trend is being driven by

---

[4] OpenAI Global Affairs, *A Different Path on Local News*, The Prompt (Feb. 3, 2026), https://openaiglobalaffairs.substack.com/p/a-different-path-on-local-news.

younger people. If unaddressed by the courts, such a practice can create durable expectations among readers that they can freely access news using chatbots.[5]

In 2025, the United States Copyright Office published a report on generative AI training and concluded that copying protected works for AI training "threatens significant potential harm to the market for or value of copyrighted works." U.S. Copyright Off., Copyright and Artificial Intelligence, Part 3: Generative AI Training 73 (May 2025) (pre-publication version). It reached this conclusion based on the fact that copying for AI training purposes "can lead to lost sales" if the "model can produce substantially similar outputs that directly substitute for works in the training data." *Id.* Moreover, even if the "model's outputs are not substantially similar to any specific copyrighted work, they can dilute the market for works similar to those found in its training data, including by generating material stylistically similar to those works." *Id.*

In addition to copying the Publishers' works, LLMs harm the business of producing news because they do not send users to the websites that they use to generate answers to prompts and often fail to cite the original source. *See Kadrey v. Meta Platforms, Inc.*, 788 F.Supp.3d 1026, 1052 (N.D. Cal. 2025) (explaining that

[5] Amy Ross Arguedas, *Emerging Uses of AI Chatbots for News and What It Means for Journalism*, Reuters Inst. for the Study of Journalism (June 16, 2026), https://reutersinstitute.politics.ox.ac.uk/digital-news-report/2026/emerging-uses-ai-chatbots-news-and-what-it-means-journalism.

when users can prompt LLMs to generate copyrighted books for free, "[the] [h]arm from this form of competition is the harm of market dilution."). ChatGPT, like other generative AI products, is specifically designed to synthesize and present answers directly within an interface, which eliminates the need for users to visit and view the underlying material even when sources are cited. Data from a range of academic and industry sources show that traffic referrals to publishers have fallen precipitously with less than 1% of chatbot users clicking through to a site (if the option is even provided).

But the Publishers' economic viability depends on users visiting their websites because they earn revenue through subscription fees and advertising. When users can bypass paywalls and avoid paying for subscriptions and viewing ads, the Publishers are deprived of essential revenue and will eventually be unable to continue reporting the news.

The Defendants' large-scale infringement transcends the specific publishers in the case at hand because it affects the entire business of journalism. Tracking down sources, interviewing witnesses, conducting deep-dive investigations, and reporting out stories require a great deal of talent, training, creativity, relationship building, and diligence. When the Defendants provide users with news, they are not merely reciting widely known facts, but instead they are free riding on the labor and expression of reporters.

More than a matter of private pecuniary interest, the Publishers' work carries profound public importance. Journalism is considered the fourth estate for a reason. It is vital to a well-functioning democracy. *Times-Picayune Pub. Co. v. United States*, 345 U.S. 594, 602 (1953) ("The daily newspaper…[is] essential to the effective functioning of our political system[.]"). This industry is already struggling and may not survive for much longer if they are unable to protect their ability to generate a "fair return for their labors." *Harper & Row*, 471 U.S. at 546. Indeed, Defendant Microsoft itself recognized the existential threat that LLMs have on the production and dissemination of news and creative works generally: "Our AI content strategy has started a 'doom loop' that will hurt the performance of our models and the entire web at the same time: It is highly unusual that an end-product threatens the economic foundations of its essential suppliers, but that is the situation we have created for our LLM business with respect to its 'content supply chain.'" [Plaintiffs' Brief, ECF No. 1977-1, at 2].

## II. The Defendants' Conduct Undermines Law-Abiding LLM Rivals and Could Destroy an Emerging Market for Licensing Copyrighted Materials.

Because the Defendants' copying of the Publishers' work is not protected by fair use as explained in Section I, their conduct constitutes unfair competition against a second distinct class of rivals. In addition to harming the Publishers, their disregard for copyright protections injures law-abiding competitors in the market

for LLMs. By refusing to seek permission and pay royalties for using the Publishers' works, the Defendants' obtain a significant cost and competitive advantage over LLM rivals that comply with the nation's copyright laws.

The Defendants' large-scale, unauthorized reproduction of the Publishers' materials has a high likelihood of destroying a growing market for the licensing of copyrighted works. Unless this conduct is enjoined by the court, rival LLM developers that respect copyright protection and seek licenses will be harmed. These firms will face the choice of either accepting a higher cost structure relative to their scofflaw rivals or emulating their lawbreaking.

Today, the market for licensing copyrighted materials for training LLMs is rapidly growing. Such licensing markets are an important and legally recognized source of revenue for copyright owners, *Hachette Book Grp., Inc. v. Internet Archive*, 115 F.4th 163, 192 (2d Cir. 2024), provided that they are "traditional, reasonable, or likely to be developed markets[.]" *Texaco*, 60 F.3d at 930. Contrary to the Department of Justice's assertions in its statement of interest, LLM developers of all sizes are obtaining licenses to use copyrighted works to train their models and agreeing to assorted methods of compensation, including pay per use and pay per access. Courtney Radsch & Karina Montoya, *Same Gatekeepers, New Tollbooths: Mapping the AI Content Licensing Market*, Open Markets Inst. 5–7

(2026).[6] License deals are often negotiated bilaterally and through specialized intermediaries that connect copyright owners with LLM developers. *Id.* at 5–6.

If LLM developers are required by the courts to respect the exclusive rights of copyright owners, 17 U.S.C. § 106, these myriad licensing arrangements will continue to flourish and grow. For example, copyright owners could form collectives to offer blanket licenses to use the covered works, much like artists and record labels have for decades. *Broad. Music, Inc. v. Columbia Broad. Sys., Inc.*, 441 U.S. 1 (1979). The Supreme Court recognized the value of the blanket license: By aggregating the copyrighted songs of many individual artists, "[t]he blanket license has certain unique characteristics: It allows the licensee immediate use of covered compositions, without the delay of prior individual negotiations and great flexibility in the choice of musical material." *Id.* at 22. Indeed, some of these arrangements have already emerged to enable LLM developers to obtain permission to use thousands of copyrighted works. In May 2025, the Copyright Office reported: "Many commenters stated that individual and *collective licenses* for AI use were already in existence or under development." U.S. Copyright Off., *supra*, at 67 (emphasis added).

---

6 https://static1.squarespace.com/static/5efcb64b1cf16e4c487b2f61/t/69ea38642f5aa266473a4403/1776957540232/Same+Gatekeepers+New+Tollbooths+-+Mapping+the+AI+Content+Licensing+Market+Report+April+2026+WEB-1.pdf.

Instead of using these methods to acquire licenses for copyrighted materials, the Defendants brazenly flout the Copyright Act, which gives them an unfair competitive advantage over their copyright-compliant rivals. The Defendants illegitimately lower their cost structures by violating their legal obligation to obtain licenses for copyrighted works and thereby avoid paying royalties and other compensation to copyright owners. Accordingly, they gain an illegitimate cost advantage over rivals that honor statutory copyright protections, which in turn enables the Defendants to gain more customers because they can offer lower prices to consumers and businesses for their services.

If Defendants' conduct, which is not entitled to the fair-use defense, is left unchecked, their copyright infringement puts law-abiding rivals in an impossible situation. LLM developers who follow the law "designed to assure contributors to the store of knowledge a fair return for their labors," *Harper & Row*, 471 U.S. at 546, and license copyrighted works and pay royalties, put themselves at a permanent competitive disadvantage. Due to their higher cost structure and resulting higher prices, they may steadily lose market share to rivals who take copyrighted materials without a license. Under these circumstances, one possible and perverse result may be that developers that respect statutory copyright protections lose share and eventually exit the market. Sandeep Vaheesan,

*Lawbreaking as a Method of Competition*, 75 Am. U. L. Rev. 1535, 1591–92 (2026).

Alternatively, law-abiding firms may feel pressure to become lawbreakers and ignore copyright protections themselves. Due to the success of their infringing rivals, they may conclude that unlawful emulation is the key to sales growth. *Id.* at 1592. In a 1934 decision, the Supreme Court captured this dynamic and wrote that lawbreaking "cast[] upon one's competitors the burden of the loss of business unless they will descend to a practice which they are under a powerful moral compulsion not to adopt . . ." *Fed. Trade Comm'n v. R.F. Keppel & Bro.*, 291 U.S. 304, 313 (1934). In other words, the success of the lawbreakers unleashes a race to the bottom as competitors realize they must also break the law to succeed.

If LLMs can copy vast troves of copyrighted works despite the lack of fair-use protection, the market for licensing copyrighted materials could dry up entirely. Firms that license copyrighted works may steadily lose market share to lawbreaking competitors or opt to just copy the works without permission themselves. A once thriving market for licensing copyrighted works may ultimately disappear as law-abiding firms leave the market and those that remain use copyrighted material without authorization. Under this scenario, honest rivals would exit the market, and an important and growing source of earnings for publishers and authors would vanish.

The competitive dynamics unleashed by labor exploitation and practices like wage theft are illustrative. Employers that underpay or overwork their employees gain an unfair cost advantage over high-road competitors and can undercut them in product markets. For instance, a restaurant that commits wage theft can outcompete law-abiding rivals on price. In the Fair Labor Standards Act ("FLSA"), which established national wage-and-hour standards, Congress declared that such exploitation of workers constitutes an "unfair method of competition." 29 U.S.C. § 202(a). A firm's mistreatment of its workers hurts honest rivals. When it outlawed debt peonage under the Thirteenth Amendment in 1944, the Supreme Court recognized, like Congress did in the FLSA, that this exploitative system harm not only the directly bound workers but also "every other with whom his labor comes in competition." *Pollock v. Williams*, 322 U.S. 4, 18 (1944).

As with unchecked labor exploitation, unchecked copyright infringement threatens to unleash destructive competition. LLM developers that follow the requirement of the Copyright Act and obtain licenses for using protected works will be at a serious competitive disadvantage, relative to their unscrupulous rivals. By complying with the requirements of copyright law, they will be punishing themselves in the market. Absent legal intervention to stop the theft of copyrighted works, they may "descend to a practice which they are under a powerful moral compulsion not to adopt . . ." *Keppel*, 291 U.S. at 313. Just as good jobs with fair

wages may disappear when low-road employers have effective freedom to operate, the growing market for licensing copyrighted works to LLM developers may evaporate if the Defendants are not required to abide by copyright protections.

## CONCLUSION

For the reasons stated above, the Publishers' combined summary judgment motion should be granted and the Defendants' motion for summary judgement should be denied.

Dated: October 30, 2026

Respectfully submitted,

**MIGLIACCIO & RATHOD LLP**
*s/ Bryan G. Faubus*
Bryan G. Faubus
Nicholas A. Migliaccio
bfaubus@classlawdc.com
nmigliaccio@classlawdc.com
412 H St. NE, Suite 302
Washington, DC 20002
Telephone: (202) 470-3520
Facsimile: (202) 800-2730

*Attorneys for Proposed Amicus Curiae Open Markets Institute*

## CERTIFICATE OF COMPLIANCE WITH WORD-COUNT LIMITATION

Pursuant to Local Civil Rule 7.1(c), the above-named counsel certifies that this brief complies with the word-count limitation set by the Court's Order of August 7, 2026 (Dkt. No. 1663). As calculated by the word-count function of the word-processing program used to prepare this brief, the brief contains 4219 words, excluding the corporate disclosure statement, statement regarding authorship and funding, caption, table of contents, table of authorities, signature block, and this certificate.