# EXHIBIT A

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE:<br><br>OpenAI, INC.,<br><br>COPYRIGHT INFRINGEMENT LITIGATION<br><br>This Document Relates To:<br><br>1:23-cv-11195-SHS-OTW<br>1:24-cv-01515-SHS-OTW<br>1:24-cv-03285-SHS-OTW<br>1:24-cv-04872-SHS-OTW<br>1:25-cv-04315-SHS-OTW | 25-md-3143 (SHS) (OTW) |

**[PROPOSED] BRIEF OF FIRST AMENDMENT SCHOLARS AS *AMICI CURIAE* IN SUPPORT OF NEWS PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

Christina Lee
*Counsel of Record*
John Langford
Dave Schulz
MEDIA FREEDOM &
INFORMATION ACCESS CLINIC
YALE LAW SCHOOL
127 Wall Street
New Haven, CT 06511
(203) 436-5836
christina.a.lee@ylsclinics.edu

*Counsel for First Amendment Scholars as Amici Curiae*

# TABLE OF CONTENTS

TABLE OF CONTENTS ........ I

TABLE OF AUTHORITIES ........ II

INTEREST OF *AMICI* ........ 1

INTRODUCTION ........ 1

ARGUMENT ........ 3

I. The Press Performs a Critical Role in the Democratic Process. ........ 3

A. The Press Gathers New Information. ........ 4

B. The Press Organizes and Disseminates Information. ........ 5

C. The Press Checks Government and Corporate Actors ........ 7

II. Defendants' Unauthorized Use of the Press's Journalistic Work Undermines the Press's Ability to Perform These Democratic Functions ........ 13

A. The Press's Reporting and Publishing Work Requires Substantial Time, Resources, and Expertise. ........ 14

B. Defendants' AI Chatbots Imperil the Press's Economic Viability. ........ 16

C. AI Models Cannot Replace Journalists and Fulfill the Constitutional Functions Long Performed by the Press. ........ 17

CONCLUSION ........ 19

## TABLE OF AUTHORITIES

### Cases

*Associated Press v. United States*,
326 U.S. 1 (1945) ....................3

*Estes v. Texas*,
381 U.S. 532 (1965) ....................4

*Grosjean v. Am. Press Co.*,
297 U.S. 233 (1936) ....................4, 7

*Houchins v. KQED*,
438 U.S. 1 (1978) ....................4

*Mia. Herald Publ'g. Co. v. Tornillo*,
418 U.S. 241 (1974) ....................3, 5

*Mills v. Alabama*,
384 U.S. 214 (1966) ....................1

*Minneapolis Star & Trib. Co. v. Minn. Comm'r of Revenue*,
460 U.S. 575 (1983) ....................4

*N.Y. Times Co. v. United States*,
403 U.S. 713 (1971) ....................7

*Nixon v. Warner Commc'ns*,
435 U.S. 589 (1978) ....................4

*Richmond Newspapers, Inc. v. Virginia*,
448 U.S. 555 (1980) ....................4, 8

*Smith v. Daily Mail Publ'g. Co.*,
443 U.S. 97 (1979) ....................2

*Thornhill v. Alabama*,
310 U.S. 88 (1940) ....................1

### Other Authorities

2 Zachariah Chafee, *Government and Mass Communications* (1947) ....................5

A.G. Sulzberger, *A.I., Journalism and the Uncertain Future of the Public Square*,
N.Y. Times (June 1, 2026) ....................15, 16

Alexander Meiklejohn, *Free Speech and Its Relation to Self-Government* (1948) ....................6

Ben Wilhelm, *Removal of Inspectors General: Rules, Practice, and Considerations for Congress*, Cong. Rsch. Serv. (Jan. 27, 2025) ....................12

Benedict Anderson, *Imagined Communities: Reflections on the Origin and Spread of Nationalism* 33–35, 37–40 (1983) ....................6

Brant Houston et al., *The Investigative Reporter's Handbook: A Guide to Documents, Databases, and Techniques* (6th ed. 2021) ....................4

C. W. Parker & Matthew Dull, *Rooting Out Waste, Fraud, and Abuse: The Politics of House Committee Investigations, 1947 to 2004*, 66 Pol. Rsch. Q. 630 (2012) ....................12

Carl Bernstein & Bob Woodward, *FBI Finds Nixon Aides Sabotaged Democrats*, Wash. Post (Oct. 10, 1972) ....................9

Christopher St. Aubin, *Where Do Americans Turn First for Information about Breaking News?*, Pew Rsch. Ctr. (Mar. 24, 2026) ....................6

Clara Jeffrey, *Cost of the NYT Nola Story Broken Down*, Mother Jones (Aug. 28, 2009) ....................14

Cong. Rsch. Serv., RL30240, *Congressional Oversight Manual* (Mar. 27, 2026) ....................11

Dana A. Scherer & Clare Y. Cho, Cong. Rsch. Serv., R47018, *Stop the Presses? Newspapers in the Digital Age* (May 24, 2023) ....................16

David A. Anderson, *The Press and Democratic Dialogue*, 127 Harv. L. Rev. F. 331 (2014) ....................5

David E. Pozen, *The Leaky Leviathan: Why the Government Condemns and Condones Unlawful Disclosures of Information*, 127 Harv. L. Rev. 512 (2013) ....................11

David Shaw, *An Uneasy Alliance of News and Ads*, L.A. Times (Mar. 29, 1998) ....................4

Dominic Gates, *Flawed Analysis, Failed Oversight: How Boeing, FAA Certified the Suspect 737 MAX Flight Control System*, Seattle Times (Mar. 21, 2019) ....................10

Int'l Consortium of Journalists, *Giant Leak of Offshore Financial Records Exposes Global Array of Crime and Corruption* (Apr. 3, 2016) ....................13

James M. Snyder Jr. & David Strömberg, *Press Coverage and Political Accountability*, 118 J. Pol. Econ. 355 (2010) ........ 7

James Risen & Eric Lichtblau, *Bush Lets U.S. Spy on Callers Without Courts*, N.Y. Times (Dec. 16, 2005) ........ 10

James T. Hamilton, *Democracy's Detectives* (2016) ........ 14, 15

Jeffery J. Mondak, *Nothing to Read: Newspapers and Elections in Social Experiments* (1995) ........ 7

Jodi Kantor & Megan Twohey, *Harvey Weinstein Paid Off Sexual Harassment Accusers for Decades*, N.Y. Times (Oct. 5, 2017) ........ 10

Joseph M. Adelman, *Revolutionary Networks: The Business and Politics of Printing the News, 1763-1789* (2019) ........ 8

Joseph P. Darr et al., *Newspaper Closures Polarize Voting Behavior*, 68 J. Commc'n 1007 (2018) ........ 6, 16

Julie K. Brown, *Cops Worked to Put Serial Sex Abuser in Prison. Prosecutors Worked to Cut Him a Break*, Miami Herald (Feb. 13, 2026) ........ 9

Jürgen Habermas, *The Structural Transformation of the Public Sphere: An Inquiry into a Category of Bourgeois Society* (1989) ........ 5

Kate Conger, Ana Swanson & Cecilia Kang, *OpenAI's Systems Meddled With U.S. Government Sites After Going Rogue*, N.Y. Times (Sept. 25, 2026) ........ 19

Kevin Schaul, Szu Yu Chen & Nitasha Tiku, *Inside the Secret List of Websites that Make AI like ChatGPT Sound Smart*, Wash. Post (Apr. 19, 2023) ........ 2

Matt Carroll, *Why Investigative Journalism Needs Our Help*, Glob. Investigative Journalism Network (Jan. 19, 2017) ........ 15

Matthew S. Weber & Allie Kosterich, *Managing A 21st-Century Newsroom Workforce: A Case Study of NYC News Media*, Tow Ctr. for Digit. Journalism, Colum. L. School (2018) ........ 15

Miriam Seifter, *Further from the People? The Puzzle of State Administration*, 93 N.Y.U. L. Rev. 107 (2018) ........ 12, 13

Nellie Bly, *Behind Asylum Bars*,
N.Y. World (Oct. 17, 1887)....................9

Nestor M. Davidson, *Localist Administrative Law*,
126 Yale L.J. 564 (2017) ....................13

*News Platform Fact Sheet*,
Pew Rsch. Ctr. (Oct. 19, 2026)....................5

Nic Newman, *Journalism, Media, and Technology Trends and Predictions 2026*,
Reuters Inst. (Jan. 12, 2026) ....................17

Patrick Radden Keefe, *The Family that Built an Empire of Pain*,
New Yorker (Oct. 23, 2017) ....................10

Penelope Muse Abernathy, *The Expanding News Desert*,
Univ. N.C.: Ctr. for Innovation & Sustainability in Loc. Media (2018)....................16

Pengjie Gao, Cheng Lee & Dermot Murphy, *Financing Dies in Darkness? The Impact of Newspaper Closures on Public Finance* (Hutchins Ctr., Working Paper No. 44, 2018)....................13

Robert C. Post, *Data Privacy and Dignitary Privacy: Google Spain, the Right to be Forgotten, and the Construction of the Public Sphere*, 67 Duke L.J. 981 (2018)....................5

Ron Fonger, *Lead Levels in Flint Water Spiked after Switch to River, State Records Show*,
Flint J. (Sept. 9, 2015) ....................9

Sergei Guriev & Daniel Treisman, *Informational Autocrats*,
33 J. Econ. Perspectives 100 (2019)....................11

Seymour M. Hersh, *Lieutenant Accused of Murdering 109 Civilians*,
St. Louis Post-Dispatch (Nov. 13, 1969) ....................9

Sharyl Attkisson, *Gunrunning Scandal Uncovered at the ATF*, CBS News (Feb. 24, 2011), https://www.cbsnews.com/news/gunrunning-scandal-uncovered-at-the-atf/....................10

Sonja D. West, *The Majoritarian Press Clause*, 2020 U. Chi. Legal F. 311 (2020) ....................8

Sonja R. West, *Press Exceptionalism*,
127 Harv. L. Rev. 2434 (2014) ....................3

*Talk to the Times: Assistant Managing Editor Gerald Marzorati*,
N.Y. Times (Aug. 24, 2009)....................14

Tom Ginsburg & Aziz Z. Huq, *How to Save a Constitutional Democracy* (2018) ....................7

U.S. Gov't Accountability Office, *Securities and Exchange Commission: Recent Workforce Reductions and Other Personnel Management Changes* (GAO-26-107813) (Mar. 27, 2026) ..... 13

Upton Sinclair, *The Jungle* (1906) ..... 9

V-Dem Institute, *Democracy Report 2025* (2025) ..... 11

Victor Pickard, *Restructuring Democratic Infrastructures: A Policy Approach to the Journalism Crisis*, 8 Digit. Journalism 704 (2020) ..... 3

Vincent Blasi, *The Checking Value in First Amendment Theory*, 1977 Am. Bar Found. Rsch. J. 521 ..... 7

*Why Language Models Hallucinate*, OpenAI (Sept. 5, 2026) ..... 17

Zach Metzger, *The State of Local News 2025*, Nw.-Medill Loc. News Initiative (2025) ..... 3

**Treatises**

Soc'y of Prof'l Journalists, Code of Ethics (Oct. 4, 2026) ..... 4

**Constitutional Provisions**

U.S. Const. amend. I ..... 8

U.S. Const. amend. X ..... 11

U.S. Const. art. I ..... 11

U.S. Const. art. II ..... 11

U.S. Const. art. III ..... 11

## INTEREST OF *AMICI*[1]

*Amici* are First Amendment scholars and practitioners who have taught courses on constitutional law and the First Amendment, published books and articles on the First Amendment and press-related topics, and dedicated substantial time to the study of First Amendment protections. *See* Appendix. Drawing on their experience, *amici* submit this brief to assist the Court in deciding the issues presented by the cross motions for summary judgment in this multi-district litigation and to describe the importance of a vibrant and independent press to the democratic system and our constitutional order.

## INTRODUCTION

Journalists perform a critical role in our democratic system. They uncover new facts, order and organize information, and disseminate that information to the voting public. They report on public officials and expose government wrongdoing, serving as "a powerful antidote to any abuses of power by governmental officials" and "a constitutionally chosen means for keeping officials elected by the people responsible to all the people whom they were selected to serve." *Mills v. Alabama*, 384 U.S. 214, 219 (1966). The press likewise checks private power, uncovering and publishing facts that give rise to "discussion concerning the conditions in industry" that is "indispensable to the effective and intelligent use of the processes of popular government to shape the destiny of modern industrial society." *Thornhill v. Alabama*, 310 U.S. 88, 103 (1940). A healthy democracy requires an independent press.

---

[1] No counsel for a party authored this brief in whole or in part. No party or party's counsel contributed money that was intended to fund preparing or submitting the brief. No person other than amici curiae or their counsel contributed money that was intended to fund preparing or submitting the brief.

The most vital journalism requires extensive outlays of labor, capital, and time. Journalism is most essential when it uncovers and publishes information powerful actors would prefer to be kept secret or when it highlights developments that have escaped public attention. To surface that kind of information, journalists spend years developing sources, obtaining and poring over records, speaking to experts, and working to confirm the accuracy of what they report. Reputable news organizations retain investigators, editors, and lawyers, and they expend tremendous sums to ensure the accuracy of what their journalists learn. Without substantial, up-front investments from journalists and news organizations, the public would be left "to rely solely upon the sufferance of government" or powerful private actors to provide it with information, a state inimical to the functioning of a democracy. *Smith v. Daily Mail Publ'g. Co.*, 443 U.S. 97, 104 (1979). To perform its constitutional role, an independent press requires an economic model that sustains and fuels its independent reporting.

Defendants built their generative artificial intelligence ("AI") products on the constitutionally salient labor of the press. These chatbots were constructed, in part, by copying millions of Plaintiffs' news articles and using their content to train large language models—part of what Microsoft's own Director of Applied Science has referred to as perhaps "the largest theft of labor in human history." ECF No. 2036 ("SF") ¶ 1652.[2] Defendants then turned the press's own work product against it, building AI models that generate news-like content and funnel readers away from the News Plaintiffs' own sites. ECF No. 1977-1 ("News Br.") at 2 (describing an 83–93% drop in click through rates for *The New York Times's* and the *Daily News's* news domains

[2] A study of the websites captured by Google's C4 dataset which was used to train many large language models found that half of the top ten websites scraped were news organizations' websites, with nytimes.com at number four. Kevin Schaul, Szu Yu Chen & Nitasha Tiku, *Inside the Secret List of Websites that Make AI like ChatGPT Sound Smart*, Wash. Post (Apr. 19, 2023), https://www.washingtonpost.com/technology/interactive/2023/ai-chatbot-learning/.

from Microsoft Copilot "answer engine" as compared to traditional Bing searches).[3] Permitted to continue, Defendants' exploitation of Plaintiffs' work could sound the death knell for a press industry decimated by a confluence of political, technological, and economic forces. *See* Zach Metzger, *The State of Local News 2025*, Nw.-Medill Loc. News Initiative (2025), https://localnewsinitiative.northwestern.edu/projects/state-of-local-news/2025/; Victor Pickard, *Restructuring Democratic Infrastructures: A Policy Approach to the Journalism Crisis*, 8 Digit. Journalism 704, 705 (2020).

And when the free press is gone, who will uncover new information and hold the powerful to account? The AI companies whose business depends on favorable regulation by public officials? The AI tools built to replicate existing information? We write to emphasize the democratic and constitutional costs of allowing Defendants to continue gutting the economic model upon which the free press depends.

## ARGUMENT

### I. The Press Performs a Critical Role in the Democratic Process

Our democratic system of government requires a vibrant and independent press. *Mia. Herald Publ'g. Co. v. Tornillo*, 418 U.S. 241, 252 (1974) ("[A] free press is a condition of a free society.") (quoting *Associated Press v. United States*, 326 U.S. 1, 20 (1945)). The press performs at least three functions critical to our governmental system: it gathers new facts; it organizes these facts and distributes them to the voting public; and it checks government and corporate power.[4]

---

[3] All ECF numbers herein refer to docket entries in *In re: OpenAI, Inc., Copyright Infringement Litig.*, No. 25-md-3143-SHS-OTW (S.D.N.Y.).

[4] *See* Sonja R. West, *Press Exceptionalism*, 127 Harv. L. Rev. 2434, 2443–44 (2014) (describing these three constitutional functions of the press).

### A. The Press Gathers New Information.

The press uncovers new information. Journalists make phone calls, send emails, attend public meetings, and track down new facts, figures, and trends. They utilize data science techniques to obtain and analyze complex datasets. They comb through regulatory filings and listen to earnings calls. They cultivate confidential sources to gather insider information that is not otherwise available to the public. *See generally* Brant Houston et al., *The Investigative Reporter's Handbook: A Guide to Documents, Databases, and Techniques* (6th ed. 2021).

The press engages in this fact-finding as a proxy for the public. It is "the information-gathering agent of the public." *Nixon v. Warner Commc'ns*, 435 U.S. 589, 609 (1978); *see also, e.g.*, *Estes v. Texas*, 381 U.S. 532, 539 (1965) ("The free press has been a mighty catalyst in awakening public interest in governmental affairs" and "generally informing the citizenry of public events and occurrences."). The press acts as "the eyes and ears of the public," *Houchins v. KQED*, 438 U.S. 1, 8 (1978) (internal quotations omitted), and as the public's "chief[]" source of information about matters of public concern. *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 573 (1980).[5] An informed public depends on "an untrammeled press" serving as a "vital source of public information." *Minneapolis Star & Trib. Co. v. Minn. Comm'r of Revenue*, 460 U.S. 575, 585 (1983) (quoting *Grosjean v. Am. Press Co.*, 297 U.S. 233, 250 (1936)).

[5] Journalists themselves often understand their role in quasi-constitutional terms, analogizing the press's division between business and editorial functions to the constitutional separation between church and state. Soc'y of Prof'l Journalists, Code of Ethics (Oct. 4, 2026), https://www.spj.org/spj-code-of-ethics/ (describing the duty to insulate editorial functions from advertising demands); David Shaw, *An Uneasy Alliance of News and Ads*, L.A. Times (Mar. 29, 1998), https://www.latimes.com/archives/la-xpm-1998-mar-29-mn-33969-story.html (describing the separation of the news and business departments as "the Church/State Wall").

### B. The Press Organizes and Disseminates Information.

The press—just as critically—organizes the information it gathers and disseminates it for public consumption. David A. Anderson, *The Press and Democratic Dialogue*, 127 Harv. L. Rev. F. 331, 333–34 (2014) (arguing that the press operates as the "principal organizer" of "democratic dialogue"); *Mia. Herald Publ'g. Co.*, 418 U.S. at 258 n.24 ("A journal does not merely print observed facts . . . [a]s soon as the facts are set in their context, you have interpretation and you have selection.") (quoting 2 Zachariah Chafee, *Government and Mass Communications* 633 (1947)).

In doing so, the press both creates and sustains space for civic discourse. As Professor Robert Post has explained, the creation of the public sphere is a necessary precondition for democratic self-governance, for "[i]t is through their identification as a 'public' that the people of a country exercise the prerogatives of democracy." Robert C. Post, *Data Privacy and Dignitary Privacy: Google Spain, the Right to be Forgotten, and the Construction of the Public Sphere*, 67 Duke L.J. 981, 1018 (2018); *see generally* Jürgen Habermas, *The Structural Transformation of the Public Sphere: An Inquiry into a Category of Bourgeois Society* (1989). The press has long enabled this process by publishing a set of texts that provide communities throughout the nation with common points of reference. Post, *supra*, at 1020.

The press performs an outsized role in this process, ordering democratic discussion and driving the topics of public debate in today's fractured and saturated media environment. Journalists sift through a deluge of content and make editorial judgments as to which facts and issues warrant the public's attention. *See, e.g.*, *News Platform Fact Sheet*, Pew Rsch. Ctr. (Oct. 19, 2026), https://www.pewresearch.org/journalism/fact-sheet/news-platform-fact-sheet/ (showing that a majority of adults in the United States still regularly obtain news from news websites and apps); Christopher St. Aubin, *Where Do Americans Turn First for Information about Breaking*

*News?*, Pew Rsch. Ctr. (Mar. 24, 2026), https://www.pewresearch.org/short-reads/2026/03/24/where-do-americans-turn-first-for-information-about-breaking-news/ (showing that a plurality of adults in the United States first turn to their preferred news organizations, rather than to social media sites, for information about breaking news). In our content-rich world, the public is reliant upon the press to make editorial judgments about which issues and facts to present to the public.

The press also performs community-building functions, especially at the local level. It operates as a tool of social cohesion, publishing topics of interest within a town or city or other geographic community, including school board meetings, high school sports games, zoning board decisions, retirements, births, marriages, and deaths. Local newspapers create what political scientist Benedict Anderson has referred to as an "imagined community," or a socially constructed group identity. Benedict Anderson, *Imagined Communities: Reflections on the Origin and Spread of Nationalism* 33–35, 37–40 (1983) (describing the role of newspapers in establishing imagined communities). These community-building functions, in turn, have important democratic consequences. Political scientists have linked growing political polarization, for example, to the decline of local community activity and spaces for shared connections, including the decline of the local press. *See* Joseph P. Darr et al., *Newspaper Closures Polarize Voting Behavior*, 68 J. Commc'n 1007, 1009 (2018) (showing that "the displacement of local newspaper audiences leads to [voting] polarization").

Through the work of organizing and publishing information, the press also facilitates democratic self-governance by informing the electorate. Democratic self-governance requires a knowledgeable public. Alexander Meiklejohn, *Free Speech and Its Relation to Self-Government* 24–27 (1948). The press performs a crucial role in this process, providing the electorate with

truthful facts upon which to base their electoral choices. *Grosjean v. Am. Press Co., Inc.*, 297 U.S. 233, 250 (1936) ("A free press stands as one of the great interpreters between the government and the people."); Tom Ginsburg & Aziz Z. Huq, *How to Save a Constitutional Democracy* 230 (2018) (arguing that government attacks on the media undermine "the possibility of shared epistemic premises for democracy"). The public cannot engage in the public deliberation required to sustain a democracy without an organized and reliable source of information. *N.Y. Times Co. v. United States*, 403 U.S. 713, 728 (1971) (Stewart, J., concurring) ("For without an informed and free press there cannot be an enlightened people.").

Researchers have demonstrated the link between the press and the quality of voters' knowledge about government. When a local newspaper closes, voters are less informed about their local congressional race compared to residents in neighboring areas with press coverage. Jeffery J. Mondak, *Nothing to Read: Newspapers and Elections in Social Experiments* 99–100, 159 (1995). Conversely, when local newspaper coverage of congressional representatives is high, voters are better informed about the activities of their representative and more likely to participate in elections. James M. Snyder Jr. & David Strömberg, *Press Coverage and Political Accountability*, 118 J. Pol. Econ. 355, 402 (2010). The press's newsgathering, curating, and disseminating efforts are crucial to the democratic order. They inform the public, give rise to the public sphere, facilitate democratic discourse, and permit the voting public to make informed electoral decisions.

### C. The Press Checks Government and Corporate Actors.

The press also operates as a check on the powerful. Journalists uncover wrongdoing and expose information that public and private actors seek to keep hidden. This checking function, too, forms a critical component of our democratic and constitutional order. *See* Vincent Blasi, *The Checking Value in First Amendment Theory*, 1977 Am. Bar Found. Rsch. J. 521, 527 (describing

"the value that free speech, a free press, and free assembly can serve in checking the abuse of power by public officials").

The drafters of the Constitution crafted the First Amendment to preserve the public's right to criticize those in power. The First Amendment does so in two ways: it extends a set of individual protections to ensure free expression, and it operates as a structural provision that allows the public to hold their leaders to account. U.S. Const. amend. I; *see also Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 587 (1980) (Brennan, J., concurring) ("[T]he First Amendment embodies more than a commitment to free expression and communicative interchange for their own sakes; it has a *structural* role to play in securing and fostering our republican system of self-government."); Sonja D. West, *The Majoritarian Press Clause*, 2020 U. Chi. Legal F. 311, 314 (2020) (describing the structural function of the Press Clause of the First Amendment).

The founding generation understood the press to perform an essential function in this new constitutional order. Printers helped to spread patriot ideas and galvanize support for the cause of independence, playing "a crucial role in the formation and shaping of political rhetoric during the American Revolution." Joseph M. Adelman, *Revolutionary Networks: The Business and Politics of Printing the News, 1763-1789*, at 3 (2019). These tradesmen exerted editorial influence over the ideas presented to the public, operating the physical machinery of the printing presses and presiding over the bureaucratic infrastructure required to disseminate these ideas. *Id.* at 13 ("[P]rinters, through their control of the mechanisms of print, shaped political texts and debate, helped to produce coordinated resistance to imperial politics, and began to develop a national communications infrastructure"). The exercise of the press's checking functions traces back to those colonial-era endeavors to resist British governmental tyranny.

A throughline can be drawn between those early colonial printers and the contemporary journalists working now to hold those in power accountable. Muckraking journalists from the Progressive Era exposed unconscionable working conditions and unsanitary food-processing practices. Upton Sinclair, *The Jungle* (1906) (documenting unsanitary conditions in the meat packing industry); Nellie Bly, *Behind Asylum Bars*, N.Y. World (Oct. 17, 1887) (documenting abuses occurring inside a New York City psychiatric asylum). The investigative reporting of the 1960s and 70s helped end a war and topple a president. *See* Carl Bernstein & Bob Woodward, *FBI Finds Nixon Aides Sabotaged Democrats*, Wash. Post (Oct. 10, 1972), https://www.washingtonpost.com/politics/fbi-finds-nixon-aides-sabotaged-democrats/2012/06/06/gJQAoHIJJV_story.html (linking the Watergate cover up to a campaign of spying and sabotage by President Nixon's White House); Seymour M. Hersh, *Lieutenant Accused of Murdering 109 Civilians*, St. Louis Post-Dispatch (Nov. 13, 1969), https://www.newspapers.com/article/st-louis-post-dispatch-first-sy-hersh-s/18082558/?locale=en-US (documenting the My Lai massacre in Vietnam).

Today, the press checks those in power by chronicling the activities of powerful decision makers and disseminating that information to the public. Journalists uncover misconduct and abuse by public officials at all levels of government. *See, e.g.*, Ron Fonger, *Lead Levels in Flint Water Spiked after Switch to River, State Records Show*, Flint J. (Sept. 9, 2015), https://www.mlive.com/news/flint/2015/09/flint_water_lead_levels_spiked.html (documenting the widespread contamination of drinking water in Flint, Michigan and its effect on children in the city); Julie K. Brown, *Cops Worked to Put Serial Sex Abuser in Prison. Prosecutors Worked to Cut Him a Break*, Miami Herald (Feb. 13, 2026), https://www.miamiherald.com/news/local/crime/article214210674.html (exposing the lenient

treatment federal prosecutors granted convicted sex offender Jeffrey Epstein); James Risen & Eric Lichtblau, *Bush Lets U.S. Spy on Callers Without Courts*, N.Y. Times (Dec. 16, 2005), https://www.nytimes.com/2005/12/16/politics/bush-lets-us-spy-on-callers-without-courts.html (revealing the National Security Agency's domestic warrantless wiretapping program); Sharyl Attkisson, *Gunrunning Scandal Uncovered at the ATF*, CBS News (Feb. 24, 2011), https://www.cbsnews.com/news/gunrunning-scandal-uncovered-at-the-atf/ (exposing the details of a secret ATF program that permitted suspected gun traffickers to purchase thousands of weapons).

Journalists also constrain the power of the private sector, shedding light on corporate wrongdoing and protecting consumer welfare. Investigative journalists Jodi Kantor and Megan Twohey uncovered the rampant sexual abuse Harvey Weinstein inflicted on women in Hollywood. Jodi Kantor & Megan Twohey, *Harvey Weinstein Paid Off Sexual Harassment Accusers for Decades*, N.Y. Times (Oct. 5, 2017), https://www.nytimes.com/2017/10/05/us/harvey-weinstein-harassment-allegations.html. Reporter Patrick Radden Keefe exposed the Sackler family's central role in the opioid epidemic. Patrick Radden Keefe, *The Family that Built an Empire of Pain*, New Yorker (Oct. 23, 2017), https://www.newyorker.com/magazine/2017/10/30/the-family-that-built-an-empire-of-pain. Journalists at *The Seattle Time*s uncovered design flaws in the Boeing 737 MAX that resulted in deadly plane crashes. Dominic Gates, *Flawed Analysis, Failed Oversight: How Boeing, FAA Certified the Suspect 737 MAX Flight Control System*, Seattle Times (Mar. 21, 2019), http://seattletimes.com/business/boeing-aerospace/failed-certification-faa-missed-safety-issues-in-the-737-max-system-implicated-in-the-lion-air-crash/. An independent press helps

police the corridors of power and inform the public about matters of both national and local interest.[6]

The press performs this checking function by informing members of the public, who then vote, protest, petition, and engage in other forms of oversight. But the press also performs a secondary function within our constitutional structure: it facilitates intergovernmental checks and balances. The constitutional drafters crafted a system of horizonal checks and balances between the coequal branches of government, U.S. Const. arts. I–III, along with vertical checks via a federalist structure that divides power between a centralized federal government and multiple state sovereigns. U.S. Const. amend. X.

Yet for these intergovernmental checks to function, government bodies require information to hold each other to account. The coequal branches of government rely on the press to uncover such information so that they may perform their intergovernmental oversight functions. Cong. Rsch. Serv., RL30240, *Congressional Oversight Manual* 111 (Mar. 27, 2026) ("Media organizations are a frequent source of information that might be useful to Members and committees conducting oversight."); David E. Pozen, *The Leaky Leviathan: Why the Government Condemns and Condones Unlawful Disclosures of Information*, 127 Harv. L. Rev. 512, 577 (2013) (classified information leaks to the press "facilitate richer information flows throughout the bureaucracy and

---

[6] The checking power of the press is not unique to the United States. The sheer force of a free and independent press is evident in the lengths to which authoritarians will go to eliminate independent journalism. A study of twenty-seven formerly democratic countries in the process of transitioning to autocracies, for example, found that one of the most common actions taken by political leaders was to suppress independent news media. V-Dem Institute, *Democracy Report 2025* at 6 (2025), https://www.v-dem.net/documents/60/V-dem-dr__2025_lowres.pdf ("The favorite weapon of autocratizers is media censorship."). Similarly, two political scientists studying new forms of authoritarianism around the globe concluded that "the key to such regimes" is "the manipulation of information." Sergei Guriev & Daniel Treisman, *Informational Autocrats*, 33 J. Econ. Perspectives 100, 101 (2019). Autocrats fear the press precisely because free and independent journalism is so effective at constraining government power.

constitute an important means by which the executive branch speaks to itself"). State and federal actors do as well: journalists ease the flow of information between and among federal and sub-federal levels of government. Miriam Seifter, *Further from the People? The Puzzle of State Administration*, 93 N.Y.U. L. Rev. 107, 141–46 (2018) (describing the links between local journalism and regulatory oversight of state and local agencies). Without the press working externally to uncover and disseminate information about government, these interlocking systems of checks begin to erode. In these ways, too, a free and vibrant press is vital to our constitutional order.

The press's watchdog function has grown more critical in recent years, as other checks on public and private power have weakened. In the federal context, Congress often declines to exercise its oversight functions, especially under conditions of consolidated party control. David C. W. Parker & Matthew Dull, *Rooting Out Waste, Fraud, and Abuse: The Politics of House Committee Investigations, 1947 to 2004*, 66 Pol. Rsch. Q. 630, 630–31 (2012). Intra-branch accountability mechanisms, such as agency inspectors general, have suffered deep personnel cuts and budgetary restrictions as well. Ben Wilhelm, *Removal of Inspectors General: Rules, Practice, and Considerations for Congress*, Cong. Rsch. Serv. (Jan. 27, 2025), https://www.everycrsreport.com/files/2025-01-27_IF11546_0d74c48d539a1ebcfe3d5ef7a348f948f2b66ce7.pdf. As these intergovernmental mechanisms of public oversight and accountability decline, the constitutional functions of the press bear increased weight.

These flaws in intergovernmental accountability mechanisms are even more pronounced at state and local levels. Local governments often collapse executive and legislative functions into one, eliminating any possibility of interbranch checks and balances. Nestor M. Davidson, *Localist*

*Administrative Law*, 126 Yale L.J. 564, 571–72 (2017). At the same time, there are fewer alternative civil society actors available to cast light on municipal activities. Seifter, *supra*, at 138–40. For these reasons, local press plays an especially crucial role when checking local government power. Journalists at the local level shine a light on police abuse, environmental destruction, municipal corruption, and other topics of public importance. Researchers have demonstrated this link between the local press and the public interest empirically: when local newspapers close, for example, the number of government employees and the cost of municipal borrowing rises. Pengjie Gao, Cheng Lee & Dermot Murphy, *Financing Dies in Darkness? The Impact of Newspaper Closures on Public Finance* 4–5 (Hutchins Ctr., Working Paper No. 44, 2018).[7]

In sum, the press's checking functions are crucial to the process of democratic self-government and the proper functioning of our constitutional system. An independent press constrains government power and facilitates public oversight of private actors.

## II. Defendants' Unauthorized Use of the Press's Journalistic Work Undermines the Press's Ability to Perform These Democratic Functions

The press performs a vital role in the process of democratic self-governance. Yet to fulfil this role, news organizations require an economic model that supports their reporting activities and preserves their journalistic independence. Defendants' AI chatbots reproduce news products, reduce demand for the press's work, and dilute the news market with low-quality news material.

[7] Government oversight of the private sector has also weakened. Budgetary and personnel cuts have undermined federal regulatory agencies' capacity to monitor corporate activity. *See, e.g.*, U.S. Gov't Accountability Office, *Securities and Exchange Commission: Recent Workforce Reductions and Other Personnel Management Changes* (GAO-26-107813) (Mar. 27, 2026), https://files.gao.gov/reports/GAO-26-107813/index.html (describing workforce reductions in the SEC). As government enforcement declines, the press plays an increasingly important role in holding private power to account. *See, e.g.*, Int'l Consortium of Journalists, *Giant Leak of Offshore Financial Records Exposes Global Array of Crime and Corruption* (Apr. 3, 2016), https://www.icij.org/investigations/panama-papers/20160403-panama-papers-global-overview/ (documenting widespread tax evasion by political and corporate leaders around the globe).

News Br. at 1–3, 60–71. These economic harms threaten the press's capacity to perform its democratic functions.

### A. The Press's Reporting and Publishing Work Requires Substantial Time, Resources, and Expertise.

Reporting—especially investigative reporting—requires substantial time and resources. Investigative reporters purchase and analyze large datasets, file and negotiate complex public records requests, and travel long distances to track down sources, witnesses, and documents. Editors review and rework the story in collaboration with journalists. Fact checkers verify the accuracy of the reporting. Photographers capture images of the subject of the article. Lawyers review the story for defamation liability and other legal risks. All of this costs time and money. James T. Hamilton, *Democracy's Detectives* 112–29 (2016).

Complex stories often take years to write. *ProPublica's* and *The New York Times*'s Pulitzer Prize-winning story about the decision to euthanize patients at a New Orleans hospital during Hurricane Katrina took several years to report and publish, and it cost these news outlets an estimated $400,000. *Talk to the Times: Assistant Managing Editor Gerald Marzorati*, N.Y. Times (Aug. 24, 2009), https://www.nytimes.com/2009/08/24/business/media/24askthetimes.html.[8] A five-part investigative series by the *Washington Post* on the use of deadly force by D.C. police officers cost an estimated half a million dollars to report, verify, and publish. Hamilton, *supra*, at 126. The *Boston Globe* devoted substantial resources to uncovering the widespread sexual abuse of children by Catholic priests. As one of those *Globe* reporters explained, "An investigation is gritty, slow, laborious. We researched for months before we published that first story. Four people,

[8] For a breakdown of costs, see Clara Jeffrey, *Cost of the NYT Nola Story Broken Down*, Mother Jones (Aug. 28, 2009), https://www.motherjones.com/criminal-justice/2009/08/cost-nyt-magazine-nola-story-broken-down/.

months, that's a lot of shoe leather." Matt Carroll, *Why Investigative Journalism Needs Our Help*, Glob. Investigative Journalism Network (Jan. 19, 2017), https://gijn.org/?p=26526.

The broader fixed costs for a media organization are also significant. Press organizations employ teams of journalists, editors, fact checkers, videographers, data scientists, photographers, lawyers, marketers, business personnel, and more. Matthew S. Weber & Allie Kosterich, *Managing A 21st-Century Newsroom Workforce: A Case Study of NYC News Media*, Tow Ctr. for Digit. Journalism, Colum. L. School (2018), https://www.cjr.org/tow_center_reports/managing-a-newsroom-workforce-nyc-case-study.php. In the past year, the *New York Times* published roughly 500,000 articles, photographs, videos, and podcasts. A.G. Sulzberger, *A.I., Journalism and the Uncertain Future of the Public Square*, N.Y. Times (June 1, 2026), https://www.nytco.com/press/a-i-journalism-and-the-uncertain-future-of-the-public-square/. *Times* journalists reported from all 50 U.S. states and 155 different countries. *Id.* These reporting efforts cost the company more than $2 billion. *Id.*

Investigative journalism also requires expertise. Sifting through tips, analyzing datasets, conducting interviews, cultivating sources, navigating public records laws and systems—these are skills that require time and practice. Hamilton, *supra*, at 258–60. Cultivating journalistic talent is expensive. Historically, local and regional news outlets have performed much of this work. But as local press outlets disappear, these pipelines of journalistic talent are at risk of drying up. *Id.* at 138–39 (arguing that "the shift in talent away from a local newspaper base . . . rais[es] the question of where the next generation of innovative investigative reporters will get the time and resources to develop their skills"). The deterioration of the press's longstanding economic model, especially at local levels, imperils the press's ability to perform its democratic and constitutional functions.

### B. Defendants' AI Chatbots Imperil the Press's Economic Viability.

The press is under significant financial strain. As the press's democratic functions grow more important, its economic foundations are weakening. The internet has siphoned advertising revenue away from newspapers. Dana A. Scherer & Clare Y. Cho, Cong. Rsch. Serv., R47018, *Stop the Presses? Newspapers in the Digital Age* 6 (May 24, 2023). Technological developments have allowed websites to disaggregate costly news reporting from more profitable sectors like sports and entertainment. Darr et al., *supra*, at 5. And corporate investors have funneled profits away from journalism and toward corporate payouts. Penelope Muse Abernathy, *The Expanding News Desert*, at 69–72, Univ. N.C.: Ctr. for Innovation & Sustainability in Loc. Media (2018), https://www.usnewsdeserts.com/reports/expanding-news-desert/download-a-pdf-of-the-report/.

The economic headwinds facing news organizations are complex. Yet Defendants' chatbot products do not merely exacerbate this peril and accelerate the financial decline of the press; they represent a new type of threat. News Br. at 70–71.[9] Defendants copied millions of Plaintiffs' news articles to build and train their large language models. News Br. at 5–7. AI chatbots now produce simulacrums of Plaintiffs' news content in response to user queries, diminishing demand for the press's news offerings and reducing subscribers' incentives to pay for media products. News Br. at 17, 67–71. The Head of ChatGPT at OpenAI has openly acknowledged that publishers face "an existential threat" from these AI products. *Id.* at 1.

---

[9] *See also* Sulzberger, *supra* ("Until A.I. arrived, there had been a real—if skewed—value exchange between tech platforms and digital content creators like news organizations . . . Tech companies—namely the search and social platforms—would take an increasing share of the ad dollars that used to go to news organizations, but deliver a much larger audience in return . . . Competing A.I. models [today] send referral traffic at a rate that is 96 percent lower than Google search, according to one study.").

It is not only Plaintiff news organizations that are affected. One survey found that news publishers expected traffic to their websites to fall by almost half in the next three years, largely because of low click-through rates from AI-generated summaries. Nic Newman, *Journalism, Media, and Technology Trends and Predictions 2026*, Reuters Inst. (Jan. 12, 2026), https://reutersinstitute.politics.ox.ac.uk/journalism-media-and-technology-trends-and-predictions-2026.

The economic harms inflicted by Defendants' products threaten the press's ability to engage in journalism, especially investigative journalism, with dire effects for the democratic system.

### C. AI Models Cannot Replace Journalists and Fulfill the Constitutional Functions Long Performed by the Press.

Defendants' generative AI models act as a market substitute for the press's news products. SF ¶ 1473 (quoting OpenAI's Head of ChatGPT as stating that the company's AI products are "largely substitutive, period"). But while AI models produce high volumes of "pink slime"—unreliable and low-quality news content that is often either plagiarized or remixed from legitimate sources—that competes directly with news organizations' publications, News Br. at 69–70, AI products cannot actually replicate the press's constitutional and democratic functions.

The press actively gathers *new* information, including through methods Defendants' products cannot yet replicate (for example, selecting and developing human sources and pressing government officials for answers). The press painstakingly confirms the accuracy and reliability of the information it gathers. AI chatbots simply piggyback off others' publications, presenting it to users without the same ability to independently confirm the accuracy of what it publishes. *Why Language Models Hallucinate*, OpenAI (Sept. 5, 2026), https://openai.com/index/why-language-models-hallucinate/. Moreover, the information that AI chatbots do uncover is often misleading or

incomplete. AI chabots frequently "flub[] local elections, including information about how to register, where to vote, the positions of candidates, and how disabled people could vote." Steven Waldman, Testimony Before the Senate Committee on Commerce, Science, and Transportation (Feb. 10, 2026), https://www.rebuildlocalnews.org/rebuild-local-news-calls-on-congress-to-act-as-ai-big-tech-squeeze-local-newsrooms/.

AI chatbots are equally incapable of performing the checking functions of the press. To fulfill this role, the press acts as an adversary to those in power. Journalists must interrogate official accounts, asking uncomfortable questions and persisting in their reporting in the face of government and corporate pressure. *See, e.g.*, Journalist Bob Woodward on Deep Throat, Fresh Air, NPR (July 7, 2005), https://www.npr.org/2005/07/07/4732602/journalist-bob-woodward-on-deep-throat ("The uncovering of [Watergate] took place in an environment where we were denounced and threatened."). When the press uncovers uncomfortable truths, it reports the facts, regardless of whether readers want to learn the truth. By Defendant companies' own admissions, AI chatbots are trained to do the opposite—to remain perpetually agreeable. *Sycophancy in GPT-4o: What Happened and What We're Doing About It*, OpenAI (Apr. 29, 2025), https://openai.com/index/sycophancy-in-gpt-4o/ (describing the problem of overly "sycophantic" chatbots). *See also* Myra Cheng, et al., *Sycophantic AI Decreases Prosocial Intentions and Promotes Dependence*, Science (Mar. 26, 2026), https://www.science.org/doi/10.1126/science.aec8352 (measuring the prevalence of chatbot sycophancy across 11 leading AI models and finding that "sycophancy is both prevalent and harmful," and that these models "affirmed users' actions 49 percent more often than humans on average, including in cases involving deception, illegality, or other harms"). To perform the

checking function, the press must contest those in power and publish what they learn to the public. Defendants' AI models have been built to serve the opposite function.

Defendants' generative AI products are especially ill-suited to check the activities of the technology companies themselves. The press has kept the public informed about developments in the creation and evolution of these new technologies, as well as about the costs and energy required to power generative AI. *See, e.g.*, Kate Conger, Ana Swanson & Cecilia Kang, *OpenAI's Systems Meddled With U.S. Government Sites After Going Rogue*, N.Y. Times (Sept. 25, 2026). https://www.nytimes.com/2026/09/25/technology/openais-ai-us-government-websites.html. Relying on Defendants' products to fill the gap left by a disappearing press risks leaving powerful societal actors unmonitored, especially the technology companies responsible for creating these AI chatbots.

In sum, the press performs functions critical to democratic self-government. They gather new facts, disseminate information to the public, and check the power of government and corporate actors. To perform these functions, the press requires a sustainable economic model: the press's financial self-sufficiency preserves its journalistic independence. Defendants' AI products parachute in after the press's hardest work is done to benefit from the fruits of its labor, stripping data from news organizations' articles, imitating the press's reporting and publishing work, and driving down subscriber demand and advertising revenue for news outlets. They do so without providing the democratic and constitutional benefits long offered by the press, imperiling our system of democratic self-government and undermining our constitutional order.

## CONCLUSION

For the foregoing reasons, the Court should grant the News Plaintiffs' motion for summary judgment and deny the Defendants' motions for summary judgment.

Dated: October 30, 2026

Respectfully submitted,

/s/ Christina A. Lee
Christina Lee
*Counsel of Record*
John Langford
Dave Schulz
MEDIA FREEDOM &
INFORMATION ACCESS CLINIC
YALE LAW SCHOOL[10]
127 Wall Street
New Haven, CT 06511
(203) 436-5836
christina.a.lee@ylsclinics.edu

*Counsel for First Amendment Scholars as Amici Curiae*

[10] The views expressed herein do not purport to represent the institutional of Yale Law School, if any exist.

**CERTIFICATE OF COMPLIANCE**

Pursuant to Local Civil Rule 7.1(c) and the Court's order, I hereby certify that the foregoing proposed amicus brief contains 5,460 words according to the word-count feature of the word-processing program used to prepare it, and therefore it complies with paragraph 2.C of this Court's Individual Practices.

/s/ Christina A. Lee
Christina A. Lee

## APPENDIX (LIST OF AMICI CURIAE)[1]

**RonNell Andersen Jones**
University Distinguished Professor & Teitelbaum Chair in Law
University of Utah S.J. Quinney College of Law

**Jack M. Balkin**
Knight Professor of Constitutional Law and the First Amendment
Yale Law School

**Erin Carroll**
Professor of Law
Georgetown Law

**Alan Chen**
Distinguished University Professor & Thompson G. Marsh Law Alumni Professor
Sturm College of Law

**Heidi Kitrosser**
William W. Gurley Professor of Law
Northwestern – Pritzker School of Law

**Jane E. Kirtley**
Silha Professor of Media Ethics and Law Emerita
University of Minnesota

**Burt Neuborne**
Norman Dorsen Professor of Civil Liberties Emeritus
New York University School of Law

**Jonathan Peters**
Associate Dean for Academic Affairs
Professor and Carter Chair for Excellence in Journalism
Grady College of Journalism and Mass Communication
University of Georgia

**Victor Pickard**
C. Edwin Baker Professor of Media Policy and Political Economy
University of Pennsylvania

**Francesca Procaccini**
Associate Professor of Law & Robert S. and Theresa L. Reder Faculty Fellow
Vanderbilt Law School

**Sonja R. West**
Brumby Distinguished Professor of First Amendment Law
University of Georgia School of Law