# EXHIBIT A

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE:<br><br>OPENAI, INC.,<br>COPYRIGHT INFRINGEMENT LITIGATION<br><br>This Document Relates To:<br>*All Cases* | 25-md-3143 (SHS) (OTW) |

**BRIEF OF *AMICI CURIAE* RECORDING INDUSTRY ASSOCIATION OF AMERICA, NATIONAL MUSIC PUBLISHERS ASSOCIATION, AMERICAN ASSOCIATION OF INDEPENDENT MUSIC, SONGWRITERS OF NORTH AMERICA, BLACK MUSIC ACTION COALITION, NATIONAL ACADEMY OF RECORDING ARTS & SCIENCES, INC., AMERICAN SOCIETY OF COMPOSERS, AUTHORS AND PUBLISHERS, BROADCAST MUSIC, INC., AND ARTIST RIGHTS ALLIANCE IN SUPPORT OF PLAINTIFFS' MOTIONS FOR SUMMARY JUDGMENT**

COWAN, LIEBOWITZ & LATMAN, P.C.

By: */s/ Jonathan Z. King*
Jonathan Z. King (jzk@cll.com)
114 West 47th Street
New York, NY 10036-1525
(212) 790-9200

*Attorneys for Amici Curiae*

# TABLE OF CONTENTS


TABLE OF AUTHORITIES ........ ii

INTEREST OF *AMICI CURIAE* ........ 1

PRELIMINARY STATEMENT ........ 1

ARGUMENT ........ 4

I. TRAINING ON COPYRIGHTED WORKS TO GENERATE SYNTHETIC SUBSTITUTES RUNS AFOUL OF THE BASIC PURPOSES OF COPYRIGHT LAW ........ 4

A. The Broad Purposes of Copyright Law and Fair Use ........ 4

B. Training an AI Model to Generate Uncopyrightable Facsimiles of Human Authorship Contravenes the Purpose of Copyright Law and Fair Use ........ 6

II. TRAINING ON COPYRIGHTED WORKS TO PRODUCE OUTPUTS OF THE SAME TYPE CANNOT BE TRANSFORMATIVE ........ 8

A. *Warhol's* Clarification of the First Fair Use Factor ........ 8

B. Defendants' Particular Use of Copyrighted Works Shares the Same Purpose as Those Works
9

III. COPYING COPYRIGHTED WORKS TO GENERATE MARKET SUBSTITUTES CAN NEVER BE FAIR ........ 13

A. Training on Copyrighted Works Invades the Existing Market for Licensing Music as Training Data ........ 13

B. Training on Copyrighted Music Damages Traditional Markets for Music Regardless of Whether Outputs Are Infringing ........ 16

# TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Am. Geophysical Union v. Texaco Inc.*,
60 F.3d 913 (2d Cir. 1994) ....................11, 15, 18

*Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*,
598 U.S. 508 (2023) .................... *passim*

*Campbell v. Acuff-Rose Music, Inc.*,
510 U.S. 569 (1994) .................... *passim*

*Castle Rock Entm't, Inc. v. Carol Publ'g Grp., Inc.*,
150 F.3d 132 (2d Cir. 1998) ....................10

*Eldred v. Ashcroft*,
537 U.S. 186 (2003) ....................5

*Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*,
499 U.S. 340 (1991) ....................7

*Fox News Network, LLC v. TVEyes, Inc.*,
883 F.3d 169 (2d Cir. 2018) ....................10, 11

*Google LLC v. Oracle Am., Inc.*,
593 U.S. 1 (2020) ....................18

*Hachette Book Grp., Inc. v. Internet Archive*,
115 F.4th 163 (2d Cir. 2024) ....................13

*Harper & Row, Publishers, Inc. v. Nation Enterprises*,
471 U. S. 539 (1985) ....................4, 10, 11, 13

*Kadrey v. Meta Platforms, Inc.*,
788 F. Supp. 3d 1026 (N.D. Cal. 2025) .................... *passim*

*Lynk Media, LLC v. Indep. Digit. News & Media, LLC*,
2025 U.S. Dist. LEXIS 191002 (S.D.N.Y. Sept. 21, 2025) ....................11

*Naruto v. Slater*,
2016 U.S. Dist. LEXIS 11041 (N.D. Cal. Jan. 28, 2016) ....................7

*Romanova v. Amilus Inc.*,
138 F.4th 104 (2d Cir. 2025) ....................4, 5

*Sega Enters. v. Accolade, Inc.*,
977 F.2d 1510 (9th Cir. 1992) ....................6

*Sony Corp. of Am. v. Universal City Studios, Inc.*,
464 U.S. 417 (1984) ....................................................................................................4, 5, 7

*Stewart v. Abend*,
495 U. S. 207 (1990) ....................................................................................................................5

*Thaler v. Perlmutter*,
130 F.4th 1039 (D.C. Cir. 2025) ...............................................................................5, 6, 7

*Thomson Reuters Enter. Ctr. GmbH v. Ross Intel., Inc.*,
2026 U.S. App. LEXIS 29958 (3d Cir. July 11, 2026) .............................................8, 11, 16, 18

*Twentieth Century Music Corp. v. Aiken*,
422 U.S. 151 (1975) ....................................................................................................4, 5

*Urantia Found. v. Maaherra*,
114 F.3d 955–59 (9th Cir. 1997) ........................................................................................7

**Statutes**

17 U.S.C. § 106 ....................................................................................................17, 18

17 U.S.C. § 107 .................................................................................................... *passim*

**Treatises**

*1 Nimmer on Copyright* (6th ed. 2026)....................................................................5, 8, 9, 13

## INTEREST OF *AMICI CURIAE*[1]

*Amici curiae* ("*Amici*") represent the creators behind much of this country's most valuable music. *Amici* and their members have submitted extensive comments to the U.S. Copyright Office on artificial intelligence, and members of some *Amici* are parties to multiple lawsuits challenging the unauthorized copying of their copyrights to train artificial intelligence systems. *Amici*'*s* members own or control the majority of music consumed in the United States. For a detailed description of each *Amici*, *Amici* respectfully refer the Court to the accompanying brief in support of their motion for leave to file this *amicus* brief.

## PRELIMINARY STATEMENT

Rightsholders in the music community have a long history of confronting technologies that enable widespread copyright infringement, ranging from unauthorized duplication of cassette tapes to online infringements via file sharing and the proliferation of user-generated content on streaming platforms. These rightsholders have relied on copyright law in each technological era to protect the key assets on which the music ecosystem is built -- copyrighted music and the bundle of exclusive rights that attends it.

As daunting as past challenges have been, they are dwarfed in scope and jeopardy by AI services that instantaneously generate digital facsimiles of the human-authored music on which their models are built. AI companies copy millions of copyrighted sound recordings and musical compositions without authorization to train their models to generate a limitless supply of synthetic substitutes that invade the music marketplace. AI-generated music floods streaming platforms, tops charts, and dominates social media playlists. It displaces human-authored music

---

[1] No counsel for any party authored this brief in whole or in part, and no person other than *Amici* contributed money intended to fund the preparation or submission of this brief.

and deceives consumers, who cannot tell whether they are listening to human artists or to outputs created by a computer. With recent estimates that more than *half* of all music uploaded to streaming platforms is AI-generated, these outputs displace the copyrighted works that enabled their generation.

Like Plaintiffs in this case, *Amici's* members have sued AI companies that, without license, train on their copyrighted works to mimic human authorship and artistry.[2] And like Defendants in this case, the services targeted by the music community insist that training on their copyrighted works is fair use. They are wrong. *Amici*, whose members own some of the most cherished copyrights in modern culture, submit this brief to focus on three defects in Defendants' fair use defense.

First, Defendants pay little heed to the Supreme Court's requirement that courts consider the broad purposes of copyright law when balancing the statutory fair use factors. The Copyright Act grants authors exclusive rights to encourage humans to produce creative works for the public's benefit. Fair use may excuse certain otherwise unlawful conduct when enforcement of those exclusive rights would inhibit the creative authorship copyright promotes. However, fair use does not exonerate copying that propagates content devoid of human authorship in order to supplant human creation. Indeed, rather than stimulating human creativity, infringing copyrighted works to generate digital imitations affirmatively undermines the constitutional incentives for humans to author creative works. Training on copyrighted works to facilitate the creation of AI-generated fascimiles thus deserves none of the solicitude of the fair use doctrine.

---

[2] *See, e.g., Concord Music Group, Inc. et al. v. Anthropic PBC*, Civil Action No. 24-cv-03811-EKL (N.D. Cal.); *Concord Music Group, Inc. et al. v. Anthropic PBC,* Civil Action No. 5:26-cv-00880-EKL (N.D. Cal.); *Sony Music Entertainment et al. v. Uncharted Labs, Inc.*, Civil Action No. 1:24-cv-04777-AKH (S.D.N.Y.); *UMG Recordings, Inc., et al. v. Suno, Inc.*, Civil Action No. 1:24-cv-11611 (FDS) (D. Mass).

Second, Defendants misapply the first fair use factor as recalibrated by *Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*, 598 U.S. 508 (2023). *Warhol* clarifies that "transformativeness" does not control the first factor analysis, much less the entire fair use inquiry, and depends on whether the challenged use serves a *purpose* akin to that of the original work. Defendants speciously identify their "purpose" in copying Plaintiffs' works in the broadest of terms -- to teach their systems to provide "natural language responses to user prompts" and "spread knowledge." But the relevant purpose is not that of training large language models ("LLMs") generally, or of LLMs themselves, but rather of the specific use challenged as infringing – *i.e.*, training on specific copyrighted content for purposes of generating specific kinds of outputs. An AI model does not ingest romance poetry or bluegrass to learn about language or music at large, but rather to generate substitutes that read and sound like them in practice, thus achieving the same, non-transformative purpose.

Finally, on the fourth fair use factor, Defendants insist that training imposes no cognizable market harm if the resulting outputs do not reveal the training materials to the public. There is no such requirement in the law. Reproduction does not require public exposure of the copyrighted work, or else infringers would always be free to copy in secret. Moreover, AI has the unique capacity to output endless content that displaces the market for and diminishes the value of the copyrighted works on which it trained. That kind of harm falls squarely within the types of substitutional market impacts that defeat fair use.

# ARGUMENT

## I. TRAINING ON COPYRIGHTED WORKS TO GENERATE SYNTHETIC SUBSTITUTES RUNS AFOUL OF THE BASIC PURPOSES OF COPYRIGHT LAW

For a use to be fair, it must serve the broad purposes of copyright, *see Campbell v. Acuff-Rose Music, Inc*., 510 U.S. 569, 578 (1994) (statutory factors are weighed "in light of the purposes of copyright"), particularly where it involves new technologies. *See Sony Corp. of Am. v. Universal City Studios, Inc*., 464 U.S. 417, 432 (1984) ("[w]hen technological change has rendered its literal terms ambiguous, the Copyright Act must be construed in light of" basic purposes of copyright law). Training on copyrighted songs or writings to produce machine-generated substitutes defeats copyright's core aims.

### A. The Broad Purposes of Copyright Law and Fair Use

Copyright law "encourages creativity by granting to the author of an original work 'a bundle of exclusive rights.'" *Warhol*, 598 U.S.at 526 (quoting *Harper & Row, Publishers, Inc. v. Nation Enterprises*, 471 U. S. 539 (1985)). The incentives created by those rights ensure wide dissemination of creative authorship for the general public good. *Sony*, 464 U.S. at 431-32 (1984) (copyright's ultimate aim is "to stimulate artistic creativity for the general public good"). *See also Romanova v. Amilus Inc.*, 138 F.4th 104, 109 (2d Cir. 2025) (Copyright Act balances "the creation of art with its availability to the public") (citing *Twentieth Century Music Corp. v. Aiken*, 422 U.S. 151, 156 (1975)).

*Warhol* explains that fair use effectuates these dual goals of stimulating creativity and ensuring the public's access to "literature, music, and the other arts": "The balancing act between creativity and availability … is reflected in one such limitation, the defense of 'fair use,'" which "'permits courts to avoid rigid application of the copyright statute when, on

occasion, it would stifle the very creativity which that law is designed to foster.'" *Id.* at 526-27 (quoting *Stewart v. Abend*, 495 U. S. 207, 236 (1990)). *See also Romanova*, 138 F. 4th at 109 (same). Several key principles flow from *Sony, Warhol*, and their progeny.

First, copyright law operates on an incentive structure. Authors are rewarded so that the public benefits from their creative output. *See Warhol*, 598 U.S. at 526; *Eldred v. Ashcroft*, 537 U.S. 186, 212 n.18 (2003) ("copyright law celebrates the profit motive, recognizing that the incentive to profit from the exploitation of copyrights will redound to the public benefit") (citation omitted).

Second, copyright law is author-centric. It affords "author[s]" exclusive rights, *Warhol*, 598 U.S.at 526, to promote the "benefits derived by the public from the labors of authors." *Sony*, 464 U.S. at 432. "Authors are at the center of the Copyright Act." *Thaler v. Perlmutter*, 130 F.4th 1039, 1045 (D.C. Cir. 2025). *See also 1 Nimmer on Copyright* § 5.01[A] (6th ed. 2026) ("authorship is a *sine qua non* for any claim of copyright"). And, critically, other than in the case of a work for hire, "author" in the Copyright Act "refers only to human beings." *Thaler*, 130 F.4th at 1045. As developed below, because AI systems are not "authors," the outputs they generate are far less likely to qualify for the fair use protections afforded human authors.

Finally, the impetus for fair use aligns with that for copyright law overall – to stimulate and incentivize human authorship. Courts invariably apply fair use as a means of ensuring that the copyright monopoly does not suffocate "the very creativity which that law is designed to foster." *Warhol*, 598 U.S at 527. Thus, while fair use checks exclusive rights, its ultimate aim is to stimulate *human* creativity by allowing one author to draw creatively on the work of predecessors, whether by parodying a song, *see Campbell*, 510 U.S. at 579-85, or reverse engineering a video game console's software so that others can create compatible games, thereby

fostering "growth in creative expression … that the Copyright Act was intended to promote." *Sega Enters. v. Accolade, Inc.*, 977 F.2d 1510, 1523 (9th Cir. 1992).

### B. Training an AI Model to Generate Uncopyrightable Facsimiles of Human Authorship Contravenes the Purpose of Copyright Law and Fair Use

Training on copyrighted works so that an AI model can generate synthetic content that apes the aesthetic characteristics of those works contravenes the aims of copyright law. It subverts copyright law's incentive structure at several levels. AI-generated news stories, novels, and music affirmatively quell incentives for authors to create expressive works by providing a free alternative that can be generated in seconds. This impact is felt not only at the level of a pop icon or venerated novelist, but also by a composer of stock advertising music or a freelance copywriter hired to promote products and services. Their incentives to create spring from the exclusive rights that they can assign or license to prospective clients. But if prospective licensees can use an AI model trained on the composer's or copywriter's works to generate substitutional content without the expense of engaging human authors, those authors are stripped of the income and incentives that push them to create the content in the first place. A technology that, at bottom, purposefully discourages human authorship cannot be fair use.

The parallel logic holds true at the level of the AI model itself. AI systems are "inanimate objects that do not need an incentive to create" and simply "do the work they are programmed to do, without regard to incentives." *See Copyright and Artificial Intelligence Part 2: Copyrightability* (January 2025) ("2 CO Report") at 33 (footnotes and citations omitted). *See also Thaler*, 130 F.4th at 1050 (unlike human authors, "machines … do not respond to economic incentives"). Because they are immune to the incentives on which copyright is built, AI systems do not warrant the exemptions afforded by fair use, which safeguards downstream human authorship when suppressing it would stifle the human creativity copyright law encourages.

And finally, what AI produces is not the creative expression copyright law promotes. Material that lacks human authorship is ineligible for copyright protection. This principle predated AI, *see, e.g., Urantia Found. v. Maaherra*, 114 F.3d 955, 957–59 (9th Cir. 1997) (writings of purportedly non-human "spiritual beings" deemed uncopyrightable); *Naruto v. Slater*, 2016 U.S. Dist. LEXIS 11041, at *10 (N.D. Cal. Jan. 28, 2016) (denying protection for images captured by a monkey with a camera), and has been reaffirmed when applied to AI-generated content. *See Thaler*, 130 F.4th at 1041 (affirming refusal to register image created by AI model developed by plaintiff). Noting that multiple uses of "author" in the Copyright Act necessarily mean a human, *Thaler* held that a work created by a "machine" lacks human authorship and thus is not copyrightable. *Id.* at 1045-47. *See also* 2 CO Report at *iii* ("[c]opyright does not extend to purely AI-generated material"). AI systems are not "authors."

The lack of human authorship in AI-generated material has profound implications for the fair use analysis. By promising "a fair return for an *author's* creative labor," copyright law encourages "the labors of *authors*" so that the public benefits from the increased availability of "literature, music and the other arts." *Sony*, 464 U.S. at 432 (emphasis added). But rather than proliferate the human creativity copyright law encourages, AI models parasitically copy it to generate digital simulations devoid of human authorship. An AI-generated song is the product of statistical predictions rather than "the fruits of intellectual labor." *See Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 346 (1991) (citations omitted). Thus, rather than "stimulat[ing] artistic creativity for the general public good," *Sony*, 464 U.S. at 432, AI outputs exploit human creativity to generate digital substitutes that serve none of the values of copyright law to promote authorship.

## II. TRAINING ON COPYRIGHTED WORKS TO PRODUCE OUTPUTS OF THE SAME TYPE CANNOT BE TRANSFORMATIVE

The first fair use factor considers "the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes." 17 U.S.C. § 107(1). Following *Warhol*, this factor considers the degree to which the specific use of a copyrighted work serves a different purpose than the original work and balances that degree of difference against the commercial nature of the use. Here, Defendants stray from both sides of the equation, obfuscating the ultimate purpose of their copying and giving short shrift to the breathtaking commerciality of their systems.

### A. ***Warhol's* Clarification of the First Fair Use Factor**

Consideration of the "purpose and character of the use" may turn on the extent to which the challenged use is "transformative." While *Warhol* invokes the familiar inquiry into "'whether the new work merely 'supersede[s] the objects' of the original creation … or instead adds something new, with a further purpose or different character,'" 598 U.S. at 528 (quoting *Campbell,* 510 U.S. at 579), it refocuses the "central question" of the first factor on whether the secondary use serves a *similar purpose* to that of the original work. It warns that while "new expression may be relevant to whether a copying use has a sufficiently distinct purpose or character, it is not, without more, dispositive of the first factor." *Id.* at 525. *See also id.* at 541 (adding "new expression, meaning, or message" does not automatically make a use transformative). The key question is not how much the second work changes the original, but rather whether it reflects a *different purpose* than the copied work. *See also Thomson Reuters Enter. Ctr. GmbH v. Ross Intel., Inc.*, 2026 U.S. App. LEXIS 29958, at *16 (3d Cir. July 11, 2026) ("The 'lodestar' of this inquiry is whether the copier maintains a 'distinctive purpose' for its use.") (quoting *Nimmer*, § 13F:10[G][2][a][i])).

*Warhol* ties this focus on *purpose* to the notion of *substitution*: "…the first factor relates to the problem of substitution—copyright's *bête noire*. The use of an original work to achieve a purpose that is the same as, or highly similar to, that of the original work is more likely to substitute for, or supplant, the work." 598 U.S. at 528 (citations and quotation omitted). *See also id.* at 531-32 ("A use that shares the purpose of a copyrighted work … is more likely to provide 'the public with a substantial substitute' … which undermines the goal of copyright") (citation omitted). And, critically, since the "same copying may be fair when used for one purpose but not another," assessing the first factor "requires an analysis of the specific 'use' of a copyrighted work that is alleged to be 'an infringement.'" *Id.* at 533 (quoting 17 U.S.C. § 107). *See also id.* at 554 (Gorsuch, J., concurring) ("the law trains our attention on the particular use under challenge" in assessing purpose); *Nimmer* § 13F.03[6][b] ("*Warhol* directed the inquiry to the specific use alleged to be infringing").

Finally, *Warhol* rebalanced the impact of commerciality on transformativeness: "… the first fair use factor considers whether the use of a copyrighted work has a further purpose or different character, which is a matter of degree, and the degree of difference must be balanced against the commercial nature of the use." 598 U.S at 532-33. Thus, even where the challenged use achieves some different purpose, that difference must sufficiently outweigh the commerciality of the use.

### B. Defendants' Particular Use of Copyrighted Works Shares the Same Purpose as Those Works

Defendants perform a sleight-of-hand in comparing the purpose of their use of Plaintiffs' works to that of the works themselves. Defendants insist that books themselves are for reading but are used in training "to create an innovative new technology for communication, speech, and the spread of knowledge." Defendant Microsoft Corporation's Memorandum of Law In Support

Of Motion For Summary Judgment In Books Plaintiffs' Consolidated Cases, ECF 1690 ("Microsoft Br.") at 11, 13. *See* OpenAI's Memorandum of Points and Authorities in Support of Motion for Summary Judgment, ECF 1983 ("OpenAI Br.") at 20 (while "Plaintiffs wrote their books to be read," OpenAI used them to create "general purpose software that is able to interpret and output natural human language"). That analysis is flawed in several respects.

First, Defendants apply the same blanket purpose to all AI training on every copyrighted work in every LLM. They permit no distinction between training on different types of copyrighted works (whether iconic songs or compilations of weather data) and assign them all the same sweeping purpose of "spreading knowledge" and creating technology that mimics human authorship. They disregard the particular kinds of outputs that flow from training on particular copyrights, such as why a model trains on modern jazz or the writings of a war correspondent and what outputs those training materials enable. Indeed, if the goal were genuinely to "spread knowledge," there should be no need to train on the creative substance of thousands of modern jazz recordings rather than, for example, general music theory texts. For Defendants, all training achieves the same salutary purpose, so the LLM always wins. *See* Microsoft Br. at 3 ("This Court should hold that the use of copyrighted works to train a general-purpose LLM is fair use as a matter of law").

But that undifferentiated analysis does disservice to the principle that fair use "is not to be simplified with bright-line rules, for the statute, like the doctrine it recognizes, calls for case-by-case analysis." *Campbell*, 510 U.S. at 577 (citing *Harper & Row,* 471 U.S. at 549). *See also Fox News Network, LLC v. TVEyes, Inc.*, 883 F.3d 169, 176 (2d Cir. 2018) ("In fair use litigation, courts undertake a case-by-case analysis") (citation omitted); *Castle Rock Entm't, Inc. v. Carol Publ'g Grp., Inc.*, 150 F.3d 132, 141 (2d Cir. 1998) ("Fair use analysis, therefore,

always calls for case-by-case analysis") (citation omitted). Yet worse, Defendants ignore *Warhol's* admonition that the first fair use factor "requires an analysis of the specific 'use' of a copyrighted work that is alleged to be 'an infringement.'" *Warhol*, 598 U.S. at 533. *See also Harper & Row*, 471 U.S. at 549 ("Section 107 requires a case-by-case determination whether a particular use is fair"); *Lynk Media, LLC v. Indep. Digit. News & Media, LLC*, 2025 U.S. Dist. LEXIS 191002, at *41 (S.D.N.Y. Sept. 21, 2025) ("it is crucial to examine the 'justification' for the specific use challenged"). Defendants' argument does the exact opposite, because it treats all training on any type of copyrighted works as achieving the same broad and oversimplified purpose.

Not surprisingly, courts have rejected claims of transformativeness pitched at the abstract and self-justifying levels offered by the AI community. In *Thomson Reuters*, 2026 U.S. App. LEXIS 29958, at *17-18, the Third Circuit noted that, while defendant Ross ostensibly used Westlaw's headnotes "to train an AI program" -- essentially the same justification offered by Defendants and their supporters here – Ross's "ultimate purpose" for that copying was to create a competing legal research platform. Similarly, the Second Circuit rebuffed the suggestion that photocopying scientific articles was for the transformative purpose of "research." *Am. Geophysical Union v. Texaco Inc.*, 60 F.3d 913, 924 (2d Cir. 1994). Since "'transformative' use would be extended beyond recognition" if the copying could be excused under the umbrella of "research," the Court observed that "it would be equally extravagant for a newspaper to contend that because its business is 'news reporting' it may line the shelves of its reporters with photocopies of books on journalism," as it would supplant the need for those journalistic texts. *Id. See also Fox News Network*, 883 F.3d at 178 n.4 ("That a secondary use can facilitate research does not itself support a finding that the secondary use is transformative").

It is "equally extravagant" for AI companies to justify voracious, unauthorized copying as serving the broader purpose of "spreading knowledge." Pursuant to *Warhol*, the relevant purpose of the *specific use* of training on a John Grisham novel or a Stevie Wonder song is to teach the model to output a Grisham-like legal thriller or a Wonder-like audio file. If the purpose of such copying were merely to train the models to sound like a human, they would not need to ingest the entire creative substance of these works, but could simply rely on data or texts about language or music in general. Nor is Defendants' purpose remotely akin to author Joan Didion drawing on Hemingway's works as influences. *See* Statement of Interest of the United States, ECF 316 ("DOJ") at 16-17. Law-abiding authors pay for the modest universe of works that inspire them. They do not steal them by the millions and encode copies on their brains like an AI system does.

The training use of copyrighted articles or music is also commercial on a nearly unimaginable scale. Defendants and their supporters make the reflexive argument that commerciality is not dispositive, *see, e.g.*, Microsoft Br. at 16 (most fair uses are commercial); DOJ at 12 ("Nearly all" of the paradigmatic fair uses listed in § 107 "are generally conducted for profit"), but neither is the secondary use's degree of "transformativeness," which Defendants and their supporters routinely insist controls the inquiry. That view is blind to the express language of the Copyright Act, *Warhol*, and the critical commercial contribution that training on unlicensed copyrighted works makes to their AI models.

Section 107 articulates the first factor as "the purpose and character of the use, *including whether such use is of a commercial nature or is for nonprofit educational purposes*" (emphasis added). Commerciality thus is not only a key component of "purpose and character," but is the only one explicitly called out by the statute. Commerciality is always "relevant." *Warhol*, 598

U.S. at 531. *See also Nimmer* § 13F.05[D] ("Commerciality is also significant to the analysis of factor one, albeit again not dispositive"). Defendants' massive commercial enterprises – valued in the *trillions of dollars* – are built on training on copyrighted works. But for that training, their models would not have the functionality that attracts the staggering investments they enjoy. Because their unauthorized use of copyrighted works shares the same purpose as the works themselves and comprises the key commercial building blocks of their business, factor one weighs against fair use.

## III. COPYING COPYRIGHTED WORKS TO GENERATE MARKET SUBSTITUTES CAN NEVER BE FAIR

The fourth fair use factor addresses "the effect of the use upon the potential market for or value of the copyrighted work," 17 U.S.C. § 107(4), and is "undoubtedly the most important element of fair use." *See Harper & Row,* 471 U.S. at 566. *See also Warhol*, 598 U.S. at 555. It looks to effects on both existing and "potential" markets, *see Campbell*, 510 U.S. at 592, and requires courts to consider "'whether unrestricted and widespread conduct of the sort engaged in by the defendant . . . would result in a substantially adverse impact on the potential market' for the original." *Id.* at 590 (citation omitted); *Hachette Book Grp., Inc. v. Internet Archive*, 115 F.4th 163, 189 (2d Cir. 2024) (same). *Amici* are well-situated to address factor four, because of the vast range of markets their members commercially inhabit, the demonstrable damage that training on their members' music has inflicted in those markets, and their members' history of successfully licensing music on a mass basis.

### A. Training on Copyrighted Works Invades the Existing Market for Licensing Music as Training Data

There is a robust marketplace for licensing music to train AI models, including but not limited to:



33265\004\7260904.v8

- KLAY Vision Inc. licensed music from the world's three largest music companies -- Universal Music Group ("UMG"), Sony Music Entertainment ("SME"), and Warner Music Group ("WMG") -- to develop an AI music platform "trained entirely on licensed music." *See https://www.musicbusinessworldwide.com/umg-sony-and-warner-strike-licensing-deals-with-new-ai-music-platform-klay/*; *https://www.sonymusic.com/sonymusic/klay-signs-ai-licensing-deals-universal-sony-music-publishing-warner-chappell/*.

- Stability AI licensed music from UMG, WMG, and stock music provider AudioSparx to train AI music creation tools. *See https://www.universalmusic.com/universal-music-group-and-stability-ai-announce-strategic-alliance-to-co-develop-professional-ai-music-creation-tools/*; *https://www.wmg.com/news/warner-music-group-and-stability-ai-join-forces-to-build-the-next-generation-of-responsible-ai-tools-for-music-creation*; *https://stability.ai/research/stable-audio-efficient-timing-latent-diffusion*.

- UMG, WMG and Merlin contracted with Udio to develop music creation platforms trained on licensed music, *see https://www.universalmusic.com/universal-music-group-and-udio-announce-udios-first-strategic-agreements-for-new-licensed-ai-music-creation-platform/*; *https://www.wmg.com/news/warner-music-group-and-udio-collaborate-to-build-a-new-licensed-music-creation-service*; *https://merlinnetwork.org/merlin-and-udio-partner-to-advance-ai-for-independent-music/*, and *amicus* NMPA negotiated a model licensing agreement with Udio. *See https://www.musicbusinessworldwide.com/music-publishers-strike-ai-licensing-deals-with-udio-and-klay-as-nmpa-reveals-landmark-industry-wide-pacts/*.

- WMG, BMG and NMPA member Believe licensed music to Suno to develop music generative AI models. *See https://www.wmg.com/news/warner-music-group-and-suno-forge-groundbreaking-partnership; https://www.musicbusinessworldwide.com/suno-inks-global-licensing-deal-with-believe/*.

- UMG, Kobalt, Bertelsmann, and Merlin entered into licensing agreements with ElevenLabs for its AI music platform, which is trained on trained on licensed content. *See https://elevenlabs.io/blog/umg; https://www.musicbusinessworldwide.com/kobalts-ai-suno-most-favored-nation/; https://elevenlabs.io/blog/bertelsmann; https://www.businesswire.com/news/home/20250805333301/en/ElevenLabs-Launches-Eleven-Music-in-Collaboration-with-Music-Industry-Partners*.

- Spotify announced collaborations with UMG, WMG, SME, Merlin and others "to develop responsible AI products that empower the artists and songwriters they represent, and connect them with the fans who support them." *See https://newsroom.spotify.com/2025-10-16/artist-first-ai-music-spotify-collaboration/.*

*See AI Licensing by Copyright Owners | Copyright Alliance* for more examples.

It is thus a myth that licensing copyrighted works for AI training is either too "sporadic" or speculative to establish a "reasonable licensing" market. *See* Microsoft Br. at 28; OpenAI Br. at 37. It is equally false that the need to license from authors who are "dispersed, difficult to identify, and costly to negotiate or contract with" makes obtaining sufficient data infeasible. Microsoft Br. at 28. The music industry is as fragmented as the book and news publishing industries, and yet copyright owners of sound recordings license nearly all their recorded music to streaming platforms, and musical work copyright owners directly license enormous catalogs of musical compositions to a variety of digital services, as well as public performance rights through ASCAP, BMI, and other performance rights organizations.

When YouTube was flooded with a seemingly insurmountable problem of user postings of virtually every published song or recording, the music industry collaborated with YouTube to develop a solution that allows copyright owners either to block or monetize videos that are flagged as matching digital fingerprints provided by the owners. *See* *https://support.google.com/youtube/answer/2797370?hl=en.* This history proves that licensing on the scale needed for training is operationally and economically feasible. As one court held, with AI developers projected to earn "billions, even trillions" from their models, it is "ridiculous" to suggest otherwise. *See Kadrey v. Meta Platforms, Inc.*, 788 F. Supp. 3d 1026, 1036 (N.D. Cal. 2025) ("If using copyrighted works to train the models is as necessary as the companies say, they will figure out a way to compensate copyright holders for it.").

The market for licensing copyrighted works for training data is thus amply "reasonable" and more than "likely to be developed," satisfying what this Circuit deems a relevant market for fair use analysis. *See Am. Geophysical Union*, 60 F.3d at 930. Defendants nevertheless insist that considering this market is circular, because copyright owners are not "legally entitled to

monopolize" markets for transformative uses. OpenAI Br. at 36-37 (citing *Kadrey*, 788 F. Supp. 3d at 1052). What is circular is to assume that the challenged use is fair and then ignore an existing market for that very type of use. To be faithful to the statutory requirement to consider both potential and actual markets, the better approach is the Third Circuit's in *Thomson Reuters*, which held that copying Westlaw's headnotes "for use as training data … usurped Thomson Reuters's opportunity to enter that derivative market and license its headnotes for that purpose." 2026 U.S. App. LEXIS 29958, at *27. The AI companies that eschew licensing are similarly appropriating opportunities that belong to copyright owners.

### B. Training on Copyrighted Music Damages Traditional Markets for Music Regardless of Whether Outputs Are Infringing

Training on copyrighted music also invades myriad traditional markets for music. Consumers listen to music on streaming platforms and internet and terrestrial radio. They encounter it in social media, advertising, movie soundtracks, documentaries, theatrical productions, podcasts, apps, toys, and sonic signatures for brands. Sound recordings often incorporate "samples" from other recordings, and compositions often "interpolate" other compositions. By law, all such uses ordinarily require licenses, which generate significant income that fuels the production of new music in all these key markets. AI-generated music has infiltrated these markets and diverted critical licensing revenues and opportunities away from copyright owners.

Where outputs are infringing, the market impact is so clear that Defendants have little to say. *See, e.g.,* OpenAI Br. at 23 n.13 ("To the extent Plaintiffs assert" that output is infringing, "that assertion would require a separate and individualized analysis" the Court need not undertake). Defendants, however, vigorously object that market harm from non-infringing outputs never counts. *See* OpenAI Br. at 31 ("harm from new works that do not reproduce

substantial protected expression from the original is not cognizable"). As they see it, so long as AI outputs do not "reveal" training materials to the public, there can be no relevant market effects, and the use qualifies as fair. *See* Microsoft Br. at 18 ("it is fair use for a new technology to expand the utility of copyrighted work when it does not deliver the entirety of that content to the public"); DOJ at 14 ("training does not reveal anything to the public at all"). But the question is not whether unauthorized copying is in public view, but whether the fruits of that copying affect the "market for or value of the copyrighted work." 17 U.S.C. § 107(4). And where that copying generates copious content that displaces copyrighted works, the answer is an unequivocal yes.

That result is commanded first by the language of the Copyright Act. The fair use provision looks without qualification to the "effect of the use upon the potential market for or value of the copyrighted work." 17 U.S.C. § 107(4). As the Copyright Office observed in determining that non-infringing AI outputs can impose market harm, "[t]he statute on its face encompasses any 'effect' upon the potential market." *Copyright and Artificial Intelligence Part 3: Generative AI Training* (May 2025) ("3 CO Report") at 65. The focus is on the *consequence* of the copying to the relevant market and not the means by which that consequence is imposed: "[L]ess similar outputs, such as books on the same topics or in the same genres, can still compete for sales with the books in the training data. And by taking sales from those books, or by flooding stores and online marketplaces so that some of those books don't get noticed and purchased, those outputs would reduce the incentive for authors to create." *Kadrey*, 788 F. Supp. 3d at 1054.

Moreover, training violates, at a minimum, the reproduction right, which prohibits unauthorized reproduction of "the copyrighted work in copies." 17 U.S.C. § 106(1). Unlike, for

example, the rights to "distribute copies of the copyrighted work to the public" (§ 106(3)) or display "the copyrighted work publicly" (§ 106(5)), reproduction does not entail "revealing" anything to the public. Defendants' argument would effectively immunize unauthorized reproduction as a fair use so long as it remains secret.

Not surprisingly, cases find market harm even when copying never makes it to public view. In *Thomson Reuters*, Ross copied Westlaw's headnotes in training but never reproduced them in outputs. The Court nevertheless found that training on those headnotes affected their "value" as a "draw" to use Westlaw and thus imposed market harm. *See* 2026 U.S. App. LEXIS 29958, at *24-25. In *Am. Geophysical Union*, 60 F.3d at 931, the Second Circuit found market harm even though the copies of scientific articles were never distributed beyond the researchers who copied them.

The Supreme Court cautions that § 107 sets forth only "general principles, the application of which requires judicial balancing, depending upon relevant circumstances, including 'significant changes in technology.'" *Google LLC v. Oracle Am., Inc.*, 593 U.S. 1, 19 (2020) (citation omitted). Here, that change could not be more significant:

> [AI] involves a technology that can generate literally millions of secondary works, with a miniscule fraction of the time and creativity used to create the original works it was trained on. No other use … has anything near the potential to flood the market with competing works the way that LLM training does.

*Kadrey*, 788 F. Supp. 3d at 1055. *See also* 3 CO Report at 65 ("The speed and scale at which AI systems generate content pose a serious risk of diluting markets for works of the same kind as in their training data"). AI's ability to flood markets with substitutional content is the apotheosis of "unrestricted and widespread" intrusion into the relevant markets.

The experience of the music industry provides a stark example. The streaming service Deezer estimates that AI-generated tracks represent over 50% of all new music uploaded to the

platform. *See https://newsroom-deezer.com/2026/07/ai-music-exceeds-50-percent-daily-uploads-deezer/*. Spotify responded to an earlier Deezer estimate that it has "no reason to disbelieve it's a similar amount on any streaming service." *See https://www.billboard.com/pro/spotify-exec-ai-music-removing-songs-on-the-record/.* AI is also a tool of music fraudsters, one of whom pled guilty to using bots to stream hundreds of thousands of AI-generated tracks billions of times to generate $8 million in fraudulent royalties. *See https://www.justice.gov/usao-sdny/pr/north-carolina-musician-charged-music-streaming-fraud-aided-artificial-intelligence* (noting that fraudulent streams of AI-generated music "divert[ed] funds from musicians and songwriters whose songs were legitimately streamed by real consumers"). Other unscrupulous actors are "flooding Spotify, Apple Music and the rest with AI-generated tracks, to try and hoover up the royalties generated by people listening to them." *See https://www.theguardian.com/music/2025/jun/03/ai-bot-farms-and-innocent-indie-victims-how-music-streaming-became-a-hotbed-of-and-fakery.*

AI-generated music can also garner remarkable consumer attention. Breaking Rust, a fully AI-generated country music project, topped the Billboard Country Digital Song Sales chart. *See https://en.deezercommunity.com/music-culture-games-17/top-10-ai-generated-artists-tracks-%E2%84%B9-ai-generated-content-82786.* A fabricated "artist" named "Xania Monet" garnered 17 million streams during just two months and entered into a $3 million "record contract" that might otherwise have gone to a human artist. *See https://www.billboard.com/pro/ai-artist-record-deals-ethical-sign-xania-monet.*

This surge in AI-generated music dilutes royalty pools, which are paid out to copyright owners in proportion to the number streams tracks generate, and diverts payment away from the very human artists whose works were used to create that content. *See* 3 CO Report at 65. One

study estimates that AI-generated music will be worth a cumulative $42 billion by 2028, with a corresponding loss of 24% of human music creators' revenue. *See https://www.musicbusinessworldwide.com/market-for-gen-ai-outputs-to-be-worth-over-16bn-annually-by-2028-but-it-could-cannibalize-24-of-music-creators-revenues-cisac-predicts/.* Record companies and music publishers will suffer equivalent losses, depriving them of the resources to cultivate new talent by investing in human artists and thereby foster the creativity copyright aims to stimulate. If fair use is a "flexible doctrine that takes account of significant changes in technology," *Kadrey*, 788 F. Supp. 3d at 1055 (citation omitted), then surely factor four must account for market effects this far-reaching.

For these and the other reasons cited above, the Court should find that Defendants' training on Plaintiffs' copyrighted works is not fair use as a matter of law.

Dated: October 30, 2026

COWAN, LIEBOWITZ & LATMAN, P.C.

By: */s/ Jonathan Z. King*
Jonathan Z. King (jzk@cll.com)
114 West 47th Street
New York, NY 10036-1525
(212) 790-9200

*Attorneys for Amici Curiae*