# EXHIBIT A

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

IN RE OPENAI, INC., COPYRIGHT INFRINGEMENT LITIGATION

This Document Relates to:
*All Cases*

Case No. 25-md-3143 (SHS) (OTW)

Hon. Sidney H. Stein
Hon. Ona T. Wang

**[PROPOSED] BRIEF OF *AMICI CURIAE* COPYRIGHT LAW PROFESSORS EDWARD LEE AND REBECCA TUSHNET IN SUPPORT OF DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

**Page**


STATEMENT OF INTEREST OF AMICI ........ 1

INTRODUCTION AND SUMMARY OF ARGUMENT ........ 1

ARGUMENT ........ 3

I. OPENAI'S SCALING OF DATASETS TO ADVANCE AI'S FUNCTIONALITIES SERVED A HIGHLY TRANSFORMATIVE PURPOSE AND U.S. INTERESTS ........ 3

A. Scaling the Amount of Training Material Was Critical to AI's Development ........ 4

B. Noninfringing Works Users Create Are Separate from Training and Are Not "Competing Substitutes" Within Plaintiffs' Copyright ........ 7

II. PLAINTIFFS' "DILUTION" THEORY VIOLATES THE COPYRIGHT CLAUSE ........ 8

A. No Author Can Claim Genres or Facts as "Their Writings" ........ 8

B. Authors' "Exclusive Right[s]" Cannot Extend to Uncopyrightable Genres or Facts Under Infringement or Fair Use Analysis ........ 10

III. DILUTION VIOLATES THE FIRST AMENDMENT BY DISCRIMINATING BASED ON CONTENT AND CLASS OF SPEAKERS ........ 14

A. The First Amendment Protects Individuals Who Use AI for Expression ........ 14

B. "Dilution" Is Speaker-Based Discrimination ........ 15

C. "Dilution" Is Content Discrimination That Fails Strict Scrutiny ........ 17

## TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Abdin v. CBS Broad. Inc.*, 971 F.3d 57 (2d Cir. 2020) .......... 9

*Anderson v. City of Hermosa Beach*, 621 F.3d 1051 (9th Cir. 2010) .......... 14

*Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*, 598 U.S. 508 (2023) .......... 3, 7, 8, 10

*Arica Institute, Inc. v. Palmer*, 970 F.2d 1067 (2d Cir. 1992) .......... 3, 10, 12

*Authors Guild v. Google, Inc.*, 804 F.3d 20 (2d Cir. 2015) .......... 3, 11, 12

*Authors Guild, Inc. v. HathiTrust*, 755 F.3d 87 (2d Cir. 2014) .......... 6

*Barbosa da Cunha v. Freden*, 175 F.4th 61 (2d Cir. 2026) .......... 13

*Bartz v. Anthropic PBC*, 787 F. Supp. 3d 1007 (N.D. Cal. 2025) .......... passim

*Bleistein v. Donaldson Lithographing Co.*, 188 U.S. 239 ,(1903) .......... 17

*Boisson v. Banian, Ltd.*, 273 F.3d 262 (2d Cir. 2001) .......... 10

*Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569 (1994) .......... 3, 10, 11

*Castle Rock Entm't, Inc. v. Carol Publ'g Group*, 150 F.3d 132 (2d Cir. 1998) .......... 10

*Citizens United v. FEC*, 558 U.S. 310 (2010) .......... 15

*Cohen v. California*, 403 U.S. 15 (1971) .......... 14

*Consol. Edison Co. of N.Y. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 530 (1980) .......... 18

*Design Basics, LLC v. Signature Constr., Inc.*, 994 F.3d 879 (7th Cir. 2021) .......... 9

*DiTocco v. Riordan*, 815 F. Supp. 2d 655 (S.D.N.Y. 2011) .......... 11

*Eldred v. Ashcroft*, 537 U.S. 186 (2003) .......... 10, 14

*Emerson v. Davies*, 8 F. Cas. 615 (C.C.D. Mass. 1845) (No. 4,436) .......... 10

*Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340 (1991) .......... 8, 13

*Freeman v. Deebs-Elkenaney*, 823 F. Supp. 3d 402 (S.D.N.Y. 2026) .......... 11

*Google LLC v. Oracle America, Inc.*, 593 U.S. 1 (2021) .......... 3, 6, 7, 13

*Hachette Book Group, Inc. v. Internet Archive*, 115 F.4th 163 (2d Cir. 2024) .......... 8

*Hoehling v. Universal City Studios, Inc.*, 618 F.2d 972 (2d Cir. 1980) .......... 11

*INS v. AP*, 248 U.S. 215 (1918) .......... 11

*Kadrey v. Meta*, 788 F. Supp. 3d 1026 (N.D. Cal. 2025) .......... passim

*Kelly v. Arriba Soft Corp.*, 336 F.3d 811 (9th Cir. 2003) .......... 7

*Martin v. City of Struthers*, 319 U.S. 141 (1943) .......... 14

*McCullen v. Coakley*, 573 U.S. 464 (2014) .......... 18

*Moody v. NetChoice, LLC*, 603 U.S. 707 (2024) .......... 14

*NBA v. Motorola, Inc.*, 105 F.3d 841 (2d Cir. 1987) .......... 11

*Nichols v. Universal Pictures Corp.*, 45 F.2d 119 (2d Cir. 1930) .......... 11

*Perry v. L.A. Police Dep't*, 121 F.3d 1365 (9th Cir. 1997) .......... 16

*Reed v. Town of Gilbert*, 576 U.S. 155 (2015) .......... 17

*Reyher v. Children's Television Workshop*, 533 F.2d 87 (2d Cir. 1976) .......... 11

*Romanova v. Amilus Inc*, 138 F.4th 104 (2d Cir. 2025) .......... 2, 3, 8

*Rosemont Enters. v. Random House*, 366 F.2d 303 (2d Cir. 1966) .......... 11, 12

*Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819 (1995) .......... 15

*Sega Enters. Ltd. v. Accolade, Inc.*, 977 F.2d 1510 (9th Cir. 1991) .......... 7, 13

*Skidmore as Trustee for Randy Craig Wolfe Trust v. Led Zeppelin*, 952 F.3d 1051 (9th Cir. 2020) (en banc) .......... 9

*Skidmore v. Swift & Co.*, 323 U.S. 134 (1944) .......... 13

*Sony Computer Entm't, Inc. v. Connectix Corp.*, 203 F.3d 596 (9th Cir. 2000) .......... 13

*Sony Corp. of America v. Universal City Studios*, 464 U.S. 417 (1984) .......... 17

*Stiles v. HarperCollins Publishers*, 801 F. Supp. 2d 233 (S.D.N.Y. 2011) .......... 11

*Tinker v. Des Moines Ind. Commun. Sch. Dist.*, 393 U.S. 503 (1969) ........................................ 14

*Tufenkian Import/Export Ventures, Inc. v. Einstein Moomjy, Inc.*, 338 F.3d 127 (2d Cir. 2003) ........................................ 3, 10

*United States v. Caronia*, 703 F.3d 149 (2d Cir. 2012) ........................................ 3, 16

*Wainwright Secs., Inc. v. Wall St. Transcript Corp.*, 558 F.2d 91 (2d Cir. 1977) ........................ 11

*Walker v. Time Life Films, Inc.*, 784 F.2d 44 (2d Cir. 1986) ........................................ 11

*Williams v. Crichton*, 84 F.3d 581 (2d Cir. 1996) ........................................ 11

*Wright v. Warner Books, Inc.*, 953 F.2d 731 (2d Cir. 1991) ........................................ 12

**CONSTITUTIONAL PROVISIONS**

U.S. CONST. amend. I ........................................ 14

U.S. CONST. art. I, § 8, cl. 8 ........................................ 2, 8

**STATUTES**

17 U.S.C. § 102 ........................................ 9, 13

17 U.S.C. § 106 ........................................ 13

17 U.S.C. § 107 ........................................ 3, 7, 13

**TREATISES**

4 PATRY ON COPYRIGHT § 10.155.40 ........................................ 2, 18

**OTHER AUTHORITIES**

Tom B. Brown et al., *Language Models Are Few-Shot Learners*, arXiv (2020) ........................... 4

Zihan Chen et al., *A Survey of Scaling in Large Language Model Reasoning*, 28 ACM SIGKDD EXPLORATIONS NEWSLETTER 63 (2025) ........................................ 4

Richard Corliss, *What Jack Valenti Did for Hollywood*, TIME (Apr. 26, 2007) .......................... 16

Kat Eschner, *John Philip Sousa Feared 'The Menace of Mechanical Music,'* SMITHSONIAN MAG. (Nov. 6, 2017) ........................................ 16

IAN GOODFELLOW, YOSHUA BENGIO & AARON COURVILLE, DEEP LEARNING (2016) .................. 5

Wendy J. Gordon, *Fair Use as Market Failure: A Structural and Economic Analysis of the Betamax Case and Its Predecessors*, 82 COLUM. L. REV. 1600 (1982) ..................................... 5

Tom Hodgkinson, *Laments of the Old Trades*, IDLER (Jul. 21, 2023) ........................................ 16

Jordan Hoffmann et al., *Training Compute-Optimal Large Language Models*, arXiv (2022)....... 4

Jared Kaplan et al., *Scaling Laws for Neural Language Models*, arXiv (2020) ........................ 1, 4

Alex Krizhevsky, Ilya Sutskever & Geoffrey Hinton, *ImageNet Classification with Deep Convolutional Neural Networks*, 60 COMMUNS. ACM 84 (2017) ............................................ 5

Yann LeCun, Yoshua Bengio & Geoffrey Hinton, *Deep Learning*, 521 NATURE 436 (2015) .................................................................................... 1-2, 4

Edward Lee, *Copyright Dilution Under Constitutional Scrutiny*, 25 CHI.-KENT J. INTELL. PROP. 1 (2026)............................................................................................. 17

Edward Lee, *Fair Use and the Origin of AI Training,* 63 HOU. L. REV. 105 (2025) .................. 16

Mark A. Lemley & Bryan Casey, *Fair Learning*, 99 TEX. L. REV. 743 (2021) ........................ 5, 6

Amanda Levendowski, *How Copyright Law Can Fix Artificial Intelligence's Implicit Bias Problem*, 93 WASH. L. REV. 579 (2018) ......................................................................... 5

Kelvin Luu et al., *Time Waits for No One! Analysis and Challenges of Temporal Misalignment*, in Proceedings of 2022 Conference of NAACL: Human Language Techs. 5944 (2022) .......... 6

Jim Milliot, *Publishing Sales Hit $33.4 Billion in 2025*, PUBLISHERS WEEKLY (Aug. 10, 2026) ........................................................................................................ 18

DWARKESH PATEL & GAVIN LEECH: THE SCALING ERA: AN ORAL HISTORY OF AI. 2019-2025 (2025)...................................................................................................... 2

Christian Peukert, *The Economics of Copyright and AI: Empirical Evidence and Optimal Policy* (2025)............................................................................................... 5

Kevin Roose, *GPT-4 Is Exciting and Scary*, N.Y. TIMES (Mar. 15, 2023) .................................. 1

KEVIN ROOSE, THE AGI CHRONICLES (2026) ................................................................... 4

Kevin Roose, *The Brilliance and Weirdness of ChatGPT*, N.Y. TIMES (Dec. 5, 2022)................. 1

Rebecca Tushnet, *All of This Has Happened Before and All of This Will Happen Again: Innovation in Copyright Licensing*, 29 BERKELEY TECH. L.J. 1447 (2014) .............................. 6

*The New York Times Company Reports Second-Quarter 2026 Results*, SEC (Aug. 5, 2026) ..... 18

U.S. COPYRIGHT OFF., AUTHORS, ATTRIBUTION, AND INTEGRITY (Apr. 2019) .......... 14

U.S. COPYRIGHT OFF., COPYRIGHT & A.I. PART 3: GENERATIVE AI TRAINING (prepublication version May 2025) .......... 13

## STATEMENT OF INTEREST OF AMICI

Amici Copyright Law Professors Edward Lee and Rebecca Tushnet are scholars whose research focuses on copyright law and the First Amendment. They have taught and written on copyright law, the Copyright Clause, and the First Amendment. Amici have no direct interest in this litigation. They share a professional interest in seeing copyright law serve the broader public interest in the United States, consistent with the Copyright Clause's goal of promoting the progress of science. Because of their expertise, Amici are uniquely positioned to provide the Court with a perspective reflecting the broader public interest in copyright's fair use doctrine.[1]

## INTRODUCTION AND SUMMARY OF ARGUMENT

ChatGPT was a milestone in AI research. After decades of failures resulting in AI models that were "terrible," ChatGPT was "quite simply, the best artificial intelligence chatbot ever released to the general public." Kevin Roose, *The Brilliance and Weirdness of ChatGPT*, N.Y. TIMES (Dec. 5, 2022), https://tinyurl.com/222ws27z. ChatGPT "is a powerful engine for creativity, and there is no telling the new kinds of scientific, cultural and educational production it may enable." Kevin Roose, *GPT-4 Is Exciting and Scary*, N.Y. TIMES (Mar. 15, 2023), https://tinyurl.com/yjsjzjt4.

To advance the state of the art, OpenAI utilized a concept known to AI researchers as the "scaling laws," which OpenAI's research helped to prove. *See* Jared Kaplan et al., *Scaling Laws for Neural Language Models*, arXiv 3-6 (2020), https://arxiv.org/pdf/2001.08361. In 2015, luminaries in AI research had predicted this "accelerat[ion]" in "progress" from "increases in the amount of available computation and data." Yann LeCun, Yoshua Bengio & Geoffrey Hinton,

[1] No party or party's counsel authored this brief in whole or in part, or contributed money that was intended to fund preparing or submitting this brief. No person other than amici or their counsel contributed money that was intended to fund preparing or submitting this brief.

*Deep Learning*, 521 NATURE 436, 436 (2015), https://tinyurl.com/4bm9d858. Scaling, or increasing the amount of data used to train a model, along with the model size and computing power, improved AI's performance proportionally: as the size increases so does AI's performance. Kaplan et al., *supra*, at 3. OpenAI's scaling of datasets with intermediate copies of copyrighted works to develop better, more advanced AI provides ample justification and a highly transformative purpose under Factor 1 of fair use. *See Romanova v. Amilus Inc*, 138 F.4th 104, 111 (2d Cir. 2025). Scaling was critical to AI's advances. *See* DWARKESH PATEL & GAVIN LEECH: THE SCALING ERA: AN ORAL HISTORY OF AI. 2019-2025, at 20-22 (2025).

The Books and News Plaintiffs attempt to defeat OpenAI's fair use by claiming they suffered market harm from noninfringing outputs people create using Defendants' AI. Books Pl. 37 (Dkt. 1982); News Pl. 63 (Dkt. 2108). These noninfringing outputs are not substantially similar to Plaintiffs' works but are simply in the same genre or contain similar facts. Plaintiffs' unprecedented theory of "dilution" turns copyright on its head. Genres and facts are uncopyrightable. Under the Copyright Clause, these elements are not original "writings" of any "author" and are free to copy. *Feist Publ'ns, Inc. v. Rural Tel. Serv.*, 499 U.S. 340, 347-50 (1991).

The Constitution precludes Plaintiffs' dilution theory. The Copyright Clause limits copyrights granted to authors to "their respective writings." U.S. CONST. art. I, § 8, cl. 8. No author can claim "their writings" extends to genres or facts. Indeed, Plaintiffs themselves borrowed these genres to create their own works. In more than 235 years of copyright law, dilution is "without any precedent and is an erroneous position given it is not only contrary to the statute but is not based on … any infringement at the output stage." 4 PATRY ON COPYRIGHT § 10.155.40 (2026). And penalizing as "dilution" the noninfringing works only of people who used AI—but no one else—violates the First Amendment as impermissible content- and speaker-based discrimination. The

law cannot "target one kind of speaker"—here, creators who use AI to create noninfringing works—"while allowing others to speak without restriction." *United States v. Caronia*, 703 F.3d 149, 165 (2d Cir. 2012).

The Second Circuit strictly adheres to these constitutional limits. For works involving unprotected elements, the "more discerning observer" test requires courts to apply greater scrutiny to avoid basing infringement on unprotected elements. *Tufenkian Import/Export Ventures, Inc. v. Einstein Moomjy, Inc.*, 338 F.3d 127, 130 (2d Cir. 2003). The Second Circuit and this Court have rejected numerous copyright claims based merely on unprotected genres and facts—even though the defendants' works competed with the plaintiffs' works. *Infra* pp. 10-12. And, in analyzing Factor 4 of fair use, the Second Circuit limits "cognizable" market harm to the author's "interest *in the protected aspect* of the author's work." *Authors Guild v. Google, Inc*., 804 F.3d 202, 224 (2d Cir. 2015) (emphasis in original). Everyone "is perfectly entitled to create a competing work" that does not "us[e] plaintiff's original expression." *Arica Institute, Inc. v. Palmer*, 970 F.2d 1067, 1078 (2d Cir. 1992). Plaintiffs do not own genres or facts—and cannot put "a lock limiting the future creativity of new programs." *Google LLC v. Oracle America, Inc.*, 593 U.S. 1, 39 (2021).

## ARGUMENT

### I. OPENAI'S SCALING OF DATASETS TO ADVANCE AI'S FUNCTIONALITIES SERVED A HIGHLY TRANSFORMATIVE PURPOSE AND U.S. INTERESTS

Under Factor 1 of fair use, courts examine "the purpose and character of the use." 17 U.S.C. § 107. Transformative uses, which have "a further purpose or different character" than the original work, weigh in favor of fair use. *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 579 (1994). Transformative purposes provide a "justification for the use." *Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*, 598 U.S. 508, 531 (2023); *Romanova*, 138 F.4th at 111. Defendants'

"further purpose" of using works to develop pioneering technology, which advances both progress and national interest, is a highly transformative fair use. *Google*, 593 U.S. at 29-30.

**A. Scaling the Amount of Training Material Was Critical to AI's Development**

OpenAI's scaling the amount of datasets to develop more advanced AI provides ample justification for OpenAI's use of intermediate copies of works. Through their research, OpenAI recognized the scaling laws: using more—and more diverse—data in training resulted in better, more advanced AI models. *See* Kaplan, *supra*, at 3-6; Tom B. Brown et al., *Language Models Are Few-Shot Learners*, arXiv 6-9 (2020), https://arxiv.org/pdf/2005.14165 (OpenAI's scaling of data's size and diversity for GPT-3). OpenAI's scaling laws were "clearly a major breakthrough." KEVIN ROOSE, THE AGI CHRONICLES 69 (2026). GPT-3, then the largest LLM ever trained, learned the "structure of language" and "appl[ied] it to things it had never seen before." *Id.* at 86-87.

By 2022, other researchers concluded that "the amount of training data that is projected to be needed is far beyond what is currently used to train large models," including OpenAI's GPT-3, which was outperformed by a smaller model trained on far more data. Jordan Hoffmann et al., *Training Compute-Optimal Large Language Models*, arXiv 1, 8, 12 (2022), https://arxiv.org/pdf/2203.15556. The "compute-optimal training" requires increasing training data and model size "in approximately equal proportions" *Id.* at 7. OpenAI agreed, making dramatic improvements in GPT-4 by this scaling approach. ROOSE, *supra*, 116-19. "Scaling has played a pivotal role in the development of state-of-the-art LLMs such as GPT-4, … enabling [it] to generalize across a broad range of tasks with unprecedented accuracy and fluency." Zihan Chen et al., *A Survey of Scaling in Large Language Model Reasoning*, 28 ACM SIGKDD EXPLORATIONS NEWSLETTER 63, 63 (2025), https://tinyurl.com/5248ebc4.

Scaling laws built on knowledge top AI researchers shared. LeCun, Bengio & Hinton,

*supra*, at 1; Alex Krizhevsky, Ilya Sutskever & Geoffrey Hinton, *ImageNet Classification with Deep Convolutional Neural Networks*, 60 COMMUNS. ACM 84, 85 (2017), https://tinyurl.com/2k826a6t (predicting AI advances by "faster GPUs and bigger datasets"). Scaling "completely changed what was possible with deep learning." IAN GOODFELLOW, YOSHUA BENGIO & AARON COURVILLE, DEEP LEARNING 19 (2016), https://tinyurl.com/3pux3pak.

To increase the scale needed to develop more advanced AI models, which "need[] billions of words to train any given LLM," using copyrighted works is unavoidable. *See Bartz v. Anthropic PBC*, 787 F. Supp. 3d 1007, 1030 (N.D. Cal. 2025); *Kadrey v. Meta*, 788 F. Supp. 3d 1026, 1040 (N.D. Cal. 2025) ("LLM's training dataset must be large and diverse"). Using copyrighted works is essential to provide both volume and diversity of works, thereby mitigating biases in AI models. Amanda Levendowski, *How Copyright Law Can Fix Artificial Intelligence's Implicit Bias Problem*, 93 WASH. L. REV. 579, 621 (2018). Moreover, there is "no plausible option" to negotiate licenses for the sheer number of works necessary to train LLMs. Mark A. Lemley & Bryan Casey, *Fair Learning*, 99 TEX. L. REV. 743, 748 (2021). If one copyrighted work must be licensed, then all must— creating an impassible thicket of rights leading to market failure. *See* Wendy J. Gordon, *Fair Use as Market Failure: A Structural and Economic Analysis of the Betamax Case and Its Predecessors*, 82 COLUM. L. REV. 1600, 1627-29 (1982).

Locating all copyright owners for the millions of training works would be difficult enough; negotiating licenses for them, impossible. As one study prepared for the EU Parliament concluded: "identifying individual rightsholders at web-scale is close to impossible," and "bilateral clearance at internet scale is infeasible." Christian Peukert, *The Economics of Copyright and AI: Empirical Evidence and Optimal Policy* 10, 16 (2025), https://tinyurl.com/ye53edw4; *see AI & Copyright: The Infeasibility of Licensing and the Impact on Startups*, ENGINE 2-3 (2026),

https://tinyurl.com/29r695vu. In short, "privately negotiated licenses can never be comprehensive." Rebecca Tushnet, *All of This Has Happened Before and All of This Will Happen Again: Innovation in Copyright Licensing*, 29 BERKELEY TECH. L.J. 1447, 1483 (2014), https://tinyurl.com/yyyvh2k2.

Although no single work from the millions of works used to train LLMs is essential, the entire corpus of training works *is* essential to scale and improve LLMs. *Supra* pp. 4-5. And limiting training data to public domain works from before the 1930s would produce archaic LLMs "filled with 'thous' and 'dosts.'" Lemley & Casey, *supra*, at 755-56. Models would become obsolete upon their creation. It would also exacerbate the challenge of training state-of-the-art AI models that can be responsive and current. *Cf.* Kelvin Luu et al., *Time Waits for No One! Analysis and Challenges of Temporal Misalignment*, *in* Proceedings of 2022 Conference of NAACL: Human Language Techs. 5944 (2022), https://tinyurl.com/58dhajjr (pretraining data older than evaluation data led to degraded model performance).

Both district courts to consider this issue held that using copyrighted works to train LLMs was "highly transformative" in developing a new technology with manifold uses. *Kadrey*, 788 F. Supp. 3d at 1044; *Bartz*, 787 F. Supp. 3d at 1033 ("among the most transformative" technology). Other technology cases support this conclusion. As the Supreme Court recognized, developing "a highly creative and innovative tool" that can perform "a new collection of tasks operating in a distinct and different computing environment" is "inherently transformative." *Google*, 593 U.S. at 30-32. Similarly, Google Book Search's copying and storing of millions of copyrighted books served the "highly transformative purpose" of enabling within-book searches and "new forms of research, known as 'text mining' and 'data mining.'" *Authors Guild*, 804 F.3d at 209-10, 216-17; *Authors Guild, Inc. v. HathiTrust*, 755 F.3d 87, 97 (2d Cir. 2014).

The transformativeness here is even more compelling. After decades of failures in AI research, OpenAI used scaling to advance AI development. Scaling the intermediate training copies "served a different function from the original": to improve AI's overall noninfringing functionalities. *HathiTrust,* 755 F.3d at 97. To disallow scaling would "reduc[e] the usefulness of" LLMs. *Kelly v. Arriba Soft Corp.*, 336 F.3d 811, 821 (9th Cir. 2003). By achieving a major breakthrough in AI, OpenAI's scaling had the transformative purpose of developing "a highly creative and innovative tool," *Google*, 593 U.S. at 30, that far surpassed earlier AI. Such an innovative tool is "consistent with that creative 'progress' that is the basic constitutional objective of copyright itself." *Id.*

### B. Noninfringing Works Users Create Are Separate from Training and Are Not "Competing Substitutes" Within Plaintiffs' Copyright

Under *Warhol*, the training of an AI model is a different use than its subsequent uses by individual prompters. *Warhol*, 598 U.S. at 533-34 (Warhol's 1984 originals separate from later uses). It is uncontested that OpenAI's models can, and regularly do, produce noninfringing outputs. But, if the outputs do not copy any protected elements of works used to train the AI model, there is simply no "use of a copyrighted work." 17 U.S.C. § 107. No one can copyright genres or facts.

The Second Circuit has uniformly limited infringement and fair use analysis to copying of *protected elements*. *Infra* pp. 10-12. Likewise, the Ninth Circuit recognized that "the Copyright Act was intended to promote" intermediate copying to create a new, noninfringing videogame. *Sega Enters. Ltd. v. Accolade, Inc.*, 977 F.2d 1510, 1523 (9th Cir. 1991).

Plaintiffs cannot wish away this fundamental limit on copyright by repeatedly calling a work a "competing substitute" because it involves the same uncopyrightable genre, fact, or idea. Books Pl. 34; News Pl. 60. That would make the Second Circuit's requirement of copying *protected* elements for infringement unnecessary so long as the accused work competes with the

plaintiff's. *Infra* pp. 10-12. None of the cases Plaintiffs cite support such a boundless view of "competing substitutes" including noninfringing works. *See Warhol*, 598 U.S. at 515 (Warhol print copied photograph); *Hachette Book Group, Inc. v. Internet Archive*, 115 F.4th 163, 175 (2d Cir. 2024) (entire book copies); *cf. Romanova*, 138 F.4th at 116-17 (fair use involving copying to provide "a service important to the public … without allowing the reading of any of the copied works"). *Warhol* involved a competing substitute because it contained *protected* elements from and supplanted the plaintiff's photograph. *Warhol*, 598 U.S. at 515. By contrast, works that copy no protected elements cannot cause cognizable copyright harm. *Feist*, 499 U.S. at 343.

## II. PLAINTIFFS' "DILUTION" THEORY VIOLATES THE COPYRIGHT CLAUSE

The Copyright Clause sets forth constitutional limits on copyright. Authors can receive "exclusive right[s]" in only "their respective writings." U.S. CONST. art. I., § 8, cl. 8. And these exclusive rights are limited to the *original* elements authors create in "their respective writings." *Feist*, 499 U.S. at 348. Plaintiffs try to skirt these constitutional limits with a new theory of "market dilution." But Plaintiffs cannot use copyright to penalize as "dilution" wholly noninfringing works that are *not* substantially similar to Plaintiffs' works, but are simply in the same genre or include the same unprotected facts. Plaintiffs' attempt to expand their copyright beyond "their respective writings"—to encompass genres and facts they did not create—violates the Copyright Clause.

### A. No Author Can Claim Genres or Facts as "Their Writings"

Plaintiffs advance dilution theory of market harm based on dicta in *Kadrey*, 788 F. Supp. 3d at 1052. But the parties in *Kadrey* did not even brief this "dilution" theory. *Id.* at 1056. Briefing would have exposed the constitutional infirmities of "dilution."

Under the Constitution, no one can own genres or facts. To be copyrightable, "writings" must satisfy the "constitutional requirement" of originality. *Feist*, 499 U.S. at 346. Originality derives

from the Copyright Clause's word "author," which the Supreme Court defined "in a constitutional sense, to mean 'he to whom anything owes its origin.'" *Id.* (cleaned up). Originality is both a threshold constitutional requirement for copyright and a limit on copyright's scope. "The mere fact that a work is copyrighted does not mean that every element of the work may be protected." *Feist*, 499 U.S. at 348. As the Supreme Court admonished, "copyright protection may extend only to those components of a work that are original to the author." *Id.* No one may claim copyright in facts or ideas because they are not original expression of authors. *Id.* at 349-50. Everyone can "build freely upon the ideas and information conveyed by a work." *Id.*

So too with genres, which are not the original "writing" of any author. Plaintiffs did not originate the genres within which their works fall. They borrowed these genres, as everyone is free to do. Genres are unprotected ideas or methods for structuring common formats of expression—"building blocks [that] belong in the public domain and cannot be exclusively appropriated by any particular author." *Skidmore as Trustee for Randy Craig Wolfe Trust v. Led Zeppelin*, 952 F.3d 1051, 1069 (9th Cir. 2020) (en banc); *see* 17 U.S.C. § 102(b); *Bartz*, 787 F. Supp. 3d at 1021-22.

Likewise, the *scenes a faire* doctrine, *Abdin v. CBS Broad. Inc.*, 971 F.3d 57, 67 (2d Cir. 2020), precludes copyright for "[s]tandard elements in a genre." *Design Basics, LLC v. Signature Constr., Inc.*, 994 F.3d 879, 889 (7th Cir. 2021). If it were otherwise, "then the creation of a single work in a genre would prevent others from contributing to that genre because the copyright owner would have exclusive rights in all of the genre's basic elements." *Id.* Dilution cannot be used to "prevent others from contributing to that genre" as Plaintiffs attempt to do here.

Judge Alsup correctly rejected the *Bartz* plaintiffs' argument for dilution as "unthinkable" because outputs using ideas and facts extracted from training works use nothing protectable from those works. *Bartz*, 787 F. Supp. 3d at 1021-22. Copyright law allows people to freely use concepts

embodied in "all the modern-day classics." *Id.* As Justice Story recognized long ago, "Every book in literature, science and art, borrows, and must necessarily borrow, and use much which was well known and used before. No man creates a new language for himself . . . in writing a book." *Emerson v. Davies*, 8 F. Cas. 615, 619 (C.C.D. Mass. 1845) (No. 4,436); *accord Campbell*, 510 U.S. at 575; *Castle Rock Entm't, Inc. v. Carol Publ'g Group*, 150 F.3d 132, 141 (2d Cir. 1998).

### B. Authors' "Exclusive Right[s]" Cannot Extend to Uncopyrightable Genres or Facts Under Infringement or Fair Use Analysis

Copyright law incorporates this constitutional limit on copyright by recognizing, including in fair use, that using unprotected elements is everyone's right. The "traditional First Amendment safeguards" in copyright law that make it consistent with the First Amendment include both the idea/expression distinction and fair use. *Eldred v. Ashcroft*, 537 U.S. 186, 219-20 (2003); *see also Warhol*, 598 U.S. at 550 (copyright law's "escape valves" include "idea–expression distinction; the general rule that facts may not receive protection; the requirement of originality; the legal standard for actionable copying; and … fair use").

The Second Circuit enforces this constitutional divide between what copyright can and cannot protect. If a plaintiff's work incorporates unprotected elements, the Second Circuit applies greater scrutiny under a "more discerning observer" test. *Tufenkian*, 338 F.3d at 130. This test is "intended to emphasize that substantial similarity must exist between the defendant's allegedly infringing design and the *protectible* elements in the plaintiff's [work]." *Id.* Plaintiffs must that show that defendant's work is substantially similar in the protected elements, "and only those elements." *Boisson v. Banian, Ltd.*, 273 F.3d 262, 272 (2d Cir. 2001) (cleaned up). "[C]opyright laws do not protect these building blocks of knowledge from exploitation by anyone." *Arica*, 970 F.2d at 1074.

Accordingly, the Second Circuit has rejected infringement claims in numerous cases involving similarities in unprotected genres or other stock elements. *See, e.g.*, *Abdin*, 971 F.3d at

70-72 (collecting cases finding stock elements to "science fiction genre"); *Williams v. Crichton*, 84 F.3d 581, 588 (2d Cir. 1996) (dinosaur zoo plot); *Walker v. Time Life Films, Inc.*, 784 F.2d 44, 50 (2d Cir. 1986) (police fiction genre); *Reyher v. Children's Television Workshop*, 533 F.2d 87, 92 (2d Cir. 1976) (story of lost child finding mother); *Nichols v. Universal Pictures Corp.*, 45 F.2d 119, 121-22 (2d Cir. 1930) (parents disapprove children's marriages); *Freeman v. Deebs-Elkenaney*, 823 F. Supp. 3d 402, 444 (S.D.N.Y. 2026) (no infringement because "this is 'romantasy' fiction, so there has to be a romance, and hot boys are a staple of the genre"). And this Court dismissed copyright cases based solely on unprotected elements in books. *Stiles v. HarperCollins Publishers*, 801 F. Supp. 2d 233, 241 (S.D.N.Y. 2011) (Stein, J.); *DiTocco v. Riordan*, 815 F. Supp. 2d 655, 672 (S.D.N.Y. 2011) (Stein, J.), *aff'd*, 496 F. App'x 126 (2d Cir. 2012).

The Second Circuit has also rejected infringement claims in numerous cases involving copying of facts. *See, e.g.*, *Hoehling v. Universal City Studios, Inc.*, 618 F.2d 972, 979 (2d Cir. 1980) ("[T]his circuit['s cases] . . . make clear that factual information is in the public domain."); *Wainwright Secs., Inc. v. Wall St. Transcript Corp.*, 558 F.2d 91, 95 (2d Cir. 1977) (uncopyrightable "news events"); *Rosemont Enters. v. Random House*, 366 F.2d 303, 306 (2d Cir. 1966) (same). News events are just uncopyrightable "history of the day." *INS v. AP*, 248 U.S. 215, 234 (1918). Beyond a narrow exception for "hot news" misappropriation, facts reported in news articles can be freely shared. *NBA v. Motorola, Inc.*, 105 F.3d 841, 852 (2d Cir. 1987). This Court dismissed Plaintiff's misappropriation claim. Order (Dkt. 514).

This constitutional safeguard also limits "cognizable" market harms under Factor 4 of fair use. *Cf. Campbell,* 510 U.S. at 592. The Second Circuit limits cognizable market harm to the author's "interest *in the protected aspect* of the author's work." *Authors Guild*, 804 F.3d at 224. As *Warhol*

explained, fair use is concerned "'with a substantial substitute for matter protected by [the copyright owner's] interests in the original wor[k] or derivatives of [it].'" *Warhol*, 598 U.S. at 531-32 (quoting *Authors Guild*, 804 F.3d at 207). Genres and facts are not "matter protected by" copyright and cannot be cognizable market harm. Applying this limitation, the Second Circuit ruled that performing a Google Books search to find "an unprotected fact" did not infringe a copyrighted book Google copied into its permanent database. *Authors Guild*, 804 F.3d at 224-25. Nor did such use constitute market harm to the book from which the facts were copied, under fair use analysis. *Id.*

If Plaintiffs' dilution theory were correct, a biographer who made a personal copy of a past work to annotate it in developing her own analysis of historical events would infringe even if the biography she published was noninfringing. Why? Under Plaintiffs' theory, the biographer's intermediate copy, used only for annotation purposes, puts her on the hook for putative "market dilution" because the noninfringing biography is a "competing substitute." But that is not the law. *Cf. Wright v. Warner Books, Inc.*, 953 F.2d 731, 740 (2d Cir. 1991) (biographer's quotes from Richard Wright's published works and unpublished letters were fair use); *Rosemont Enters.*, 366 F.2d at 305 (biographer may have fair use in using published articles on Howard Hughes).

Everyone "is perfectly entitled to create a competing work" that does not "us[e] plaintiff's original expression," or contain "infringing portions." *Arica*, 970 F.2d at 1078. If a defendant creates a new work that does not copy any original element from plaintiff's work, there is simply no cognizable harm. *Id.*; *see Wright*, 953 F.2d at 739 (Factor 4 focuses on market effect from copying expression, not facts). As Judge Alsup explained in rejecting the book authors' dilution argument in *Bartz*, "This is not the kind of competitive or creative displacement that concerns the Copyright Act. The Act seeks to advance original works of authorship, not to protect authors against competition." *Bartz*, 787 F. Supp. 3d at 1032. "[A]n attempt to monopolize the market by making it impossible for

others to compete runs counter to the statutory purpose of promoting creative expression and cannot constitute a strong equitable basis for resisting … the fair use doctrine." *Sega*, 977 F.2d at 1523-24.

Creating new, noninfringing works thus weighs in favor of fair use: "It is precisely this growth in creative expression, based on the dissemination of other creative works and the unprotected ideas contained in those works, that the Copyright Act was intended to promote." *Sega*, 977 F.2d at 1523. In *Sega*, the Ninth Circuit held that Accolade, Sega's competitor, made a fair use in copying Sega's operating system to extract an uncopyrightable element to allow Accolade's own video games to play on Sega's consoles—creating a noninfringing work in the same genre. *See id.* at 1523-24. And the public benefited from this increase in new works, favoring fair use. *Id.* at 1522, 1524; *see Sony Computer Entm't, Inc. v. Connectix Corp.*, 203 F.3d 596, 606-08 (9th Cir. 2000) (fair use where defendant's new work did "not itself contain infringing material"); *Google*, 593 U.S. at 22, 39 (citing *Sega*, 977 F.2d at 1521-27; *Connectix*, 203 F.3d at 607); *HathiTrust*, 755 F.3d at 95 (citing *Connectix*, 203 F.3d at 599-601).

Constitutional avoidance compels this Court to reject "dilution," a concept contrary to the terms of the Copyright Act. *See Barbosa da Cunha v. Freden*, 175 F.4th 61, 93 (2d Cir. 2026). The Act ties exclusive rights and fair use to uses of "the copyrighted work," meaning "original works." *See* 17 U.S.C. §§ 102, 106, 107. The scope of what copyright holders may assert is always limited to original elements in the work. *Feist*, 499 U.S. at 348. But with outputs alleged to cause dilution, there is no substantial similarity between works, or even copying of any protected element. Copyright holders have no copyright interest to assert.[2]

---

[2] In a nonfinal, prepublication report, the Copyright Office conceded that "dilution" is "uncharted territory." U.S. COPYRIGHT OFF., COPYRIGHT & A.I. PART 3: GENERATIVE AI TRAINING 64-66 (prepublication version May 2025), https://tinyurl.com/bdcwd6nc.The Copyright Office's terse endorsement of dilution receives no deference, *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 392 (2024), and does not qualify even as persuasive authority under *Skidmore v. Swift & Co.*, 323 U.S. 134, 139-40 (1944). The Office did not discuss the requirement of "cognizable" market harm

## III. DILUTION VIOLATES THE FIRST AMENDMENT BY DISCRIMINATING BASED ON CONTENT AND CLASS OF SPEAKERS

Dilution disfavors the noninfringing works of only one class of speakers—people who use Defendants' AI in creating their works. By discriminating based on both content and class of speakers, dilution violates the First Amendment. U.S. CONST. amend. I.

### A. The First Amendment Protects Individuals Who Use AI for Expression

People who use AI to create or publish noninfringing works are engaged in expressive activities protected by the First Amendment. As the Supreme Court recognized in drawing a limit on copyright's scope, "[t]he First Amendment securely protects the freedom to make … one's own speech." *Eldred*, 537 U.S. at 221. Speech activities protected by the First Amendment are broad and are not limited to works of authorship. *See, e.g.*, *Cohen v. California*, 403 U.S. 15, 16 (1971) (wearing jacket with "Fuck the Draft"); *Tinker v. Des Moines Ind. Commun. Sch. Dist.*, 393 U.S. 503, 505-06 (1969) (wearing antiwar black armbands).

The First Amendment protects not just creators of expression, but also entities and individuals who adopt, edit, curate, publish, or just receive expression. *See Moody v. NetChoice, LLC*, 603 U.S. 707, 728 (2024) ("expressive activity includes presenting a curated compilation of speech originally created by others"); *Anderson v. City of Hermosa Beach*, 621 F.3d 1051, 1062 (9th Cir. 2010) (tattoo artist and person receiving tattoo "are engaged in expressive activity"). Accordingly, "[t]his freedom embraces the right to distribute literature … and necessarily protects the right to receive it." *Martin v. City of Struthers*, 319 U.S. 141, 143 (1943). The First Amendment protects individuals who express their views by disseminating noninfringing outputs they created

under fair use precedents. Nor did the Office acknowledge, much less analyze, the serious constitutional issues raised by dilution, in sharp contrast to its report on moral rights that admonished: "[A]ny changes to the law must comport with the First Amendment, fair use, and constitutional requirement of limited copyright terms." U.S. COPYRIGHT OFF., AUTHORS, ATTRIBUTION, AND INTEGRITY 28-32 (Apr. 2019), https://tinyurl.com/39pfjjas.

from prompts, just as the First Amendment protects a person who quotes the Bible. But the public distribution of AI-generated works is precisely what Plaintiffs seek to penalize as dilution.

**B. "Dilution" Is Speaker-Based Discrimination**

Dilution curtails the "traditional contours" of fair use and the idea-expression distinction, *Eldred*, 537 U.S. at 221. And it violates the First Amendment by discriminating based on the class of speakers. Dilution divides human creators into two classes: (1) people who "create things the old-fashioned way," and (2) "[p]eople … [who] prompt … AI models to produce … outputs." *Kadrey*, 788 F. Supp. 3d at 1034-35. Only AI creators' noninfringing works are disfavored as "dilution."

But this speaker-based discrimination—disfavoring AI creators alone—is unconstitutional. As the Supreme Court explained, "the Government may commit a constitutional wrong when by law it identifies certain preferred speakers." *Citizens United v. FEC*, 558 U.S. 310, 340 (2010). "Prohibited, too, are restrictions distinguishing among different speakers, allowing speech by some but not others." *Time Warner Cable, Inc. v. FCC*, 729 F.3d 137, 155 (2d Cir. 2013) (quoting *Citizens United*, 588 U.S. at 340). The law "may not favor one speaker over another," *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 828 (1995), or "determine … what speech and speakers are worthy of consideration." *Citizens United*, 558 U.S. at 341.

Dilution does exactly that. It favors traditional creators who create their works "the old-fashioned way," Books Pl. 2-3 (quoting *Kadrey*, 788 F. Supp. 3d at 1035), over everyone who uses Defendants' AI to create wholly noninfringing works in the same genres shared by Plaintiffs' works. Dilution penalizes what many other defendants in Second Circuit cases were all allowed to do: publish noninfringing works that copied no protected elements. *Supra* pp. 10-12 (collecting cases). Dilution discriminates against AI creators alone.

*United States v. Caronia* is instructive. The Second Circuit held that the government's interpretation of the Federal Food, Drug and Cosmetic Act's misbranding provision to prohibit a pharmaceutical manufacturer's promotion of an off-label use of its drug was speaker-based discrimination. 703 F.3d at 154, 165. It "is speaker-based because it targets one kind of speaker—pharmaceutical manufacturers—while allowing others to speak without restriction," including physicians who prescribe off-label uses. *Id.*; *see Perry v. L.A. Police Dep't*, 121 F.3d 1365, 1371 (9th Cir. 1997) (statutory exception discriminating against certain speakers violated First Amendment). So, too, here. Dilution targets only one kind of speaker—AI creators—while allowing all others to create noninfringing works in the same genre or containing the same facts as Plaintiffs' works without restriction. Indeed, news organizations routinely report the same news reported in an "exclusive" story by another organization.

"[Printers] flood the market with anything that hints of lasciviousness. Destroy the printing press I beg you," a scribe decried in 1473. Tom Hodgkinson, *Laments of the Old Trades*, IDLER (Jul. 21, 2023), https://tinyurl.com/2rayry98. The painter Paul Delaroche exclaimed, of photography: "From today, painting is dead!"; John Philip Sousa said the phonograph would destroy music; musicians later feared "software-based music production would replace human artists." Edward Lee, *Fair Use and the Origin of AI Training,* 63 HOU. L. REV. 105, 190 (2025); Kat Eschner, *John Philip Sousa Feared 'The Menace of Mechanical Music,'* SMITHSONIAN MAG. (Nov. 6, 2017), https://tinyurl.com/2tpj95b6. Jack Valenti condemned the VCR's "savagery and … ravages." Richard Corliss, *What Jack Valenti Did for Hollywood*, TIME (Apr. 26, 2007), https://tinyurl.com/ysn7ss2f. These past fears were all unfounded.

Radio competed with books; television with radio; videogames with television; the Internet with broadcast media. These new technologies all had significant social effects; so will AI. But it is

for Congress to address "major technological innovations [that] alter the market for copyrighted works." *Sony Corp. of America v. Universal City Studios*, 464 U.S. 417, 431 (1984). As the Supreme Court recognized in a past case of technological disruption, a "recurring theme" is "[t]he judiciary's reluctance to expand the protections afforded by copyright without explicit legislative guidance." *Id.*

History repeats itself in today's debate over using AI in artistic expression. *See* Edward Lee, *Copyright Dilution Under Constitutional Scrutiny*, 25 CHI.-KENT J. INTELL. PROP. 1, 33-35 (2026). Many criticisms of AI—even vitriol against AI "slop"—were submitted to the Copyright Office's study that endorsed dilution. *See* Lee, 63 HOU. L. REV. at 207-09 & n.561. It is not proper, however, for courts to evaluate the quality of works—or treat some as second class. *Cf. Bleistein v. Donaldson Lithographing Co.*, 188 U.S. 239, 251 (1903).

"[M]ore speech, not less, is the governing rule" in the United States. *Citizens United*, 558 U.S. at 361. Some view AI creators as second class. But the law may not do so. Under the First Amendment, one person's slop is "another's lyric." *Cohen*, 403 U.S. at 25.

**C. "Dilution" Is Content Discrimination That Fails Strict Scrutiny**

Denying fair use based on "dilution" from noninfringing expression violates the First Amendment. "Content-based laws—those that target speech based on its communicative content—are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). Plaintiffs' dilution theory is content-based: it "singles out specific subject matter for differential treatment," namely, noninfringing AI-generated works in the same genre or containing the same facts as Plaintiffs' works. *Reed*, 576 U.S. at 169. To identify dilution, one must target specific content (i.e., genres and facts) in the works at issue.

"Mere speculation of harm does not constitute a compelling state interest." *Consol. Edison Co. of N.Y. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 530, 543 (1980). Plaintiffs' justification for dilution falls far short. *Kadrey* rejected dilution because there was no evidence substantiating it, just "speculation." 788 F. Supp. at 1056; 4 PATRY ON COPYRIGHT § 10.155.40 (dilution is erroneous and "speculative"). Plaintiffs may offer evidence showing that they expect to make less revenue than they would in a hypothetical world without AI or with universal licensing, but, under the First Amendment, such a showing is not evidence of a compelling need to insulate them from competition from noninfringing works. *Cf.* Jim Milliot, *Publishing Sales Hit $33.4 Billion in 2025*, PUBLISHERS WEEKLY (Aug. 10, 2026), https://tinyurl.com/44w9tkzy (book revenues up 2.5%); *The New York Times Company Reports Second-Quarter 2026 Results*, SEC (Aug. 5, 2026) (Q2 revenues increased 11.2% to $762.5 million), https://tinyurl.com/3p87jvr6.

Content-based restrictions must also be "the least restrictive means of achieving a compelling state interest." *McCullen v. Coakley*, 573 U.S. 464, 478 (2014). But, if fair use in AI training is denied merely based on "dilution" from noninfringing works, everyone's ability to use AI to create any noninfringing works is in jeopardy. *Kadrey*, 788 F. Supp. 3d at 1034-35 (suggesting dilution may make AI training "generally illegal"). Plaintiffs even ask this Court to order the "destruction" of all AI models trained on any of their works. *See, e.g.*, Third Am. Compl. 66 (Dkt. 1677). That destruction would deny the public any use of Defendants' AI.

There are far less restrictive alternatives, such as adhering to the constitutional limit on copyright to original elements. *Bartz*, 787 F. Supp. 3d at 1021-22. Extending copyright to genres or facts to deny fair use in training AI for wholly noninfringing uses "would … shackle the First Amendment in its attempt to secure 'the widest possible dissemination of information from diverse and antagonistic sources.'" *Sullivan*, 376 U.S. at 266 (cleaned up).

## CONCLUSION

The Court should grant Defendants' motion for summary judgment on fair use.

Dated: Oct. 30, 2026

Respectfully submitted,

*/s/ Rebecca Tushnet*
Rebecca Tushnet
Frank Stanton Professor of the First Amendment
Harvard Law School
1563 Massachusetts Avenue, Hauser 520
Cambridge, MA 02138
(703) 593-6759
rtushnet@law.harvard.edu

*Counsel for [Proposed] Amici Curiae Copyright Law Professors Edward Lee and Rebecca Tushnet*

Donald M. Falk
**SCHAERR JAFFE LLP**
One Embarcadero Center, Suite 1200
San Francisco, CA 94111
(415) 562-4942
*Admission pro hac vice pending*

## CERTIFICATE OF COMPLIANCE

I, Rebecca Tushnet, an attorney duly admitted to practice law in this Court, hereby certify that this brief complies with the word count limit because it contains 5,867 words, excluding the parts exempted by Local Civil Rule 7.1(c). In preparing this certification, I have relied on the word count of the word-processing system used to prepare this brief.

Dated: Oct. 30, 2026

*/s/ Rebecca Tushnet*

Rebecca Tushnet
Frank Stanton Professor of the First Amendment Harvard Law School
1563 Massachusetts Avenue, Hauser 520
Cambridge, MA 02138
(703) 593-6759
rtushnet@law.harvard.edu

*Counsel for [Proposed] Amici Curiae Copyright Law Professors Edward Lee and Rebecca Tushnet*