# EXHIBIT A

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE: OPENAI, INC., COPYRIGHT INFRINGEMENT LITIGATION<br><br>This Document Relates To:<br><br>Case No. 1:23-cv-08292<br>Case No. 1:25-cv-04315<br>Case No. 1:23-cv-11195 | 25-md-3143 (SHS) (OTW)<br><br>Hon. Sidney H. Stein<br>Hon. Ona T. Wang |

**[PROPOSED] BRIEF OF AMICUS CURIAE ASHLEY JUDD IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**

Dated: October 30, 2026

Elizabeth C. Lockwood
Kathryn M. Ali
Arianna H. Zoghi
Ali & Lockwood LLP
501 H Street NE, Suite 200
Washington, D.C. 20002
(202) 651-2475
liz.lockwood@alilockwood.com

*Counsel for Amicus Curiae Ashley Judd*

**TABLE OF CONTENTS**

INTEREST OF AMICUS CURIAE .................... 1

INTRODUCTION AND SUMMARY OF ARGUMENT .................... 1

ARGUMENT .................... 3

CONCLUSION .................... 8

# TABLE OF AUTHORITIES

## Cases

*Authors Guild v. Google, Inc.*, 804 F.3d 202 (2d Cir. 2015) .......... 8

*Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569 (1994) .......... 8, 9

*Chi Sch. Reform Bd. of Trs. v. Substance, Inc.*, 79 F. Supp. 2d 919 (N.D. Ill. 2000) .......... 9

*Chi. Bd. of Educ. v. Substance, Inc.*, 354 F.3d 624 (7th Cir. 2003) .......... 9

*Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539 (1985) .......... 8

*Soc'y of Holy Transfiguration Monastery, Inc. v. Gregory*, 689 F.3d 29 (1st Cir. 2012) .......... 9

*Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417 (1984) .......... 12

## Statutes

17 U.S.C. § 107 .......... 8

## Other Authorities

Dr. Stacy L. Smith & the Annenberg Inclusion Initiative, *Inequality in 1,900 Popular Films* (2026), https://bit.ly/4is7nO7 .......... 11, 12

Jodi Kantor & Megan Twohey, *Harvey Weinstein Paid Off Sexual Harassment Accusers for Decades*, N.Y. Times (Oct. 5, 2017), https://bit.ly/4stFF86 .......... 6

## INTEREST OF AMICUS CURIAE

Ashley Judd is an actress, humanitarian, and political activist who was the first prominent person to go on the record as a source in *The New York Times*'s investigation into Harvey Weinstein. Ms. Judd would not have gone public with her story were it not for the human element of the journalistic process, including her personal relationships with the reporters and her trust in the reporters' decision making and publication strategy. Ms. Judd's decision to publicly tell her story paved the way for others to come forward, and for further reporting on sexual misconduct, ultimately mainstreaming the #MeToo movement and catapulting a public reckoning with sexual harassment and assault. None of this transformational reporting would have been possible without well-resourced human journalists. Ms. Judd's experience as a named source in this groundbreaking story gives her a unique understanding of the importance of preserving the professional judgment, relationships of trust, and institutional resources that are the bedrock of quality investigative journalism.

## INTRODUCTION AND SUMMARY OF ARGUMENT

In October 2017, *The New York Times* published a bombshell article revealing that Harvey Weinstein had been sexually harassing and assaulting women in the film industry for decades.[1] Since then, more than 80 women in the entertainment industry have come forward to accuse Weinstein of sexual misconduct. As a result, he is currently serving time in prison for sexual assault. And the article was a watershed moment, inspiring thousands of women to come forward about their own experiences with sexual assault and harassment, propelling the #MeToo movement, and driving systemic and cultural change in how society thinks about and treats sexual

[1] *See* Jodi Kantor & Megan Twohey, *Harvey Weinstein Paid Off Sexual Harassment Accusers for Decades*, N.Y. Times (Oct. 5, 2017), https://bit.ly/4stFF86.

misconduct in the workplace.

Only one well-known actress was willing to go on record for that article: Ashley Judd. Her decision to do so did not come easily or quickly. Ms. Judd was originally contacted about the story by her friend Nicholas Kristof, a journalist and columnist at the New York Times, who told her that his colleague, Jodi Kantor, was interested in speaking with her. Ms. Judd trusted Mr. Kristof, with whom she had a long friendship, and was open to the introduction. The first time she spoke with Ms. Kantor was over an hour-long FaceTime call, during which Ms. Judd described a 1997 incident where Weinstein sexually harassed her in a hotel. Ms. Kantor listened attentively, letting Ms. Judd tell her story. But Ms. Judd was wary of accusing Weinstein publicly, worried about how the public might react and about the possibility of retaliation. Ms. Kantor did not push Ms. Judd: She respected her hesitation and was patient with her.

Over several months, Ms. Kantor built a relationship with Ms. Judd. They met in person, and Ms. Kantor asked Ms. Judd to imagine what it would be like to go on the record. Ms. Kantor listened to Ms. Judd's concerns and understood that Ms. Judd would feel more comfortable coming forward if her story was corroborated by other similar incidents. In one phone call, Ms. Kantor detailed for Ms. Judd the strength of the corroborating evidence she had carefully collected, including accounts of Weinstein's employees, human resources documents, and legal and financial records of settlements, all demonstrating a clear pattern of behavior. But Ms. Judd was still uncertain; again, Ms. Kantor gave her the space she needed to make the decision.

When Ms. Judd ultimately decided to go public, it was because she trusted Ms. Kantor, as well as Ms. Kantor's colleague, Megan Twohey. She believed in their judgment about how to tell the story responsibly, and was confident that Ms. Kantor and Ms. Twohey would give her the room to decide what she wanted to say. That trust was not built on reassurances alone. It grew out of

months of human interaction—conversations, in-person meetings, and the gestures, emotions, and body language that no automated process can replicate.

Copyright protection makes investigative journalism like the reporting that gave Ms. Judd the confidence to publicly accuse Weinstein possible. It allows news organizations to recoup the substantial investment that such reporting requires, and that investment sustains the careful, human-driven process on which sources like Ms. Judd rely. Allowing artificial intelligence to freeload off of the work of investigative journalists threatens the industry as a whole, and risks leaving potentially paradigm-shifting stories like Ms. Judd's untold.

## ARGUMENT

"The ultimate goal of copyright is to expand public knowledge and understanding, which copyright seeks to achieve by giving potential creators exclusive control over copying of their works, thus giving them a financial incentive to create informative, intellectually enriching works for public consumption." *Authors Guild v. Google, Inc.*, 804 F.3d 202, 212 (2d Cir. 2015). There are limited exceptions to copyright laws for certain "fair use" of copyrighted materials. The fair use exception allows courts to "avoid rigid application of the copyright statute" if "it would stifle the very creativity which that law is designed to foster." *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 577 (1994) (quotation omitted). To determine whether reproduction of a copyrighted work constitutes fair use, the "single most important element" courts consider is "the effect of the use upon the potential market for or value of the copyrighted work." *Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 566 (1985); 17 U.S.C. § 107. Evidence that "unrestricted and widespread conduct of the sort engaged in by the defendant" would adversely impact the market for the original copyrighted works weighs heavily against a finding of fair use. *Campbell*, 510 U.S. at 590 (quotation omitted).

*The New York Times*'s works are the product of exactly the kind of investment described above. The value of those works lies not only in the facts they report but in how the *Times* reports them: the selection and arrangement of sources, the narrative structure, and the editorial judgments that make a story credible to readers and safe for sources. That is the value Defendants' use puts at risk.

In particular, Defendants' products threaten the market for the *Times*'s investigative reporting by offering users a substitute for the reporting itself: not merely the underlying facts, which anyone may report, but the *Times*'s expression of them. When a user can obtain the *Times*'s account of a story without visiting the *Times*, revenue that would have flowed to the outlet that invested in the story is diverted elsewhere. That loss of revenue threatens the resources available for future investigations and the quality of investigative journalism, and it could ultimately eliminate the market for in-depth investigative journalism altogether.

Investigative journalism is expensive. Even a single story can take months or years of reporting, editing, and legal review before publication. Add travel and infrastructure expenses, and costs quickly balloon. If generative-AI is able to reproduce that work and provide it to users at no cost (or a lower cost), would-be subscribers will have less reason to pay for the original, and advertisers will be less likely to purchase placements with the news outlets that produced it.

The result would be less funding for journalists like Jodi Kantor and Megan Twohey to investigate stories like Ashley Judd's. Breaking the Weinstein case took months of painstaking work, including obtaining and reviewing records, interviewing sources, and writing and editing the article itself. Without adequate funding, Ms. Judd's story may never have been brought to light, Weinstein may never have been held to account for his actions, and there may never have been a #MeToo movement that revolutionized the way society viewed and handled workplace sexual

misconduct. Diverting funding away from investigative reporting would leave survivors like Ms. Judd without public exposure as an important accountability mechanism, further emboldening people like Weinstein who abuse their positions of power. In short, "unrestricted and widespread" use of products like those at issue in this case would harm not only *The New York Times* and similar institutions, but also investigative journalism as a whole, and the public good it provides. *Campbell*, 510 U.S. at 590 (quotation omitted).[2]

The proliferation of generative-AI products will also adversely affect the market for investigative journalism by removing the human element from the storytelling process, making future sources like Ms. Judd more reluctant to go on record for fear that their stories will be retold irresponsibly or inaccurately. Ms. Judd trusted Ms. Kantor and Ms. Twohey with her story because she had faith in their journalistic judgment and ethics, and in their creative process, including their ability to be thoughtful about how to portray survivors and abusers, appropriately fact-check the story, discern which details to include in the story, and decide how to frame the narrative. That trust came from the relationship that Ms. Kantor and Ms. Twohey built with Ms. Judd. Defendants' products threaten to reframe these stories in ways untouched by that vital human element and to introduce inaccuracies that can harm credibility with readers and misrepresent sources' stories. *See* Compl. ¶ 138, ECF No. 1 (Defendants' products have hallucinated fake quotes from sources).

Ms. Judd never would have entrusted her story to an anonymous process, an aggregator, or

---

[2] Courts have recognized that the fourth factor "cannot be reduced to strictly monetary terms." *Soc'y of Holy Transfiguration Monastery, Inc. v. Gregory*, 689 F.3d 29, 64 (1st Cir. 2012); *see also Chi Sch. Reform Bd. of Trs. v. Substance, Inc.*, 79 F. Supp. 2d 919, 933–34 (N.D. Ill. 2000) (refusing to distinguish between "future profits" and "future educational value" of copyrighted work and holding the publishing of standardized test questions did not fall under fair use); *Chi. Bd. of Educ. v. Substance, Inc.*, 354 F.3d 624, 630 (7th Cir. 2003) (agreeing that publishing those standardized test questions was not fair use and noting that "the fact that it's not a *market* value has no significance once the right to copyright unpublished works is conceded").

a machine lacking personal accountability to her as a source. But if Defendants' products proliferate to the point where many—or even most—people's first (or only) exposure to a story is from these generative-AI outputs, that is precisely what future sources would need to do. Sources would have to place their trust not only in the humans telling their story initially, but also the generative-AI products re-telling it more broadly. Some sources will no doubt stay in the shadows as a result, further harming the market for investigative journalism.

In addition, the way Defendants' products work offers plenty of reasons to worry that they might repurpose investigative journalism in other harmful ways. Generative AI is trained on the collective human history. That history contains and reflects many explicit and implicit biases. Although human beings can evolve over time and work to control for implicit bias, generative AI is not capable of that same reflection. Defendants' products therefore can reproduce and amplify the biases embedded in their training material. Human journalists are of course imperfect. But the editorial process encourages reflection on inherited assumptions, seeking out alternative perspectives, and revision lacking in how generative-AI models are trained and operate.

These biases manifest in different ways and reflect a variety of historical inequalities. Particularly relevant to stories of sexual harassment and abuse is whose experiences have been treated as newsworthy, and who has done the reporting. Across the hundreds of years on which generative-AI models are trained, both the subjects and the authors of news coverage have been predominately male. Though progress has been made, disparities in whose stories are told—and how, and by whom—persist.

Ms. Judd has seen these biases play out firsthand in the film industry. A study by the USC Annenberg Inclusion Initiative of the 1,900 top-grossing films released theatrically in the United

States from 2007 to 2025 found that women and girls held just 31.8% of speaking roles.[3] Of older (40+) characters, just 24% were women.[4] Behind the camera, the disparities were even starker, with women making up only 19.5% of all directors, writers, and producers.[5] Unsurprisingly, representation of women of color on-screen and behind the scenes reflects a history of marginalization and inequity, as well. Of the less than one-third of speaking roles given to women and girls, 68.7% of them went to white actresses.[6] When looking at who directs the most popular films, Black, Latino, and Asian men combined to make up just 14.4% of directors across the study's sample.[7] While that number is incredibly startling in its own right, it still pales in comparison to the underrepresentation of Black, Latino, and Asian women, who made up just 2.1% of all top-grossing directors over a 19-year sample size.[8] Generative-AI models trained on a historical record shaped by such disparities risk reproducing them. For a survivor deciding whether to come forward, that risk is one more reason to hesitate.

It is not "necessary to show with certainty that future harm will result" or "[a]ctual present harm" to defeat a fair use defense. *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 451 (1984). What matters is whether "*some* meaningful likelihood of future harm exists." *Id.* (emphasis in original). It does here. Defendants' use of the *Times*'s work threatens the revenue streams that fund investigative journalism and the human relationships that encourage sources to come forward, and their products operate in ways likely to reproduce historical inequity and bias. Together, these effects jeopardize the market for and value of investigative journalism, and

---

[3] Dr. Stacy L. Smith & the Annenberg Inclusion Initiative, *Inequality in 1,900 Popular Films* 7 (2026), https://bit.ly/4is7nO7.
[4] *Id.* at 10.
[5] *Id.* at 12–15.
[6] *Id.* at 20.
[7] *Id.* at 26.
[8] *Id.*

Defendants' copying of the *Times*'s work should not be protected as fair use.

## CONCLUSION

The Court should deny Defendants' motions for summary judgment.

Respectfully submitted,

Dated: October 30, 2026

By: */s/ Elizabeth C. Lockwood*
Elizabeth C. Lockwood
Kathryn M. Ali
Arianna H. Zoghi
Ali & Lockwood LLP
501 H Street NE, Suite 200
Washington, D.C. 20002
(202) 651-2475
liz.lockwood@alilockwood.com

*Counsel for Amicus Curiae Ashley Judd*

## CERTIFICATE OF COMPLIANCE

I, Elizabeth C. Lockwood, an attorney duly admitted to practice law in this Court, hereby certify that this brief complies with the word count limits because it contains 2,469 words, excluding the parts exempted by Local Civil Rule 7.1(c). In preparing this certification, I have relied on the word count of the word-processing system used to prepare this brief.

Dated: October 30, 2026

By: *<u>/s/ Elizabeth C. Lockwood</u>*
Elizabeth C. Lockwood
Ali & Lockwood LLP
501 H Street NE, Suite 200
Washington, D.C., 20002
(202) 651-2475
liz.lockwood@alilockwood.com

*Counsel for Amicus Curiae Ashley Judd*