BEFORE THE UNITED STATES JUDICIAL
PANEL ON MULTIDISTRICT LITIGATION

---------------------------------------------------------------x

IN RE OPENAI, INC., COPYRIGHT INFRINGEMENT LITIGATION

This document relates to:

No. 1:23-cv-08292 (SHS) (OTW)

---------------------------------------------------------------x

MDL No. 25-MD-3143-SHS-OTW

**DECLARATION OF NAOMI JANE GRAY IN SUPPORT OF MOTION OF *AMICUS CURIAE* AUTHORS, PHOTOGRAPHERS, PLAYWRIGHTS, AND LITERARY TRANSLATORS TO FILE BRIEF IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

I, Naomi Jane Gray, declare as follows:

1. I am the principal of Shades of Gray Law, P.C., attorneys for proposed *amici curiae* authors, photographers, playwrights, and literary translators in the above-captioned action, and a member of the Bar of this Court. I have personal knowledge of the facts set forth herein, and if called as a witness, I could and would competently testify thereto. I submit this Declaration in support of proposed *amici*'s Motion for Leave to File Brief in Support of Plaintiffs' Motion for Summary Judgment (the "Brief").

2. No counsel for any party authored the Brief in whole or in part or made any monetary contribution intended to fund the preparation or submission thereof.

3. Annexed hereto as Exhibit A is a true and correct copy of the proposed Brief.

I declare under penalty of perjury that the foregoing is true and correct, and that I executed this declaration on October 30, 2026 in Mill Valley, California.

Respectfully submitted,

*/s/ Naomi Jane Gray*

Naomi Jane Gray
Shades of Gray Law, P.C.
100 Shoreline Highway, Suite 386B
Mill Valley, CA 94941
Tel: (415) 746-9260
Email: ngray@shadesofgray.law

Attorneys for *Amici Curiae*
Authors, Photographers, Playwrights, and
Literary Translators

# EXHIBIT A

BEFORE THE UNITED STATES JUDICIAL
PANEL ON MULTIDISTRICT LITIGATION

-------------------------------------------------------------x

| | |
|---|---|
| IN RE OPENAI, INC., COPYRIGHT INFRINGEMENT LITIGATION<br><br>This document relates to:<br><br>No. 1:23-cv-08292 (SHS) (OTW) | MDL No. 25-MD-3143-SHS-OTW<br><br>**[PROPOSED] BRIEF OF *AMICUS CURIAE* AUTHORS, PHOTOGRAPHERS, PLAYWRIGHTS, AND LITERARY TRANSLATORS IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT** |

-------------------------------------------------------------x

**TABLE OF CONTENTS**


INTEREST OF *AMICI CURIAE* .......... 1

INTRODUCTION .......... 1

ARGUMENT .......... 2

I. THE "MOST IMPORTANT" FOURTH FAIR USE FACTOR PLAYS A CRITICAL ROLE IN PROTECTING CREATORS' LIVELIHOODS AND INCENTIVES TO CREATE. .......... 2

II. MARKET HARM WEIGHS HEAVILY AGAINST FAIR USE WHERE THE USE IS HIGHLY COMMERCIAL AND MIMINALLY TRANSFORMATIVE. .......... 4

III. MARKET HARM WEIGHS AGAINST FAIR USE WHERE DEFENDANTS ENGAGED IN BAD-FAITH CONDUCT. .......... 6

IV. DEFENDANTS ARE CAUSING *AMICI* GRAVE MARKET HARM BY KNOWINGLY AND IN BAD FAITH SEEKING TO SUBSTITUTE FOR THEIR WORKS. .......... 7

A. Defendants' Uses Are Highly Commercial. .......... 7

B. Defendants Designed Their Products to Provide Substitutes for *Amici's* Works. .......... 7

C. Defendants' Uses Are Flooding the Market With Substitutes for *Amici's* Works. 8

D. Defendants' Uses Enable the Targeting and Siphoning of Sales From Human-Created Works. .......... 13

E. Defendants' Uses Undermine Creators' Incentives to Create. .......... 14

F. Defendants Acted in Bad Faith. .......... 15

CONCLUSION .......... 16

# TABLE OF AUTHORITIES

## Cases

*Andy Warhol Found. v. Goldsmith,* 598 U.S. 508 (2023) ........ 2, 3
*Authors Guild v. Google, Inc.*, 804 F.3d 202 (2nd Cir. 2015) ........ 3
*Authors Guild v. HathiTrust*, 755 F.3d 87 (2nd Cir. 2014) ........ 2
*Bartz v. Anthropic PBC*, 787 F.Supp.3d 1007 (N.D. Cal. 2025) ........ 10
*Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569 (1994) ........ 3, 4, 5, 7
*Fox News Network, LLC v. TVEyes, Inc.*, 883 F.3d 169 (2nd Cir. 2018) ........ 4, 5
*Google LLC v. Oracle America, Inc.*, 593 U.S. 1 (2021) ........ 7
*Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539 (1985) ........ *passim*
*Kadrey v. Meta Platforms, Inc.,* 788 F. Supp. 3d 1026 (N.D. Cal. 2026) ........ 2, 4, 8, 9
*Rogers v. Koons*, 960 F.2d 301 (2nd Cir. 1992) ........ 6
*Stewart v. Abend*, 495 U.S. 207 (1990) ........ 2, 14
*Thomson Reuters Enter. Centre GmbH v. ROSS Intelligence Inc.*, __ F.4th __, No. 25-2153, 2026 WL 2932557 (3rd Cir. Sept. 29, 2026) ........ 4, 5, 8, 14

## Other Authorities

Comment of The United States Federal Trade Commission to the United States Copyright Office on Artificial Intelligence and Copyright, Oct. 30, 2023 ........ 9, 14
Jane Ginsburg, *Fair Use Factor Four Revisited: Valuing The "Value of the Copyrighted Work,"* 67 J. Copyright Soc'y U.S.A. 19 (2020) ........ 3
Pierre Leval, *Campbell As a Fair Use Blueprint*, 90 Wash. L. Rev. 597 (2015) ........ 3
Pierre Leval, *Toward a Fair Use Standard*, 103 Harv. L. Rev. 1105 (1990) ........ 3
U.S. Copyright Office, Identifying the Economic Implications of Artificial Intelligence for Copyright Policy ........ 9

## Constitutional Provisions

U.S. Constitution Article. I, Section 8, Clause 8 ........ 2

## INTEREST OF *AMICI CURIAE*[1]

*Amici curiae* comprise leading industry associations committed to supporting creators and their rights, including authors, photographers, playwrights, and literary translators. Members of *amici* rely on copyright law to protect their works and provide them with the financial ability to continue to create for the public good. As such, *amici* and their members have a strong interest in the proper application of copyright law, including by appropriately circumscribing the fair use doctrine to protect their livelihoods and Constitutional incentives to create. A full list of *amici* and each organization's individualized statement of interest is annexed hereto as Exhibit A.

## INTRODUCTION

Copyright law incentivizes human authorship by granting creators exclusive rights to their original works. The fair use doctrine carves out a limited exception that allows certain uses of copyrighted works if such uses do not interfere with the owner's ability to exploit the work.

Applying the exception here would swamp the market for creative works and threaten the livelihoods of creators. Artificial intelligence models can create works that substitute for human-authored works in seconds, for pennies, around the clock. To develop these models, Defendants systematically looted millions of works of authorship and exploited their creative expression, without permission from or compensation to creators, knowing that they would destroy creators' professions. The fair use doctrine does not justify this conduct.

[1] No counsel for any party authored this brief in whole or in part or made any monetary contribution intended to fund the preparation or submission of this brief.

# ARGUMENT

## I. THE "MOST IMPORTANT" FOURTH FAIR USE FACTOR PLAYS A CRITICAL ROLE IN PROTECTING CREATORS' LIVELIHOODS AND INCENTIVES TO CREATE.

Copyright "is intended to provide" creators with "the necessary bargaining capital to garner a fair price for the value of the works passing into public use." *Stewart v. Abend*, 495 U.S. 207, 229 (1990). The fair use doctrine allows certain uses of copyrighted works if those uses promote a public benefit, but only if they do not threaten copyright owners' economic interests. "If the law allowed people to copy your creations in a way that would diminish the market for your works, this would diminish your incentive to create more in the future." *Kadrey v. Meta Platforms, Inc.,* 788 F. Supp. 3d 1026, 1037 (N.D. Cal. 2026). The financial incentive for creators lies at the heart of the Constitution's careful balance between "securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries" and promoting "the Progress of Science and the useful Arts." U.S. Constitution Article I, Section 8, Clause 8; *see also Andy Warhol Found. v. Goldsmith,* 598 U.S. 508, 526 (2023) (copyright trades off benefits of incentives to create against costs of restrictions on copying); *Authors Guild v. HathiTrust*, 755 F.3d 87, 94-95 (2nd Cir. 2014) (Copyright Act grants creators limited monopoly over and thus opportunity to profit from dissemination of their works).

Accordingly, the "effect of the use upon the potential market for or value of the copyrighted work" is "undoubtedly the single most important element of fair use." *Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 566 (1985); *see also Warhol*, 398 U.S. at 555 ("this Court has described the fourth factor as the 'most important one'" (Gorsuch & Jackson, JJ., concurring)); *Stewart,* 495 U.S. at 238. "This is consistent with the fact that the copyright is a commercial right, intended to protect the ability of authors to profit from the

exclusive right to merchandise their own work." *Authors Guild v. Google, Inc.*, 804 F.3d 202, 214 (2nd Cir. 2015).

The Supreme Court adopted the concept of "transformative" use under the first fair use factor as a measure of whether a secondary use of a copyrighted work "merely supersedes the objects of the original creation" in *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 579 (1994) (cleaned up) (citing Pierre Leval, *Toward a Fair Use Standard*, 103 Harv. L. Rev. 1105, 1111 (1990)). In subsequent decades, lower courts gradually expanded the reach of transformativeness to virtually "engulf all of fair use. A finding of transformativeness often foreordained the ultimate outcome, as the remaining factors withered into restatements of the first." Jane Ginsburg, *Fair Use Factor Four Revisited: Valuing The "Value of the Copyrighted Work,"* 67 J. Copyright Soc'y U.S.A. 19, 19-20 (2020) (cleaned up).

*Campbell* never envisioned subordinating the "most important" fourth factor to the first, however:

> While *Campbell* unquestionably gives high importance to the enrichment of society provided by creatively transformative copying, that importance is not at the expense of the fourth factor. To the contrary, *Campbell* characterizes the first factor inquiry as subservient to the fourth.

Pierre Leval, *Campbell As a Fair Use Blueprint*, 90 Wash. L. Rev. 597, 605 (2015) (cleaned up).

*Campbell* itself demonstrated that a finding of transformativeness does not automatically preclude a finding of market harm and a use that is not fair. *Campbell* involved a rap parody of the Roy Orbison song "Pretty Woman." *Campbell*, 510 U.S. at 572. The Court held that "parody has an obvious claim to transformative value," while recognizing that "parody may or may not be fair use" after examining all four fair use factors and weighing them together. *Id.* at 579-80. Any use, even a transformative one, "has to work its way through the relevant factors, and be judged case by case, in light of the ends of the copyright law." *Id.* at 580. The song comprised "not only parody but also rap music, and the derivative market for rap music is a proper focus of

enquiry" under factor four. *Id.* at 592-93. "Evidence of substantial harm to it would weigh against a finding of fair use" despite its transformative character, "because the licensing of derivatives is an important economic incentive to the creation of originals." *Id.* Noting a "silent record" on the fourth factor, the Court remanded, remarking that "the evidentiary hole will doubtless be plugged on remand." *Id.* at 594; *see also Kadrey*, 788 F.Supp. 3d at 1050-51 (defendant "wrong to suggest that, because the first factor strongly favors it, the inquiry should basically end there").

## II. MARKET HARM WEIGHS HEAVILY AGAINST FAIR USE WHERE THE USE IS HIGHLY COMMERCIAL AND MIMINALLY TRANSFORMATIVE.

Market harm weighs heavily against fair use where the use is both "highly commercial and minimally transformative." *See Thomson Reuters Enter. Centre GmbH v. ROSS Intelligence Inc.*, __ F.4th __, No. 25-2153, 2026 WL 2932557 (3rd Cir. Sept. 29, 2026); *see also Fox News Network, LLC v. TVEyes, Inc.*, 883 F.3d 169, 179-80 (2nd Cir. 2018). *ROSS* presents closely analogous facts and highly relevant analysis of the relationship between the first and fourth factors. There, the defendant for-profit AI company used Westlaw headnotes to train its AI legal search engine. *Ross,* 2026 WL 2932557 at *2. The Third Circuit affirmed that this use was highly commercial. "ROSS did not hide its intention that this for-profit AI platform compete with Westlaw. … ROSS executives hoped ROSS would serve as a substitute for Westlaw, and some law firms switched from using Westlaw to ROSS." *Id.* at *3. ROSS "aimed to create a legal-research platform charging comparable prices to Westlaw to compete with Westlaw for customers." *Id.* at *6. Moreover, despite using the headnotes for training, ROSS's ultimate purpose was to "create and optimize a legal-research platform that helps users find responsive legal material. Thus, ROSS's use of the headnotes shares the same ultimate purpose as Thomson Reuters's use, making ROSS's use minimally transformative, at best." *Id.* Because "ROSS's use

was highly commercial and minimally transformative," the first factor weighed against fair use. *Id.* at *7.

When assessing market harm under the fourth factor, including "both the market for the original work and any market for derivative uses of the original work," the Third Circuit observed, "ROSS copied the headnotes to create a competing legal-research platform in the same market as Westlaw." *Id.* at *9. Such "unrestricted and widespread copying" would "harm Westlaw's position in that original market." *Id.* at *9. Additionally, the evidence in *ROSS* showed "that the market for licensing headnotes as text to train AI is rapidly developing." *Id.* at *9. And "Thomson Reuters presented evidence that it is using its headnotes as training data for its own AI search products." *Id.* at *9. The court affirmed, "ROSS usurped Thomson Reuters's opportunity to enter that derivative market and license its headnotes for that purpose," which weighed against fair use. *Id.*

Similarly, in *TVEyes*, the Second Circuit affirmed market harm arising from a moderately transformative and commercial use. TVEyes continuously recorded television programming in its entirety and stored it in a searchable database where paying subscribers could watch excerpts of up to 10 minutes' duration each. *TVEyes*, 883 F.3d at 173, 176. The court affirmed that this use enjoyed "modest transformative character." *Id.* at 178. Nonetheless, "TVEyes undercuts Fox's ability to profit from licensing searchable access to its copyright content to third parties." *Id.* at 180. TVEyes' business model demonstrated that consumers would pay for a service that allowed them to search for and view television clips. *Id.* Consequently, there was a "plausibly exploitable market" for such a product, and TVEyes had "usurped a function for which Fox [was] entitled to demand compensation under a licensing agreement." *Id.* at 181.

Thus, even if the Court finds that Defendants' use is transformative, such a finding would not outweigh actual market harm or devaluation of *amici*'s works.

## III. MARKET HARM WEIGHS AGAINST FAIR USE WHERE DEFENDANTS ENGAGED IN BAD-FAITH CONDUCT.

The first fair use factor also considers the "propriety of the defendant's conduct" where appropriate *Harper & Row,* 471 U.S. at 562;[2] *see also Rogers v. Koons*, 960 F.2d 301, 309 (2nd Cir. 1992) ("wrongful denial of exploitative conduct towards the work of another may bar an otherwise legitimate fair use claim"). Fair use is an equitable defense, which "presupposes good faith and fair dealing." *Harper & Row,* 471 U.S. at 562 (cleaned up); *Rogers*, 960 F.2d at 309.

In *Harper & Row*, the Nation magazine was unable to rely on fair use to defend its publication of excerpts of President Ford's unpublished memoirs in part because the Nation "knowingly exploited a purloined manuscript" in an effort to "scoop" the publication of the memoirs. *Harper & Row*, 471 U.S. at 562-63. The Nation could not "offer up even the fiction of consent as justification" for its copying; "it was free to bid for the right of abstracting excerpts" from the memoirs but chose not to do so. *Id.* at 563. Similarly, in *Rogers,* a sculptor's act of tearing the copyright notice off a photograph before using it as the basis for a sculpture "suggest[ed] bad faith in [his] use of plaintiff's work, and militates against a finding of fair use." *Rogers*, 960 F.2d at 309. "Fair use distinguishes between a true scholar and a chiseler who infringes a work for personal profit." *Harper & Row*, 471 U.S. at 563 (cleaned up).

[2] The Supreme Court in *Google LLC v. Oracle America, Inc.*, 593 U.S. 1 (2021), characterized *Campbell* as "express[ing] some skepticism about whether bad faith has any role in a fair use analysis." *Id.* at 32. *Campbell*, however, merely rejected in a footnote the plaintiff's argument that using a work after being denied permission weighed against fair use, "regardless of the weight one might place on the alleged infringer's state of mind." *Campbell*, 510 U.S. at 1174 n.18. "If the use is otherwise fair, then no permission need be sought or granted" and "being denied permission … does not weigh against" fair use. This is a far cry from deliberately and knowingly obtaining "purloined" copies of books in lieu of purchasing them. *See Harper & Row*, 471 U.S. at 562-63; *cf. Bartz v. Anthropic PBC*, 777 F. Supp. 3d 1007, 1025 ("downloading source copies from pirate sites *that [defendant] could have purchased or otherwise accessed lawfully* … is inherently, irredeemably infringing. …") (emphasis in original); *see infra* § IV.F. At most, *Campbell* questioned whether "good faith [is] central to fair use," not whether it is appropriate to consider at all. *Campbell*, 510 U.S. at 1174 n.18.

## IV. DEFENDANTS ARE CAUSING *AMICI* GRAVE MARKET HARM BY KNOWINGLY AND IN BAD FAITH SEEKING TO SUBSTITUTE FOR THEIR WORKS.

In this case, Defendants acted in bad faith to make highly commercial uses of copyrighted works, knowing that the ultimate result would be to swamp and dilute the market for, and otherwise devalue, *amici's* works.

### A. Defendants' Uses Are Highly Commercial.

Robust evidence establishes that, like the defendant in *ROSS*, Defendants were motivated by commercial gain, and extensively commercialized their generative AI products. (ECF No. 1987 ¶¶ 110-120, 125, 349, 741, 750.) OpenAI's co-founder wrote that he "was deeply motivated by the gazillions." (*Id.* at ¶ 88.) OpenAI launched ChatGPT Plus in 2023 as a paid subscription, and continued to generate revenue from the accused products at least through 2025. (*Id.* ¶¶ 110-120.) Microsoft has deployed OpenAI's GPT models across multiple commercial Microsoft products, including Copilot and Microsoft 365 Copilot. (*Id.* ¶ 125.)

The market harm that Defendants are causing *amici* weighs heavily against fair use given the highly commercial nature of Defendants' uses. *ROSS*, No. 25-2153, 2026 WL 2932557; *see also TVEyes,* 883 F.3d at 179-80.

### B. Defendants Designed Their Products to Provide Substitutes for *Amici's* Works.

Defendants intended to develop products capable of supplanting human creators, and deliberately refined their products over time to do so, noting that it was an "important future direction" to generate "short stories, long form journalism, scientific articles, textbooks, or novels." (ECF No. 1987 ¶ 708; *see also id.* ¶¶ 707, 709.) An OpenAI employee wrote that the company's work "is going to increasingly lead to us creating systems that substitute for the labor of the people that define the 'culture' of society." (*Id.* ¶ 749.) Defendants knew that this would

harm creators: "Our work in this area will make people unemployed." (*Id.* ¶ 749; *see also id.* ¶¶ 767-68 (risk that "authors and books will suffer economic harm and perhaps not be able to continue in their businesses" was supported by sufficient evidence to present to Microsoft employee's colleagues, and "goes well beyond authors")).

Indeed, Defendants openly market their products to be used for writing creative works such as novels. (ECF No. 1987 ¶¶ 740-44.) An OpenAI employee publicly posted that it has been his "research mission" to meet a proposed "new LLM creative writing benchmark, 'can it write the last two books of A Song of Ice and Fire,'" the well-known George R. R. Martin series of fantasy novels. (*Id.* ¶ 727.) And Defendants' models have been used for this purpose: a researcher discovered user requests in OpenAI chat logs seeking to generate material in the anticipated but still unpublished sixth volume in the series. (*Id.* ¶¶ 736-39.)

*Amici* include creators of a wide range of works of authorship, including novels in science fiction and fantasy, crime, and romance genres, as well as plays, articles, photographs, and other creative works. Like the legal platform in *ROSS,* Defendants' models explicitly and by design seek to generate the same types of works as *amici,* and compete in the same markets that sustain *amici*'s livelihoods. This weighs heavily against a finding of fair use. *ROSS*, No. 25-2153, 2026 WL 2932557, at *9 (copying headnotes to train competing legal research platform was highly commercial and minimally transformative and weighed against fair use).

C. <u>Defendants' Uses Are Flooding the Market With Substitutes for *Amici's* Works.</u>

"A use that supplants any part of the normal market for a copyrighted work would ordinarily be considered an infringement." *Harper & Row*, 471 U.S. at 568 (cleaned up). The court in *Kadrey* envisioned how such market substitution is occurring today. *Kadrey*, 788 F. Supp.3d at 1052-53. "[I]t's easy to imagine that AI-generated books could successfully crowd out lesser-known works or works by up-and-coming authors." *Id.* Generative AI products can

spit out endless quantities of works in minutes based on high-level inputs, flooding the market with books that compete directly with those authored by *amici*. Even if these works do not directly replicate *amici*'s works,

> less similar outputs, such as books on the same topics or in the same genres, can still compete for sales with the books in the training data. And by taking sales from those books, or by flooding stores and online marketplaces so that some of those books don't get noticed and purchased, those outputs would reduce the incentive for authors to create—the harm that copyright aims to prevent.

*Id.* at 1054. Put more simply, "indirect substitution is still substitution." *Id.; see also* U.S. Copyright Office, Identifying the Economic Implications of Artificial Intelligence for Copyright Policy,[3] at pp. 9-12 (identifying potential harms of substitution of AI-generated works for human-authored works, including licensing non-infringing AI works of lower quality and decrease in value of human-authored works); Comment of The United States Federal Trade Commission to the United States Copyright Office on Artificial Intelligence and Copyright, Oct. 30, 2023 (noting potential harm of AI-generated works to creators' reputation or the value of creators' existing or future works).[4]

> Moreover:
>
> when considering market dilution, the proper comparison isn't to a world with no LLMs, but to a world where LLMs weren't trained on copyrighted books. Perhaps an LLM trained only on public domain works could still be capable of quickly generating large numbers of books that could compete for sales with copyrighted books. But there is plenty of evidence in the record that training on books substantially benefits LLMs' creativity and ability to generate long pieces of text."

*Kadrey*, 788 F. Supp.3d at 1053. Indeed, Defendants considered and rejected relying on public domain books to train its models, recognizing that the quality of expression resulting from such

---

[3] https://www.copyright.gov/economic-research/economic-implications-of-ai/Identifying-the-Economic-Implications-of-Artificial-Intelligence-for-Copyright-Policy-FINAL.pdf.
[4] https://www.ftc.gov/system/files/ftc_gov/pdf/p241200_ftc_comment_to_copyright_office.pdf

books was inferior to those of modern books still subject to copyright. (ECF No. 1987 ¶¶ 301-03.)

This highlights the crux of why Defendants' conduct cannot support a finding of fair use. Defendants deliberately exploited the expressive content and value of copyrighted books with the express end goal of competing against, and destroying the market for, those very books. (*See, e.g.,* ECF No. 1987 ¶¶ 301-03 (in-copyright books yielded better training results than public domain books). Defendants did not just use copyrighted books for to train their AI models on the dry rules of grammar and syntax, or the common elements and structure of a romance novel. They used them because of the value of their expressive content. (*See, e.g.,* ECF No. 1987 ¶ 741 ("[i]f you want to train a model to write poetry, you wouldn't want to train it on a bunch of noisy JavaScript code that was irrelevant"); *see also id.* ¶¶ 467-72, 479-94). They wanted to ensure, for example, that their AI models would know when to sign an email "yours truly" instead of "sincerely," "warmly," or "best," or, if translating a crime novel from English to French, when to use "*un policier*" (police officer) versus "*un flic*" (cop), and what that expressive choice would convey to the reader.[5]

*Amici* are experiencing concrete and existential harm to their markets resulting from the proliferation of substitutive works generated by Defendants' products across creative industries. "My sales have dropped dramatically in the last two years," reports Jennifer Lewis, a member of *amicus* Novelists, Inc. ("NINC"). Margaret Porter, another NINC member, writes:

> Beyond the frustration and anger caused by AI companies unlawfully downloading and scraping my creative intellectual property, I'm conscious that any compensation I receive through a settlement for the violation of my copyrights—all of which I possess through reversion of rights by publishers—is

[5] Another court dismissed this form of market harm as being "no different" than complaining that "training schoolchildren to write well would result in an explosion of competing works." *Bartz v. Anthropic PBC*, 787 F.Supp.3d 1007, 1032 (N.D. Cal. 2025). This analogy fails because schoolchildren typically are not trained on books that have either been pirated or otherwise obtained "without paying the customary price," *Harper & Row*, 471 U.S. at 563, and because schoolchildren grow up into adult human creators who cannot spew infinite reams of content 24/7.

> hardly sufficient to remedy the wrong. These large language models are being used by unscrupulous persons to make and upload "novels" that dilute the market. The majority of the readership appears to be averse to reading AI-generated material. But those who don't purchase these fake books and those who do probably aren't aware of the illegal basis of the product. Or the detrimental effect on human authors, who labored months and years in artistic endeavor, only to have the fruits of their creativity and inspiration stolen from them, misused, re-purposed, and sold in altered form. There has already been an impact upon me—emotional, financial—and I suspect that over time, the usage and degradation of my titles stored on piracy sites will not only continue, but escalate. Most likely without the restitution through compensation to which I am entitled, along with a multitude of my fellow authors.

Even litigation has been insufficient to compensate many creators for the blatant theft of their works. NINC member Lainey Davis reports:

> I am independently published and had nearly 20 titles listed in the Anthropic list of pirated materials. However, I had not taken the step to officially register my work with the US Copyright office. Thus, I was not eligible for the lawsuit. So my work was pirated but I received no recompense.

E-book sales present a stark example of the dilution and devaluation of creators' works. Amazon sells an estimated 67% of e-books globally. (ECF No. 1987 ¶ 841.) Researchers report that the number of new e-book titles released on Amazon grew explosively in parallel with the rise of generative AI, and estimate that the share of e-books on Amazon surpassed 60% in 2025. (ECF No. 1987 ¶¶ 855-56.) E-book authors selling works on Amazon's Kindle can enroll their works in a program called "KDP Select," where they are eligible to earn royalties from a "KDP Select Global Fund."[6] Amazon establishes the size of the fund, which is fixed, and pays authors based on their "share of total pages read or listened to by Kindle+ subscribers."[7] Swamping Kindle with terabytes of AI-generated e-books not only diverts readers away from human-authored books, but reduces the size of human authors' slice of royalty pie in the KDP Select Global fund.

[6] https://kdp.amazon.com/en_US/help/topic/G201541130.
[7] *Id.*

Market harm is not limited to book authors, but extends across the creative industries, as Defendants recognized it would. (ECF No. 1987 ¶¶ 767-68 (anticipated economic harm "goes well beyond authors"). AI translation tools threaten the livelihoods of literary translators. The CEO of HarperCollins, a major U.S. publisher, announced in 2026 that the company aims to automate its overseas translations.[8] The widespread use of AI-assisted translation could "fundamentally change the nature" of literary translation by "changing translators from interpreters into primarily editors of large language model outputs," draining the profession of creativity.[9] Because languages do not map onto each other word for word, translation requires constant creative choices. The Executive Director of *amicus* the American Literary Translators Association analogized, "If we think of the literary translation of a book as a cover song, just imagine if Jimi Hendrix had been asked to post-edit an AI cover of Bob Dylan's 'All Along the Watchtower' instead of creating his unique take on the song."[10] Outsourcing the heavy lifting of translation to an AI model not only takes work from literary translators, it deprives the public of the creative expression only humans can provide.[11]

In the photography industry, a survey released in 2026 by the UK-based Association of Photographers reported a 65% reduction in commissioned images being licensed by its members relative to the previous year.[12] The survey also found a 46% decrease in images displayed on photographers' website, "most likely" due to "concern over the illegal scraping of their work."[13] And almost two-thirds of members reported that they lost commissioned work to generative AI services compared to the previous year.[14]

[8] https://www.publishersweekly.com/pw/by-topic/industry-news/publisher-news/article/101221-lost-in-translation.html
[9] *Id.*
[10] *Id.*
[11] *Id.* (referencing Emily Wilson's 2017 translation of the *Odyssey*, "which applies a unique, and still controversial, feminist lens to Homer's 3,000-year-old epic."
[12] https://petapixel.com/2026/01/30/58-of-photographers-have-lost-work-to-generative-ai-survey/
[13] *Id.*
[14] *Id.*

These harms are concrete, material, and growing, and weigh substantially against a finding of fair use here.

D. Defendants' Uses Enable the Targeting and Siphoning of Sales From Human-Created Works.

The harm to creators extends beyond market dilution resulting from flooding the market with competing works. Authors have reported the proliferation of AI-generated works being deceptively marketed alongside their own on platforms like Amazon, mimicking the subjects, titles, or even author names of human-created works. (ECF No. 1987 ¶¶ 874, 877-883.) Examples include:

- "[G]arbage books getting uploaded to Amazon where my name is credited as the author…preying on writers who trust my name and think I've actually written these books. I have not";[15]
- "AI deepfakes" of a journalist's memoir, "leading some to accidentally purchase the books without realizing they are not authored" by the journalist;[16]
- Confusingly similar titles, covers, or author names designed to confuse consumers, "clearly intended to fool unsuspecting customers who are looking to save a few bucks."[17]

These scams also present substantial risks of harm to the public, which the FTC noted in a comment to the U.S. Copyright Office. "Conduct that may violate the copyright laws—such as training an AI tool on protected expression without the creator's consent or selling output

[15] https://janefriedman.com/i-would-rather-see-my-books-pirated/
[16] https://www.newsnationnow.com/on-balance-with-leland-vittert/fake-ai-copies-of-leland-vitterts-book-sold-on-amazon/
[17] *See* https://futurism.com/artificial-intelligence/kevin-roose-ai-industry-book-amazon-copycat; https://theamericanscholar.org/who-is-blake-whiting/; https://www.yahoo.com/news/savannah-book-became-part-copycat-224505125.html?guccounter=1

generated from such an AI tool, including by mimicking the creator's writing style, vocal or instrumental performance, or likeness—may also constitute an unfair method of competition or an unfair or deceptive practice, especially when the copyright violation deceives consumers…." FTC Comment at pp. 5-6. Fair uses are those that benefit the public, not deceive it. *See ROSS*, No. 25-2153, 2026 WL 2932557, at *8 (fourth factor considers market harm and "alleged public benefits of copying").

E. <u>Defendants' Uses Undermine Creators' Incentives to Create.</u>

The harm caused by Defendants is not limited to substitution. It should come as no surprise that these effects would discourage creators and undermine their incentives to create. Ms. Lewis writes:

> [M]y productivity and even my ability to write have been very adversely affected by the realization that I'm just creating meat for the AI meatgrinder. I've been a professional writer earning my full income from books for most of my adult life, 52 books written so far, first (traditionally published) book published 2007. I wrote romance for many years, then lately historical mysteries. Every book I wrote up until the mass scrapings was on LibGen despite my purchasing Muso anti-piracy services for years. Since 2019, seeing that genre fiction would be a busy market for AI "writers," I decided to write super original material with no online footprint (an obscure historical character called Ela of Salisbury, where all the research materials were print books), and now AI can just LEGALLY buy my 10 book series and scrape them and all that highly original content is there for anyone to chew up and spit out using AI. … I honestly think I might be writing my last book. I've never had a book take so long to write, and I've never felt so unenthusiastic about the writing market.

Defendants' conduct will discourage creators from entering their professions entirely. Beyond harm to creators' livelihoods, it threatens to deprive the public of the "value of the works passing into public use." *Stewart*, 495 U.S. at 229.

* * *

The harm caused by Defendants' acts of misappropriation and substitution are widespread and significant, and weigh heavily against a finding of fair use.

F. Defendants Acted in Bad Faith.

The record is replete with facts demonstrating Defendants' bad-faith conduct, which included knowingly downloading pirated books and deliberately refraining from licensing books to avoid incurring costs. (*See, e.g.*, ECF. No. 1982 pp. 5-8, 19-22; ECF. No. 1987 ¶¶ 126-181, 329-367, 393-97. OpenAI employees downloaded over 2 million books from a known Russian pirate site, LibGen, for free, instead of purchasing them. (ECF No. 1987 ¶¶ 126-130, 145-153, 193-200, 210-213, 217, 235-37, 241.) OpenAI employed a "Spark-based domain classifier" to "help eliminate copyright info" from books downloaded from LibGen. (*Id.* ¶¶ 205-206.) Defendants knew this conduct was wrong. OpenAI's corporate representative testified, "I don't think you should be training on stolen material." *Id.* at ¶ 369. OpenAI's founder admitted that "piracy is wrong and illegal." *Id.* at ¶¶ 370, 372. OpenAI employees characterized LibGen as "sketchy [as f---]." *Id.* at 348; *see also id*. at ¶¶ 276, 341, 352-54. And a Microsoft employee acknowledged that the public might view the assumption "that any data on the internet can be used for model training … regardless of licenses, permissions, or consent" as "an astonishing theft of unprecedented proportions." ECF No. 1987 ¶¶ 757-58.

The fair use doctrine should not be weaponized to allow Defendants to knowingly exploit "purloined" material with the end goal of driving *amici* and other similarly situated creators out of business. *Harper & Row*, 471 U.S. at 562-63.

//

## CONCLUSION

For the foregoing reasons, the Court should grant Class Plaintiffs' Partial Motion for Summary Judgment: (1) that OpenAI's downloading of pirated copies from LibGen and via Books3 is not fair use; (2) that OpenAI's further copying of Plaintiffs' works to train its Large Language Models is not fair use; and (3) that OpenAI and Microsoft's distribution of copies of Plaintiffs' works to each other and third parties is not fair use.

Dated: October 30, 2026 Respectfully submitted,

*/s/ Naomi Jane Gray*

______________________________

Naomi Jane Gray
Shades of Gray Law, P.C.
100 Shoreline Highway, Suite 386B
Mill Valley, CA 94941
Tel: (415) 746-9260
Email: ngray@shadesofgray.law

Attorneys for *Amici Curiae*
Authors, Photographers, Playwrights, and
Literary Translators

**CERTIFICATE OF COMPLIANCE**

In accordance with Local Civil Rule 7.1(c) and the Court's Order at ECF No. 1663, 25-md-3143, I certify that the foregoing Memorandum of Law is 5,982 words, including footnotes but exclusive of the caption page, table of contents, table of authorities, certificates and signature block. The basis of my knowledge is the word count feature of the word-processing system used to prepare this memorandum.

Dated: October 30, 2026

SHADES OF GRAY LAW, P.C.

*/s/ Naomi Jane Gray*

Naomi Jane Gray

# EXHIBIT A

**American Society of Journalists and Authors, Inc.** ("ASJA") is a non-governmental, 501(c)(6) not for profit organization incorporated in the State of New York with a membership of approximately 1,400 outstanding freelance writers of magazine articles, trade books, and many other forms of nonfiction writing.

**American Society of Media Photographers** ("ASMP") is a 501(c)(6) nonprofit trade association, established in 1944 to protect and promote the interests of professional photographers who earn their living by making photographs intended for publication, licensing fees and other compensation derived from the bundle of rights arising under the Copyright Act. With more than 7,400 members nationwide working in every genre of commercial photography, ASMP is a leading trade organization representing professional photographers' interests.

**American Literary Translators Association** ("ALTA") is the only organization in the United States devoted exclusively to literary translators. Founded in 1978 to develop cultural communication and understanding through the art and craft of literary translation, ALTA's mission is to support the work of literary translators, advance the art of literary translation, and connect students, teachers, publishers, and readers of literature in translation. This mission is realized through its work as a professional nonprofit membership association that provides resources, community, support, and advocacy to the literary translation community. The annual ALTA conference and year-round events are structured around developing the professional skills of literary translators and providing them with networking opportunities. ALTA also administers awards to recognize excellence in translation and provides fellowships and mentorships to support emerging literary translators.

**Garden Communications International** ("GardenComm") is the professional association for garden and horticulture communicators. Founded in 1948 as the Garden Writers

Association of America, GardenComm is a nonprofit 501(c)(3) organization that has evolved to represent writers, authors, editors, photographers, speakers, educators, podcasters, broadcasters, digital creators, marketers, public relations professionals, and other experts working across garden media and the horticulture industry. Its mission is to empower, connect, and advance garden communicators across all forms of media, supporting those who inform and influence public understanding of gardening, sustainability, and the natural world.

**National Association of Science Writers** ("NASW") is a community of journalists, authors, editors, producers, institutional communicators, students and people who write and produce material intended to inform the public about science, health, engineering, and technology. NASW promotes the professional interests of science writers nationally and globally, plays an active role in supporting efforts to ensure writers are paid for their work, and advocates for copyright protections for writers.

**The National Press Photographers Association** ("NPPA") is a 501(c)(6) nonprofit organization dedicated to the advancement of visual journalism in the creation, editing and distribution of copyrighted works. NPPA's members include television and still photographers, editors, students, and representatives of businesses that serve the visual journalism industry. Since its founding in 1946, as the Voice of Visual Journalists, NPPA has vigorously promoted and defended the rights of photographers and journalists, including intellectual property rights and freedom of the press in all its forms, especially as it relates to visual journalism.

**National Writers Union ("NWU")** is an independent national labor union that advocates for freelance and contract writers and media workers. NWU works to advance the economic and labor conditions of writers and media workers in all genres, media, and formats. NWU membership includes, among others, journalists, fiction and nonfiction book authors, poets, novelists, playwrights, editors, academic writers, business and technical writers, website and

email newsletter content providers, bloggers, social media producers, podcasters, videographers, illustrators, photographers, graphic artists, and other digital media workers. NWU includes geographic chapters as well as at-large members nationwide and abroad.

**Novelists, Inc.** Founded in 1989, amicus Novelists, Inc. ("NINC") is a nonprofit organization focusing on networking, education, and advocacy for professional authors of book-length fiction. NINC members include traditionally-published novelists, indie or self-published authors, and writers whose careers combine both traditional and indie publication. Many NINC members also write professionally in other fields, such as journalism, screenwriting, comics, drama, short fiction, and nonfiction.

**Romance Writers of America, Inc.** (the "RWA") is a Romance Writers of America, Inc. ("RWA"), founded in 1980, is a nonprofit trade association, with a membership of more than 1,500 romance writers and related industry professionals, whose mission is to advance the professional interests of career-focused romance writers through networking and advocacy. RWA works to support the efforts of its members to earn a living, to make a full-time career out of writing romance—or a part-time one that supplements his/her main income.

**Sisters in Crime** ("SinC") was founded in 1986 as an advocacy organization for women crime writers. Its mission, "to promote the ongoing advancement, recognition and professional development of women crime writers," has been expanded in recent years to include other marginalized writers. SinC supports its over 4,000 members by providing craft and business webinars, rich online resources, a robust online community, and advocacy for the entire genre. Its members include authors at all stages of their writing journey as well as other advocates for the community, such as librarians, booksellers, readers, and agents. SinC has more than 50 chapters worldwide.

**The Dramatists Guild of America, Inc.** ("DGA") is the only professional organization promoting the interests of playwrights, composers, lyricists, and librettists writing for the stage. Established over 100 years ago for the purpose of aiding dramatists in protecting both the artistic and economic integrity of their work, DGA continues to educate, and advocate on behalf of its over 8,000 members. DGA believes a vibrant, vital theater is an essential element of this country's ongoing cultural debate and seeks to protect those individuals who write for the theater to ensure its continued success.

**The Science Fiction and Fantasy Writers of America** d/b/a Science Fiction and Fantasy Writers Association ("SFWA") is a 501(c)(3) nonprofit organization focused on providing support, defense, advocacy, education, and resources for speculative writers and the publishing industry. SFWA was founded in 1965 and is home to over 2,500 authors, artists, and allied professionals worldwide. The mission of the Science Fiction and Fantasy Writers Association includes the promotion, writing, and appreciation of science fiction, fantasy and related genres and fields. Its work involves informing, supporting, promoting, defending, and advocating for writers of science fiction, fantasy and related genres, with a focus on promoting and defending the interests of writers in these genres within the publishing industry. Each year, SFWA assists members in various legal disputes, administers grants to SFF community organizations and members facing medical or legal expenses, and hosts the prestigious Nebula A wards at our annual Nebula Awards Conference.