Andrew D. Patrick (SBN 3039393)
Michael D. McCormack (SBN 5183975)
**PATRICK & MCCORMACK**
45 Main Street, Suite 1030
Brooklyn, NY 11201
Tel: (718) 625-7200
drew@patmaclaw.com
michael@patmaclaw.com

*Attorneys for [Proposed] Amicus Curiae*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE OPENAI, INC.,<br>COPYRIGHT INFRINGEMENT<br>LITIGATION<br><br>This Document Relates to:<br>*All Cases* | No.: 1:25-md-03143 (SHS) (OTW)<br><br>Hon. Sidney H. Stein |

# [PROPOSED] BRIEF OF KENNETH BURNS AS AMICUS CURIAE IN SUPPORT OF PLAINTIFFS

**Table of Contents**


I. STATEMENT OF INTEREST OF AMICUS CURIAE .......... 1

II. BACKGROUND .......... 2

A. HISTORICAL DOCUMENTARY PRODUCTION REQUIRES PRODIGIOUS AMOUNTS OF HUMAN LABOR. .......... 2

B. DEFENDANTS HAVE UPLOADED BURNS'S LIFE'S WORK TO THEIR SERVERS, AND HAVE USED IT TO TRAIN THEIR AI MODELS, WITHOUT BURNS'S CONSENT. 4

III. ARGUMENT .......... 5

A. DEFENDANTS' INTAKE OF BURNS'S WORKS TO TRAIN THEIR GENERATIVE AI MODELS IS DESTROYING THE MARKET FOR QUALITY, HISTORICAL DOCUMENTARIES .......... 5

B. DEFENDANTS' AI MODELS REGURGITATE EXACT REPLICAS OF COPYRIGHTED MATERIAL FROM BURNS'S WORK, WHICH CANNOT BE CONSIDERED FAIR USE. .......... 7

IV. CONCLUSION .......... 9

# Table of Authorities

## Cases

*Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*, 598 U.S. 508 (2023) ........................ 7
*Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569 (1994) ............................................................ 7
*Hachette Book Group v. Internet Archive*, 115 F.4th 163 (2d Cir. 2024)....................................... 5
*Harper & Row v. Nation Enterprises*, 471 U.S. 539 (1985) .......................................................... 5
*In re OpenAI ChatGpt Litigation*, No. 23-cv-3223 (N.D. Cal. Jan. 17 2025), Dkt. No. 254 ......... 4

## Other Authorities

AI Watchdog, THE ATLANTIC, https://www.theatlantic.com/category/ai-watchdog....................... 4
Andrew Deck, *Thousands of documentaries are fueling AI models built by Apple, Meta, and Nvidia*, NIEMAN LAB (Jan. 7, 2025) ........................................................................................ 4
Dan Milmo, *Elon Musk says all human data for AI training 'exhausted'*, THE GUARDIAN (Jan. 9, 2025) ........................................................................................................................... 7
Josh Taylor, *OpenAI promises more 'granular control' to copyright owners after Sora 2 generates videos of popular characters*, THE GUARDIAN (Oct. 6, 2025)................................... 9
Kate Rooney and Ashley Capoot, *OpenAI nears up to $30 billion funding round at $1.25 trillion valuation led by UAE investors*, CNBC (Oct. 22, 2026) ......................................................... 10
Melanie Mitchelle, *Large Language Models*, MIT OPEN ENCYCLOPEDIA OF COGNITIVE SCIENCE (Jul. 24, 2024) ............................................................................................................... 6
Miles Klee, *Hollywood Is Losing Audiences to AI Fatigue*, WIRED (Feb. 5, 2026) ....................... 7
OpenArt print advertisement (viewed Oct. 27, 2026)..................................................................... 5
Osmond Chia and Emma Calder, *OpenAI closes Sora video-making app and cancels $1bn Disney deal*, BBC (Mar. 25, 2026) ......................................................................................... 9
Rachel Metz, *OpenAI Rolls Out GPT-6 Astra Model With Cyber Guardrails*, BLOOMBERG (Sept. 3, 2026) ........................................................................................................................... 9
Rebecca Bellan, *AI's promise to indie filmmakers: Faster, cheaper, lonelier*, TECHCRUNCH (Feb. 20, 2026) ......................................................................................................................... 6
Sam Altman (@sama), X (Mar. 2, 2023, 5:30 PM), https://x.com/sama/status/1631421715434831872 ............................................................ 6
Shirin Anlen and Katerina Cizek, *The Synthesis: AI Is Everywhere, Even in Your Documentary*, INTERNATIONAL DOCUMENTARY ASSOCIATION (Nov. 5, 2024) .................................................. 6
Transcript of Netflix Second Quarter 2026 Earnings Interview, NETFLIX, https://ir.netflix.net/.... 6

## I. STATEMENT OF INTEREST OF AMICUS CURIAE

For nearly fifty years, Ken Burns ("Burns") has been making acclaimed documentary films that examine Americans' shared history and heritage—weaving together complex stories, without taking political sides, to demonstrate how the *unum* emerges from our *pluribus*. In more than 40 films, he has profiled important American figures (from Thomas Jefferson to Jackie Robinson, Susan B. Anthony to Mark Twain, Frank Lloyd Wright to the Roosevelts); pondered uniquely American "inventions" (from baseball to jazz, national parks to country music); explored the American landscape (from the Brooklyn Bridge and Statue of Liberty to the route of Lewis and Clark and the devastation of the Dust Bowl); and followed the nation through four transformational conflicts (the American Revolution, the Civil War, World War II, and the Vietnam War). The result—more than 230 hours of programming, and counting—is a national treasure, telling the story of who we are as a people.

Recently, Burns has learned that several large language models (LLMs), including Defendants', have copied and ingested dozens (if not all) of his film's transcripts – and perhaps other copyrighted material that he owns or controls, including companion books to the films – without his permission. These works are now being regurgitated by the LLMs in response to queries from copycat filmmakers, who are using the outputs to produce competing films, of inferior quality, at far lower cost. The result is a vicious downward spiral, which is already having deleterious, downstream effects on Burns's work: as research becomes less expensive (thanks to Burns's enormous upfront investment of time and resources), non-fiction film budgets decrease; as budgets decrease, quality suffers; as quality suffers, the public's trust and interest in historical documentaries erodes; and, as audiences dwindle, budgets sink even further.

Burns holds the copyright to his films, in various entities that he owns and controls. His interest in this case is to ensure that the Defendants' permissive interpretation of fair use – which would excuse the misappropriation of decades of his work, and eviscerate the market for thoughtfully-researched, historical documentaries – does not become the accepted standard.

## II. BACKGROUND

### A. HISTORICAL DOCUMENTARY PRODUCTION REQUIRES PRODIGIOUS AMOUNTS OF HUMAN LABOR.

Quality, documentary filmmaking is a collaborative, time-intensive pursuit. Burns himself often likens the process to making maple syrup: Gallons of sap must be collected from dozens of trees, in a steady drip. Then, the sap is boiled down, slowly and methodically, to create a single bottle of syrup.

*Enormous amounts of human effort are expended, to select and tap the trees*: To research his projects, Burns casts an extraordinarily wide net, dispatching researchers, producers, writers and other personnel to identify, locate, collect and analyze primary and secondary materials from all over the country (indeed, sometimes, the world). Separate teams are dedicated to researching, respectively, archival photographs, archival footage, print journalism and period music. Materials are sourced over many years – sometimes, over a decade – from hundreds of institutional archives, such as museums, libraries, and universities; but also, to a significant degree, from small, private collections. Often, key archival materials, such as family photos and letters, are held in long-forgotten, dusty boxes, in remote storage rooms and attics, totally unavailable to the general public.

The films' interviews are likewise generated through years of patient investigation. Producers begin by identifying the relevant thought leaders (e.g., writers and historians), who, in turn, help identify key witnesses and other historically significant figures. More typically,

though, the most prominent voices in Burns's films are those of everyday people, whose personal stories intersect with momentous, historical events – individuals sourced by Burns's team, after chasing down hundreds (sometimes, thousands) of leads and hitting myriad dead ends.

These individuals are often reluctant to share their most intimate experiences and personal effects, for inclusion in a documentary that will likely be seen by tens of millions of people. Burns and his producers must spend years building trust – often, traveling great distances to meet prospective interviewees in-person, sometimes three or four times, without a camera, to hear their stories and assuage their individual concerns. Even then, a person who agrees to participate may prove unable to articulate their thoughts effectively on camera. Burns has personally conducted hundreds of interviews that wound up entirely on the cutting room floor.

*But the persistent effort yields the gallon of sap*: For Burns's series, *Country Music*, producers collected 175 hours of interview footage, over 100,000 photographs, and hundreds of articles of archival, historical footage. For *The American Revolution*, they reviewed and recorded approximately 18,250 archival images, 1,700 archival maps and 1,700 primary source documents; and shot hundreds of hours of footage, over 165 days of filming, across six years.

*Then, the distillation begins*: Burns and his team, advised by leading scholars, spend years reviewing, organizing and synthesizing the massive accumulation of information and materials into multi-layered storyboards; footage assemblies; rough cuts; final cuts; and finally, the multi-part series that audiences see on public television. The process inevitably presents the filmmakers with agonizing choices about what to include, and what to leave out. Often, entire sequences are edited together, and then excised, in the interest of pacing or clarity. What remains at the end of editing is a carefully crafted tapestry, consisting of the most important and

impactful, historical threads, interwoven in ways that push the boundaries of scholarship and conventional wisdom.

The films' scripts represent the product of this Herculean effort, in text form. They include all of the film's spoken words, whether in interviews or narration. Burns's writers spend years writing just the *first draft* of each program episode; then, they repeatedly fact check and calibrate each phrase and transition in collaboration with the film's expert advisors, to ensure that the final version presents a vividly accurate picture of the historical events depicted on screen.

These scripts, and perhaps other elements from Burns's documentaries, have already been copied and ingested by Defendants' generative AI models.

B. DEFENDANTS HAVE UPLOADED BURNS'S LIFE'S WORK TO THEIR SERVERS, AND HAVE USED IT TO TRAIN THEIR AI MODELS, WITHOUT BURNS'S CONSENT.

Using "AI Watchdog", a tool developed by *The Atlantic* to search the "pile" of datasets used to train most LLMs, Burns found verbatim transcripts of at least ninety-seven program episodes that he owns or controls. AI Watchdog, THE ATLANTIC, https://www.theatlantic.com/category/ai-watchdog. Dozens of AI companies, including Defendants, have uploaded these texts – the culmination of tens of thousands of hours of human labor – to their servers in just a few, short moments. *See In re OpenAI ChatGpt Litigation*, No. 23-cv-3223 (N.D. Cal. Jan. 17 2025), Dkt. No. 254 at 2 (referring to OpenAI's production of LibGen training datasets, in which, Burns's scripts appear); Andrew Deck, *Thousands of documentaries are fueling AI models built by Apple, Meta, and Nvidia*, NIEMAN LAB (Jan. 7, 2025). Since, Defendants' products have been using them, without authorization, for retrieval-augmented generation, and in infringing outputs provided to their end users.

## III. ARGUMENT

Defendants claim that their wholesale, unauthorized copying of Burns's work to assist in AI "learning" is a "fair use". However, the result of their conduct is hardly fair to Burns.

### A. DEFENDANTS' INTAKE OF BURNS'S WORKS TO TRAIN THEIR GENERATIVE AI MODELS IS DESTROYING THE MARKET FOR QUALITY, HISTORICAL DOCUMENTARIES.

"Fair use, when properly applied, is limited to copying by others which does not materially impair the marketability of the work which is copied." *Harper & Row v. Nation Enterprises*, 471 U.S. 539, 566-67 (1985) (citing 1 Nimmer § 1.10, at 1-87). In considering the effect on the market, courts consider "not only the market harm caused by the particular alleged infringer, but also the market harm that would result from unrestricted and widespread conduct of the same sort". *Hachette Book Group v. Internet Archive*, 115 F.4th 163, 189 (2d Cir. 2024). Here, Defendants' generative AI models have unilaterally copied and ingested Burns's works, and are using their contents, without consent, to enable the production of cheaply made facsimiles that are destroying the market for thoughtfully researched, historical documentaries, including Burns's.

Having "learned" on others' copyrighted works, AI technologies now make it far cheaper and easier to create video content. Indeed, this is the central value proposition of Defendants' products: "If you can say it, [AI] can create it", one ad campaign boasts. OpenArt print advertisement (viewed Oct. 27, 2026). There is no need, they claim, for human researchers, sifting through long-forgotten boxes of materials and sourcing, or tracking down the oral histories of thousands of living witnesses; because Burns and others like him have already done that legwork. All that is required is to pay the Defendants a small, monthly fee, and their products will happily regurgitate the information for you, in just a few seconds.

This gambit – stealing the cow and providing the milk to consumers, at below-market costs – has proven attractive to the world's largest media financiers. *See, e.g.,* Transcript of Netflix Second Quarter 2026 Earnings Interview, NETFLIX, p. 12, https://ir.netflix.net/ (excitedly noting that AI tools produce content "twice as fast and at half the cost of previous options"). In the first half of 2026 alone, Netflix used AI on 300 of its film projects, including documentary projects like *The American Experiment*, which employs seventeen minutes of AI-enhanced footage to animate battle sequences from the Revolutionary War.

But as AI adoption accelerates, Producers are being forced to zero out budgetary lines that had previously been allocated to researchers, writers and editors. *See, e.g.*, Rebecca Bellan, *AI's promise to indie filmmakers: Faster, cheaper, lonelier*, TECHCRUNCH (Feb. 20, 2026); Shirin Anlen and Katerina Cizek, *The Synthesis: AI Is Everywhere, Even in Your Documentary*, INTERNATIONAL DOCUMENTARY ASSOCIATION (Nov. 5, 2024).

As a result, the content is suffering: with fewer humans mining the analogue world for never-before-digitized materials and anecdotes, fewer films contain new information or scholarship. And as fewer factual revelations and novel historical analyses enter the marketplace, the LLMs on which producers rely – which do nothing more than predict what words should follow a user's query, based entirely on the dataset, on which, they have been trained – become increasingly redundant. *See* Melanie Mitchelle, *Large Language Models*, MIT OPEN ENCYCLOPEDIA OF COGNITIVE SCIENCE (Jul. 24, 2024) ("LLMs are generative models, which, given a prompt (decomposed into tokens), compute a probability distribution over the model's vocabulary and probabilistically select the next token to generate."); Sam Altman (@sama), X (Mar. 2, 2023, 5:30 PM), https://x.com/sama/status/1631421715434831872 ("language models just being programmed to try to predict the next word is true…"). Worse,

they output inaccurate or misleading information that evades detection, even by the most sophisticated media users; and then begin using those "synthetic" data points to reinforce their own misconceptions. Dan Milmo, *Elon Musk says all human data for AI training 'exhausted'*, THE GUARDIAN (Jan. 9, 2025) (explaining Musk's concern that, once original, human data for AI models runs out, hallucinations will increase, leading to "model collapse", an industry term for the deterioration of AI outputs).

With each banal and inaccurate output that enters the bloodstream of mass market, non-fiction content, the entire genre loses more traction. Viewers are less engaged by films that, as a whole, retread old ground, and/or traffic in distortions and falsehoods. Miles Klee, *Hollywood Is Losing Audiences to AI Fatigue*, WIRED (Feb. 5, 2026). And, as engagement declines, budgets decrease even further. This negatively reinforcing, doom loop was made possible only by Defendants' initial, wholesale, unauthorized ingestion of the copyrighted work of Burns and others. They cannot now characterize the disastrous effects of their misconduct as "fair".

B. DEFENDANTS' AI MODELS REGURGITATE EXACT REPLICAS OF COPYRIGHTED MATERIAL FROM BURNS'S WORK, WHICH CANNOT BE CONSIDERED FAIR USE.

Defendants' generative AI models can also be prompted to produce outputs that infringe and directly compete with Burns's copyrighted works. These outputs are not "transformative", because they do not transcend the use of the original work, by, for example, adding context, or employing the work for a different purpose and in a different market than the original. *See generally*, *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569 (1994); *Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*, 598 U.S. 508 (2023) (finding that the commercial licensing of a silkscreened portrait of Prince, based on a stylized version of claimant's pre-existing photograph, was not a transformative use).

Here, Defendants' models create nothing more than verbatim counterfeits of Burns's works. For example, when prompted via the OpenAI API, both GPT-5.5 and GPT-4.1 produced substantial verbatim passages from Mr. Burns's script "Civil War, Episode 1: The Cause":

**Output from GPT-5.5**

> User
>
> Film: "The Civil War" by Ken Burns
> Request: Next paragraph
>
> Assistant
>
> Assistant
>
> "Men who had never strayed 20 miles from their own front doors now found themselves soldiers in great armies, fighting epic battles hundreds of miles from home. They knew they were making history, and it was the greatest adventure of their lives." (The Civil War, Episode 1, Opening)

**Output from GPT-4.1**

> User
>
> Film: "The Civil War" by Ken Burns
> Request: Opening narration
>
> Assistant
>
> "'The Civil War was fought in 10,000 places, from Valverde, New Mexico, and Tullahoma, Tennessee, to St. Albans, Vermont, and Fernandina on the Florida coast. More than three million Americans fought in it, and more than 600,000 men, two percent of the population, died in it. American homes became headquarters. American churches and schools became hospitals. And the very currency of our lives was often rendered worthless. Two out of every three men who ever died in battle died in the Civil War. This was the great watershed of our lives, our Iliad, our Odyssey.' (The Civil War, Episode 1: The Cause, Opening Narration)"

These are direct, word-perfect reproductions of the original copyrighted work. No additional context is provided. Moreover, because they were produced in response to a user's prompt for Burns's film script, the purpose of these copies is by design identical to that of the original work. Under any possible application of the "transformative use" test, the outputs fail.

Nor is there any reason to believe that this conduct will abate at any point in the future. Defendants make noise about the safeguards they're erecting, to prevent their models from responding to user queries with infringing copies of copyrighted works. *See, e.g.*, Josh Taylor, *OpenAI promises more 'granular control' to copyright owners after Sora 2 generates videos of popular characters*, THE GUARDIAN (Oct. 6, 2025); Rachel Metz, *OpenAI Rolls Out GPT-6 Astra Model With Cyber Guardrails*, BLOOMBERG (Sept. 3, 2026). However, several, well-publicized events have laid bare just how little control Defendants have in preventing their own products from trampling on the intellectual property rights of others. Among other examples: OpenAI launched a generative AI video tool, Sora, in 2024, but was forced to take it off the market in the spring of this year when, despite multiple pronouncements about the software's internal guardrails and restrictive user terms, it was unable to stop the product from outputting "non-consensual imagery and realistic misinformation, not to mention major copyright infringement". Osmond Chia and Emma Calder, *OpenAI closes Sora video-making app and cancels $1bn Disney deal*, BBC (Mar. 25, 2026); *see also OpenAI pulls the plug on Sora, the viral AI video app that sparked deepfake concerns*, THE ASSOCIATED PRESS (Mar. 25, 2026).

Defendants' AI products are thus likely to incorporate Burns's copyrighted content into countless different, infringing outputs, for so long as such products remain available to end users. These infringing outputs are not "transformative", usurp the market for Burns's original works, and should not be countenanced.

IV. CONCLUSION

Defendants and their ilk have used Burns's copyrighted works to produce untold numbers of infringing outputs, which are likely to harm sales and licensing of Burns's own films, and to degrade the quality of (and thus, appetite for) non-fiction content, generally. This is not a case of

fair use. It's a case of wanton misconduct, from which, Defendants now stand to make billions, if not trillions, of dollars. *See* Kate Rooney and Ashley Capoot, *OpenAI nears up to $30 billion funding round at $1.25 trillion valuation led by UAE investors*, CNBC (Oct. 22, 2026). By rendering judgment in favor of the Plaintiffs in this case, the Court would send a clear message to tech companies that have repeatedly flouted the rights of others, for their own financial gain, and provide a meaningful path for content creators to enforce the copyrights in their life's work.

Dated: October 30, 2026

By: /s/ Andrew D. Patrick
Andrew D. Patrick (SBN 3039393)

By: /s/ Michael D. McCormack
Michael D. McCormack (SBN 5183975)

**PATRICK & MCCORMACK**
45 Main Street, Suite 1030
Brooklyn, NY 11201
Tel: (718) 625-7200
drew@patmaclaw.com
michael@patmaclaw.com

*Attorneys for [Proposed] Amicus Curiae Kenneth Burns*

**CERTIFICATE OF COMPLIANCE WITH WORD-COUNT LIMITATION**

Pursuant to Local Civil Rule 7.1(c), the undersigned certifies that this brief complies with the word-count limitation set by the Court's Order of August 7, 2026 (Dkt. No. 1663), which provides that a proposed amicus brief shall be no more than 6,000 words. As calculated by the word-count function of the word-processing program used to prepare this brief, the brief contains 3,161 words.

Dated: October 30, 2026

By: /s/ Andrew D. Patrick
Andrew D. Patrick (SBN 3039393)

By: /s/ Michael D. McCormack
Michael D. McCormack (SBN 5183975)

**PATRICK & MCCORMACK**
45 Main Street, Suite 1030
Brooklyn, NY 11201
Tel: (718) 625-7200
drew@patmaclaw.com
michael@patmaclaw.com

*Attorneys for [Proposed] Amicus Curiae Kenneth Burns*