**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE: OPEN AI, INC., COPYRIGHT INFRINGEMENT LITIGATION<br><br>This document relates to:<br>All matters | Case No. 25-md-03143-SHS-OMW |

**AMICUS CURIAE BRIEF OF ELECTRONIC FRONTIER FOUNDATION IN SUPPORT OF DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**

Victoria J. Noble
Mitchell L. Stoltz
ELECTRONIC FRONTIER FOUNDATION
815 Eddy Street
San Francisco, CA 94109
Telephone: (415) 436-9333
Facsimile: (415) 436-9993
Email: tori@eff.org, mitch@eff.org

*Counsel for Amicus Curiae Electronic Frontier Foundation*

Dated: October 30, 2026

## CORPORATE DISCLOSURE STATEMENT

Proposed amicus curiae Electronic Frontier Foundation, by its attorneys and pursuant to Rule 7.1 of the Federal Rules of Civil Procedure, hereby states that it is a corporation organized under Section 501(c)(3) of the Internal Revenue Code. Electronic Frontier Foundation does not have a parent corporation, and no publicly held company has a 10 percent or greater ownership interest in it.

Dated: October 30, 2026

*/s/ Victoria J. Noble*
Victoria J. Noble

# TABLE OF CONTENTS


CORPORATE DISCLOSURE STATEMENT ..... i

TABLE OF AUTHORITIES ..... iii

INTEREST OF AMICUS CURIAE ..... 1

INTRODUCTION ..... 1

ARGUMENT ..... 3

I. CONDITIONING FAIR USE ON DATA PROVENANCE WOULD UNDERMINE FAIR USE PROTECTIONS FOR TRANSFORMATIVE USES ..... 3

II. COPYRIGHT IS DESIGNED TO INHIBIT INFRINGEMENT, NOT CREATIVE COMPETITION ..... 7

A. Factor One: Generative AI Training Is Transformative, Not Substitutive ..... 8

B. Factor Four: Market Competition Is Not Market Harm ..... 10

III. Rewriting Fair Use Would Threaten an Array of Socially Beneficial Activities ..... 12

A. Widely Used Web Scraping Practices. ..... 12

B. Publicly Available AI Training Data. ..... 14

C. Third Party Uses of AI Tools. ..... 16

CONCLUSION ..... 19

CERTIFICATE OF COMPLIANCE ..... 20

# TABLE OF AUTHORITIES

## Cases

*A.V. ex rel. Vanderhye v. iParadigms, LLC*,
562 F.3d 630 (4th Cir. 2009) ..... 4

*A&M Recs., Inc. v. Napster*,
239 F.3d 1004 (9th Cir. 2001) ..... 4

*Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*,
598 U.S. 508 (2023) ..... 3, 6, 8

*Arica Inst., Inc. v. Palmer*,
970 F.2d 1067 (2d Cir. 1992) ..... 10

*Authors Guild v. Google*,
804 F.3d 202 (2d Cir. 2015) ..... 4, 10, 11

*Authors Guild, Inc. v. HathiTrust*,
755 F.3d 87 (2d Cir. 2014) ..... 3, 4

*Bartz v. Anthropic PBC*,
787 F. Supp. 3d 1007 (N.D. Cal. 2025) ..... 4, 8

*Campbell v. Acuff-Rose Music, Inc.*,
510 U.S. 569 (1994) ..... 6, 10

*Cox Comm'ns, Inc. v. Sony Music Ent.*,
146 S. Ct. 959 (2026) ..... 11, 12

*Evox Prods. v. Stanford University*,
No. 25-cv-9521, ECF No. 87 (N.D. Cal. Sept. 25, 2026) ..... 1

*Feist Publications, Inc. v. Rural Tel. Serv. Co.*,
499 U.S. 340 (1991) ..... 7

*Google LLC v. Oracle Am., Inc.*,
593 U.S. 1 (2021) ..... 6, 7, 12

*Harper & Row Publishers, Inc. v. Nation Enterprises*,
471 U.S. 539, 542 (1985) ..... 6

*Infinity Broad. Corp v. Kirkland*,
150 F.3d 104 (2d Cir. 1998) ..... 10

*Kadrey v. Meta Platforms, Inc.*,
788 F. Supp. 3d 1026 (N.D. Cal. 2025) ..... 4

*Kirtsaeng v. John Wiley & Sons, Inc.*,
568 U.S. 519 (2013) ..... 5

*NXIVM Corp. v. Ross Inst.*,
364 F.3d 471 (2d Cir. 2004) ..... 6

*Perfect 10, Inc. v. Amazon.com, Inc.*,
508 F.3d 1146 (9th Cir. 2007) ........ 4, 13

*Santos v. Kimmel*,
154 F.4th 30 (2d Cir. 2025) ........ 6

*Sega Enters. Ltd. v. Accolade, Inc.*,
977 F.2d 1510 (9th Cir. 1992) ........ 4

*Sony BMG Music Ent. v. Tenenbaum*,
672 F. Supp. 2d 217 (D. Mass. 2009) ........ 4

*Sony Computer Ent., Inc. v. Connectix Corp.*,
203 F.3d 596 (9th Cir. 2000) ........ 10

*Sony Corp. of Am. v. Universal City Studios, Inc.*,
464 U.S. 417 (1984) ........ 2, 7

*Thomson Reuters Enter. Ctr. GmbH v. ROSS Intel. Inc.*,
2026 WL 2932557 (3d Cir. Sept. 29, 2026) ........ 8, 9

*Twentieth Century Music Corp. v. Aiken*,
422 U.S. 151 (1975) ........ 7, 9

*Yonay v. Paramount Pictures Corp.*,
163 F.4th 685 (9th Cir. 2026) ........ 11

**Statutes**

17 U.S.C. § 102(b) ........ 11

17 U.S.C. § 107 ........ 5

17 U.S.C. § 109(a) ........ 5

**Other Authorities**

4 NIMMER ON COPYRIGHT § 13F.05[E][2] ........ 7

A. Feder Cooper, et al., *Extractable Memorization from First Principles*, ARXIV
(Sept. 25, 2026) ........ 7

Adrianne Jeffries & Leon Yin, *Amazon Puts Its Own "Brands" First Above Better-Rated Products*, THE MARKUP (Oct. 14, 2021) ........ 12

Adrianne Jeffries & Leon Yin, *How We Analyzed Amazon's Treatment of Its "Brands" in Search Results*, THE MARKUP (Oct. 14, 2021) ........ 12

Alexei Miagkov & Daly Barnett, *Introducing Badger Swarm: New Project Helps Privacy Badger Block Ever More Trackers*, ELECTRONIC FRONTIER FOUNDATION (Nov. 7, 2023) ........ 13

Andrew Deck, *A Record-Breaking Eight Pulitzer Awardees Disclosed AI Use This Year*, NIEMANLAB (Aug. 3, 2026) ........ 17

Apurv Singh Gautam, *Undercover Operations: Scraping the Cybercrime Underground*, SANS (Jan. 15, 2025) ........ 13

Ashim Mahara, *Cybersecurity Data Extraction from Common Crawl*, ARXIV (March 2025) ..... 15

Ayyub Ibrahim & Tarak Shah, *Using Large Language Models for Structured Information Extraction from the Innocence Project New Orleans' Wrongful Conviction Case Files,* HUMAN RIGHTS DATA ANALYSIS GROUP ..... 17

CENTER FOR COUNTERING DIGITAL HARM, *Toxic Twitter: How Twitter Generates Millions in Ad Revenue by Bringing Back Banned Accounts* (Feb. 9, 2023) ..... 13

Christoph Schuhmann, et al., *LAION-5B: An Open Large-Scale Dataset for Training Generation Image-Text Models*, ARXIV (Oct. 16, 2022) ..... 14

COMMON CRAWL, *About* ..... 14, 15

Daniil A. Boiko, et al., *Autonomous Chemical Research with Large Language Models*, NATURE (Dec. 20, 2023) ..... 18

Dave Gershgorn, *The Data that Transformed AI Research—and Possibly the World*, QUARTZ (July 20, 2022) ..... 15

Edward Lee, *Fair Use and the Origin of AI Training*, 63 HOU. L. REV. 105 (2025) ..... 5, 15

Ethan Toven-Lindsey, et al., *How AI-Assisted Workflows Are Unlocking California Police Records*, CURRENT (Jan. 16, 2026) ..... 17

GOOGLE, *In-Depth Guide to How Google Search Works* ..... 13

Hugo Laurençon, et al., *The BigScience ROOTS Corpus: A 1.6TB Composite Multilingual Dataset*, PROCEEDINGS OF THE 36TH CONFERENCE ON NEURAL INFORMATION PROCESSING SYSTEMS (Mar. 7, 2023) ..... 15

*Introducing: Be My AI*, BE MY EYES (Aug. 7, 2023) ..... 18

James Love, *We Need Smart Intellectual Property Laws for Artificial Intelligence*, SCIENTIFIC AMERICAN (August 7, 2023) ..... 16

Jason Stoughton, *Meet 'Coscientist,' Your AI Lab Partner*, U.S. NATIONAL SCIENCE FOUNDATION (Dec. 20, 2023) ..... 18

Jordan G. Teicher, *When Photography Wasn't Art*, JSTOR DAILY (Feb. 6, 2016) ..... 2, 3

Josh Richman, *Podcast Episode: AI on the Artist's Palette*, ELECTRONIC FRONTIER FOUNDATION (June 4, 2024) ..... 18

Josh Richman, *Podcast Episode: Building a Tactile Internet*, ELECTRONIC FRONTIER FOUNDATION (May 7, 2024) ..... 18

Kathryn Squyres, *California News Coalition Launches Database of Police Misconduct Records*, CURRENT (Aug. 25, 2025) ..... 17

Laura Edelson & Damon McCroy, *We Research Misinformation on Facebook. It just Disabled Our Accounts*, N.Y. TIMES (Aug. 10, 2021) ..... 16

Laurie Clarke, *These Diseases Were Thought to Be Incurable. Now AI Is Unlocking New Treatments*, BBC (Mar. 10, 2026) ..... 19

Lawerence Lessig, *Zombie Copyright: Déjà Vu All Over Again* (Oct. 19, 2026) ..... 16

Livia Gershon, *Did Photography Really Kill Portrait Painting?* JSTOR DAILY (Sept. 13, 2022)........................................ 2, 3

Matthew Sag, *The False Hope of Content Licensing at Internet Scale*, PROMARKET (Nov. 19, 2025)........................................ 15

Michael Carroll, *Copyright and the Progress of Science*, 53 U.C. DAVIS L. REV. 893 (2019)...... 5

Pierre N. Leval, *Toward a Fair Use Standard*, 103 HARV. L. REV. 1105 (1990) ........................................ 6

PUBLIC KNOWLEDGE & CENTER FOR DEMOCRACY AND TECHNOLOGY, *Pro-Social Scraping Factsheet*........................................ 12

PUBLICATIONS OFFICE OF THE EUROPEAN UNION, *Democratisation of AI through Open Data: Empowering Innovation* (Feb. 24, 2025) ........................................ 14

SFO MUSEUM, *Women of Afrofuturism* ........................................ 18

SMITHSONIAN LEARNING LAB, *Nettrice Gaskins' Deep Dream Featured Futurists* .................... 18

Stefan Baack, *A Critical Analysis of the Largest Source for Generative AI Training Data: Common Crawl*, ASSN. FOR COMPUTING MACHINERY 2199 (June 5, 2024)............................ 14

Stefan Baack, *Training Data for the Price of a Sandwich*, MOZILLA (Feb. 6, 2024).................. 14

*The Scope of Fair Use: Hearing Before the Subcomm. on Courts, Intellectual Property, and the Internet of the H. Comm. on the Judiciary*, 113th Cong. 2 (2014) ............................... 9

Timothy B. Lee, *How a Stubborn Computer Scientist Accidentally Launched the Deep Learning Boom*, ARS TECHNICA (Nov. 11, 2024) ........................................ 15

U.S. COPYRIGHT OFFICE, *Orphan Works and Mass Digitization* (June 2015) ............................ 16

U.S. FEDERAL TRADE COMMISSION, *Generative AI Raises Competition Concerns* (June 29, 2023) ........................................ 15

Zuojun Xu, et al., *A Generative AI-Discovered TNIK Inhibitor for Idiopathic Pulmonary Fibrosis: A Randomized Phase 2a Trial*, NATURE MEDICINE (June 3, 2025) .......................... 19

## INTEREST OF AMICUS CURIAE

The Electronic Frontier Foundation ("EFF") is a member-supported, nonprofit civil liberties organization that has worked for more than 30 years to protect free expression, access to knowledge, and innovation. EFF, its more than 30,000 members, and the community of technology users they represent have a strong interest in a copyright system that promotes the progress of science by balancing copyright incentives with countervailing constitutional interests. Consistent with this mission, EFF has participated, as counsel or amicus curiae, in multiple copyright cases pertaining to new technologies; provides free legal counseling on copyright issues; and advocates for balanced copyright policy in legislative and regulatory arenas. EFF brings a critical and underrepresented perspective to its amicus advocacy work by keeping the public interest at the forefront and highlighting how judicial decisions may impact people other than commercial stakeholders or the immediate parties to a dispute.

## INTRODUCTION

Two decades ago, a computer science professor had a radical idea: to drive the development of high-capacity AI models by improving the data on which they were trained. Her research team built a massive dataset, ImageNet, comprised of millions of images downloaded from the internet and carefully labeled and curated by human researchers—an unprecedented project at the time. ImageNet would soon prove a catalyst for AI research that transformed the field, including a pathbreaking 2017 paper from a team of researchers based primarily at Stanford University. In keeping with normal scientific practice, Stanford published the underlying data sets to enable others to replicate and verify the work. Seven years later, a stock car image company whose works were included in the data set hit Stanford with a billion-dollar copyright infringement lawsuit. *Evox Prods. v. Stanford University*, No. 25-cv-9521, ECF No. 87 (N.D. Cal. Sept. 25, 2026).

That lawsuit is ongoing, but it illustrates the real stakes of key issue in this case: whether or not routine AI research and development make fair use of copyrighted works. Several courts have concluded that fair use does indeed protect AI training and Defendants have explained why the reasoning in those decisions, and many others, applies here. Amicus will not burden the court by replicating those arguments.

Rather, we focus on two particularly dangerous theories Plaintiffs advance to try to avoid the overwhelming weight of case law. The Supreme Court has cautioned that where copyright law has not kept up with technological developments, courts should be careful not to expand copyright protections on their own. *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 429–31 (1984). Plaintiffs are asking the Court to throw that caution to the winds and rewrite copyright law to include a lawful acquisition requirement that finds no basis in statute or case law; and to tilt the fair use analysis against the developer of a general-purpose tool if that tool might be used to create potentially competing *non-infringing* works.

The Court should reject both theories. The Constitution gives *Congress* the role of adjusting copyright law to address new technologies, including deciding whether those significant changes are needed at all. *Sony Corp. of Am.*, 464 U.S. at 430–431. Congress may not move quickly, but that legislative lag can be beneficial when it comes to adapting copyright to new technologies. To take just one of many historical examples, portrait artists once feared the camera would replace the paintbrush, because cameras could produce thousands of images in the time it would take a human to paint just one.[1] In practice, photography sparked a resurgence in

---

[1] *See* Livia Gershon, *Did Photography Really Kill Portrait Painting?* JSTOR DAILY (Sept. 13, 2022), https://daily.jstor.org/did-photography-really-kill-portrait-painting/; Jordan G. Teicher, *When Photography Wasn't Art*, JSTOR DAILY (Feb. 6, 2016), https://daily.jstor.org/when-photography-was-not-art/.

portraiture painting and provided artists with a new revenue source by allowing them to capture and sell reproductions of their own artworks.[2]

AI tools are developing rapidly, and it is not yet clear what new regulations may be needed, and even less clear that copyright is the appropriate regulatory terrain. In the meantime, this Court should apply well-established copyright precedents that, construed in light of copyright's purpose to promote progress of science and culture, favor fair use here.

## ARGUMENT

### I. CONDITIONING FAIR USE ON DATA PROVENANCE WOULD UNDERMINE FAIR USE PROTECTIONS FOR TRANSFORMATIVE USES.

Plaintiffs seek to clothesline Defendants' fair use defense by insisting that, even if training is a fair use, a necessary step in that process—acquiring training data—is independently infringing, particularly if the works were downloaded from "pirate" sites. Book Plfs' Br. 19; News Plfs' Br. 35, 56. Book Plaintiffs introduce the requirement in the guise of asserting an independent infringement claim for "downloading"—even though that copying was done for the purpose of training. News Plaintiffs take a different tack, arguing that Defendants' "transgressive and deceptive" conduct in the course of acquiring training data, such as disregarding terms of use, tilts Factor One against fair use. *See* News Plfs' Br. 52, 56–57.

Neither approach succeeds.

*First*, decades of fair use case law focuses on the ultimate use of the work, not how it was acquired. In *Warhol*, for example, the Supreme Court stressed that the fairness of the copying is closely tied to its purpose; different purposes might lead to different conclusions. *Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*, 598 U.S. 508, 533 (2023); *see also id.* at 557–58 (Gorsuch, J., concurring). In *Authors Guild v. Google* and *Authors Guild v. Hathitrust*, the

[2] *Id.*

Second Circuit focused its analysis not on the initial copying—which was massive—but on the Defendant's purpose: creating a searchable database of books. *Authors Guild v. Google*, 804 F.3d 202, 216–17 (2d Cir. 2015); *Authors Guild, Inc. v. HathiTrust*, 755 F.3d 87, 97 (2d Cir. 2014). Several other courts have followed a similar approach in cases involving new technologies. *See, e.g., Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1165 (9th Cir. 2007) (image search engine); *A.V. ex rel. Vanderhye v. iParadigms, LLC*, 562 F.3d 630, 639 (4th Cir. 2009) (plagiarism detection software); *Sega Enters. Ltd. v. Accolade, Inc.*, 977 F.2d 1510, 1522–23 (9th Cir. 1992), *as amended* (Jan. 6, 1993) (video games).

Rejecting virtually identical arguments last year, one federal judge wrote that claiming "downloading [for training] was 'piracy' and thus cannot be fair use begs the question because the whole point of fair use analysis is to determine whether a given act of copying was unlawful." *See Kadrey v. Meta Platforms, Inc.*, 788 F. Supp. 3d 1026, 1046 (N.D. Cal. 2025). In dicta upon which Plaintiffs heavily rely, a fellow judge expressed "doubts" that transformative uses of "copies from pirate sites" could ever be fair, but declined to decide the case on that basis. *Compare* Book Plfs' Br. 2 *with Bartz v. Anthropic PBC*, 787 F. Supp. 3d 1007, 1025–26 (N.D. Cal. 2025).

Plaintiffs find no more support in the file-sharing cases. *See* Book Plfs' Br. 19–20; News Plfs' Opp'n 11. Courts have recognized that downloading to avoid payment is not enough to satisfy fair use, but also stress that the ultimate transformative purpose is key. *See A&M Recs., Inc. v. Napster*, 239 F.3d 1004, 1015 (9th Cir. 2001) ("downloading MP3 files does not transform the copyrighted work"); *see also Sony BMG Music Ent. v. Tenenbaum*, 672 F. Supp. 2d 217, 228 (D. Mass. 2009) ("More important for this inquiry… is the conclusion that this use was not accompanied by any public benefit or transformative purpose that would trigger the core

concerns of the doctrine.”).

*Second,* if Congress had wanted to make “lawful acquisition” a predicate to fair use, it knew how to do so. *Compare* 17 U.S.C. § 109(a) (“the owner of a particular *copy…lawfully made* under this title”) (emphasis added) *with id.* § 107 (“fair use of a copyrighted work”); *See generally Kirtsaeng v. John Wiley & Sons, Inc*., 568 U.S. 519, 537 (2013). Instead, it deliberately drafted Section 107 to be flexible enough to ensure that fair use could serve copyright’s public interest purpose.[3] Limiting that doctrine based on the lawfulness of the copy that was used “would undermine the balance that fair use provides by depriving society of the benefits of the secondary use as a punishment for a prior infringing act for which liability would already lie.”[4]

That flexibility, reinforced by the Supreme Court’s directive that courts should not undertake to usurp Congress’s role in deciding whether and how to regulate new technologies, has cleared the way for decades of innovation.[5] The resulting digital age is characterized by a massive amount of everyday copying for which copyright’s incentives are neither needed nor wanted. In the 21st century, pegging fair use to a demonstration of lawful provenance would cast legal doubt on the billions of copies we collectively make every day through routine online activities like opening emails, clicking on an embedded link, visiting websites, sharing pictures, streaming music, and watching videos. All of this activity requires intermediate copying. Fair use, in conjunction with other sensible limits on copyright’s reach, allows users to enjoy the internet without worrying about the provenance of every copyrighted work they open or share.

*Third*, News Plaintiffs’ suggestion that “transgressive and deceptive” conduct must weigh

---

[3] Edward Lee, *Fair Use and the Origin of AI Training*, 63 HOU. L. REV. 105, 129–131 (2025).
[4] Michael Carroll, *Copyright and the Progress of Science*, 53 U.C. DAVIS L. REV. 893, 957–59 (2019) (discussing use of shadow libraries for text and data mining research).
[5] *See* Lee, *supra* note 3, at 129–131.

against fair use, *see* News Plfs' Br., 52, 56–57, is an obvious attempt to revive the moribund idea that fair use depends on a party's good faith. In fact, good faith has no significant role in modern fair use analysis. In *Harper & Row Publishers, Inc. v. Nation Enterprises*, the Court noted its concern that a magazine had "purloined" a manuscript, treating it as additional evidence that the magazine's true purpose was to "scoop" a book publisher's right of first publication. 471 U.S. 539, 542, 562 (1985). But the Court has subsequently "distanced itself" from "good faith" as a fair use consideration. *Santos v. Kimmel*, 154 F.4th 30, 34 (2d Cir. 2025). In *Campbell,* the Court relegated good faith to a mere footnote and quoted with implicit approval Judge Leval's conclusion that good faith was irrelevant to fair use. *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 585 n.18 (1994). In *Google v. Oracle*, the Court stopped just short of overruling *Harper & Row* on this point but observed that *Campbell*'s "skepticism" was "justifiable." *Google LLC v. Oracle Am., Inc.*, 593 U.S. 1, 32 (2021). And the Court's most recent fair use opinion omits this consideration altogether. *See generally Warhol*, 598 U.S. 508.

The message is clear: fair use, like copyright generally, "is not a privilege reserved for the well-behaved." *Google*, 593 U.S. at 32 (quoting Pierre N. Leval, *Toward a Fair Use Standard*, 103 HARV. L. REV. 1105, 1126 (1990)). As one appellate judge has explained: "Fair use is not a doctrine that exists by sufferance, or that is earned by good works and clean morals," but rather a public right "that is 'necessary to fulfill copyright's very purpose.'" *NXIVM Corp. v. Ross Inst.,* 364 F.3d 471, 485 (2d Cir. 2004) (Jacobs, J., concurring) (quoting *Campbell*, 510 U.S. at 575). If acquiring copies without permission is enough to foreclose the defense, fair use cannot serve that purpose. Nimmer offers a telling example:

> Imagine an undercover reporter who obtains access to a high politician's private writings under false pretenses—should the socially valuable revelations contained in those writings be lost to the public based on the circumstances of a lie having been told? Presumably, sound public policy counsels against that result.

4 NIMMER ON COPYRIGHT § 13F.05[E][2] n.245. This logic extends to necessary intermediate copying in the process of creating transformative technological works.

## II. COPYRIGHT IS DESIGNED TO INHIBIT INFRINGEMENT, NOT CREATIVE COMPETITION.

Contrary to the flurry of speculation that accompanied the public launch of several LLMs, independent research shows that large generative models are generally unlikely to memorize and reproduce works on which they were trained.[6] Confronted with this practical reality, Plaintiffs advance the so-called "market dilution" theory: that building generative AI tools cannot be fair use because those tools might encourage the proliferation of non-infringing competing works.

Accepting this theory would amount to more than a slight doctrinal shift; it would refocus the fair use analysis toward maximizing profit and control for rightsholders, and away from copyright's true purpose: stimulating creativity in service of the general public good. *See Twentieth Century Music Corp. v. Aiken*, 422 U.S. 151, 156 (1975) ("Creative work is to be encouraged and rewarded, but private motivation must ultimately serve the cause of promoting broad public availability of literature, music, and the other arts."); *see also Sony Corp. of Am.*, 464 U.S. at 432 (copyright law "has never accorded the copyright owner complete control over all possible uses of his work"). Copyright law not only allows "but *encourages* others to build freely" on existing works. *Feist Publications, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 349–50 (1991) (emphasis added). That is why copyright law is designed to inhibit *infringement*—*i.e.*, the proliferation of identical or substantially similar works—not competition.[7]

---

[6] *See* A. Feder Cooper, et al., *Extractable Memorization from First Principles*, ARXIV (Sept. 25, 2026), https://arxiv.org/pdf/2607.12649.

[7] In fact, fair use is designed to protect competition by avoiding "unrelated or illegitimate harms in other markets or to the development of other products." *Google*, 593 U.S. at 22.

The market dilution theory infects Plaintiffs' Factor One and Factor Four arguments, *infra*, but belongs in neither category.

**A. Factor One: Generative AI Training Is Transformative, Not Substitutive.**

Factor One assesses whether a secondary use substitutes for, or has a new and/or significantly different purpose from, that of the original work. *Warhol*, 598 U.S. at 528, 531–32. Generative AI training falls in the latter group; its purpose is not only transformative, but "spectacularly so." *Bartz*, 787 F. Supp. 3d at 1021. Neither the LLMs nor their outputs serve as substitutes for the works on which they are trained. Instead, they are used to generate new creations, insights, and tools for medicine, science, journalism, art, accessibility, and so on. *See* Section III.C, *infra*.

Plaintiffs respond with a radically distorted idea of "substitution." In copyright jurisprudence, that term is an analytical device to determine whether expression in a *specific* secondary work is so similar to copyrightable expression in a *specific* original work that a user might turn to that work instead. *Warhol*, 598 U.S. at 533, 535 n.11. Book Plaintiffs' idea of substitution, however, includes any "stories" that might compete with their books—whether or not that content reproduces or is substantially similar to copyrightable expression. *See* Book Pltfs' Br. 26–28. News Plaintiffs' concept of substitution is even broader, including all "news" content and any search engine-style "answers" that reference their works—again, whether or not that content reproduces or is substantially similar copyrightable expression. News Plfs' Br. 52–54.

Plaintiffs' definitions of substitutes sweep far beyond those that courts have previously recognized. In *Warhol*, for example, the Supreme Court held that two specific "portraits of Prince used in magazines to illustrate stories about Prince" shared "substantially the same" purpose. *Warhol*, 598 U.S. at 535–36. Similarly, in *Thomson Reuters Enter. Ctr. GmbH v. ROSS*

*Intel. Inc*., the Third Circuit Court of Appeals held that using Westlaw headnotes to build a competing legal research platform was not transformative, because both the plaintiff and the defendant used the headnotes for the "same ultimate purpose." 2026 WL 2932557, at *6 (3d Cir. Sept. 29, 2026). The court expressly distinguished training large language models, like OpenAI's, that can "generate original expression." *Id.* at *6 n.7.

If accepted, Plaintiffs' market dilution theory would upend widely accepted creative and academic practices that have nothing to do with AI. For example, best-selling fantasy author Naomi Novik developed her skills and style by writing fanfiction, a genre where fans use characters and worlds from an existing book, movie, show, or game to explore alternate plots or character arcs.[8] In other words, Novik "trained" on existing works, including fantasy works, and then went on to publish several fantasy novels herself that, in theory, "competed" with the works on which she "trained." Her new works might even be "substitutes" in the sense that a reader might choose to buy her books instead of another fantasy novel involving, say, dragons. Under Plaintiffs' theory, that possibility would have tilted Factor One against affording fair use protections for the fiction she wrote as a fan.

The same issue applies to academic literature reviews, which seek to distill insights from prior publications on a topic. Future scholars might rely on those literature reviews, rather than articles they analyze, potentially diverting readers away from the original works. According to Plaintiffs' theory, the possibility of diversion would weigh against fair use even though such an outcome would hardly serve the "general public good." *Cf. Twentieth Century Music Corp.*, 422 U.S. at 156.

---

[8] *The Scope of Fair Use: Hearing Before the Subcomm. on Courts, Intellectual Property, and the Internet of the H. Comm. on the Judiciary*, 113th Cong. 2 (2014) (statement of Naomi Novik, Co-Founder, Org. for Transformative Works).

### B. Factor Four: Market Competition Is Not Market Harm.

Plaintiffs' anti-competitive take on fair use is also inconsistent with Factor Four precedent. The "market harm" analysis excludes harms that "occur in relation to interests that are not protected by the copyright." *Authors Guild*, 804 F.3d at 224. The market for dissimilar works does not properly belong to the copyright holder because, by definition, such works do not embody protectible elements of the original. *See also Infinity Broad. Corp v. Kirkland*, 150 F.3d 104, 110 (2d Cir. 1998) (market harm exists only where secondary user "usurp[s] a market that properly belongs to the copyright-holder"); *Campbell*, 510 U.S. at 592–93, 593 n.24. Fair use may apply even if the copyright holder suffers "some economic loss" resulting from increased competition from works that copyright does not entitle rightsholders to control. *Sony Computer Ent., Inc. v. Connectix Corp.*, 203 F.3d 596, 607 (9th Cir. 2000). In other words, the "only" market effect considered by courts is "that which stems from defendant's use of plaintiff's 'expression,' not that which stems from defendant's work as a whole." *Arica Inst., Inc. v. Palmer*, 970 F.2d 1067, 1078 (2d Cir. 1992).

Accordingly, if a model was trained on a Bridgerton novel—among millions of other works—*and* was later used by a third party to produce other romance novels, *and* fans decided to buy those random "romance novels" instead of works produced by a bestselling author they know and love, that (unlikely) choice might harm Julia Quinn's bottom line. But the question under copyright law is whether protectable aspects of those new works are substantially similar to protectable aspects of a Bridgerton novel—a question that cannot be answered in the abstract and does not depend on how the works were created. If the answer to that question is no, Julia Quinn has no right under copyright law to prevent these competing books from entering the market, nor any right to compensation even if that competition impacts her book sales. *Authors Guild*, 804 F.3d at 224.

In *Authors Guild*, for example, the court noted that a user searching for particular facts might find them via the "snippets" Google's book search tools provided, obviating the need to obtain the actual book. *Authors Guild*, 804 F.3d at 224. That potential lost sale, however, did not "change the taking of an unprotected fact into a copyright infringement." *Id*. at 224. And because the "snippets" provided by Google were deemed unlikely to satisfy the user's "interest *in the protected aspect* of the author's work," the snippets did not "provide a significant substitute for the purchase of the author's book." *Id.* at 224–25.

Even if it did *not* contradict clear precedent in this and other circuits, Plaintiffs' anti-competition approach threatens other limits on copyright—such as the idea-expression dichotomy, merger, and *scenes-a-faire*—that prevent rightsholders from claiming broad ownership over tropes, genres, styles, and so on. 17 U.S.C. § 102(b); *Yonay v. Paramount Pictures Corp*., 163 F.4th 685, 692 (9th Cir. 2026). These limits collectively ensure that new generations can stand on the shoulders of giants.

Finally, even if Plaintiffs *could* show that the training at issue resulted in models that did output substantially similar works, Plaintiffs' "dilution" theories suffer from yet another problem: they collapse direct and secondary liability by tying direct liability, or lack thereof, to the acts of third parties. Under Plaintiffs' theory, if third parties can use a tool to generate "competing" works, then that supposed harm tilts fair use against the creators of the tool. News Plfs' Br. 69–70; Book Plfs' Br. 34–36. But responsibility for what third parties do with a tool—including using it to generate books or "pink-slime" journalism—is considered under doctrines of contributory or vicarious liability. And even if we assume that use resulted in an infringing work, "a company is not liable as a copyright infringer for merely providing a service to the general public with knowledge that it will be used by some to infringe copyrights." *Cox*

*Comm'ns, Inc. v. Sony Music Ent.*, 146 S. Ct. 959, 964 (2026).

### III. Rewriting Fair Use Would Threaten an Array of Socially Beneficial Activities.

The fair use analysis "must take into account the public benefits the copying will likely produce." *Google*, 593 U.S. at 35–36. Endorsing a lawful acquisition requirement and expanding market harm to include potential competition from non-infringing works would threaten all kinds of important work that benefits the public, from life-saving medical advancements to news reporting that facilitates democratic accountability. This "would risk harm to the public" and "would interfere with, not further, copyright's basic creativity objectives." *Id.* at 39–40.

#### A. Widely Used Web Scraping Practices.

The web scraping practices that Plaintiffs challenge in their briefs are critical for research and other publicly beneficial activities.[9] Examples include:

***Research and Journalism.*** Researchers, journalists, and other watchdog groups use web scraping tools to gather the information necessary to hold powerful institutions accountable and protect the public. For example, *The Markup*, a non-profit news site, used scraping to investigate potentially anti-competitive practices by tech companies, such as Amazon's tendency to prioritize Amazon brands and Amazon-exclusive products over competitors with higher ratings.[10] Similarly, the Center for Countering Digital Harm used web scraping in research into

---

[9] PUBLIC KNOWLEDGE & CENTER FOR DEMOCRACY AND TECHNOLOGY, *Pro-Social Scraping Factsheet*, https://publicknowledge.org/policy/public-knowledge-cdt-pro-social-scraping-factsheet/.

[10] Adrianne Jeffries & Leon Yin, *Amazon Puts Its Own "Brands" First Above Better-Rated Products*, THE MARKUP (Oct. 14, 2021), https://themarkup.org/amazons-advantage/2021/10/14/amazon-puts-its-own-brands-first-above-better-rated-products; Adrianne Jeffries & Leon Yin, *How We Analyzed Amazon's Treatment of Its "Brands" in Search Results*, THE MARKUP (Oct. 14, 2021), https://themarkup.org/amazons-advantage/2021/10/14/how-we-analyzed-amazons-treatment-of-its-brands-in-search-results.

hateful content and misinformation posted on X.[11]

Many of these uses rely on the same practices News Plaintiffs attempt to portray as improper, such as scraping without permission from a site's owners, in violation of a site's terms of service, or without disclosing the scraper's identity or intended use of the information. *See* News Plfs' Br., 8–9. The threat of copyright liability would make these important research, journalistic, and investigative activities impractical at best.

***Privacy and Cybersecurity.*** Web scraping is also crucial for cybersecurity professionals, who use automated tools to monitor the web for information that helps them protect against malicious attackers.[12] Privacy tools, including EFF's Privacy Badger, also crawl sites to identify online trackers that compromise user privacy.[13]

***Web Search.*** Search engines such as Google Search also crawl or "index" webpages that include unlicensed images and other copyrighted materials.[14] The Ninth Circuit held that fair use applied to indexing and displaying that web content in search results, partially due to the "significant benefit" that Google's search engine provided to the public. *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1168 (9th Cir. 2007). There is no way to reconcile that conclusion with the lawful acquisition requirement Plaintiffs' propose. Adopting such a requirement would thus cast doubt on the legal status of indispensable search tools on which

---

[11] CENTER FOR COUNTERING DIGITAL HARM, *Toxic Twitter: How Twitter Generates Millions in Ad Revenue by Bringing Back Banned Accounts* (Feb. 9, 2023), https://www.counterharm.com/research/toxic-twitter.

[12] Apurv Singh Gautam, *Undercover Operations: Scraping the Cybercrime Underground*, SANS (Jan. 15, 2025), https://www.sans.org/blog/undercover-operations-scraping-the-cybercrime-underground.

[13] Alexei Miagkov & Daly Barnett, *Introducing Badger Swarm: New Project Helps Privacy Badger Block Ever More Trackers*, ELECTRONIC FRONTIER FOUNDATION (Nov. 7, 2023), https://www.eff.org/deeplinks/2023/10/privacy-badger-learns-block-ever-more-trackers.

[14] *See* GOOGLE, *In-Depth Guide to How Google Search Works*, https://developers.google.com/search/docs/fundamentals/how-search-works.

billions of people rely to find information online.

**B. Publicly Available AI Training Data.**

Book Plaintiffs' contention that sharing AI training data is not fair use, Book Plfts' Br. 38–40, similarly puts publicly beneficial activities at risk. Open datasets used for AI training enable non-commercial research teams, start-ups, and others with limited resources to make technological advancements and compete with Big Tech companies. Until relatively recently, lack of access to adequate training data was a major impediment to participation in many areas of generative AI research.[15] As discussed above, nonprofits, researchers, and others sought to address this problem by constructing massive datasets using data scraped from the open web—inevitably including copyrighted information—and making them available to the public.[16]

Democratizing participation in the field has led to rapid technological progress.[17] These open datasets, such as Common Crawl, have allowed more researchers and startups to develop generative AI tools. One study found that at least 64 percent of large language models ("LLMs") published between 2019 and 2023 were built using Common Crawl data, and that the availability of that data led to improved competition and transparency in LLM development.[18] Researchers have cited Common Crawl data in over 12,000 publications[19] and used subsets of the data to create specialized, high quality datasets that have provided the foundation for important

---

[15] Christoph Schuhmann, et al., *LAION-5B: An Open Large-Scale Dataset for Training Generation Image-Text Models*, ARXIV (Oct. 16, 2022), https://arxiv.org/abs/2210.08402.
[16] *Id.*; Stefan Baack, *A Critical Analysis of the Largest Source for Generative AI Training Data: Common Crawl*, ASSN. FOR COMPUTING MACHINERY 2199, 2201–02, 2204 (June 5, 2024), https://dl.acm.org/doi/epdf/10.1145/3630106.3659033.
[17] *Id. See also, e.g.*, PUBLICATIONS OFFICE OF THE EUROPEAN UNION, *Democratisation of AI through Open Data: Empowering Innovation* (Feb. 24, 2025), https://data.europa.eu/en/news-events/news/democratisation-ai-through-open-data-empowering-innovation.
[18] Stefan Baack, *Training Data for the Price of a Sandwich*, MOZILLA (Feb. 6, 2024), https://www.mozillafoundation.org/en/research/library/generative-ai-training-data/common-crawl/.
[19] COMMON CRAWL, *About*, https://commoncrawl.org/about.

cybersecurity research[20] and scientific advancements.[21] For example, open datasets comprised of scraped images such as ImageNet have led to important research breakthroughs and are widely regarded as one of the most important catalysts for the development of modern AI.[22]

Moreover, there is no realistic market for licensing every copyrighted work in a generative AI training dataset, *contra* Book Plfs' Opp'n to OpenAI's Mot. 21. There aren't enough consolidated interests, with rights to large enough training datasets, to come to the table.[23] Common Crawl, for example, contains more than 10 petabytes of data from every corner of the internet.[24] ImageNet contains over 14 million scraped images.[25]

Establishing clearly lawful data provenance for these works would require identifying rightsholders and negotiating licenses for all kinds of content, on all kinds of webpages, many of which were scraped by third parties over a decade ago. That licensing quagmire would likely

---

[20] Ashim Mahara, *Cybersecurity Data Extraction from Common Crawl*, ARXIV (March 2025), https://arxiv.org/abs/2602.22218.
[21] Hugo Laurençon, et al., *The BigScience ROOTS Corpus: A 1.6TB Composite Multilingual Dataset*, PROCEEDINGS OF THE 36TH CONFERENCE ON NEURAL INFORMATION PROCESSING SYSTEMS (Mar. 7, 2023), https://www.semanticscholar.org/reader/16c64f74ce0e6a59b0709c0d8e66596a5bc08ed6.
[22] Dave Gershgorn, *The Data that Transformed AI Research—and Possibly the World*, QUARTZ (July 20, 2022), https://qz.com/1034972/the-data-that-changed-the-direction-of-ai-research-and-possibly-the-world; Timothy B. Lee, *How a Stubborn Computer Scientist Accidentally Launched the Deep Learning Boom*, ARS TECHNICA (Nov. 11, 2024), https://arstechnica.com/ai/2024/11/how-a-stubborn-computer-scientist-accidentally-launched-the-deep-learning-boom/.
[23] Matthew Sag, *The False Hope of Content Licensing at Internet Scale*, PROMARKET (Nov. 19, 2025), https://www.promarket.org/2025/11/19/the-false-hope-of-content-licensing-at-internet-scale/; *see also* U.S. FEDERAL TRADE COMMISSION, *Generative AI Raises Competition Concerns* (June 29, 2023), https://www.ftc.gov/policy/advocacy-research/tech-at-ftc/2023/06/generative-ai-raises-competition-concerns ("The volume and quality of data required to pre-train a generative AI model from scratch may impact the ability of new players to enter the market," especially if rightsholders "leverage their control to dampen or distort competition in generative AI markets.")
[24] COMMON CRAWL, *supra* note 19.
[25] Lee, *supra* note 3, at 162.

reduce the quality and usefulness of AI tools; licensing disputes could, for example, result in the exclusion of relevant scientific materials from training datasets used in health research.[26] Datasets would necessarily exclude orphan works altogether.[27] And even assuming it were possible to find all of the right licensing partners, depriving training of fair use protection would still ensure that technological development stays in the hands of the very few companies that can afford to make those deals. As copyright scholar Lawrence Lessig recently explained:

> If all training requires a license, then none but a handful of tech giants will be able to afford the costs of training. That's not because authors are greedy but because the copyright system is the least efficient property system known to man. It is effectively impossible to clear rights to the vast majority of copyrighted works, if only because it is economically impossible to identify who owns what.…Books go out of print, contracts for clearances are lost, creators pass, estates are messy: anyone who asserts that licensing would be simple is either ignorant or thinks you are.

Lawerence Lessig, *Zombie Copyright: Déjà Vu All Over Again* (Oct. 19, 2026).[28]

### C. Third Party Uses of AI Tools.

Rewriting fair use doctrines to cast legal doubt on unlicensed AI training will inevitably chill the development and use of the tools that training enables. That, in turn, will undermine the publicly beneficial activities those tools facilitate. A few of many examples:

---

[26] *See* James Love, *We Need Smart Intellectual Property Laws for Artificial Intelligence*, SCIENTIFIC AMERICAN (August 7, 2023), https://www.scientificamerican.com/article/we-need-smart-intellectual-property-laws-for-artificial-intelligence/ ("When AI is used in hospitals and in gene therapy, do you really want to exclude relevant information from the training database?"). Site owners may also refuse access to researchers, journalists, and activists who criticize them, impeding their work. For example, Facebook shut down accounts belonging to researchers who used web scraping to study misinformation on the platform. Laura Edelson & Damon McCroy, *We Research Misinformation on Facebook. It just Disabled Our Accounts*, N.Y. TIMES (Aug. 10, 2021), https://www.nytimes.com/2021/08/10/opinion/facebook-misinformation.html.
[26] Available at https://lessig.substack.com/p/zombie-copyright-deja-vu-all-over.
[27] *See* U.S. COPYRIGHT OFFICE, *Orphan Works and Mass Digitization* (June 2015), https://www.copyright.gov/orphan/reports/orphan-works2015.pdf.
[28] Available at https://lessig.substack.com/p/zombie-copyright-deja-vu-all-over.

***Journalism and Government Accountability.*** In 2026 alone, five Pulitzer Prize winners and three finalists used AI tools in their reporting.[29] The Pulitzer-winning reporting included the *Minnesota Star Tribune*'s breaking news coverage of a mass shooting, which used ChatGPT to translate pages of the shooter's journal that appeared in a YouTube video, and the *New York Times*' investigative reporting on President Trump's conflicts of interest with crypto companies, which used OpenAI's GPT-5 to doublecheck reporters' analyses of more than 10,000 documents.[30] AI tools also allow researchers to analyze large numbers of government documents to reveal patterns of police misconduct. For example, researchers at the nonprofit Human Rights Data Analysis Group used OpenAI's LLMs to extract information from records of cases that led to wrongful convictions to help inform investigations into police misconduct and corruption.[31] Similarly, the California Reporting Project, a collaboration of more than 40 California news organizations, used OpenAI's GPT models to build a first-of-its-kind searchable public database containing approximately 1.5 million pages of police misconduct and use-of-force records.[32]

***Art, Film, and Music.*** While Plaintiffs portray "AI-generated" art as orthogonal to *human* creativity, Book Plfs' Br. 34, in fact, human artists have used generative AI to create many new artistic works. For example, acclaimed digital artist Nettrice Gaskins uses AI to create

---

[29] Andrew Deck, *A Record-Breaking Eight Pulitzer Awardees Disclosed AI Use This Year*, NIEMANLAB (Aug. 3, 2026), https://www.niemanlab.org/2026/08/a-record-breaking-eight-pulitzer-awardees-disclosed-ai-use-this-year/.
[30] *Id.*
[31] Ayyub Ibrahim & Tarak Shah, *Using Large Language Models for Structured Information Extraction from the Innocence Project New Orleans' Wrongful Conviction Case Files,* HUMAN RIGHTS DATA ANALYSIS GROUP, https://hrdag.org/tech-notes/large-language-models-IPNO.html.
[32] Ethan Toven-Lindsey, et al., *How AI-Assisted Workflows Are Unlocking California Police Records*, CURRENT (Jan. 16, 2026), https://current.org/2026/01/how-ai-assisted-workflows-are-unlocking-california-police-records/; Kathryn Squyres, *California News Coalition Launches Database of Police Misconduct Records*, CURRENT (Aug. 25, 2025), https://current.org/2025/08/california-news-coalition-launches-database-of-police-misconduct-records/.

Afrofuturist art, including a series of portraits exhibited by the Smithsonian Arts + Industries Building, and a portrait of Octavia Butler now on display at the San Francisco Airport as part of the "Women of Afrofuturism" exhibition.[33] Ana Miljački, a professor of architecture at MIT, used generative AI to create a "non-linear documentary" film on Yugoslav World War II memorials and the values they embodied. AI company Bronze works with musicians like Disclosure and Jai Paul to create songs that never sound the same when played back twice, with the goal of challenging audience conceptions of what music could be.

***Accessibility.*** Further, AI-powered tools, when designed safely and inclusively, can help make the world more accessible for people with disabilities. For example, a tool called Be My AI uses OpenAI's GPT models to provide visual descriptions for people who are blind or have low vision.[34]

***Science and Medicine.*** Finally, generative AI tools have accelerated scientific research and driven important medical advancements. For example, researchers at Carnegie Mellon University developed "Coscientist," a research tool that plans and performs chemistry experiments using OpenAI's GPT-4 model.[35] Researchers have also used generative AI to design

---

[33] SFO MUSEUM, *Women of Afrofuturism*, https://www.sfomuseum.org/sites/default/files/2025-12/Extended-Labels-Women-of-Afrofuturism-251219.pdf; SMITHSONIAN LEARNING LAB, *Nettrice Gaskins' Deep Dream Featured Futurists*, https://learninglab.si.edu/collections/nettrice-gaskins-deep-dream-featured-futurists/rU3KpCRiL5QvqTg2#r/1428914; Josh Richman*, Podcast Episode: AI on the Artist's Palette*, ELECTRONIC FRONTIER FOUNDATION (June 4, 2024), https://www.eff.org/deeplinks/2024/05/podcast-episode-ai-artists-palette.

[34] Josh Richman, *Podcast Episode: Building a Tactile Internet*, ELECTRONIC FRONTIER FOUNDATION (May 7, 2024), https://www.eff.org/deeplinks/2024/05/podcast-episode-building-tactile-internet; *Introducing: Be My AI*, BE MY EYES (Aug. 7, 2023), https://www.bemyeyes.com/blog/introducing-be-my-ai/.

[35] Daniil A. Boiko, et al., *Autonomous Chemical Research with Large Language Models*, NATURE (Dec. 20, 2023), https://www.nature.com/articles/s41586-023-06792-0; Jason Stoughton, *Meet 'Coscientist,' Your AI Lab Partner*, U.S. NATIONAL SCIENCE FOUNDATION (Dec. 20, 2023), https://www.nsf.gov/science-matters/meet-coscientist-your-ai-lab-partner.

new medical treatments for a variety of conditions, including novel antibiotics targeting antibiotic-resistant bacterial infections,[36] and a medication for idiopathic pulmonary fibrosis, a fatal lung disease, that is already undergoing Phase III clinical trials.[37]

## CONCLUSION

Plaintiffs fears of economic uncertainty caused by rapidly changing AI technology are understandable, but the theories they advance threaten important and widespread legal uses of copyrighted works that go far beyond AI. Adopting them would thwart copyright's constitutional purpose. Accordingly, Amicus urges the Court to grant Defendants' motions for summary judgment.

Dated: October 30, 2026

Respectfully submitted,

*<u>/s/ Victoria J. Noble</u>*
Victoria J. Noble
Mitchell L. Stoltz
ELECTRONIC FRONTIER FOUNDATION
815 Eddy Street
San Francisco, CA 94109
Phone: 415-436-9333
Fax: 415-436-9993
tori@eff.org

*Counsel for Amicus Curiae Electronic Frontier Foundation*

---

[36] Laurie Clarke, *These Diseases Were Thought to Be Incurable. Now AI Is Unlocking New Treatments*, BBC (Mar. 10, 2026), https://www.bbc.com/future/article/20260309-ai-is-finding-treatments-for-incurable-diseases.
[37] Zuojun Xu, et al., *A Generative AI-Discovered TNIK Inhibitor for Idiopathic Pulmonary Fibrosis: A Randomized Phase 2a Trial*, NATURE MEDICINE (June 3, 2025), https://www.nature.com/articles/s41591-025-03743-2.

**CERTIFICATE OF COMPLIANCE**

Pursuant to Local Rule of the United States District Courts for the Southern and Eastern Districts of New York 7.1 ("Local Rule 7.1") and this Court's August 7, 2026 Order (ECF No. 1663), I certify as follows:

1. This Amicus Curiae Brief of Electronic Frontier Foundation in Support of Defendants' Motions for Summary Judgment complies with the type-volume limitation because this brief contains 5,777 words, as calculated by Microsoft Word, excluding the parts of the brief exempted by Local Rule 7.1(c).

2. This brief complies with the typeface and type style requirements of Local Rule 7.1(b) because this brief has been prepared in a proportionally spaced typeface using Microsoft 365, the word processing system used to prepare the brief, in 12 point font in Times New Roman font.

Dated: October 30, 2026

*/s/ Victoria J. Noble*
Victoria J. Noble