UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE:<br><br>OpenAI, INC.,<br><br>COPYRIGHT INFRINGEMENT LITIGATION<br><br>This Document Relates To:<br><br>1:23-cv-11195-SHS-OTW<br>1:24-cv-01515-SHS-OTW<br>1:24-cv-03285-SHS-OTW<br>1:24-cv-04872-SHS-OTW<br>1:25-cv-04315-SHS-OTW | 25-md-3143 (SHS) (OTW) |

# BRIEF OF PEN AMERICA, PROTECT DEMOCRACY PROJECT, AND REPORTERS WITHOUT BORDERS, INC. (RSF USA) AS *AMICI CURIAE* IN SUPPORT OF NEWS PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Cameron Stracher
Cameron Stracher, PLLC
1133 Broadway, Suite 516
New York, New York 10010
(646) 992-3850
cam@stracherlaw.com

Of Counsel:

Jacob M. Schriner-Briggs
CLEVELAND STATE UNIVERSITY, COLLEGE OF LAW
2121 Euclid Avenue, LB 225
Cleveland, OH 44115
(330) 727-9118
j.schrinerbriggs@csuohio.edu

Sonja R. West
UNIVERSITY OF GEORGIA, SCHOOL OF LAW
225 Herty Drive
Athens, GA 30602
(706) 542-5145
srwest@uga.edu

*Counsel for Amici Curiae*

## TABLE OF CONTENTS

TABLE OF CONTENTS ........ I

TABLE OF AUTHORITIES ........ II

INTEREST OF THE *AMICI CURIAE* ........ 1

INTRODUCTION ........ 1

ARGUMENT ........ 1

I. FOUNDING-ERA EVIDENCE DEMONSTRATES THAT THE PRESS AND PROGRESS CLAUSES MUTUALLY REINFORCED REPUBLICAN SELF-GOVERNMENT ........ 4

*A. Expansive Notions of Press Freedom and Real-World Press Practices Supported Republican Self-Government Before, During, and After the Founding* ........ *5*

*B. The Progress Clause Incentivized Authors to Create Valuable Writings and Worked Harmoniously with Press Freedom to Reinforce Republican Self-Government* ........ *8*

*C. Subsequent Developments in Press Practice and Copyright Law Continued to Harmonize the Press Clause, the Progress Clause, and Republican Self-Government* ........ *11*

II. DEFENDANTS' FAIR USE DEFENSES WOULD INVERT THE RELATIONSHIP BETWEEN THE PRESS AND PROGRESS CLAUSES AND ARE THUS INFIRM AS A MATTER OF CONSTITUIONAL HISTORY AND STRUCTURE ........ 13

*A. The Speed, Scale, and Consequences of Defendants' Copyright Infringements Threaten the Economic Viability of a Free and Independent Press* ........ *13*

*B. The Economic Realities in this Case are Constitutionally Significant and Support a Ruling for the News Plaintiffs* ........ *15*

1. Defendants' arguments invert the historical relationship between the Press and Progress Clauses ........ 17

2. Defendants' business practices threaten the viability of a free and independent press ........ 17

CONCLUSION ........ 19

# TABLE OF AUTHORITIES

**Cases**

*Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*,
598 U.S. 508 (2023) .......... 2

*Campbell v. Acuff-Rose Music, Inc.*,
510 U.S. 569 (1994) .......... 14

*Cox Broadcasting Corp. v. Cohn*,
420 U.S. 469 (1975) .......... 18

*Eldred v. Ashcroft*,
537 U.S. 186 (2003) .......... 15

*Estes v. Texas*,
381 U.S. 532 (1965) .......... 17

*Golan v. Holder*,
565 U.S. 302 (2012) .......... 16

*Grosjean v. Am. Press Co.*,
297 U.S. 233 (1936) .......... 17

*Harper & Row, Publishers, Inc. v. Nation Enters.*,
471 U.S. 539 (1985) .......... 12

*Iowa St. Univ. Rsch. Found., Inc. v. ABC, Inc.*,
621 F.2d 57 (2d Cir. 1980) .......... 2

*Kadrey v. Meta Platforms*,
788 F.Supp.3d 1026 (N.D. Cal. June 25, 2025) .......... 15

*New York Times Co. v. Sullivan*,
376 U.S. 254 (1964) .......... 17

*New York Times Co. v. United States*,
403 U.S. 713 (1971) .......... 17

*Sarl Louis Intern v. Viewfinder, Inc.*,
489 F.3d 474 (2d. Cir. 2007) .......... 14

*Sony Corp. of America v. Universal City Studios, Inc.*,
464 U.S. 417 (1984) .......... 14

*Vidal v. Elster*,
602 U.S. 286 (2024) .......... 3, 16

**Statutes**

17 U.S.C. § 5(b) .......... 9, 12

Act of May 31, 1790, ch. 15, 1 Stat. 124 .......... 9

An Act to Establish the Post-Office and Post Roads Within the United States, ch. 7, 1 Stat. 232 (1792) .......... 10, 17

**Other Authorities**

1 *Journals of the Continental Congress, 1774-1789* (Worthington C. Ford ed. 1904) .......... 6

3 Annals of Cong. 289 (1791) .......... 10, 11

4 Annals of Cong. 934 (1794) (Rep. Madison) .......... 6

Akhil Reed Amar, *America's Constitution: A Biography* (paperback ed. 2006) .......... 4

Arthur M. Schlesinger Sr., *Prelude to Independence: The Newspaper War on Britain, 1764-1776* (1958) .......... 7, 9

Bernard Bailyn, *The Ideological Origins of the American Revolution* (2017 ed.) .......... 2, 4

C. Edwin Baker, *The Independent Significance of the Press Clause Under Existing Law*,
35 Hofstra L. Rev. 955 (2007) .......... 12

C. Edwin Baker, *The Media That Citizens Need*,
147 U. Penn. L. Rev. 317 (1998) .......... 18

David A. Anderson, *Freedom of the Press*,
80 Tex. L. Rev. 429 (2002) .......... 11

David A. Anderson, *The Origins of the Press Clause*,
30 UCLA L. Rev. 455 (1983) .......... 6

Floyd Abrams et al., *The Press Clause: The Forgotten First Amendment*,
5 J. Free Speech L. 561 (2024) .......... 7

Genevieve Lakier, *The Non-First Amendment Law of Freedom of Speech*,
134 Harv. L. Rev. 2299 (2021) .......... 10

Gordon S. Wood, *The Creation of the American Republic 1776-1787* (1998 ed.) .......... 4

James Madison, *Letter to William T. Barry*, Nat'l Archives (Aug. 4, 1822) .......... 4

James T. Hamilton, *Democracy's Detectives: The Economics of Investigate Journalism* (2016) ........ 10, 11

Joseph M. Adelman, *Revolutionary Networks: The Business and Politics of Printing the News, 1763-1789* (2019) ........ 6, 7, 9, 11

Jud Campbell, *Natural Rights and the First Amendment*, 127 Yale L. J. 246 (2017) ........ 3

Kim Lane Scheppele, *Autocratic Legalism*, 85 U. Chi. L. Rev. 545 (2018) ........ 18

*Madison's Report on the Virginia Resolutions*, 4 The Debates in the Several State Conventions on the Adoption of the Federal Constitution (Jonathan Elliot ed. 1836) ........ 6, 7

Martha Minow, *The Changing Ecosystem of News and Challenges for Freedom of the Press*, 64 Loy. L. Rev. 499 (2018) ........ 18

Pierre N. Leval, *Toward a Fair Use Standard*, 103 Harv. L. Rev. 1105 (1990) ........ 9

Potter Stewart, *"Or of the Press"*, 26 Hastings L.J. 631 (1975) ........ 11

Robert Brauneis, *The Transformation of Originality in the Progressive-Era Debate Over Copyright in News*, 27 Cardozo Arts & Ent. L. J. 321, 366 (2009) ........ 13

RonNell Andersen Jones, *Press Speakers and the First Amendment Rights of Listeners*, 90 U. Colo. L. Rev. 499 (2019) ........ 18

Sonja R. West, *Favoring the Press*, 106 Calif. L. Rev. 91 (2018) ........ 3

Sonja R. West, *Press Exceptionalism*, 127 Harv. L. Rev. 2434 (2014) ........ 11

Sonja R. West, *The "Press," Then & Now*, 77 Ohio St. L.J. 49 (2016) ........ 7

Steven Levitsky & Lucan A. Way, *Competitive Authoritarianism in America*, 37 J. Democracy 5 (2026) ........ 18

*The Federalist No. 43* (James Madison) (Clinton Rossiter ed. 1961) ........ 2

Thomas Jefferson, *Letter to Edward Carrington*, Nat'l Archives (Jan. 16, 1787) ..........................4

Wendell Bird, *Criminal Dissent: Prosecutions Under the Alien and Sedition Acts of 1798* (2020) ..........................8

Wendell Bird, *The Revolution in Freedoms of Press and Speech: From Blackstone to the First Amendment and Fox's Libel Act* (2020) ..........................5, 7

Will Slauter, *Who Owns the News? A History of Copyright* (2019) ..........................10, 12, 17

**Treatises**

3 Joseph Story, *Commentaries on the Constitution of the United States* § 1147 (1833) ............ 8, 9

4 William Blackstone, *Commentaries*.......................... 5

**Constitutional Provisions**

U.S. Const. amend. I .......................... 2

U.S. Const. art. I, § 4, cl. 1.......................... 4

U.S. Const. art. I, § 8, cl. 8.......................... 2, 8

U.S. Const. art. IV, § 4 .......................... 3, 4

Va. Const. § 12 (1776) .......................... 8

## INTEREST OF THE *AMICI CURIAE*

*Amici curiae* PEN America, Protect Democracy Project, and Reporters Without Borders, Inc. (RSF USA) are organizations that advocate the First Amendment-based rights of a free press. *Amici* believe that an economically viable press is essential to democratic self-government and that Defendants' invocation of a fair use defense in these consolidated cases betrays the concept of fair use as well as the first principles of representative government that undergird both the Constitution's Progress and Press Clauses. The specific interests of each of the *amici* are separately contained in the Appendix to this brief.

## INTRODUCTION

This case raises significant legal, economic, and political stakes while implicating fundamental issues of constitutional history and structure. Since the Founding, press freedom and copyright law have worked in tandem to support republican self-government. Defendants' legal arguments would invert this relationship, jeopardizing the economic viability of the news media under the banner of fair use. Because *amici* First Amendment and democracy organizations believe that the Constitution demands a copyright regime that would support rather than destroy the democratic functions of the press, they submit this brief in support of the News Plaintiffs' Motion for Summary Judgment against OpenAI and Microsoft Corporation.

## ARGUMENT

Founding-era evidence demonstrates that the Constitution's Progress Clause and Press Clause mutually reinforced republican self-government. Defendants' fair use defenses, infirm on the merits,[1] should be rejected for the additional reason that they imperil the historically reciprocal

---

[1] *See* News Plaintiffs' Combined Summary Judgment Br., Dkt. No. 1977-1, at 5-75 ("News Brief").

relationship between copyright law and press freedom. Contrary to the essence of Defendants' position, fair use "is not a license for corporate theft." *Iowa St. Univ. Rsch. Found., Inc. v. ABC, Inc.*, 621 F.2d 57, 61 (2d Cir. 1980). This commonsense proposition must hold true where, as here, that theft threatens the economic viability of a free and independent press.

The Copyright or "Progress" Clause empowers Congress to "promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries." U.S. Const. art. I, § 8, cl. 8. Pursuant to the Progress Clause, Congress can pass copyright laws that, by securing intellectual property rights in certain writings, incentivize authors to create works of educational, social, and political value. *See Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*, 598 U.S. 508, 526 (2023).

The Founders rightly understood that the benefits of copyright would redound not just to individual creators but to political society, nurturing a nationwide literary culture "crowded with columns of arguments and counter-arguments appearing as letters, official documents, extracts of speeches, and sermons." Bernard Bailyn, *The Ideological Origins of the American Revolution* 1 (2017 ed.) ("Bailyn, *Ideological Origins*"). Even those who did not themselves create copyrightable work stood to benefit as members of an informed citizenry capable of electing virtuous representatives. Thus, as Madison observed in *The Federalist Papers*, the "public good fully coincide[d]" with "the claims of individuals" to property rights in their literary creations. *The Federalist No. 43*, at 268 (James Madison) (Clinton Rossiter ed. 1961) (discussing the Progress Clause).

At the same time, the First Amendment's Press Clause supported real-world commercial practices that made good on the Progress Clause's theoretical promise. Guaranteeing the "freedom . . . of the press," U.S. Const. amend. I, constitutional press protections, buoyed by complementary

legislation, facilitated the publication and distribution of newspapers throughout the newly independent United States.[2]

The Founders saw these dynamics as vital to the Constitution's structure. Because republican self-rule required the people to be informed on matters of civic import, intellectual property and press freedom have "play[ed] well" together historically, *Vidal v. Elster*, 602 U.S. 286, 300 (2024) (cleaned up), working harmoniously to "guarantee to every State in this Union a Republican Form of Government," U.S. Const. art. IV, § 4.

Today, Defendants ask this Court to exempt them from the strictures of copyright law on grounds that their business practices—including copying millions of articles as pre-training data for AI systems designed to produce economically competitive substitutes for those articles—are fair use. *See* Defendant Microsoft Corporation's Memorandum of Law in Support of Motion for Summary Judgment in News Plaintiffs' Consolidated Cases, Dkt. No. 1975, at 10-31 (Microsoft); Defendants' Memorandum of Points and Authorities in Support of Motion for Summary Judgment, Dkt. No. 1753, at 7-19 (OpenAI).

A ruling to this effect would obliterate the historically harmonious relationship between the Progress Clause and the Press Clause. This Court should rule differently. In prohibiting Defendants from freeriding off the work of storied journalistic institutions, a decision for the News Plaintiffs would preserve financial remuneration for the press, sustain the press's ongoing viability as a newsgathering proxy for the public, and reaffirm the contemporary relevance of bedrock constitutional principles.

---

[2] *See* Jud Campbell, *Natural Rights and the First Amendment*, 127 Yale L. J. 246, 253 (2017) ("By the late eighteenth century, . . . the freedom of speaking, writing, and publishing ensured that well-intentioned statements of one's views were immune from regulation."); Sonja R. West, *Favoring the Press*, 106 Calif. L. Rev. 91, 118 (2018) (noting legislators' longstanding interest in protecting the press's "economic stability as a means to ensure its independence").

## I. FOUNDING-ERA EVIDENCE DEMONSTRATES THAT THE PRESS AND PROGRESS CLAUSES MUTUALLY REINFORCED REPUBLICAN SELF-GOVERNMENT

The Revolutionary and Founding periods witnessed a profound political transformation. In ratifying the Constitution, "New World republicans would keep Old World monarchs at a distance and thus make democracy work on a scale never before dreamed possible." Akhil Reed Amar, *America's Constitution: A Biography*, at 5 (paperback ed. 2006). Breaking with their British counterparts, the Founders conceptualized sovereignty as resting with the people themselves. Indeed, popular sovereignty was central to Founding-era notions of republican government. *See* Gordon S. Wood, *The Creation of the American Republic 1776-1787* 162-73 (1998 ed.); Bailyn, *Ideological Origins* 344.

The Constitution's commitments to popular sovereignty and republicanism were formally enshrined by its provision for democratic elections, U.S. Const. art. I, § 4, cl. 1, and its express commitment to republican government itself, U.S. Const. art. IV, § 4. Yet the Founding generation saw clearly that the election of representatives was not enough to guarantee the Republic's long-term flourishing. If the people were to govern successfully, they needed to stay abreast of the social and political issues of the day. This required access to written work of artistic, scientific, and political value, to a flow of information capable of ensuring enlightened democratic decisionmaking. *See* James Madison, *Letter to William T. Barry*, Nat'l Archives (Aug. 4, 1822), https://perma.cc/K883-UCX8 ("A popular Government, without popular information, or the means of acquiring it, is but a prologue to a Farce or a Tragedy; or perhaps both.").

Prominent Founding-era figures understood these considerations as central to the Constitution's ethos and structure.[3] Thus, apart from formal institutional design, the Framers

[3] *Cf.* Thomas Jefferson, *Letter to Edward Carrington*, Nat'l Archives (Jan. 16, 1787), https://perma.cc/3LH2-2U6Z ("The basis of our governments being the opinion of the people, the

drafted constitutional provisions to facilitate the creation and distribution of writings indispensable to the success of the political system the Constitution established.

This Part details how the Press and Progress Clauses operated in the Founding era to reciprocally advance these constitutional ends. Part I.A focuses on the Press Clause. Part I.B turns to the Progress Clause with a particular focus on how the two provisions worked in tandem. Finally, Part I.C describes how modern relationships between the news media and copyright continue to advance these constitutional purposes. All told, the fact that press freedom and copyright law have long operated harmoniously in support of republican self-government provides independent reason for this Court to grant summary judgment to the News Plaintiffs.

### A. Expansive Notions of Press Freedom and Real-World Press Practices Supported Republican Self-Government Before, During, and After the Founding

The American Revolution was accompanied by a "revolution in rights" that popularized a broad conception of press freedom and spurred "provisions in fundamental law" to protect it. Wendell Bird, *The Revolution in Freedoms of Press and Speech: From Blackstone to the First Amendment and Fox's Libel Act* 269 (2020) ("Bird, *The Revolution in Freedoms of Press and Speech*"). Though William Blackstone's *Commentaries on the Laws of England* had reduced the freedom of the press to nothing more than freedom from prior restraint, 4 William Blackstone, *Commentaries* *151-52, a broader view took hold in Revolutionary and Founding-era America.

The shift from a cramped to broad view of press freedom stemmed from a fundamental distinction between British and American conceptions of sovereignty. Arguing that the 1798

very first object should be to keep that right; and were it left to me to decide whether we should have a government without newspapers, or newspapers without a government, I should not hesitate a moment to prefer the latter. But I should mean that every man should receive those papers and be capable of reading them.").

Sedition Act violated the Press Clause, Madison emphasized that, under the Constitution, "[t]he people, not the government, possess the absolute sovereignty." *Madison's Report on the Virginia Resolutions*, 4 The Debates in the Several State Conventions on the Adoption of the Federal Constitution 569 (Jonathan Elliot ed. 1836). With this revolutionary idea—that, in "the nature of Republican Government, we shall find that the censorial power is in the people over the Government, and not in the Government over the people," 4 Annals of Cong. 934 (1794) (Rep. Madison)—came a distinct appreciation for the freedom of the press.

Thus, when the first Continental Congress wrote to settlers in Quebec hoping to win their support in the approaching Revolutionary War, it lambasted Parliament for threatening the "freedom of the press." 1 *Journals of the Continental Congress, 1774-1789* 108 (Worthington C. Ford ed. 1904). The "importance" of this freedom, the Congress urged, consisted in its "advancement of truth, science, morality, and arts in general" as well as its "diffusion of liberal sentiments on the administration of Government, its ready communication of thoughts between subjects," and its capacity to render "oppressive officers . . . shamed or intimidated into more honorable and just modes of conducting affairs." *Id.* As Professor David Anderson observed in his influential account of the Press Clause's history, the Quebec Address was sensitive to both press freedom's "broader intellectual and cultural objectives" and its status as a "necessary concomitant of self-government." David A. Anderson, *The Origins of the Press Clause*, 30 UCLA L. Rev. 455, 464, 490-91 (1983).

Real-world printing practices substantiated the Quebec Address's lofty assertions. Before the Founding, "printers played a crucial role in the formation and shaping of political rhetoric during the American Revolution." Joseph M. Adelman, *Revolutionary Networks: The Business and Politics of Printing the News, 1763-1789* 3 (2019) ("Adelman, *Revolutionary Networks*"). In

Boston, "patriot journalists achieved great[] success in undermining whatever confidence the common folk still felt" in the city's "two pro-British newspapers." Arthur M. Schlesinger Sr., *Prelude to Independence: The Newspaper War on Britain, 1764-1776* 218 (1958) ("Schlesinger Sr., *Prelude to Independence*"). And, when "royal governors attempted to prosecute" the press for "seditious libels," they "ceased further attempts when grand juries or trial juries" declined to "indict or convict." Bird, *The Revolution in Freedoms of Press and Speech* 240.

At the Founding, newspapers were indispensable to the Constitution's ratification. Indeed, the ratification debates quite literally "played out in the press." Floyd Abrams et al., *The Press Clause: The Forgotten First Amendment*, 5 J. Free Speech L. 561, 610 (2024). Printers "opened the pages of their newspapers to dozens of news articles tracking the state conventions and essays debating the merits of the Constitution." Adelman, *Revolutionary Networks*, at 197. And, as their political importance solidified, printers came to see themselves as defenders of liberty, arguing that "the people required recourse to the press in order to expose the corrupt actions of the government." *Id*. at 46. *See also* Sonja R. West, *The "Press," Then & Now*, 77 Ohio St. L.J. 49, 67 (2016) (the "framing generation" recognized that the "freedom of the press quite clearly had a job to do—to defend and protect the people and the republic").

In the early years of the Republic, "printers and newspaper editors" became "central players in the early national political parties," understanding themselves as "key combatants in the politics of the early United States." Adelman, *Revolutionary Networks*, at 202-03. They "exerted a freedom in canvassing the merits and measures of public men, of every description." *Madison's Report on the Virginia Resolutions*, 4 The Debates in the Several State Conventions on the Adoption of the Federal Constitution 570 (Jonathan Elliot ed. 1836). And they established themselves as crucial vectors for discussion and dissent during public debate over the Sedition Act

of 1798 and the Election of 1800. *See* Wendell Bird, *Criminal Dissent: Prosecutions Under the Alien and Sedition Acts of* 1798 363 (2020).

Against this backdrop, however, one fact remained: for printers to disseminate written work of political and cultural import, there had to be such work to disseminate. If the freedom of the press was to make good on its promise as "one of the great bulwarks of liberty," Va. Const. § 12 (1776), the press needed meritorious writing to print. In this way, the power enshrined by the Progress Clause worked harmoniously with the Press Clause to incentivize the creation and spread of valuable writings, mutually reinforcing the civic culture required by the very Republic that the people themselves, through their Constitution, had established.

### B. The Progress Clause Incentivized Authors to Create Valuable Writings and Worked Harmoniously with Press Freedom to Reinforce Republican Self-Government

The purpose of the Progress Clause is made plain by its text. "To promote the Progress of Science and useful Arts," the Clause grants Congress power to "secur[e] for limited Times to Authors . . . the exclusive Right to their respective Writings." U.S. Const. art. I, § 8, cl. 8. Joseph Story recognized the Progress Clause's intended functions, observing in his *Commentaries on the Constitution* that "authors would have little inducement to prepare elaborate works for the public, if their publication was to be at a large expense, and, as soon as they were published, there would be an unlimited right of depredation and piracy of their copyright." 3 Joseph Story, *Commentaries on the Constitution of the United States* § 1147 49 (1833).

Echoing Madison, Story emphasized that congressional power under the Progress Clause "was beneficial to all parties." *Id*. at 48. Without it, authors "would have been subjected to the varying laws and systems of the different states on this subject, which would impair, and might even destroy the value of their rights." *Id*. at 48-49. The public, meanwhile, stood to benefit, "after

a short interval," from the "full possession and enjoyment of all writings and inventions without restraint." *Id.* at 49. In short, the Progress Clause served to "stimulate activity and progress in the arts for the intellectual enrichment of the public." Pierre N. Leval, *Toward a Fair Use Standard*, 103 Harv. L. Rev. 1105, 1107 (1990).

Keenly aware of the importance of a national copyright regime, Congress, "for the encouragement of learning," Act of May 31, 1790, ch. 15, 1 Stat. 124, passed the Copyright Act of 1790. The Act permitted copyrights in books, maps, and charts. *Id.* at § 1. Though newspapers were not expressly covered by a federal copyright statute until 1909, 17 U.S.C. § 5(b), this Founding-era omission underscores how the relationships between printing practices, copyright law, and republican government have developed harmoniously over time.

As detailed below, keeping Founding-era newspapers free from the strictures of copyright ensured that democratically salient information would be efficiently disseminated throughout the country. Though subsequent developments in communication technologies and press practices created an information environment in which self-government was promoted rather than hampered by copyright protections for journalism, *see infra* Part I.C, these shifts demonstrate how press freedom and copyright law have evolved over time to maintain their original, mutually reinforcing constitutional functions.

While today the press is valued for its investigative reporting on matters of public concern, Founding-era printers frequently solicited and printed the writing of others. *See* Adelman, *Revolutionary Networks*, at 176, 181. To be sure, Founding-era printers exercised curatorial discretion, Schlesinger Sr., *Prelude to Independence* 61 (newspaper editors "decid[ed] what to put in or leave out" of their papers), and occasionally contributed work of their own. Yet notwithstanding the distinct political voice printers adopted during the Revolutionary and

Founding periods, they frequently shaped public discourse through editorial cultivation rather than original reporting. *Compare* Will Slauter, *Who Owns the News? A History of Copyright* 87 (2019) (early American printers "selected, arranged, and modified material from a range of sources") ("Slauter, *Who Owns the News?*"), *with* James T. Hamilton, *Democracy's Detectives: The Economics of Investigate Journalism* 36-41 (2016) (providing early instances of "investigative" journalism from the 1870s) ("Hamilton, *Democracy's Detectives*").

Given that the constitutional value of printers largely resided in their curation and propagation of other people's writings (including, importantly, writing published in other newspapers[4]), the Founding generation concluded that reducing certain transaction costs in the copying and spread of news would strengthen republican government.[5] Thus, rather than granting printers intellectual property rights in the content of their papers, the Second Congress, through the Postal Service Act of 1792,[6] allowed them to transmit those papers through the national mails "at heavily subsidized rates." Genevieve Lakier, *The Non-First Amendment Law of Freedom of Speech*, 134 Harv. L. Rev. 2299, 2310 (2021).

Proponents of the Postal Service Act expressly connected the spread of newspapers to the vitality of self-government. As Congressman Elbridge Gerry argued, "liberty . . . cannot long subsist if the channels of information be stopped." 3 Annals of Cong. 289 (1791). As such, Gerry insisted that the House "adopt measures by which the information, contained in any one paper within the United States, might immediately spread from one extremity of the continent to the

[4] *See* Slauter, *Who Owns the News?* 88.

[5] Defendants' AI tools cannot stand in for the press on this score in part because those tools often fail to verify the accuracy of their outputs and produce hallucinatory misinformation. *See infra* Part II.B.2.

[6] An Act to Establish the Post-Office and Post Roads Within the United States, ch. 7, 1 Stat. 232 (1792).

other," ensuring that the "whole body of the citizens will be enabled to see and guard against any evil that may threaten them." *Id*.

This episode underscores that arrangements between the press and copyright law have long been sensitive to the needs of republican self-government. While the Postal Service Act allowed printers to efficiently distribute newspapers to readers, the Copyright Act incentivized authors to write works that newspaper publishers could excerpt and print. *See* Adelman, *Revolutionary Networks*, at 193 ("Printers, editors, and booksellers began to work out the contours of what would constitute a national literature and communications network.").

### C. Subsequent Developments in Press Practice and Copyright Law Continued to Harmonize the Press Clause, the Progress Clause, and Republican Self-Government

In the centuries following the Founding, the press transformed. From the 1870s through the Progressive Era, news journalism evolved alongside the development of corresponding professional institutions. *See* Potter Stewart, *"Or of the Press"*, 26 Hastings L.J. 631, 633 (1975) ("[T]he Free Press Clause extends protection to an institution. The publishing business is, in short, the only organized private business that is given explicit constitutional protection."); David A. Anderson, *Freedom of the Press*, 80 Tex. L. Rev. 429, 447 (2002) ("In the twentieth century, universities created journalism schools to supply the market for journalists, and journalists organized themselves into professional societies and unions."); Sonja R. West, *Press Exceptionalism*, 127 Harv. L. Rev. 2434, 2457 (2014) ("News organizations, professional journalism societies, and groups that offer various types of press credentials reflect public norms regarding which speakers best fulfill the functions of the press.").

As they professionalized, newspapers began dedicating considerable time and resources to investigative reporting on matters of public concern. Hamilton, *Democracy's Detectives* 36-44.

Today, the press is celebrated for its ability to produce original, newsworthy reporting[7] and to place a check on the powerful.[8] These activities are resource-intensive: "[a] lot of work, time, manpower, and expense is required to generate news." News Plaintiffs' Corrected Combined Rule 56.1 Statement of Material Undisputed Facts, Dkt. No. 2036, ¶ 73 ("SF").

Copyright law has been sensitive to these changes. The Copyright Act of 1909 expressly provided that "[p]eriodicals, including newspapers" would be copyrightable. 17 U.S.C. § 5(b). With the news market growing crowded and competitive, copyright recognized the property interests of news organizations in their increasingly time- and resource-intensive work. *See* Slauter, *Who Owns the News?*, at 218. Though republican government benefitted from the rapid proliferation of newspapers at the Founding, increased information flows shifted copyright's approach to the press from a hands-off relationship meant to encourage copying and dissemination to a hands-on approach striving to economically incentivize the production of quality journalistic expression.[9]

Simply put, though the legal tools changed, the fundamental constitutional aims did not. When information was generally scarce, law subsidized newspaper distribution and permitted printers to copy each other's work. Yet as the information environment became more robust and

---

[7] *See, e.g.*, RonNell Andersen Jones & Sonja R. West, *The Future of Press Freedom*, in The Future of Press Freedom: Democracy, Law, and the News in Changing Times 6 (RonNell Andersen Jones & Sonja R. West eds. 2025) (functions of the press include "contributing to public discourse" and "distributing democracy-enhancing information").

[8] *See* Vincent Blasi, *The Checking Value in First Amendment Theory*, 2 Am. Bar Found. Rsch. J. 521 (1977).

[9] *See* C. Edwin Baker, *The Independent Significance of the Press Clause Under Existing Law*, 35 Hofstra L. Rev. 955, 974 (2007) ("[T]he institutional press is able to perform its Fourth Estate role only due to its ability to sell its product . . . The incentive provided by ownership to produce saleable products turns copyright into a purported 'engine of free expression[.]'" (quoting *Harper & Row, Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 558 (1985)).

original reporting more valuable, Congress extended the economic incentives of copyright to the journalistic expression that original reporting produced. *See* Robert Brauneis, *The Transformation of Originality in the Progressive-Era Debate Over Copyright in News*, 27 Cardozo Arts & Ent. L. J. 321, 366 (2009) (noting that during the late nineteenth and early twentieth centuries, "copyright law was faced with the increasing desire of newspapers for protection of their investments in newsgathering").

## II. DEFENDANTS' FAIR USE DEFENSES WOULD INVERT THE RELATIONSHIP BETWEEN THE PRESS AND PROGRESS CLAUSES AND ARE THUS INFIRM AS A MATTER OF CONSTITUIONAL HISTORY AND STRUCTURE

The News Plaintiffs persuasively argue that Defendants' fair use defenses fail on the merits. They contend that Defendants' commercial practices—copying articles at astonishing scale to train AI models which then generate economic substitutes for those articles—undermine Defendants' fair use defenses. *See* News Brief, at 50-75. Yet the fact that Defendants' assertions of fair use would generate profound economic friction between copyright law and the news media provides independent constitutional reason to reject them. Copyright law has consistently harmonized intellectual property with press freedom to the ends of republican self-government. Defendants' arguments would invert this relationship, jeopardizing the economic viability of the press under the banner of fair use. This is not an outcome the Constitution abides.

### A. The Speed, Scale, and Consequences of Defendants' Copyright Infringements Threaten the Economic Viability of a Free and Independent Press

The facts in this record are remarkable. Defendants copied millions of articles without permission to pre-train their commercial products. News Brief at 1; *see, e.g.*, SF ¶¶ 848-49, 1186-87, 1221. Those products—AI chatbots—have subsequently generated outputs copying Plaintiffs' works verbatim, News Brief at 15-16, as well as "substitutive and harmful non-verbatim outputs that result from Defendants having trained and/or grounded on copies of Plaintiffs' content," *id.* at

17. As appraised by individuals in Defendants' employ, this all amounts to an "'astonishing theft of unprecedented proportions,'" *id.* at 1 (quoting Microsoft's Director of Applied Science); poses an "'existential threat'" to publishers, *id.* (quoting Open AI's Head of ChatGPT); and risks a "'doom loop'" in which the "'end-product'" of AI chatbots "'threaten[] the economic foundations of its essential suppliers,'" that is, writers and publishers across the internet, *id.* at 2 (quoting a "Microsoft document").[10]

Such an economic death cycle is entirely plausible. Increased public reliance on AI has decreased public resort to traditional "search," reducing click-through rates to the News Plaintiffs' websites. *See* SF ¶¶ 1505-13, 1520, 1530-37. Because "[a]udience attention is a scarce resource," *id.* ¶ 1630, AI's syphoning of readers from News Plaintiffs has, by way of just one example, "adversely impacted" the *New York Times*'s "online traffic and audience," ¶ 1799.

---

[10] The unauthorized copying and market substitution demonstrated by this record mean that even strong fair use protections are consistent with a finding of copyright infringement against these Defendants. *Amici* recognize the importance of fair use, including its contribution to the spread of creative work. *See Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 575 (1994) ("some opportunity for fair use of copyrighted materials has been thought necessary to fulfill copyright's very purpose"). A fact-bound decision against fair use here, however, need not deliver a blow to fair use elsewhere. This is doubly so in light of the distinct constitutional considerations, historical and structural, implicated by this case. The press's institutional significance raises particular constitutional equities that may not be present in cases involving certain non-press speakers. *Cf. Sarl Louis Intern v. Viewfinder, Inc.*, 489 F.3d 474, 480 (2d. Cir. 2007) (an "entity's status as a news publication may be highly probative on certain relevant inquiries" in the fair use context).

At the same time, the Speech Clause, like the Press and Progress Clauses, should be harmonized with the Constitution's structure and purposes, and fair use analysis should generally account for the constitutional values at play in a given case. *See, e.g.*, *Sony Corp. of America v. Universal City Studios, Inc.*, 464 U.S. 417, 455 n.40 (1984) ("Congress has plainly instructed us that fair use analysis calls for a sensitive balancing of interests. . . . copying to promote a scholarly endeavor certainly has a stronger claim to fair use than copying to avoid interrupting a poker game").

Though *amici* do not purport to offer a systemic treatment of these issues here, the immediate point remains: the facts on this record, alongside the distinct constitutional role played by the News Plaintiffs, support a decision against fair use that need not weaken fair use more generally.

The logic of the "doom loop" Defendants have instigated is as straightforward as it is consequential. As Judge Chhabria recently explained in *Kadrey v. Meta Platforms*,

> Generative AI has the potential to flood the market with endless amounts of images, songs, articles, books, and more. People can prompt generative AI models to produce these outputs using a tiny fraction of the time and creativity that would otherwise be required. So by training generative AI models with copyrighted works, companies are creating something that often will dramatically undermine the market for those works, and thus dramatically undermine the incentive for human beings to create things the old-fashioned way.

788 F.Supp.3d 1026, 1034-35 (N.D. Cal. June 25, 2025). Under this theory of economic displacement, a theory Defendants themselves accept, News Brief at 1-2, *Kadrey* emphasized that "markets for certain types of works (like news articles) might be [particularly] vulnerable to indirect competition from AI outputs," 788 F.Supp.3d at 1059.

### B. The Economic Realities in this Case are Constitutionally Significant and Support a Ruling for the News Plaintiffs

Defendants' claims to fair use jeopardize the economic viability of a free and independent press. This would invert the relationship between the Progress and Press Clauses, using legislation passed pursuant to the former to debilitate press institutions emblematic of the latter. Constitutional history and structure do not countenance this outcome, and neither should the Court.

As a threshold matter, Founding-era evidence might be of particular relevance in this case. The Supreme Court has repeatedly employed historical evidence and reasoning to decide cases at the intersection of intellectual property and the First Amendment. Thus, in *Eldred v. Ashcroft*, 537 U.S. 186 (2003), the Court upheld a twenty-year extension of existing copyrights against First Amendment challenge because the contemporaneous adoption of the First Amendment and the Progress Clause belied the notion that they were in conflict. *See id*. at 219 ("The Copyright Clause and First Amendment were adopted close in time. This proximity indicates that, in the Framers' view, copyright's limited monopolies are compatible with free speech principles.").

Likewise, in *Golan v. Holder*, 565 U.S. 302 (2012), the Supreme Court held that the First Amendment did not prohibit congressional restoration of copyrights to certain foreign works because the Framers' original understandings, *id.* at 328, alongside "traditional contours of copyright protection" like fair use, *id.* (cleaned up), made First Amendment scrutiny unnecessary, *id.* at 329.

Most recently, in the trademark case *Vidal v. Elster*, 602 U.S. 286 (2024), the Court upheld the Lanham Act's "names clause" against First Amendment challenge on the ground that "history and tradition" was "sufficient to conclude that the names clause . . . [was] compatible with the First Amendment," *id.* at 301.

Without opining as to the desirability of this trend,[11] *amici* contend that the historical evidence provided in Part I raises the constitutional salience of the economic and democratic realities presented by this record. By inverting the historically harmonious relationship between the Press and Progress Clauses, Defendants' fair use arguments work a harm to constitutional structure. That the business practices Defendants seek to immunize imperil the economic viability of the press, moreover, implicates bedrock constitutional principles all its own. AI substitutes threaten to replace the News Plaintiffs' journalistic work on an economic level and yet cannot possibly replace them on a democratic one. All else considered, the Constitution's commitment to republican government provides reason to doubt that Defendants' fair use arguments can be reconciled with the Constitution's structure and design.

---

[11] *Amici* take no position on the appropriateness of "history and tradition," "originalism" or other historicist methods of constitutional interpretation, nor do they suggest that this Court is bound to apply such methods. *Amici*'s more modest point is that, as a matter of constitutional history and structure, the Progress Clause has historically "play[ed] well" with the Press Clause, *Elster*, 602 U.S. at 300 (cleaned up), providing additional grounds for granting News Plaintiffs' motion.

1. *Defendants' arguments invert the historical relationship between the Press and Progress Clauses*

In the Founding-era, the Copyright Act of 1790 "reflect[ed] the fact that Congress sought to promote learning in the new nation." Slauter, *Who Owns the News?*, at 88. The Press Clause, meanwhile, secured theretofore broad freedoms, encouraging the publication of valuable literary work. And the Postal Service Act of 1792 encouraged the wide dissemination of whatever writings the press thought fit to print. Yet even as journalism evolved, copyright evolved with it, securing a property interest in news organizations' original, investigative reporting.

Defendants' arguments would upend this harmonious relationship, pitting the Progress Clause against the Press Clause and threatening to drive news organizations toward insolvency under the banner of fair use. The historical evidence detailed above strongly suggests this outcome would run contrary to the structural relationship between copyright law and the press that prevailed in the Founding era.

What is at stake here, however, is not simply a deviation from constitutional history. The historic relationship between the Progress and Press Clauses is not valuable by mere virtue of its age. More than that: from the Founding to the present, it has furthered the end of republican self-government, a value of immense significance for both constitutional structure and contemporary democratic life.

2. *Defendants' business practices threaten the viability of a free and independent press*

The Supreme Court has repeatedly singled out the institutional press for its democratic and constitutional significance.[12] Legal scholars, political scientists, and sociologists consistently

[12] *See, e.g.*, *Grosjean v. Am. Press Co.*, 297 U.S. 233, 250 (1936) (the "free press stands as one of the greater interpreters between the government and the people"); *New York Times Co. v. Sullivan*, 376 U.S. 254, 275 (1964); *Estes v. Texas*, 381 U.S. 532, 539 (1965) (the press is a "mighty catalyst" in "exposing corruption among public officers and employees and generally informing the citizenry of public events"); *New York Times Co. v. United States*, 403 U.S. 713, 717 (1971)

connect a free press to popular self-rule.[13] In this way, both the bench and the academy are in accord with the Founding generation: the press is a constitutionally significant institution. Today, threats to the news media's economic viability imperil the same requirements of republican self-government the Founders, through the Press and Progress Clauses, sought to nurture. Defendants' arguments are at odds with constitutional structure on this score.

Yet despite the fact that Defendants' practices risk replacing journalistic output on an economic level, they cannot do so on a democratic one. AI chatbots "cannot perform the human involvement in the collection and producing of news content, yet they nevertheless compete for readers and consume readers' limited attention in place of newspapers." SF ¶ 1460. When these AI tools are not regurgitating the reporting news organizations have already produced, *see, e.g.*, News Brief at 15-31, they are generating hallucinations and misinforming the public, SF ¶¶ 1713-71. "This tendency," OpenAI's March 27, 2023 GPT-4 Technical Report explained, "can be particularly harmful as models become increasingly convincing and believable, leading to overreliance on them by users." *Id.* ¶ 1742 (internal quotation marks omitted).

Defendants' practices raise the specter of economic ruin for the press. This is not just bad news for news media but a threat to democracy itself, endangering the republican form of

---

(Black, J., concurring) ("the Founding Fathers gave the free press the protection it must have to fulfill its essential role in our democracy"); *Cox Broadcasting Corp. v. Cohn*, 420 U.S. 469, 492 (1975) (without the press "most of us and many of our representatives would be unable to vote intelligently").

[13] *See, e.g.*, C. Edwin Baker, *The Media That Citizens Need*, 147 U. Penn. L. Rev. 317, 318 (1998); Martha Minow, *The Changing Ecosystem of News and Challenges for Freedom of the Press*, 64 Loy. L. Rev. 499, 555 (2018); RonNell Andersen Jones, *Press Speakers and the First Amendment Rights of Listeners*, 90 U. Colo. L. Rev. 499, 544-45 (2019); Kim Lane Scheppele, *Autocratic Legalism*, 85 U. Chi. L. Rev. 545, 558 (2018); *cf.* Steven Levitsky & Lucan A. Way, *Competitive Authoritarianism in America*, 37 J. Democracy 5, 14 (2026) (noting that "frequent harassment of media" suggest democratic backsliding).

government the Constitution established. Defendants cannot proceed apace without undermining bedrock constitutional principles. This Court should stop them before they do.

## CONCLUSION

For the foregoing reasons, the Court should grant the News Plaintiffs' motion for summary judgment and deny the Defendants' motions for summary judgment.

Dated: October 30, 2026

Respectfully submitted,

/s/ Cameron Stracher
Cameron Stracher, PLLC
1133 Broadway, Suite 516
New York, New York 10010
(646) 992-3850
cam@stracherlaw.com

Of Counsel:

Jacob M. Schriner-Briggs
CLEVELAND STATE UNIVERSITY, COLLEGE OF LAW[14]
2121 Euclid Avenue, LB 225
Cleveland, OH 44115
(330) 727-9118
j.schrinerbriggs@csuohio.edu

Sonja R. West
UNIVERSITY OF GEORGIA, SCHOOL OF LAW[15]
225 Herty Drive
Athens, GA 30602
(706) 542-5145
srwest@uga.edu

*Counsel for Amici Curiae*

---

[14] For identification purposes only—the views expressed herein do not purport to represent the institutional views of Cleveland State University or CSU LAW, if any.

[15] For identification purposes only—the views expressed herein do not purport to represent the institutional views of the University of Georgia or its School of Law, if any.

**CERTIFICATE OF COMPLIANCE**

Pursuant to Local Civil Rule 7.1(c) and the Court's order, I hereby certify that the foregoing proposed amicus brief contains 5,813 words according to the word-count feature of the word-processing program used to prepare it, and therefore it complies with paragraph 2.C of this Court's Individual Practices.

/s/ Cameron Stracher
Cameron Stracher

## APPENDIX: INDIVIDUAL STATEMENTS OF INTEREST OF *AMICI CURIAE*

PEN American Center, Inc. ("PEN America") is a nonpartisan nonprofit organization working at the intersection of literature and human rights. Founded in 1922, PEN America advocates for free expression and the interests of writers and journalists in the United States and abroad. Its membership includes more than 5,000 writers, journalists, literary professionals, and readers nationwide. PEN America protects press freedom and journalists by combatting disinformation, defending journalists against online abuse, and supporting local news.

Protect Democracy Project ("Protect Democracy") is a nonpartisan, nonprofit organization dedicated to building more resilient democratic institutions and preventing our democracy from declining into a more authoritarian form of government. Protect Democracy uses litigation, policy advocacy, research, and data analysis to protect the constitutional rights of dissenters, marginalized communities, politically disfavored groups, and a free press. A robust free press plays a fundamental role in a functioning democracy—serving as a check on abuses of power and providing the public with reliable information needed for civic participation and democratic self-governance. Protect Democracy has an interest in ensuring that the First Amendment's guarantee of the freedom of the press is upheld.

Reporters Without Borders, Inc. ("RSF USA") is the U.S. affiliate of the independent international non-profit organization Reporters Sans Frontiers ("RSF") that defends the right of every human being to have access to free and reliable information. RSF acts for the freedom, pluralism, and independence of journalism and defends those who embody these ideals. RSF advocates for press freedom throughout the world by monitoring and communicating on abuses committed against journalists and on all forms of censorship, including by publishing the annual World Press Freedom Index, which measures the state of press freedom in 180 countries. RSF

regularly acts before national and international judicial or quasi-judicial bodies (including UN human rights organs) and regularly files amicus briefs in support of media freedom.