# Exhibit A

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE: OPENAI, INC.,<br>COPYRIGHT INFRINGEMENT LITIGATION<br><br>This Document Relates To:<br>*All Actions* | 25-md-3143 (SHS) (OTW) |

**[PROPOSED] BRIEF OF *AMICI CURIAE* COMPUTER AND COMMUNICATIONS INDUSTRY ASSOCIATION, NETCHOICE, LLC, AND TECHNET IN SUPPORT OF DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

**Page**


INTRODUCTION AND SUMMARY OF ARGUMENT ........................................................... 1

ARGUMENT ................................................................................................................. 2

I. The Purpose of the Copyright Act, and of Fair Use in Particular, Is to Promote Progress—Not Protectionism......................................................................................... 2

II. Training Generative AI Models Is a Transformative Use. ................................................ 6

III. Plaintiffs' Market Dilution and Licensing Theories Misconstrue the Fair Use Inquiry and Are Antithetical to the Purposes of Copyright. ............................................ 11

A. Market Dilution Is Not Cognizable Harm Under the Fourth Factor......................11

B. A Copyright Owner Cannot Create a Cognizable Market by Demanding Licenses for a Transformative Use. ........................................................................17

CONCLUSION ............................................................................................................ 19

## TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Am. Geophysical Union v. Texaco Inc.*,
60 F.3d 913 (2d Cir. 1994)....18

*Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*,
11 F.4th 26 (2d Cir. 2021)....15

*Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*,
598 U.S. 508 (2023)....7, 8, 10, 14

*Authors Guild, Inc. v. HathiTrust*,
755 F.3d 87 (2d Cir. 2014).... *passim*

*Authors Guild v. Google, Inc.*,
804 F.3d 202 (2d Cir. 2015).... *passim*

*Barclays Capital Inc. v. Theflyonthewall.com, Inc.*,
650 F.3d 876 (2d Cir. 2011)....16

*Bartz v. Anthropic PBC*,
787 F. Supp. 3d 1007 (N.D. Cal. 2025).... *passim*

*Bill Graham Archives v. Dorling Kindersley Ltd.*,
448 F.3d 605 (2d Cir. 2006)....17, 18

*Burrow-Giles Lithographic Co. v. Sarony*,
111 U.S. 53 (1884)....6

*Byrne v. British Broadcasting Corp.*,
132 F. Supp. 2d 229 (S.D.N.Y. 2001) (Stein, J.)....9

*Campbell v. Acuff-Rose Music, Inc.*,
510 U.S. 569 (1994).... *passim*

*Eldred v. Ashcroft*,
537 U.S. 186 (2003)....17

*Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*,
499 U.S. 340 (1991)....3, 12, 15

*Fogerty v. Fantasy, Inc.*,
510 U.S. 517 (1994)....5

*Fox Film Corp. v. Doyal*,
286 U.S. 123 (1932)....3

*Fox News Network, LLC v. TVEyes, Inc.*,
883 F.3d 169 (2d Cir. 2018)....18

*Google LLC v. Oracle Am., Inc.*,
593 U.S. 1 (2021) ... *passim*

*Hachette Book Group, Inc. v. Internet Archive*,
115 F.4th 163 (2d Cir. 2024) ... 15

*Hayuk v. Starbucks Corp.*,
157 F. Supp. 3d 285 (S.D.N.Y. 2016) ... 16

*Kadrey v. Meta Platforms, Inc.*,
788 F. Supp. 3d 1026 (N.D. Cal. 2025) ... *passim*

*Lennon v. Premise Media Corp.*,
556 F. Supp. 2d 310 (S.D.N.Y. 2008) (Stein, J.) ... 9, 17

*Moseley v. V Secret Catalogue, Inc.*,
537 U.S. 418 (2003) ... 13

*N.Y. Times Co. v. Microsoft Corp.*,
777 F. Supp. 3d 283 (S.D.N.Y. 2025) ... 15

*Sony Corp. of Am. v. Universal City Studios, Inc.*,
464 U.S. 417 (1984) ... 3, 4

*Stewart v. Abend*,
495 U.S. 207 (1990) ... 4

*Thomson Reuters Enterprise Centre GmbH v. ROSS Intelligence Inc.*,
2026 WL 2932557 (3d Cir. Sept. 29, 2026) ... 9, 10, 18

*Twentieth Century Music Corp. v. Aiken*,
422 U.S. 151 (1975) ... 3

*United States v. Paramount Pictures, Inc.*,
334 U.S. 131 (1948) ... 3

## CONSTITUTIONAL PROVISIONS

U.S. Const. art. I, § 8, cl. 8 ... 1, 3, 12

## STATUTES

15 U.S.C. § 1125 ... 13

17 U.S.C. § 102 ... 12, 16

17 U.S.C. § 106 ... 3

17 U.S.C. § 107 ... *passim*

## LEGISLATIVE MATERIALS

H.R. Rep. No. 94-1476 (1976).....3

## INTRODUCTION AND SUMMARY OF ARGUMENT

The fair use doctrine exists to ensure that copyright's limited monopoly does not "stifle the very creativity which that law is designed to foster." *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 577 (1994) (cleaned up). Training a generative AI model is a paradigmatic application of that principle. Developers engage in intermediate, non-expressive copying of works—not to enjoy, display, or distribute them, but to build a fundamentally new kind of tool: one that analyzes statistical relationships among words and word fragments to enable human users not only to create *new* expression, but also to answer factual research questions, detect fraud, classify and organize information, assist people with disabilities, and achieve many other goals.

Courts have consistently held that such transformative uses further the constitutional objective of promoting the "Progress of Science and useful Arts," even when the development process involves large-scale reproduction of copyrighted material. *See Google LLC v. Oracle Am., Inc.*, 593 U.S. 1, 30 (2021); *Authors Guild v. Google, Inc.*, 804 F.3d 202, 214 (2d Cir. 2015) ("*Google Books*"). The Second Circuit has long recognized that fair use protects copying of entire works undertaken to create new tools and information-access technologies. *See Google Books*, 804 F.3d at 216-18; *Authors Guild, Inc. v. HathiTrust*, 755 F.3d 87, 97-98 (2d Cir. 2014). Two federal courts have now squarely addressed the question presented here—whether use of copyrighted material in the process of training a generative AI model is a fair use—and reached the same conclusion: It is. *See Bartz v. Anthropic PBC*, 787 F. Supp. 3d 1007 (N.D. Cal. 2025); *Kadrey v. Meta Platforms, Inc.*, 788 F. Supp. 3d 1026 (N.D. Cal. 2025). This Court should join them.

*Amici curiae* submit this brief to address three points. First, the purpose of the Copyright Act in general, and the fair use doctrine in particular, is to promote "Progress." U.S. Const. art. I, § 8, cl. 8. Affording fair use protection to generative AI training is fully consistent with that purpose. A recurring objection to AI training—that it is antithetical to the purposes underlying fair

use because AI output lacks human authorship—misreads the doctrine's foundation, is inconsistent with settled law, and ignores how AI models actually work and how people use them.

Second, training a generative AI model is among the most clearly transformative uses a court has been asked to evaluate. The copyrighted works are not copied to be consumed or distributed; they are analyzed to extract statistical patterns that enable a tool to generate new text or other output at the direction of a human user. The purpose and character of this use categorically differ from the original purpose and character of the underlying works.

Third, Plaintiffs' theories of market harm—market dilution and lost fees for licensing a transformative use—misconstrue the fourth fair use factor and are contrary to the purposes of copyright. Neither the Supreme Court nor the Second Circuit has ever adopted a theory under which the creation of new, non-infringing expression constitutes cognizable market harm. To the contrary, both courts have recognized that copyright does not confer a monopoly against competition; fair use exists to prevent incumbent rightsholders from strangling the technologies that others will use to add to the store of human creativity and expression. *E.g.*, *Google*, 593 U.S. at 35; *HathiTrust*, 755 F.3d at 99-100.

## ARGUMENT

### I. The Purpose of the Copyright Act, and of Fair Use in Particular, Is to Promote Progress—Not Protectionism.

Plaintiffs contend that using copyrighted works to train generative AI is inherently contrary to fair use's goal of preserving "the incentive for human creation," because the outputs of generative AI tools are not human creations. *See, e.g.*, Class Pls.' Mem. of Law in Supp. of Mot. for Partial Summ. J., ECF No. 1982 ("Class Br."), at 34-36. That objection misapprehends the purpose of copyright and fair use, as well as generative AI's function as a tool in assisting with, rather than replacing, human creativity.

The Constitution makes clear that copyright's exclusive rights are a means to serve the public end of "promot[ing] the Progress of Science and useful Arts." U.S. Const. art. I, § 8, cl. 8. As the Supreme Court explained in *Twentieth Century Music Corp. v. Aiken*, "[c]reative work is to be encouraged and rewarded, but private motivation must ultimately serve the cause of promoting broad public availability of literature, music, and the other arts." 422 U.S. 151, 156 (1975). The "immediate effect" of copyright is to secure "a fair return for an 'author's' creative labor," but its "ultimate aim is, by this incentive, to stimulate artistic creativity for the general public good." *Id.* And when "technological change has rendered [the Act's] literal terms ambiguous, the Copyright Act must be construed in light of this basic purpose." *Id.* The Court has reaffirmed that principle for decades. *See, e.g.*, *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 429 (1984); *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 349-50 (1991); *United States v. Paramount Pictures, Inc.*, 334 U.S. 131, 158 (1948) ("The copyright law, like the patent statutes, makes reward to the owner a secondary consideration."); *Fox Film Corp. v. Doyal*, 286 U.S. 123, 127 (1932) (the "primary object" in conferring copyright monopoly is the public benefit). Consistent with this settled understanding of copyright's constitutional purposes, Congress codified fair use in the 1976 Copyright Act. *See* H.R. Rep. No. 94-1476, at 66 (1976) ("Section 107 is intended to restate the present judicial doctrine of fair use ….").

That is why the Copyright Act carefully balances incentives to authors—as one mechanism to promote publication—against other interests, including the public's access to information and the ability of others to build upon earlier work. The Act "has never accorded the copyright owner complete control over all possible uses of his work." *Sony*, 464 U.S. at 432. It grants only certain enumerated rights, 17 U.S.C. § 106, subject to fair use, 17 U.S.C. § 107—even where fair uses might diminish the incentives otherwise granted to authors.

Against this backdrop, fair use "permits courts to avoid rigid application of the copyright statute" when it would suppress innovation and creativity. *Google*, 593 U.S. at 18 (quoting *Stewart v. Abend*, 495 U.S. 207, 236 (1990)). The Supreme Court has accordingly recognized that copyright does not grant incumbents a veto over new technologies merely because they introduce competitive efficiencies or alter established markets. *See Sony*, 464 U.S. at 429.

History confirms the point. Nearly every major technological disruption in the production or distribution of creative works was met by predictions from incumbent rightsholders that the new technology would destroy creativity. The movie and television industry predicted that home video recording would be its undoing; the Supreme Court held otherwise, *see Sony*, 464 U.S. at 456 (holding that time-shifting via VCR was fair use), home video became one of Hollywood's most lucrative revenue streams, and the industry thrived. In each prior instance, the technology that incumbents opposed resulted not in less creativity, but in more—more creators, more works, more competition, and broader public access to new knowledge and information. Predictions that generative AI will replace human writers, *see* Class Br. 26, are the latest iteration of a familiar and wrongheaded refrain.

The Supreme Court's decision in *Google LLC v. Oracle America, Inc.* illustrates the point. Google duplicated thousands of lines of code from Oracle's Java interface in the process of creating Android—a new platform for software developers building new applications for mobile devices. 593 U.S. at 11, 27-28. The Court found this use transformative because Google's purpose—creating a "distinct and different computing environment" for software development—fundamentally differed from Oracle's purpose in creating Java for desktops and laptops. *Id.* at 29-33. And the Court warned that allowing Oracle to "hold the key" to all such developmental use could hinder "creative improvements" such as "new applications" and "new uses"—a result that

"would interfere with, not further, copyright's basic creativity objectives." *Id.* at 35, 39. Just as allowing Oracle to lock up the Java code would have stifled the very creativity copyright is meant to foster, allowing copyright holders to lock up copyrighted works and prevent their use as training data would stifle the vast downstream creativity that generative AI enables.

Plaintiffs contend that copyright fosters exclusively human authorship and that its fundamental purpose is to preserve the incentive for human creation. *See* Class Br. 34-36. This argument confuses one mechanism for incentivizing new works (granting limited rights to authors) with the purpose of the Copyright Act more generally—and, critically, with the purpose of the fair use doctrine, which limits those rights. As the Second Circuit has put it, "while authors are undoubtedly important intended beneficiaries of copyright, the ultimate, primary intended beneficiary is the public." *Google Books*, 804 F.3d at 212. Fair use is no mere carve-out; it is a mechanism affirmatively designed to serve copyright's broader constitutional purposes of promoting public access, downstream creativity, and progress. *Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 527 (1994). Copyright encourages human authorship, but fair use does not ask whether a new technology preserves any *particular method* of creating works; it asks whether the use serves copyright's purposes.

The objection that a finding of fair use would not promote human authorship also fails on its own terms, because it ignores how people use AI models. Generative AI models are mere tools—built by human developers and deployed by human users who supply the initiative, intent, judgment, and editorial selection that drive the creative process. Researchers use large language models to synthesize scientific literature across disciplines. Independent creators—authors, musicians, designers—use them to draft, revise, and polish their work. In each case, the human user remains the locus of creative decision-making; the model is the instrument.

This is nothing new. The history of creative expression is the history of humans using ever-more-sophisticated tools to produce works of authorship. The photographer's camera, the writer's word processor, the filmmaker's editing software, the musician's digital audio workstation—each of these tools performs significant work in service of the human creator's expressive vision. Generative AI, like many tools before it, is a tool for computer-assisted human expression, not the computer's own expression.

The Supreme Court settled more than a century ago that creative works produced using new technologies remain the work of human authors. In *Burrow-Giles Lithographic Co. v. Sarony*, the Court upheld copyright in a photograph, rejecting the argument that photography involved a "merely mechanical" process incapable of supporting authorship. 111 U.S. 53, 59 (1884). The photographer's "selecti[on] and arrang[ement]" of the subject—positioning, lighting, costume—constituted the requisite "original intellectual conceptions." *Id.* at 58, 60. For the same reasons, some works created by humans using generative AI tools remain eligible for copyright protection.

Moreover, the humans who build, deploy, and use these models do respond to economic incentives. Developers invest substantial resources in training models. Researchers use them to accelerate scientific discovery and promote knowledge. Users employ them for a wide range of purposes, including to help them create works of authorship that they can publish, distribute, and commercialize. To restrict the ability of these actors to develop and use AI tools for public benefit would subordinate the constitutional purpose of copyright to the protection of incumbent business models. Fair use exists precisely to prevent that result. *See Google*, 593 U.S. at 34.

## II. Training Generative AI Models Is a Transformative Use.

Training a generative AI model is among the most clearly transformative uses courts have ever been asked to evaluate. *Bartz*, 787 F. Supp. 3d at 1033. The training process does not reproduce copyrighted works to perform, display, or distribute them to a new audience; instead, it

analyzes these works to extract statistical patterns that enable generative AI models to perform a variety of novel tasks. Both the purpose and the character of this use are categorically different from the expressive purpose and character of the original works.

The first factor in the statutory fair use analysis—"the purpose and character of the use," 17 U.S.C. § 107(1)—turns primarily on whether the challenged use "adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message." *Campbell*, 510 U.S. at 579. *Campbell* also emphasized that the "more transformative the new work, the less will be the significance of other factors, like commercialism, that may weigh against a finding of fair use." *Id.*

In *Google*, the Court confirmed that this transformative-use analysis is not limited to the context of creative commentary or traditional expressive arts. 593 U.S. at 11, 29-30. There, Google's copying of code from Oracle's Java software to build the Android smartphone platform was highly transformative because Google's purpose—creating a new platform for software development on mobile devices—fundamentally differed from Oracle's purpose in creating Java for computers. *Id.* at 27-28. The Court reached this conclusion "even though Google's use was a commercial endeavor." *Id.* at 32. Crucially, the Court recognized that Google's copying to build a new tool served "the basic constitutional objective of copyright itself." *Id.* at 30.

Most recently, the Court reaffirmed that the "'central' question" for the first factor is whether the use "adds something new, with a further purpose or different character." *Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*, 598 U.S. 508, 528 (2023) (quoting *Campbell*, 510 U.S. at 579). *Warhol* reemphasizes that the transformative-use inquiry is purpose-driven: Where the secondary use is for "substantially the same purpose" as the original, the use is not

transformative. *Id.* at 526. And the inquiry is “objective”; it does not turn on the subjective intent of the user. *See id.* at 544-45.

Plaintiffs misread *Warhol* to require Defendants to show that copying *their* works in particular was necessary, pointing to testimony that no individual work or category of works was required to train the models at issue. Class Br. 30-32; *see* News Pls.’ Combined Summ. J. Br., ECF No. 1977-1 (“News Br.”), at 57-58. That inverts the inquiry. *Warhol* explained that “a use that has a distinct purpose is justified because it furthers the goal of copyright,” and that an independent justification for borrowing is “particularly relevant” where “an original work and copying use share the same or highly similar purposes.” 598 U.S. at 531-32 (citing *Google Books*, 804 F.3d at 214). Here, the use has a distinct purpose: the original works are books and articles to be read, while the challenged use is the derivation of statistical parameters that no author owns and no human can even read.

When developers train a generative AI model on a novel, article, or commentary, the purpose is not to read, enjoy, or convey the expression contained within it, or to provide users with the very same novels, articles, or commentaries on demand. Instead, the purpose is computational: to analyze statistical relationships among oceans of text fragments in order to create *new* products that offer the public creative and innovative uses not achievable by the copyrighted materials in the training data. *See Google*, 593 U.S. at 30.

This distinction mirrors a long line of Second Circuit cases establishing that non-expressive uses of expressive works are fair use. In *HathiTrust*, the Second Circuit ruled that creating a digital database of books to allow users to search for specific terms was a transformative use because that use of the books served a different function from the original. 755 F.3d at 97-98. Similarly, in *Google Books*, the Second Circuit found Google’s copying of tens of millions of books to enable

search and "data mining" highly transformative because Google did not copy the books for consumption of their expressive content. 804 F.3d at 209, 217. In both cases, copying entire works was reasonable in relation to the transformative purpose, *HathiTrust*, 755 F.3d at 98; *Google Books*, 804 F.3d at 221, even though no particular book was indispensable to either search tool, whose value lay in the corpus as a whole. Training a generative AI model is the technological evolution of these judicially endorsed, non-expressive uses of whole-work copies. A model learns from patterns across billions of works rather than from the particular expression of any one of them—which is why, as Plaintiffs emphasize, no single work was necessary to the models' capabilities. Class Br. 30-31. That is the hallmark of a non-expressive use, not a reason to deny fair use.

This Court has already rejected a strict-necessity test: Determining whether a use is transformative "does *not* require courts to decide whether it was strictly necessary that it be used." *Lennon v. Premise Media Corp.*, 556 F. Supp. 2d 310, 324 (S.D.N.Y. 2008) (Stein, J.). Neither *Byrne v. British Broadcasting Corp.*, 132 F. Supp. 2d 229 (S.D.N.Y. 2001) (Stein, J.), on which Class Plaintiffs rely, Class Br. 31, nor the Third Circuit's recent decision in *Thomson Reuters Enterprise Centre GmbH v. ROSS Intelligence Inc.*, ---F.4th ---, 2026 WL 2932557 (3d Cir. Sept. 29, 2026), requires a developer to justify the inclusion of each work individually. In *Byrne*, a broadcaster recorded a copyrighted song for a news story about Irish-American media reaction to a criminal investigation, and this Court concluded that a jury could find the song unnecessary to that purpose because "equally informative non-infringing alternatives"—such as the radio hosts' own on-air statements—were available. 132 F. Supp. 2d at 234-35. *ROSS* likewise held that copying headnotes was unnecessary because the judicial opinions they summarized were freely available, and "ease is not a justification for copying." 2026 WL 2932557, at *7-8. Both uses

overlapped with the original's purpose—the BBC recorded the song and played it for viewers, and ROSS used Westlaw's headnotes to build a Westlaw substitute—precisely where *Warhol* makes an independent justification "particularly relevant." 598 U.S. at 532. Training neither shares the works' purpose nor exploits any particular work's expression, and a rule requiring developers to justify each work in a corpus would condemn the very uses the Second Circuit upheld in *HathiTrust* and *Google Books*.

Both courts to decide whether training generative AI models is transformative have held that it is. In *Bartz*, Judge Alsup found that Anthropic's use of copyrighted books to train its models was "quintessentially transformative" and "among the most transformative many of us will see in our lifetimes." 787 F. Supp. 3d at 1022, 1033. Judge Chhabria reached the same conclusion on the first factor in *Kadrey*, finding that there was "no serious question that Meta's use of the plaintiffs' books had a 'further purpose' and 'different character' than the books—that it was highly transformative." 788 F. Supp. 3d at 1044. *ROSS* draws the same line: the Third Circuit found ROSS's use "minimally transformative, at best," and expressly distinguished "the AI models in *Bartz* and *In re: OpenAI*" from ROSS's tool, which "cannot generate original expression." 2026 WL 2932557, at *6 & n.7.

The rule this Court adopts will reach far beyond these Defendants—to startups, university labs, non-profit research institutes, and developers that release open-weight models free of charge so that others can reproduce results, audit model behavior, study bias and safety, and build on one another's work. Models trained on broad corpora are in turn adapted to purposes no novel or news article could serve: analyzing genomic and clinical-trial data, translating low-resource languages, powering assistive technologies for people with disabilities, detecting fraud, and reviewing voluminous legal and medical records. None of these applications share any connection or purpose

with the original expressive use of the copyrighted works in the training data, and they exemplify the very definition of adding "a further purpose or different character" to existing copyrighted works. *Campbell*, 510 U.S. at 579.

This Court should reject Plaintiffs' incorrect analysis of the transformativeness inquiry and, consistent with *Google Books* and *HathiTrust*, join *Bartz* and *Kadrey* in finding that training generative AI models is a transformative use.

## III. Plaintiffs' Market Dilution and Licensing Theories Misconstrue the Fair Use Inquiry and Are Antithetical to the Purposes of Copyright.

Plaintiffs advance two theories of market harm: that AI-generated works will dilute the market for their works, and that training deprived them of licensing fees. Neither is cognizable.

### A. Market Dilution Is Not Cognizable Harm Under the Fourth Factor.

Plaintiffs miss the mark in arguing that the fourth fair use factor cuts against AI training because generative AI models might create competing works that dilute the market and indirectly substitute for their works. Class Br. 34-36; News Br. 62-64. Recognizing "market dilution" as a form of market harm under factor four would undermine the fundamental purpose of copyright law to promote progress and run headfirst into decades of Supreme Court and Second Circuit authority recognizing that copyright owners do *not* enjoy the right to exclude competition beyond a work's specific, copyrightable expression. The fourth fair use factor—harm to the market for the copyrighted work—has never been understood to reach competitive pressure from works that are not substantially similar to the copyrighted work and therefore do not substitute for it. And there is good reason to be cautious about stretching the market-harm inquiry in a manner that threatens the principles embodied by the First Amendment and the Progress Clause.

Plaintiffs' principal authority is *Kadrey*, which observed that "using copyrighted books to train an [AI model] might harm the market for those works [] by helping to enable the rapid

generation of countless works that compete with the originals, even if those works aren't themselves infringing." 788 F. Supp. 3d at 1052; *see* Class Br. 34; News Br. 63. The *Kadrey* court deemed "[h]arm from this form of competition" to be "the harm of market dilution"—a theory with no footing in Supreme Court or Second Circuit precedent—although it found that the harm had not been established on the record before it. *Id.* This Court should reject Plaintiffs' invitation to apply that reasoning.

Copyright protects only "Authors['] … respective Writings," not concepts and ideas, U.S. Const. art. I, § 8, cl. 8; *see* 17 U.S.C. § 102(b), and infringement requires "copying of constituent elements of the work that are original." *Feist*, 499 U.S. at 361.

Plaintiffs' dilution theory would brush aside the balance reflected in the Constitution and decades of copyright jurisprudence by recognizing purported "harms" to authors from competing *new* expression—indeed, harms to authors whose works have not been copied at all. A generative AI model may help people create new stories that compete with books that were not used for training just as well as it helps create competitors to books that were. On Plaintiffs' theory, the millions of authors and publishers whose works were never used in training have the same dilution grievance as Plaintiffs whose works were. Plaintiffs' own example proves the point: when a reader buys an AI-generated romance novel "instead of a romance novel written by a human author," Class Br. 34, the substitution is for romance novels generally, not for any work used in training. If the asserted harm occurs whether or not the plaintiff's work is used, it is not harm caused by the use of the copyrighted work—which is what § 107(4) asks.

Consistent with the limited purposes of copyright, the fourth factor assesses the effect of the use on "the potential market for or value of *the* copyrighted work." 17 U.S.C. § 107(4) (emphasis added). The question is whether *this* use substitutes for *these* works, not whether a

category of technology may over time affect a market in which these and other works compete. When Congress has wanted to protect intellectual-property owners against "dilution," it has said so expressly—and even then only for famous marks, and only against the use of similar marks. 15 U.S.C. § 1125(c); *see Moseley v. V Secret Catalogue*, *Inc.*, 537 U.S. 418, 429 (2003) (dilution protection is not "the product of common-law development"). Congress has never enacted a dilution right for copyright, and § 107(4) should not be read to create one.

The Supreme Court has repeatedly rejected efforts to expand the meaning of the fourth factor to preclude competition from transformative uses. In *Campbell*, for example, the Court held that a commercial parody could be a fair use despite the risk that it could "kill[] demand for the original." 510 U.S. at 591-92 (explaining that "when a lethal parody, like a scathing theater review, kills demand for the original, it does not produce a harm cognizable under the Copyright Act"). Courts must distinguish between uses that merely "suppress[] demand" and infringement, which "usurps it." *Id.* at 592 (citation omitted).

While the fourth factor "focuses upon the 'effect' of the copying in the 'market for or value of the copyrighted work,'" *Google*, 593 U.S. at 35 (quoting 17 U.S.C. § 107(4)), the Court in *Google* again made clear that not all market harms are cognizable, rejecting an effort to preclude a transformative use on the basis of market harm. *Id.* at 40. There, the Court held that it was fair use for Google to copy software code in pursuit of developing a new mobile operating system that, to have any chance of success, needed to attract developers familiar with the copied code, warning that letting Oracle control downstream "creative improvements" such as "new applications" and "new uses" "would interfere with, not further, copyright's basic creativity objectives." *See id.* at 29-33, 39.

Indeed, the Court specifically rejected the myopic view that "a potential loss of revenue" is sufficient to establish a cognizable market harm—"even if directly translated into foregone dollars"—because such an "'all or nothing' [approach] would [not] be faithful to the Copyright Act's overall design." *Id.* at 23, 35. Rather, courts must "consider not just the amount but also the source of the loss" and "take into account the public benefits the copying will likely produce," including "new expression." *Id.* at 35. So even if some dilution-type effect could be considered, it would be outweighed by the public benefits of tools that expand the creation of new expression and access to knowledge. *See id.* at 35-36.

The Second Circuit has likewise refused to treat competition from non-substitutive uses as cognizable harm. When a book search satisfied a user's need by conveying a historical fact, for example, the resulting loss of a sale was not cognizable, because the author's "copyright does not extend to the facts communicated by his book. It protects only the author's manner of expression." *Google Books*, 804 F.3d at 224. Plaintiffs' dilution theory is premised on the same market control theory that the Second Circuit has rejected.

Plaintiffs' reliance on the statute's reference to the "value of" the copyrighted work does not change the analysis. *See* News Br. 62-63; Class Br. 34. Even if "value" reaches beyond "market," it is still the value "of the copyrighted work" that counts, and the statute asks about the effect "of the use" of that work. 17 U.S.C. § 107(4). As *Campbell*'s lethal parody shows, a use may diminish a work's value without causing cognizable harm. Nor does the Second Circuit's *Warhol* decision suggest otherwise: the "broader market" it considered was the market for licensing photographs like the plaintiff's "to serve as the basis of a stylized derivative image"—a market the defendant entered by copying the plaintiff's photograph—not competition from works that never copied it. *Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*, 11 F.4th 26, 50

(2d Cir. 2021). And Plaintiffs' insistence that no individual work was necessary to train Defendants' models confirms that the harm they assert does not flow from the use of any particular work: A use that does not depend on a work's expression cannot usurp the market for that expression.

*Hachette Book Group, Inc. v. Internet Archive*, 115 F.4th 163 (2d Cir. 2024), is not to the contrary. *Hachette* itself asks "not whether the second work would damage the market for the first (by, for example, devaluing it through parody or criticism), but whether it usurps the market for the first by offering a competing substitute." *Id.* at 189 (cleaned up). Its inquiry into the effect of widespread conduct, *id.* at 193, concerned a use that supplied the "same product" as the originals—complete books for reading—at no cost, *id.* at 190. It does not authorize courts to aggregate competition from non-infringing works across an entire category of content, as News Plaintiffs propose. News Br. 62.

The news-specific variants of Plaintiffs' theory fare no better. News Plaintiffs embrace *Kadrey*'s observation that an AI model "that could generate accurate information about current events might be expected to greatly harm the print news market." News Br. 64 (quoting *Kadrey*, 788 F. Supp. 3d at 1053). But accurate information about current events is precisely what copyright leaves free: "[t]he most fundamental axiom of copyright law is that '[n]o author may copyright his ideas or the facts he narrates.'" *Feist*, 499 U.S. at 344-45 (citation omitted). This Court has already applied that axiom: AI-generated summaries that conveyed "the facts contained in [the news] articles" and differed "in style, tone, length, and sentence structure" were not substantially similar to the originals. *N.Y. Times Co. v. Microsoft Corp.*, 777 F. Supp. 3d 283, 328 (S.D.N.Y. 2025). Competition from those who convey the same facts, or from websites publishing low-quality AI-generated content, *see* News Br. 69-70, may affect publishers' revenues, but it is not harm to the

market for their copyrighted expression. *See Google Books*, 804 F.3d at 224; *cf. Barclays Cap. Inc. v. Theflyonthewall.com, Inc.*, 650 F.3d 876, 907 (2d Cir. 2011) (ability "to make news" confers no right "to control who breaks that news and how"). The Copyright Office's suggestion that the fourth factor reaches material "stylistically similar" to works in training data, News Br. 63, fails for the same reason: copyright protects particular expression, not the styles and genres that works share. *See* 17 U.S.C. § 102(b) ("In no case does copyright protection for an original work of authorship extend to any idea …."); *Hayuk v. Starbucks Corp.*, 157 F. Supp. 3d 285, 291 (S.D.N.Y. 2016) (author's "style" not "protected by copyright law").

As Judge Alsup explained in *Bartz*, "the fourth factor focuses on *actual* or *potential* market substitution" and "points against fair use when a copyist makes copies available that displace demand for copies the copyright owner already makes available or readily could." 787 F. Supp. 3d at 1031. But Plaintiffs' dilution theory does something different:

> [The plaintiffs'] complaint is no different than it would be if they complained that training schoolchildren to write well would result in an explosion of competing works. This is not the kind of competitive or creative displacement that concerns the Copyright Act. The Act seeks to advance original works of authorship, not to protect authors against competition.

*Id.* at 1032. Plaintiffs respond that large language models "are not children learning how to read and write." Class Br. 35. But the analogy does not depend on the two being identical. Its point is that copyright does not protect authors against competition from new, non-infringing works, however efficiently those works are produced.

Finally, the Court should not take lightly the serious implications for expression that dilution theory invites by treating as a societal evil the greater and more efficient production of new, non-infringing expression. While "copyright's built-in free speech safeguards are generally adequate to address" First Amendment rights, that presumption does not hold—and further First Amendment scrutiny is required—when the "traditional contours of copyright protection" have

been altered. *Eldred v. Ashcroft*, 537 U.S. 186, 221 (2003). Plaintiffs' dilution theory would condemn as harmful the new, non-infringing works that users may create with AI tools, including new reporting and commentary on matters of public concern, and the messages those works convey. Expanding copyright in the manner Plaintiffs suggest would allow copyright holders to interfere with the creation of original works with different or opposing points of view, a result that would be starkly inconsistent with the First Amendment.

The Court need not engage in a detailed First Amendment analysis because longstanding copyright jurisprudence makes clear that it would be antithetical to the Progress Clause and fair use doctrine to allow copyright owners to suppress technology that enables the creation of competing but non-infringing speech. Plaintiffs' dilution theory can and should be rejected on that basis alone.

### B. A Copyright Owner Cannot Create a Cognizable Market by Demanding Licenses for a Transformative Use.

Plaintiffs also contend that training deprived them of fees in a market for licensing works as AI training data, pointing to publicly disclosed agreements between content providers and AI companies. Class Br. 36-37; *see* News Br. 71-72. The Second Circuit, recognizing the circularity of that argument, has held that a copyright owner cannot "prevent others from entering fair use markets merely 'by developing or licensing a market for parody, news reporting, educational or other transformative uses of its own creative work.'" *Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605, 614-15 (2d Cir. 2006); *accord Lennon*, 556 F. Supp. 2d at 327 (applying *Bill Graham* where "defendants copied plaintiffs' work for a transformative purpose"). If offering a license for a transformative use were enough to establish market harm, the owner could convert any use into an unfair one simply by making the offer, and the fourth factor "would always favor the copyright holder." *See Am. Geophysical Union v. Texaco Inc.*, 60 F.3d 913, 929 n.17 (2d Cir.

1994). For the same reason, neither Acuff-Rose's refusal of 2 Live Crew's offer to pay nor the breakdown of Google's licensing talks with Sun defeated fair use. *Campbell*, 510 U.S. at 572-73, 585 n.18 ("If the use is otherwise fair, then no permission need be sought or granted."); *Google*, 593 U.S. at 8, 38. Lost licensing revenue thus "counts under Factor Four only when the use serves as a substitute for the original." *HathiTrust*, 755 F.3d at 100.

*Texaco* is not to the contrary. It limited cognizable licensing markets to those that are "traditional, reasonable, or likely to be developed," 60 F.3d at 930, and it involved archival photocopying that served the same purpose as the journal articles themselves, *see id.* at 919-24. The Second Circuit has credited lost licensing revenue only where the use substituted for the original—*Texaco*'s archival photocopies, or a service that made "virtually all" of a broadcaster's programming available to its clients—not where the use served a different purpose. *Compare id.* at 929-31, *and Fox News Network, LLC v. TVEyes, Inc.*, 883 F.3d 169, 174, 180-81 (2d Cir. 2018), *with HathiTrust*, 755 F.3d at 99-100, *and Bill Graham*, 448 F.3d at 614-15. *ROSS* follows the same pattern: the court credited a market for licensing headnotes as AI training data only after concluding that ROSS's use was "minimally transformative, at best" and sought "to make a commercial substitute for Westlaw using Westlaw's work." 2026 WL 2932557, at *6-7.

Nor does the mere existence of licensing deals establish that copyright owners hold an exclusive right to the transformative use of training. Such agreements may secure many things—access to information not otherwise available, such as paywalled archives, real-time feeds, or data in a better format; rights to display content to users; or freedom from litigation. That some developers have paid for those things does not convert every unlicensed act of statistical learning into the usurpation of a protected market. *See Bill Graham*, 448 F.3d at 615 (willingness to pay license fees "does not establish that the publisher may not, in the alternative, make fair use"). The

copies in *Google Books* and *HathiTrust* were also complete and verbatim, yet they caused no cognizable harm because they did not make the works' expression available as a substitute. *Google Books*, 804 F.3d at 224-25; *HathiTrust*, 755 F.3d at 99-100. A verbatim intermediate copy made for a transformative purpose stands on the same footing.

## CONCLUSION

The Court should hold that training a generative AI model on copyrighted works is a fair use.

Dated: October 30, 2026

Respectfully submitted,

WILSON SONSINI GOODRICH & ROSATI
Professional Corporation

/s/ *Eric K. Nikolaides*
Eric K. Nikolaides
Wilson Sonsini Goodrich & Rosati, P.C.
31 West 52nd Street, Fifth Floor
New York, New York 10019-6118
Telephone: (212) 999-5800
Email: enikolaides@wsgr.com

Paul N. Harold (*pro hac vice* pending)
Wilson Sonsini Goodrich & Rosati, P.C.
1700 K Street NW
Washington, DC 20006
Telephone: (202) 973-8800
Email: pharold@wsgr.com

*Counsel for Amici Curiae Computer and Communications Industry Association, NetChoice, LLC, and TechNet*

## CERTIFICATION OF COMPLIANCE

I certify that this brief complies with the Court's order of August 7, 2026, which permits a proposed amicus brief of no more than 6,000 words, ECF No. 1663, and with the formatting requirements of Local Civil Rule 7.1(b). The brief contains 5,995 words.

Dated: October 30, 2026

/s/ *Eric K. Nikolaides*
Eric K. Nikolaides