**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE: OPENAI, INC., COPYRIGHT INFRINGEMENT LITIGATION,<br><br>This Document Relates To:<br><br>Case No. 1:23-cv-11195 | 25-md-3143 (SHS) (OTW)<br><br>Hon. Sidney H. Stein<br>Hon. Ona T. Wang |

# [PROPOSED] BRIEF OF AMICUS CURIAE MICHAEL MORITZ

Dated: October 30, 2026

Justin V. Arborn
Heise Suarez Melville, P.A.
3 International Drive
Suite 205
Rye Brook, New York 10573
(305) 800-4476

*Counsel for Amicus Curiae Michael Moritz*

# TABLE OF CONTENTS

Interest of Amicus Curiae ..... 3

Introduction ..... 4

Argument ..... 5

I. Both Large Language Models and Independent Journalism Are Fundamentally Important to the Future of Our Society ..... 5

A. Large Language Models Have Boundless Potential. ..... 5

B. Independent Journalism Is a Foundational, Bedrock Part of Our Society, and Far Too Important to Lose. ..... 6

C. Large Language Models Depend on the Continued Generation of Quality Independent Investigative Journalism. ..... 8

II. For LLMs and Independent Journalism to Peacefully Coexist, a Workable Licensing Market Must Be Developed. ..... 9

Compliance with Court's Order and Rule 29 Statement ..... 12

Conclusion ..... 12

## INTEREST OF AMICUS CURIAE

Amicus curiae Michael Moritz is a technology investor, philanthropist, author, and former journalist. Over the past forty years, Mr. Moritz has invested in emerging technology companies and supported independent investigative journalism. As such, he is uniquely situated to recognize that the uncompensated appropriation of journalists' works by the companies developing large language models ("LLMs") both threatens the continued existence of investigative journalism and threatens to undermine the growth and sustainability of LLM technologies.

In the late 1970s and early to mid-1980s, Mr. Moritz worked as a correspondent and reporter for Time Magazine, serving as the magazine's San Francisco bureau chief. During these years, Mr. Moritz reported extensively on the emerging technology scene in Northern California, interviewing the founders and executives of foundational companies like Apple, Microsoft, Oracle, and Atari. In 1984, Mr. Moritz published the book *The Little Kingdom: The Private Story of Apple Computer*, an enduring source of historical information about Apple founder Steve Jobs and the rise of the technology industry in Silicon Valley.[1]

Mr. Moritz's wife, Harriet Heyman, also has significant experience as a journalist. Early in her professional career, she worked as a writer, editor, and journalist on staff at the *New York Times* and LIFE magazine and published on a freelance basis for several national magazines. Ms. Heyman has published multiple short- and long-form works, including a fine-art book of essays and photography.

[1] Mr. Moritz also authored *Going for Broke: The Chrysler Story*, a business history book about the near-collapse of the Chrysler Corporation in the late 1970s, published in 1981, and *Ausländer: One Family's Story of Escape and Exile*, a family history and memoir, published in 2026.

Following his years as a journalist, Mr. Moritz went on to be a successful technology investor. For over forty years, Mr. Moritz has played key investment roles and held board positions at prominent technology companies, including Google, Yahoo!, PayPal, LinkedIn, and Stripe. Entities controlled by Mr. Moritz have also invested directly in companies developing LLMs. In 2000, Mr. Moritz and Ms. Heyman founded Crankstart, a San Francisco-based philanthropic foundation that funds education, economic mobility, housing affordability, parks and community spaces, and other community-fortifying causes. Since its creation, Crankstart has distributed over a billion dollars in grants to advance its central mission of encouraging social welfare and protecting civil rights. In furtherance of that mission, Crankstart has and supported independent investigative journalism, including significant funding for the independent, nonprofit investigative reporting outlet ProPublica.[2] In addition to providing financial support and advocacy for journalists, Mr. Moritz and Ms. Heyman helped establish the news organization that has since become *The San Francisco Standard*.[3]

**INTRODUCTION**

Mr. Moritz respectfully submits this statement in support of a workable licensing market between the publishers of independent journalism and the developers of large language models like OpenAI and Microsoft. Large language models offer tremendous potential to advance technology across countless industries. However, that advancement cannot in turn push independent journalism toward the brink of extinction, a disastrous outcome for both the proper functioning of civil society and for the efficacy of the LLMs themselves. Although amicus does

---

[2] *See* ProPublica, "Grant Activity," *available at* https://www.influencewatch.org/non-profit/propublica/#grant-activity (listing sizable donations from the Crankstart Foundation in 2021, 2022, 2023, and 2024).

[3] The Standard Staff, "Jonathan Weber joins Here/Say Media as editor-in-chief" (Aug. 10, 2021), THE SAN FRANCISCO STANDARD, *available at* https://sfstandard.com/2021/08/10/jonathan-weber-joins-here-say-media-as-editor-in-chief.

not take a specific position with respect to the summary judgment briefings filed by the parties, he asks that the court find that LLM developers cannot copy the works of journalists and offer substitutive news without offering any form of compensation.

## ARGUMENT

### I. Both Large Language Models and Independent Journalism Are Fundamentally Important to the Future of Our Society.

As one of the most experienced technology investors in the world, a former journalist, and a longstanding supporter of independent journalism, Mr. Moritz believes that *both* of the following statements are true:

(1) Large language models have the potential to be among the most important tools of our time, potentially revolutionizing scientific research, academic writing, large-scale data analysis, computer programming, and countless other fields; *and*

(2) Independent journalism is a foundational, bedrock component of American society that will be severely threatened if LLMs continue to use news content without compensation.

The development of a reasonable, sustainable licensing regime is necessary for the long-term survival of both LLM technologies and independent journalism.

#### A. Large Language Models Have Boundless Potential.

Mr. Moritz believes that the large language models developed by the defendants in this case have the potential to increase human productivity, accelerate scientific advancements, and revolutionize myriad industries. The potential benefits they offer to advance research, writing,

data analysis, computer programming, and mathematical reasoning are well-documented.[4] For these reasons, Mr. Moritz has consistently invested in the development of these technologies.

### B. Independent Journalism Is a Foundational, Bedrock Part of Our Society, and Far Too Important to Lose.

Journalism provides an essential function in a democratic society, particularly in local communities. Members of communities depend on journalists to attend and report on city council meetings, review budget proposals, and report on the actions taken by politicians and political institutions. Without reliable, high-quality coverage, community members cannot hold their politicians to account.[5] Our nation was founded on the notion that a functioning democracy relies upon a well-educated, well-informed populace,[6] and only through reliable independent journalistic reporting can the people stay abreast of relevant political developments.

Although modern independent journalists have developed many creative ways to earn compensation for their original reporting, the news organizations and institutions that employ

---

[4] *See, e.g.,* Anton Korinek, "Generative AI for Economic Research: Use Cases and Implications for Economists," Journal of Economic Literature, Vol. 61, No. 4, December 2023 (analyzing how economists can effectively enlist LLMs to serve as research assistants and tutors for providing ideation and feedback and assisting with writing, background research, data analysis, coding, and mathematical derivations), https://www.aeaweb.org/articles?id=10.1257/jel.20231736; Erik Brynjolfsson , Danielle Li , Lindsey Raymond, "Generative AI at Work," THE QUARTERLY JOURNAL OF ECONOMICS, Volume 140, Issue 2, May 2025 (Feb. 4, 2025), Pages 889–942, https://doi.org/10.1093/qje/qjae044 (finding that on average, access to an AI assistant increased productivity for workers by 15%).

[5] *See, e.g.*, James M. Snyder, Jr. and David Strömberg, "Press Coverage and Political Accountability," NATIONAL BUREAU OF ECONOMIC RESEARCH, https://www.nber.org/system/files/working_papers/w13878/w13878.pdf (finding correlation between reduced local press coverage of Congressional representatives and both lower voter knowledge and decreased attention paid by representatives to their constituents); *see also* Elisa Shearer et al., "Americans' Changing Relationship With Local News," PEW RESEARCH CENTER, https://www.pewresearch.org/journalism/2024/05/07/americans-changing-relationship-with-local-news (finding approximately 85% of adults consider local news outlets at least somewhat important to the well-being of their communities),.

[6] *See, e.g.,* Thomas Jefferson, Letter to William C. Jarvis (1820) ("I know no safe depositary of the ultimate powers of the society but the people themselves; and if we think them not enlightened enough to exercise their control with a wholesome discretion, the remedy is not to take it from them, but to inform their discretion by education."); James Madison, Letter to W. T. Barry (1822) ("A popular Government without popular information, or the means of acquiring it, is but a Prologue to a Farce or a Tragedy, or perhaps both."); John Adams, "A Dissertation on the Canon and the Feudal Law," (1765) ("Liberty cannot be preserved without general knowledge among the people.").

journalists typically earn revenue from some combination of advertising and circulation (i.e., selling subscriptions and single issues).[7] The proliferation of LLMs providing AI-generated answers to consumers' online queries—even *with* attribution—severely undermines this business model, which relies upon publishers attracting readers to their websites.

Studies consistently show that users who are provided AI-generated answers to online queries typically do not end up visiting the publisher's website.[8] Therefore, the user does not either pay the subscription fee necessary to access the content or does not provide the click/site visit which deprives the publisher of advertising revenue. When users are able to view journalists' works through the AI-generated answer instead of visiting the publisher's site, the publisher's business model is directly undermined. Central to the fair use inquiry at the heart of this case is what *effect* the LLM developers' training of their models on the publishers' original works will have on the market for the publishers' works.[9] By diminishing publishers' website traffic and revenue, the continued uncompensated use of news content by AI companies increases the risk that local news organizations will be forced to cease operations.[10] The loss of local news

---

[7] *See, e.g.,* Michael Barthel, "6 key takeaways about the state of the news media in 2020," PEW RESEARCH CENTER (July 27, 2021), https://www.pewresearch.org/short-reads/2021/07/27/6-key-takeaways-about-the-state-of-the-news-media-in-2020 (examining trends in the two primary sources of revenue for newspapers).

[8] Athena Chapekis and Anna Lieb, "Google users are less likely to click on links when an AI summary appears in the results," PEW RESEARCH CENTER (July 22, 2025), https://www.pewresearch.org/short-reads/2025/07/22/google-users-are-less-likely-to-click-on-links-when-an-ai-summary-appears-in-the-results (finding that Google search users clicked on the direct citation links within AI summaries only 1% of the time, and those users visited the cited publishers' websites approximately half as often when an AI-generated summary was provided alongside the search results).

[9] Market impact is one of the core considerations of the fair use analysis. *See* 17 U.S.C. § 107(4) (requiring courts to consider "the effect of the use upon the potential market for or value of the copyrighted work" in evaluating a fair use defense); *see also Folsom v. Mars*h, 9 F. Cas. 342, 348 (C.C.D. Mass. 1841) (foundational copyright case focusing inquiry on whether the unauthorized copying might prejudice sales, diminish profits, or substitute for the original works); *Harper & Row, Publishers, Inc. v. Nation Enterprises*, 471 U.S. 539, 566–68 (1985) (emphasizing the importance of market harm in evaluating fair use); *Campbell v. Acuff-Rose Music, Inc*., 510 U.S. 569, 590 (1994) (recognizing that harm to markets for derivative works is relevant to the fair use inquiry).

[10] See "News/Media Alliance Study Finds Pervasive Unauthorized Use of Publisher Content to Power Generative AI Technologies (Oct. 31, 2023), NEWS/MEDIA ALLIANCE, https://www.newsmediaalliance.org/release-news-media-alliance-study-finds-pervasive-unauthorized-use-of-publisher-content-to-power-generative-ai-technologies (warning

organizations will result in weakened government accountability, lower civic participation, increased political polarization, and weakened community identity.

Communities also need investigative journalists to provide high-quality reporting. Although LLMs have the capacity to quickly generate and digest vast troves of information, certain important features of original, investigative reporting cannot be replicated by AI-generated writing. For example, studies show original articles contain more creative reporting angles and analytical insights than AI-generated writing, and journalists seek out and evaluate diverse informational sources.[11]

### C. Large Language Models Depend on the Continued Generation of Quality Independent Investigative Journalism.

The survival of independent journalism is also tied to the continued survival of large language models. LLMs require a steady supply of timely, original, and professionally verified information to survive. Those models that can effectively incorporate relevant and up-to-date information retrieved through search engines are substantially more accurate than those relying on older, archival information.[12]

Researchers have found that LLMs cannot be reliably trained on AI-generated content without risking "model collapse" and severely reduced functionality. This phenomenon is further exacerbated by the fact that AI-powered search tools often cannot identify and attribute original

---

that continued unauthorized, uncompensated use of publisher content by generative AI developers threatens the sustainability and availability of high-quality original news content).

[11] Alexander Spangher et al., "Do LLMs Plan Like Human Writers? Comparing Journalist Coverage of Press Releases with LLMs." Proceedings of the Conference on Empirical Methods in Natural Language Processing (Nov. 2024) (finding that in study of approximately 250,000 press releases and 650,000 related news articles, human journalists produced more creative reporting angles and relied on more diverse informational sources than large language models), https://aclanthology.org/2024.emnlp-main.1216.pdf.

[12] Tu Vu et al., "FreshLLMs: Refreshing Large Language Models with Search Engine Augmentation," THE ASSOCIATION FOR COMPUTATIONAL LINGUISTICS (Aug. 2024), https://aclanthology.org/2024.findings-acl.813.pdf.

reporting with precision (i.e., distinguish between human-generated and AI-generated content)[13]. Therefore, continuous, ongoing access to original, human-generated material is essential for training future generations of LLMs.[14] Some studies indicate that LLM developers could exhaust the effective stock of publicly available human-generated training data within the next several years, potentially severely slowing the development of these tools.[15]

## II. For LLMs and Independent Journalism to Peacefully Coexist, a Workable Licensing Market Must Be Developed.

A workable market for licensing original content from journalists is necessary for the continued survival of both the investigative journalism industry and the LLMs themselves. Thankfully, there is both historical precedent for establishing such a market and ample evidence that a licensing market has already started to emerge.

In the late 1990s and early 2000s, online peer-to-peer file sharing applications (e.g., Napster) began providing users with the ability to download music for free, dramatically undercutting the music industry's revenue model. After courts determined that the free music-sharing services were harming copyright holders by reducing sales undermining the copyright holders' ability to earn money from their music,[16] a licensing market emerged to serve both

[13] Klaudia Jaźwińska and Aisvarya Chandrasekar, "AI Search Has a Citation Problem," Columbia Journalism Review (Mar. 6, 2025), https://www.cjr.org/tow_center/we-compared-eight-ai-search-engines-theyre-all-bad-at-citing-news.php.

[14] Ilia Shumailov et al., "AI models collapse when trained on recursively generated data," NATURE (July 24, 2024), https://www.nature.com/articles/s41586-024-07566-y.

[15] Pablo Villalobos et al., "Position: Will we run out of data? Limits of LLM scaling based on human-generated data," Proceedings of Machine Learning Research (2024) (projecting that AI developers could exhaust the effective stock of publicly available human-generated training text between 2026 and 2032), https://openreview.net/pdf?id=ViZcgDQjyG.

[16] *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1016–17 (9th Cir. 2001) (upholding preliminary injunction after finding that Napster's free music-sharing service harmed copyright holders by reducing CD sales, creating barriers to the holders entering the digital music downloads market, and undermining the holders' efforts to charge money for their copyrighted works).

listeners and musicians alike. Starting in 2003, Apple launched the iTunes Music Store, which provided consumers with lawful digital access to music for purchase, thereby creating revenue opportunities for copyright holders.[17]

Large technology companies have already successfully implemented automated systems for identifying copyrighted content and compensating rightsholders for the use of that content. For example, Google's YouTube platform has paid more than $12 billion in advertising revenue to rightsholders through content claimed and monetized using Content ID, YouTube's automated system for identifying copyrighted content in uploaded videos.[18] Spotify has paid more than $70 billion to the music industry, including $11 billion in 2025 alone, with approximately two-thirds of music revenue distributed to rightsholders.[19]

Several major AI companies and news publishers, including some of the parties to this lawsuit, have entered into significant licensing deals already. For example:

- OpenAI and News Corp have a multiyear licensing agreement granting OpenAI access to both current and archived works from News Corp publications including *The Wall Street Journal*, *Barron's*, *MarketWatch*, and *the New York Post*.[20]
- Google and the Associated Press have an agreement wherein Google pays to incorporate the AP's real-time news feed into Google's Gemini AI application.[21]

---

[17] "Apple Launches the iTunes Music Store," APPLE (Apr. 28, 2003), https://www.apple.com/newsroom/2003/04/28Apple-Launches-the-iTunes-Music-Store.

[18] *See* "YouTube Copyright Transparency Report," YOUTUBE, https://transparencyreport.google.com/youtube-copyright/summary.

[19] Charlie Hellman, "From $11B in 2025 Payouts to What We're Building for Artists in 2026," SPOTIFY (Jan. 28, 2026), https://newsroom.spotify.com/2026-01-28/2025-music-industry-payouts-whats-next-for-artists.

[20] "A landmark multi-year global partnership with News Corp," OPENAI (May 22, 2024), https://openai.com/index/news-corp-and-openai-sign-landmark-multi-year-global-partnership.

[21] Jaffer Zaidi, "Working with The Associated Press to provide fresh results for the Gemini app", GOOGLE (Jan. 15, 2025), https://blog.google/products-and-platforms/products/news/associated-press-gemini-app.

- Perplexity AI and Getty Images have a global, multiyear licensing agreement that permits Perplexity to display Getty Images' licensed creative and editorial photographs in its AI-powered search products, along with required improvements to Perplexity's image attribution and source-linking abilities.[22]
- Amazon and the New York Times have a multiyear licensing agreement wherein Amazon can use The Times's journalism and content from NYT Cooking and The Athletic for training Amazon's proprietary models.[23]
- OpenAI and Axios have a partnership that enables OpenAI's ChatGPT product to feature select summaries and excerpts from partner media outlets, with clear citations and direct links to the original sources.[24]

These agreements demonstrate that LLM developers and publishers can enter into collaborative commercial arrangements that preserve the publishers' underlying rights to their content and help both the publishers and developers enrich their products. These deals also indicate that the LLM developers recognize the essential role that human-generated journalistic content plays in the future of LLMs' development. In fact, some developers, including OpenAI, have included in their commercial partnership commitments to supporting local news. The OpenAI-Axios partnership includes millions of dollars of funding to expand Axios's local news coverage into areas including Pittsburgh, Kansas City, Boulder, and Huntsville.[25] OpenAI also

---

[22] "Getty Images and Perplexity strike multi-year image partnership" (Oct. 31, 2025), https://www.globenewswire.com/news-release/2025/10/31/3178264/0/en/getty-images-and-perplexity-strike-multi-year-image-partnership.html.

[23] Jaspreet Singh, "New York Times partners with Amazon for first AI licensing deal," REUTERS (May 29, 2025) https://www.reuters.com/business/retail-consumer/new-york-times-amazon-sign-ai-licensing-deal-2025-05-29.

[24] "Partnering with Axios expands OpenAI's work with the news industry," OPENAI (Jan. 15, 2025), https://openai.com/index/partnering-with-axios-expands-openai-work-with-the-news-industry.

[25] *Id.*

has an active partnership with the American Journalism Project[26] wherein OpenAI provides AI technology development support to nonprofit local newsrooms.

These partnerships demonstrate that LLM developers and local news organizations are already establishing commercial partnerships intended to support both technological innovation and original journalism. The companies developing the LLMs possess the ability to build systems wherein journalists are paid for providing access to their original content, but as the Napster example demonstrates, these arrangements will only develop if the law makes clear that the developers cannot copy the publishers' content without paying.

**COMPLIANCE WITH COURT'S ORDER AND RULE 29 STATEMENT**

This proposed brief contains 2,924 words, fewer than the 6,000 words provided by this Court's Order at Dkt. No. 1663 and includes the certification called for by Local Civil Rule 7.1(c). It further states that no party or party's counsel authored this brief in whole or in part or contributed money that was intended to fund preparing or submitting the brief.[27] No person other than amicus contributed money that was intended to fund preparing or submitting the brief. See Fed. R. App. P. 29(a)(4)(E).

## CONCLUSION

Amicus wishes to see a future in which OpenAI, Microsoft, *the New York Times*, and the thousands of smaller publishers whose work is at stake can coexist and thrive. As the Court weighs the applicability of the fair use doctrine to the case at hand, amicus respectfully asks that the Court

---

[26] "The Product & AI Studio expands with renewed OpenAI support," THE AMERICAN JOURNALISM PROJECT (July 21, 2026) https://theajp.org/the-product-ai-studio-expands-with-renewed-openai-support.

[27] Mr. Arborn's colleague Nicholas Standish, who authored this brief in part, formerly served as counsel for The New York Times from July 2024 through April 2025 as part of a secondment in connection with his then-employment at Wilmer Cutler Pickering Hale and Dorr LLP. Mr. Standish does not currently serve as counsel for The Times.

consider what will happen to independent journalism and to the communities that are served by independent journalism if developers are permitted to treat journalists' content as free.

Dated: October 30, 2026

By: /s/_Justin V. Arborn
Justin V. Arborn
Heise Suarez Melville, P.A.
3 International Drive
Suite 205
Rye Brook, New York 10573
jarborn@hsmpa.com
(305) 800-4476

*Counsel for [Proposed] Amicus Curiae Michael Moritz*