# Exhibit A

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

IN RE:

OPENAI, INC.,

COPYRIGHT INFRINGEMENT LITIGATION

This Document Relates To:

1:23-cv-11195-SHS-OTW
1:24-cv-01515-SHS-OTW
1:24-cv-03285-SHS-OTW
1:24-cv-04872-SHS-OTW
1:25-cv-04315-SHS-OTW

Case No. 25-md-3143 (SHS) (OTW)

**[PROPOSED] BRIEF OF *AMICUS CURIAE* AMERICA'S NEWSPAPERS IN SUPPORT OF NEWS PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AND IN OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Civil Procedure 7.1, *amicus curiae* America's Newspapers makes the following corporate disclosure:

America's Newspapers is a nonprofit organization incorporated under the laws of the District of Columbia with its principal place of business in Tallahassee, Florida. It does not have any parent corporations, nor does it issue stock, and thus there is no publicly held corporation that owns 10% or more of its stock.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT .......... i

TABLE OF AUTHORITIES .......... iii

INTEREST OF *AMICUS CURIAE* .......... 1

INTRODUCTION .......... 2

ARGUMENT .......... 4

I. LOCAL NEWS IS AMONG THE MOST TRUSTED SOURCES OF NEWS IN AMERICA, BUT IT IS FIGHTING FOR SURVIVAL. .......... 4

A. Local Journalism Is Both Trusted and Essential. .......... 4

B. The Local News Industry Was Already Fragile When Defendants' Products Were Introduced. .......... 6

II. DEFENDANTS' PRODUCTS ARE BUILT ON LOCAL JOURNALISM AND ARE DESIGNED TO SUBSTITUTE FOR IT. .......... 7

A. Local Reporting Is Woven into Defendants' Models. .......... 7

B. Defendants Know Their Products Substitute for the Journalism They Copied. .......... 8

C. For Local Publishers, This Substitution Is Especially Severe and Extremely Damaging. .......... 10

III. IF DEFENDANTS' PRODUCTS ARE PERMITTED TO DRIVE LOCAL NEWS OUT OF EXISTENCE, COMMUNITIES ACROSS THE COUNTRY WILL PAY THE PRICE. .......... 12

A. Government Grows Costlier and Less Accountable When No One Is Watching. .......... 13

B. Communities Become Less Safe When There Is Less Local News Coverage. .......... 14

C. The Decline of Local News Weakens Democracy. .......... 16

CONCLUSION .......... 18

# TABLE OF AUTHORITIES

**Cases**

*Am. Geophysical Union v. Texaco Inc.*,
60 F.3d 913 (2d Cir. 1994), *cert. dismissed*, 516 U.S. 1005 (1995) ....................................12

*Campbell v. Acuff-Rose Music, Inc.*,
510 U.S. 569 (1994)................................................................................................................12

*Google LLC v. Oracle Am., Inc.*,
593 U.S. 1 (2021)....................................................................................................................17

*Harper & Row, Publishers, Inc. v. Nation Enters.*,
471 U.S. 539 (1985)................................................................................................................12

**Statutes**

17 U.S.C. § 1202(b) ..................................................................................................................3

**Other Authorities**

Penelope Muse Abernathy, *Saving Community Journalism: The Path Ahead*, Medill
Local News Initiative (Jan. 18, 2024)..............................................................................6, 11

Matthew Baker & Dermot Murphy, *Local News Shortage Leads to $1.1 Billion in Extra Borrowing Costs for Local Governments and Taxpayers*, Rebuild Local News
(June 10, 2026)........................................................................................................................14

Filipe R. Campante & Quoc-Anh Do, *Isolated Capital Cities, Accountability, and Corruption: Evidence from US States*, 104 Am. Econ. Rev. 2456 (2014) ...........................13

Michelle Chapman, *OpenAI to Start Using News Content from News Corp. as Part of a Multiyear Deal*, Associated Press (May 23, 2024) ..........................................................11

Joshua P. Darr, Matthew P. Hitt & Johanna L. Dunaway, *Newspaper Closures Polarize Voting Behavior*, 68 J. Commc'n 1007 (2018) ..........................................................17

Kirsten Eddy & Elisa Shearer, *How Americans' Trust in Information from News Organizations and Social Media Sites Has Changed over Time*, Pew Rsch. Ctr.
(Oct. 29, 2025) ....................................................................................................................4, 5

Tim Frank, *Building Toward a Sustainable Content Economy for the Agentic Web*,
Microsoft Advert. Blog (Feb. 3, 2026) .....................................................................................11

Pengjie Gao, Chang Lee & Dermot Murphy, *Financing Dies in Darkness? The Impact of Newspaper Closures on Public Finance*, 135 J. Fin. Econ. 445 (2020)...........................13, 14

Tess Haddock, K. Aleks Schaefer, Brian E. Whitacre & Trey Malone, *Local News Deserts and Community Social Capital Erosion*, 66 J. Reg'l Sci. 626 (2026).............5, 15, 17

Danny Hayes & Jennifer L. Lawless, *The Decline of Local News and Its Effects: New Evidence from Longitudinal Data*, 80 J. Pol. 332 (2018) ....................................................16

Jianing Li & Michael W. Wagner, *Partisanship in Context: The (A)symmetric Influence of Local Newspaper Availability and Selective Exposure on Political Misperceptions in the U.S.*, Commc'n Rsch. (June 29, 2026)....................17

Nicola Mastrorocco & Arianna Ornaghi, *Who Watches the Watchmen? Local News and Police Behavior in the United States*, 17 Am. Econ. J.: Econ. Pol'y 285 (2025)....................15

Zach Metzger & John Volk, Medill Local News Initiative, Northwestern Univ., *The State of Local News: The 2026 Report* (Oct. 13, 2026)....................5, 6, 11

Rachel Moran, *News Deserts Leave Voters Vulnerable to Election Misinformation*, Brennan Ctr. for Just. (June 17, 2026)....................16

Carol Peters, *Loss of Local Newspapers Drives Americans Toward Partisan News, Rutgers Study Finds*, Rutgers Sch. of Commc'n & Info. (Sept. 24, 2026)....................17

Courtney C. Radsch, *Same Gatekeepers, New Tollbooths in the AI Content Licensing Market*, Brookings Inst. (June 9, 2026)....................11

Dean Ridings, *Why Local Newspapers Are Most Trusted Source*, Yamhill County's News-Register (Nov. 8, 2024)....................4, 5

Meghan E. Rubado & Jay T. Jennings, *Political Consequences of the Endangered Local Watchdog: Newspaper Decline and Mayoral Elections in the United States*, 56 Urb. Aff. Rev. 1327 (2020)....................16

Sam Schulhofer-Wohl & Miguel Garrido, *Do Newspapers Matter? Short-Run and Long-Run Evidence from the Closure of The Cincinnati Post*, 26 J. Media Econ. 60 (2013)....................16

Elisa Shearer et al., *Americans' Changing Relationship with Local News*, Pew Rsch. Ctr. (May 7, 2024)....................4, 6

Qiaoni Shi, Kai Zhu & Kai Gu, *Answering Without Referring: How AI Search Rewrites the Web's Economic Bargain* (July 8, 2026)....................10

James M. Snyder, Jr. & David Strömberg, *Press Coverage and Political Accountability*, 118 J. Pol. Econ. 355 (2010)....................13

Rob Waugh, *AI Answer Engines Bypass Local News Outlets, Going Straight to Official Sources*, Press Gazette (Oct. 22, 2026)....................11

Kai-Cheng Yang, *News Source Citing Patterns in AI Search Systems* (July 7, 2025)....................10

## INTEREST OF *AMICUS CURIAE*[1]

*Amicus curiae* America's Newspapers is a nonprofit trade association of more than 1,500 local news publishers and related companies across the United States. It advocates for the interests of local news publishers, provides a forum for discussing best practices and challenges facing the industry, and offers educational opportunities on innovations and trends in local journalism. America's Newspapers' members range from regional dailies to family-owned community weeklies. Many have served the same towns and counties for generations, and their reporters keep their communities informed about the issues that most directly affect residents' daily lives.

America's Newspapers has a direct and substantial interest in the Court's determination of whether copying online news content to build and run generative artificial intelligence ("AI") products is fair use under copyright law. Virtually all of America's Newspapers' members publish their articles online, and their content is often protected by paywalls in addition to copyright notices and terms of use that prohibit copying for commercial purposes. Many of its members' reporting is among the vast body of online news content that Defendants copied without authorization to train and operate their AI technology. Moreover, members have experienced significant declines in website traffic and revenue as AI products, including Defendants', use their content to answer readers' questions directly without sending readers to members' websites.

This Court's resolution of the fair use question presently before it will have an industry-wide impact on the market for news. Yet the national publishers before the Court represent only one segment of that industry. America's Newspapers represents another: thousands of local and independent publishers whose economic models, bargaining power, and ability to absorb lost audience differ dramatically from those of the largest national publishers. America's Newspapers

[1] No person or entity other than *amicus curiae* America's Newspapers and its counsel assisted in or made a monetary contribution to the preparation or submission of this brief.

submits this brief to explain what is at stake for local journalism and for the communities that depend on it.

## INTRODUCTION

Local news publishers are the lifeblood of their communities. They send reporters to city council meetings and school board hearings. They investigate corruption and hold local officials accountable. They cover the latest high school football game, the new restaurant opening downtown, and the storm bearing down on the coast. They publish voter guides and public health notices. They tell the everyday stories of local civic life that national outlets do not routinely cover, and millions of Americans trust and rely upon them every day.

But local news now faces an existential threat at the hands of AI companies that have built some of the most valuable businesses in history using the creative work of local journalists without permission or payment. Defendants OpenAI and Microsoft have systematically crawled news publishers' websites, using automated programs to visit page after page and copy what they find onto their own servers. In the process, they stripped away the bylines, mastheads, copyright notices, and terms of use that identify who created the work and who owns it. They then used that content to build products designed to give readers the news without necessarily directing them to—or even crediting—the publishers that reported it.

The record before the Court shows that OpenAI and Microsoft knew exactly what they were doing. They were fully aware that they were copying protected news content without permission. Microsoft's own Director of Applied Science predicted that large-model training would be viewed by the public as "an astonishing theft of unprecedented proportions," acknowledging that "almost no one intended for content they created to be used in this fashion,

nor are they compensated for its use."[2] Defendants also knew that the products they were building would supplant the publishers whose work they took. OpenAI's head of ChatGPT acknowledged that "[o]ur products are largely substitutive, period," and called publishers' predicament an "existential threat."[3] Microsoft's CEO testified that chatbot conversations have "substituted" for visits to publishers' sites,[4] and internal Microsoft documents warned that its AI strategy "has started a 'doom loop,'" concluding that AI models like those Defendants developed are "a product that destroys its supply chain," including the local reporting on which it is built.[5] National publishers are poised to weather this substitution. Local publishers will not survive it.

The Copyright Act and the Digital Millennium Copyright Act exist precisely to protect against these abuses. No commercial enterprise may copy protected works wholesale and exploit them in a manner that destroys the market for the originals. Nor is it permitted to strip those works of the copyright management information that identifies their authors and owners, knowing that doing so will "induce, enable, facilitate, or conceal" infringement.[6] If such conduct is blessed as fair use, it will deal a devastating blow to an already struggling local news industry and do significant harm to the communities that depend on it.

## ARGUMENT

### I. LOCAL NEWS IS AMONG THE MOST TRUSTED SOURCES OF NEWS IN AMERICA, BUT IT IS FIGHTING FOR SURVIVAL.

#### A. Local Journalism Is Both Trusted and Essential.

Local news publishers occupy an important role in American civic life. Unlike national outlets, they routinely cover school board meetings, municipal elections, zoning disputes, local

---

[2] News Pls.' Combined Summ. J. Br. at 11, ECF No. 1977-1 (citing SF ¶ 1437).
[3] *Id.* at 1-2, 53, 66-67 (citing SF ¶¶ 1432, 1466, 1473, 1510).
[4] *Id.* at 2, 53 (citing SF ¶¶ 1432, 1510).
[5] *Id.* at 69 (citing SF ¶ 1461).
[6] *See* 17 U.S.C. § 1202(b).

court proceedings, and other issues that directly shape people's daily lives. Readers rely on them because they show up, they are accessible to their neighbors, and they are members of the communities they cover.

Their on-the-ground presence has earned local publishers a high level of public trust. A 2024 national study commissioned by America's Newspapers found that more than half of Americans name local newspapers as their most reliable news sources, "citing the transparency, ethical standards and community focus that are unique to local journalism."[7] In September 2025, 70% of American adults reported having at least some trust in information from local news organizations, compared with 56% for national news organizations.[8] Eighty-five percent of Americans say local news outlets are important to the well-being of their community, and 71% say local journalists do a good job reporting the news accurately.[9] Readers also see local news as a check on those in power: 61% say local outlets do a good job keeping an eye on local political leaders, and 69% say local journalists are in touch with their communities.[10] Remarkably, that trust extends across party lines—a rarity in today's fractured media environment. Democrats and Republicans alike trust local news more than national news: 78% of Democrats and 64% of Republicans trust local news, compared with 69% and 44%, respectively, for national news.[11] In an era of extreme political polarization, local journalism remains the news source that people across the political spectrum trust most.

---

[7] Dean Ridings, *Why Local Newspapers Are Most Trusted Source*, Yamhill County's News-Register (Nov. 8, 2024), https://newsregister.com/article?articleId=50405.
[8] Kirsten Eddy & Elisa Shearer, *How Americans' Trust in Information from News Organizations and Social Media Sites Has Changed over Time*, Pew Rsch. Ctr. (Oct. 29, 2025), https://www.pewresearch.org/short-reads/2025/10/29/how-americans-trust-in-information-from-news-organizations-and-social-media-sites-has-changed-over-time/.
[9] Elisa Shearer et al., *Americans' Changing Relationship with Local News*, Pew Rsch. Ctr. (May 7, 2024), https://www.pewresearch.org/journalism/2024/05/07/americans-changing-relationship-with-local-news/.
[10] *Id.*
[11] Eddy & Shearer, *supra* n. 8.

But more than being a trusted news source, local journalism is often a community's *only* news source. National outlets do not send reporters to county commission meetings or comb through small town budgets, nor do they have the sources, institutional memory, or sustained presence necessary to identify what is newsworthy in a particular locality, let alone report on it. In more than 1,400 counties across the United States, a single outlet—often a weekly newspaper—is all that remains.[12] When a locality's last outlet disappears, stories covering local events that matter to the community go untold. Coverage of a town's Fourth of July parade, a local team's championship run, or a longtime neighbor's retirement are the types of stories that give residents a shared identity and "foster[] social cohesion."[13] And as discussed in Section III, *infra*, local news provides residents with information that is critical to a functioning democracy, including what their local government is doing, how their tax dollars are spent, and what the candidates on their ballot stand for. Americans recognize just how vital this makes local news: 85% believe local newspapers are "essential to sustaining democracy," and 74% "worry that losing their local paper would significantly hurt their community."[14]

### B. The Local News Industry Was Already Fragile When Defendants' Products Were Introduced.

When OpenAI made ChatGPT available to the public in 2022, the local news industry was already economically fragile. Since 2005, the United States has lost roughly 3,400 newspapers—almost 40% of all publications nationwide.[15] In the most recent year studied, 170 newspapers closed or merged, an average of about three per week.[16] Today, some 47 million Americans live

[12] Zach Metzger & John Volk, Medill Local News Initiative, Northwestern Univ., *The State of Local News: The 2026 Report* (Oct. 13, 2026), https://localnewsinitiative.northwestern.edu/projects/state-of-local-news/2026/report/.
[13] Tess Haddock, K. Aleks Schaefer, Brian E. Whitacre & Trey Malone, *Local News Deserts and Community Social Capital Erosion*, 66 J. Reg'l Sci. 626, 626 (2026).
[14] Ridings, *supra* n. 7.
[15] Metzger & Volk, *supra* n. 12.
[16] *Id.*

with limited or no access to reliable local news, and more than 75% of newspaper jobs have disappeared since 2005.[17]

Over the past two decades, the local publishers that have survived did so by retooling their businesses to focus on digital readership, sustaining their operations primarily through advertising and subscription sales, both of which depend on readers visiting a publisher's website. Unlike large national outlets with diversified revenue streams and global audiences, most local publishers have "slim profit margins in the single digits" and no cushion with which to absorb further losses.[18] And because only 15% of Americans report paying for local news in the past year—a figure essentially unchanged since 2018—the advertising revenue generated by each visit to a publisher's website is critical to local publishers' ability to keep their newsrooms open.[19] That business model leaves local publishers acutely vulnerable to any disruption that diverts readers from their websites, which is what Defendants specifically built their products to do.

## II. DEFENDANTS' PRODUCTS ARE BUILT ON LOCAL JOURNALISM AND ARE DESIGNED TO SUBSTITUTE FOR IT.

The threat posed by Defendants' products is existential for publishers of local news. The large language models that power ChatGPT and Copilot are built on the works of local publishers, and the products eliminate the need for readers to visit a publisher's website to access its reporting.

### A. Local Reporting Is Woven into Defendants' Models.

The News Plaintiffs have presented voluminous evidence showing that Defendants systematically crawled their websites and copied their content to build their AI models. And yet, the summary judgment record captures only a portion of Defendants' conduct. In addition to the

[17] *Id.*
[18] Penelope Muse Abernathy, *Saving Community Journalism: The Path Ahead*, Medill Local News Initiative (Jan. 18, 2024), https://localnewsinitiative.northwestern.edu/posts/2024/01/18/saving-community-journalism-abernathy/index.html.
[19] Shearer et al., *supra* n. 9.

News Plaintiffs' content, Defendants are also alleged to have copied an extraordinary amount of local news content to power their products. Since the News Plaintiffs filed their respective complaints, *dozens* of local publishers have come forward to file suit against Defendants, alleging that they suffered similar harm.

In June 2026, for example, a coalition of local and regional news publishers led by Richner Communications Inc. brought their own claims against Defendants in this District, with a second cohort of local, regional, and specialty publishers following suit in September 2026 (collectively, the "Local Publisher Plaintiffs").[20] Together, the Local Publisher Plaintiffs operate more than 550 news outlets across more than 30 states. Most are independently owned, and many are family-owned small businesses. They range from community weeklies with a handful of employees to regional groups with newspapers in multiple states, and many have served their communities for more than a century. The Local Publisher Plaintiffs, like the News Plaintiffs, allege that Defendants copied hundreds of thousands of their articles.[21] Moreover, the Local Publisher Plaintiffs allege their websites collectively account for more than 150 million tokens of text in the C4 dataset, a publicly available proxy for one of the datasets Defendants used to train OpenAI's GPT-3 model.[22]

According to the Local Publisher Plaintiffs, Defendants copied their local reporting the same way they copied the News Plaintiffs'. Defendants allegedly built massive training datasets by scraping the internet and curating text from high-quality sources including the Local Publisher Plaintiffs' news sites.[23] The Local Publisher Plaintiffs similarly allege that Defendants put their

[20] Compl., *Richner Commc'ns, Inc. et al. v. Microsoft Corp. et al.*, No. 1:26-cv-05320 (S.D.N.Y. filed June 24, 2026) (hereinafter "*Richner* Compl."), ECF No. 1; First Am. Compl., *Times Publ'g Co. et al. v. Microsoft Corp. et al.*, No. 1:26-cv-08082 (S.D.N.Y. filed September 16, 2026) (hereinafter "*Times Publ'g Co.* Compl."), ECF No. 10.
[21] *Richner* Compl. ¶¶ 1, 130, 134; *Times Publ'g Co.* Compl. ¶¶ 1, 113, 117.
[22] *Richner* Compl. ¶¶ 128-131; *Times Publ'g Co.* Compl. ¶¶ 111-114.
[23] *Richner* Compl. ¶¶ 119-120; *Times Publ'g Co.* Compl. ¶¶ 102-103.

copyrighted content through an ingestion process that stripped bylines, publication names, copyright notices, and terms of use from the works it copied.[24] And Defendants' retrieval tools are also alleged to have crawled the Local Publisher Plaintiffs' websites in real time to deliver their current reporting directly to users.[25] Defendants' copying thus did not distinguish between a national daily and a community weekly. The crawlers that swept up *The New York Times*'s content allegedly swept up the reporting of local outlets like the *Long Island Herald*, the *Tampa Bay Times*, and the *Arkansas Democrat-Gazette* just the same. And while the Local Publisher Plaintiffs collectively own and operate hundreds of papers, filings from across the cases in this multi-district litigation would suggest OpenAI and Microsoft's conduct impacted *thousands* of local outlets.

**B. Defendants Know Their Products Substitute for the Journalism They Copied.**

Defendants knowingly built their products to replace the sources they copied. In the words of Microsoft's counsel, an AI chatbot such as ChatGPT or Copilot is "designed to answer your question," rather than "just giving you a series of links to things you can go look for yourself."[26] And the summary judgment record shows that Defendants understood exactly what impact such a design would have on news publishers.

OpenAI's head of ChatGPT wrote that "[o]ur products are largely substitutive, period," and described publishers' predicament as an "existential threat."[27] Microsoft's CEO testified that chatbot conversations have "substituted" for visits to publishers' sites.[28] Internal Microsoft documents went further, warning that its AI content strategy "has started a 'doom loop'" and that "LLMs are a product that destroys its supply chain."[29] In the news context, this means that by

[24] *Richner* Compl. ¶¶ 2, 166, 175; *Times Publ'g Co.* Compl. ¶¶ 2, 149, 158.
[25] *Richner* Compl. ¶¶ 124, 143; *Times Publ'g Co.* Compl. ¶¶ 107, 126.
[26] News Pls.' Combined Summ. J. Br. at 2 (citing SF ¶¶ 1511-13).
[27] *Id.* at 1-2, 53, 66-67 (citing SF ¶¶ 1432, 1466, 1473, 1510).
[28] *Id.* at 2, 53 (citing SF ¶¶ 1432, 1510).
[29] *Id.* at 69 (citing SF ¶ 1461).

using news publishers' content to build and run their products, Defendants are undermining the economics that make that journalism possible in the first place.

That threat to publishers' economic viability stems from the fact that when Defendants' products provide readers with answers using news content on which the products were trained, they generally do not send readers to the original reporting or provide proper attribution. Even when the products include links to the content on which their answers are based, readers rarely follow them. Indeed, one OpenAI engineer observed that "[n]o matter how prominently we show the links, users won't click."[30] Defendants' internal data bear this out. According to Microsoft's metrics, when users receive answers from Copilot instead of traditional Bing search, click-throughs to news websites plummet, dropping by more than 90% for some publishers.[31] Independent data show the same pattern across the industry. One recent study of U.S. household browsing data found that ChatGPT users clicked through to an outside website in just 5.2% of conversations, compared with 31.1% of Google searches, and that nearly three-quarters of households using ChatGPT never clicked through to a source at all.[32] And every ChatGPT or Copilot answer that keeps a reader from a publisher's original reporting is a website visit—and a source of revenue—the publisher never receives.

Defendants' products also substitute for publishers' reporting by retrieving and summarizing their news content in real time. OpenAI markets ChatGPT search as a source for "up-to-date sports scores, news, stock quotes, and more," and internal OpenAI documents describe ChatGPT as "[t]he modern newsstand."[33] Through a technique known as retrieval-augmented

[30] *Id.* at 67 (citing SF ¶ 1475).
[31] *Id.* at 68 (citing SF ¶ 1536).
[32] Qiaoni Shi, Kai Zhu & Kai Gu, *Answering Without Referring: How AI Search Rewrites the Web's Economic Bargain*, 8-11 (July 8, 2026), https://arxiv.org/abs/2607.07652.
[33] News Pls.' Combined Summ. J. Br. at 53 (citing SF ¶¶ 1500, 1526).

generation, Defendants' chatbots search the web to identify a response to a user's question and fold the content they retrieve—often verbatim or closely paraphrased—directly into their answers. So, when a user asks a chatbot for the morning's news, Defendants' products can retrieve a publisher's story, published just hours earlier, and deliver its substance to the reader in a conversational answer, repackaging the publisher's most valuable and most current work while preventing any benefit from flowing back to the publisher. Simply put, Defendants designed their "modern newsstand" to be stocked with the reporting of publishers they never paid.

### C. For Local Publishers, This Substitution Is Especially Severe and Extremely Damaging.

Local publishers experience Defendants' substitution differently from their national counterparts, and the consequences they face are far more severe. Whatever traffic AI chatbots do send to news sites flows overwhelmingly to a handful of large national and wire outlets. One analysis of AI search results found that just 20 outlets accounted for roughly two-thirds of the news citations produced by OpenAI's models, led by Reuters and the Associated Press.[34] Even when users ask about local issues, where local publishers' reporting should be most valuable, chatbots largely bypass them. In a recent study of questions about local issues, ChatGPT drew on local news sources for fewer than 1% of answers, relying instead on government websites.[35] The toll this has taken on local publishers' traffic is already apparent. Visits to the websites of 100 of the nation's largest local newspapers fell by nearly 50% over the last four years, a decline the State of Local News Project has attributed in part to the shift toward AI-driven "answer machine[s]."[36]

[34] Kai-Cheng Yang, *News Source Citing Patterns in AI Search Systems*, 5 (July 7, 2025), https://arxiv.org/pdf/2507.05301.
[35] Rob Waugh, *AI Answer Engines Bypass Local News Outlets, Going Straight to Official Sources*, Press Gazette (Oct. 22, 2026), https://pressgazette.co.uk/news/ai-answer-engines-bypass-local-news-outlets-going-straight-to-official-sources/.
[36] Metzger & Volk, *supra* n. 12.

And local publishers, most of which operate on "slim profit margins in the single digits," have the least capacity to absorb those losses.[37]

Meanwhile, local publishers are unable to participate effectively in the one market that could help them offset these losses. AI companies, Defendants among them, have begun to strike licensing deals with large media companies for access to and use of their news content. OpenAI has signed agreements with News Corp, the Associated Press, and Axel Springer, among others,[38] and Microsoft has developed an AI content-licensing marketplace in partnership with national publishers including the Associated Press, Condé Nast, and Vox Media.[39] Those deals represent a burgeoning market for licensing news content to AI developers that publishers have been—and will likely continue to be—largely unable to break into. As a recent Brookings analysis concluded, local newspapers are "effectively absent from the AI licensing market entirely," and the bilateral deals that dominate it are "structurally inaccessible to the vast majority of publishers . . . at the local level."[40] Unlike national publishers, local and regional publishers lack the leverage to negotiate licensing deals with leading AI companies and the resources to monitor or control how AI products use their work. If the wholesale copying at issue here is fair use, local publishers will be left in an impossible position: unable to stop AI companies from using their work and unable to demand payment when they do.

---

[37] Abernathy, *supra* n. 18.

[38] Michelle Chapman, *OpenAI to Start Using News Content from News Corp. as Part of a Multiyear Deal*, Associated Press (May 23, 2024), https://apnews.com/article/openai-news-corp-a49144d381796df5729c746f52fbef19.

[39] Tim Frank, *Building Toward a Sustainable Content Economy for the Agentic Web*, Microsoft Advert. Blog (Feb. 3, 2026), https://about.ads.microsoft.com/en/blog/post/february-2026/building-toward-a-sustainable-content-economy-for-the-agentic-web.

[40] Courtney C. Radsch, *Same Gatekeepers, New Tollbooths in the AI Content Licensing Market*, Brookings Inst. (June 9, 2026), https://www.brookings.edu/articles/same-gatekeepers-new-tollbooths-in-the-ai-content-licensing-market/.

If Defendants may simply take local news without paying for it, local publishers will keep losing the readers and revenue they depend on while remaining locked out of the nascent licensing market that could help sustain them. These harms go to the heart of this Court's fair use inquiry. The fourth factor—"undoubtedly the single most important element of fair use," *Harper & Row, Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 566 (1985)—asks whether "unrestricted and widespread conduct of the sort engaged in by the defendant . . . would result in a substantially adverse impact on the potential market" for the original, *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 590 (1994) (internal quotation marks omitted), or on licensing markets that are "traditional, reasonable, or likely to be developed," *Am. Geophysical Union v. Texaco Inc.*, 60 F.3d 913, 930 (2d Cir. 1994), *cert. dismissed*, 516 U.S. 1005 (1995). Defendants' conduct negatively impacts both markets, as they divert readers from local publishers' original reporting and take for free what they pay larger publishers to license.

## III. IF DEFENDANTS' PRODUCTS ARE PERMITTED TO DRIVE LOCAL NEWS OUT OF EXISTENCE, COMMUNITIES ACROSS THE COUNTRY WILL PAY THE PRICE.

If Defendants' products continue to drain local publishers of their readers and revenue, the consequences will reach far beyond publishers. A growing body of research shows that when local news disappears, government grows more expensive and less accountable, neighborhoods become less safe, and citizens disengage from civic life and become more politically polarized.

### A. Government Grows Costlier and Less Accountable When No One Is Watching.

In many communities, a local reporter is the only person in the room at a city council meeting who does not work for the government. Research shows that when that seat goes empty, government becomes less accountable to the public and more expensive for taxpayers.

Take Bell, California, for example, a two-and-a-half-square-mile city in Los Angeles County that is home to roughly 30,000 residents. After the city's local weekly newspaper shut down in the late 1990s, Bell had "no local media of any sort," and the major Los Angeles outlets rarely covered it.[41] Over the following years, the city manager's salary climbed from $72,000 to $787,637 a year, and the police chief came to earn roughly 50% more than the chief of the Los Angeles Police Department. When *Los Angeles Times* reporters finally exposed the salaries in 2010, prosecutors charged eight city officials with stealing $5.5 million in public funds.

Public officials behave differently when there is no local press watching. A study published in the *Journal of Political Economy* found that where newspapers provided less coverage of local members of Congress, voters knew less about their representatives, those representatives worked less actively on their constituents' behalf, and their districts received less federal funding.[42] Research published in the *American Economic Review* likewise found that state governments subject to less newspaper scrutiny experience greater corruption and worse delivery of public services.[43]

The loss of media scrutiny also carries a significant price tag for local communities. In a peer-reviewed study published in the *Journal of Financial Economics*, economists at the University of Notre Dame and the University of Illinois Chicago examined newspaper closures across the country from 1996 to 2015.[44] They found that after a local newspaper closed, the community's municipal borrowing costs rose by 5 to 11 basis points, costing the average municipality roughly $650,000 per bond issue. The increases were largest for revenue bonds,

[41] Pengjie Gao, Chang Lee & Dermot Murphy, *Financing Dies in Darkness? The Impact of Newspaper Closures on Public Finance*, 135 J. Fin. Econ. 445, 449 (2020).
[42] James M. Snyder, Jr. & David Strömberg, *Press Coverage and Political Accountability*, 118 J. Pol. Econ. 355, 355 (2010).
[43] Filipe R. Campante & Quoc-Anh Do, *Isolated Capital Cities, Accountability, and Corruption: Evidence from US States*, 104 Am. Econ. Rev. 2456, 2456 (2014).
[44] Gao et al., *supra* n. 41.

which finance projects like schools and hospitals. The researchers concluded that the effect was "causal and not driven by underlying economic conditions." They attributed the increase to the loss of "government monitoring" that follows a closure, concluding that "local newspapers hold their governments accountable, keeping municipal borrowing costs low and ultimately saving local taxpayers money." Extrapolating from that research, one recent analysis estimates that the loss of local news now costs local governments and taxpayers roughly $1.1 billion a year in added borrowing costs alone.[45] The *Journal of Financial Economics* study also found that newspaper closures were associated with less efficient government. After a newspaper closure, the share of county wages going to government employees rose by 1.3 percentage points, an increase of about $1.4 million for the median county. Counties added about four government employees per 1,000 residents, collected about $85 more per resident in taxes, and ran deficits that were about $53 per resident larger.[46]

### B. Communities Become Less Safe When There Is Less Local News Coverage.

Research also shows that by reporting on crime, local news helps prevent it. A 2026 study in the *Journal of Regional Science* examined U.S. counties from 1990 to 2016 and found that losing a local newspaper was associated with a roughly 4% increase in property crimes such as burglary and a more than 7% increase in "victimless" crimes such as drunk driving and illegal drug sales.[47] The researchers explained that local newspapers "often serve as a deterrent by fostering community awareness of these offenses," and that "their absence appears to create a vacuum in

---

[45] Matthew Baker & Dermot Murphy, *Local News Shortage Leads to $1.1 Billion in Extra Borrowing Costs for Local Governments and Taxpayers*, Rebuild Local News (June 10, 2026), https://www.rebuildlocalnews.org/local-news-shortage-leads-to-1-1-billion-in-extra-borrowing-costs-for-local-governments-and-taxpayers/.
[46] Gao et al., *supra* n. 41.
[47] Haddock et al., *supra* n. 13.

local accountability." And such effects grew stronger in the years following a closure, indicating that the loss of community vigilance "endures and grows for a number of years."[48]

Part of the reason for this dynamic is that the loss of local news coverage changes how law enforcement responds to crime. A study published in the *American Economic Journal: Economic Policy* examined local television stations that cut back on local crime reporting after being acquired by a national broadcast group.[49] The study found that, in the affected communities, police solved a smaller share of violent crimes, attributing the decline to reduced public attention to crime.

**C. The Decline of Local News Weakens Democracy.**

Research also shows that a decline in local news is a threat to democracy in several measurable ways. *First*, citizens lose access to the information they need to participate in self-government. In one study published in the *Journal of Politics* that tracked the same voters over time, researchers found that as local newspapers published less—and less substantive—coverage of congressional races, the voters who relied on those papers became less informed about the candidates and less likely to participate in the election.[50] The researchers described their study as "the first longitudinal evidence that declining local political news coverage is reducing citizen engagement." And in the absence of local news, citizens turn to non-journalistic sources such as social media groups, influencers, and friends and family to get their news. The Brennan Center

---

[48] *Id.* §§ 5.1, 5.4.

[49] Nicola Mastrorocco & Arianna Ornaghi, *Who Watches the Watchmen? Local News and Police Behavior in the United States*, 17 Am. Econ. J.: Econ. Pol'y 285, 287 (2025).

[50] Danny Hayes & Jennifer L. Lawless, *The Decline of Local News and Its Effects: New Evidence from Longitudinal Data*, 80 J. Pol. 332 (2018).

for Justice has warned that these and other alternatives are "less reliable sources" and "impact[] voters' access to information about election issues."[51]

*Second*, fewer people run for local office and those in office face less competition. For example, when the *Cincinnati Post* closed in 2007, the Kentucky suburbs that relied most heavily on it were left without their primary source of local news. The next year, fewer candidates ran for municipal office in those communities, incumbents became more likely to win reelection, and voter turnout fell.[52] A study of 246 mayoral elections in California cities reached a similar conclusion: where local newspapers cut their newsroom staff, fewer candidates ran for mayor, incumbents were more likely to run unopposed, and winners prevailed by wider margins.[53] Without a local paper to report on their campaigns, new candidates have a harder time communicating their message to the public, and incumbents have less reason to fear a challenge.

*Third*, without access to local news, voters become more politically polarized. As one study explained, without a local paper, voters "rely more heavily on available national news or partisan heuristics to make political decisions."[54] Comparing otherwise similar counties, researchers found that where a local newspaper closed, split-ticket voting fell by 1.9%.[55] Another recent study found that when local newspapers disappear, residents turn toward national partisan media.[56] As one of the study's authors explained, "the loss of local newspapers can strengthen

---

[51] Rachel Moran, *News Deserts Leave Voters Vulnerable to Election Misinformation*, Brennan Ctr. for Just. (June 17, 2026), https://www.brennancenter.org/our-work/research-reports/news-deserts-leave-voters-vulnerable-election-misinformation.
[52] Sam Schulhofer-Wohl & Miguel Garrido, *Do Newspapers Matter? Short-Run and Long-Run Evidence from the Closure of The Cincinnati Post*, 26 J. Media Econ. 60, 60 (2013).
[53] Meghan E. Rubado & Jay T. Jennings, *Political Consequences of the Endangered Local Watchdog: Newspaper Decline and Mayoral Elections in the United States*, 56 Urb. Aff. Rev. 1327, 1327 (2020).
[54] Joshua P. Darr, Matthew P. Hitt & Johanna L. Dunaway, *Newspaper Closures Polarize Voting Behavior*, 68 J. Commc'n 1007, 1007 (2018).
[55] *Id.*
[56] Jianing Li & Michael W. Wagner, *Partisanship in Context: The (A)symmetric Influence of Local Newspaper Availability and Selective Exposure on Political Misperceptions in the U.S.*, Commc'n Rsch. (June 29, 2026).

biases tied to political identities."[57] Other research has found that counties that lost their local paper saw the dominant party's share of the presidential vote grow.[58]

* * *

These public harms are central to this Court's fair use inquiry. The Supreme Court has instructed that courts assessing fair use must "take into account the public benefits the copying will likely produce" and weigh those benefits against the losses the copying will cause. *Google LLC v. Oracle Am., Inc.*, 593 U.S. 1, 35-36 (2021). OpenAI claims its products' public benefits are "vast" because they "put the world's facts within reach of anyone who asks."[59] But the facts most critical to a given town or neighborhood—how the local school board is spending its budget, why property taxes are going up, what a city council candidate stands for—do not gather and report themselves. They surface only because local reporters expend the "sweat [and] shoe-leather"[60] that OpenAI dismisses out of hand. Meanwhile, Defendants' products threaten to put those reporters out of a job and their papers out of business. And when those newsrooms close, the public pays an enormous price. Whatever public benefits Defendants claim their products offer, they cannot outweigh the cost of depriving local communities across the country of their most trusted and essential news source.

## CONCLUSION

For the foregoing reasons, *amicus curiae* America's Newspapers respectfully urges the Court to grant the News Plaintiffs' motion for partial summary judgment and deny the Defendants' motions for summary judgment.

---

[57] Carol Peters, *Loss of Local Newspapers Drives Americans Toward Partisan News, Rutgers Study Finds*, Rutgers Sch. of Commc'n & Info. (Sept. 24, 2026), https://sci.rutgers.edu/news/loss-local-newspapers-drives-americans-toward-partisan-news-rutgers-study-finds (quoting Professor Jianing Li).

[58] Haddock et al., *supra* n. 13.

[59] Defs.' Mem. of P. & A. in Supp. of Mot. for Summ. J. at 1-2, *In re OpenAI, Inc. Copyright Infringement Litig.*, No. 1:25-md-03143 (S.D.N.Y. Sept. 17, 2026), ECF No. 1980.

[60] *Id.* at 1.

October 30, 2026

Respectfully submitted,

/s/ *Matthew J. Platkin*

Matthew J. Platkin (#MP0621)
Angela Cai (#AC2014)
Aaron E. Haier (#5787999)
**PLATKIN LLP**
1 Gateway Center
Suite 1150
Newark, NJ 07102
Phone: (973) 561-1951
Email: mplatkin@platkinllp.com

*Counsel for Amicus Curiae*
*America's Newspapers*

**CERTIFICATE OF COMPLIANCE**

Pursuant to Local Civil Rule 7.1(c), I hereby certify that the foregoing Brief of *Amicus Curiae* America's Newspapers contains 5,402 words according to the word-count feature of the word-processing program used to prepare it, and therefore it complies with this Court's Order of August 7, 2026, ECF No. 1,663.

/s/ *Matthew J. Platkin*__