**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

**IN RE: OPENAI, INC. COPYRIGHT INFRINGEMENT LITIGATION**

No. 1:25-md-03143-SHS-OTW

This Document Relates To:
The New York Times Company v. Microsoft Corporation, et al., No. 1:23-cv-11195

# BRIEF OF AMICUS CURIAE WILLIAM MORRIS ENDEAVOR ENTERTAINMENT, LLC IN SUPPORT OF THE NEWS PLAINTIFFS' OPPOSITIONS TO DEFENDANTS' SUMMARY-JUDGMENT MOTIONS ON FAIR USE

**JAYARAM PLLC**
Vivek Jayaram
54 W. 21st Street, New York, New York 10010
vivek@jayaramlaw.com
Counsel for Proposed Amicus Curiae

# TABLE OF CONTENTS

**INTEREST OF AMICUS CURIAE** ........ **1**

**INTRODUCTION AND SUMMARY OF ARGUMENT** ........ **3**

**ARGUMENT** ........ **5**

**I. THERE IS AN EXISTING AND ROBUST MARKET FOR LICENSING COPYRIGHTED WORK FOR AI USE** ........ **5**

A. AI Companies Are Already Licensing Copyrighted Material ........ 5

B. The AI Licensing Market Extends to Artists' Voices and Likenesses ........ 6

C. WME's Negotiations Reflect Accepted Protections for Creators in the Existing AI Licensing Market ........ 7

**II. AI'S UNAUTHORIZED USE OF CREATIVE MATERIALS HARMS THE LICENSING MARKET** ........ **8**

A. AI Companies Can Create Substitute or Derivative Works and Performances from Unauthorized Access to Copyrighted Material ........ 8

B. Unauthorized AI Replicas Supplant and Tarnish the Market for Real Appearances by Talent and Approved Digital Likenesses ........ 9

C. Lost Licensing Fees Count as Market Harm ........ 11

**III. PAYING FOR CREATIVE WORK WILL NOT STOP AI, ANY MORE THAN IT STOPPED RADIO OR STREAMING** ........ **13**

**CONCLUSION** ........ **14**

# TABLE OF AUTHORITIES

## Cases

*A&M Records, Inc. v. Napster, Inc.* .......... 13
*American Geophysical Union v. Texaco Inc.* .......... 4, 9, 11–12
*Bartz v. Anthropic PBC* .......... 4
*Concord Music Group, Inc. v. Anthropic PBC* .......... 8
*Disney Enterprises, Inc. v. Midjourney, Inc.* .......... 8
*Fortnightly Corp. v. United Artists Television, Inc.* .......... 13
*Kadrey v. Meta Platforms, Inc.* .......... 4
*Thomson Reuters Enterprise Centre GmbH v. ROSS Intelligence Inc.* .......... 12
*United States v. Smith* .......... 10

## Statutes and Other Authorities

17 U.S.C. § 107 .......... 2, 4
17 U.S.C. § 111 .......... 13
Orrin G. Hatch–Bob Goodlatte Music Modernization Act .......... 13
WME, Copyright Office Comments (2023) .......... 2, 11

## INTEREST OF AMICUS CURIAE

William Morris Endeavor Entertainment, LLC ("WME") is the original advocate for the world's most extraordinary artists, content creators, and talent across the creative spectrum. WME, as one of the nation's preeminent talent agencies, represents actors, screenwriters, directors, musicians, authors, athletes, digital creators, and public figures in a variety of commercial negotiations to leverage the full potential of their intellectual property, diversify and grow their businesses, and bring projects to life that define the cultural landscape.

Founded in 1898, the William Morris Agency represented artists from vaudeville through the arrival of radio, recorded music, motion pictures, television, and streaming. Through the years, WME and its predecessors have guided clients through major changes in how creative work is made and distributed. At each turn, new technology at first threatened creators' livelihoods, and WME helped its clients secure new forms of compensation as licensing frameworks grew up around the new medium. When radio arrived, the William Morris Agency moved its vaudeville clients onto the new medium and helped make performers such as Eddie Cantor and Will Rogers national stars. A generation later, when television threatened to empty movie theaters, collective bargaining secured residuals for actors whose films aired on television, and the agency made sure its clients' individual deals captured and built on that new income. And in 2008, as entertainment moved online, WME again built new revenue models for streaming and digital media into its clients' deals. Each time, a technology that first seemed to threaten creators became a new source of income once their work was licensed and paid for.

Generative AI ("AI") is following the same path, and WME is again at the forefront, helping its clients build the licensing market around the new technology. WME thus comes to this case not as an opponent of AI but as a participant in the licensing market for creative works, on

behalf of clients who already profit from AI when it is licensed. And WME is uniquely positioned to describe that market. As an agency, it works with all sides of it: the authors, artists, and performers whose copyrighted work AI systems use, the studios, brands, and technology companies that seek to license that work and incorporate it into their AI models, products, and services; WME represents AI startups like AI-powered animation studio Toonstar, which builds its business on authorized content. WME's position is therefore not that AI use of creative materials should be stopped, but that it should be licensed.

In line with its prior statements to the U.S. Copyright Office in 2023, WME advocates that all uses of AI must be ethical and responsible, and any use of AI that affects talents' and creators' rights must come with proper compensation and authorization.[1] WME seeks to preserve the legal framework that lets creators decide whether, and on what terms, their protected work is used to develop or train AI systems. This cross-industry account of how those arrangements operate bears directly on the fourth fair use factor, "the effect of the use upon the potential market for or value of the copyrighted work." 17 U.S.C. § 107(4).

Corporate disclosure. William Morris Endeavor Entertainment, LLC identifies its direct parent entity as WME Group Holdings, LLC. No publicly held corporation owns 10% or more of William Morris Endeavor Entertainment's equity.

Authorship and funding disclosure. No party or counsel for a party authored this brief, in whole or in part; no party or party's counsel, or person other than WME or its counsel, made a monetary contribution intended to fund its preparation or submission.

---

[1] *See* Comments of William Morris Endeavor Entertainment, LLC, *In re Artificial Intelligence and Copyright*, Docket No. 2023-6, at 2–4, 6–7 (U.S. Copyright Office Oct. 30, 2023), https://downloads.regulations.gov/COLC-2023-0006-8691/attachment_1.pdf.

## INTRODUCTION AND SUMMARY OF ARGUMENT

In the summer of 2023, the writer Jane Friedman discovered that about half a dozen books had appeared on Amazon under her name. She had not written them; they appeared to have been generated by AI, and Amazon at first declined to take them down. [2] In late 2024, another author, Josh Bernoff, received a very different message. His publisher, HarperCollins, asked whether he would license one of his books for a fee to an AI company for training. He said yes, explaining that he wanted "to support AI companies actually using legitimate channels to license books."[3] The two stories describe the same licensing market from opposite ends. In one, a creator's name is used without permission; in the other, the creator is asked, agrees, and is paid. This case will help decide which of those two models the law builds on, and the fourth fair use factor is where that question is answered.

Every new medium for creative work has forced the same question: where the Constitution secures authors an exclusive right to their creative works, must the newcomer pay for work it depends on, or may it take that work without compensation? Radio stations once wanted to broadcast songs without paying songwriters, and file-sharing services distributed recordings without paying anyone at all. In each case, the technology survived and the newcomer came to pay. Copyright's answer was licensing, not the disappearance of the new medium.

Defendants ask this Court to answer that question differently for AI. Their models, they say, do not republish what they copy; they learn from it, and learning has never required a license. But whether a machine "learns" like a person is beside the point. The Copyright Act does not ask

---

[2] Jason Nelson, *Amazon Won't Remove Books Listed Under a Real Author's Name but Allegedly Written with AI*, DECRYPT (Aug. 8, 2023), https://decrypt.co/151674/amazon-refuses-authors-request-to-remove-fake-books-written-with-ai.

[3] Josh Bernoff, *Why I Took the $2,500 Check to License My Book for AI* (Apr. 15, 2025), https://bernoff.com/blog/why-i-took-the-2500-check-to-license-my-book-for-ai.

how a defendant describes its technology; it asks what the challenged use does to "the potential market for or value of the copyrighted work." 17 U.S.C. § 107(4). WME, which negotiates the deals through which WME clients across the creative spectrum are paid, can answer that question from inside that very market: WME clients are losing paid work to AI output built on their own copyrighted works, and they are losing the licensing fees they would otherwise command for the very use Defendants made of those works for free. The Second Circuit has long recognized that lost licensing revenue counts under the fourth factor when it comes from "traditional, reasonable, or likely to be developed markets." *American Geophysical Union v. Texaco Inc.*, 60 F.3d 913, 930 (2d Cir. 1994).

The early AI decisions confirm that the inquiry turns on evidence.[4] WME is uniquely situated to provide evidence of that market as it negotiates in that market every day. It structures the deals through which content owners license their libraries for AI training, through which artists and estates authorize AI uses of their voices and likenesses, and through which brands and technology companies pay for that access. It also sees the other side of the ledger: the unauthorized imitations and the deals that never happen because the same material is available without permission. The Parts that follow describe that market, and the harm of unlicensed copying, from WME's vantage point at the center of it.

Three points follow. First, there is an existing and robust market for licensing copyrighted work for AI use in which WME routinely negotiates on behalf of its clients. Second, AI's unauthorized use of creative materials harms that market, both by producing substitutes for creators' work and by undercutting the licenses those creators would otherwise command. Third,

---

[4] *Compare Bartz v. Anthropic PBC*, 787 F. Supp. 3d 1007, 1020–22 (N.D. Cal. 2025) (declining to treat speculative competition as market injury), *with Kadrey v. Meta Platforms, Inc.*, 788 F. Supp. 3d 1026, 1052–59 (N.D. Cal. 2025) (recognizing AI's ability to flood markets but finding the record inadequate).

licensing creative work will not stop AI, any more than it stopped radio or streaming. For these reasons, the fourth factor weighs against Defendants' sweeping fair-use defense.

## ARGUMENT

### I. THERE IS AN EXISTING AND ROBUST MARKET FOR LICENSING COPYRIGHTED WORK FOR AI USE

#### A. AI Companies Are Already Licensing Copyrighted Material

Compensating artists for AI use of their copyrighted material is not a litigation-driven theory; it reflects an economic reality already taking shape. Between mid-2023 and mid-2024 alone, rights holders and AI companies publicly announced more than two dozen licensing deals or partnerships, with at least twenty-eight involving payment for access to data to train AI models, including News Corp's reported five-year, $250 million agreement with OpenAI, Reddit's $60 million deal with Google, and Shutterstock's reported $25 million to $50 million deals with each of Apple, Amazon, and Google.[5] And that market has grown as AI developers continue to actively shop for licenses to film and television libraries.[6]

WME sees that market firsthand. WME presently represents a content owner in negotiating and structuring licenses authorizing a major technology company to use its IP to train large language models and other AI systems. Many of these discussions began not with WME, but with AI developers themselves, who directly approached WME to ask whether it represented clients with bodies of content available for licensing. In these transactions, WME sits across the table from leading technology companies on behalf of major entertainment content owners, working through the terms that define this emerging market: the scope of the works licensed, the permitted training and output uses, attribution and provenance controls, protections against unauthorized

---

[5] Paul Sweeting, *Generative AI & Licensing: How Rights Holders Can Monetize Their Content as Training Data for Large Language Models*, VARIETY VIP+ 5, 19 (Oct. 2024).

[6] *Id.* at 23.

reproduction, and compensation structures that reflect the substantial value these content libraries supply to AI systems.

WME's counterparties across the creative spectrum are following suit. HarperCollins, for example, reportedly offered its nonfiction authors $5,000 per title, split with the publisher, to opt in to a license allowing Microsoft to train AI models on their books.[7] These are real deals, negotiated over real rights, permitted uses, and prices. These examples show that AI developers can, and do, obtain the training material they desire through negotiated, compensated licenses for copyrighted works.

**B. The AI Licensing Market Extends to Artists' Voices and Likenesses**

WME's AI licensing work also reaches beyond copyrighted material to encompass the voices, likenesses, and creative legacies of the artists it represents. These are distinct protections: copyright protects creative expression, while the right of publicity and related name, image, and likeness (so-called "NIL") laws protect a person's identity, and WME does not ask the Court to adjudicate the latter here. But these deals are evidence of the same market the copyright licenses reveal: AI developers and brands pay for creative material when they have to ask for it.

In some instances, WME negotiates AI deals that incorporate both copyright and NIL rights. For example, in 2023, WME negotiated a deal between PepsiCo and the estate of The Notorious B.I.G. to celebrate Biggie and his music through the use of AI, connecting both his copyrighted work (the music) and his likeness with contemporary audiences. In 2024, WME negotiated a partnership between Meta and a client that explicitly addressed protection for both copyrighted material and right of publicity. Meta licensed both the client's copyrighted audio

---

[7] Grace Harmon, *Microsoft and HarperCollins Sign AI Licensing Deal, but Author Opt-In Still Required*, EMARKETER (Nov. 25, 2024), https://www.emarketer.com/content/microsoft-harpercollins-sign-ai-licensing-deal--author-opt-in-still-required.

recordings and his voice to train its model and market the resulting voice option for Meta's AI assistant across Meta's products: Facebook, Instagram, WhatsApp, and Meta Ray-Ban smart glasses.

In many other instances, WME negotiates with AI companies to license clients' NIL rights independent of copyright. For example, WME negotiated a deal to lend a prominent hip-hop artist's voice to an AI app for use with AI-powered chatbots. WME has also helped clients launch authorized AI "digital twins" that let them connect with fans at scale, including a digital twin deal for an H&M model client with Alva. In each transaction, the AI developer or brand obtained the creative material it needed through licensing the client's protected NIL rather than taking it without authorization or compensation. Those deals hold value only so long as the client controls who may use their protected work and persona; an unauthorized imitation offers the same thing for free.

### C. WME's Negotiations Reflect Accepted Protections for Creators in the Existing AI Licensing Market

WME's client agreements address AI use directly, in terms that separate authorized and unauthorized uses. Many contain specifically negotiated terms governing whether a counterparty may use the client's existing works or performances to train AI tools and, if so, on what conditions of consent, monetization, and transparency.

In a recent agreement between a WME author client and a major English-language publisher, for example, the author's contract prevents the publisher from using, licensing, or authorizing anyone to use the work to develop or train AI. In other agreements with international publishers, WME's clients have secured the right to say no to any AI narration, AI translation, or AI-generated cover art; all of these agreements have reasonable exceptions for the publisher's use of internal AI tools in the ordinary course of business. In the commercials and endorsements space, if a client does not agree to AI use, WME negotiates to bar the brand from using AI tools to

replicate the client's NIL or voice in output content, and from using the client's NIL or any footage captured during the client's services, to create, train, or enhance any AI model. Those provisions expressly reach digital replicas, deepfakes, AI dubbing and translation, and AI-generated content that would otherwise have required the client's additional, paid services. These performer protections track the consent and compensation terms that SAG-AFTRA has negotiated for digital replicas, just as the publishing terms parallel the AI-specific provisions the WGA secured for writers.[8] The market itself is writing these distinctions into contracts.

## II. AI'S UNAUTHORIZED USE OF CREATIVE MATERIALS HARMS THE LICENSING MARKET

### A. AI Companies Can Create Substitute or Derivative Works and Performances from Unauthorized Access to Copyrighted Material

While WME welcomes and encourages licensing its clients' protected works with AI companies, WME's clients have legitimate concerns that their performances or copyrighted works have been and will continue to be used to train AI tools to generate wholly new content without compensation. Competition from new, independent work is the ordinary price of a free market. But lost sales and lost licenses that flow from copying protected creative expression, whether to generate substitutes for the copied works or to alter the works themselves, are a cognizable harm that the fourth factor reaches.

Recent copyright litigation addresses claims that AI providers improperly reproduce protected lyrics, sound recordings, and visual material in their outputs. *See Concord Music Group, Inc. v. Anthropic PBC*, 772 F. Supp. 3d 1131, 1135 (N.D. Cal. 2025); *Disney Enterprises, Inc. v. Midjourney, Inc.*, No. 2:25-cv-05275, ECF No. 1 (C.D. Cal. June 11, 2025) (complaint). When an

---

[8] *Artificial Intelligence*, WRITERS GUILD OF AM. WEST (last visited Oct. 26, 2026), https://www.wga.org/contracts/know-your-rights/artificial-intelligence; *Digital Replicas*, SAG-AFTRA, https://sagaftra.org/files/sa_documents/DigitalReplicas.pdf.

output reproduces protected expression without authorization, it can compete directly with the original.

The same is true for performers. An AI model trained on, for example, a copyrighted film could create an output that reproduces an actor's specific performance, offering audiences a substitute for the performance itself. The natural extension of training an AI model on an unlicensed copyrighted work is that the model may be able to emulate that work and the performances within.

### B. Unauthorized AI Replicas Supplant and Tarnish the Market for Real Appearances by Talent and Approved Digital Likenesses

The copyright harm reaches performers directly. A model can convincingly imitate a performer's voice or persona because it was trained on copyrighted recordings, films, books, and other works embodying that performer's work, whether the copyright is held by the performer or by a label, studio, or publisher. Even where performers do not own those copyrights, they often share in the works' economic value, including through residuals paid when the films, television programs, and other works in which they appear are reused or licensed. When AI output substitutes for those works, it reduces the licensing and reuse that generate those residuals, and that harm flows directly from the copying.

Even if the model does not specifically duplicate the copyrighted work, it is still using the performer's existing labor to build replacement content, rather than compensating the performer for new work. For example, as described above, WME licenses its clients' voices and likenesses for AI uses. An unauthorized AI imitation of a client competes directly with those authorized versions: every improper synthetic copy is one fewer reason for technology companies and brands to pay for the artist's protected works, NIL, or their authorized AI persona. That is the loss of a

"traditional, reasonable, or likely to be developed" market that the fourth factor protects. *Texaco*, 60 F.3d at 930.

Voice work shows how this plays out. Synthetic narrators now compete for jobs that have always gone to human performers. By May 2025, more than 50,000 Audible titles were labeled "Narrated By: Virtual Voice."[9] WME represents authors who found unauthorized AI-narrated versions of their works posted online and monetized through advertising, usurping an opportunity for a paid voice actor and competing with the authorized audiobooks those authors license. WME now relies on its clients' approval rights over audiobook narrators to keep synthetic voices out of authorized recordings. Synthetic music is flooding streaming platforms as well: Deezer reported that fully AI-generated tracks exceeded half of its daily uploads by July 2026.[10] The viral 2023 song "Heart on My Sleeve," which imitated the voices of Drake and The Weeknd, showed how quickly a convincing synthetic imitation can find an audience.[11] Bots can also siphon off royalties: federal prosecutors charged a scheme involving AI-generated songs streamed by bots billions of times. *United States v. Smith*, No. 1:24-cr-00504-JGK, ECF No. 3 ¶¶ 1, 24–25 (S.D.N.Y. Aug. 26, 2024) (indictment).

Deepfakes take that imitation a step further, associating artists' faces and voices with products they never endorsed. In 2025, AI-altered videos circulated on social media in which a number of our celebrity clients appeared to promote products, apps, and schemes they had never endorsed, ranging from fake money-making apps promising viewers "between $100 and $300 a

---

[9] Lauren Forristal, *Audible Is Expanding Its AI-Narrated Audiobook Library*, TECHCRUNCH (May 13, 2025), https://techcrunch.com/2025/05/13/audible-is-expanding-its-ai-narrated-audiobook-library/.

[10] Ivan Mehta, *Music Streamer Deezer Says More Than 50% of Daily Uploads Are AI-Generated*, TECHCRUNCH (July 21, 2026), https://techcrunch.com/2026/07/21/music-streamer-deezer-says-more-than-50-of-daily-uploads-are-ai-generated/.

[11] Rachel Brodsky, *Viral "Drake & The Weeknd" Song Made with AI Pulled from Streaming Services*, STEREOGUM (Apr. 17, 2023), https://stereogum.com/2220727/viral-drake-the-weeknd-song-made-with-ai-pulled-from-streaming-services/news.

day" to review videos, to fraudulent investment platforms and consumer goods. These scams typically pair a client's fabricated face and voice with a fake news segment, interview, or testimonial to lend the pitch credibility and lure consumers into handing over money or personal information. In one example, Wayne Gretzky, a client of a WME affiliate, appeared in a fabricated deepfake "interview" presented as CNN reporting purporting to endorse an AI-powered investment platform.[12] Synthetic imitation does not stop at a performer's face and voice; it now reaches the creative work itself. On October 29, 2026, The *New York Times* reported that AI-generated "virtual comedians" on Instagram had been performing jokes taken from real stand-up comics, including WME client Olivia Carter, whose "taut, deftly crafted joke" was "copied word for word, with a less expressive delivery" by a synthetic performer.[13] The *Times* described the trend as an "industrial-scale heist" that "swiped from one demographic almost exclusively: . . . female comics," and observed that "unlike humans, A.I. comics can't be shamed."[14] Each fake took, without consent or payment, the very kind of endorsement or performance that brands and AI developers now license from WME clients, as in the PepsiCo, Meta, and digital-twin deals described above, and undercut the value of WME clients' creative works. As a result of all of this, WME now works with Vermillio and Loti AI, technology companies whose software detects unauthorized online content featuring a client's likeness and requests its removal, to identify and address suspected unauthorized digital-replica uses involving its clients. Even with those tools, securing the removal of unauthorized content from social media platforms remains a struggle. And

---

[12] See Comments of William Morris Endeavor Entertainment, LLC, *In re Artificial Intelligence and Copyright*, Docket No. 2023-6, at 4 (U.S. Copyright Office Oct. 30, 2023), https://downloads.regulations.gov/COLC-2023-0006-8691/attachment_1.pdf.

[13] Jason Zinoman, *Invasion of the Sexy A.I. Joke Thieves*, N.Y. TIMES (Oct. 29, 2026), https://www.nytimes.com/2026/10/29/arts/ai-bots-jokes-theft-comedians.html.

[14] *Id.*

detection and takedown begin too late: once a fake has been viewed, shared, and copied across platforms, the reputational harm cannot be undone.

**C. Lost Licensing Fees Count as Market Harm**

Defendants may protest that this argument chases its own tail: every fair use deprives someone of a fee, so lost AI training fees cannot count. The Second Circuit has already rejected that objection. "The vice of circular reasoning," it explained, "arises only if the availability of payment is conclusive against fair use." *Texaco*, 60 F.3d at 931. No court treats every imaginable license as dispositive, but courts do recognize lost revenue from "traditional, reasonable, or likely to be developed markets." Id. at 930. In *Texaco* itself, an established mechanism for licensing journal photocopies helped establish that the foregone fees were cognizable. Id. at 929–31.

The market for AI training licenses clears that bar with room to spare. The News Plaintiffs did not invent it for litigation. Publishers, labels, studios, and creators are building it now, and, as discussed above, AI developers are already participating in it. A company that pays some rights holders for authorized uses can hardly deny that the licensing market exists. The Third Circuit has recognized a rapidly developing market for licensing copyrighted headnotes "as text to train AI" and held that unlicensed use impaired the rightsholder's opportunity to enter it. *Thomson Reuters Enterprise Centre GmbH v. ROSS Intelligence Inc.*, 2026 WL 2932557, at *9–10 (3d Cir. Sept. 29, 2026). That decision involved a non-generative AI research product, but its recognition of a functioning training-data market is instructive here. And lost training fees are only the beginning. The displacement of demand for protected creative works, including through outputs that reproduce or replace those works as described above, is a further market harm that the fourth factor requires courts to weigh.

WME has seen that harm firsthand. Throughout 2025, WME sought AI content-licensing arrangements on behalf of publishers and other rights holders, including major digital media,

sports, and trade publications. WME's experience is that the availability of unlicensed online material makes it harder for rights holders to obtain a meaningful negotiation over the same content. The absence of closed deals does not mean the content was worthless. It can mean the buyers had already helped themselves.

## III. PAYING FOR CREATIVE WORK WILL NOT STOP AI, ANY MORE THAN IT STOPPED RADIO OR STREAMING

When radio arrived, broadcasters resisted paying licensing fees for music. Blanket licensing through performing-rights organizations such as ASCAP and BMI helped provide a scalable means to pay songwriters.[15] When cable television arrived, the Supreme Court held that certain retransmissions were not performances under the 1909 Act, *Fortnightly Corp. v. United Artists Television, Inc.*, 392 U.S. 390, 400–01 (1968); Congress later adopted a statutory cable license, 17 U.S.C. § 111. When peer-to-peer file sharing arose, the Ninth Circuit rejected the contention that unauthorized downloading was fair use, *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1014–19 (9th Cir. 2001). Licensed downloads and streaming developed, and Congress subsequently created a blanket licensing system for digital musical works. Orrin G. Hatch–Bob Goodlatte Music Modernization Act, Pub. L. No. 115-264, 132 Stat. 3676 (2018).

Tracking and attribution at AI scale are within reach. Existing rights-management infrastructure already identifies, catalogs, and tracks the use of millions of works: content-identification systems match uploads against reference files, industry registries maintain ownership and metadata records, and usage-reporting systems tell rightsholders whose works were used and how often. Early AI analogues are already appearing: opt-in marketplaces and

---

[15] *History*, BROADCAST MUSIC, INC. (last visited Oct. 26, 2026), https://www.bmi.com/about/history; *ASCAP Forms to Protect Writers and Publishers of Music*, EBSCO RESEARCH STARTERS (last visited Oct. 26, 2026), https://ebsco.com/research-starters/history/ascap-forms-protect-writers-and-publishers-music.

provenance tools are emerging to record which creators' works are used and on what terms.[16] The licensing agreements described in Part I show that AI developers, including Defendants, can and do license content when they choose to. And WME's clients have shown, in deal after deal, that they will engage with AI when consent, transparency, and compensation are built in.

A ruling for Defendants would also distort competition within the AI industry itself. Some AI developers have chosen to train AI models using licensed or public-domain material; Adobe, for example, describes that approach for Firefly.[17] A rule that excuses unlicensed copying would hand a lasting advantage to developers that took rather than paid, at the expense of those that did the opposite.

## CONCLUSION

The fourth fair use factor asks what Defendants' use does to the markets for the works they copied. From inside the industries that create those works, the answer is already visible: unlicensed AI use is displacing artists' protected work and suppressing licensing arrangements that rights holders and developers have begun to build. For these reasons, and those stated by the News Plaintiffs, the Court should hold that the fourth factor weighs against fair use and deny Defendants' summary-judgment motions on that defense.

---

[16] Paul Sweeting, *AI Training Consent & Content: Emerging Technical Approaches Toward Control and Compensation for Creators and Rights Holders*, VARIETY VIP+ 5, 13, 17–19 (Mar. 2025).

[17] ADOBE INC., *Our Approach to Generative AI with Adobe Firefly* (last visited Oct. 26, 2026), https://www.adobe.com/fireflyapproach.

Dated: October 30, 2026

Respectfully submitted,

**/s/ Vivek Jayaram**
Vivek Jayaram
Palak V. Patel (*pro hac vice forthcoming)*
JAYARAM PLLC
54 W. 21st St.
New York, New York 10010
vivek@jayaramlaw.com
palak@jayaramlaw.com
(646) 325-9855
Counsel for Proposed Amicus Curiae

Courtney Braun
WME Group
cbraun@wmegrp.com
Counsel for Proposed Amicus Curiae

Of Counsel (not appearing):
Jonathan Seiden
Michael Onufer
WME Group
jseiden@wmegrp.com
monufer@wmegrp.com
(212) 373-4875

## CERTIFICATE OF COMPLIANCE

Pursuant to Local Civil Rule 7.1(c) and the Court's August 7, 2026 Order (ECF No. 1450), I certify that the proposed amicus brief contains 4,270 words, including the brief and footnotes but excluding the caption, table of contents, table of authorities, signature block, and this certificate.

**/s/ Vivek Jayaram**