**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE:<br><br>OPENAI, INC.<br><br>COPYRIGHT INFRINGEMENT LITIGATION<br><br>THIS DOCUMENT RELATES TO:<br><br>ALL MATTERS | 25-md-3143 (SHS) (OTW) |

**BRIEF OF *AMICI CURIAE* FORMER UNITED STATES SENATOR RICK SANTORUM AND FORMER UNITED STATES REPRESENTATIVE RICK BOUCHER IN SUPPORT OF DEFENDANTS**

# TABLE OF CONTENTS

**Page**


Interests Of Amici Curiae .......... vi

Introduction .......... 1

Argument .......... 2

I. Congress Designed The Fair-Use Exception To Be Flexible So As To Best Promote the Progress of Science And The Useful Arts .......... 2

II. AI Training Continues A Long Tradition Of Non-Expressive, Transformative Uses Of Copyrighted Material By New Technologies .......... 4

III. The Fair-Use Doctrine Has Helped And Should Continue To Help Build The United States' Global Leadership In Technology .......... 7

Conclusion .......... 14

# TABLE OF AUTHORITIES

Page(s)

## Cases

*A.V. ex rel. Vanderhye v. iParadigms, LLC*,
562 F.3d 630 (4th Cir. 2009) ....................4

*Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*,
598 U.S. 508 (2023)....................5, 6

*Authors Guild, Inc. v. HathiTrust*,
755 F.3d 87 (2d Cir. 2014)....................4

*Authors Guild v. Google, Inc.*,
804 F.3d 202 (2d Cir. 2015)....................4, 6

*Auto. Club of N.Y., Inc. v. Port Auth. of N.Y. & N.J.*,
2011 WL 5865296 (S.D.N.Y. Nov. 22, 2011) .................... vii

*Bartz v. Anthropic PBC*,
787 F. Supp. 3d 1007 (N.D. Cal. 2025) ....................5

*Campbell v. Acuff-Rose Music, Inc.*,
510 U.S. 569 (1994)....................3, 4, 6

*Cisco Sys., Inc. v. Shenzhen Usource Tech. Co.*,
2020 WL 5199434 (N.D. Cal. Aug. 17, 2020) ....................12

*Feist Pubs., Inc. v. Rural Tel. Serv. Co.*,
499 U.S. 340 (1991)....................2

*Google LLC v. Oracle Am., Inc.*,
593 U.S. 1 (2021)....................4, 5, 6, 7, 9, 12, 13

*Harper & Row Publishers, Inc. v. Nation Enters.*,
471 U.S. 539 (1985)....................3

*Kirtsaeng v. John Wiley & Sons, Inc.*,
579 U.S. 197 (2016)....................2

*NXIVM Corp. v. Ross Inst.*,
364 F.3d 471 (2d Cir. 2004)....................7

*Perfect 10, Inc. v. Amazon.com, Inc.*,
508 F.3d 1146 (9th Cir. 2007) ....................4

*Reddit, Inc. v. SerpApi LLC*,
840 F. Supp. 3d 308 (S.D.N.Y. 2026)....................7

*Sega Enters. Ltd. v. Accolade, Inc.*,
977 F.2d 1510 (9th Cir. 1992), *as amended* (Jan. 6, 1993) ....................9

*Sony Computer Ent., Inc. v. Connectix Corp.*,
203 F.3d 596 (9th Cir. 2000) ....................4, 5

*Sony Corp. of Am. v. Universal City Studios, Inc.*,
464 U.S. 417 (1984)....................1, 4, 13

*Sony Music Ent. v. Uncharted Labs, Inc.*,
2026 WL 1019199 (S.D.N.Y. Apr. 15, 2026)....................7

*Swatch Grp. Mgmt. Servs. Ltd. v. Bloomberg L.P.*,
756 F.3d 73 (2d Cir. 2014)....................3

*Tenn. Valley Auth. v. Hill*,
437 U.S. 153 (1978)....................13, 14

*Twentieth Century Music Corp. v. Aiken*,
422 U.S. 151 (1975)....................2

*Wall Data Inc. v. Los Angeles Cnty. Sheriff's Dep't*,
447 F.3d 769 (9th Cir. 2006) ....................4

**Constitutional Provisions**

U.S. Const. art. I, § 8, cl. 8....................2, 7, 9

**Statutes**

17 U.S.C. § 107....................2, 3, 14

17 U.S.C. § 110(5)(B)(ii)(I)-(II) ....................3

17 U.S.C. § 1201(a)(1)(A) ....................7

**Legislative Materials**

H.R. Rep. No. 94-1476 (1976)....................3

**Other Authorities**

*AI and Fair Use*, Elec. Frontier Found., https://www.eff.org/node/112047....................8

Anne Trafton, *Using Generative AI, Researchers Design Compounds That Can Kill Drug-Resistant Bacteria*, MIT News (Aug. 14, 2025) ....................8

Cao Yin, *China Unveils Copyright Plan for 2026-30*, China Daily (Sept. 8, 2026) ....................11

Christian Peukert, *Copyright and the Dynamics of Innovation in Artificial Intelligence*, Proc. 58th Haw. Int'l Conf. on Sys. Sci. 4480 (2025) ....................7

Claus Zhang, *Using Copyrighted Content to Train Generative AI Can Be Deemed Fair Following Ultraman Infringement Dispute*, IAM (Apr. 30, 2025) ....................12

*Court Grants Final Approval of $1.5 Billion Anthropic Copyright Settlement*, Authors Guild (July 21, 2026) ....................8

Eric Zhou & Dokyun Lee, *Generative Artificial Intelligence, Human Creativity, and Art*, 3 PNAS Nexus pgae052 (2024) ....................9

Grace Guo & Stefaan Meuwissen, *From AI-Generated Works to Training Data: China's Highest Court Draws the Lines on AI Disputes*, Hogan Lovells Cadwalader (Sept. 18, 2026) ....................11

Jacob Bryant, *Trump Says It Is 'Not Do-able' for AI Companies to Pay for All Copyrighted Content Used in Training Models*, The Wrap (July 23, 2025) ....................10, 11

Jared Kaplan et al., *Scaling Laws for Neural Language Models* (2020) (unpublished manuscript) ....................10

Jason Jia-Xi Wu, *Techno-Federalism: How Regulatory Fragmentation Shapes the U.S.-China AI Race*, 17 Harv. Nat'l Sec. J. 82 (2025) ....................10

Jesse Dodge et al., *Documenting Large Webtext Corpora: A Case Study on the Colossal Clean Crawled Corpus*, Proc. 2021 Conf. on Empirical Methods in Nat. Language Processing 1286 (2021) ....................12

Josh Lerner & Greg Rafert, *Lost in the Clouds: The Impact of Copyright Scope on Investment in Cloud Computing Ventures* (Nat'l Bureau of Econ. Rsch., Working Paper No. 21140, 2015) ....................7

Mauro Cazzaniga et al., *Gen-AI: Artificial Intelligence and the Future of Work* (Int'l Monetary Fund, Staff Discussion Note No. 2024/001, 2024) ....................13

Max Tani, *New York Times Goes All-In on Internal AI Tools*, Semafor (Feb. 17, 2025) ....................9

Megan Deschenes, *Innovation Becoming a Security Dilemma: The U.S.-China AI Race*, Org. for World Peace (Sept. 18, 2026) ....................10

Mike Palmedo, *R&D Spending and Patenting in the Technology Hardware Sector in Nations With and Without Fair Use* (Am. U. Program on Info. Just. & Intell. Prop., Research Paper No. 2017-02, 2016) ....7

Press Release, Royal Swedish Acad. of Scis., *The Nobel Prize in Chemistry 2024* (Oct. 9, 2024) ....9

Scott Singer & Pavlo Zvenyhorodskyi, *Chinese Robots Could Decide the AI Race*, Foreign Aff. (Oct. 12, 2026) ....10

Sean Flynn & Michael Palmedo, *The User Rights Database: Measuring the Impact of Copyright Balance* (Am. U. Program on Info. Just. & Intell. Prop., Research Paper No. 2018-01, 2017) ....7

Statement of Interest of the United States, Dkt. 1682....1, 5, 6, 9, 10, 12

Thinh H. Nguyen & Derek E. Bambauer, *The US Copyright Office Is Wrong About Artificial Intelligence*, The Hill (June 30, 2025) ....13

U.S. Copyright Off., *Copyright and Artificial Intelligence Part 2: Copyrightability* (2025) ....9

Xurong Sun, *Fair Use Boundaries for AI Training Data: A Comparative Study of Chinese and U.S. Copyright Law*, Proc. 5th Int'l Conf. on Int'l L. & Legal Pol'y 213 (2026). ....11

## INTERESTS OF AMICI CURIAE

*Amici* are former Members of Congress from different parties who share a longstanding commitment to the goal of securing meaningful incentives for authors while preserving room for innovation that has made the United States the world's leader in emerging technologies.

Senator Rick Santorum represented Pennsylvania in the United States House of Representatives from 1991 to 1995 and in the United States Senate from 1995 to 2007. From 2001 to 2007, he served as Chairman of the Senate Republican Conference, the third-ranking position in the Senate Republican leadership. Senator Santorum is now a senior political analyst for Newsmax. His work in news media has given him a firsthand appreciation of both the value of independent journalism and the promise that new tools hold for the press and its audiences.

Representative Rick Boucher represented Virginia's Ninth Congressional District in the United States House of Representatives from 1983 to 2011. He served on the House Judiciary Committee, including its Subcommittee on Courts, the Internet, and Intellectual Property, and chaired the House Energy and Commerce Subcommittee on Communications, Technology, and the Internet. He authored the 1992 legislation that first permitted commercial use of the Internet, co-founded and for many years co-chaired the Congressional Internet Caucus, and was among Congress's leading advocates for fair use, introducing both the Digital Media Consumers' Rights Act and the FAIR USE Act. After Congress, Representative Boucher was the honorary chairman of the Internet Innovation Alliance, a coalition that advocated for broadband deployment and Internet innovation.

*Amici* have no financial stake in the outcome of this litigation and no interest in defending the particular practices of any company. They submit this brief to offer the Court a legislative and institutional perspective on the fair-use doctrine that Congress codified in 1976, and on why that doctrine, faithfully applied, permits the training of artificial intelligence ("AI") models on

copyrighted works. That focus satisfies the standard for leave to file an *amicus curiae* brief. *See, e.g.*, *Auto. Club of N.Y., Inc. v. Port Auth. of N.Y. & N.J.*, 2011 WL 5865296, at *2 (S.D.N.Y. Nov. 22, 2011) (granting a motion to file *amicus curiae* brief by Congressional and state representatives and noting that an *amicus* brief should be granted "when the *amicus* has unique information or perspective that can help the court beyond the help that the lawyers for the parties are able to provide" (citation omitted)).

## INTRODUCTION

"From its beginning, the law of copyright has developed in response to significant changes in technology." *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 430 (1984). Consistent with that provenance, the doctrine of fair use, which was made statutory law through the Copyright Act of 1976, is meant to work in tandem with technological change, not against it. AI is the latest and the most consequential technology to which that doctrine must be applied.

The use of copyrighted works to train AI models is a paradigmatic case of fair use. An AI model relies on works not to communicate their expression to the public but rather, quite differently, to derive the statistical patterns of language that allow the model to function.

A ruling that AI training constitutes a fair use is vitally important to our Nation. The freedom of American scientists, companies, and entrepreneurs to train AI is of paramount economic and strategic importance. As the United States has explained in this very litigation, AI training bears directly on our Nation's ability to compete with foreign adversaries in the race for AI leadership. *See* Statement of Interest of the United States, Dkt. 1682 ("U.S. Statement"), at 1-2. That race is, above all, a race against China, and it is one that we cannot afford to lose.

A contrary ruling would impose a *de facto* licensing regime with grave consequences for AI development—and, ultimately, for copyright holders themselves. Although Congress may one day choose to create such a regime by amending the Copyright Act in a manner that takes account of the technological characteristics of AI and global strategic considerations, current law permits the use of copyrighted works to train AI. Any change to that framework is for Congress to make, not the federal courts.[1]

---

[1] This brief addresses only the training of AI models. Such training is distinct from the outputs that a mature AI may generate. Whether a particular output infringes—because, for example, it reproduces protected expression—is a different question on which *amici* take no position here.

## ARGUMENT

### I. CONGRESS DESIGNED THE FAIR-USE EXCEPTION TO BE FLEXIBLE SO AS TO BEST PROMOTE THE PROGRESS OF SCIENCE AND THE USEFUL ARTS

The United States Constitution empowers Congress "[t]o promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries." U.S. Const. art. I, § 8, cl. 8. For that reason, "[t]he primary objective of copyright is not to reward the labor of authors, but '[t]o promote the Progress of Science and useful Arts.'" *Feist Pubs., Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 349 (1991) (quoting U.S. Const. art. I, § 8, cl. 8).

The Copyright Act pursues that objective by relaxing copyright protection where doing so would better encourage innovation. As the Supreme Court has explained, the Copyright Act "achieves [its] end by striking a balance between two subsidiary aims: encouraging and rewarding authors' creations while also enabling others to build on that work." *Kirtsaeng v. John Wiley & Sons, Inc.*, 579 U.S. 197, 204 (2016). When those aims conflict, "the Copyright Act must be construed in light of [its] basic purpose" of "stimulat[ing] artistic creativity for the general public good." *Twentieth Century Music Corp. v. Aiken*, 422 U.S. 151, 156 (1975).

The fair-use exception is one of the principal mechanisms by which the Copyright Act fosters innovation and was accordingly designed to be particularly flexible in relation to technological advances. That flexibility is clear on the face of the statute. Section 107 sweeps broadly. It expressly protects diverse uses of copyrighted material, from "criticism" and "news reporting" to "teaching" and "research," while allowing that novel uses may also qualify as fair use. 17 U.S.C. § 107 (providing non-exhaustive list). To that end, it provides four non-exhaustive factors for courts to consider when determining whether "the use made of a work in any particular case is a fair use." *Id.* at § 107(1)-(4). Specifically, courts must take into account "(1) the purpose

and character of the use; (2) the nature of the copyrighted work; (3) the substantiality of the portion used in relation to the copyrighted work as a whole; (4) the effect on the potential market for or value of the copyrighted work." *Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 560-61 (1985); *see also* 17 U.S.C. § 107(1)-(4). That open-ended nature contrasts with other provisions of the Copyright Act. Section 110(5), for example, exempts the performance of "nondramatic musical work[s]" in restaurants only if the establishment is smaller than 3,750 square feet or, if larger, uses no more than six loudspeakers in total and no more than four in any one room. 17 U.S.C. § 110(5)(B)(ii)(I)-(II). Clearly, therefore, Congress contemplated that the fair-use analysis would be adaptable to new or unique circumstances.

That is also clear in the Act's legislative history. The relevant House Judiciary Committee report explained that the "general intention behind" the fair-use exception is to allow courts to "be free to adapt the doctrine to particular situations on a case-by-case basis." H.R. Rep. No. 94-1476, at 66 (1976). "[T]he endless variety of situations and combinations of circumstances that can rise in particular cases precludes the formulation of exact rules in the statute." *Id.* With respect to technology in particular, "[t]here is no disposition to freeze the doctrine in the statute, especially during a period of rapid technological change." *Id.*

Consistent with the statutory text, structure, and legislative history, courts have repeatedly confirmed the flexible nature of the fair-use exception, including in the context of technological change. As the Second Circuit has explained, the statutory fair-use factors are mandatory but also "non-exclusive"—"all factors are to be explored," with "the results weighed together, in light of the purposes of copyright." *Swatch Grp. Mgmt. Servs. Ltd. v. Bloomberg L.P.*, 756 F.3d 73, 81 (2d Cir. 2014) (cleaned up). By virtue of this design, the fair-use exception "permits and requires courts to avoid rigid application of the copyright statute when, on occasion, it would stifle the very

creativity which that law is designed to foster." *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 577 (1994) (cleaned up). And the "relevant circumstances" for making this determination include "significant changes in technology." *Google LLC v. Oracle Am., Inc.*, 593 U.S. 1, 19 (2021) (citation and quotation omitted). Thus, as one court of appeals has put it, "fair use is a tool for adapting copyright law to brisk technological advances." *Wall Data Inc. v. Los Angeles Cnty. Sheriff's Dep't*, 447 F.3d 769, 778 (9th Cir. 2006).

## II. AI TRAINING CONTINUES A LONG TRADITION OF NON-EXPRESSIVE, TRANSFORMATIVE USES OF COPYRIGHTED MATERIAL BY NEW TECHNOLOGIES

Consistent with its purpose and constitutional underpinnings, the fair-use exception has often helped advance technological innovation, both by permitting new technology to use copyrighted works and by facilitating the development of new technology itself. Courts have applied the fair-use exception to permit new technologies to make use of copyrighted works. For example, in *Sony Corporation of America v. Universal City Studios, Inc.*, the Supreme Court held that the use of home-video tape recorders to copy copyrighted television broadcasts was a fair use. 464 U.S. at 419-21, 447-55. More recently, lower courts have applied the fair-use exception to search engines and similar tools that copy works to help users locate and analyze information—much like AI does now. *See, e.g.*, *Authors Guild v. Google, Inc.*, 804 F.3d 202, 216-25 (2d Cir. 2015) (*Google Books*) (full-text search of digitized library collections); *Authors Guild, Inc. v. HathiTrust*, 755 F.3d 87, 97-101 (2d Cir. 2014) (same); *A.V. ex rel. Vanderhye v. iParadigms, LLC*, 562 F.3d 630, 638-45 (4th Cir. 2009) (plagiarism-detection database archiving student papers); *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1164-68 (9th Cir. 2007) (image search engine).

Courts have likewise applied the fair-use exception to facilitate the development of new technology itself. For example, in *Sony Computer Ent., Inc. v. Connectix Corp.*, 203 F.3d 596 (9th

Cir. 2000), the Ninth Circuit applied the fair-use exception to the reverse engineering of Sony's firmware, which the defendant was doing to make a product to play games on Windows computers that were previously available only on Sony's PlayStation. *Id.* at 601-08. More recently, in *Google LLC v. Oracle America, Inc.*, the Supreme Court considered whether Google could fairly copy portions of a software program (specifically, an API in the Java programming language) to build the now-ubiquitous Android platform for smartphones. 593 U.S. at 6-7. The Court sided with Google. *Id.* at 40. In holding that Google's use was fair, the Court emphasized "the public benefits the copying will likely produce." *Id.* at 35. Refusing to recognize fair use "would risk harm to the public" by making the copied "code a lock limiting the future creativity of new programs" and thus would "interfere with, not further, copyright's basic creativity objectives." *Id.* at 39. But recognizing a fair use would "allow[] creative new computer code to more easily enter the market." *Id.* at 40. The Android platform itself was an example. It was a "new product" giving "programmers a highly creative and innovative tool for a smartphone environment." *Id.* at 30. The Court recognized that protecting such a product would be "consistent with that creative 'progress' that is the basic constitutional objective of copyright itself." *Id.* (citation omitted).

Consistent with this uniform tradition of flexibly applying the fair-use doctrine to emerging technologies, this Court should conclude that using copyrighted materials to train AI platforms qualifies as a fair use. The United States' submission on this issue is well reasoned. *See* U.S. Statement at 5-19. On the first fair-use factor, the use is "transformative—spectacularly so." *Bartz v. Anthropic PBC*, 787 F. Supp. 3d 1007, 1021 (N.D. Cal. 2025). An AI model learns from a work not to communicate the work's expression to readers but to derive statistical relationships among words and concepts across an enormous corpus. *See* U.S. Statement at 10. Because "[t]he same copying may be fair when used for one purpose but not another," the training use must be assessed

on its own terms, distinct from any particular output. *Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*, 598 U.S. 508, 533 (2023). The commercial or noncommercial character of the training carries little weight where, as here, a use is highly transformative. *See Google Books*, 804 F.3d at 219 ("Our court has since repeatedly rejected the contention that commercial motivation should outweigh a convincing transformative purpose and absence of significant substitutive competition with the original.").

The second and third factors add little in this context. Although training requires copying whole works, "[w]hat matters" to the third factor is the extent to which the works are "made accessible to a public for which [the works] may serve as a competing substitute." *Id.* at 222 (emphasis omitted). AI training in itself does not make anything available to the public, nor do the statistical relationships a model derives have any necessary connection to the plagiarism of copyrighted content. Importantly, *amici* are not here concerned with the *output* of AI models. *See supra* note 1.

The fourth factor supports a finding of fair use as well. The relevant harm is substitution for the original work. *Campbell*, 510 U.S. at 591; *Google Books*, 804 F.3d at 223-25. But AI training does not supply the public with substitutes of the underlying works, and the theory of indirect "market dilution" advanced by some conflates AI training in general with certain AI outputs. *See* U.S. Statement at 13-17. Most significantly, the fourth factor includes an assessment of "the public benefits the copying will likely produce." *Google*, 593 U.S. at 35. Those benefits are enormous and growing here—indeed, likely to an extent that is unprecedented.[2]

---

[2] The manner in which a developer gains access to copyrighted material can bear on the fair-use analysis, but *amici* take no position on how any given defendant fares in this respect. *See, e.g.*, News Pls.' Combined Summ. J. Br., Dkt. 1709, at 2, 9-10, 55-57 (discussing issues regarding acquisition); Class Pls.' Mem. Supp. Partial Summ. J., Dkt. 1881, at 19-21 (same). *Amici* merely note that if a developer has accessed copyrighted material improperly—by circumventing a

## III. THE FAIR-USE DOCTRINE HAS HELPED AND SHOULD CONTINUE TO HELP BUILD THE UNITED STATES' GLOBAL LEADERSHIP IN TECHNOLOGY

The fair-use exception has given the United States a meaningful advantage in scientific and technological progress. By "promot[ing] the Progress of Science and useful Arts," U.S. Const. art. I, § 8, cl. 8, fair use has helped the United States become the commercial epicenter of technology hardware,[3] cloud computing,[4] software development,[5] and now AI.[6] *Cf. Google*, 593 U.S. at 39-40 (noting that a failure to allow for fair use of software code "would risk harm to the public," and that fair use "allows creative new computer code to more easily enter the market").

---

paywall, for instance—then that fact weighs in favor of the copyright holder but should not necessarily defeat a finding of fair use in all circumstances. *See NXIVM Corp. v. Ross Inst.*, 364 F.3d 471, 479 (2d Cir. 2004) ("[W]e believe that the bad faith of a defendant is not dispositive of a fair use defense."); *see also Google*, 593 U.S. at 32-33 ("We have no occasion here to say whether good faith is as a general matter a helpful inquiry."). And other laws regulate unauthorized access. *E.g.*, 17 U.S.C. § 1201(a)(1)(A); *see Reddit, Inc. v. SerpApi LLC*, 840 F. Supp. 3d 308, 339-45 (S.D.N.Y. 2026) (denying motion to dismiss Section 1201 claims); *Sony Music Ent. v. Uncharted Labs, Inc.*, 2026 WL 1019199, at *3 (S.D.N.Y. Apr. 15, 2026) (same).

[3] Mike Palmedo, *R&D Spending and Patenting in the Technology Hardware Sector in Nations With and Without Fair Use* 8 (Am. U. Program on Info. Just. & Intell. Prop., Research Paper No. 2017-02, 2016) (finding that "fair use . . . has a significant effect" in promoting R&D spending or patenting activity).

[4] Josh Lerner & Greg Rafert, *Lost in the Clouds: The Impact of Copyright Scope on Investment in Cloud Computing Ventures* 2-3 (Nat'l Bureau of Econ. Rsch., Working Paper No. 21140, 2015) (finding that countries with "strong upstream intellectual property rights" had less investment in cloud computing than those that "gave greater rights to downstream technology firms using this content").

[5] Sean Flynn & Michael Palmedo, *The User Rights Database: Measuring the Impact of Copyright Balance* 22 (Am. U. Program on Info. Just. & Intell. Prop., Research Paper No. 2018-01, 2017) (finding that "[f]irms in the software, computer systems design and contract research and development industries earned higher revenues when operating in countries with more open copyright limitations").

[6] Christian Peukert, *Copyright and the Dynamics of Innovation in Artificial Intelligence*, Proc. 58th Haw. Int'l Conf. on Sys. Sci. 4480, 4488 (2025) ("We show that broad copyright exceptions, particularly those enabling access to data TDM and fair use, are positively correlated with higher levels of AI innovation.").

At a time of intense global competition, preserving the fair-use framework will help ensure that American researchers, startups, and companies can compete on equal footing with developers operating under different copyright regimes and will keep cutting-edge innovation anchored in the United States.

Specifically, universities, scientists, nonprofits, libraries, and smaller developers will be harmed by the imposition of a *de facto* licensing regime. These organizations often lack the resources to negotiate and pay for licenses across the enormous number of works on which AI training depends.[7] The costs of licensing at such a scale can be prohibitive. Take the recent settlement between Anthropic and authors in a class action case involving similar allegations of copyright infringement regarding "the 'inputs' side" of AI training.[8] Anthropic agreed to pay over ***1.5 billion dollars***, which comes to about $3,000 per work.[9] Imposing licensing fees anywhere near that level on nonprofit or smaller entities would likely be prohibitive.

That would in turn harm the public, which stands to benefit from AI models developed and used by such nonprofit and smaller entities . For example, researchers at MIT have already used in-house generative AI algorithms to design new antibiotic candidates that kill drug-resistant bacteria.[10] And researchers in the field of chemistry received the 2024 Nobel Prize in part for their use of an in-house AI, called AlphaFold2, to solve a 50-year-old problem of predicting protein

[7] *AI and Fair Use*, Elec. Frontier Found., https://www.eff.org/node/112047 ("These privately negotiated licenses will entrench the best-funded and earliest-arriving companies, making it harder for smaller developers, researchers, and non-profits to create alternatives to big AI.").

[8] *Court Grants Final Approval of $1.5 Billion Anthropic Copyright Settlement*, Authors Guild (July 21, 2026), https://authorsguild.org/news/court-grants-final-approval-anthropic-copyright-settlement/.

[9] *Id.*

[10] Anne Trafton, *Using Generative AI, Researchers Design Compounds That Can Kill Drug-Resistant Bacteria*, MIT News (Aug. 14, 2025), https://news.mit.edu/2025/using-generative-ai-researchers-design-compounds-kill-drug-resistant-bacteria-0814.

structure.[11] These are just the sort of advances in "Science and useful Arts" that copyright aims to promote. U.S. Const. art. I, § 8, cl. 8; *see Google*, 593 U.S. at 35.

Moreover, the harm of imposing a licensing regime will extend to creators themselves. The supposed tension between AI development and the interests of copyright holders is largely illusory.[12] *See, e.g.*, *Google*, 593 U.S. at 39 (although restricting use would "prove highly profitable" to one company, finding fair use allows for "creative improvements, new applications, and new uses" that further "copyright's basic creativity objectives"); *Sega Enters. Ltd. v. Accolade, Inc.*, 977 F.2d 1510, 1523-24 (9th Cir. 1992), *as amended* (Jan. 6, 1993) ("An attempt to monopolize the market by making it impossible for others to compete runs counter to the statutory purpose of promoting creative expression"). AI is becoming increasingly useful not only to those working in fields where copyright protection is atypical (such as in mathematics or the biological sciences) but also to copyright holders themselves.[13] And many creators—including plaintiff New York Times—use AI tools in their work. The Times has reportedly approved a suite of AI tools for use by its journalists and built its own internal AI summarization tool,[14] and its writers use AI to help them "conceptualize and edit" articles. U.S. Statement at 18 & n.19.

---

[11] Press Release, Royal Swedish Acad. of Scis., *The Nobel Prize in Chemistry 2024* (Oct. 9, 2024), https://www.nobelprize.org/prizes/chemistry/2024/press-release/.

[12] Eric Zhou & Dokyun Lee, *Generative Artificial Intelligence, Human Creativity, and Art*, 3 PNAS Nexus pgae052, at 1 (2024) (finding that "AI significantly enhances human creative productivity by 25% and increases the value as measured by the likelihood of receiving a favorite per view by 50%").

[13] U.S. Copyright Off., *Copyright and Artificial Intelligence Part 2: Copyrightability* 12 (2025) (noting situations where "creators have begun to experiment with using AI as a brainstorming tool").

[14] *See* Max Tani, *New York Times Goes All-In on Internal AI Tools*, Semafor (Feb. 17, 2025), https://www.semafor.com/article/02/16/2025/new-york-times-goes-all-in-on-internal-ai-tools.

Independent writers, too, use AI to research and publish commentary that challenges established outlets. *Id.* at 18 & n.20. AI is thus a boon to creators of copyrighted material, not a hindrance.

Finally, finding fair use here is crucial to national security. The United States and China are locked in a race to develop increasingly sophisticated AI models.[15] As one observer warns, "China's leading labs such as DeepSeek and Z.ai are scaling large language models as aggressively as their American counterparts," moving ever "closer to what technology experts call 'recursive self-improvement,' when highly capable AI is able to continuously build ever more capable AI, which could create a potential intelligence explosion."[16] The AI race is important on nearly every metric. China "views AI as a strategic asset to reshape its economy for geopolitical ends." Jason Jia-Xi Wu, *Techno-Federalism: How Regulatory Fragmentation Shapes the U.S.-China AI Race*, 17 Harv. Nat'l Sec. J. 82, 84 (2025). The United States and China "now prioritize AI as a national security imperative, given its potential to disrupt critical infrastructures and erode trust in government institutions." *Id.* Of course, the military applications of AI, and the risks of falling behind in that respect, loom large. *See* U.S. Statement at 2.

Critically, the winner of the AI race will be determined in part by the relative freedom of developers to train AI.[17] For at least two reasons, a correct application of the fair-use exception would help ensure that the United States maintains its lead.

---

[15] Megan Deschenes, *Innovation Becoming a Security Dilemma: The U.S.-China AI Race*, Org. for World Peace (Sept. 18, 2026), https://theowp.org/reports/innovation-becoming-a-security-dilemma-the-u-s-china-ai-race/ ("The concern is that, rather than creating security, this competition is creating a cycle that could eventually mimic a Cold War-style rivalry. As each country takes steps it views as a defensive measure, the other interprets those actions as threatening.").

[16] Scott Singer & Pavlo Zvenyhorodskyi, *Chinese Robots Could Decide the AI Race*, Foreign Aff. (Oct. 12, 2026), https://www.foreignaffairs.com/china/chinese-robots-could-decide-ai-race.

[17] *See* Jared Kaplan et al., *Scaling Laws for Neural Language Models* 1-3 (2020) (unpublished manuscript), https://arxiv.org/abs/2001.08361 (finding that language-model performance improves predictably as the size of the training dataset increases); *see also* Jacob Bryant, *Trump*

First, the fair-use exception currently gives the United States an edge in domestic development. Although China has its own version of the exception, it has traditionally been more restrictive. Reports indicate that "the legality of the underlying training" is among "the most consequential open questions in Chinese IP law."[18] China's current legal framework eschews American flexibility and prefers to "identif[y] specific permissible circumstances and impose[] general constraints around normal exploitation and legitimate interests."[19] "The result is greater statutory predictability, but less room for courts to create new exceptions through individual cases."[20]

Yet now China is moving to close the gap. China's National Copyright Administration released a 2026–2030 Five-Year Plan that "highlights the need to update copyright regulations in line with advances in . . . artificial intelligence" and calls for the development of "a fair-use system for AI training data[.]"[21] One can reasonably expect that any new regulations will favor AI training. A Chinese appellate court has already indicated that using copyrighted works to train AI

---

*Says It Is 'Not Do-able' for AI Companies to Pay for All Copyrighted Content Used in Training Models*, The Wrap (July 23, 2025), https://www.thewrap.com/donald-trump-ai-company-copyright-content-training-models/ (President Trump stated that "[y]ou can't be expected to have a successful AI program when every single article, book or whatever you've studied, you're expected to pay for," and noted that "China's not doing it").

[18] Grace Guo & Stefaan Meuwissen, *From AI-Generated Works to Training Data: China's Highest Court Draws the Lines on AI Disputes*, Hogan Lovells Cadwalader (Sept. 18, 2026), https://www.hlc.com/en/publications/from-aigenerated-works-to-training-data-chinas-highest-court-draws-the-lines-on-ai-disputes.

[19] Xurong Sun, *Fair Use Boundaries for AI Training Data: A Comparative Study of Chinese and U.S. Copyright Law*, Proc. 5th Int'l Conf. on Int'l L. & Legal Pol'y 213, 220 (2026).

[20] *Id.*

[21] Cao Yin, *China Unveils Copyright Plan for 2026-30*, China Daily (Sept. 8, 2026), https://global.chinadaily.com.cn/a/202609/08/WS6a9f7e31e4b06d4aa055ceca.html.

may be a fair use.[22] The upshot is that the United States' flexible fair-use doctrine is an advantage that China itself hopes to neutralize.

Second, in every case where United States law would apply to AI training carried out by Chinese actors, an adverse ruling here would hurt only the United States. As the United States itself has explained in this litigation, an adverse ruling would "put American AI companies at a competitive disadvantage relative to competitors located in other countries"—like China—"that do not consistently respect U.S. intellectual property law" and that can be expected to use copyrighted material to train AI regardless of whether such a use is permitted under United States law.[23] U.S. Statement at 4 n.13. As between American companies and Chinese companies, Chinese companies are far more likely to evade intellectual-property protections. *See Cisco Sys., Inc. v. Shenzhen Usource Tech. Co.*, 2020 WL 5199434, at *11 (N.D. Cal. Aug. 17, 2020) ("[I]t is also difficult if not impossible to enforce U.S. judgments in China[.]").

This litigation accordingly presents a paradigmatic case for judicial restraint. If plaintiffs prevail, the result will be a *de facto* licensing regime that will bottleneck AI development and restructure its underlying economics at a critical time. Since "AI training datasets include hundreds of millions to billions of works," requiring licensing for every piece of copyrighted work within those datasets "risks crippling innovation and forfeiting American technological

[22] Claus Zhang, *Using Copyrighted Content to Train Generative AI Can Be Deemed Fair Following Ultraman Infringement Dispute*, IAM (Apr. 30, 2025), https://www.iam-media.com/article/using-copyrighted-content-train-generative-ai-can-be-deemed-fair-following-ultraman-infringement-dispute.

[23] *See also* Jesse Dodge et al., *Documenting Large Webtext Corpora: A Case Study on the Colossal Clean Crawled Corpus*, Proc. 2021 Conf. on Empirical Methods in Nat. Language Processing 1286, 1289 (2021) (examining a dataset used to train "two of the largest pretrained English language models" and finding that "51.3%" of the website pages that make up the dataset are hosted in the United States).

leadership."[24] *Cf. Google*, 593 U.S. at 39 ("allowing enforcement here would make" copyrighted materials "a lock limiting the future creativity of new programs.").

That result would conflict with the Supreme Court's admonition that courts should be reluctant to extend copyright protections in the context of new technology. *See Sony*, 464 U.S. at 430-31. It is Congress, not the Judiciary, that is best suited to balance the "competing interests that are inevitably implicated by such new technology." *Id.* at 431. "Repeatedly, as new developments have occurred in this country, it has been the Congress that has fashioned the new rules that new technology made necessary." *Id.* at 430-31. In that context, "the judiciary's reluctance to expand the protections afforded by the copyright without explicit legislative guidance is a recurring theme." *Id.* at 431 (collecting cases). "Sound policy, as well as history, supports our consistent deference to Congress when major technological innovations alter the market for copyrighted materials." *Id.* As a result, "[i]n a case like this, in which Congress has not plainly marked our course, we must be circumspect in construing the scope of rights created by a legislative enactment which never contemplated such a calculus of interests." *Id.*

That instruction applies here with special force because of AI's potential to transform the economy, society, and international relations.[25] Given the enormous stakes, questions about who gets paid, which works qualify for payments, how rates are established, how orphan works are handled, and whether any exceptions are warranted are best left for Congress to address through targeted legislation. *See Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 194 (1978) ("[I]t is . . . the

---

[24] Thinh H. Nguyen & Derek E. Bambauer, *The US Copyright Office Is Wrong About Artificial Intelligence*, The Hill (June 30, 2025), https://thehill.com/opinion/judiciary/5376134-ai-innovation-fair-use-debate/.

[25] *See, e.g.*, Mauro Cazzaniga et al., *Gen-AI: Artificial Intelligence and the Future of Work* 2 (Int'l Monetary Fund, Staff Discussion Note No. 2024/001, 2024) ("Artificial Intelligence . . . has the potential to reshape the global economy.").

exclusive province of the Congress not only to formulate legislative policies and mandate programs and projects, but also to establish their relative priority for the Nation.").

## CONCLUSION

For the foregoing reasons, the Court should hold that the use of copyrighted works to train AI models is a fair use under 17 U.S.C. § 107.

Dated: October 30, 2026

Respectfully submitted,

**QUINN EMANUEL URQUHART & SULLIVAN, LLP**

*/s/ William B. Adams*

William B. Adams
295 Fifth Ave., 9th Floor
New York, NY 10016
(212) 849-7000
williamadams@quinnemanuel.com

John F. Bash (*pro hac vice* submitted)
300 West 6th Street, Suite 2010
Austin, TX 78701
(737) 667-6100
johnbash@quinnemanuel.com

*Counsel for Amici Curiae Former United States Senator Rick Santorum And Former United States Representative Rick Boucher*

**CERTIFICATE OF COMPLIANCE**

I hereby certify that according to the word-count feature of the word-processing program used to prepare this brief, this brief contains 4890 words (exclusive of the cover page, certificate of compliance, table of contents, and table of authorities), and complies with Local Civil Rule 7.1 and the Individual Practices of Judge Stein.

Dated: October 30, 2026

*/s/ William B. Adams*
William B. Adams

**CERTIFICATE OF SERVICE**

I hereby certify that on October 30, 2026, I caused this brief to be filed electronically through the Court's CM/ECF system. Notice will be sent by operation of the Court's electronic filing system to all registered counsel of record.

Dated: October 30, 2026

*/s/ William B. Adams*
William B. Adams