Ryan McCarl (Cal. SBN 302206)
Kimberly Chemerinsky (Cal. SBN 277637)
*Pro hac vice motions pending*
**RUSHING MCCARL LLP**
2219 Main Street, No. 144
Santa Monica, CA 90405
T: (310) 896-5082
E: service@rushingmccarl.com

*Counsel for Proposed Amici Curiae*
*BandLab Singapore Pte. Ltd.; Boomy Corporation;*
*Created by Humans, Inc.; Credtent, Inc.;*
*Distributed Creation Inc. dba Splice;*
*Newstex LLC; ProrataAI, Inc.;*
*SourceAudio Holdings LLC;*
*Vandal AI Inc. dba Cashmere; and Voice-Swap Ltd.*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re<br><br>OPENAI, INC., COPYRIGHT INFRINGEMENT LITIGATION<br><br>This Document Relates To:<br>All Cases | No. 25-md-3143 (SHS) (OTW)<br><br>**[Proposed] Brief of AI Startups as Amici Curiae in Support of Plaintiffs**<br><br>Hon. Sidney H. Stein<br>Hon. Ona T. Wang |

## TABLE OF CONTENTS


I. Introduction ........ 8

II. Developers can build commercially useful AI products without violating copyright law. ........ 10

A. Piracy-free AI training is feasible (and already being done). ........ 11

B. Existing products show that consent-based AI training is commercially viable and pro-innovation. ........ 13

C. Requiring rightsholders' permission will not price out AI developers. ........ 15

III. Licensing supports innovation and distributes AI's economic benefits. ........ 17

A. Licensing creates new markets and economic opportunities. ........ 17

B. Paying creators rewards their effort and supports continued creation. ........ 19

C. Licensing reduces litigation risk and commercial uncertainty. ........ 19

IV. Conclusion ........ 20

# TABLE OF AUTHORITIES

## Cases

*Harper & Row, Publishers, Inc. v. Nation Enters.*, 471 U.S. 539 (1985) ............................ 10

## Statutes

17 U.S.C. § 107(4) ............................ 10

17 U.S.C. § 504(c)(1)–(2) ............................ 16

## Court filings

OpenAI's Opposition to News Plaintiffs' Motion for Partial Summary Judgment, *In re OpenAI, Inc. Copyright Infringement Litig.*, No. 1:25-cv-04315 (SHS) (OTW) (S.D.N.Y. Oct. 23, 2026), ECF No. 734 ............................ 8

Statement of Interest of the United States, *In re OpenAI, Inc. Copyright Infringement Litig.*, No. 1:25-cv-03483 (SHS) (OTW) (S.D.N.Y. Sept. 1, 2026), ECF No. 316... 8, 15

## Other authorities

Aaron Chatterji et al., *How People Use ChatGPT* (Nat'l Bureau of Econ. Rsch., Working Paper No. 34255, Sept. 15, 2025) ............................ 17

Adobe, *Adobe Firefly for Contributors FAQ* (updated Sept. 16, 2026) (visited Oct. 30, 2026) ............................ 14

Alec Radford et al., *Language Models Are Unsupervised Multitask Learners* (2019) ....... 12

Athena Chapekis & Anna Lieb, *Google Users Are Less Likely to Click on Links When an AI Summary Appears in the Results*, Pew Rsch. Ctr. (July 22, 2025) (visited Oct. 30, 2026) ............................ 17

Brian Kennedy et al., *How Americans View AI and Its Impact on People and Society* (Pew Rsch. Ctr. Sept. 17, 2025) ............................ 9

Cashmere, *What Is Cashmere?* (updated Mar. 27, 2026) (visited Oct. 30, 2026) ..... 14, 20

Declan McGlynn, *Introducing Stem-Swap: Change the Vocals of Fully Mixed Tracks Without Acapellas*, Voice-Swap (Jan. 15, 2024) (visited Oct. 30, 2026) .................... 14

Ed Nawotka, *Created by Humans AI Rights Platform Launches for Authors*, Publishers Wkly. (Jan. 14, 2025) (visited Oct. 30, 2026)........................................................ 8, 13

Fairly Trained, *Certifications* (visited Oct. 30, 2026)...................................................... 15

Getty Images, *Generate New AI Images or Modify Our Creative Imagery* (visited Oct. 29, 2026) ........................................................................................................ 14, 20

Ilia Shumailov et al., *AI Models Collapse When Trained on Recursively Generated Data*, 631 Nature 755 (2024) ................................................................................ 19

Klaudia Jaźwińska, *Lawsuit or License?*, Colum. Journalism Rev. (Dec. 4, 2025) (visited Oct. 30, 2026)................................................................................ 13

Laura Silver et al., *Globally, More People Expect AI to Cause Job Loss Than Growth* (Pew Rsch. Ctr. Sept. 17, 2026) ................................................................................ 9

Mandy Dalugdug, *Musical AI Raises $4.5m to Scale AI Attribution Tech*, Music Bus. Worldwide (Jan. 13, 2026) (visited Oct. 30, 2026) .................................................... 14

Moonvalley, *Marey* (visited Oct. 29, 2026) ....................................................................... 15

Murray Stassen, *Splice Launches AI Tools That Compensate Sample Creators When Their Sounds Are Used*, Music Bus. Worldwide (Apr. 16, 2026) (visited Oct. 30, 2026) .. 15

Newstex, *Content Licensing for AI Developers* (visited Oct. 27, 2026) ............................ 13

Nikhil Kandpal et al., *The Common Pile v0.1: An 8TB Dataset of Public Domain and Openly Licensed Text* (June 5, 2025)........................................................... 11, 12

OECD, *Intellectual Property Issues in Artificial Intelligence Trained on Scraped Data* (OECD Artificial Intelligence Papers No. 33, Feb. 2025) ......................................... 19

Peermusic & Boomy, *Comments on the Notice of Inquiry and Request for Comments Regarding Artificial Intelligence and Copyright*, U.S. Copyright Office Docket No. 2023-6 (Oct. 2023) ................................................................................ 15

Pierre-Carl Langlais et al., *Pleias 1.0: The First Ever Family of Language Models Trained on Fully Open Data*, 267 Procedia Comput. Sci. 146 (2025) .................................... 12

Professional Publishers Association, *AI Firm ProRata Strikes Licensing Agreement with Publishers* (Dec. 16, 2025) (visited Oct. 30, 2026) ...................................................... 16

S. Alex Yang & Angela Huyue Zhang, *Generative AI and Copyright: A Dynamic Perspective* (Dec. 5, 2025)................................................................................ 19

Sara Guaglione, *Boston Globe, Future, Vox Media Join ProRata's Generative AI Licensing Model*, Digiday (June 6, 2025) (visited Oct. 30, 2026) .................................................. 13

SourceAudio, *SourceAudio Inks Deal with Symphonic, Expanding Ethical AI Licensing Opportunities for Artists* (Feb. 18, 2026) (visited Oct. 30, 2026) ................................. 14

Splice, *FAQ: Splice Sounds Plugin — Now in Beta*, Splice Help Ctr. (July 20, 2026) (visited Oct. 30, 2026)................................................................................... 15, 20

Tom B. Brown et al., *Language Models Are Few-Shot Learners* (2020) ............................ 12

U.S. Copyright Office, *Copyright and Artificial Intelligence, Part 3: Generative AI Training* (pre-publication version May 2025)................................. 9, 12, 16, 18, 19

## INTEREST OF AMICI CURIAE

Amici are startup companies at the forefront of AI that respect intellectual-property rights. Each amicus builds AI products from licensed content or runs a platform through which that content is licensed.

**BandLab** runs a music-creation platform with more than 100 million creators and a licensing service through which artists and other rightsholders can offer their songs for AI training.

**Boomy** allows consumers to create, publish, and monetize original songs with generative AI.

**Cashmere** gives AI applications access to publishers' content through one platform that lets publishers control who may use it and on what terms.

**Created by Humans** lets authors register their books and set licensing terms for AI companies that want to train on them.

**Credtent** connects rightsholders with AI developers for licensing-related services. It also maintains an opt-out registry through which creators can record that their consent is needed before AI may be trained on their work.

**Newstex** supplies AI developers with content from over 1,500 licensed sources through a single delivery stream.

**ProRata** runs an AI search engine that answers users' questions using content licensed from publishers and shares its revenue with those publishers.

**SourceAudio** has arranged opt-in AI-training licenses for music catalogs.

**Splice** generates unique audio samples from a licensed catalog and compensates creators when their samples are used to generate variations and when those variations are downloaded or licensed.

**Voice-Swap** builds AI models based on singers' voices under licenses from the singers themselves, and pays those artists a share of the royalties when their voices are used.

Each company has a stake in both the continued development of AI and continued copyright protection for creators. Their business models show that the two are not in tension.

# BRIEF OF AI STARTUPS AS AMICI CURIAE IN SUPPORT OF PLAINTIFFS

## I. Introduction

Developing artificial-intelligence systems does not require mass piracy, and protecting copyright will not throttle innovation. The reverse is true. Copyright law itself promotes innovation by rewarding original work.

OpenAI[1] and the Department of Justice[2] suggest that AI innovation requires unfettered training on copyrighted content. Amici — successful AI startups whose business models are built around respect for copyright — disagree. Amici's businesses run on licensed content. Some build AI products from music, news, and books that rightsholders have agreed to license; others run the marketplaces through which those licenses are made. Their experience shows that copyright protection fosters more innovation, not less, for both AI developers and creators.

Copyright protection creates opportunities for all stakeholders, including those that facilitate licensing. These opportunities include a growing market for AI–creator intermediaries like Created by Humans, which connects AI builders and users with creators who choose to license their work.[3] Licensing also supports more reliable AI. Licensed training data comes from known sources that have often curated it for

---

[1] OpenAI's Opposition to News Plaintiffs' Motion for Partial Summary Judgment at 17, *In re OpenAI, Inc. Copyright Infringement Litig.*, No. 1:25-cv-04315 (SHS) (OTW) (S.D.N.Y. Oct. 23, 2026), ECF No. 734.

[2] *See* Statement of Interest of the United States at 4 n.13, *In re OpenAI, Inc. Copyright Infringement Litig.*, No. 1:25-cv-03483 (SHS) (OTW) (S.D.N.Y. Sept. 1, 2026), ECF No. 316 ("DOJ Statement") (requiring licensing would "hamper innovation").

[3] *See* Ed Nawotka, *Created by Humans AI Rights Platform Launches for Authors*, Publishers Wkly. (Jan. 14, 2025), https://publishersweekly.com/pw/by-topic/digital/content-and-e-books/article/96846-created-by-humans-launches-ai-rights-platform-for-authors.html (visited Oct. 30, 2026).

quality, and knowing where the data comes from helps customers confirm that it was lawfully obtained.

AI's rapid development has raised concerns about its effects on human creativity and who will share in AI's economic gains. One concern is that AI-unassisted human art (in the visual arts, music, writing, and other creative domains) will decline because AI models trained on the creators' expressive works will be able to imitate their work without compensation, weakening incentives to create original work in the first place.[4] Another is that AI's economic gains will accrue mainly to frontier-model developers like OpenAI, which built early models by copying millions of copyrighted works without permission.[5]

---

[4] See U.S. Copyright Office, *Copyright and Artificial Intelligence, Part 3: Generative AI Training* 64, 66 (pre-publication version May 2025), https://copyright.gov/ai/Copyright-and-Artificial-Intelligence-Part-3-Generative-AI-Training-Report-Pre-Publication-Version.pdf ("Copyright Office Report"). See also Brian Kennedy et al., *How Americans View AI and Its Impact on People and Society* 6–7 (Pew Rsch. Ctr. Sept. 17, 2025), https://pewresearch.org/wp-content/uploads/sites/20/2025/09/PS_2025.9.15_AI-and-its-impact_report.pdf (reporting that 53% of U.S. adults expected AI to worsen creative thinking and 50% were more concerned than excited about its increased use in daily life).

[5] The term "frontier model" refers to the most advanced general-purpose AI systems, notably those developed by OpenAI (GPT) and Anthropic (Claude). Other companies that have developed or are working to develop frontier models include Google (Gemini), Microsoft (MAI-Base-2), Meta (Muse Wonder), and SpaceXSI (Grok). On concerns about the distribution of AI's gains, *see* Laura Silver et al., *Globally, More People Expect AI to Cause Job Loss Than Growth* 27 (Pew Rsch. Ctr. Sept. 17, 2026), https://pewresearch.org/wp-content/uploads/sites/20/2026/09/pg_2026.09.17_global-views-of-ai_report.pdf (reporting that 46% of U.S. adults expected AI to increase the gap between rich and poor).

Applying established copyright law, rather than expanding fair use to allow AI training on copyrighted works without permission, will address both concerns.

This brief offers technical and economic context for the Court's fair-use inquiry — especially the fourth factor, which considers the effect of the use on the potential market for (or value of) copyrighted works,[6] and which the Supreme Court has deemed "undoubtedly the single most important element of fair use."[7]

Part II shows that a consent-based approach to AI development — in which AI companies train their models on licensed or nonprotected content instead of using copyrighted works without permission — is feasible and pro-innovation. Indeed, the market for IP-respecting AI products, and for intermediaries such as license-aggregators that make such products possible, is already thriving. Part III shows why protecting creators' copyrights and requiring model developers to get consent before training on their work is in the public interest.

Amici can inform the Court's factor-four analysis through their experience building for-profit, pro-creator businesses in the emerging AI licensing economy. Their experience shows that protecting copyright — and rejecting an interpretation of the fair-use doctrine that would allow AI companies to train their models on copyrighted works without payment or permission — can provide technical and economic benefits to creators and AI developers alike.

## II. Developers can build commercially useful AI products without violating copyright law.

Generative-AI systems use patterns learned from training data to produce text, images, audio, or video. Training data can include works in the public domain (such

---

[6] *See* 17 U.S.C. § 107(4).

[7] *Harper & Row, Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 566 (1985).

as books available through Project Gutenberg), works that the creators have licensed for free commercial use (such as Wikipedia articles),[8] works that the model developer has paid to license (such as Getty Images' licensed training datasets), and synthetic data created by the AI model developer. These sources provide alternatives to using copyrighted works without permission.

No dire consequences will ensue if AI developers must get copyright owners' permission before training models on their work. Amici know this by firsthand experience because they are all participating in the data-licensing market and can attest that it is not just working, but thriving.

### A. Piracy-free AI training is feasible (and already being done).

Many companies already develop AI software without violating creators' intellectual-property rights, so doing so is possible — as Amici's business models show. Companies expect AI developers and users to respect copyright law. Those with finite litigation budgets cannot afford to build first and seek permission later.

Enough licensable (and public) data is available, and training on it need not be cost-prohibitive for startups. Not all training data needs to be paid for. New works enter the public domain each year. Many creators also make their works publicly available and free to use under open licenses. Developers can also create synthetic data, data derived from other licensed or public sources, to train their models.

Models are better off for being trained on high-quality copyrighted works licensed from their creators. Such data is usually better than what could be obtained

---

[8] See Nikhil Kandpal et al., *The Common Pile v0.1: An 8TB Dataset of Public Domain and Openly Licensed Text* 2–4, 29 (June 5, 2025), https://arxiv.org/abs/2506.05209v1 (describing license-selection criteria and the inclusion of CC BY-SA-licensed StackExchange questions and answers).

through web scraping or the public domain. Early AI developers often resorted to algorithmic guessing to estimate the quality of training data.[9] Now, when creators license training data and intermediaries such as Created by Humans package it, developers can use that provenance as a heuristic for quality. They can also reuse the material[10] and generate new high-quality training samples from it.[11]

Book publishers, record labels, newspapers, and similar businesses have traditionally curated information so consumers can trust it. Forward-thinking businesses are now doing the same for training data. Copyright protection makes it economically possible for them to perform that function.

A developer can reduce the costs of assembling data by contracting with intermediaries (like publishers, licensed content aggregators, or collective licensing organizations) that curate the data and document creators' permission to use it.[12]

---

[9] See Alec Radford et al., *Language Models Are Unsupervised Multitask Learners* 3, § 2.1 (2019), https://cdn.openai.com/better-language-models/language_models_are_unsupervised_multitask_learners.pdf (describing Reddit links with at least three karma as a heuristic signal that users found linked material interesting, educational, or funny); Tom B. Brown et al., *Language Models Are Few-Shot Learners* 8, § 2.2, 43 app. A (2020), https://arxiv.org/abs/2005.14165 (describing a classifier used to score and resample Common Crawl, with WebText, Wikipedia, and web books as positive examples and unfiltered Common Crawl as negative examples).

[10] *See* Kandpal et al., *supra* note 8, at 7, § 4.2 (repeated training passes); *id.* at 7–8, fig. 2, §§ 4.2–4.3 (controlled data-quality comparisons).

[11] *See* Pierre-Carl Langlais et al., *Pleias 1.0: The First Ever Family of Language Models Trained on Fully Open Data*, 267 Procedia Comput. Sci. 146, 152, § 4 (2025), https://doi.org/10.1016/j.procs.2025.08.241.

[12] *See* Copyright Office Report, *supra* note 4, at 85 n.479, 104.

Newstex, for example, offers AI developers content from over 1,500 fully licensed sources through a single delivery stream.[13]

Licensing content for AI is now common. By late 2025, OpenAI itself had signed licensing arrangements with nearly twenty media groups.[14]

**B. Existing products show that consent-based AI training is commercially viable and pro-innovation.**

Consent-based AI development is already a commercial reality. Amici and others have brought generative products to market using licensed material for images, music, video, and text.

***Text***. ProRata runs an AI search engine that answers users' questions with content licensed from publishers, and it shares its revenue with those publishers.[15] Created by Humans offers a marketplace where authors register their books and set the terms on which AI companies may train on them.[16] Cashmere lets

---

13 Newstex, *Content Licensing for AI Developers* (visited Oct. 27, 2026), https://newstex.com/content-licensing-services/ai-developers.

14 Klaudia Jaźwińska, *Lawsuit or License?*, Colum. Journalism Rev. (Dec. 4, 2025), https://cjr.org/analysis/lawsuit-license-openai-microsoft-training-data-traffic-copyright.php (visited Oct. 30, 2026) ("Nearly twenty media groups have signed licensing arrangements with OpenAI.").

15 *See* Sara Guaglione, *Boston Globe, Future, Vox Media Join ProRata's Generative AI Licensing Model*, Digiday (June 6, 2025), https://digiday.com/media/boston-globe-future-vox-media-join-proratas-generative-ai-licensing-model/ (visited Oct. 30, 2026).

16 Nawotka, *supra* note 3.

AI applications draw on publishers' content through a single platform, with access controls that let publishers decide who may use their content and on what terms.[17]

***Images***. Adobe and Getty are established businesses that built AI image models trained on licensed data rather than unbounded web scraping. Adobe's first commercially released Firefly model was trained on Adobe Stock images, openly licensed content, and public-domain content.[18] Similarly, Getty Images lets users create images using a model trained on its licensed creative library.[19]

***Music and audio***. SourceAudio has arranged opt-in AI-training licenses for participating music catalogs.[20] Voice-Swap offers AI voice models of singers who have licensed their voices to the company, and it pays those artists a share of the royalties when their voices are used.[21] Musical AI lets AI developers license training data from music rightsholders through a central platform.[22] Boomy lets consumers

---

[17] *See* Cashmere, *What Is Cashmere?* (updated Mar. 27, 2026), https://cashmere.io/docs/guides/what-is-cashmere/ (visited Oct. 30, 2026).

[18] *See* Adobe, *Adobe Firefly for Contributors FAQ* (updated Sept. 16, 2026), https://helpx.adobe.com/stock/contributor/submit-your-content/submit-generative-ai-content/firefly-faq.html (visited Oct. 30, 2026).

[19] Getty Images, *Generate New AI Images or Modify Our Creative Imagery*, https://gettyimages.com/AI (visited Oct. 29, 2026).

[20] See SourceAudio, *SourceAudio Inks Deal with Symphonic, Expanding Ethical AI Licensing Opportunities for Artists* (Feb. 18, 2026), https://sourceaudio.com/blog/2026/02/18/sourceaudio-inks-deal-with-symphonic-expanding-ethical-ai-licensing-opportunities-for-artists/ (visited Oct. 30, 2026).

[21] Declan McGlynn, *Introducing Stem-Swap: Change the Vocals of Fully Mixed Tracks Without Acapellas*, Voice-Swap (Jan. 15, 2024), https://voice-swap.ai/blog/stem-swap (visited Oct. 30, 2026).

[22] *See* Mandy Dalugdug, *Musical AI Raises $4.5m to Scale AI Attribution Tech*, Music Bus. Worldwide (Jan. 13, 2026), https://musicbusinessworldwide.com/musical-ai-bags-4-5m-in-funding-round-to-scale-ai-attribution-tech/ (visited Oct. 30, 2026).

create, publish, and monetize original songs with generative AI.[23] And Splice compensates creators when their samples are used to generate variations and when those variations are downloaded or licensed.[24]

***Video***. Marey is a video-generation model trained on licensed, high-resolution footage and developed for filmmakers who want commercially safe output.[25]

***Certification***. Fairly Trained offers a certification for services that train their models using licensed or otherwise consensually obtained data. It also requires developers to maintain robust due-diligence and recordkeeping processes.[26]

### C. Requiring rightsholders' permission will not price out AI developers.

The Department of Justice contends that licensing costs could disadvantage smaller developers.[27] But licensing markets can — and do — accommodate

---

[23] Peermusic & Boomy, *Comments on the Notice of Inquiry and Request for Comments Regarding Artificial Intelligence and Copyright* 1, U.S. Copyright Office Docket No. 2023-6 (Oct. 2023), https://downloads.regulations.gov/COLC-2023-0006-8989/attachment_1.pdf.

[24] *See* Murray Stassen, *Splice Launches AI Tools That Compensate Sample Creators When Their Sounds Are Used*, Music Bus. Worldwide (Apr. 16, 2026), https://musicbusinessworldwide.com/splice-launches-ai-tools-that-compensate-sample-creators-when-their-sounds-are-used/ (visited Oct. 30, 2026); Splice, *FAQ: Splice Sounds Plugin—Now in Beta*, Splice Help Ctr. (July 20, 2026), https://support.splice.com/en/articles/12997860-faq-splice-sounds-plugin-now-in-beta (visited Oct. 30, 2026) ("Splice FAQ").

[25] *See* Moonvalley, *Marey*, https://moonvalley.com/marey (visited Oct. 29, 2026) ("Moonvalley *Marey*").

[26] *See* Fairly Trained, *Certifications*, https://fairlytrained.org/certifications (visited Oct. 30, 2026).

[27] *See* DOJ Statement, *supra* note 2, at 4 & n.13.

developers with different financial resources and business models, ensuring their ability to compete.

Developers can reduce startup costs by sharing revenue with rightsholders as it is earned instead of paying them before launch.[28] The Copyright Office has also identified revenue- or profit-linked compensation as a potential means for smaller developers to acquire rights with less initial cash outlay.[29]

Developers' licensing fees — the costs of paying creators for their work — are also partly offset by licensing's commercial benefits. Because licensed works tend to be of higher quality, licensing can reduce training costs and make AI development and optimization more predictable.

Licensing also helps protect developers and users from being sued. A copyright-infringement suit is expensive, and obtaining permission before using copyrighted work avoids that expense. For instance, copyright law allows statutory damages of up to $150,000 per work for willful infringement.[30] A single suit can cost more than smaller companies can absorb. Licensing allows AI developers and users to manage that risk. And because the market for licensed training data has already done the costly work of tracing who owns what, companies can use AI in their workflows without having their decisions constrained by fear of liability.

---

[28] *See* Professional Publishers Association, *AI Firm ProRata Strikes Licensing Agreement with Publishers* (Dec. 16, 2025), https://ppa.co.uk/ai-firm-prorata-strikes-licensing-agreement-with-publishers (visited Oct. 30, 2026).

[29] *See* Copyright Office Report, *supra* note 4, at 93–94, 103.

[30] 17 U.S.C. § 504(c)(1)–(2).

## III. Licensing supports innovation and distributes AI's economic benefits.

Licensing distributes the economic benefits of AI development beyond the companies that train the models. It creates demand for original human work and the businesses that curate and distribute it.

### A. Licensing creates new markets and economic opportunities.

When AI developers use copyrighted work without permission, no one else has any say, and no one else stands to profit. Rightsholders go uncompensated. By contrast, when copyrighted works are protected, the need to get creators' consent forces developers to take their preferences into account. It also gives creators a stake in the transaction. The developer, no longer able to take without asking, becomes a potential business partner.

Requiring developers to license copyrighted training data can also help mitigate digital monopolization. Frontier chatbots like ChatGPT and other AI services have begun serving as one-stop shops for their users to seek information,[31] diverting web traffic by letting users avoid visiting the sources that supply the information.[32] If AI companies can poach those sources' work without paying for it, the diversion of traffic will threaten some companies' economic survival.

---

[31] *See* Aaron Chatterji et al., *How People Use ChatGPT* 2 (Nat'l Bureau of Econ. Rsch., Working Paper No. 34255, Sept. 15, 2025), https://doi.org/10.3386/w34255.

[32] In a study of March 2025 browsing, Google users clicked a conventional search result on 8% of visits with an AI summary, compared with 15% without one. *See* Athena Chapekis & Anna Lieb, *Google Users Are Less Likely to Click on Links When an AI Summary Appears in the Results*, Pew Rsch. Ctr. (July 22, 2025), https://pewresearch.org/short-reads/2025/07/22/google-users-are-less-likely-to-click-on-links-when-an-ai-summary-appears-in-the-results/ (visited Oct. 30, 2026).

Licensing and revenue-sharing offer another way to compensate creators when AI users don't visit their sites, mitigating market harm, protecting competition, and supporting new work.

AI model developers might negotiate with individual rightsholders in exceptional cases — just as music streaming services, for example, have sometimes needed to negotiate with major artists. In most cases, however, developers (and end users) will find it more economical to work with intermediaries like publishers, record labels, data curators, and licensing collectives. Intermediaries can identify content, record who owns it, trace permissions, and collect royalties or other payments for rightsholders.[33] The resulting economic activity is therefore distributed rather than entirely appropriated by the developer.

Amici and other intermediaries are shaping this new economy by helping AI developers, AI users, and rightsholders meet each other's needs, facilitating positive-sum transactions that benefit everyone.

Requiring AI developers to get permission before training models on copyrighted data will change what gets built and how it gets built in a way that benefits all stakeholders; it will not slow innovation.[34] Instead, it will spur it. As the Copyright Office has noted, new model architectures and training techniques "may be developed to facilitate training using fewer unlicensed works without sacrificing quality," and investment decisions may be influenced "by the shifting incentives created by legal and licensing developments."[35]

---

[33] *See* Copyright Office Report, *supra* note 4, at 85, 89–94, 104.

[34] The Copyright Office found that "[e]ffective licensing options can ensure that innovation continues to advance without undermining intellectual property rights." Copyright Office Report, *supra* note 4, at 107.

[35] *See* Copyright Office Report, *supra* note 4, at 105.

### B. Paying creators rewards their effort and supports continued creation.

Licensing helps sustain the supply of original work that AI developers and users depend on. Payments to journalists, researchers, musicians, and artists can support their next article, study, song, or image, which can provide new material for future models.[36] Without new human-created work, developers would increasingly train on AI-generated material, which researchers fear can degrade future model quality.[37] A decline in new human-created work would also harm Amici's licensing businesses: fewer new works would mean less content for Amici to license, curate, and supply to AI developers.

Any practical difficulties in paying creators can be resolved. Startups like Amici, and long-established businesses like Adobe, have developed ways to compensate rightsholders while tying the amount owed to the value their work creates for developers and their customers.

### C. Licensing reduces litigation risk and commercial uncertainty.

Licensing helps developers and their customers trace where training data comes from, verify its quality and reliability, and confirm legal compliance.[38] It thus also promotes AI safety. For example, books licensed for AI training by reputable

---

[36] *See* Copyright Office Report, *supra* note 4, at 68–70, 93–94; S. Alex Yang & Angela Huyue Zhang, *Generative AI and Copyright: A Dynamic Perspective* 24–25 (Dec. 5, 2025), https://arxiv.org/abs/2402.17801v2 (modeling how compensation can encourage people to produce training data when existing data are scarce).

[37] *See* Ilia Shumailov et al., *AI Models Collapse When Trained on Recursively Generated Data*, 631 Nature 755, 755, 758–59 (2024), https://doi.org/10.1038/s41586-024-07566-y.

[38] See OECD, *Intellectual Property Issues in Artificial Intelligence Trained on Scraped Data* 13–14 (OECD Artificial Intelligence Papers No. 33, Feb. 2025).

publishers are less likely to contain misinformation. Publishers and other intermediaries keep permissions records and help developers ensure that their models train only on copyright-compliant data. Such chains of title also reduce legal risks for AI companies' customers,[39] letting them confidently use the models with less concern about being sued.

## IV. Conclusion

Protecting copyright owners against nonconsensual AI training will not slow innovation, hurt small developers, or have any of the other adverse consequences warned of by OpenAI and the Department of Justice. Amici's success shows that AI companies and users alike increasingly want to ensure that models are trained on data used with its owners' permission.

Licensing has turned out to be pro-innovation and profitable for all sides, protecting existing markets while creating new ones, and it helps ensure that the benefits of the AI economy accrue beyond large-model developers that built their fortunes by training on copyrighted data without consent.

Amici are at the forefront of AI innovation, and their business models help AI developers and users respect copyright, secure creators' consent, and protect themselves against litigation risk. Their business models — and those of artists, journalists, and other creators and curators — assume and require robust copyright protections. These are the markets that stand to thrive if AI developers must seek copyright owners' consent before training on their data, and to suffer if AI developers are granted a fair-use exemption from the law's requirements.

---

[39] *See* Cashmere, *supra* note 17; Splice FAQ, *supra* note 24; Getty Images, *supra* note 19.

Dated: October 30, 2026

Respectfully submitted,

By: /s/ Ryan McCarl

Ryan McCarl (Cal. SBN 302206)
Kimberly Chemerinsky (Cal. SBN 277637)
*Pro hac vice motions pending*

**Rushing McCarl LLP**
2219 Main Street, No. 144
Santa Monica, CA 90405
T: (310) 896-5082
E: service@rushingmccarl.com

*Counsel for Proposed Amici Curiae BandLab Singapore Pte. Ltd.; Boomy Corporation; Created by Humans, Inc.; Credtent, Inc.; Distributed Creation Inc. dba Splice; Newstex LLC; ProrataAI, Inc.; SourceAudio Holdings LLC; Vandal AI Inc. dba Cashmere; and Voice-Swap Ltd.*

## CERTIFICATE OF COMPLIANCE WITH WORD LIMIT

Pursuant to Local Civil Rule 7.1(c) and the Court's August 7, 2026 order, I certify that this brief complies with the 6,000-word limit. It contains 3,604 words, including footnotes and endnotes and excluding the caption, tables of contents and authorities, signature blocks, and this certificate. I relied on Microsoft Word's word-count feature.

Dated: October 30, 2026

By: /s/ Ryan McCarl

*Pro hac vice motion pending*