# EXHIBIT A

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

IN RE:

OPENAI, INC.

COPYRIGHT INFRINGEMENT LITIGATION

This Document Relates To: All Matters

25-md-3143 (SHS) (OTW)

**[PROPOSED] AMICUS BRIEF OF MIDJOURNEY, INC. AND RUNWAY AI, INC. IN SUPPORT OF DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**

Dated: October 30, 2026

CLEARY GOTTLIEB STEEN & HAMILTON LLP

Angela L. Dunning
adunning@cgsh.com
CLEARY GOTTLIEB STEEN
& HAMILTON LLP
151 University Avenue
Palo Alto, CA 94301

Charity Lee
clee@cgsh.com
Nathan Swire
nswire@cgsh.com
Emma Valiante
evaliante@cgsh.com
CLEARY GOTTLIEB STEEN
& HAMILTON LLP
One Liberty Plaza
New York, NY 10004

Counsel for Proposed Amici Curiae
Midjourney, Inc. and Runway AI, Inc.

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 7.1 of the Federal Rules of Civil Procedure, Proposed Amici Curiae Midjourney, Inc. and Runway AI, Inc. declare as follows:

Midjourney, Inc. has no parent company, and there is no publicly held company owning ten percent (10%) or more of its stock.

Runway AI, Inc. has no parent company, and there is no publicly held company owning ten percent (10%) or more of its stock.

## STATEMENT REGARDING AUTHORSHIP AND FUNDING

No party's counsel authored this brief in whole or in part. No party, party's counsel, or person other than Midjourney, Inc., Runway AI, Inc., and their counsel contributed money intended to fund the preparation or submission of this brief.

# TABLE OF CONTENTS

Page


I. PRELIMINARY STATEMENT ....................1

II. SUMMARY OF GUIDING COPYRIGHT PRINCIPLES ....................2

III. GENERATIVE AI MODELS DRIVE, RATHER THAN DIMINISH, HUMAN CREATIVITY AND EXPRESSION ....................7

A. Model Training Is Designed To Enable New Expression ....................7

B. AI Tools Are a Catalyst for Creativity ....................11

1. Generative AI Tools Allow More People To Create ....................12

2. AI Tools Supercharge the Creative Capabilities of Professionals ....................16

IV. CONCLUSION ....................27

# TABLE OF AUTHORITIES

**Page(s)**

**Rules and Statutes**

17 U.S.C. § 102 ........ 3

17 U.S.C. § 106 ........ 3

17 U.S.C. § 107 ........ 4

**Cases**

*Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith,*
598 U.S. 509 (2023) ........ *passim*

*Authors Guild v. Google, Inc.,*
804 F.3d 202 (2d Cir. 2015) ........ 5,6,11

*Authors' Guild v. HathiTrust,*
755 F.3d 87 (2d Cir. 2014) ........ 5

*Bartz v. Anthropic PBC,*
787 F. Supp. 3d 1007 (N.D. Cal. 2025) ........ 5

*Bill Graham Archives v. Dorling Kindersley Ltd.,*
448 F.3d 605 (2d Cir. 2006) ........ 9

*Campbell v. Acuff-Rose Music, Inc.,*
510 U.S. 569 (1994) ........ 3,4,5,6

*Eldred v. Ashcroft,*
537 U.S. 186 (2003) ........ 3,4,11

*Feist Publ'ns., Inc. v. Rural Tel. Serv. Co.,*
499 U.S. 340 (1991) ........ 3

*Google LLC v. Oracle Am., Inc.,*
593 U.S. 1 (2021) ........ *passim*

*Harper & Row, Publishers, Inc. v. Nation Enters.,*
471 U.S. 539 (1985) ........ 3,5

*Lenz v. Univ. Music Corp.*,
815 F.3d 1145 (9th Cir. 2016) ....................4

*Sony Computer Ent., Inc. v. Connectix Corp.*,
203 F.3d 596 (9th Cir. 2000) ....................10

*Sony Corp. of Am. v. Univ. City Studios, Inc.*,
464 U.S. 417 (1984)....................3,6

*Suntrust Bank v. Houghton Mifflin Co.*,
268 F.3d 1257 (11th Cir. 2001) ....................4,6

*Twentieth Century Music Corp. v. Aiken*,
422 U.S. 151, 156 (1975)....................3

*United States v. Paramount Pictures, Inc.*,
334 U.S. 131 (1948)....................3

**Other Authorities**

Pierre N. Leval, Toward a Fair Use Standard, 103 Harv. L. Rev. 1105, 1110 (1990) ....................3,5

U.S. Const. art. I, § 8, cl. 8....................2

## INTEREST OF AMICI

Midjourney, Inc. ("Midjourney") is a small artificial intelligence ("AI") research lab dedicated to creating tools that augment and expand the human imagination. Runway AI, Inc. ("Runway") is an applied AI research lab building foundational real-world AI models, including video generation, world simulation, and robotics models. Amici are not parties to this suit and have no personal stake in the outcome of this case. However, they share a common interest in seeing copyright law develop in a way that preserves its core purposes of encouraging the creation of new works for the benefit of the public.

## I. PRELIMINARY STATEMENT

Generative AI technology is a catalyst for human creativity and innovation. Through use of large language, image, and video models, users can transmute their ideas into new and never-before-seen works of written and visual art or simulated environments. Everyday people use large language models like ChatGPT, Midjourney's eponymous image models, or Runway's video and robotics models to ideate, experiment, and better communicate their ideas and artistic vision. Companies use these tools to better promote and run their businesses, allowing them to operate more efficiently, improve their goods and services, and benefit consumers. And the tools have ushered in an era of unlimited creative possibilities for professional artists. In short, generative AI models are helping us learn, discover, and create more than ever before. And that is only possible because these tools have been trained on the vast body of knowledge and prior writings, photographs, and artworks available to anyone on the public internet—our collective birthright to learn from and build upon.

Defendants have already explained why the training of their AI models constitutes fair use. *See* Dkt. 1973 ("Microsoft Books MSJ") at 9-33; Dkt. 1975 ("Microsoft News MSJ") at 10-13; Dkt. 1720 ("OpenAI Books MSJ") at 19-38; Dkt. 1980 ("OpenAI News MSJ") at 7-11. In brief, the

technology is spectacularly transformative, enabling the creation of new expression, and the use at issue—training a model—does not substitute for any text on which it was trained. *Id.*

What the Court also "must take into account [are] the public benefits the copying will likely produce," and whether they are "related to copyright's concern for the creative production of new expression." *Google LLC v. Oracle Am., Inc.*, 593 U.S. 1, 35 (2021) ("*Oracle*").[1] In the case of generative AI models, the answer is plainly "yes."

To help the Court reach that determination, Amici will show just some of the extraordinary benefits that generative AI models provide to the public—the primary intended beneficiaries of copyright—and why those benefits counsel so strongly in favor of a finding that training on copyrighted content constitutes fair use. This inquiry does not turn on any false dichotomy between human and AI creation. The tools at issue have been developed for use *by humans* to create all sorts of new works that will enrich our common culture. And that is the whole point of copyright and fair use: encouraging the creation of something new from what has come before and thereby promoting the progress of science and the useful arts for the benefit of us all.

## II. SUMMARY OF GUIDING COPYRIGHT PRINCIPLES

The purpose of U.S. copyright law is to foster creativity, new forms of expression, and the proliferation of scientific knowledge. The U.S. Constitution's Copyright Clause authorizes Congress "[t]o promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries." U.S. Const. art. I, § 8, cl. 8. "The Copyright Act encourages creativity by granting to the creator of an original work 'a bundle of rights,'" *Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*, 598 U.S. 509,

[1] Unless otherwise stated, all emphases are added and citations and internal quotation marks and brackets are omitted.

526 (2023) ("*Warhol*"), including the right to make copies of the work, 17 U.S.C. § 106. These rights are afforded not "based upon any natural right that the author has in his writings, but upon the ground that the welfare of the public will be served and progress of science and useful arts … promoted" thereby. *Sony Corp. of Am. v. Univ. City Studios, Inc.*, 464 U.S. 417, 429 n.10 (1984) ("*Sony Betamax*"). Thus, "reward to the owner [is] a secondary consideration" in service to the "primary object" of benefiting the public. *United States v. Paramount Pictures, Inc.*, 334 U.S. 131, 158 (1948); *see also Twentieth Century Music Corp. v. Aiken*, 422 U.S. 151, 156 (1975) ("The sole interest of the United States and the primary object in conferring [copyright protection] ... lie in the general benefits derived by the public ….").

Copyright's objectives also "parallel those of the First Amendment." Pierre N. Leval, *Toward a Fair Use Standard*, 103 Harv. L. Rev. 1105, 1110 (1990) ("Leval").[2] Copyright is meant "to be the engine of free expression." *Harper & Row, Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 558 (1985); *Sony Betamax*, 464 U.S. at 431 n.12 (copyright has "always been closely connected with freedom of expression").

To protect and promote the public's ability to learn from, criticize, discuss, and build on the works of others, copyright protection is constrained in three important respects.

<u>First</u>, copyright is given for a limited term, ensuring that works pass into the public domain when copyrights expire. *See Eldred v. Ashcroft*, 537 U.S. 186, 192 (2003).

<u>Second</u>, copyright protects original expression, not facts or ideas. *See Feist Publ'ns., Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 344-45 (1991) ("no author may copyright his ideas"); 17 U.S.C. § 102. Thus, "every idea, theory, and fact in a copyrighted work becomes instantly available for

[2] The Supreme Court has repeatedly relied on Judge Leval's article in applying the fair use doctrine (*see Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 576 (1994); *Oracle*, 593 U.S. at 18, and *Warhol*, 598 U.S. at 529), and it remains a seminal authority on modern fair use analysis.

public exploitation at the moment of publication." *Eldred*, 537 U.S. at 219. This "idea/expression dichotomy" is essential to copyright's purpose: "[e]very book in literature, science and art … must necessarily borrow[] and use much which … [came] before." *Campbell*, 510 U.S. at 575.

Third, copyright law allows fair use of even protected expression. "From the infancy of copyright protection, some opportunity for fair use … has been thought necessary to fulfill copyright's very purpose[s]," *Campbell*, 510 U.S. at 575, which include both "promoting broad public availability of literature, music, and the [] arts," *Warhol*, 598 U.S. at 526, and "preservation of a meaningful public or democratic dialogue," *Suntrust Bank v. Houghton Mifflin Co.*, 268 F.3d 1257, 1263 (11th Cir. 2001). "Fair use is not just excused by the law, it is wholly authorized by the law." *Lenz v. Univ. Music Corp.*, 815 F.3d 1145, 1151-52 (9th Cir. 2016). Further, where a "use is otherwise fair, then no permission need be sought or granted." *Campbell*, 510 U.S. at 585 n.18. By excluding transformative uses from the ambit of copyright, the fair use doctrine serves as a "context-based check that can help to keep a copyright monopoly within its lawful bounds" by ensuring authors are afforded no "more economic power than is necessary to achieve the incentive to create" and cannot "us[e] copyright to stifle innovation" by others. *Oracle*, 593 U.S. at 21-22.

Under Section 107 of the 1976 Copyright Act, "fair use of a copyrighted work, ... for purposes such as criticism, comment, news reporting, teaching ... scholarship, or research, is *not an infringement of copyright*." 17 U.S.C. § 107. Factors to be considered in determining whether "any particular case is a fair use" include:

> (1) the purpose and character of the use, including whether such use is of a commercial nature …;
>
> (2) the nature of the copyrighted work;
>
> (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and
>
> (4) the effect of the use upon the potential market for or value of the copyrighted work.

*Id.* The "list of factors is not exhaustive," *Oracle*, 593 U.S. at 19, and the enumerated fair uses are "illustrative, [] not limitative," *Campbell*, 510 U.S. at 577. A use is fair if it "serves the copyright objective of stimulating productive thought and public instruction without excessively diminishing the incentives for creativity." Leval, at 1110.

Although no factor is dispositive, the first and fourth factors are the most important and closely intertwined. *Authors Guild v. Google, Inc.*, 804 F.3d 202, 213-14 (2d Cir. 2015) ("*Google Books*"). The first asks whether the use is "transformative," i.e., "adds something new, with a further purpose or a different character," rather than "merely 'supersed[ing] the objects' of the original creation." *Warhol*, 598 U.S. at 528-29. The fourth assesses whether the use serves as a substitute in a "normal market for the copyrighted work[.]" *Harper & Row, Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 568 (1985); *see Authors' Guild v. HathiTrust*, 755 F.3d 87, 99 (2d Cir. 2014) (factor four "is concerned with only one type of economic injury to a copyright holder: the harm that results because the secondary use serves as a substitute for the original work"). "The more the appropriator [uses] copied material for new, transformative purposes, the more it serves copyright's goal of enriching public knowledge and the less likely [] the appropriation will serve as a substitute for the original[.]" *Google Books*, 804 F.3d at 214.

Likewise, if what is reproduced is not original expression, but merely facts and information about a work, then nothing protectable has been taken and the secondary use neither serves as a substitute nor causes harm cognizable under copyright. *Id.* at 224 (Google's copying of millions of books to create a tool enabling users to search for information from or about a book might sometimes "eliminat[e] any need to purchase it or acquire it from a library," but that "would not change the taking of an unprotected fact into a copyright infringement"); *see also HathiTrust*, 755 F.3d at 100 (ability to search books' text "does not serve as a substitute for the books"); *Bartz v. Anthropic PBC*,

787 F. Supp. 3d 1007, 1032 (N.D. Cal. 2025) (granting summary judgment on fair use and reasoning that new, non-infringing writings produced by LLMs trained on plaintiffs' works were "not the kind of competitive or creative displacement that concerns the Copyright Act").

The fair use factors must be applied flexibly to embrace "significant changes in technology." *Oracle*, 593 U.S. at 19. Courts must be "circumspect in construing" the "limited scope of the copyright holder's monopoly" when "major technological innovations alter the market for copyrighted materials." *Sony Betamax*, 464 U.S. at 431. In such cases, the public benefit is paramount. In *Oracle*, for example, the Court ruled that Google's copying of Sun Java implementing code to build Google's competing Android platform was fair use, noting that preventing use of that code would create "a lock limiting the future creativity of new programs" that would "interfere with, not further, copyright's basic creativity objectives." *Oracle*, 593 U.S. at 39-40. Likewise, in *Sony Betamax*, the Supreme Court considered the public's greater access to television shows through time-shifting technology as a benefit that weighed in favor of fair use. 464 U.S. at 454. And in *Google Books*, the Second Circuit had "no difficulty concluding that Google's making of a digital copy of [millions of] Plaintiffs' books" was "highly transformative" and fair, because the purpose of Google's copying was "to make available significant information about those books," thereby furthering the "goals of copyright" to advance the public's "access to knowledge[.]" 804 F.3d at 212, 216-17, 225.

Together, these principles distill into one key directive: copyright should foster new expression, not "put manacles" upon the arts and sciences, *Campbell*, 510 U.S. at 575, or serve as a "device of censorship," *Suntrust Bank*, 268 F.3d at 1260.

## III. Generative AI Models Drive, Rather Than Diminish, Human Creativity and Expression

Generative AI models are perhaps the greatest engine of new expression and innovation that has ever been devised, and their training on the world's information, writings, and images to provide these capabilities benefits the public and is quintessential fair use.

### A. Model Training Is Designed To Enable New Expression

As explained in Defendants' papers, development of an LLM like ChatGPT begins with assembling a large and diverse training corpus of text. Dkt. 1974, "Microsoft Books SUF" ¶ 4a. This data is processed into billions of "tokens"—mathematical representations of words or parts of words, *id.* ¶ 4b—from which the training process extracts and converts grammatical, syntactical, and other patterns and information from the corpus into numerical "weights" that define relationships between all tokens in the datasets and dictate basic building blocks of language. *Id.* ¶¶ 4c, 4d, 12. If trained on sufficiently vast and varied data, a model will develop the ability to "generalize" and thereby produce an astonishing array of new text in response to user prompts. *Id.* ¶¶ 3, 5-13.

Although the technology differs, enormous volumes of images and videos are also required to train models capable of generating new visual content. "Diffusion" models like Midjourney's and Runway's begin with random pixels and, through numerous training runs, learn to "denoise" that data to create coherent images and video in response to user prompts.[3] To do this, models must be trained on billions of diverse images and videos, paired with text descriptions, so they can identify and extract patterns across the entire training corpus, iteratively adjust the model weights that store this information, and "learn" visual concepts and how they are represented in language[4]—the general

[3] Jay Alammar, *The Illustrated Stable Diffusion* (Oct. 4, 2022), https://jalammar.github.io/illustrated-stable-diffusion/.

[4] Midjourney, Summary of Training Content (Mar. 17, 2026), https://docs.midjourney.com/hc/en-us/articles/48067080311309-Public-Summary-of-Training-Content.

attributes of a car, flower, or cat, rather than how they have been specifically depicted by others.

This training process, in turn, enables Midjourney's and Runway's communities of creators to prompt these tools for new and beautiful content in any style, genre, or mood, constrained only by the limits of their imagination[5]:













And while Midjourney and Runway provide the tools, it is the user herself who decides the output by selecting the desired elements of a composition and arranging them through iterative

[5] All images generated by Midjourney users and publicly viewable, with their prompt text, on the Midjourney Explore page: https://www.midjourney.com/jobs/c9362280-4bcd-4ad2-b57f-9c7b0a71fd8f?index=2; https://www.midjourney.com/jobs/25f7a807-ab8c-4286-8f22-49283720b25c?index=3; https://www.midjourney.com/jobs/71af5d97-66fe-4f4b-9d2f-e63538b1771c?index=0; https://www.midjourney.com/jobs/f4f54d4c-613d-4827-93a7-f9a391a3bf5e?index=1; https://www.midjourney.com/jobs/db1b6c7a-6c0b-4909-bd8b-2de828f02093?index=1; https://www.midjourney.com/jobs/03ce9fab-9a23-44d5-bf03-195b5c237e6a?index=2.

prompting. In doing so, the user creates a new image that does not embody, much less substitute for, the protected expression in any work on which the model was trained, but is the end result of a transformative process beginning with the model's training and ending with her creative choices.

It is not possible to license the volume and diversity of content necessary to train a model capable of creating transformative works like these.[6] Even if one could ascertain the author, find their contact information, confirm the work remains under copyright and the counterparty has authority to license it, initiate negotiations, and successfully come to terms (e.g. price, scope of use, and appropriate representations and warranties) in the span of a single minute—which is, of course, absurd—licensing a million works would take a million minutes, or roughly 1.9 years, and licensing a billion would take nearly two thousand years. Licensing simply is not feasible.[7]

Nor would licensing be required even if such a market could develop. "[A] copyright holder cannot prevent others from entering fair use markets merely 'by developing or licensing a market for … transformative uses of its own creative work.'" *Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605, 614-15 (2d Cir. 2006). In *Bill Graham Archives*, the Second Circuit held that the unlicensed reproduction of entire concert posters in a book about the Grateful Dead constituted fair use because it was "transformatively different from the [posters'] original expressive purpose" and caused no "impairment to a traditional, as opposed to a transformative market," even where the plaintiff had "expressed a willingness to license" them to the defendant. 448 F.3d at 614, 615.

---

[6] Matthew Sag, *The False Hope of Content Licensing at Internet Scale* (Nov. 19, 2025), https://www.promarket.org/2025/11/19/the-false-hope-of-content-licensing-at-internet-scale/.

[7] *See* OpenAI Books MSJ, at 37-38 (arguing that, because "[a]ny given work is an infinitesimally small part of the whole," "the transaction costs for licensing any individual works (or even groups of works) would vastly exceed the marginal benefit of those works"); Microsoft Books SUF ¶ 63 ("value is not attributable to any discrete piece of interchangeable data.... There is no settled or workable means for pricing any given piece of training data.").

Simply stated, "copyright owners may not preempt exploitation of transformative markets." *Id.* at 615.

And a copyright owner likewise has no right to prevent others from competing in the market for a transformative use of their work. In *Oracle*, the Supreme Court affirmed fair use where Google had sought, but subsequently abandoned, efforts to secure a license for the Java code it used to build its competing Android platform. 593 U.S. at 8. Likewise, in *Sony Computer Entertainment, Inc. v. Connectix Corp.*, the Ninth Circuit found that copies of Sony code made to reverse-engineer the PlayStation platform "were protected fair use." 203 F.3d 596, 599 (9th Cir. 2000). Although directly competitive, the purpose of the copying was to create a new gaming platform which did not "itself contain object code that infringes Sony's copyright." *Id.* at 606.

The distinction between an AI model's transformative use and its underlying training data is especially stark for a robotics application model like Runway's Praxis-1. Praxis-1 is trained on, among other things, large amounts of video data. Its output, however, is limited to controlling how physical robotic embodiments act and move, as demonstrated in the image below of two robotic arms powered by Praxis-1 as their "brain."[8]

[8] Runway, *Introducing Praxis-1* (Sep. 2026), https://runway.com/research/introducing-praxis-1.




This kind of robotics model does not "supersede the objects" of the videos it learned from, *Warhol*, 598 U.S. at 528, and the videos are not used to reproduce their expressive content. Instead, the training process extracts information about the world, including how objects move, how physical forces act and how actions lead to outcomes—none of which is copyrightable. *Eldred*, 537 U.S. at 219; *Google Books*, 804 F.3d at 224.

These and the further examples below showcase the extraordinary human creativity made possible by generative AI models and how they are enriching our collective culture and serving copyright's core purpose of advancing the arts and sciences for the public benefit.

**B. AI Tools Are a Catalyst for Creativity**

Author Plaintiffs argue that LLM technology "poses a fundamental threat to the incentive for human creation," thereby leading to a "'dearth of creative activity' which would ... 'undoubtedly negatively impact the public.'" Dkt. 1881 ("Author Plaintiffs' MSJ") at 34, 36. However, exactly the opposite is true. AI models are democratizing access to the means of creating. Even Plaintiffs

are using these tools to aid their craft. *See, e.g.,* OpenAI Books MSJ at 6 (*New York Times* journalists use OpenAI's "ChatExplorer" tool to "generate and analyze headlines, brainstorm content, draft interview questions, and research, and edit articles"). AI thus functions as a complement and tool to augment human creativity, not a substitute for it.

### 1. Generative AI Tools Allow More People To Create

Generative AI tools give more people than ever the means to create art. They allow ordinary people to experiment with disciplines like visual arts, graphic design, or poetry to the limits of their imagination, rather than their formal training. And they allow people with disabilities to expand the types of art they can make.

One fundamental way AI tools encourage creativity is by democratizing the tools of artistic creation. Although we no longer live in an age where painters require royal patronage, developing artistic skills can still require years of formal training and the resources to access expensive tools and supplies. An amateur or student who cannot afford art classes or oil paints may never be able to transfer the vision in her mind's eye onto a physical canvas. What she can do, however, is create a digital painting using Midjourney's tools or a short film using Runway's models and the power of her imagination. Based on Midjourney's internal metrics, roughly 50-70% of people using its platform are amateur creatives.[9] They use the platform experientially for fun, exploration of new concepts, or even as a form of meditation or art therapy, such as generating images of a favorite pet who has passed away.[10]

---

[9] Thomas Claburn, *David Holz, founder of AI art generator Midjourney, on the future of imaging*, The Register (Aug. 1, 2022), https://www.theregister.com/software/2022/08/01/holz-founder-of-ai-art-service-midjourney-on-future-images/1198009?ref=antoinebuteau.com.

[10] *Id.*

The result is to make everyday people "feel like an artist." As one writer noted, "The natural language input is a total open sandbox, and if you can [wield] words to the model's liking, you can create almost anything."[11] And people are doing exactly that, creating art that would not otherwise exist merely to see what might be possible:[12]



"Extreme wide shot, tiny human floating down in an endless dark void, a colossal squid swimming through glowing mist below, waving all its tentacles rapidly, one of the tentacle wrapped a person and dragging it to the deep sea, the colossal squid is a hologram, a school of fish pass by, volumetric light rays, epic scale. half of the image has pixel drifting away," by Midjourney user qian6701.



"An abstract painting of a planet ruled by little castles" by user @RiversHaveWings on Twitter, using OpenAI's CLIP tool.

[11] Charlie Snell, *Alien Dreams: An Emerging Art Scene*, Machine Learning at Berkeley (Jun. 30, 2021), https://mlberkeley.substack.com/p/clip-art?utm_source=publication-search.

[12] Images below at *id.*; https://www.midjourney.com/jobs/7ff0bf1f-2791-4b7c-9fa1-21544a52d496?index=2.

Others treat the act of prompting itself as an art form, such as through "prompt templates," which encourage others to create similar compositions with their own twist:[13]



**Figure 6: Example of the prompt "Audacious and whimsical fantasy house shaped like <object> with windows and doors, <location>". All images above use "strawberry" as the shape, with the location varied ("countryside", "Paris", "Tokyo").**

Differently abled people can also particularly benefit from these tools. For example, students who suffer from dysgraphia—a learning disorder that impairs written communication—now have access to numerous AI tools that allow them to better convert their thoughts into writing and, in turn, to more effectively communicate and contribute to the public discourse.[14] Other disabled artists have described how they incorporated AI tools into their process:

- A blind artist used tactile images generated by ChatGPT and Bard LLMs to explore different shapes that could be incorporated into final tactile works.
- A deaf artist who was a native ASL speaker used LLMs to overcome barriers in written communication in English, allowing her to free up time and energy for her art.
- An artist with a long-term memory disability created an art installation combining text and video journals focused on the theme of prosthetic memory, using AI trained on those materials to develop a system of cross-referencing.[15]

---

[13] M. Chang *et al.*, *The Prompt Artists*, C&C '23: Proceedings of the 15th Conference on Creativity and Cognition (2023) at 81-82, https://arxiv.org/pdf/2303.12253.

[14] Dan Fitzpatrick, *AI Tools for Students With Dysgraphia: 6 Picks for Getting Ideas Onto the Page*, Blog.AIEducator.Tools (Oct. 18, 2026), https://blog.aieducator.tools/posts/ai-tools-for-students-with-dysgraphia.

[15] C. Bennett *et al.*, *Painting with Cameras and Drawing with Text: AI Use in Accessible Creativity*, in Proceedings of the 26th Int'l. ACM Assets ¶¶ 4.2.1, 4.2.2, 4.3.1 (2024), https://dl.acm.org/doi/fullHtml/10.1145/3663548.3675644.

Game designer Sean Aaberg credited Midjourney with allowing him to "achieve some sort of creative feeling that I haven't felt for too long" after a stroke left him unable to draw.[16]



Digital painting by Sean Aaberg, created using Midjourney

Empirical evidence confirms that AI tools can spark and improve creativity. In one study, researchers asked participants to generate ideas for everyday problem-solving (such as picking gifts) using an LLM, using Google, or receiving no assistance.[17] In blind tests, judges rated the ideas generated using LLM assistance as most creative.[18] Another study that provided a custom AI tool to visual designers found the AI-aided designs were more creative than human-only designs.[19] It

[16] Dale J. Rappaneau, Art-generating AI as an accessibility tool for disabled artists, The Techtualist (Jan. 25, 2023), https://techtualist.substack.com/p/art-generating-ai-as-an-accessibility; Sean Aaberg, *AI Art*, Goblinko (Dec. 9, 2022), https://goblinkomegamall.com/blogs/gkocommunications/ai-art?srsltid=AU7gw4U9e-TEAlmoy6qA6mbk4bnbrazgwK9WDx5Vupq09VkBlBmczDNZ.

[17] Dunning Ex. 1, Byung Cheol Lee & Jaeyeon (Jae) Chung, *An empirical investigation of the impact of ChatGPT on creativity*, 8 Nat. Hum. Behav. 1906, 1907-1909 (2023).

[18] *Id.* at 1910-11.

[19] Dunning Ex. 2, Nan Wang *et al.*, *Exploring creativity in human-AI co-creation: a comparative study across design experience*, Frontiers in Computer Science (Sep. 30, 2025).

also found that AI tools helped novice designers generate new ideas and learn new skills, while experienced designers used them to refine and accelerate their creative process.[20] In all cases, the AI tools helped real people.

### 2. AI Tools Supercharge the Creative Capabilities of Professionals

AI is also supercharging the human artistry of professionals—from artists to entrepreneurs—and lowering barriers to entry for emerging artists or those with limited resources. AI models are powerful new tools, but not a substitute for the artists who wield them.

Take artist Kelly Boesch, who, after years working as a graphic designer and film producer at IMAX, got "hooked" on AI and is now "completely focused on it as [her] chosen art form." She uses a combination of Midjourney and video models from Runway and Pika to create original, surreal videos, and "sees AI as a powerful collaborator, pushing creative boundaries at the intersection of human artistry and machine learning."[21]

AI also lets nonprofits and organizations with limited resources produce work that used to be out of reach. The United Nations Refugee Agency used Runway to create a FIFA World Cup film that would otherwise have required a cost-prohibitive multi-continent shoot.[22] The resulting film drew 1.2 million organic views in the first 24 hours, was screened at the UN General Assembly, and is now on permanent display at the UN headquarters.

---

[20] *Id.* at 11-13.

[21] Jeff Foster, *AI Tools Artist Spotlight: an Interview with Kelly Boesch*, Provideo Coalition (Jan. 5, 2026), https://www.provideocoalition.com/ai-tools-artist-spotlight-kelly-boesch/.

[22] YouTube, *From uprooted, to unstoppable: UNHCR's Gamechanging Team* (May 18, 2026), https://www.youtube.com/watch?v=Tgx-n4UNNoY&t=8s.

Other artists are likewise creating works recognized for originality and beauty. Jason Allen won a 2022 Colorado State Fair art competition by using a combination of Midjourney and other tools to create a rich and dramatic artwork:[23]



Théâtre D'opéra Spatial by Jason M. Allen using Midjourney

[23] Jason M. Allen, *Embark on a Cosmic Journey: Experience The Future of Fine AI Art with Space Opera Theater* (2024), https://www.jasonmallen.com/space-opera-theater.

Likewise, a short film by Jacob Adler created using Runway won the Grand Prize at the 2025 AI Film Festival:[24]



"Total Pixel Space," short film by Jacob Adler using Runway tools

And generative AI technology does not merely enable new levels of creativity; it also fosters community, which, in turn, pushes art to evolve. Art movements from impressionism to cubism to hip-hop have always advanced through groups of artists collaborating, iterating, and inventing together in specific times and places. AI art is no different.

[24] Craig S. Smith, *An AI Film Festival And The Multiverse Engine*, Forbes (Jun. 7, 2025), https://www.forbes.com/sites/craigsmith/2025/06/07/an-ai-film-festival-and-the-multiverse-engine/.

Midjourney is intentionally designed as a community. By default, images generated on Midjourney's Discord server[25] are publicly available, allowing users to view others' prompts and outputs, and comment and riff on them. Midjourney even suggests daily "themes" for users to explore, allowing them to interpret those themes as they wish and share the results:




Two different users' interpretation of the theme "vestibule" on October 7, 2026

25 Midjourney Discord, available at http://discord.com/invite/Midjourney. Discord is a general-purpose chat and voice-over-internet social media platform.

These tools help people form connections and create together offline. At the Rideau-Rockcliffe Community Resource Centre in Ottawa, Canada, a "collective" of seniors meets to create AI art and develop that art into books and calendars.[26] According to organizer Luc Lalande, this "represents a novel approach to addressing some of the most pressing problems facing seniors – social isolation and lack of opportunities to meaningfully participate in community life."[27]

For individual artists, AI tools are invaluable for ideation and design. Jason Jamerson, a professor at Louisiana State University and theater set designer, uses Midjourney for concept generation. He compared the process to cutting out magazine pictures, or using Google image search, to find sparks of inspiration, but emphasized that the human set designer was ultimately in control: "[W]e don't want the A.I. to design the set. We just want it to give us new, interesting concept overlays. We want to remain the designers."[28]

---

[26] Luc Lalande, *GenAI with Creative Seniors at the Rideau-Rockcliffe Community Resource Centre (Ottawa, Canada)*, Medium (Jul. 28, 2023), https://luclalande.medium.com/ai-art-seniors-program-at-rrcrc-284926eaceaa.

[27] The Awesome Foundation, *Seniors AI Art Collective* (last visited Oct. 28, 2026), https://www.awesomefoundation.org/en/projects/229786-seniors-ai-art-collective.

[28] Michael Schweikardt, *Imagine/: Artificial Intelligence Comes to Theatrical Design*, The Theatre Times (Sep. 17, 2022), https://thetheatretimes.com/imagine-artificial-intelligence-comes-to-theatrical-design/.



Alphonse Mucha inspired set design for *A Midsummer Night's Dream* by Jason Jamerson with Midjourney

Fine artists working in paint, sculpture, and textiles are similarly using Midjourney as a support tool in their creative process: testing color palettes for textiles before beginning the dyeing process; modeling a sculpture in an atrium prior to installation; or simulating lighting on reflective surfaces prior to a photography shoot.[29]

Artists similarly report using Midjourney for inspiration in domains such as fashion:[30]

[29] JM Bonthous, *The Strengths and Weaknesses of Midjourney for Fine Art*, Medium (Dec. 5, 2025), https://medium.com/@jmbonthous/the-strengths-and-weaknesses-of-midjourney-for-fine-art-2c0fbe71a128.

[30] Instagram, Post of Oct. 26, 2022 by Fireflypath, https://www.instagram.com/p/CkMM3ayAMGt/.





Concept art generated in Midjourney and final sewn dress by "Fireflypath," shared on Instagram

Illustrations:[31]



Concept art generated using Midjourney and colored pencil illustration by Jennifer Morrison



[31] Jennifer Morrison, *Using Midjourney (AI) to Create Reference Images for my Colored Pencil Drawings*, Jennifer Morrison Art (last visited Oct. 28, 2026),

And textiles:[32]



Textile wall hanging designed using Midjourney by artist Milla Novo

Established film and television studios are likewise integrating AI tools into the work of their creative professionals to expand what they can accomplish. The results are already on screen. Jon Erwin—a writer, director, and producer who serves as CEO of the independent studio Kingdom Story Company—used Runway's tools in creating *House of David*, a historical epic produced by The Wonder Project in collaboration with Amazon MGM Studios.[33]

https://jennifermorrisonart.com/using-midjourney-ai-to-create-reference-images-for-my-colored-pencil-drawings/?srsltid=AU7gw4WbErJekcrWJeLQnAGyVi30gAzTOutB9ZwxZKIul_z_DGetU9Yo.

[32] Roddy Clarke, *Meet Milla Novo: The textile artist bridging the gap between technology and heritage crafts*, Icon (Nov. 26, 2024), https://www.iconeye.com/design/meet-milla-novo-the-textile-artist-bridging-the-gap-between-technology-and-heritage-crafts.

[33] Runway, *How "House of David" Used Runway to Become Amazon's Latest Hit Series* (last visited Oct. 28, 2026), https://runway.com/customers/how-house-of-david-used-runway-to-become-amazons-latest-hit-series.



Created using Runway for *House of David*

Erwin's team began by using the tools for high-end pre-visualization, then found the imagery strong enough to include in the show itself. According to Erwin, Runway "allowed us to create these photoreal visuals and tell the story"—"work that we would not have otherwise been able to do and we're able to do it in a cost-effective, creatively exceptional process."[34]

AI tools can similarly allow professional creatives to explore new ideas. Architects now have tools that can develop a sketch into a full rendering or transform a two-dimensional drawing into editable three-dimensional models, allowing the architect to ideate more comprehensively before picking a final design.[35] And these tools can be even more powerful when combined. Architect John W. Lynch, for example, described using an iterative conversation with ChatGPT to

[34] *Id.*

[35] Faiza Ansari, *Top 15 AI Tools for Architecture and Design*, Parametric Architecture (Sep. 23, 2026), https://parametric-architecture.com/top-15-ai-tools-for-architecture/.

design a building, which he was then able to illustrate using Midjourney.[36] He wrote that using these tools "puts architects in a narrative role, supervising development and riffing off the open-sourced web to formulate and advance unforeseen imaginings."[37]

AI tools can even help projects get off the ground. Independent filmmaking studio Mermaid Toast, for example, uses AI tools to generate proofs-of-concept for film pitches that would otherwise be prohibitively expensive to make. As co-founder Ellenor Argyropoulos has explained:

> It was a lightbulb moment when I realized that by harnessing the power of AI, we could not only streamline the filmmaking pitching process, but also open up new avenues for storytelling and create opportunities for emerging talent. AI could be a tool to enhance creativity, not replace it … [while providing] [c]ommunity and the ability to create proof of concepts in an industry where the barrier for entry is so costly and hard.[38]

These benefits extend to the writing process. Author Plaintiffs themselves admit that LLMs can aid the creative process. *See* OpenAI Books MSJ at 15 (plaintiff authors "used ChatGPT to help them research, write, and brainstorm new ideas"). This is not unusual: In the hands of professional writers, ChatGPT can boost both the quality and efficiency of writing. It is a dictionary, thesaurus, research assistant, and sparring partner, all in one. Beyond basic use cases such as research and proofreading, writers use LLMs to brainstorm and ideate, develop characters, improve accuracy, sharpen dialogue, and polish outlines.[39] The ideas, concepts, lived experiences, and insights that inform the work remain the writer's, but AI accelerates the writing process and improves the writing.

---

[36] John W. Lynch, *Translating from ChatGPT to Midjourney Could Be a Productive Part of Early Design Thinking*, The Architect's Newspaper (Apr. 21, 2023), https://www.archpaper.com/2023/04/translating-from-chatgpt-to-midjourney-could-productive-part-early-design-thinking/.

[37] *Id.*

[38] *Meet Ellenor Argyropoulos*, Canvas Rebel (May 6, 2024), https://canvasrebel.com/meet-ellenor-argyropoulos/.

[39] Erik Bork, *ChatGPT and screenwriting* (Dec. 2024), https://www.flyingwrestler.com/2024/12/chatgpt-and-screenwriting/; Paul Peditto, *Script Gods*

These AI tools are also building blocks for creativity in industry and the sciences by enabling emerging technologies that have the potential for tremendous societal benefits. For example, training on video can teach a model how the physical world behaves: how objects move, actions cause effects, and scenes change over time. That understanding makes generative video models a strong foundation for both world models (systems that simulate physical environments in real time and predict the outcomes of actions within them) and robotics models (systems that can perceive, plan, and act in the physical world). These burgeoning technologies hold great promise for critical industries, including manufacturing, logistics, healthcare, transportation, and scientific research.

In another example, a coffeehouse owner, with the help of ChatGPT, designed a system of sensors and water spray to remove static electricity from coffee grounds, preventing them from sticking together in the bag.[40] These advancements—big and small—are exactly the kind of public benefits fair use is meant to advance. Without a finding of fair use here, these innovative developments and many we haven't even thought of yet risk being stopped in their tracks.

Indeed, in a 2025 survey conducted by the U.S. Chamber of Commerce, 58% of small businesses self-identified as using generative AI, primarily externally-developed AI tools such as ChatGPT.[41] And a 2026 study by Goldman Sachs found that 93% of business owners who used AI tools said that those tools had a positive impact on their business.[42]

---

*Must Die: Luna 'N Me*, Script Magazine (Jan. 8, 2025), https://scriptmag.com/features/script-gods-must-die-luna-n-me.

[40] U.S. Chamber of Commerce, Empowering Small Business: The Impact of Technology on U.S. Small Business, (4th Ed. 2025) at 14, https://www.uschamber.com/assets/documents/20251621-CTEC-Empowering-Small-Business-Report-2025-v1-r10-Digital-FINAL.pdf.

[41] *Id.* at 3, 15.

[42] Goldman Sachs, *AI Presents a Major Opportunity for Small Businesses—But Support Is Needed to Close the Implementation Gap* (Mar. 17, 2026), https://www.goldmansachs.com/community-transformation/10000-small-businesses-voices/insights/ai-presents-a-major-opportunity-for-small-businesses.

Other data backs up the value of AI tools too. One study demonstrated that education about AI tools produced firm-wide productivity gains for start-ups in an incubator.[43] Compared to a control group, the firms that received training were more likely to discover new use cases for AI, and in turn were 18% more likely to acquire paying customers, generated 1.9x as much revenue, and required less external capital investment.[44] The public is the direct beneficiary of the cost savings and innovation generative AI enables for these businesses.

## IV. Conclusion

The foregoing examples represent a mere fraction of the astonishingly varied and transformative new expression generative AI tools like ChatGPT, Midjourney, and Runway are engendering. In short, these tools are driving and augmenting creativity, not diminishing it. Their training should be recognized for what it is: a quintessential transformative fair use that serves the core purposes of copyright by enriching our common culture and advancing the arts and sciences for the public benefit.

---

[43] H. Kim *et al.*, *Mapping AI into Production: A Field Experiment on Firm Performance* 8-11, INSEAD Working Paper No. 2026/20/STR (Mar. 30, 2026), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=6513481.

[44] *Id.* at 3.

Dated: October 30, 2026

CLEARY GOTTLIEB STEEN & HAMILTON LLP

*/s/ Angela L. Dunning*

Angela L. Dunning
adunning@cgsh.com
CLEARY GOTTLIEB STEEN
& HAMILTON LLP
151 University Avenue
Palo Alto, CA 94301

Charity Lee
clee@cgsh.com
Nathan Swire
nswire@cgsh.com
Emma Valiante
evaliante@cgsh.com
CLEARY GOTTLIEB STEEN
& HAMILTON LLP
One Liberty Plaza
New York, NY 10004

Attorneys for Proposed Amici Curiae
Midjourney, Inc. and Runway AI, Inc.

## CERTIFICATE OF COMPLIANCE

I, Angela Dunning, an attorney duly admitted to practice law in this Court, hereby certify that this brief complies with the word count limit because it contains 5986 words, excluding the parts exempted by Local Civil Rule 7.1(c). In preparing this certification, I have relied on the word count of the word-processing system used to prepare this brief.

Dated: October 30, 2026

CLEARY GOTTLIEB STEEN & HAMILTON LLP

*/s/ Angela L. Dunning*

Angela L. Dunning
adunning@cgsh.com
CLEARY GOTTLIEB STEEN
& HAMILTON LLP
151 University Avenue
Palo Alto, CA 94301

Counsel for Proposed Amici Curiae
Midjourney, Inc. and Runway AI, Inc.