# EXHIBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE:<br><br>OPENAI, INC.,<br><br>COPYRIGHT INFRINGEMENT LITIGATION<br><br>This Document Relates To:<br><br>1:23-cv-08292 (SHS) (OTW)<br>1:23-cv-10211 (SHS) (OTW)<br>1:25-cv-03482 (SHS) (OTW)<br>1:23-cv-11195 (SHS) (OTW)<br>1:24-cv-01515 (SHS) (OTW)<br>1:24-cv-03285 (SHS) (OTW)<br>1:24-cv-04872 (SHS) (OTW)<br>1:25-cv-04315 (SHS) (OTW) | 1:25-MD-3143 (SHS) (OTW)<br><br>Hon. Sidney H. Stein<br>Hon. Ona T. Wang |

**BRIEF OF TREVOR LAWRENCE JR., CHAMBER OF PROGRESS, AND ABUNDANCE INSTITUTE AS AMICI CURIAE IN SUPPORT OF OPENAI, INC.'S MOTION FOR SUMMARY JUDGMENT AND OPPOSING PLAINTIFFS' MOTIONS FOR SUMMARY JUDGMENT**

Kathleen Farley
Vice President of Litigation
CHAMBER OF PROGRESS
1390 Chain Bridge Road #A108
McLean, VA 22101

*Counsel for Amici Curiae Trevor Lawrence Jr., Chamber of Progress, and Abundance Institute*

## TABLE OF CONTENTS

AMICI'S IDENTITIES, INTERESTS, AND AUTHORITY TO FILE THIS BRIEF ................. 1

INTRODUCTION AND SUMMARY OF ARGUMENT ........................................................... 3

ARGUMENT ........................................................................................................................... 5

I. Extracting non-expressive patterns is transformative and serves copyright's purpose of encouraging substantial new creativity. ........................................................ 5

II. The experience of amici and other working musicians documents how generative AI enables human creativity. ............................................................................ 7

A. AI is the latest example of technology that is creating new frontiers for creativity in the music industry. .............................................................................. 8

B. New generative AI tools empower musicians' human authorship. ....................... 9

C. Generative AI empowers independent artists to tell stories they otherwise could not afford to tell. ........................................................................................... 11

III. The public benefits of Defendants' generative AI training strongly favor fair use. .......................................................................................................................... 12

CONCLUSION ...................................................................................................................... 14

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Authors Guild v. Google, Inc.*,
804 F.3d 202 (2d Cir. 2015)....................3, 5, 6, 7

*Authors Guild v. Google, Inc.*,
954 F. Supp. 2d 282, 287 (S.D.N.Y. 2013)....................6

*Authors Guild, Inc. v. HathiTrust*,
755 F.3d 87, 95 (2d Cir. 2014)....................7

*Am. Soc'y for Testing & Materials v. UpCodes, Inc.*,
172 F.4th 253 (3d Cir. 2026) ....................11

*Bartz v. Anthropic PBC*,
787 F. Supp. 3d 1007 (N.D. Cal. 2025) ....................6, 7

*Campbell v. Acuff-Rose Music, Inc.*,
510 U.S. 569 (1994)....................3

*Google LLC v. Oracle Am., Inc.*,
593 U.S. 1 (2021)....................3, 4, 12, 13

*Kadrey v. Meta Platforms, Inc.*,
788 F. Supp. 3d 1026 (N.D. Cal. 2025) ....................6

*Sega Enters. Ltd. v. Accolade, Inc.*,
977 F.2d 1510 (9th Cir. 1992) ....................12

*Sony Computer Entm't, Inc. v. Connectix Corp.*,
203 F.3d 596 (9th Cir. 2000) ....................7

*Thomson Reuters Enter. Ctr. GmbH v. ROSS Intel. Inc.*,
No. 25-2153, 2026 WL 2932557 (3d Cir. Sept. 29, 2026) ....................6

*Walker v. Time Life Films, Inc.*,
784 F.2d 44 (2d Cir. 1986)....................13

*Williams v. Crichton*,
84 F.3d 581 (2d Cir. 1996)....................13

**Constitutional Provision:**

U.S. Const., Art. I, § 8, cl. 8....................3, 4

**Statute:**

17 U.S.C. § 102(b) ....................7, 13

17 U.S.C. § 107 ....................5

**TABLE OF AUTHORITIES**

**(continued)**

**Page(s)**

**Other Authorities:**

Jerry L. Barrow, 'BBL Drizzy' Creator King Willonius on AI & Black Music: 'This Is Unprecedented Territory,' HOT 97 (June 12, 2024), https://www.hot97.com/interviews/bbl-drizzy-king-willonius-interview-black-music-month/ ....................10

Chamber of Progress, Partners, https://progresschamber.org/partners (last visited Oct. 30, 2026) ....................2

Trevor Lawrence Jr., Ash Soan Interview, The TrevBeats Show, ep. 48, https://www.trevorlawrencejr.com/the-trevbeats-show/ash-soan-interview (last visited Oct. 28, 2026) ....................8, 9, 11

Trevor Lawrence Jr., DJ Quik Interview, The TrevBeats Show, ep. 28, transcript, discussion of AI and stems, https://www.trevorlawrencejr.com/the-trevbeats-show/dj-quik-interview (last visited Oct. 28, 2026) ....................9, 10

Trevor Lawrence Jr., Keyon Harrold Interview, The TrevBeats Show, ep. 33, https://www.trevorlawrencejr.com/the-trevbeats-show/keyon-harrold-interview (last visited Oct. 28, 2026) ....................8, 9, 10, 11

Trevor Lawrence Jr., Mike Elizondo Interview, The TrevBeats Show, ep. 2, “AI, Humanity & the Future” segment, https://www.trevorlawrencejr.com/the-trevbeats-show/mike-elizondo-interview-episode-2 (last visited Oct. 28, 2026) ....................10

Trevor Lawrence Jr., Mike Moore Interview, The TrevBeats Show, ep. 44, https://www.trevorlawrencejr.com/the-trevbeats-show/mike-moore-interview (last visited Oct. 28, 2026) ....................9, 10

Trevor Lawrence Jr., Paul Jackson Jr. Interview, The TrevBeats Show, ep. 32, https://www.trevorlawrencejr.com/the-trevbeats-show/paul-jackson-jr-interview (last visited Oct. 28, 2026) ....................10, 11

Trevor Lawrence Jr., Pocket Queen Interview, The TrevBeats Show, ep. 29, AI discussion, https://www.trevorlawrencejr.com/the-trevbeats-show/pocket-queen-interview (last visited Oct. 28, 2026) ....8, 10, 11

Grammy Winner Trevor Lawrence Jr. on Drumming, Producing, Music, and Technology, AFM Local 47 (Aug. 3, 2026), https://afm47.org/press/grammy-winner-trevor-lawrence-jr-on-drumming-producing-music-and-technology/ ....9, 11

**TABLE OF AUTHORITIES**

**(continued)**

**Page(s)**

Jason Parham, The Filmmaker Who Says AI Is Reparations, WIRED (Mar. 20, 2024), https://www.wired.com/story/willonius-hatcher-the-filmmaker-who-says-ai-is-reparations/ ....11

Rachel Roberts, "It Unlocked All My Creativity": King Willonius on Using AI for His Comedic Track, BBL Drizzy, MusicTech (May 13, 2024), https://musictech.com/news/music/king-willonius-ai-bbl-drizzy-metro-boomin/ ....10

Helen Todd, King Willonius: BBL Drizzy, A.I. & Manifesting, Creativity Squared, ep. 75 (Dec. 19, 2024), https://creativitysquared.com/podcast/ep75-king-willonius-bbl-drizzy-a-i-manifesting/ ....9, 11

## AMICI'S IDENTITIES, INTERESTS, AND AUTHORITY TO FILE THIS BRIEF[1]

Amici are a multi-Grammy-winning musician and mission-driven nonprofit organizations committed to ensuring that interpretations of copyright law promote genuine creativity, the explicit purpose of the U.S. Constitution's Copyright Clause, and benefit the public interest. Amici believe and argue that Plaintiffs' claims contravene basic copyright principles and would, if deemed to justify summary judgment, suppress innovation at the cost of the public's interest in new creative works. Indeed, the outcome of this case is likely to shape music tools in addition to the generative AI tools that are the subject of this lawsuit.

**Trevor Lawrence Jr.** is a multi-Grammy-winning drummer, producer, and developer. Lawrence has contributed to influential work across hip-hop, R&B, pop, gospel, jazz, film, and television. His credits include collaborations with Dr. Dre, Eminem, Kendrick Lamar, Bruno Mars, Alicia Keys, Ed Sheeran, Mariah Carey, Lionel Richie, Herbie Hancock, Stevie Wonder, and many others. He has performed on major stages across the world, including the Super Bowl LVI Halftime Show.

**Chamber of Progress** is a technology-industry coalition devoted to a progressive society, economy, workforce, and consumer climate. Chamber of Progress supports public policies that will build a fairer, more inclusive country in which the technology industry operates responsibly and fairly for all people. In keeping with that mission, Chamber of Progress seeks to encourage economic growth and empower technology users. Chamber of Progress's work is supported by its corporate partners, but its partners do not sit on its board of directors and do not have a vote on, or

[1] No party's counsel authored this brief in whole or in part; no party or party's counsel contributed money that was intended to fund preparing or submitting this brief; and no person other than the amici curiae, their members, or their counsel contributed money that was intended to fund preparing or submitting this brief.

veto over, its positions. Chamber of Progress does not speak for individual partner companies, and it remains true to its stated principles even when its partners disagree.[2]

**Abundance Institute** is a mission-driven 501(c)(3) nonprofit focused on creating space for emerging technologies to grow, thrive, and have a chance to reach their full potential. Abundance Institute supports talent development; fosters a community of optimists, founders, innovators, and creators; and shapes public policies before emerging technologies go mainstream. Abundance Institute's Creative Frontiers initiative explores the intersection of creativity and emerging technology through historical research and firsthand creator experience to support policies that expand creative agency by keeping new tools and creative resources broadly accessible. Abundance Institute has an interest in this case because the outcome will directly affect the ability of its creator community and the general public to access and use powerful new creative tools.

Plaintiff authors and news organizations sued Defendants Microsoft and OpenAI regarding methods that these companies developed and used to train large language models ("LLMs"). These methods—which review text to extract non-expressive patterns and use these patterns to power general-purpose, predictive language models—are transformative and help to inform, inspire, and produce new creative works, thus qualifying as fair use under well-established copyright principles. For these reasons, the Court should deny Plaintiffs' motions for summary judgment insofar as they challenge the training uses addressed here and grant OpenAI's motions for summary judgment on fair use as to those uses.[3]

---

[2] Chamber of Progress's partners are listed at https://progresschamber.org/partners (last visited Oct. 30, 2026).

[3] Amici's brief focuses on Defendants' fair-use arguments as they concern training. Amici take no position on how Defendants obtained the works; this brief addresses only the training use. Citations to "Class Opp." refer to OpenAI's Opposition to Class Plaintiffs' Motion for Summary Judgment, MDL ECF No. 2203 (Oct. 23, 2026), and citations to "News Opp." refer to OpenAI's Opposition to News Plaintiffs' Motion for Partial Summary Judgment, MDL ECF No. 2207 (Oct. 23, 2026). Pinpoint citations use the briefs' printed page numbers.

## INTRODUCTION AND SUMMARY OF ARGUMENT

Creativity rarely emerges in a vacuum. Authors quote sources, historians reproduce archival materials, music critics incorporate clips for commentary, and researchers analyze vast collections of copyrighted works to generate new knowledge. Fair use preserves the space for these activities to occur, helping to ensure that copyright law serves its "very purpose, '[t]o promote the Progress of Science and useful Arts.'" *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 575 (1994) (quoting U.S. Const., Art. I, § 8, cl. 8); *see also Google LLC v. Oracle Am., Inc.*, 593 U.S. 1, 16–17 (2021) (noting that copyright is not a "special reward" for authorship and should not "stand in the way of others exercising their own creative powers").

The fair-use doctrine requires courts to consider several relevant factors, which notably prioritize whether a use is *transformative*, not derivative, "because a transformative use is one that communicates something new and different from the original or expands its utility, thus serving copyright's overall objective of contributing to public knowledge." *Authors Guild v. Google, Inc.*, 804 F.3d 202, 214 (2d Cir. 2015). Plaintiff authors and news organizations contend that Defendants violated copyright law by training LLMs on Plaintiffs' works. But Plaintiffs' works were written to communicate their expressive value. The training use at issue puts the works to a fundamentally different purpose: extracting non-expressive, linguistic patterns as the basis for general-purpose, predictive language models. This is a paradigmatic transformative use, strongly favoring fair use. *See id.* at 216 (finding similar language extraction "highly transformative" even where, unlike here, the use intentionally involved providing direct portions of text to the public).

The modern creative industry's experience with generative AI provides an excellent illustration of these principles in action, demonstrating how generative AI tools advance copyright's central purpose to enable further human creativity. For example, musicians use generative AI to explore arrangements, develop melodies, and bring projects within reach that

limited resources might otherwise foreclose. These tools support and help to effectuate the artist's judgment, expanding the possibilities for human expression and the works available to the public.[4]

Observations from creators who use generative AI tools also highlight another important consideration for fair use: the use's *public benefit* (*i.e.*, helping to foster more creative production). *Oracle*, 593 U.S. at 30, 35. This consideration strongly favors fair use here, given how generative AI is unlocking "future creativity." *See Oracle*, 593 U.S. at 39. Requiring permission for the transformative training use at issue would, in a manner antithetical to copyright principles, burden development of tools that expand independent creators' opportunities to produce new works. *Cf. id.* ("[A]llowing [copyright] enforcement here would . . . [create] a lock limiting the future creativity of new programs.").

To ensure that copyright law continues to serve its purpose of promoting creativity for the public's benefit, the Court should recognize the transformative purpose of Defendants' training activities and the opportunities for new human expression that those activities enable. Applying fair-use principles in this manner preserves copyright's protection for existing works without allowing that protection to become an obstacle to further creative production, consistent with the balance inherent in the Copyright Clause. *See* U.S. Const., Art. I, § 8, cl. 8. For these reasons, the Court should deny Plaintiffs' motions for summary judgment insofar as they challenge the training uses addressed here and grant OpenAI's motions for summary judgment on fair use as to those uses.

[4] Indeed, the arguments in this brief inherently apply to all creativity and creators in any medium, known or yet to be invented.

## ARGUMENT

### I. Extracting non-expressive patterns is transformative and serves copyright's purpose of encouraging substantial new creativity.

The Second Circuit has held that copying works to extract non-expressive information about them can serve copyright law's purpose of encouraging new expression and therefore constitute fair use. The same reasoning applies to the linguistic patterns collected when training generative AI. *See Authors Guild*, 804 F.3d at 214 (concluding that Google Books' search and snippet functions constitute a "transformative use, which augments public knowledge").

Under the first fair-use factor,[5] whether the use is "transformative" is highly consequential. "The more the appropriator is using the copied material for new, transformative purposes, the more it serves copyright's goal of enriching public knowledge and the less likely it is that the appropriation will serve as a substitute for the original or its plausible derivatives, shrinking the protected market opportunities of the copyrighted work." *Authors Guild*, 804 F.3d at 214.

*Authors Guild* establishes that copying works to provide information about them is transformative when the resulting service does not supply a meaningful substitute for their protected expression. 804 F.3d at 214, 217–18, 223–25. In that case, plaintiff authors brought copyright claims against Google regarding Google Books, a service created by necessarily scanning and uploading the full text of millions of books to a digital database to provide users with various powerful tools for learning about the books. *Id.* at 208–09. For example, Google provided tools enabling "text mining" and "data mining" to "discern fluctuations of interest in a particular subject . . . by showing increases and decreases in the frequency of reference and usage in different

[5] Fair use requires consideration of four statutory factors: (1) "the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes"; (2) "the nature of the copyrighted work"; (3) "the amount and substantiality of the portion used in relation to the copyrighted work as a whole"; and (4) "the effect of the use upon the potential market for or value of the copyrighted work." 17 U.S.C. § 107.

periods and different linguistic regions," "derive information on how nomenclature, linguistic usage, and literary style have changed over time," *id.* at 209, and assess "word frequencies, syntactic patterns, and thematic markers," *id.* (quoting *Authors Guild, Inc. v. Google Inc.*, 954 F. Supp. 2d 282, 287 (S.D.N.Y. 2013)). The Second Circuit had "no doubt that the purpose of this copying" was transformative, given that the purpose was to glean information about the books, not republish the books or their expressive elements. *See id.* at 217.

Defendants' generative AI model training similarly has the purpose of extracting linguistic information regarding written materials, rather than reproducing their expression. As Defendants explain in their briefing, LLM training depends on breaking text from many sources into "tokens" that are then mathematically related to each other, allowing a model to predict new sequences. *See, e.g.*, Microsoft Opposition to Books Plaintiffs' Motion for Partial Summary Judgment, ECF No. 2173 at 12; Class Opp. 9. Across many different materials, the training identifies non-expressive, statistical relationships between words to reveal patterns about how words are used. This information is then used to construct and enable the operation of a general-purpose language model that can generate responses to user prompts.

As in *Authors Guild*, this endeavor is "highly transformative," and is done to gather information about the works. *See Bartz v. Anthropic PBC*, 787 F. Supp. 3d 1007, 1021 (N.D. Cal. 2025) ("[U]sing works to train LLMs was transformative—spectacularly so."); *Kadrey v. Meta Platforms, Inc.*, 788 F. Supp. 3d 1026, 1044 (N.D. Cal. 2025) ("There is no serious question that Meta's use of the plaintiffs' books . . . was highly transformative. The purpose of Meta's copying was to train its LLMs, which are innovative tools that can be used to generate diverse text and perform a wide range of functions."); *cf. Thomson Reuters Enter. Ctr. GmbH v. ROSS Intel. Inc.*, No. 25-2153, 2026 WL 2932557, at *6 n.7 (3d Cir. Sept. 29, 2026) ("Unlike the AI models in

*Bartz* and *In re: OpenAI*, ROSS's AI platform cannot generate original expression, and the evidence here supports the opposite conclusion about transformativeness."). Copyright protects an author's particular expression of ideas, but does not extend to analytical information about that expression. 17 U.S.C. § 102(b) ("In no case does copyright protection for an original work of authorship extend to any idea, procedure, process, system, method of operation, concept, principle, or discovery, regardless of the form in which it is described, explained, illustrated, or embodied in such work."); *cf. Sony Computer Entm't, Inc. v. Connectix Corp.*, 203 F.3d 596, 602 (9th Cir. 2000) ("Connectix's intermediate copying and use of Sony's copyrighted BIOS was a fair use for the purpose of gaining access to the unprotected elements of Sony's software.").

Indeed, training inherently differs dramatically from "[p]aradigmatic examples of derivative works," such as "the translation of a novel into another language, the adaptation of a novel into a movie or play, or the recasting of a novel as an e-book or an audiobook." *Authors Guild*, 804 F.3d at 215 (quoting *Authors Guild, Inc. v. HathiTrust*, 755 F.3d 87, 95 (2d Cir. 2014)). OpenAI explains that its models learn general patterns, that it uses safeguards against regurgitation, and that reproduction of training text is rare and limited. Class Opp. 4–5, 18–19; News Opp. 5, 8–9. Those features support the conclusion that the resulting LLMs do not constitute meaningful substitutes for Plaintiffs' protected expression.

## II. The experience of amici and other working musicians documents how generative AI enables human creativity.

The individuals whose work drives the creative industry offer a practical perspective on how generative AI supports human creativity. Their experiences illustrate how new generative AI tools help artists develop ideas, refine their craft, and realize projects and goals that might for practical reasons otherwise never have been attempted. These uses expand the possibilities for

creative expression and outputs while preserving the central role of human judgment and creativity.

**A. AI is the latest example of technology that is creating new frontiers for creativity in the music industry.**

While generative AI is a new technology, its role in musical creation reflects a familiar relationship between evolving tools and human creativity. Musicians have repeatedly adopted technologies that changed how music is produced without eliminating the importance of artistic judgment, craft, and performance. Generative AI is seen by many as a new frontier in the trajectory of music's evolution that previously featured developments such as multitrack recording, electric guitars, Auto-Tune, and many others.[6] Musicians have found ways to use these developments to enhance their own creativity and make new and better music. While the means of realizing a musical vision may change with time and new tools, the vision remains the artist's and that artist's alone.[7]

Despite the emergence of drum machines, for example, talented drummers have continued to work, thrive, and create. The ability to automate or augment a musical task did not eliminate the centrality of human drummers to the process of making music; musicians instead found additional ways to engage audiences.[8] Similarly, for decades before generative AI, engineers used EQ, filters, and phase tricks to try to isolate parts of recordings, including drums. Today, generative AI makes

---

[6] *See* Trevor Lawrence Jr., Keyon Harrold Interview, The TrevBeats Show, ep. 33, at 34:49–38:59 (transcript), https://www.trevorlawrencejr.com/the-trevbeats-show/keyon-harrold-interview (last visited Oct. 28, 2026) (comparing AI with synthesizers, multitrack recording, and electric-guitar technology as tools serving artists' ideas); Trevor Lawrence Jr., Ash Soan Interview, The TrevBeats Show, ep. 48, at 24:38–25:57 (transcript), https://www.trevorlawrencejr.com/the-trevbeats-show/ash-soan-interview (last visited Oct. 28, 2026) (recounting the creative use of Auto-Tune on Cher's "Believe").

[7] *See* Lawrence, Keyon Harrold Interview, *supra* note 6, at 34:49–38:59 (describing AI as a means to realize the musician's existing vision while retaining the musician's own ideas and direction).

[8] Trevor Lawrence Jr., Pocket Queen Interview, The TrevBeats Show, ep. 29, transcript, AI discussion, https://www.trevorlawrencejr.com/the-trevbeats-show/pocket-queen-interview (last visited Oct. 28, 2026) (Pocket Queen observing that she and Lawrence built drumming careers despite drum machines and found new ways to attract audiences to the craft).

it possible to isolate parts even more quickly and efficiently. But the underlying creative activity—taking a recording apart to understand its construction and learn from individual performances—predates the new tool.[9]

### B. New generative AI tools empower musicians' human authorship.

AI provides tools for musicians to explore new ideas and shape their performances in countless ways.[10] For example, a producer can experiment with hearing how a jazz standard in the public domain might sound as hip-hop before developing an arrangement, treating the generated version as an intermediate creative stimulus.[11] Similarly, an AI-generated drum demo can illustrate a producer's desired sound and feel to a human drummer, who then contributes their unique, very human interpretation.[12] Musicians also draw inspiration from AI-generated responses to their own performances.[13] In each instance, generative AI broadens the musical possibilities available for an artist to consider while leaving composition, selection, and performance to human judgment.[14]

---

[9] Trevor Lawrence Jr., DJ Quik Interview, The TrevBeats Show, ep. 28, transcript, discussion of AI and stems, https://www.trevorlawrencejr.com/the-trevbeats-show/dj-quik-interview (last visited Oct. 28, 2026) (describing isolation of drums using filters, compression, expansion, and gating around 2000, and present-day AI separation and live DJ stem processing).

[10] *See* Grammy Winner Trevor Lawrence Jr. on Drumming, Producing, Music, and Technology, AFM Local 47 (Aug. 3, 2026), https://afm47.org/press/grammy-winner-trevor-lawrence-jr-on-drumming-producing-music-and-technology/ (Lawrence discussing AI in his creative work and music-software development, including tools for shaping drum sounds and rhythmic feel).

[11] *Cf.* Helen Todd, King Willonius: BBL Drizzy, A.I. & Manifesting, Creativity Squared, ep. 75, at 22:04–22:45 (Dec. 19, 2024) (transcript), https://creativitysquared.com/podcast/ep75-king-willonius-bbl-drizzy-a-i-manifesting/ (Hatcher describing exploration of his song in multiple genres, including gospel, yacht rock, and K-pop); Lawrence, DJ Quik Interview, *supra* note 9, transcript, AI discussion (Lawrence describing AI as a way to hear an idea differently before re-creating it with musicians or through one's own production process).

[12] Lawrence, Ash Soan Interview, *supra* note 6, at 53:20–54:18 (Soan describing clients sending Suno-generated drum demos to convey a desired sound and feel while asking him to contribute his own playing).

[13] Trevor Lawrence Jr., Mike Moore Interview, The TrevBeats Show, ep. 44, at 38:27–41:04 (transcript), https://www.trevorlawrencejr.com/the-trevbeats-show/mike-moore-interview (last visited Oct. 28, 2026) (Moore describing submitting a musical idea to AI, considering its suggestion, and developing the idea again in his own way; Lawrence describing his own use of AI for inspiration).

[14] *See* Lawrence, Keyon Harrold Interview, *supra* note 4, at 34:49–38:59 (emphasizing the artist's continuing vision and thought process); Lawrence, Mike Moore Interview, *supra* note 13, at 38:46–39:37 (distinguishing further human development from simply using an AI output unchanged).

AI-assisted creation draws on familiar artistic skills: selecting promising material, experimenting with arrangements, and developing an idea into a finished work.[15] A musician can use an AI-generated phrase as a starting point while supplying the composition, performance, and creative direction that make the resulting work her own.[16] These practices illustrate how generative AI tools support human authorship.[17]

Additionally, generative AI offers musicians new ways to learn from existing recordings and hone their craft. For example, source-separation tools can isolate bass, kick drum, or guitar parts, allowing musicians to study what was played and how individual performances interact.[18] Thus, even without access to the original multitrack recording, a student or amateur musician can examine an arrangement, study techniques, and create practice mixes.[19] These uses extend familiar activities—listening closely, experimenting with arrangements, and learning from other performers—by making recordings more useful as resources to further human creativity.

---

[15] Rachel Roberts, "It Unlocked All My Creativity": King Willonius on Using AI for His Comedic Track, BBL Drizzy, MusicTech (May 13, 2024), https://musictech.com/news/music/king-willonius-ai-bbl-drizzy-metro-boomin/ (reporting Hatcher's process of testing prompts, listening critically, and repeatedly revising a track).

[16] *See* Lawrence, Mike Moore Interview, *supra* note 13, at 38:46–39:37 (describing an AI suggestion as an idea to develop through the musician's own approach).

[17] *See* Jerry L. Barrow, 'BBL Drizzy' Creator King Willonius on AI & Black Music: 'This Is Unprecedented Territory,' HOT 97 (June 12, 2024), https://www.hot97.com/interviews/bbl-drizzy-king-willonius-interview-black-music-month/ (Hatcher describing writing the lyrics before using an AI music generator and creating accompanying artwork in Midjourney).

[18] *See* Trevor Lawrence Jr., Mike Elizondo Interview, The TrevBeats Show, ep. 2, transcript, "AI, Humanity & the Future" segment, https://www.trevorlawrencejr.com/the-trevbeats-show/mike-elizondo-interview-episode-2 (last visited Oct. 28, 2026) (identifying stem splitting as a useful assistive tool); Lawrence, DJ Quik Interview, *supra* note 9, transcript, AI discussion (describing separation of songs into stems for listening and education when the original multitrack is unavailable).

[19] Trevor Lawrence Jr., Paul Jackson Jr. Interview, The TrevBeats Show, ep. 32, at 32:09–33:33 (transcript), https://www.trevorlawrencejr.com/the-trevbeats-show/paul-jackson-jr-interview (last visited Oct. 28, 2026) (describing removal of guitar or vocal parts with Moises so students could supply those parts themselves while playing or singing with the recording); Lawrence, Pocket Queen Interview, *supra* note 8, transcript, AI discussion (describing drum removal and control of separate parts in a mix).

### C. Generative AI empowers independent artists to tell stories they otherwise could not afford to tell.

Generative AI also lets independent artists pursue creative visions that their budgets or personal circumstances might otherwise put beyond reach.[20] To illustrate, earlier software such as Pro Tools and Logic brought production capabilities into people's homes.[21] Generative AI extends that development further by reducing the resources needed to turn an idea into a finished product. For example, a creator can begin with a hummed melody, a beatboxed rhythm, or a drum loop and use generative AI to explore a robust arrangement without already possessing every technical skill, instrument, or production resource the project might require.[22] Or a newcomer can sketch an orchestral arrangement before hiring players to record it.[23] Or an up-and-coming artist can produce polished videos with limited resources, bringing his own creative vision to the work.[24] The result is that independent artists have wider access to creation and can participate more fully in music-making. In turn, audiences enjoy the creation of new works, as copyright law intends, that limited resources might otherwise prevent from coming to fruition.[25]

---

[20] *See* Lawrence, Keyon Harrold Interview, *supra* note 6, at 34:49–38:59 (describing AI as a tool for realizing an artist's ideas within tighter budgets and shorter production schedules).

[21] *See* Lawrence, Paul Jackson Jr. Interview, *supra* note 19, at 28:11–31:15 (discussing the transition from tape to digital audio workstations and recording at home for remote sessions); Lawrence, Ash Soan Interview, *supra* note 6, at 21:14–24:02 (discussing lower equipment costs and the growth of home recording).

[22] Lawrence, Pocket Queen Interview, *supra* note 8, transcript, AI discussion (Lawrence describing inputting one's own idea, beatboxing, hummed melody, or drum loop into Suno for further development).

[23] Lawrence, Keyon Harrold Interview, *supra* note 6, at 34:49–38:59 (discussing AI's potential to achieve an orchestral sound when a production lacks the budget for a hundred-piece orchestra).

[24] Jason Parham, The Filmmaker Who Says AI Is Reparations, WIRED (Mar. 20, 2024), https://www.wired.com/story/willonius-hatcher-the-filmmaker-who-says-ai-is-reparations/ (describing how King Willonius combines his own writing and narration with Midjourney images and Runway animation to make short films and present his creative projects).

[25] *See* Todd, *supra* note 11, at 30:02–30:42 (Hatcher describing increased productivity and more ambitious songs, trailers, and immersive projects); Grammy Winner Trevor Lawrence Jr., *supra* note 10 (Lawrence describing AI as enabling creative projects and substantially expanding his output).

## III. The public benefits of Defendants' generative AI training strongly favor fair use.

In assessing the fourth fair-use factor, courts may consider "the public benefits the copying will likely produce," including whether the benefits are "related to copyright's concern for the creative production of new expression." *Oracle*, 593 U.S. at 35; *see also Am. Soc'y for Testing & Materials v. UpCodes, Inc.*, 172 F.4th 253, 270 (3d Cir. 2026) ("We assess how likely public benefits balance against likely economic harm, paying special attention to implications for copyright's core concern with 'the creative production of new expression.'" (quoting *Oracle*, 593 U.S. at 35)). Given the many ways that generative AI tools are contributing to creativity, as evidenced by the experiences of working creators discussed above, these considerations strongly favor fair use in this case. *See Oracle*, 593 U.S. at 35, 39–40.

In *Oracle*, the Supreme Court held that Google engaged in fair use when it copied certain portions of computer code that made it possible for developers to easily create programs for the Android platform. *Id.* at 6–9, 39–40. The Court observed that, "given programmers' investment in learning" the APIs, copyright enforcement "would risk harm to the public." *Id.* at 39. In effect, "the costs and difficulties of producing alternative APIs with similar appeal to programmers" would create "a lock limiting the future creativity of new programs." *Id.* While that lock would prove "highly profitable to Oracle" and similarly situated firms, it would detract from "creative improvements, new applications, and new uses developed by users who have learned to work with that interface," and in that respect, "the lock would interfere with, not further, copyright's basic creativity objectives." *Id.*; *see also Sega Enters. Ltd. v. Accolade, Inc.*, 977 F.2d 1510, 1523 (9th Cir. 1992), *as amended* (Jan. 6, 1993) ("[A]n attempt to monopolize the market by making it impossible for others to compete runs counter to the statutory purpose of promoting creative expression and cannot constitute a strong equitable basis for resisting the invocation of the fair use

doctrine."). Accordingly, the Court concluded that consideration of potential public benefits favored fair use.

*Oracle*'s concern with control over future creativity is relevant to Plaintiffs' challenge to the training uses at issue here. Requiring permission for the training use at issue, as Plaintiffs' position would require, would materially burden the development of tools that support new creative work. As OpenAI explains, securing permissions across enormous training corpora would impose transaction costs disproportionate to individual works' contributions and give rightsholders control over technological development. News Opp. 16–17. Such a requirement could impede further creativity—the very concern *Oracle* identified when it explained that a restriction could enrich a copyright owner while impeding the creativity copyright exists to encourage. 593 U.S. at 39–40.

Looking at this issue from another angle, musical styles, genres, techniques, conventions, or influences form part of the shared vocabulary and raw materials of creativity. These elements are not expressive, the same way that a literary genre is non-expressive and not copyrightable. *See* 17 U.S.C. § 102(b) (stating that copyright protection "in no case" includes protection for "any idea, procedure, process, system, method of operation, concept, principle, or discovery"); *see also Williams v. Crichton*, 84 F.3d 581, 587 (2d Cir. 1996) ("[S]cenes a faire, sequences of events that 'necessarily result from the choice of a setting or situation,' do not enjoy copyright protection." (quoting *Walker v. Time Life Films, Inc.*, 784 F.2d 44, 48 (2d Cir. 1986), *cert. denied*, 476 U.S. 1159 (1986))). Artists have always learned from elements in existing works and recombined them into new expression. If creators lose the freedom to learn from and work within or go beyond those kinds of influences, society risks protecting past expression in ways that constrain future creativity, directly counter to the principles of copyright law.

Amici's experience demonstrates the public stakes: independent musicians use these tools to undertake creative projects that limited resources would otherwise foreclose. Burdening those opportunities through the permission requirement that Plaintiffs seek would leave the public with fewer new works and creators with fewer paths to producing them. The public interest in enabling that new expression strongly supports recognizing Defendants' training as fair use.

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' motions for summary judgment insofar as they challenge the training uses addressed here and grant OpenAI's motions for summary judgment on fair use as to those uses.

Respectfully submitted,

October 30, 2026

/s/ Kathleen Farley
Kathleen Farley
Vice President of Litigation
CHAMBER OF PROGRESS
1390 Chain Bridge Road #A108
McLean, VA 22101

*Counsel for Amici Curiae Trevor Lawrence Jr., Chamber of Progress, and Abundance Institute*