**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE:<br><br>OPENAI, INC.,<br>COPYRIGHT INFRINGEMENT LITIGATION<br><br>This document relates to:<br>***All Actions*** | 25-md-3143 (SHS) (OTW) |

***AMICUS CURIAE*** **BRIEF**
**OF TEODOR JAMES HOLMBERG**
**IN SUPPORT OF PLAINTIFFS**

# TABLE OF CONTENTS


Table of Contents ........ i

Table of Authorities ........ ii

List of Plaintiff's Motions for Summary Judgment (and other filings thereof) ........ iv

List of Defendants' Motions for Summary Judgment (and other filings thereof) ........ v

INTRODUCTION ........ 1

ARGUMENT ........ 5

I. The Use of Copyrighted Works as AI Input is a Derivative Use under §106(2) ........ 5

A. 17 U.S.C. §§101 & 106(2): "Derivative Works" ........ 5

B. The Market for Copyrighted Works as AI Input is Huge and Growing ........ 6

C. Fair Use Does Not Apply to the Market/Use of Copyrighted Works as AI Input ........ 7

*1. Any modification of a copyrighted work in order to make it suitable as AI input is not transformative under a fair use analysis ........ 9*

*2. To the extent that Kadrey/Bartz considered AI input rather than AI output, Kadrey/Bartz's conclusions are wrong ........ 10*

II. In the alternative (taking *Bartz/Kadrey*'s side), the Use of Copyrighted Works as AI Input is a New and Separate Property Interest Not Yet Recognized by the Copyright Statute ........ 12

A. Because the Right to use a Copyrighted Work as AI Input is Not a Right Protected by the Copyright Act, a State Law/Common Law claim based on that Right is not Preempted by the Copyright Act ........ 13

B. Should State Law/Common Law Claims based on the Use of Copyrighted Works as AI input be Back on the Table? ........ 14

*1. Unfair Competition through, inter alia, Misappropriation ........ 15*

*2. Unjust Enrichment ........ 17*

CONCLUSION ........ 19

# TABLE OF AUTHORITIES

## CASES

*Anderson v. Stability AI*, 744 F. Supp. 3d 956 (N.D. Cal. 2024)................................................ 17

*Andy Warhol Foundation for the Visual Arts, Inc. v. Goldsmith,* 598 U.S. 508 (2023)................. 9

*Author's Guild v. Google, Inc.*, 804 F. 3d 202 (2d Cir. 2015) ("*Google Books*") ................ 8, 9, 10

*Barclays Cap. Inc. v. Theflyonthewall.com, Inc.*, 650 F.3d 876 (2d Cir. 2011) .................... 15, 16

*Bartz v. Anthropic PBC*, 787 F. Supp. 3d 1007 (N.D. Cal. 2025) .......................................... 3, 12

*Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605 (2d Cir. 2006) .................... 10, 11

*Briarpatch v. Phoenix Pictures*, 373 F. 3d 206 (2d Cir. 2004)...................................................... 18

*Campbell v. Acuff Rose Music Inc.*, 510 U.S. 569 (1994)........................................................... 11

*Computer Assoc. Int'l Inc. v. Altai, Inc.*, 982 F.2d 693 (2d Cir.1992) ............................. 13, 14, 18

*Doe 1 v. GitHub, Inc.*, 2024 WL 235217 (N.D. Cal. Jan. 22, 2024)............................................ 17

*Harper & Row Publishers, Inc. v. Nation Enters*., 471 U.S. 539 (1985)....................................... 8

*Harper & Row v Nation Enterprises*, 723 F.2d 195 (2nd Cir. 1983)............................................ 14

*International News Service v. Associated Press*, 248 U.S. 215 (1918) ....................................... 14

*Kadrey v. Meta Platforms, Inc.*, 788 F. Supp. 3d 1026 (N.D. Cal. 2025) ...................... 3, 4, 10, 12

*Nat'l Basketball Ass'n v. Motorola, Inc.*, 105 F.3d 841 (2d Cir. 1997) ....................................... 14

*New York Times v. Microsoft*, 777 F. Supp. 3d 283 (S.D.N.Y. 2025)........................................... 14

*Roy Exp. Co. v. Columbia Broad. Sys., Inc.*, 672 F.2d 1095 (2d Cir. 1982) .................................. 16

*Sidney Frank Importing Co., Inc. v. Beam Inc.*, 998 F. Supp. 2d 193 (S.D.N.Y. 2014) .............. 16

*Thomson Reuters Enter. Ctr. GmbH v. Ross Intel. Inc.*, 694 F. Supp. 3d 467 (D.Del. 2023)........ 17

*Thomson Reuters Enter. Ctr. GmbH v. Ross Intel. Inc.*, 765 F. Supp. 3d 382 (D. Del. 2025)....... 17

*Thomson Reuters Enter. Ctr. GmbH v. ROSS Intel., Inc.*, 2026 U.S. App. LEXIS 29958 (Sep. 29, 2026) ........ 3

*Tresóna Multimedia, LLC v. Burbank High School Vocal Music Association*, 953 F.3d 638 (9th Cir. 2020) ........ 10, 11

*Wolo Mfg. v. ABC*, 349 F. Supp. 3d 176 (E.D.N.Y. 2018) ........ 16

## Statutes

17 U.S.C. §101 ........ 5, 9

17 U.S.C. §106 ........ 12

17 U.S.C. §106(2) ........ 4, 5

17 U.S.C. §107 ........ 7

17 U.S.C. §1202(b)(1) ........ 1

17 U.S.C. §301 ........ 13, 17, 19

17 U.S.C. §301(b) ........ 13, 17

17 U.S.C. 301(a) ........ 13

## Articles

Pierre N. Leval, *Toward a Fair Use Standard*, 103 Harv. L. Rev. 1105 (1990) ........ 10

## LIST OF PLAINTIFF'S MOTIONS FOR SUMMARY JUDGMENT (AND OTHER FILINGS THEREOF)

| FILING | Short Name | Sealed mdl ECF | Public mdl ECF |
|---|---|---|---|
| **Class Plaintiffs' Motion for Partial Summary Judgment** *(on BOOKS prima facie copyright claims against DEFs, on BOOKS vicarious copyright claim against MS, and on DEFs fair use defenses)* | **BOOKS SJ>Defs** | **1759** | |
| Class Plaintiffs' Memorandum of Law in support of Motion for Partial Summary Judgment | BOOKS Memo iso SJ>Defs | 1848 | 1982 |
| Class Plaintiffs' Corrected Rule 56.1 Statement of Undisputed Material Facts in support of Class Plaintiffs' Motion for Partial Summary Judgment | BOOKS R56.1 Facts | 1988 | 1987 |
| Defendant Microsoft Corporation's Opposition to Books Plaintiffs' Motion for Partial Summary Judgment | MS Opp to BOOKS SJ>Defs | 2179 | 2173 |
| Defendants' Response to Class Plaintiffs' Rule 56.1 Statement *(joint OAI+MS response to BOOKS Facts)* | DEFs Joint Resp to BOOKS R56.1 Facts | 2237 | 2267 |
| OPENAI's Opposition to Class Plaintiffs' Motion for Summary Judgment | OAI Opp to BOOKS SJ>Defs | 2205 | 2312 (2203) |
| Defendants' Response to Class Plaintiffs' Rule 56.1 Statement *(joint OAI+MS response to BOOKS Facts)* | DEFs Joint Resp to BOOKS R56.1 Facts | 2237 | 2267 |
| **News Plaintiffs Motion for Partial Summary Judgment** *(on NEWS prima facie copyright claims against DEFs, on DEFs fair use defenses, and on 3 out of the 4 elements of DMCA claim against OAI)* | **NEWS SJ>Defs** | **1700** | |
| News Plaintiffs' Combined Summary Judgment Brief | NEWS Memo iso SJ>Defs | 1728 | 2108 |
| News Plaintiffs' Corrected Combined Rule 56.1 Statement of Material Undisputed Material Facts | NEWS R56.1 Facts | 1985-1 | 2036 |
| Defendant Microsoft Corporation's Opposition to News Plaintiffs' Motion for Partial Summary Judgment | MS Opp to NEWS SJ>Defs | 2225 | 2217 |
| Defendants' Response to News Plaintiffs' Rule 56.1 Statement *(joint OAI+MS response to NEWS Facts)* | DEFs Joint Resp to NEWS R56.1 Facts | 2253 | 2269 |
| OPENAI's Opposition to News Plaintiffs' Motion for Partial Summary Judgment | OAI Opp to NEWS SJ>Defs | 2216 | 2207 |
| Defendants' Response to News Plaintiffs' Rule 56.1 Statement *(joint OAI+MS response to NEWS Facts)* | DEFs Joint Resp to NEWS R56.1 Facts | 2253 | 2269 |

# LIST OF DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT (AND OTHER FILINGS THEREOF)

| FILING | Short Name | Sealed mdl ECF | Public mdl ECF |
|---|---|---|---|
| **MS's Motion for Summary Judgment on NEWS claims** (*viz., that LLM Training is fair use, MS's "web grounding"(RAG) is fair use, NEWS non-usage of MS meta tags = implied license*) | **MS SJ>NEWS** | - | |
| Defendant Microsoft Corporation's Memorandum of Law in support of Motion for Summary Judgment in News Plaintiff's Consolidated Cases | MS Memo iso SJ>NEWS | 1699 | 1975 |
| Defendant Microsoft Corporation's Rule 56.1 Statement of Material Undisputed Material Facts in support of Motion for Summary Judgment in News Plaintiffs' Consolidated Cases | MS R56.1 Facts iso SJ>NEWS | 1702 | 2026 |
| News Plaintiff's Omnibus Memorandum of Law in Opposition to Defendants' Motions for Summary Judgment (*for both OAI SJ>NEWS and MS SJ>NEWS*) | NEWS Opp to ALL SJs | 2119 | 2118 |
| News Plaintiffs' Response to Defendant Microsoft Corporation's Rule 56.1 Statement of Material Undisputed Material Facts in support of Motion for Summary Judgment in News Plaintiffs' Consolidated Cases | NEWS Resp to MS R56.1 Facts>NEWS | 2122 | 2330 |
| **MS's Motion for Summary Judgment on BOOKS claims** (*viz., that LLM Training is fair use*) | **MS SJ>BOOKS** | - | |
| Defendant Microsoft Corporation's Memorandum of Law in support of Motion for Summary Judgment in Books Plaintiff's Consolidated Cases | MS Memo iso SJ>BOOKS | 1692 | 1973 |
| Defendant Microsoft Corporation's Rule 56.1 Statement of Material Undisputed Material Facts in support of Motion for Summary Judgment in Books Plaintiffs' Consolidated Cases | MS R56.1 Facts iso SJ>BOOKS | 1694 | 1974 |
| Class Plaintiffs' Memorandum of Law in Opposition to Microsoft's Motion for Summary Judgment | BOOKS Opp to MS SJ>BOOKS | 2260 | 2346 |
| Class Plaintiffs' Response to Microsoft's Rule 56.1 Statement of Undisputed Material Facts in support of Microsoft's Motion for Summary Judgment | BOOKS Resp to MS R56.1 Facts>BOOKS | 2213 | 2274 |
| Class Plaintiffs' Counterstatement of Material Facts in Opposition to Microsoft's Motion for Summary Judgment | BOOKS Counter to MS R56.1 Facts>BOOKS | 2241 | 2245 |

| FILING | Short Name | Sealed mdl ECF | Public mdl ECF |
|---|---|---|---|
| **OPEANAI's Motion for Summary Judgment**<br>**on NEWS claims**<br>(*all OAI's alleged uses are fair use*) | **OAI SJ>NEWS** | **1712** | |
| Defendants' Memorandum of Points and Authorities in support of Motion for Summary Judgment | OAI Memo iso SJ>NEWS | 1749 | 1980 |
| OPENAI's Statement of Undisputed Material Facts in support of Its Motions for Summary Judgment<br>(*for both OAI SJ>NEWS and OAI SJ>BOOKS*) | OAI R56.1 Facts | 1735 | 1979 |
| News Plaintiff's Omnibus Memorandum of Law in Opposition to Defendants' Motions for Summary Judgment<br>(*for both OAI SJ>NEWS and MS SJ>NEWS*) | NEWS Opp to Defs SJs | 2119 | 2320 |
| News Plaintiffs' Counterstatement of Material Facts | NEWS Counter to OAI R56.1 Facts | 2126 | 2128 |
| **OPEANAI's Motion for Summary Judgment**<br>**on BOOKS claims**<br>(*all OAI's alleged uses are fair use*) | **OAI SJ>BOOKS** | **1715** | |
| OPENAI's Memorandum of Points and Authorities in support of Motion for Summary Judgment | OAI Memo iso SJ>BOOKS | 1718 | 1983 |
| OPENAI's Statement of Undisputed Material Facts in support of Its Motions for Summary Judgment<br>(*for both OAI SJ>NEWS and OAI SJ>BOOKS*) | OAI R56.1 Facts | 1735 | 1979 |
| BOOKS Opp to OAI's SJ>BOOKS | BOOKS Opp to OAI SJ>BOOKS | 2262 | 2347<br>2271 |
| Class Plaintiffs' Counterstatement of Material Facts in Opposition to OPENAI's Motion for Summary Judgment | BOOKS Counter to OAI R56.1 Facts | 2247 | 2249 |
| BOOKS and NEWS Plaintiffs' Response to OPENAI's Statement of Undisputed Material Facts in support of its Motions for Summary Judgment | PLTFFs Joint Resp to OAI R56.1 Facts | 2202 | 2195 |

# INTRODUCTION

The graphic on the next page breaks down the overall situation in terms in AI input and output along with the causes of action in the SJ motions. Although greatly simplified, generally speaking, there is the input of copyrighted material created by content creators[1] which is used by the AI for training and other purposes and there is the output of a response by the AI to a prompt from the AI customer.

Roughly speaking, on the output side, the copyright claims in the case revolve around when copyrighted material appears in the responses to prompts (whether referred to as "regurgitation" or another term) and/or as a result of retrieving current information from the Internet (whether referred to as RAG (Retrieval Augmented Generation), "Browse," or "web grounding").

On the input side, the copyright claims concern direct copying or "pirating," which is used herein as a blanket term for any procurement and use of copyrighted material without the right to do so,[2] as well as the input-side DMCA violations, such as CMI removal. In terms of the presently pending SJs, only the NEWS plaintiffs are moving for summary judgment on the DMCA violation and, further, the NEWS plaintiffs are only moving on the first 3 elements of 17 U.S.C. §1202(b)(1), but not on the 4th element which concerns knowledge that the removal would likely induce, enable, facilitate, or conceal an infringement. See, *e.g.*, NEWS SJ>Defs [ECF 1700], p. 2.

---

[1] For the moment, we do not care how exactly this content was retrieved/obtained for AI input, whether by scraping, downloading as bulk data, buying from data brokers, *etc.*

[2] Such "procurement and use" includes, for example and without limitation, the "acquisition, training, and 'horse trading'" referred to in Sect. III.B(1) of NEWS Memo iso SJ>Defs [ECF 2108], pp. 35-42. All docket references herein (*i.e.*, "[ECF ####]) are to the publicly available versions; the lists of filings *infra* provide the corresponding ECF numbers for the sealed versions.




The use/market for copyrighted works as AI input (in blue in the graphic) has been coming into focus in this and the other AI copyright cases as a consideration under the 4th fair use factor ("the effect of the use upon the potential market for or value of the copyrighted work"—§107(4)). *See, e.g.*, NEWS Opp to Defs SJs [ECF 2320], Sect. I.A.4(ii), pp. 29-30 (entitled "Unauthorized use of news to train harms the market for such use," the section discusses existing agreements

concerning the use of copyrighted material as AI input); BOOKS Opp to OAI SJ>BOOKS [ECF 2271], Sect. II.C, pp. 31-32 (refuting OAI's argument that no such market for AI input exists and is not "likely to be developed"); *Kadrey v. Meta Platforms, Inc.*, 788 F. Supp. 3d 1026 (N.D. Cal. 2025); *Bartz v. Anthropic PBC*, 787 F. Supp. 3d 1007 (N.D. Cal. 2025); and *Thomson Reuters Enter. Ctr. GmbH v. ROSS Intel., Inc.*, 2026 U.S. App. LEXIS 29958 (3rd Cir. Sep. 29, 2026).

The recent cases cited above suggest two mutually exclusive approaches to the use/market for copyrighted works as AI input. In *Thomson Reuters*, the Third Circuit found there was no fair use in part because of the "harm to the potential derivative market," thereby implying that the use of copyrighted works as AI input may be a derivative use under 17 U.S.C. §106(2). *Thomson Reuters*, 2026 U.S. App. LEXIS 29958, slip op., p. 26 ("By copying the headnotes for use as training data without Thomson Reuters's authorization, ROSS usurped Thomson Reuters's opportunity to enter that derivative market and license its headnotes for that purpose," and thus the "market harm caused by ROSS's use weights against fair use").

By contrast, in *Kadrey* and *Bartz* (hereinafter, "*Kadrey/Bartz*"), the District Court of Northern California ("N.D.Cal.") reached the opposite conclusion—*i.e.*, that the use of copyrighted materials as AI input is fair use—by jumping from the fact that the use of copyrighted works as AI input does not "count[] under the Copyright Act" to the conclusion that any such market for copyrighted works as AI input may be completely ignored under any fair use analysis. *Bartz*, 787 F. Supp. 3d 1007 (N.D. Cal. 2025),[3] and *Kadrey*, 788 F. Supp. 3d 1026 (N.D. Cal.

[3] "The copies used to train specific LLMs did not and will not displace demand for copies of Authors' works, ***or not in the way that counts under the Copyright Act***. … Authors next contend that training LLMs displaced (or will [displace]) an emerging market for licensing their works for the narrow purpose of training LLMs. Anthropic argues that transactional costs would exceed Anthropic's expected benefit from any such bargain, prompting it to cease dealing with any rightsholders or else to cease developing such technology altogether. Our record could support either account — so this order must assume Authors are correct. A market could develop. Even so, ***such a market for that use is not one the Copyright Act entitles Authors to exploit***." *Bartz*, 787 F. Supp. 3d 1007 (N.D. Cal. 2025), slip op., p. 28 (emphasis added; internal cites removed).

2025).[4] Ignoring, for the moment, the propriety of such an enormous leap in logic and legal reasoning, *Kadrey/Bartz*'s implication that the use/market for copyrighted works as AI input is completely missing from the Copyright Act suggests that the harm to that market shown by plaintiffs is a harm that may be the basis of a state law/common law claim ***not preempted*** by the Copyright Act. See Sect. II below.

This brief asks the Court to consider the two mutually exclusive alternatives suggested by these cases:

- the use of copyrighted works as AI input, such as training data, is a **derivative work under 17 U.S.C. §106(2)**, and there is a huge market for such derivative works, whose use and sale are not covered by fair use; **or**
- in the alternative, the use of copyrighted works as AI input, such as training data, should be considered **a new, separate, and independent use/right** not covered by the Copyright Act and, if so, the state law/common law claims based on the harms to this market/use are not preempted by the Copyright Act.

[4] "The plaintiffs' primary theory of market harm is that Meta's unauthorized use of their books for LLM training harms the market for licensing their books for that purpose. … But whether such a market exists or is likely to develop is irrelevant, because this market is not one that the plaintiffs are legally entitled to monopolize." *Kadrey*, 788 F. Supp. 3d 1026 (N.D. Cal. 2025), slip op., p. 27.

## ARGUMENT

### I. The Use of Copyrighted Works as AI Input is a Derivative Use under §106(2)

#### A. 17 U.S.C. §§101 & 106(2): "Derivative Works"

Pertinent parts of the statute are reproduced below:

> ***17 U.S.C. §106—Exclusive Rights in Copyrighted Works***.
>
> Subject to Sections 107 through 122, the owner of copyright under this title has the exclusive rights to do and authorize any of the following:
>
> …
>
> (2) to prepare derivative works based upon the copyrighted work;
> …
>
> ***17 U.S.C. §101—Definitions***.
>
> …
>
> A "derivative work" is a work based upon one or more preexisting works, such as a translation, musical arrangement, dramatization, fictionalization, motion picture version, sound recording, art reproduction, abridgment, condensation, or any other form in which a work may be recast, transformed, or adapted. A work consisting of editorial revisions, annotations, elaborations, or other modifications which, as a whole, represent an original work of authorship, is a "derivative work".
> …

Accordingly, any formatting, modification, and/or preparation of copyrighted works to make them suitable for AI input may be considered the creation of a derivative work. For example, the act of tokenizing the words of a copyrighted work thereby creating one or more files of tokenized data may be considered a derivative work under §106(2). Under this interpretation, any fair use analysis must consider the market for such derivative works as ***AI input*** as separate and distinct from the market for ***AI output***, such as the responses to prompts.

### B. The Market for Copyrighted Works as AI Input is Huge and Growing

The plaintiffs have collected compelling and overwhelming evidence of the market for copyrighted works as AI input:

> As Defendants' experts recognize, OpenAI and Microsoft have themselves already licensed media content to train their GAI models. OpenAI alone has licensed content from more than [redacted] media companies for "training" and "display" uses – with annual minimum payments of as much as [redacted] per year. Similarly, Microsoft has entered into at least [redacted] GenAI license agreements and has thus far paid up to [redacted] for access to licensed content. Moreover, Defendants intentionally targeted and prioritized licensing high-quality news content. Third parties'—including Amazon, Google, Meta, Perplexity, ProRata.ai, and Mistral AI—licensing of news content for LLM training further evidence the existence of a developing market. NP-SOF-247-94.

NEWS Opp to Defs SJs [ECF 2320], Sect. I.A.4(ii), p. 30
(citing NEWS R56.1 Facts [ECF 2306], Facts #135-294; citations omitted)

The NEWS plaintiffs' combined statement of facts has a section for "Developing Market for Licensing Data (including News) for Generative AI Purposes." NEWS R56.1 Facts [ECF 2036], Sect. I.D, Facts #135-294, pp. 29-57 (including OAI's Executed Agreements, Facts #147-206, pp. 32-40; MS's Executed Agreements, Facts #207-228, pp. 40-43; and Amazon Data Services Agreements, Facts #247-273, pp. 47-50). In that section, we also find examples of "Additional Publicly Announced GenAI Agreements," Facts #274-294, pp. 50-57, including:

> 279. Human Native AI is a startup building a marketplace to broker deals between companies building large language models and parties who are willing to license data to them, helping AI companies to find data **to train their models on** while ensuring rights holders opt in and are compensated. …
>
> 281. TollBit is a two-sided marketplace for publishers and AI companies that brings together companies with openly accessible websites whose data are vulnerable to scraping (such as publishers, sites with user-generated content, and sites that allow end users to take action like e-commerce sites) and AI companies who scrape data in order to allow the AI companies to pay site owners directly for use of data. …

> 282. Copyright Clearance Center ("CCC") is a copyright licensing intermediary that announced in July 2024 a collective licensing approach for content usage in internal AI systems, based on a subscription model that would offer rights to use copyrighted works internally, **such as for training**, and publishers involved in the license would be paid in royalties in exchange for use of their works. …
>
> 283. In June 2024, Dappier announced its launch of a marketplace for publishers to sell content to large language model builders, in which publishers can set a price for using their content **in AI model training**. …
>
> 284. Defined.ai is a marketplace for AI training data in which companies can purchase high-quality and ethically sourced datasets (including speech & audio, image & video, and text) **to train AI models**. …
>
> …
>
> 287. Cloudflare offers an AI licensing initiative called "Pay Per Crawl" to allow content owners to charge AI crawlers for accessing their content, and the publisher or domain owner has full control over their monetization strategy and can define their own pricing for access. …
>
> …
>
> 289. Calliope Networks aggregates audiovisual content, including movies, TV series, news, etc., for licensing by generative AI companies **for model training**, and it highlights its "License to Scrape" model, a voluntary collective license, that enables creators on YouTube and other platforms to have control over content. …

NEWS R56.1 Facts [ECF 2306], Facts #279, 281-284, 287, 289, pp. 53-57

### C. Fair Use Does Not Apply to the Market/Use of Copyrighted Works as AI Input

Pertinent parts of the fair use statute are reproduced below:

> ***17 U.S.C. §107—Limitations on Exclusive Rights: Fair Use*.**
>
> Notwithstanding the provisions of sections 106 and 106A, the fair use of a copyrighted work, including such use by reproduction in copies or phonorecords or by any other means specified by that section, for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research, is not an infringement of copyright. In determining whether the use made of a work in any particular case is a fair use the factors to be considered shall include—
>
> (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;
>
> (2) the nature of the copyrighted work;

> (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and
>
> (4) the effect of the use upon the potential market for or value of the copyrighted work.
>
> The fact that a work is unpublished shall not itself bar a finding of fair use if such finding is made upon consideration of all the above factors.

First, it should be noted that modifying/formatting a copyrighted work so that it may serve as AI input, such as, *e.g.*, training data, is **not** "for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research." The defendants here are making a commercial product, AI, that ***requires*** properly formatted copyrighted material as input in order to work. Just because copyrighted materials are the indispensable fuel required by the AI engine does not make its use a fair one.

Second, the 4th fair use factor is "undoubtedly the single most important element of fair use." *Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 566 (1985). "This is consistent with the fact that the copyright is a commercial right, intended to protect the ability of authors to profit from the exclusive right to merchandise their own work." *Author's Guild v. Google, Inc.*, 804 F. 3d 202, 214 (2d Cir. 2015) ("*Google Books*").

Third, the defendants' argument relies entirely on the transformative nature of AI technology. But that applies to the market/use of AI ***output***, not the market/use of AI ***input***. Although the derivative use/market for AI input may modify involve "transformation" for purposes of ingestion by AI technology (such as, e.g., tokenizing), such transformation is not a cognizable issue under a fair use analysis.

### *1. Any modification of a copyrighted work in order to make it suitable as AI input is not transformative under a fair use analysis*

Fair use requires an analysis of the specific "use" of a copyrighted work that is alleged to be "an infringement." *Andy Warhol Foundation for the Visual Arts, Inc. v. Goldsmith,* 598 U.S. 508, 533 (2023). The important use/market to be considered here is on the input side of AI technology, not the output side. The market for copyrighted works as AI input is large and growing. See Sect. I.B above. As mentioned above, although this derivative use/market may involve "transformation" for purposes of ingestion by AI technology (such as, e.g., tokenizing), such transformation is not a cognizable issue under a fair use analysis. *Google Books*, 804 F. 3d, at 215 ("A further complication that can result from oversimplified reliance on whether the copying involves transformation is that the word "transform" also plays a role in defining "derivative works," over which the original rights holder retains exclusive control. … The statute defines derivative works largely by example, rather than explanation. … [Specifically, by using a list] … to which list the statute adds "any other form in which a work may be … *transformed*." 17 U.S.C. §101.") (emphasis in original).

When a text is tokenized for AI input, it is not one or more ideas being broken down into tokens, it is the words and letters and syllables, the expressive content of the original work being broken down. See, *e.g.*, *Google Books*, 804 F. 3d, at 215 ("While such changes can be described as transformations, they do not involve the kind of transformative purpose that favors a fair use finding. The statutory definition suggests that derivative works generally involve transformations in the nature of *changes of form*.")[5] (emphasis in original).

---

[5] "As noted above, [the statutory definition of derivative works], while imprecise, strongly implies that derivative works over which the author of the original enjoys exclusive rights ordinarily are those that ***re-present the protected aspects of the original work, i.e., its expressive content***, converted into an altered form, such as the conversion of a

### *2. To the extent that Kadrey/Bartz considered AI input rather than AI output, Kadrey/Bartz's conclusions are wrong*

> The plaintiffs' primary theory of market harm is that Meta's unauthorized use of their books for LLM training harms the market for licensing their books for that purpose. …
>
> But whether such a market exists or is likely to develop is irrelevant, because this market is not one that the plaintiffs are legally entitled to monopolize. In every fair use case, the "plaintiff suffers a loss of a potential market if that potential [market] is defined as the theoretical market for licensing" the use at issue in the case. *Tresóna Multimedia, LLC v. Burbank High School Vocal Music Association*, 953 F.3d 638, 652 (9th Cir. 2020) (emphasis omitted) (quoting 4 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 13.05 (2019)). Therefore, to prevent the fourth factor analysis from becoming circular and favoring the rightsholder in every case, harm from the loss of fees paid to license a work for a transformative purpose is not cognizable. *Id.*; *Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605, 614–15 (2d Cir. 2006); *see also Oracle*, 593 U.S. at 38 ("cautioning against the 'danger of circularity'" (quoting 4 Nimmer § 13.05)).

*Kadrey*, slip op., pp. 27-28

In the passage above, the "circularity" being in the cited cases and Nimmer arises from the fact that "[b]y definition every fair use involves some loss of royalty revenue because the secondary user has not paid royalties." Pierre N. Leval, *Toward a Fair Use Standard*, 103 Harv. L. Rev. 1105, 1124 (1990). This is just common sense. If a teacher copies some pages of a library book for teaching or research purposes, then "by definition" the publisher has not received royalties because the teacher has not paid anything. The point is, if it is fair use, the teacher is not liable for copyright infringement. In other words, "the decision by secondary users to pay, or not pay," does ***not*** "establish whether fair use exists." *Tresóna Multimedia*, slip op., p. 26.

---

novel into a film, the translation of a writing into a different language, the reproduction of a painting in the form of a poster or post card, recreation of a cartoon character in the form of a three-dimensional plush toy, adaptation of a musical composition for different instruments, or other similar conversions." *Google Books*, 804 F. 3d, at 225.

These cited cases also refer to the concept of a "transformative market," where the accused use was "transformatively different from their original expressive purpose." In *Bill Graham Archives*, the originals were Grateful Dead posters, and the accused use was the reproduction of those posters as images "in reduced size and scattered among many other images and texts" in a coffee book. *Bill Graham Archives*, 448 F.3d, at 613, see also 614 ("we hold that DK's use of BGA's images is transformatively different from their original expressive purpose"). In *Tresóna Multimedia*, the original was the sheet music for Olivia Newton-John's song "Magic," and the accused use was "an entirely different theatrical work—a show piece for the high school choir that reworks pieces from multiple songs to tell a story with new expressive content and meaning," namely, "the story of a local Dust Bowl era community ravaged by drought." *Tresóna Multimedia*, slip op., p. 20, see also p. 21 ("Because Greene's rearrangement of a portion of 'Magic' created a new work with new meaning, it was a transformative use.")

"The central purpose of this investigation is to see … whether the new work merely 'superseded the objects' of the original creation or instead adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message; it asks, in other words, whether and to what extent the new work is 'transformative.'" *Tresóna Multimedia*, slip op., p. 20 (quoting *Campbell v. Acuff Rose Music Inc.*, 510 U.S. 569, 579 (1994)). The market for the copyrighted works as AI input is not a "transformative market" because the desired AI input is the exact same expressive content of the original copyrighted works, even if they are modified to be in a tokenized format. While the AI ***output*** may add something new and be transformative, what the defendants want and need for AI ***input*** is the original expressions of the plaintiffs' copyrighted works.

*Bartz* follows the same faulty logic regarding AI input as *Kadrey*. Both *Bartz* and *Kadrey* seem to imply that (i) the use of copyrighted material as AI input is not a use under 17 U.S.C. §106; and (ii) because of this, the market/use of copyrighted material as AI input may be completely ignored in any fair use analysis. See, *e.g.*, *Bartz*, slip op., p. 28 ("Even so, such a market for that use is not one the Copyright Act entitles Authors to exploit") and *Kadrey*, slip op., p. 27 ("But whether such a market exists or is likely to develop is irrelevant, because this market is not one that the plaintiffs are legally entitled to monopolize"). In any event, *Bartz*/*Kadrey* completely disregard the market/use of copyrighted works as AI input in their fair use analyses.

Under our first alternative, *Bartz/Kadrey* are wrong in this regard because the market/use of copyrighted works as AI input is a derivative use under §106(2) and thus is a market "that the plaintiffs are legally entitled to monopolize" (assuming fair use does not apply). Our second alternative, which is explored in the next section, is based on the assumption that *Bartz/Kadrey* are correct that the market/use of copyrighted works as AI input is not "cognizable" under the Copyright Act.

## II. In the alternative (taking *Bartz/Kadrey*'s side), the Use of Copyrighted Works as AI Input is a New and Separate Property Interest Not Yet Recognized by the Copyright Statute

This part of the brief takes the alternative view that *Kadrey/Bartz* are correct and the use/market for copyrighted works is not cognizable under the Copyright Act. However, AI technology ***requires*** the use of copyrighted material as input and, as such, the use of copyrighted works as AI input should be recognized as a protectible property interest with its own market. One day, the use of a copyrighted work as AI input may be added to the list of statutory uses in §106 (as a new §106(7) perhaps). For today, is there any way to recognize this nascent property right? *Amicus* respectfully submits that, ***because*** the use of a copyrighted work as AI input is not in the

list of statutory uses in §106, the use of a copyrighted work as AI input can be the basis of a common law/state law cause of action—*i.e.*, it is the **extra element** required by the "extra element" test.

### A. Because the Right to use a Copyrighted Work as AI Input is Not a Right Protected by the Copyright Act, a State Law/Common Law claim based on that Right is not Preempted by the Copyright Act

Federal law preempts most common law/state law causes of action, such as unfair competition, misappropriation, and/or unjust enrichment, in lawsuits based on copyrighted works. See, *e.g*., 17 U.S.C. §301. However, preemption does not apply to common law/state law causes of action which: (1) do "not come within the subject matter of copyright as specified by sections 102 and 103;" or (2) involve "legal or equitable rights that are not equivalent to any of the exclusive rights within the general scope of copyright as specified by section 106." 17 U.S.C. 301(a) or, conversely, §301(b)(1) and (3) ("Nothing in this title annuls or limits any rights or remedies under the common law or statutes of any State with respect to—(1) subject matter that does not come within the subject matter of copyright as specified by sections 102 and 103, …; **or** … (3) activities violating legal or equitable rights that are not equivalent to any of the exclusive rights within the general scope of copyright as specified by section 106 …") (emphasis added).

Thus, without an "extra element," a state law cause of action based on the same subject matter as copyright and the same protectible rights as copyright is preempted. *Computer Assoc. Int'l Inc. v. Altai, Inc*., 982 F.2d 693, 716 (2d Cir.1992) ("But if an "extra element" is required instead of or in addition to the acts of reproduction, performance, distribution or display, in order to constitute a state-created cause of action, then the right does not lie 'within the general scope of copyright,' and there is no preemption.") (internal quote marks omitted; quoting 1 Nimmer on

Copyright §1.0l[B] at 1-15); see also, *e.g.*, *Nat'l Basketball Ass'n v. Motorola, Inc*., 105 F.3d 841, 848 (2d Cir. 1997) ("*NBA*").

In this case, the "extra element" is the right to use a copyrighted work as AI input, which is ***not*** "one of the bundle of exclusive rights already protected by copyright law under 17 U.S.C. §106." *NBA*, 105 F.3d at 848 see also, *e.g*., *Computer Assoc*., 982 F.2d at 716 ("A state law claim is not preempted if the "extra element" changes the nature of the action so that it is qualitatively different from a copyright infringement claim.") (internal quote marks omitted) and *Harper & Row v Nation Enterprises*, 723 F.2d 195, 200 (2nd Cir. 1983), *rev'd on other grounds*, 471 U.S. 539 (1985) ("[W]hen a state law violation is predicated upon an act incorporating elements beyond mere reproduction or the like, the rights involved are not equivalent and preemption will not occur.").

**B. Should State Law/Common Law Claims based on the Use of Copyrighted Works as AI input be Back on the Table?**

In this case, the NEWS plaintiffs' misappropriation claim was preempted because it did not meet all of the requirements of the "hot news" misappropriation exception under *NBA*. April 4, 2025 Order [NYT v. OAI ECF 514], a.k.a. *New York Times v. Microsoft*, 777 F. Supp. 3d 283 (S.D.N.Y. 2025). *Amicus* respectfully submits that the "hot news" exception is limited to the "hot news" factual scenario (a claim based upon facts regarding "hot news" like the *INS* case) and that other state law causes of action based on copyrighted works in other factual scenarios are not necessarily preempted. *NBA*, 105 F.3d at 843 ("The crux of the dispute concerns the extent to which a state law "hot-news" misappropriation claim based on *International News Service v. Associated Press*, 248 U.S. 215, 39 S. Ct. 68, 63 L. Ed. 211 (1918) ("*INS*"), survives preemption

by the federal Copyright Act and whether the NBA's claim fits within the surviving **INS-type claims**") (emphasis added). *NBA* also quotes the legislative history of 17 U.S.C. §301 as follows:

> "Misappropriation" is not necessarily synonymous with copyright infringement, and thus a cause of action labeled as "misappropriation" is not preempted if it is in fact based neither on a right within the general scope of copyright as specified by section 106 nor on a right equivalent thereto. ***For example***, state law should have the flexibility to afford a remedy (under traditional principles of equity) against a consistent pattern of unauthorized appropriation by a competitor of the facts (i.e., not the literary expression) constituting "hot" news, whether in the traditional mold of … [*INS*] …, or in the newer form of data updates from scientific, business, or financial data bases.

H.R. No. 94-1476 at 132, reprinted in 1976 U.S.C.C.A.N. at 5748 (emphasis added) (quoted in *NBA*, 105 F.3d at 850).

In other words, the "hot news" exception is an example of a possible misappropriation claim under state law, ***not*** the only type of un-preempted misappropriation claim under state law. At the very least, the greater category within which misappropriation falls—unfair competition—is definitely not limited to the "hot news" exception and thus could support an un-preempted state law claim based on the use of a copyrighted work as AI input.

### *1. Unfair Competition through, inter alia, Misappropriation*

The Second Circuit has commented on the unfairness aspect of a claim for misappropriation. In a section of *Barclays* entitled "Moral Dimensions," Judge Newman noted that "… the INS Court emphasized the unfairness of INS's practice of pirating AP's stories. It condemned, in what sounded biblical in tone, the defendant's "reaping where it had not sown."" *Barclays Cap. Inc. v. Theflyonthewall.com, Inc.*, 650 F.3d 876, 895 (2d Cir. 2011) (cleaned up). Judge Newman continued: "[t]his dicta has been absorbed by New York misappropriation law," quoting the following:

> New York courts have noted the incalculable variety of illegal practices falling within the unfair competition rubric, calling it a broad and flexible

> doctrine that depends more upon the facts set forth than in most causes of action. It has been broadly described as encompassing any form of commercial immorality, or simply as endeavoring to reap where one has not sown; it is taking the skill, expenditures and labors of a competitor, and misappropriating for the commercial advantage of one person a New York courts have noted the incalculable variety of illegal practices falling within the unfair competition rubric, calling it a broad and flexible doctrine that depends more upon the facts set forth than in most causes of action. It has been broadly described as encompassing any form of commercial immorality, or simply as endeavoring to reap where one has not sown; it is taking the skill, expenditures and labors of a competitor, and misappropriating for the commercial advantage of one person a benefit or property right belonging to another. The tort is adaptable and capacious.

*Barclays*, 650 F.3d at 895 (2d Cir. 2011) (quoting *Roy Exp. Co. v. Columbia Broad. Sys., Inc.*, 672 F.2d 1095, 1105 (2d Cir. 1982)).

In New York, "[t]o state a claim for the misappropriation theory of unfair competition, a plaintiff must allege that the defendant: (1) misappropriated the plaintiff's labors, skills, expenditures, or good will; and (2) displayed some element of bad faith in doing so." *Sidney Frank Importing Co., Inc. v. Beam Inc.*, 998 F. Supp. 2d 193, 209 (S.D.N.Y. 2014), see also at 208-9 ("Misappropriation . . . concerns the taking and use of the plaintiff's property to compete against the plaintiff's own use of the same property. . . . Misappropriation is ***also*** described as taking the skills, expenditures, and labor of a competitor, . . . and misappropriating for the commercial advantage of one person a benefit or property right belonging to another.") (cleaned up; emphasis added). Moreover, a claim of unfair competition under a misappropriation theory in New York may be based on a copyrighted work, as long as what's misappropriated concerns neither the subject matter in 17 U.S.C. §102/3 nor the general scope of rights/uses listed in 17 U.S.C. §106. See, *e.g.*, *Wolo Mfg. v. ABC*, 349 F. Supp. 3d 176 (E.D.N.Y. 2018) ("However, to the extent plaintiff's common law unfair competition claim is based upon conduct other than defendants' …

unauthorized use of plaintiff's sound recordings, the amended complaint states a plausible claim for unfair competition under New York common law") (internal citations omitted).

*Amicus* respectfully suggests the parties be allowed to brief the misappropriation/unfair competition claim under this approach.[6] Although this cause of action had been previously decided on the narrower "hot news" misappropriation exception, the novelty of the extraordinary issues at play here make such a re-visiting of this cause of action unsurprising and unremarkable. "…, any order or other decision, however designated, that adjudicates fewer than all the claims … does not end the action as to any of the claims and ***may be revised at any time*** before the entry of judgment adjudicating all the claims … ." F.R.C.P. 54(b) (emphasis added).[7]

***2. Unjust Enrichment***

In this case, the unjust enrichment claims of at least some of the plaintiffs were dismissed because, *inter alia*, they failed the "extra elements" test and thus were preempted by §301. December 15, 2025 Order [ECF 968], pp. 4-5, 15, see, e.g., 5 ("The fundamental nature of [Ziff Davis's unjust enrichment claim] is equivalent to a claim to enforce exclusive rights within the general scope of copyright," citing *Doe 1 v. GitHub, Inc.*, No. 22-cv-6823, 2024 WL 235217, at *7–8 (N.D. Cal. Jan. 22, 2024) and *Anderson v. Stability AI*, 744 F. Supp. 3d 956, 972–73 (N.D. Cal. 2024)). *Amicus* respectfully submits that the plaintiffs have a cognizable unjust enrichment claim under New York law because the right/use of copyrighted works as AI input and the concomitant market for AI input are "extra elements" making the state law claim "qualitatively

---

[6] The use of a copyrighted work ***as AI input*** is an activity "violating legal or equitable rights that are ***not equivalent*** to any of the exclusive rights within the general scope of copyright as specified by section 106" (17 U.S.C. §301(b)(3); emphasis added), and thus not subject to preemption under 17 U.S.C. §301.

[7] While the *Thomson Reuters* case was still in the District Court, the presiding judge re-visited his decision awarding summary judgment to Ross from a year earlier and revised it to award partial summary judgment to Thomson Reuters—the revised ruling was the one affirmed by the Third Circuit. See *Thomson Reuters Enter. Ctr. GmbH v. Ross Intel. Inc.*, 694 F. Supp. 3d 467 (D. Del. 2023) and *Thomson Reuters Enter. Ctr. GmbH v. Ross Intel. Inc.*, 765 F. Supp. 3d 382 (D. Del. 2025).

different from a copyright infringement claim" based on the acts of reproduction, performance, distribution or display. *Computer Assoc.*, 982 F.2d at 716.

"The basic elements of an unjust enrichment claim in New York require proof that (1) defendant was enriched, (2) at plaintiffs expense, and (3) equity and good conscience militate against permitting defendant to retain what plaintiff is seeking to recover." *Briarpatch v. Phoenix Pictures*, 373 F. 3d 206 (2d Cir. 2004). Similarly to the preceding section, *Amicus* respectfully suggests the parties be allowed to brief the unjust enrichment claim under this approach.

**CONCLUSION**

I respectfully request that the Court consider the two different, mutually exclusive alternatives described herein: (i) the use/market for copyrighted works as AI input is a derivative use/market under 17 U.S.C. §106(2), to which the doctrine of fair use does not apply; or (ii) the use/market for copyrighted works as AI input is a new use/market not covered by the copyright statute and thus is a use/right which may be the basis for a state law/common law cause of action not preempted under 17 U.S.C. §301. If alternative (ii) is found to be sound, I respectfully suggest there be additional briefing on the common law/state law claims of unfair competition, misappropriation, and/or unjust enrichment based on the defendants' use of plaintiffs' copyrighted works as AI input.

Respectfully submitted,

DATED: November 2, 2026

By: *<u>/s/ Teodor Holmberg</u>*
Teodor J. Holmberg (TH6566)
tidge@computer.org
8 Gregory Lane
Florence, MA 01062
(401) 225-4538

*Attorney for Teodor J. Holmberg*

**CERTIFICATE OF COMPLIANCE WITH WORD LIMITS**

In accordance with August 7, 2026 Order [ECF 1663] that the proposed *amicus* briefs "be no more than 6,000 words," I certify the foregoing *amicus* brief is 5,800 words, excluding the caption page, table of contents, table of authorities, listings of filings, and signature block. The basis of my knowledge is the word-count feature of the word-processing system used to prepare this brief.

Dated: November 2, 2026

*/s/ Teodor Holmberg*
Teodor J. Holmberg