**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **IN RE: OPENAI, INC., COPYRIGHT INFRINGEMENT LITIGATION** | **MDL No. 1:25-md-03143 (SHS) (OTW)** |
| **This Document Relates To:** ***All Related Cases*** | **Hon. Sidney H. Stein** |

## AMICUS CURIAE BRIEF

E.H and W.E, high school students in Los Angeles County within the Las Virgenes Unified School District (LVUSD) in grade 11, respectfully submit this brief in support of the New York Times.

## INTEREST OF AMICUS CURIAE

Amici Curiae E.H and W.E are high school students. We are not corporation owners, litigation funders, or industry lobbyists. We are kids, artists, writers, musicians, and members of the generation that will grow up with Generative AI. We have a direct and vital interest in this case.

We are the nascent supply-side of the copyright ecosystem. We are coming of age in a digital world that increasingly treats our creative labor not as property to be protected, but as raw material to be mined.

We file this brief in support of Plaintiffs because their fight to protect their copyrighted works from unlicensed extraction is our fight, as well. Defendants argue that using millions of copyrighted articles to train their AI models is a "fair use" because it is transformative. But from our perspective, it is not transformative; it is a replacement. We watch as generative AI models, trained on the uncompensated work of human creators, flood our digital environment. If AI can freely consume and regurgitate people's life's work without compensation, the incentive to do the hard work will vanish.

We offer this Court a perspective the corporate parties cannot provide: the view from the next generation of copyright holders. Unlicensed AI training is not just a theoretical economic harm, but it is a documented and lived reality that is actively constricting the market and environment for student's creative works. This consequence strikes at the very heart of the constitutional purpose of the Copyright Act,[1] and it weighs heavily against Defendants' fair use defense.

We desire to speak for those who are unable. We acknowledge that our viewpoint may not be unanimously agreed upon, however we believe that this perspective is vital for this issue. We acknowledge that this case's outcome has many repercussions, therefore, hope is held for the future of our generation.

[1] *See* United States Copyright Act 17 U.S. Code § 102. https://www.copyright.gov/title17/

## SUMMARY OF ARGUMENT

Defendants ask the Court to legalize the mass ingestion of human expression under the guise of "fair use." They argue that scraping millions of copyrighted works to train artificial intelligence is a "transformative" public good. Amici Curiae, as high school students and the next generation of creators, respectfully disagree.

First, Defendants' use is not transformative; it is extraction. As revealed in Plaintiffs' briefs, OpenAI's own employees admitted they trained early models on "pirated stuff."[2] Building a multi-billion industry on the unauthorized labor of authors and journalists can not be considered fair use; it can be equated to theft.

Second, this unlicensed use creates a "doom loop" that threatens the very existence of human journalism.[3] Microsoft's own executives admitted that their "web grounding"[4] technology, which summarizes news articles without sending users to the original website, threatens the economic foundations of the press. If human journalism dies, the AI will have no real facts left to learn from.

Third, the harm to our generation is already happening. Because AI models are trained on the unregulated internet, including our childhood social media posts,

---

[2] *See* Internal OpenAI Notes, August 2019 (SUF¶344). *Class Plaintiffs' MSJ.*

[3] *See* SF1672. *News Plaintiffs' MSJ.*

[4] *See* "Microsoft's AI chatbot, Copilot" *Microsoft's MSJ - News.*

we are losing control of our own digital identities before we even enter the workforce.

Finally, because AI can so easily fake and devalue human work, our schools are banning digital tools. We are being forced back to pen and paper just to prove we are human. The Copyright Clause was designed to protect creators, not punish them for the actions of tech monopolies. This Court must reject Defendants' fair use defense.

## ARGUMENT

### I. The First Factor Weighs Against Fair Use Because AI Training Is Not "Transformative"; It Is Extraction.

Under the first fair use factor, a use is only "transformative" if it adds new meaning or purpose to the original work.[5] Defendants argue that turning our articles, books, and essays into statistical weights is transformative. It is not. It is extraction.

When a student spends weeks writing an essay, it takes hours of research, continuous effort, constant revisions, and feedback that will lead to more revisions. A journalist in a similar way spends months investigating a story, they are creating original expressions. As children, our voices and how we present ourselves in the world is still developing, and this process is delicate, able to be easily altered by

[5] *See Andy Warhol Found. for Visual Arts, Inc. v. Goldsmith,* 598 U.S. 508, 529 (2023).

the smallest aspects of our lives. Generative AI does not engage with that expression. It does not critique it or parody it. It simply ingests it to mimic it.

Defendants' own internal documents prove they knew this was wrong. In 2019, OpenAI employees wrote internally: "We trained GPT-3 on pirated stuff! No sharing that!" [6] In 2026, Sam Altman was asked, “You agree that piracy is wrong and illegal?” and he responded, “I do.”[7] Also, Satya Nadella was asked, “It’s illegal to download pirated material, right?” and he replied, “Absolutely. That’s correct.”[8] These leaders know that what they are doing is illegal and wrong. A multi-billion-dollar company that built its empire by scraping human labor cannot claim that its use is "fair."

## II. Defendants' Technology Creates A "Doom Loop" And Threatens The Future Of Journalism.

Defendants argue that their AI models do not harm the market for news because they only provide "summaries." But this Court must look at how the technology actually operates. Microsoft's Copilot uses a process called "web grounding," where it pulls the text of an article behind the scenes to generate an

---

[6] *See* SUF¶344, *Class Plaintiffs' MSJ. Supra* note 2.

[7] *See* SUF¶370, *Class Plaintiffs' MSJ. Supra* note 2.

[8] SUF¶382, *Class Plaintiffs' MSJ. Supra* note 2.

answer.[9] The user gets the facts, but they never click on the New York Times website. The journalist loses the reader, the traffic, and the advertising revenue.

Microsoft's own Director of Applied Science admitted this creates a "doom loop." He wrote that AI "threatens the economic foundations of its essential suppliers," meaning the journalists who write the news.[10] If the tech companies steal all the news to train their bots, all of the newspapers go out of business. "Web grounding" doesn't just summarize people's work; it replaces the need for the consumer to visit the original site. Under the fourth fair use factor, a use that acts as a direct market substitute for the original work weighs heavily against fair use.

Amici Curiae rely on real journalism to understand the world. If this Court allows AI companies to strip the value from journalism without compensation, it will not just harm the New York Times; it will destroy the truth.

## III. The Harm Is Already Happening: AI Is Stealing Our Digital Childhoods

The fourth fair use factor asks this Court to consider the effect of the use on the "potential market" for copyrighted work.[11] For students, the harm is not just the loss of future income; it is the loss of our identity.

---

[9] *See* "Microsoft's AI chatbot, Copilot" *Microsoft's MSJ - News. Supra* note 4.

[10] *See* SF1672. *News Plaintiffs' MSJ. Supra* note 3.
[11] *See* 17 U.S.C. § 107(4).

Artificial Intelligence models are trained on massive datasets scraped from the internet, often from the non-profit organization Common Crawl.[12] This means that the photos, essays, and social media posts we created when we were thirteen have likely been scraped and used to train AI.

We never consented to this. We were children. Soon, if OpenAI wins this case, any stranger can use an AI prompt to generate images or text that mimic our blog posts from elementary school, our essays that were uploaded to school forms, or our childhoods. As the U.S. Copyright Office has recognized, the "speed and scale at which AI systems generate content pose a serious risk of diluting markets for works" and devaluing human expression. Because our early digital footprints were stolen, our futures are already at a disadvantage.

## IV. The "Pen And Paper" Punishment: How AI Is Hurting Student Creativity.

Perhaps the most tragic consequence of Defendants' unchecked copying is how it is affecting our education. Because AI companies have flooded the internet with synthetic, unregulated content, our schools can no longer trust digital assignments.

As we previously stated: "We watch our schools retreat from digital assignments, forcing us back to pen and paper just to prove our work is human." In

[12] *See* OpenAI MSJ, p. 2.

Los Angeles County, school districts like LAUSD and our own LVUSD have implemented strict moratoriums and guidelines on Generative AI to preserve academic integrity. These districts now use invasive tracking software (for example, Securely, a restrictive software blocking many websites, including Artificial Intelligence, which gives teachers full access to viewing anything a student does on their screen).[13] In reality, teachers are prevented from utilizing websites for instruction because they are restricted; students are unable to learn from online resources they will eventually see in college. Furthermore, educational institutions are also not accessible on the student wifi in LVUSD; for example, PubMed has been blocked, which is another repercussion of the district's digital restrictions.

These institutional shifts are not educational choices; rather, they are a tragic retreat. We are the first generation to grow up with the digital tools to share our creativity globally, only to be told we must abandon those tools because the digital space has been flooded with unlicensed AI.

The Copyright Clause exists to "promote the Progress of Science and useful Arts."[14] By allowing tech companies to freely consume our work to build machines that replace us, Defendants are killing the incentive to create. This Court should rule in favor of the Plaintiffs and protect the future of human authorship.

---

[13] *See* Securely - Student Safety. https://www.securly.com/student-safety

[14] *See* U.S. Const. art. I, § 8, cl. 8.

## CONCLUSION

Amici does not ask this Court to unplug the future. We do not ask this Court to ban artificial intelligence. We ask the Court to recognize that the fair use analysis cannot be conducted in a vacuum, detached from the real-world consequences for the next generation of authors. Fair use will dictate if Amici and their peers become the future artists, creators, writers, and musicians of the world or if Artificial Intelligence churns out Frankenstein pieces.

We are the generation that will inherit the copyright ecosystem this Court shapes. If the Court rules that human expression can be harvested without consequence, it will produce a generation that sees no future, and no value, in creating at all.

For the foregoing reasons, Amici Curiae respectfully requests that the Court reject Defendants' fair use defense, and give full weight to the documented shrinking of the new creator market, ruling in favor of Plaintiffs.

Dated: October 29th, 2026

New York, New York

Respectfully submitted,

/s/ E.H.

**E.H.**

Contact information provided to Court

*Pro Se Amicus Curiae*

/s/ W.E.

**W.E.**

Contact information provided to Court

*Pro Se Amicus Curiae*