**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In Re OpenAI, Inc. Copyright Infringement Litigation | Lead Case No.: 1:25-md-03143-SHS-OTW |
| AND RELATED CASES. | **MOTION FOR LEAVE TO FILE AMICUS CURIAE BRIEF; [PROPOSED] BRIEF OF AMICI CURIAE PROFESSORS IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT** |

**CORPORATE DISCLOSURE STATEMENT**

Amici curiae Professors Jon M. Garon, Adam Mossoff, Loren E. Mulraine, Chris Newman, Sean Pager, Zvi Rosen, and Mark F. Schultz are individuals with no parent organizations, subsidiaries, or publicly traded ownership interests.

Dated: October 30, 2026

**HORVITZ & LEVY LLP**
GASPARD RAPPOPORT
WARREN CHU*

By: ______________________
Warren Chu
HORVITZ & LEVY LLP
3601 W. Olive Avenue, 8th Floor
Burbank, California 91505-4681
(818) 995-0800 • FAX: (844) 497-6592
grappoport@horvitzlevy.com
wchu@horvitzlevy.com

Attorneys for Amici Curiae Professors
**JON M. GARON, ADAM MOSSOFF, LOREN E. MULRAINE, CHRIS NEWMAN, SEAN PAGER, ZVI ROSEN,** and **MARK F. SCHULTZ**

## TABLE OF CONTENTS

**PAGE**

TABLE OF AUTHORITIES ........ ii

MOTION FOR LEAVE TO FILE AMICUS CURIAE BRIEF ........ 1

[PROPOSED] BRIEF OF AMICI CURIAE PROFESSORS JON M. GARON, ADAM MOSSOFF, LOREN E. MULRAINE, CHRIS NEWMAN, SEAN PAGER, ZVI ROSEN, AND MARK F. SCHULTZ ........ 1

I. INTERESTS OF THE AMICUS CURIAE ........ 1

II. INTRODUCTION ........ 2

III. ARGUMENT ........ 3

- A. The fundamental goal of copyright is to incentivize human creation. ........ 3
  - 1. Copyright grants authors exclusive rights in their expression—including the right to say no. ........ 3
  - 2. Threatening copyright incentives jeopardizes the creation of human-authored works. ........ 4
- B. Fair use has never included categorical exceptions and must be applied case by case. ........ 7
  - 1. There is no categorical exception for AI training. ........ 7
  - 2. There is no categorical exception for intermediate copying. ........ 9
  - 3. Transformative purpose varies depending on the facts. ........ 10
  - 4. Transformativeness does not control the fair-use inquiry ........ 11
  - 5. Market harm includes harm to any potential market that is reasonable or likely to develop. ........ 12
  - 6. Market dilution is also a cognizable harm under factor four. ........ 13

IV. CONCLUSION ........ 15

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*A&M Recs., Inc. v. Napster, Inc.*,
239 F.3d 1004 (9th Cir. 2001) ....................13

*Andy Warhol Foundation for the Visual Arts, Inc. v. Goldsmith*,
598 U.S. 508 (2023)....................2, 7, 8, 10, 11, 12, 13

*Authors Guild v. Google, Inc.*,
804 F.3d 202 (2d Cir. 2015)....................9

*Bartz v. Anthropic PBC*,
787 F. Supp. 3d 1007 (N.D. Cal. 2025) ....................8

*Bateman v. Mnemonics, Inc.*,
79 F.3d 1532 (11th Cir. 1996) ....................7

*Campbell v. Acuff-Rose Music, Inc.*,
510 U.S. 569 (1994)....................7, 10, 11, 12, 13

*Castle Rock Ent., Inc. v. Carol Publ'g Grp.*,
150 F.3d 132 (2d Cir. 1998)....................13

*Granite Music Corp. v. United Artists Corp.*,
532 F.2d 718 (9th Cir. 1976) ....................4

*Harper & Row Publishers, Inc. v. Nation Enters.*,
471 U.S. 539 (1985)....................3, 6, 10, 12

*Kadrey v. Meta Platforms, Inc.*,
788 F. Supp. 3d 1026 (N.D. Cal. 2025) ....................4, 8, 9, 14

*Laws v. Sony Music Ent., Inc.*,
448 F.3d 1134 (9th Cir. 2006) ....................3

*Lenz v. Universal Music Corp.*,
815 F.3d 1145 (9th Cir. 2016) ....................7

*Mattel, Inc. v. Walking Mountain Prods.*,
353 F.3d 792 (9th Cir. 2003) ....................7

*Sega Enters. Ltd. v. Accolade, Inc.*,
977 F.2d 1510 (9th Cir. 1992) ....................9

*Sony Corp. of Am. v. Universal City Studios, Inc.*,
464 U.S. 417 (1984)....................6

*Thaler v. Perlmutter*,
130 F.4th 1039 (D.C. Cir. 2025)....................4

*Thomson Reuters Enter. Ctr. GmbH v. ROSS Intel. Inc.*,
___ F.4th ___, No. 25-2153, 2026 WL 2932557 (3d Cir. Sep. 29, 2026)............10, 11, 12, 13

*Twin Peaks Prods., Inc. v. Publ'ns Int'l, Ltd.*,
996 F.2d 1366 (2d Cir. 1993)....................12

*UMG Recordings, Inc. v. MP3.com, Inc.*,
92 F. Supp. 2d 349 (S.D.N.Y. 2000)....................13

**Constitutions**

U.S. Const. art. I, § 8, cl. 8....................3

**Statutes**

17 U.S.C. § 102(a)....................3

17 U.S.C. § 106....................3

17 U.S.C. § 106(1)–(6)....................3

17 U.S.C. § 107....................7, 8, 9, 11, 15

17 U.S.C. § 107(1)....................11

17 U.S.C. § 107(4)....................12, 13

**Miscellaneous**

Barbara Bruni, *Training on Trial: Insights from* Bartz *and* Kadrey,
73 J. Copyright Soc'y 261 (2026)....................5, 6

BJ Ard, *Copyright's Latent Space: Generative AI and the Limits of Fair Use*,
110 Cornell L. Rev. 509 (2025)....................7, 10

Daniel J. Gervais et al., *The Heart of the Matter: Copyright, AI Training, and LLMs,*
71 J. Copyright Soc'y 482 (2024)....................5, 9, 10

David W. Opderbeck, *Copyright in AI Training Data: A Human-Centered Approach*,
76 Okla. L. Rev. 951 (2024)....................5, 9

Frank Pasquale & Haochen Sun, *Consent and Compensation: Resolving Generative AI's Copyright Crisis*, 110 Va. L. Rev. Online 207 (2024) ..........................4, 6, 10

H.R. Rep. No. 94-1476 (1976)..........................................................................................7, 8

Katherine Lee, et. al, *Talkin' 'Bout AI Generation: Copyright and the Generative AI-Supply Chain*, 72 J. Copyright Soc'y 251 (2025) ....................................................8, 10, 14

Mackenzie Caldwell, Note, *What Is an "Author"?—Copyright Authorship of AI Art Through a Philosophical Lens*, 61 Hous. L. Rev. 411 (2023) ............................................6

Patrick K. Lin, *Retrofitting Fair Use: Art & Generative AI After* Warhol, 64 Santa Clara L. Rev 467 (2025) ...........................................................................10

Robert Brauneis, *Copyright and the Training of Human Authors and Generative Machines*, 48 Colum. J.L. & Arts 1 (2024) .........................................................5, 6, 8

U.S. Copyright Off., *Copyright and Artificial Intelligence, Part 3: Generative AI Training* (May 2025)..........................................................................................11

Zvi S. Rosen, *The Future Was Then: The Recurrent History of AI Authorship*, 59 Ind. L. Rev. 701 (2026)..........................................................................................4, 6

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In Re OpenAI, Inc. Copyright Infringement Litigation | Lead Case No.: 1:25-md-03143-SHS-OTW |
| AND RELATED CASES. | **MOTION FOR LEAVE TO FILE AMICUS CURIAE BRIEF** |

Pursuant to the Court's August 7, 2026 Order Re Amici Curiae Briefs (Dkt. 1663) and Federal Rule of Appellate Procedure 29(a)(4), amici curiae Professors Jon M. Garon, Adam Mossoff, Loren E. Mulraine, Chris Newman, Sean Pager, Zvi Rosen, and Mark F. Schultz respectfully move for leave to file the attached proposed brief in support of Plaintiffs' motion for summary judgment and in opposition to Defendants' motion for summary judgment. The proposed brief complies with the Court's word count limit and disclosure requirements.

All parties consent to the filing. The proposed brief will assist the Court by providing a focused scholarly perspective on the Copyright Act's purposes, the use-specific nature of fair use, the limits of intermediate-copying precedents, and the market effects of using expressive books to develop generative AI.

The brief is relevant to the pending summary-judgment motions because it explains why the record cannot support a categorical fair-use rule for Defendants' copying and use of Plaintiffs' books, and why Plaintiffs' claims concerning

unauthorized use of expressive works for model training should be evaluated under the traditional fact-specific fair-use inquiry. Amici respectfully request leave to file the attached brief.

Dated: October 30, 2026

**HORVITZ & LEVY LLP**
GASPARD RAPPOPORT
WARREN CHU*

By: ______________________________
Warren Chu
HORVITZ & LEVY LLP
3601 W. Olive Avenue, 8th Floor
Burbank, California 91505-4681
(818) 995-0800 • FAX: (844) 497-6592
grappoport@horvitzlevy.com
wchu@horvitzlevy.com

Attorneys for Amici Curiae Professors
**JON M. GARON, ADAM MOSSOFF, LOREN E. MULRAINE, CHRIS NEWMAN, SEAN PAGER, ZVI ROSEN,** and **MARK F. SCHULTZ**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In Re OpenAI, Inc. Copyright Infringement Litigation | Lead Case No.: 1:25-md-03143-SHS-OTW |
| AND RELATED CASES. | **[PROPOSED] BRIEF OF AMICI CURIAE PROFESSORS JON M. GARON, ADAM MOSSOFF, LOREN E. MULRAINE, CHRIS NEWMAN, SEAN PAGER, ZVI ROSEN, AND MARK F. SCHULTZ** |

## I. INTERESTS OF THE AMICUS CURIAE

Amici are scholars and professors whose research focuses on copyright law. Their scholarship addresses copyright history, human authorship, and creative markets. Amici have no financial stake in the outcome and submit this brief to assist the Court with the scholarly and policy dimensions of the copyright questions presented. All parties consent to the filing of this brief. Amici are listed in alphabetical order.

**Jon M. Garon**, Associate Dean for Technology and Innovation; Director, Goodwin Program for Society, Technology, and the Law, Shepard Broad College of Law, Nova Southeastern University

**Adam Mossoff**, Professor of Law, Antonin Scalia Law School, George Mason University

**Loren E. Mulraine**, Professor of Law; Director of Music and Entertainment Law Studies, Belmont University College of Law

**Chris Newman**, Associate Professor of Law, Antonin Scalia Law School, George Mason University

**Sean Pager**, Professor of Law; Director, Intellectual Property, Information & Communications Law Program (IPIC); Associate Dean of Graduate & Online Studies, Michigan State University College of Law

**Zvi Rosen**, Associate Professor of Law; Faculty Director of the Franklin Pierce Center for Intellectual Property, Franklin Pierce School of Law, University of New Hampshire

**Mark F. Schultz**, Goodyear Tire & Rubber Company Endowed Chair in Intellectual Property Law, Faculty Chair, IPPI: The IP Policy Institute, The University of Akron School of Law

## II. INTRODUCTION

Defendants seek an AI-training exemption that Congress never enacted, the Constitution does not recognize, and Supreme Court precedent forecloses. Calling the copying "training" does not excuse the unauthorized reproduction of thousands of copyrighted books. Accepting Defendants' position would leave authors without recourse when others take their work without permission, extract its value, and build a system that generates competing content—all without compensation.

Copyright exists to prevent that result. The Constitution empowers Congress to secure to authors exclusive rights in their writings to promote progress—including control over reproducing and adapting works for commercially significant purposes like AI development. Stripping authors of that control would erode the incentives that produce the high-quality works these systems depend on.

Fair use has never recognized categorical exceptions—not for "intermediate copying," not for "technology development," and not for "training." As the Supreme Court confirmed in *Andy Warhol Foundation for the Visual Arts, Inc. v. Goldsmith*, 598 U.S. 508, 528 n.4 (2023), courts must evaluate each use on its own terms, weighing purpose, commerciality, and market effect. Using books to build a translation tool differs fundamentally from using them to build a

system that generates competing prose. Defendants bear the burden of proving fair use, and the fourth factor reaches markets that are reasonable or likely to develop—including existing licensing markets for AI training.

The question is whether taking authors' works without compensation, when lawful alternatives exist, can be fair use. It cannot. The Court should reject Defendants' request for a categorical fair-use ruling and grant Plaintiffs' motion on the separate unauthorized downloading and distribution claims.

## III. ARGUMENT

### A. The fundamental goal of copyright is to incentivize human creation.

#### 1. Copyright grants authors exclusive rights in their expression—including the right to say no.

The Constitution allows Congress to secure to "Authors" exclusive rights in their "Writings" to promote the progress of science and useful arts. U.S. Const. art. I, § 8, cl. 8. Congress implemented that mandate by granting authors exclusive rights to reproduce their works and prepare derivative works. 17 U.S.C. §§ 102(a), 106(1)–(6). Those rights incentivize the creation and dissemination of human expression. *Harper & Row Publishers, Inc. v. Nation Enters*., 471 U.S. 539, 558 (1985) ("By establishing a marketable right to the use of one's expression, copyright supplies the economic incentive to create and disseminate ideas.").

That incentive structure includes control over whether others may copy or reproduce a work. *Laws v. Sony Music Ent., Inc.*, 448 F.3d 1134, 1137 (9th Cir. 2006) ("'[T]he owner of copyright . . . has the exclusive rights to do and to authorize' others to display, perform, reproduce or distribute copies of the work, and to prepare derivative works." (quoting 17 U.S.C. § 106)). An author may allow sales, license translations or adaptations, reserve a work for a later market, or *refuse* a proposed use. The right to say no is essential to the right Congress granted.

*Granite Music Corp. v. United Artists Corp.*, 532 F.2d 718, 720 (9th Cir. 1976) ("A . . . copyright is an absolute right to prevent others from copying his work."). That right includes deciding whether a work may be used to train a generative AI system.

The regime is designed to encourage human authorship. Technological tools may assist authors, but copyright law preserves the conditions in which human authors create and receive the benefits of creation. *See Thaler v. Perlmutter*, 130 F.4th 1039, 1046 (D.C. Cir. 2025) ("The point, instead, is that the current Copyright Act's text, taken as a whole, is best read as making humanity a necessary condition for authorship under the Copyright Act."); *see also* Zvi S. Rosen, *The Future Was Then: The Recurrent History of AI Authorship*, 59 Ind. L. Rev. 701, 761 (2026) ("Copyright law has always been centered on human authorship . . . .").

**2. Threatening copyright incentives jeopardizes the creation of human-authored works.**

Unlicensed ass copying for AI development threatens the incentive structure that sustains human-authored work. AI developers seek high-quality content because it produces better results than free works or machine-generated alternatives. *See Kadrey v. Meta Platforms, Inc.*, 788 F. Supp. 3d 1026, 1039 (N.D. Cal. 2025) (finding "books make for especially valuable training data" because they "maintain[] a particular style and coherent structure" and are "high quality in the sense that they generally are well written and use proper grammar (especially compared to text from the internet, which varies widely on these metrics)"). Copying those works without compensation extracts their value, dilutes their markets, and reduces the incentive to create the very works AI systems need. *See* Frank Pasquale & Haochen Sun, *Consent and Compensation: Resolving Generative AI's Copyright Crisis*, 110 Va. L. Rev. Online 207, 211 (2024) (explaining that "free expropriation of copyrighted works by AI providers not only devalues human creativity, but also threatens to undermine AI itself by eliminating critical incentives for the ongoing creation of works necessary for further technological development"). AI training "raises the classic problems of free riding and, over time, public-goods underproduction, which

copyright was set up to solve in the first place." *See* Barbara Bruni, *Training on Trial: Insights from* Bartz *and* Kadrey, 73 J. Copyright Soc'y 261, 294 (2026).

Unauthorized training also undermines the emerging market for AI-training licenses. *See* Daniel J. Gervais, et al., *The Heart of the Matter: Copyright, AI Training, and LLMs*, 71 J. Copyright Soc'y 482, 515–16 (2024) (concluding "licensing provides both parties with compliant access to high-quality works" and "reduce[s] uncertainty"). A robust licensing market sustains incentives for human authorship while supplying the high-quality inputs AI models require. If widespread unauthorized copying is deemed fair use, that market may disappear. *See, e.g.*, *id.* at 506 ("[I]f there is a market for licensing copyrighted work for ingestion in AI models, as clearly there is, then using such works . . . without authorization clearly deprives the rightsholder of potential licensing fees."). Publishers have already entered licensing agreements with AI developers—including OpenAI—for lawful access to training data. *Id.*; *see also* David W. Opderbeck, *Copyright in AI Training Data: A Human-Centered Approach*, 76 Okla. L. Rev. 951, 980 (2024) ("There is now a growing market for use of existing and new works of all kinds as AI training data . . . ."); Robert Brauneis, *Copyright and the Training of Human Authors and Generative Machines*, 48 Colum. J.L. & Arts 1, 44 (2024) (noting that generative AI company "Stability AI offers a generative music service called 'Stable Audio' that is trained entirely on music licensed from a platform called Audiosparx," which also allows for creators "to opt out of having their music used for training."). Developers who bypass that market undercut licensing revenue and threaten its viability.

Copyright's economic theory is straightforward.[1] Exclusive rights let authors recoup the investment required to create works. *See Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 429 (1984) ("[Copyright's] limited grant . . . is intended to motivate the creative activity of authors and inventors by the provision of a special reward."); *Harper & Row*, 471 U.S. at 546 ("The rights conferred by copyright are designed to assure contributors to the store of knowledge a fair return for their labors."). Authors and publishers invest time and effort expecting copyright law to protect that investment. When others copy entire books without authorization or compensation, they capitalize on the works' expressive value without bearing any costs. *See* Bruni, *supra*, at 297 (explaining that when AI systems "absorb expressive value from copyrighted works" and the outputs end up in the public domain or are misappropriated by users who claim authorship over those outputs, "the creative ecosystem does not recover the value expended in producing the original works"); *see also* Pasquale & Sun, *supra*, at 221 ("If uncompensated and uncontrolled expropriation of copyrighted works continues, many creatives are likely to be further demoralized and eventually defunded as AI unfairly outcompetes them or effectively drowns them out."). That threatens the "economic incentive to create and disseminate ideas" that copyright maintains. *Harper & Row*, 471 U.S. at 558.

Recognizing these risks does not give authors control over styles, ideas, facts, or independent works, nor does it condemn every AI use. It concerns only unauthorized copying of expressive works for commercial purposes—a use Defendants cannot justify as fair. With copyright's essential incentives at stake, the Court should reject any categorical exemption for unauthorized commercial copying. *See* Brauneis, *supra*, at 45 ("[W]e should consider whether

[1] To be clear, the economic theory of copyright is not the only one. Indeed, "the intertwined personality and communication theories considers creative work to be 'communication with the public' intertwined with the author's autonomy," and "[w]hen the author's works are circulated without permission or attribution, 'the personality of the author has been violated.'" Rosen, *supra*, at 761 (quoting Mackenzie Caldwell, Note, *What Is an "Author"?—Copyright Authorship of AI Art Through a Philosophical Lens*, 61 Hous. L. Rev. 411, 430 (2023)). These other theories of copyright should also be considered when evaluating the unauthorized use of copyrighted works.

copyright policy, in the form of a fair use exemption for training generative machines . . . will accelerate and deepen creative labor displacement in a way that we should avoid.”).

### B. Fair use has never included categorical exceptions and must be applied case by case.

#### 1. There is no categorical exception for AI training.

Applying 17 U.S.C. § 107 (“Section 107”) requires “case-by-case analysis and a flexible balancing of” the four nonexclusive factors. *Mattel, Inc. v. Walking Mountain Prods.*, 353 F.3d 792, 800 (9th Cir. 2003). The party invoking fair use bears the burden of proving it. *Lenz v. Universal Music Corp.*, 815 F.3d 1145, 1153 (9th Cir. 2016) (“[T]he burden of proving fair use is always on the putative infringer.” (quoting *Bateman v. Mnemonics, Inc.*, 79 F.3d 1532, 1542 n.22 (11th Cir. 1996)). Congress deliberately left room for different results on different facts. *See* H.R. Rep. No. 94-1476, at 66 (1976) (“[T]he endless variety of situations and combinations of circumstances that can rise in particular cases precludes the formulation of exact rules in [section 107].”). And the Supreme Court has refused to let any single factor or label control. *See Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 578 (1994) (“All [factors] are to be explored, and the results weighed together, in light of the purposes of copyright.”).

Defendants’ “AI training” label does not govern this inquiry. That label covers uses with materially different purposes and effects. Ingestion for a nonprofit search or accessibility project may be fair use; a commercial system that generates competing expressive works may not be. *Warhol*, 598 U.S. at 533 (“The same copying may be fair when used for one purpose but not another.”); *see also* BJ Ard, *Copyright’s Latent Space: Generative AI and the Limits of Fair Use*, 110 Corn. L. Rev. 509, 595 (2025) (“Some forms of AI training may qualify as fair under this test insofar as they exploit the value of styles and subject matters that authors cannot monopolize. Courts nonetheless face hard questions where the exploitation of seemingly non-authorial value imperils wider fields of creative endeavor.”). A categorical rule would freeze the doctrine precisely as Congress sought to avoid and could undermine the entire copyright system.

*See* H.R. Rep. No. 94-1476, at 66 (1976) ("[Congress] endorse[d] . . . fair use['s] purpose and general scope . . . but there is no disposition to freeze the doctrine in the statute, especially during a period of rapid technological change."); *see also* Katherine Lee, et. al, *Talkin' 'Bout AI Generation: Copyright and the Generative AI-Supply Chain*, 72 J. Copyright Soc'y 251, 401 (2005) ("If all generative AI were categorically legal, then developers would plausibly start adding generative components to other systems in order to launder copyrighted works through them. The endpoint could be the effective collapse of copyright.").

The Court should reject any analysis that begins and ends with the word "training." *See* Brauneis, *supra*, at 43 ("Human beings have always been learning how to create new, dissimilar works from existing copyrighted works. That has never been sufficient in itself to render that learning use a fair use, and it should not be sufficient to render generative AI training a fair use either."). Obtaining the books, retaining or sharing copies, using them to develop a model, and deploying that model are distinct uses, each requiring separate analysis. *Warhol*, 598 U.S. at 533 ("[F]air use . . . requires an analysis of the specific 'use' of a copyrighted work that is alleged to be 'an infringement.'" (quoting 17 U.S.C. § 107)). Defendants collapse those uses into a single category and ask the Court to bless all of them because their ultimate purpose was training a large language model. *Warhol* forbids that shortcut.

Recent district court decisions reaffirm the requirement of a use-by-use analysis. In *Bartz v. Anthropic PBC*, the court held that unauthorized acquisition of Books3—one of the datasets at issue here—was not fair use, even though training itself might be transformative. 787 F. Supp. 3d 1007, 1013 (N.D. Cal. 2025). Judge Alsup distinguished between the initial piracy and subsequent training: "Pirating copies to build a research library without paying for it, and to retain copies should they prove useful for one thing or another, was its own use—and not a transformative one." *Id.* at 1026.

In *Kadrey*, the court found fair use only because the plaintiffs failed to present evidence of market harm on that record. 788 F. Supp. 3d at 1060. The court acknowledged that its "conclusion may be in significant tension with reality, but it's dictated by the choice the

plaintiffs made to put forward two flawed theories of market harm while failing to present meaningful evidence on the effect of training LLMs like Llama with their books on the market for those books." *Id.* at 1057. Neither decision created a categorical rule; both applied Section 107 to specific facts and recognized that different facts could yield different results.

**2. There is no categorical exception for intermediate copying.**

Nor is "intermediate copying" a categorical defense. Courts recognize that internal copies can infringe even when the eventual product differs from the copied material. *See Sega Enters. Ltd. v. Accolade, Inc.*, 977 F.2d 1510, 1518–19 (9th Cir. 1992). Whether a particular intermediate copy is fair use depends on the facts.

The cases Defendants invoke involved copying for limited, non-substitutive purposes. In *Sega*, the defendant copied video-game software to understand the functional requirements needed to make its own games work on that gaming system. 977 F.2d at 1526. Importantly, the defendant "sought only to become a legitimate competitor in the field of Genesis-compatible video games" and did not copy any "characteristics of the game program as experienced by the user that determine the program's commercial success." *Id.* at 1523. In *Authors Guild v. Google, Inc.*, Google scanned books to create a search index returning only limited snippets. *See* 804 F.3d 202, 208 (2d Cir. 2015). The Second Circuit held that Google's "snippet function d[id] not give searchers access to effectively competing substitutes." *Id.* at 224. The function did "not threaten the rights holders with any significant harm to the value of their copyrights or diminish their harvest of copyright revenue." *Id.* Ultimately, "the court credited Google's . . . *factual* arguments that search snippets, which the full-text scans enabled, would not erode the market for complete published books." Opderbeck, *supra*, at 978. Such a holding was "not a sweeping doctrinal conclusion about other kinds of 'bulk non-expressive uses,' much less about AI or robot uses." *Id.*

In "search engine and indexing cases . . . the use served a new purpose—facilitating information access without replacing the original works' consumption." Gervais et al., *supra*, at 505. "[T]he fact that the works were not used for their expressive or aesthetic value appears to

have weighed heavily in favor of fair use." *Id.* Where a system ingests works precisely for their expressive value and then *generates* expressive works in the same market, the analysis is fundamentally different. *See* Lee, *supra*, at 370 (explaining the logic of *Authors Guild* "does not work for generative-AI models that can generate expressive works" because such models can produce outputs that "will incorporate copyrighted material that will be seen by humans"); Pasquale & Sun, *supra*, at 213 ("Search engines have historically provided links that lead users to works themselves. In contrast, AI tends to provide substitutes for such works . . . .").

### 3. Transformative purpose varies depending on the facts.

The first factor of fair use asks, in part, whether the secondary use merely supersedes the original or "adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message." *Campbell*, 510 U.S. at 579. "[I]t asks, in other words, whether and to what extent the new work is 'transformative.'" *Id.* "If an original work and a secondary use share the same or highly similar purposes, and the secondary use is of a commercial nature, the first factor is likely to weigh against fair use, absent some other justification for copying." *Warhol*, 598 U.S. at 532–33.

The Court should ask what the model was built to do and whether that purpose shares the original works' market or audience. *See* Ard, *supra*, at 515 (explaining "an AI model's purposes may be indeterminate at the time of training" but courts have been evaluating "whether the use substitutes for the original"); Patrick K. Lin, *Retrofitting Fair Use: Art & Generative AI After* Warhol, 64 Santa Clara L. Rev. 467, 490 (2025) ("AI learning to generate content that serves the same aesthetic, expressive, or functional purpose as the training data is likely not transformative."). If the end product competes in the same market, commerciality weighs against fair use. *See Warhol*, 598 U.S. at 537 ("The undisputed commercial character of [defendant]'s use, though not dispositive, 'tends to weigh against a finding of fair use.'" (quoting *Harper & Row*, 471 U.S. at 562)).

Indeed, the Third Circuit applied exactly this principle. *Thomson Reuters Enter. Ctr. GmbH v. ROSS Intel. Inc.*, ___ F.4th ___, No. 25-2153, 2026 WL 2932557, at *6–7 (3d Cir. Sep.

29, 2026). There, ROSS sought to build an AI-powered legal-research platform to compete directly with Westlaw, using thousands of Westlaw's copyrighted case headnotes to create memos that trained its AI search tool, because the headnotes offered an "easy" way to frame legal questions. *Id.* at *2, *7. The court looked past the "intermediate step of using [case] headnotes to train an AI program" to the use that training served, holding that because the copier's use "share[d] the same ultimate purpose" as the original, it was "minimally transformative, at best." *Id.* at *6. That reasoning applies here as well, where the model is alleged to serve the same audience as the copied works.

Translation illustrates the point. A model used to translate an article serves a different purpose by conveying its content in another language. *See* U.S. Copyright Off., *Copyright and Artificial Intelligence, Part 3: Generative AI Training* (May 2025) at 45 (explaining "a language model can be used to help learn a foreign language by chatting with users on diverse topics and offering corrective feedback," which is "distinct from the purpose of the copyrighted works [it was] trained on"). That use does not compete with the original in its market and may have a strong fair-use argument. But a model trained on novels to generate novels or story-like prose uses the source works to acquire capabilities valuable in the same market.

#### 4. Transformativeness does not control the fair-use inquiry.

Transformativeness is relevant but not dispositive even of the first factor, let alone of fair use generally. All four factors must be weighed together. *See* 17 U.S.C. § 107; *Campbell*, 510 U.S. at 578 ("[T]he four statutory factors . . . . are to be explored, and the results weighed together, in light of the purposes of copyright.").

Some commentators contend that transformative purpose should be dispositive in the AI context. *Warhol* forecloses that view. An "overbroad concept of transformative use, one that includes any further purpose, or any different character, would narrow the copyright owner's exclusive right to create derivative works." *Warhol*, 598 U.S. at 529. "*Campbell* cannot be read

to mean that § 107(1) weighs in favor of any use that adds some new expression, meaning, or message. Otherwise, 'transformative use' would swallow the copyright owner's exclusive right to prepare derivative works." *Id.* at 541.

### 5. Market harm includes harm to any potential market that is reasonable or likely to develop.

Factor four examines the effect of the use on the potential market for or value of the copyrighted work. 17 U.S.C. § 107(4). It "requires courts to consider not only the extent of market harm caused by the particular actions of the alleged infringer, but also 'whether unrestricted and widespread conduct of the sort engaged in by the defendant . . . would result in a substantially adverse impact on the potential market' for the original." *Campbell*, 510 U.S. at 590. The Supreme Court has called factor four "undoubtedly the single most important element of fair use," *Harper & Row*, 471 U.S. at 566, and market substitution is "copyright's bête noire," *Warhol*, 598 U.S. at 528.

Defendants' claim that there is no cognizable market harm is wrong. Factor four reaches markets the copyright owner is entitled or likely to develop, and for training, the relevant market is not limited to book sales. *See Harper & Row*, 471 U.S. at 568. The question is whether the challenged use appropriates a market the copyright owner could reasonably enter, not whether the owner has already entered it. *Twin Peaks Prods., Inc. v. Publ'ns Int'l, Ltd.*, 996 F.2d 1366, 1377–78 (2d Cir. 1993) (holding that a summary guide "that reports the plot [of TV episodes] in such extraordinary detail as to risk impairment of the market for the copyrighted works themselves or derivative works that the author is entitled to license" weighed against finding fair use). The Third Circuit recently applied these principles to AI training data, recognizing that "the market for licensing [copyrighted works] as text to train AI is rapidly developing," that a rightsholder's not having licensed its works to others "does not disprove that a market exists to do so," and that copying "for use as training data without [the owner's] authorization . . . usurped [its] opportunity to enter that derivative market." *Thomson Reuters*, 2026 WL 2932557, at *9. The court likewise held that "'[u]nrestricted and widespread' copying . . . to develop substitute . .

. tools" would harm the original market. *Id.* (quoting *Warhol*, 598 U.S. at 524 n.3). The absence of a fully developed licensing market is therefore no defense. *See generally* Pasquale & Sun, *supra* (detailing potential compensation schemes for the use of copyrighted works in AI training.).

A rightsholder's refusal to license is irrelevant to this inquiry. Copyright protects the owner's choice to retain exclusivity. *Castle Rock Ent., Inc. v. Carol Publ'g Grp.*, 150 F.3d 132, 145–46 (2d Cir. 1998) (holding "copyright law must respect th[e] creative and economic choice" not to exploit a specific derivative market). The right to exclude entails the right to reserve a market for future exploitation, and factor four protects that right. *See A&M Recs., Inc. v. Napster, Inc.*, 239 F.3d 1004, 1027 (9th Cir. 2001) (explaining that copyright holder's exclusive rights "include the right, within broad limits, to curb the development of such a derivative market by refusing to license a copyrighted work or by doing so only on terms the copyright owner finds acceptable" (quoting *UMG Recordings, Inc. v. MP3.com, Inc.*, 92 F. Supp. 2d 349, 351 (S.D.N.Y. 2000)).

Defendants cannot shift their burden by demanding that Plaintiffs prove precise lost sales or a fully developed licensing market. Fair use is an affirmative defense, and Defendants must prove it. *See Campbell*, 510 U.S. at 590 ("Since fair use is an affirmative defense, its proponent would have difficulty carrying the burden of demonstrating fair use without favorable evidence about relevant markets." (footnote omitted)).

### 6. Market dilution is also a cognizable harm under factor four.

Beyond licensing markets, AI outputs generated by models built on copyrighted works dilute the market for those works—a distinct harm cognizable under factor four. Factor four asks about "the effect of the *use* upon the potential market for or value of the copyrighted work," 17 U.S.C. § 107(4) (emphasis added), and the use here is copying copyrighted works to build a commercial system that generates competing works at scale. That use diminishes not only the

licensing value of the copied works but also their sales. *See* Lee et al., *supra*, at 367 ("The outputs of a generative-AI system, however, can substitute for a copyrighted work in the expressive way that copyright cares about.").

The *Kadrey* court recognized this very harm. It explained that training enables "the rapid generation of countless works that compete with the originals, even if those works aren't themselves infringing," and "[h]arm from this form of competition is the harm of market dilution." 788 F. Supp. 3d at 1052. Such outputs, "by taking sales from those books, or by flooding stores and online marketplaces so that some of those books don't get noticed and purchased, . . . would reduce the incentive for authors to create—the harm that copyright aims to prevent." *Id.* at 1054. And "indirect substitution is still substitution." *Id.*

The scale at which AI models built on unauthorized copies can produce competing works makes market dilution an existential threat. AI model training "involves a technology that can generate literally millions of secondary works, with a miniscule fraction of the time and creativity used to create the original works it was trained on." *Id.* at 1055. Nor is this "legitimate" competition outside factor four. Rather, these models "are better able to generate text (including competing works) *because* they are trained on the creative expression in copyrighted books." *Id.* at 1054 (emphasis added). The dilution harm flows directly from copying protected expression.

Defendants bear the "burden of presenting evidence that its copying doesn't threaten to substantially harm the market for the plaintiffs' books," *id.* at 1056, and on a developed record, "it seems likely that market dilution will often cause plaintiffs to decisively win the fourth factor—and thus win the fair use question overall," *id.* at 1055. The Court should hold that market dilution is cognizable under factor four.

## IV. CONCLUSION

The Court can recognize AI's public benefits without granting an exemption Congress never enacted. Fair use does not place the cost of technological progress on uncompensated authors. The proper course is to apply Section 107 to the particular uses proved in this case, not to declare a new category of copying outside the statute. For these reasons, amici curiae Professors Jon M. Garon, Adam Mossoff, Loren E. Mulraine, Chris Newman, Sean Pager, Zvi Rosen and Mark F. Schultz respectfully request that the Court (1) deny Defendants' motion to the extent that it seeks a categorical ruling that copying Plaintiffs' books for model training, research, or development was fair use; (2) grant Plaintiffs' motion on the distinct unauthorized downloading, copying, and distribution uses to the extent that the record is undisputed; and (3) apply Section 107 to the particular uses and facts in the record.

Dated: October 30, 2026

**HORVITZ & LEVY LLP**
GASPARD RAPPOPORT
WARREN CHU*

By: ______________________________
Warren Chu
HORVITZ & LEVY LLP
3601 W. Olive Avenue, 8th Floor
Burbank, California 91505-4681
(818) 995-0800 • FAX: (844) 497-6592
grappoport@horvitzlevy.com
wchu@horvitzlevy.com

Attorneys for Amici Curiae Professors
**JON M. GARON, ADAM MOSSOFF, LOREN E. MULRAINE, CHRIS NEWMAN, SEAN PAGER, ZVI ROSEN, and MARK F. SCHULTZ**